**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| THE COLONIAL BANCGROUP, INC., as post-confirmation debtor, and KEVIN O'HALLORAN, as plan trustee acting for and on behalf of the debtor,<br><br>      Plaintiffs,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP, a United States limited liability partnership; CROWE HORWATH, LLP, a United States limited liability partnership,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 2:11-cv-00746-MHT<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT PRICEWATERHOUSECOOPERS LLP'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

Elizabeth V. Tanis
Ga. Bar No. 697415
  *admitted pro hac vice*
Drew D. Dropkin
Ga. Bar No. 231031
  *admitted pro hac vice*
KING & SPALDING LLP
1180 Peachtree St., NE
Atlanta, GA 30309
(404) 572-4600 (p)
(404) 572-5140 (f)

Tabor R. Novak, Jr. (NOV 001)
BALL, BALL, MATTHEWS
  & NOVAK, P.A.
2000 Interstate Park Drive
Suite 204
Post Office Box 2148
Montgomery, AL 36102-2148
(334) 387-7680 (p)
(334) 387-3222 (t)

*Attorneys for Defendant PricewaterhouseCoopers LLP*

# TABLE OF CONTENTS

Overview ........................................................................................................1

Factual Allegations ........................................................................................4

I.    Colonial BancGroup, Inc. .......................................................................4

   A.  An Alabama-Based Financial Holding Company ...........................................4

   B.  The Mortgage Warehouse Lending Division and Its Relationship With Taylor Bean & Whitaker Mortgage Corporation ...........................................6

   C.  The Collusive BancGroup-TBW Fraud............................................................6

   D.  The Revelation of the Fraud and the Confessions of the Fraudsters..............8

II.   BancGroup's Internal Audit Function and the Role of Crowe Horwath LLP ......................................................................................12

III.  BancGroup's Independent External Auditor, PwC .......................................12

   A.  The Contracts....................................................................................................13

   B.  Elements of an Audit Conducted Pursuant to Generally Accepted Auditing Standards ........................................................................................15

      1.  The Role of the Audit Client....................................................................15

      2.  The Role of the Independent External Auditor.........................................16

   C.  PwC's Audit Reports ........................................................................................19

Argument and Citation of Authorities ...................................................................20

I.    BancGroup's Breach-of-Contract Claim Against PwC Must Be Dismissed Because BancGroup Did Not Perform Its Obligations Under Its Contracts with PwC.....................................................................20

   A.  Alabama Law Governs BancGroup's Breach-of-Contract Claim Against PwC. ....................................................................................................22

B.  Under Alabama Law, the Plaintiff's Performance Under the Contract
Is an Essential Element of a Breach-of-Contract Claim.................................23

C.  BancGroup Did Not Allege Its Performance Under the Contracts
With PwC...........................................................................................................24

D.  BancGroup's Complaint Alleges Facts That Demonstrate That
BancGroup Did Not Perform Under the Contracts With PwC. ...................25

1.  Informing PwC of Known or Suspected Fraud.........................................26

2.  Ensuring Compliance With Laws and Regulations ..................................28

II.  BancGroup's Professional Negligence Claim Against PwC Must Be
Dismissed Because the Complaint Alleges BancGroup's Contributory
Negligence in Two Different Respects............................................................29

A.  Alabama Law Governs BancGroup's Professional Negligence Claim
Against PwC. ....................................................................................................30

B.  Under Alabama Law, Contributory Negligence Is a Complete Defense
to a Professional Negligence Claim...............................................................32

C.  BancGroup's Complaint Alleges That BancGroup's Agent, PwC's Co-
Defendant Crowe Horwath, Was Negligent.................................................32

D.  BancGroup's Complaint Alleges That Company Management Was
Negligent............................................................................................................37

III.  BancGroup's Breach-of-Contract and Professional Negligence
Claims Against PwC Must Be Dismissed With Prejudice Based
on the *In Pari Delicto* Defense. .....................................................................39

A.  Under Alabama Law, *In Pari Delicto* Is a Complete Defense to a
Breach-of-Contract Claim and a Professional Negligence Claim................39

B.  BancGroup's Complaint Alleges That the Company Was At Least
Equally at Fault as PwC..................................................................................40

Conclusion .....................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ala. Municipal Ins. Corp. v. Alliant Ins. Servs., Inc.*,
  2010 WL 743009 (M.D. Ala. Mar. 1, 2010) ...................................................25

*Alabama Dep't of Revenue v. FDIC*,
  Civil Action No. 2:11-cv-00272 (M.D. Ala.) .......................................................5

*Anderson v. Donald*,
  261 F. App'x 254 (11th Cir. 2008) ....................................................................30

*Araya v. McLelland*,
  525 F.2d 1194 (5th Cir. 1976) ...........................................................................14

*Arch Ins. Co. v. Clements, Purvis, & Stewart, P.C.*,
  2011 WL 2749667 (11th Cir. July 14, 2011) ....................................................21

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)...................................................................21, 25, 41, 45

*Baloco ex rel. Tapia v. Drummond Co.*,
  640 F.3d 1338 (11th Cir. 2011) ........................................................................30

*Baptista v. JP Morgan Chase Bank, N.A.*,
  640 F.3d 1194 (11th Cir. 2011) .............................................................21, 26, 27

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 229 (1985)...........................................................................................39

*Beauchamp v. Coastal Boat Storage, LLC*,
  4 So. 3d 443 (Ala. 2008)....................................................................................23

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................20, 21, 25, 41, 45

*Black-Gammons v. Zurich Am. Ins. Co.*,
  2006 WL 47503 (M.D. Ala. Jan. 9, 2006)..........................................................24

*Brotherhood of Locomotive Engineers & Trainmen v. CSX Transp., Inc.*,
    522 F.3d 1190 (11th Cir. 2008) ..........................................................................30

*Brown v. Beacon Ins. Co.*,
    317 F. App'x 915 (11th Cir. 2009) ....................................................................29

*Brown v. Communcial Dispatch Publ. Co.*,
    504 So. 2d 245 (Ala. 1987)................................................................................33

*Bryant v. Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999) ...........................................................................4

*Cedar Hill Hardware & Constr. Supply, Inc. v. Ins. Corp. of Hannover*,
    563 F.3d 329 (8th Cir. 2009) .............................................................................36

*Chambers v. Cooney*,
    2007 WL 2493682 (S.D. Ala. Aug. 29, 2007)...................................................31

*Chambers v. Cooney*,
    535 F. Supp. 2d 1255 (S.D. Ala. 2008) .............................................................31

*Cherokee Ins. Co. v. Sanches*,
    975 So. 2d 287 (Ala. 2007).................................................................................23

*Cherry, Bekaert & Holland v. Brown*,
    582 So. 2d 502 (Ala. 1991).................................................................................22

*Claybrook v. Central United Life Ins. Co.*,
    387 F. Supp. 2d 1199 (M.D. Ala. 2005) ............................................................24

*Coggins v. Crouch*,
    2009 WL 1737605 (M.D. Ala. June 17, 2009).....................................................5

*Cottone v. Jenne*,
    326 F.3d 1352 (11th Cir. 2003) .........................................................................30

*Dapremont v. Overcash, Walker & Co., P.C.*,
    2000 WL 1566532 (S.D. Ala. Oct. 4, 2000).......................................................38

*Day v. Taylor*,
    400 F.3d 1272 (11th Cir. 2005) .....................................................................4, 14

*Ely v. Fortier Loss Control Consultants, Inc.*,
  2002 WL 32514575 (W.D. Va. Aug. 2, 2002) ....................................................29

*Ex parte W.D.J.*,
  785 So. 2d 390 (Ala. 2000)...............................................................................39

*FindWhat Investor Group v. FindWhat.com*,
  2011 WL 4506180 (11th Cir. Sept. 30, 2011) .......................................................4

*Fitts v. Minnesota Mining & Mfg. Co.*,
  581 So. 2d 819 (Ala. 1991).................................................................................30

*Ford Motor Co. v. Duckett*,
  2011 WL 480046 (Ala. Feb. 11, 2011)..........................................................30, 31

*Franklin v. Mitchell*,
  2011 WL 3863028 (Ala. Civ. App. Sept. 2, 2011)...............................................33

*Gallardo v. FedEx Kinko's Office & Print Servs., Inc.*,
  2008 WL 2143011 (D. Md. May 12, 2008).........................................................29

*Glass v. So. Wrecker Sales*,
  990 F. Supp. 1344 (M.D. Ala. 1998) ..................................................................31

*Glenn Constr. Co. v. Bell Aerospace Servs., Inc.*,
  785 F. Supp. 2d 1258 (M.D. Ala. 2011) .............................................................37

*Gonzalez v. Reno*,
  325 F.3d 1228 (11th 2003) .................................................................................30

*Grandinetti v. T-Hop*,
  2006 WL 1476029 (M.D. Ala. May 24, 2006).......................................................5

*Griffin Indus., Inc. v. Irvin*,
  496 F.3d 1189 (11th Cir. 2007) .........................................................................42

*Halmos v. Bomardier Aerospace Corp.*,
  404 F. App'x 376 (11th Cir. 2010) ......................................................................5

*Hanby v. Campbell*,
  132 So. 893 (Ala. 1931).....................................................................................24

*Hardy v. Broward County Sheriff's Office*,
    238 F. App'x 435 (11th Cir. 2007) ....................................................................30

*Horne v. Potter*,
    392 F. App'x 800 (11th Cir. 2010) ....................................................................29

*In re Verilink Corp.*,
    2009 WL 4609308 (Bankr. N.D. Ala. Dec. 3, 2009) ...................................39, 40

*In re Verilink Corp.*,
    405 B.R. 356 (Bankr. N.D. Ala. 2009) .......................................................passim

*Jackson v. Bellsouth Telecomm'ns*,
    372 F.3d 1250 (11th Cir. 2004) ........................................................................30

*Jones v. Bock*,
    549 U.S. 199 (2007) ..........................................................................................29

*Kerns v. Sealy*,
    496 F. Supp. 2d 1306 (S.D. Ala. 2007) ............................................................27

*Kivisto v. Miller, Canfield, Paddock & Stone, PLC*,
    413 F. App'x 136 (11th Cir. 2011) ......................................................................4

*Koger v. Fla.*,
    130 F. App'x 327 (11th Cir. 2005) ....................................................................30

*Lankford v. Witmondt*,
    528 So. 2d 850 (Ala. 1988) ...............................................................................27

*Lifestar Resp. of Ala., Inc. v. Admiral Ins. Co.*,
    17 So. 3d 200 (Ala. 2009) .................................................................................23

*Long v. Addix*,
    63 So. 982 (Ala. 1913) ......................................................................................24

*Lynn Strickland Sales & Serv., Inc. v. Aero-Lane Fabricators, Inc.*,
    510 So. 2d 142 (Ala. 1987) ...............................................................................38

*Marsh v. Butler County, Ala.*,
    268 F.3d 1014 (11th Cir. 2001) ...................................................................29, 30

*Mason v. Lee*,
   44 F. Supp. 2d 1249 (M.D. Ala. 1999) ................................................................32

*Monroe v. Brown*,
   307 F. Supp. 2d 1268 (M.D. Ala. 2004) ..............................................................38

*Movie Gallery US, LLC v. Greenshields*,
   648 F. Supp. 2d 1252 (M.D. Ala. 2009) ..........................................22, 23, 30, 31

*Mukamal v. Bakes*,
   378 F. App'x 890 (11th Cir. 2010) ......................................................................22

*Nihon Rufuto Co. v. Nidek Med. Prods., Inc.*,
   2011 WL 3505211 (11th Cir. Aug. 11, 2011) .....................................................24

*Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*,
   437 F.3d 1145 (11th Cir. 2006) .....................................................................39, 40

*Okpala v. Drew*,
   248 F. App'x 72 (11th Cir. 2007) ........................................................................30

*Penmont, LLC v. Blue Ridge Piedmont, LLC*,
   607 F. Supp. 2d 1266 (M.D. Ala. 2009) ..............................................................24

