# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

|  |  |
|---|---|
| THE COLONIAL BANCGROUP, INC., as post-confirmation debtor, and KEVIN O'HALLORAN, as plan trustee acting for and on behalf of the debtor,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>PRICEWATERHOUSECOOPERS LLP, a United States limited liability partnership; CROWE HORWATH LLP, a United States limited liability partnership,<br><br>　　　　　Defendants. | Case No. 2:11-cv-00746-MHT |

## AMENDED COMPLAINT

Plaintiffs The Colonial BancGroup, Inc. ("BancGroup"), as the debtor under its confirmed *Second Amended Chapter 11 Plan of Liquidation of The Colonial BancGroup, Inc.* (as amended, the "Plan"), and Kevin O'Halloran, as the plan trustee acting for and on behalf of BancGroup under the Plan, hereby assert the following claims against Defendants, both of whom transact business in this judicial circuit:

## I.　OVERVIEW

1.　　　Between 2002 and 2009, BancGroup and its wholly-owned banking subsidiary Colonial Bank were victimized by one of the largest and longest-lasting frauds in the history of the U.S. banking industry. This fraud was centered in BancGroup's mortgage warehouse lending division ("MWLD") in Orlando, Florida, and ultimately detected as a result of the raid by federal

2162886_4

enforcement authorities of the offices of the MLWD and its largest client, Taylor Bean & Whitaker Mortgage Corporation ("Taylor Bean") on August 3, 2009.  This raid and the resulting discovery were rapidly followed by the closure and sale by regulators of Colonial Bank on August 14, 2009, and the Chapter 11 bankruptcy filing of BancGroup in Montgomery, Alabama on August 25, 2009.

2.     The fraud involved, among other things, the sale by Taylor Bean to Colonial Bank of 99% participation interests in allegedly qualifying pools of mortgages which were required to be subject to existing, enforceable, takeout commitments from the takeout buyers.  This purchase facility was only available to Taylor Bean and referred to as the "AOT" facility, meaning "assignments of trade."  The magnitude of these purchases was significant.  BancGroup's year-end consolidated financial statements for 2007 and 2008 stated the balance of this AOT facility, referred to as "Securities Purchased Under Agreements to Resell," to be in excess of $1.5 billion each year.

3.     In reality, there were no qualifying pools of mortgages, only manufactured data based on pre-existing mortgages that had long ago been sold in the marketplace to investors.  There were no collateral packages delivered to Colonial Bank as custodian that matched or supported this fraudulent data on the fictitious mortgage pools.  There were no takeout commitments from takeout buyers.  There were no real takeout buyers.  The AOT facility was an empty vessel, and what had been purchased was a sham.  The facts, details, and extent of this bank, wire and securities fraud would lead to the criminal conviction of Lee Farkas, the president of Taylor Bean, in April of 2011, and the guilty pleas of other employees of Taylor Bean and certain individuals within the MWLD.  The extent of the Taylor Bean fraud exceeds $1.8 billion.

4.     Throughout the extended period of this fraud, BancGroup employed the services of PricewaterhouseCoopers LLP ("PwC") to serve as its outside independent auditor.  BancGroup also engaged Crowe Horwath, LLP (together with its predecessor in interest, Crowe Chizek and

Company LLC, "Crowe") to provide BancGroup's internal audit function. As BancGroup's independent outside auditor and internal auditor, respectively, PwC and Crowe reported to BancGroup's Audit Committee. At the conclusion of each audit, PwC represented in its audit reports that it had performed its "integrated" audits of BancGroup in accordance with professional auditing standards, that BancGroup's financial statements were fairly stated under generally accepted accounting principles ("GAAP"), and that effective internal controls existed over BancGroup's financial reporting. Crowe, on the other hand, separately represented that it would monitor BancGroup's controls over warehouse lending activity and that it was conducting internal audits of the MWLD sufficient to "safeguard the assets" of BancGroup. PwC's and Crowe's audits of the MWLD were as empty as the AOT facility. PwC and Crowe conducted no meaningful audit of the AOT facility or the financing lines that Taylor Bean had with the MWLD, despite the fact that Taylor Bean was the only customer approved under the AOT facility and over 80% of the overall assets attributable to the MWLD were related to Taylor Bean transactions. No effort was made by PwC and Crowe to understand or audit the AOT facility at all, despite its materiality to BancGroup's consolidated financial statement.

5.      Both PwC's independent audits and Crowe's internal audits of BancGroup's financial statements demonstrate a remarkable lack of due care and a failure by Defendants to gain an understanding of BancGroup's business and the risks associated with it. PwC's and Crowe's complete failure to audit the MWLD's AOT facility or to perform a meaningful audit of the Taylor Bean relationship with the MLWD constitutes gross negligence, and PwC's and Crowe's representations and reports to BancGroup's Audit Committee were reckless and grossly inaccurate with regard to BancGroup's true financial condition and Defendants' compliance with professional standards.

6.      Had PwC and Crowe properly discharged their professional duties, the ongoing fraud and the hole in BancGroup's balance sheet in excess of $1.8 billion would have been detected by no later than fiscal year-end 2007, and BancGroup's Board of Directors could have taken corrective measures, including (but not limited to) drastically altering the business or even placing BancGroup into bankruptcy at that point, thereby avoiding the deepening of BancGroup's insolvency and the concomitant consumption of BancGroup's existing assets.  Unaware of such fraud, BancGroup continued to downstream to Colonial Bank more than $500,000,000 from the second quarter of 2008 through the second quarter of 2009 and incurred substantial additional debt in connection therewith.

7.      By the time the fraud was exposed in 2009, more than $1.8 billion had been siphoned out of Colonial Bank and BancGroup was left with hundreds of millions of dollars in worthless or non-existent assets on its balance sheet.  By that point, however, BancGroup's collapse was assured. Unable at that point to take any corrective steps or to obtain any federal assistance, and left with no ability to raise funds by other means, BancGroup had no choice but to file for bankruptcy protection. BancGroup's capital investment in Colonial Bank in excess of $1.2 billion dollars was rendered worthless.  BancGroup's damages, which continue to be assessed and determined, easily exceed $500,000,000.

## II.      PARTIES, JURISDICTION AND VENUE.

8.      On August 25, 2009 (the "Petition Date"), BancGroup filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Alabama (the "Bankruptcy Court").  On June 2, 2011, the Bankruptcy Court entered an order confirming the Plan.  The Plan became effective on June 3, 2011 (the "Effective Date").  Pursuant to the Plan, all assets and property remain vested in BancGroup's bankruptcy estate and BancGroup continues in existence, with its affairs, disposition of

its assets and the pursuit of claims now being overseen by Kevin O'Halloran, the duly appointed plan trustee under the Plan (the "Plan Trustee").

9.     Section 10.6 of the Plan provides, among other things, that BancGroup retains all causes of action accruing to it and its bankruptcy estate, including all "Estate Causes of Action." The Plan defines Estate Causes of Action to include all claims against any professional person (including attorneys, accountants, consultants and other professional persons identified in BancGroup's disclosure statement accompanying the Plan) that were retained by BancGroup prior to the Petition Date.  The claims asserted in this Complaint constitute Estate Causes of Action which BancGroup and the Plan Trustee have standing to pursue.

10.    Defendant PwC is a limited liability partnership with partners located throughout the United States, including Alabama.  PwC is currently one of the four largest accounting firms in the United States and the world.  PwC audited the consolidated financial statements of BancGroup and its banking subsidiary as of and for the years ended December 31, 2002 through 2008 in connection with the filing of such financial statements with the U.S. Securities and Exchange Commission (the "SEC") on Form 10-K.   During this same period, BancGroup also engaged PwC to audit BancGroup's internal controls over financial reporting.  Beginning in fiscal year end 2004, PwC's financial statement audits were integrated with audits over BancGroup's internal control structure.

11.    Defendant Crowe is now a limited liability partnership with partners located throughout the United States, including Alabama (prior to the firm changing its name in 2008, Crowe was a limited liability company).  Crowe is currently one of the ten largest accounting and consulting firms in the United States.  Between 2002 and 2009, Crowe played a critical role in serving as BancGroup's internal auditor.  Crowe was charged with the responsibility of designing, implementing and monitoring risk management practices at BancGroup, including controls over

BancGroup's MWLD for the purpose (among others) of safeguarding BancGroup's assets. Crowe's engagement as internal auditor was greatly influenced by PwC. In fact, BancGroup's engagement of Crowe was arranged through PwC auditor, Michael Thomas, who then switched over to become Crowe's engagement partner on the internal audits of BancGroup.

12.     Jurisdiction in this Court is proper because the amount in controversy exceeds $10,000.

13.     The statutes of limitation for the claims asserted herein were tolled pursuant to the provisions of 11 U.S.C. § 108, for a period of no less than two years from the date of the order for relief in bankruptcy.

## III.     GENERAL BACKGROUND.

### A.     Overview Of BancGroup's Banking Operations.

14.     As a publicly-traded bank and financial holding company, BancGroup's principal activity was to oversee the business of its operating subsidiaries, including Colonial Bank.

15.     BancGroup's subsidiary, Colonial Bank, was organized in six reporting segments. The MWLD, Colonial Bank's mortgage warehouse lending division, was located in Orlando, Florida. In addition, there were five regional bank segments, which correlated to each of the five geographic locations in which the bank conducted business – Florida, Alabama, Georgia, Nevada and Texas. Colonial Bank operated full service branches in each of these five states where it provided loan, wealth management and mortgage banking services.

