**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

THE COLONIAL BANCGROUP, INC., as post-confirmation debtor, and KEVIN O'HALLORAN, as plan trustee acting for and on behalf of the debtor,

Plaintiffs,

vs.

Case No. 2:11-cv-00746-MHT-WC

PRICEWATERHOUSECOOPERS LLP, a United States limited liability partnership, and CROWE HORWATH, LLP, a United States limited liability partnership,

Defendants.

---

**CROWE HORWATH LLP'S MOTION TO DISMISS**
**PURSUANT TO RULE 12(b)(6)**

---

Defendant Crowe Horwath LLP ("Crowe") hereby moves this Court, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the claims against Crowe in the Amended Complaint filed by The Colonial BancGroup, Inc. and Kevin O'Halloran as plan trustee acting for and behalf of The Colonial BancGroup, Inc. ("BancGroup").[1] In support of this Motion, Crowe submits its Brief

[1] On November 21, 2011, BancGroup timely filed an Amended Complaint under Rule 15. The Amended Complaint supersedes the original Complaint as a matter of law, and the original Complaint is deemed to be abandoned. *See, e.g.*, *Dresdner Bank AG v. M/V Olympia Voyager*, 463 F. 3d 1210, 1215 (11th Cir. 2006); *Montgomery v. Hooper*, 2009 WL 1151938, at *2 (M.D. Ala. Apr. 29, 2009) (Thompson, J.). Accordingly, Crowe's motion to dismiss the

in Support of Defendant Crowe Horwath LLP's Motion to Dismiss, filed concurrently herewith, and states as follows:

1. The breach of contract claim asserted against Crowe fails because it does not plausibly allege that BancGroup complied with all of its contractual obligations, a necessary element of the cause of action. The complaint alleges that Colonial officials perpetrated a long-running fraud that was concealed from Crowe. Those allegations make clear that, among other things, BancGroup failed to comply with a critical contractual obligation: BancGroup's promise to "ensure" that all of the information Crowe received—from whatever source—was accurate, complete, and without material omission. Accordingly, the breach of contract claim against Crowe should be dismissed.

2. The negligence claim against Crowe should be dismissed because a plaintiff cannot circumvent its inability to sue in contract (see *supra*) by recasting its allegations in tort. BancGroup and Crowe entered into a series of similar contracts specifying the parties' respective rights and obligations. Plaintiff now seeks to sue in tort by alleging that Crowe agreed to act as BancGroup's internal auditor and in that capacity violated professional duties governing internal auditors. But the premise of this entire argument is wrong. Under governing Eleventh Circuit law, Crowe's contracts with BancGroup control, and those contracts make clear that Crowe was *not* BancGroup's internal auditor. Rather, Crowe was hired merely to perform specified services under the direction and control of BancGroup's General Auditor and Audit Committee, who pursuant to the contracts were "responsible for determining and approving" the scope of Crowe's work and "maintain[ing] ownership" over the entire internal audit function. Therefore, because

original Complaint (Dkt. No. 25) is moot. Crowe now files this motion to dismiss the claims alleged against it in the Amended Complaint.

the complaint does not allege that Crowe violated any professional duties *applicable to the role it actually played*, and because plaintiffs cannot base a claim on an alternative allegation that is contradicted by the plain language of the parties' contracts (on which the complaint otherwise relies), the so-called negligence claim fails. There can be no tort claim when, as here, the complaint alleges only a failure to perform contractual obligations. Accordingly, the negligence claim should be dismissed.

3. Both the contract and tort claims fail for an independent reason: the complaint does not allege recoverable damages. Plaintiff's newly added claim for a return of *all* fees paid to Crowe fails because the complaint does not allege, as it must to obtain a return of fees, that the entirety of Crowe's work between 2002 and 2009 was worthless and without value to Colonial. Moreover, plaintiff cannot recover the remaining damages it seeks because (a) the complaint does not allege loss causation (also called proximate causation)—it does not allege that BancGroup would have avoided these losses had Crowe's challenged statements been true; and (b) plaintiff is impermissibly seeking to recover consequential damages, a form of recovery expressly barred by the parties' agreements.

WHEREFORE, for the reasons stated herein and in its Brief in Support of Crowe Horwath LLP's Motion to Dismiss, Crowe requests that this Court grant its Motion to Dismiss and dismiss the claim against Crowe with prejudice.

Respectfully submitted,

Dated: December 8, 2011

/s/ Stanley J. Parzen

James H. Anderson (ANDE4440)
JACKSON, ANDERSON & PATTY, P.C.
Post Office Box 1988
250 Commerce Street, Suite 100

Montgomery, Alabama 36102-1988
Telephone: (334) 834-5311
Telecopier: (334) 834-5362

Stanley J. Parzen
Jonathan C. Medow
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 701-7326
Telecopier: (312) 706-8668

*Attorneys for Defendant Crowe Horwath LLP*

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

THE COLONIAL BANCGROUP, INC., as post-confirmation debtor, and KEVIN O'HALLORAN, as plan trustee acting for and on behalf of the debtor,

Plaintiffs,

vs.

Case No. 2:11-cv-00746-MHT-WC

PRICEWATERHOUSECOOPERS LLP, a United States limited liability partnership, and CROWE HORWATH, LLP, a United States limited liability partnership,

Defendants.

**BRIEF IN SUPPORT OF DEFENDANT**
**CROWE HORWATH LLP'S MOTION TO DISMISS**

James H. Anderson (ANDE4440)
JACKSON, ANDERSON & PATTY, P.C.
Post Office Box 1988
250 Commerce Street, Suite 100
Montgomery, Alabama 36102-1988
Telephone: (334) 834-5311
Telecopier: (334) 834-5362

Stanley J. Parzen (pro hac vice)
Jonathan C. Medow (pro hac vice)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 701-7326
Telecopier: (312) 706-8668

Attorneys for Crowe Horwath LLP

# TABLE OF CONTENTS


**Page**

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 4

A. Crowe's Engagement Letters ........ 4

B. The Colonial Insiders' Fraudulent Scheme ........ 7

C. Discovery Of The Fraud ........ 9

D. Plaintiffs' Claims ........ 9

ARGUMENT ........ 11

I. The Breach Of Contract Claim Fails Because Plaintiffs' Own Allegations Demonstrate That BancGroup Did Not Comply With Its Obligation To Ensure That Crowe Received Accurate And Complete Information ........ 11

II. The Complaint Does Not Allege A Negligence Claim Against Crowe ........ 14

A. Plaintiffs Do Not Allege That Crowe Violated Any Professional Duties That Apply To Providers Of Outsourced Internal Audit Services ........ 15

B. Allegations That The Defendant Failed To Perform Its Obligations Do Not State A Claim In Tort ........ 19

III. The Claims Against Crowe Are Also Deficient Because They Do Not Allege Loss Causation Or Recoverable Damages ........ 20

A. Plaintiffs' New Request For Fees Is Deficient ........ 20

B. The Complaint Does Not Allege Loss Causation (Also Known As Proximate Cause) ........ 21

1. A plaintiff must allege loss causation ........ 21

2. The complaint here does not allege loss causation ........ 25

C. The Engagement Letter Specifically Bars Plaintiffs' Claim For Consequential Damages ........ 28

CONCLUSION ........ 31

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Adams v. Kellett*,
360 F. App'x 67 (11th Cir. 2010) ....................4

*Armstrong Business Servs. v. AmSouth Bank*,
817 So. 2d 665 (Ala. 2001) ....................19

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ....................4, 11, 13, 18, 27, 28

*Askanase v. Fatjo*,
130 F.3d 657 (5th Cir. 1997) ....................24, 25

*Auto-Owners Ins. v. Southeast Floating Docks*,
632 F.3d 1195 (11th Cir. 2011) ....................12

*Bank of North Georgia v. Reznick Group*,
262 F. App'x 928 (11th Cir. 2008) ....................17

*Barber v. Business Prods. Ctr.*,
677 So. 2d 223 (Ala. 1996), *overruled in part on other grounds*,
*White Sands Group v. PRS II*, 32 So. 3d 5....................19, 20

*Bastian v. Petren Resources Corp.*,
648 N.E.2d 165 (Ill. App. Ct. 1995) ....................24

*Bastian v. Petren Resources Corp.*,
892 F.2d 680 (7th Cir. 1990) ....................21, 22, 23, 24, 25, 26

*Bell Atl. v. Twombly*,
550 U.S. 544 (2007) ....................4, 11, 13, 18, 27

*Berckeley Invest. Group v. Colkitt*,
455 F.3d 195 (3d Cir. 2006) ....................22

*Blumberg v. Touche Ross & Co.*,
514 So. 2d 922 (Ala. 1987) ....................18

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir. 1981) ....................17

*Case v. State Farm Mut. Auto. Ins.*,
294 F.2d 676 (5th Cir. 1961) ....................17

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Cellnet Data Sys., In re,*
327 F.3d 242 (3d Cir. 2003)....................29

*Cherry, Bekaert & Holland v. Brown,*
582 So. 2d 502 (Ala. 1991)....................11

