**EXHIBIT C**
**(PwC Subpoena to FDIC in TBW Case)**

**CRAIG BUSKIRK DBA**
**PREFERRED PROCESS SERVICE**
330 BLUE RIBBON RD   214 3997293
WAXAHACHIE, TX 75165

1237

32-2/1110 TX
18537

6-23-14
Date

Pay To The
Order Of _____ FDIC _____ $ 10.00

_____ Ten + no/100 _____ Dollars

Security
Features
Details on
Back.

**Bank of America** ⬮⬮⬮

ACH R/T 111000025

For _____ Witness Fee _____          Craig Buskirk          MP

⑆111000025⑆ 4880146618 24⑈1237

Harland Clarke

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**COMPLEX BUSINESS LITIGATION SECTION**

TAYLOR, BEAN & WHITAKER PLAN TRUST,

        Plaintiff,                         **CASE NO. 13-33964 CA 01 (40)**

vs.

PRICEWATERHOUSECOOPERS, LLP,

        Defendant.
_____/

## SUBPOENA *DUCES TECUM*

**THE STATE OF FLORIDA:**

**TO:    The Federal Deposit Insurance Corporation, as Receiver for Colonial Bank
       c/o Donald B. McKinley, Esq.
       1601 Bryan Street
       Dallas, Texas 75201**

    YOU ARE COMMANDED to appear at the law offices of Kenny Nachwalter, P.A., 201 South Biscayne Boulevard, Suite 1100, Miami, Florida 33131, on July 15, 2014, at 9:00AM, and to have with you at that time and place all documents set forth in Exhibit "A" attached hereto.

    These items will be inspected and may be copied at that time. You will not be required to surrender the original items. You may comply with this subpoena by providing legible, bates-stamped copies of the items to be produced to the attorneys whose names appear on this subpoena on or before the scheduled date of production and thereby eliminate your appearance at the time and place specified above. You may condition the preparation of the copies upon the payment in advance of a reasonable cost of production.

    You have the right to object to the production pursuant to this subpoena at any time before production by giving written notice to the attorney whose name appears on this subpoena. **THIS WILL NOT BE A DEPOSITION. NO TESTIMONY WILL BE TAKEN.**

    If you fail to:
(1)    appear as specified; or
(2)    furnish the records instead of appearing as provided above, or
(3)    object to this subpoena,

RECEIVED
DALLAS OFFICE

JUN 2 3 2014

Legal Division
Served on FDIC

you may be in contempt of court. You are subpoenaed by the following attorneys and unless excused from this subpoena by these attorneys or the court, you shall respond to this subpoena as directed.

DATED this _30th_ day of _June_____, 2014.

FOR THE COURT:

Richard H. Critchlow (FL Bar No. 155227)

**Counsel for PricewaterhouseCoopers LLP**

Richard H. Critchlow (FL Bar No. 155227)
rcritchlow@knpa.com
Harry R. Schafer (FL Bar No. 508667)
hschafer@knpa.com
Elizabeth B. Honkonen (FL Bar No. 0149403)
ehonkonen@knpa.com
Kenny Nachwalter, P.A.
201 South Biscayne Blvd., 1100 Miami Center
Miami, Florida 33131-4327
Telephone: (305) 373-1000
Facsimile: (305) 372-1861

- and -

Elizabeth V. Tanis (PHV No. 97203)
etanis@kslaw.com
Drew D. Dropkin (PHV No. 107990)
ddropkin@kslaw.com
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309-3521
Telephone:    (404) 572-4660
Facsimile:    (404) 572-5100

- and -

Geoffrey M. Ezgar (PHV No. 108165)
gezgar@kslaw.com
King & Spalding LLP
601 S. California Avenue
Palo Alto, California 94304
Telephone:    (650) 422-6700
Facsimile:    (650) 422-6800

2

Any minor subpoenaed for testimony shall have the right to be accompanied by a parent or guardian at all times during the taking of testimony notwithstanding the invocation of the rule of sequestration of section 90.616, Florida Statutes, except upon a showing that the presence of a parent or guardian is likely to have a material, negative impact on the credibility or accuracy of the minor's testimony, or that the interests of the parent or guardian are in actual or potential conflict with the interests of the minor.

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Maria Gonzalez, Kenny Nachwalter, P.A. (305-373-1000 by phone) or (mgonzalez@kennynachwalter.com by email) within 2 working days of receipt of this subpoena; if you are hearing or voice impaired, call 711.

3

**EXHIBIT A**

**DEFINITIONS**

1.    The term "PwC" means PricewaterhouseCoopers LLP, a limited liability partnership organized under the laws of the State of Delaware, and its current or former partners, principals, senior managers, managers, staff, and other employees.

2.    "You" and "your" refer to the FDIC-R.

3.    The term "any" shall be construed as each and every.

4.    The term "AOT" means the AOT facility of Colonial Bank's MWLD.

5.    The term "ASBD" refers to the Alabama State Banking Department, and to any of its current or former partners, principals, directors, managers, officers, employees, agents or representatives.

6.    .The term "Audits" means PwC's audits of CBG's consolidated financial statements for the years ended December 31, 2002, through 2008.

7.    "Bank of America" refers to Bank of America Corporation, including in its capacity as successor to LaSalle Bank, and to any of its current or former directors, officers or employees, agents or representatives.

8.    "BNP Paribas" refers to BNP Paribas S.A., BNP Paribas Mortgage Corporation, BNP Paribas Securities Corporation, BNP Paribas North America, and to any of their current or former directors, officers, or employees.

9.    "CBG" refers to The Colonial BancGroup, Inc., and to any of CBG's current or former directors, officers, or employees (either pre- or post-bankruptcy), including but not limited to Kevin O'Halloran, Lewis Beville, Bobby Lowder, Sarah Moore, Kamal Hosein and Cathie Kissick.

4

10.    "Complaint" means the Second Amended Complaint filed by you in *Federal Deposit Insurance Corporation, as Receiver for Colonial Bank v. PricewaterhouseCoopers, LLP, et al.*, Case No. 2:12-cv-00957, in the Middle District of Alabama, on September 20, 2013.

11.    The term "COLB" means the COLB facility of Colonial Bank's MWLD.

12.    "Colonial" refers to CBG (either pre- or post-bankruptcy) or Colonial Bank (either pre- or post-receivership).

13.    "Colonial Bank" refers to Colonial Bank, N.A. and Colonial Bank, and to any of their current or former directors, officers, or employees, including but not limited to Catherine Kissick, Teresa Kelly, Kamal Hosein, Sarah Moore, Bobby Lowder, Rodney Lewis, and Pam Vitto.

14.    The term "Colonial Bankruptcy Proceeding" means *In re The Colonial BancGroup, Inc.*, Case No. 09-32303-DHW (Bankr. M.D. Ala.).

15.    The term "communication" means all written, oral, electronic, or recorded communications as well as any documents that reference or relate to those communications, including, without limitation, the transmittal of information in the form of facts, ideas, inquiries, or otherwise in any oral or written utterance, notation, or statement of any nature whatsoever, and any non-verbal transmission, relay or exchange of information or knowledge, by and to whomsoever made, including but not limited to correspondence, telecopied, telephonic, wire or computer transmissions, text or other instant messages, e-mail, conversations, dialogues, discussions, interviews, consultations, agreements, and understandings between or among two or more persons.

16.    The terms "concerning," "regarding" and "relating to," or any derivatives thereof, mean concerning, relating to, referring to, reflecting, describing, evidencing, involving,

5

constituting, comprising, containing, setting forth, summarizing, reflecting, stating, recording, noting, embodying, mentioning, studying, analyzing, discussing, or evaluating, whether directly or indirectly.

17.    "Crowe" refers to Crowe Horwath LLP, and to any of its predecessors (including Crowe Chizek LLP) and their current or former partners, principals, directors, managers, officers, employees, agents or representatives.

18.    "Deloitte" refers to Deloitte & Touche LLP, and to any of its current or former partners, principals, senior managers, managers, staff, and other employees.

19.    "Deutsche Bank" refers to Deutsche Bank AG and Deutsche Bank Securities, Inc., and to any of their current or former directors, officers, or employees.

20.    The term "document" or "documents" shall have the broadest meaning allowable under Rule 1.350 of the Florida Rules of Civil Procedure, including, without limitation, all Blackberry PIN communications, documents loaded into the Universal File Transfer system, agreements, contracts, communications, correspondence, letters, telegrams, telecopies, telexes, messages, memoranda, records, reports, books, summaries, diaries, diary entries, calendars, appointment books, time records, instructions, work assignments, visitor records, forecasts, statistical data, statistical statements, financial statements, work sheets, work papers, drafts, graphs, maps, charts, tables, accounts, analytical records, consultants' reports, appraisals, bulletins, brochures, pamphlets, circulars, trade letters, press releases, notes, notices, marginal notations, notebooks, telephone bills or records, bills, statements, records of obligations and expenditure, invoices, lists, journals, advertising, recommendations, files, printouts, compilations, tabulations, purchase orders, receipts, sell orders, confirmations, checks, canceled checks, letters of credit, envelopes or folders or similar containers, vouchers, analyses, studies,

surveys, transcripts of hearings, transcripts of testimony, expense reports, microfilm, microfiche, articles, speeches, tape or disc recordings, sound recordings, video recordings, film, tape photographs, punch cards, programs, data compilations from which information can be obtained (including matter used in data processing), text or other instant messages, e-mail, and other printed, written, handwritten, typewritten, recorded, stenographic, computer-generated, computer-stored, or electronically-stored matter, however, and by whomever produced, prepared, reproduced, disseminated, or made. A draft or non-identical copy is a separate document within the meaning of this term. "Document" also includes any removable "post-it" notes or other attachments or exhibits affixed to any of the foregoing.

21. "DOJ" refers to the Department of Justice, including the United States' Attorneys' Office, and to any of its current or former directors, officers, or employees.

22. "Ernst & Young" refers to Ernst & Young LLP, and to any of its current and former partners, principals, senior managers, managers, staff, and other employees.

23. "FBI" refers to the Federal Bureau of Investigation, and to any of its current or former directors, officers, or employees.

24. "Fannie Mae" refers to the Federal National Mortgage Association, and to any of its current or former directors, officers, or employees.

25. "Federal Reserve" refers to the Federal Reserve System, including the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of Atlanta, and to any of its current or former directors, officers, or employees.

26. "Federal Insurance" refers to Federal Insurance Company, the defendant in *FDIC v. Federal Ins. Co.*, Case No 2:11-cv-00610 (M.D. Ala.), and any of its current or former directors, officers, or employees.

27.    "FDIC" refers to the United States Federal Deposit Insurance Corporation in its non-receivership capacities, and to any of its current or former directors, officers, or employees.

28.    "FDIC-R" means the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank, and any person who is acting on behalf of, or has acted on behalf of the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank.

29.    The term "the Fraud" means those frauds or fraudulent or illegal activities that are outlined in paragraphs 13 through 21 of the Complaint.

30.    "Freddie Mac" refers to Federal Home Loan Mortgage Corporation, and to any of its current or former directors, officers, or employees.

31.    "Ginnie Mae" refers to Government National Mortgage Association, and to any of its current or former directors, officers, or employees.

32.    "GMAC" refers to GMAC Mortgage Corporation, the defendant in *Taylor, Bean & Whitaker Mort. Corp. v. GMAC Mortgage Corp.*, Case No 5:05-cv-260 (M.D. Fla.), and any of its current or former directors, officers, or employees.

33.    "HUD" refers to the United States Department of Housing and Urban Development, and to any of its current or former directors, officers, or employees.

34.    "KPMG" refers to KPMG LLP, and to any of its current and former partners, principals, senior managers, managers, staff, and other employees.

