# EXHIBIT E

## Exhibit E

| Second Amended Complaint ("SAC") | PCAOB Reports* *The 2009 and 2006 reports follow this document. The 2008 report is attached to the Motion to Compel as Ex. H. |
|---|---|
| **Acceptance of and Reliance on Management's Assertions** | |
| PwC failed to corroborate management's explanations and representations concerning material matter (SAC p. 29-30 (see quotation below)) | "(3)'deficiencies identified in areas with a high degree of judgment and potential for management bias, and in areas involving the application of complex accounting literature.'" (2008 PCAOB Report p. 12) |
| "With very large numbers of loans acknowledged to be defective, PwC should have suspected a serious breakdown in internal controls designed to prevent loans from being warehoused indefinitely on the COLB facility. Accepting management's explanation that no valuation issues arose from such aged loans in a facility designed to keep loans for only 30-60 days is demonstrative of PwC's failure to exercise due professional care in the performance of the audit and obtain sufficient competent evidential matter in violation of AU Sections 230 and 326." (SAC p. 29-30) | "The inspection team has identified concerns with significant elements of the audit process, such as the failure to adequately challenge management assumptions, excessive reliance on management's responses to inquiries, and the failure to respond appropriately to potential issues identified during an audit." (2008 PCAOB Report p. 14) |
| **Lack of Evidence Supporting Management's Estimates** | |
| PwC failed to require sufficiently persuasive evidence to support its conclusions and Colonial management's material accounting estimates and representations (SAC p. 49 (see quotation below)) | The PCAOB's audit reviews also provided "cause for concern about the effectiveness of [PwC's] quality controls with respect to auditing management's estimates and fair value determinations," and "failed to test the completeness and accuracy of inventory aging reports." (2008 PCAOB Report p. 9-10, 11) |
| "PwC and Crowe owed Colonial a duty to perform their audits and professional services in accordance with applicable professional standards. As alleged more fully herein, PwC breached its duty in at least the following ways, among others: (i) failing to require sufficiently persuasive evidence to support its conclusions and Colonial management's material accounting estimates and representations;" (SAC p. 49) | |
| **Failure to Detect Fraud** | |
| PwC's failures with respect to the detection of fraud (SAC p. 28 (see quotation below)) | "For one type of high-risk derivative, the issuer used certain external pricing information and values calculated by its valuation process. The issuer's documentation indicated that the external pricing information was obtained from multiple pricing sources. Although there was a heightened risk of fraud and the Firm identified a significant audit adjustment and |
| "Had PwC and Crowe complied with applicable professional standards, they would have detected the TBW fraud several months before it was ultimately uncovered. They would have been required to promptly communicate such fraud | |

| | |
|---|---|
| to Colonial and BancGroup which disclosure would have prompted immediate action by Colonial to terminate its relationship with TBW, thus avoiding or significantly reducing the losses that Colonial sustained." (SAC at 53).<br><br>"PwC's audit confirmation procedures also were grossly deficient in light of the potential fraud risks relating to TBW. (AU Section 316). The confirmation evidence that PwC obtained was unreliable. (AU Section 326). PwC violated GAAS with respect to confirmation control (AU Section 330), proficiency of its auditors (AU Section 210), lack of supervision by senior auditors (AU Section 311), and the failure to exercise due professional care and appropriate professional skepticism. (AU Section 230)." (SAC p. 28) | deficiencies in controls in this area, the Firm failed to obtain corroboration of the accuracy of this pricing information from independent sources outside the issuer. In addition, the Firm failed to test the reasonableness of certain of the significant assumptions that the issuer made regarding this external pricing information and regarding the values calculated by the issuer's valuation model. The Firm also failed to perform substantive procedures to evaluate the reasonableness of certain higher-risk pricing inputs to the issuer's valuation model."<br>(2009 PCAOB Report, p. 6). |

**Failure to Obtain Sufficient Competent Evidential Matter**

| | |
|---|---|
| "The obtaining of competent evidential matter to afford a reasonable basis for its opinions regarding Colonial's financial statements during PwC's audits." (SAC p. 29-30)<br><br>"With very large numbers of loans acknowledged to be defective, PwC should have suspected a serious breakdown in internal controls designed to prevent loans from being warehoused indefinitely on the COLB facility. Accepting management's explanation that no valuation issues arose from such aged loans in a facility designed to keep loans for only 30-60 days is demonstrative of PwC's failure to exercise due professional care in the performance of the audit and obtain sufficient competent evidential matter in violation of AU Sections 230 and 326." (SAC 29-30) | "In some cases, the deficiencies identified were of such significance that it appeared to the inspection team that [PwC], at the time it issued its audit report, had not obtained sufficient competent evidential matter to support its opinion on the issuer's financial statements." (2008 PCAOB Report p. 4) |
| | Some of the general observations of the PCAOB involved: (1) "[PwC's] failure to obtain competent evidential matter, at the time it issued its audit report, to support its audit opinion" (2008 PCAOB Report p. 12) |

**Sales Accounting (FAS 140)**

| | |
|---|---|
| PwC's opinions regarding the sales accounting treatment of Colonial's mortgage warehouse division (FAS 140) (SAC p. 30 (see quotation below))<br><br>"While appropriately recognizing that Colonial owned a 99 percent participation interest in the COLB loans, PwC nonetheless negligently treated COLB loan financing to TBW as a purchase of loans from TBW to be held for sale to end investors rather than as an extension of credit to allow TBW | "The Firm failed to appropriately test whether the issuer's impairment analysis regarding mortgage servicing rights complied with the Statement of Financial Accounting Standards ("SFAS") No. 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities. SFAS No. 140 requires that mortgage servicing rights be stratified according to their predominant risk characteristics for purposes of evaluating impairment. The issuer included over 90 percent of its mortgage servicing rights in one stratum |

| | |
|---|---|
| to make loans. Sales treatment allowed TBW to remove COLB loans from its balance sheet and free up its mortgage warehouse line of credit. This was a significant accounting determination that enabled TBW to obtain financing without regard to Colonial's regulatory lending limits on the amount of loans Colonial could make to a single borrower." (SAC p. 30). | (sub-prime loans).  Despite the fact that the loans underlying the mortgage servicing rights in that stratum displayed varying risk characteristics, such as including fixed rate, variable rate, and hybrid mortgages and being collateralized by properties located in every state, the Firm accepted the issuer's approach."  (2006 PCAOB Report at p. 4-5). |
| **Misapplication of GAAP** | |
| "At the conclusion of each audit, PwC reported that PwC had performed its audit work in accordance with applicable professional standards and that BancGroup's financial statements were fairly stated in all material respects in accordance with Generally Accepted Accounting Principles ("GAAP")." (SAC p. 17). | The PCAOB stated that "the inspection team identified matters that it considered to be audit deficiencies  [that] included failures by [PwC] to identify or appropriately address errors in the issuer's application of GAAP." (2008 PCAOB Report p. 3). |
| **Professional Skepticism** | |
| To comply with GAAS, the auditor needs to identify risks of material misstatement at appropriate levels of detail, and design appropriate auditing procedures in light of such risks.  Due professional care requires the auditor to exercise professional skepticism – i.e., a questioning mind and a critical assessment of audit evidence based on the assumption that management is neither dishonest nor honest beyond doubt." (SAC p. 18-19)

"PwC breached its duty under GAAS to exercise appropriate professional skepticism by failing to question how Colonial, particularly during an unfolding economic crisis in credit markets, had funded billions of dollars of mortgages over the years without ever experiencing a loss." (SAC p. 25) | Some of the general observations of the PCAOB involved: . . . (2) the sufficiency of [PwC's] emphasis on the critical need to exercise due care and professional skepticism  when performing audits" (2008 PCAOB Report p. 12)

"The PCAOB also stated that 'the deficiencies identified by the inspection team suggest that [PwC] may be placing too much reliance on management's responses to the teams' inquiries and not sufficiently challenging or evaluating management's assumptions, and that [PwC] may not be applying an appropriate level of professional skepticism in subjective areas susceptible to management bias.'" (2008 PCAOB Report p. 13) |



**PCAOB**
Public Company Accounting Oversight Board

1666 K Street, N.W.
Washington, DC 20006
Telephone: (202) 207-9100
Facsimile: (202) 862-8430
www.pcaobus.org

# Report on

# 2006 Inspection of PricewaterhouseCoopers LLP

## Issued by the

# Public Company Accounting Oversight Board

## October 18, 2007

> **THIS IS A PUBLIC VERSION OF A PCAOB INSPECTION REPORT**
>
> **PORTIONS OF THE COMPLETE REPORT ARE OMITTED FROM THIS DOCUMENT IN ORDER TO COMPLY WITH SECTIONS 104(g)(2) AND 105(b)(5)(A) OF THE SARBANES-OXLEY ACT OF 2002**

PCAOB RELEASE NO. 104-2007-129



PCAOB Release No. 104-2007-129

Public Company Accounting Oversight Board

## Preface to Reports Concerning Annually Inspected Firms

The Sarbanes-Oxley Act of 2002 requires the Public Company Accounting Oversight Board ("PCAOB" or "the Board") to conduct an annual inspection of each registered public accounting firm that regularly provides audit reports for more than 100 issuers.  The Board's report on any such inspection includes this preface to provide context for information in the public portion of the report.

A Board inspection includes, among other things, a review of selected audits of financial statements and of internal control over financial reporting.  If the Board inspection team identifies deficiencies in those audits, it alerts the firm to the deficiencies during the inspection process.  Deficiencies that exceed a certain significance threshold are also summarized in the public portion of the Board's inspection report.  The Board encourages readers to bear in mind two points concerning those reported deficiencies.

First, inclusion in an inspection report does not mean that the deficiency remained unaddressed after the inspection team brought it to the firm's attention.  Under PCAOB standards, a firm must take appropriate action to assess the importance of the deficiency to the firm's present ability to support its previously expressed audit opinions.  Depending upon the circumstances, compliance with these standards may require the firm to perform additional audit procedures, or to inform a client of the need for changes to its financial statements or reporting on internal control, or to take steps to prevent reliance on previously expressed audit opinions.  A Board inspection does not typically include review of a firm's actions to address deficiencies identified in that inspection, but the Board expects that firms are attempting to take appropriate action, and firms frequently represent that they have taken, are taking, or will take, action.  If, through subsequent inspections or other processes, the Board determines that the firm failed to take appropriate action, that failure may be grounds for a Board disciplinary sanction.

Second, the Board cautions against drawing conclusions about the comparative merits of the annually inspected firms based on the number of reported deficiencies in any given year.  The total number of audits reviewed is a small portion of the total audits performed by these firms, and the frequency of deficiencies identified does not necessarily represent the frequency of deficiencies throughout the firm's practice. Moreover, if the Board discovers a potential weakness during an inspection, the Board may revise its inspection plan to target additional audits that may be affected by that weakness, and this may increase the number of deficiencies reported for that firm in that year.  Such weaknesses may emerge in varying degrees at different firms in different years.



