# EXHIBIT G

Case 2:11-cv-00746-BJR-WC   Document 167-7   Filed 08/27/15   Page 2 of 10
Case 2:12-cv-00957-WKW-TFM   Document 53   Filed 09/20/13   Page 1 of 59


UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP,<br><br>Defendants. | Case No. 2:12-cv-00957-WKW |

## SECOND AMENDED COMPLAINT

Plaintiff Federal Deposit Insurance Corporation, in its capacity as Receiver of Colonial Bank of Montgomery, Alabama, and pursuant to the Court's Memorandum Opinion and Order dated September 10, 2013 (Doc. No. 52), files this Second Amended Complaint against PricewaterhouseCoopers LLP and Crowe Horwath LLP.

### I. INTRODUCTION

1. On August 14, 2009, the Alabama State Banking Department closed Colonial Bank ("Colonial" or "the Bank") and named the Federal Deposit Insurance Corporation as Receiver ("FDIC"). Colonial's closure was triggered by the discovery that its largest mortgage banking customer, Taylor Bean & Whitaker

PwC knew that its audit of BancGroup's consolidated financial statements served as the audit required by 12 U.S.C. § 1831m. At the conclusion of each audit, PwC reported that PwC had performed its audit work in accordance with applicable professional standards and that BancGroup's financial statements were fairly stated in all material respects in accordance with Generally Accepted Accounting Principles ("GAAP"), and that effective internal controls over BancGroup's financial reporting were in place.

23.   In fact, PwC's audit of Colonial's 2007 financial statements (and other years) fell short of governing professional standards in several respects. If PwC had performed its audit work properly, it would have discovered the TBW fraud and Colonial would have avoided the damages the FDIC seeks against PwC in this complaint.

### 1. Applicable Auditing Standards

24.   PwC's 2007 audit of the consolidated financial statements of BancGroup and Colonial and the effectiveness of BancGroup's internal controls over financial reporting was an "integrated audit." Under PCAOB requirements, integrated audits by a PCAOB-registered public accounting firm such as PwC must be conducted in accordance with PCAOB Auditing Standards. These standards adopted Generally Accepted Auditing Standards ("GAAS") as they existed on April 16, 2003, subject to amendment or supplementation by the PCAOB. (For

ease of reference, GAAS standards that were adopted by the PCAOB will be referred to as GAAS and cited as AU. Standards enacted by the PCAOB will be referred to as AS.). There are ten GAAS standards applicable to PwC's audit of Colonial, the most important of which for purposes of this case are:

- The auditor must adequately plan the work and must properly supervise any assistants.

- The auditor must obtain a sufficient understanding of the entity being audited and its environment, including its internal controls, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.

- The auditor must obtain sufficient competent evidential matter to afford a reasonable basis for an opinion regarding the financial statements under audit.

25.   GAAS and AS also require the auditor to understand (i) the audit client, customer relationships, industry conditions, economic conditions, regulatory environment, relevant accounting pronouncements, and other external factors; and (ii) the internal controls that the audit client has in place to determine whether they are designed properly and operate effectively.

26.   To comply with GAAS, the auditor needs to identify risks of material misstatement at appropriate levels of detail, and design appropriate auditing procedures in light of such risks. Due professional care requires the auditor to exercise professional skepticism – i.e., a questioning mind and a critical

assessment of audit evidence based on the assumption that management is neither dishonest nor honest beyond doubt.

27. Under GAAS and AS requirements, which audit procedures the auditor selects generally depend on the risk of material misstatement. The higher the auditor's assessment of risk, the more reliable and relevant the audit evidence obtained from tests of the effectiveness of internal controls and substantive audit procedures must be. The auditor must plan and perform the audit to obtain sufficient competent evidential matter to afford a reasonable basis for an opinion regarding the financial statements and to reduce to a low level the risk that the auditor will fail to detect a material misstatement. If the auditor is unable to obtain sufficient competent evidential matter, the auditor should express a qualified opinion or a disclaimer of opinion.

### 2. Elevated Risk of Fraud Affecting PwC's 2007 Audit

28. Throughout 2007 home prices were falling in regions of the country that had recently witnessed major booms, mortgage loan originators were suffering from eroding markets, homeowners with subprime and other high-rate mortgages were defaulting in increasing numbers and, by the summer of 2007, many markets for mortgage-backed securities ("MBS"), particularly securities backed by residential mortgage loans, had all but frozen.

ledger. In violation of applicable professional standards, PwC failed to investigate this audit exception, failed to increase its assessment of risk, and failed to implement additional substantive audit procedures in light of the heightened risk. Follow-up procedures would have revealed that the TBW balance could not be confirmed.

