# EXHIBIT H



1666 K Street, N.W.
Washington, DC 20006
Telephone: (202) 207-9100
Facsimile: (202) 862-8433
www.pcaobus.org

# Report on

# 2008 Inspection of PricewaterhouseCoopers LLP

## (Headquartered in New York, New York)

### Issued by the

# Public Company Accounting Oversight Board

### March 25, 2009

> **THIS IS A PUBLIC VERSION OF A PCAOB INSPECTION REPORT**
>
> **PORTIONS OF THE COMPLETE REPORT ARE OMITTED
> FROM THIS DOCUMENT IN ORDER TO COMPLY WITH
> SECTIONS 104(g)(2) AND 105(b)(5)(A)
> OF THE SARBANES-OXLEY ACT OF 2002**

PCAOB RELEASE NO. 104-2009-038A
(Includes portions of Part II of the full report that
were not included in PCAOB Release No. 104-2009-038)



PCAOB Release No. 104-2009-038A

Public Company Accounting Oversight Board

## <u>Preface to Reports Concerning Annually Inspected Firms</u>

The Sarbanes-Oxley Act of 2002 requires the Public Company Accounting Oversight Board ("PCAOB" or "the Board") to conduct an annual inspection of each registered public accounting firm that regularly provides audit reports for more than 100 issuers.  The Board's report on any such inspection includes this preface to provide context for information in the public portion of the report.

A Board inspection includes, among other things, a review of selected audits of financial statements and of internal control over financial reporting.  If the Board inspection team identifies deficiencies in those audits, it alerts the firm to the deficiencies during the inspection process.  Deficiencies that exceed a certain significance threshold are also summarized in the public portion of the Board's inspection report.  The Board encourages readers to bear in mind two points concerning those reported deficiencies.

First, inclusion in an inspection report does not mean that the deficiency remained unaddressed after the inspection team brought it to the firm's attention.  Under PCAOB standards, a firm must take appropriate action to assess the importance of the deficiency to the firm's present ability to support its previously expressed audit opinions. Depending upon the circumstances, compliance with these standards may require the firm to perform additional audit procedures, or to inform a client of the need for changes to its financial statements or reporting on internal control, or to take steps to prevent reliance on previously expressed audit opinions.  A Board inspection does not typically include review of a firm's actions to address deficiencies identified in that inspection, but the Board expects that firms are attempting to take appropriate action, and firms frequently represent that they have taken, are taking, or will take, action.  If, through subsequent inspections or other processes, the Board determines that the firm failed to take appropriate action, that failure may be grounds for a Board disciplinary sanction.

Second, the Board cautions against drawing conclusions about the comparative merits of the annually inspected firms based on the number of reported deficiencies in any given year.  The total number of audits reviewed is a small portion of the total audits performed by these firms, and the frequency of deficiencies identified does not necessarily represent the frequency of deficiencies throughout the firm's practice. Moreover, if the Board discovers a potential weakness during an inspection, the Board may revise its inspection plan to target additional audits that may be affected by that weakness, and this may increase the number of deficiencies reported for that firm in that year.  Such weaknesses may emerge in varying degrees at different firms in different years.



PCAOB Release No. 104-2009-038A

Public Company Accounting Oversight Board

### Notes Concerning this Report

1.  Portions of this report may describe deficiencies or potential deficiencies in the systems, policies, procedures, practices, or conduct of the firm that is the subject of this report. The express inclusion of certain deficiencies and potential deficiencies, however, should not be construed to support any negative inference that any other aspect of the firm's systems, policies, procedures, practices, or conduct is approved or condoned by the Board or judged by the Board to comply with laws, rules, and professional standards.

2.  Any references in this report to violations or potential violations of law, rules, or professional standards should be understood in the supervisory context in which this report was prepared.  Any such references are not a result of an adversarial adjudicative process and do not constitute conclusive findings of fact or of violations for purposes of imposing legal liability.  Similarly, any description herein of a firm's cooperation in addressing issues constructively should not be construed, and is not construed by the Board, as an admission, for purposes of potential legal liability, of any violation.

3.  Board inspections encompass, among other things, whether the firm has failed to identify departures from U.S. Generally Accepted Accounting Principles ("GAAP") or Securities and Exchange Commission ("SEC" or "Commission") disclosure requirements in its audits of financial statements.  This report's descriptions of any such auditing failures necessarily involve descriptions of the related GAAP or disclosure departures. The Board, however, has no authority to prescribe the form or content of an issuer's financial statements.  That authority, and the authority to make binding determinations concerning an issuer's compliance with GAAP or Commission disclosure requirements, rests with the Commission.  Any description, in this report, of perceived departures from GAAP or Commission disclosure requirements should not be understood as an indication that the Commission has considered or made any determination regarding these issues unless otherwise expressly stated.



