# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE COLONIAL BANCGROUP, INC., as post-confirmation debtor, and KEVIN O'HALLORAN, as plan trustee acting for and on behalf of the debtor, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:11-cv-00746-WKW |
| v. | ) ) ) | |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP, | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) ) ) | Case No. 2:12-cv-00957-WKW |
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP, | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANT CROWE HORWATH LLP'S
BRIEF IN SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT**

James Anderson (ANDE4440)
Copeland Franco Screws & Gill
444 South Perry Street
Montgomery, AL 36104
(334) 834-1180
Anderson@copelandfranco.com

Stanley J. Parzen
Jonathan C. Medow
Justin McCarty
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL  60606-4637
(312) 782-0600

*Attorneys for Crowe Horwath LLP*
October 14, 2015

## TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 2

    A. The Accountants' Roles ................................................................................. 2

    B. Crowe's Engagement Letters ........................................................................ 3

    C. The Alleged Fraud Schemes ......................................................................... 4

    D. Plaintiffs' Claims Against Crowe ................................................................. 6

SUMMARY JUDGMENT STANDARD ..................................................................... 7

ARGUMENT ............................................................................................................... 8

I.      The FDIC's Claims Are Fatally Flawed ........................................................ 8

    A.     The FDIC's Claims Against Crowe Are Time-Barred ....................... 8

    B.     The FDIC Cannot Sue Crowe Because The Bank Was Not Permitted To Rely On Crowe's Work ................................................. 11

II.    CBG Seeks Only Damages It Cannot Recover .............................................. 16

    A.     CBG Requests Only Consequential Damages .................................... 16

    B.     CBG's Claims For Consequential Damages Are Barred By The Engagement Terms .................................................................... 21

CONCLUSION ............................................................................................................ 23

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Atlantic City Assocs. v. Carter & Burgess Consultants*,
  453 F. App'x 174 (3d Cir. 2011) ........................................................................18, 19, 20, 21

*Badische Corp. v. Caylor*,
  825 F.2d 339 (11th Cir. 1987) .................................................................................13

*Bevelheimer v. Gierach*,
  339 N.E.2d 299 (Ill. App. Ct. 1975) .......................................................................15

*Bily v. Arthur Young & Co.*,
  834 P.2d 745 (Cal. 1992) .........................................................................................12

*Boykin v. Arthur Andersen & Co.*,
  639 So. 2d 504 (Ala. 1994), *overruled in part on other grounds*, *Altrust Fin. v.
  Adams*, 76 So. 3d 228 (Ala. 2011) .........................................................................12

*Bronstein v. GZA GeoEnvironmental*,
  665 A.2d 369 (N.H. 1995) .......................................................................................13

*Colonial Bank v. Ridley & Schweigert*,
  551 So. 2d 390 (Ala. 1989) ......................................................................................12

*Colonial BankGroup v. PricewaterhouseCoopers LLP*,
  __ F. Supp. 3d __, 2015 WL 3751090 (D.D.C. June 8, 2015) ................................15

*Cooper v. Meridian Yachts*,
  575 F.3d 1151 (11th Cir. 2009) ...............................................................................16

*Crommelin v. Montgomery Indep. Telecasters*,
  194 So. 2d 548 (Ala. 1967) ........................................................................17, 18, 19, 20, 21

*Dawson v. City of Montgomery*,
  2008 WL 659800 (M.D. Ala. Mar. 6, 2008) ...........................................................16

*DynCorp v. GTE Corp.*,
  215 F. Supp. 2d 308 (S.D.N.Y. 2002) ......................................................................22

*Ellis v. Grant Thornton LLP*,
  530 F.3d 280 (4th Cir. 2008) ...................................................................................13

*Evra Corp. v. Swiss Bank*,
  673 F.2d 951 (7th Cir. 1982) ...................................................................................18

## TABLE OF AUTHORITIES
(continued)

**Page**

*FDIC v. RBS Secs.*,
   798 F.3d 244 (5th Cir. 2015) ....................................................9

*Fleming Farms v. Dixie Ag Supply*,
   631 So. 2d 922 (Ala. 1994) .......................................................16

*Fox Alarm Co. v. Wadsworth*,
   913 So. 2d 1070 (Ala. 2005) .....................................................23

*Grand Pier Center v. ATC Group*,
   2008 WL 4933971 (N.D. Ill. Nov. 14, 2008) ...................13, 14

*Hartford Acc. & Indem. v. Case Foundation Co.*,
   294 N.E.2d 7 (Ill. App. Ct. 1973) .........................17, 19, 20, 21

*Hicks v. Airborne Express*,
   858 N.E.2d 48 (Ill. App. Ct. 2006) ...........................................22

*Ledlow v. Goodyear Tire & Rubber Co.*,
   189 So. 78 (Ala. 1939) ..............................................................15

*McCaleb v. A.O. Smith Corp.*,
   200 F.3d 747 (11th Cir. 2000) ..............................................7, 8

*National Credit Union Admin. Bd. v. Barclays Cap.*,
   785 F.3d 387 (10th Cir. 2015) ...................................9, 10, 11

*NCUA v. UBS Secs.*,
   2015 WL 3407863 (D. Kan. May 27, 2015) ...........................11

*North River Ins. v. Jones*,
   655 N.E.2d 987 (Ill. App. Ct. 1995) .........................................21

*O'Neal Homes v. City of Orange Beach*,
   333 F. App'x 428 (11th Cir. 2009) .............................................8

*Penncro Assocs. v. Sprint Spectrum*,
   499 F.3d 1151 (10th Cir. 2007) .........................18, 19, 20, 21

*Peoples Bank v. Crowe Chizek & Co.*,
   277 S.W.3d 255 (Ky. Ct. App. 2008) .......................................23

*Piazza v. Ebsco Indus.*,
   273 F.3d 1341 (11th Cir. 2001) .................................................8

**TABLE OF AUTHORITIES**
(continued)

Page

*Puckett, Taul & Underwood v. Schreiber Corp.*,
    551 So. 2d 979 (Ala. 1989) ...........................................................................22

*Saia Food Distribs. v. SecurityLink*,
    902 So. 2d 46 (Ala. 2004) ............................................................................23

*Sears Termite & Pest Control v. Robinson*,
    883 So. 2d 153 (Ala. 2003) ...........................................................................22

*Southland Farms v. Ciba-Geigy Corp.*,
    575 So. 2d 1077 (Ala. 1991) .........................................................................22

*Tractebel Energy v. AEP Power*,
    487 F.3d 89 (2d Cir. 2007) ......................................................................18, 19

