# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE COLONIAL BANCGROUP, INC., as post-confirmation debtor, and KEVIN O'HALLORAN, as plan trustee acting for and on behalf of the debtor, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:11-cv-00746-WKW |
| v. | ) ) | |
| PRICEWATERHOUSECOOPERS LLP, and CROWE HORWATH LLP, | ) ) ) | |
| Defendants. | ) ) ) | |
| | ) ) | Case No. 2:12-cv-00957-WKW |
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP, | ) ) ) | |
| Defendants. | ) ) ) | |

## DECLARATION OF JUSTIN A. MCCARTY IN SUPPORT OF CROWE HORWATH LLP'S MOTIONS FOR SUMMARY JUDGMENT

STATE OF ILLINOIS, COUNTY OF COOK

I, Justin A. McCarty, being of lawful age and duly sworn, deposes and says:

1.  I am an attorney duly admitted to practice before this Court *pro hac vice*. I am an associate at Mayer Brown LLP, attorneys for Defendant Crowe Horwath LLP ("Crowe"). I submit this declaration in support of Crowe's concurrently filed Motions for Summary Judgment.

1

2.      Attached as Exhibit 1 is a true and correct copy of the Board of Governors of the Federal Reserve, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, and Office of Thrift Supervision, *Interagency Policy Statement on the Internal Audit Function and its Outsourcing* (Mar. 17, 2003), available at http://www.occ.gov/news-issuances/bulletins/2003/bulletin-2003-12a.pdf.

3.      Attached as Exhibit 2 is a true and correct copy of the engagement letter executed by Crowe and Colonial Bancgroup, Inc. ("CBG"), dated April 15, 2008 (produced by Crowe as CH195951-195959).

4.      Attached as Exhibit 3 is a true and correct copy of an exerpt from the Reply Memorandum in Further Support of FDIC-Receiver's Motion for Summary Judgment on All Claims in *The Colonial BancGroup, Inc. v. FDIC*, No. 2:10-cv-198-MHT (M.D. Ala.) (filed October 6, 2011).

5.      Attached as Exhibit 4 is a true and correct copy of an excerpt from the initial disclosures served on Crowe by CBG on October 24, 2014.

6.      Attached as Exhibit 5 is a true and correct copy of an email sent by David Mullin, counsel for the FDIC, to Stanley Parzen, counsel for Crowe, dated August 6, 2012.

7.      Attached as Exhibit 6 is a true and correct copy of the August 9, 2012 Tolling Agreement between Crowe and the FDIC.

8.      Attached as Exhibit 7 is a true and correct copy of the August 31, 2012 Tolling Agreement Extension between Crowe and the FDIC.

9.      Attached as Exhibit 8 is a true and correct copy of an excerpt from the Brief of Amicus Curiea [*sic*] Federal Deposit Insurance Corporation in Support of Appellant in *National Credit Union Admin. Bd. v. Barclays Cap.*, Case No. 13-3183 (10th Cir.) (filed Aug. 30, 2013).

10.     Attached as Exhibit 9 is a true and correct copy of the Colonial BancGroup, Inc. Internal Audit Report, Mortgage Warehouse Lending 2008-2009 (produced by Crowe as CH05812-5822).

11.     Attached as Exhibit 10 is a true and correct copy of the Memorandum of Understanding By and Among The Colonial BancGroup, Inc., Federal Reserve Bank of Atlanta, and State of Alabama, State Banking Department (produced by CBG as CBG-Leg-0059160-59163). This document is filed under seal.

12.     Attached as Exhibit 11 is a true and correct copy of the Meeting Minutes, Meeting of the Board of Directors of The Colonial BancGroup, Inc., July 16, 2008 (produced by CBG as CBG-Leg-0047408-47421). This document is filed under seal.

13.     Attached as Exhibit 12 is a true and correct copy of an excerpt from the Meeting Minutes, Meeting of the Board of Directors of The Colonial BancGroup, Inc., January 21, 2009 (produced in full by CBG as CBG-Leg-0059107-59159; excerpt is 0059107-59109). This document is filed under seal.

14.     Attached as Exhibit 13 is a true and correct copy of the Meeting Minutes, Special Joint Meeting of the Board of Directors of Colonial Bank and The Colonial BancGroup, Inc., May 27, 2009 (produced by CBG as CBG-Leg-0069778-69783). This document is filed under seal.

15.     Attached as Exhibit 14 is a true and correct copy of the Meeting Minutes, Special Joint Meeting of the Board of Directors of Colonial Bank and The Colonial BancGroup, Inc., July 15, 2009 (produced as FDIC-R-COL-PWC-CROWE-E-05054697-5054703). This document is filed under seal.

16.     Attached as Exhibit 15 are true and correct copies of excepts from the Federal

Financial Institutions Examination Counsel, Consolidated Reports of Condition and Income for Colonial Bank N.A., Schedule RI-A – Changes in Equity Capital (for the quarters ended 12/31/2002, 12/31/2003, 12/31/2004, 12/31/2005, 12/31/2006, 12/31/2007, 9/30/2008), available at https://cdr.ffiec.gov/public/ManageFacsimiles.aspx (search for Report: Call/TFR; Institution Name: Colonial Bank; State or Territory: Alabama; and for each quarter Report Date, Single Date: 12/31/2002, 12/31/2003, 12/31/2004, 12/31/2005, 12/31/2006, 12/31/2007, 9/30/2008).

17.     On August 21, 2015, I took part in a conference call with Rufus Dorsey, counsel for CBG and the bankruptcy trustee. During this call Mr. Dorsey represented that the "unfunded benefit liabilities and the insurance premiums related thereto" disclosed as damages in CBG's initial disclosures consist of the unfunded portion of pensions for CBG employees that have accrued since CBG filed for bankruptcy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 12, 2015

# EXHIBIT 1

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://www.occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

**OCC 2003-12**

Attachment

**Board of Governors of the Federal Reserve System**
**Federal Deposit Insurance Corporation**
**Office of the Comptroller of the Currency**
**Office of Thrift Supervision**

# INTERAGENCY POLICY STATEMENT ON THE INTERNAL AUDIT FUNCTION AND ITS OUTSOURCING

## March 17, 2003

## INTRODUCTION

Effective internal control[1] is a foundation for the safe and sound operation of a financial institution (institution).[2] The board of directors and senior management of an institution are responsible for ensuring that the system of internal control operates effectively. Their responsibility *cannot* be delegated to others within the institution or to outside parties. An important element in assessing the effectiveness of the internal control system is an internal audit function. When properly structured and conducted, internal audit provides directors and senior management with vital information about weaknesses in the system of internal control so that management can take prompt, remedial action. The federal banking agencies'[3] (agencies) long-standing examination policies call for examiners to review an institution's internal audit function and recommend improvements, if needed. In addition, pursuant to Section 39 of the Federal Deposit Insurance Act (FDI Act) (12 U.S.C. 1831p-1), the agencies have adopted Interagency Guidelines Establishing Standards for Safety and Soundness that apply to insured

---

[1] In summary, internal control is a process designed to provide reasonable assurance that the institution will achieve the following internal control objectives: efficient and effective operations, including safeguarding of assets; reliable financial reporting; and, compliance with applicable laws and regulations. Internal control consists of five components that are a part of the management process: control environment, risk assessment, control activities, information and communication, and monitoring activities. The effective functioning of these components, which is brought about by an institution's board of directors, management, and other personnel, is essential to achieving the internal control objectives. This description of internal control is consistent with the Committee of Sponsoring Organizations of the Treadway Commission (COSO) report *Internal Control—Integrated Framework.* In addition, under the COSO framework, financial reporting is defined in terms of published financial statements, which, for purposes of this policy statement, encompasses both financial statements prepared in accordance with generally accepted accounting principles and regulatory reports (such as the Reports of Condition and Income and the Thrift Financial Report). Institutions are encouraged to evaluate their internal control against the COSO framework if they are not already doing so.

[2] The term "institution" includes depository institutions insured by the Federal Deposit Insurance Corporation (FDIC), U.S. financial holding companies and bank holding companies supervised by the Federal Reserve System, thrift holding companies supervised by the Office of Thrift Supervision (OTS), and the U.S. operations of foreign banking organizations.

[3] Board of Governors of the Federal Reserve System, FDIC, Office of the Comptroller of the Currency, and OTS.

---

The OCC now supervises federal savings associations (FSA). References to regulatory citations,
reporting requirements, or other guidance for FSAs contained in this document may have changed.
Please see http://www.occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the
latest information on rule, reporting and guidance changes.

depository institutions.[4]  Under these guidelines and policies, each institution should have an
internal audit function that is appropriate to its size and the nature and scope of its activities.

In addressing various quality and resource issues, many institutions have been engaging
independent public accounting firms and other outside professionals (outsourcing vendors) in
recent years to perform work that traditionally has been done by internal auditors.  These
arrangements are often called "internal audit outsourcing," "internal audit assistance," "audit
co-sourcing," and "extended audit services" (hereafter collectively referred to as outsourcing).
Typical outsourcing arrangements are more fully illustrated in Part II below.

Outsourcing may be beneficial to an institution if it is properly structured, carefully conducted,
and prudently managed.  However, the agencies have concerns that the structure, scope, and
management of some internal audit outsourcing arrangements do not contribute to the
institution's safety and soundness.  Furthermore, the agencies want to ensure that these
arrangements with outsourcing vendors do not leave directors and senior management with the
erroneous impression that they have been relieved of their responsibility for maintaining an
effective system of internal control and for overseeing the internal audit function.

This policy statement sets forth key characteristics of the internal audit function in Part I.  Sound
practices concerning the use of outsourcing vendors are discussed in Part II.  Part III discusses
the effect outsourcing arrangements have on the independence of an external auditor who also
provides internal audit services to an institution.  Part III also discusses the prohibition on
internal audit outsourcing to a public company's external auditor under the Sarbanes-Oxley Act
of 2002,[5] the effect of this prohibition on insured depository institutions subject to the annual
audit and reporting requirements of Section 36 of the FDI Act (12 U.S.C. 1831m), and the
agencies' views on compliance with this provision of the Sarbanes-Oxley Act by institutions not
subject to Section 36 (including smaller depository institutions) that are not publicly-held.
Finally, Part IV of this statement provides guidance to examiners concerning their reviews of
internal audit functions and related matters.

## PART I — THE INTERNAL AUDIT FUNCTION

### Board and Senior Management Responsibilities

The board of directors and senior management are responsible for having an effective system of
internal control and an effective internal audit function in place at their institution.  They are also
responsible for ensuring that the importance of internal control is understood and respected
throughout the institution.  This overall responsibility *cannot* be delegated to anyone else.  They
may, however, delegate the design, implementation and monitoring of specific internal controls

---

[4]  For national banks, Appendix A to Part 30; for state member banks, Appendix D-1 to Part 208; for insured state
nonmember banks and insured state-licensed branches of foreign banks, Appendix A to Part 364; for savings
associations, Appendix A to Part 570.

[5]  Pub. L. 107-204, 116 Stat. 745 (2002).

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://www.occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

to lower-level management and the testing and assessment of internal controls to others. Accordingly, directors and senior management should have reasonable assurance that the system of internal control prevents or detects significant inaccurate, incomplete, or unauthorized transactions; deficiencies in the safeguarding of assets; unreliable financial reporting (which includes regulatory reporting); and deviations from laws, regulations, and the institution's policies.[6]

Some institutions have chosen to rely on so-called "management self-assessments" or "control self-assessments," wherein business line managers and their staff evaluate the performance of internal controls within their purview.  Such reviews help to underscore management's responsibility for internal control, but they are not impartial.  Directors and members of senior management who rely too much on these reviews may not learn of control weaknesses until they have become costly problems, particularly if directors are not intimately familiar with the institution's operations.  Therefore, institutions generally should also have their internal controls tested and evaluated by units without business-line responsibilities, such as internal audit groups.

Directors should be confident that the internal audit function addresses the risks and meets the demands posed by the institution's current and planned activities.  To accomplish this objective, directors should consider whether their institution's internal audit activities are conducted in accordance with professional standards, such as the Institute of Internal Auditors' (IIA) *Standards for the Professional Practice of Internal Auditing*.  These standards address independence, professional proficiency, scope of work, performance of audit work, management of internal audit, and quality assurance reviews.  Furthermore, directors and senior management should ensure that the following matters are reflected in their institution's internal audit function.

*Structure*.  Careful thought should be given to the placement of the audit function in the institution's management structure.  The internal audit function should be positioned so that the board has confidence that the internal audit function will perform its duties with impartiality and not be unduly influenced by managers of day-to-day operations.  The audit committee,[7] using objective criteria it has established, should oversee the internal audit function and evaluate its performance.[8]  The audit committee should assign responsibility for the internal audit function

---

[6] Under Section 36 of the FDI Act, as implemented by Part 363 of the FDIC's regulations (12 CFR 363), FDIC-insured depository institutions with total assets of $500 million or more must submit an annual management report signed by the chief executive officer (CEO) and chief accounting or chief financial officer.  This report must discuss management's responsibility for financial reporting controls and assess the effectiveness of those controls as well as the institution's compliance with designated laws and regulations.

[7] Depository institutions subject to Section 36 of the FDI Act and Part 363 of the FDIC's regulations must maintain independent audit committees (i.e., comprised of directors who are not members of management).  Consistent with the 1999 Interagency Policy Statement on External Auditing Programs of Banks and Savings Associations, the agencies also encourage the board of directors of each depository institution that is not otherwise required to do so to establish an audit committee consisting entirely of outside directors.  Where the term "audit committee" is used in this policy statement, the board of directors may fulfill the audit committee responsibilities if the institution is not subject to an audit committee requirement.

[8] For example, the performance criteria could include the timeliness of each completed audit, comparison of overall performance to plan, and other measures.

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance related to FSAs or thrift institutions in this document may have changed. Please see http://www.occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

to a member of management (hereafter referred to as the manager of internal audit or internal audit manager) who understands the function and has no responsibility for operating the system of internal control. The ideal organizational arrangement is for this manager to report directly and solely to the audit committee regarding both audit issues and administrative matters, e.g., resources, budget, appraisals, and compensation. Institutions are encouraged to consider the IIA's *Practice Advisory 2060-2: Relationship with the Audit Committee*, which provides more guidance on the roles and relationships between the audit committee and the internal audit manager.

Many institutions place the manager of internal audit under a dual reporting arrangement: functionally accountable to the audit committee on issues discovered by the internal audit function, while reporting to another senior manager on administrative matters. Under a dual reporting relationship, the board should consider the potential for diminished objectivity on the part of the internal audit manager with respect to audits concerning the executive to whom he or she reports. For example, a manager of internal audit who reports to the chief financial officer (CFO) for performance appraisal, salary, and approval of department budgets may approach audits of the accounting and treasury operations controlled by the CFO with less objectivity than if the manager were to report to the chief executive officer. Thus, the chief financial officer, controller, or other similar officer should ideally be excluded from overseeing the internal audit activities even in a dual role. The objectivity and organizational stature of the internal audit function are best served under such a dual arrangement if the internal audit manager reports administratively to the CEO.

Some institutions seek to coordinate the internal audit function with several risk monitoring functions (e.g., loan review, market risk assessment, and legal compliance departments) by establishing an administrative arrangement under one senior executive. Coordination of these other monitoring activities with the internal audit function can facilitate the reporting of material risk and control issues to the audit committee, increase the overall effectiveness of these monitoring functions, better utilize available resources, and enhance the institution's ability to comprehensively manage risk. Such an administrative reporting relationship should be designed so as to not interfere with or hinder the manager of internal audit's functional reporting to and ability to directly communicate with the institution's audit committee. In addition, the audit committee should ensure that efforts to coordinate these monitoring functions do not result in the manager of internal audit conducting control activities nor diminish his or her independence with respect to the other risk monitoring functions. Furthermore, the internal audit manager should have the ability to independently audit these other monitoring functions.

In structuring the reporting hierarchy, the board should weigh the risk of diminished independence against the benefit of reduced administrative burden in adopting a dual reporting organizational structure. The audit committee should document its consideration of this risk and mitigating controls. The IIA's *Practice Advisory 1110-2: Chief Audit Executive Reporting Lines* provides additional guidance regarding functional and administrative reporting lines.

*Management, staffing, and audit quality.* In managing the internal audit function, the manager of internal audit is responsible for control risk assessments, audit plans, audit programs, and audit reports.

- A control risk assessment (or risk assessment methodology) documents the internal auditor's understanding of the institution's significant business activities and their associated risks. These assessments typically analyze the risks inherent in a given business line, the mitigating control processes, and the resulting residual risk exposure of the institution. They should be updated regularly to reflect changes to the system of internal control or work processes, and to incorporate new lines of business.

- An internal audit plan is based on the control risk assessment and typically includes a summary of key internal controls within each significant business activity, the timing and frequency of planned internal audit work, and a resource budget.

- An internal audit program describes the objectives of the audit work and lists the procedures that will be performed during each internal audit review.

- An audit report generally presents the purpose, scope, and results of the audit, including findings, conclusions, and recommendations. Workpapers that document the work performed and support the audit report should be maintained.

Ideally, the internal audit function's only role should be to independently and objectively evaluate and report on the effectiveness of an institution's risk management, control, and governance processes. Internal auditors increasingly have taken a consulting role within institutions on new products and services and on mergers, acquisitions, and other corporate reorganizations. This role typically includes helping design controls and participating in the implementation of changes to the institution's control activities. The audit committee, in its oversight of the internal audit staff, should ensure that the function's consulting activities do not interfere or conflict with the objectivity it should have with respect to monitoring the institution's system of internal control. In order to maintain its independence, the internal audit function should not assume a business-line management role over control activities, such as approving or implementing operating policies or procedures, including those it has helped design in connection with its consulting activities. The agencies encourage internal auditors to follow the IIA's standards, including guidance related to the internal audit function acting in an advisory capacity.

The internal audit function should be competently supervised and staffed by people with sufficient expertise and resources to identify the risks inherent in the institution's operations and assess whether internal controls are effective. The manager of internal audit should oversee the staff assigned to perform the internal audit work and should establish policies and procedures to guide the audit staff. The form and content of these policies and procedures should be consistent with the size and complexity of the department and the institution. Many policies and procedures may be communicated informally in small internal audit departments, while larger departments would normally require more formal and comprehensive written guidance.

*Scope*. The frequency and extent of internal audit review and testing should be consistent with the nature, complexity, and risk of the institution's on- and off-balance-sheet activities. At least annually, the audit committee should review and approve internal audit's control risk assessment

and the scope of the audit plan, including how much the manager relies on the work of an outsourcing vendor. It should also periodically review internal audit's adherence to the audit plan. The audit committee should consider requests for expansion of basic internal audit work when significant issues arise or when significant changes occur in the institution's environment, structure, activities, risk exposures, or systems.[9]

*Communication.* To properly carry out their responsibility for internal control, directors and senior management should foster forthright communications and critical examination of issues to better understand the importance and severity of internal control weaknesses identified by the internal auditor and operating management's solutions to these weaknesses. Internal auditors should report internal control deficiencies to the appropriate level of management as soon as they are identified. Significant matters should be promptly reported directly to the board of directors (or its audit committee) and senior management. In periodic meetings with management and the manager of internal audit, the audit committee should assess whether management is expeditiously resolving internal control weaknesses and other exceptions. Moreover, the audit committee should give the manager of internal audit the opportunity to discuss his or her findings without management being present.

Furthermore, each audit committee should establish and maintain procedures for employees of their institution to submit confidentially and anonymously concerns to the committee about questionable accounting, internal accounting control, or auditing matters.[10] In addition, the audit committee should set up procedures for the timely investigation of complaints received and the retention for a reasonable time period of documentation concerning the complaint and its subsequent resolution.

*Contingency Planning.* As with any other function, the institution should have a contingency plan to mitigate any significant discontinuity in audit coverage, particularly for high-risk areas. Lack of contingency planning for continuing internal audit coverage may increase the institution's level of operational risk.

## Small Institutions

An effective system of internal control and an independent internal audit function form the foundation for safe and sound operations, regardless of an institution's size. As noted in the Introduction, each institution should have an internal audit function that is appropriate to its size and the nature and scope of its activities. The procedures assigned to this function should include adequate testing and review of internal controls and information systems.

---

[9] Major changes in an institution's environment and conditions may compel changes to the internal control system and also warrant additional internal audit work. These include: (a) new management; (b) areas or activities experiencing rapid growth or rapid decline; (c) new lines of business, products, or technologies or disposals thereof; (d) corporate restructurings, mergers, and acquisitions; and (e) expansion or acquisition of foreign operations (including the impact of changes in the related economic and regulatory environments).