*Puckett v. Randolph County Sheriff's Dep't*,
   2010 WL 919941 (M.D. Ala. Mar. 11, 2010) .......................................................5

*Rolison v. Sterling*,
   2009 WL 2514294 (S.D. Ala. Aug. 13, 2009) .....................................................27

*Romero v. Drummond Co.*,
   552 F.3d 1303 (11th Cir. 2008) ..........................................................................30

*Samuels & Assocs., Inc. v. Boxcar Foods, USA, Inc.*,
   286 F. App'x 708 (11th Cir. July 21, 2008) ........................................................24

*Serio v. Merrell, Inc.*,
   941 So. 2d 960 (Ala. 2006) ..................................................................................32

*SFM Holdings, Ltd. v. Banc of America Sec., LLC*,
   600 F.3d 1334 (11th Cir. 2010) ............................................................................4

*Snider v. Jefferson State Community College*,
344 F.3d 1325 (11th Cir. 2003) ........................................................30

*SouthTrust Bank v. Jones, Morrison, Womack & Dearing, P.C.*,
939 So. 2d 885 (Ala. Civ. App. 2005) ..............................................40

*St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*,
572 F.3d 893 (11th Cir. 2009) ..........................................................22

*Stovall v. Universal Constr. Co.*,
893 So. 2d 1090 (Ala. 2004).............................................................23

*Stratton v. Miller*,
113 B.R. 205 (D. Md. 1989) .............................................................29

*Sunbelt Veterinary Supply, Inc. v. Int'l Bus. Sys. U.S., Inc.*,
985 F. Supp. 1352 (M.D. Ala. 1997) ................................................31

*Superior Wall & Paver, LLC v. Gacek*,
2011 WL 2279215 (Ala. Civ. App. June 10, 2011)...........................27

*Sweetwater Investors, LLC v. Sweetwater Apartments Loan LLC*,
2010 WL 4904673 (M.D. Ala. Nov. 24, 2010) .................................25

*Thompson v. RelationServe Media, Inc.*,
610 F.3d 628 (11th Cir. 2010) ..........................................................21

*U.S. Fid. & Guar. Co. v. Russo Corp.*,
628 So. 2d 486 (Ala. 1993)................................................32, 36, 37

*U.S. v. Kelly*,
888 F.2d 732 (11th Cir. 1989) ..........................................................14

*Winkleblack v. Murphy*,
811 So. 2d 521 (Ala. 2001)...............................................................23

**STATUTES**

18 U.S.C. § 1349 ......................................................................................9

28 U.S.C. § 1334(b) ...............................................................................22

Ala. Code § 8-2-7..............................................................................36, 37

**AUDITING AND ACCOUNTING STANDARDS**

Statement on Auditing Standards, AU § 110.02...................................................18

Statement on Auditing Standards, AU § 110.03.........................................15, 17, 35

Statement on Auditing Standards, AU § 220.02...................................................17

Statement on Auditing Standards, AU § 230.10...................................................19

Statement on Auditing Standards, AU § 230.11...................................................17

Statement on Auditing Standards, AU § 230.12...................................................18

Statement on Auditing Standards, AU § 230.13...................................................19

Statement on Auditing Standards, AU § 310.06.............................................15, 16

Statement on Auditing Standards, AU § 316.04...................................................15

Statement on Auditing Standards, AU § 316.10...................................................18

Statement on Auditing Standards, AU § 317.03...................................................16

Statement on Auditing Standards, AU § 317.07...................................................16

Statement on Auditing Standards, AU § 326.23...................................................17

Statement on Auditing Standards, AU § 342.01...................................................17

Institute of Internal Auditors, IIA § 2000.......................................................35, 36

Institute of Internal Auditors, IIA § 2010.............................................................35

Institute of Internal Auditors, IIA § 2020.............................................................35

Institute of Internal Auditors, IIA § 2030.............................................................35

Institute of Internal Auditors, IIA § 2040.............................................................35

Institute of Internal Auditors, IIA § 2060.............................................................35

Institute of Internal Auditors, IIA § 2070.............................................................35

# OTHER AUTHORITIES

Rule 11 of the Federal Rules of Civil Procedure ....................................................42

Rule 12(b)(6) of the Federal Rules of Civil Procedure..............................................1

PCAOB website available at
  http://pcaobus.org/Standards/Auditing/Pages/default.aspx. ...............................14

*SEC v. Kelly*,
  Civil Action No. 1:11-cv-00268, Docket Nos. 1, 9
  (E.D. Va. Mar. 16, 2011) ...................................................................................11

*SEC v. Kissick*,
  Civil Action No. 1:11-cv-00215, Docket Nos. 1, 4
  (E.D. Va. Mar. 2, 2011) .....................................................................................10

*United States v. Kelly*, Criminal Case No. 1:11-cr-00119,
  Docket Nos. 2, 7, 15, 20 (E. D. Va. Mar. 2, 2011)......................................11, 42

*United States v. Kissick*, Criminal Case No. 1:11-cr-00088,
  Docket Nos. 7, 15, 22 (E. D. Va. Mar. 2, 2011)......................................9, 10, 42

Interagency Policy Statement on the Internal Audit Function and Its
  Outsourcing (Mar. 17, 2003) .............................................................................34

NYSE Listed Company Manual 303A.07(c) ..........................................................34

SEC Release No. 34-48745 (Nov. 4, 2003) ...........................................................34

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant PricewaterhouseCoopers LLP ("PwC") moves to dismiss the claims asserted against PwC by post-confirmation debtor The Colonial BancGroup, Inc. and its plan trustee, Kevin O'Halloran (collectively, "BancGroup").

## Overview

BancGroup's Complaint resounds with allegations of an historic, massive, and long-lasting fraud.  But not PwC's fraud . . . ***BancGroup's*** fraud.

Almost unapologetically, the Complaint recounts the deceptive and illegal acts of Cathie Kissick—identified in the Complaint as the director of BancGroup's Mortgage Warehouse Lending Division and a member of its management— undertaken in collusion with BancGroup's largest client, Taylor Bean & Whitaker Mortgage Corporation ("TBW").  That collusive BancGroup-TBW fraud ultimately culminated with criminal guilty pleas by—and civil consent judgments against—Kissick and one of her subordinates.  The fraudsters are now on their way to jail, having confessed to the crimes they committed while working for the company.

BancGroup alleges all of the above in the Complaint.  But, despite having admitted—as it must—that this massive fraud was perpetrated by its own management, BancGroup now points the finger at two deep-pocket defendants that allegedly were at "the scene of the crime":  (1) Crowe Horwath LLP ("Crowe"), one of the ten largest accounting firms in the United States, which provided internal audit services to BancGroup; and (2) PricewaterhouseCoopers LLP, a "Big 4" accounting firm, which served as BancGroup's independent external auditor.

As explained below, BancGroup's transparent attempt to pass the buck to PwC for a BancGroup-initiated and BancGroup-perpetuated eight-year fraud fails as a matter of law, and it does so from square one.

BancGroup asserts two claims against PwC:  breach of contract and professional negligence.  Both claims must be dismissed, for a number of reasons.

*First*, the breach-of-contract claim must be dismissed because the Complaint conclusively shows that BancGroup did not perform its obligations under its contracts with PwC.  Under Alabama law, the plaintiff's performance under the contract is an essential element of a breach-of-contract claim.  Here, BancGroup assumed a contractual obligation to have its management inform PwC about "all known or suspected fraud" involving management or other employees involved in financial reporting.  BancGroup also agreed that it would ensure that the company "complies with the laws and regulations applicable to its activities."  Yet BancGroup's Complaint does not allege even once that BancGroup fulfilled its contractual duties.  Quite the contrary:  The Complaint concedes that a member of its management, Cathie Kissick, knew about the fraud—because she orchestrated it—without ever informing PwC of that fraud.  Because the Complaint affirmatively alleges facts showing that BancGroup did not perform under its contracts with PwC, BancGroup's breach-of-contract claim against PwC must be dismissed.

*Second*, the professional negligence claim against PwC should be dismissed because the Complaint affirmatively alleges that Crowe—BancGroup's agent—was negligent.  Under Alabama law, contributory negligence is a complete defense

2

to a negligence claim.  BancGroup was required to have a corporate internal audit function, but the company outsourced certain of its internal audit activities to Crowe.  BancGroup had the right to control, and ultimately was responsible for, the results of Crowe's work:  BancGroup approved Crowe's work plan, determined the scope and frequency of Crowe's internal audit activities, and managed and oversaw Crowe's activities.  Now, however, BancGroup alleges that Crowe was negligent.  This is no different from the Complaint alleging that BancGroup's *in-house* internal audit department had acted negligently.  Under the doctrine of contributory negligence, a company simply cannot allege that its internal audit function was performed negligently and still pursue a negligence claim against its independent external auditor.  The professional negligence claim against PwC must be dismissed.

*Third,* the professional negligence claim against PwC also must be dismissed because the Complaint explicitly alleges another instance of contributory negligence on BancGroup's part:  the perpetration of an eight-year fraud by Kissick, BancGroup's Mortgage Warehouse Lending Division director, in cahoots with at least one of her subordinates.  The legal consequence of those allegations is unmistakable.  Orchestrating fraud falls considerably short of fulfilling one's duty to exercise reasonable care.  And the nature of that fraud provides an even more compelling case for PwC's contributory negligence defense because Kissick and her subordinate have since admitted that their fraud was designed—deliberately— to deceive PwC.  The professional negligence claim against PwC must be dismissed on this ground as well.

3

***Fourth***, both the breach-of-contract claim and the professional negligence claim against PwC must be dismissed because the Complaint's allegations regarding BancGroup's fraud establish PwC's *in pari delicto* defense.  The *in pari delicto* defense bars recovery by a plaintiff who is equally or more at fault as the defendant in the breach of the law.  Here, Kissick and her subordinate admittedly engaged in fraud, while PwC has been accused only of negligence.  Under Alabama agency law and based on the factual allegations of the Complaint, Kissick's and her subordinate's intentional acts must be imputed to BancGroup.  Therefore, both of BancGroup's claims against PwC must be dismissed based on the *in pari delicto* defense.

## Factual Allegations[1]

I. **Colonial BancGroup, Inc.**

    A. **An Alabama-Based Financial Holding Company**

BancGroup was a bank and financial holding company.  Compl. ¶ 14.  Its stock was publicly traded (*id.*) and listed on the New York Stock Exchange.  *See*

---

[1] For the purposes of PwC's Motion to Dismiss only, PwC assumes, as it must, that the factual allegations of the Complaint are true.  *See, e.g.*, *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 137-38 (11th Cir. 2011).  In addition to the allegations of the Complaint, this Court should consider the content of documents that BancGroup has incorporated by reference into the Complaint:  BancGroup's Form 10-Ks (*see* Compl. ¶ 10), the guilty pleas of certain MWLD employees (*see id.* ¶ 3), and the engagement letters between BancGroup and PwC (*see id.* ¶¶ 58, 60, 167-68).  These documents are attached to PwC's Motion to Dismiss.  *See, e.g.*, *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (on a motion to dismiss, a district court may consider documents that are incorporated by reference into the complaint, *i.e.*, that are central to the plaintiff's claim and undisputed); *FindWhat Investor Group v. FindWhat.com*, 2011 WL 4506180, at *8 n.15 (11th Cir. Sept. 30, 2011) (SEC filings); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (SEC filings); *SFM Holdings, Ltd. v. Banc of America Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) ("relationship-forming contracts").

Colonial BancGroup, Inc.'s 2008 Form 10-K ("2008 Form 10-K"), Ex. F, at 2.  As a holding company, BancGroup's primary function was to oversee the business of its operating subsidiaries, including Colonial Bank.  Compl. ¶ 14.