16.     As set forth in BancGroup's public filings, the bulk of Colonial Bank's business and assets were located in Florida. Of the 347 retail banking branches operated by Colonial Bank as of December 31, 2008, 197 of those branches were located in Florida, 90 were located in Alabama, 19 were located in Georgia, 21 were located in Texas, and 20 were located in Nevada.

**B.**     **The Business Relationship Between The MWLD And Taylor Bean & Whitaker Mortgage Corporation.**

17.     As one of the largest mortgage warehousing banks in the country, Colonial Bank's MWLD provided secured, short-term financing to residential mortgage originators to help them meet their working capital needs and to fund the origination of loans until such time as the loans could be sold to a final investor in the secondary market.  The MWLD was a major source of BancGroup's revenue and accounted for approximately 20% of BancGroup's reported net income between 2005 and 2009.

18.     The MWLD had a longstanding business relationship with Taylor Bean, a Florida based mortgage broker, which dated back to at least 2002.  Taylor Bean was controlled by an individual named Lee Farkas, who served as Taylor Bean's Chairman.  By 2008, Taylor Bean had become one of the nation's largest non-depository mortgage lenders, having allegedly originated over $30 billion in residential home mortgage loans.

19.     Like many other mortgage brokers, Taylor Bean did not have sufficient capital to fund the residential mortgage loans that it originated even though it supposedly had contractually pre-arranged the sale of those loans to agencies such as the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), the Government National Mortgage Association ("Ginnie Mae") and private third-party investors.  Taylor Bean, therefore, relied heavily upon its interim funding arrangement with the MWLD to facilitate the origination of loans until such time as the contractually pre-arranged sales of those loans to third parties in the secondary market had been finally consummated.

20.     As discussed more fully herein, as a result of the transactions and the accounting rules that applied to them, the loans which were purportedly being originated by Taylor Bean and financed or the subject of participation purchases by BancGroup were required to be recorded as assets in the

financial statements of BancGroup until such time as the loans were purchased from BancGroup by third parties who had supposedly already entered into binding commitments to purchase them.

21.     Upon information and belief, by 2007, the total amount of financing and purchases outstanding to Taylor Bean under these contractual interim-funding arrangements was approximately $3.5 billion.  This amount represented over 80% of the $4.3 billion in total MWLD assets that BancGroup reported in its PwC-audited year-end financial statements.  Unfortunately, nearly half of the loans allegedly securing the Taylor Bean obligations and identified on BancGroup's financial statements were fictitious or already pledged to third parties and, therefore, utterly worthless.

C.     **Under PwC And Crowe's Watch, A Fraud Is Perpetrated Against BancGroup And Colonial Bank Resulting In The Funding And Recording Of More Than $1.8 Billion In Worthless Or Non-Existent Loans Over A Period Of Seven Years.**

1.     **Taylor Bean's Initial Overdrafts And Sweeping.**

22.     Beginning in 1998, Taylor Bean established a lending and banking relationship with the MWLD.  This relationship ultimately included the establishment of Taylor Bean operating and escrow accounts with Colonial Bank.

23.     Unknown to BancGroup, Taylor Bean began experiencing financial difficulties in 2002, resulting in overdrafts in Taylor Bean's operating account caused by its lack of funds to make payroll, cover operating expenses and pay obligations to third-party banks known as "pair offs" relating to loan originations.  These overdrafts were initially in the tens of millions of dollars each day, but rapidly grew in magnitude during 2002 and 2003.

24.     With the assistance of Cathie Kissick ("Kissick"), the director of the MWLD, and certain individuals working for Colonial Bank at Kissick's instruction, the overdrafts by Farkas and Taylor Bean were concealed from BancGroup, its Board of Directors and its Audit Committee.

(Kissick (and those acting at her direction) and Farkas are hereinafter referred to as the "Adverse Parties").

25.     The Adverse Parties were acting in their own interests, adversely to the interests of BancGroup and were engaged in committing independent fraudulent acts as they looted the assets of BancGroup for their own benefit.  The actions of these Adverse Parties were directly and completely adverse to the corporate interests of BancGroup.  The Adverse Parties did not include any director, officer or employee of BancGroup and had no authority to act on behalf of BancGroup.  No director, officer, or employee of BancGroup, including, without limitation, any member of BancGroup's Audit Committee, participated in the fraudulent scheme conducted by the Adverse Parties and the directors, officers and employees of BancGroup only became aware of such scheme, and the damages resulting therefrom, as a result of the actions taken in August 2009 by government agents to seize the records of Taylor Bean and the MWLD.  To the extent any information requested by either PwC or Crowe relating to the MWLD or otherwise was inaccurate in part or whole, such information was provided by the Adverse Parties, not by a director, officer, or employee of BancGroup, and did not constitute an act of BancGroup.

26.     The Adverse Parties attempted to conceal the overdrafts by moving the overdrafts around to other accounts, "sweeping" Taylor Bean's account and engaging in a pattern of "kiting" whereby debits and credits to Taylor Bean's account were timed in a manner designed to conceal the overdrafts.

## 2.     Taylor Bean's Overdraft Is Moved To COLB Facility.

27.     By the end of 2003, Taylor Bean's overdraft at Colonial Bank reached a daily balance of approximately $150 million.  The overdrafts in Taylor Bean's account had grown so large that the Adverse Parties grew concerned that they would no longer be able to conceal the fraud.  The Adverse Parties then determined to eliminate the overdraft in its entirety by making an advance

under what was referred to as the "COLB" facility based on fictitious mortgages referred to as "Plan B" loans.

28.     The COLB account was a facility where individual loans were carried and reflected as "Loans Held For Sale" on BancGroup's balance sheet until such time as the sale of the loan to the end investor had been consummated.  To obtain the advance on the COLB account, Taylor Bean would transfer fictitious Plan B mortgage pool data as "collateral" for these advances.  Upon information and belief, from late November to December of 2003, Colonial Bank made advances under the COLB facility to Taylor Bean in the approximate amount of $150 million.  In connection with these advances, Taylor Bean provided fictitious Plan B mortgage loan data which was placed on the books of BancGroup to justify the fraudulent advances.  The "loans" were carried on BancGroup's books even though, in reality, they did not exist and, therefore, could never be "sold" to any end investor.

29.     As Taylor Bean's cash flow further deteriorated, Taylor Bean's operating shortfall was covered by fraudulent advances under the COLB facility, resulting in an ever-growing balance in Taylor Bean's COLB account.  In an attempt to justify this balance on the books of BancGroup, Taylor Bean continued to provide fraudulent mortgage loan data relating to an expanding and evolving list of Plan B loans and other seriously deficient, sub-standard loans originated by Taylor Bean, which did not qualify for sale to the secondary mortgage market and were euphemistically referred to by the Adverse Parties as the "Crap" loans.

30.     With the passage of time, the Adverse Parties would also "refresh" the fraudulent data relating to the Plan B loans and Crap loans to avoid the appearance that the loans were aging past expected sale dates.

31.      Among other things, the internal audits of the MWLD should have tested the assertion of the existence of these mortgage loans and resulted in the detection of the fraud embedded in the COLB account.

### 3.      Taylor Bean's Fraudulent COLB Balance Is Moved To AOT Facility.

32.      By late 2004, the size of Taylor Bean's fraudulent COLB balance and the number of "Plan B" and "Crap" loans on BancGroup's books began to grow exponentially.  To further conceal the growing fraud, the Adverse Parties moved the fraudulent balance to a new facility known as the "Assignment of Trade" or "AOT" facility for which only Taylor Bean was an approved customer.

33.      Under the AOT facility, Colonial Bank would purchase 99% participation interests in allegedly qualifying pools of mortgages which were required to be subject to existing, enforceable takeout commitments to third party agency investors.  As a condition of such purchases, Taylor Bean was required to deliver to the custodial department of Colonial Bank the underlying collateral packages evidencing the mortgage loans in the pool and deliver to Colonial Bank, as the purchaser of the participation interest, (i) the participation certificates (which were to include the schedule of documents to be found in the custody department), (ii) an executed "Takeout Commitment" from the investor who had committed to purchase the pool of mortgages, and (iii) the fully executed "Assignment of the Takeout Commitment."

34.      Purchases under the AOT facility were reported as a separate asset category referred to on BancGroup's consolidated financial statement as "Securities Purchased Under Agreements to Resell."

35.      Upon information and belief, by the end of 2007, the fraudulent balance on BancGroup's books for the AOT account exceeded $1.5 billion – all of which stemmed from funds advanced to Taylor Bean.  By 2009, $1.6 billion of so-called Taylor Bean Plan B and Crap "loans" remained on BancGroup's books.

36.     Even after the fraudulent Taylor Bean balances were moved to the AOT facility and account, Taylor Bean also began to obtain additional advances under the COLB facility based on double pledged, fictitious and/or non-qualifying mortgage loans.

37.     As a result of PwC's and Crowe's gross negligence in failing to detect the ongoing fraud, the members of BancGroup's Board of Directors and Audit Committee were left with the false impression that the MWLD was a sound, profitable business, and that the billions of dollars of "Securities Purchased Under Agreements to Resell" (i.e. "AOT") and "Loans Held for Sale" (i.e. "COLB") reported on BancGroup's balance sheet actually existed and had the value reported in BancGroup's financial statements.  The Board of Directors and Audit Committee also believed that binding commitments with third party investors really existed, thereby assuring that BancGroup would suffer little if any loss relating to those assets.  In fact, as PwC and Crowe knew or should have known throughout the course of their audits, funds were being siphoned out of BancGroup through the COLB account and later through the AOT account without BancGroup receiving any value whatsoever.