*Chicago, R.I. & P. R.R., In re,*
860 F.2d 267 (7th Cir. 1988)....................29

*Crommelin v. Montgomery Independent Telecasters,*
194 So. 2d 548 (Ala. 1967)....................28

*Dura Pharms. v. Broudo,*
544 U.S. 336 (2005)....................22, 24

*DZ Bank v. McCranie,*
2011 WL 3862635 (M.D. Fla. Aug. 31, 2011)....................12

*Elizabeth Homes, L.L.C. v. Cato,*
968 So. 2d 1 (Ala. 2007)....................15

*Evra Corp. v. Swiss Bank Corp.,*
673 F.2d 951 (7th Cir. 1982)....................28

*Ex parte Certain Underwriters at Lloyd's of London,*
815 So. 2d 558 (Ala. 2001)....................15

*Ex parte Harold L. Martin Distrib. Co.,*
769 So. 2d 313 (Ala. 2000)....................22

*Financial Sec. Assur. v. Stephens, Inc.,*
500 F.3d 1276 (11th Cir. 2007)....................4, 11

*FindWhat Investor Group v. FindWhat.com,*
658 F.3d 1282 (11th Cir. 2011)....................22

*Gateway Trade Finance v. Howell,*
2009 WL 1507537 (M.D. Ala. May 29, 2009)....................11, 12

*Gooden v. City of Talladega,*
966 So. 2d 232 (Ala. 2007)....................21

*Green Leaf Nursery v. E.I. DuPont de Nemours & Co.,*
341 F.3d 1292 (11th Cir. 2003)....................14

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Griffin Indus. v. Irvin*,
496 F.3d 1189 (11th Cir. 2007) ....................13

*Hartshorn v. State Farm Ins.*,
838 N.E.2d 211 (Ill. App. Ct. 2005) ....................12, 13

*Hicks v. Airborne Express*,
858 N.E.2d 48 (Ill. App. Ct. 2006) ....................30

*Hilliard v. City of Huntsville Elec. Util. Bd.*,
599 So. 2d 1108 (Ala. 1992)....................22

*Hirsch v. Arthur Andersen & Co.*,
72 F.3d 1085 (2d Cir. 1995)....................13

*HomeBanc Corp. Sec. Litig., In re*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010) ....................27

*Hoopla Sports & Entertainment v. Nike, Inc.*,
947 F. Supp. 347 (N.D. Ill. 1996) ....................14

*Lemon v. Golf Terrace Owners Ass'n*,
611 So. 2d 263 (Ala. 1992)....................15

*LHLC Corp. v. Cluett, Peabody & Co.*,
842 F.2d 928 (7th Cir. 1988) ....................22, 23

*Locke v. Ozark City Bd. of Educ.*,
910 So. 2d 1247 (Ala. 2005)....................15, 19, 20

*Martin v. Heinold Commodities*,
643 N.E.2d 734 (Ill. 1994)....................21, 23

*Mask v. Chickering Claims/Aetna*,
2006 WL 3770607 (M.D. Ala. Dec. 21, 2006)....................12

*Morrow v. Green Tree Servicing*,
360 F. Supp. 2d 1246 (M.D. Ala. 2005) ....................12

*Movitz v. First Nat'l Bank of Chicago*,
148 F.3d 760 (7th Cir. 1998) ....................13, 22

*Mukamal v. Bakes*,
378 F. App'x 890 (11th Cir. 2010) ....................11

## TABLE OF AUTHORITIES
(continued)

**Page**

*N-Tron Corp. v. Rockwell Automation*,
2010 WL 653760 (S.D. Ala. Feb. 18, 2010).....12

*North River Ins. v. Jones*,
655 N.E.2d 987 (Ill. App. Ct. 1995).....30, 31

*Puckett, Taul & Underwood, Inc. v. Schreiber Corp.*,
551 So. 2d 979 (Ala. 1989).....30

*Quail Cruises v. Agencia de Viagens*,
645 F.3d 1307 (11th Cir. 2011).....4

*Ralston, In re*,
401 F.2d 293 (6th Cir. 1968).....29

*Redfield v. Continental Cas. Co.*,
818 F.2d 596 (7th Cir. 1987).....12, 13, 14

*Robbins v. Koger Props.*,
116 F.3d 1441 (11th Cir. 1997).....22, 23, 25

*Rosengard v. McDonald*,
562 N.E.2d 583 (Ill. App. Ct. 1990).....25

*Rousseff v. E.F. Hutton Co.*,
843 F.2d 1326 (11th Cir. 1988).....25

*Rutley v. Country Skillet Poultry*,
549 So. 2d 82 (Ala. 1989).....15

*Ryan v. Kanne*,
170 N.W.2d 395 (Iowa 1969).....21

*Sabir v. ADT Security Services*,
2008 WL 1924984 (M.D. Ala. Apr. 30, 2008).....15, 19, 20

*Saia Food Distribs. v. SecurityLink*,
902 So. 2d 46 (Ala. 2004).....30, 31

*Schaaf v. Residential Funding Corp.*,
517 F.3d 544 (8th Cir. 2008).....22

*Sec. Cap. Assur. Ltd. Sec. Litig., In re*,
729 F. Supp. 2d 569 (S.D.N.Y. 2010).....27

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Seven Towns, Ltd. v. Western Publishing*,
1995 WL 745898 (N.D. Ill. Dec. 13, 1995)....................14

*Southern Med. Health Sys. v. Vaughn*,
669 So. 2d 98 (Ala. 1995)....................12

*Universal Express v. SEC*,
177 F. App'x 52 (11th Cir. 2006)....................4, 27

*Usery, In re*,
123 F.3d 1089 (8th Cir. 1997)....................29

*Van Der Molen v. Washington Mut. Finance*,
835 N.E.2d 61 (Ill. App. Ct. 2005)....................12

*Verilink Corp., In re*,
405 B.R. 356 (Bankr. N.D. Ala. 2009)....................11, 15, 25

**STATUTES AND RULES**

11 U.S.C. § 541(a)(1)....................3

Fed. R. Evid. 803(8)....................27

**OTHER AUTHORITIES**

24 WILLISTON ON CONTRACTS § 64:12 (4th ed.)....................28

BLACK'S LAW DICTIONARY 445-46 (9th ed. 2009)....................28

W. Keeton, D. Dobbs, R. Keeton & D. Owen, PROSSER AND KEETON ON LAW OF TORTS §
110, (5th ed. 1984)....................23, 24

## INTRODUCTION

Plaintiff Colonial BancGroup, Inc. (together with its co-plaintiff chapter 11 bankruptcy trustee, "BancGroup"), acting through its wholly owned subsidiary, Colonial Bank, joined with a Colonial Bank customer in a fraudulent scheme that the fraudsters concealed from banking regulators, auditors, and (according to the complaint) others at BancGroup for seven years. After the fraud was uncovered in 2009, the bank failed and was taken over by the FDIC, BancGroup filed for bankruptcy, and two Colonial insiders eventually pled guilty to criminal charges, one receiving an eight-year sentence as a result. Now, BancGroup is suing two accounting firms, PricewaterhouseCoopers LLP ("PwC") and Crowe Horwath LLP (formerly Crowe Chizek and Company LLC), attempting to blame them for the criminal fraud.

Crowe did not audit BancGroup's financial statements; BancGroup hired Crowe only to provide certain outsourced internal audit services under the direction of BancGroup itself. Crowe's duties were delineated in engagement letters that BancGroup signed and accepted no less than seven times. Under the terms of these engagement letters, BancGroup's General Auditor and Audit Committee determined both the areas of the Bank that Crowe would examine and the scope and extent of Crowe's work within those areas. Not surprisingly, given Crowe's limited role, the agreements equally limited Crowe's potential exposure to liability, including by barring all claims for consequential and incidental damages.

The complaint violates the parties' agreement in numerous respects. Crowe moved to dismiss the original complaint on that basis (Dkt. No. 25), and in response, plaintiffs filed an amended complaint ("Cmplt."). Despite the amendment, the two claims asserted against Crowe (breach of contract and negligence) remain fatally flawed for several reasons.

The contract claim is governed by Illinois law (the Crowe-BancGroup engagement letters

have Illinois choice-of-law provisions), and Illinois law requires a plaintiff to allege, as an element of its cause of action, that it complied with *all* of its contractual obligations. The new complaint adds a conclusory allegation that BancGroup "performed, or substantially performed, its material obligations" (¶ 180), but the actual facts alleged elsewhere in the complaint make clear that BancGroup did not comply with a critical obligation set forth in the engagement letters: BancGroup's explicit agreement to "ensure" that "all" information provided to Crowe would be "accurate and complete in all material respects," without any material omissions. The failure to allege that BancGroup performed this specific contractual obligation was the focal point of Crowe's previous motion to dismiss, yet the amended complaint still does not make this allegation. And no wonder: given that the complaint admits that Colonial insiders concealed a criminal fraud for more than seven years, including by creating false documents to hide fictitious assets, BancGroup cannot possibly show that it complied with its contractual duty to ensure that Crowe received information that was accurate, complete, and without material omissions. Accordingly, the contract claim against Crowe is legally insufficient and must be dismissed.