35.    "LaSalle Bank" refers to LaSalle Bank, N.A., and to any of its current or former directors, officers, or employees.

36.    "Mortgage Dynamics" refers to Mortgage Dynamics Inc. and to any of its current or former directors, officers or employees, agents or representatives.

8

37.   "MWLD" refers to the Mortgage Warehouse Lending Division of Colonial Bank, and to any of its current or former directors, officers, or employees.

38.   "Natixis" refers to Natixis Global Asset Management and its subsidiaries and affiliates, including but not limited to Natixis Real Estate Capital, LLC, and to any of their current or former directors, officers, managers, members, employees, agents or representatives.

39.   "Ocala Funding" refers to Ocala Funding, LLC (either pre- or post-bankruptcy), and to any of its current or former directors, managers, managing members, special members, officers, employees, agents or representative, including but not limited to Neil Luria.

40.   "OCC" refers to the Office of the Comptroller of Currency, and to any of its current or former directors, officers, or employees.

41.   The term "Other Litigation" shall include:

- *Bank of America v. Colonial Bank*, Case No. 1:09-cv-22384 (S.D. Fla.);
- *Bank of America v. FDIC*, Appeal No. 09-14844 (11th Cir. Apr. 26, 2010);
- *Bank of America v. FDIC*, Case No. 1:10-cv-1681 (D.D.C.);
- *Bank of America v. FDIC*, Case No. 2:13-mc-03657 (M.D. Ala.);
- *Bank of America, N.A. v. Taylor Bean & Whitaker Corp.*, No. 09 Civ. 22478 (S.D. Fla.);
- *BNP Paribas Mortgage Corp. v. Bank of America, N.A.*, Case No. 09 Civ. 9783 (S.D.N.Y.);
- *BNP Paribas Mortgage Corp. v. Bank of America, N.A.*, Case No. 10 Civ. 8630 (S.D.N.Y.);
- *Certain Underwriters at Lloyd's v. Taylor Bean & Whitaker Mortgage Corp.*, Case No. 3:10-ap-243 (Bankr. M.D. Fla.);
- *Colonial BancGroup, Inc. v. Ernst & Young LLP*, Case No. 2:11-ap-3065 (Bankr. M.D. Ala.);
- *Colonial BancGroup, Inc. v. FDIC*, Case No. 2:10-mc-3502 (M.D. Ala.);
- *Colonial BancGroup, Inc. v. FDIC*, Case No. 2:10-mc-3503 (M.D. Ala.);
- *Colonial BancGroup, Inc. v. FDIC*, Case No. 2:10-cv-198 (M.D. Ala.);

9

- *Colonial BancGroup, Inc. v. FDIC*, Case No. 2:09-ap-3087 (Bankr. M.D. Ala.);

- *Colonial BancGroup, Inc. v. FDIC*, Case No. 2:10-mc-133 (M.D. Ala.);

- *Colonial BancGroup, Inc. v. FDIC*, Case No. 2:10-cv-411 (M.D. Ala.);

- *Colonial BancGroup, Inc. v. FDIC*, Case No. 2:10-ap-3018 (Bankr. M.D. Ala.);

- *Colonial BancGroup, Inc. v. FDIC*, Case No. 2:10-mc-3504 (M.D. Ala.);

- *Colonial BancGroup, Inc. v. FDIC*, Case No. 2:10-cv-410 (M.D. Ala.);

- *In re Colonial BancGroup, Inc.*, Case No. 2:10-cv-409 (M.D. Ala.);

- *In re Colonial BancGroup, Inc. ERISA Litigation*, Case No. 2:09-cv-792 (M.D. Ala.);

- *Deutsche Bank AG v. Bank of America, N.A.*, Case No. 09 Civ. 9784 (S.D.N.Y.);

- *Deutsche Bank AG v. Bank of America, N.A.*, Case No. 10 Civ. 8299 (S.D.N.Y.);

- *Deutsche Bank AG v. Deloitte & Touche, LLP*, Case No. 11-48778 CA (40) (Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida);

- *FDIC v. Banc of America Funding Corp.*, Case No. CV-2012-901035 (Circuit Court of Montgomery County, Alabama);

- *FDIC v. Banc of America Funding Corp.*, Case No. 2:12-cv-791 (M.D. Ala.);

- *FDIC v. Chase Mortgage Finance Corp.*, Case No. 1:12-cv-6166 (S.D.N.Y.);

- *FDIC v. Citigroup Mortgage Loan Trust, Inc.*, Case No. CV-2012-901036 (Circuit Court of Montgomery County, Alabama);

- *FDIC v. Citigroup Mortgage Loan Trust, Inc.*, Case No. 2:12-cv-790 (M.D. Ala.);

- *FDIC v. Colonial BancGroup, Inc.*, Case No. 2:10-cv-877 (M.D. Ala.);

- *FDIC v. Countrywide Securities Corp.*, Case No. 2:12-cv-6911 (C.D. Cal.);

- *FDIC v. Countrywide Securities Corp.*, Case No. CV-2012-901037 (Circuit Court of Montgomery County, Alabama);

10

- *FDIC v. Countrywide Securities Corp.*, Case No. 2:12-cv-784 (M.D. Ala.);

- *FDIC v. Federal Ins. Co.*, Case No. 2:11-cv-00610 (M.D. Ala.);

- *Ocala Funding, LLC v. Deloitte & Touche, LLP*, Case No. 11-30957 CA (40) (Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida);

- *Neil F. Luria, Plan Trustee v. Deloitte & Touche, LLP*, Case No. 11-30967 CA (40) (Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida);

- *Securities & Exchange Commission v. Desiree E. Brown*, Case No. 1:11-cv-00192 (E.D. Va.);

- *Securities & Exchange Commission v. Lee B. Farkas*, Case No. 1:10-cv-00667 (E.D. Va.);

- *Securities & Exchange Commission v. Teresa A. Kelly*, Case No. 1:11-cv-00268 (E.D. Va.);

- *Securities & Exchange Commission v. Catherine L. Kissick*, Case No. 1:11-cv-00215 (E.D. Va.);

- *Taylor, Bean & Whitaker Mort. Corp. v. GMAC Mortgage Corp.*, Case No. 5:05-cv-260 (M.D. Fla.);

- *United States ex rel. Friddle v. Taylor, Bean & Whitaker Mort. Corp.*, Case No: 1:06-cv-3023 (N.D. Ga.);

- *United States v. Paul Allen*, Case No. 1:11-cr-00165 (E.D. Va.);

- *United States v. Raymond Edward Bowman*, Case No. 1:11-cr-00118 (E.D. Va.);

- *United States v. Desiree Elizabeth Brown*, Case No. 1:11-cr-0084 (E.D. Va.);

- *United States v. Lee Bentley Farkas*, Case No. 1:10-cr-200 (E.D. Va.);

- *United States v. Lee Bentley Farkas*, Case No. 5:10-mj-010128 (M.D. Fla.);

- *United States v. Teresa A. Kelly*, No. 1:11-cr-00119 (E.D. Va.);

- *United States v. Catherine Kissick*, Case No. 1:11-cr-00088 (E.D. Va.); and

- *United States v. Sean William Ragland*, Case No. 1:11-cr-00162 (E.D. Va.).

42.   The term "person" means any natural person or any entity, organization or association whether business, legal, governmental, or otherwise.

43.   "Platinum Bank" refers to Platinum Community Bank.

44.   The term "Quarterly Reviews" means procedures conducted by PwC with respect to CBG's quarterly financial statements.

45.   "SEC" refers to the United States Securities and Exchange Commission, and to any of its current or former directors, officers, or employees.

46.   "SIGTARP" refers to the Office of the Special Inspector General for the Troubled Asset Relief Program, and to any of its current or former directors, officers, or employees.

47.   "TARP" refers to the Troubled Asset Relief Program.

48.   "TBW" refers to (a) Taylor, Bean & Whitaker Mortgage Corporation; and to any of TBW's current or former directors, officers, or employees (either pre- or post-bankruptcy), including but not limited to Lee Farkas, Paul Allen, Delton de Armas, Melissa Henry Davis, Desiree Brown, Brian Callahan, Kim Bush Davis, Virginia Longo, Michael Wawrzyniak, Sean Ragland, and Neil Luria; and (b) any parent, subsidiary or affiliated entity of TBW (either pre- or post-bankruptcy), including but not limited to the TBW Plan Trust; HMC-Home Mortgages Company; Second Street Insurance Corporation; CDF Tax and Flood Services, LLC; Complete Mortgage Solutions, LLC; Maslow Insurance Agency, LLC; REO Specialists, LLC; Magnolia Street Funding, Inc.; Magnolia Street Funding, II; TBALT Corp.; Ocala Funding, LLC; TBW Funding Company, LLC; and TBW Funding Company II, LLC.; and any current or former directors, officers, members, managing members, special members, or employees of any parent, subsidiary or affiliated entity of TBW.

49. "TBW Plan Trust" refers to Taylor, Bean & Whitaker Plan Trust, as purported successor to the claims of Taylor, Bean & Whitaker Mortgage Corp.

50. "TBW Complaint" means the Amended Complaint filed by Taylor, Bean & Whitaker Plan Trust, as purported successor to the claims of Taylor, Bean & Whitaker Mortgage Corp., on November 20, 2013, as further amended by interlineation pursuant to the Court's November 27, 2013 Order in *Taylor, Bean & Whitaker Plan Trust v. PricewaterhouseCoopers LLP*, Case No. 13-33964 CA 01 (40), in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida.

## INSTRUCTIONS

1. You shall produce legible, bates-stamped copies of the requested documents as they are kept in the usual course of business or shall be labeled to correspond with the requests below. The documents shall be delivered to counsel for PwC at one of the following addresses:

Drew Dropkin, Esq.
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309

Richard H. Critchlow, Esq.
Kenny Nachwalter, P.A.
201 South Biscayne Boulevard
Suite 1100
Miami, FL 33131

2. Each requested document shall be produced in its entirety, including all attachments, appendices, exhibits, lists, schedules or other matters at any time affixed thereto. File folders, labels and indices identifying documents requested herein shall be produced intact with such documents. Documents attached to each other shall not be separated.

3. Each requested document shall be produced in accordance with Exhibit 1.

4. To the extent that a document requested by these requests is responsive to more than one specific request, you need produce the document only once.

13

5.      Documents that cannot be legibly copied should be made available or produced in their original form.

6.      Given the time period alleged in the TBW Complaint, the documents requested by PwC herein are those created, sent, or received between January 1, 2002 and December 31, 2009, except to the extent that a Request specifies a different time period, in which case the time period specified in the Request is controlling.

7.      If there are no documents responsive to any of the following document requests, please provide a written response so stating.

**REQUESTS FOR PRODUCTION**

1.      With the exception of those documents and communications that have previously been produced to you by PwC, all documents and communications relating to PwC and any of the following:  PwC's Audits; PwC's Quarterly Reviews; fraud detection and prevention; Colonial's Treasury department; Colonial's MWLD; Catherine Kissick; Teresa Kelly; COLB; AOT; TBW; Ocala Funding; Crowe; Pamela Vitto; or Kamal Hosein.

2.      All documents and communications relating to the quality of PwC's Audits or Quarterly Reviews, including but not limited to all documents and communications relating to PwC's negligence or non-compliance with auditing standards as alleged in the Complaint.

3.      All Colonial policies, procedures, and guidelines (including but not limited to accounting and internal control policies, procedures and guidelines) applicable to, used in connection with, or relating to any external audits and reviews of CBG's financial statements or internal controls.

4.      All documents and communications relating to any Colonial regulator's review or use of any documents concerning PwC's Audits or Quarterly Reviews.