PCAOB Release No. 104-2007-129

Public Company Accounting Oversight Board

     During 2006, the Board's inspection process focused on how efficiently the annually inspected U.S. firms performed audits in the second year of implementation of Auditing Standard No. 2, *An Audit of Internal Control over Financial Reporting Performed in Conjunction with an Audit of Financial Statements* ("AS No. 2").  As described in Appendix B to this report, the inspection process occurred at three levels: (1) meetings with senior firm leadership, (2) national office inspection procedures, and (3) inspection procedures for audits of accelerated filers.  In general, the Board's inspection teams observed that the firms achieved increased efficiencies as compared to the first year of implementation of AS No. 2.  Nonetheless, the Board's inspection teams believed that, in many of these engagements, there were additional opportunities for the auditors to achieve efficiencies in the implementation of AS No. 2.  Those observations have been discussed with the firms, and the Board expects that those discussions are contributing to changes to methodology, additional firm training and guidance, and more rigorous discussions with issuers about ways in which firms and issuers can work together to make audits more efficient.

# PCAOB
Public Company Accounting Oversight Board

PCAOB Release No. 104-2007-129

---

### Notes Concerning this Report

1. Portions of this report may describe deficiencies or potential deficiencies in the systems, policies, procedures, practices, or conduct of the firm that is the subject of this report. The express inclusion of certain deficiencies and potential deficiencies, however, should not be construed to support any negative inference that any other aspect of the firm's systems, policies, procedures, practices, or conduct is approved or condoned by the Board or judged by the Board to comply with laws, rules, and professional standards.

2. Any references in this report to violations or potential violations of law, rules, or professional standards should be understood in the supervisory context in which this report was prepared. Any such references are not a result of an adversarial adjudicative process and do not constitute conclusive findings of fact or of violations for purposes of imposing legal liability. Similarly, any description herein of a firm's cooperation in addressing issues constructively should not be construed, and is not construed by the Board, as an admission, for purposes of potential legal liability, of any violation.

3. Board inspections encompass, among other things, whether the firm has failed to identify departures from U.S. Generally Accepted Accounting Principles ("GAAP") or Securities and Exchange Commission ("SEC" or "Commission") disclosure requirements in its audits of financial statements. This report's descriptions of any such auditing failures necessarily involve descriptions of the related GAAP or disclosure departures. The Board, however, has no authority to prescribe the form or content of an issuer's financial statements. That authority, and the authority to make binding determinations concerning an issuer's compliance with GAAP or Commission disclosure requirements, rests with the Commission. Any description, in this report, of perceived departures from GAAP or Commission disclosure requirements should not be understood as an indication that the Commission has considered or made any determination regarding these issues unless otherwise expressly stated.

PCAOB Release No. 104-2007-129



**Public Company Accounting Oversight Board**

## 2006 INSPECTION OF PRICEWATERHOUSECOOPERS LLP

In 2006, the Board conducted an inspection of PricewaterhouseCoopers LLP ("PwC" or "the Firm"). The Board is today issuing this report of that inspection in accordance with the requirements of the Sarbanes-Oxley Act of 2002 ("the Act").

The Board is making portions of the report publicly available. Specifically, the Board is releasing to the public Part I of the report, Appendix B, and portions of Appendix C. Appendix B provides an overview of the inspection process. Appendix C includes the Firm's comments, if any, on a draft of the report.[1]

The Board has elsewhere described in detail its approach to making inspection-related information publicly available consistent with legal restrictions.[2] A substantial portion of the Board's criticisms of a firm (specifically criticisms of the firm's quality control system), and the Board's dialogue with the firm about those criticisms, occurs out of public view, unless the firm fails to make progress to the Board's satisfaction in addressing those criticisms. In addition, the Board generally does not disclose otherwise nonpublic information, learned through inspections, about the firm or its clients. Accordingly, information in those categories generally does not appear in the publicly available portion of an inspection report.

---

[1]     The Board does not make public any of a firm's comments that address a nonpublic portion of the report. In addition, pursuant to section 104(f) of the Act, 15 U.S.C. § 7214(f), and PCAOB Rule 4007(b), if a firm requests, and the Board grants, confidential treatment for any of the firm's comments on a draft report, the Board does not include those comments in the final report at all. The Board routinely grants confidential treatment, if requested, for any portion of a firm's response that addresses any point in the draft that the Board omits from, or any inaccurate statement in the draft that the Board corrects in, the final report.

[2]     See Statement Concerning the Issuance of Inspection Reports, PCAOB Release No. 104-2004-001 (August 26, 2004).



**PART I**

**INSPECTION PROCEDURES AND CERTAIN OBSERVATIONS**

Members of the Board's inspection staff ("the inspection team") performed an inspection of the Firm from May 2006 through January 2007. The inspection team performed field work at the Firm's National Office and at 22 of its approximately 63 U.S. practice offices.

Board inspections are designed to identify and address weaknesses and deficiencies related to how a firm conducts audits.[3/] To achieve that goal, Board inspections include reviews of certain aspects of selected audits performed by the firm and reviews of other matters related to the firm's quality control system. Appendix B to this report provides a description of the steps the inspection team took with respect to the review of audits of financial statements and of internal control over financial reporting and the review of eight functional areas related to quality control.

In the course of reviewing aspects of selected audits, an inspection may identify ways in which a particular audit is deficient, including failures by the firm to identify, or to address appropriately, respects in which an issuer's financial statements do not present fairly the financial position, results of operations, or cash flows of the issuer in conformity with GAAP.[4/] It is not the purpose of an inspection, however, to review all of a firm's audits or to identify every respect in which a reviewed audit is deficient. Accordingly, a Board inspection report should not be understood to provide any assurance that the firm's audits, or its issuer clients' financial statements or reporting on internal control, are free of any deficiencies not specifically described in an inspection report.

---

[3/]     This focus necessarily carries through to reports on inspections and, accordingly, Board inspection reports are not intended to serve as balanced report cards or overall rating tools.

[4/]     When the Board becomes aware that an issuer's financial statements appear not to present fairly, in a material respect, the financial position, results of operations, or cash flows of the issuer in conformity with GAAP, the Board's practice is to report that information to the SEC, which has jurisdiction to determine proper accounting in issuers' financial statements.



A.      Review of Audit Engagements

        The scope of the inspection procedures performed included reviews of aspects of selected audits of financial statements and of internal control over financial reporting performed by the Firm.  Those audits and aspects were selected according to the Board's criteria, and the Firm was not allowed an opportunity to limit or influence the selection process.  In most cases, the review of the audit of an accelerated filer included a review of aspects of both the Firm's audit of financial statements and its audit of internal control over financial reporting ("ICFR").

        In reviewing the audits, the inspection team identified matters that it considered to be audit deficiencies.[5]  Those deficiencies included failures by the Firm to identify or appropriately address errors in the issuer's application of GAAP.  In addition, the deficiencies included failures by the Firm to perform, or to perform sufficiently, certain necessary audit procedures.

        In some cases, the conclusion that the Firm failed to perform a procedure may be based on the absence of documentation and the absence of persuasive other evidence, even if the Firm claims to have performed the procedure.  PCAOB Auditing Standard No. 3, *Audit Documentation* ("AS No. 3") provides that, in various circumstances including PCAOB inspections, a firm that has not adequately documented that it performed a procedure, obtained evidence, or reached an appropriate conclusion must demonstrate with persuasive other evidence that it did so, and that oral assertions and explanations alone do not constitute persuasive other evidence.[6]  For purposes of the inspection, an observation that the Firm did not perform a procedure, obtain evidence, or reach an appropriate conclusion may be based on the absence of such documentation and the absence of persuasive other evidence.

        When audit deficiencies are identified after the date of the audit report, PCAOB standards require a firm to take appropriate actions to assess the importance of the

---

[5]      The discussion in this report of any deficiency observed in a particular audit reflects information reported to the Board by the inspection team and does not reflect any determination by the Board as to whether the Firm has engaged in any conduct for which it could be sanctioned through the Board's disciplinary process.

[6]      See AS No. 3, paragraph 9; Appendix A to AS No. 3, paragraph A28.



deficiencies to the firm's present ability to support its previously expressed opinions,[7/] and failure to take such actions could be a basis for Board disciplinary sanctions. In response to the inspection team's identification of deficiencies, the Firm, in some cases, performed additional procedures or supplemented its work papers, and in some instances, follow-up between the Firm and the issuer led to a change in the issuer's accounting or disclosure practices or led to representations related to prospective changes.[8/]

In some cases, the deficiencies identified were of such significance that it appeared to the inspection team that the Firm, at the time it issued its audit report, had not obtained sufficient competent evidential matter to support its opinion on the issuer's financial statements. The deficiencies that reached this degree of significance are described below, on an audit-by-audit basis.

Issuer A

As described below, in this audit, the Firm failed to adequately test mortgage servicing rights and their amortization.

• The Firm failed to appropriately test whether the issuer's impairment analysis regarding mortgage servicing rights complied with Statement of Financial Accounting Standards ("SFAS") No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*. SFAS No. 140 requires that mortgage servicing rights be stratified according to their predominant risk characteristics for purposes of evaluating impairment. The issuer included over 90 percent of its mortgage servicing rights in one stratum (sub-prime loans). Despite the fact that the loans underlying the mortgage

---

[7/]     See AU 390, *Consideration of Omitted Procedures After the Report Date*, AU 561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report* (both included among the PCAOB's interim auditing standards, pursuant to PCAOB Rule 3200T), and PCAOB Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction With an Audit of Financial Statements* ("AS No. 2"), ¶ 197.

[8/]     The Board inspection process generally did not include review of such additional procedures or documentation, or of such revised accounting, although future Board inspections of the Firm may, as appropriate, include further review of any of these matters.



servicing rights in that stratum displayed varying risk characteristics, such as including fixed rate, variable rate, and hybrid mortgages and being collateralized by properties located in every state, the Firm accepted the issuer's approach.

- The Firm failed to resolve potential audit differences, representing approximately six percent of pre-tax income, that it had identified in the Firm's assessment of the issuer's accounting for the amortization of mortgage servicing rights.

- There was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had tested the data and assumptions that the issuer had used to support a change in the estimated period for the amortization of mortgage servicing rights.

- The Firm failed to perform substantive procedures to test the data and assumptions underlying the amortization expense for the first three quarters of the year.  Further, in its fourth quarter testing, the Firm failed to test certain key inputs to the amortization calculation, such as the weighted average lives of the underlying loans and the carrying values of the mortgage servicing rights.