46. PwC's audit confirmation procedures also were grossly deficient in light of the potential fraud risks relating to TBW. (AU Section 316). The confirmation evidence that PwC obtained was unreliable. (AU Section 326). PwC violated GAAS with respect to confirmation control (AU Section 330), proficiency of its auditors (AU Section 210), lack of supervision by senior auditors (AU Section 311), and the failure to exercise due professional care and appropriate professional skepticism. (AU Section 230).

    e.    <u>Failure to Investigate Stale TBW Loans in COLB Account</u>

47. A year-end 2007 aging analysis of COLB loans under the COLB agreements in effect at the time showed that loans totaling $166 million had origination dates before July 1, 2007, meaning they had been on Colonial's books for more than six months. (PwC also had access to Crowe's workpapers which revealed that (1) in April 2006, the Bank had $272.7 million of outstanding TBW loans under the COLB facility that were more than 120 days old when the loans should have been paid for or repurchased within 60 days and (2) the Bank was not

sending violation notices for not being paid timely for loans that the Bank had sold and shipped. *See* Paragraphs 73-74, *infra*.) Kissick admitted that virtually all (99.6 percent) of the $166 million in loans had been originated by TBW. Because COLB loans should have been sold within a short period (30-60 days), this was a clear sign of a serious potential problem. Kissick told PwC that these loans had not been sold due to documentation exceptions that disqualified them for sale to the secondary market. Upon information and belief, PwC never questioned why large numbers of aged and defective mortgage loans from TBW were being held for sale by Colonial in the COLB facility rather than being put back to TBW in accordance with the Loan Participation and Sale Agreement requiring TBW to repurchase such loans. PwC justified its failure to investigate this serious potential problem on the grounds that it perceived no valuation issues specific to the loans. This "justification" strains credulity because if these loans could not be sold due to documentation deficiencies as Kissick had represented, simple logic suggests that their valuation was in question if not impaired. A reasonable auditor with appropriate skepticism would not have let the matter drop, yet PwC did in violation of AU Sections 210, 230, and 316.

48. With very large numbers of loans acknowledged to be defective, PwC should have suspected a serious breakdown in internal controls designed to prevent loans from being warehoused indefinitely on the COLB facility. Accepting

management's explanation that no valuation issues arose from such aged loans in a facility designed to keep loans for only 30-60 days is demonstrative of PwC's failure to exercise due professional care in the performance of the audit and obtain sufficient competent evidential matter in violation of AU Sections 230 and 326. At the very least, PwC should have made a fair-value determination for a representative sample of these defective loans. Had it done so, it would have discovered substantial valuation issues that would have necessitated a more extensive investigation of the MWLD's dealings with TBW, leading to the discovery of the TBW fraud.

    f.  Approval of Erroneous Sales Accounting Treatment of COLB Loans

    49.  While appropriately recognizing that Colonial owned a 99 percent participation interest in the COLB loans, PwC nonetheless negligently treated COLB loan financing to TBW as a purchase of loans from TBW to be held for sale to end investors rather than as an extension of credit to allow TBW to make loans. Sales treatment allowed TBW to remove COLB loans from its balance sheet and free up its mortgage warehouse line of credit. This was a significant accounting determination that enabled TBW to obtain financing without regard to Colonial's regulatory lending limits on the amount of loans Colonial could make to a single borrower.

f. failing to employ appropriate audit procedures for Colonial's AOT account;

g. failing to identify reportable conditions and material weaknesses in BancGroup's internal control over financial reporting, particularly with respect to the manner in which Colonial's Treasury area maintained control over AOT collateral and reconciled the balance of AOTs recorded as Securities Purchased Under Agreements to Resell;

h. failing to recognize that the scope of work performed by Crowe was not sufficient to meet the requirements of SOX 404 and, in particular, did not adequately address key controls in the Treasury area relating to maintaining control over AOT collateral and reconciling the balance of AOTs recorded as Securities Purchased Under Agreements to Resell;

i. failing to require sufficiently persuasive evidence to support its conclusions and Colonial management's material accounting estimates and representations;

j. failing to investigate a material discrepancy in TBW's confirmation response;

k. failing to design more effective and robust audit procedures in response to inconsistencies observed during its audit;

l. failing to corroborate management's explanations and representations concerning material matters, in spite of the fact that certain of these representations were patently unreasonable on their face.

80. Each of PwC's cited failures above violated one or more of the following applicable professional standards:

- AU 210 – Training and Proficiency of the Independent Auditor

- AU 220 – Independence

- AU 230 – Due Professional Care in the Performance of Work

- AU 311 – Planning and Supervision

- IIA Standards 2400 – Communicating Results
- IIA Standards 2420 – Quality of Communications

84. PwC's and Crowe's work violated governing professional standards in many significant ways, and thus they missed several opportunities to identify one or more aspects of the TBW fraud.

85. Had PwC and Crowe complied with applicable professional standards, they would have detected the TBW fraud several months before it was ultimately uncovered. They would have been required to promptly communicate such fraud to Colonial and BancGroup which disclosure would have prompted immediate action by Colonial to terminate its relationship with TBW, thus avoiding or significantly reducing the losses that Colonial sustained. Specifically, the losses Colonial sustained by continuing to advance money to TBW in return for nothing of value would have been arrested if PwC and Crowe had performed their audits in accordance with professional standards and reported the resulting findings to Colonial. PwC's and Crowe's misconduct constituted such an extreme departure from professional standards as to constitute gross negligence.

86. As a direct and proximate result of PwC's and Crowe's negligence, Colonial sustained significant damages in an amount to be proven at trial, but currently estimated to exceed $1 billion.