PCAOB Release No. 104-2009-038A

**Public Company Accounting Oversight Board**

### 2008 INSPECTION OF PRICEWATERHOUSECOOPERS LLP

In 2008, the Board conducted an inspection of PricewaterhouseCoopers LLP ("PwC" or "the Firm").  The Board is today issuing this report of that inspection in accordance with the requirements of the Sarbanes-Oxley Act of 2002 ("the Act").

The Board is making portions of the report publicly available.  Specifically, the Board is releasing to the public Part I of the report, Appendix B, and portions of Appendix C.  Appendix B provides an overview of the inspection process.  Appendix C includes the Firm's comments, if any, on a draft of the report.[1]

The Board has elsewhere described in detail its approach to making inspection-related information publicly available consistent with legal restrictions.[2]  A substantial portion of the Board's criticisms of a firm (specifically criticisms of the firm's quality control system), and the Board's dialogue with the firm about those criticisms, occurs out of public view, unless the firm fails to make progress to the Board's satisfaction in addressing those criticisms.  In addition, the Board generally does not disclose otherwise nonpublic information, learned through inspections, about the firm or its clients.  Accordingly, information in those categories generally does not appear in the publicly available portion of an inspection report.

---

[1]     The Board does not make public any of a firm's comments that address a nonpublic portion of the report. In addition, pursuant to section 104(f) of the Act, 15 U.S.C. § 7214(f), and PCAOB Rule 4007(b), if a firm requests, and the Board grants, confidential treatment for any of the firm's comments on a draft report, the Board does not include those comments in the final report at all.  The Board routinely grants confidential treatment, if requested, for any portion of a firm's response that addresses any point in the draft that the Board omits from, or any inaccurate statement in the draft that the Board corrects in, the final report.

[2]     See Statement Concerning the Issuance of Inspection Reports, PCAOB Release No. 104-2004-001 (August 26, 2004).



## PART I

### INSPECTION PROCEDURES AND CERTAIN OBSERVATIONS

Members of the Board's inspection staff ("the inspection team") performed an inspection of the Firm from April 2008 through October 2008.  The inspection team performed field work at the Firm's National Office and at 30 of its approximately 61 U.S. assurance practice offices.

Board inspections are designed to identify and address weaknesses and deficiencies related to how a firm conducts audits.[3/] To achieve that goal, Board inspections include reviews of certain aspects of selected audits performed by the firm and reviews of other matters related to the firm's quality control system.  Appendix B to this report provides a description of the steps the inspection team took with respect to the review of audits and the review of certain firm-wide quality control processes.

In the course of reviewing aspects of selected audits, an inspection may identify ways in which a particular audit is deficient, including failures by the firm to identify, or to address appropriately, respects in which an issuer's financial statements do not present fairly the financial position, results of operations, or cash flows of the issuer in conformity with GAAP.[4/] It is not the purpose of an inspection, however, to review all of a firm's audits or to identify every respect in which a reviewed audit is deficient. Accordingly, a Board inspection report should not be understood to provide any assurance that the firm's audits, or its issuer clients' financial statements or reporting on internal control, are free of any deficiencies not specifically described in an inspection report.

---

[3/]     This focus on weaknesses and deficiencies necessarily carries through to reports on inspections and, accordingly, Board inspection reports are not intended to serve as balanced report cards or overall rating tools.

[4/]     When the Board becomes aware that an issuer's financial statements appear not to present fairly, in a material respect, the financial position, results of operations, or cash flows of the issuer in conformity with GAAP, the Board's practice is to report that information to the SEC, which has jurisdiction to determine proper accounting in issuers' financial statements.



**Public Company Accounting Oversight Board**

A.    Review of Audit Engagements

The scope of the inspection procedures performed included reviews of aspects of selected audits performed by the Firm.  Those audits and aspects were selected according to the Board's criteria, and the Firm was not allowed an opportunity to limit or influence the selection process.

In reviewing the audits, the inspection team identified matters that it considered to be audit deficiencies.[5] Those deficiencies included failures by the Firm to identify or appropriately address errors in the issuer's application of GAAP.  In addition, the deficiencies included failures by the Firm to perform, or to perform sufficiently, certain necessary audit procedures.

In some cases, the conclusion that the Firm failed to perform a procedure may be based on the absence of documentation and the absence of persuasive other evidence, even if the Firm claims to have performed the procedure.  PCAOB Auditing Standard No. 3, *Audit Documentation* ("AS No. 3") provides that, in various circumstances including PCAOB inspections, a firm that has not adequately documented that it performed a procedure, obtained evidence, or reached an appropriate conclusion must demonstrate with persuasive other evidence that it did so, and that oral assertions and explanations alone do not constitute persuasive other evidence.[6]  For purposes of the inspection, an observation that the Firm did not perform a procedure, obtain evidence, or reach an appropriate conclusion may be based on the absence of such documentation and the absence of persuasive other evidence.