*Tredennick v. Bone*,
    647 F. Supp. 2d 495 (W.D. Pa. 2007), *aff'd*, 323 F. App'x 103 (3d Cir. 2008) ..........12, 15, 16

*Usery*, *In re*,
    123 F.3d 1089 (8th Cir. 1997) ......................................................................18

*Wafra Leasing v. Prime Cap.*,
    2004 WL 1977572 (N.D. Ill. Aug. 31, 2004) ........................................................13

**Statutes and Rules**

12 U.S.C. § 1787(b)(14) ...................................................................................10

12 U.S.C. § 1821(d)(14)(A) ............................................................................9, 10

12 U.S.C. § 1821(d)(14)(A)-(B) .........................................................................8, 9

Ala. Code § 5-13B-8 ......................................................................................11

Ala. Code § 5-13B-8(c) ...................................................................................14

Ala. Code § 6-2-38 .........................................................................................8

Fed. R. Civ. P. 26 .....................................................................................18, 20

Fed. R. Civ. P. 56(a) ......................................................................................7

Pub. L. No. 110-343, § 101 *et seq.*, 122 Stat. 3765, 3767 (Oct. 3, 2008) (codified
    at 12 U.S.C.A. § 5211 *et seq.*) ....................................................................20

**TABLE OF AUTHORITIES**
(continued)

**Page**

**Other Authorities**

BLACK'S LAW DICTIONARY (9th ed. 2009) ....................................................................................17

RESTATEMENT (SECOND) OF TORTS § 552 .............................................................................14, 15

PCAOB Rules, § 3 Rule 3520.................................................................................................3

WILLISTON ON CONTRACTS § 64:12 (4th ed. 2015) ...............................................17, 18, 19, 20, 21

## INTRODUCTION

Colonial Bank ("Colonial" or the "Bank") was a subsidiary of Colonial BancGroup (together with its chapter 11 trustee, "CBG"). For years, insiders joined with a Bank customer, Taylor Bean & Whitaker Mortgage ("TBW"), in a fraudulent scheme that the insiders concealed from banking regulators and auditors; after the insiders finally ended that scheme, TBW embarked on a new fraud of its own, which it then concealed from the insiders. After the frauds were uncovered in 2009, the Bank failed and was taken over by the FDIC; its parent, CBG, filed for bankruptcy; and two insiders pled guilty to criminal charges. Now, CBG and the FDIC (in its capacity as the Bank's receiver) are suing PricewaterhouseCoopers LLP ("PwC") and Crowe Horwath LLP (formerly Crowe Chizek and Company LLC) ("Crowe"), attempting to blame them for not catching the criminal frauds.

The FDIC's claims against Crowe (three negligence claims) are barred for two independent reasons. *First*, the FDIC's claims are untimely under the applicable federal statute of limitations; the FDIC had a tolling agreement with Crowe, but the Tenth Circuit held recently that a virtually identical federal limitations provision *cannot* be extended by agreement—and the FDIC filed its claims against Crowe more than two months after the limitations period expired. This is a pure legal issue, based on the unambiguous language of the statute and the Crowe-FDIC tolling agreement. *Second*, Crowe's engagement letters and reports expressly prohibit third parties (such as the Bank, in whose shoes the FDIC is standing) from relying on Crowe's work. Courts around the country have held that similar prohibitions bar negligence-based claims by third parties, such as those asserted by the FDIC here, as a matter of law. The Court's earlier denial of Crowe's motion to dismiss on this ground was based on a misstatement by the FDIC that CBG was not subject to state banking regulations. But CBG was subject to state banking

1

regulations, as an Alabama statute and discovery in this case establish unequivocally.

Crowe is entitled to summary judgment on CBG's claims (breach of contract and negligence) because CBG's Rule 26 disclosures make clear that it is seeking only damages that it is barred from recovering. Pursuant to signed engagement letters, CBG (not the Bank) hired Crowe to provide certain outsourced internal audit services under CBG's direction. And those engagement letters, reflecting Crowe's limited role, expressly limited Crowe's potential exposure, barring all claims for consequential, special, and incidental damages. Courts in Illinois (whose law governs CBG's contract claim because of the engagement letters' choice-of-law provision) and Alabama (whose law governs CBG's negligence claim) regularly enforce consequential damages exclusions in cases between commercial parties.

CBG's damages disclosures and the documents produced in discovery make clear that CBG seeks *only* consequential damages: (1) CBG's downstream transfers of $734 million that it allegedly injected into the Bank in 2008 and 2009—money that the Bank later lost; (2) fees and expenses allegedly incurred in pursuing recapitalization under the federal TARP program in late 2008 and 2009; and (3) pension expenses that accrued after CBG's August 2009 bankruptcy filing. These are classic examples of consequential damages—alleged economic harm beyond the immediate scope of the Crowe-CBG contracts. If these are not consequential damages, nothing is.

## BACKGROUND

**A. The Accountants' Roles.** PwC and Crowe had different responsibilities in their work for CBG. As CBG's external auditor, PwC audited CBG's annual financial statements and CBG's assertions about the effectiveness of its internal controls over financial reporting. CBG Amended Complaint ("CBG Compl.") (Doc. No. 28) ¶¶ 10, 50; FDIC Second Amended

Complaint ("FDIC Compl.") ¶ 22 (Doc. No. 53, case no. 12-cv-957). PwC was required to act independently of CBG. PCAOB Rules, § 3 Rule 3520 ("A registered public accounting firm and its associated persons must be independent of the firm's audit client throughout the audit and professional engagement period") (available at http://pcaobus.org/Rules/PCAOBRules/Pages/Section_3.aspx#rule3520).

By contrast, Crowe worked for and under the direction of CBG. CBG conducted its own internal audits. Among other things, it employed a CPA, Pam Vitto, who worked out of the Bank's mortgage warehouse lending division ("MWLD"), and whose full-time job was performing internal audits of the MWLD throughout the year. FDIC Compl. ¶ 70; CBG Compl. ¶ 156. To supplement its internal audit staff, a company may also hire a third party to perform specified internal audit services if the third party remains under the company's control and direction. Bd. of Govrs. of Fed. Reserve, FDIC, OCC, Office of Thrift Supervision, *Interagency Policy Statement on the Internal Audit Function and its Outsourcing*, at 7-10 (Mar. 17, 2003) (Crowe Ex. 1).[1] In effect, a company can retain outside contractors to assist it in its internal audit work and avoid the costs of hiring additional employees itself. That was Crowe's narrow role: CBG hired Crowe to provide certain outsourced internal audit services under CBG's direction.