[10] Where the board of directors fulfills the audit committee responsibilities, the procedures should provide for the submission of employee concerns to an outside director.

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance provided to FSAs or document management level badges. Please see http://www.occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

It is the responsibility of the audit committee and management to carefully consider the extent of auditing that will effectively monitor the internal control system after taking into account the internal audit function's costs and benefits. For institutions that are large or have complex operations, the benefits derived from a full-time manager of internal audit or an auditing staff likely outweigh the cost. For small institutions with few employees and less complex operations, however, these costs may outweigh the benefits. Nevertheless, a small institution without an internal auditor can ensure that it maintains an objective internal audit function by implementing a comprehensive set of independent reviews of significant internal controls. The key characteristic of such reviews is that the person(s) directing and/or performing the review of internal controls is not also responsible for managing or operating those controls. A person who is competent in evaluating a system of internal control should design the review procedures and arrange for their implementation. The person responsible for reviewing the system of internal control should report findings directly to the audit committee. The audit committee should evaluate the findings and ensure that senior management has or will take appropriate action to correct the control deficiencies.

## U.S. Operations of Foreign Banking Organizations

The internal audit function of a foreign banking organization (FBO) should cover its U.S. operations in its risk assessments, audit plans, and audit programs. Its U.S. domiciled audit function, head-office internal audit staff, or some combination thereof normally performs the internal audit of the U.S. operations. Internal audit findings (including internal control deficiencies) should be reported to the senior management of the U.S. operations of the FBO and the audit department of the head office. Significant adverse findings also should be reported to the head office's senior management and the board of directors or its audit committee.

## PART II — INTERNAL AUDIT OUTSOURCING ARRANGEMENTS

### Examples of Arrangements

An outsourcing arrangement is a contract between an institution and an outsourcing vendor to provide internal audit services. Outsourcing arrangements take many forms and are used by institutions of all sizes. Some institutions consider entering into these arrangements to enhance the quality of their control environment by obtaining the services of a vendor with the knowledge and skills to critically assess, and recommend improvements to, their internal control systems.

The internal audit services under contract can be limited to helping internal audit staff in an assignment for which they lack expertise. Such an arrangement is typically under the control of the institution's manager of internal audit, and the outsourcing vendor reports to him or her. Institutions often use outsourcing vendors for audits of areas requiring more technical expertise, such as electronic data processing and capital markets activities. Such uses are often referred to as "internal audit assistance" or "audit co-sourcing."

Some outsourcing arrangements are structured so that an outsourcing vendor performs virtually all the procedures or tests of the system of internal control. Under such an arrangement, a

designated manager of internal audit oversees the activities of the outsourcing vendor and typically is supported by internal audit staff. The outsourcing vendor may assist the audit staff in determining risks to be reviewed and may recommend testing procedures, but the internal audit manager is responsible for approving the audit scope, plan, and procedures to be performed. Furthermore, the internal audit manager is responsible for the results of the outsourced audit work, including findings, conclusions, and recommendations. The outsourcing vendor may report these results jointly with the internal audit manager to the audit committee.

**Additional Considerations for Internal Audit Outsourcing Arrangements**

Even when outsourcing vendors provide internal audit services, the board of directors and senior management of an institution are responsible for ensuring that both the system of internal control and the internal audit function operate effectively. In any outsourced internal audit arrangement, the institution's board of directors and senior management must maintain ownership of the internal audit function and provide active oversight of outsourced activities. When negotiating the outsourcing arrangement with an outsourcing vendor, an institution should carefully consider its current and anticipated business risks in setting each party's internal audit responsibilities. The outsourcing arrangement should not increase the risk that a breakdown of internal control will go undetected.

To clearly distinguish its duties from those of the outsourcing vendor, the institution should have a written contract, often taking the form of an engagement letter.[11] Contracts between the institution and the vendor typically include provisions that:

- Define the expectations and responsibilities under the contract for both parties;

- Set the scope and frequency of, and the fees to be paid for, the work to be performed by the vendor;

- Set the responsibilities for providing and receiving information, such as the type and frequency of reporting to senior management and directors about the status of contract work;

- Establish the process for changing the terms of the service contract, especially for expansion of audit work if significant issues are found, and stipulations for default and termination of the contract;

- State that internal audit reports are the property of the institution, that the institution will be provided with any copies of the related workpapers it deems necessary, and that employees

---

[11] The engagement letter provisions described are comparable to those outlined by the American Institute of Certified Public Accountants (AICPA) for financial statement audits (see AICPA Professional Standards, AU section 310). These provisions are consistent with the provisions customarily included in contracts for other outsourcing arrangements, such as those involving data processing and information technology. Therefore, the federal banking agencies consider these provisions to be usual and customary business practices.

authorized by the institution will have reasonable and timely access to the workpapers prepared by the outsourcing vendor;

- Specify the locations of internal audit reports and the related workpapers;

- Specify the period of time (for example, seven years) that vendors must maintain the workpapers;[12]

- State that outsourced internal audit services provided by the vendor are subject to regulatory review and that examiners will be granted full and timely access to the internal audit reports and related workpapers prepared by the outsourcing vendor;

- Prescribe a process (arbitration, mediation, or other means) for resolving disputes and for determining who bears the cost of consequential damages arising from errors, omissions, and negligence; and

- State that the outsourcing vendor will not perform management functions, make management decisions, or act or appear to act in a capacity equivalent to that of a member of management or an employee and, if applicable, will comply with AICPA, U.S. Securities and Exchange Commission (SEC), Public Company Accounting Oversight Board (PCAOB), or regulatory independence guidance.

*Vendor Competence.* Before entering an outsourcing arrangement, the institution should perform due diligence to satisfy itself that the outsourcing vendor has sufficient staff qualified to perform the contracted work. The staff's qualifications may be demonstrated, for example, through prior experience with financial institutions. Because the outsourcing arrangement is a personal-services contract, the institution's internal audit manager should have confidence in the competence of the staff assigned by the outsourcing vendor and receive timely notice of key staffing changes. Throughout the outsourcing arrangement, management should ensure that the outsourcing vendor maintains sufficient expertise to effectively perform its contractual obligations.

*Management.* Directors and senior management should ensure that the outsourced internal audit function is competently managed. For example, larger institutions should employ sufficient competent staff members in the internal audit department to assist the manager of internal audit in overseeing the outsourcing vendor. Small institutions that do not employ a full-time audit manager should appoint a competent employee who ideally has no managerial responsibility for the areas being audited to oversee the outsourcing vendor's performance under the contract. This person should report directly to the audit committee for purposes of communicating internal audit issues.

---

[12] If the workpapers are in electronic format, contracts often call for the vendor to maintain proprietary software that enables the bank and examiners to access the electronic workpapers for a specified time period.

The OCC now supervises federal savings associations (FSA). References to regulatory citations,
reporting requirements, or other guidance involving OTS or OTS documents may need to be updated.
Please see http://www.occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the
latest information on rule, reporting and guidance changes.

*Communication.*  Communication between the internal audit function and the audit committee and senior management should not diminish because the institution engages an outsourcing vendor.  All work by the outsourcing vendor should be well documented and all findings of control weaknesses should be promptly reported to the institution's manager of internal audit.  Decisions not to report the outsourcing vendor's findings to directors and senior management should be the mutual decision of the internal audit manager and the outsourcing vendor.  In deciding what issues should be brought to the board's attention, the concept of "materiality," as the term is used in financial statement audits, is generally not a good indicator of which control weakness to report.  For example, when evaluating an institution's compliance with laws and regulations, any exception may be important.

*Contingency Planning.*  When an institution enters into an outsourcing arrangement (or significantly changes the mix of internal and external resources used by internal audit), it may increase its operational risk.  Because the arrangement may be terminated suddenly, the institution should have a contingency plan to mitigate any significant discontinuity in audit coverage, particularly for high-risk areas.

## PART III — INDEPENDENCE OF THE INDEPENDENT PUBLIC ACCOUNTANT

*This part of the policy statement relates only to an outsourcing vendor who is a public accountant and is considering providing both external audit and internal audit services to an institution.*

When one accounting firm performs both the external audit and the outsourced internal audit function, the firm risks compromising its independence.  These concerns arise because, rather than having two separate functions, this outsourcing arrangement places the independent public accounting firm in the position of appearing to audit, or actually auditing, its own work.  For example, in auditing an institution's financial statements, the accounting firm will consider the extent to which it may rely on the internal control system, including the internal audit function, in designing audit procedures.

The next three sections outline the applicability of the SEC's auditor independence requirements to public companies, insured depository institutions subject to Section 36 of the FDI Act, and non-public institutions that are not subject to Section 36.  They are followed by information on the AICPA's independence guidance.

### Institutions that are Public Companies

To strengthen auditor independence, Congress passed the Sarbanes-Oxley Act of 2002.  Title II of this act applies to any company that has a class of securities registered with the SEC or the appropriate federal banking agency under Section 12 of the Securities Exchange Act of 1934 or that is required to file reports with the SEC under Section 15(d) of that act,[13] i.e., a public company.  Within Title II, Section 201(a) prohibits an accounting firm from acting as the

---

[13]  15 U.S.C. 78l and 78o(d).

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for OTS as contained in this document may have changed. Please see http://www.occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

external auditor of a public company during the same period that the firm provides internal audit outsourcing services to the company.[14] In addition, if a public company's external auditor will be providing auditing services and non-audit services, such as tax services, that are not otherwise prohibited by Section 201(a) of the Sarbanes-Oxley Act, Title II also provides that the company's audit committee must pre-approve each of these services.

The SEC adopted final rules implementing the non-audit service prohibitions and audit committee pre-approval requirements of Title II on January 22, 2003.[15] According to these rules, an accountant is not independent if, at any point during the audit and professional engagement period, the accountant provides internal audit outsourcing or other prohibited non-audit services to a public company audit client. These rules generally become effective on May 6, 2003, although a one-year transition period is provided for contractual arrangements in place as of that date. Under this transition rule, an external auditor's independence will not be deemed to be impaired until May 6, 2004, if the auditor is performing internal audit outsourcing and other prohibited non-audit services for a public company audit client pursuant to a contract in existence on May 6, 2003. However, the services being provided must not have impaired the auditor's independence under the pre-existing independence requirements of the SEC, the Independence Standards Board, and the AICPA.

The SEC's pre-existing auditor independence requirements are contained in regulations that were adopted in November 2000 and became fully effective in August 2002.[16] Although the SEC's November 2000 regulations do not prohibit the outsourcing of internal audit services to a public company's independent public accountant, they place conditions and limitations on internal audit outsourcing.

**Depository Institutions Subject to the Annual Audit and Reporting Requirements of Section 36 of the FDI Act**

Under Section 36 as implemented by Part 363 of the FDIC's regulations, each FDIC-insured depository institution with total assets of $500 million or more is required to have an annual

---

[14] In addition to prohibiting internal audit outsourcing, Section 201(a) of the Sarbanes-Oxley Act also identifies other non-audit services that an external auditor is prohibited from providing to a public company whose financial statements it audits. The legislative history of Section 201(a) indicates that three broad principles should be considered when determining whether an auditor should be prohibited from providing a non-audit service to an audit client. These principles are that an auditor should not (1) audit his or her own work, (2) perform management functions for the client, or (3) serve in an advocacy role for the client. To do so would impair the auditor's independence. Based on these three broad principles, the other non-audit services that Section 201(a) prohibits an auditor from providing for a public company audit client include bookkeeping or other services related to the client's accounting records or financial statements; financial information systems design and implementation; appraisal or valuation services, fairness opinions, or contribution-in-kind reports; actuarial services; management functions or human resources; broker or dealer, investment adviser, or investment banking services; legal services and expert services unrelated to the audit; and any other service determined to be impermissible by the PCAOB.

[15] 68 Fed. Reg. 6006, February 5, 2003.

[16] 65 Fed. Reg. 76007, December 5, 2000.

The OCC now supervises federal savings associations (FSA). References to regulatory citations,
reporting requirements, or other guidance for FSAs or its documents in this document may have changed.
Please see http://www.occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the
latest information on rule, reporting and guidance changes.

audit performed by an independent public accountant.[17]  The Part 363 guidelines address the
qualifications of an independent public accountant engaged by such an institution by stating that
"[t]he independent public accountant should also be in compliance with the AICPA's *Code of
Professional Conduct* and meet the independence requirements and interpretations of the SEC
and its staff."[18]

Thus, the guidelines provide for each FDIC-insured depository institution with $500 million or
more in total assets, whether or not it is a public company, and its external auditor to comply
with the SEC's auditor independence requirements that are in effect during the period covered by
the audit.  These requirements include the non-audit service prohibitions and audit committee
pre-approval requirements implemented by the SEC's January 2003 auditor independence rules
once they take effect May 6, 2003, subject to the transition rule for internal audit outsourcing and
other contracts in existence on that date described in the preceding section.  That transition rule
provides that such outsourcing arrangements will not impair an auditor's independence until
May 6, 2004, provided certain conditions are met.[19]

**Institutions Not Subject to Section 36 of the FDI Act that are Neither Public Companies
nor Subsidiaries of Public Companies**

The agencies have long encouraged each institution not subject to Section 36 of the FDI Act[20]
that is neither a public company nor a subsidiary of a public company to have its financial
statements audited by an independent public accountant.[21]  The agencies also encourage each
such non-public institution to follow the internal audit outsourcing prohibition in Section 201(a)
of the Sarbanes-Oxley Act when the SEC's January 2003 regulations implementing this
prohibition take effect, as discussed above for institutions that are public companies.

As previously mentioned, some institutions seek to enhance the quality of their control
environment by obtaining the services of an outsourcing vendor who can critically assess their
internal control system and recommend improvements.  The agencies believe that a small non-

---

[17]  12 CFR 363.3(a).

[18]  *Appendix A to Part 363—Guidelines and Interpretations, Paragraph 14. Independence.*

[19]  If a depository institution subject to Section 36 and Part 363 satisfies the annual independent audit requirement
by relying on the independent audit of its parent holding company, once the SEC's January 2003 regulations
prohibiting an external auditor from performing internal audit outsourcing services for an audit client take effect
May 6, 2003, or May 6, 2004, depending on the circumstances, the holding company's external auditor cannot
perform internal audit outsourcing work for that holding company or the subsidiary institution.

[20]  FDIC-insured depository institutions with less than $500 million in total assets are not subject to Section 36 of
the FDI Act.  Section 36 does not apply directly to holding companies, but it provides that, for an insured depository
institution that is a subsidiary of a holding company, its audited financial statements requirement and certain of its
other requirements may be satisfied by the holding company.

[21]  See, for example, the 1999 Interagency Policy Statement on External Auditing Programs of Banks and Savings
Institutions.

Case 1:11-cv-00746-DJR-WC   Document 185-4   Filed 10/14/15   Page 19 of 106

public institution with less complex operations and limited staff can, in certain circumstances,
use the same accounting firm to perform both an external audit and some or all of the
institution's internal audit activities.  These circumstances include, but are not limited to,
situations where:

- Splitting the audit activities poses significant costs or burden;

- Persons with the appropriate specialized knowledge and skills are difficult to locate and
  obtain;

- The institution is closely held and investors are not solely reliant on the audited financial
  statements to understand the financial position and performance of the institution; and

- The outsourced internal audit services are limited in either scope or frequency.

In circumstances such as these, the agencies view an internal audit outsourcing arrangement
between a small non-public institution and its external auditor as not being inconsistent with
their safety and soundness objectives for the institution.

When a small non-public institution decides to hire the same firm to perform internal and
external audit work, the audit committee and the external auditor should pay particular attention
to preserving the independence of both the internal and external audit functions.  Furthermore,
the audit committee should document both that it has pre-approved the internal audit outsourcing
to its external auditor and has considered the independence issues associated with this
arrangement.[22]  In this regard, the audit committee should consider the independence standards
described in Parts I and II of this policy statement, the AICPA guidance discussed in the
following section, and the broad principles that the auditor should not perform management
functions or serve in an advocacy role for the client.

Accordingly, the agencies will not consider an auditor who performs internal audit outsourcing
services for a small non-public audit client to be independent unless the institution and its auditor
have adequately addressed the associated independence issues.  In addition, the institution's
board of directors and management must retain ownership of and accountability for the internal
audit function and provide active oversight of the outsourced internal audit relationship.

A small non-public institution may be required by another law or regulation, an order, or another
supervisory action to have its financial statements audited by an independent public accountant.
In this situation, if warranted for safety and soundness reasons, the institution's primary federal

---

[22]  If a small non-public institution is considering having its external auditor perform other non-audit services (see
footnote 14 for examples of such services), its audit committee may wish to discuss the implications of the
performance of these services on the auditor's independence.

Case 1:11-cv-00746-DJR-VSG   Document 185-4   Filed 10/14/15   Page 20 of 106

regulator may require that the institution and its independent public accountant comply with the
auditor independence requirements of Section 201(a) of the Sarbanes-Oxley Act.[23]

## AICPA Guidance

As noted above, the independent public accountant for a depository institution subject to
Section 36 of the FDI Act also should be in compliance with the AICPA's *Code of Professional
Conduct*. This code includes professional ethics standards, rules, and interpretations that are
binding on all certified public accountants (CPAs) who are members of the AICPA in order for
the member to remain in good standing. Therefore, this code applies to each member CPA who
provides audit services to an institution, regardless of whether the institution is subject to
Section 36 or is a public company.

The AICPA has issued guidance indicating that a member CPA would be deemed not
independent of his or her client when the CPA acts or appears to act in a capacity equivalent to a
member of the client's management or as a client employee. The AICPA's guidance includes
illustrations of activities that would be considered to compromise a CPA's independence.
Among these are activities that involve the CPA authorizing, executing, or consummating
transactions or otherwise exercising authority on behalf of the client. For additional details, refer
to Interpretation 101-3 – *Performance of Other Services* and Interpretation 101-13 – *Extended
Audit Services* in the AICPA's *Code of Professional Conduct*.

# PART IV — EXAMINATION GUIDANCE

## Review of the Internal Audit Function and Outsourcing Arrangements

Examiners should have full and timely access to an institution's internal audit resources,
including personnel, workpapers, risk assessments, work plans, programs, reports, and budgets.
A delay may require examiners to widen the scope of their examination work and may subject
the institution to follow-up supervisory actions.

Examiners will assess the quality and scope of an institution's internal audit function, regardless
of whether it is performed by the institution's employees or by an outsourcing vendor.
Specifically, examiners will consider whether:

- The internal audit function's control risk assessment, audit plans, and audit programs are
  appropriate for the institution's activities;

- The internal audit activities have been adjusted for significant changes in the institution's
  environment, structure, activities, risk exposures, or systems;

---

[23]  For OTS-required audits under 12 CFR 562.4, independent public accountants performing such audits must meet
the independence requirements and interpretations of the SEC and its staff.

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have changed. Please see http://www.occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

- The internal audit activities are consistent with the long-range goals and strategic direction of the institution and are responsive to its internal control needs;

- The audit committee promotes the internal audit manager's impartiality and independence by having him or her directly report audit findings to it;

- The internal audit manager is placed in the management structure in such a way that the independence of the function is not impaired;

- The institution has promptly responded to significant identified internal control weaknesses;

- The internal audit function is adequately managed to ensure that audit plans are met, programs are carried out, and results of audits are promptly communicated to senior management and members of the audit committee and board of directors;

- Workpapers adequately document the internal audit work performed and support the audit reports;

- Management and the board of directors use reasonable standards, such as the IIA's *Standards for the Professional Practice of Internal Auditing*, when assessing the performance of internal audit; and

- The audit function provides high-quality advice and counsel to management and the board of directors on current developments in risk management, internal control, and regulatory compliance.

The examiner should assess the competence of the institution's internal audit staff and management by considering the education, professional background, and experience of the principal internal auditors.

In addition, when reviewing outsourcing arrangements, examiners should determine whether:

- The arrangement maintains or improves the quality of the internal audit function and the institution's internal control;

- Key employees of the institution and the outsourcing vendor clearly understand the lines of communication and how any internal control problems or other matters noted by the outsourcing vendor are to be addressed;

- The scope of the outsourced work is revised appropriately when the institution's environment, structure, activities, risk exposures, or systems change significantly;

- The directors have ensured that the outsourced internal audit activities are effectively managed by the institution;

- The arrangement with the outsourcing vendor satisfies the independence standards described in this policy statement and thereby preserves the independence of the internal audit function, whether or not the vendor is also the institution's independent public accountant; and

- The institution has performed sufficient due diligence to satisfy itself of the vendor's competence before entering into the outsourcing arrangement and has adequate procedures for ensuring that the vendor maintains sufficient expertise to perform effectively throughout the arrangement.