Both BancGroup and Colonial Bank were Alabama-based companies. BancGroup was headquartered in Alabama, and its principal offices were located in Alabama.  2008 Form 10-K, Ex. F, at 1.  Similarly, Colonial Bank was headquartered in Alabama—from 2003 to June 10, 2008, it was a national banking association with its principal place of business in Alabama, and then, after June 10, 2008, Colonial Bank was an Alabama state-chartered bank with its principal place of business in Alabama.  *Id.* at 1, 3; *see also* Answer, *Alabama Dep't of Revenue v. FDIC*, Civil Action No. 2:11-cv-00272, Docket No. 9, ¶ 6 (M.D. Ala. July 19, 2011) (the FDIC, as receiver for Colonial Bank, admitting allegation that "Colonial Bank's principal place of business was in Montgomery, Alabama").[2]  When BancGroup ultimately filed for bankruptcy in 2009, it did so in Alabama as an Alabama-based company.  Compl. ¶¶ 1, 8.  Likewise, when Colonial Bank was placed in receivership in 2009, the receivership was initiated by the Alabama State Banking Department.  *Id.* ¶ 46; 2008 Form 10-K, Ex. F, at 1, 3.

---

[2] This Court can take judicial notice of documents filed in other courts within and outside of this District.  *See, e.g.*, *Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010) (reliance on matters of public record, including filings in another action, was not error); *Puckett v. Randolph County Sheriff's Dep't*, 2010 WL 919941, at *2 n.4 (M.D. Ala. Mar. 11, 2010) (Thompson, J.) (taking judicial notice of pleadings filed in prior action when considering motion to dismiss); *Coggins v. Crouch*, 2009 WL 1737605, at *1 n.3 (M.D. Ala. June 17, 2009) (Thompson, J.) (taking judicial notice of court records in another action to ascertain defendant's job title) *Grandinetti v. T-Hop*, 2006 WL 1476029, at *1 (M.D. Ala. May 24, 2006) (Thompson, J.) (taking judicial notice of PACER records).

**B.     The Mortgage Warehouse Lending Division and Its Relationship With Taylor Bean & Whitaker Mortgage Corporation**

Among its many operations, the company provided secured, short-term mortgage warehouse loans to mortgage originators through its Mortgage Warehouse Lending Division ("MWLD").  Compl. ¶¶ 17, 62.  Mortgage warehouse lending provides mortgage originators with a source of interim funding, generally for a period of fewer than 90 days, to enable the mortgage originator to lend money to a homebuyer at closing.  That short-term financing, in turn, is secured by the mortgage itself.  *Id.*

BancGroup's Mortgage Warehouse Lending Division was led by Cathie Kissick, who served as the director of the MWLD (*id.* ¶ 24) and was a member of management (*id.* ¶ 88).  Kissick's actions, and those of her subordinates, play a central role in BancGroup's Complaint, particularly as they relate to the collusive fraud between BancGroup and TBW.  *See id.* ¶¶ 1, 22-37.

**C.     The Collusive BancGroup-TBW Fraud**

TBW, BancGroup's partner-in-crime, was one of the nation's largest non-depository mortgage lenders and the MWLD's "largest customer by far."  *Id.* ¶¶ 18, 90; *see also id.* ¶ 1.  The fraud concocted by BancGroup and TBW took on a variety of forms in order to escape detection by PwC and others, but it began in 2002 when TBW started experiencing financial difficulties.

In connection with their lending and banking relationship, which dated back at least to 1998, TBW established several operating and escrow accounts with Colonial.  Compl. ¶ 22.  Beginning in 2002, however, TBW began to experience

financial difficulties and could not cover its expenses and other obligations.  *Id.* ¶ 23.  As a result, TBW started overdrafting its operating account at Colonial.  *Id.*

Cathie Kissick, the MWLD director, became aware of TBW's overdrafts. *Id.* ¶ 24.  To help TBW deal with those overdrafts, Kissick and others in the MWLD swept money into TBW's operating account from other TBW accounts and timed the posting of debits and credits to TBW's account in a manner that would conceal overdrafts.  *Id.* ¶¶ 24, 26.

By the end of 2003, however, TBW's daily overdraft balance had grown to approximately $150 million.  *Id.* ¶ 27.  Due to concerns that the overdraft was growing too big to conceal, the fraud took on a new dimension.  *Id.* ¶¶ 27-28.

From late November to December 2003, Colonial advanced $150 million to TBW to cover the overdraft.  *Id.* ¶ 28.  Colonial advanced TBW the $150 million through Colonial's mortgage warehouse lending facility called "COLB."  *Id.* ¶ 27. Under this facility, Colonial purchased an interest in mortgages sold to it by a mortgage originator (such as TBW) and held these mortgages on a short-term basis until another investor bought them.  *Id.* ¶¶ 28, 65.   With respect to the $150 million advanced to TBW to cover the overdraft, however, the mortgages that TBW sold to Colonial were fake.  *Id.* ¶¶ 27, 28.

As TBW's cash flow deteriorated further, its operating shortfall increased, causing TBW to sell more fictitious mortgage loans to Colonial in exchange for additional advances under the COLB facility.  *Id.* ¶ 29.  TBW also provided Colonial with substandard loans that did not qualify for sale to other investors in the secondary mortgage market.  *Id.*  To give the appearance that these fake and

substandard loans were being timely sold to other investors in the secondary market, TBW and BancGroup's MWLD worked together to "refresh" the fraudulent collateral data in Colonial's systems.  *Id.* ¶ 30.

In late 2004, TBW and BancGroup's MWLD changed their collusive scheme again, transferring the fraudulent portion of the Colonial-TBW COLB business to a different mortgage warehouse lending facility called the "Assignment of Trade," or "AOT," facility.  *Id.* ¶¶ 32, 66.  Under the AOT facility, instead of providing advances to TBW by purchasing an interest in the mortgage loans themselves, Colonial purchased participation interests in "securitized" pools of mortgages that were subject to enforceable "takeout commitments" from third party investors.  *Id.* ¶ 33.  By the end of 2007, the fraudulent balances regarding the AOT facility on Colonial's books exceeded $1.5 billion.  *Id.* ¶ 35.

> **D.  The Revelation of the Fraud and the Confessions of the Fraudsters**

In early August 2009, federal law enforcement agencies exposed the collusive fraud between TBW and BancGroup's Mortgage Warehouse Lending Division.  *Id.* ¶¶ 1, 46.  Regulators closed Colonial Bank shortly thereafter, on August 14, 2009.  *Id.*  Less than two weeks later, on August 25, BancGroup filed for bankruptcy in Montgomery, Alabama.  *Id.*

In the aftermath of what BancGroup now describes as "one of the largest and longest-lasting frauds in the history of the U.S. banking industry" (*id.* ¶ 1), six different fraudsters are bound for jail.  *Id.* ¶ 3.  That includes MWLD Director Cathie Kissick and one of her subordinates, MWLD Operations Supervisor Teresa

Kelly. *Id.* ¶ 3.  On their way to jail, these two former MWLD employees admitted in their guilty pleas that, among other things, they intentionally deceived PwC.

Kissick pleaded guilty to felony conspiracy to commit bank fraud, wire fraud, and securities fraud under 18 U.S.C. § 1349.  *See* Judgment in a Criminal Case, *United States v. Kissick*, Criminal Case No. 1:11-cr-00088, Docket No. 22, at 1 (E.D. Va. June 17, 2011); *see also supra* footnotes 1 & 2.  In connection with her guilty plea, Kissick executed a statement of facts that illustrates her concerted efforts to hide BancGroup and TBW's fraud from PwC:

- "To avoid scrutiny from . . . auditors, . . . [Kissick], [TBW President Lee] Farkas, and other co-conspirators devised and implemented a plan that gave the appearance that TBW was periodically selling . . . loans off of the COLB facility."  Statement of Facts, *United States v. Kissick*, Criminal Case No. 1:11-cr-00088, Docket No. 7, ¶ 7 (E.D. Va. Mar. 2, 2011), attached as Exhibit D to PwC's Motion to Dismiss; *see also supra* footnotes 1 & 2.

- "The conspirators moved the deficit to the AOT facility in part because, unlike the COLB facility, Colonial Bank generally did not track in its accounting records loan-level data for the Trades held on the AOT facility, thus making detection of the scheme by . . . auditors . . . less likely."  *Id.*, Ex. D, ¶ 8.

- "[Kissick], Farkas, and other co-conspirators engaged in . . . sham sales to deceive others, including . . . auditors . . . ."  *Id.*, Ex. D, ¶ 13.

- "At all times relevant to the Information, [Kissick] knew that her actions were wrong and not permitted by law.  [Kissick] and her co-conspirators took steps to hide their scheme from . . . auditors . . . ."  *Id.*, Ex. D, ¶ 15.

- "[Kissick] and her co-conspirators took steps to hide the fraud scheme described in this statement of facts from . . . auditors, . . .

including by providing materially false information that significantly overstated assets held in the COLB and AOT facilities." *Id.*, Ex. D, ¶ 16.

Kissick was sentenced to eight years in federal prison. Kissick Criminal Judgment, at 2.

Meanwhile, the SEC filed a civil enforcement action against Kissick. *See* Complaint for Injunctive and Other Relief, *SEC v. Kissick*, Civil Action No. 1:11-cv-00215, Docket No. 1 (E.D. Va. Mar. 2, 2011); *see also supra* footnote 2. The allegations of the SEC's complaint mirrored Kissick's own admissions, stating that "Defendant Kissick further repeatedly misrepresented to BancGroup's outside auditors that the account balances in the AOT and COLB Accounts were accurate – which she knew not to be true," and that "Defendant Kissick . . . conspired to deceive BancGroup's outside auditor by predetermining matching dollar amounts for the AOT account that could be represented on the third-party audit confirmations that Colonial's outside auditor sent to TBW." *Id.* ¶¶ 49-50. The SEC asserted eight claims against Kissick, including aiding and abetting BancGroup's violations of Section 10(b) of the Exchange Act (securities fraud), Section 13(b)(2)(A) of the Exchange Act (books and records violations), and Section 13(a) of the Exchange Act (reporting violations). *See id.* ¶¶ 67-68, 79-81, 83-85. Kissick consented to the entry of judgment against her. *See* Judgment as to Defendant Catherine L. Kissick, *SEC v. Kissick*, Civil Action No. 1:11-cv-00215, Docket No. 4, at 1-6 (E.D. Va. Mar. 2, 2011); *see also supra* footnote 2.

But Kissick was not alone. Teresa Kelly, an MWLD operations supervisor, also pleaded guilty to felony conspiracy to commit bank fraud, wire fraud, and

securities fraud.  *See* Judgment in a Criminal Case, *United States v. Kelly*, Criminal Case No. 1:11-cr-00119, Docket No. 20, at 1 (E.D. Va. filed June 17, 2011); *see also supra* footnotes 1 & 2.  In connection with her guilty plea, Kelly executed a statement of facts containing admissions that echo those found in Kissick's statement of facts:  the conspirators devised and implemented a plan to "avoid scrutiny" of auditors; they moved the deficit around to make detection of the scheme by auditors "less likely"; they engaged in "sham sales" to deceive auditors; they provided "materially false information" to hide the fraud from auditors; and her actions were, in all respects, intentional, deliberate, and illegal.  *See* Statement of Facts, *United States v. Kelly*, Criminal Case No. 1:11-cr-00119, Docket No. 7, ¶¶ 7, 8, 13, 15, 19 (E.D. Va. Mar. 16, 2011), attached as Exhibit E to PwC's Motion to Dismiss; *see also supra* footnotes 1 & 2.  Kelly was sentenced to three months in federal prison.  Kelly Criminal Judgment, at 2.