**D.     PwC And Crowe's Wrongful Conduct Perpetuates The Fraud And Conceals Massive Losses In The MWLD.**

38.     The fraud perpetrated on BancGroup could only be accomplished because the audit failures by PwC and Crowe became so predictable and significant that PwC and Crowe effectively provided a roadmap for the Adverse Parties to commit and perpetrate the fraud.  In fact, the fraud would have been detected had PwC and Crowe discharged their professional responsibilities.

39.     PwC and Crowe never obtained a basic understanding of the MWLD and the transactions which gave rise to the assets reflected in the AOT and COLB accounts.  In violation of their professional duties, including, but not limited to, their duties to exercise due care, professional skepticism, and independence, PwC and Crowe failed to design and apply basic audit procedures to

obtain the audit evidence required to address the risks specifically identified in its respective workpapers.

40.     In any given audit year, both PwC and Crowe understood that most of the billions of dollars worth of MWLD assets reported in BancGroup's financial statements related to funds advanced to Taylor Bean which were purportedly secured by loans originated by Taylor Bean and/or the subject of a participation purchase for which there was a takeout commitment.  Yet PwC's and Crowe's audits are devoid of any meaningful testing, especially as such testing relates to the AOT account which ultimately became the repository for hundreds of millions of dollars of fraudulent Taylor Bean "loans."

41.     The failure of Crowe and PwC to gain an understanding of the MWLD transactions, including the AOT facility with Taylor Bean, started at the top.  PwC's audit engagement leader, Gary Westbrook, never bothered to review the contractual agreements relating to the AOT line of credit to gain an understanding of the AOT facility and no copies of those agreements exist in PwC's workpapers.  Similarly, Crowe's engagement partner, Michael Thomas, who was in charge of Crowe's internal audit of the MWLD, never even heard of the AOT facility until a few weeks prior to providing sworn testimony.

42.     Nowhere is this lack of understanding more apparent than in each firm's audit "testing" or lack thereof.  By way of example (and as set forth more fully herein), Crowe recklessly turned a blind eye to the potential for fraud by selectively avoiding the collateral testing of any Taylor Bean "loans" or performing any procedures whatsoever to test the internal controls relating to the AOT facility with Taylor Bean despite the high concentration of Taylor Bean loans in the COLB and AOT accounts.

43.     PwC similarly avoided performing any meaningful testing of the AOT account until 2008 when PwC's senior manager and "Fraud Policy Coordinator" suddenly became much more interested in PwC's audit work as it related to AOT.  As discussed more fully herein, PwC's expanded audit turned up information which clearly suggested the potential for fraud surrounding Taylor Bean and the AOT account.  Instead of inquiring any further or performing any additional testing, PwC disregarded the red flags and adopted a position that PwC need not be concerned with these danger signals.

44.     These audit failures are especially reckless because PwC and Crowe were fully cognizant of the explosive growth in the MWLD.  PwC and Crowe were both aware of the high operational risk and the "potential for customer fraud" that existed in the MWLD.  This risk was significantly magnified by the extremely high concentration of Taylor Bean loans (totaling in the billions of dollars) purportedly backing the AOT and COLB assets on BancGroup's financial statements.  PwC and Crowe also knew that AOT, which related solely to participation interests purchased from Taylor Bean, had grown from $605 million as of year-end 2006 to over $1.5 billion by year-end 2007, in stark contrast to PwC's expectation that there would be a slowdown in the MWLD area during 2007.

45.     BancGroup applied to the United States Department of Treasury to receive funds under the Troubled Asset Relief Program ("TARP").  Unlike PwC and Crowe, who had collectively been paid many millions of dollars by BancGroup over the course of the previous seven years, federal investigators with the Office of the Special Inspector General for the Troubled Asset Relief Program (SIGTARP) discovered the problems at Taylor Bean.

46.     In early August 2009, the fraud was exposed.  Any hope that BancGroup had of obtaining assistance under TARP evaporated.  On August 14, 2009, regulators closed Colonial Bank and seized its assets.  BancGroup's bankruptcy petition followed eleven days later.

47.     Had PwC and Crowe properly discharged their professional duties, the fraud would have been disclosed to BancGroup and the public by no later than late 2007 or early 2008 (at the conclusion of each firm's 2007 audit) at which time the Taylor Bean AOT account balance had ballooned to nearly $1.6 billion.  Had this gaping hole in BancGroup's balance sheet been exposed at that time, BancGroup, and its Board of Directors (and likely banking regulators) could have and would have taken measures to protect BancGroup, including, but not limited to, drastically altering the business in light of BancGroup's true financial condition and/or placing BancGroup into bankruptcy at that point in time.

48.     Unaware of such fraud and the true state of the financial condition of BancGroup and Colonial Bank, BancGroup downstreamed more than $500,000,000 from the second quarter of 2008 through the second quarter of 2009 to Colonial Bank which was insolvent at the time of each transfer as a result, in substantial part, of the ongoing fraud in the MWLD and PwC's and Crowe's failure to detect the fraud.  During this same time period, BancGroup also expended substantial funds and incurred substantial additional debt which, had it known of the fraud and the true state of its financial condition, it would not, and could not, have expended or incurred.  BancGroup's downstreaming of funds to Colonial Bank, incurrence of additional debt and additional expenditures of funds had the direct and immediate impact at the time of each such event of deepening the insolvency of BancGroup and damaging BancGroup's financial position.  BancGroup was also damaged in an amount equal to the millions of dollars paid to both Crowe and PwC for audit services provided over

the years of their engagement letters when each Defendant failed to discharge their professional duties and properly perform the service for which they were engaged.

49.     By the time the fraud was exposed in 2009, BancGroup was left with hundreds of millions of dollars in worthless or non-existent assets on its balance sheet and substantially more indebtedness.  Unable to take any corrective steps, or obtain any federal assistance, and left with no ability to raise funds by other means, BancGroup had no choice but to file for bankruptcy protection. BancGroup's damages, which continue to be assessed and determined, exceed $500,000,000.

## IV.     IN BREACH OF THE PROFESSIONAL DUTIES OWED TO BANCGROUP, PWC'S AUDITS VIOLATED GAAS AND SERVED TO CONCEAL THE SEVEN-YEAR FRAUD FROM BANCGROUP.

50.     Between 2002 and 2009, BancGroup engaged PwC to perform "integrated" audits meaning PwC was engaged to audit BancGroup's financial statements and also to audit BancGroup's internal controls over financial reporting, which included financial reporting over the MWLD.

### A.     PwC's Duties As Proscribed By The Public Company Accounting Oversight Board And GAAS As Reflected In Defendants' Own Engagement Letters.

51.     PwC owed BancGroup – a public company – a duty to perform each of its integrated audits of BancGroup in accordance with various auditing standards adopted by the Public Company Accounting Oversight Board (the "PCAOB") as well as the AICPA Code of Professional Conduct.

52.     PCAOB standards required PwC to conduct its integrated audits of BancGroup in accordance with generally accepted auditing standards ("GAAS") as promulgated by the American Institute of Certified Public Accountants to the extent those standards were not in conflict with any new auditing standard ("AS") promulgated by the PCAOB.[1]

---

[1] Given the relationship between PCAOB and GAAS standards, this Complaint will use GAAS and PCAOB interchangeably when referring to the standards which governed PwC's audits of BancGroup.

53.     There are 10 GAAS standards promulgated by the American Institute of Certified Public Accountants ("AICPA") as described in AU § 150: three General Standards, three Standards of Field Work, and four Standards of Reporting.  Those standards are as follows:

*General Standards*

1.      The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

2.      In all matters reliant related to the assignment, an independence of mental attitude is to be maintained by the auditor or auditors.

3.      Due professional care is to be exercised in the performance of the audit and the preparation of the report.

*Standards of Field Work*

1.      That the work is to be adequately planned and assistants, if any, are to be properly supervised.

2.      That sufficient understanding of internal control is to be obtained to plan the audit to determine the nature, timing, and extent of tests to be performed.

3.      That sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmation to afford a reasonable basis for an opinion regarding the financial statements under audit.

*Standards of Reporting*

1.      The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

2.      The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3.      Informative disclosure in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

4.      The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed.  When an overall opinion cannot be expressed, the reasons therefore should be stated.  In all cases where an

auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

54.     PCAOB (and GAAS) standards also require PwC to comply with all of the Statements on Auditing Standards ("SAS"), issued by the Auditing Standards Board of the AICPA as well as the Principles of Ethical Conduct and various other standards promulgated by the AICPA.

55.     PwC's duties under PCAOB (and GAAS) standards included, without limitation, the following: (1) the duty to remain independent (AU § 220); (2) the duty to exercise due professional care including, but not limited to, the duty to exercise professional skepticism in the conduct of its audits (AU § 230); (3) the duty to obtain sufficient competent evidential matter (including independent corroboration of management representations) to support the assertions made in the financial statements and control risk assessments and the concomitant duty to document that evidence and as well as any all significant audit issues in PwC's workpapers (See AU §§ 326, 342 and AS Nos. 3 and 5); (4) the duty to evaluate the risk of fraud and the potential that BancGroup's financial statements might be material misstated as a result of such fraud as well as the duty to plan and perform its audits with the purpose of detecting fraud (AU § 316); (5) the duty to communicate material weaknesses and/or significant deficiencies in BancGroup's internal control structure (AU § 325); (6) the duty to report departures from generally accepted accounting principles ("GAAP") (AU § 380); (7) the duty to report adjustments arising from the audit as well as any uncorrected misstatements (AU § 380); and (8) the duty to issue a report that accurately reflects the findings made during its audits (AU § 508).