The fundamental problem with the putative negligence claim is that it is based on allegations that Crowe breached professional duties it purportedly assumed by agreeing to act as BancGroup's internal auditor. But the engagement letters make clear that Crowe did *not* agree to serve as internal auditor—Crowe agreed only to provide certain outsourced internal audit services under the direction of BancGroup's General Auditor and Audit Committee. In fact, the letters provide, *as federal regulators require*, that *BancGroup's* management and Audit Committee must "maintain ownership" over the entire internal audit function; they further state that BancGroup's General Auditor and Audit Committee, as the parties in charge, are responsible for "determining and approving" the nature and scope of Crowe's work. Because the complaint

does not allege that Crowe violated any professional duties *applicable to the role it actually played*, and because plaintiffs cannot base a claim on an alternative allegation that is contradicted by the plain language of the parties' contract (on which the complaint otherwise relies), the so-called negligence claim fails. As alleged, Crowe was obligated merely to abide by its contract and, thus, to do as instructed by BancGroup's General Auditor and Audit Committee. Under Alabama law (which determines the viability of purported tort claims seeking redress for alleged injuries occurring in Alabama), claims for breach of duties established by contract do not sound in tort, particularly when all that is alleged is a failure to perform contractual obligations.

Both claims against Crowe are also defective because the complaint does not allege loss causation (also known as proximate cause)—that is, that BancGroup would have avoided the losses it now claims had the facts been as allegedly represented by Crowe and there had been no fraud. Absent allegations of loss causation, there is no causal connection between the defendant's alleged misconduct and the plaintiff's alleged harm—no indication that the defendant's conduct, rather than something else, caused the purported losses. That is the case here—the complaint does not allege that BancGroup would have avoided its alleged losses in the absence of the fraud. The lack of such an allegation is especially telling because although Crowe's prior motion to dismiss emphasized this omission and plaintiffs went to the trouble of amending their complaint in response, the necessary allegation still does not appear. The complaint does not plead, as it must, that Crowe's purported misconduct caused BancGroup's alleged losses.

The claims against Crowe are also deficient because Crowe and BancGroup agreed in the engagement letters that Crowe would not be liable for *any* consequential or incidental damages—a provision that binds the bankruptcy trustee because he stands in BancGroup's shoes. See 11 U.S.C. § 541(a)(1). Illinois and Alabama regularly enforce such provisions against

plaintiffs alleging breach of contract and negligence claims. Other than a new claim seeking the return of all fees paid to Crowe (which fails because plaintiffs do not allege that *all* work performed by Crowe over seven years had no value), the complaint seeks only consequential damages, which the contract explicitly bars.

## FACTUAL BACKGROUND

For purposes of this motion only, the complaint's well-pleaded allegations are taken as true, *Bell Atl. v. Twombly*, 550 U.S. 544, 555-56 (2007), but conclusory allegations are not, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Financial Sec. Assur. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007). On a motion to dismiss, the Court also may consider documents submitted by the defendants when the complaint refers to the documents, the documents are central to the plaintiffs' claim, and the documents' contents are not in dispute. *Quail Cruises v. Agencia de Viagens*, 645 F.3d 1307, 1310 n.5 (11th Cir. 2011); *Financial Sec.*, 500 F.3d at 1284. In addition, the Court may take judicial notice of public records, including documents filed in other courts. *Adams v. Kellett*, 360 F. App'x 67, 69 (11th Cir. 2010); *Universal Express v. SEC*, 177 F. App'x 52, 53 (11th Cir. 2006).

**A. Crowe's Engagement Letters.** Crowe is an accounting firm engaged by BancGroup to provide certain outsourced internal auditing services, under the direction of BancGroup, between 2002 and 2009. Those services are detailed in engagement letters signed annually by both Crowe and BancGroup between 2002 and 2009. See Cmplt. ¶¶ 118-20 (alleging also that the engagement letters for fiscal years 2005-2008 described "the nature and scope of the services [Crowe] would provide to BancGroup"). These engagement letters were all substantially identical. See *id.* ¶¶ 119-20. A representative letter is attached as Ex. A (engagement letter for the twelve-month period ending March 31, 2008). The engagement letters incorporated and

attached additional engagement terms that also apply to the parties' relationship and govern any disputes arising out of that relationship. See attachment to Ex. A.

The engagement letters did *not* engage Crowe as BancGroup's internal auditor. Rather, the letters stated:

> The Audit Committee and senior management of the Bank *must maintain ownership of the internal audit function and provide active oversight of the internal audit activities*. They are responsible for having an effective system of internal control and effective internal audit function in place. They are also responsible for ensuring that the importance of internal control is understood and respected throughout the institution.[1]

Ex. A at 3-4 (emphasis added).

Accordingly, the engagement letters provided that "[t]he Bank is responsible for designating a competent individual, preferably within senior management, as the General Auditor, to be responsible for and to oversee the internal audit services function." *Id.* at 3. The "General Auditor is responsible for the results of the audit work, including findings, conclusion, and recommendations"; is "the coordinator for all internal audit services activities"; and is the "principal person responsible for reporting internal audit services activities to the Audit Committee." *Id.*

The engagement letters stated that Crowe would "assist" the General Auditor in determining the risks to be reviewed and "recommend" testing procedures to be employed, but the General Auditor, "in conjunction with the Audit Committee, will be responsible for *determining* and approving *the risk, scope, and frequency of internal audit service activities*." *Id.*

---

[1] The quoted language from the engagement letter comes straight out of federal regulators' guidance on internal audit outsourcing: "In any outsourced internal audit arrangement, the institution's board of directors and senior management must maintain ownership of the internal audit function and provide active oversight of outsourced activities." Board of Governors of the Federal Reserve System, FDIC, Office of the Comptroller of the Currency, Office of Thrift Supervision, *Interagency Policy Statement on the Internal Audit Function and its Outsourcing*, at 8 (Mar. 17, 2003) (Ex. B).

(emphasis added). Thus, even within those areas of the Bank where Crowe was asked to perform procedures, the scope of its work was determined by the General Auditor and the Audit Committee. See also *id*. at 2 ("We will perform periodic internal audit services, *as authorized by the General Auditor*, based upon the approved risk-based audit plan.…Specifics concerning the risks, frequency, and scope of the areas to be reviewed will be outlined within the internal audit services plan") (emphasis added).

The Interagency Policy Statement (Ex. B; see n.1, *supra*) required no less: "The outsourcing vendor may assist the audit staff in determining risks to be reviewed and may recommend testing procedures, but *the internal audit manager is responsible for approving the audit scope, plan, and procedures to be performed*," as well as being "responsible for the results of the outsourced audit work, including findings, conclusions, and recommendations." Ex. B at 8 (emphasis added). "In managing the internal audit function, the manager of internal audit is responsible for control risk assessments, audit plans, audit programs, and audit reports." *Id*. at 4.

The engagement letters stated that the General Auditor's determinations were subject to review only by the Audit Committee, which "[a]t least annually" was obligated to "review and approve the…scope of the audit plan, including how much the General Auditor relies on the work of Crowe Chizek." Ex. A at 3. To insure that the General Auditor assumed responsibility for all conclusions derived from a process he had overseen from the outset, Crowe's engagement letters expressly barred Crowe from "report[ing] to the Audit Committee on behalf of management or the General Auditor." *Id*. The engagement letters further provided that "we [Crowe] cannot perform management functions, make management decisions, or appear to act in a capacity equivalent to a member of the Bank's management or an employee." *Id*. at 1.

The engagement letters stated that Crowe's internal audit services included "a review of

key internal controls and detail testing of a sample of transactions. Higher risk areas will be covered in more detail and with greater frequency." *Id*. at 2. Because Crowe's internal audit services included "the concepts of selective testing and sampling," the letters provided that Crowe's services, "of necessity, would not include all aspects of the Bank's internal control nor would they include a detailed examination of all transactions." *Id*. Thus, Crowe's services did "not guarantee that errors or irregularities will not occur" or that Crowe necessarily would "detect errors or irregularities that may exist." *Id*.

In order for Crowe to perform its work properly, the engagement letters stated: "The Bank's management will also *ensure* that *all* information provided to us is *accurate and complete in all material respects, contains no material omissions*, and is updated on a prompt and continuous basis." *Id*. at 4 (emphasis added). The engagement terms also limited the types of damages that could be recovered:

> Any liability of Crowe Chizek to you shall not include any special, consequential, incidental, punitive, or exemplary damages or loss nor any lost profits, savings, or business opportunity.

*Id*., Engagement Terms at 2.

The engagement letters provided that "[t]his Agreement is governed by the internal laws of the State of Illinois." Ex. A at 6. The letters did not engage Crowe to audit BancGroup's financial statements or BancGroup's assertions regarding the effectiveness of the company's internal controls over financial reporting; PwC performed those responsibilities. Cmplt. ¶¶ 10, 50.