5.      All documents exchanged and communications between Colonial and TBW or Ocala Funding relating to PwC.

6.      With the exception of those documents and communications that have previously been produced to you by PwC, all documents exchanged and communications between Colonial and PwC relating to TBW or Ocala Funding.

7.      All documents and communications evidencing or relating to the dissemination of CBG's audited financial statements or PwC's audit reports on those financial statements to any of the following:  TBW; Ocala Funding; LaSalle Bank; Bank of America; Deutsche Bank; BNP Paribas; and any Colonial regulator, including but not limited to the Federal Reserve, the FDIC, the OCC, the ASBD, or HUD.

8.      All documents and communications relating to any of the following: the Fraud; any transactions related to the Fraud; any mortgage loans, securities, or mortgage loan pools used in or affected by the Fraud, including the "Plan B" mortgage loans, the "Plan B" AOT pools, and loans referred to as "crap" loans or "do not sell" loans (and loan data, loan pool data and reports for those mortgage loans and pools); and any documents or transactions fabricated or falsified in connection with the Fraud.

9.      All documents and communications sent to or received from Catherine Kissick relating to any of the following: PwC; Deloitte; Crowe; regulators; correspondence or other communications with regulators; regulatory examinations of TBW or Colonial; internal audits of TBW or Colonial; the Fraud; any transactions related to the Fraud; any mortgage loans,

securities or mortgage loan pools used in or affected by the Fraud, including the "Plan B" mortgage loans, the "Plan B" AOT pools and loans referred to as "crap" loans or "do not sell" loans (and loan data, loan pool data, and reports for these mortgage loans and pools); or any documents or transactions fabricated or falsified in connection with the Fraud.

10.    All documents and communications sent to or received from Teresa Kelly relating to any of the following: PwC; Deloitte; Crowe; regulators; correspondence or other communications with regulators; regulatory examinations of TBW or Colonial; internal audits of TBW or Colonial; the Fraud; any transactions related to the Fraud; any mortgage loans, securities or mortgage loan pools used in or affected by the Fraud, including the "Plan B" mortgage loans, the "Plan B" AOT pools and loans referred to as "crap" loans or "do not sell" loans (and loan data, loan pool data, and reports for these mortgage loans and pools); or any documents or transactions fabricated or falsified in connection with the Fraud.

11.    All documents and communications relating to, sent to or received from any of the following persons: Lee Farkas; Desiree Brown; Paul Allen; Delton DeArmas; Raymond Bowman; Sean Ragland; Michael Wawrzyniak; any other TBW officer; any TBW director; any Ocala Funding officer; or any Ocala Funding director.

12.    All documents and communications relating to confirmations of transactions or account balances that PwC, Colonial, or Crowe requested from TBW and all documents and communications relating to confirmations of transactions or account balances that TBW provided to PwC, Colonial, or Crowe, including but not limited to documents and communications relating to any falsification of such confirmations.

13.    All reports or other summaries of the results of any audit, examination, or investigation, conducted at any time through the present, relating to any aspect of the Fraud, including but not limited to any audit, examination, or investigation into the nature and extent of the Fraud, the parties responsible for the Fraud, or the damages caused by the Fraud.

14.    All documents and communications relating to whether the MWLD employees involved in the alleged fraud "were acting solely for their own benefit or the benefit of TBW[,]" as alleged in paragraph 13 of the Complaint.

15.    Without regard to the time frame specified in the Instructions above, all documents and communications relating to any investigation or inquiry into the source of the overdrafts in TBW's master account at Colonial Bank, including, but not limited to the investigations conducted by any consultants hired by TBW or Colonial, as described by Teresa Kelly in her April 5, 2011 testimony in *United States v. Lee Farkas*, No. 1:10-cr-200 (E.D. Va.). *See United States v. Lee Farkas*, No. 1:10-cr-200 at 371 (E.D. Va. April 6, 2011) [DKT # 209], attached hereto as Exhibit 2.

16.     Without regard to the time period specified in the Instructions above, all documents and communications relating to the database Teresa Kelly maintained to track the mortgage loans from TBW that were improperly included on the books and records of Colonial, as described by Teresa Kelly in her April 6, 2011 testimony in *United States v. Lee Farkas*, No. 1:10-cr-200 (E.D. Va.).  *See United States v. Lee Farkas*, No. 1:10-cr-200 at 499-501 (E.D. Va. April 7, 2011) [DKT # 213], attached hereto as Exhibit 3.

17.     Without regard to the time period specified in the Instructions above, all documents and communications relating to "Project Walter."

18.     All documents and communications relating to any of the following: Colonial's application for TARP funds; Colonial's capital-raising efforts, through TBW or otherwise, in connection with the receipt of TARP funds; the SIGTARP investigation into Colonial's efforts to obtain TARP funds; and "Project Squirrel."

19.     All written contracts or agreements between Colonial and TBW entered into between January 1, 1998, and August 25, 2009, including any agreements governing TBW's mortgage warehouse line of credit, working capital line of credit, overline facility, COLB facility, or AOT facility.

20.     All custodial or master bailment agreements between Colonial and any person or entity related to TBW entered into between January 1, 1998, and August 25, 2009, including but not limited to any custodial agreement between Colonial and Freddie Mac.

21.     All written contracts or agreements between Colonial and Ocala Funding.

22.     All documents and communications provided to TBW relating to Colonial's financial condition or internal controls.

23.     All documents and communications provided to Colonial relating to TBW's financial condition or internal controls, including all documents and communications reflecting Colonial's receipt of TBW's quarterly and annual financial statements.

24.     Without regard to the time frame specified in the Instructions above, all documents and communications relating to when and how TBW became a customer of Colonial Bank.

25.     All documents and communications relating to whether and why TBW was the only MWLD customer with which Colonial conducted AOT transactions.

26.     All documents and communications relating to the litigation between GMAC and TBW, *TBW v. GMAC Mortgage Corp.*, No. 5:05-cv-260 (M.D. Fla.), including but not limited to transcripts of testimony provided by Catherine Kissick or any Colonial director, officer or employee.

27.     Without regard to the time frame specified in the Instructions above, all documents and communications relating to Fannie Mae's evaluation and termination of its relationship with TBW.

28.     All documents and communications relating to any audit, review, business evaluation, risk assessment, or due diligence performed with respect to TBW's operations, financial condition, or credit worthiness (regardless of whether such audit, review, business evaluation, risk assessment, or due diligence was performed by or on behalf of Colonial), including but not limited to any such undertaking conducted by Mortgage Dynamics, Inc.

29.     All documents and communications relating to TBW's credit file with Colonial, including any credit limits and sublimits and any applicable committee approvals of such limits.

30.     All documents and communications relating to Deloitte's audits or reviews of the financial statements of TBW or Ocala Funding, including all documents and communications sent to or received from Deloitte in connection with those audits or reviews.

31.     All documents identifying any income earned, accrued or received, including any fees and interest, by Colonial from or on behalf of TBW or Ocala Funding, with those documents including but not limited to the General Ledger, the Trial Balance, the U503 Yield Reports, the U134 Breakdowns of Lender Interest, the U513 GL Summaries, the U530 CitiGroup Securitization Reports, the U110 Trial Balance Details, the U523 TM1 Extracts, the U527 Fee Summaries, the U536 Daily Interest Accrual Extracts, the U227 Daily Payment Reports, the U100 Account Usage Reports, the U101 Loan Activity Reports, the U106 Trial Balance Summaries, the U107 Shipping Schedules, the U509 Participated Account Usage reports, the U510 Lender Commitment Summaries, and the U516 Consolidated Statements.

32.     All documents identifying any payments made by Colonial to or on behalf of TBW or Ocala Funding as a result of the Fraud, with those documents including but not limited to the General Ledger, the Trial Balance, the U503 Yield Reports, the U134 Breakdowns of Lender Interest, the U513 GL Summaries, the U530 CitiGroup Securitization Reports, the U110 Trial Balance Details, the U523 TM1 Extracts, the U527 Fee Summaries, the U536 Daily Interest Accrual Extracts, the U227 Daily Payment Reports, the U100 Account Usage Reports, the U101 Loan Activity Reports, the U106 Trial Balance Summaries, the U107 Shipping Schedules, the U509 Participated Account Usage reports, the U510 Lender Commitment Summaries, and the U516 Consolidated Statements.

33.     All documents exchanged and communications about TBW between Colonial and any of the following entities: Freddie Mac, Fannie Mae, Ginnie Mae, BNP Paribas, Deutsche Bank, LaSalle Bank, Bank of America, Natixis, and Mortgage Dynamics.

34. All documents exchanged and communications about the MWLD, Catherine Kissick, Teresa Kelly, AOT, COLB, TBW, or Ocala Funding between Colonial and any of the following entities: the FBI, the United States Attorney's Office, the DOJ, and SIGTARP.

35. To the extent not privileged or otherwise protected from disclosure, all documents exchanged and communications between Colonial and any of the following entities about the MWLD; COLB; AOT; TBW Ocala Funding; Colonial's application for TARP funds; Colonial's capital-raising efforts, through TBW or otherwise, in connection with the receipt of TARP funds; or the SIGTARP investigation into Colonial's efforts to obtain TARP funds: Ackerman Senterfitt LLP; Alston & Bird, LLP; Arnold & Porter LLP; Balch & Bingham LLP; Capell and Howard PC; Jones Walker LLP; Latham & Watkins LLP; Mayer Brown LLP; Miller Hamilton Snider and Odom LLC; and Waller Lansden Dortch and Davis LLP.

36. All organizational charts for Colonial, setting forth any of the following: Colonial's management structure; ownership structure; Board of Directors structure; Board committee structure; corporate department, segment or division structure; Treasury department structure; and MWLD structure.

37. All Colonial Articles of Incorporation, bylaws, charters, and any state- or federal-mandated corporate filings.

38. All documents and communications identifying or describing the professional experience, background, employment history, or qualifications of Colonial's directors.

39. All documents and communications identifying or describing the professional experience, background, employment history, or qualifications of the following Colonial personnel: Arthur Barksdale; Mary Lou Batten; Young Boozer; Terry Bryant; David Byrne; Michelle Carroll; Caryn Cope; Brent Hicks; Patti Hill; Kamal Hosein; Sandra Jansky; Teresa Carrier Kelly; Catherine Kissick; Rodney Lewis; Robert Lowder; Sarah Moore; Amy Nunnelly; Flake Oakley; Hans Petit; Joyce Schultz; Tamara Stidham; Thomas Tynes; and Pamela Vitto.

40. All documents and communications identifying the compensation paid to any member of a Colonial Board of Directors in connection with his or her service on a Colonial Board, including but not limited to any compensation paid to any such director for service on a Colonial Board committee.

41. The minutes, board packages, presentations, agendas and any other documents relating to any meeting of a Colonial Board of Directors.

42. All documents and communications setting forth the responsibilities of the Colonial Boards of Directors, including but not limited to any corporate governance policies or Board committee charters.

19

43.     All documents and communications sent, received, or prepared by any Colonial Board of Directors, or any member thereof, related to PwC, Crowe, the MWLD, Catherine Kissick, Teresa Kelly, COLB, AOT, TBW or Ocala Funding.

44.     The minutes, packages, presentations, agendas and any other documents relating to any meeting of the following Colonial committees:

    a.     Audit Committee;

    b.     Executive Committee;

    c.     Asset Liability Committee;

    d.     Risk Committee;

    e.     Nominating and Corporate Governance Committee;

    f.     Asset Liability Management Committee;

    g.     Disclosure Committee;

    h.     Asset Purchase Committee;

    i.     Mortgage Warehouse Lending Committee;

    j.     Senior Loan Committee;

    k.     To the extent not listed above, any committee of Colonial's Board of Directors or any committee whose responsibilities related to the MWLD.