Issuer B

The issuer operates in many different industry segments and has numerous reporting units, many of which are individually insignificant and/or use different computer and internal control systems.  The Firm failed in the following respects to obtain sufficient competent evidential matter to support its audit opinion –

- Regarding the issuer's largest industry segment, the Firm identified deficiencies in all of the controls that the issuer had identified as key controls over certain assertions relating to significant portions of revenue.  In many of those areas, there was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had considered how the identified deficiencies should have affected its assessment of control risk and the nature, timing, and extent of its substantive procedures.

- The Firm failed to perform sufficient procedures to test consolidated revenues.  In addition to the matters described in the preceding paragraph,



which related to revenue and related areas, the Firm failed in the following respects –

- The Firm failed, for certain of the reporting units in the issuer's largest industry segment where the Firm performed testing, to properly design and execute tests of internal controls and substantive tests and to properly evaluate the results of those tests.   Examples of failures at certain reporting units include the following:

  - The control activity selected for testing did not address the financial statement assertion for which the Firm planned to rely on controls, and therefore the test work performed on the control activity did not support reliance on controls for that assertion.
  - The test procedures did not relate to, or test, the selected control activity.
  - The Firm failed to sufficiently test whether revenue was recognized in the proper period.
  - The Firm failed to perform substantive audit procedures on certain critical estimates inherent in the accounting for long-term contracts.
  - The Firm failed to perform procedures on loss contracts.
  - The Firm failed to apply appropriate sampling techniques in its tests of details for revenue.   For example, in some cases, it tested only a portion of the items it had selected for testing, and/or it did not consider the implications of certain of the errors it had identified.

- With respect to certain of the reporting units in the issuer's largest two industry segments where the Firm did not perform substantive procedures to test revenue – units that accounted for a significant amount of the consolidated revenue – there was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had considered whether, in view of the matters described above, it needed to perform substantive tests of revenues.

- The Firm failed to reconcile the financial statement amounts audited by certain of its foreign affiliates to the information underlying the consolidated financial statements.



Issuer C

In this audit, the Firm failed to perform sufficient procedures to test accounts receivable. For one of the issuer's segments, the Firm requested confirmation of certain receivables that it selected based upon their size and age. For those returned confirmations on which there were differences, the Firm failed to investigate the differences beyond comparing the recorded amounts with the purchase orders and shipping documents that were in the issuer's possession. Further, the Firm failed to consider the effects of these unresolved differences on the portion of the population that was not subject to confirmation. In addition, for the portion of the accounts receivable that was not subject to confirmation, which represented 85 percent of the account balance, the Firm's planned substantive testing was limited to analytical procedures that covered the entire balance. As executed, however, these procedures did not qualify as substantive tests, as the Firm failed to establish precise expectations, set a threshold that would identify a potential material misstatement, and obtain corroboration of management's explanations of certain significant differences.

Issuer D

In this audit, the Firm failed to sufficiently test certain assumptions that management used in its goodwill impairment test. Specifically, the issuer projected significant revenue growth rates and operating profit margins with respect to the segment to which the goodwill was allocated. Although the segment's actual revenue growth rates in the prior three years were either flat or negligible, and the operating profit margins ranged from negative amounts to amounts below those projected, there was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had evaluated the appropriateness of the projections, other than by making inquiries of management.

Issuer E

In this audit, the Firm relied on the issuer's inventory cycle count process without appropriately testing the operating effectiveness of the cycle count controls or testing the cycle count procedures. For example, although the Firm relied on the cycle count controls to function effectively throughout the year, the Firm's observation and concurrent testing of the cycle counts was limited to one cycle count of finished goods during the fourth quarter at three of the six inventory sites. The Firm did not observe and test any counts of an important component of finished goods, nor did it observe and test any cycle counts of the raw materials and work in process, which have different risks and controls and which constituted a majority of the issuer's inventory at year end.



Issuer F

In this audit, the Firm relied on the issuer's inventory cycle count process without appropriately evaluating the design of the cycle count controls or testing the cycle count procedures.  For example, the Firm failed to test the issuer's cycle count process to evaluate whether all inventory items were subject to cycle counting and whether the reports that were used in the process were complete and accurate.  In addition, the Firm observed and concurrently tested only a single cycle count, although the Firm relied on this control to function effectively throughout the year.

B.      Review of Quality Control System

In addition to evaluating the quality of the audit work performed on specific audits, the inspection included review of certain of the Firm's practices, policies, and procedures related to audit quality.   This review addressed practices, policies, and procedures concerning audit performance and the following eight functional areas: (1) tone at the top; (2) practices for partner evaluation, compensation, admission, assignment of responsibilities, and disciplinary actions; (3) independence implications of non-audit services; business ventures, alliances, and arrangements; personal financial interests; and commissions and contingent fees; (4) practices for client acceptance and retention; (5) practices for consultations on accounting, auditing, and SEC matters; (6) the Firm's internal inspection program; (7) practices for establishment and communication of audit policies, procedures, and methodologies, including training; and (8) the supervision by U.S. audit engagement teams of the work performed by foreign affiliates on foreign operations of U.S. issuer audit clients.  Any defects in, or criticisms of, the Firm's quality control system are discussed in the nonpublic portion of this report and will remain nonpublic unless the Firm fails to address them to the Board's satisfaction within 12 months of the date of this report.

END OF PART I



PCAOB Release No. 104-2007-129
Inspection of PricewaterhouseCoopers LLP
October 18, 2007
Page 9

PART II, PART III, AND APPENDIX A OF THIS REPORT ARE NONPUBLIC
AND ARE OMITTED FROM THIS PUBLIC DOCUMENT



**APPENDIX B**

**THE INSPECTION PROCESS**

The inspection process was designed and performed to provide a basis for assessing the degree of compliance of the Firm with applicable requirements and standards related to auditing issuers. This process included reviews of components of selected issuer audit engagements completed by the Firm. These reviews were intended both to identify deficiencies, if any, in the conduct of those audits and to determine whether the results of those audits indicated deficiencies in the design or operation of the Firm's system of quality control over audits. In addition, the inspection included reviews of the design of, and in some cases the application of, policies and procedures related to certain functional areas of the Firm that could be expected to influence audit quality.

1.      Review of Selected Audit Engagements

The inspection team reviewed aspects of selected audits performed by the Firm. The inspection team chose the engagements according to the Board's criteria. The Firm was not allowed an opportunity to limit or influence the engagement selection process or any other aspect of the review.

For each audit engagement selected, the inspection team reviewed the issuer's financial statements and certain SEC filings. The inspection team selected certain higher-risk areas for review and, at the practice offices, inspected the engagement team's work papers and interviewed engagement personnel regarding those areas. The areas subject to review included, but were not limited to, revenues, reserves or estimated liabilities, derivatives, income taxes, related party transactions, supervision of work performed by foreign affiliates, and assessment of risk by the audit team. The inspection team also analyzed potential adjustments to the issuer's financial statements that had been identified during the audit but not recorded in the financial statements. For certain selected engagements, the inspection team reviewed written communications between the Firm and the issuer's audit committee. With respect to certain engagements, the inspection team also interviewed the chairperson of the issuer's audit committee.

When the inspection team identified a potential issue, it discussed the issue with members of the engagement team. If the inspection team was unable to resolve the issue through this discussion and any review of additional work papers or other documentation, the inspection team issued a comment form on the matter and the Firm



provided a written response to the comment form.  In certain instances, if the inspection team was unable to resolve the issue through these processes, the inspection team requested that the engagement team consult with the Firm's National Office.  In many cases, this process resulted in resolution of the matter, either because the Firm agreed with the position the inspection team had taken and the Firm or the issuer took steps in light of the significance of the error to remedy the exception, or because the Firm was able to provide additional information that effectively addressed the inspection team's concerns.

2.      Efficiency of Implementation of AS No. 2

The inspection team reviewed aspects of the Firm's approach to the implementation of AS No. 2 in light of the provisions of that standard and related Board statements.[9/]  Specifically, inspectors evaluated the Firm's approach to (1) integrating the audit of ICFR with the audit of the financial statements, (2) using a top-down approach to the audit, (3) using a risk-based approach, and (4) using the work of others.

The inspection procedures in this area began with the inspection team, along with senior staff in the Board's Division of Registration and Inspections and Office of the Chief Auditor, meeting with members of the Firm's leadership to hear the Firm's perspective on whether and how it had achieved efficiencies in ICFR audits.  The inspection team then reviewed the Firm's methodology, tools, and training to determine if those methodology, tools, and training were designed to effectively achieve appropriate efficiencies.  This evaluation was followed by a review of aspects of specific ICFR audits.  For each audit of an accelerated filer that was the subject of an engagement review, the inspection team assessed the efficiency of the ICFR audit with respect to at least one of the four aspects identified above.  The inspection team then met with members of the Firm's leadership to discuss observations from the specific engagement reviews and to provide other feedback relating to the Firm's methodology, tools, and training.  The feedback was provided during the course of the inspection field work to facilitate the Firm's ability to use that feedback in ongoing and future ICFR audits.

---

[9/]      See PCAOB Release No. 2005-009, *Policy Statement Regarding Implementation of [AS No. 2]* (May 16, 2005); PCAOB Release No. 2005-023, *Report on the Initial Implementation of [AS No. 2]* (Nov. 30, 2005); see also Staff Questions and Answers, *Auditing Internal Control Over Financial Reporting* (May 16, 2005).



Public Company Accounting Oversight Board

3.    Review of Eight Functional Areas

The inspection team performed the review of the eight functional areas both to identify possible defects in the Firm's system of quality control and, where applicable, to update the Board's knowledge of the Firm's policies and procedures in the functional areas.   A more detailed description of the scope with respect to each of the eight functional areas follows.

a.    Review of Partner Evaluation, Compensation, Admission, Assignment of Responsibilities, and Disciplinary Actions

The inspection team reviewed the Firm's policies and procedures related to partner evaluation, partner compensation, nomination and admission of new partners, assignment of responsibilities, disciplinary actions, and termination of partners.   The objective of the inspection procedures was to assess whether the design of these processes, as documented and communicated, could be expected to encourage an appropriate emphasis on audit quality and technical competence, as compared to marketing or other activities of the Firm.

The inspection team interviewed members of the Firm's leadership at its National Office, as well as members of leadership and audit partners in practice offices, regarding these topics.   In addition, the inspection team analyzed schedules provided by the Firm that detailed information on each partner, including the partner's office location and recent evaluation history.   The inspection team also reviewed a sample of partners' evaluations, including evaluations of newly admitted partners, partners who resigned or took early retirement, and partners who received bonus compensation.

b.    Review of Independence Policies

The objectives of the inspection procedures in this area included evaluating the Firm's policies and procedures relating to its compliance with independence requirements with respect to the provision of non-audit services to issuer audit clients; Firm participation in business ventures, alliances, and arrangements; commissions and contingent fee arrangements; personal financial interests and the relationships of Firm professionals with issuer audit clients; and the provision of non-audit services related to issuer audit clients' compliance with Section 404 of the Act.   To accomplish these objectives, the inspection team reviewed the Firm's policies, procedures, guidance, and training materials pertaining to these independence matters.   The inspection team also reviewed the Firm's internal inspection program as it relates to monitoring compliance with the Firm's independence policies and procedures; tested the Firm's independence



consultation process; and reviewed information concerning the Firm's existing business ventures, alliances, and arrangements, as well as the Firm's process for establishing such enterprises. The inspection team also interviewed numerous National Office and practice office personnel regarding the Firm's independence policies, practices, and procedures.