When audit deficiencies are identified after the date of the audit report, PCAOB standards require a firm to take appropriate actions to assess the importance of the deficiencies to the firm's present ability to support its previously expressed opinions,[7]

---

[5]    The discussion in this report of any deficiency observed in a particular audit reflects information reported to the Board by the inspection team and does not reflect any determination by the Board as to whether the Firm has engaged in any conduct for which it could be sanctioned through the Board's disciplinary process.

[6]    See AS No. 3, paragraph 9; Appendix A to AS No. 3, paragraph A28.

[7]    See AU 390, *Consideration of Omitted Procedures After the Report Date,* AU 561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report* (both included among the PCAOB's interim auditing standards, pursuant to PCAOB



and failure to take such actions could be a basis for Board disciplinary sanctions. In response to the inspection team's identification of deficiencies, the Firm, in some cases, performed additional procedures or supplemented its work papers, and in some instances, follow-up between the Firm and the issuer led to a change in the issuer's accounting or disclosure practices or led to representations related to prospective changes.[8/]

In some cases, the deficiencies identified were of such significance that it appeared to the inspection team that the Firm, at the time it issued its audit report, had not obtained sufficient competent evidential matter to support its opinion on the issuer's financial statements. The deficiencies that reached this degree of significance are described below, on an audit-by-audit basis, with the exception of similar deficiencies that were observed in multiple audits and are therefore grouped together.

Deficiencies in testing goodwill for possible impairment (four audits)

In four audits, due to deficiencies in its testing of goodwill for possible impairment, the Firm failed to obtain sufficient competent evidential matter to support its audit opinion. The deficiencies are as follows:

- One issuer had acquired a reporting unit in the prior year. In the year under audit, for its annual goodwill impairment test, the issuer concluded, and the Firm agreed, that it had met the criteria to carry forward the fair value determination of the reporting unit from the prior year. The Firm failed to perform audit procedures, beyond relying on management's representations, to address certain evidence that indicated that the criteria had not been met and that therefore a current-year fair value determination of the reporting unit was required to identify any potential impairment. (Issuer A)

---

Rule 3200T), and PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ("AS No. 5"), ¶ 98.

[8/]      The Board inspection process generally did not include review of such additional procedures or documentation, or of such revised accounting, although future Board inspections of the Firm may, as appropriate, include further review of any of these matters.



**PCAOB**

Public Company Accounting Oversight Board

- In one audit, the Firm obtained a schedule from the issuer that indicated that the carrying amount of one of its reporting units significantly exceeded its fair value. There was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had performed procedures, beyond inquiries of management, to address the issuer's assertions that the fair value indicated in the schedule was not relevant and that no impairment had occurred.[9]  (Issuer B)

- In connection with an acquisition that resulted in recorded goodwill, one issuer engaged a valuation specialist who provided the issuer with an estimated enterprise value for the acquired business, which approximated the purchase price.  Later in the year, the issuer settled a contingent liability of the acquired business under terms that were significantly less favorable from a cash flow perspective than had been expected at the time of the acquisition. In the fourth quarter, as part of its annual test for goodwill impairment, the issuer estimated the fair value of the acquired entity based on the lower projected cash flows.  In this fair value estimate, certain of the issuer's other assumptions, including the discount rate and terminal growth rate, were significantly more favorable than those that the valuation specialist had used earlier that year.  The effect of these more favorable assumptions more than offset the effect of the decrease in projected cash flows, and, had these other assumptions not been changed, the estimated fair value of the acquired business would have been less than its carrying value.   There was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had addressed the inconsistencies between the assumptions used to estimate the values on the two dates.

  In addition, there was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had evaluated the appropriateness of the issuer's use, in its annual test for goodwill impairment, of the same discount rate for all of its reporting units when the reporting units had different risks, such as those relating to the differing maturities of the businesses and varying rates of customer acceptance of their products and services.  (Issuer C)

---

[9]      During the second quarter of the following year, the issuer determined that goodwill for certain reporting units, including the one identified above, was impaired and recognized an impairment charge for this goodwill.



- One issuer prepared cash flow projections to use in a fair value determination for purposes of its annual goodwill impairment test. The gross profit margin in the third year of the issuer's projections was significantly higher than the actual gross profit margin achieved by the issuer in any of the most recent five years, and this higher margin had the effect of substantially increasing the fair value used in the impairment test. The Firm accepted the higher gross profit margin without evaluating whether it was reasonable in light of the issuer's past experience. Also, the Firm identified that, in the year under audit, the issuer's actual revenues were below its projected amounts for the year while its cost of sales and operating expenses exceeded its projected amounts. Despite the significant cumulative effect of those variances, the Firm did not question the issuer's ability to make reasonable cash flow projections. (Issuer D)

Issuer E

The issuer used estimated values obtained from two broker-dealers to estimate the fair values of its investment securities that were not actively trading. To test the fair values of these investment securities, the Firm compared the recorded prices to the broker-dealer estimates, which the Firm had obtained from the issuer. The Firm, however, failed to obtain an understanding of the methodologies and evaluate the reasonableness of the assumptions that the broker-dealers had used to develop their estimates.