**B. Crowe's Engagement Letters.** From 2002 to August 2009, Crowe provided outsourced internal audit services to CBG; those services were detailed in substantially identical engagement letters signed annually by Crowe and CBG. CBG Compl. ¶¶ 119-20; see Crowe Ex. 2 (4/15/08 letter). The engagement letters, governed by Illinois law (Crowe Ex. 2 at 6), incorporated and attached additional terms that also apply to the parties' relationship and govern any disputes. *Id*. at 1, 6 & attached Engagement Terms.

The engagement letters stated that CBG hired Crowe "to provide internal audit services

---

[1] The exhibits cited herein are attached to the Declaration of Justin McCarty, filed concurrently.

for Colonial BancGroup, Inc." (defined in the letters as the "Bank"). *Id*. at 1. Each letter provided: "This Agreement is between the Bank [*i.e.*, CBG] and Crowe Chizek only. It is not intended that any other person or organization rely on the services rendered by Crowe Chizek under this letter." *Id*. The engagement terms also provided that specified types of damages were never recoverable:

> NO PUNITIVE OR CONSEQUENTIAL DAMAGES—Any liability of Crowe Chizek to you shall not include any special, consequential, incidental, punitive, or exemplary damages or loss nor any lost profits, savings, or business opportunity.

*Id*., Engagement Terms at 2. In addition, CBG and Crowe agreed in the engagement letters "to waive a trial by jury to facilitate judicial resolution and save time and expense of both parties." *Id*., Engagement Terms at 3.

**C. The Alleged Fraud Schemes.** Plaintiffs allege that fraud at Colonial Bank started in 2002 involving, among others, Cathie Kissick, director of Colonial's Mortgage Warehouse Lending Division ("MWLD"), and at least one other MWLD employee, Teresa Kelly, both of whom later pled guilty to federal criminal charges. FDIC Compl. ¶¶ 13-15; CBG Compl. ¶ 24. The schemes centered on an MWLD customer, TBW, a mortgage lender to which the MWLD provided financing. FDIC Compl. ¶¶ 1, 9; CBG Compl. ¶¶ 2, 17-18. The FDIC has admitted that "[t]he TBW fraud involved two separate and distinct frauds in timing and amount under two separate sets of loan sale agreements." Crowe Ex. 3 at 46 (FDIC 10/6/11 summary judgment reply in CBG-FDIC litigation). The first was a collusive fraud between insiders and TBW that lasted from 2002 until mid-2008. The second was a non-collusive fraud involving TBW alone, which began in late December 2008 and ended when the Bank was shut down in August 2009.

*1. The collusive fraud.* The first fraud had three phases, all concealed from bank regulators and auditors by insiders and TBW's chairman, Lee Farkas (now in federal prison).

4

FDIC Compl. ¶¶ 15, 17-20; CBG Compl. ¶¶ 3, 24. *First*, in 2002, TBW began overdrawing its accounts at Colonial by increasingly larger amounts; the overdrafts were concealed by the insiders. FDIC Compl. ¶ 17; CBG Compl. ¶¶ 23-24, 26. *Second*, in December 2003, the fraudsters transferred TBW's account deficit to "COLB," a mortgage loan purchase facility at MWLD. FDIC Compl. ¶¶ 11, 18; CBG Compl. ¶¶ 27-28. Under COLB, Colonial paid TBW for 99% participation interests in individual mortgage loans originated by TBW pending resale of the loans to investors; the Bank was to be repaid from the sale proceeds. FDIC Compl. ¶ 11; CBG Compl. ¶ 28. TBW—with the knowledge of the insiders—gave Colonial false loan data showing Colonial's interest in loans that were, in reality, worthless. FDIC Compl. ¶ 18; CBG Compl. ¶¶ 28-30.

*Third*, by mid-2005, TBW's deficit was transferred from COLB to MWLD's Assignment of Trade ("AOT") facility. FDIC Compl. ¶ 19; CBG Compl. ¶ 32. Under AOT, Colonial paid TBW for 99% participation interests in pools of loans rather than individual loans. FDIC Compl. ¶ 12; CBG Compl. ¶ 33. Here, too, the conspirators had Colonial buy fictitious assets, creating documents giving the false appearance that the valueless TBW pools were being sold periodically in securitizations. FDIC Compl. ¶¶ 19-20; CBG Compl. ¶¶ 3, 33.

*2. The non-collusive fraud.* A second fraud scheme began in late 2008. After Kissick told TBW's Farkas in mid-2008 that she would no longer participate in the fraud, Farkas responded by switching to another scheme, which he concealed from Kissick: from December 2008 through August 2009, TBW pledged the same COLB loans to both Colonial and other lenders. FDIC Compl. ¶ 21; CBG Compl. ¶ 36. The Bank advanced funds to TBW that were supposed to be repaid when a TBW affiliate, Ocala Funding, purchased the loans. FDIC Compl. ¶ 21; CBG Compl. ¶ 36. Those loans were in "shipped not paid" status—they were shipped to Ocala as

investor, but Ocala never bought the loans and Colonial was never repaid.

In 2009, CBG applied for funds under the Troubled Asset Relief Program ("TARP"). In August 2009, federal TARP investigators found fraud at both the Bank and TBW. CBG Compl. ¶ 45. The Alabama State Banking Department closed the Bank on August 14, 2009 and named the FDIC as its receiver. *Id*. ¶ 46; FDIC Compl. ¶ 1. CBG filed for bankruptcy on August 25, 2009.

**D. Plaintiffs' Claims Against Crowe.** The FDIC, suing in the Bank's shoes, alleges three claims against Crowe: professional negligence (FDIC Compl. ¶¶ 78-86), negligent misrepresentation (*id*. ¶¶ 95-98), and gross negligence (*id*. ¶¶ 87-89). The claims are based on allegations concerning only Crowe's work in 2006 and 2007. *Id*. ¶¶ 3, 61, 63, 67-68, 73-74, 77, 97. The FDIC's theory is that Crowe should have discovered the earlier AOT fraud involving loan pools (phase 3 of the collusive fraud) "no later than December 31, 2007" (*id*. ¶ 77), which supposedly would have prevented the separate shipped not paid fraud that began a year later (*id*. ¶ 21b). The FDIC does not allege that Crowe should have uncovered the 2008-2009 shipped not paid fraud.

CBG alleges that "Crowe knew or should have known throughout the course of [its] audits" that "funds were being siphoned out of [CBG] through the COLB account" (*i.e.*, phase 2, from December 2003 to mid-2005) "and later through the AOT account" (*i.e.*, phase 3, from mid-2005 to mid-2008) "without [CBG] receiving any value whatsoever." CBG Compl. ¶ 37. According to CBG, "Crowe … was grossly negligent in discharging its professional and contractual obligations and, as a result, the fraud went undetected for years." *Id*. ¶ 138. The FDIC contends that Crowe's purported negligence "continued throughout its representation of [CBG], from its 2002 internal audit engagement through its 2008-2009 internal audit

6

engagement." *Id.* ¶ 174. At the latest, CBG alleges, Crowe should have discovered fraud "by no later than late 2007 or early 2008." *Id.* ¶ 47.