**Concerns about the Adequacy of the Internal Audit Function**

If the examiner concludes that the institution's internal audit function, whether or not it is outsourced, does not sufficiently meet the institution's internal audit needs, does not satisfy the Interagency Guidelines Establishing Standards for Safety and Soundness, if applicable,[24] or is otherwise inadequate, he or she should consider adjusting the scope of the examination. The examiner should also discuss his or her concerns with the internal audit manager or other person responsible for reviewing the system of internal control. If these discussions do not resolve the examiner's concerns, he or she should bring these matters to the attention of senior management and the board of directors or audit committee. Should the examiner find material weaknesses in the internal audit function or the internal control system, he or she should discuss them with appropriate agency staff in order to determine the appropriate actions the agency should take to ensure that the institution corrects the deficiencies. These actions may include formal and informal enforcement actions.

The institution's management and composite ratings should reflect the examiner's conclusions regarding the institution's internal audit function. The report of examination should contain comments concerning the adequacy of this function, significant issues or concerns, and recommended corrective actions.

**Concerns about the Independence of the Outsourcing Vendor**

An examiner's initial review of an internal audit outsourcing arrangement, including the actions of the outsourcing vendor, may raise questions about the institution's and its vendor's adherence to the independence standards described in Parts I and II of this policy statement, whether or not the vendor is an accounting firm, and in Part III if the vendor provides both external and internal audit services to the institution. In such cases, the examiner first should ask the institution and the outsourcing vendor how the audit committee determined that the vendor was independent. If the vendor is an accounting firm, the audit committee should be asked to demonstrate how it assessed that the arrangement has not compromised applicable SEC, PCAOB, AICPA, or other regulatory standards concerning auditor independence. If the examiner's concerns are not adequately addressed, the examiner should discuss the matter with appropriate agency staff prior to taking any further action.

---

[24] See footnote 4.

- 16 -

The OCC now supervises federal savings associations (FSA). References to regulatory citations, reporting requirements, or other guidance for FSAs contained in this document may have been changed. Please see http://www.occ.gov/about/who-we-are/occ-for-you/bankers/ots-integration.html for the latest information on rule, reporting and guidance changes.

If the agency staff concurs that the independence of the external auditor or other vendor appears to be compromised, the examiner will discuss his or her findings and the actions the agency may take with the institution's senior management, board of directors (or audit committee), and the external auditor or other vendor.  In addition, the agency may refer the external auditor to the state board of accountancy, the AICPA, the SEC, the PCAOB, or other authorities for possible violations of applicable independence standards.  Moreover, the agency may conclude that the institution's external auditing program is inadequate and that it does not comply with auditing and reporting requirements, including Sections 36 and 39 of the FDI Act and related guidance and regulations, if applicable.

EXHIBIT 2



**Crowe Chizek and Company LLC**
Member Horwath International

*Mailing Address:*
201 TechnaCenter Drive, Suite 103
Montgomery, AL 36117
Tel 334.260.8038
Fax 334.279.8452
www.crowechizek.com

April 15, 2008

Mr. Thomas H. Tynes
Internal Audit Liaison
Colonial BancGroup, Inc.
100 Colonial Bank Boulevard
Montgomery, Alabama  36117

Dear Mr. Tynes:

This letter confirms the arrangements for Crowe Chizek and Company LLC ("Crowe Chizek" or "us" or "we" or "our") to provide internal audit services for Colonial BancGroup, Inc. (the "Bank" or "you" or "your") for the period beginning April 1, 2008 through March 31, 2009. This Agreement is between the Bank and Crowe Chizek only. It is not intended that any other person or organization rely on the services rendered by Crowe Chizek under this letter. The attached Crowe Chizek Engagement Terms is an integral part of this letter and its terms are incorporated herein.

Presented below are the services to be provided by Crowe Chizek, along with the related professional fees, as of the date of this letter. While the scope of the services described below represent the current plans, such plans may change.

<u>Our Responsibilities</u>

Crowe Chizek will meet with your management and assist in developing an annual risk-based internal audit services plan for the period beginning April 1, 2008 through March 31, 2009. This plan will be approved by the internal audit liaison and the Audit Committee and executed by us. This plan will establish the scope and frequency of the work to be performed. We will direct, review, and supervise the day-to-day performance of the audit plan. However, we cannot perform management functions, make management decisions, or appear to act in a capacity equivalent to a member of the Bank's management or an employee. Additionally, we cannot be involved in activities such as authorizing, executing, or consummating transactions or otherwise exercising authority on behalf of the Bank. Accordingly, we cannot perform ongoing monitoring activities or control activities, prepare source documents on transactions, or have custody of the Bank's assets. We will comply with applicable AICPA, U.S. Securities and Exchange Commission (SEC), Public Company Accounting Oversight Board (PCAOB), and other regulatory independence guidance.

Confidential Treatment Requested
By Crowe Horwath LLP

Mr. Thomas H. Tynes
Colonial BancGroup, Inc.
April 7, 2008
Page 2

We will perform periodic internal audit services, as authorized by the internal audit liaison, based upon the approved risk-based audit plan. Our services will include a review of key internal controls and detail testing of a sample of transactions. Higher risk areas will be covered in more detail and with greater frequency, while lower risk areas will be covered in less detail and on a rotational basis. Specifics concerning the risks, frequency, and scope of the areas to be reviewed will be outlined within the internal audit services plan.

We will periodically discuss with the internal audit liaison the status of the audit engagement and audits in progress. At least quarterly, we will provide the Audit Committee with an update of the status of the internal audit plan.

We will submit written reports throughout the year to communicate the results of our internal audit services for each area of the audit plan. Our reports will be addressed to the Audit Committee and will describe the areas covered and include our findings and recommendations. The internal audit services reports are the property of the Bank.

The internal audit services contemplated within the context of this engagement letter include the concepts of selective testing and sampling. Accordingly, these services, of necessity, would not include all aspects of the Bank's internal control nor would they include a detailed examination of all transactions. Therefore, our work does not guarantee that errors or irregularities will not occur and may not detect errors or irregularities that may exist. These services would also not ordinarily address abuses of management discretion.

We agree to allow employees authorized by the Bank, upon request, to have reasonable and timely access to the internal audit services workpapers supporting our issued reports and to provide the Bank with any copies of workpapers documenting the results of the internal audit services that the Bank deems necessary. We understand that the outsourced internal audit services are subject to regulatory review, and we agree to grant federal and state banking regulators full and timely access to the internal audit services reports and related workpapers we prepare. The workpapers will be located in our office in Montgomery, Alabama when not on-site with us at the Bank. Access to the requested workpapers will be provided to the Bank and/or the regulatory agencies under the supervision of our personnel and at a location mutually agreed upon. We agree to use reasonable industry standards for record retention of documents and workpapers created for these services, and employ reasonable disaster recovery and business continuity practices. Crowe Chizek currently retains engagement records for a period of seven years.

Confidential Treatment Requested
By Crowe Horwath LLP                                                              CH195952

Mr. Thomas H. Tynes
Colonial BancGroup, Inc.
April 7, 2008
Page 3

The Bank's Responsibilities

The Bank is responsible for designating an individual who possesses suitable skill, knowledge, and/or experience, preferably within senior management, as the internal audit liaison to be responsible for and to oversee the internal audit services function. This individual will be the liaison with Crowe Chizek and will be the coordinator for all internal audit services activities. Working with members of the Bank's management, Crowe Chizek will assist the internal audit liaison in determining risks to be reviewed and will recommend testing procedures. Crowe Chizek will also assist in developing control risk assessments, audit plans, audit programs, and audit reports. However, the internal audit liaison, in conjunction with the Audit Committee, will be responsible for determining and approving the risk, scope, and frequency of internal audit services activities. The signature of the internal audit liaison and the signatures of the Audit Committee member(s) on the annual plan will signify this approval.

At least annually, the Audit Committee should review and approve the control risk assessment and scope of the audit plan, including how much the internal audit liaison relies on the work of Crowe Chizek. The Audit Committee should also consider the internal audit liaison's requests for expansion of the basic internal audit services when significant issues arise or when significant changes occur in the institution's environment, structure, activities, risk exposures, or systems. Major changes in an institution's environment and conditions may lead to changes in internal control and may warrant additional internal audit services. These major changes include: (a) new management; (b) areas or activities experiencing rapid growth; (c) new lines of business, products, or technologies; and (d) corporate restructurings, mergers, and acquisitions.

The internal audit liaison is responsible for the results of the audit work, including findings, conclusions, and recommendations. The internal audit liaison will be the primary person responsible for evaluating the findings and results arising from internal audit services activities. The internal audit liaison will be responsible for reporting internal control deficiencies as soon as they are identified to the appropriate level of the Bank's management and for promptly reporting significant matters to the Audit Committee.

The internal audit liaison will be the principal person responsible for reporting internal audit services activities to the Audit Committee. We plan to meet with the Audit Committee and assist the internal audit liaison in this regard, but we cannot report to the Audit Committee on behalf of management or the internal audit liaison. The Audit Committee should assess whether the Bank's management is resolving internal control weaknesses or other exceptions expeditiously.

The Audit Committee and senior management of the Bank must maintain ownership of the internal audit function and provide active oversight of the internal audit activities. They are responsible for having an effective system of internal control and an effective internal audit function in place. They are also responsible for ensuring that the importance of internal control is understood and respected throughout the institution. Effective internal control reduces the

CH195953

Mr. Thomas H. Tynes
Colonial BancGroup, Inc.
April 7, 2008
Page 4

likelihood that the following will occur and remain undetected: inaccurate, incomplete, or unauthorized transactions; deficiencies in the safeguarding of assets; unreliable financial and regulatory reporting; and deviations from laws, regulations, and the institution's policies. However, it does not completely eliminate that possibility. The Bank's management will perform periodic reviews to determine and shall be solely responsible for determining when, whether, and how the recommendations suggested by Crowe Chizek under this engagement are to be implemented. If, from time to time, we provide you with accounting information or advice, the management of the Bank understands that the ultimate responsibility for proper accounting rests with management.

The Bank will provide reasonable workspace for Crowe Chizek personnel at the audit locations. The Bank's management will also ensure that all information provided to us is accurate and complete in all material respects, contains no material omissions, and is updated on a prompt and continuous basis. Management will also assume responsibility for obtaining all of the third-party consents that are required for us to access and use any third-party products necessary to the performance of the service plan.

The Bank agrees to allow its bank regulatory examiners to have full and timely access to the internal audit services reports maintained on-site by the Bank.

During the engagement term, the Bank will cause its Audit Committee and/or management team to meet with Crowe Chizek personnel at such times as Crowe Chizek may from time to time reasonably request. Without limiting the generality of the foregoing, Crowe Chizek shall have full and regular access to the Bank's Audit Committee and/or management team and shall be entitled to meet with the Audit Committee in private without any member of the Bank's management being present. Crowe Chizek shall report solely to the Bank's internal audit liaison and the Audit Committee with respect to the performance of its obligations under this engagement letter.

### FEES

Billings for our services for the period beginning April 1, 2008 through March 31, 2009 will be $1,904,454 ($1,213,998 for internal audit services and $690,456 for information risk management services), plus out-of-pocket expenses not to exceed 10% of the fee annually. Billings will be submitted on a monthly basis and are due upon receipt. Any amount not paid within 30 days of receipt will be subject to a finance charge of 1.5% per month. In the event an invoice is not paid within 60 days, you agree that we can, solely at our discretion, stop work on the matter subject to the payment.

Mr. Thomas H. Tynes
Colonial BancGroup, Inc.
April 7, 2008
Page 5

The fee payment arrangements are designed for clarity and efficiency and will frequently not correspond to the amount of time and cost we incur on your behalf during a particular calendar period for a variety of reasons. While we bill you for services on an equal monthly payment, our professional fees and expenses incurred will often exceed the monthly billing amount early in the contract period because of engagement planning. You agree that in the event, regardless of the cause, the arrangement under this letter is terminated, you will pay us any professional fees and expenses incurred in excess of billings received, in addition to any termination payment this letter might call for. Similarly, in the event of early termination, if your payments have exceeded our fees and expenses, we will return the excess payments to you.

The above fees are based on the internal audit services plan that details the scope and frequency of the work to be performed. Fees and expenses for any additional projects or services will be agreed to and billed separately.

Our fee estimates assume that personnel of the Bank will assist us in gathering the information necessary to perform the engagement, including obtaining supporting documents, pulling customer files, following up on exceptions, and in other similar ways. We also assume that no irregularities will be discovered, no unusual procedures will be required, internal control is reasonably adequate, and there will be no substantial changes in the operations of the Bank. If unforeseen circumstances indicate that the fees will change, the situation will be discussed with management.

## CONTRACT TERMINATION

From time-to-time, businesses decide that an agreement does not continue to meet their needs. Accordingly, we mutually agree that either party can terminate this engagement upon delivery of written notice 90 days prior to the date of the desired termination. We also mutually agree that specific scope elements may be terminated upon delivery of written notice 90 days prior to the date of the desired termination.

The services under this letter represent meaningful commitments of both parties. Because of the importance of our services to you, in the event of a termination requested by us, we agree to complete full delivery of any projects or audit segments begun during the 90-day notice period, even if they will not be completed until after the actual termination date (of course, you agree to pay for the services performed).

*      *      *      *      *      *

Confidential Treatment Requested
By Crowe Horwath LLP

Mr. Thomas H. Tynes
Colonial BancGroup, Inc.
April 7, 2008
Page 6

This engagement letter and the attached Crowe Chizek Engagement Terms reflect the entire agreement between us relating to the services covered by this letter. The headings included in this letter are to assist in ease of reading only; the letter and attachment are to be construed as a single document, with the provisions of each section applicable throughout. This agreement may not be amended or varied except by a written document signed by both parties. It replaces and supersedes any other proposals, correspondence, agreements and understandings, whether written or oral, relating to the services covered by this letter. The agreements of the Bank and Crowe Chizek contained in this engagement letter shall survive the completion or termination of this engagement. If any term hereof is found unenforceable or invalid, this shall not affect the other terms hereof, all of which shall continue in effect as if the stricken term had not been included. This agreement is governed by the internal laws of the State of Illinois.

If the terms of this letter and the attached Crowe Chizek Engagement Terms are acceptable to you, please authorize us to proceed by returning one signed copy and designating the Bank's internal audit liaison.

Very truly yours,

Crowe Chizek and Company LLC

By: _E. Michael Thomas_

E. Michael Thomas, Executive

I have reviewed the arrangements outlined above and in the attached Crowe Chizek Engagement Terms, and I accept on behalf of the Bank the terms and conditions as stated.

Bank: _COLONIAL BANCGROUP, INC._

Signature: _Thomas H. Tynes_

Printed Name: _THOMAS H. TYNES_

Title: _SUP- RISK AND COMPLIANCE_

Date: _4/29/08_

Designated Internal Audit Liaison:

_Thomas H. Tynes_

## Crowe Chizek Engagement Terms

We want you to understand the basis under which we offer our services to you and determine our fees, as well as to clarify the relationship and responsibilities between your organization and ours. These terms are part of our engagement letter and apply to all future services, unless a specific engagement letter is entered into for those services. We specifically note that no advice we may provide should be construed to be investment advice.

YOUR ASSISTANCE - For us to provide our services effectively and efficiently, you agree to provide us timely with the information we request and to make your employees available for our questions. The availability of your personnel and the timetable for their assistance are key elements in the successful completion of our services and in the determination of our fees. Completion of our work depends on appropriate and timely cooperation from your personnel; complete, accurate and timely responses to our inquiries; and timely communication by you of all significant accounting and financial reporting matters of which you are aware. If for any reason this does not occur, a revised fee to reflect the additional time or resources required by us will be mutually agreed upon, and you agree to hold us harmless against all matters that arise in whole or in part from any resulting delay.

If circumstances arise that, in our professional judgment, prevent us from completing this engagement, we retain the right to take any course of action permitted by professional standards, including declining to issue a report or other work product, or withdrawing from the engagement.

CONFIDENTIALITY - We will maintain the confidentiality of your confidential information in accordance with professional standards. You agree not to disclose any confidential material you obtain from us without our prior written consent, except to the extent such disclosure is an agreed objective of this engagement. Your use of our work product shall be limited to its stated purpose and to your business use only. We retain the right to use the ideas, concepts, techniques, industry data, and know-how we use or develop in the course of the engagement. You agree to the use of fax, email, and voicemail to communicate both sensitive and non-sensitive matters; provided, however, that nonpublic personal information regarding your customers or consumers shall not be communicated by unencrypted email. We may use a third-party service provider in providing professional services to you which may require our sharing your confidential information with the provider. If we use a third-party service provider, we will enter into a confidentiality agreement with the provider to require them to maintain the confidentiality of your confidential information.

1 of 3

Confidential Treatment Requested
By Crowe Horwath LLP

CH195957

CONSUMER PRIVACY - In order to provide the services called for in this engagement, you may be disclosing to us certain nonpublic personal information regarding your accounts, customers, and consumers. To the extent permitted by law, we will not disclose any such nonpublic personal information except to you and our employees and agents. However, in circumstances that fall under an exception in the regulations "Privacy of Consumer Financial Information" implementing the Gramm-Leach-Bliley Act, we may disclose or use such nonpublic personal information in the ordinary course of business to carry out the services in this engagement. We have implemented and will maintain physical, electronic and procedural safeguards ("Safeguards") reasonably designed to protect the security, confidentiality and integrity of, to prevent unauthorized access to or use of, and to ensure the proper disposal, of nonpublic personal information regarding your customers or consumers. We further agree that the Safeguards shall meet the objectives of the Interagency Guidelines Establishing Information Security Standards, adopted by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision, as they currently exist, or as they may be amended from time to time.

CHANGES – We may periodically communicate changes in laws, rules, or regulations to you. However, you have not engaged us to and we do not undertake an obligation to advise you of changes in laws, rules, regulations, industry or market conditions, your own business practices, or other circumstances, except to the extent required by professional standards.

PUBLICATION - You agree to obtain our specific permission before using our report or our firm's name in a published document, and you agree to submit to us copies of such documents to obtain our permission before they are filed or published.

NO PUNITIVE OR CONSEQUENTIAL DAMAGES – Any liability of Crowe Chizek to you shall not include any special, consequential, incidental, punitive, or exemplary damages or loss nor any lost profits, savings, or business opportunity.

LIMIT OF LIABILITY - The provisions of this section establishing a limit of liability will not apply if, as determined in a judicial proceeding, we performed our services with gross negligence or willful misconduct. Our engagement with you is not intended to shift risks normally borne by you to us. With respect to any services or work product or this engagement in general, the liability of Crowe Chizek and its personnel shall not exceed the fees we receive for the portion of the work giving rise to liability. A claim for a return of fees paid shall be the exclusive remedy for any damages. This limitation of liability is intended to apply to the full extent allowed by law, regardless of the grounds or nature of any claim asserted. This limitation of liability shall also apply after termination of this agreement.

INDEMNIFICATION FOR THIRD PARTY CLAIMS – The provisions of this section for indemnification will not apply if, as determined in a judicial proceeding, we performed our services with gross negligence, or with willful misconduct. Our engagement with you is not intended to shift risks normally borne by you to us. In the event of a legal proceeding or other claim brought against us by a third party you agree to indemnify and hold harmless Crowe Chizek and its personnel against all costs, fees, expenses, damages, and liabilities, including defense costs and legal fees, associated with such third-party claim arising from or relating to any services or work product that you use or disclose to others, or this engagement generally. This indemnification is intended to apply to the full extent allowed by law, regardless of the grounds or nature of any claim asserted. This indemnification shall also apply after termination of this agreement.

2 of 3

Confidential Treatment Requested
By Crowe Horwath LLP

CH195958

RESPONSE TO LEGAL PROCESS – If we are requested by subpoena, other legal process, or other proceedings to produce documents pertaining to you, and we are not a named party to the proceeding, you will reimburse us for our professional time, plus out-of-pocket expenses, as well as reasonable attorney fees we incur in responding to such request.

MEDIATION - If a dispute arises, in whole or in part, out of or related to this engagement, or after the date of this agreement, between you or any of your affiliates or principals, and Crowe Chizek, and if the dispute cannot be settled through negotiation, you and Crowe Chizek agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its mediation rules for professional accounting and related services disputes before resorting to litigation or any other dispute-resolution procedure. The results of mediation shall be binding only upon agreement of each party to be bound. Costs of any mediation shall be shared equally by both parties.