As it had done with Kissick, the SEC brought a parallel civil enforcement action against Kelly.  *See* Complaint for Injunctive and Other Relief, *SEC v. Kelly*, Civil Action No. 1:11-cv-00268, Docket No. 1 (E.D. Va. Mar. 16, 2011); *see also supra* footnote 2.  The SEC asserted six claims against Kelly—including aiding and abetting BancGroup's violations of Section 10(b), Section 13(b)(2)(A), and Section 13(a) of the Exchange Act (*id.* ¶¶ 56-57, 67-69, 71-73)—and, with Kelly's consent, a judgment was entered against her.  *See* Judgment as to Defendant Teresa A. Kelly, *SEC v. Kelly*, Civil Action No. 1:11-cv-00268, Docket No. 9 (E.D. Va. Mar. 16, 2011); *see also supra* footnote 2.

II.    **BancGroup's Internal Audit Function and the Role of Crowe Horwath LLP**

From 2005 onward, while the collusive fraud between BancGroup and TBW was ongoing, BancGroup engaged Defendant Crowe Horwath LLP (previously Crowe Chizek and Company LLC) "to provide BancGroup's internal audit function."  Compl. ¶ 4.  According to BancGroup's Complaint, Crowe played "a critical role" for BancGroup.  *Id.* ¶ 11.  Crowe allegedly was hired "to implement and monitor internal controls, including those controls specifically relating to BancGroup's mortgage warehouse lending division, and to help safeguard BancGroup's bank assets."  *Id.* ¶ 118; *see also id.* ¶¶ 11, 126.  Crowe also was tasked with carrying out internal audit activities regarding the Mortgage Warehouse Lending Division.  *Id.* ¶ 4.  But Crowe did not uncover the fraudulent scheme between TBW and BancGroup.  *Id.* ¶ 127.

Now, in this action, BancGroup alleges that Crowe was negligent.  *See, e.g.*, Compl. ¶¶ 127, 138, 160, 172; *see also id.* ¶¶ 140, 152, 160, 172.  In particular, BancGroup contends that Crowe negligently failed to detect the MWLD fraud (*id.* ¶¶ 127, 138), resulting in substantial damages to BancGroup.  *Id.* ¶¶ 138, 174, 179.

III.   **BancGroup's Independent External Auditor, PwC**

From 2002 to 2009, BancGroup engaged PwC to serve as its independent external auditor for BancGroup's year-end consolidated financial statements.  The objective of those audits was for PwC to render an opinion as to whether BancGroup's year-end consolidated financial statements were fairly presented, in all material respects, in accordance with Generally Accepted Accounting

Principles ("GAAP").  Starting in 2004, PwC also opined as to the effectiveness of BancGroup's internal control over financial reporting.  Compl. ¶ 50.

## A.    The Contracts

BancGroup executed an engagement letter with PwC for each year's audit. Compl. ¶¶ 58, 167.  These engagement letters (hereinafter, "the Contracts") are the contracts on which BancGroup's breach-of-contract claims against PwC are based. *Id.* ¶¶ 167-68.  The Contracts were addressed to BancGroup's headquarters in Montgomery, Alabama, and bear a PwC return address of either Montgomery, Alabama, or Birmingham, Alabama, depending on the year.  *See* 2006 Eng. Ltr., Ex. A, at 1; 2007 Eng. Ltr., Ex. B, at 1; 2008 Eng. Ltr., Ex. C, at 1.  The Contracts spell out the obligations of both PwC and BancGroup.

Under the Contracts, PwC was required to perform its audits in accordance with auditing standards adopted by the Public Company Accounting Oversight Board (the "PCAOB").  Compl. ¶ 51.  Those standards are derived from two sources:  (1) preexisting auditing standards that had been promulgated by the American Institute of Certified Public Accountants and that were adopted by the PCAOB and (2) six new auditing standards that were promulgated by the PCAOB during PwC's engagements for BancGroup.[3]  *Id.* ¶ 52.  These standards are

_____

[3] The AICPA-promulgated, PCAOB-adopted "generally accepted auditing standards" are organized topically in a set of professional standards, and those standards are referred to by "AU" section (*e.g.*, AU § 110, AU § 150).  *See, e.g.*, Compl. ¶¶ 53, 55.  The new, PCAOB-promulgated auditing standards are referred to by Auditing Standard, or "AS," number (for example, AS No. 3, AS No. 5).  *See, e.g.*, Compl. ¶¶ 52, 55.  Viewed collectively, these standards, contained in AU sections and AS numbers, constitute the body of generally accepted auditing standards established by the PCAOB that governs the audits of the financial statements

commonly referred to—and are referred to in this Memorandum—as Generally

Accepted Auditing Standards, or "GAAS," and are discussed in more detail

below.[4]  *See id.* ¶ 52 n.1.

In addition to setting forth PwC's responsibilities, the Contracts contained a

section entitled "Management's Responsibilities" that recited, among other things,

the following contractual obligations of BancGroup:

> ***Management also is responsible*** for the design and implementation of
> programs and controls to prevent and detect fraud, and ***for informing
> us [PwC] (i) about all known or suspected fraud affecting the entity
> involving (a) management, (b) employees who have significant roles
> in internal control over financial reporting, and (c) others where the
> fraud could have a material effect on the financial statements***; and
> (ii) of its knowledge of any allegations of fraud or suspected fraud
> affecting the entity received in communications from employees,
> former employees, analysts, regulators, short sellers, or others.
>
> \*   \*   \*   \*
>
> ***Management also is responsible for identifying and ensuring that
> the BancGroup complies with the laws and regulations applicable to
> its activities.***

*See* 2006 Eng. Ltr., Ex. A, at 5; 2007 Eng. Ltr., Ex. B, at 3-4; 2008 Eng. Ltr., Ex.

C, at 3-4.  BancGroup's CEO, CFO, and Audit Committee chairman signed the

Contracts each year on behalf of BancGroup.  *See* 2006 Eng. Ltr., Ex. A, at 9-10;

2007 Eng. Ltr., Ex. B, at 7; 2008 Eng. Ltr., Ex. C, at 7.

---

of public companies.  *Id.* ¶ 52.  These AU sections and AS numbers are available on the
PCAOB's website:  http://pcaobus.org/Standards/Auditing/Pages/default.aspx.

[4] The PCAOB standards are incorporated by reference in the Complaint (*see* Compl. ¶ 162) and
also are a proper subject for judicial notice.  *See, e.g.*, *Day v. Taylor*, 400 F.3d 1272, 1276 (11th
Cir. 2005) (incorporation by reference); *Araya v. McLelland*, 525 F.2d 1194, 1197 n.5 (5th Cir.
1976) (judicial notice of the United States Marshals Manual); *U.S. v. Kelly*, 888 F.2d 732, 743
n.21 (11th Cir. 1989) (judicial notice of State Bar of Georgia handbook).

## B.      Elements of an Audit Conducted Pursuant to Generally Accepted Auditing Standards

The responsibilities set forth in the Contracts are taken by and large right out of GAAS.

### 1.      The Role of the Audit Client

GAAS, like the Contracts, place responsibility for the financial statements on the audit client, not the independent external auditor:

> The financial statements are management's responsibility.  The auditor's responsibility is to express an opinion on the financial statements. . . .  The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.  The auditor's knowledge of these matters . . . is limited to that acquired through the audit.  Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AU § 110.03; *see also* AU § 310.06 ("Management is responsible for the entity's financial statements.").

Likewise, GAAS place the burden for internal control on the company rather than on the external auditor:

> Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. . . .  The auditor's knowledge of . . . internal control is limited to that acquired through the audit.

AU § 110.03; *see also* AU § 310.06 ("Management is responsible for establishing and maintaining effective internal control over financial reporting."); AU § 316.04

( "[I]t is management's responsibility to design and implement programs and controls to prevent, deter, and detect fraud").

GAAS also place squarely on the Company's shoulders the responsibility "for identifying and ensuring that the entity complies with the laws and regulations applicable to its activities."  AU § 310.06.  External auditors, after all, are not lawyers and are not involved in the Company's transactions or operations.  *See* AU § 317.03 (determining whether an act is illegal "is normally beyond the auditor's professional competence"); AU § 317.07 (a GAAS audit "provides no assurance that illegal acts will be detected").

### 2.    The Role of the Independent External Auditor

Under GAAS, the fundamental responsibility of the auditor is to obtain *reasonable* assurance as to whether the company's financial statements are stated, in all material respects, in accordance with GAAP.  GAAS are clear (as were the Contracts themselves) that an audit contains certain inherent and practical limitations that prevent the external auditor from being able to obtain or provide *absolute* assurance that the financial statements are free from material misstatement.

First, the independent external auditor is just that:  independent and external. The independent external auditor is not involved in the Company's operations or underlying transactions, does not make the accounting entries that go into the Company's financial statements, and does not make business decisions or judgments for the Company.  As a result, the auditor does not have, and cannot

16

have, first-hand knowledge of all of the information in the financial statements. *See, e.g.,* AU § 110.03 (quoted above); *see also* AU § 220.02.

Second, in order to be completed in a timely and affordable manner, the auditor cannot look at or test every item reflected in the company's financial statements. AU § 326.23 ("An auditor typically works within economic limits; the auditor's opinion, to be economically useful, must be formed within a reasonable length of time and at reasonable cost."). Therefore, a GAAS audit by necessity is based on testing samples of information. And "[t]he nature of most testing derives, in part, from the concept of selective testing of the data being audited, which involves judgment regarding both the areas to be tested and the nature, timing, and extent of the tests to be performed." AU § 230.11. Furthermore, "[i]n the great majority of cases, the auditor has to rely on evidence that is persuasive rather than convincing." AU § 230.11.

Third, many of the items in financial statements are estimates and opinions that require highly subjective judgments by the Company as to essentially unverifiable information, such as assumptions about future events and market conditions. *See* AU § 342.01 (estimates are often included in financial statements because of uncertainty pending the outcome of certain future events and because of the inability to accumulate relevant data on a timely and cost-efficient basis).

Fourth, the characteristics of fraud can permit fraud to go undetected even when the audit is properly performed in accordance with GAAS. When fraud is concealed through collusion (such as between BancGroup and TBW here), GAAS recognize that the auditor might conclude "that evidence provided is persuasive

when it is, in fact, false." AU § 316.10; AU § 230.12. Adding to the risk of collusion is the risk that a fraud will involve falsified documents, as likewise occurred here; GAAS acknowledge that auditors are not trained to authenticate documents. AU § 230.12 ("In addition, an audit conducted in accordance with generally accepted auditing standards rarely involves authentication of documentation, nor are auditors trained as or expected to be experts in such authentication."); AU § 316.10 ("As another example, the auditor may receive a false confirmation from a third party that is in collusion with management.").

GAAS therefore provide:

> Because of the characteristics of fraud, a properly planned and performed audit may not detect a material misstatement. Characteristics of fraud include (a) concealment through collusion among management, employees, or third parties; (b) withheld, misrepresented, or falsified documentation; and (c) the ability of management to override or instruct others to override what otherwise appears to be effective controls.

AU § 230.12.

It is because of these practical constraints that an audit conducted pursuant to GAAS is required to obtain only *reasonable*, not absolute, assurance that the financial statements are free of material misstatements: "Because of the nature of audit evidence and the characteristics of fraud, the auditor is able to obtain reasonable, but not absolute, assurance that material misstatements are detected." AU § 110.02. Nor can the auditor insure or guarantee the accuracy of the company's financial statements:

> Since the auditor's opinion on the financial statements or internal control over financial reporting is based on the concept of

obtaining reasonable assurance, ***the auditor is not an insurer and his or her report does not constitute a guarantee***.

AU § 230.13 (emphasis added).  Indeed, GAAS recognize that even a properly performed audit might not detect a material misstatement.  AU § 230.10.

### C.  PwC's Audit Reports

In connection with each audit engagement, PwC issued an audit report that contained its opinions regarding BancGroup's financial statements and BancGroup's internal control over financial reporting.  PwC issued its audit reports in Alabama.  *See, e.g.*, 2008 Form 10-K, Ex. F, at 79.