56.     In performing its audits of BancGroup, PwC was also specifically required to evaluate the potential for fraud, and it was PwC's "responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement,

whether caused by error or fraud." (AU § 316).  In this regard, GAAS required PWC to, among other things, conduct its integrated audits at all times with the mindset that fraud was possible.

57.     Under AS No. 5, which was effective at the time PwC conducted its 2007 audit, PwC was also required to identify significant accounts and disclosures and their relevant assertions, and, in so doing, "evaluate the qualitative and quantitative risk factors related to the financial statement line items and disclosures."  Risk factors relevant to the identification of significant accounts and disclosures and their relevant assertions include:

- Size and composition of the account;

- Susceptibility to misstatement due to errors or fraud;

- Volume of activity, complexity, and homogeneity of the individual transactions processed through the account or reflected in the disclosure;

- Nature of the account or disclosure; and

- Accounting and reporting complexities associated with the account or disclosure

In conducting an audit in accordance with PCAOB standards, PwC also knew or should have known that it was required to consult audit guides published by the AICPA which were specifically applicable to audits of banks, including, but not limited to, the "Audit and Accounting Guide: Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies."

58.     The professional duties that PwC owed BancGroup are also reflected in each of the engagement letters provided to BancGroup.  PwC understood that BancGroup, including its Boards of Directors and Audit Committee, were entitled to rely upon the representations and covenants made by PwC in each of its engagement letters and did, in fact, intend such reliance.

59.     BancGroup and its Board of Directors did, in fact, reasonably and justifiably rely on the representations made by PwC in each of its engagement letters, including, but not limited to, the representations and covenants that PwC would perform its audits of BancGroup's in accordance with PCAOB standards for the purpose of determining whether BancGroup's financial statements conformed with GAAP, would test BancGroup's accounting records, and would communicate any deficiencies in internal control or any evidence of fraud which came to its attention.

60.     PwC failed to conduct its integrated audits in accordance with PCAOB standards in violation of the duty of due professional care owed to BancGroup and in breach of its engagement agreement with BancGroup.

61.     PwC's audit failures include, but are not limited to, the following: (1) the failure to exercise due care in the performance of its audits; (2) the failure to properly plan and supervise its audits, including the failure to gain an understanding of BancGroup and its MWLD; (3) the failure to exercise professional skepticism; (4) the failure to increase the scope of its audits in light of the facts and circumstances known to PwC to ensure that PwC's audits were supported by competent evidential matter; (5) the failure to adequately address the risk of material misstatement due to fraud and to properly investigate evidence which should have alerted PwC to the possibility that BancGroup's financial statements were, in fact, materially misstated as a result of such fraud; (7) the failure to disclose material weaknesses or significant deficiencies in BancGroup's control structure to BancGroup's Board of Directors and audit committee so that corrective actions could be taken; and (8) the issuance of "clean" or unqualified audit reports when PwC knew or should have known that its audits did not comply with GAAS and that a qualified opinion was required.

B.    **PwC's Reckless Audits And Numerous Audit Failures Lead To The Material Misstatement of BancGroup's Financial Statements And PwC's Failure To Detect Fraud In The Financial Reporting In BancGroup's MWLD**

62.    As previously discussed, the MWLD was in the business of extending credit to and purchasing participation interests from mortgage originators, including Taylor Bean, for the interim financing of residential mortgage loans until such time as the contractually pre-arranged sales of the underlying loans and/or "securities" to third parties had been completed.

63.    Between 2003 and 2009, BancGroup's balance sheet included three main types of MWLD assets: "Mortgage Warehouse Loans," "Loans Held For Sale," (hereinafter also referred to as "COLB" loans) and "Securities Purchased Under Agreements to Resell" (hereinafter also referred to as "AOT.").

64.    The "Mortgage Warehouse Loan" assets related to BancGroup's warehouse lines of credit which were periodically used by mortgage companies such as Taylor Bean to finance operating expenses and residential home loans secured by first mortgages.

65.    The "Loans Held For Sale" assets reflected in the COLB account represented a secondary source of financing for loan originators who may have, for example, exceeded the limits under a pre-existing warehouse line of credit.  BancGroup would provide interim funding under the COLB facility to mortgage originators such as Taylor Bean with the understanding and on the condition that binding and enforceable commitments with third-party end investors existed to purchase those loans.  Under applicable accounting pronouncements, including, but not limited to, FAS 140, this financing effectively resulted in a "sale" of the loan from Taylor Bean to BancGroup which required the loans funded under the COLB facility to be carried on BancGroup's balance sheet (as "Loans Held For Sale") until the sale to the end investor could be completed.

66.    Similar to the "Loans Held for Sale" (COLB), the "Assignment of Trade" or AOT facility also represented a secondary source of financing for the origination of loans.  However,

unlike COLB, this type of facility was only available to Taylor Bean.  As PwC knew or should have known, under the AOT facility, Colonial Bank would purchase 99% participation interests in allegedly qualifying pools of mortgages which were required to be subject to existing, enforceable takeout commitments to third party buyers.  As a condition of such purchases, Taylor Bean was required to deliver to the custodial department of Colonial Bank the underlying collateral packages evidencing the mortgage loans in the pool and deliver to Colonial Bank, as the purchaser of the participation interest, (i) the participation certificates (which were to include the schedule of documents to be found in the custody department), (ii) an executed "Takeout Commitment" from the takeout buyer who had committed to purchase the pool of mortgages, and (iii) the fully executed "Takeout Commitment Assignment."

68.    Similar to the COLB loans, under applicable accounting pronouncements, including, but not limited to, FAS 140, this collateralized financing effectively resulted in a "sale" which required the "Securities Purchased (from Taylor Bean) under Agreements to Resell" to be carried on BancGroup's balance sheet until such time as the ultimate sale of the "securities" to the takeout buyer could be consummated.

68.    During the time that PwC conducted its audits, the MWLD's COLB and AOT lines experienced significant growth, as follows:

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| Mortgage Warehouse Loans | $982.4M | $1.11B | $483.7M | $281.9M | $290.6M | $731.1M |
| **Loans Held For Sale (COLB)** | **$378.2M** | **$678.4M** | **$1.09B** | **$1.47B** | **$1.54B** | **$2.08B** |
| **Securities Purchased Under Agreements To Resell (AOT)** | **---** | **$221.4M** | **$589.9M** | **$605.9M** | **$2.04B** | **$1.55B** |
| TOTAL | $1.36B | $1.99B | $2.13B | $2.31B | $3.87B | $4.36B |

1.   **PwC Understood That The Operational Risk Associated With Auditing The MWLD Was High And Also That It Needed To Design Audit Procedures Which Mitigated The Risk Of Customer Fraud**

69.   The scope of the audit procedures applied by PwC to the COLB and AOT lines should have been guided, at least, in part by PwC's own assessment of risk and the facts and circumstances which were known at the time PwC conducted its audits.

70.   PwC understood that BancGroup was a rapidly growing financial institution that conducted the majority of its operations in Florida and that BancGroup's MWLD was significant.

71.   PwC knew or should have known that its audit of BancGroup presented certain characteristics or circumstances that increased the susceptibility of BancGroup's assets to misappropriation.  (AU § 316).  For example, PwC knew that the MWLD handled large amounts of cash and that the cash was being used to fund large volumes of loans which were not always easily identifiable.

72.   PwC also understood that the operational risk in BancGroup's MWLD was "high" because the volume and magnitude of the transactions gave rise to the very real *potential for customer fraud* – that is to say fraud by mortgage brokers such as Taylor Bean who lacked their own funds, who depended upon loan volume to remain profitable and who, therefore, had little interest in the quality and integrity of the underlying loan process.  The risk that fraudulent or "double sold" loan advance requests might be funded by the MWLD and that BancGroup might otherwise be carrying "fictitious loans" on its balance sheet was a very real risk against which PwC was required to audit.

73.   With regard to the MWLD's COLB and AOT assets, PwC understood that the biggest risk facing BancGroup was not necessarily credit risk relating to the valuation of those assets (though this was obviously a concern), but rather the very real risk that those assets, and the underlying loans, did not exist because the amounts advanced or paid by BancGroup were not

actually being used to fund mortgage loans, but rather were being misappropriated by the MWLD mortgage broker customers, including its largest customer Taylor Bean. In light of these known risks, PwC's audit of the COLB and AOT account balances should have included basic audit testing, akin to that applied to an audit of inventory of a wholesaler, to gain reasonable assurance that the inventory of mortgage loans supposedly backing the AOT and COLB balances actually existed.

74.     Here, PwC's awareness of the risk of customer fraud in the MWLD and the manner in which it might address that risk through the audit process was further colored by its knowledge that COLB and AOT accounts were largely concentrated in a *single* customer, Taylor Bean.

75.     Indeed, during each of the years that PwC conducted its audits, PwC understood that approximately 50% or more of the COLB loans "held for sale" and carried on BancGroup's balance sheet related to the funding of residential home loans that were originated by Taylor Bean, supposedly secured by the underlying loan collateral (i.e. first mortgage) and supposedly re-sold to a third party.

76.     In addition to the approximately 50% concentration in the COLB line, PwC knew that Taylor Bean was the *only* mortgage broker who was approved under the AOT facility with the MWLD.  PwC understood that the entirety of the MWLD's AOT asset related to transactions with Taylor Bean in which Colonial Bank would purchase 99% participation interests in allegedly qualifying pools of mortgages which were required to be subject to existing, enforceable takeout commitments to third-party agency investors.   PwC also knew that billions of dollars in BancGroup's reported AOT and COLB assets were tied directly to transactions with Taylor Bean.