**B. The Colonial Insiders' Fraudulent Scheme.** The complaint alleges that between 2002 and 2009 a fraud occurred at BancGroup, which involved, among others, the director of Colonial's Mortgage Warehouse Lending Division ("MWLD") and at least one other MWLD

employee, both of whom later pled guilty to federal criminal charges. Cmplt. ¶¶ 1, 3, 15, 24; Exs. C, D (guilty pleas of Catherine Kissick, a senior vice president of Colonial and head of the MWLD, and Teresa Kelly, an operations supervisor at the MWLD). The fraudulent scheme centered on a MWLD customer, Taylor Bean & Whitaker Mortgage Corp., a mortgage lender to which the MWLD provided short-term financing. Cmplt. ¶¶ 2, 17-18. The Colonial insiders and Taylor Bean concealed the fraud from BancGroup (including its Board of Directors and Audit Committee), bank regulators, and auditors. *Id.* ¶ 24; Ex. C ¶ 7; Ex. D ¶ 7.

The fraud had three principal phases. First, starting in 2002, Taylor Bean began overdrawing its accounts at Colonial by increasingly larger amounts, which was concealed by the Colonial insiders who participated in the fraud. Cmplt. ¶¶ 23-24, 26. Then, in late 2003, the fraudsters caused Taylor Bean's account deficit to be transferred to "COLB," a mortgage loan purchase facility at MWLD. *Id.* ¶¶ 27-28; Ex. C ¶ 4; Ex. D ¶ 4. Under COLB, Colonial paid Taylor Bean for participation interests in individual mortgage loans extended by Taylor Bean, pending the resale of those interests to third-party investors; Colonial was to be repaid when the interests were sold. Cmplt. ¶ 28; Ex. C ¶ 4; Ex. D ¶ 4. However, in order to avoid scrutiny from regulators, auditors, and Colonial's management, Taylor Bean—with the knowledge of the Colonial insiders—provided Colonial with false loan data indicating that it was selling Colonial's interests in the mortgage loans to investors; in reality, many of the loans were worthless. Cmplt. ¶¶ 28-30; Ex. C ¶¶ 5-7; Ex. D ¶¶ 5-7.

In the third phase of the Colonial-Taylor Bean scheme, Colonial employees transferred the deficit from COLB into MWLD's Assignment of Trade ("AOT") facility between late 2004 and mid-2005. Cmplt. ¶ 32; Ex. C ¶ 8; Ex. D ¶ 8. Under AOT, Colonial paid Taylor Bean for interests in pools of loans rather than individual loans. Here, too, the conspirators caused

Colonial to buy fictitious assets, again creating a document trail that gave the false appearance that the valueless Taylor Bean assets were being sold periodically. Cmplt. ¶¶ 3, 33, 36; Ex. C ¶¶ 9-13; Ex. D ¶¶ 9-13.

**C. Discovery Of The Fraud.** By 2007, the complaint alleges, "nearly half of the loans allegedly securing the Taylor Bean obligations and identified on BancGroup's financial statements were fictitious or already pledged to third parties and, therefore, utterly worthless." Cmplt. ¶ 21. Plaintiffs allege that if PwC and Crowe had "properly discharged" their responsibilities, "the ongoing fraud" and the "hole in BancGroup's balance sheet…would have been detected by no later than fiscal year-end 2007," and BancGroup's management "could" have taken "corrective measures," including "placing BancGroup into bankruptcy at that point, thereby avoiding the deepening of BancGroup's insolvency." *Id.* ¶ 6; see also *id.* ¶ 47 (alleging that "banking regulators" also may have compelled a bankruptcy filing at that time). The complaint alleges that PwC and Crowe failed in performing their responsibilities because they "conducted no meaningful audit of the AOT facility or the financing lines that Taylor Bean had with the MWLD," and made "[n]o effort…to understand or audit the AOT facility at all." *Id.* ¶ 4.

The fraud was uncovered on August 3, 2009. *Id.* ¶¶ 1, 7. As of that time, the complaint alleges, there was a $1.6-$1.8 billion "hole" in BancGroup's balance sheet. *Id.* ¶¶ 6-7, 35. Banking regulators closed Colonial on August 14, 2009. *Id.* ¶ 1. BancGroup's bankruptcy filing followed soon thereafter, on August 25, 2009. *Id.*

**D. Plaintiffs' Claims.** Two claims are alleged against Crowe: breach of contract and negligence/accounting malpractice. *Id.* ¶¶ 171-81. The breach of contract claim alleges that Crowe breached its "contractual duties" by, among other things, "failing to perform its audits in accordance with…express promises that it made in its engagement letters and Internal Control

reports." *Id*. ¶ 179. In particular, Crowe allegedly breached its contractual promises to

> "assist in developing an annual risk-based internal audit services plan";
>
> "direct, review, and supervise the day-to-day performance of the audit plan";
>
> "comply with applicable AICPA, U.S. Securities and Exchange Commission (SEC), Public Company Accounting Oversight Board (PCAOB), and other regulatory independence guidance";
>
> "review…key internal controls" and perform "detail[ed] testing of a sample of transactions," including covering "higher risk areas…in more detail and with greater frequency"; and
>
> perform internal audit services regarding "monitoring controls over Mortgage Warehouse Lending activity, managing customer relationships, processing and recording transactions, safeguarding assets, and regulatory compliance."

*Id*. ¶¶ 177-78.

The negligence claim alleges that Crowe breached its professional responsibilities because it

> "failed to gain an understanding of BancGroup's MWLD or the nature of its financing transactions with Taylor Bean";
>
> "failed to perform any audit procedures with respect to AOT and otherwise failed to design audit procedures which would have addressed" the "'high' operational risk" posed by those loans;
>
> "avoided Taylor Bean loans at the time it conducted critical audit tests";
>
> "failed to specifically evaluate the potential for the occurrence of fraud and how fraud risk is managed in the MWLD and to implement internal audit tests that were designed to unearth such fraud"; and
>
> "failed to safeguard BancGroup's assets" because it "fail[ed] to appropriately monitor internal controls relating to the MWLD."

*Id*. ¶ 173.

The complaint also alleges breach of contract and negligence/accounting claims against PwC, which audited BancGroup's financial statements and the effectiveness of BancGroup's

internal controls over financial reporting. *Id*. ¶¶ 50, 161-70.

## ARGUMENT

In order to withstand a motion to dismiss, it is "necessary that a complaint 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" *Financial Sec.*, 500 F.3d at 1282-83. Moreover, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim has "facial plausibility" only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. A complaint must be dismissed when it "stops short of the line between possibility and plausibility of 'entitle[ment] to relief'" (*Twombly*, 550 U.S. at 557)—a claim is insufficient when it is merely "'conceivable'" and "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 129 S. Ct. at 1950-51.

### I. The Breach Of Contract Claim Fails Because Plaintiffs' Own Allegations Demonstrate That BancGroup Did Not Comply With Its Obligation To Ensure That Crowe Received Accurate And Complete Information.

Illinois law governs the breach of contract claim against Crowe. BancGroup and Crowe selected Illinois law in the engagement letters (Ex. A at 6), and Alabama—whose choice-of-law rules apply, *Mukamal v. Bakes*, 378 F. App'x 890, 896 (11th Cir. 2010); *In re Verilink Corp.*, 405 B.R. 356, 365 (Bankr. N.D. Ala. 2009)—routinely enforces contractual choice-of-law provisions: "Alabama law has long recognized the right of parties to an agreement to choose a particular state's laws to govern an agreement." *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506 (Ala. 1991). See, *e.g.*, *Gateway Trade Finance v. Howell*, 2009 WL 1507537, at *2 n.2 (M.D. Ala. May 29, 2009) (applying Washington law pursuant to a contract's choice-of-law

provision); *N-Tron Corp. v. Rockwell Automation*, 2010 WL 653760, at *5 n.9 (S.D. Ala. Feb. 18, 2010) (same as to Wisconsin law). Choice-of-law provisions incorporate the chosen state's substantive law, *Auto-Owners Ins. v. Southeast Floating Docks*, 632 F.3d 1195, 1202 (11th Cir. 2011), and it is well settled that the elements of a cause of action are substantive, see *Gateway*, 2009 WL 1507537, at *2; *DZ Bank v. McCranie*, 2011 WL 3862635, at *2-3 (M.D. Fla. Aug. 31, 2011).

One essential element of a breach of contract claim under Illinois law is "performance by the plaintiff." *Van Der Molen v. Washington Mut. Finance*, 835 N.E.2d 61, 69 (Ill. App. Ct. 2005). To satisfy this element, "a breach-of-contract plaintiff must plead that he or she performed all of his or her obligations under the contract." *Hartshorn v. State Farm Ins.*, 838 N.E.2d 211, 215 (Ill. App. Ct. 2005). See also, *e.g.*, *Redfield v. Continental Cas. Co.*, 818 F.2d 596, 610 (7th Cir. 1987) ("An essential allegation of a complaint based upon a breach of contract is that the plaintiff performed all contractual conditions required of him") (collecting Illinois cases). And "[a]bsent such an allegation, the…complaint fails to state a cause of action for breach." *Id.*[2]

Unlike its predecessor, the amended complaint purports to allege this essential element of a breach-of-contract claim: it alleges generally that "BancGroup performed, or substantially performed, its material obligations under the engagement letters," and then lists several obligations that BancGroup allegedly performed, including "the provision of access to books and records of BancGroup and its subsidiaries to the extent and in accordance with Crowe's request."