45.     All documents and communications setting forth the responsibilities of the following Colonial committees, including but not limited to any committee policies or charters:

    a.     Audit Committee;

    b.     Executive Committee;

    c.     Asset Liability Committee;

    d.     Risk Committee;

    e.     Nominating and Corporate Governance Committee;

    f.     Asset Liability Management Committee;

    g.     Disclosure Committee;

h.      Asset Purchase Committee;

i.      Mortgage Warehouse Lending Committee;

j.      Senior Loan Committee;

k.      To the extent not listed above, any committee of Colonial's Board of Directors or any committee whose responsibilities related to the MWLD.

46.     All documents and communications sent, received, or prepared for or by any Colonial officer or director relating to the financial condition or operations of Colonial's MWLD, TBW, or Ocala Funding.

47.     All documents and communications relating to the allegation in paragraph 29 of the Complaint that "by the summer of 2007, many markets for [MBS], particularly securities backed by residential mortgage loans, had all but frozen[,]" including all documents relating to the knowledge or awareness of Colonial's officers and directors regarding these market conditions.

48.     All documents and communications sent to or received from any Colonial director or officer between January 1, 2006, and August 14, 2009, relating to any economic downturn or slowdown affecting the mortgage industry.

49.     All documents and communications relating to any compensation packages, annual performance reviews, or assessments of employee conduct for Catherine Kissick and Teresa Kelly.

50.     All documents exchanged and communications between you and any Colonial bank regulator, including but not limited to the Federal Reserve, the FDIC, the OCC, the ASBD, or HUD.

51.     All documents, including but not limited to examination reports, supervisory letters, recommendations, correspondence, memoranda, and reports, relating to any Colonial regulator and any of the following:  PwC's Audits; PwC's Quarterly Reviews; Colonial's corporate governance; fraud detection and prevention; changes in Colonial's supervisory or risk ratings; Colonial's Treasury department; Colonial's MWLD; COLB; AOT; TBW; Ocala Funding; Colonial's internal audit function; or Crowe.

52.     All documents and communications relating to any change in Colonial regulators, including but not limited to the June 2008 change in primary federal regulators from the OCC to the FDIC.

53.     All documents and communications relating to any action taken by Colonial to identify, detect, or protect against fraudulent activity in Colonial's Treasury department or

MWLD, including but not limited to, internal controls, internal audits, ethics policies, and whistleblower hotlines.

54.    All documents and communications relating to any whistleblower (internal or external) assertions of wrongdoing by TBW, any Colonial officer or director, Colonial's MWLD, or any employee who worked in or for Colonial's MWLD.

55.    All reports and communications made through Colonial's Ethicspoint hotline and any documents and communications regarding the evaluation of any such reports.

56.    All documents and communications relating to any Colonial Compliance and Security Reports, Compliance and Security Quarterly Monitoring Summaries, Suspicious Activity Reports, OFAC Reports, Information Security Reports, and Bank Secrecy Act Reports to the extent those reports contain information relating to the MWLD, Catherine Kissick, Teresa Kelly, COLB, AOT, TBW or Ocala Funding.

57.    All policies, procedures, and guidelines (including but not limited to accounting and internal control policies, procedures and guidelines) applicable to, used in connection with, or relating to Colonial's Treasury department, the MWLD, COLB, AOT or TBW.

58.    All documents and communications relating to the oversight of Colonial's MWLD, including but not limited to documents and communications relating to the oversight of the MWLD by Colonial's Treasury or Credit departments.

59.    All documents and communications relating to the internal controls or control environment of Colonial's Treasury department or MWLD, including but not limited to any documents and communications related to the evaluation or testing of internal controls by Pamela Vitto, Young Boozer, or Crowe.

60.    All policies, procedures, and guidelines (including but not limited to accounting and internal control policies, procedures and guidelines) applicable to, used in connection with, or relating to internal audits and reviews of CBG's financial statements or internal controls, including but not limited to audits and reviews performed by or at the direction of Pamela Vitto, Young Boozer, or Crowe.

61.    All documents and communications relating to Crowe and any of the following: fraud detection and prevention; Colonial's Treasury department; Colonial's MWLD; Catherine Kissick; Teresa Kelly; COLB; AOT; TBW; Ocala Funding; Pamela Vitto; or Kamal Hosein.

62.    All documents and communications relating to the preparation or dissemination of any report prepared by Pamela Vitto, or any person acting at her direction, regarding the MWLD, COLB, AOT, TBW or Ocala Funding, including but not limited to any MWLD analysis or any semi-annual, quarterly, or monthly risk management audit or report.

63.     All documents and communications sent, received, or prepared by Pamela Vitto or at her direction.

64.     All documents and communications sent, received, or prepared by any employee who worked in the MWLD assessing or evaluating, whether informally or formally, Catherine Kissick's and Teresa Kelly's performance, including but not limited to documents and communications assessing or evaluating Catherine Kissick's or Teresa Kelly's relationship with TBW or Ocala Funding.

65.     All documents and communications relating to the accounting in the financial statements of CBG or TBW for COLB and AOT transactions, including but not limited to documents and communications relating to the application of Statement of Financial Accounting Standards No. 140 to those transactions, the classification of those assets on the balance sheet as loans held for sale or securities purchased under agreements to resell, and any regulatory inquiries about the accounting or classification of these transactions.

66.     To the extent not privileged or protected attorney work product, all documents and communications from January 1, 2002, through the present relating to any inquiries, investigations, or forensic examinations, whether formal or informal, conducted by any person or entity regarding Colonial's MWLD or TBW, including but not limited to inquiries, investigations, or forensic examinations conducted or directed by Colonial, Colonial's Audit Committee, KPMG, Waller Lansden Dortch & Davis LLP, or Ernst & Young LLP.

67.     Without regard to the time frame set forth in the Instructions above, all claims, proofs of loss or other documents that Colonial has submitted to any insurer in connection with a claim relating to negligent, improper, fraudulent, dishonest, or criminal acts of any Colonial director, officer, or employee.

68.     Without regard to the time frame set forth in the Instructions above, all documents produced or received, all deposition and hearing transcripts and exhibits, all written discovery, and all expert disclosures and reports exchanged in connection with *FDIC v. Federal Insurance Company*, No. 2:11-cv-610 (M.D. Ala.).

69.     Without regard to the time frame set forth in the Instructions above, all documents and communications relating to the Proof of Loss dated February 1, 2010 submitted by CBG or the FDIC-R to the Federal Insurance, and the Federal Insurance's investigation of the Proof of Loss.

70.     Without regard to the time frame set forth in the Instructions above, all deposition and hearing transcripts and exhibits, all written discovery, and all expert disclosures and reports exchanged in the Other Litigation, to the extent any such documents relate to any of the following: PwC; Deloitte; Crowe; regulators; correspondence or other communications with regulators; regulatory examinations of TBW or Colonial; internal audits of TBW or Colonial; the

Fraud; any transactions related to the Fraud; any mortgage loans, securities or mortgage loan pools used in or affected by the Fraud, including the "Plan B" mortgage loans, the "Plan B" AOT pools and loans referred to as "crap" loans or "do not sell" loans  (and loan data, loan pool data, and reports for these mortgage loans and pools); or any documents or transactions fabricated or falsified in connection with the Fraud.

71.     Without regard to the time frame set forth in the Instructions above, all documents produced or received in the Other Litigation to the extent such documents relate to any of the following: PwC; Deloitte; Crowe; regulators; correspondence or other communications with regulators; regulatory examinations of TBW or Colonial; internal audits of TBW or Colonial; the Fraud; any transactions related to the Fraud; any mortgage loans, securities or mortgage loan pools used in or affected by the Fraud, including the "Plan B" mortgage loans, the "Plan B" AOT pools and loans referred to as "crap" loans or "do not sell" loans  (and loan data, loan pool data, and reports for these mortgage loans and pools); or any documents or transactions fabricated or falsified in connection with the Fraud.

72.     Without regard to the time frame specified in the Instructions above, the documents contained in the 21 banker boxes referred to as the "'R' Boxes," as discussed in Paragraph D in the court's March 3, 2011 Order Granting Joint Motion to Establish Protocol for Production of Documents and Non-Waiver of Applicable Privileges, *Colonial Bank Group, Inc. v. FDIC-R*, No. 2:10-cv-198 (M.D. Ala. Mar. 3, 2011) [DKT #49], attached hereto as Exhibit 4.

73.     Without regard to the time frame specified in the Instructions above, the documents contained in the 20 boxes that came from the offices of Sarah Moore and Lisa Free, as described in an email sent by J. David Freedman on November 3, 2010, a copy of which is attached as Exhibit 3 to the Declaration of John J. Clarke, Jr., *Colonial Bank Group, Inc. v. FDIC-R*, No. 2:10-cv-198 (M.D. Ala. May 2, 2011) [DKT # 67-1], attached hereto as Exhibit 5.

74.     Without regard to the time frame specified in the Instructions above, all documents exchanged and communications between you and Robert Hutchins, a director with Navigant Consulting who provided a declaration in *Colonial Bank Group, Inc. v. FDIC-R*, No. 2:10-cv-198 (M.D. Ala.*). See Colonial Bank Group, Inc. v. FDIC-R*, No. 2:10-cv-198 (M.D. Ala. Oct. 6, 2011) [DKT # 138-1].

75.     Without regard to the time frame specified in the Instructions above, the August 5, 2010 letter from the FDIC, in its capacity as the receiver for Platinum Bank, denying Bank of America's proof of claim filed in Platinum Bank's receivership.

76.     Without regard to the time frame specified in the Instructions above, all presentations or other documents or materials received or provided in connection with any meeting between the FDIC-R, Bank of America, and any other person or entity regarding "the scope of TBW, Colonial, and Platinum Bank's fraud," including but not limited to documents exchanged in connection with any of the following meetings:

a.   the telephone conference held on October 6, 2009 between Bank of America and the FDIC-R, as described in paragraph 24 of the October 21, 2011 affidavit of Patrick L. Robson (*see Bank of America v. Federal Deposit Insurance Corporation*, No. 1:10-cv-1681 (D.D.C. October 21, 2011) [DKT# 35-1]) (the "Robson Affidavit", attached hereto as Exhibit 6);

b.   the telephone conference held on October 7, 2009 with the FDIC-R and Bank of America, as described in paragraph 25 of the Robson Affidavit;

c.   the October 14, 2009 meeting in Jacksonville, Florida between the FDIC-R, Bank of America, and others, as described in paragraph 26 of the Robson Affidavit;

d.   the November 4, 2009 meeting in Orlando, Florida in which Bank of America made a presentation to the FDIC-R, KPMG, TBW, and others, as described in paragraph 28 of the Robson Affidavit;

e.   the December 3, 2009 meeting in Ocala, Florida between Bank of America, TBW, the FDIC and others, as described in paragraph 32 of the Robson Affidavit;

f.   the March 2, 2010 meeting between the FDIC-R and Bank of America in Orlando, Florida, as described in paragraph 34 of the Robson Affidavit; and

g.   any meeting or conversation that occurred between the FDIC-R and Bank of America "during the eight month period" when the FDIC-R was considering Bank of America's proofs of claim, as described in paragraph 40 of Robson Affidavit.

77.   Without regard to the time frame specified in the Instructions above, all documents exchanged and communications between you and the TBW Plan Trust relating to PwC, Colonial, TBW, or Ocala Funding.