At the practice offices, the inspection team selected a sample from the engagements it reviewed and, for that sample, reviewed relevant information to identify any non-audit services performed for the issuer, including whether any of the services involved commissions or contingent fee arrangements; to determine whether the fees for the services provided were classified appropriately in the issuer's proxy statement; and to determine whether the Firm was involved in any business ventures, alliances, or arrangements with the issuer. In addition, for the sample, the inspection team read and evaluated the most recent letter pursuant to Independence Standards Board Standard No. 1, *Independence Discussions with Audit Committees*.

<div align="center">c.     Review of Client Acceptance and Retention Policies</div>

The objectives of the inspection procedures in this area were to evaluate whether the Firm's client acceptance and retention policies and procedures reasonably assure that it is not associated with issuers whose management lacks integrity, that it undertakes only engagements within its professional competence, and that it appropriately considers the risks involved in accepting and retaining clients in the particular circumstances. Toward those objectives, the inspection team reviewed the Firm's policies, procedures, and forms related to client acceptance and continuance; evaluated documentation related to new clients and to clients that had recently changed auditors from the Firm; and interviewed members of the Firm's leadership.

At the practice offices, the inspection team selected a sample from the engagements it reviewed and, for that sample, evaluated whether the client acceptance or continuance documentation was completed and approved in accordance with Firm policies; interviewed the audit partners and managers on these engagements concerning the reasons for accepting the issuer as a client or continuing to serve the issuer, the approval process, and whether specific risk mitigation steps were performed and documented in response to any identified risks; and assessed whether the audit planning documentation incorporated the specific actions, if any, contemplated in response to any identified risks.



d.      Review of Practices for Consultations

The objective of the inspection procedures in this area was to assess the Firm's compliance with professional requirements regarding consultations on accounting, auditing, and SEC matters.  Toward this objective, the inspection team gained an understanding of and evaluated the Firm's policies and procedures relating to its consultation process.  The inspection team also reviewed a sample of consultations that occurred during the inspection period to evaluate the effectiveness of the Firm's consultation process, the Firm's compliance with its policies and procedures, whether the conclusions were in accordance with professional standards, and whether the engagement teams acted in accordance with the conclusions.

e.      Review of Internal Inspection Program

The objectives of the inspection procedures in this area were to evaluate the effectiveness of the Firm's annual internal inspection program in enhancing audit quality, as well as to assess the Firm's compliance with the quality control standards adopted by the Board.  To meet those objectives, the inspection team reviewed policies, procedures, guidance, and forms related to the Firm's internal inspection program, documentation of the results of the current year's inspection program, and steps the Firm took in response to those results.  The inspection team also interviewed the Firm's leadership concerning the process and effectiveness of its internal inspection program.

The inspection team reviewed and tested the conduct of the internal inspection program by performing reviews of certain engagements on which the Firm had conducted internal inspections.  These procedures included evaluating the qualifications of the Firm's inspectors, reading the inspectors' comments, and interviewing both regional leadership and selected audit personnel concerning the internal inspection program.  In addition, for a sample of engagements, the inspection team reviewed documentation of the internal inspectors' review, reviewed certain aspects of the audit work papers, and discussed with the Firm any significant differences in the results of the inspection team's review and those of the Firm's internal inspectors.

f.      Review of Practices for Establishment and Communication of Audit Policies, Procedures, and Methodologies, Including Training

The objectives of the inspection procedures in this area were to update the inspection team's understanding of the Firm's processes for establishing and communicating audit policies, procedures, and methodologies, including training; to evaluate whether the design of these processes could be expected to promote audit



quality and enhance compliance; and to evaluate changes in audit policies that the Firm had made since the Board's most recent inspection of the Firm.

Toward those objectives, the inspection team reviewed documentation relating to the Firm's method for developing policies and procedures, as well as internal guidance and/or training materials distributed to audit personnel with respect to recent changes in requirements and with respect to selected specific areas. The inspection team also evaluated the effectiveness of the design of the Firm's processes for monitoring developments that could affect the Firm's audit policies, procedures, and methodologies.

g.      Review of Policies Related to Foreign Affiliates

The objective of the inspection procedures in this area was to evaluate the processes the Firm uses to ensure that the audit work that its foreign affiliates perform on the foreign operations of U.S. issuers is effective and in accordance with standards established by the Board. The inspection team did not inspect the audit work of foreign affiliates; rather, the inspection procedures in this area were limited to the supervision and control exercised by the U.S. engagement team over such work.

To accomplish this objective, the inspection team reviewed the Firm's policies and procedures related to its supervision and control of work performed by foreign affiliates on the foreign operations of U.S. issuer clients; analyzed audit guidance related to planning and administering multi-location engagements; and reviewed available information relating to the most recent foreign affiliated firms' internal inspections. In addition, the inspection team interviewed members of the Firm's leadership with responsibility for oversight of the work performed by foreign affiliates on foreign operations of U.S. issuer clients. Finally, with respect to a sample of the engagements reviewed, the inspection team reviewed the U.S. engagement team's supervision and control procedures concerning the audit work that the Firm's foreign affiliates performed.

h.      Review of Tone at the Top

The objective of the review of the Firm's "tone at the top" was to assess whether actions and communications by the Firm's leadership demonstrate a commitment to audit quality and compliance with the Act, the rules of the Board, the rules of the SEC, and PCAOB standards in connection with the Firm's performance of audits, issuance of audit reports, and related matters involving issuers. Toward that end, the inspection team reviewed and analyzed information at the Firm's National Office. Such information



included the Firm's code of conduct; documents relating to measuring and monitoring audit quality; descriptions of the duties of, and relationships between and among, the Firm's staff and leadership; results of surveys of staff and clients; public company audit proposals; internal and external communications from management; and agendas and minutes of the Firm's Board of Partners.  In addition, the inspection team interviewed numerous members of the Firm's leadership team.

The inspection team conducted interviews at 15 of the Firm's practice offices to obtain perspectives on communications from the Firm's leadership relating to audit quality and tone at the top.  The inspection team interviewed members of the leadership at certain of these offices, as well as certain audit partners and senior managers assigned to engagements that were reviewed.



**APPENDIX C**

**RESPONSE OF THE FIRM TO DRAFT INSPECTION REPORT**

Pursuant to section 104(f) of the Act, 15 U.S.C. § 7214(f), and PCAOB Rule 4007(a), the Firm provided a written response to a draft of this report.  Pursuant to section 104(f) of the Act and PCAOB Rule 4007(b), the Firm's response, minus any portion granted confidential treatment, is attached hereto and made part of this final inspection report.[10/]

---

[10/]    In any version of an inspection report that the Board makes publicly available, any portions of a firm's response that address nonpublic portions of the report are omitted.  In some cases, the result may be that none of a firm's response is made publicly available.



PRICEWATERHOUSECOOPERS 🄿🄲

PricewaterhouseCoopers LLP
PricewaterhouseCoopers Center
300 Madison Avenue
New York NY 10017
Telephone (646) 471 3000
Facsimile (813) 286 6000

September 26, 2007

Mr. George H. Diacont
Director
Division of Registration and Inspections
Public Company Accounting Oversight Board
1666 K Street, N.W.
Washington, D.C. 20006

**Re: PricewaterhouseCoopers LLP Response to Draft Report on 2006 Inspection of PricewaterhouseCoopers LLP**

Dear Mr. Diacont:

We are pleased to provide our response on the Public Company Accounting Oversight Board's ("PCAOB" or the "Board") Draft Report on the 2006 Inspection of our firm's 2005 audits (the "Report").

We strongly support the PCAOB's efforts. The on-going communication and interactions between the PCAOB Inspections Staff and our firm contribute to our overall efforts to execute consistent, quality audits. Fundamental to our view of audit quality is our conviction that, to perform a quality audit, each and every engagement must have a properly-balanced focus on effectiveness and efficiency. We continue to enhance our extensive training and our internal review processes in support of improved audit methodology and delivery. While our internal efforts continuously reinforce this view, we value the input from the PCAOB in this regard.

We have carefully assessed each of the Part I findings under our policies and under PCAOB standards and we have reassessed our work on each of the specific audits identified in *Part I - Inspection Procedures and Certain Observations* of your Report. We have concluded that, in each instance, our original procedures were sufficient to support our audit conclusions and the opinion rendered at the time. Provided below are additional comments regarding the specific audit engagements discussed in Part I of the 2006 Report:

<u>Issuer A</u>

In connection with addressing the PCAOB's comments on this engagement, we have reassessed the issuer's underlying accounting. In our judgment, the issuer's accounting for mortgage servicing rights and related amortization is acceptable under the applicable authoritative literature. With respect to the PCAOB comments on our audit work, in our judgment the audit procedures originally performed by us were sufficient to support our audit opinion. We have, however, enhanced certain of the documentation in our audit work papers, including with regard to the "potential audit differences" discussed in the Report to reflect our conclusion that such matter did not in fact constitute an audit adjustment.



Mr. George H. Diacont
September 26, 2007
Page 2

## Issuer B

We believe it is important to place the PCAOB comments in the proper context in order to recognize that the comments deal principally with a single audit area (revenue) within a single business unit of the issuer. In our judgment, virtually all of this business unit's revenue transactions were not considered complex, and the portion that were considered complex and, therefore, higher risk, comprised a small percentage of consolidated revenues.

We have re-evaluated the relevant audit work performed in this area, in the context of our respective risk assessments, and have concluded that the opinion originally rendered on the consolidated financial statements was appropriate and that there was no need to perform any additional audit procedures. However, we acknowledge that aspects of the work performed in auditing this area for this business unit could have been enhanced and more fully documented.

In addition, the comment within the Report indicating that we had "identified deficiencies in all of the key controls that the issuer had identified" is factually incorrect. Rather, within this business unit, a majority of the key controls were not considered deficient.

With respect to the last matter described in this aspect of the Report, in our judgment the audit procedures performed to reconcile the amounts audited to the consolidated financial statements were sufficient and responsive to our risk assessment, and we believe that our procedures, including the testing of the issuer's controls, support the audit opinion rendered by us.