Issuer A

The issuer sells software products under licenses and subscription agreements, as well as professional and maintenance services. For certain of its bundled sales, the issuer used the stated renewal rates included in its agreements with customers when determining vendor-specific objective evidence of fair value of its postcontract customer support ("PCS"). The Firm's work papers identified a significant range in the renewal rates charged to the issuer's customers for PCS. In evaluating whether such rates were substantive as required by Statement of Position 97-2, *Software Revenue Recognition*, and related interpretations, the Firm failed to consider whether the stated rates were consistent with the issuer's normal pricing practices.



Issuer F

The issuer enters into customer contracts that include multiple elements. For certain contracts with revenues over a specified amount, the issuer allocated revenues to the separate elements based upon the issuer's list prices, which, according to the Firm, the issuer asserted were indicative of the relative fair values of each of the elements. Data in the Firm's work papers, however, indicated that the issuer sold separate elements at amounts that varied significantly from its list prices. The Firm failed to test the issuer's assertion that the list prices were representative of fair value. Further, for contracts below the specified amount mentioned above, the issuer allocated revenues to the various elements based upon the rates stated in the contract. For these contracts, the Firm failed to evaluate the effect of the issuer recording revenue using the contractually stated rates instead of fair value to determine whether the effect was material to the financial statements.

B.      Review of Quality Control System

In addition to evaluating the quality of the audit work performed on specific audits, the inspection included review of certain of the Firm's practices, policies, and processes related to audit quality. This review addressed practices, policies, and procedures concerning audit performance and the following five areas (1) management structure and processes, including the tone at the top; (2) practices for partner management, including allocation of partner resources and partner evaluation, compensation, admission, and disciplinary actions; (3) policies and procedures for considering and addressing the risks involved in accepting and retaining clients, including the application of the Firm's risk-rating system; (4) processes related to the Firm's use of audit work that the Firm's foreign affiliates perform on the foreign operations of the Firm's U.S. issuer audit clients; and (5) the Firm's processes for monitoring audit performance, including processes for identifying and assessing indicators of deficiencies in audit performance and processes for responding to weaknesses in quality control. Any defects in, or criticisms of, the Firm's quality control system are discussed in the nonpublic portion of this report and will remain nonpublic unless the Firm fails to address them to the Board's satisfaction within 12 months of the date of this report.

END OF PART I



PCAOB Release No. 104-2009-038A
Inspection of PricewaterhouseCoopers LLP
March 25, 2009
Page 8

PORTIONS OF THE REST OF THIS REPORT ARE NONPUBLIC AND ARE OMITTED
FROM THIS PUBLIC DOCUMENT



**Public Company Accounting Oversight Board**

## PART II

## ISSUES RELATED TO QUALITY CONTROLS

This Part II describes the Board's concerns about potential defects in the Firm's quality control system.  Assessment of a firm's quality control system rests both on review of a firm's stated quality control policies and procedures and on inferences that can be drawn from respects in which a firm's system has failed to assure quality in the actual performance of engagements.  On the basis of the information reported by the inspection team, the Board has the following concerns about aspects of the Firm's system of quality control.[10/]

A.     Audit Performance

A firm's system of quality control should provide reasonable assurance that the firm's audit work will meet professional standards and regulatory requirements.  Not every deficiency in an audit indicates that a firm's quality control system is insufficient to provide that assurance, and this report does not discuss every auditing deficiency observed by the inspection team.  On the other hand, some deficiencies, or repeated instances of a similar deficiency, may indicate a potentially significant defect in a firm's quality control system even if the deficiency has not resulted in an insufficiently supported audit opinion.  As described below, some deficiencies reported by the inspection team do suggest that the Firm's system of quality control may in some respects fail to provide sufficient assurance that the Firm's audit work will meet applicable standards and requirements.

1.     Specific Categories of Deficiencies

a.     Auditing Estimates and Fair Value

The engagement reviews provide cause for concern about the effectiveness of the Firm's quality controls with respect to auditing management's estimates and fair

---

[10/]     This report's description of quality control issues is based on the inspection team's observations during the inspection field work, which concluded in October 2008.  Any changes or improvements that the Firm may have made in its system of quality control since that time are not reflected in this report, but will be taken into account by the Board during the 12-month remediation process following the issuance of this report.



value determinations.  In addition to five audits discussed in Part I.A,[11] the inspection team identified five audits[12] with deficiencies in this area and an additional such deficiency in one of the audits discussed in Part I.A.[13]

- In one audit,[14] the Firm obtained brokerage statements and performed management inquiries to test the fair values of certain auction rate securities. With respect to a portion of the issuer's auction rate securities portfolio, however, the Firm failed to obtain corroboration of management's assertions regarding the assumptions that the brokerage firms had used in estimating fair value.