CBG, which signed Crowe's engagement letters, asserts two claims against Crowe: breach of contract and accounting malpractice/professional negligence. *Id.* ¶¶ 171-80. CBG asserts that it was damaged, as the Bank's parent, because it "downstreamed" money to Colonial "from the second quarter of 2008 through the second quarter of 2009," when it was "[u]naware" of "fraud and the true state" of its own and the Bank's financial condition. *Id.* ¶ 48. In particular, CBG contends that it suffered losses on $734 million that it downstreamed to the Bank from late March 2008 through June 2009. Crowe Ex. 4 at 24-25 (CBG's initial disclosures). It also alleges other 2009 losses totaling $36.6 million: (a) expenses of about $5.5 million that CBG incurred from late 2008 through July 2009 in "pursuing recapitalization through the TARP application and pursuit of equity investment to supplement the TARP application," and (b) "unfunded benefit liabilities and the insurance premiums related thereto," which together total about $31.1 million. Crowe Ex. 4 at 26-28 (CBG's initial disclosures). CBG has informed the defendants that the latter amount consists of the unfunded portion of pensions for CBG employees that have accrued since it filed for bankruptcy. Declaration of Justin A. McCarty ¶ 17. CBG's Initial Disclosures disclose no other damages that it seeks in this case.

## SUMMARY JUDGMENT STANDARD

A defendant is entitled to summary judgment on a claim when it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In particular, summary judgment is warranted when, as a matter of law, the plaintiff cannot prove recoverable damages, *McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 753 (11th Cir. 2000), the claims are time-barred, *id.* at 752, or the plaintiff cannot establish

the element of reliance, *O'Neal Homes v. City of Orange Beach*, 333 F. App'x 428, 431 (11th Cir. 2009).

## ARGUMENT

## I.    The FDIC's Claims Are Fatally Flawed.

The FDIC does not assert a contract claim against Crowe (although it does do so against PwC). It alleges only three negligence claims: professional negligence (FDIC Compl. ¶¶ 78-86), negligent misrepresentation (*id*. ¶¶ 95-98), and gross negligence (*id*. ¶¶ 87-89). The FDIC's claims have at least two fatal problems that additional discovery cannot cure: (a) they are time-barred, and (b) Crowe's engagement letters and audit reports bar the FDIC from relying on Crowe's work.

### A.    The FDIC's Claims Against Crowe Are Time-Barred.

A federal statute sets the time limit for the FDIC to sue: "*Notwithstanding any provision of any contract*, the applicable statute of limitations" for tort claims by the FDIC as receiver "shall be" the longer of three years (from the date of its appointment as receiver) or the applicable state law period. 12 U.S.C. § 1821(d)(14)(A)-(B) (emphasis added). Tort claims in Alabama must be brought within two years after the injury, *Piazza v. Ebsco Indus.*, 273 F.3d 1341, 1347 (11th Cir. 2001); Ala. Code § 6-2-38, so the FDIC's claims are subject to the three-year period. The FDIC was appointed as the Bank's receiver on August 14, 2009 (FDIC Compl. ¶ 1), which means that the three-year period expired on August 14, 2012. The FDIC filed its complaint on October 31, 2012—2-1/2 months after the deadline.

On August 6, 2012, the FDIC asked Crowe if it was willing to agree to a tolling agreement. Crowe Ex. 5. On August 9, 2012, Crowe and the FDIC agreed "to toll and suspend

all timing defenses and statutes of limitation" until October 10, 2012. Crowe Ex. 6 at 1.[2] At the FDIC's request, that date was later extended to October 31, 2012. Crowe Ex. 7 ¶ 1 (8/31/12 extension). The parties agreed that the "Tolling Agreement contains the full and complete agreement of the Parties concerning the subject matter hereof," that "it may not be altered or amended except in writing executed by the Parties," and that "no Party has relied upon any statement, representation or warranty of the other Party that is not set forth expressly herein." Crowe Ex. 6 ¶ 10.

That tolling agreement could not extend the three-year limitations period, which is set by a statute establishing the maximum length of time for the FDIC to bring suit "[n]otwithstanding *any* provision of *any* contract." 12 U.S.C. § 1821(d)(14)(A)-(B) (emphasis added). In *National Credit Union Admin. Bd. v. Barclays Cap.*, 785 F.3d 387 (10th Cir. 2015), the Tenth Circuit held that a tolling agreement *cannot* extend the limitations period under an unambiguous statute that, as the FDIC's amicus brief in *Barclays* conceded, is "identical in all material respects to 12 U.S.C. § 1821(d)(14)(A)." Crowe Ex. 8 at 1-2. See also *FDIC v. RBS Secs.*, 798 F.3d 244, at 250 n.8 (5th Cir. 2015) (the NCUA statute "is for all intents and purposes identical to the FDIC" statute). The NCUA is the federal agency that regulates federally insured credit unions, just as the FDIC regulates federally insured banks. The Tenth Circuit case involved tolling agreements that the NCUA entered into with Barclays that "purported to exclude all time that passed during the settlement negotiations when 'calculating any statute of limitations … that might be

---

[2]    In particular, the tolling agreement provided: "Any and all statutes of limitations or repose that would have otherwise expired or lapsed at any time during the time period beginning on the Effective Date [August 9, 2012] and ending on October 10, 2012 (the 'Termination Date') shall be tolled, suspended, and not expire or lapse until after the Termination Date. … The Tolling Period shall not be included in the calculation of the time under any Statute of Limitations … . All Statutes of Limitations tolled pursuant to this Tolling Agreement will begin to run once again beginning on the day following the Termination Date." Crowe Ex. 6 ¶ 1.

applicable to any Potential Claim that the NCUA may have against Barclays.'" *Barclays*, 785 F.3d at 390 (quoting the agreements). Like the FDIC's statute, the NCUA statute (called the "Extender Statute") provided: "Notwithstanding any provision of any contract, the applicable statute of limitations" for tort claims brought by the NCUA "shall be" the longer of three years or the applicable state law period. 12 U.S.C. § 1787(b)(14).