JURY TRIAL - In the unlikely event that differences concerning our services or fees arise between us that are not resolved by mutual agreement or mediation, you and we agree to waive a trial by jury to facilitate judicial resolution and save time and expense of both parties.

LEGAL AND REGULATORY CHANGE – The scope of services and fees for the services covered by the accompanying letter are based on current laws and regulations. If changes in laws or regulations change your requirements or the scope of our work, you and we agree that our fees will be modified to a mutually agreed upon amount to reflect the changed level of our effort.

NON-SOLICITATION – You and we acknowledge the importance of retaining key personnel. Accordingly, both parties agree that during the period of this agreement and for one year after its expiration or termination, neither party will solicit any personnel of the other party for employment without the written consent of the other party. If an individual becomes an employee of the other party, the other party agrees to pay a fee equal to the individual's compensation for the prior full twelve-month period to the original employer.

AFFILIATES - Crowe Chizek and Company LLC (Crowe Chizek) is a member of Horwath International Association, a Swiss association (Horwath). Each member firm of Horwath is a separate and independent legal entity. Crowe Chizek and its affiliates are not responsible or liable for any acts or omissions of any other member of Horwath and hereby specifically disclaim any and all responsibility or liability for acts or omissions of any other member of Horwath.

3 of 3

Confidential Treatment Requested
By Crowe Horwath LLP

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

THE COLONIAL BANCGROUP, INC.,

        Plaintiff,

      v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver
for Colonial Bank,

        Defendant.

Case No. 2:10-cv-0198 (MHT)

REPLY MEMORANDUM IN FURTHER SUPPORT OF FDIC-RECEIVER'S
MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS

Michael A. Fritz, Sr.
michael@fritzandhughes.com
Fritz, Hughes & Hill LLC
1784 Taliaferro Trail, Suite A
Montgomery, Alabama  36117
(334) 215-4422

John J. Clarke, Jr.
Thomas R. Califano
Michael D. Hynes
Spencer Stiefel
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
(212) 335-4500

Attorneys for the
  Federal Deposit Insurance Corporation,
  as Receiver for Colonial Bank

Dated:  October 6, 2011

**Table of Contents**

Page

Table of Authorities ................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT:  SUMMARY JUDGMENT SHOULD BE GRANTED IN
    FAVOR OF THE FDIC-RECEIVER ON ALL CLAIMS ................................. 4

I.    BANCGROUP NEVER HAD ANY PROPERTY INTEREST IN THE
    FEDERAL INCOME TAX REFUNDS AT ISSUE ......................................... 4

    A.    The Tax Allocation Policy Is Not Enforceable Under
        Federal Banking Law ..................................................................... 5

    B.    The Language of the Tax Allocation Policy Does Not Support
        BancGroup's Debtor-Creditor Argument ................................... 9

    C.    Under BancGroup's Interpretation the Tax Allocation Policy Would
        Violate Sections 23A and 23B of the Federal Reserve Act ................. 20

    D.    The Tax Allocation Policy Is Not Enforceable Under
        the Bankruptcy Code ..................................................................... 22

        1.    Rejection of the Tax Allocation Policy Renders
            it Unenforceable ............................................................ 22

        2.    Section 365(c)(2) Applies and Bars BancGroup's
            Debtor-Creditor Argument ........................................... 24

    E.    Trial Is Not Required to Establish the FDIC-Receiver as the Owner
        of the Tax Refunds as a Matter of Undisputed Fact ........................... 25

    F.    No Genuine Issue of Material Fact Has Been Identified as to
        BancGroup's Other Tax-Related Claims ......................................... 28

II.    THE FDIC-RECEIVER, NOT BANCGROUP, OWNS THE PROCEEDS TO BE
    RECOVERED UNDER FIDELITY INSURANCE POLICIES ..................... 28

    A.    BancGroup Ignores Its Express Contractual Role as
        "Sole Agent" for Colonial Bank ................................................... 29

    B.    BancGroup Cannot Distinguish the FDIC-Receiver's Cases ............... 32

    C.    BancGroup Does Not Have Any Right of Action to Assign
        to the Insurer as Subrogee ............................................................. 34

III.   SUMMARY JUDGMENT SHOULD BE ENTERED FOR THE FDIC-
       RECEIVER ON ALL OF BANCGROUP'S REIT PREFERRED
       SECURITIES CLAIMS .................................................................................. 35

       A.   Ownership of the REIT Preferred Securities Was Transferred to
            Colonial Bank as a Matter of Fact and Law ......................................... 35

       B.   12 U.S.C § 1828(u) Bars BancGroup's Avoidance Claim .................................. 40

       C.   BancGroup Misstates the "Control" Test, Which Also Precludes Its
            Avoidance Claims as to the REIT Preferred Securities ....................................... 40

IV.    BANCGROUP'S AVOIDANCE CLAIMS ARE GROUNDLESS AS A
       MATTER OF LAW AND UNDISPUTED FACT ............................................................ 41

       A.   Section 1828(u) Requires a "Direction issued in Writing" to
            Increase Capital.  It Does Not Require a Capital "Directive" ............................. 41

       B.   Section 502(d) of the Bankruptcy Code Is Not Excluded from
            the Reach of 12 U.S.C § 1828(u) ...................................................................... 43

       C.   No Triable Issue Exists With Respect to Colonial Bank's
            Solvency Before December 15, 2008 .................................................................. 45

V.     TRIAL IS NOT WARRANTED FOR ANY OF BANCGROUP'S
       OTHER MISCELLANEOUS CLAIMS .......................................................................... 49

CONCLUSION ........................................................................................................................... 54

banking agency (including in its capacity as conservator or receiver)" for the return of an avoidable transfer, for monetary damages with respect to such a transfer, or for "*other legal or equitable relief* in connection with such transfer." [24]   12 U.S.C. § 1828(u)(1) (emphasis added). Section 1828(u) deprives BancGroup of the remedy afforded under section 502(d) of the Bankruptcy Code for every alleged downstream transfer made to Colonial Bank on or after December 15, 2008, because it prohibits any "other legal or equitable relief" against the FDIC-Receiver with respect to those transfers.[25]

### C.   No Triable Issue Exists With Respect to Colonial Bank's Solvency Before December 15, 2008.

BancGroup concedes that a contribution by a parent corporation to its solvent subsidiary cannot form the basis for a fraudulent transfer claim because, by definition, the parent receives reasonably equivalent value in the form of its equity investment.  *See* Opp. Mem. at 70.  Sarah Moore, BancGroup's chief financial officer, was adamant in her testimony that Colonial Bank was solvent at all relevant times.  *See* FDIC-Receiver Mem. at 64-68.  In attempting to establish

---

[24] BancGroup's assertion that "Section 1828 does not purport to prohibit the avoidance of transfers," Opp. Mem. at 68 (emphasis in original), is a blatant misstatement of the law.  The statute clearly and definitively prohibits that relief by its plain terms.

[25] For this and other reasons, BancGroup's attempt to analogize the prohibition of section 1828(u) with a statute of limitations is inapt.  *See* Opp. Mem. at 68-69.  Unlike a statute of limitations, which only bars a claim that once might have been brought if it is not commenced in time, section 1828(u) *always* prohibits claims seeking "other legal or equitable relief in connection with" a challenged transfer.  The difference reflects congressional intent to protect the FDIC as receiver for failed depository institutions (and other federal bank regulators) from all types of relief in connection with avoidance litigation brought by bankrupt holding companies or their bankruptcy trustees.  *See* H.R. Conf. Rep. 106-434, at 160-61, *reprinted in* 1999 U.S.C.C.A.N. at 276.  In addition, the cases that have allowed a defensive use of section 502(d) after a statute of limitations has expired on an underlying avoidance action ignore the express language of section 502(d), which states that the section only applies if the transferee fails to turn over the amount for which the transferee "is liable."  *See In re Mktg. Assocs. of Am., Inc.*, 122 B.R. 367, 369 (Bankr. E.D. Mo. 1991).  As already discussed, courts have recognized that this statutory language requires a judgment to be obtained against the transferee before section 502(d) can have effect.

a disputed issue of material fact as to Colonial Bank's solvency prior to December 15, 2008 (when the Bank first became subject to a written direction to increase its capital), BancGroup relies on a gross distortion of the facts concerning the fraud inflicted upon Colonial Bank involving Taylor Bean & Whitaker Mortgage Corporation ("TBW") and others.

BancGroup's claim that the TBW fraud led to a $2.3 billion overstatement of Colonial Bank's assets is wrong.  To reach a number that it hopes will save its claims from summary judgment, BancGroup counts the same loss twice and misstates the timing of the losses.  The TBW fraud involved two separate and distinct frauds in timing and amount under two separate sets of loan sale agreements.  These agreements include two Mortgage Loan Participation and Sale Agreements, dated April 1, 2007 between TBW and Colonial Bank (together, the "AOT Facility"), under which Colonial purchased 99% participation interests in pools of mortgage loans, and a Loan Participation Sale Agreement dated December 17, 2007 between TBW and Colonial Bank (the "COLB Facility"), under which Colonial purchased 99% participation interests in individual loans.  *See* Declaration of Andrew Campbell dated Sept. 22, 2011 ("Campbell Decl."), Exh. P (TBW Reconciliation Report) at 15, 61-63, 68-77.

To calculate its figure, BancGroup counts the loss under the AOT Facility *twice* and includes the COLB Facility loss, which did not occur until June and July 2009.  *See* Opp. Mem. at 71-72.  Indeed, BancGroup cites to the $670 million "hole" under the AOT Facility, *then* adds $1.8 billion based on the testimony of Neil Luria, TBW's liquidating trustee, for the estimated "collateral shortfall" under *both* the AOT Facility and the COLB Facility when the Bank closed,

46

*then* adds an estimated $889 million loss under the COLB Facility again.  *Id.*; Campbell Decl., Ex. O, 1880:9-16.[26]

BancGroup is correct that the testimony from the criminal trial of TBW's former chairman, Lee Farkas, shows a $670 million "hole" under the AOT Facility as of December 31, 2008, but that same testimony also shows that the "hole" was never larger than that amount.  *See* Declaration of John J. Clarke, Jr. dated October 6, 2011 ("10/6 Clarke Decl."), Exh. 2 at 2007 (testimony of government expert); *id.*, Exh. 1 at 479 (testimony of former Colonial Bank employee Teresa Kelly).  Consequently, even if the AOT "hole" were subtracted from Colonial Bank's reported results, the Bank would have reported equity capital of more than *$1.7 billion* as of December 31, 2007, more than *$1.6 billion* as of March 31, 2008, roughly *$1.8 billion* as of June 30, 2008 and more than *$700 million* as of the end of the year.  *See* Stmt. Facts, ¶¶ 72, 77-81 (discussing Call Report figures for relevant periods).  In no event would the AOT fraud have rendered Colonial Bank insolvent at any relevant time.[27]

The loss under the COLB Facility is irrelevant here because, even based upon the evidence relied upon by BancGroup, it did not occur until 2009, by which time Colonial Bank already was subject to a direction in writing to increase its capital triggering 12 U.S.C. § 1828(u).  The fraudulent process through which loans from the Colonial Bank COLB Facility were used as collateral for Ocala Funding and sold to take-out purchasers without payment to Colonial Bank

---

[26] The $1.8 billion figure is consistent with the FDIC's statement during the Farkas trial that Colonial Bank suffered an approximate $1.8 billion loss as of its closure date (August 14, 2009) under both the AOT and COLB Facilities.  *See* Opp. Mem. at 73.  BancGroup also cites to a $772 million figure when discussing the COLB loss, but this number is already included in the $889 million loss figure.  *Id.* at 72.

[27] BancGroup's bare assertion that regulators would have closed Colonial Bank if the fraud had been revealed at any of those earlier dates is not based on any evidence and is not entitled to any weight in considering a motion for summary judgment.  *See* Opp. Mem. at 77 n. 141;  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Matsushita*, 475 U.S. at 596.

did not begin until December 29, 2008, months after the last of the pre-2009 transfers that BancGroup challenges. *See* 10/6 Clarke Decl., Exh. 3 (Declaration of Robert Hutchins dated October 6, 2011 ("Hutchins Decl.")); Campbell Decl., Exh. P, ¶ 117. In particular, Colonial Bank's loss as a result of the COLB fraud arose based on the sale of almost 5,000 COLB loans worth approximately $900 million in June and July 2009, without payment to Colonial Bank.[28] *See* Hutchins Decl., at ¶¶ 6-7. Therefore, none of Colonial Bank's losses from the COLB fraud are relevant to the determination of Colonial Bank's solvency.

BancGroup's attempt to conflate the loss caused to Colonial Bank from the TBW fraud with the amount of loss sustained by the FDIC's deposit insurance fund in protecting Colonial Bank's depositors is also misleading. *See* Opp. Mem. at 73. None of the estimates of the FDIC's costs as deposit insurer indicate that those costs were solely attributable to the TBW fraud.[29]

BancGroup similarly errs in its argument concerning the Citrus & Chemical Bancorporation transaction in December 2007. As BancGroup admits, the transaction was an acquisition by *BancGroup* of another bank holding company, which Colonial Bank itself funded in substantial part. *See* Opp. Mem. at 78. BancGroup's assertion that it contributed assets to Colonial Bank that BancGroup acquired in that transaction is false. To the contrary, after the merger with Citrus & Chemical Bancorporation, BancGroup became the parent of two separate

---

[28] All these loans were sold in June and July of 2009, except one that was sold in May 2009, for which Colonial Bank was owed $112,000. *See* Hutchins Decl., ¶ 7.

[29] The fact that the FDIC-Receiver has asserted contingent claims against BancGroup for unlawful dividends paid by the Bank to its holding company is also probative of nothing. BancGroup is well aware, but has failed to disclose to the Court, that the FDIC-Receiver has asserted those unlawful dividends claims protectively to be satisfied by BancGroup only in the unlikely event that BancGroup establishes the insolvency of Colonial Bank at any relevant time. *See* FDIC-Receiver Reply in Further Support of Motion for Estimation Solely for Voting Purposes, filed March 3, 2011 [Bankr. Doc. No. 1173], ¶ 5(iii).

48

bank subsidiaries, Citrus & Chemical Bank and Colonial Bank, which thereafter merged.  *See* 10/6 Clarke Decl., Exh. 4 (Citrus & Chemical bank merger agreement).  That bank merger did not involve any transfer of property from BancGroup to Colonial Bank, and no avoidable transfer resulted from it.  In addition, Colonial Bank was solvent at the time of the merger, as BancGroup's chief financial officer confirmed in her testimony.  *See* Moore Tr. 39:12-39:15.

Finally, BancGroup has now admitted that the only reason it has asserted any of its avoidance claims is to provide it with a putative defense to any claim that might arise in favor of the FDIC-Receiver in the unlikely event that any of BancGroup's claims to own tax refunds, insurance proceeds or REIT preferred securities is successful.  *See* Opp. Mem. at 68 (avoidance claims asserted "for the purpose of disallowing the FDIC-Receiver's Proof of Claim pursuant to Section 502(d) of the Bankruptcy Code and not for the 'return of assets.'").  The issue will never need to be reached, therefore, because summary judgment should be entered in favor of the FDIC-Receiver on all of BancGroup's claims to those other assets for the reasons already discussed.

## V.   TRIAL IS NOT WARRANTED FOR ANY OF BANCGROUP'S OTHER MISCELLANEOUS CLAIMS.

BancGroup's attempt to belatedly justify its of other miscellaneous claims only demonstrates that those claims were placeholders that BancGroup never seriously intended to pursue.  This Court should enter judgment against BancGroup on all of those claims.

*First*, in the unlikely event that trial were held and judgment entered for BancGroup on any of these claims, a judgment would be satisfied with a receivership certificate from the Colonial Bank receivership.  *See Battista v. F.D.I.C.*, 195 F.3d 1113, 1116 (9th Cir. 1999) ("There is no question that the FDIC may pay creditors with receiver's certificates instead of with cash."); *R.T.C. v. Titan Fin. Corp.*, 36 F.3d 891, 892 (9th Cir. 1994); *Dunlap v. F.D.I.C.*,

49

paid the principal owed.").  There is no similar basis for post-insolvency interest for BancGroup here.

## CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in its prior submission, the FDIC-Receiver respectfully requests that the Court enter judgment in its favor with respect to all claims asserted in the amended complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure and grant the FDIC-Receiver such other and further relief as it may deem just and proper.

Dated:  Montgomery, Alabama
      October 6, 2011

                                       ___/s/ Michael A. Fritz, Sr._____
                                       Michael A. Fritz, Sr.
                                       Fritz Hughes & Hill, LLC
                                       1784 Talieferro Trail, Suite A
                                       Montgomery, AL 36117
                                       T: (334) 215-4422

                                         - and –

                                       John J. Clarke, Jr.
                                       Thomas R. Califano
                                       Michael D. Hynes
                                       Spencer Stiefel
                                       DLA Piper LLP (US)
                                     1251 Avenue of the Americas
                                     New York, New York  10020-1104
                                     (212) 335-4500

                                     Attorneys for the
                                       Federal Deposit Insurance Corporation
                                       as receiver for Colonial Bank

## CERTIFICATE OF SERVICE

The undersigned hereby certifies he is one of the attorneys for defendant FDIC-Receiver and that on October 6, 2011, a true and correct copy of the foregoing document, and all other documents referenced herein, were filed with this Court's ECF system in this action, which will cause the electronic service of this, and all other, documents upon all persons registered in this action to receive CM/ECF notifications as of its filing to include the following:

Brent W. Herrin
Cohen Pollock Merlin & Small, P.C.
3350 Riverwood Parkway, Suite 1600
Atlanta, GA  30339

Peter E. Calamari
Kevin Reed
David L. Elsberg
Benjamin I. Finestone
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
New York, NY 10010

Andrew P. Campbell
Caroline Smith Gidiere
Stephen D. Wadsworth
Leitman, Siegal, Payne & Campbell PC
420 N. 20th Street, Suite 2000
Birmingham, AL 35203

_   /s/ Michael A. Fritz, Sr.   _
Michael A. Fritz, Sr.

EXHIBIT 4

**IN THE DISTRICT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| THE COLONIAL BANCGROUP, INC. and KEVIN O'HALLORAN,<br><br>        Plaintiffs,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP,<br>and CROWE HORWATH LLP,<br><br>        Defendants. | Case No. 2:11-cv-00746-WKW |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK,<br><br>        Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP,<br><br>        Defendants. | Case No. 2:11-cv-00957-WKW |

**PLAINTIFFS' INITIAL DISCLOSURES**

protection of an order of the bankruptcy court that prevents CBG from making these documents available to any party without the consent of E&Y and the law firm of Waller Lansden Dortch & Davis, LLP.  The productions represent work papers and supporting documentation from work performed by E&Y for CBG initially surrounding the TARP issue, as well as certain custodial files gathered from E&Y of those personnel who worked on the engagement.  In addition, CBG expects to receive a production of Colonial data gathered by E&Y during the course of their engagement.  All but one of the productions are or will be available in electronic format.  The workpapers were produced in hardcopy format resulting in approximately 10 bankers boxes of binders.

### F.   **Navigant Data**

Navigant has not produced any documents – in electronic form or otherwise – to CBG.  CBG, however, has access to, but is not in possession or control of, the Navigant Relativity data base relating to TBW.  CBG may rely upon information contained within this database to establish its claims against PwC and Crowe.