In accordance with GAAS, PwC's audit reports highlighted the characteristics of PwC's audit work that were prescribed by GAAS and reiterated in the Contracts:

> ***In our opinion***, the consolidated financial statements . . . present fairly, in all material respects, the financial position of The Colonial BancGroup, Inc and its subsidiaries . . . and the results of their operations and their cash flows . . . in conformity with accounting principles generally accepted in the United States of America.  Also, ***in our opinion***, the Company maintained, in all material respects, effective internal control over financial reporting . . . .  ***The Company's management is responsible for these financial statements*** and for maintaining effective internal control over financial reporting . . . .  ***Our responsibility is to express opinions*** . . . .  We conducted our audits in accordance with the standards of the [PCAOB].  Those standards require that ***we plan and perform the audits to obtain reasonable assurance*** about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects.  Our audits of the financial statements included ***examining, on a test basis***, evidence supporting the amounts and disclosures in the financial statements . . .

2008 Form 10-K, Ex. F, at 79 (emphasis added).

## Argument and Citation of Authorities

Despite the deliberate efforts of its management to perpetrate a massive eight-year fraud while concealing the illegal scheme from PwC, BancGroup now has chosen to try to pin the blame, at least in part, on PwC.  Its attempt to plead viable claims against PwC, however, falls short.

Simply put, BancGroup is barking up the wrong tree.  Its Complaint alleges that the company's management committed fraud and that the company's agent was negligent.  This Court need not consider anything else; those allegations alone require dismissal.  As PwC explains below, those allegations, taken as true, establish that BancGroup did not perform its obligations under its contracts with PwC; that BancGroup was contributorily negligent, based on both the negligent conduct of Crowe and the fraudulent conduct of BancGroup's management; and that BancGroup is at least equally at fault when compared to PwC, thus triggering the defense of *in pari delicto*.

I.   **BancGroup's Breach-of-Contract Claim Against PwC Must Be Dismissed Because BancGroup Did Not Perform Its Obligations Under Its Contracts with PwC.**

At the outset, to survive dismissal, BancGroup's Complaint must do more than simply set forth conclusory allegations, labels, and unfounded conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  In fact, even "a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.  Instead, district courts must "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id*. at 558.  With these principles in mind, the Supreme Court has declared that, in order to state a

cognizable claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 570).

This plausibility standard takes on added force when a complaint fails to allege facts regarding an essential element of a claim.  In such a scenario, the Eleventh Circuit has held that the claim must be dismissed.  *See, e.g.*, *Arch Ins. Co. v. Clements, Purvis, & Stewart, P.C.*, 2011 WL 2749667, at *2 (11th Cir. July 14, 2011) (affirming dismissal of negligence misrepresentation claim against auditor because "the complaint lacked a sufficient factual basis upon which the district court could infer the existence of an essential element of the claim"); *Thompson v. RelationServe Media, Inc.*,  610 F.3d 628, 635-36 (11th Cir. 2010) (affirming dismissal of claim under Section 20(a) of the Securities Exchange Act of 1934 based on plaintiff's failure to sufficiently plead an "essential element" of the Section 20(a) claim).

Going one step further, when a complaint not only fails to ***allege*** an essential element of the claim sufficiently, but also demonstrates that the plaintiff ***cannot prove*** an essential element of the claim, the claim fails not just as a matter of pleading, but also as a matter of law.  *See, e.g.*, *Baptista v. JP Morgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 n.3 (11th Cir. 2011) (concluding, at the pleading stage, that an unjust enrichment claim "fails as a matter of law" because the complaint demonstrated that the plaintiff "cannot prove each element of the claim").

Under the Supreme Court's *Twombly/Iqbal* plausibility standard, as applied by the Eleventh Circuit, BancGroup's breach-of-contract must be dismissed.

### A. Alabama Law Governs BancGroup's Breach-of-Contract Claim Against PwC.

At a status conference on September 26, 2011, the Court asked the parties what law governs BancGroup's claims. BancGroup responded that, with respect to its claims against PwC, an issue might exist as to whether Alabama or Florida law applies. PwC disagrees. Alabama law clearly applies.[5]

To determine the applicable state law, the Court must first determine which choice-of-law rules apply. Here, the Court must apply the choice-of-law rules of Alabama, the forum state, because BancGroup's state-law contract claim is subject to federal jurisdiction based on "related to" bankruptcy jurisdiction under 28 U.S.C. § 1334(b). This means that the district court must apply its forum state's choice-of-law rules to determine the applicable state law. The Eleventh Circuit reached this very conclusion just last year. *See Mukamal v. Bakes*, 378 F. App'x 890, 896 (11th Cir. 2010).

Alabama applies the traditional *lex loci contractus* choice-of-law rule in contract actions. *See, e.g.*, *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506-07 (Ala. 1991); *see also St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 894 n.1 (11th Cir. 2009). Explaining that rule, this Court has noted, based on Alabama Supreme Court precedent, that "Alabama follows the law agreed upon by the parties or, in the absence of such an agreement, the law of the State in which the contract was formed." *Movie Gallery US, LLC v.*

---

[5] Since the status conference, PwC has twice asked BancGroup which law it contends applies, but BancGroup has not answered that question. Given how clear it is that Alabama law controls the claims asserted against PwC, this brief does not address Florida law.

*Greenshields*, 648 F. Supp. 2d 1252, 1269 (M.D. Ala. 2009) (Thompson, J.) (citing *Stovall v. Universal Constr., Co.*, 893 So. 2d 1090, 1102 (Ala. 2004)).

BancGroup's breach-of-contract claim against PwC is predicated on the Contracts (*i.e.*, the engagement letters) between BancGroup and PwC. *See, e.g.*, Compl. ¶ 167. The Contracts do not contain a choice-of-law provision, but they were formed in Alabama: The Contracts were issued by PwC in Alabama and they were delivered to BancGroup in Alabama. *See* 2006 Eng. Ltr., Ex. A, at 1; 2007 Eng. Ltr., Ex. B, at 1; 2008 Eng. Ltr., Ex. C, at 1. Alabama law therefore governs a breach-of-contract action based upon them. *See Lifestar Resp. of Ala., Inc. v. Admiral Ins. Co.*, 17 So. 3d 200, 213 (Ala. 2009) (under *lex loci contractus*, a contract is governed "by the law of the jurisdiction within which the contract was made"); *Cherokee Ins. Co. v. Sanches*, 975 So. 2d 287, 292-93 (Ala. 2007) (the place of the contract is the state where "the policy was issued and delivered").

## B. Under Alabama Law, the Plaintiff's Performance Under the Contract Is an Essential Element of a Breach-of-Contract Claim.

The Alabama Supreme Court has identified the plaintiff's performance under a contract as an "essential element" of a breach-of-contract claim. *Winkleblack v. Murphy*, 811 So. 2d 521, 529 (Ala. 2001) (plurality opinion); *Beauchamp v. Coastal Boat Storage, LLC*, 4 So. 3d 443, 450-51 (Ala. 2008) (adopting *Winkleblack*, and upholding jury verdict for defendant based on evidence that plaintiffs were not ready, willing, and able to perform under the purchase agreement). For at least a century, Alabama law has required plaintiffs to aver their own performance under the contract:

> When mutual covenants go to the whole consideration of both sides, they are dependent conditions, and ***performance must be averred in an action by either party for a breach***, or instead, an offer of performance be alleged, and at least a readiness to perform must be shown by the party seeking to enforce performance. . . .  [W]here the performance of an act by one party is intended to be concurrent with an act to be performed by the other, ***neither party can maintain an action against the other without an allegation of performance or of an offer to perform*** on his part, or an averment of facts, which constitute, according to the rule heretofore laid down, a sufficient excuse for failing to perform or to offer to perform.

*Long v. Addix*, 63 So. 982, 984 (Ala. 1913) (emphasis added) (reversing judgment for plaintiffs because complaint did not aver plaintiff's performance or willingness to perform); *see also, e.g.*, *Hanby v. Campbell*, 132 So. 893, 894 (Ala. 1931) (reiterating this rule).  The Eleventh Circuit has acknowledged this law.  *See Nihon Rufuto Co. v. Nidek Med. Prods., Inc.*, 2011 WL 3505211, at *5 (11th Cir. Aug. 11, 2011); *Samuels & Assocs., Inc. v. Boxcar Foods, USA, Inc.*, 286 F. App'x 708, 713-14 (11th Cir. July 21, 2008).  So has this Court, on several occasions.  *See, e.g.*, *Penmont, LLC v. Blue Ridge Piedmont, LLC*, 607 F. Supp. 2d 1266, 1272-73 (M.D. Ala. 2009) (Thompson, J.); *Black-Gammons v. Zurich Am. Ins. Co.*, 2006 WL 47503, at *3  (M.D. Ala. Jan. 9, 2006) (Thompson, J.); *Claybrook v. Central United Life Ins. Co.*, 387 F. Supp. 2d 1199, 1204 (M.D. Ala. 2005) (Thompson, J.).

## C.  BancGroup Did Not Allege Its Performance Under the Contracts With PwC.

Although this rule is a bedrock principle of Alabama contract law, BancGroup's Complaint ignores it.  The Complaint does not allege anything about BancGroup's performance.  It does not identify BancGroup's responsibilities under the Contracts, although, as described above (*see supra* pages 13-16) and as

24

reflected in the Contracts themselves (*see* Exs. A, B, and C), there are many.  Nor does it plead any facts regarding BancGroup's performance of those responsibilities.  Indeed, it does not even include a conclusory allegation or a formulaic recitation of this element of a breach-of-contract claim (although, of course, such statements would need to be disregarded under *Twombly* and *Iqbal*).  *See, e.g.*, Compl. ¶¶ 167-69 (formulaically reciting three elements of BancGroup's breach-of-contract claim against PwC—the existence of the contract, breach of the contract, and damages—but neglecting to allege anywhere the fourth element of that claim, that BancGroup performed its obligations under the contracts).

With respect to this element of BancGroup's breach-of-contract claim, the Complaint's silence—standing alone—compels dismissal.  *See, e.g.*, *Sweetwater Investors, LLC v. Sweetwater Apartments Loan LLC*, 2010 WL 4904673, at *3-4 (M.D. Ala. Nov. 24, 2010) (Watkins, J.) (dismissing breach-of-contract claims against two defendants because the complaint did not allege the essential element of a valid contract binding the parties); *Ala. Municipal Ins. Corp. v. Alliant Ins. Servs., Inc.*, 2010 WL 743009, at *1-2 (M.D. Ala. Mar. 1, 2010) (Watkins, J.) (dismissing complaint under *Twombly*/*Iqbal* for failure to identify the essential element of the defendant's nonperformance of the allegedly binding contract).

### D.   BancGroup's Complaint Alleges Facts That Demonstrate That BancGroup Did Not Perform Under the Contracts With PwC.

This Court is not merely confronted by a complaint that fails to allege an essential element, however.  BancGroup's Complaint affirmatively alleges facts that negate that essential element—facts that show that BancGroup did ***not*** perform

its obligations under the Contracts.  Because of that, BancGroup cannot prove its breach-of-contract claim against PwC, and its claim fails as a matter of law.  *See, e.g.*, *Baptista*, 640 F.3d at 1198 n.3 (when the complaint shows that the plaintiff cannot prove an essential element of the claim, the claim fails as a matter of law).

### 1.    Informing PwC of Known or Suspected Fraud

Under its Contracts with PwC, BancGroup agreed to the following contractual duty:  "Management . . . is responsible . . . for informing [PwC] (i) about all known or suspected fraud affecting the entity involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements."  *See* 2006 Eng. Ltr., Ex. A, at 5; 2007 Eng. Ltr., Ex. B, at 3-4; 2008 Eng. Ltr., Ex. C, at 3-4.  The Complaint plainly alleges facts showing that BancGroup did not perform this duty under the contract.