77.     Upon information and belief, the amount transferred to Taylor Bean in connection with the COLB and AOT accounts in fiscal years 2003 through 2005 is proportional to the amounts advanced in 2006, 2007, and 2008.

78.     Thus, at the time PwC conducted its audits, it was not only aware that the AOT and COLB balances were increasing at a rapid clip, jumping nearly five-fold between 2002 and 2007, but also that most of that growth in these assets was supposedly as a result of the financing and/or acquisition of participation interests in pools of loans originated by Taylor Bean.  PwC knew that MWLD volume continued to increase despite its expectations that volumes would decrease and even though PwC knew that Florida loan pipelines had slowed down; are where most of the volume was supposedly coming from.

79.     Increases in the AOT and COLB balances which defied PwC's own expectations should have caused PwC's trained accountants to exercise even greater professional skepticism with regard to those balances and the audit procedures it would apply to them.

80.     As PwC understood, the MWLD was only intended to provide short-term interim funding, and the fact that the AOT and COLB balances were increasing or even remaining steady in the face of expectations should have caused PwC's trained auditors to greatly expand the scope of its audits to gain a further understanding of this apparent anomaly.

81.     PwC failed to take any of these risks into account when conducting its audit of BancGroup.  Had PwC properly discharged the most fundamental duties of an auditor by, among other things, gaining a full understanding of BancGroup's MWLD business, exercising healthy professional skepticism, performing audit procedures designed to address known risks, and basing its audits on sufficient *competent* evidence, rather than incompetent evidence (or a total lack of evidence), PwC's audits would have detected the fraud.  Instead, PwC breached its duties, and the fraud remained undetected for years.

2. **PwC's Auditors Lacked Mortgage Warehouse Lending Audit Experience And Recklessly Failed To Gain That Understanding In Violation Of GAAS**

82.     Under GAAS (AU § 311), PwC was required to gain an understanding of BancGroup's business.  In the context of its integrated audits of BancGroup, this means PwC was required to gain an understanding of the entirety of BancGroup's business, including the business conducted by its Orlando-based MWLD and, perhaps more importantly, the nature of the MWLD's transactions with its largest "customer," Taylor Bean.

83.     In violation of GAAS, PwC recklessly failed to gain an understanding of the MWLD.

84.      However, PwC did not ever look at any such agreements to get an understanding of the manner in which the facility was supposed to work.

85.     PwC's failure to gain an understanding of the MWLD, and in particular the process and mechanics of the underlying AOT transactions with Taylor Bean, was particularly egregious and inexcusable because PwC was supposed to be performing an "integrated audit," which meant that PwC was purportedly auditing both the underlying AOT account balance (which was clearly significant) as well as the internal controls relating to the recording of this balance on BancGroup's balance sheet.

3. **PwC's Audit Testing Of BancGroup's MWLD, And The AOT Account Balance In Particular, Was Grossly Deficient Under PCAOB (And GAAS) Standards**

86.     Under GAAS, an auditor is required to base its audit report on "sufficient competent (or "appropriate") audit evidence."  (AU § 326).  The auditor is required to document that evidence in its audit working papers which form "the written record of the basis for the auditor's conclusions…" (AS No. 3).

87.     As set forth in AU § 230.07, "[d]ue professional care requires the auditor to exercise professional skepticism" which is "an attitude that includes a questioning mind and a critical assessment" of the evidence compiled by the auditor.

88.     GAAS did not allow PwC's auditors to rely solely upon the representations of management, including Cathie Kissick, in auditing the MWLD COLB and AOT asset balances or to rely on anything less than persuasive evidence.  (AU §§ 333.02, 326).

89.     The existence of fraud does not mitigate PwC's duties under GAAS or its liability for breaching those duties. To the contrary, it was PwC's "responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."  (AU § 316).

90.     Further, in conducting its audits of BancGroup, PwC was required to implement audit procedures that specifically addressed the risks known by PwC at the time it conducted its audits. (AU § 318).  In mitigating the known risk of potential customer fraud and the resultant funding of "fictitious loans" by the MWLD, it was, therefore, imperative that PwC design and implement audit procedures and tests that were specifically targeted at Taylor Bean (MWLD's largest customer by far) and the very existence of the loans and collateral purportedly originated and sold to third party investors.

91.     Upon information and belief, the PwC auditor responsible for auditing the MWLD, including the COLB and AOT accounts for the 2002 through 2007 year-end audits, was Susan Thompson, a junior staff auditor who would later be elevated to the level of a senior staff auditor.

92.     Notwithstanding the billions of dollars in "Loans Held For Sale" and "Securities Purchased Under Agreements to Resell" on BancGroup's books as of fiscal years ended 2006

through 2007, PwC failed to comply with its duty to perform substantial audit testing and to obtain the competent audit evidence that was necessary under GAAS.

93.     Under GAAS, "[c]onfirmation is the process of obtaining and evaluating a direct communication from a third party in response to a request for information about a particular item affecting financial statement assertions." (AU § 330).  It is one source of audit evidence that may be obtained by an auditor.

94.     An auditor is required to "exercise an appropriate level of professional skepticism throughout the confirmation process." (AU § 330).  When "designing the confirmation requests, the auditor should consider the assertion(s) being addressed and the factors that are likely to affect the reliability of the confirmations."

95.     Significantly, under GAAS, the auditor's "understanding of the client's arrangements and transactions with third parties is key to determining the information to be confirmed. The auditor should obtain an understanding of the substance of such arrangements and transactions to determine the appropriate information to include on the confirmation request." (AU § 330).

96.     Under GAAS, an auditor is also at all times required to be in control of the confirmation process.  In this regard, GAAS requires "direct communication between the intended recipient and the auditor to minimize the possibility that the results will be biased because of interception and alteration of the confirmation requests or responses." (AU § 330).

97.     As discussed above, due to the volume of transactions and magnitude of the transactions, PwC understood that one of the biggest risks confronting the MWLD was the risk of fraud by its customers who might otherwise attempt to borrow funds based on fictitious or double-pledged loans.  As a result, PwC knew or should have known that obtaining a confirmation from a customer such as Taylor Bean that the outstanding AOT and COLB balances were accurate would

do little to confirm the existence of the underlying asset including the underlying loan and do little to mitigate the risk of fraud.  Had PwC fully grasped the nature of the transactions which gave rise to the COLB and AOT balances, PwC would have sent confirmations not to Taylor Bean but rather to the takeout buyers who supposedly had already executed binding takeout commitments to purchase these loans from BancGroup.  In violation of GAAS, PwC did not do this.

98.     As discussed above, by 2005, Farkas and the Adverse Parties had shifted all of the bogus Plan B "loans" and Crap loans from the COLB account to the AOT account.  Notwithstanding the numerous red flags and risks surrounding the AOT account as previously discussed herein, other than obtaining questionable and unreliable confirmations, PwC made little or no effort to perform audit procedures that were designed to detect and mitigate against the very significant risk of potential fraud by BancGroup's MWLD's only AOT customer, Taylor Bean.

99.     PwC knew or should have known that it could not discharge its duties under GAAS (including, but not limited to, AU § 316) and address the documented risk relating to potential customer fraud and misappropriation of BancGroup's assets without performing audit tests to gain reasonable assurance that the inventory of Taylor Bean "loans" funded and purchased by BancGroup actually existed.

100.     PwC also could not rely on the work of BancGroup's internal auditor as, Crowe, as a substitute for discharging its duties under GAAS especially when, as set forth herein, Crowe's monitoring and testing of BancGroup's MWLD internal controls were facially deficient from the reports provided to PwC.  Under GAAS, including, but not limited to, AU § 322, "[e]ven though the internal auditors' work may affect the auditor's procedures, the auditor should perform procedures to obtain sufficient, appropriate evidential matter to support the auditor's report."  As a result of Crowe's gross negligence, Crowe's internal audit reports did not provide that evidence.

101.    Year after year, PwC's audit of the Orlando-based MWLD became predictably flawed, and Farkas and the Adverse Parties exploited the gross deficiencies in PwC's audits to their benefit and to the great detriment of COB. Had PwC discharged its professional duties under PCAOB and GAAS standards by, among other things, exercising due care and the appropriate level of professional skepticism, the fraud would have been detected and exposed years earlier.  A reasonable auditor discharging its duties under PCAOB GAAS would have exposed the Taylor Bean fraud utilizing appropriate auditing procedures and techniques.

**4.       PwC Was Required To Qualify Or Disclaim Its Audit Reports Because, Among Other Things, It Knew, Or Should Have Known, That It Lacked Sufficient Competent Evidential Matter Upon Which To Base Its Unqualified Audit Reports**

102.    The PCAOB (and GAAS) standards require that the auditor issue a report expressing an opinion as to the financial statements under audit or an assertion to the effect that an opinion cannot be expressed.  When an opinion is not expressed, the auditor is required to state the reasons therefore.

103.    As expressed in AU § 508.03, the auditor's justification for expression of an opinion "rests on the conformity of his audit with generally accepted auditing standards."  Stated differently, if an auditor knows or should know that he has not performed an audit in accordance with GAAS, the auditor is required to not express an opinion.

104.    AU § 508.14 (effective at the time PwC conducted the BancGroup audits), dictates that an auditor shall not express an opinion or state that the financial statements present fairly in accordance with GAAP if the auditor believes the statements contain a departure from any accounting principle.