---

[2] Alabama law likewise requires that the plaintiff must allege its own performance under the contract as an essential element of a breach of contract claim. See *Southern Med. Health Sys. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995); *Morrow v. Green Tree Servicing*, 360 F. Supp. 2d 1246, 1251 (M.D. Ala. 2005) (Thompson, J.); *Mask v. Chickering Claims/Aetna*, 2006 WL 3770607, at *4 (M.D. Ala. Dec. 21, 2006).

Cmplt. ¶ 180. But the complaint *still* does not allege that BancGroup performed its contractual obligation to "ensure that all information provided to us [Crowe] is accurate and complete in all material respects, contains no material omissions, and is updated on a prompt and continuous basis" (Ex. A at 4)—even though it was BancGroup's failure to allege performance of *this* obligation that was the subject of Crowe's motion to dismiss the contract claim in the original complaint, and even though a complaint must allege that the plaintiff complied with "all" of its contractual obligations. *E.g., Hartshorn*, 838 N.E.2d at 215; *Redfield*, 818 F.2d at 610.

Plaintiffs' new allegations in paragraph 180 do not save the breach-of-contract claim against Crowe. *First*, the complaint's failure to allege that BancGroup performed the key contractual obligation at issue—to "ensure" that "all" information that Crowe received "is accurate and complete in all material respects" and "contains no material omissions" (Ex. A at 4)—is not rectified by the general allegation that "BancGroup performed, or substantially performed, its material obligations under the engagement letters." Cmplt. ¶ 180. The Supreme Court has made clear that "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertions' devoid of 'further factual enhancement'" are not enough to "survive a motion to dismiss." *Iqbal*, 129 S. Ct. at 1949.

*Second*, "[g]eneral conclusory allegations need not be credited…when they are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995). "Our duty to accept the facts in the complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations." *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007). And when the "'path[] to relief'" is "'blocked'" or "'refuted'" by the plaintiff's "'own allegations,'" the complaint must be dismissed. *Id*. at 1205; see also *id*. at 1210 ("the facts in Griffin's own complaint plainly

contradict the conclusory allegation that the defendants had no rational basis for taking regulatory action"). Here, the conclusory allegation that BancGroup "performed, or substantially performed, its material obligations" (Cmplt. ¶ 180) is fatally undermined by the complaint's detailed allegations of a seven-year fraud engaged in by high-ranking Colonial insiders that involved falsified documents and worthless assets, all of which was admittedly concealed from Crowe. Given those detailed allegations, BancGroup plainly did not perform its contractual obligation to "ensure" that "all" of the information that Crowe received was "accurate and complete in all material respects" and "contain[ed] no material omissions." Ex. A at 4. BancGroup's duty was not limited to information furnished by employees of BancGroup itself.

Because Crowe's previous motion to dismiss emphasized BancGroup's failure to perform this fundamental contractual obligation, the amended complaint's omission of any allegation that BancGroup satisfied this contractual requirement speaks volumes. Plaintiffs evidently know that they cannot, consistent with their obligations under Rule 11, make such an allegation in light of the long-running fraud that was concealed from Crowe. As a result, plaintiffs cannot recover on the breach-of-contract claim against Crowe, which therefore must be dismissed with prejudice. *E.g.*, *Redfield*, 818 F.2d at 610; *Hoopla Sports & Entertainment v. Nike, Inc.*, 947 F. Supp. 347, 357 (N.D. Ill. 1996); *Seven Towns, Ltd. v. Western Publishing*, 1995 WL 745898, at *1 (N.D. Ill. Dec. 13, 1995).

## II. The Complaint Does Not Allege A Negligence Claim Against Crowe.

The engagement letters' choice-of-law provision, which states that "[t]his Agreement is governed by" Illinois law (Ex. A at 6), does not apply to the negligence claim against Crowe. See *Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1300 (11th Cir. 2003). Accordingly, for that claim we address the law of Alabama, the state in which BancGroup was

headquartered and purportedly injured, and where the engagement letters that established the parties' relationship were addressed. See *Verilink*, 405 B.R. at 365. As explained below, the negligence claim against Crowe is fatally flawed.

### A. Plaintiffs Do Not Allege That Crowe Violated Any Professional Duties That Apply To Providers Of Outsourced Internal Audit Services.

Although plaintiffs have labeled count III as a negligence claim against Crowe, a pleading's caption "'is not the determining factor of what the pleading actually is or what it states.'" *Elizabeth Homes, L.L.C. v. Cato*, 968 So. 2d 1, 8 (Ala. 2007) (quoting *Rutley v. Country Skillet Poultry*, 549 So. 2d 82, 84 (Ala. 1989)). Rather, "[i]n determining the nature of a cause of action, this Court looks to allegations in the body of the complaint, not the caption or label the party applies"—in other words, Alabama "'look[s] to substance over form.'" *Elizabeth Homes*, 968 So. 2d at 8.

Alabama has long followed the rule that when the defendant allegedly "failed to perform its contractual duties," the "complaint sounds in contract, not in tort." *Locke v. Ozark City Bd. of Educ.*, 910 So. 2d 1247, 1254 (Ala. 2005). Alabama law does not permit a plaintiff to assert "breach of contract claims recast as tort claims." *Sabir v. ADT Security Services*, 2008 WL 1924984, at *4 (M.D. Ala. Apr. 30, 2008). A putative negligence claim that is, "in effect, nothing more than a restatement of [a] claim for breach of contract," cannot be asserted in tort. *Lemon v. Golf Terrace Owners Ass'n*, 611 So. 2d 263, 264 n.1 (Ala. 1992).

In some circumstances, a plaintiff may assert a tort claim by alleging "'the negligent breach of a duty implied by law, such duty being not expressed in the contract, but arising by implication of law from the relation of the parties created by the contract.'" *Ex parte Certain Underwriters at Lloyd's of London*, 815 So. 2d 558, 563 (Ala. 2001). The plaintiffs here appear to attempt to do that; they assert a negligence claim based on Crowe's purported extracontractual

duties that apply to an internal auditor. But that claim is based on an erroneous premise that is inconsistent with the plain language of the engagement letters, which control over the allegations of the complaint and which plaintiffs elsewhere admit describe "the nature and scope of the services [Crowe] would provide to BancGroup" (Cmplt. ¶ 119) and set forth Crowe's "contractual duties" and "express promises" (*id*. ¶ 179).

In particular, the negligence claim alleges that Crowe owed BancGroup "a duty to exercise due professional care *in the conduct of its internal audits of BancGroup's financial statements*." *Id*. ¶ 172 (emphasis added). And the allegations of the purported sources for Crowe's professional duties are all based on the assumption that Crowe was "BancGroup's *internal auditor*." *Id*. ¶¶ 121-23 (citing standards that allegedly apply to an "internal auditor") (emphasis added). See also *id*. ¶ 11 (alleging that Crowe "serv[ed] as BancGroup's internal auditor").

The engagement letters, however, make clear that Crowe was *not* BancGroup's internal auditor. Quite to the contrary, Crowe agreed only to provide "outsourced internal audit services" under the direction of BancGroup itself. Ex. A at 2. The engagement letters stressed that "[t]he Audit Committee and senior management of the Bank *must maintain ownership of the internal audit function* and provide active oversight of the internal audit activities" (*id*. at 3; emphasis added) and that "we [Crowe] cannot perform management functions" (*id*. at 1). Indeed, federal regulators *prohibit* the company from delegating the internal audit function to anyone else. Like the engagement letter, the federal regulators' policy statement on internal audit outsourcing provides: "In any outsourced internal audit arrangement, the institution's board of directors and senior management *must maintain ownership of the internal audit function* and provide active oversight of outsourced activities." *Interagency Policy Statement*, at 8 (Ex. B) (emphasis added).

The *Interagency Policy Statement* stresses that responsibility for a company's internal audit function "*cannot be delegated to anyone else*"; rather, the company's directors and management must retain "responsibility for maintaining an effective system of internal control and for overseeing the internal audit function." *Id*. at 2.