78.   Without regard to the time frame specified in the Instructions above, all documents produced to or by Colonial and all transcripts of testimony (and exhibits used during that testimony) taken, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure or otherwise, in the Colonial Bankruptcy Proceeding that include information relating to any of the following:  PwC; Deloitte; Crowe; LaSalle Bank; Bank of America; Deutsche Bank; BNP Paribas; the Fraud; TBW; Ocala Funding; Catherine Kissick; Teresa Kelly; the MWLD; the regulatory oversight of Colonial; the accounting for COLB and AOT transactions; Colonial's TARP application; Colonial's TARP capital-raising efforts through TBW or otherwise; and the SIGTARP investigation into Colonial's TARP application.

79.   Without regard to the time frame specified in the Instructions above and to the extent not privileged or protected attorney work product, all indices, summaries, or lists of the

documents and communications that you have relating to the events or transactions alleged in the Complaint.

80.     Without regard to the time frame specified in the Instructions above, all demands, claims, settlement agreements or tolling agreements to which you are or were a party relating to the events and transactions alleged in the Complaint.

81.     Without regard to the time frame specified in the Instructions above, all documents and communications relating to any agreements by any person or entity to cooperate with you, or by you to cooperate with any person or entity, in the prosecution of any claims arising from the events and transactions alleged in the Complaint or the TBW Complaint.

# EXHIBIT

# 1

# Document Production Specifications

All documents are to be produced as Group IV single-page TIFF files in the Concordance load-ready format.

- Include associated native files, extracted text, fielded data, OCR, and any linked image files (if applicable).

- Hard copy document are to be produced as imaged files as described below.

When images are produced, they should comply with the following requirements:

- Black and white images must be 300 DPI Group IV single-page TIFF files

- File names cannot contain embedded spaces or special characters

- Images must be endorsed with sequential Bates numbers in lower right corner of each image page

The following fielded data should be included within Concordance load file:

| FIELD | DESCRIPTION | TYPE | REQUIRED |
|---|---|---|---|
| Begno | Displays the document identifier of the first page in a document or the entire document of an E-Doc. | Text | YES |
| Endno | Page ID of the last page in a document (for image collections  only). | Text | If it Exists |
| BegAttach | Displays the document identifier of a parent record. | Text | If it Exists |
| EndAttach | Displays the document identifier of the last attached document in a family | Text | If it Exists |
| Custodian | Custodian extracted from metadata of native file | Text | Yes |
| PgCount | Number of pages in a document (for image collections only). | Text | If it Exists |
| FileDescription | Description of a native file type. | Text | YES |
| Filename | Original filename of a native file or the subject of an e-mail message for e-mail records. | Text | YES |
| RecordType | Displays the record type for each entry in the load file. | Text | YES |
| ParentID | Displays the document identifier of the attachment record's parent (only for attachments). | Text | If it Exists |

| NumAttach | Total number of records attached to the document. The value will always be 0 (zero) for the actual attachment records. | Text | If it Exists |
|---|---|---|---|
| Attachmt | Populates parent records with document identifier of each attached record and is separated by semi-colons. | Text | If it Exists |
| From | Author of the e-mail message. | Text | If it Exists |
| To | Main recipient(s) of the e-mail message. | Text | If it Exists |
| cc | Recipient(s) of "Carbon Copies of the e-mail message, | Text | If it Exists |
| BCC | Recipient(s) of "Blind Carbon Copies" of the e-mail message. | Text | If it Exists |
| EMail_Subject | Subject of the e-mail message. | Paragraph | If it Exists |
| DateSent | Sent date of an e-mail message. | MM/DD/YYYY | If it Exists |
| TimeSent | Time the e-mail message was sent. | Text | If it Exists |
| IntMsgID | Internet Message ID assigned to an email message by outgoing server | Text | If it Exists |
| ConversationIndex | Email Thread identification | Text | If it Exists |
| EntryID | Unique Identifier of emails in mail stores | Text | If it Exists |
| Author | Author extracted from metadata of native file | Text | If it Exists |
| Organization | Company extracted from metadata of native file | Text | If it Exists |
| Subject | Subject value extracted from metadata of native file | Paragraph | If it Exists |
| DateCreated | Creation date of Native File | MM/DD/YYYY | If it Exists |
| DateLastMod | Date Native File last modified | MM/DD/YYYY | If it Exists |
| MD5HASH | MD5 Hash Value | Text | YES |
| EDSource | Original Path to source folder, files, and/or mail stores | Text | YES |
| NativeFile | Hyperlink to Native File | Text | YES |
| OCRText | Extracted or OCR Text | Paragraph | YES |
| ImageKey | Page ID of first page of document (for imaged documents | Paragraph | YES |

# EXHIBIT

# 2

260

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA          .        Criminal No. 1:10cr200
                                  .
        vs.                       .        Alexandria, Virginia
                                  .        April 5, 2011
LEE BENTLEY FARKAS,               .        1:53 p.m.
                                  .
          Defendant.              .
                                  .
    .   .   .   .   .   .   .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME 2 - P.M.

APPEARANCES:

FOR THE GOVERNMENT:              CHARLES F. CONNOLLY, AUSA
                                 PAUL J. NATHANSON, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314
                                   and
                                 PATRICK F. STOKES, ESQ.
                                 ROBERT ZINK, ESQ.
                                 United States Department of Justice
                                 Criminal Division, Fraud Section
                                 1400 New York Avenue, N.W.
                                 Washington, D.C. 20005


FOR THE DEFENDANT:               WILLIAM B. CUMMINGS, ESQ.
                                 William B. Cummings, P.C.
                                 P.O. Box 1177
                                 Alexandria, VA 22313



(APPEARANCES CONT'D. ON FOLLOWING PAGE)


(Pages 260 - 420)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

Kelly - Direct                                                              371

1   A.    The hole loans that didn't qualify from the list were

2   typically they had previously been sold to another investor

3   already.

4   Q.    So Taylor Bean would send over loans that had already been

5   sold to somebody else?

6   A.    Yeah, that our records showed were sold.

7   Q.    Now, as a result of these hole loans, were you able to pay

8   down the overdraft?

9   A.    A little bit.

10  Q.    Did the, did the overdraft continue to expand during this

11  time?

12  A.    Yes.

13  Q.    Did you also obtain cash at times from Colonial Bank -- I'm

14  sorry, from TBW?

15  A.    At times, they would be able to send money in to deposit to

16  the account, yes.

17  Q.    And are you aware of whether or not Taylor Bean hired any

18  consultants to try to find the, the problems that were causing the

19  overdrafts?

20  A.    Yes, they did.

21  Q.    And was that done in consultation with Colonial Bank?

22  A.    Yes.

23  Q.    Did those consultants fix the problem?

24  A.    No.   They weren't able to locate the, the hole loans.

25  Q.    Did the overdrafts continue?

# EXHIBIT

# 3

421

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .      Criminal No. 1:10cr200
                              .
      vs.                     .      Alexandria, Virginia
                              .      April 6, 2011
LEE BENTLEY FARKAS,           .      9:30 a.m.
                              .
            Defendant.        .
                              .
.  .  .  .  .  .  .  .  .  .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME 3 - A.M.

APPEARANCES:

FOR THE GOVERNMENT:            CHARLES F. CONNOLLY, AUSA
                               PAUL J. NATHANSON, AUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314
                                 and
                               PATRICK F. STOKES, ESQ.
                               ROBERT ZINK, ESQ.
                               United States Department of Justice
                               Criminal Division, Fraud Section
                               1400 New York Avenue, N.W.
                               Washington, D.C. 20005


FOR THE DEFENDANT:             WILLIAM B. CUMMINGS, ESQ.
                               William B. Cummings, P.C.
                               P.O. Box 1177
                               Alexandria, VA 22313



(APPEARANCES CONT'D. ON FOLLOWING PAGE)


(Pages 421 - 542)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

Kelly - Direct                                                          499

1  Q.    So, to the extent that a paid in full loan was identified,

2  what would Taylor Bean have to do?

3  A.    They would have to repay Colonial Bank that amount of money.

4  Q.    And so, to the extent that you were alerted that a loan was

5  paid in full, would you take that off of AOT?

6  A.    Yes.

7  Q.    How about if it was identified to you that a loan was

8  extinguished and now was just, there was just property, it was

9  REO, what would you do?

10  A.    That would remain on AOT just as a place holder as I called

11  it, just as--   There was still an asset there, it just couldn't be

12  immediately sold as is.

13  Q.    What about loans that had been charged off by banks?

14  A.    Charged off loans, if I was notified, those would be removed

15  from AOT.

16  Q.    And if you were notified by Taylor Bean, would they have to

17  pay back Colonial Bank for those loans?

18  A.    Yes.

19  Q.    How about loans that had already been sold to somebody else,

20  could they be on AOT?

21  A.    No.

22  Q.    Were you alerted to loans that had been sold off of AOT?

23  A.    On occasion.

24  Q.    And what would you do then?

25  A.    Taylor Bean would have to repay Colonial Bank for that loan.

Kelly - Direct                                                    500

1   Q.   And would you keep track of all this information in a

2   database?

3   A.   Yes.

4   Q.   Who had access to this database?

5   A.   I did, and a few of my team members had access to it as well.

6   Q.   Would you periodically update your database?

7   A.   Yes.

8   Q.   What sort of information would you put in your database?

9   A.   The pool number, the contract number of the trade that did

10  have loans assigned to it, and then the individual loans that were

11  assigned to that pool number.

12  Q.   In your database, would you identify loans that were in a

13  paid in full status or a paid down or charged off status?

14  A.   Yes.

15  Q.   Would you identify loans that were active?

16  A.   Yes.

17  Q.   Would you identify loans that were REO?

18  A.   Yes.

19  Q.   Would you then in your database identify what pool those

20  loans were assigned to?

21  A.   Yes.

22  Q.   And to the extent that they are paid in full, would you

23  assign them to any of the pools?

24  A.   They would have a pool number assigned in the database, but

25  they wouldn't be counted as a valid collateral backing up that

Kelly - Direct                                                          501

1   particular pool because they had been paid off.

2   Q.   Did you share this database with auditors?

3   A.   No.

4   Q.   With Colonial Bank management in Montgomery?

5   A.   No.

6   Q.   Did you provide that database to the Government?

7   A.   Yes.

8   Q.   Now, Ms. Kelly, in addition to the loans that we have just

9   discussed that actually were on AOT, did you periodically learn of

10  loans that were associated with the defendant?

11  A.   Yes.

12  Q.   Did you have a name for those?

13  A.   The loans in Lee's name would be the, just the Farkas loans.

14  Q.   And did you have a name for loans that you believed might be

15  associated with friends of Mr. Farkas?

16  A.   Yes.

17  Q.   What were those?

18  A.   The friend of Lee loans.

19  Q.   And if you would take a look at Government's Exhibit 19-6,

20  please.

21              THE COURT:  Is there any objection, Mr. Cummings?

22              MR. CUMMINGS:  If I could take a moment, Your Honor.  It

23  is going to take a moment for us to find it, Your Honor.

24              THE COURT:  I don't know why defense counsel wasn't

25  given the notebook the same way the Court was.