## Issuer C

Our engagement team concluded at the time of the original audit work that the potential impact of the confirmation differences described in the Report could not be material to the consolidated financial statements. Further, it is our judgment that the audit evidence obtained from the substantive analytic procedures was sufficient in the context of our risk assessment and overall top-down, risk-based approach to this audit. Accordingly, we concluded that the procedures performed support the opinion rendered by us.

## Issuer D

We believe as a matter of professional judgment that the audit procedures originally performed were responsive to our risk assessment and also to the results of our testing of the issuer's internal controls over both its forecasting and impairment assessment processes. The level of testing of a forecasting process in the context of a goodwill impairment test is a matter of audit judgment. As noted above, we concluded that the procedures originally performed support the opinion rendered by us.



Mr. George H. Diacont
September 26, 2007
Page 3

Issuers E and F

In our judgment, the nature and extent of our testing was sufficient given our risk assessments and the entirety of the inventory testing performed at the time of the audit. For each of these issuers, we performed a top-down, risk-based assessment in planning and conducting the audit. Our cumulative audit knowledge demonstrated that, historically, highly-effective internal controls over physical inventory were in place. Therefore, as noted above, we concluded that the procedures which had been performed supported the opinion rendered by us.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

We take seriously the matters identified by the PCAOB during the 2006 inspection process. As with any audit process, judgments are necessarily involved in the PCAOB's inspections. We recognize that your findings and comments are offered in a constructive context. We have carefully reviewed all of the matters included within your 2006 Report, and will fully consider your findings and recommendations.

We appreciate this opportunity to formally respond to the PCAOB's 2006 Inspection Report and look forward to continuing to work with the PCAOB in support of our unwavering commitment to audit quality. We would be pleased to discuss any aspect of our response or any questions you may have.

Sincerely,

*PricewaterhouseCoopers LLP*



1666 K Street, N.W.
Washington, DC 20006
Telephone: (202) 207-9100
Facsimile: (202) 862-8433
www.pcaobus.org

# Report on

# 2009 Inspection of PricewaterhouseCoopers LLP

## (Headquartered in New York, New York)

### Issued by the

# Public Company Accounting Oversight Board

### August 12, 2010

---

**THIS IS A PUBLIC VERSION OF A PCAOB INSPECTION REPORT**

**PORTIONS OF THE COMPLETE REPORT ARE OMITTED
FROM THIS DOCUMENT IN ORDER TO COMPLY WITH
SECTIONS 104(g)(2) AND 105(b)(5)(A)
OF THE SARBANES-OXLEY ACT OF 2002**

---

PCAOB RELEASE NO. 104-2010-131A
(Includes portions of Part II of the full report that
were not included in PCAOB Release No. 104-2010-131)

PCAOB Release No. 104-2010-131A



Public Company Accounting Oversight Board

## Preface to Reports Concerning Annually Inspected Firms

The Sarbanes-Oxley Act of 2002 requires the Public Company Accounting Oversight Board ("PCAOB" or "the Board") to conduct an annual inspection of each registered public accounting firm that regularly provides audit reports for more than 100 issuers.  The Board's report on any such inspection includes this preface to provide context for information in the public portion of the report.

A Board inspection includes, among other things, a review of selected audits of financial statements and of internal control over financial reporting.  If the Board inspection team identifies deficiencies in those audits, it alerts the firm to the deficiencies during the inspection process.  Deficiencies that exceed a certain significance threshold are also summarized in the public portion of the Board's inspection report.  The Board encourages readers to bear in mind two points concerning those reported deficiencies.

First, inclusion in an inspection report does not mean that the deficiency remained unaddressed after the inspection team brought it to the firm's attention.  Under PCAOB standards, a firm must take appropriate action to assess the importance of the deficiency to the firm's present ability to support its previously expressed audit opinions.  Depending upon the circumstances, compliance with these standards may require the firm to perform additional audit procedures, or to inform a client of the need for changes to its financial statements or reporting on internal control, or to take steps to prevent reliance on previously expressed audit opinions.  A Board inspection does not typically include review of a firm's actions to address deficiencies identified in that inspection, but the Board expects that firms are attempting to take appropriate action, and firms frequently represent that they have taken, are taking, or will take, action.  If, through subsequent inspections or other processes, the Board determines that the firm failed to take appropriate action, that failure may be grounds for a Board disciplinary sanction.

Second, the Board cautions against drawing conclusions about the comparative merits of the annually inspected firms based on the number of reported deficiencies in any given year.  The total number of audits reviewed is a small portion of the total audits performed by these firms, and the frequency of deficiencies identified does not necessarily represent the frequency of deficiencies throughout the firm's practice.  Moreover, if the Board discovers a potential weakness during an inspection, the Board may revise its inspection plan to target additional audits that may be affected by that weakness, and this may increase the number of deficiencies reported for that firm in that year.  Such weaknesses may emerge in varying degrees at different firms in different years.

PCAOB Release No. 104-2010-131A



**Public Company Accounting Oversight Board**

---

### Notes Concerning this Report

1. Portions of this report may describe deficiencies or potential deficiencies in the systems, policies, procedures, practices, or conduct of the firm that is the subject of this report. The express inclusion of certain deficiencies and potential deficiencies, however, should not be construed to support any negative inference that any other aspect of the firm's systems, policies, procedures, practices, or conduct is approved or condoned by the Board or judged by the Board to comply with laws, rules, and professional standards.

2. Any references in this report to violations or potential violations of law, rules, or professional standards should be understood in the supervisory context in which this report was prepared. Any such references are not a result of an adversarial adjudicative process and do not constitute conclusive findings of fact or of violations for purposes of imposing legal liability. Similarly, any description herein of a firm's cooperation in addressing issues constructively should not be construed, and is not construed by the Board, as an admission, for purposes of potential legal liability, of any violation.

3. Board inspections encompass, among other things, whether the firm has failed to identify departures from U.S. Generally Accepted Accounting Principles ("GAAP") or Securities and Exchange Commission ("SEC" or "Commission") disclosure requirements in its audits of financial statements. This report's descriptions of any such auditing failures necessarily involve descriptions of the related GAAP or disclosure departures. The Board, however, has no authority to prescribe the form or content of an issuer's financial statements. That authority, and the authority to make binding determinations concerning an issuer's compliance with GAAP or Commission disclosure requirements, rests with the Commission. Any description, in this report, of perceived departures from GAAP or Commission disclosure requirements should not be understood as an indication that the Commission has considered or made any determination regarding these issues unless otherwise expressly stated.



Public Company Accounting Oversight Board

## 2009 INSPECTION OF PRICEWATERHOUSECOOPERS LLP

In 2009, the Board conducted an inspection of the registered public accounting firm PricewaterhouseCoopers LLP ("PwC" or "the Firm"). The Board is issuing this report of that inspection in accordance with the requirements of the Sarbanes-Oxley Act of 2002 ("the Act").

The Board is making portions of the report publicly available. Specifically, the Board is releasing to the public Part I of the report, Appendix B, and portions of Appendix C. Appendix B provides an overview of the inspection process. Appendix C includes the Firm's comments, if any, on a draft of the report.[1]

The Board has elsewhere described in detail its approach to making inspection-related information publicly available consistent with legal restrictions.[2]   A substantial portion of the Board's criticisms of a firm (specifically criticisms of the firm's quality control system), and the Board's dialogue with the firm about those criticisms, occurs out of public view, unless the firm fails to make progress to the Board's satisfaction in addressing those criticisms.   In addition, the Board generally does not disclose otherwise nonpublic information, learned through inspections, about the firm or its clients. Accordingly, information in those categories generally does not appear in the publicly available portion of an inspection report.

---

[1]      The Board does not make public any of a firm's comments that address a nonpublic portion of the report. In addition, pursuant to section 104(f) of the Act, 15 U.S.C. § 7214(f), and PCAOB Rule 4007(b), if a firm requests, and the Board grants, confidential treatment for any of the firm's comments on a draft report, the Board does not include those comments in the final report at all. The Board routinely grants confidential treatment, if requested, for any portion of a firm's response that addresses any point in the draft that the Board omits from, or any inaccurate statement in the draft that the Board corrects in, the final report.

[2]      See Statement Concerning the Issuance of Inspection Reports, PCAOB Release No. 104-2004-001 (August 26, 2004).



**Public Company Accounting Oversight Board**

PCAOB Release No. 104-2010-131A
Inspection of PricewaterhouseCoopers LLP
August 12, 2010
Page 2

## PART I

### INSPECTION PROCEDURES AND CERTAIN OBSERVATIONS

Members of the Board's inspection staff ("the inspection team") conducted primary procedures for the inspection from October 2008 through October 2009. The inspection team performed field work at the Firm's National Office and at 34 of its approximately 61 U.S. assurance practice offices.

Board inspections are designed to identify and address weaknesses and deficiencies related to how a firm conducts audits.[3] To achieve that goal, Board inspections include reviews of certain aspects of selected audits performed by the firm and reviews of other matters related to the firm's quality control system. Appendix B to this report provides a description of the steps the inspection team took with respect to the review of audits and the review of certain firm-wide quality control processes.

In the course of reviewing aspects of selected audits, an inspection may identify ways in which a particular audit is deficient, including failures by the firm to identify, or to address appropriately, respects in which an issuer's financial statements do not present fairly the financial position, results of operations, or cash flows of the issuer in conformity with GAAP.[4] It is not the purpose of an inspection, however, to review all of a firm's audits or to identify every respect in which a reviewed audit is deficient. Accordingly, a Board inspection report should not be understood to provide any assurance that the firm's audits, or its issuer clients' financial statements or reporting on internal control, are free of any deficiencies not specifically described in an inspection report.

---

[3]   This focus on weaknesses and deficiencies necessarily carries through to reports on inspections and, accordingly, Board inspection reports are not intended to serve as balanced report cards or overall rating tools.

[4]   When it comes to the Board's attention that an issuer's financial statements appear not to present fairly, in a material respect, the financial position, results of operations, or cash flows of the issuer in conformity with GAAP, the Board's practice is to report that information to the SEC, which has jurisdiction to determine proper accounting in issuers' financial statements.



Public Company Accounting Oversight Board

A.    Review of Audit Engagements

      The inspection procedures included reviews of aspects of 76 audits performed by the Firm.  The scope of this review was determined according to the Board's criteria, and the Firm was not allowed an opportunity to limit or influence the scope.

      In reviewing the audits, the inspection team identified matters that it considered to be audit deficiencies.[5] Those deficiencies included failures by the Firm to identify or appropriately address errors in the issuer's application of GAAP.  In addition, the deficiencies included failures by the Firm to perform, or to perform sufficiently, certain necessary audit procedures.