- In another audit,[15] there was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had tested the data that the issuer had provided to an outside specialist who estimated the fair value of certain acquired intangible assets, or that it had evaluated the reasonableness of the useful lives and amortization methods assigned to the intangible assets.

- In another audit,[16] the issuer used a service organization to process certain self-insurance claims.  The claims data were a primary input into the determination of the issuer's self-insurance reserves.  The Firm failed either to test key components of the data that were processed by the service organization and that were used to determine the estimate or, alternatively, to obtain assurance regarding the design and operating effectiveness of the controls at the service organization.

---

[11]     Issuers A, B, C, D, and E

[12]     Issuers G, H, I, J, and K

[13]     Issuer D

[14]     Issuer G

[15]     Issuer H

[16]     Issuer I



- In another audit,[17] for certain contracts accounted for under the percentage-of-completion method, the Firm failed to test the costs incurred to date or evaluate the reasonableness of the issuer's estimated costs to complete the contracts.  Further, there was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had sufficiently tested the completeness assertion for contract loss reserves.  The Firm used a combination of controls testing and analytical procedures to test this assertion.  The Firm's testing did not evidence that the controls operated at an appropriate level of precision to enable the Firm to rely on these controls with respect to the completeness assertion.  Further, there was no evidence in the audit documentation, and no persuasive other evidence, that, in performing the analytical procedures, the Firm had obtained corroboration of management's explanations for significant variances in the reserves.

- One issuer[18] hired an outside valuation specialist to evaluate an asset group for possible impairment, and the specialist's report indicated that the fair value of a significant asset within the group was less than its carrying value.  There was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had considered the information in this report when evaluating the issuer's assertion that there were no events or changes in circumstances that would indicate that the carrying value of the asset group may not be recoverable.

- In one of the audits discussed in Part I.A,[19] the Firm failed to test the completeness and accuracy of inventory aging reports that the issuer had used in determining its excess and obsolete inventory reserves and that the Firm used in evaluating the reasonableness of the reserves.

\* \* \* \*

---

[17]   Issuer J

[18]   Issuer K

[19]   Issuer D



2.    General Observations Concerning Audit Performance

The nature and number of the reported deficiencies identified by the inspection team (including, in six of the 50 engagements reviewed, the Firm's failure to obtain sufficient competent evidential matter, at the time it issued its audit report, to support its audit opinion) suggest that important issues may exist regarding:

* * * *

- The sufficiency of the Firm's emphasis on the critical need to exercise due care and professional skepticism when performing audits;

- The Firm's supervision and review activities to ensure that the audit is performed thoroughly and with due care;

* * * *

Some of these quality control issues are discussed further below.

Many of the quality control issues described below relate in whole or in part to apparent deficiencies in the Firm's supervision and review activities.  This observation provides cause for concern about the effectiveness of this critical aspect of the audit process, including the timing and quality of the supervision and review activities and the attention devoted by senior members of the engagement team to such activities.

* * * *

The deficiencies identified in areas with a high degree of judgment and potential for management bias, and in areas involving the application of complex accounting literature (such as * * * * and fair value), similarly suggest that the audit personnel * * * * were not adequately supervised.  In addition, the deficiencies suggest the possibility that senior members of the engagement team were not devoting sufficient attention to developing an appropriate audit strategy for these areas and that quality review partners were not devoting sufficient attention to reviewing the audit strategy for these areas. * * * *

A specific area of concern with the testing of fair value relates to engagement teams' understanding of PCAOB standards and the Firm's policies with respect to assessing fair values in connection with testing for impairment, and the quality of supervision and review exercised by partners and managers over such tests.  For



**Public Company Accounting Oversight Board**

example, the inspection team observed instances[20] where evidence existed that indicated the carrying value of certain assets may have exceeded their fair value, and yet the Firm failed to expand its audit procedures.  In other instances,[21] engagement teams failed to evaluate certain management assumptions or assertions that were used in the fair value estimates but were contrary to historical results or other evidence contained in the work papers.  The deficiencies identified by the inspection team suggest that engagement teams may be placing too much reliance on management's responses to the teams' inquiries and not sufficiently challenging or evaluating management's assumptions, and that they may not be applying an appropriate level of professional skepticism in subjective areas susceptible to management bias.

\* \* \* \*

        The inspection team observed that the engagement partners for three of the six audits discussed in Part I.A[22] had a significant number of issuer audit clients with year ends at or around December 31.  For one of these three engagements,[23] the hours reported by the engagement partner on the audit represented approximately 2.1 percent of the lead office audit hours.  This was approximately 45 percent less than the average percentage of lead office engagement hours reported by the engagement partners on the other 49 issuer audits selected for inspection.  The engagement partner for another audit[24] described in Part I.A was responsible for four issuer audit clients with a calendar year end, an average market capitalization of approximately \$2.7 billion, and average audit fees of approximately \$1.1 million.  These facts and the significance of the deficiencies in these engagements suggest that the Firm may not sufficiently monitor partners' workloads to ensure that they do not negatively affect partners' ability to effectively participate in the planning and execution of their audits and to appropriately supervise and review their audits.