The Tenth Circuit held that while "[f]ederal statutes of limitations can often be tolled by agreement … the text of the statute can override this general rule and prohibit tolling by agreement." 785 F.3d at 392. This was precisely what the Extender Statute's opening clause did: "'*[n]otwithstanding any provision of any contract*' … amounts to an express statement that the Extender Statute's limitations period cannot be tolled by agreement." *Id*. As a result, "contractual provisions purporting to toll that statute are ineffective," and "the NCUA's claims are outside the statutory periods and therefore untimely." *Id*. at 392, 395. The court went on to rule, however, that Barclays was estopped from asserting a limitations defense because it "expressly made a separate promise in the tolling agreements that it would not 'argue or assert' in any future litigation a statute of limitations defense that included the time passed in the … negotiations." *Id*. at 390; see *id*. at 395 ("we hold Barclays to that promise," which the NCUA "reasonably relied on").

Crowe's tolling agreement has no separate promise not to assert a limitations defense that counted the time when the statute was tolled (see Crowe Ex. 6), so that part of *Barclays* is irrelevant. But the Tenth Circuit's first holding is directly on point: the FDIC statute also establishes a limitations period that "shall" apply "[n]otwithstanding any provision of any contract." 12 U.S.C. § 1821(d)(14)(A). That "amounts to an express statement that the … periods cannot be tolled by agreement." *Barclays*, 785 F.3d at 392. The FDIC's limitations period thus

expired on August 14, 2012, and its claims against Crowe, not filed until October 31, 2012, "are outside the statutory period and therefore untimely." *Id*. at 395. See also *NCUA v. UBS Secs.*, 2015 WL 3407863, at *4 (D. Kan. May 27, 2015) (claims were untimely because Morgan Stanley's tolling agreement with the NCUA "did *not* include a separate express promise by Morgan Stanley not to rely on the period of the tolling agreement in asserting a limitations defense").

As a result, Crowe is entitled to summary judgment on all of the FDIC's claims against it. Further discovery will have no impact on this legal argument: it is based on the plain language of the statute and the tolling agreement, which together make clear that the FDIC's claims against Crowe are time-barred.

> **B.    The FDIC Cannot Sue Crowe Because The Bank Was Not Permitted To Rely On Crowe's Work.**

Crowe's engagement letters stated plainly that the agreement was between Crowe and CBG "*only*." Crowe Ex. 2 at 1 (4/15/08 letter) (emphasis added). The letters then provided: "It is not intended that *any other person or organization* rely on the services rendered by Crowe Chizek under this letter." *Id*. (emphasis added). The engagement letters also said that "federal and state banking regulators" would have "full and timely access" to Crowe's reports and related workpapers. *Id*. at 2. Similarly, Crowe's reports stated that they were prepared "in accordance with the terms of our engagement letter" and furnished "*solely*" for the "information and use of management, the Audit Committee, and the Board of Directors of *Colonial BancGroup, Inc*. and *its* regulatory agencies and [are] *not to be used for any other purpose*." Crowe Ex. 9, cover page (2008-2009 report) (emphasis added). CBG's federal regulator was the Federal Reserve, not the FDIC; its state regulator was the Superintendent of the Alabama State Banking Department. Ala. Code § 5-13B-8; Crowe Exs. 10-14.

By their plain terms, Crowe's engagement letters and reports *prohibit* the Bank from relying on Crowe's work. That fact dooms the FDIC's claims against Crowe, which is suing in the Bank's shoes and asserts only negligence-based claims. In Alabama and elsewhere, "'accountants retain control over their liability exposure'" to third parties suing in negligence. *Boykin v. Arthur Andersen & Co.*, 639 So. 2d 504, 510 (Ala. 1994) (ruling on a claim for professional negligence and quoting *First Nat'l Bank v. Monco Agency*, 911 F.2d 1053, 1059 (5th Cir. 1990)), *overruled in part on other grounds*, *Altrust Fin. v. Adams*, 76 So. 3d 228, 247 (Ala. 2011). It is well settled that an accountant and its client may "agree between themselves as to who will be permitted to rely" on the accountant's work. *Colonial Bank v. Ridley & Schweigert*, 551 So. 2d 390, 393, 395 (Ala. 1989) (affirming summary judgment for accountants on a third-party negligence claim because the accountant's duty "did not extend to Colonial").

Courts bar negligence claims against accountants when their agreements bar third parties from relying on the accountants' work. In *Tredennick v. Bone*, 647 F. Supp. 2d 495, 498 (W.D. Pa. 2007), an accountant's contract with its client provided that the accountant's work "'may not be relied upon by any third party,'" and the court thus dismissed a negligent misrepresentation claim by a third party (the client's primary shareholder): "because the operative contract … specifically excludes reliance upon the accounting information by any third party, plaintiff cannot establish that it was foreseeable that she would use or rely upon it." *Id*. at 502. The Third Circuit affirmed, holding that "Tredennick cannot establish it was foreseeable that she would use or rely on the accounting information KPMG provided because the contract between Resco and KPMG specifically forecloses third party reliance on such information." 323 F. App'x 103, 105 (3d Cir. 2008). See also *Bily v. Arthur Young & Co.*, 834 P.2d 745, 758 (Cal. 1992) ("there is no liability" to third parties when an accountant does work "with the express understanding the

12

report will be transmitted only to a specified bank and it is then transmitted to other[s]");
*Bronstein v. GZA GeoEnvironmental*, 665 A.2d 369, 372 (N.H. 1995) (affirming summary judgment on negligence and negligent misrepresentation claims; defendant did not owe non-clients a duty because its agreement had an express "limitation" that its report was for the "'exclusive use'" of its client).

The same rule applies when a report states that third parties cannot rely. *Ellis v. Grant Thornton LLP*, 530 F.3d 280, 289, 292 (4th Cir. 2008) (because "[t]he audit report plainly state[d] that [it] was *not* intended for use by third parties," plaintiff "could not justifiably rely" on the report); *Badische Corp. v. Caylor*, 825 F.2d 339, 341 (11th Cir. 1987) ("professional liability for negligence" "'may be, of course, limited by appropriate disclaimers which would alert those not in privity with the supplier of information that they may rely upon it only at their peril'") (affirming summary judgment for accountant under Georgia law); *Wafra Leasing v. Prime Cap.*, 2004 WL 1977572, at *14 (N.D. Ill. Aug. 31, 2004) (judgment as a matter of law for accounting firm on negligent misrepresentation claim because "'the plain language'" of the letter on which the claim was based "'defeat[ed] Wafra's argument that it could have reasonably relied upon [it]'"—it had "disclaimers limiting which parties may rely" and said that "'this report is intended solely for the use of the addressees'"); *Grand Pier Center v. ATC Group*, 2008 WL 4933971, at *2, 4 (N.D. Ill. Nov. 14, 2008) (granting summary judgment on negligence and negligent misrepresentation claims, because ATC's environmental report "stated it was intended for the sole use of RMC and could not be used or relied upon by another party without ATC's written consent," which "precluded [plaintiff's] reliance" as a matter of law).