## III.   Computation of damages claimed by CBG.

As a financial institution, CBG relied heavily upon PwC and Crowe to perform and/or implement audit tests, procedures and controls that would serve to safeguard CBG's assets and detect material misstatements in CBG's financial statements, whether such misstatements resulted from error or fraud -- which was

entirely consistent with PwC's and Crowe's contractual and professional duties and obligations.  PwC and Crowe breached their professional duties and, as a result, served to facilitate and perpetuate the TBW fraud and to conceal CBG's true financial condition.  As detailed in the following charts, as a result of Defendants' wrongful conduct, CBG suffered substantial losses as it down-streamed funds to Bank and incurred substantial expenditures at a time when Bank was a failing financial institution and when CBG was otherwise insolvent or in the zone of insolvency.  CBG's damages are calculated in the following charts:[1]

### A.    Down-stream Transfers

Losses associated with the down-streaming of funds to the Bank from December 2007 through August 2009, including the following:

| $  65,000,000 | March 27, 2008 – CBG's cash infusion to Bank. |
|---|---|
| $140,000,000 | April 30, 2008 - CBG's cash infusion to Bank. |
| $150,000,000 | June 6, 2008 - CBG's cash infusion to Bank. |
| $  20,000,000 | September 16, 2008 - CBG's cash infusion to Bank. |

---

[1] This damage calculation is being made based on information currently in CBG's possession and to the best of CBG's knowledge given the inherent limitations on accessing, correlating, and reconciling such data.  The disclosure is subject to further discovery and improved access to and supplementations of data, including without limitation, supplementation through access to data in the possession of the FDIC-R and its custodians.

| | |
|---|---|
| $120,605,200 | December 30, 2008 - CBG funded purchase of loans by its subsidiary CBG Real Estate from Bank followed by CBG's transfer of a 65% participation interest in the loans back to the Bank in March 31, 2009. |
| $ 20,900,000 | March 31 2009 – CBG contributed $20.9M in auction rate securities to the Bank. |
| $ 50,880,867 | June 30, 2009 - CBG's cash infusion to Bank. |
| $166,000,000 | June 1, 2009 – CBG's cash payment to Bank under the tax allocation agreement approved annually by the Bank and CBG's respective boards on account of Bank's hypothetical "separate return" tax refunds. |
| $      514,421 | Intercompany receivables for expenses incurred by CBG on behalf of Bank prior to the Receivership. |
| **$ 734,900,488** | **Total Damages Due to Down-streaming** |

The above calculation excludes the amount of $300 million of REIT

Preferred Securities transferred by CBG Florida REIT Corp to CBG on or around

August 11, 2009.  CBG Florida REIT Corp, an indirect wholly-owned REIT

subsidiary of Bank, issued $300 million in REIT Preferred Securities in May 2007.

Pursuant to an Exchange Agreement, the REIT Preferred Securities were

conditionally exchangeable for preferred stock of CBG upon certain conditions,

including in the event that the Bank became or the OCC anticipated the Bank

becoming undercapitalized or the Bank was placed into receivership.  It is

undisputed that this exchange was triggered and occurred on or about August 11,

2009, but there is a dispute as to whether once exchanged, the securities were transferred by CBG to the Bank or were instead maintained at CBG.  CBG maintains that the actual transfer never took place, such that the securities remain the property of CBG's bankruptcy estate.  Alternatively, and in an abundance of caution, if there was a transfer to Bank, the transfer represents further losses which should be added to the above damage numbers.

### B.     TARP Process Cost

Losses incurred in pursuing recapitalization through the TARP application and pursuit of equity investment to supplement the TARP application.  This loss includes, by way of example, costs of the application process; fees paid for the securities investigation that flowed from the announcement; fees paid to counsel to CBG to provide legal advice in connection with the transaction involving TBW, the inquiry by the Office of the Inspector General for the TARP program, and related regulatory matters; the cost of pursuing the $300 million supplemental equity through capital markets; fees paid for the investigation of issues relating to the TARP transaction; fees and expenses paid in connection with potential transactions involving SunTX Capital Partners and Old Dominion.

| $ 2,198,542 | Arnold & Porter fees and expenses. A&P was engaged by CBG and the Bank together by letter date May 15, 2009. The engagement was to provide services in connection with (i) the transaction involving TBW, (ii) the inquiry being conducted by the Office of the Special Inspector General for TARP, and (iii) "related regulatory matters." |
|---|---|
| $ 46,454 | Alston & Bird LLP fee and expenses. Alston & Bird was retained in 2009 to provide certain services relating to TARP. |
| $ 500,000 | Citi Group Fee. CBG retained Citigroup by engagement letter dated July 9, 2009 to serve as a financial advisor for CBG and to assist CBG in arranging for a sale of all or a majority of CBG's business, assets or securities by way of merger, consolidation, reorganization, recapitalization, exchange, leveraged buyout, negotiated purchase or collaborative venture. |
| $ 769,678 | Keefe Bruyette & Woods, Inc. fees and expenses. KBW was retained to assist in sale of company and/or raise cash. |
| $ 93,527 | Mayer Brown LLP fees and expenses. Fees incurred with respect to advice regarding public disclosure in December 2008. |
| $ 366,788 | Simpson Thacher & Bartlett LLP fees and expenses. Simpson Thacher was retained at the end of 2008 to give CBG advice regarding efforts to raise capital. |
| $ 38,920 | Sun TX Capital II Management Corp, d/b/a SunTX Capital Partners. Costs incurred in connection with efforts to raise capital. |
| $ 994,505 | Ernst & Young LLP was retained by CBG's audit committee in connection with TARP matters. |

| | |
|---|---|
| $    500,000 | Promontory Financial Corp.'s fees and expenses. Promontory was retained by engagement letter dated June 15, 2009, to assist CBG in responding to the cease and desist order by FDIC, and worked on capital plan, asset quality improvement plan, management plan, and ALLL policy prepared as part of this engagement. |
| **$ 5,508,414** | **Total TARP Process Costs** |

**C.     Pension Benefit Obligations:**

Approximately $31,144,164 in unfunded benefit liabilities and the insurance premiums related thereto which would have been substantially reduced.

**IV.     Insurance agreements under which an insurer may be liable to satisfy all or part of a possible judgment.**

Not applicable.

[*Signatures on following page.*]

Dated: October 24, 2014    /s/ Rufus T. Dorsey, IV

Rufus T. Dorsey, IV
Ronald T. Coleman, Jr.
**Parker, Hudson, Rainer & Dobbs LLP**
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303
T: (404) 523-5300
F: (404) 522-8409
rtd@phrd.com
rtc@phrd.com


Andrew P. Campbell
Caroline Smith Gidiere
**Campbell, Guin, Williams, Guy & Gidiere LLC**
505 N. 20th Street, Suite 1600
Birmingham, AL 35203
(205) 224-0751
andy.campbell@campbellguin.com
caroline.gidiere@campbellguin.com


Nicholas DiCarlo
Christopher Caserta
**DiCarlo Caserta & McKeighan PLC**
6900 E. Cambelback Road, Suite 250
Scottsdale, AZ 85251
T: (480) 892-2488
ndicarlo@dcmplaw.com
ccaserta@dcmplaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing

document was served on October 24, 2014 by electronic mail and first class U.S. mail,

postage pre-paid, upon the following parties at their respective addresses:

David Mullin
Mullin Hoard & Brown, LLP
500 South Taylor, Suite 800
Amarillo, Texas 79101
*Counsel for FDIC-R*

Stanley J. Parzen
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
*Counsel for Crowe*

Elizabeth V. Tanis
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, GA 30309
*Counsel for PwC*

  /s/ Rufus T. Dorsey, IV
Rufus T. Dorsey, IV

# EXHIBIT 5

**Parzen, Stanley J.**

---

**From:**      David Mullin [dmullin@mhba.com]
**Sent:**      Monday, August 06, 2012 2:17 PM
**To:**        Parzen, Stanley J.
**Subject:**   Colonial Bank


Stanley, Would Crowe be interested in a 45 day tolling agreement if I could get one approved
by the FDIC? David

Sent from my iPad

# EXHIBIT 6

# TOLLING AGREEMENT

**THIS TOLLING AGREEMENT** is made this 9th day of August, 2012 (the "Effective Date"), by and between the Federal Deposit Insurance Corporation, as receiver for Colonial Bank ("FDIC"), and Crowe Horwath LLP ("Crowe"). FDIC and Crowe may be referenced collectively in this Tolling Agreement as the "Parties" or each separately as a "Party."

**WHEREAS**, the Alabama State Banking Department closed Colonial Bank ("Colonial") on August 14, 2009, and FDIC was appointed as the receiver for Colonial; and

**WHEREAS**, the FDIC is considering one or more claims it may assert as Colonial's receiver against Crowe relating to the internal audit services Crowe provided, up through and including August 14, 2009, pursuant to the agreements Crowe made with Colonial BancGroup, Inc. ("Holding Company") (such claims hereafter the "FDIC Claims"); and

**WHEREAS**, nothing in the foregoing definition of "FDIC Claims" or this Tolling Agreement generally shall be construed to expand or limit the claims the FDIC could have brought against Crowe in the absence of this Tolling Agreement; and

**WHEREAS**, Crowe has denied, and continues to deny, all wrongdoing; and

**WHEREAS**, the Parties have indicated a desire to continue discussions during the Tolling Period (as defined below) regarding whether the FDIC Claims (and/or any claims or counterclaims that Crowe might have against the FDIC) should be brought or otherwise resolved; and

**WHEREAS**, the Parties have therefore agreed to toll and suspend all timing defenses and statutes of limitation in accordance with this Tolling Agreement; and

**WHEREAS**, execution of this Tolling Agreement and the agreements hereunder shall not be construed as an admission of any wrongdoing of any manner whatsoever, nor shall the execution of this Tolling Agreement be deemed to expand, waive or preclude any claim or any right to institute litigation (except as expressly set forth herein).

**NOW THEREFORE**, with the foregoing recitals incorporated herein, the Parties, intending to be legally bound, agree in consideration of the terms of this Tolling Agreement, the sufficiency of which is acknowledged, as follows:

1.      Any and all statutes of limitations or repose that would have otherwise expired or lapsed at any time during the time period beginning on the Effective Date and ending on October 10, 2012 (the "Termination Date") shall be tolled, suspended, and not expire or lapse until after the Termination Date.  The time from the Effective Date until the Termination Date shall be referred to as the "Tolling Period."  The Tolling Period shall not be included in the calculation of the time under any Statute of Limitations, as defined below. All Statutes of Limitations tolled pursuant to this Tolling Agreement will begin to run once again beginning on the day following the Termination Date.

2.     For purposes of this Tolling Agreement, the term "Statute of Limitations" shall include any timing defense, and any statutory, common law, equitable, or contractual time period of limitations or repose of claims and any defense related to, or predicated upon, the passage of time, including, without limitation, the defense of laches, with respect to the FDIC Claims and/or any claims or counterclaims that Crowe might have against the FDIC.

3.     All claims, defenses, cross-claims, or counterclaims that either Party could have asserted against the other Party at any time on or before the Effective Date shall be preserved without any prejudice during the Tolling Period.  The Tolling Agreement shall be prospective in nature, and, therefore, without prejudice to any claims or defenses that either Party had or may have had as they respectively stood as of the Effective Date.  Nothing in this Tolling Agreement or any actions taken pursuant thereto shall be construed to revive any claim or counterclaim that was barred at any time on or before the Effective Date by reason of any Statute of Limitation, or to excuse or cure any defect in any claim or counterclaim that existed on or before the Effective Date.  Nor does this Tolling Agreement constitute an admission or acknowledgement as to the applicability or inapplicability of any particular Statute of Limitations.

4.     In consideration of the stipulations, covenants, and agreements of the Parties set forth herein, the FDIC covenants and agrees that it will not file a lawsuit against Crowe on the FDIC Claims prior to October 3, 2012.  Nor shall the FDIC seek to take any administrative actions against Crowe (including, without limitation, the initiation or enforcement of administrative discovery) or seek to impose any new obligations upon Crowe during the Tolling Period.

5.     Nothing in this Tolling Agreement shall in any way limit or impair the FDIC's ability to initiate proceedings against the Holding Company or any party other than Crowe in any jurisdiction to determine ownership of the FDIC Claims.

6.     This Tolling Agreement shall not be construed as an admission of any wrongdoing of any manner whatsoever or the merit of any purported claim in connection with any activities of Crowe.

7.     The Tolling Period provided by this Tolling Agreement or other terms in this Tolling Agreement may be modified or extended by an agreement in writing and signed by the Parties.

8.     The Parties agree that, solely for purposes of enforcing the rights and obligations established hereunder, this Tolling Agreement shall be construed, governed, and enforced in accordance with federal law of the United States of America, and in the absence thereof, the laws of the State of Alabama; provided, however, that it is understood that any rule of construction against the drafter of this Tolling Agreement shall not be applied to any interpretation of this Tolling Agreement.

9.     It is acknowledged that both Parties have consulted with their respective legal counsel as to the terms and effect of this Tolling Agreement and otherwise.

10.     This Tolling Agreement contains the full and complete agreement of the Parties concerning the subject matter hereof, and it may not be altered or amended except in writing

executed by the Parties.  In entering into this Tolling Agreement, no Party has relied upon any statement, representation or warranty of the other Party that is not set forth expressly herein. This Tolling Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but also which together will constitute one and the same instrument; provided, however, this Tolling Agreement shall have no force or effect until and unless it is executed and delivered on behalf of both Parties. Photocopies and/or facsimile and/or e-mail transmissions of original signatures shall be considered in all respects equivalent to original signatures.

11.     Each Party stipulates, agrees and warrants to the other Party (i) that the terms, extent, and duration of this Tolling Agreement are reasonable, (ii) that it will not challenge or contest in any way the capacity or the authority of either Party hereto to make the agreements, covenants, waivers, stipulations, and warranties herein set forth, and (iii) that the person executing and delivering this Tolling Agreement on its behalf has the necessary and appropriate authority and capacity to execute and deliver this Tolling Agreement and to make this Tolling Agreement fully binding upon and enforceable against it.

12.     This Tolling Agreement is binding upon and inures to the benefit of the Parties hereto and their successors.

13.     This Tolling Agreement shall not be used for any purpose except to enforce its terms or to establish its existence.

**IN WITNESS WHEREOF**, the parties have executed this Tolling Agreement as of the Effective Date and intend to be legally bound by its terms.

**FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF COLONIAL BANK**

By: _____
One of Its Attorneys

**CROWE HORWATH LLP**

By: _____
One of Its Attorneys

EXHIBIT 7

# EXTENSION OF TOLLING AGREEMENT

**WHEREAS,** effective August 9, 2012, the Federal Deposit Insurance Corporation, as receiver for Colonial Bank ("FDIC"), and Crowe Horwath LLP ("Crowe") entered into a tolling agreement ("Tolling Agreement") tolling the statute of limitations and containing other provisions as relating to Colonial Bank (FDIC and Crowe are hereinafter collectively referred to as the "Parties" or each separately as a "Party");

**WHEREAS,** paragraph 7 of the Tolling Agreement provides that its terms may be modified or extended by an agreement in writing signed by the Parties; and

**WHEREAS,** by executing this Extension of Tolling Agreement ("Extension") the Parties wish to extend the deadlines set out in the Tolling Agreement.

**NOW, THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:**

1.   The Termination Date set forth in Paragraph 1 of the Tolling Agreement shall be changed from October 10, 2012 to October 31, 2012.

2.   The first sentence of Paragraph 4 of the Tolling Agreement is amended to read as follows: "In consideration of the stipulations, covenants, and agreements of the Parties set forth herein, the FDIC covenants and agrees that it will not file a lawsuit against Crowe on the FDIC Claims prior to October 24, 2012."

3.   Except as modified by paragraphs 1 and 2 above, all provisions of the Tolling Agreement shall remain in full force and effect.

4.   Each Party stipulates, agrees and warrants to the other Party (i) that the terms, extent, and duration of this Extension are reasonable, (ii) that it will not challenge or

contest in any way the capacity or the authority of either Party hereto to make the agreements, covenants, waivers, stipulations, and warranties herein set forth, and (iii) that the person executing and delivering this Extension on its behalf has the necessary and appropriate authority and capacity to execute and deliver this Extension and to make this Extension fully binding upon and enforceable against it.

5.   In entering into this Extension, no Party has relied upon any statement, representation or warranty of the other Party that is not set forth expressly herein.  This Extension may be executed in counterparts which collectively shall constitute an original document; provided, however, this Extension shall not be effective until and unless it is executed and delivered on behalf of both Parties. Facsimile and electronic transmissions, and photocopies of original signatures shall be equivalent to original signatures.

**IN WITNESS WHEREOF**, the parties have executed this Extension of Tolling Agreement as of August 31, 2012, and intend to be legally bound by its terms.

**FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF COLONIAL BANK**

By: _____
One of Its Attorneys

**CROWE HORWATH LLP**

By: _____
One of Its Attorneys

# EXHIBIT 8

No. 13-3183

# In the United States Court of Appeals
# for the Tenth Circuit

---

## NATIONAL CREDIT UNION ADMINISTRATION BOARD,

**Plaintiff-Appellant,**

**v.**

## BARCLAYS CAPITAL, INC., *et al*.,

**Defendants-Appellees.**

---

**On Appeal from the United States District Court for the District of Kansas
Honorable John W. Lungstrum, District Judge, Civil Action No. 2:12-cv-02631**

---

## BRIEF OF AMICUS CURIEA FEDERAL DEPOSIT INSURANCE
## CORPORATION IN SURPPORT OF APPELLANT

---

COLLEEN J. BOLES
Assistant General Counsel
KATHRYN R. NORCROSS
Senior Counsel
JEROME A. MADDEN
Counsel
FEDERAL DEPOSIT INSURANCE
    CORPORATION
3501 Fairfax Drive, VS-D7176
Arlington, VA 22226-3500
(703) 562-2049
Email: cboles@fdic.gov
Email: knorcross@fdic.gov
Email: jemadden@fdic.gov

**August 30, 2013**

# Table of Contents

Table of Authorities....................................................................iii

Statement of Identity, Interest, and Authority to File............................1

Summary of Argument...............................................................2

Argument................................................................................5

    I.   The District Court Erred in Concluding that the Extender
          Statute Prohibits Tolling Agreements ....................................5

        A. Nothing in the Plain Meaning of the Extender Statute
           Precludes Tolling Agreements..............................................5

        B. Two Other Courts Have Interpreted the Extender
           Statute's "Notwithstanding" Phrase to Displace Short
           Limitations Provisions in a Bank's Fidelity Bonds.............8

        C. The District Court Failed to Apply the Correct Analytic
           Approach in Interpreting the Extender Statute ...............11

           i.    Tolling Agreements Further the Purpose of
                FIRREA to Protect Depositors, the Deposit
                Insurance Fund, and the Public in General.............15

           ii.   The Legislative History of the Extender Statute
                Supports the Use of Tolling Agreements .................17

           iii.  The Structure and Purpose of Section 1821 of
                FIRREA Read as a Whole Supports the FDIC's
                Reading of the Extender Statute.............................20

        D. At a Minimum, the District Court's Reading of the
           Extender Statute Renders It Ambiguous..........................22

           i.    Ambiguous Statutes of Limitations Are Interpreted
                in Favor of the Government ......................................23

i

      ii.    The FDIC's Reading of the Extender Statute Is
              Entitled to *Skidmore* Deference ................................ 23

II.  Even if the Extender Statute Cannot Be Tolled by
     Agreement, Defendants Should Be Estopped by Their
     Conduct from Arguing That the Limitations Period Expired 24

III.  The Extender Statute Provides that Appointment of the
     NCUA as Conservator or Liquidating Agent Restarts the
     State Law of Statutes of Limitation ....................................... 28

Conclusion    ..... ...................................................................... 31

**Statement of Identity, Interest, and Authority to File**

The Federal Deposit Insurance Corporation ("FDIC") is an agency of the United States created by Congress to maintain stability and public confidence in the nation's financial system by insuring deposits, examining and supervising financial institutions, and managing receiverships.[1]  The FDIC, therefore, is authorized to file this *amicus curiae* brief pursuant to Fed. R. App. P. 29(a).  At the end of 2012, the FDIC insured approximately $6 trillion in deposits in the nation's 7,019 banks and thrifts.  Since the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"),[2] 1,552 financial institutions have been closed and placed into receivership and today there are approximately 500 open receiverships.

The FDIC has a compelling interest in this appeal because the statute at issue, 12 U.S.C. § 1787(b)(14)(A), which is part of the statutory scheme administered by the National Credit Union Administration Board ("NCUA") in connection with the liquidation of failed credit unions, is identical in all material respects to 12 U.S.C. §

---

[1] 12 U.S.C. § 1811 *et seq.*; *see also* 12 U.S.C. § 1819 Fourth (stating that the FDIC is authorized "[t]o sue and be sued, and complain and defend, by and through its own attorneys, in any court of law or equity, State or Federal"); and http://www.fdic.gov/about/mission/index.html.
[2] Pub. L. No. 101—73, 103 Stat. 183 (1989).

1821(d)(14)(A), which is part of the statutory scheme administered by the FDIC in connection with resolving failed insured depository institutions.[3]  Both statutes were enacted as part of FIRREA.  Since 1989, the FDIC has regularly entered into hundreds of tolling agreements, with approximately eighty currently in effect, and this practice was never challenged until this case.

## Summary of Argument

The Extender Statute provides that "[n]otwithstanding any provision of any contract, the applicable statute of limitations . . . shall be. . . the 3-year period beginning on the date the claim accrues" unless the otherwise applicable state limitations period is longer.[4]  These words literally mean what they say:  Notwithstanding any provision of any contract, the statute of limitations in the Extender Statute displaces such provisions.  The District Court, however, merely read the "notwithstanding" phrase and held that it prohibits the use of tolling agreements because such agreements *change* the statute of limitations.