Cathie Kissick spearheaded the company's role in the fraud.  Compl. ¶ 24.  The Complaint itself acknowledges that Kissick was a member of management.  *Id.* ¶ 88 (referring to "***management, including Kissick***") (emphasis added); *see also id.* ¶ 24 (describing Kissick as the director of one of the six reporting segments); *id.* ¶ 17 (describing Kissick's division as the source of 20% of BancGroup's reported net income); Redacted Complaint, Case No. 09-32303, Docket No. 1519-1, ¶ 93 (Bankr. M.D. Ala. Sept. 20, 2011) (again characterizing Kissick as a member of management).

Because Kissick was a member of management, it necessarily follows that BancGroup did not comply with the Contracts.  As a member of management,

26

Kissick was required, under those Contracts, to inform PwC of any known or suspected fraud involving management, employees who have significant roles in internal control, or others whose fraud could materially affect the financial statements.  The Complaint alleges that Kissick did not just suspect fraud; she knew about—and actually orchestrated—the company's fraud with TBW.  That fraud involved management (Kissick herself), and it also involved employees who had a significant role in internal control and whose fraud could materially impact the financial statements (both Kissick and MWLD operations supervisor Teresa Kelly).

In short, the Complaint affirmatively alleges that BancGroup did not comply with its obligations under this provision of the Contracts.  When a plaintiff cannot establish an essential element of its breach-of-contract claim, that claim necessarily fails as a matter of law, and it should be dismissed with prejudice.  *See Baptista,* 640 F.3d at 1198 n.3; *see also, e.g.*, *Superior Wall & Paver, LLC v. Gacek*, 2011 WL 2279215, at *6-7 (Ala. Civ. App. June 10, 2011) (affirming judgment for defendant following bench trial based on evidence that plaintiff did not substantially perform under the contract); *Lankford v. Witmondt*, 528 So. 2d 850, 852-53 (Ala. 1988) (affirming summary judgment for defendant based on unrebutted assertion that plaintiff's performance was unsatisfactory); *Rolison v. Sterling*, 2009 WL 2514294, at *10-12 (S.D. Ala. Aug. 13, 2009) (Granade, J.) (granting summary judgment to defendants based on plaintiff's failure to perform under the contract); *Kerns v. Sealy*, 496 F. Supp. 2d 1306, 1319-20 (S.D. Ala.

2007) (Steele, J.) (granting summary judgment to defendants based on, among other things, plaintiff's non-performance).

### 2. Ensuring Compliance With Laws and Regulations

BancGroup also failed to perform another of its key obligations under the Contracts.  In those Contracts, BancGroup's management agreed that it would ensure that BancGroup "complies with the laws and regulations applicable to its activities."  *See* 2006 Eng. Ltr., Ex. A, at 5; 2007 Eng. Ltr., Ex. B, at 4; 2008 Eng. Ltr., Ex. C, at 4.  It did not.

Instead, BancGroup violated federal law for eight years.  Compl. ¶ 1.  As a result of that fraud, two Colonial employees have pleaded guilty to felony conspiracy to commit fraud, and are headed to jail.  *Id.* ¶ 3.  Before doing so, they also consented to the entry of civil judgments against them in enforcement actions in which the Securities and Exchange Commission asserted claims for aiding and abetting ***BancGroup's*** securities fraud violations (under Section 10(b) of the Exchange Act and SEC Rule 10b-5), ***BancGroup's*** books and records violations (under Section 13(b)(2)(A) of the Exchange Act), and ***BancGroup's*** reporting violations (under Section 13(a) of the Exchange Act).  *See supra* pages 10-11**.**  Because BancGroup's management failed to ensure that BancGroup complied with laws and regulations applicable to its activities—a contractual obligation that BancGroup's management expressly assumed in the Contracts—BancGroup has alleged that it did not perform under the Contracts, and its breach-of-contract claim fails as a matter of law on this ground, too.  *See* cases cited *supra* page 27.

II.     **BancGroup's Professional Negligence Claim Against PwC Must Be
Dismissed Because the Complaint Alleges BancGroup's Contributory
Negligence in Two Different Respects.**

A complaint may be dismissed if an affirmative defense appears on the face

of the complaint.  *See, e.g.*, *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1022

(11th Cir. 2001) (en banc).  The Supreme Court has summed up this point nicely:

> A complaint is subject to dismissal for failure to state a claim if the
> allegations, taken as true, show the plaintiff is not entitled to relief.  If
> the allegations, for example, show that relief is barred by the
> applicable statute of limitations, the complaint is subject to dismissal
> for failure to state a claim; that does not make the statute of
> limitations any less an affirmative defense . . . .  Whether a particular
> ground for opposing a claim may be the basis for dismissal for failure
> to state a claim depends on whether the allegations in the complaint
> suffice to establish that ground, not on the nature of the ground in the
> abstract.

*Jones v. Bock*, 549 U.S. 199, 215 (2007).  When plaintiffs include allegations in

their complaint that establish a contributory negligence defense, courts dismiss

their complaints.  *See, e.g.*, *Gallardo v. FedEx Kinko's Office & Print Servs., Inc.*,

2008 WL 2143011, at *2-3 (D. Md. May 12, 2008) (dismissing gratuitous bailment

claim based on contributory negligence defense); *Ely v. Fortier Loss Control

Consultants, Inc.*, 2002 WL 32514575, at *2-3 (W.D. Va. Aug. 2, 2002)

(dismissing entire action based on contributory negligence defense); *Stratton v.

Miller*, 113 B.R. 205, 208 (D. Md. 1989) (dismissing legal malpractice claim based

on contributory negligence defense).[6]

---

[6] On at least a dozen occasions in the last decade alone, the Eleventh Circuit has affirmed a
district court's dismissal of a claim based on an affirmative defense that appeared on the face of
the complaint.  *See, e.g.*, *Horne v. Potter*, 392 F. App'x 800, 801, 804-05 (11th Cir. 2010) (res
judicata); *Brown v. Beacon Ins. Co.*, 317 F. App'x 915, 918 (11th Cir. 2009) (res judicata);

### A.   Alabama Law Governs BancGroup's Professional Negligence Claim Against PwC.

Like its breach-of-contract claim, BancGroup's professional negligence claim is governed by Alabama law.

For the reasons stated above, the Court must apply Alabama choice-of-law rules to determine which state's law governs the professional negligence claim against PwC.  *See supra* page 2.  Alabama applies the traditional *lex loci delicti* choice-of-law rule to tort claims.  *See, e.g.*, *Fitts v. Minnesota Mining & Mfg. Co.*, 581 So. 2d 819, 820-23 (Ala. 1991) (reaffirming Alabama's adherence to *lex loci delicti*); *see also Romero v. Drummond Co.*, 552 F.3d 1303, 1319 (11th Cir. 2008) (observing that *lex loci delicti* has been the rule in Alabama for 115 years).  Under that choice-of-law rule, the substantive law of the state where the injury occurred applies.  *See, e.g.*, *Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338, 1349 n.12 (11th Cir. 2011) ("substantive rights are determined according to the law of the forum where the injury occurred"); *Movie Gallery US, LLC v. Greenshields*, 648 F. Supp. 2d 1252, 1262 (M.D. Ala. 2009) (Thompson, J.) (Alabama courts apply "the substantive law of the place of injury"); *Ford Motor Co. v. Duckett*,

---

*Brotherhood of Locomotive Engineers & Trainmen v. CSX Transp., Inc.*, 522 F.3d 1190, 1200 (11th Cir. 2008) (statute of limitations); *Anderson v. Donald*, 261 F. App'x 254, 256 (11th Cir. 2008) (failure to exhaust administrative remedies); *Okpala v. Drew*, 248 F. App'x 72, 73 (11th Cir. 2007) (failure to exhaust administrative remedies); *Hardy v. Broward County Sheriff's Office*, 238 F. App'x 435, 443 (11th Cir. 2007) (qualified immunity); *Koger v. Fla.*, 130 F. App'x 327, 333-35 (11th Cir. 2005) (qualified immunity); *Jackson v. Bellsouth Telecomm'ns*, 372 F.3d 1250, 1277 (11th Cir. 2004) (litigation privilege); *Snider v. Jefferson State Community College*, 344 F.3d 1325, 1330 (11th Cir. 2003) (qualified immunity); *Cottone v. Jenne*, 326 F.3d 1352, 1362 (11th Cir. 2003) (qualified immunity); *Gonzalez v. Reno*, 325 F.3d 1228, 1236 (11th Cir. 2003) (qualified immunity); *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1022, 1040 (11th Cir. 2001) (en banc) (qualified immunity).

2011 WL 480046, at *1 n.3 (Ala. Feb. 11, 2011) ("law of the state where the injury occurred") (internal quotations and citation omitted).

Under the *lex loci delicti* rule, Alabama law governs BancGroup's professional negligence claim against PwC. BancGroup was headquartered in Alabama, and its principal offices were located there, too. Form 2008 10-K, Ex. F, at 1. When BancGroup filed for bankruptcy, it did so in Alabama. Compl. ¶¶ 1, 8. As an Alabama-headquartered company with its principal offices in Alabama, BancGroup sustained its alleged damages in Alabama: "Where, as here, the injury in question is financial, the location where the financial injury was felt is determinative under *lex loci delicti*." *Chambers v. Cooney*, 2007 WL 2493682, at *11 (S.D. Ala. Aug. 29, 2007) (Steele, J.); *see also Movie Gallery US, LLC v. Greenshields*, 648 F. Supp. 2d 1252, 1262 (M.D. Ala. 2009) (Thompson, J.) ("[T]he place of injury for tort claims involving financial injury is the state in which the plaintiff suffered the economic impact.") (internal quotations and citation omitted); *Glass v. So. Wrecker Sales*, 990 F. Supp. 1344, 1348 (M.D. Ala. 1998) (Albritton, J.) (economic loss occurred in the state of plaintiff's "place of business"); *Sunbelt Veterinary Supply, Inc. v. Int'l Bus. Sys. U.S., Inc.*, 985 F. Supp. 1352, 1353-54, 1356 (M.D. Ala. 1997) (Albritton, J.) (corporation "with its principal place of business in Montgomery" sustained its alleged injuries in Alabama); *Chambers v. Cooney*, 535 F. Supp. 2d 1255, 1259 n.4 (S.D. Ala. 2008) (Steele, J.) (looking to state of residency of individual plaintiff to determine where financial injury would have been felt for purposes of *lex loci delicti*).

### B.    Under Alabama Law, Contributory Negligence Is a Complete Defense to a Professional Negligence Claim.

Alabama embraces the traditional principle of contributory negligence: "Contributory negligence is an affirmative and complete defense to a claim based on negligence." *Serio v. Merrell, Inc.*, 941 So. 2d 960, 964 (Ala. 2006) (quotations and citation omitted).  To avail itself of this defense, a defendant need only show that the plaintiff's own negligence was a proximate cause of the plaintiff's injury. *See, e.g.*, *Mason v. Lee*, 44 F. Supp. 2d 1249, 1250 (M.D. Ala. 1999) (Thompson, J.) ("Contributory negligence is merely the negligent act of the plaintiff which is the proximate cause of his or her injury.").  And when the plaintiff is an entity (like BancGroup here), the negligence of the entity's agent or employee is the negligence of the entity for the purposes of Alabama's contributory negligence rule:

> The general rule is that if the master is injured by the negligence of the third person and by the concurring negligence of its own servant or agent, the servant or agent's negligence is imputed to his master and will defeat the master's action against the third person.

*U.S. Fid. & Guar. Co. v. Russo Corp.*, 628 So. 2d 486, 489 (Ala. 1993).

### C.    BancGroup's Complaint Alleges That BancGroup's Agent, PwC's Co-Defendant Crowe Horwath, Was Negligent.

The Complaint establishes PwC's contributory negligence defense on its face, courtesy of three sets of allegations:  (1) Crowe was BancGroup's agent; (2) Crowe was negligent[7]; and (3) Crowe proximately caused BancGroup's damages.

---

[7] PwC is not itself accusing Crowe of negligence but rather is simply taking the Complaint allegations as true for the purpose of this motion to dismiss.