105.    As further expressed in AU § 508.20, under GAAS, an auditor is required to qualify its audit report when "there is a lack of sufficient competent evidential matter or there are restrictions

on the scope of the audit that have led the auditor to conclude that he cannot express an unqualified opinion," or when the auditor believes "that the financial statements contain a departure from GAAP."

106.    PwC misrepresented that it had conducted the BancGroup audits in accordance with GAAS and that BancGroup's financial statements were fairly stated in accordance with GAAP and further gave BancGroup comfort with regard to its internal controls over financial reporting.  PwC knew or should have known that its audits violated GAAS because, among other things, its audits recklessly ignored the huge AOT and COLB balances and the risk of fraud relating to those assets. PwC, therefore, violated GAAS by issuing unqualified audit reports on BancGroup's year-end financial statements.

**C.      PwC's Failed Audits And Unqualified Audit Reports And The Misrepresentations Contained Therein Conceal BancGroup's True Financial Condition And The Ongoing Fraud From BancGroup And Its Board Of Directors**

107.    As previously alleged, PwC was engaged to perform independent audits of the financial statements of BancGroup and its subsidiaries for the fiscal years ended 2002 through 2009. Beginning in 2004, PwC's financial statement audits were integrated with audits of BancGroup's internal control structure.

108.    At the conclusion of each of its audits, PwC issue a report that was addressed to "Colonial BancGroup, its Board of Directors and its shareholders.  In its audit reports, PwC made various representations regarding its audit and the financial condition of BancGroup.  Substantially the same representations were made by PwC in its audit reports issued in conjunction with its audits of BancGroup's financial statements for the fiscal years ended December 31, 2002, 2003, 2004, 2005, 2006, and 2008.

109.     As set forth herein, unbeknownst to BancGroup, its Board, and management, these representations were materially false and misleading in that PwC's audits did not comport with PCAOB standards (or GAAS) and BancGroup's financial statements were, in fact, materially misstated under GAAP.

110.     PwC's failed audits and the misrepresentations in PwC's unqualified audit reports concealed the fraud and the material misstatements in BancGroup's financial statements for each of the fiscal years ended December 31, 2002 through December 31, 2008.  As a result of PwC's wrongful conduct and the resulting failure to detect the fraud, well over $1.0 billion was transferred to Taylor Bean based on bogus Plan B and or severely impaired Crap loans in return.

111.     As a result of PwC's malpractice and resulting unqualified audit reports, BancGroup's reported net income and financial condition during each of the periods audited by PwC were overstated.

112.     PwC's failed audits and unqualified audit reports also resulted in numerous materially inaccurate and incomplete disclosures in BancGroup's financial statements.

113.     PwC's failed audits and the unqualified audit reports issued at the conclusion of those audits masked BancGroup's true financial condition, and the true quality of the MWLD asset portfolio and served to effectively conceal the fraud being perpetuated on BancGroup by Taylor Bean and the Adverse Parties.

114.     PwC knew or should have known that BancGroup's Board of Directors and Audit Committee members were foreseeable users of BancGroup's respective financial statements and would reasonably and justifiably rely upon BancGroup's audited financial statements and the audited financial statements in making business decisions on BancGroup's behalf.

115.   As a direct result of Defendants' gross departures from PCAOB standards, BancGroup's true financial condition and the nature and extent of the fraud being perpetuated on BancGroup was concealed from BancGroup and the Board of Directors such that the Board was prevented from taking corrective action.

116.   As a result of PwC's numerous audit failures and misrepresentations and BancGroup's justifiable reliance upon those misrepresentations, BancGroup sustained massive financial harm, including, but not limited to, the deepening of BancGroup's insolvency.

## V.   IN VIOLATION OF ITS DUTIES AS BANCGROUP'S INTERNAL AUDITOR, CROWE IS GROSSLY NEGLIGENT IN FAILING TO DETECT THE MASSIVE $1.8 BILLION FRAUD BEING PERPETRATED ON BANCGROUP

117.   The failures of BancGroup's external auditor, PwC, were compounded by the gross negligence of its internal auditor, Crowe, also one of the world's largest accounting and consulting firms.

118.   As set forth herein, between 2002 and 2009 BancGroup engaged Crowe to implement and monitor internal controls, including those controls specifically relating to BancGroup's mortgage warehouse lending division, and to help safeguard BancGroup's bank assets.

### A.   Crowe's Role And Its Duties As BancGroup's Internal Auditor

119.   In its internal audit engagement letter dated April 19, 2005, Crowe made certain representations and covenants regarding the nature and scope of the services it would provide to BancGroup.

120.   Crowe's internal audit engagement letters for fiscal years 2006, 2007, and 2008 contain substantially the same representations and covenants as those set forth in Crowe's April 29, 2005 audit engagement letter.

121.   In discharging its professional obligations as BancGroup's internal auditor, Crowe was required to comply with the Code of Professional Conduct and the Statements on Standards for

Consulting Services as promulgated by the AICPA.  Among other things, Crowe was required to (i) discharge its duties with professional competence; (ii) exercise due professional care; (iii) carefully plan and supervise the audit engagement; (iv) obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed; (v) accomplish the engagement objectives; and (vi) do so with integrity and objectivity.  (CS § 100).

122.    Crowe's duties as BancGroup's internal auditor are further explained under GAAS, including, but not limited to, AU § 322, which states that "[i]nternal auditors are responsible for providing analyses, evaluations, assurances, recommendations, and other information to the entity's management and board of directors or to others with equivalent authority and responsibility."  As reflected in AU 322, an "important responsibility of the internal audit function" and, therefore, Crowe's important responsibility in conjunction with its role as BancGroup's internal auditor was "to monitor the performance of [BancGroup's] controls."

123.    The nature and scope of Crowe's duties as BancGroup's internal auditor are further reflected in standards promulgated by the Institute of Internal Auditors ("IIA"), which impose numerous duties on accounting professionals such as Crowe who have undertaken to provide internal audit services.

124.    In order to maintain its required objectivity and independence, under the terms of its engagement agreement, Crowe was required to report directly to a the "General Auditor," an individual employed by BancGroup.  Crowe, not the General Auditor, was responsible for preparing the original internal audit plan and for selecting and performing all of the audit testing and sampling. Nobody at BancGroup placed any limitations on the scope of Crowe's internal audit or the tests that Crowe could or should perform and most certainly never restricted or limited the scope of Crowe's audits as it related to the MWLD and the AOT and COLB facilities, where the fraud was housed.

125.     Crowe's audit duties included monitoring controls over Mortgage Warehouse Lending activity, managing customer relationships, processing and recording transactions, safeguarding assets, and regulatory compliance.

126.     Having agreed to serve as BancGroup's internal auditor and also agreeing to monitor controls over Mortgage Warehouse Lending Activity, manage customer relationships and to safeguard assets, the scope of Crowe's duties included performing testing of controls relating to the MWLD's AOT line of credit with Taylor Bean, an account which totaled more than $1.5 billion by 2007 and which was clearly "material" to BancGroup's financial statements.

127.     Crowe was grossly negligent (if not reckless) in failing to detect the massive fraud in the MWLD and how nearly $1.8 billion had been funneled out of Colonial Bank to Taylor Bean to fund or acquire "loans" which either did not exist or Taylor Bean did not have the right to sell (e.g., double-pledged).

**B.      Crowe Breached Its Professional Duties And Contractual Obligations**

**1.      Crowe Understood That The Operational Risk Within The MWLD Was "High" As A Result Of The Potential For Customer Fraud And The Misappropriation of Assets**

128.     In connection with its 2006/2007 internal audit, Crowe identified "Mortgage Warehouse Lending" as a key business process which was focused on participating in nationally syndicated credits and direct lending opportunities.  Crowe knew that MWLD credits are collateralized by real estate mortgages on residential property and/or mortgage servicing rights. Crowe also knew that a significant improvement for the MWLD's operations was the "ProMerit Collateral Monitoring System," which, as its name suggests, helped the MWLD monitor loan collateral in an effort to safeguard BancGroup's assets.

129.     In connection with each internal audit engagement, Crowe analyzed BancGroup's major business processes and assigned a rating to the various risks which arose from that process.

130.    Largely as a result of a rating risk that it assigned, Crowe determined that the aggregate inherent risk assessment was deemed to be "High" in the MWLD.

131.    Crowe knew or should have known of the risk that new or existing customers could double pledge loans or produce fraudulent loans resulting in losses for the Bank and increased reserve requirements going forward.

132.    Crowe also assessed the risk relating to the Bank's electronic funds transfer-wire transfer.  Crowe determined that one of the significant risks relating to the funding process was losses due to fraudulent transactions and that the operational inherent risk was high due to the fact that BancGroup was exposed to losses due to fraudulent activity from both internal and external parties.  Largely as a result of this conclusion, Crowe also deemed the aggregate inherent risk assessment relating to the wire funding process to be high.

133.    Upon information and belief, Crowe made these same determinations and reached these same conclusions in connection with each of its other internal audits of BancGroup.

134.    As previously discussed, during the time that Crowe conducted its internal audits, the MWLD, COLB and AOT facilities experienced explosive growth.  Crowe also understood that approximately 50% or more of the COLB loans "held for sale" and carried on BancGroup's balance sheet related to the funding of residential home loans that were originated by Taylor Bean.  These loans were supposedly secured by the underlying loan collateral (i.e., first mortgage) and subject to pre-arranged agreements by third parties to purchase the loans.