Plaintiffs are bound by what the engagement letters actually say; they cannot base a claim on allegations that are inconsistent with the terms of the engagement letters. See *Bank of North Georgia v. Reznick Group*, 262 F. App'x 928, 930 (11th Cir. 2008) (affirming dismissal of negligence claims against an auditor and refusing to credit the allegation that the auditor "intended the audit to be used to induce" the plaintiff to refinance a loan, because that allegation was contradicted by documents demonstrating that "the purpose of the audit was to submit it to Merrill Lynch…so that Merrill Lynch could monitor the financial health" of the audited company); *Case v. State Farm Mut. Auto. Ins.*, 294 F.2d 676, 677-78 (5th Cir. 1961) (affirming dismissal of a tort claim for wrongful termination of a contract, because the allegations were contradicted "by the explicit terms of the contract," which permitted either party to terminate with or without cause).[3]

Not only is the negligence claim against Crowe based on a false premise that is contradicted by the parties' contracts and forbidden by federal regulators, but the complaint does not allege that Crowe violated *any* professional duties that apply as a matter of law to providers of outsourced internal audit services—Crowe's actual role. The alleged professional duties that apply to internal auditors (Cmplt. ¶¶ 121-23)—the *only* such duties mentioned in the

---

[3] *Case* is binding precedent in the 11th Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

complaint—are irrelevant because that was not—and could not be—Crowe's role.[4]

This case is thus unlike *Blumberg v. Touche Ross & Co.*, 514 So. 2d 922 (Ala. 1987), where the court held that a plaintiff could sue the auditor of a company's financial statements in contract or tort for allegedly violating its "promise[] to use generally accepted accounting principles and generally accepted auditing standards." *Id.* at 927. The audit of a company's financial statements is a task that a company *must* delegate to an independent outside accounting firm and the company cannot tell the auditor what to do; the auditor's work is guided and governed by a broad set of recognized professional duties. In contrast, responsibility for an internal audit is a non-delegable duty of the company, and insofar as Crowe agreed to assist BancGroup by providing specified internal audit services on an outsourced basis, the engagement letters state clearly that BancGroup's General Auditor and Audit Committee would tell Crowe what to do. The complaint does not allege that Crowe violated any professional duties that apply to third-party contractors hired merely to perform specified internal audit services under the direction of the company's management and Audit Committee.

The only duties that the complaint even remotely suggests that Crowe violated in the role it actually played are contractual. The contracts bear that out: they describe in detail what Crowe is to do under the direction of BancGroup's General Auditor and Audit Committee. Because the only relevant duties alleged in the complaint were contractual, plaintiffs have not stated a claim

[4] In the engagement letters, Crowe agreed to "comply with applicable AICPA, U.S. Securities Exchange Commission (SEC), Public Company Accounting Oversight Board (PCAOB), and other regulatory independence guidance." Ex. A at 1. The complaint has one entirely conclusory allegation that Crowe violated its duty to exercise "independence" (Cmplt. ¶ 39), but because no facts are alleged to support that conclusion, it must be disregarded. *Twombly*, 550 U.S. at 555; *Iqbal*, 129 S. Ct. at 1949. In addition, the negligence claim against Crowe (Cmplt. ¶¶ 171-75) does not mention the duty to exercise independence. Even if it had, it would have nothing to do with what is at issue in this case: the scope and extent of Crowe's work, which was determined by BancGroup's General Auditor and Audit Committee, not Crowe.

for negligence. See *Sabir*, 2008 WL 1924984, at *4 (allegations that ADT negligently installed and maintained an inadequate security system did not state a claim in tort because "the only obligations [ADT] owes to [plaintiff] and his business arise out of the contract between the parties," and the plaintiff "cannot bring tort claims…which essential[ly] fault[] ADT's performance under its contract"). Accordingly, the negligence claim against Crowe should be dismissed.

**B. Allegations That The Defendant Failed To Perform Its Obligations Do Not State A Claim In Tort.**

There is another reason why the negligence claim should be dismissed. When, as here, the plaintiff and defendant were parties to a contract that was allegedly breached and the plaintiff attempts to assert a tort claim, Alabama follows the rule that "'a negligent *failure to perform* a contract express or implied…is but a breach of the contract.'" *Locke*, 910 So. 2d at 1254 (emphasis added). See also, *e.g.*, *Sabir*, 2008 WL 1924984, at *4 ("an action in tort cannot be maintained where the alleged negligence consists of failure to perform a contractual obligation"); *Armstrong Business Servs. v. AmSouth Bank*, 817 So. 2d 665, 681 (Ala. 2001) ("'a mere failure to perform a contractual obligation is not a tort'"); *Barber v. Business Prods. Ctr.*, 677 So. 2d 223, 228 (Ala. 1996) (same), *overruled in part on other grounds*, *White Sands Group v. PRS II*, 32 So. 3d 5, 14 (Ala. 2009).

That rule requires dismissal of the negligence claim against Crowe. That claim alleges *failure to perform* contractual obligations, pure and simple; it alleges that Crowe:

> "*failed to gain an understanding* of BancGroup's MWLD or the nature of its financing transactions with Taylor Bean";
>
> "*failed to perform any audit procedures* with respect to AOT and otherwise *failed to design audit procedures* which would have addressed" the "'high' operational risk" posed by those loans;

> "*avoided* Taylor Bean loans at the time it conducted critical audit tests";
>
> "*failed to specifically evaluate* the potential for the occurrence of fraud and how fraud risk is managed in the MWLD *and to implement* internal audit tests that were designed to unearth such fraud"; and
>
> "*failed to safeguard* BancGroup's assets" because it "*fail[ed] to appropriately monitor* internal controls relating to the MWLD."

*Id*. ¶ 173 (emphasis added). These are the same alleged wrongs that give rise to the purported contract liability. See *id*. ¶¶ 177-79.

In short, the negligence claim alleges nothing more than that Crowe failed to perform duties it allegedly was obligated to perform by the parties' contracts. And under Alabama law, a plaintiff "cannot bring tort claims…which essential[ly] fault[] [the defendant's] performance under its contract." *Sabir*, 2008 WL 1924984, at *4. Here, plaintiffs' negligence claim necessarily faults Crowe's "performance under its contract," because one cannot know what Crowe agreed to do without reviewing the contract, which sets forth Crowe's responsibilities. That is why the plaintiffs here may attempt to allege, if anything, a contract claim, but not a negligence claim. And because a claim that the defendant "failed to perform its contractual duties…sounds in contract, not in tort" (*Locke*, 910 So. 2d at 1254), this is an independent reason why the negligence claim against Crowe must be dismissed.

## III. The Claims Against Crowe Are Also Deficient Because They Do Not Allege Loss Causation Or Recoverable Damages.

### A. Plaintiffs' New Request For Fees Is Deficient.

Our original motion to dismiss showed that plaintiffs' claims against Crowe did not state a claim because (1) plaintiffs failed to allege loss causation (plaintiffs failed to allege that they would have avoided the losses they now claim had Crowe's statements been true), and (2) plaintiffs sought only a recovery of consequential damages, which are barred by an express

provision in the engagement letters. To try to get around these problems, the amended complaint added an allegation that BancGroup was damaged in an amount equal to all fees paid to Crowe "for audit services provided over the years." Cmplt. ¶ 48. But regardless of whether the parties' engagement letters permit such a claim,[5] the law plainly does not. Because plaintiffs do not, and cannot, allege that they received *no* value from Crowe's work over the years—work that encompassed many areas of the Bank beyond the MWLD—a claim seeking a return of *all* fees must fail. See *Ryan v. Kanne*, 170 N.W.2d 395, 400 (Iowa 1969).

This leaves plaintiffs' original claims for damages. As explained below, the remaining damages claims are defective for the same reasons explained in our original motion to dismiss: plaintiffs have still not alleged loss causation, and they are still attempting to recover consequential damages in violation of a contract provision expressly barring such a claim.

### B. The Complaint Does Not Allege Loss Causation (Also Known As Proximate Cause).

#### 1. A plaintiff must allege loss causation.

"'It is a fundamental principle applicable alike to breaches of contract and to torts'" that a plaintiff's alleged damages "'must be the natural and not merely a remote consequence of the defendant's act.'" *Martin v. Heinold Commodities*, 643 N.E.2d 734, 746 (Ill. 1994). See also *Gooden v. City of Talladega*, 966 So. 2d 232, 239-40 (Ala. 2007) ("'Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred'"). A plaintiff must "show two types of causation: (1) transaction causation; and (2) loss causation." *Martin*, 643 N.E.2d at 747 (citing *Bastian v. Petren Resources Corp.*, 892 F.2d 680 (7th Cir. 1990), and

---

[5] Absent a finding of "gross negligence or willful misconduct," the engagement letters limit Crowe's liability to those fees relating to "the portion of the work giving rise to liability." Ex. A, Engagement Terms at 2.

*LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928 (7th Cir. 1988)).