# EXHIBIT

# 4

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| **THE COLONIAL BANCGROUP, INC.,** <br><br> **Plaintiff,** <br><br> v. <br><br> **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank,** <br><br> **Defendant.** | **Case No. 2:10-cv-0198 (MHT)** |

## ORDER GRANTING JOINT MOTION TO ESTABLISH PROTOCOL FOR PRODUCTION OF DOCUMENTS AND NON-WAIVER OF APPLICABLE PRIVILEGES

This matter came on for consideration by the Court *[at a hearing on March __, 2011,]* upon the *Joint Motion to Establish Protocol for Production of Documents and Non-Waiver of Applicable Privileges* filed by plaintiff The Colonial BancGroup, Inc. ("BancGroup"), and defendant Federal Deposit Insurance Corporation, as receiver for Colonial Bank, Montgomery, Alabama (the "FDIC-Receiver"). With the consent of BancGroup and the FDIC-Receiver, the Court hereby finds as follows:

A.      On August 14, 2009, Colonial Bank was closed by the Alabama State Banking Department, and the FDIC-Receiver was appointed as its receiver. Upon its appointment as receiver, pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-Receiver succeeded, *inter alia*, to all rights, titles, powers and privileges of the bank;

B.      On August 25, 2009 (the "Petition Date"), BancGroup filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Alabama. BancGroup is a corporation formed under the laws of the State of Delaware. Prior to the receivership both BancGroup and Colonial Bank had their headquarters and

1820146_5

conducted business at 100 Colonial Bank Boulevard, Montgomery, Alabama 36117.  BancGroup was the holding company for Colonial Bank prior to the order closing Colonial Bank;

C.      The parties have jointly moved this Court (the "Motion") for an order regarding the method of production of certain documents containing information potentially relevant to issues in the above-captioned civil action (the "FIRREA Action"), as well as a currently pending contested matter before this Court under case number 2:10-cv-00409 (the "Claim Objection").[1]

D.      The documents that are the subject of the Motion include board meeting minutes and subcommittee meeting minutes of BancGroup's board of directors, and other documents relating to the operation and management of BancGroup prior to the commencement of its Chapter 11 bankruptcy case.  These materials are stored in approximately 21 banker boxes that are referred to as the "'R' Boxes," as opposed to other boxes of materials currently housed at BancGroup's counsel's office (these 21 banker boxes and the materials therein are referred to collectively in this Order as the "Documents").

E.      The parties understand that, prior to the closure of Colonial Bank, the Documents were stored at the headquarters building in Montgomery, Alabama.

F.      At the time of the closure of Colonial Bank on August 14, 2009, the FDIC-Receiver took possession and/or control of the Documents and thereafter inventoried the Documents.

G.      The Documents were later released to BancGroup and thereafter transferred from Montgomery, Alabama to BancGroup's counsel's office in Atlanta, Georgia.

---

[1]  This Court has previously ordered that any discovery taken in the FIRREA Action or in the Claim Objection may be used in both matters.  *See* Claim Objection, Doc. No. 36, § II.A.  While this Court also stayed a related adversary proceeding under case number 2:10-cv-00410 (the "541 Proceeding"), if the stay is lifted in the 541 Proceeding and the matter proceeds to an adjudication on the merits of the complaint therein, discovery conducted in the FIRREA Action and the Claim Objection may be used in the 541 Proceeding as well.  *See* 541 Proceeding, Doc. No. 39, ¶ 4.

H.     BancGroup contends that, during the period in which the FDIC-Receiver had possession and/or control of the Documents, the FDIC-Receiver made copies of all of the Documents and currently has copies of the Documents. The FDIC-Receiver disputes the foregoing and contends that it only has copies of a portion of the Documents and does not currently have access to all of the Documents.

I.     Given the nature of the Documents, the Court finds that a review of the documents for privilege and/or attorney work product prior to the FDIC-Receiver's inspection of the Documents would be burdensome and result in an unnecessary expense to BancGroup.[2]

J.     The parties wish to employ a methodology for allowing the FDIC-Receiver to review the Documents while minimizing the parties' cost and expense relating to the pre-production preparation and inspection of the Documents.

With the consent of BancGroup and the FDIC-Receiver, it is hereby ORDERED that:

1.     In accordance with Federal Rule of Evidence 502(d), and in response to the Motion, this Court hereby orders that production and/or inspection of the Documents shall be made in the following method of production (the "Production Protocol"):

(a)     BancGroup shall only be required to make the Documents available for inspection in the Atlanta, Georgia offices of its counsel.

(b)     The FDIC-Receiver's counsel shall be permitted to inspect the Documents beginning no later than the date of entry of this Order and continuing day-to-day during normal business hours with reasonable diligence until completed. During this time, the FDIC-Receiver's counsel may examine any of the Documents and make notes regarding the same. The FDIC-

---

[2] For the avoidance of doubt, the Court expresses no opinion on whether a review of any documents other than the Documents for privilege and/or attorney work product prior to an inspection of such documents by the FDIC-Receiver would be burdensome or result in an unnecessary expense to BancGroup.

Receiver's counsel shall not be permitted to photocopy, photograph, or otherwise reproduce any Document during the inspection without the written permission of the BancGroup's counsel. The foregoing time period may be modified by mutual agreement of the parties confirmed in writing without further order of this Court.

    (c)  Following, or concurrent with, this inspection, the FDIC-Receiver's counsel may request copies of those documents that it asserts are responsive to its pending discovery requests in the FIRREA Action. The FDIC-Receiver may identify the documents it wishes to obtain copies of, and the order of priority in which those documents are to be produced. The FDIC-Receiver shall do so by designating blocks of documents as follows:

      (i)  "Block One" may consist of the first 500 pages of documents; and if the FDIC-Receiver wishes to receive copies of more than 500 pages, it may do so by creating "Block Two."

      (ii)  Block Two may consist of up to 5,000 additional pages of documents; and if the FDIC-Receiver wishes to receive copies of more than 5,000 additional pages, it may do so by creating "Block Three."

      (iii)  Block Three may consist of up to 10,000 additional pages of documents; and if the FDIC-Receiver wishes to receive copies of more than 10,000 pages, it may do so by creating "Block Four."

      (iv)  Block Four may consist of up to 20,000 additional pages of documents.

In the event the FDIC-Receiver contends that it is entitled to and requires in excess of 35,500 pages, the parties shall meet and confer in good faith in an effort to devise a reasonable production method

for such excess pages. The foregoing may be modified by mutual agreement of the parties confirmed in writing without further order of the Court.

      (d)      Counsel for BancGroup shall have the following time periods after the FDIC-Receiver submits a request to examine certain documents for privilege, and provide a privilege log for any withheld documents, or to otherwise object to the production of the specific document at issue and make a motion for protective order to the Court:[3]

      (i)      Block One shall be produced (or withheld as privileged or made the subject of a protective order) by BancGroup within 3 days of receipt of the FDIC-Receiver's designation of its constituent pages.

      (ii)      Block Two shall be produced (or withheld as privileged or made the subject of a protective order) by BancGroup within 7 days of the production of Block One.

      (iii)      Block Three shall be produced (or withheld as privileged or made the subject of a protective order) by BancGroup within 14 days of the production of Block Two.

      (iv)      Block Four shall be produced (or withheld as privileged and made the subject of a protective order) by BancGroup within 21 days of the production of Block Three.

      (v)      All of the documents requested by the FDIC-Receiver, totaling 35,000 pages or less shall be produced (or withheld as privileged or

---

[3] No motion for protective order is required for Documents withheld on a claim of privilege, though the FDIC-Receiver may challenge the claim of privilege through a motion to compel.

made the subject of a protective order) no later than 45 days from the

date they are requested by the FDIC-Receiver.

The foregoing time period may be modified by mutual agreement of the parties confirmed in writing

without further order of the Court.

    2.    In light of the above, the Court finds that the Production Protocol is both a reasonable

and prudent means of protecting any privileged information contained within the Documents.

    3.    The Court further finds that compliance with this Order shall constitute due and

appropriate diligence on the part of BancGroup and its counsel in protecting any privilege.

    4.    The inspection of the Documents at BancGroup's counsel's office by the FDIC-

Receiver or its counsel in accordance with the Production Protocol shall not constitute any waiver of

attorney/client privilege, work product, or any other applicable privilege that might be asserted

regarding such Documents or any part thereof. This non-waiver of privilege applies to the parties in

this case, and to any other parties seeking to assert such a privilege or arguing that production to the

FDIC-Receiver in accordance with this Order constitutes waiver. The production of Documents by

BancGroup after the inspection by the FDIC-Receiver shall be governed by the ordinary and

applicable rules regarding inadvertent production and waiver of applicable privileges.


Dated:  March 3, 2011
       Montgomery, Alabama


               /s/ Dwight H. Williams, Jr.
               United States Bankruptcy Judge


- 6 -

# EXHIBIT

# 5

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA

|  |  |
|---|---|
| THE COLONIAL BANCGROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE<br>CORPORATION, as Receiver<br>for Colonial Bank,<br><br>Defendant. | Case No. 2:10-cv-0198 (MHT) |

## DECLARATION OF JOHN J. CLARKE, JR.

Pursuant to 28 U.S.C. § 1746, John J. Clarke Jr., Esq. declares:

1.    I am a member of DLA Piper LLP (US), counsel for defendant Federal Deposit Insurance Corporation, as Receiver for Colonial Bank (the "FDIC-Receiver") in this action, and of the Bar of the State of New York and various federal courts. I have been admitted *pro hac vice* in this action. I submit this declaration to place before the Court certain documents that are discussed in the FDIC-Receiver's memorandum of points and authorities in opposition to the motion of plaintiff The Colonial BancGroup, Inc. ("BancGroup"), for an order temporarily staying discovery in this action and in a related proceeding styled *In re The Colonial BancGroup, Inc.*, No. 2:10-cv-0409 (MHT) (M.D. Ala.). This declaration is made on personal knowledge unless indicated otherwise, in which case they are made to the best of my knowledge based on the information available to me.

2.    Attached hereto as Exhibit 1 is a true and correct copy of a letter dated October 11, 2010 from my partner Michael D. Hynes to Rufus T. Dorsey IV, counsel for BancGroup in this action.

3.      Attached hereto as Exhibit 2 is a true and correct copy of an email sent by Mr. Hynes to Mr. Dorsey on October 27, 2010, together with the letter that was attached to that email.

4.      Attached hereto as Exhibit 3 is a true and correct copy of an email sent to Mr. Hynes by Mr. Dorsey's colleague J. David Freedman on November 3, 2010.

5.      Attached hereto as Exhibit 4 is a true and correct copy of a letter dated January 31, 2011 from Mr. Hynes to Mr. Dorsey and Mr. Freedman.

6.      Attached as Exhibit 5 is a true and correct copy of a letter dated February 10, 2011 from Mr. Dorsey to Mr. Hynes.

7.      Attached as Exhibit 6 is a true and correct copy of a letter dated February 7, 2011 from Mr. Hynes to Mer. Dorsey and Mr. Freedman.

8.      Attached as Exhibit 7 is a true and correct copy of an email from Mr. Hynes to Mr. Freedman and Mr. Dorsey sent on February 21, 2011 together with the letters that were attached to that email.

9.      Attached hereto as Exhibit 8 is a true and correct copy of excerpts from the monthly fee statement of Parker Hudson Rainier & Dobbs LLP for July 2010 in the BancGroup chapter 11 case, the complete version of which was emailed to me and others involved in that case by Mr. Freedman on August 20, 2010.

10.      Attached hereto as Exhibit 9 is a true and correct copy of an email sent by Mr. Freedman to Mr. Hynes on April 11, 2011 confirming the dates for certain depositions in this action.

11.      Attached hereto as Exhibit 10 is a true and correct copy of an email sent by Mr. Freedman to me on April 22, 2011. The attachment to that email has been omitted.

12.     Attached hereto as Exhibit 11 is a true and correct copy of an email I sent to Mr. Freedman on April 22, 2011 responding to his email of earlier that day, together with the document that was attached to that email.

13.     Attached hereto as Exhibit 12 is a true and correct copy of BancGroup's Objection to Motion of the FDIC-Receiver for Estimation and Temporary Allowance of Claims Solely for Voting Purposes Pursuant to Bankruptcy Rule 3018, which was filed in the bankruptcy court on March 21, 2011 in BancGroup's chapter 11 case, *In re The Colonial BancGroup, Inc.*, No. 09-32303 (DHW) (Bankr. M.D. Ala.) [Doc. 1163].