      In some cases, the conclusion that the Firm failed to perform a procedure may be based on the absence of documentation and the absence of persuasive other evidence, even if the Firm claims to have performed the procedure.  PCAOB Auditing Standard No. 3, *Audit Documentation* ("AS No. 3") provides that, in various circumstances including PCAOB inspections, a firm that has not adequately documented that it performed a procedure, obtained evidence, or reached an appropriate conclusion must demonstrate with persuasive other evidence that it did so, and that oral assertions and explanations alone do not constitute persuasive other evidence.[6]  For purposes of the inspection, an observation that the Firm did not perform a procedure, obtain evidence, or reach an appropriate conclusion may be based on the absence of such documentation and the absence of persuasive other evidence.

      When audit deficiencies are identified after the date of the audit report, PCAOB standards require a firm to take appropriate actions to assess the importance of the deficiencies to the firm's present ability to support its previously expressed opinions,[7]

---

      [5]     The discussion in this report of any deficiency observed in a particular audit reflects information reported to the Board by the inspection team and does not reflect any determination by the Board as to whether the Firm has engaged in any conduct for which it could be sanctioned through the Board's disciplinary process.

      [6]     See AS No. 3, paragraph 9; Appendix A to AS No. 3, paragraph A28.

      [7]     See AU 390, *Consideration of Omitted Procedures After the Report Date,* AU 561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report* (both included among the PCAOB's interim auditing standards, pursuant to PCAOB Rule 3200T), and PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over*



**Public Company Accounting Oversight Board**

and failure to take such actions could be a basis for Board disciplinary sanctions.  In response to the inspection team's identification of deficiencies, the Firm, in some cases, performed additional procedures or supplemented its work papers, and in one instance, follow-up between the Firm and the issuer led to a change in the issuer's accounting and disclosure practices.[8]

In some cases, the deficiencies identified were of such significance that it appeared to the inspection team that the Firm, at the time it issued its audit report, had not obtained sufficient competent evidential matter to support its opinion on the issuer's financial statements or internal control over financial reporting ("ICFR").  The deficiencies that reached this degree of significance are described below, on an audit-by-audit basis, with the exception of similar deficiencies that were observed in multiple audits and are therefore grouped together.

Deficiencies in testing fair values of investment securities and derivatives (four audits)

In four audits, due to deficiencies in its testing of the fair values of investment securities and/or derivatives, the Firm failed to obtain sufficient competent evidential matter to support its audit opinion.  The deficiencies are as follows:

- One issuer estimated the fair values of certain investment securities that were not actively traded using a weighted average of two fair value estimates. One estimate was determined using a discounted cash flow model and the other was obtained from an external pricing service.  For the fair value estimate determined using the discounted cash flow model, the Firm failed to test certain key assumptions underlying the cash flow projections.  For the fair value estimate obtained from an external pricing service, the Firm failed to evaluate the reasonableness of the assumptions the external pricing service had used in its models to estimate the fair values of the investment securities. Further, the Firm failed to resolve its specialist's questions regarding the

*Financial Reporting That Is Integrated with An Audit of Financial Statements* ("AS No. 5"), ¶ 98.

[8]      The Board inspection process generally did not include review of such additional procedures or documentation, or of such revised accounting, although future Board inspections of the Firm may, as appropriate, include further review of any of these matters.



appropriateness of the weighting of the two estimates that were used to estimate the fair value. (Issuer A)

- In one audit, the engagement team had requested that the Firm's internal investment securities pricing group obtain third-party pricing information to corroborate the issuer's fair value estimates for its investment securities. The Firm's internal investment securities pricing group was unable to obtain pricing information for a portion of the issuer's investment securities. The engagement team performed alternative procedures to test the issuer's estimated fair value of certain types of these securities, but it failed to perform alternative procedures to test the issuer's estimated fair value of certain other types of these securities whose recorded values were significant. (Issuer B)

- One issuer held investments in auction rate securities that had failed at auction. As a result, the issuer used a discounted cash flow model to estimate the fair value of these securities at year end. The issuer's discounted cash flow model, which used the same discount rate for all of the auction rate securities that the issuer held, resulted in an aggregate estimated fair value for the securities that was slightly above par value. As a result of the failed auctions, the interest rates for each of the auction rate securities had changed to specified contractual maximum rates. In some cases, these maximum rates were as much as twice the discount rate used by the issuer in its discounted cash flow model. The Firm failed to evaluate the reasonableness of the discount rate the issuer used in light of the contractual maximum rates and the credit and liquidity risks that suggested the discount rate should have been considerably higher. (Issuer C)

- In one audit, the Firm failed to perform adequate audit procedures to evaluate the fair values of various types of the issuer's investment securities and derivatives as described below:

  o For one of the portfolios of investment securities that the issuer held, the issuer obtained valuation data from pricing services for 100 percent of the portfolio and obtained broker quotes for only 54 percent of the portfolio. The issuer used the pricing services' data to value more than 98 percent of the portfolio. The Firm's valuation specialists tested the valuation of a small number of the securities in the portfolio and formed the view that, in all but one of the cases they tested, the broker quotes were more indicative of fair value than the pricing services' data. The Firm



Public Company Accounting Oversight Board

nevertheless accepted the issuer's valuation without performing additional tests to determine whether it was reasonable to value the securities using the data from the pricing services.

○ For one type of high-risk derivative, the issuer used certain external pricing information and values calculated by its valuation model in its valuation process. The issuer's documentation indicated that the external pricing information was obtained from multiple pricing sources. Although there was a heightened risk of fraud and the Firm identified a significant audit adjustment and deficiencies in controls in this area, the Firm failed to obtain corroboration of the accuracy of this pricing information from independent sources outside the issuer. In addition, the Firm failed to test the reasonableness of certain of the significant assumptions that the issuer made regarding this external pricing information and regarding the values calculated by the issuer's valuation model. The Firm also failed to perform substantive procedures to evaluate the reasonableness of certain higher-risk pricing inputs to the issuer's valuation model. (Issuer D)

Issuer E

In this audit, the Firm failed to sufficiently test certain assumptions and key inputs used to develop a significant portion of the issuer's loan loss allowance. Specifically, the Firm tested one of the inputs through inquiry only on a few loans. In addition, the Firm used the work of the issuer's internal loan review group to test certain key inputs; however, it did not reperform any of the group's testing or perform its own independent testing of these inputs. Further, the Firm failed to evaluate the reasonableness of certain significant assumptions used to calculate one component of this portion of the issuer's loan loss allowance and failed to test certain key inputs to the calculation of this component beyond inquiry.

Issuer F

One issuer had a deficiency in its internal control over financial reporting at year end that the Firm and the issuer classified as a significant deficiency. The deficiency resulted from the aggregation of access control deficiencies regarding information technology systems that maintained the contract pricing of sales transactions, customer account set-up, and the financial reporting system. The Firm's tests of revenue and accounts receivable were not sufficient given the existence of this deficiency. Specifically, the Firm failed to test the completeness and accuracy of the data that the



issuer used in an important entity-level control as well as the data that the Firm used in the performance of certain of its analytical procedures. It also failed to sufficiently test the entity-level control, as the Firm's testing of the control was limited to a walkthrough and verification that management prepared certain reports, reviewed them, and investigated variances. While the Firm performed certain other control and substantive test procedures, the controls and substantive testing did not address the risk that critical data in the issuer's systems related to the pricing of the issuer's services could have been changed inappropriately at any point in the year.

In addition, while the Firm tested certain revenue transactions that occurred during the first seven months of the year, it failed to perform roll-forward procedures for the remaining five months of the year or to adequately test revenues and accounts receivable at year end as the year-end procedures were limited to analytical procedures and certain cash receipts testing. The analytical procedures, however, were not disaggregated to an appropriate level of precision to detect whether there was a material misstatement in the financial statements and the Firm failed to test the completeness and accuracy of the data used in the analytical procedures and cash receipts testing.

Issuer G

One issuer had numerous foreign locations, which accounted for over 20 percent of the issuer's revenue. The Firm did not visit any of the foreign locations in connection with the audit, nor did it use the work of its international affiliates or other auditors in reporting on the issuer's financial statements in the year under audit. The issuer's foreign locations did not have common information technology systems, processes, or controls. With respect to these locations, the Firm's procedures were limited to testing the issuer's entity-level controls, the performance of analytical procedures for a few of the locations, and inquiry of management. The Firm failed to properly test revenue from the foreign locations in the following respects –

- The Firm's audit approach placed significant reliance on the issuer's performance of entity-level controls related to these foreign locations. The Firm failed to test the integrity of the data that the issuer used in performing the entity-level controls. The Firm also failed to sufficiently test those entity-level controls in order to determine whether they would prevent or detect a material misstatement of revenue at the issuer's foreign locations, as the Firm's testing of the operating effectiveness of such controls was limited to verifying that management had signed off as having completed the procedure.



- For the foreign locations for which the Firm planned to perform substantive analytical procedures, the Firm failed to appropriately develop expectations that were sufficiently precise to identify for investigation differences that may be potential material misstatements, individually or when aggregated with other misstatements. Specifically, for some locations the expectations were limited to whether the Firm expected the balance to increase or decrease as compared to prior periods, and for the others, the expectations were that the balances would be consistent with budgets and forecasts. In addition, the Firm failed to test the completeness and accuracy of the information used in the analytical procedures.

- The Firm excluded journal entries relating to the foreign locations from its journal entry testing.

Issuer H

One issuer had numerous foreign locations. For certain of the issuer's foreign locations, which represented 29 percent of its revenues, the Firm's planned approach placed significant reliance on certain entity-level controls and the performance of substantive analytical procedures for a few of the foreign locations. The Firm failed to properly test revenue from these foreign locations in the following respects –

- The Firm failed to test the issuer's entity-level controls, which had no defined precision levels, at a sufficient depth to determine whether they would prevent or detect a material misstatement of revenue at the issuer's foreign locations. Specifically, the Firm's testing was limited to performing a walkthrough, obtaining issuer-prepared documents to be used at certain meetings of members of the issuer's management that constituted the entity-level controls, reviewing evidence that such meetings occurred, and performing inquiries of management. The Firm also failed to test the completeness and accuracy of the data that the issuer used in performing the entity-level controls.

- For the foreign locations for which the Firm planned to perform substantive analytical procedures, the Firm's expectations were not sufficiently precise as the expectations only consisted of whether the amounts would increase or decrease. The results at these locations were different from expectations, and the Firm failed to obtain corroboration of management's explanations of the significant unexpected differences between expected and actual revenues at these locations.



Public Company Accounting Oversight Board

In addition, the Firm's plan to test revenue for a significant number of the issuer's domestic divisions included the performance of substantive analytical procedures on a quarterly basis.  The Firm failed to develop appropriate expectations to be used in these procedures, as the Firm's expectations were based on previous quarters' sales data, despite significant negative economic developments following those quarters.   In addition, the Firm failed to define a threshold for significant differences at a level that would identify misstatements that had the potential to be material to the financial statements.  Further, the Firm failed to obtain corroboration of management's explanations of significant unexpected differences between expected and actual revenues.