\* \* \* \*

---

[20]    Issuers B and K

[21]    Issuers A, C, and D

[22]    Issuers A, D, and E

[23]    Issuer D

[24]    Issuer A



As described in the preceding paragraphs, the inspection team has identified concerns with significant elements of the audit process, such as the failure to adequately challenge management assumptions, excessive reliance on management's responses to inquiries, and the failure to respond appropriately to potential issues identified during the audit. In certain instances, in interactions with the inspection team or in responses to comment forms, engagement teams have asserted that cumulative audit knowledge and experience ("CAKE")[25/] represented a meaningful component of their audit assurance. The aforementioned concerns may indicate that engagement teams rely on CAKE to a greater degree than is appropriate. Although CAKE can be useful in planning and scoping the audit, using CAKE as a source of substantive assurance to address issues that arise during the execution of audit procedures may cause engagement teams to misjudge the level of audit comfort actually obtained. In addition, the Firm's audit policies do not provide guidance regarding the extent to which CAKE should be documented other than for the purposes of planning and scoping the audit. If CAKE is not sufficiently documented and there are changes in key members of engagement teams, the ability of the supervising members of the engagement team to review and evaluate audit plans and evidence and to make appropriate conclusions based on CAKE may be questionable. Overreliance on CAKE might also cause engagement teams not to exercise sufficient professional skepticism and may lead to inappropriate risk assessments or judgments concerning the nature, timing, and extent of audit procedures to be performed.

* * * * In addition, in critical audit areas (such as * * * * fair value, estimates, * * * *) the inspection team identified numerous instances where key assumptions or conclusions were not supported in the work papers. * * * * In addition, these observations suggest that senior members of some engagement teams may not be performing a sufficiently detailed review of higher risk areas and may not be exercising an appropriate level of supervision over the audit.

---

[25/]    According to the Firm's audit guide, cumulative audit knowledge and experience is "the knowledge and experience we bring to the audit engagement as a result of testing performed in prior years. We use cumulative audit knowledge and experience to assist in making informed judgments about the current year's audit. Cumulative audit knowledge and experience is largely intangible and reflects the knowledge and experience of the key team members. Its extent and how it impacts the audit is dependent on their professional judgment."



**Public Company Accounting Oversight Board**

## APPENDIX B

## THE INSPECTION PROCESS

The inspection process was designed and performed to provide a basis for assessing the degree of compliance by the Firm with applicable requirements related to auditing issuers. This process included reviews of components of selected issuer audits completed by the Firm. These reviews were intended both to identify deficiencies, if any, in those components of the audits and to determine whether the results of those reviews indicated deficiencies in the design or operation of the Firm's system of quality control over audits. In addition, the inspection included reviews of policies and procedures related to certain quality control processes of the Firm that could be expected to affect audit quality.

1.      Review of Selected Audits

The inspection team reviewed aspects of selected audits, which it chose according to the Board's criteria. The Firm was not allowed an opportunity to limit or influence the engagement selection process or any other aspect of the review.

For each audit engagement selected, the inspection team reviewed the issuer's financial statements and certain SEC filings. The inspection team selected certain higher-risk areas for review and inspected the engagement team's work papers and interviewed engagement personnel regarding those areas. The areas subject to review included, but were not limited to, revenues, fair value, financial instruments, income taxes, reserves or estimated liabilities, inventories, consideration of fraud, related party transactions, supervision of work performed by foreign affiliates, and assessment of risk by the engagement team. The inspection team also analyzed potential adjustments to the issuer's financial statements that were identified during the audit but not corrected. For certain selected engagements, the inspection team reviewed written communications between the Firm and the issuer's audit committee. With respect to certain engagements, the inspection team also interviewed the chairperson of the issuer's audit committee.

When the inspection team identified a potential issue, it discussed the issue with members of the engagement team. If the inspection team was unable to resolve the issue through this discussion and any review of additional work papers or other documentation, the inspection team issued a comment form on the matter and the Firm provided a written response to the comment form.



2.      Implementation of AS No. 5

Shortly after the approval of AS No. 5, members of the Board's Office of the Chief Auditor and of the Division of Registration and Inspections reviewed documentation of the Firm's initial approach to the implementation of AS No. 5 and provided feedback to the Firm's National Office.   Field inspection procedures in this area began with discussions with members of the Firm's leadership to address specific areas of inspection emphasis and the appropriate use of auditor judgment, and to outline planned communications with the Firm. The reviews of certain audits included discussions with engagement teams and the review of documentation regarding the following aspects of the Firm's audit of internal control over financial reporting: (1) risk assessment; (2) risk of fraud; (3) entity-level controls; (4) the nature, timing, and extent of tests of controls; and (5) evaluating and reporting deficiencies. The inspection team discussed its observations about the effectiveness of the implementation of AS No. 5 with the engagement teams, with emphasis on areas where implementation could be improved in subsequent audits.   Periodically the observations were summarized and discussed with the Firm's National Office.