When Crowe raised this argument in its motion to dismiss, the Court stated that "there is a question of fact whether Colonial … is eligible to recover" as a third party under

RESTATEMENT (SECOND) OF TORTS § 552, which Alabama has adopted. Doc. No. 52 at 11 (case no. 12-cv-957, 9/9/13 opinion). The Court agreed that the "language of the engagement letters … does appear to be an attempt by the accounting firms to limit their respective liabilities." *Id*. at 11-12. For two reasons, the Court stated that it was unable to "conclude as a matter of law at this stage" that the Bank (and hence the FDIC, standing in the Bank's shoes) "is precluded from bringing suit for professional negligence under Alabama law." *Id*. at 12.

*First*, and "[most] importantly," the Court noted that "the FDIC alleges facts … suggesting" that Crowe intended its work to benefit the Bank; "[i]n the case of Crowe," the Court cited its engagement letters, which said that Crowe "would 'grant federal and state banking regulators full and timely access'" to its reports. Doc. No. 52 at 12. The Court then stated that "Colonial—not [CBG]—was the entity subject to state banking regulations" (*id*.), evidently concluding from that assumption that Crowe's work was, in part, for Colonial's benefit. *Id*.

The Court's statement was apparently based on a misstatement in the FDIC's brief, which said (without citing anything) that "Colonial was the only entity being regulated by state banking regulators." Doc. No. 32 at 11 (case no. 12-cv-957). The FDIC was wrong. Contrary to its statement, CBG is subject to state banking regulations. See Ala. Code § 5-13B-8(c) ("The superintendent [of the Alabama State Banking Department] may examine an Alabama bank holding company whenever the superintendent has reason to believe that the company is not being operated in compliance with the laws of this state or in accordance with safe and sound banking practices"). Moreover, discovery demonstrates that the FDIC's statement was unquestionably incorrect: for example, Alabama State Banking Department employees regularly attended CBG Board meetings, and the Alabama Department (along with the Federal Reserve)

entered into a Memorandum of Understanding with CBG that addressed deficiencies in CBG's operations and required CBG to obtain the "prior written approval" of the State Banking Department before CBG could take specified actions. Crowe Exs. 10-14. Because CBG was regulated by state banking regulators,[3] the language of Crowe's engagement letters does not show that Crowe intended that its work would be available to the Bank—especially when that language is considered in conjunction with Crowe's reports, which stated that they were prepared "in accordance with the terms of our engagement letter" and furnished "*solely*" for the "information and use of management, the Audit Committee, and the Board of Directors of *Colonial BancGroup, Inc. and its regulatory agencies* and [are] not to be used for any other purpose." Crowe Ex. 9, cover page (2008-2009 report). The reference to "its regulatory agencies" is an unmistakable reference to CBG's regulatory agencies, not Colonial Bank's.

*Second*, the Court also noted that "[t]he practical realities of the relationship between the Bank and [CBG], whereby the Bank was a wholly owned subsidiary of [CBG] and [CBG's] only asset of significance, call those limitations into question." Doc. No. 52 at 12. Crowe's further analysis of this legal issue has not disclosed any case that has declined to enforce a no-reliance provision on the ground that under § 552, the separate legal existence of corporate entities can be ignored. To do so would contravene Alabama law, which has long followed the "'general rule'" that a parent and a subsidiary are "'distinct legal entit[ies].'" *Ledlow v. Goodyear Tire & Rubber Co.*, 189 So. 78, 80 (Ala. 1939); see also *Bevelheimer v. Gierach*, 339 N.E.2d 299, 303 (Ill. App. Ct. 1975) ("it is the general rule that one who has created a corporate entity will not be permitted to disregard it to gain an advantage which under it would be lost"). Indeed, the *Tredennick* court

---

[3]   Tellingly, despite regulators' "enormous amount of responsibility for the supervision and monitoring of banks," *Colonial BankGroup v. PricewaterhouseCoopers LLP*, __ F. Supp. 3d __, 2015 WL 3751090, at *3 (D.D.C. June 8, 2015) (referring to the OCC), none of the regulators discovered the frauds that occurred here.

enforced a very similar no-reliance provision against a third party who was not the accountant's client (a company called Resco), but "controlled approximately 92% of Resco's capital stock." 647 F. Supp. 2d at 497.

For all of these reasons, the unambiguous terms of Crowe's engagement letters *and* its reports do not permit Colonial or the FDIC, standing in Colonial's shoes, to rely on Crowe's work. Accordingly, the FDIC cannot assert its claims against Crowe.

## II.     CBG Seeks Only Damages It Cannot Recover.

As for CBG, it cannot recover from Crowe because it is seeking only consequential damages that purportedly resulted from Crowe's alleged negligence over a six-year period, from 2002 through early 2008. See CBG Compl. ¶¶ 37, 47, 138, 174. But consequential damages are expressly barred by the engagement letter that CBG and Crowe signed. As a result, Crowe is entitled to summary judgment on both of CBG's claims. *See Dawson v. City of Montgomery*, 2008 WL 659800, at *12 (M.D. Ala. Mar. 6, 2008) (Watkins, J.) (granting summary judgment because there is "no evidence" that the plaintiff suffered the type of damages required for a slander claim, and therefore he "cannot establish" an essential element of the claim); *Fleming Farms v. Dixie Ag Supply*, 631 So. 2d 922, 924, 926 (Ala. 1994) (affirming summary judgment because contract provision barring recovery for consequential damages precluded recovery for damage to crops caused when defendant's product was sprayed on plaintiff's cotton fields); *Cooper v. Meridian Yachts*, 575 F.3d 1151, 1168 (11th Cir. 2009) (Florida law) (holding on summary judgment that tort claims were "completely barred" by a limitation-of-liability provision, which "explicitly states that liability for 'consequential damages or other (indirect) damage ... is always excluded'").

### A.     CBG Requests Only Consequential Damages.

The engagement letters that CBG signed expressly limited Crowe's potential liability. The Engagement Terms explicitly bar recovery of any special, consequential, or incidental damages:

> NO PUNITIVE OR CONSEQUENTIAL DAMAGES—*Any liability* of Crowe Chizek to you *shall not include any special, consequential, incidental*, punitive, or exemplary *damages* or loss nor any lost profits, savings, or business opportunity.

Crowe Ex. 2, Engagement Terms at 2 (emphasis added). As the signatory, CBG is unquestionably bound by this contractual bar.