---

[3] ("NCUA Extender Statute" and "FDIC Extender Statute," respectively; collectively the "Extender Statute").  In enacting the Housing and Economic Recovery Act of 2008, Congress enacted the same statute applicable to the claims of Government Sponsored Enterprises such as Freddie Mac and Fannie Mae for which the newly created Federal Housing Finance Agency acts as conservator.  12 U.S.C. § 4617(b).

[4] 12 U.S.C. § 1787(b)(14)(A).

2

## Conclusion

For all of the foregoing reasons, the FDIC respectfully requests

that the Order of the District Court be reversed and the case remanded.

Respectfully submitted,

COLLEEN J. BOLES
ASSISTANT GENERAL COUNSEL
KATHRYN R. NORCROSS
SENIOR COUNSEL
/s/ *Jerome A. Madden*
JEROME A. MADDEN
COUNSEL
FEDERAL DEPOSIT INSURANCE
CORPORATION
3501 FAIRFAX DRIVE, VS-D7004
ARLINGTON, VA 22226-3500
TELEPHONE: (703) 562-2010
FACSIMILE: (703) 562-2477
EMAIL: CJBOLES@FDIC.GOV
EMAIL: KNORCROSS@FDIC.GOV
EMAIL: JEMADDEN@FDIC.GOV

## Certificate of Compliance with
## <u>Fed. R. App. P. 32(a)(7)(C) and Fed. R. App. P. 29(d)</u>

This brief was prepared using Century proportionally spaced face in 14 point font size.  The brief contains 6,845 words.

/s/ <u>*Jerome A. Madden*</u>
Jerome A. Madden

## CERTIFICATE OF SERVICE

I, Jerome A. Madden, hereby certify that on August 30, 2013 a true and correct copy of the foregoing brief of the Federal Deposit Insurance Corporation, as Appellee, was served by way of the CM/ECF system upon all counsel of record.


/s/ *Jerome A. Madden*
JEROME A. MADDEN

EXHIBIT 9

# COLONIAL BANCGROUP, INC.

# INTERNAL AUDIT REPORT

# MORTGAGE WAREHOUSE LENDING

# 2008-2009

Crowe Horwath.

This report has been prepared by Crowe Horwath LLP in accordance with the terms of our engagement letter, dated April 15, 2008, and furnished solely for the information and use of management, the Audit Committee, and the Board of Directors of Colonial BancGroup, Inc. and its regulatory agencies and is not to be used for any other purpose.


Colonial
BancGroup

Confidential treatment requested by
Crowe Horwath LLP

CH 05812

COLONIAL BANCGROUP, INC.

INTERNAL AUDIT REPORT

MORTGAGE WAREHOUSE LENDING



Confidential treatment requested by
Crowe Horwath LLP

CH 05813

COLONIAL BANCGROUP, INC.

INTERNAL AUDIT REPORT
MORTGAGE WAREHOUSE LENDING

CONTENTS

I. Executive Summary.................................................................................. 1

II. Internal Audit Scope.............................................................................. 3

III. Audit Findings, Recommendations and Action Plans........................... 7

Confidential treatment requested by
Crowe Horwath LLP

CH 05814

## COLONIAL BANCGROUP, INC.

## INTERNAL AUDIT REPORT

## MORTGAGE WAREHOUSE LENDING

---

## I.   Executive Summary

During the period ending October 3, 2008, Crowe Horwath staff performed an internal audit in the Mortgage Warehouse Lending area of Colonial Bank as of July 31, 2007 Our work focused on the Bank's policies and procedures used in the area, based on a risk assessment by your management, with which we concurred.  Your Internal Audit Liaison approved our work plan, based on this risk assessment, and we communicated the work we did and our results with management and your Internal Audit Liaison.  The purpose of the internal audit was to review the controls over Mortgage Warehouse Lending activities.  We reviewed policies and procedures, discussed compliance with these policies and procedures with Bank personnel, and tested certain detail records.

In this report, we give you a summary of our findings and recommendations along with management's responses.  A detailed listing of the audit results was provided to the line of business manager at our exit meeting.  Thank you for this opportunity to report the results of our internal audit process.  We wish to also thank the Mortgage Warehouse Lending staff for their cooperation and assistance during the audit.

The Mortgage Warehouse Lending internal audit at Colonial Bank resulted in two findings, as follows:

| Finding Number | Nature of Finding | Risk Rating | Repeat/ Partial Repeat Finding |
|---|---|---|---|
| 1 | During our testing of five new customers from 2008, we noted the sublimit interest rates for one customer as approved and documented on file were found to be wrong in the ProMerit system. | 3 | |
| 2 | We noted that, while the Mortgage Warehouse Loan Committee appears to be monitoring problem loans, they were not receiving a formal problem loan report used to ensure the discussion of all loans. | 4 | |

Risk Rating Scale:
(1 – most important)
(5 – least important)

Based on the results noted above, the overall control environment remains strong.  However, management should focus on ensuring sublimit interest rates input into ProMerit are correct and that monitoring of problem loans is enhanced.

---

**Crowe Horwath**™


Colonial
BancGroup

Confidential treatment requested by
Crowe Horwath LLP

CH 05815

COLONIAL BANCGROUP, INC.

INTERNAL AUDIT REPORT

MORTGAGE WAREHOUSE LENDING

This audit report has received an overall rating of **Satisfactory** from the Internal Audit Liaison. A Satisfactory rating is defined as follows:

> The controls in place are adequate to maintain a level of risk which, in our opinion, is acceptable under the circumstances. We may make several recommendations for further strengthening of controls and/or efficiencies in operation, but we do not consider the overall risk to be greater than prudent bankers would be willing to accept in the normal course of business.

Crowe Horwath™


Colonial
BancGroup

Confidential treatment requested by
Crowe Horwath LLP

CH 05816

COLONIAL BANCGROUP, INC.

INTERNAL AUDIT REPORT

MORTGAGE WAREHOUSE LENDING

---

## II. Internal Audit Scope

The scope of our internal audit included monitoring controls over Mortgage Warehouse Lending activity, managing customer relationships, processing and recording transactions, safeguarding of assets, and regulatory compliance. Internal controls over Mortgage Warehouse Lending were evaluated through observation and interviews with various key personnel, as well as testing of selected transactions.

We performed the following tests and procedures:

- Reviewed the system of internal controls (operational, financial reporting, and compliance) by interacting with management throughout the business process to evaluate objectives, risks and the appropriate level of control. In addition, we performed tests, where appropriate, to determine if established controls were in place and functioning effectively.

- Updated the 2008-2009 Risk Assessment relative to the Mortgage Warehouse Lending process.

- Determined the current status of prior audit findings and related management action plans.

- Obtained and reviewed the most recent regulatory examination report and performed follow-up with management, as applicable, on action plans implemented to address issues relating to the business process.

- Reviewed all general ledger accounts relating to the business process to ensure a reconcilement was prepared and approved in a timely manner and mathematically correct. Determined that reconciling items were adequately described and, for selected accounts greater than $50,000 and in-process accounts, traced a sample of items to ensure validity and proper and timely clearance. Subsidiary and general ledger totals were verified for accuracy. Examined selected suspense items to determine validity.

- Obtained a copy of the Demand Deposit Accounting Overdraft Report for a consecutive number of days and reviewed to ensure the reason for the overdraft was documented for each item and selected a sample of 10 accounts for review to determine whether overdrafts paid were in approved in accordance with policy.

- Obtained a copy of the July 31, 2008 Division reports provided to the Accounting Department and the Loan Loss Reserve reports for the Division prepared by the accounting department and performed testing as follows:

  o Agreed to the total loans on the MWL statement of condition.

---

Crowe Horwath™



Confidential treatment requested by
Crowe Horwath LLP

CH 05817

COLONIAL BANCGROUP, INC.

INTERNAL AUDIT REPORT

MORTGAGE WAREHOUSE LENDING

_____

- o Agreed the loans rated 5 (Management Attention), 6 (Special Mention), and 7 (substandard) to the ProMerit system.

- o Agreed the loan balances on the management report for the MWL Division to the MWL statement of condition.

- o Recalculated the Reserve to loans (period end) of 0.20% on the management report for the MWL Division.

- o Agreed the Special Mention and Substandard loan balances on the adequacy of the allowance for loan losses to the ProMerit system.

- For a sample of 10 customers (including 5 new customers acquired during 2008), performed testing of file documentation to determine adherence to loan policy and underwriting guidelines.

- Reviewed the interest rates for a sample of 5 new customers to ensure that the rates are properly reflected on ProMerit (each customer has various rates related to various sub-limits under their overall relationship).

- Selected a sample of loans that were not being curtailed in accordance with the curtailment schedule from the Compliance Report used to monitor loans that were not following the current curtailment schedule.  Note whether appropriate follow-up was being done with the customer.

- Selected a sample of loans from the Shipped Not Paid Report that were 45 days or older and noted whether appropriate follow-up was being done with the customer and determined whether Bailee Violation Letters had been sent.

- Obtained Pipeline Reports and selected a sample of collateral packages (including loans backing warehouse lines and those purchased and available for sale or COLB) and reviewed the packages for the following documents:

- o Note (i.e. original and endorsed in blank);

- o Mortgage (i.e. certified copy);

- o Assignment to Colonial Bank (i.e. original in recordable form, but unrecorded);

- o Product information as recorded on the ProMerit system agrees with the documentation in the collateral package.

- For each of the collateral packages reviewed, reviewed the Loan Advance Request (LAR) for the following items:

_____

Crowe Horwath.


Colonial
BancGroup

Confidential treatment requested by
Crowe Horwath LLP

CH 05818

## COLONIAL BANCGROUP, INC.

## INTERNAL AUDIT REPORT

## MORTGAGE WAREHOUSE LENDING

- o LAR was signed by an authorized signer, as noted in the Corporate Resolution;

- o Advance amount did not exceed loan amount;

- o Funding information was complete, indicating either the check number and amount of check, or indicating that a wire was used to advance the funds; and

- o Ensured that the Investor information was complete and matched the Investor information as recorded on the ProMerit system.

- ▪ Reviewed a sample of COLB transactions to determine there was a Master Participation agreement on file for the customer and that there was a participation certificate for each transaction.

- ▪ Obtained the Loans-in-Process outstanding items reports for the last business day of the previous two months preceding our audit date and reviewed with management for suspicious patterns and stale items.  Documented and assessed monitoring controls over the Loans-in-Process account.

- ▪ Reviewed the controls over incoming and outgoing wire transfers.

- ▪ Obtained outgoing wire transfer reports and selected a sample of 20 outgoing wires related to line advances or purchases.  Reviewed the wire instructions for each customer and reviewed the Wire Transfer Agreements to ensure that the transfer was completed in accordance with the agreements and policy.

- ▪ Selected a sample of 10 incoming wires received during and determined the following:

- o The wire posted to Investor Funding Account timely on day of the wire.

- o The "haircut" transferred from the Investor Funding account to the Master Advance account properly.

- o The wire amount washed through general ledger Loans In Process account properly.

- ▪ Reviewed the scope of the internal compliance review function and determined adequacy.

- ▪ Selected a sample of 5 accounts and verified that the mailing address for the DDA statement was not in hold mail status or being sent to Mortgage Warehouse Lending or Loan Operations.

- ▪ Reviewed the controls over the process for balancing participation accounts.

- ▪ Reviewed the controls over custodial services processes.

Crowe Horwath™


Colonial
BancGroup

Confidential treatment requested by
Crowe Horwath LLP

CH 05819

COLONIAL BANCGROUP, INC.

INTERNAL AUDIT REPORT

MORTGAGE WAREHOUSE LENDING

- Reviewed and summarized the Mortgage Warehouse Loan Committee meetings minutes from 2008 and determined the Committee was reviewing sufficient information to provide oversight to the Division.

- Performed testing of Sarbanes-Oxley 404 key controls.

Crowe Horwath.

-6-



Confidential treatment requested by
Crowe Horwath LLP

CH 05820

COLONIAL BANCGROUP, INC.

INTERNAL AUDIT REPORT

MORTGAGE WAREHOUSE LENDING

---

### III.  Audit Findings, Recommendations and Action Plans

**Finding #1:  ProMerit System Input**
**Risk Rating:  3**

Interest rates charged to customers on the ProMerit system should agree to the rates approved by management and documented on file.  During our testing of five new customers from 2008, we noted the sublimit interest rates for one customer as approved and documented on file were found to be wrong in the ProMerit system.  Rates were higher on the system by 25 basis points.  The customer was refunded $699 in interest.  While there appeared to be a secondary review processes in place to help identify errors as customer account information is set-up or changed in ProMerit, this was the first credit the assigned Relationship Manager reviewed and he did not catch the error.  According to management, the client was very complex in the terms structure.

**Implication**

Input errors could lead to poor customer service and potential inaccuracies in financial reporting.

**Recommendation**

We recommend management reinforce the importance of diligently following processes to ensure accurate system input.  In addition, management may want to consider assigning more complex clients to more experienced Relationship Managers in the future.

**Management Action Plan**

Management has reiterated the controls in place to check pricing.  The Relationship Manager assigned to this account is VERY experienced in the business – 20+ years.  However, he'd only been with Colonial for 3 months – and didn't catch the change – because the pricing decreased in mid-documentation.  We have gone over the finding with him, and he is very aware of what to look for in the future.

**Individual Responsible:** Cathie Kissick and Laura Bryan

**Due Date:** Complete

---

Crowe Horwath.


Colonial
BancGroup

Confidential treatment requested by
Crowe Horwath LLP

CH 05821

COLONIAL BANCGROUP, INC.

INTERNAL AUDIT REPORT

MORTGAGE WAREHOUSE LENDING

**Finding #2:  Problem Loan Reporting**
**Risk Rating:  4**

A listing of problem loans should be provided to Mortgage Warehouse Loan Committee members to ensure that all problems loans are discussed during periodic meetings.   We noted that, while the Committee appears to be monitoring problem loans, they were not receiving a formal problem loan report used to ensure the discussion of all loans.

**Implication**

Without a listing of the problem loans, there is an increased risk that a loan may not be discussed.

**Recommendation**

We recommend management prepare listing of all loans that need to be discussed and the listing be presented to the Committee to ensure that the committee discusses and is aware of all problem loans.

**Management Action Plan**

Management feels this is a good recommendation to formalize what we've been doing.  The week after the Crowe Horwath audit site work was completed, we held a regularly scheduled loan committee and added on the agenda the review of the "Special Assets".  This has been on all agendas going forward.  Therefore, the review of the Special Assets is not only in the minutes, but it's on the Agendas, as well.   Anyone who comes to audit MWL will see that we discuss these loans on a frequent basis.

**Individuals Responsible:** Cathie Kissick and Sandra Pogue

**Due Date:**  Complete

Crowe Horwath™


Colonial
BancGroup

Confidential treatment requested by
Crowe Horwath LLP

CH 05822

# Exhibit 10
# To Be Filed
# Under Seal

# Exhibit 11

# To Be Filed Under Seal

# Exhibit 12

# To Be Filed Under Seal

# Exhibit 13

# To Be Filed Under Seal

# Exhibit 14
# To Be Filed
# Under Seal

EXHIBIT 15

Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Office of the Comptroller of the Currency

**Federal Financial Institutions Examination Council**



1

# Consolidated Reports of Condition and Income for A Bank With Domestic and Foreign Offices - FFIEC 031

| | |
|---|---|
| Institution Name | **COLONIAL BANK** |
| City | **MONTGOMERY** |
| State | **AL** |
| Zip Code | **36101** |
| Call Report Quarter End Date | **12/31/2002** |
| Report Type | **031** |
| RSSD-ID | **570231** |
| FDIC Certificate Number | **9609** |
| OCC Charter Number | **0** |
| ABA Routing Number | **62001319** |
| Last updated on | **8/8/2005** |

Case 2:11-cv-00746-BJR-WC   Document 185-4   Filed 10/14/15   Page 92 of 106

## Schedule RI-A - Changes in Equity Capital

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Total equity capital most recently reported for the December 31, 2001, Reports of Condition and Income (i.e., after adjustments from amended Reports of Income)................................ | RIAD3217 | 937,299 | 1. |
| 2. Restatements due to corrections of material accounting errors and changes in accounting principles................................................................................................................................... | RIADB507 | 0 | 2. |
| 3. Balance end of previous calendar year as restated.............................................................. | RIADB508 | 937,299 | 3. |
| 4. Net income (loss)................................................................................................................... | RIAD4340 | 146,144 | 4. |
| 5. Sale, conversion, acquisition, or retirement of capital stock, net (excluding treasury stock transactions)......................................................................................................................... | RIADB509 | 0 | 5. |
| 6. Treasury stock transactions, net.......................................................................................... | RIADB510 | 0 | 6. |
| 7. Changes incident to business combinations, net.................................................................. | RIAD4356 | 174,674 | 7. |
| 8. Cash dividends declared on preferred stock......................................................................... | RIAD4470 | 0 | 8. |
| 9. Cash dividends declared on common stock........................................................................... | RIAD4460 | 66,032 | 9. |
| 10. Other comprehensive income................................................................................................ | RIADB511 | 9,338 | 10. |
| 11. Other transactions with parent holding company.................................................................. | RIAD4415 | -68 | 11. |
| 12. Total equity capital end of current period............................................................................. | RIAD3210 | 1,201,355 | 12. |

## Schedule RI-B, Part I - Charge-offs and Recoveries on Loans and Leases

| Dollar amounts in thousands | (Column A) Charge-offs Calendar year-to-date | | (Column B) Recoveries Calendar year-to-date | | |
|---|---|---|---|---|---|
| 1. Loans secured by real estate | | | | | 1. |
| a. Construction, land development, and other land loans in domestic offices................................................................................................................ | RIAD3582 | 1,810 | RIAD3583 | 93 | 1.a. |
| b. Secured by farmland in domestic offices................................................ | RIAD3584 | 413 | RIAD3585 | 0 | 1.b. |
| c. Secured by 1-4 family residential properties in domestic offices: | | | | | 1.c. |
| 1. Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit................................... | RIAD5411 | 1,053 | RIAD5412 | 73 | 1.c.1. |
| 2. Closed-end loans secured by 1-4 family residential properties | | | | | 1.c.2. |
| a. Secured by first liens.................................................... | RIADC234 | 2,397 | RIADC217 | 71 | 1c2a. |
| b. Secured by junior liens................................................. | RIADC235 | 1,770 | RIADC218 | 421 | 1c2b. |
| d. Secured by multifamily (5 or more) residential properties in domestic offices................................................................................................................ | RIAD3588 | 54 | RIAD3589 | 2 | 1.d. |
| e. Secured by nonfarm nonresidential properties in domestic offices.. | RIAD3590 | 3,597 | RIAD3591 | 1,003 | 1.e. |
| f. In foreign offices.................................................................................. | RIADB512 | 0 | RIADB513 | 0 | 1.f. |
| 2. Loans to depository institutions and acceptances of other banks: | | | | | 2. |
| a. To U.S. banks and other U.S. depository institutions....................... | RIAD4653 | 0 | RIAD4663 | 0 | 2.a. |
| b. To foreign banks.................................................................................. | RIAD4654 | 0 | RIAD4664 | 0 | 2.b. |
| 3. Loans to finance agricultural production and other loans to farmers..... | RIAD4655 | 230 | RIAD4665 | 30 | 3. |
| 4. Commercial and industrial loans: | | | | | 4. |
| a. To U.S. addressees (domicile)........................................................... | RIAD4645 | 16,625 | RIAD4617 | 1,159 | 4.a. |
| b. To non-U.S. addressees (domicile)................................................... | RIAD4646 | 3,000 | RIAD4618 | 0 | 4.b. |
| 5. Loans to individuals for household, family, and other personal expenditures: | | | | | 5. |
| a. Credit cards........................................................................................ | RIADB514 | 0 | RIADB515 | 0 | 5.a. |
| b. Other (includes single payment, installment, all student loans, and revolving credit plans other than credit cards)................................... | RIADB516 | 3,606 | RIADB517 | 1,589 | 5.b. |
| 6. Loans to foreign governments and official institutions........................... | RIAD4643 | 0 | RIAD4627 | 0 | 6. |
| 7. All other loans....................................................................................... | RIAD4644 | 1,082 | RIAD4628 | 444 | 7. |
| 8. Lease financing receivables: | | | | | 8. |
| a. To U.S. addressees (domicile)........................................................... | RIAD4658 | 0 | RIAD4668 | 0 | 8.a. |
| b. To non-U.S. addressees (domicile)................................................... | RIAD4659 | 0 | RIAD4669 | 0 | 8.b. |

Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Office of the Comptroller of the Currency

**Federal Financial Institutions Examination Council**



1

# Consolidated Reports of Condition and Income for A Bank With Domestic and Foreign Offices - FFIEC 031

| | |
|---|---|
| Institution Name | **COLONIAL BANK, NATIONAL ASSOCIATION** |
| City | **MONTGOMERY** |
| State | **AL** |
| Zip Code | **36101** |
| Call Report Quarter End Date | **12/31/2003** |
| Report Type | **031** |
| RSSD-ID | **570231** |
| FDIC Certificate Number | **9609** |
| OCC Charter Number | **24444** |
| ABA Routing Number | **62001319** |
| Last updated on | **8/15/2005** |

COLONIAL BANK, NATIONAL ASSOCIATION
RSSD-ID 576331
Last Updated on 8/15/2005

FFIEC 031
Quarter End Date 12/31/2003

5

Case 2:11-cv-00746-BJR-WC   Document 185-4   Filed 10/14/15   Page 94 of 106

Dollar amounts in thousands

| | | | |
|---|---|---:|---|
| 4. Income on tax-exempt securities issued by states and political subdivisions in the U.S. (included in Schedule RI, item 1.d.(3))................................................ | RIAD4507 | 3,997 | M.4. |
| 5. Number of full-time equivalent employees at end of current period............................ | RIAD4150 | 3939 | M.5. |
| 6. Not applicable | | | M.6. |
| 7. If the reporting bank has restated its balance sheet as a result of applying push down accounting this calendar year, report the date of the bank's acquisition........................... | RIAD9106 | 0 | M.7. |
| 8. Trading revenue (from cash instruments and derivative instruments): | | | M.8. |
|    a. Interest rate exposures.............................................................. | RIAD8757 | 0 | M.8.a. |
|    b. Foreign exchange exposures......................................................... | RIAD8758 | 0 | M.8.b. |
|    c. Equity security and index exposures.............................................. | RIAD8759 | 0 | M.8.c. |
|    d. Commodity and other exposures.................................................. | RIAD8760 | 0 | M.8.d. |
| 9. Impact on income of derivatives held for purposes other than trading: | | | M.9. |
|    a. Net increase (decrease) to interest income....................................... | RIAD8761 | -395 | M.9.a. |
|    b. Net (increase) decrease to interest expense..................................... | RIAD8762 | 9,033 | M.9.b. |
|    c. Other (noninterest) allocations..................................................... | RIAD8763 | 0 | M.9.c. |
| 10. Credit losses on derivatives.......................................................................... | RIADA251 | 0 | M.10. |
| 11. Does the reporting bank have a Subchapter S election in effect for federal income tax purposes for the current tax year?.............. | RIADA530 | No | M.11. |

## Schedule RI-A - Changes in Equity Capital

Dollar amounts in thousands

| | | | |
|---|---|---:|---|
| 1. Total equity capital most recently reported for the December 31, 2002, Reports of Condition and Income (i.e., after adjustments from amended Reports of Income).............................. | RIAD3217 | 1,201,356 | 1. |
| 2. Restatements due to corrections of material accounting errors and changes in accounting principles..................................................................................................... | RIADB507 | 0 | 2. |
| 3. Balance end of previous calendar year as restated............................................... | RIADB508 | 1,201,356 | 3. |
| 4. Net income (loss)...................................................................................... | RIAD4340 | 156,727 | 4. |
| 5. Sale, conversion, acquisition, or retirement of capital stock, net (excluding treasury stock transactions)................................................................................................ | RIADB509 | 0 | 5. |
| 6. Treasury stock transactions, net.................................................................... | RIADB510 | 0 | 6. |
| 7. Changes incident to business combinations, net.................................................. | RIAD4356 | 36,574 | 7. |
| 8. Cash dividends declared on preferred stock....................................................... | RIAD4470 | 0 | 8. |
| 9. Cash dividends declared on common stock......................................................... | RIAD4460 | 67,044 | 9. |
| 10. Other comprehensive income........................................................................ | RIADB511 | -19,338 | 10. |
| 11. Other transactions with parent holding company (not included in items 5, 6, 8, or 9 above)..................................................................................................... | RIAD4415 | 56,391 | 11. |
| 12. Total equity capital end of current period.......................................................... | RIAD3210 | 1,364,666 | 12. |

## Schedule RI-B, Part I - Charge-offs and Recoveries on Loans and Leases

| Dollar amounts in thousands | (Column A) Charge-offs Calendar year-to-date | | (Column B) Recoveries Calendar year-to-date | | |
|---|---|---:|---|---:|---|
| 1. Loans secured by real estate: | | | | | 1. |
|    a. Construction, land development, and other land loans in domestic offices.................................................................................. | RIAD3582 | 1,493 | RIAD3583 | 197 | 1.a. |
|    b. Secured by farmland in domestic offices.......................... | RIAD3584 | 747 | RIAD3585 | 18 | 1.b. |
|    c. Secured by 1-4 family residential properties in domestic offices: | | | | | 1.c. |
|       1. Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit............................. | RIAD5411 | 2,167 | RIAD5412 | 125 | 1.c.1. |
|       2. Closed-end loans secured by 1-4 family residential properties: | | | | | 1.c.2. |
|          a. Secured by first liens.......................... | RIADC234 | 89 | RIADC217 | 62 | 1.c2.a |

Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Office of the Comptroller of the Currency

**Federal Financial Institutions Examination Council**



1

# Consolidated Reports of Condition and Income for A Bank With Domestic and Foreign Offices - FFIEC 031

| | |
|---|---|
| Institution Name | **COLONIAL BANK, NATIONAL ASSOCIATION** |
| City | **MONTGOMERY** |
| State | **AL** |
| Zip Code | **36101** |
| Call Report Quarter End Date | **12/31/2004** |
| Report Type | **031** |
| RSSD-ID | **570231** |
| FDIC Certificate Number | **9609** |
| OCC Charter Number | **24444** |
| ABA Routing Number | **62001319** |
| Last updated on | **8/24/2005** |

COLONIAL BANK, NATIONAL ASSOCIATION
RSSD-ID 570231
Last Updated on 8/24/2005

Case 2:11-cv-00746-BJR-WC   Document 185-4   Filed 10/14/15   Page 96 of 106

FFIEC 031
Quarter End Date 12/31/2004

5

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 10. Income (loss) before extraordinary items and other adjustments...................... | RIAD4300 | 181,985 | 10. |
| 11. Extraordinary items and other adjustments, net of income taxes..................... | RIAD4320 | 0 | 11. |
| 12. Net income (loss)............................................................................ | RIAD4340 | 181,985 | 12. |
| 1. Interest expense incurred to carry tax-exempt securities, loans, and leases acquired after August 7, 1986, that is not deductible for federal income tax purposes.......................... | RIAD4513 | 439 | M.1. |
| 2. Income from the sale and servicing of mutual funds and annuities in domestic offices (included in Schedule RI, item 8)........................................................ | RIAD8431 | 5,458 | M.2. |
| 3. Income on tax-exempt loans and leases to states and political subdivisions in the U.S. (included in Schedule RI, items 1.a and 1.b)............................................ | RIAD4313 | 524 | M.3. |
| 4. Income on tax-exempt securities issued by states and political subdivisions in the U.S. (included in Schedule RI, item 1.d.(3))............................................... | RIAD4507 | 3,195 | M.4. |
| 5. Number of full-time equivalent employees at end of current period....................... | RIAD4150 | 4300 | M.5. |
| 6. Not applicable | | | M.6. |
| 7. If the reporting bank has restated its balance sheet as a result of applying push down accounting this calendar year, report the date of the bank's acquisition................... | RIAD9106 | 0 | M.7. |
| 8. Trading revenue (from cash instruments and derivative instruments): | | | M.8. |
| a. Interest rate exposures............................................................. | RIAD8757 | 0 | M.8.a. |
| b. Foreign exchange exposures........................................................ | RIAD8758 | 0 | M.8.b. |
| c. Equity security and index exposures................................................ | RIAD8759 | 0 | M.8.c. |
| d. Commodity and other exposures.................................................... | RIAD8760 | 0 | M.8.d. |
| 9. Impact on income of derivatives held for purposes other than trading: | | | M.9. |
| a. Net increase (decrease) to interest income......................................... | RIAD8761 | -146 | M.9.a. |
| b. Net (increase) decrease to interest expense........................................ | RIAD8762 | 21,524 | M.9.b. |
| c. Other (noninterest) allocations.................................................... | RIAD8763 | 0 | M.9.c. |
| 10. Credit losses on derivatives........................................................ | RIADA251 | 0 | M.10. |
| 11. Does the reporting bank have a Subchapter S election in effect for federal income tax purposes for the current tax year?................................................... | RIADA530 | No | M.11. |

# Schedule RI-A - Changes in Equity Capital

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Total equity capital most recently reported for the December 31, 2003, Reports of Condition and Income (i.e., after adjustments from amended Reports of Income)........................... | RIAD3217 | 1,364,666 | 1. |
| 2. Restatements due to corrections of material accounting errors and changes in accounting principles......................................................................... | RIADB507 | 0 | 2. |
| 3. Balance end of previous calendar year as restated......................................... | RIADB508 | 1,364,666 | 3. |
| 4. Net income (loss)............................................................................ | RIAD4340 | 181,985 | 4. |
| 5. Sale, conversion, acquisition, or retirement of capital stock, net (excluding treasury stock transactions)........................................................................ | RIADB509 | 0 | 5. |
| 6. Treasury stock transactions, net......................................................... | RIADB510 | 0 | 6. |
| 7. Changes incident to business combinations, net.......................................... | RIAD4356 | 107,545 | 7. |
| 8. Cash dividends declared on preferred stock............................................... | RIAD4470 | 0 | 8. |
| 9. Cash dividends declared on common stock................................................ | RIAD4460 | 75,535 | 9. |
| 10. Other comprehensive income............................................................. | RIADB511 | -8,809 | 10. |
| 11. Other transactions with parent holding company (not included in items 5, 6, 8, or 9 above)........................................................................... | RIAD4415 | 23,027 | 11. |
| 12. Total equity capital end of current period................................................ | RIAD3210 | 1,592,879 | 12. |

# Schedule RI-B, Part I - Charge-offs and Recoveries on Loans and Leases

| | (Column A) Charge-offs Calendar year-to-date | | (Column B) Recoveries Calendar year-to-date | | |
|---|---|---|---|---|---|
| Dollar amounts in thousands | | | | | |
| 1. Loans secured by real estate: | | | | | 1. |

Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Office of the Comptroller of the Currency

**Federal Financial Institutions Examination Council**



1

# Consolidated Reports of Condition and Income for A Bank With Domestic and Foreign Offices - FFIEC 031

| | |
|---|---|
| Institution Name | **COLONIAL BANK, NATIONAL ASSOCIATION** |
| City | **MONTGOMERY** |
| State | **AL** |
| Zip Code | **36101** |
| Call Report Quarter End Date | **12/31/2005** |
| Report Type | **031** |
| RSSD-ID | **570231** |
| FDIC Certificate Number | **9609** |
| OCC Charter Number | **24444** |
| ABA Routing Number | **62001319** |
| Last updated on | **2/26/2007** |

COLONIAL BANK, NATIONAL ASSOCIATION
RSSD-ID 572231
Last Updated on 2/26/2007

FFIEC 031
Quarter End Date 12/31/2005

Case 2:11-cv-00746-BJR-WC   Document 185-4   Filed 10/14/15   Page 98 of 106

5

Dollar amounts in thousands

| | | | |
|---|---|---:|---|
| b. Realized gains (losses) on available-for-sale securities.............................................. | RIAD3196 | -24,654 | 6.b. |
| 7. Noninterest expense: | | | 7. |
| a. Salaries and employee benefits................................................................................ | RIAD4135 | 262,850 | 7.a. |
| b. Expenses of premises and fixed assets (net of rental income) (excluding salaries and employee benefits and mortgage interest)............................................................. | RIAD4217 | 106,692 | 7.b. |
| c. Not available | | | 7.c. |
| 1. Goodwill impairment losses.................................................................................. | RIADC216 | 0 | 7.c.1. |
| 2. Amortization expense and impairment losses for other intangible assets............. | RIADC232 | 11,604 | 7.c.2. |
| d. Other noninterest expense..................................................................................... | RIAD4092 | 126,906 | 7.d. |
| e. Total noninterest expense..................................................................................... | RIAD4093 | 508,052 | 7.e. |
| 8. Income (loss) before income taxes and extraordinary items and other adjustments......... | RIAD4301 | 368,265 | 8. |
| 9. Applicable income taxes (on item 8)................................................................................ | RIAD4302 | 124,327 | 9. |
| 10. Income (loss) before extraordinary items and other adjustments.................................... | RIAD4300 | 243,938 | 10. |
| 11. Extraordinary items and other adjustments, net of income taxes.................................... | RIAD4320 | 0 | 11. |
| 12. Net income (loss)........................................................................................................... | RIAD4340 | 243,938 | 12. |
| 1. Interest expense incurred to carry tax-exempt securities, loans, and leases acquired after August 7, 1986, that is not deductible for federal income tax purposes............................. | RIAD4513 | 553 | M.1. |
| 2. Income from the sale and servicing of mutual funds and annuities in domestic offices (included in Schedule RI, item 8)..................................................................................... | RIAD8431 | 6,410 | M.2. |
| 3. Income on tax-exempt loans and leases to states and political subdivisions in the U.S. (included in Schedule RI, items 1.a and 1.b)...................................................................... | RIAD4313 | 550 | M.3. |
| 4. Income on tax-exempt securities issued by states and political subdivisions in the U.S. (included in Schedule RI, item 1.d.(3)).............................................................................. | RIAD4507 | 2,290 | M.4. |
| 5. Number of full-time equivalent employees at end of current period................................... | RIAD4150 | 4605 | M.5. |
| 6. Not applicable | | | M.6. |
| 7. If the reporting bank has restated its balance sheet as a result of applying push down accounting this calendar year, report the date of the bank's acquisition................................ | RIAD9106 | 0 | M.7. |
| 8. Trading revenue (from cash instruments and derivative instruments): | | | M.8. |
| a. Interest rate exposures......................................................................................... | RIAD8757 | NR | M.8.a. |
| b. Foreign exchange exposures.................................................................................. | RIAD8758 | NR | M.8.b. |
| c. Equity security and index exposures........................................................................ | RIAD8759 | NR | M.8.c. |
| d. Commodity and other exposures............................................................................. | RIAD8760 | NR | M.8.d. |
| 9. Impact on income of derivatives held for purposes other than trading: | | | M.9. |
| a. Net increase (decrease) to interest income............................................................ | RIAD8761 | -63 | M.9.a. |
| b. Net (increase) decrease to interest expense.......................................................... | RIAD8762 | 12,886 | M.9.b. |
| c. Other (noninterest) allocations............................................................................... | RIAD8763 | 0 | M.9.c. |
| 10. Credit losses on derivatives........................................................................................... | RIADA251 | 0 | M.10. |
| 11. Does the reporting bank have a Subchapter S election in effect for federal income tax purposes for the current tax year?.................................................................................... | RIADA530 | No | M.11. |

## Schedule RI-A - Changes in Equity Capital

Dollar amounts in thousands

| | | | |
|---|---|---:|---|
| 1. Total equity capital most recently reported for the December 31, 2004, Reports of Condition and Income (i.e., after adjustments from amended Reports of Income)............................. | RIAD3217 | 1,592,879 | 1. |
| 2. Restatements due to corrections of material accounting errors and changes in accounting principles............................................................................................................................ | RIADB507 | -1,710 | 2. |
| 3. Balance end of previous calendar year as restated........................................................ | RIADB508 | 1,591,169 | 3. |
| 4. Net income (loss)........................................................................................................... | RIAD4340 | 243,938 | 4. |
| 5. Sale, conversion, acquisition, or retirement of capital stock, net (excluding treasury stock transactions)..................................................................................................................... | RIADB509 | 0 | 5. |
| 6. Treasury stock transactions, net.................................................................................... | RIADB510 | 0 | 6. |
| 7. Changes incident to business combinations, net.............................................................. | RIAD4356 | 487,301 | 7. |

Case 2:11-cv-00746-BJR-WC   Document 185-4   Filed 10/14/15   Page 99 of 106

Dollar amounts in thousands

| | | | |
|---|---|---:|---|
| 8. Cash dividends declared on preferred stock................................................ | RIAD4470 | 0 | 8. |
| 9. Cash dividends declared on common stock................................................ | RIAD4460 | 224,421 | 9. |
| 10. Other comprehensive income................................................................ | RIADB511 | -37,367 | 10. |
| 11. Other transactions with parent holding company (not included in items 5, 6, 8, or 9 above)............................................................................................ | RIAD4415 | 94,015 | 11. |
| 12. Total equity capital end of current period................................................ | RIAD3210 | 2,154,635 | 12. |

## Schedule RI-B Part I - Charge-offs and Recoveries on Loans and Leases

| Dollar amounts in thousands | (Column A) Charge-offs Calendar year-to-date | | (Column B) Recoveries Calendar year-to-date | | |
|---|---|---:|---|---:|---|
| 1. Loans secured by real estate: | | | | | 1. |
| a. Construction, land development, and other land loans in domestic offices | RIAD3582 | 2,445 | RIAD3583 | 254 | 1.a. |
| b. Secured by farmland in domestic offices................................. | RIAD3584 | 110 | RIAD3585 | 10 | 1.b. |
| c. Secured by 1-4 family residential properties in domestic offices: | | | | | 1.c. |
| 1. Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit............... | RIAD5411 | 373 | RIAD5412 | 182 | 1.c.1. |
| 2. Closed-end loans secured by 1-4 family residential properties: | | | | | 1.c.2. |
| a. Secured by first liens............................................. | RIADC234 | 533 | RIADC217 | 20 | 1.c2a. |
| b. Secured by junior liens........................................... | RIADC235 | 2,249 | RIADC218 | 382 | 1.c2b. |
| d. Secured by multifamily (5 or more) residential properties in domestic offices | RIAD3588 | 7 | RIAD3589 | 0 | 1.d. |
| e. Secured by nonfarm nonresidential properties in domestic offices.. | RIAD3590 | 8,743 | RIAD3591 | 1,161 | 1.e. |
| f. In foreign offices.................................................... | RIADB512 | 0 | RIADB513 | 0 | 1.f. |
| 2. Loans to depository institutions and acceptances of other banks: | | | | | 2. |
| a. To U.S. banks and other U.S. depository institutions..................... | RIAD4653 | 0 | RIAD4663 | 0 | 2.a. |
| b. To foreign banks.................................................... | RIAD4654 | 0 | RIAD4664 | 0 | 2.b. |
| 3. Loans to finance agricultural production and other loans to farmers..... | RIAD4655 | 118 | RIAD4665 | 8 | 3. |
| 4. Commercial and industrial loans: | | | | | 4. |
| a. To U.S. addressees (domicile)........................................ | RIAD4645 | 8,335 | RIAD4617 | 3,422 | 4.a. |
| b. To non-U.S. addressees (domicile).................................... | RIAD4646 | 0 | RIAD4618 | 78 | 4.b. |
| 5. Loans to individuals for household, family, and other personal expenditures: | | | | | 5. |
| a. Credit cards........................................................ | RIADB514 | 70 | RIADB515 | 12 | 5.a. |
| b. Other (includes single payment, installment, all student loans, and revolving credit plans other than credit cards).................... | RIADB516 | 2,489 | RIADB517 | 1,239 | 5.b. |
| 6. Loans to foreign governments and official institutions.................. | RIAD4643 | 0 | RIAD4627 | 0 | 6. |
| 7. All other loans...................................................... | RIAD4644 | 1,734 | RIAD4628 | 1,227 | 7. |
| 8. Lease financing receivables: | | | | | 8. |
| a. To U.S. addressees (domicile)........................................ | RIAD4658 | 0 | RIAD4668 | 0 | 8.a. |
| b. To non-U.S. addressees (domicile).................................... | RIAD4659 | 0 | RIAD4669 | 0 | 8.b. |
| 9. Total.............................................................. | RIAD4635 | 27,206 | RIAD4605 | 7,995 | 9. |
| 1. Loans to finance commercial real estate, construction, and land development activities (not secured by real estate) included in Schedule RI-B, part I, items 4 and 7, above. | RIAD5409 | 8,843 | RIAD5410 | 3,544 | M.1. |
| 2. Loans secured by real estate to non-U.S. addressees (domicile) (included in Schedule RI-B, part I, item 1, above)................... | RIAD4652 | 0 | RIAD4662 | 0 | M.2. |
| 3. Not applicable | | | | | M.3. |

Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Office of the Comptroller of the Currency

**Federal Financial Institutions Examination Council**



1

# Consolidated Reports of Condition and Income for A Bank With Domestic and Foreign Offices - FFIEC 031

| | |
|---|---|
| Institution Name | **COLONIAL BANK, NATIONAL ASSOCIATION** |
| City | **MONTGOMERY** |
| State | **AL** |
| Zip Code | **36101** |
| Call Report Quarter End Date | **12/31/2006** |
| Report Type | **031** |
| RSSD-ID | **570231** |
| FDIC Certificate Number | **9609** |
| OCC Charter Number | **24444** |
| ABA Routing Number | **62001319** |
| Last updated on | **2/26/2007** |

COLONIAL BANK, NATIONAL ASSOCIATION
RSSD-ID 572751
Last Updated on 2/26/2007

FFIEC 031
Quarter End Date 12/31/2006

5

Case 2:11-cv-00746-BJR-WC   Document 185-4   Filed 10/14/15   Page 101 of 106

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 9. Applicable income taxes (on item 8)............................................ | RIAD4302 | 146,476 | 9. |
| 10. Income (loss) before extraordinary items and other adjustments...................... | RIAD4300 | 280,117 | 10. |
| 11. Extraordinary items and other adjustments, net of income taxes.................... | RIAD4320 | 0 | 11. |
| 12. Net income (loss)................................................ | RIAD4340 | 280,117 | 12. |
| 1. Interest expense incurred to carry tax-exempt securities, loans, and leases acquired after August 7, 1986, that is not deductible for federal income tax purposes.................... | RIAD4513 | 494 | M.1. |
| 2. Income from the sale and servicing of mutual funds and annuities in domestic offices (included in Schedule RI, item 8).......................... | RIAD8431 | 5,099 | M.2. |
| 3. Income on tax-exempt loans and leases to states and political subdivisions in the U.S. (included in Schedule RI, items 1.a and 1.b)...................... | RIAD4313 | 376 | M.3. |
| 4. Income on tax-exempt securities issued by states and political subdivisions in the U.S. (included in Schedule RI, item 1.d.(3))...................... | RIAD4507 | 2,046 | M.4. |
| 5. Number of full-time equivalent employees at end of current period.................... | RIAD4150 | 4717 | M.5. |
| 6. Not applicable | | | M.6. |
| 7. If the reporting bank has restated its balance sheet as a result of applying push down accounting this calendar year, report the date of the bank's acquisition.................... | RIAD9106 | 0 | M.7. |
| 8. Trading revenue (from cash instruments and derivative instruments): | | | M.8. |
|    a. Interest rate exposures.................................... | RIAD8757 | NR | M.8.a. |
|    b. Foreign exchange exposures................................ | RIAD8758 | NR | M.8.b. |
|    c. Equity security and index exposures........................ | RIAD8759 | NR | M.8.c. |
|    d. Commodity and other exposures............................ | RIAD8760 | NR | M.8.d. |
| 9. Not applicable | | | M.9. |
| 10. Credit losses on derivatives.................................... | RIADA251 | 0 | M.10. |
| 11. Does the reporting bank have a Subchapter S election in effect for federal income tax purposes for the current tax year?.......................... | RIADA530 | No | M.11. |

## Schedule RI-A - Changes in Equity Capital

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Total equity capital most recently reported for the December 31, 2005, Reports of Condition and Income (i.e., after adjustments from amended Reports of Income).................... | RIAD3217 | 2,154,635 | 1. |
| 2. Restatements due to corrections of material accounting errors and changes in accounting principles.................................... | RIADB507 | 0 | 2. |
| 3. Balance end of previous calendar year as restated.......................... | RIADB508 | 2,154,635 | 3. |
| 4. Net income (loss).................................... | RIAD4340 | 280,117 | 4. |
| 5. Sale, conversion, acquisition, or retirement of capital stock, net (excluding treasury stock transactions).................................... | RIADB509 | 1,619 | 5. |
| 6. Treasury stock transactions, net.................................... | RIADB510 | 0 | 6. |
| 7. Changes incident to business combinations, net.......................... | RIAD4356 | 0 | 7. |
| 8. Cash dividends declared on preferred stock.......................... | RIAD4470 | 0 | 8. |
| 9. Cash dividends declared on common stock.......................... | RIAD4460 | 281,727 | 9. |
| 10. Other comprehensive income.................................... | RIADB511 | 2,435 | 10. |
| 11. Other transactions with parent holding company (not included in items 5, 6, 8, or 9 above).................................... | RIAD4415 | 0 | 11. |
| 12. Total equity capital end of current period.......................... | RIAD3210 | 2,157,079 | 12. |

## Schedule RI-B Part I - Charge-offs and Recoveries on Loans and Leases

| Dollar amounts in thousands | (Column A) Charge-offs Calendar year-to-date | | (Column B) Recoveries Calendar year-to-date | | |
|---|---|---|---|---|---|
| 1. Loans secured by real estate: | | | | | 1. |
|    a. Construction, land development, and other land loans in domestic offices.................... | RIAD3582 | 5,690 | RIAD3583 | 571 | 1.a. |

Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Office of the Comptroller of the Currency

**Federal Financial Institutions Examination Council**

1



# Consolidated Reports of Condition and Income for A Bank With Domestic and Foreign Offices - FFIEC 031

| | |
|---|---|
| Institution Name | **COLONIAL BANK, NATIONAL ASSOCIATION** |
| City | **MONTGOMERY** |
| State | **AL** |
| Zip Code | **36117** |
| Call Report Quarter End Date | **12/31/2007** |
| Report Type | **031** |
| RSSD-ID | **570231** |
| FDIC Certificate Number | **9609** |
| OCC Charter Number | **24444** |
| ABA Routing Number | **62001319** |
| Last updated on | **1/30/2008** |

Case 2:11-cv-00746-BJR-WC   Document 185-4   Filed 10/14/15   Page 103 of 106

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| d. Other noninterest expense.................................................................... | RIAD4092 | 134,132 | 7.d. |
| e. Total noninterest expense................................................................... | RIAD4093 | 555,344 | 7.e. |
| 8. Income (loss) before income taxes and extraordinary items and other adjustments.......... | RIAD4301 | 287,071 | 8. |
| 9. Applicable income taxes (on item 8)..................................................... | RIAD4302 | 94,935 | 9. |
| 10. Income (loss) before extraordinary items and other adjustments........................ | RIAD4300 | 192,136 | 10. |
| 11. Extraordinary items and other adjustments, net of income taxes....................... | RIAD4320 | 0 | 11. |
| 12. Net income (loss)...................................................................... | RIAD4340 | 192,136 | 12. |
| 1. Interest expense incurred to carry tax-exempt securities, loans, and leases acquired after August 7, 1986, that is not deductible for federal income tax purposes............................. | RIAD4513 | 890 | M.1. |
| 2. Income from the sale and servicing of mutual funds and annuities in domestic offices (included in Schedule RI, item 8)................................................................. | RIAD8431 | 5,253 | M.2. |
| 3. Income on tax-exempt loans and leases to states and political subdivisions in the U.S. (included in Schedule RI, items 1.a and 1.b)........................................................ | RIAD4313 | 480 | M.3. |
| 4. Income on tax-exempt securities issued by states and political subdivisions in the U.S. (included in Schedule RI, item 1.d.(3))...................................................... | RIAD4507 | 11,099 | M.4. |
| 5. Number of full-time equivalent employees at end of current period...................... | RIAD4150 | 4643 | M.5. |
| 6. Not applicable | | | M.6. |
| 7. If the reporting bank has restated its balance sheet as a result of applying push down accounting this calendar year, report the date of the bank's acquisition.............................. | RIAD9106 | 0 | M.7. |
| 8. Trading revenue (from cash instruments and derivative instruments): | | | M.8. |
| a. Interest rate exposures..................................................................... | RIAD8757 | NR | M.8.a. |
| b. Foreign exchange exposures................................................................ | RIAD8758 | NR | M.8.b. |
| c. Equity security and index exposures....................................................... | RIAD8759 | NR | M.8.c. |
| d. Commodity and other exposures............................................................ | RIAD8760 | NR | M.8.d. |
| e. Credit exposures.......................................................................... | RIADF186 | NR | M.8.e. |
| 9. Net gains (losses) recognized in earnings on credit derivatives that economically hedge credit exposures held outside the trading account: | | | M.9. |
| a. Net gains (losses) on credit derivatives held for trading............................... | RIADC889 | 0 | M.9.a. |
| b. Net gains (losses) on credit derivatives held for purposes other than trading............. | RIADC890 | 0 | M.9.b. |
| 10. Credit losses on derivatives.......................................................... | RIADA251 | 0 | M.10. |
| 11. Does the reporting bank have a Subchapter S election in effect for federal income tax purposes for the current tax year?................................................................. | RIADA530 | No | M.11. |
| 12. Noncash income from negative amortization on closed-end loans secured by 1-4 family residential properties (included in Schedule RI, item 1.a.(1)(a))................................ | RIADF228 | NR | M.12. |

## Schedule RI-A - Changes in Equity Capital

Dollar amounts in thousands

| | | | |
|---|---|---|---|
| 1. Total equity capital most recently reported for the December 31, 2006, Reports of Condition and Income (i.e., after adjustments from amended Reports of Income).............................. | RIAD3217 | 2,157,079 | 1. |
| 2. Restatements due to corrections of material accounting errors and changes in accounting principles................................................................................... | RIADB507 | -540 | 2. |
| 3. Balance end of previous calendar year as restated.................................... | RIADB508 | 2,156,539 | 3. |
| 4. Net income (loss)...................................................................... | RIAD4340 | 192,136 | 4. |
| 5. Sale, conversion, acquisition, or retirement of capital stock, net (excluding treasury stock transactions)............................................................................. | RIADB509 | 2,543 | 5. |
| 6. Treasury stock transactions, net....................................................... | RIADB510 | 0 | 6. |
| 7. Changes incident to business combinations, net........................................ | RIAD4356 | 521,952 | 7. |
| 8. Cash dividends declared on preferred stock............................................ | RIAD4470 | 0 | 8. |
| 9. Cash dividends declared on common stock............................................... | RIAD4460 | 624,573 | 9. |
| 10. Other comprehensive income........................................................... | RIADB511 | 40,728 | 10. |
| 11. Other transactions with parent holding company (not included in items 5, 6, 8, or 9 above)................................................................................... | RIAD4415 | 0 | 11. |

COLONIAL BANK, NATIONAL ASSOCIATION
RSSD-ID 917265
Last Updated on 1/30/2008

FFIEC 031
Quarter End Date 12/31/2007

Case 2:11-cv-00746-BJR-WC   Document 185-4   Filed 10/14/15   Page 104 of 106

6

Dollar amounts in thousands

| | | |
|---|---|---|
| 12. Total equity capital end of current period........................................................ | RIAD3210 | **2,289,325** 12. |

# Schedule RI-B Part I - Charge-offs and Recoveries on Loans and Leases

| Dollar amounts in thousands | (Column A) Charge-offs Calendar year-to-date | | (Column B) Recoveries Calendar year-to-date | | |
|---|---|---|---|---|---|
| 1. Loans secured by real estate: | | | | | 1. |
| a. Construction, land development, and other land loans in domestic offices........................................................ | RIAD3582 | **45,363** | RIAD3583 | **255** | 1.a. |
| b. Secured by farmland in domestic offices........................................ | RIAD3584 | **80** | RIAD3585 | **13** | 1.b. |
| c. Secured by 1-4 family residential properties in domestic offices: | | | | | 1.c. |
| 1. Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit............................ | RIAD5411 | **946** | RIAD5412 | **242** | 1.c.1. |
| 2. Closed-end loans secured by 1-4 family residential properties: | | | | | 1.c.2. |
| a. Secured by first liens........................................................ | RIADC234 | **4,061** | RIADC217 | **112** | 1.c2.a |
| b. Secured by junior liens..................................................... | RIADC235 | **1,509** | RIADC218 | **206** | 1.c2.b. |
| d. Secured by multifamily (5 or more) residential properties in domestic offices........................................................ | RIAD3588 | **35** | RIAD3589 | **14** | 1.d. |
| e. Secured by nonfarm nonresidential properties in domestic offices.. | RIAD3590 | **3,533** | RIAD3591 | **90** | 1.e. |
| f. In foreign offices........................................................ | RIADB512 | **0** | RIADB513 | **0** | 1.f. |
| 2. Loans to depository institutions and acceptances of other banks: | | | | | 2. |
| a. To U.S. banks and other U.S. depository institutions.................... | RIAD4653 | **0** | RIAD4663 | **0** | 2.a. |
| b. To foreign banks........................................................ | RIAD4654 | **0** | RIAD4664 | **0** | 2.b. |
| 3. Loans to finance agricultural production and other loans to farmers..... | RIAD4655 | **210** | RIAD4665 | **35** | 3. |
| 4. Commercial and industrial loans: | | | | | 4. |
| a. To U.S. addressees (domicile)........................................... | RIAD4645 | **4,142** | RIAD4617 | **4,250** | 4.a. |
| b. To non-U.S. addressees (domicile).................................... | RIAD4646 | **0** | RIAD4618 | **9** | 4.b. |
| 5. Loans to individuals for household, family, and other personal expenditures: | | | | | 5. |
| a. Credit cards........................................................ | RIADB514 | **14** | RIADB515 | **5** | 5.a. |
| b. Other (includes single payment, installment, all student loans, and revolving credit plans other than credit cards)................................ | RIADB516 | **1,458** | RIADB517 | **939** | 5.b. |
| 6. Loans to foreign governments and official institutions.................... | RIAD4643 | **0** | RIAD4627 | **0** | 6. |
| 7. All other loans........................................................ | RIAD4644 | **2,290** | RIAD4628 | **1,102** | 7. |
| 8. Lease financing receivables: | | | | | 8. |
| a. Leases to individuals for household, family, and other personal expenditures........................................................ | RIADF185 | **0** | RIADF187 | **0** | 8.a. |
| b. All other leases........................................................ | RIADC880 | **0** | RIADF188 | **0** | 8.b. |
| 9. Total. | RIAD4635 | **63,641** | RIAD4605 | **7,272** | 9. |
| 1. Loans to finance commercial real estate, construction, and land development activities (not secured by real estate) included in Schedule RI-B, part I, items 4 and 7, above.......................... | RIAD5409 | **4,131** | RIAD5410 | **2,634** | M.1. |
| 2. Loans secured by real estate to non-U.S. addressees (domicile) (included in Schedule RI-B, part I, item 1, above)............................. | RIAD4652 | **0** | RIAD4662 | **0** | M.2. |
| 3. Not applicable | | | | | M.3. |

# Schedule RI-B Part I - Charge-offs and Recoveries on Loans and Leases

Dollar amounts in thousands

| | | |
|---|---|---|
| 4. Uncollectible retail credit card fees and finance charges reversed against income (i.e., not included in charge-offs against the allowance for loan and lease losses)....................... | RIADC388 | **NR** M.4. |

Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Office of the Comptroller of the Currency

**Federal Financial Institutions Examination Council**



1

# Consolidated Reports of Condition and Income for A Bank With Domestic and Foreign Offices - FFIEC 031

| | |
|---|---|
| Institution Name | **COLONIAL BANK** |
| City | **MONTGOMERY** |
| State | **AL** |
| Zip Code | **36117** |
| Call Report Quarter End Date | **9/30/2008** |
| Report Type | **031** |
| RSSD-ID | **570231** |
| FDIC Certificate Number | **9609** |
| OCC Charter Number | **0** |
| ABA Routing Number | **62001319** |
| Last updated on | **10/30/2008** |

COLONIAL BANK
RSSD-ID 9531293
Last Updated on 10/30/2008

FFIEC 031
Quarter End Date 9/30/2008

Case 2:11-cv-00746-BJR-WC   Document 185-4   Filed 10/14/15   Page 106 of 106

6

## Schedule RI-A - Changes in Equity Capital

Dollar amounts in thousands

| | | |
|---|---|---|
| 1. Total equity capital most recently reported for the December 31, 2007, Reports of Condition and Income (i.e., after adjustments from amended Reports of Income)................................ | RIAD3217 | **2,289,325** | 1. |
| 2. Restatements due to corrections of material accounting errors and changes in accounting principles.................................................................................................................. | RIADB507 | **-671** | 2. |
| 3. Balance end of previous calendar year as restated............................................... | RIADB508 | **2,288,654** | 3. |
| 4. Net income (loss)....................................................................................... | RIAD4340 | **-38,101** | 4. |
| 5. Sale, conversion, acquisition, or retirement of capital stock, net (excluding treasury stock transactions)........................................................................................................... | RIADB509 | **0** | 5. |
| 6. Treasury stock transactions, net................................................................. | RIADB510 | **0** | 6. |
| 7. Changes incident to business combinations, net.............................................. | RIAD4356 | **0** | 7. |
| 8. Cash dividends declared on preferred stock................................................... | RIAD4470 | **0** | 8. |
| 9. Cash dividends declared on common stock.................................................... | RIAD4460 | **58,000** | 9. |
| 10. Other comprehensive income.................................................................... | RIADB511 | **-100,529** | 10. |
| 11. Other transactions with parent holding company (not included in items 5, 6, 8, or 9 above)............................................................................................................... | RIAD4415 | **377,266** | 11. |
| 12. Total equity capital end of current period................................................... | RIAD3210 | **2,469,290** | 12. |

## Schedule RI-B Part I - Charge-offs and Recoveries on Loans and Leases

| Dollar amounts in thousands | (Column A) Charge-offs Calendar year-to-date | | (Column B) Recoveries Calendar year-to-date | | |
|---|---|---|---|---|---|
| 1. Loans secured by real estate: | | | | | 1. |
| a. Construction, land development, and other land loans in domestic offices | | | | | 1.a. |
| 1. 1-4 family residential construction loans.................................... | RIADC891 | **30,179** | RIADC892 | **560** | 1.a.1. |
| 2. Other construction loans and all land development and other land  loans ...................................................................... | RIADC893 | **143,584** | RIADC894 | **239** | 1.a.2. |
| b. Secured by farmland in domestic offices......................................... | RIAD3584 | **802** | RIAD3585 | **0** | 1.b. |
| c. Secured by 1-4 family residential properties in domestic offices: | | | | | 1.c. |
| 1. Revolving, open-end loans secured by 1-4 family residential properties and extended under lines of credit........................... | RIAD5411 | **4,409** | RIAD5412 | **155** | 1.c.1. |
| 2. Closed-end loans secured by 1-4 family residential properties: | | | | | 1.c.2. |
| a. Secured by first liens.............................................. | RIADC234 | **6,454** | RIADC217 | **65** | 1.c2a. |
| b. Secured by junior liens.............................................. | RIADC235 | **2,081** | RIADC218 | **183** | 1.c2b. |
| d. Secured by multifamily (5 or more) residential properties in domestic offices............................................................................................... | RIAD3588 | **662** | RIAD3589 | **23** | 1.d. |
| e. Secured by nonfarm nonresidential properties in domestic offices: | | | | | 1.e. |
| 1. Loans secured by owner-occupied nonfarm nonresidential properties.......................................................................... | RIADC895 | **2,388** | RIADC896 | **31** | 1.e.1. |
| 2. Loans secured by other nonfarm nonresidential properties...... | RIADC897 | **8,835** | RIADC898 | **180** | 1.e.2. |
| f. In foreign offices........................................................... | RIADB512 | **0** | RIADB513 | **0** | 1.f. |
| 2. Loans to depository institutions and acceptances of other banks: | | | | | 2. |
| a. To U.S. banks and other U.S. depository institutions...................... | RIAD4653 | **11,941** | RIAD4663 | **0** | 2.a. |
| b. To foreign banks........................................................... | RIAD4654 | **0** | RIAD4664 | **0** | 2.b. |
| 3. Loans to finance agricultural production and other loans to farmers..... | RIAD4655 | **17** | RIAD4665 | **19** | 3. |
| 4. Commercial and industrial loans: | | | | | 4. |
| a. To U.S. addressees (domicile)...................................... | RIAD4645 | **10,453** | RIAD4617 | **1,207** | 4.a. |
| b. To non-U.S. addressees (domicile)................................ | RIAD4646 | **0** | RIAD4618 | **1** | 4.b. |
| 5. Loans to individuals for household, family, and other personal expenditures: | | | | | 5. |
| a. Credit cards.............................................................. | RIADB514 | **1** | RIADB515 | **5** | 5.a. |