By bringing a negligence claim against Crowe (*see* Compl. ¶¶ 176-79), BancGroup has necessarily taken the position that the factual allegations of its Complaint are sufficient to plead both Crowe's negligence and proximate causation.[8]  That leaves only the issue of whether Crowe was BancGroup's agent.  Based on the allegations of the Complaint, it certainly was.

Under Alabama law, the test for agency is whether the principal had a right of control over the manner of performance of the agent, regardless of whether that right actually was exercised.  *Franklin v. Mitchell*, 2011 WL 3863028, at *6 (Ala. Civ. App. Sept. 2, 2011) ("Under Alabama law, the test of agency is the right of control, whether exercised or not.") (citing *Brown v. Commercial Dispatch Publ. Co.*, 504 So. 2d 245, 246 (Ala. 1987)).

The Complaint is littered with allegations showing that Crowe provided internal audit services to BancGroup.  *See, e.g.*, Compl. ¶¶ 4, 11, 100, 117, 120, 121, 122, 123, 126, 160.  Simply put, BancGroup "outsourced" certain internal audit activities to Crowe.  As a matter of law—under NYSE rules, federal banking regulations, and the professional standards that governed BancGroup's internal audit function—BancGroup had the right, and indeed was obligated, to control Crowe's performance of those activities, and therefore Crowe was BancGroup's agent.

---

[8] Crowe contends, in its Motion to Dismiss, that BancGroup's Complaint does not sufficiently allege proximate causation.  Because the Complaint's causation theories as to Crowe and as to PwC are indistinguishable (*see, e.g.*, Compl. ¶ 6), the failure of the Complaint to plead facts sufficient to allege proximate causation as to Crowe would apply with equal force to PwC, and would be fatal to BancGroup's claims against PwC.  Accordingly, PwC joins Crowe's proximate causation argument, and hereby incorporates that argument by reference.

As a bank holding company listed on the New York Stock Exchange, BancGroup was required by both federal bank regulator guidelines and NYSE rules to have an internal audit function.[9]  These rules allowed BancGroup to hire a third party service provider, like Crowe, to assist it in discharging its internal audit obligations.[10]  But if BancGroup elected to outsource internal audit services, federal bank regulations required BancGroup to maintain ownership of, and control over, its internal audit function:

> Even when outsourcing vendors provide internal audit services, the board of directors and senior management of an institution are responsible for ensuring that both the system of internal control and the internal audit function operate effectively.  In any outsourced internal audit arrangement, the institution's board of directors and senior management must maintain ownership of the internal audit function and provide active oversight of outsourced activities.

Interagency Policy Statement on the Internal Audit Function and Its Outsourcing, at Part II.

Likewise, the professional standards promulgated by the Institute of Internal Auditors ("IIA") required BancGroup to oversee and manage the work of its

---

[9] See Interagency Policy Statement on the Internal Audit Function and Its Outsourcing (Mar. 17, 2003) (jointly issued by the Federal Reserve, the FDIC, the OCC, and the OTS), available at <http://www.occ.treas.gov/news-issuances/bulletins/2003/bulletin-2003-12.html>, at Part I ("[t]he board of directors and senior management are responsible for having . . . an effective internal audit function in place at their institution"); NYSE Listed Company Manual 303A.07(c) and Commentary, available at <http://nysemanual.nyse.com/LCM/> ("Each listed company must have an internal audit function."); see also SEC Release No. 34-48745 (Nov. 4, 2003) (approving NYSE internal audit requirement).

[10] See, e.g., Interagency Policy Statement on the Internal Audit Function and Its Outsourcing, at Part II ("An outsourcing arrangement is a contract between an institution and an outsourcing vendor to provide internal audit services."); NYSE Listed Company Manual 303A.07(c) Commentary (providing that a NYSE-listed company "may choose to outsource this function to a third party service provider other than its independent auditor").

outsourced internal audit function.  *See* Compl. ¶ 123 (alleging that BancGroup's relationship with Crowe was governed by IIA professional standards).  Under those standards, a company's "chief audit executive" is responsible for overseeing the work of the company's internal auditors and "must effectively manage the internal audit activity to ensure it adds value to the organization."  IIA § 2000.  In this regard, the chief audit executive must establish a risk-based audit plan (IIA § 2010), obtain approval from senior management and the board of directors with respect to that plan (IIA § 2020), ensure that resources are properly employed (IIA § 2030), establish internal audit policies and procedures (IIA § 2040), and report periodically to senior management and the board of directors (IIA § 2060).  The IIA's standards place ultimate responsibility for a company's internal audit activity on the chief audit executive and the company itself, even when internal audit activities are outsourced.[11]  *See, e.g.*, IIA § 2070.

Against the backdrop of these standards, Crowe, in connection with its internal audit activities, reported directly to BancGroup's "chief audit executive," who was referred to as BancGroup's "General Auditor."  Compl. ¶ 124.  BancGroup's General Auditor was responsible for managing the company's internal audit activity and for signing off on the internal audit plan.  *See* IIA § 2010; IIA § 2020; IIA § 2040.

---

[11] In the Contracts, BancGroup represented to PwC that BancGroup is responsible for "establishing and maintaining adequate internal control for financial reporting" and for "the design and implementation of programs and controls to prevent and detect fraud."  2006 Eng. Ltr., Ex. A, at 5; 2007 Eng. Ltr., Ex. B, at 3; 2008 Eng. Ltr., Ex. C, at 3, 4.  Likewise, GAAS place that ultimate responsibility on BancGroup (*see* AU § 110.03, quoted *supra* page 15), as do PwC's audit reports (*see supra* page 19).

As a matter of law, then, Crowe was BancGroup's agent, just like BancGroup's *in-house* internal audit personnel acted as BancGroup's agents.[12] BancGroup had, and exercised, a right of control over Crowe's work:  Crowe "was required to report directly" to BancGroup's General Auditor (Compl. ¶ 124); Crowe's internal audit work plans each year were subject to approval by BancGroup; and internal auditing standards required the internal audit activity to be "manage[d]" by BancGroup's chief audit executive (*see* IIA § 2000).

Because Crowe was BancGroup's agent, BancGroup is responsible for Crowe's alleged negligence.  Under Alabama law, "[a] principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency . . . and for his willful omission to fulfill the obligations of the principal."  Ala. Code § 8-2-7.  Furthermore, as one federal court of appeals has pointedly observed, "[i]t is undisputed that [the principal] is responsible for the actions of its outsourced agents." *Cedar Hill Hardware & Constr. Supply, Inc. v. Ins. Corp. of Hannover*, 563 F.3d 329, 335 n.3 (8th Cir. 2009) (outsourced claims-management and claim-adjustment functions for insurance company); *see also U.S. Fid. & Guar. Co. v. Russo Corp.*, 628 So. 2d 486, 489 (Ala. 1993) (applying the borrowed servant doctrine in the context of a contributory negligence defense).  As Alabama Supreme Court precedent demands, the allegations about Crowe necessarily defeat BancGroup's professional negligence claim against PwC, and

---

[12] BancGroup also alleges that it hired an in-house internal auditor, Pam Vitto, to audit the MWLD "at the same time that Crowe's engagement included internal auditing of the MWLD" (Compl. ¶ 156), but Ms. Vitto did not discover the fraud, either.

that claim fails as a matter of law.  *See U.S. Fid. & Guar. Co. v. Russo Corp.*, 628 So. 2d 486, 489 (Ala. 1993) (contributory negligence defense applies to borrowed servant's actions).

> ### D.   BancGroup's Complaint Alleges That Company Management Was Negligent.

In addition to alleging the negligence of its agent (Crowe), BancGroup's Complaint alleges the negligence of the company's employees (Kissick and Kelly). For this reason as well, the professional negligence claim against PwC must be dismissed based on contributory negligence.

As an initial matter, when Kissick and Kelly carried out the fraud, they did so in their roles as the company's employees.  *See, e.g.*, Compl. ¶ 24 (Kissick as MWLD Director); *id.* ¶ 3 (acknowledging guilty pleas of "certain individuals within the MWLD").  Indeed, Kissick was a member of company management.  *Id.* ¶ 88.  Therefore, their actions must be charged to the company as a matter of Alabama law.  *See* Ala. Code § 8-2-7; *In re Verilink Corp.*, 405 B.R. 356, 362 n. 2, 364 (Bankr. N.D. Ala. 2009) (applying Alabama agency principles from Chapter 2 of Title 8 of the Alabama Code to determine whether bankruptcy trustee was responsible for  "knowledge and conduct" of company management); *see also, e.g.*, *Glenn Constr. Co. v. Bell Aerospace Servs., Inc.*, 785 F. Supp. 2d 1258, 1288-89 (M.D. Ala. 2011) (Fuller, J.) (noting, under Alabama law, that a company can be responsible for the acts of others through agency law or respondeat superior law, but the test is the same in both circumstances:  right of control by the

principal/employer, and conduct in the scope of the agency/employment by the agent/employee).

There can be no doubt that the company's employees, Kissick and Kelly, are alleged to have acted negligently.  Negligence, of course, "is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care."  *Monroe v. Brown*, 307 F. Supp. 2d 1268, 1271 (M.D. Ala. 2004) (Thompson, J.) (quoting *Lynn Strickland Sales & Serv., Inc. v. Aero-Lane Fabricators, Inc.*, 510 So. 2d 142, 145 (Ala. 1987)).  Here, Kissick's and Kelly's conduct goes far beyond that:  They knowingly and deliberately committed fraud.  *See supra* pages 8-11.

Lastly, Kissick's and Kelly's lack of due care contributed to BancGroup's alleged losses.  Indeed, Kissick's and Kelly's conduct was the driving force behind the fraud and, consequently, BancGroup's alleged damages.  As a consequence, BancGroup's contributory negligence (indeed, BancGroup's fraud) mandates the dismissal of its professional negligence claim against its external auditor as a matter of law.  *See, e.g.*, *Dapremont v. Overcash, Walker & Co., P.C.*, 2000 WL 1566532, at *4 (S.D. Ala. Oct. 4, 2000) (awarding judgment as a matter of law in favor of auditor with respect to professional negligence claim based on contributory negligence).

III.   **BancGroup's Breach-of-Contract and Professional Negligence Claims Against PwC Must Be Dismissed With Prejudice Based on the *In Pari Delicto* Defense.**

A.   **Under Alabama Law, *In Pari Delicto* Is a Complete Defense to a Breach-of-Contract Claim and a Professional Negligence Claim.**

*In pari delicto* is a complete defense in Alabama, both in contract actions and in tort actions.[13]  "The doctrine of *in pari delicto* bars recovery by a plaintiff who is equally as guilty as the defendant in the breach of the law."  *Ex parte W.D.J.*, 785 So. 2d 390, 393 (Ala. 2000); *In re Verilink Corp.*, 2009 WL 4609308, at *23 (Bankr. N.D. Ala. Dec. 3, 2009) ("The doctrine of *in pari delicto* is an equitable principle that provides 'a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing.'").

The defense derives from the Latin *in pari delicto potior est conditio defendentis:*  In a case of equal or mutual fault, the position of the defending party is the better one.  *Verilink Corp.*, 405 B.R. at 362 (quotations omitted) (citing *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985)); *accord Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152 (11th Cir. 2006).  The *in pari delicto* defense serves two key public policy interests—ensuring that courts do not lend their "good offices" to mediating disputes among wrongdoers, and deterring wrongdoing by denying judicial relief to an admitted wrongdoer.[14]  *Verilink Corp.*, 405 B.R. at 362.

---

[13] For the reasons noted above, *see* Argument Section I.A, *supra* pages 22-23, and Argument Section II.A, *supra* pages 30-31, Alabama law governs BancGroup's breach-of-contract and professional negligence claims and thus governs the *in pari delicto* defense.