135.    In addition to the approximately 50% concentration in the COLB line, Crowe understood that Taylor Bean was the *only* mortgage broker who had access to the AOT facility with the MWLD.  Crowe, therefore, understood that *the entirety* of the MWLD's AOT asset related to transactions with Taylor Bean in which Colonial Bank would purchase 99% participation interests in

allegedly qualifying pools of mortgages which were required to be subject to existing, enforceable takeout commitments to third-party takeout buyers. Crowe, therefore, knew that billions of dollars in BancGroup's reported AOT and COLB assets were tied directly to transactions with Taylor Bean.

136.     Crowe knew or should have known that the huge amount of funds transferred to and from Taylor Bean on a daily basis and the volume of loans which those funds were purportedly originating provided Taylor Bean with the opportunity to misappropriate funds.

137.     With this understanding and with billions of dollars in reported assets at risk, Crowe could not discharge its professional duties or appropriately safeguard BancGroup's assets against the identified risk of customer fraud or fraud by internal or external parties without performing extensive testing of AOT and the "loans" which purportedly served to collateralize that huge balance. Yet, Crowe undertook no such testing.

138.     Crowe was vested with the duty and responsibility to help implement and monitor controls to help ensure that BancGroup's assets were safe from the very risks identified by Crowe. Crowe, however, was grossly negligent in discharging its professional and contractual obligations, and, as a result, the fraud went undetected for years. Crowe's wrongful conduct resulted in substantial damages to BancGroup.

> **2.      Crowe's Wrongful Conduct, Including Its Reckless And Slipshod Monitoring And "Testing" Of Internal Controls Relating To AOT, Perpetuated And Concealed The Taylor Bean Fraud**

139.     Crowe was not merely negligent in the manner in which it discharged its professional responsibilities. Crowe acted with gross negligence and with a reckless disregard for the safety of BancGroup's financial well-being. In fact, at times, the "selectivity" in Crowe's testing – which for some reason at times did not include any Taylor Bean loans – suggests that Crowe was either oblivious to the identity of the MWLD's largest customer or purposely chose to exclude Taylor Bean from its testing.

140.     It is apparent that, in violation of its professional duties, Crowe recklessly failed to gain an understanding of the MWLD that was necessary to perform its audit.  Indeed, Crowe never truly understood the nature of the MWLD's loan transactions or the assets which were ultimately recorded as a result of those transactions.

141.     Crowe made no effort to understand the AOT facility into which the fraudulent advances moved in 2005 and thereafter expanded.  Without an understanding of what AOT and COLB asset balances were and how they were generated, Crowe was simply not in a position to properly assess the risk relating to the MWLD, or to implement controls relating to these assets, or to monitor the controls that were in place as it promised to do.

142.     The testing performed by Crowe was not merely deficient.  Crowe may have actually gone out of its way to avoid testing AOT or the Taylor Bean loans that were purportedly backing the AOT and COLB balances.

143.     In connection with its audit of the MWLD for 2006 and 2007, Crowe claimed to have reviewed the system of internal controls (operational, financial reporting, and compliance and performed tests) to determine if established controls were in place and functioning effectively.

144.     With the thousands of loans that were being originated by Taylor Bean (and other customers) and funded by the MWLD, Crowe could not reasonably have reached the conclusion that selecting a small number of loans would provide a representative sample or allow Crowe to reach a conclusion with regard to any of these "tests" or the adequacy of the controls at the MWLD.  In view of the volume of loans funded by the MWLD, Crowe's test "sample sizes" alone, were reckless.

145.     Crowe's tests did not adequately address the high operational inherent risk as it related to the potential risk of fraud by Taylor Bean and other MWLD customers.

146.    Crowe knew that all advances made by the MWLD against the warehouse line of credit and all loans were supposed to be supported by a collateral package, which included the original loan note, a copy of the mortgage, and an assignment of that mortgage to Colonial.  In other words, to the extent the MWLD funded or acquired an interest in a home loan (originated by Taylor Bean) secured by a first mortgage and that loan was reflected in BancGroup's financial statements (either in COLB, AOT, or Warehouse Line of Credit), Crowe understood that the underlying loan and collateral documents were required to be maintained in the document custody department.

147.    During both its 2006-2007 (year-ended March 31, 2007) audit as well as its 2007-2008 audit (year-ended March 31, 2008), Crowe obtained the Pipeline Report from BancGroup for seven relationships and selected 20 loans for testing. Crowe purportedly reviewed the 20 collateral packages.

148.    Crowe made no attempt in its testing to differentiate between the various facilities offered by the MWLD.  What is even more disturbing, however, is that of the 40 loans "judgmentally selected" by Crowe for collateral testing in the course of its 2006 and 2007 audits, not a single one of them was a loan that was originated by Taylor Bean.  In fact, Taylor Bean was not even one of the 14 relationships which served as the universe for selecting those forty loans in the course of Crowe's 2006 and 2007 audits.

149.    Crowe knew that the MWLD's relationship with Taylor Bean was its most significant relationship, and its workpapers reflect that Crowe understood that the entire AOT asset balance reported on BancGroup's financial statements totaling over $2.0 billion as of year-end 2007 were purportedly backed by Taylor Bean-originated mortgage loans.

150.    Had Crowe selected a representative sample of AOT "loans" and requested the collateral packages for those loans, Crowe would have discovered a big problem – specifically that

for many of the so-called "loans" originated by Taylor Bean, there was no mortgage or note or any other documentation which supported the existence of the loan or the value reported in BancGroup's financial statements.

151.    In addition to collateral testing, there were other tools available to Crowe.  For example, Crowe was aware of the risk of double pledging and the existence of an "Intercreditor Agreement" that acknowledged each bank that extended credit to the borrower could share information back and forth to help ensure that a mortgage was not used to obtain an advance from that one lender at any one time or assign any collateral documents to more than one lender.

152.    Even though Crowe was aware of this cooperative, information-sharing arrangement between competing warehouse lenders (including the MWLD), it does not appear that Crowe ever performed any tests to ascertain whether the Intercreditor Agreement and the information that was accessible under the Intercreditor Agreement was being effectively utilized as a tool to fight the double-pledging of loans by MWLD customers, including Taylor Bean.  Crowe recklessly failed to obtain the Intercreditor Agreement to test the information against the Pipeline Report, or to confirm the absence of double-pledged assets.  Had it selected even a small sample of the loans or requested to see copies of the forward commitments that were purportedly backing AOT, the Taylor Bean fraud, which also included hundreds of millions of dollars in double-pledged loans, would have been exposed.

153.    Even though AOT was comprised of pools of mortgages that were in the process of becoming structured financial securities and were even being pre-certified by the custody department of the MWLD for eligibility for agency or private label sale, Crowe's auditors apparently had no understanding of structured financial products and how the products differed from conventional warehouse lending.  Because no one within Crowe's MWLD audit team had any training or

understanding of the structured financial securities comprising AOT, it was impossible for Crowe to assess controls.

154.    That Crowe lacked any appreciation for the significance of assets or collateral associated with the MWLD is demonstrated by the limited number of audit hours it allocated to MWLD.

155.    Not only was there no testing of the AOT, Crowe's internal audit engagement partner had no knowledge of the MWLD's basic accounting or the departments that fell within the MWLD.

156.    Even though BancGroup hired Pam Vitto ("Vitto") as an internal auditor for the MWLD at the same time that Crowe's engagement included internal auditing of the MWLD, Crowe had virtually no contact with Vitto, and never developed a division of responsibilities between Crowe's staff and Vitto.

157.    While Crowe's audit of MWLD controls included certain tests of loan packages (just not Taylor Bean's collateral packages), Crowe never tested the packages for the potential for fraud by MWLD customers, including Taylor Bean, or contemporaneous wires to the closing table to determine whether the wires were consistent with collateral documentation.  Had Crowe's collateral package testing included wire testing to ensure consistency, the fraud could have been easily discovered because the wires would have been inconsistent with the information included on the collateral packages.

158.    Crowe never identified the four types of facilities within the MWLD, never identified AOT as an asset type, and never included AOT within its Sarbanes-Oxley Section 404 testing.  Upon information and belief, PwC also relied upon internal testing by Crowe which it knew or should have known was deficient.

159.     Crowe was obligated to identify and assess the controls in place to prevent or identify fraudulent activities of borrowers and Bank employees.  Despite Crowe's identification of double-pledging and customer fraud as a risk in the MWLD, Crowe's audit "testing" was limited to a single discussion with Cathie Kissick, one of the Adverse Parties.  Had Crowe taken the threat of fraud and double-pledging seriously and treated the MWLD customers as the potential fraudsters identified in its business process risk assessment, Crowe would not have relied on a discussion with one individual but instead would have performed actual tests to see whether controls were in place to prevent or identify fraudulent activities and, if so, whether those controls (such as the Intercreditor Agreement) were being effectively utilized for this purpose.

160.     In a gross departure from its professional duties as BancGroup's internal auditor, Crowe applied "tests" and procedures that not only recklessly failed to address the significant risks in the MWLD, including the risk of fraud, but also increased those risks.  Crowe's audit testing with regard to the AOT line of credit became so predictably flawed that Crowe effectively facilitated and enabled the perpetuation of the fraud.  Had Crowe appropriately discharged its professional duties and taken the steps necessary to effectively implement and monitor internal controls in the MWLD and to safeguard BancGroup's assets from the potential risk of fraud by Taylor Bean, Crowe would have, indeed, "picked up on" and exposed the Taylor Bean fraud.