In common law terminology, the same concepts are called, respectively, but-for causation (or cause in fact) and proximate causation. *Robbins v. Koger Props.*, 116 F.3d 1441, 1447 (11th Cir. 1997); *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008); *Berckeley Invest. Group v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006). Those are the terms that Alabama uses. *E.g.*, *Ex parte Harold L. Martin Distrib. Co.*, 769 So. 2d 313, 314 (Ala. 2000); *Hilliard v. City of Huntsville Elec. Util. Bd.*, 599 So. 2d 1108, 1111-12 (Ala. 1992). What federal securities cases "call 'loss causation'…is an instance of the common law's universal requirement that the tort plaintiff prove causation." *Bastian*, 892 F.2d at 683-84. See also *Dura Pharms. v. Broudo*, 544 U.S. 336, 344-45 (2005) (citing *Bastian*, noting the "common-law roots of the securities fraud action," and basing its loss causation analysis on common law tort causation principles); *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1309 (11th Cir. 2011) (citing *Bastian* and stating that "'[c]ausation in securities law involves the same analysis of cause in fact and legal cause that was developed under the common law'").[6]

Because both types of causation must be established, it is not enough for plaintiffs to allege that they were induced to take some action (or to refrain from taking some action) because they believed the defendant's statements were true. At most, that would establish transaction or but-for causation, but not loss or proximate causation. It would show "'the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to

---

[6] Though the requirement of loss causation often arises in tort litigation, contract actions are equally subject to its demands. *Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760, 764 (7th Cir. 1998) (construing Illinois law and reversing a judgment entered in favor of a plaintiff on a jury verdict for want of proof of loss causation; "[t]his case involves a breach of contract as well as tort, but we do not understand Estock to be arguing that contract law provides a more generous measure of damages. On the contrary, consequential damages are more difficult to obtain in a breach of contract suit than in a tort suit").

be a losing one.'" *Robbins*, 116 F.3d at 1449 (quoting *Bastian*, 892 F.2d at 684).

To establish loss causation, a plaintiff has the burden of showing that he "'would not have suffered a loss if the facts were what he believed them to be.'" *Martin*, 643 N.E.2d at 747 (quoting *LHLC*, 842 F.2d at 931). The key question is whether the plaintiff's alleged loss would have "'occurred even if defendant's misrepresentation had been true[.] If the answer to this question is "yes," plaintiff has failed to prove that the misrepresentation proximately caused the [loss].'" *Martin*, 643 N.E.2d at 748 (quoting W. Prosser, TORTS § 110, at 732 (4th ed. 1971)).

The rationale for this rule is plain. If a loss would have occurred *even if the defendant's statements had been true*, the defendant in no way caused the loss. In *Bastian*, plaintiffs invested $600,000 in oil and gas limited partnerships in 1981. 892 F.2d at 682. But "1981 was a peak year for oil prices," and "prices declined steadily in the succeeding years." *Id.* at 684. By 1984, their investments were "worthless." *Id.* at 682. Seeking redress, plaintiffs sued the promoters of the partnerships, alleging that plaintiffs never would have invested "had it not been for the offering memoranda's misrepresentations and misleading omissions concerning the defendants' competence and integrity." *Id.* The district court dismissed the complaint due to "a failure to allege 'loss causation'—that is, that if the facts had been as represented by the defendants the value of the limited partnerships would not have declined." *Id.* The Court of Appeals affirmed in a decision by Judge Posner. Though plaintiffs "have alleged the cause of their entering into the transaction in which they lost money," they failed to allege "the cause of the transaction's turning out to be a losing one." *Id.* at 684. Plaintiffs "knew they were assuming a risk that oil prices might drop unexpectedly." *Id.* at 686. As a result, their investments could have failed "not because of the personal shortcomings that the defendants concealed but because of industry-wide phenomena that destroyed all or most such ventures." *Id.* at 685. If so, "plaintiffs, given their

demonstrated desire to invest in such ventures, lost nothing by reason of the defendants' fraud and have no claim to damages." *Id*. See also *Bastian v. Petren Resources Corp.*, 648 N.E.2d 165, 169 (Ill. App. Ct. 1995) (holding in parallel state court litigation that the complaint "fails to allege the necessary causal connection between defendants' alleged misconduct and the ultimate failure of the partnerships" because plaintiffs "refused to allege…that the partnerships would have fared better had the managers been competent and honest").

Indeed, if a defendant could be held liable for losses incurred by its client on account of factors unrelated to the subject matter of the defendant's representations, a defendant such as Crowe would risk a virtually open-ended exposure whenever it issued a report. That is plainly not the law. In *Askanase v. Fatjo*, 130 F.3d 657 (5th Cir. 1997), the Fifth Circuit affirmed the dismissal of common law claims against an accounting firm. A bankruptcy trustee alleged that if the accountants for a failed company (LivingWell) had performed their duties properly, "LivingWell would not have continued to exist, could not have incurred more debt, and would not have lost more money." *Id*. at 676. The Fifth Circuit rejected the trustee's theory, explaining that it "would make Ernst & Young an insurer of LivingWell because Ernst & Young would be liable for LivingWell's losses no matter what created LivingWell's losses, i.e. a recession or a decline in the fitness industry." *Id*. Indeed, courts routinely find an absence of loss causation when a claimed harm resulted from "changed economic circumstances" or "new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all" of the loss. *Dura*, 544 U.S. at 343. "[L]osses do 'not afford any basis for recovery' if 'brought about by business conditions or other factors.'" *Id*. at 344-45 (quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, PROSSER AND KEETON ON LAW OF TORTS § 110, at 767 (5th ed. 1984)).

Accordingly, a plaintiff is required to establish "'the link between the defendant's misconduct and the plaintiff's economic loss.'" *Robbins*, 116 F.3d at 1447 (quoting *Rousseff v. E.F. Hutton Co.*, 843 F.2d 1326, 1329 n.2 (11th Cir. 1988)). Unless the plaintiff shows that the defendant's conduct is "the operative reason for the pecuniary loss, he has failed to prove the requisite loss causation." *Rosengard v. McDonald*, 562 N.E.2d 583, 588 (Ill. App. Ct. 1990) (affirming dismissal of a complaint for "fail[ure] to allege a proximate cause between [the] alleged injury and defendant's actions"); *Verilink*, 405 B.R. at 364-65 (dismissing claims under Alabama law for failing to allege proximate causation where the alleged losses would have occurred regardless of the defendant's conduct). "If the plaintiffs would have lost their investment regardless of the fraud, any award of damages to them would be a windfall." *Bastian*, 892 F.2d at 684-85.

**2. The complaint here does not allege loss causation.**

The complaint alleges that Crowe's work gave BancGroup "the false impression that the MWLD was a sound, profitable business." Cmplt. ¶ 37. Thinking there was no fraud, BancGroup purportedly "incurred substantial additional debt," "expended substantial funds," and "downstreamed more than $500,000,000" to Colonial during 2008 and the first half of 2009. *Id*. ¶ 48. In response to Crowe's initial motion to dismiss, plaintiffs further amended their pleading to add that Colonial was already "insolvent" when BancGroup made each of its downstream investments. *Id*.

We will assume, for purposes of this motion, that these allegations suffice to establish transaction causation. They plainly do not, however, suggest loss causation. For one thing, they are indistinguishable from the allegations previously rejected by the Fifth Circuit in *Askanase v. Fatjo*, discussed above. For another, they do not suggest that Crowe may be blamed for any

losses BancGroup may have incurred as a result of the actions it took, including the downstream transfers.

Taking the allegations at face value, had Crowe's statements been true and there had been no fraud, BancGroup (which purportedly *thought* Crowe's statements were accurate) would have acted no differently. The same downstream transfers would have been made. If these investments thereafter would have failed—for reasons independent of the fraud—BancGroup would have ended up no differently than it did, *regardless of whether Crowe acted properly or not*. BancGroup would have "lost nothing" on account of Crowe's purported misconduct and would "have no claim to damages." *Bastian*, 892 F.2d at 685.

That is precisely what the complaint suggests. According to the allegations, though there was a "gaping hole in BancGroup's balance sheet" of "nearly $1.6 billion" "by no later than late 2007 or early 2008" due to the fraud, the situation remained salvageable: BancGroup's board of directors "could have and would have taken measures to protect BancGroup." Cmplt. ¶ 47; *id*. ¶ 6 (even with a "hole in BancGroup's balance sheet in excess of $1.8 billion" as of "fiscal year-end 2007," "corrective measures remained available"). But just eighteen months later, *and though the purported "hole" was no bigger*, the situation had become hopeless. *Id*. ¶ 7 ("By the time the fraud was exposed in 2009, more than $1.8 billion had been siphoned out of Colonial Bank and BancGroup was left with hundreds of millions of dollars in worthless or non-existent assets on its balance sheet. By that point, however, BancGroup's collapse was assured"); *id*. ¶ 35 ("By 2009, $1.6 billion of so-called Taylor Bean Plan B and Crap 'loans' remained on BancGroup's books"). Evidently something occurred between the end of 2007 and the summer of 2009—something independent of the fraud—to bring the Bank down. Of course, that is when the biggest economic downturn this country has faced since the Great Depression manifested

itself and laid waste to numerous financial institutions from coast to coast. See, *e.g.*, *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1361 (N.D. Ga. 2010) (dismissing securities fraud claim for failure to plead loss causation where the complaint "fails to make any allegations that would allow the Court to distinguish between any losses caused by Defendants' alleged misrepresentations and the collapse of the mortgage industry as a whole"); *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599-600 (S.D.N.Y. 2010) (dismissing complaint for not pleading facts showing that "Plaintiffs' loss was caused by the Defendants' alleged misstatements, as opposed to the intervening events of the housing market crises and actions by third parties"). Colonial appears to be just one of many banks to succumb to this wave of economic destruction.[7]