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 2nd day of May, 2011

    /s/ John J. Clarke, Jr.    
John J. Clarke, Jr.

# EXHIBIT 3

**Stiefel, Spencer**

| | |
|---|---|
| **From:** | J. David Freedman [jdf@phrd.com] |
| **Sent:** | Wednesday, November 03, 2010 5:48 PM |
| **To:** | Hynes, Michael D.; Clarke, John J., Jr.; Stiefel, Spencer; 'Michael Fritz' |
| **Cc:** | Rufus T. Dorsey |
| **Subject:** | The Colonial BancGroup, Inc. v. FDIC, 2:10-cv-00198 |
| **Attachments:** | Inventory - Documents Maintained by Legal.pdf; Inventory - Moore & Free Boxes.pdf; Inventory - Other Documents.pdf; Inventory - Benefit Plan Boxes.pdf; Inventory - R Boxes -- FDIC Inventory.pdf |

Michael -

In your letter to Rufus Dorsey of October 11, 2010, you expressed, among other things, the FDIC-Receiver's desire to inspect 75 boxes of the Debtor's records housed at our firm. In accordance with your request during our conversation on Monday, November 1, this e-mail will set forth our proposed schedule for the FDIC-Receiver to inspect hard copy records of the Debtor. As we have set forth in our initial disclosures to you in 2:10-cv-198 (the "FIRREA Action"), the following is a brief summary of the boxes maintained at our firm. We are also providing you with the attached inventories for these boxes, which we have previously sent to you.

-- **Approximately 20** boxes that were apparently the subject of a "legal hold" (the "Legal Hold Boxes"). The inventory for these boxes, which was not prepared by the Debtor or its counsel, is attached and entitled, "Inventory - Documents Maintained by Legal."

-- **Approximately 20** boxes that we informally refer to as the Moore & Free boxes, as we were told the contents of these boxes came from Sarah Moore and Lisa Free's respective offices (the "Moore & Free Boxes"). The inventory for these boxes, which was not prepared by the Debtor or its counsel, is attached and entitled, "Inventory - Moore & Free Boxes."

-- **Approximately 13** boxes that were released to the Debtor (the "13 Other Boxes"). Our firm prepared the attached inventory for these boxes as they were apparently not inventoried by government agencies. The inventory is entitled "Inventory - Other Documents."

-- **Approximately 5** boxes that were released to the Debtor that have not been inventoried (to our knowledge) by either government agencies or the Debtor and its counsel (the "5 Miscellaneous Boxes").

-- **Approximately 35** boxes of benefit plan materials released to the Debtor by BB&T (the "Benefit Plan Boxes"). Our firm prepared the attached inventory, entitled "Inventory - Benefit Plan Boxes."

-- **Approximately 21** boxes of the Debtor's board materials that were inventoried by the FDIC-Receiver and released to the Debtor (the "'R' Boxes"). This inventory, prepared by the FDIC-Receiver, is attached and entitled "Inventory - R - Box -- FDIC Inventory."

Significant portions of these documents are not relevant to the FIRREA Action and/or are privileged. We also have reason to believe that the FDIC-receiver has in its possession significant portions of these documents. To be clear, our making these boxes available to you is not an admission as to the relevance or admissibility of the materials contained therein. Nevertheless, we are willing to make these records available to you, with the exception of privileged documents. We believe we can accomplish this on the schedule set forth below, although it will require considerable effort to cull privileged material in this time frame.

We will be able to provide the FDIC-Receiver access to no less than 30 non-Benefit Plan Boxes (excluding privileged materials) beginning on **Wednesday, November 17**. We will endeavor in good faith to make available as many non-Benefit Plan Boxes for your inspection as time reasonably permits (excluding, as explained below, the 'R' Boxes).

<u>We will be able to provide the FDIC-Receiver access to the balance of the non-Benefit Plan Boxes (excluding privileged materials) no later than **Wednesday, December 1**.   The balance of documents would include the Legal Hold Boxes, the Moore & Free Boxes, the 13 Other Boxes and the 5 Miscellaneous Boxes (again excluding, as explained below, the 'R' Boxes)</u>.

Lastly, we are surprised by your statement in your e-mail of November 2 that while you can confirm that the FDIC-Receiver inventoried the 21 'R' Boxes, the "FDIC was not permitted to retain copies" and will therefore "need to review these documents as well."  Please advise who denied the FDIC-Receiver the ability to retain copies of these boxes.  Also, please clarify your statement that the FDIC "was not permitted to retain copies" -- is the FDIC-Receiver aware of copies of these records being maintained or stored by another entity, such as BB&T?  While we certainly would like for the FDIC-Receiver to have access to all relevant documents, we are trying to minimize costs to our client.  As you all know from our prior production of documents during the 365(o) / Stay Relief litigation, the 'R' Boxes contain a significant amount of privileged information.

Assuming that you all confirm, in writing, that neither DLA Piper nor the FDIC-Receiver has access to the 'R' Boxes by other means, we ask if there is any way that you all could use the inventory for these boxes to identify specific documents/files/boxes within the 21 that you would like to review?  We would agree that this would not foreclose a subsequent request to look at additional boxes, or even the entire set, if that was necessary.

Should you have any questions about the foregoing, please contact me.

Regards,

J. David Freedman
Parker, Hudson, Rainer & Dobbs LLP
1500 Marquis Two Tower
285 Peachtree Center Avenue
Atlanta, Georgia  30303
(404) 523-6995 direct dial
(678) 533-7754 fax
dfreedman@phrd.com
www.phrd.com

**NOTE**: The information contained in this message is confidential and may be protected by the attorney-client privilege and/or the work product doctrine. If you have received this electronic message in error, please reply to the sender and destroy this message.

4/28/2011

# EXHIBIT

# 6

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BANK OF AMERICA, NATIONAL ASSOCIATION,   )
as indenture trustee, custodian, and collateral agent  )
for OCALA FUNDING, LLC,         )
             )
             )
     Plaintiff,        )
             )
   -against-        )   **Case No.: 1:10-cv-01681- JEB**
             )
FEDERAL DEPOSIT INSURANCE   )
CORPORATION, in its capacity as receiver for  )
COLONIAL BANK, and in its capacity as receiver  )
for PLATINUM COMMUNITY BANK,   )
             )
     Defendants.      )

## <u>DECLARATION OF PATRICK L. ROBSON</u>

Pursuant to 28 U.S.C. § 1746, Patrick L. Robson certifies as follows:

1.     My name is Patrick L. Robson and I am a member of the law firm Hunton &

Williams, LLP.  Hunton & Williams represents Bank of America, N.A. ("BoA") with respect to

the November 19, 2009 proof of claim filed in the Colonial Bank ("Colonial") receivership, the

December 9, 2009 proof of claim filed in the Platinum Community Bank ("Platinum")

receivership, and this litigation.  I make this declaration based on personal information and if

called up to do so, I could and would testify to the facts stated herein.

2.     Hunton & Williams also has represented BoA since August 2009 in connection

with the bankruptcy of Taylor, Bean & Whitaker Mortgage Corp. ("TBW") and efforts to

recover losses on behalf of Ocala Funding, LLC ("Ocala Funding") and its investors.

3.     Ocala Funding was a special purpose entity wholly-owned and operated by TBW

for the purpose of financing TBW's mortgage originations.  Ocala Funding issued short-term

notes, the last series of which were owned by Deutsche Bank AG ("Deutsche Bank") and BNP

Paribas Mortgage Corporation ("BNP Paribas," and collectively with Deutsche Bank, the

"Investors") at the time of TBW's collapse in August 2009. Ocala Funding used the proceeds

from its note issuances to purchase mortgage loans owned or originated by TBW.

THE OCALA FACILITY DOCUMENTS

4.     Under the various agreements governing Ocala Funding (the "Facility

Documents"), BoA served, among other roles, as the indenture trustee, custodian, and collateral

agent for Ocala Funding.

5.     A true and correct copy of the Second Amended and Restated Base Indenture

dated as of June 30, 2008 is attached hereto as Exhibit A. Section 3.1 of the Indenture states that

Ocala Funding (the Issuer) has assigned to BoA (Collateral Agent) a security interest in all of

Ocala Funding's collateral, including loans and accounts, for the benefit of the "Secured Parties."

The Secured Parties are defined in the Facility Documents to include, among others, the

Noteholders, the Subordinated Noteholders, the Indenture Trustee, the Collateral Agent, and

each Swap Counterparty. *See* Paragraph 7, below. The security interest referenced in Section

3.1 of the Indenture is contained in the Security Agreement, described at Paragraph 8, below.

6.     Section 9.2 of the Indenture requires that "[i]f and whenever an Event of Default

shall have occurred and be continuing, the Indenture Trustee [BoA] … shall, exercise from time

to time any rights and remedies available to it under the Security Agreement." Section 9.10

states that the Trustee "is authorized to file such proofs of claim and other papers or documents

as may be necessary or advisable in order to have the claims of the Indenture Trustee…allowed

in any judicial proceedings relative to the Issuer…, its creditors or its property, and shall be

2

entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claim."

7.     A true and correct copy of excerpts of Schedule I to the Base Indenture, "Definitions List," is attached hereto as Exhibit B. "Secured Parties" is defined in this "Definitions List," which provides the definitions for all of the Facility Documents, as "the Swap Counterparties, the Collateral Agent, the Series 2005-1 Depositary, the Series 2008-1 Depositary, the Indenture Trustee, the holders of all Series of Notes, including…the Secured Liquidity Notes, … the Subordinated Notes and the Term Notes." *See id.* at 31.

8.     A true and correct copy of the Second Amended and Restated Security Agreement dated as of June 30, 2008 is attached hereto as Exhibit C. In Section 4.01 of the Security Agreement, Ocala Funding assigned to BoA "as Collateral Agent for the benefit of the Secured Parties" a security interest in "all accounts, money, chattel paper, investment property, instruments, documents, securities accounts" and similar assets. The Security Agreement also conveyed to BoA "all right, title and interest of [Ocala Funding] in, to and under the Facility Documents, … including, without limitation, …the rights of the Issuer [Ocala Funding] to enforce the Facility Documents." In Section 5.02 of the Security Agreement, Ocala Funding assigned to BoA, as Collateral Agent for the benefit of the Secured Parties, "a security interest in the Collateral Account."

9.     Section 6.01 of the Security Agreement states that, after an event of default, BoA may "exercise all rights, remedies, powers, privileges and claims" of Ocala Funding under any Facility Document. Under Section 6.02, after an event of default, BoA may "exercise any rights and remedies available to it under applicable law" regarding Ocala Funding's collateral and shall have "in addition to any other rights and remedies which may be available to it at law or in equity … all

3

rights and remedies of a secured party under" the relevant Uniform Commercial Code of the jurisdiction.

10.     Section 10.06 of the Security Agreement appoints BoA, as Collateral Agent for Ocala Funding, as attorney-in-fact for Ocala Funding.

### FLORIDA LITIGATION

11.     Pursuant to the Facility Documents, on August 12, 2009, BoA as "the trustee and administrative agent for Ocala Funding" filed a complaint against Colonial Bank ("Colonial") in the Southern District of Florida, No. 09-CV-22384 (the "Florida Action").  A true and correct copy of the Complaint is attached hereto as Exhibit D.

12.     In its complaint in the Florida Action, BoA stated that the action was "for replevin, breach of contract, imposition of a constructive trust, unjust enrichment, injunctive relief, and civil theft with respect to (a) the proceeds paid by Freddie Mac to Colonial Bank, as trustee, custodian, bailee, and agent, for certain mortgage loans and corresponding loan documents owned by Ocala Funding..."