Issuer I

In this audit, the Firm identified a significant error at year end in the issuer's calculation of impairment for one of its asset groups.  In the prior year, a material weakness had existed in the internal control over the calculation of impairment for assets in a similar asset group.  A control implemented by the issuer to remediate the prior year's material weakness failed to detect the error discovered in the current year.  The Firm determined that a compensating control existed that reduced the severity of the control deficiency to a significant deficiency.  The Firm, however, did not test the operating effectiveness of this compensating control.  Accordingly, the Firm had not obtained sufficient competent evidential matter to support its opinion on internal control over financial reporting.

B.     Review of Quality Control System

In addition to evaluating the quality of the audit work performed on specific audits, the inspection included review of certain of the Firm's practices, policies, and procedures related to audit quality.  This review addressed practices, policies, and procedures concerning audit performance and the following five areas (1) management structure and processes, including the tone at the top; (2) practices for partner management, including allocation of partner resources and partner evaluation, compensation, admission, and disciplinary actions; (3) policies and procedures for considering and addressing the risks involved in accepting and retaining clients, including the application of the Firm's risk-rating system; (4) processes related to the Firm's use of audit work that the Firm's foreign affiliates perform on the foreign operations of the Firm's U.S. issuer audit clients; and (5) the Firm's processes for monitoring audit performance, including processes for identifying and assessing indicators of deficiencies in audit performance, independence policies and procedures,



PCAOB Release No. 104-2010-131A
Inspection of PricewaterhouseCoopers LLP
August 12, 2010
Page 10

and processes for responding to weaknesses in quality control.   Any defects in, or criticisms of, the Firm's quality control system are discussed in the nonpublic portion of this report and will remain nonpublic unless the Firm fails to address them to the Board's satisfaction within 12 months of the date of this report.

<div align="center">END OF PART I</div>



PCAOB Release No. 104-2010-131A
Inspection of PricewaterhouseCoopers LLP
August 12, 2010
Page 11

PORTIONS OF THE REST OF THIS REPORT ARE NONPUBLIC AND ARE OMITTED
FROM THIS PUBLIC DOCUMENT



**PCAOB**
Public Company Accounting Oversight Board

1.   <u>Specific Categories of Deficiencies</u>

      a.   Auditing Fair Value Measurements

The engagement reviews provide cause for concern about the effectiveness of the Firm's quality controls with respect to auditing fair value measurements. The specific deficiencies are described below.

\* \* \* \*

<u>Assets in Connection with Impairment Tests</u>

The inspection team identified two audits[10] with deficiencies in this area.  In one audit,[11] there was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had tested the data and cash flow projections that the issuer had used to evaluate certain long-lived assets for possible impairment.  In the other audit,[12] the Firm failed to identify that the issuer had incorrectly estimated future cash flows for certain of its reporting units in connection with evaluating and measuring goodwill for impairment.

      b.   Integrated Audit – Sufficiency of Audit Evidence

The inspection team identified deficiencies in four engagements discussed in Part I.A[13] where the Firm failed to perform sufficient procedures, or include in its work papers sufficient evidence, to support its opinion on internal control over financial reporting or its controls-reliance strategy when conducting integrated audits.  In three of these audits,[14] the deficiency resulted from the Firm's failure to appropriately perform several audit procedures, including both controls-related and substantive, in a single

---

[10]   Issuers K and L

[11]   Issuer K

[12]   Issuer L

[13]   Issuers F, G, H, and I

[14]   Issuers F, G, and H



**Public Company Accounting Oversight Board**

audit area, that, when aggregated, rendered the evidence obtained insufficient to support the audit opinion on the financial statements. In addition to the engagements described above, the inspection team identified five engagements[15] with deficiencies in this area. The specific concerns in this area that were identified through the review of the nine engagements are described below.

### Entity-level controls

In a number of instances, the Firm identified entity-level controls as a significant or primary source of audit assurance.  Typically, these entity-level controls were business performance reviews, and the Firm reduced its testing of transaction-level controls or the assurance it planned to obtain from substantive procedures by relying on the operating effectiveness of these entity-level controls.  In four audits,[16] the inspection team identified deficiencies in the testing of these entity-level controls.  Specifically, the Firm failed to 1) test that the entity-level control would operate at a level of precision sufficient to prevent or detect a material misstatement in the financial statements,[17] 2) test the completeness and accuracy of the data used in the performance of the control,[18] or 3) perform procedures, beyond confirming the occurrence of a meeting or observing evidence that the issuer's management had reviewed meeting documents, to test the operation of the control.[19]

### Use of the work of others

The inspection team identified deficiencies in the Firm's use of the work of others. For example, in one audit,[20] the Firm used the work of the issuer's internal audit group as a source of assurance, including for substantive audit evidence, but there was no evidence in the audit documentation, and no persuasive other evidence, that the Firm

---

[15]    Issuers K, M, N, O, and P

[16]    Issuers F, G, H, and O

[17]    Issuers G, H, and O

[18]    Issuers F, G, and H

[19]    Issuers F and H

[20]    Issuer H

had assessed the competence and objectivity of this group or the quality and effectiveness of the internal auditors' work. In addition, in reviewing this audit, the inspection team identified deficiencies in the internal auditors' testing, which further suggests that the Firm failed to sufficiently review and evaluate the internal auditors' testing. In one audit,[21/] for an area identified in the Firm's work papers as a key risk, the Firm used the work of the issuer's internal audit group to test the majority of the controls identified as high risk, including the most complex controls, without an apparent justification for doing so.

The inspection team also observed a number of engagements where the audit work papers failed to describe the nature, timing, and extent of the work performed by others, such as the procedures performed, the population tested, the sampling methodology used, the test results, or the conclusions reached. The Firm's policy does not require engagement teams to document the nature, timing, and extent of the work of others, unless that work was performed in direct assistance to the engagement team. Such a policy appears not to provide sufficient assurance that the Firm will comply with Auditing Standard No. 3, *Audit Documentation,* as it appears not to require engagement teams to retain sufficient documentation to allow an experienced auditor with no previous connection to the engagement to understand the basis for the conclusions reached by the Firm regarding the adequacy and results of the work of others.

Controls testing and evaluation

In addition to two audits discussed in Part I.A,[22/] the inspection team identified two additional audits[23/] with deficiencies in this area. In one of these audits,[24/] the Firm was aware of certain deficiencies in the issuer's controls over revenue in the first half of the year; however, there was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had (1) assessed the effect that the control deficiencies should have had on the nature, timing, and extent of its procedures, including its ability to rely on the controls during the period that the controls had failed, and (2) re-performed or reviewed the work performed by others on which the Firm relied

---

21/ Issuer O

22/ Issuers F and I

23/ Issuers N and O

24/ Issuer O



to determine that the controls were remediated, or performed its own testing, beyond a walkthrough, of the controls.  In the other audit,[25] the Firm raised significant questions regarding the issuer's determination of the fair value of one of the issuer's reporting units. The Firm communicated its questions to the issuer before the issuer's controls that were designed to either prevent or detect these issues had fully operated.  Although the Firm, as a result, did not test certain relevant aspects of the operating effectiveness of these controls, the Firm concluded that the controls were operating effectively.

In addition, the inspection team observed six instances,[26] which are also discussed elsewhere in the report, in which certain substantive tests and/or the operating effectiveness of certain internal controls relied on system-generated and other data.  The Firm's testing, however, did not provide a sufficient basis for reliance on the data as the engagement teams failed to test the completeness and accuracy of the data or the controls over the data.

Certain of the observations in the preceding paragraphs suggest that some engagement teams are not placing appropriate emphasis on tests of controls.  In addition, these observations suggest that the Firm's methodology regarding controls testing may not be clear enough or sufficiently well understood by the Firm's professionals.

      c.     Auditing Estimates

The engagement reviews provide cause for concern about the effectiveness of the Firm's quality controls with respect to auditing management's estimates.  In addition to one audit discussed in Part I.A,[27] the inspection team identified four audits[28] with deficiencies in this area.  In one audit,[29] the Firm failed to sufficiently test the issuer's calculation of the last-in first-out inventory reserve as it failed to (1) test certain of the data used in the calculations and (2) quantify the effect of the omission of certain

---

[25]    Issuer N

[26]    Issuers F, G, H, K, M, and P

[27]    Issuer E

[28]    Issuers F, M, P, and Q

[29]    Issuer M



## PART II

## ISSUES RELATED TO QUALITY CONTROLS

This Part II describes the Board's concerns about potential defects in the Firm's quality control system.  Assessment of a firm's quality control system rests both on review of a firm's stated quality control policies and procedures and on inferences that can be drawn from respects in which a firm's system has failed to assure quality in the actual performance of engagements.  On the basis of the information reported by the inspection team, the Board has the following concerns about aspects of the Firm's system of quality control.[9/]

A.      Audit Performance

A firm's system of quality control should provide reasonable assurance that the firm's audit work will meet professional standards and regulatory requirements.  Not every deficiency in an audit indicates that a firm's quality control system is insufficient to provide that assurance, and this report does not discuss every auditing deficiency observed by the inspection team.  On the other hand, some deficiencies, or repeated instances of similar deficiencies, may indicate a significant defect in a firm's quality control system even when the deficiency has not resulted in an insufficiently supported audit opinion.  As described below, some deficiencies reported by the inspection team do suggest that the Firm's system of quality control may in some respects fail to provide sufficient assurance that the Firm's audit work will meet applicable standards and requirements.

---

[9/]      This report's description of quality control issues is based on the inspection team's observations during the inspection field work, which concluded in October 2009.  Any changes or improvements that the Firm may have made in its system of quality control since that time are not reflected in this report, but will be taken into account by the Board during the 12-month remediation process following the issuance of this report.



components from the calculations for one of the issuer's divisions and determine whether a similar omission existed in the calculations for another division.   In the second audit,[30/] the Firm failed to test the loss percentages the issuer used as inputs to estimate the allowance for doubtful accounts.  In the third audit,[31/] the Firm failed to test certain key data that the issuer had provided to an outside specialist for use in determining the amount to be recorded for unsettled insurance receivables.   In the fourth audit,[32/] the Firm failed to test the completeness and accuracy of the data used in determining an idle plant expense.

* * * *

---

[30/]   Issuer F

[31/]   Issuer Q

[32/]   Issuer P



**APPENDIX B**

**THE INSPECTION PROCESS**

The inspection process was designed and performed to provide a basis for assessing the degree of compliance by the Firm with applicable requirements related to auditing issuers. This process included reviews of components of selected issuer audits completed by the Firm. These reviews were intended both to identify deficiencies, if any, in those components of the audits and to determine whether the results of those reviews indicated deficiencies in the design or operation of the Firm's system of quality control over audits. In addition, the inspection included reviews of policies and procedures related to certain quality control processes of the Firm that could be expected to affect audit quality.