3.      Review of Firm Management and Monitoring Processes Related to Audit
         Quality Control

The inspection team's approach to its review of the Firm's system of quality control was intended to further its understanding of how the Firm manages audit quality, so as to enhance its basis for assessing, in this year and in future years, whether that system is appropriately designed and implemented to achieve the goal of conducting audits that are in compliance with applicable standards.  The inspection team also continued its assessment of the Firm's processes and controls that relate to certain specific functional areas that relate to audit performance.  The overall approach was designed to identify possible defects in the design or operation of the Firm's system of quality control, while also continuing and enhancing the evaluation of the Firm's ability to respond effectively to indications of possible defects in its system of quality control.

a.      Review of Business Management

The objectives of the inspection procedures in this area were (a) to obtain an enhanced understanding of how the Firm's management is structured and operates the Firm's business, and the implications that the management structure and processes have on audit performance and (b) to continue assessing whether actions and communications by the Firm's leadership – the Firm's "tone at the top" – demonstrate a



**Public Company Accounting Oversight Board**

commitment to audit quality.  Toward that end, the inspection team interviewed members of the Firm's national, regional, and local leadership to obtain an understanding of the Firm's approach to, and processes for, its management, including the various management committees or other mechanisms, formal or informal, that relate to assessing and monitoring audit performance, or that otherwise affect audit performance.  The inspection team also obtained and reviewed significant management reports and documents, as well as information regarding financial metrics and the budget and goal setting processes that the Firm uses to plan for, and evaluate the success of, its business.

      b.     Review of Partner Management

      The objectives of the inspection procedures in this area were (a) to continue to assess whether the design and application of the Firm's processes related to partner evaluation, compensation, admission, termination, and disciplinary actions could be expected to encourage an appropriate emphasis on audit quality and technical competence, as compared to marketing or other activities of the Firm; (b) to assess the Firm's quality controls over the allocation of its partner resources; and (c) to identify and assess the accountability and responsibilities of the different levels of Firm management with respect to partner management.  The inspection team interviewed members of the Firm's management, as well as audit partners in practice offices, regarding these topics, and also reviewed and evaluated documentation related to certain of these topics.  In addition, the inspection team's interviews of audit partners included questions regarding their responsibilities and allocation of time and the interviews of Firm management included any situations where client management requested a change in the lead audit partner.  In addition, the inspection team reviewed a sample of partners' personnel files, including files of partners who resigned or took early retirement and partners who had significant negative inspection results from recent internal and PCAOB inspections.

      c.     Review of Client Acceptance and Retention, Including the Firm's Risk-Rating System

      The objectives of the inspection procedures in this area were to continue to assess whether the Firm appropriately considers and addresses the risks involved in accepting and retaining clients in the particular circumstances and to assess the Firm's responses to the risks identified, including the extent to which an observable link exists between the identified risks of material misstatement and the audit procedures performed.  Toward those objectives, the inspection team obtained an understanding of any changes in the acceptance and retention processes and evaluated the Firm's


Public Company Accounting Oversight Board

policies and procedures relating to the Firm's risk-rating systems.  The inspection team interviewed members of the Firm's management and selected a sample of issuer audits to (a) evaluate compliance with the Firm's policies and procedures for identifying and assessing the risks involved in accepting or continuing the client and (b) observe whether the audit procedures were responsive to the risks identified during the process.

      d.      Review of Policies Related to Foreign Affiliates

The objective of the inspection procedures in this area was to evaluate the processes the Firm uses to ensure that the audit work that its foreign affiliates perform on the foreign operations of U.S. issuers is effective and in accordance with applicable standards.  To accomplish its objective, the inspection team reviewed the Firm's policies and procedures related to its supervision and control of work performed by foreign affiliates on the operations of U.S. issuer clients, reviewed available information relating to the most recent foreign affiliated firms' internal inspections, interviewed members of the Firm's leadership, and reviewed the U.S. engagement teams' supervision and control procedures concerning the audit work that the Firm's foreign affiliates performed on a sample of audits.  The inspection team also reviewed, on a limited basis, certain of the audit work performed by the Firm's foreign affiliates on the foreign operations of U.S. issuer clients.

      e.      Review of Firm's Processes for Monitoring Audit Quality

      (i)      Review of Processes for Identifying and Assessing Indicators of Deficiencies in Audit Performance

The objective of the inspection procedures in this area was to identify and assess the monitoring processes that the Firm considers to be significant to its ability to monitor audit quality for individual engagements and for the Firm as a whole.  Toward that objective, the inspection team interviewed members of the Firm's management to build on its understanding of how the Firm identifies, evaluates, and responds to possible indicators of deficiencies in audit performance, including internal inspection findings, PCAOB inspection observations, restatements, and litigation.  In addition, the inspection team reviewed documents related to the design, operation, and findings of the Firm's internal inspection program.  The inspection team also reviewed certain audits that the Firm had inspected and compared its results to those from the internal inspection.