The engagement letters have an Illinois choice-of-law provision (Crowe Ex. 2 at 6) (4/15/08 letter), so CBG's contract claim against Crowe is governed by Illinois law; its negligence claim is governed by Alabama law. In both states, the definition of consequential damages is well settled. In Alabama, "consequential damages" are "special damages" that do "*not necessarily flow*[] from the breach of contract." *Crommelin v. Montgomery Indep. Telecasters*, 194 So. 2d 548, 551 (Ala. 1967) (emphasis added). In Illinois, "[c]onsequential damages mean loss or injury that does *not flow directly and immediately* from the wrongful act of a party but are the consequences or results of such an act." *Hartford Acc. & Indem. v. Case Foundation Co.*, 294 N.E.2d 7, 14 (Ill. App. Ct. 1973) (emphasis added). See also BLACK'S LAW DICTIONARY 445-46 (9th ed. 2009) ("consequential damages" are "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act"). Thus, consequential damages are "not an *invariable* result of *every* breach of th[e] sort" that has occurred and "they do not *always* follow a breach of this particular character," but rather "were reasonably foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of a breach." 24 Richard A. Lord, WILLISTON ON CONTRACTS § 64:12 (4th ed. 2015) (emphasis added). In contrast, general damages "follow *any breach* of similar character in

the usual course of events." *Id*. (emphasis added). See also *Crommelin*, 194 So. 2d at 551 ("General damages … necessarily flow from a wrongful act").

Accordingly, as the Third Circuit has explained, "collateral losses following the breach" of contract are consequential damages. *Atlantic City Assocs. v. Carter & Burgess Consultants*, 453 F. App'x 174, 179 (3d Cir. 2011). "'Direct damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while *consequential damages refer to economic harm beyond the immediate scope of the contract*.'" *Id*. (emphasis added; quoting *Penncro Assocs. v. Sprint Spectrum*, 499 F.3d 1151, 1156 (10th Cir. 2007)). Losses "'on collateral business arrangements'" are "'consequential damages.'" *Id*. (quoting *Tractebel Energy v. AEP Power*, 487 F.3d 89, 109 (2d Cir. 2007)). See also *Evra Corp. v. Swiss Bank*, 673 F.2d 951, 955 (7th Cir. 1982) (Posner, J.) (damages are consequential when the alleged harm resulted from a "chain reaction" of later events, such as "damages caused by failure or delay in carrying out a commercial undertaking"); *In re Usery*, 123 F.3d 1089, 1096 (8th Cir. 1997) (losses from investments in and loans to a company that plaintiffs bought based on misrepresentations about its financial condition, were "consequential damages").

At the motion-to-dismiss stage, the Court assumed the truth of CBG's allegations that it suffered "direct damages." Doc. No. 72 at 12 (9/9/14 opinion). At this stage, however, CBG's allegations are no longer "[t]aken as true." *Id*. The Court ordered CBG to disclose its damages in accordance with Fed. R. Civ. P. 26 (Doc. No. 69, 8/26/14 order), and CBG's disclosures confirm that it is seeking only consequential damages.

CBG's purported damages, which are the same for both of its claims against Crowe (breach of contract and professional negligence), fall into three categories of losses, all of which supposedly occurred "as a result of [Crowe's] wrongful conduct." Crowe Ex. 4 at 24 (CBG's

18

initial disclosures).

*First*, CBG seeks recovery for the $734 million that CBG purportedly invested in the Bank from late March 2008 through June 2009. *Id*. at 24-26. But Crowe's allegedly "wrongful conduct" that supposedly caused those downstream transfers (*id*. at 24) occurred "for years" (CBG Compl. ¶ 138) and "continued throughout its representation of [CBG], from its 2002 … engagement through its 2008-2009 … engagement" (*id*. ¶ 174). As a result, the downstream transfers are plainly consequential damages because they did "not flow directly and immediately from the [alleged] wrongful act[s]," *Hartford Acc. & Indem.*, 294 N.E.2d at 14, which occurred as long as six years earlier. Rather, the money that CBG says it injected into the Bank was lost in a "'collateral business arrangement[],'" which was "'economic harm beyond the immediate scope of the contract'"; the downstream transfers were not lost "'from the contract itself'" between CBG and Crowe; and therefore they constitute consequential damages. *Atlantic City Assocs.*, 453 F. App'x at 179 (quoting *Tractebel Energy*, 487 F.3d at 109, and *Penncro Assocs.*, 499 F.3d at 1156).

The downstream transfers are also consequential damages because they did "not necessarily flow[]" from the allegedly wrongful conduct, *Crommelin*, 194 So. 2d at 551—they were "not an invariable result of every breach of this sort." WILLISTON § 64:12. As noted, the purported breaches had been going on for years. But downstream transfers had *not* followed in their wake. Quite the contrary. During each year between 2002 and 2007, CBG pulled millions of dollars *out* of the Bank on a net basis in the form of dividends. In 2006 and 2007 alone, CBG "downstreamed" nothing and took out *over $900 million* of the Bank's cash. Crowe Ex. 15, Schedule R1-A, line 9 (call reports). That CBG would suddenly shift gears and reverse the flow of payments starting in the first quarter of 2008 was neither foreseeable to Crowe nor—given

19

CBG's prior contrary behavior—the "invariable result" of Crowe's supposedly continuing course of conduct. CBG's purported downstream transfers are not recoverable. *See* WILLISTON § 64:12 (even damages that are "reasonably foreseeable or contemplated by the parties at the time" they sign a contract are consequential when do not "invariabl[y] result" from "every breach" of the sort alleged and "do not always follow a breach of this particular character").

*Second*, CBG seeks to recover approximately $5.5 million in fees and expenses that CBG allegedly incurred from late 2008 through July 2009 in "pursuing recapitalization" through a TARP application and seeking additional equity investment "to supplement the TARP application." Crowe Ex. 4 at 26 (CBG's initial disclosures). The TARP program did not even exist until October 3, 2008 (*see* Pub. L. No. 110-343, § 101 *et seq.*, 122 Stat. 3765, 3767 (Oct. 3, 2008) (codified at 12 U.S.C.A. § 5211 *et seq.*)), and CBG contends that Crowe should have discovered fraud much earlier—at the latest, by "late 2007 or early 2008." CBG Compl. ¶ 47. CBG's TARP-related expenses obviously did not "flow directly and immediately," *Hartford Acc. & Indem.*, 294 N.E.2d at 14, "necessarily," *Crommelin*, 194 So. 2d at 551, or "invariabl[y]," WILLISTON § 64:12, from alleged conduct that occurred before TARP was created. Again, those alleged losses are "'economic harm beyond the immediate scope of the contract.'" *Atlantic City Assocs.*, 2011 453 F. App'x at 179 (quoting *Penncro Assocs.*, 499 F.3d at 1156). As a result, the TARP-related expenses cannot possibly be direct damages; they must be consequential damages.