[14] The *in pari delicto* defense not only can be asserted against a company (such as BancGroup), but can also be asserted against a bankrupt company's trustee.  *See Official Comm. of Unsecured*

**B.      BancGroup's Complaint Alleges That the Company Was At Least Equally at Fault as PwC.**

The Complaint alleges that company personnel engaged in fraud in connection with their work for the Mortgage Warehouse Lending Division.  *See, e.g.*, Compl. ¶¶ 1, 3, 24, 26, 27.  Those allegations compel the application of the *in pari delicto* defense and require dismissal of the Complaint.  *See, e.g.*, *SouthTrust Bank v. Jones, Morrison, Womack & Dearing, P.C.*, 939 So. 2d 885, 905-06 (Ala. Civ. App. 2005); *Verilink Corp.*, 405 B.R. at 362 n.2.

Under Alabama law, only one scenario could counteract the application of the *in pari delicto* defense here:  if Kissick and Kelly were acting "entirely" adversely to BancGroup, their conduct arguably would not be imputed to BancGroup under the so-called "adverse interest" exception.  *Verilink Corp.*, 405 B.R. at 362 n.2.  The adverse interest exception, however, is extremely narrow:

> Under the "adverse interest" exception to the [*in pari delicto*] doctrine, the imputation of wrongdoing by an agent . . . to the debtor-corporation will not occur if the agent was engaged in fraud or self-dealing ***entirely*** adverse to the corporate principal.  However, the exception is ***narrow*** and only applies when the individual wrongdoer or agent has ***wholly*** abandoned ***any*** corporate purpose, even if the agent's purpose is misguided or even fraudulent to the point of ultimately causing the company's failure.

*In re Verilink Corp.*, 2009 WL 4609308, at *23 (Bankr. N.D. Ala. Dec. 3, 2009) (emphasis added) (internal footnote omitted); *see also, e.g.*, *SouthTrust Bank v. Jones, Morrison, Womack & Dearing, P.C.*, 939 So. 2d 885, 905-06 (Ala. Civ. App. 2005) (adverse interest exception applies only if the agent's intentional

---

*Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1151-52 (11th Cir. 2006) (*in pari delicto* defense may be asserted against a bankruptcy trustee).

actions were "*wholly* for the gratification of the agent's personal objectives")
(emphasis added); *Verilink Corp.*, 405 B.R. at 362 n.2.

In the Complaint, BancGroup makes a half-hearted attempt to plead around
the imputation of Kissick's and Kelly's conduct to the company.  Apparently
trying to fend off an *in pari delicto* argument, BancGroup alleges in entirely
conclusory terms that Kissick and her subordinates were acting completely
adversely to BancGroup:

> The Adverse Parties [including Kissick and those acting at her
> direction] were acting in their own interests, adversely to the interests
> of BancGroup and were engaged in committing independent
> fraudulent acts as they looted the assets of BancGroup for their own
> benefit.  The actions of these Adverse Parties were directly and
> completely adverse to the corporate interests of BancGroup.

Compl. ¶ 25.  This allegation is insufficient as a matter of law to shield BancGroup
from dismissal based on the *in pari delicto* doctrine.

As an initial matter, the conclusory allegations contained in paragraph 25 of
the Complaint are a nullity.  Under *Twombly* and *Iqbal*, legal conclusions and
naked assertions are not to be given weight or assumed to be true at the pleading
stage.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).  Thus, these allegations
do not refute the Complaint's allegations showing that Kissick and Kelly were
engaged in the fraud in their capacity as company personnel.

Going further, BancGroup's conclusory allegation that Kissick and Kelly
were looting BancGroup's assets for their own benefit is directly contradicted by
the public record.  BancGroup is well aware of the criminal proceedings involving
Kissick, Kelly, and others.  *See* Compl. ¶ 3.  In those proceedings, Kissick and

Kelly have testified—and the Government itself has accepted—that they did not personally benefit from the fraud at all.  *See* Position of the United States With Respect to Sentencing, *United States v. Kissick*, Criminal Case No. 1:11-cr-00088, Docket No. 15, at 10 (E.D. Va. June 17, 2011) ("Kissick did not profit directly from the scheme . . . .  Kissick did not receive any payments in connection with the bogus transactions."); Position of the United States With Respect to Sentencing, *United States v. Kelly*, Criminal Case No. 1:11-cr-00119, Docket No. 15, at 7 (E.D. Va. filed June 10, 2011) (Kelly "appears not to have personally profited from her criminal conduct").  In fact, with respect to Kelly, the district court expressly found that Kelly "did not receive any significant financial benefit from her involvement in the scheme."  Order, *United States v. Kelly*, Criminal Case No. 1:11-cr-00119, Docket No. 28, at 2 (E.D. Va. filed Sept. 27, 2011).  BancGroup's allegation regarding looting is not just conclusory; it also is wrong, and the Court should disregard it in light of the contrary public record.  *Cf. Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007) (when conclusory allegations conflict with exhibits to the complaint, the exhibits govern).

PwC does not believe that BancGroup ever could allege—consistent with its obligations under Rule 11 of the Federal Rules of Civil Procedure—that Kissick and Kelly "entirely" or "wholly" abandoned the corporate interests of BancGroup.  Just as BancGroup is aware of the criminal proceedings against Kissick and Kelly, BancGroup also is aware of the criminal trial against TBW President Lee Farkas.

*See* Compl. ¶ 3.  Kissick and Kelly testified extensively at that trial,[15] and they testified unambiguously and repeatedly that they did ***not*** abandon the interests of BancGroup:

- Kissick explained her rationale for engaging in the sweeping scheme: "In the very beginning when I talked with my boss [Art Barksdale], we decided that keeping [TBW] alive and letting them get their problem worked out, they could pay us back.  Versus killing them off and they would never get our money back.  And so, that was what we were, that was the philosophy we were operating under.  Was we were going to help keep them going and hopefully get our money back." Tr. 775:5-14.

- Kelly testified that they allowed TBW to overdraft its Colonial account so that TBW could cover its overdrafts at *other* banks, because "if we didn't and Taylor Bean closed its doors, then that would have a detrimental impact on, on us and our department."  Tr. 375:11-13; *see also* Tr. 375:16-18 (Question: "[I]f Taylor Bean went out of business, were you concerned about what that could mean for Colonial Bank?" / Kelly's Answer: "Yes.").

- When the fraud moved from the sweeping scheme to the COLB facility, both Kissick and Kelly testified that this change was intended to allow TBW to solve its financial problem and repay Colonial. Kissick testified that the deficit was supposed to be put into the COLB facility "[f]or a short period," and "[h]opefully they would have, we could have figured out the problem and dealt with it then." Tr. 798:17-799:3.  Kelly testified:  "From that point on, once [the deficit] was moved [to the COLB facility], Taylor Bean was supposed to be a normal customer and manage their finances appropriately and then repay the amount owed to Colonial Bank." Tr. 384:6-8.

---

[15] The transcripts of Farkas's criminal trial are publicly available on PACER.  *See United States v. Farkas*, Criminal Case No. 1:10-cr-00200 (E.D. Va.); *see also supra* footnote 1 & 2.  The transcript of Kissick's testimony, which spans from pages 757 through 1141, can be viewed in docket numbers 214, 241, and 242, while the transcript of Kelly's testimony, which spans from pages 341 through 663, can be viewed in docket numbers 209, 213, and 240.

- When the fraud shifted again from the COLB facility to the AOT facility, Kissick started objecting to TBW's additional requests for advances based on fictitious loans.  But Kissick ultimately agreed to make advances because she was afraid that if TBW "blew up," Colonial would "blow up," too.[16]  Tr. 831:24-832:7.

- During the course of the fraud, Kissick and Kelly started taking money from TBW's master advance account at Colonial to make up the deficit that TBW owed to Colonial.  Those payments ranged from $50,000 a day to $100,000 a day and continued for several years.  Tr. 417:12-419:16.

In light of this testimony from Kissick and Kelly, BancGroup cannot sincerely allege that Kissick and Kelly wholly abandoned BancGroup's interests.

Furthermore, any argument that Kissick and Kelly were acting wholly adversely to BancGroup's interests ignores BancGroup's own Complaint allegations that TBW was a major source of BancGroup's revenue.  BancGroup alleges that the Mortgage Warehouse Lending Division accounted for approximately 20% of BancGroup's reported net income between 2005 and 2009 (Compl. ¶ 17), and, at times, 80% or more of the company's mortgage warehouse lending assets was attributable to TBW (*id.* ¶ 21).  TBW thus was an important customer whose business contributed very substantially to BancGroup's revenue (with even the fraudulent loans contributing interest income and fees for

---

[16]  Q:   What would [Farkas] respond if you told him you weren't going to provide Taylor Bean money?
A:   A couple times, he would get upset and tell me it would be a real, pardon my French, [expletive] show, and Colonial Bank would be the one that would be hurt, because if he blew up, we would blow up.
Q:   Sorry, if he blew up, who would blow up?
A:   Colonial would blow up.
Q:   Were you concerned about that?
A:   Very definitely.
Tr. 831:24-832:7.

BancGroup).  This is a far cry from the classic "adverse interest" fact scenario, where an employee embezzles the company's money for personal gain without generating any benefit whatsoever for the company.

After the conclusory and unfounded allegations of adverse interest are stripped away from the Complaint (as *Twombly* and *Iqbal* require), the face of the Complaint plainly establishes PwC's *in pari delicto* defense.  The fraud was carried out by Kissick and Kelly in their roles as BancGroup's agents, and the Complaint alleges no facts to support the "adverse interest" exception.  Consequently, their conduct must be imputed to BancGroup, and BancGroup stands *in pari delicto*—at least equally at fault—with PwC.  As a consequence, BancGroup's breach-of-contract and professional negligence claims against PwC must be dismissed.  *See, e.g.*, *Verilink Corp.*, 405 B.R. at 362 n.2 & 363-64 (dismissing trustee's claims against investment bank because knowledge and wrongdoing of company management was "fully imputable" to the company and its trustee, citing, *inter alia*, Alabama statutes and case precedent regarding agency; complaint's allegations fell "far short of the sort of looting and self-dealing required" for the adverse interest exception to apply).

## Conclusion

For the foregoing reasons, Defendant PricewaterhouseCoopers LLP respectfully requests that this Court dismiss BancGroup's breach-of-contract and professional negligence claims against PwC with prejudice.

45

Respectfully submitted, this 28th day of October, 2011.

*/s/ Elizabeth V. Tanis*
Elizabeth V. Tanis (Ga. Bar No. 697415)
   *admitted pro hac vice*
Drew D. Dropkin (Ga. Bar No. 231031)
   *admitted pro hac vice*
KING & SPALDING LLP
1180 Peachtree St., NE
Atlanta, GA  30309
(404) 572-4600 (p)
(404) 572-5140 (f)

Tabor R. Novak, Jr. (NOV001)
BALL, BALL, MATTHEWS & NOVAK, P.A.
2000 Interstate Park Drive, Suite 204
Post Office Box 2148
Montgomery, Alabama 36102-2148
(334) 387-7680 (p)
(334) 387-3222 (f)

*Counsel for Defendant*
 *PricewaterhouseCoopers LLP*

46

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of October, 2011, I electronically filed

the foregoing with the CM/ECF system, which will provide electronic notification

to the following counsel of record:

Andrew P. Campbell, attorney for Plaintiffs
C. Edward Dobbs, attorney for Plaintiffs
Rufus T. Dorsey, IV, attorney for Plaintiffs
Nicholas J. DiCarlo, attorney for Plaintiffs
Christopher A. Caserta, attorney for Plaintiffs
James Anderson, attorney for Defendant Crowe Horwath LLP
Stanley Parzen, attorney for Defendant Crowe Horwath LLP
Jonathan C. Medow, attorney for Defendant Crowe Horwath LLP

*/s/ Elizabeth V. Tanis*
Elizabeth V. Tanis (Ga. Bar No. 697415)
   *admitted pro hac vice*
KING & SPALDING LLP
1180 Peachtree St., NE
Atlanta, GA  30309
(404) 572-4600 (p)
(404) 572-5140 (f)

*Counsel for Defendant*
*PricewaterhouseCoopers LLP*

47