## COUNT I

### (Accounting Malpractice/Professional Negligence As Against PwC)

161.     The preceding paragraphs of this Complaint are hereby incorporated into this Count as if fully set forth herein.

162.     PwC owed BancGroup a duty to exercise due professional care in the conduct of its audits of BancGroup's financial statements which included, among other things, the duty to perform its audits in accordance with PCAOB and generally accepted auditing standards.

163.    As a result of PwC's conduct, accounting malpractice/professional negligence, which was gross if not reckless, PwC's integrated audits of BancGroup fell below and breached the level of the professional duty of due care that PwC owed to BancGroup.  As set forth more fully herein, PwC's conduct fell below the standard of care in at least the following respects, among others: PwC failed to exercise due care in connection with its audit planning and testing of BancGroup's Orlando-based MWLD; PwC routinely failed to properly compile sufficient evidential matter in its workpapers to support the AOT and COLB year-end balances reflected in BancGroup's financial statements; PwC understood that the operational risk, including the risk of customer fraud, was "high" within BancGroup's MWLD, yet, in complete disregard of this known risk, PwC auditors failed to exercise professional skepticism and failed to audit MWLD asset balances with the mindset that fraud was, indeed, possible; PwC failed to perform audit procedures which were designed to address the risks identified in its own workpapers including (but not limited to) performing effective third party confirmations and collateral testing; PwC auditors failed to increase the scope of their audits in response to indicia of potential fraud involving Taylor Bean; PwC's integrated audits failed to appropriately and adequately assess internal controls within BancGroup's MWLD and whether those controls were sufficient in light of the known risks facing BancGroup and its MWLD; PwC issued false, misleading and unqualified audit reports which concealed its own malpractice and the ongoing fraud and its impact on BancGroup's financial condition and perpetuated the continued dissemination of materially misleading and misstated financial statements which did not comply with GAAP.

164.    PwC's accounting malpractice/professional negligence, which was gross if not reckless, continued throughout its representation of BancGroup, from its 2002 audit engagement

through the issuance of its unqualified audit report on BancGroup's 2008 fiscal year-end financial statements and was the legal and proximate cause of BancGroup's injuries.

165.    As a direct and proximate result of PwC's misconduct as described herein, BancGroup sustained substantial damage in an amount to be determined at trial, including, but not limited to, the amounts set forth hereinabove.

## COUNT II

### (Breach Of Contract As Against PwC)

166.    The preceding paragraphs of this Complaint are incorporated into this Count as if fully set forth herein.

167.    As set forth herein, in connection with each of its audits, PwC provided an engagement letter directed to BancGroup's Audit Committee in which PwC agreed, among other things, to perform its integrated audits in accordance with professional standards.

168.    As set forth herein, PwC breached the contractual duties it owed to BancGroup and each of the other express promises that it made in its engagement letters.

169.    At all relevant times, BancGroup performed, or substantially performed, its material obligations under the engagement letters, including, without limitation, the payment of millions of dollars in fees and expenses to PwC for services rendered, the arrangement for onsite workspace for the conduct of the audit services as and when requested by PwC, and the provision of access to books and records of BancGroup and its subsidiaries to the extent and in accordance with PwC's request.   At no time during the course of the engagements did PwC ever provide notice to BancGroup of any failure to perform its obligations under any of the engagement letters.

170.    As a result of PwC's breach of contract as described herein, BancGroup sustained substantial damage in an amount to be proven at trial, including but not limited to the amount set forth hereinabove.

## COUNT III

### (Accounting Malpractice/Professional Negligence As Against Crowe)

171.    The preceding paragraphs of this Complaint are hereby incorporated into this Count as if fully set forth herein.

172.    Crowe owed BancGroup a duty to exercise due professional care in the conduct of its internal audits of BancGroup's financial statements.

173.    As a result of Crowe's accounting malpractice/professional negligence which was gross (if not reckless) Crowe's internal audits of BancGroup fell below and breached the level of the professional duty of due care that Crowe owed to BancGroup.  As set forth more fully herein, Crowe's conduct fell below the standard of care in at least the following respects, among others: (i) Crowe's internal auditors recklessly failed to gain an understanding of BancGroup's MWLD or the nature of its financing transactions with Taylor Bean; (ii) notwithstanding its conclusion concerning the "high" operational risk and the potential for customer fraud in the MWLD, Crowe recklessly failed to perform any audit procedures with respect to AOT and otherwise failed to design audit procedures which would have addressed this specific risk; (iii) even though Crowe understood that Taylor Bean was the MWLD's largest customer by far and that any potential fraud by Taylor Bean would be disastrous to BancGroup, Crowe's auditors "judgmentally" avoided Taylor Bean loans at the time it conducted critical audit tests – including (but not limited to) collateral testing – which would have exposed the fraud; (iv) Crowe failed to specifically evaluate the potential for the occurrence of fraud and how fraud risk is managed in the MWLD and to implement internal audit tests that were designed to unearth such fraud; and (v) in failing to appropriately monitor internal controls relating to the MWLD, Crowe also failed to safeguard BancGroup's assets as it said it would.

174.     Crowe's accounting malpractice/professional negligence, which was gross if not reckless, continued throughout its representation of BancGroup, from its 2002 internal audit engagement through its 2008-2009 internal audit engagement and was the legal and proximate cause of BancGroup's injuries.

175.     As a direct and proximate result of Crowe's misconduct as described herein, BancGroup sustained substantial damage in an amount to be determined at trial, including, but not limited to, the amounts set forth hereinabove.

## COUNT IV

## (Breach Of Contract As Against Crowe)

176.     The preceding paragraphs of this Complaint are incorporated into this Count as if fully set forth herein.

177.     As set forth herein, in connection with each of its audits, Crowe promised, among other things, that: (i) it would assist in developing an annual risk-based internal audit services plan"; (ii) it would direct, review, and supervise the day-to-day performance of the audit plan; that it would comply with applicable AICPA, U.S. Securities and Exchange Commission (SEC), Public Company Accounting Oversight Board (PCAOB), and other regulatory independence guidance; (iii) its services would include a review of key internal controls and detail testing of a sample of transactions and that higher risk areas would be covered in more detail and with greater frequency; (iv) it would submit written reports to BancGroup's Audit Committee throughout the year to communicate the results of our internal audit services for each area of the audit plan; and (v) it would assist in developing control risk assessments, audit plans, audit programs, and audit reports.

178.     Crowe further represented that the scope of its internal audit included monitoring controls over Mortgage Warehouse Lending activity, managing customer relationships, processing and recording transactions, safeguarding assets, and regulatory compliance.

179.    As set forth herein, Crowe breached the aforesaid contractual duties it owed to BancGroup by, among other things, failing to perform its audits in accordance with PCAOB standards and in accordance with each of the other express promises that it made in its engagement letters and Internal Control Reports.

180.    At all relevant times, BancGroup performed, or substantially performed, its material obligations under the engagement letters, including, without limitation, the payment of millions of dollars in fees and expenses to Crowe for services rendered, the arrangement for onsite workspace for the conduct of the audit services as and when requested by Crowe and the provision of access to books and records of BancGroup and its subsidiaries to the extent and in accordance with Crowe's request.   At no time during the course of the engagements did Crowe ever provide notice to BancGroup of any failure to perform its obligations under any of the engagement letters.

181.    As a result of Crowe's breach of contract as described herein, BancGroup sustained substantial damage in an amount to be proven at trial, including, but not limited to, the amount set forth hereinabove.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A.    For actual damages in excess of the jurisdictional limit of this Court in an amount to be proven at trial;

B.    For pre-judgment and post-judgment interest as allowed pursuant to applicable statutory and common law;

C.    For exemplary damages;

D.    For the Plaintiffs' taxable costs and expenses of litigation;

E.    Disgorgement of profits as allowed by law; and

F.    Such further equitable or other relief as the Court deems appropriate under the circumstances.

## VI.     <u>JURY DEMAND</u>

Plaintiffs hereby demand a jury for the trial of this action.

Dated:  November 21, 2011                    Respectfully submitted,

Attorneys for The Colonial BancGroup, Inc.          /s/ Andrew P. Campbell
Andrew P. Campbell
Caroline Smith Gidiere
**Leitman, Siegal, Payne & Campbell PC**
420 N. 20th Street, Suite 2000
Birmingham, AL 35203
T: (205) 251-5900
F: (205) 323-2098
acampbell@lspclaw.com
cgidiere@lspclaw.com


Nicholas DiCarlo
Christopher Caserta
**DiCarlo Caserta McKeighan & Phelps PLC**
6900 E. Cambelback Road, Suite 250
Scottsdale, AZ 85251
T: (480) 892-2488
ndicarlo@dcmplaw.com
ccaserta@dcmplaw.com


Rufus T. Dorsey, IV
C. Edward Dobbs
**Parker, Hudson, Rainer & Dobbs LLP**
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303
T: (404) 523-5300
F: (404) 522-8409
rtd@phrd.com
ced@phrd.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically served on November 21, 2011, by transmission of Notices of Electronic Filing generated by CM/ECF to persons registered as of issuance of filing as set forth below:

Drew D. Dropkin  (ddropkin@kslaw.com)

Elizabeth V. Tanis  (etanis@kslaw.com)

James H. Anderson  (janderson@beersanderson.com)

Jonathan C. Medow  (jmedow@mayerbrown.com)

Stanley J. Parzen  (sparzen@mayerbrown.com)

Tabor R. Novak, Jr.  (tnovak@ball-ball.com)


Dated:  November 21, 2011                        /s/ Andrew P. Campbell
                                                     Andrew P. Campbell

2162886_4