We are *not* asking the Court to decide what caused Colonial's demise or BancGroup's losses. This is a motion to dismiss. To defeat it, as we have made clear from the outset, all plaintiffs need do is step up to the plate and, consistent with their obligations under Rule 11, make a "'plausible'" allegation (*Iqbal*, 129 S. Ct. at 1951, quoting *Twombly*, 550 U.S. at 570) that some or all of plaintiffs' claimed losses would have been avoided had Crowe's challenged statements been true (*i.e.*, had there been no fraud). In response to Crowe's initial motion, plaintiffs went to the trouble of amending the complaint and attempting to bolster their

[7] See Ex. E at 24 (FDIC Office of Inspector General ("OIG"), Material Loss Review of Colonial Bank, April 2010) ("The ASBD [the Alabama State Banking Department, Colonial's regulator at the time of its failure] pointed out that although the MWL [Mortgage Warehouse Lending] operations caused significant losses, the CRE [commercial real estate loans] and ADC [acquisition, development, and construction loans] exposures *would have brought down the bank by themselves*") (emphasis added). The Court may consider this report in ruling on Crowe's motion to dismiss because it is a public record. *Universal Express*, 177 F. App'x at 53 ("Public records are among the permissible facts that a district court may consider" on a motion to dismiss). As a report of a government agency, it is within an exception to the hearsay rule (Fed. R. Evid. 803(8)), and plaintiffs cannot point to any facts as to why it should not be considered at this point.

allegations of loss causation (¶ 48). But the right claims still do not appear. That tells the Court all it needs to know. Because plaintiffs are avowedly unable and/or unwilling to shoulder the burden of alleging (and ultimately proving) loss causation, their claims against Crowe should be dismissed.

**C. The Engagement Letter Specifically Bars Plaintiffs' Claim For Consequential Damages.**

Plaintiffs are clearly seeking consequential damages that are not recoverable pursuant to explicit provisions in the engagement letters. The complaint alleges that BancGroup sent $500 million to Colonial in 2008 and 2009, incurring additional debt in the process (*id*. ¶ 48) and that when the fraud was exposed BancGroup "was left with hundreds of millions of dollars in worthless or non-existent assets on its balance sheet," its "capital investment in Colonial Bank in excess of $1.2 billion dollars was rendered worthless," and "more than $1.8 billion had been siphoned out of Colonial Bank." *Id*. ¶ 7.

These are plainly consequential damages (sometimes called special damages), which are defined as damages that are "not an invariable result of every breach of this sort" and "do not always follow a breach of this particular character." 24 WILLISTON ON CONTRACTS § 64:12 (4th ed.). See also *Crommelin v. Montgomery Independent Telecasters*, 194 So. 2d 548, 551 (Ala. 1967) ("consequential damages" are "special damages" that do "not necessarily flow[] from the breach of contract"); *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 955 (7th Cir. 1982) (under Illinois law, "'consequential or, as they are sometimes called, 'special damages'" are "damages caused by failure or delay in carrying out a commercial undertaking," including lost profits); BLACK'S LAW DICTIONARY 445-46 (9th ed. 2009) (defining "consequential damages" as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act").

Here, for example, the claimed damages allegedly resulted from unique circumstances—the fraud at Colonial and BancGroup's alleged response to Crowe's work—but the purported losses are not an invariable result that always occurs when a provider of outsourced internal auditing services allegedly breaches its contract. See *In re Usery*, 123 F.3d 1089, 1096 (8th Cir. 1997) (money that the plaintiffs invested in and loaned to a failing company, after buying the company based on misrepresentations about its financial condition, constitutes "consequential damages"). As in *Usery*, the damages here were allegedly incurred when BancGroup purportedly took action (for example, sending additional money to Colonial and incurring additional debt) as a consequence of Crowe's alleged conduct. In other words, BancGroup was not damaged directly by Crowe's alleged conduct, but only because BancGroup purportedly took actions as a result of Crowe's conduct and those actions later turned out to harm BancGroup. Any such losses are consequential at best.

The engagement letters, however, explicitly bar BancGroup from recovering consequential or incidental damages under any circumstances: "*Any* liability of Crowe Chizek to you *shall not include any special, consequential, incidental*, punitive, or exemplary *damages* or loss nor any lost profits, savings, or business opportunity." Ex. A, Engagement Terms at 2 (emphasis added). Thus, not only do the engagement letters prohibit consequential damages, but they also bar BancGroup from recovering any "special" or "incidental" damages. *Id*. This contractual limitation, which restricts BancGroup to a narrow range of permissible damages, is consistent with the narrow duties that Crowe agreed to perform, and BancGroup and its trustee—who are attempting to enforce the contracts—are bound by the provision. *E.g.*, *In re Cellnet Data Sys.*, 327 F.3d 242, 249 (3d Cir. 2003); *In re Chicago, R.I. & P. R.R.*, 860 F.2d 267, 272 (7th Cir. 1988); *In re Ralston*, 401 F.2d 293, 295 (6th Cir. 1968). Because of this contractual limitation on

recoverable damages, BancGroup may recover only direct damages.

In both contract and negligence cases, Illinois and Alabama regularly enforce limitation-of-liability provisions found in contracts between commercial parties. Because of "the principle of freedom of contract, contractual limitations are generally held valid" in Illinois, and "in the absence of a legislative directive to the contrary, exculpatory provisions must be deemed valid and enforceable." *North River Ins. v. Jones*, 655 N.E.2d 987, 992 (Ill. App. Ct. 1995) (affirming the dismissal of a negligence claim seeking damages resulting from the failure of a fire alarm system, because a contract provision excluded consequential damages and permitted recovery only of liquidated damages of $250). Because "[p]ublic policy permits competent parties to contractually allocate business risks as they see fit," parties "'may contract for an exclusive remedy that limits their rights, duties[,] and obligations.'" *Hicks v. Airborne Express*, 858 N.E.2d 48, 54 (Ill. App. Ct. 2006) (enforcing a contract provision that barred all special, incidental, or consequential damages). Alabama likewise enforces contractual limits of liability, in both negligence and contract cases. "Commercial parties may contract freely to limit the remedies available to them." *Puckett, Taul & Underwood, Inc. v. Schreiber Corp.*, 551 So. 2d 979, 983 (Ala. 1989) (holding that a contract clause excluding consequential damages barred the damages sought in a negligence claim, which arose out of the failure of defendant's equipment in a sewage treatment plant). See also *Saia Food Distribs. v. SecurityLink*, 902 So. 2d 46, 55 (Ala. 2004) (a contract with a security alarm company that limited damages to the $5,800 cost of the security equipment was enforceable in a case alleging negligence and breach of contract; the clause did not allow the defendant to "escape all liability" for negligence and breach of contract,

but "merely…limit[s] the amount of damages for which [it] could be held responsible").[8]

It makes particular sense to enforce the bar on consequential damages here because of the narrow scope of Crowe's engagement. In agreeing to perform a limited role—providing certain internal audit services for a set fee under the direction of BancGroup—Crowe did not agree to insure BancGroup's business or to be responsible for the failure of Colonial Bank. When enforcing contractual provisions barring consequential damages, courts often note that the defendants have not agreed to insure, and have not been compensated for insuring, the plaintiffs' losses. See *North River Ins.*, 655 N.E.2d at 993 ("Holmes did not undertake to insure anyone in case of a fire nor underwrite any risk of loss. The compensation received by Holmes under the Contract is unrelated to the value or ownership of the property"); *Saia*, 902 So. 2d at 54 ("We agree that an installer of security equipment or a supplier of fire- or security-monitoring services does not become an insurer of the property it is designed to help safeguard. Construing a security-equipment or security-monitoring contract as an insurance policy would render such a contract cost prohibitive").

BancGroup's agreement that it could not recover *any* consequential and incidental damages against Crowe is plainly enforceable. Even if the Court rules that the claim for Crowe's fees survives this motion to dismiss, it should at a minimum dismiss the remaining damages claims against Crowe, all of which seek consequential damages.

## CONCLUSION

For the reasons stated, the claims against Crowe should be dismissed with prejudice.

---

[8] Plaintiffs' request for "exemplary damages" (Cmplt. at p. 47) is barred by the plain language of the contractual provision that also bars consequential damages. Ex. A, Engagement Terms at 2.

Dated: December 8, 2011

Respectfully submitted,

/s/ Stanley J. Parzen
Attorney for Crowe Horwath LLP

**OF COUNSEL:**
JACKSON, ANDERSON & PATTY, P.C.
Post Office Box 1988
250 Commerce Street, Suite 100
Montgomery, Alabama 36102-1988
Telephone: (334) 834-5311
Telecopier: (334) 834-5362

Stanley J. Parzen (pro hac vice)
Jonathan C. Medow (pro hac vice)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 701-7326
Telecopier: (312) 706-8668

**CERTIFICATE OF SERVICE**

I, Stanley J. Parzen, hereby certify that on this 8th day of December, 2011, I electronically filed the foregoing Motion To Dismiss and Brief In Support Of Motion To Dismiss with the Clerk of Court using the ECF system, which will send notification of such filing to all persons registered to receive ECF filings in this matter.

/s/ Stanley J. Parzen

*Attorney for Defendant Crowe Horwath LLP*