13.     A temporary restraining order was entered in favor of BoA on August 13, 2009.

14.     On August 19, 2009, the FDIC was substituted into the Florida Action after Colonial was placed into FDIC Receivership.  The FDIC moved to dissolve the TRO.  A true and correct copy of the FDIC's Emergency Motion to Dissolve the Order Granting Motion for Temporary Restringing Order & Setting Preliminary Injunction Hearing is attached hereto as Exhibit E.

15.     On August 27 and 28, 2009, in connection with the Florida Action, BoA filed and served the FDIC, as Receiver for Colonial Bank, with copies of various Facility Documents, including the Base Indenture.  The FDIC was provided access to a copy of the Security Agreement no later than January 26, 2010.

16.    In its motion papers, the FDIC recognized that BoA acted as trustee for Ocala Funding and was asserting claims on its behalf. The FDIC described BoA's complaint as seeking "to enjoin [Colonial] from liquidating, transferring or encumbering more than $1 billion in assets representing (1) proceeds paid to Colonial by Freddie Mac for loans owned by Ocala Funding, LLC ("Ocala")" and (2) loans held by Colonial as custodian on behalf of Ocala that were not purchased by Freddie Mac (collectively referred to as the "Ocala Loans"), both of which Colonial refused to turn over to Ocala". *See* Exhibit E at 1-2 (emphases added).

17.    Significantly, the FDIC also stated that "Bank of America—like all other creditors—may pursue their claims through the mandatory administrative procedures set forth in FIRREA." *Id.* at 6.

18.    A true and correct copy of the FDIC's "Motion for 90-Day Stay" of the Florida litigation is attached hereto as Exhibit F. In that motion, the FDIC again stated that BoA's complaint "sought to enjoin [Colonial] from liquidating, transferring, or encumbering more than $1 billion in assets representing (1) proceeds paid to Colonial by Freddie Mac for loans owned by Ocala Funding, LLC ("Ocala") and (2) loans held by Colonial and custodian on behalf of Ocala that were not purchased by Freddie Mac (collectively referred to as the "Ocala Loans"), both of which Colonial refused to turn over to Ocala." *See* Exhibit F at 1 (emphases added).

19.    On August 31, 2009, the Court granted in part a preliminary injunction preventing the FDIC from liquidating, transferring or encumbering the assets related to Ocala Funding. On September 4, 2009, the Court ordered that the preliminary injunction already in place stay in effect. The FDIC appealed to the Eleventh Circuit Court of Appeals.

20.    A true and correct copy of the FDIC's Consolidated Brief to the Eleventh Circuit Court of Appeals is attached hereto as Exhibit G. In its appeal brief, the FDIC described its

argument before the lower court. "The FDIC argued that such a judicial determination is impermissible until the mandatory administrative remedies are exhausted, and that exhaustion is a jurisdictional requirement." Exh. F at 13-14. It further stated that "complaints...—like those advanced here by BoA—are to be resolved not through injunctive action but only through a claim for damages made in accordance with the administrative claims process...." *Id.* at 19. The FDIC acknowledged that BoA had submitted such a claim to the FDIC on November 19, 2009. *Id.* at 15. The FDIC also noted that if BoA was dissatisfied with the outcome of the administrative claims process it could appeal to the district court. *Id.* at 22.

21.     A true and correct copy of the FDIC's Reply Brief in the Eleventh Circuit is attached hereto as Exhibit H. In the reply brief, the FDIC noted that BoA had argued that its claim was not "susceptible of resolution" through the administrative claims process. In refutation of BoA's argument, the FDIC — contrary to its current argument that this Court does not have jurisdiction to decide whether BoA has any claim to the Ocala Funding assets — stated that BoA's argument that the claims were not susceptible of resolution in the administrative process was "unsupported." *See* Exhibit G at 28.

22.     A true and correct copy of the Eleventh Circuit's Opinion in the Florida litigation, dated April 26, 2010, is attached hereto as Exhibit I. The Opinion, noted that "[t]he operation of § 1821(j) does not leave Bank of America without a remedy. Its claim is one that can and should be pursued through the administrative claims process. The FDIC has consistently maintained in its pleadings before the district court and submissions to this court that it will adjudicate Bank of America's claim administratively." *See* Exhibit I at 14. The Opinion is also published in the Federal Reporter. *See Bank of America, N.A. v. Colonial Bank*, 604 F.3d 1239 (11th Cir. 2010).

### BoA's Cooperation with FDIC and TBW in Asset Reconciliation

23.     While the FDIC's motion to dissolve the preliminary injunction and the subsequent appeal of the order denying FDIC's motion were pending, counsel for BoA and representatives of the FDIC met repeatedly and exchanged information so that both parties could ascertain the scope of TBW, Colonial, and Platinum Bank's fraud.

24.     On October 6, 2009, counsel to BoA held a lengthy conference call with representatives of the FDIC and its counsel.  In the course of that conference call, the FDIC specifically asked for BoA's assistance in providing information about the Ocala Funding facility and losses the facility had sustained.

25.     On October 7, 2009, corporate representatives of BoA and its outside counsel held another conference call with representatives of the FDIC and its counsel.  In the course of that call, Leslie Flynn—one of the FDIC's lead investigators in the Colonial Bank receivership— asked for BoA's help in the asset reconciliation process that was being led by TBW and the FDIC.  Specifically, the FDIC asked BoA to meet with the FDIC in person and, among other things, to explain the structure of the Ocala Funding facility.

26.     On October 14, 2009, my colleague Andrew Zaron and I met for nearly 6 hours with, among others, representatives of the FDIC in Jacksonville, Florida.  Representatives of the Investors also were present at this meeting.  All of the parties at this meeting shared information and walked through multiple documents in an effort to understand the operation of Ocala Funding and the location and ownership of mortgage loans, including mortgage loans in which BoA as collateral agent for Ocala Funding maintained a first priority security interest.  In the course of that meeting, representatives of the FDIC indicated that they had reviewed the Ocala Facility Documents and asked questions about Ocala Funding's structure and BoA's role in the

Ocala Funding facility. The FDIC indicated that it understood that BoA was pursuing recovery on behalf of Ocala Funding and did not question BoA's authority to do so.

27.     On October 19, 2009, my colleague Marty Steinberg wrote to counsel for the FDIC regarding a proposed stipulation to handle the disposition of the Ocala Funding assets during the pendency of the Florida Litigation. Mr. Steinberg explained that Bank of America sought to protect and ultimately recover the assets of Ocala Funding. In its October 21, 2009 reply, the FDIC did not suggest that BoA lacked authority to recover on behalf of Ocala. Attached hereto as Exhibit J is true and correct copy of the FDIC's October 21, 2009 correspondence.

28.     On November 4, 2009, I traveled to Orlando, Florida at the FDIC's request and made a multiple hour presentation to (i) FDIC representatives, (ii) its inside and outside counsel, (iii) representatives of KPMG, the auditors retained by the FDIC as part of the Colonial Receivership; (iv) representatives of TBW; and (v) counsel for the Investors. In the course of that presentation, I explained the structure of the Ocala Funding facility and why BoA as indenture trustee and collateral agent was acting to recover assets on behalf of Ocala Funding.

29.     I provided everyone at the meeting with copies of exemplar documents demonstrating how the Ocala Funding facility operated and specifically what role BoA played in the facility. I also offered, subject to an agreed confidentiality order, to provide the FDIC with copies of any additional documents it needed to assist in the overall asset reconciliation process. In response, the FDIC requested and we ultimately provided documents identifying (i) wire transfers to and from Ocala Funding bank accounts at BoA; (ii) account statements for those Ocala Funding accounts; and (iii) statements identifying collateral held by Ocala Funding during the relevant time period.

8

30.     On November 19, 2009, BoA filed its proof of claim in the Colonial receivership. At the time, the parties (including BoA, TBW, the FDIC, and the Investors) were just beginning an asset reconciliation process, one which would not conclude until July 1, 2010.  Under the circumstances, BoA outlined in its proofs of claim its claims against Colonial and Platinum based upon the best information available to BOA at a very early stage in the investigation and reconciliation of the TBW, Colonial, and Platinum fraud.

31.     Both before and after BoA submitted its proofs of claim, my colleagues and I repeatedly made the FDIC and its counsel aware that we represented BoA as trustee for Ocala Funding and that BoA was seeking recovery of all assets rightfully owned by Ocala Funding. We also informed the FDIC that any recovery in the Colonial and Platinum receiverships would ultimately benefit, among others, the Investors and other Secured Parties.

32.     On December 3, 2009, I met with representatives of TBW, the FDIC and the Investors in Ocala, Florida.  In the course of those meetings, we interviewed jointly a former TBW employee as part of the continuing effort to ascertain how Ocala Funding had been defrauded.

33.     In the course of the asset reconciliation process, a complete set of the Ocala Facility Documents also were made available by TBW to all interested parties, including the FDIC.

34.     On March 2, 2010, with a number of my colleagues, I met with representatives of the FDIC at their offices in Orlando, Florida.  The purpose of the meeting was to discuss further cooperation between BoA and the FDIC and specifically the status of BoA's administrative claims in the Colonial and Platinum Receiverships.  At that meeting, I reiterated BoA's offers to answer any questions the FDIC had with respect to Ocala Funding and BoA's effort to recover

losses incurred by Ocala Funding, and again offered to provide the FDIC with copies of any additional documents it needed to assist in the asset reconciliation process.

35.     In the course of the March 2 meeting, in which we discussed extensively BoA's administrative claim, the FDIC never suggested in any way that BoA was not the proper party to seek recovery of losses on behalf of Ocala Funding or that Ocala Funding had not properly filed a proof of claim to exhaust its administrative remedies.

36.     In April 2010, the FDIC asked for consent to extend the FDIC's time to make a determination of BoA's administrative claims.  Counsel for the FDIC represented at the time that the FDIC had not yet made any decision whether to allow or deny BoA's administrative claims.

37.     On April 26, 2010, I executed a Stipulated Confidentiality Agreement in the TBW bankruptcy on behalf of "Bank of America as Indenture Trustee to Ocala Funding, LLC." Richard Hans, counsel for the FDIC, executed the Agreement on the FDIC's behalf.

38.     On April 28, 2010, I spoke with counsel for the FDIC.  The FDIC's counsel indicated that the FDIC would provide to BoA a list of loans it believed were still owned by Colonial and requested that BoA return those loans.  The FDIC's counsel also indicated that it would return to BoA any loans held by Colonial which it believed were owned by Ocala Funding.  FDIC's counsel also sought a response to its request for an extension of time to make a determination with respect to the proofs of claim.

39.     On May 6, 2010, I provided to the FDIC two CDs containing documents it previously had requested from BoA as part of the ongoing asset reconciliation process.  At that time, "Bank of America, as indenture trustee to Ocala Funding [consented] to a 90-day extension of the claims review period for the FDIC as Receiver to Colonial Bank and Platinum Bank to make a determination regarding Bank of America's respective proofs of claim."

10

40.     As described above, in connection with the TBW bankruptcy and Colonial and

Platinum receiverships, BoA's counsel repeatedly has explained to representatives of the FDIC

and its counsel the structure and operation of Ocala Funding, as well as the losses suffered by

Ocala Funding and the fact that BoA was seeking to recover for those Ocala losses.  During the

eight month period when the FDIC was considering the proofs of claim, attorneys for BoA had

multiple, lengthy meetings and conversations with representatives of the FDIC regarding BoA's

proofs of claim and answered all of the FDIC's questions regarding Ocala Funding.  Not once

did the FDIC question BoA's authority to bring claims on behalf of Ocala Funding for the losses

described in its proof of claim.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this October 21, 2011 at Boone, North Carolina.

_____

Patrick L. Robson

11