1.       Review of Selected Audits

The inspection team reviewed aspects of selected audits of financial statements and ICFR, which it chose according to the Board's criteria. The Firm was not allowed an opportunity to limit or influence the engagement selection process or any other aspect of the review.

For each audit engagement selected, the inspection team reviewed the issuer's financial statements and certain SEC filings. The inspection team selected certain higher-risk areas for review and inspected the engagement team's work papers and interviewed engagement personnel regarding those areas. The areas subject to review included, but were not limited to, revenue, fair value measurements, derivatives, pension and other postretirement benefits, income taxes, reserves or estimated liabilities, inventories, consideration of fraud, consideration of an issuer's ability to continue as a going concern, impairment considerations, supervision of work performed by foreign affiliates, and assessment of risk by the engagement team. The inspection team also analyzed potential adjustments to the issuer's financial statements that were identified during the audit but not corrected. For certain selected engagements, the inspection team reviewed written communications between the Firm and the issuer's audit committee. With respect to certain engagements, the inspection team also interviewed the chairperson of the issuer's audit committee.

When the inspection team identified a potential issue, it discussed the issue with members of the engagement team. If the inspection team was unable to resolve the issue through this discussion and any review of additional work papers or other



Public Company Accounting Oversight Board

documentation, the inspection team issued a comment form on the matter and the Firm provided a written response to the comment form.

2.    Review of Firm Management and Monitoring Processes Related to Audit Quality Control

The inspection team's approach to its review of the Firm's system of quality control was intended to further its understanding of how the Firm manages audit quality, so as to enhance its basis for assessing, in this year and in future years, whether that system is appropriately designed and implemented to achieve the goal of conducting audits that are in compliance with applicable standards.  The inspection team also continued its assessment of the Firm's processes and controls that relate to certain specific functional areas that relate to audit performance.  The overall approach was designed to identify possible defects in the design or operation of the Firm's system of quality control, while also continuing and enhancing the evaluation of the Firm's ability to respond effectively to indications of possible defects in its system of quality control.

a.    Review of Management Structure and Processes, Including the Tone at the Top

The objectives of the inspection procedures in this area were (a) to update the inspection team's understanding of how the Firm's management is structured and operates the Firm's business, and the implications that the management structure and processes have on audit performance and (b) to continue assessing whether actions and communications by the Firm's leadership – the Firm's "tone at the top" – demonstrate a commitment to audit quality.  Toward those ends, the inspection team interviewed members of the Firm's national and regional leadership to obtain an understanding of any significant changes in the Firm's approach to, and processes for, its management, including the various management committees or other mechanisms, formal or informal, that relate to assessing and monitoring audit performance, or that otherwise affect audit performance.  The inspection team also obtained and reviewed significant management reports and documents, as well as information regarding financial metrics and the budget and goal setting processes that the Firm uses to plan for, and evaluate the success of, its business.



Public Company Accounting Oversight Board

> b.     Review of Practices for Partner Management, Including Allocation of Partner Resources and Partner Evaluation, Compensation, Admission, and Disciplinary Actions

The objectives of the inspection procedures in this area were (a) to continue to assess whether the design and application of the Firm's processes related to partner evaluation, compensation, admission, termination, and disciplinary actions could be expected to encourage an appropriate emphasis on audit quality and technical competence, as compared to marketing or other activities of the Firm; (b) to assess the Firm's quality controls over the allocation of its partner resources; and (c) to identify and assess the accountability and responsibilities of the different levels of Firm management with respect to partner management. The inspection team interviewed members of the Firm's management and also reviewed and evaluated documentation related to certain of these topics. In addition, the inspection team's interviews of audit partners included questions regarding their responsibilities and allocation of time and the interviews of Firm management included the performance of partners being inspected, the evaluation and compensation process, any disciplinary actions, and any situations where client management requested a change in the lead audit partner. In addition, the inspection team reviewed a sample of partners' personnel files, including files of partners who resigned or took early retirement and partners who had significant negative inspection results from recent internal and PCAOB inspections.

> c.     Review of Policies and Procedures for Considering and Addressing the Risks Involved in Accepting and Retaining Clients, Including the Application of the Firm's Risk-Rating System

The objectives of the inspection procedures in this area were to continue to assess whether the Firm appropriately considers and addresses the risks involved in accepting and retaining clients in the particular circumstances and to assess the Firm's responses to the risks identified, including the extent to which an observable link exists between the identified risks of material misstatement and the audit procedures performed. Toward those objectives, the inspection team selected certain issuer audits to (a) evaluate compliance with the Firm's policies and procedures for identifying and assessing the risks involved in accepting or continuing the client and (b) observe whether the audit procedures were responsive to the risks identified during the process.



**Public Company Accounting Oversight Board**

d.   Review of Processes Related to the Firm's Use of Audit Work that the Firm's Foreign Affiliates Perform on the Foreign Operations of the Firm's U.S. Issuer Audit Clients

The inspection team performed procedures in this area with respect to the processes the Firm uses to ensure that the audit work that its foreign affiliates perform on the foreign operations of U.S. issuers is effective and in accordance with applicable standards.  For its procedures in this area, the inspection team reviewed the Firm's policies and procedures related to its supervision and control of work performed by foreign affiliates on the operations of U.S. issuer clients, reviewed available information relating to the most recent foreign affiliated firms' internal inspections, interviewed members of the Firm's leadership, and reviewed the U.S. engagement teams' supervision and control procedures concerning the audit work that the Firm's foreign affiliates performed on a sample of audits.  The inspection team also reviewed, on a limited basis, certain of the audit work performed by the Firm's foreign affiliates on the foreign operations of U.S. issuer clients.

e.   Review of the Firm's Processes for Monitoring Audit Performance, Including Processes for Identifying and Assessing Indicators of Deficiencies in Audit Performance, Independence Policies and Procedures, and Processes for Responding to Weaknesses in Quality Control

(i)   Review of Processes for Identifying and Assessing Indicators of Deficiencies in Audit Performance

The objective of the inspection procedures in this area was to continue to identify and assess the monitoring processes that the Firm considers to be significant to its ability to monitor audit quality for individual engagements and for the Firm as a whole.  Toward that objective, the inspection team interviewed members of the Firm's management and reviewed certain documents to build on its understanding of how the Firm identifies, evaluates, and responds to possible indicators of deficiencies in audit performance, including internal inspection findings, PCAOB inspection observations, restatements, and litigation.  In addition, the inspection team reviewed documents related to the design, operation, and evaluation of findings of the Firm's internal inspection program.  The inspection team also reviewed certain audits that the Firm had inspected and compared its results to those from the internal inspection.



(ii)      Review of Response to Weaknesses in Quality Control

The objectives of the inspection procedures in this area were to assess the design and test the effectiveness of the Firm's processes for addressing possible deficiencies in the Firm's system of quality control, including any deficiencies in the Firm's system of quality control that were noted in prior PCAOB inspection reports. Toward those objectives, the inspection team reviewed steps the Firm has taken in the past several years to address possible quality control deficiencies. The inspection team then assessed the design and evaluated the effectiveness of the processes identified. In addition, the inspection team conducted focused inspections of audits of certain issuers whose audits had been reviewed during previous PCAOB inspections of the Firm to ascertain whether the audit procedures in areas with previous deficiencies had been improved.

(iii)     Review of Certain Other Policies and Procedures Related to Monitoring Audit Quality

In this area, the procedures included obtaining an update of the inspection team's understanding of policies, procedures, and guidance related to aspects of the Firm's independence requirements and its consultation processes and the Firm's compliance with them. In addition, the inspection team reviewed documents, including certain newly issued policies and procedures, and interviewed Firm management to update its understanding of the Firm's methods for developing audit policies, procedures, and methodologies, including internal guidance and training materials.



**Public Company Accounting Oversight Board**

PCAOB Release No. 104-2010-131A
Inspection of PricewaterhouseCoopers LLP
August 12, 2010
Page C-1

### APPENDIX C

### RESPONSE OF THE FIRM TO DRAFT INSPECTION REPORT

Pursuant to section 104(f) of the Act, 15 U.S.C. § 7214(f), and PCAOB Rule 4007(a), the Firm provided a written response to a draft of this report.  Pursuant to section 104(f) of the Act and PCAOB Rule 4007(b), the Firm's response, minus any portion granted confidential treatment, is attached hereto and made part of this final inspection report.[33]

---

[33]   In any version of an inspection report that the Board makes publicly available, any portions of a firm's response that address nonpublic portions of the report are omitted.  In some cases, the result may be that none of a firm's response is made publicly available.



PricewaterhouseCoopers LLP
PricewaterhouseCoopers Center
300 Madison Avenue
New York NY 10017
Telephone (646) 471 3000
Facsimile (813) 286 6000

July 16, 2010

Mr. George H. Diacont
Director
Division of Registration and Inspections
Public Company Accounting Oversight Board
1666 K Street, N.W.
Washington, D.C.  20006

**Re:  PricewaterhouseCoopers LLP Response to Draft Report on 2009 Inspection of PricewaterhouseCoopers LLP**

Dear Mr. Diacont:

We are pleased to provide our response to the Public Company Accounting Oversight Board's ("PCAOB" or the "Board") Draft Report on the 2009 Inspection of our Firm's 2008 audits (the "Report").

We continue to support the PCAOB and we wish to convey our sincere appreciation for the professional efforts of the PCAOB Staff.  The on-going communication and interactions between the PCAOB Inspections Staff and our Firm continue to contribute to improvements in our audit quality.  We remain highly focused on both performing quality audits and our system of quality control, the importance of which is even further underscored in today's difficult economic environment.

We appreciate the objectivity and perspective that the PCAOB's inspection process brings to our Firm.  As with any audit process, judgements are necessarily involved in the inspection process and professionals can reach different conclusions about the adequacy of audit evidence in a particular circumstance.  We have evaluated each of the findings set forth in *Part I - Inspection Procedures and Certain Observations* of your Report and taken appropriate actions under both PCAOB standards and our policies.  Our evaluation included those steps necessary to comply with AU 390, *Consideration of Omitted Procedures After the Report Date,* and where applicable, AU 561, *Subsequent Discovery of Facts Existing at the Date of the Auditors Report.*  In no instance did our evaluation result in a change to our audit opinion or restatement of the issuer's financial statements.

# PRICEWATERHOUSECOOPERS

We appreciate this opportunity to formally respond to the PCAOB's 2009 Draft Inspection Report. We remain committed to working with the PCAOB in support of our continuous improvement efforts and our unwavering commitment to audit quality. We would be pleased to discuss any aspect of our response or any further questions you may have.

Sincerely,

*PricewaterhouseCoopers LLP*