(ii)     Review of Response to Weaknesses in Quality Control

The objectives of the inspection procedures in this area were to assess the design and test the effectiveness of the Firm's processes for addressing possible deficiencies in the Firm's system of quality control, including any deficiencies in the Firm's system of quality control that were noted in prior PCAOB inspection reports. Toward those objectives, the inspection team reviewed steps the Firm has taken in the past several years to address possible quality control deficiencies.  The inspection team then assessed the design and evaluated the effectiveness of the processes identified. In addition, the inspection team conducted focused inspections of audits of certain issuers whose audits had been reviewed during previous PCAOB inspections of the Firm to ascertain whether the audit procedures in areas with previous deficiencies had been improved.

(iii)    Review of Certain Other Policies and Procedures Related to Monitoring Audit Quality

The procedures in this area included obtaining an update of the inspection team's understanding of policies, procedures, and guidance related to the Firm's independence requirements and its consultation processes and the Firm's compliance with them.   In addition, the inspection team reviewed documents, including certain newly issued policies and procedures, and interviewed Firm management to update its understanding of the Firm's methods for developing audit policies, procedures, and methodologies, including internal guidance and training materials.



**Public Company Accounting Oversight Board**

**APPENDIX C**

**RESPONSE OF THE FIRM TO DRAFT INSPECTION REPORT**

Pursuant to section 104(f) of the Act, 15 U.S.C. § 7214(f), and PCAOB Rule 4007(a), the Firm provided a written response to a draft of this report.  Pursuant to section 104(f) of the Act and PCAOB Rule 4007(b), the Firm's response, minus any portion granted confidential treatment, is attached hereto and made part of this final inspection report.[26]

---

[26]  In any version of an inspection report that the Board makes publicly available, any portions of a firm's response that address nonpublic portions of the report are omitted.  In some cases, the result may be that none of a firm's response is made publicly available.



**PricewaterhouseCoopers LLP**
400 Campus Drive
P. O. Box 988
Florham Park NJ 07932
Telephone (973) 236 4000
Facsimile (973) 236 5000

February 26, 2009

Mr. George H. Diacont
Director
Division of Registration and Inspections
Public Company Accounting Oversight Board
1666 K Street, N.W.
Washington, D.C.  20006

**Re:  PricewaterhouseCoopers LLP Response to Draft Report on 2008 Inspection of PricewaterhouseCoopers LLP**

Dear Mr. Diacont:

We are pleased to provide our response on the Public Company Accounting Oversight Board's (PCAOB or the "Board") Draft Report on the 2008 Inspection of our Firm's 2007 audits (the "Report").

We continue to support the PCAOB and we wish to convey our sincere appreciation for the professional efforts of the PCAOB Staff.  The on-going communication and interactions between the PCAOB Inspections Staff and our Firm contribute to our overall efforts to execute consistent, quality audits.  We remain highly focused on both performing quality audits and our system of quality control, the importance of which is even further underscored in today's difficult economic environment.  This economic environment further heightens the importance of sound professional judgment.  Fundamental to our view of audit quality is our conviction that, to perform a quality audit, each and every engagement must have a properly balanced focus on effectiveness and efficiency.  Our internal efforts continuously reinforce our commitment to audit quality, and we actively seek opportunities to further refine and enhance our system of quality control.  The PCAOB Inspection Report provides us with an added perspective and important input.

As with any audit process, judgments are necessarily involved in the PCAOB's inspection process.  We have carefully assessed each of the findings set forth in *Part I - Inspection Procedures and Certain Observations* of your Report under both our policies and PCAOB standards.  In the assessment of our ability to continue to support our previously-expressed opinion, we concluded that, in one instance (Issuer E), additional audit procedures were required under AU 390, *Consideration of Omitted Procedures After the Report Date,* and therefore performed.  With regard to other issuers identified in Part I, additional documentation, although minor, was added to our audit files.  We believe the matters raised on

# PRICEWATERHOUSECOOPERS 🅘

the other issuers were not significant.  In no instances did the additional procedures or documentation impact our conclusions, the issuer's financial statements, or our reports thereon.

We appreciate this opportunity to formally respond to the PCAOB's 2008 Draft Inspection Report.  We remain committed to working with the PCAOB in support of our continuous improvement efforts and our unwavering commitment to audit quality.  We would be pleased to discuss any aspect of our response or any further questions you may have.

Sincerely,

*PricewaterhouseCoopers LLP*

(2)