*Third*, CBG seeks recovery for about $31.1 million in "unfunded benefit liabilities and the insurance premiums related thereto." Crowe Ex. 4 at 28. This cryptic description does not comply with CBG's Rule 26 obligations, particularly in light of its statement, in the same disclosure, that "CBG believes the benefit plan materials" contained in about 35 boxes related to CBG's benefit plans "are irrelevant to the pending litigation." *Id.* at 18. From discussions with

20

CBG's counsel, this damages item apparently concerns the unfunded portion of pensions for CBG employees that have accrued since its bankruptcy filing. If so, pension-related expenses do not "invariabl[y]," WILLISTON § 64:12, "necessarily," *Crommelin*, 194 So. 2d at 551, or "directly and immediately," *Hartford Acc. & Indem.*, 294 N.E.2d at 14, flow from the type of conduct alleged here. Pension and insurance expenses are "collateral losses following the breach" and alleged "'economic harm beyond the immediate scope of the contract'" between CBG and Crowe. *Atlantic City Assocs.*, 543 F. App'x at 179 (quoting *Penncro Assocs.*, 499 F.3d at 1156). Accordingly, the pension-related expenses are consequential damages, not direct damages.

In sum, CBG is seeking only consequential damages—it seeks to recover for purported losses in other, separate transactions and alleged collateral losses that occurred outside of the CBG-Crowe contract. Indeed, if the damages sought here are not consequential damages, it is difficult to see what would be. And as the cases discussed next establish, the contractual provision that bars recovery for consequential damages applies to both of the claims that CBG asserts against Crowe.

## B.     CBG's Claims For Consequential Damages Are Barred By The Engagement Terms.

Illinois and Alabama regularly enforce contractual provisions in commercial contracts that limit or exclude damages. In Illinois, because of "'the principle of freedom of contract, contractual limitations are generally held valid'"; absent "'a legislative directive to the contrary, exculpatory provisions must be deemed valid and enforceable.'" *North River Ins. v. Jones*, 655 N.E.2d 987, 992 (Ill. App. Ct. 1995) (affirming dismissal of a negligence claim arising from a fire alarm system's failure, because the contract excluded consequential damages and permitted recovery only of liquidated damages of $250). Because "[p]ublic policy permits competent parties to contractually allocate business risks as they see fit," parties "'may contract for an

exclusive remedy that limits their rights, duties[,] and obligations.'" *Hicks v. Airborne Express*, 858 N.E.2d 48, 51, 54 (Ill. App. Ct. 2006) (affirming summary judgment in a breach-of-contract action and enforcing a contract provision that barred all "'special, incidental[,] or consequential damages'"). Here, the contract that CBG signed expressly excludes special, consequential, and incidental damages in any circumstance. Crowe Ex. 2, Engagement Terms at 2. Because the parties "voluntarily chose to distribute the risks in a manner represented by the contract language" and "no public policy … bar[s] the contract's exclusive remedy provision," *Hicks*, 858 N.E.2d at 55, Crowe is entitled to summary judgment on CBG's contract claim. See also *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 313, 318 (S.D.N.Y. 2002) (dismissing contract claims seeking consequential damages because they were barred by a provision excluding "'any consequential, special or punitive damages'"; the plaintiff and defendant were "sophisticated parties ... and [the Court] may not re-write how the parties defined their rights and obligations, allocated their risks, and limited their liabilities and rights of recovery").

The same result applies to CBG's tort claim against Crowe (accounting malpractice/ professional negligence), which is governed by Alabama law. As in Illinois, it is well settled in Alabama that "[c]ommercial parties may contract freely to limit the remedies available to them." *Puckett, Taul & Underwood v. Schreiber Corp.*, 551 So. 2d 979, 983 (Ala. 1989). Accord, *e.g.*, *Southland Farms v. Ciba-Geigy Corp.*, 575 So. 2d 1077, 1079 (Ala. 1991) (reaffirming "the validity of risk-shifting provisions in the commercial context"). Alabama regularly applies and enforces contractual damages exclusions with respect to negligence claims. See *Puckett, Taul & Underwood*, 551 So. 2d at 982-83 (affirming summary judgment because a contract clause excluding "'any consequential, incidental or liquidated damages'" barred the damages sought in a negligence claim based on the failure of defendant's equipment); *Sears Termite & Pest Control*

*v. Robinson*, 883 So. 2d 153, 154, 158 (Ala. 2003) (negligence claims were covered by a clause stating that "'[i]n no event shall Sears be responsible … for indirect expenses or consequential damages'"); *Saia Food Distribs. v. SecurityLink*, 902 So. 2d 46, 50, 55 (Ala. 2004) (a contract with a security alarm company, which limited damages to the $5,800 cost of the security equipment and barred any "'consequential, collateral, incidental or other damages,'" was enforceable as a matter of law in a negligence case); *Fox Alarm Co. v. Wadsworth*, 913 So. 2d 1070, 1076 (Ala. 2005) (on a negligence claim, enforcing as a matter of law a general limitation-of-liability provision that limited damages to $250 and therefore reversing a $200,000 jury verdict).[4]

As a party to the agreement, CBG is plainly bound by the contract's explicit provision excluding consequential damages. And because CBG seeks only consequential damages, which are unambiguously barred by the engagement letter, it cannot recover anything from Crowe.

---

[4]    See also *Peoples Bank v. Crowe Chizek & Co.*, 277 S.W.3d 255, 266-67 (Ky. Ct. App. 2008) (holding that a similar Crowe engagement letter—stating that recoverable damages could not "'include any special, consequential, incidental or exemplary damages or loss'"—was enforceable "according to its plain terms" and barred any consequential damages "arising from Crowe Chizek's negligence in performing the audit for fiscal year 2001").

**CONCLUSION**

Crowe respectfully requests that the Court grant summary judgment on all of the claims alleged against it. The flaws in those claims discussed above cannot be fixed by discovery, and therefore the claims against Crowe should be disposed of now.

October 14, 2015                                          Respectfully submitted,


                                                         *s/  James Anderson*
Stanley J. Parzen                                        James Anderson (ANDE4440)
Jonathan C. Medow                                        Copeland Franco Screws & Gill
Justin A. McCarty                                        444 South Perry Street
Mayer Brown LLP                                          Montgomery, AL 36104
71 South Wacker Drive                                    (334) 834-1180
Chicago, IL  60606-4637                                  Anderson@copelandfranco.com
(312) 782-0600
sparzen@mayerbrown.com

                   *Attorneys for Crowe Horwath LLP*