## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| THE COLONIAL BANCGROUP, INC., and KEVIN O'HALLORAN, | |
| Plaintiff, | |
| v. | Case No. 2:11-cv-00746-WKW |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP, | |
| Defendants. | |
| FEDERAL DEPOSIT INSURANCE CORPORATON AS RECEIVER FOR COLONIAL BANK, | |
| Plaintiff, | |
| v. | Case No. 2:12-cv-00957-WKW |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP, | |
| Defendants. | |

## THE FDIC'S THIRD AMENDED COMPLAINT

Plaintiff Federal Deposit Insurance Corporation, in its capacity as Receiver

of Colonial Bank of Montgomery, Alabama, and pursuant to the Court's Uniform

Scheduling Order dated January 22, 2015 (Doc. No. 122), files this Third

Amended Complaint against PricewaterhouseCoopers LLP and Crowe Horwath LLP.

## I. Introduction

1.      On August 14, 2009, the Alabama State Banking Department closed Colonial Bank ("Colonial" or "the Bank") and named the Federal Deposit Insurance Corporation as Receiver ("FDIC").  Colonial's closure was triggered by the discovery that its largest mortgage banking customer, Taylor Bean & Whitaker Mortgage Corp. ("TBW") had committed a massive, multi-year fraud against Colonial, resulting in financial statements that grossly misstated Colonial's true financial condition.  The TBW fraud left a huge hole in the assets reported on Colonial's books and ultimately cost the Bank enormous losses.

2.      At all relevant times during this fraud, PricewaterhouseCoopers LLP ("PwC") served as the Bank's external auditor, and Crowe Horwath LLP ("Crowe") provided internal audit services to the Bank.  This lawsuit seeks to recover damages caused by (a) the negligent and grossly negligent conduct of PwC and Crowe in failing to uncover the TBW fraud in the course of their audit work and (b) the wanton conduct of PwC in characterizing certain transactions as "sales" instead of "loans" under governing accounting guidelines when it knew the transactions were in fact loans.

3.     All the time that TBW was carrying out an increasingly brazen and costly fraud against Colonial, PwC and Crowe failed to discover that many hundreds of millions of dollars of Bank assets did not exist, had been sold to others, or were worthless.   Rather, as demonstrated more fully below, PwC repeatedly issued unqualified opinions that Colonial's financial statements were fairly stated and effective internal controls were in place, while Crowe consistently overlooked serious internal control issues and failed to evaluate properly controls for the financing programs used by TBW.   Missing huge holes in Colonial's balance sheet and serious gaps in internal control, PwC and Crowe continued to perform auditing services for Colonial without ever detecting the TBW fraud.  Had they performed their auditing work in accordance with applicable professional standards, they would have learned of the TBW fraud in time to prevent additional losses suffered by Colonial at the hands of TBW.

4.     PwC's misconduct went well beyond the negligence that caused it and Crowe to miss the massive fraud being perpetrated on the Bank.  In early 2008, in response to questions raised by the Office of the Comptroller of the Currency ("OCC"), PwC was forced to re-examine the faulty conclusion reached in every one of its previous audits of Colonial that certain transactions qualified as sales under Statement of Financial Accounting Standards No. 140 ("FAS 140"), an accounting standard that dictates whether a transfer of a financial asset must be

accounted for as a sale or a loan.  By improperly concluding that the loans were sales under FAS 140, PwC enabled Colonial to circumvent the loan-to-one borrower lending limits under federal law, which were designed to limit the dollar amount of loans that a bank can make to a single borrower.  Because Colonial made hundreds of millions of dollars in loans to TBW, a determination by PwC that the transactions were loans instead of sales would have meant that Colonial was violating the legal lending limits by hundreds of millions of dollars.

5.      In order to qualify as a sale under FAS 140, a transaction must meet three requirements.  First, the asset being transferred must be legally isolated from the transferor, meaning that it is beyond the reach of the transferor and its creditors (even in the event of a bankruptcy or receivership).  One of the key requirements for an asset to be legally isolated from the transferor is that the transfer occur at fair value.  In other words, the transferee must pay fair market value for the asset. Second, there can be no constraints on the transferee's freedom to pledge or exchange the asset being transferred.   Third, the transferor cannot maintain effective control over the transferred asset.  In every audit from 2002 through 2007, PwC concluded that the transactions at Colonial governed by FAS 140 (involving Colonial's purchase of mortgage loan participation interests from various customers, including TBW) met all three tests and thus were properly accounted for as sales.  But PwC's analysis of the FAS 140 issue in these years

was superficial to the extent it existed at all, and the COLB transactions failed to meet any of the FAS 140 qualifications.  Moreover, the transactions were always in substance loans:  The COLB customers were all major borrowers of the Mortgage Warehouse Lending Division, whose COLB transactions looked like their existing loans from Colonial, the Bank and PwC repeatedly referred to the COLB transactions as a lending product and loans, and the Bank charged interest on COLB advances just as it would on a loan.   To use PwC's own words, COLB was a "guise" for transactions that looked like loans.  COLB's only reason for existence was to evade the Bank's lending limits.

6.     When PwC undertook its first meaningful analysis of the issue in the spring of 2008 in response to the OCC's questions, it made a jarring discovery: The subject transactions were not being conducted at fair value, as required under FAS 140, because Colonial (the purchaser) was paying less for the assets than what they were worth.  This discovery confronted PwC with two options:  (a) admit that all of its previous audits had been wrong, that Colonial's prior years' financials needed to be restated, and that Colonial was in violation of the loan-to-one borrower legal lending limits; or (b) attempt to hide its years-long mistake by employing accounting sleight-of-hand to make it appear that the transactions were conducted at fair value.  PwC chose the latter.

7.     When PwC discovered that the transactions were not occurring at fair value as required by FAS 140, it suggested to Colonial management that if, when Colonial purchased the loan participations from the seller, it simultaneously sold a call option on the same participations to the seller, it could assign a value to that call option that would result in the transaction occurring at fair value.[1]   PwC described the call option as "implied" even though the written contract between the parties explicitly stated that the seller did not have a call option.   PwC further explained that it would be necessary for this implied call option to be able to be "net settled for cash" in order to keep it from running afoul of the third FAS 140 requirement that the seller not maintain effective control over the transferred asset.[2]   PwC's suggestion of a call option bewildered Colonial management because for the last six years it *and PwC* had taken the position that there was no call option in the transactions, and Colonial had never recorded a call option in the Bank's books as would be required if a call option actually existed.   So the call option was pure fiction (and PwC knew it) and thus the transactions were not occurring at fair value, meaning the first requirement of FAS 140 was not satisfied.

8.     Undeterred, PwC recommended that Colonial create supporting evidence out of whole cloth so that PwC would have a basis upon which to

---

[1] In simple terms, a "seller's call option" allows the seller to re-purchase the conveyed asset.
[2]  The right to "cash settle" the call option allows the buyer to pay cash to the seller in lieu of returning the conveyed asset.

conclude that the call option existed.  This manufactured "evidence" included *post hoc* confirmations from the sellers of the participation interests who, because of their reliance on Colonial as a funding source, had a strong incentive to say whatever they were asked to say.  But these confirmations were unreliable on their face as they contained an obvious misstatement of fact.  PwC obtained a similar confirmation from a Colonial officer who, like the Bank, was relying on PwC to help him navigate the complexities of FAS 140 to ensure that the transactions met all three requirements.

9.     In the end, despite all the machinations it orchestrated to allow it to improperly conclude that the transactions were sales under FAS 140, PwC knew that the transactions did not qualify as sales under FAS 140.  Its actions in suggesting to Colonial an after-the-fact accounting workaround and the creation of evidence that it knew to be false were wanton and motivated by its desire to protect itself from the certain liability that would have accompanied the inconvenient truth of its prior audit work.  If PwC had reported the truth about the FAS 140 transactions in the spring of 2008, Colonial would not have continued such transactions with TBW and would have avoided over $1 billion in losses for which PwC should be held accountable.  The FDIC also seeks an award of punitive damages for PwC's wanton conduct.

10.     As described above and in greater detail below, in its role as Receiver of Colonial, the FDIC has identified numerous acts and omissions constituting professional malpractice, gross negligence, wantonness, breach of contract, and negligent misrepresentation committed by PwC in connection with its year-end audit engagements, subsequent quarterly reviews, sales accounting advice under FAS 140, and consulting for the Bank, and acts and omissions of professional malpractice, gross negligence, and negligent misrepresentation committed by Crowe in connection with its  outsourced internal audit and consulting services provided to the Bank.  In the absence of PwC's and Crowe's wrongful acts, the TBW fraud would have been discovered many years before it was discovered, and losses currently estimated to exceed $2.2 billion would have been avoided.  And if PwC had not lied about its mistakes in accounting for Colonial's transactions with TBW, the ongoing fraud would have ended in 2008.  This lawsuit seeks to recover these losses.

## II. PARTIES, JURISDICTION AND VENUE

11.     The FDIC is organized and existing under the laws of the United States of America.  Upon being named Receiver for Colonial Bank, the FDIC succeeded to all rights, titles, powers, and privileges of Colonial, including, but not limited to, Colonial's claims against its former professional service providers such as PwC and Crowe.  12 U.S.C. §1821(d)

12.     Defendant PwC is a Delaware limited liability partnership headquartered in New York with partners located throughout the United States.

13.     Defendant Crowe is an Indiana limited liability partnership headquartered in Illinois with partners located throughout the United States.

14.     This Court has subject matter jurisdiction over this suit pursuant to 12 U.S.C. §1819(b)(1) and (2) and 28 U.S.C. §§1331 and 1345.  The FDIC has the power to sue in any court of law. 12 U.S.C. §1819(a).  Venue is proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

### III.  BACKGROUND

15.     Colonial, a wholly-owned subsidiary of Colonial BancGroup, Inc. ("CBG"), was headquartered in Montgomery, Alabama, and had 347 offices located in Alabama, Georgia, Florida, Texas, and Nevada.  The majority of Colonial's branches were located in Florida as was its mortgage warehouse lending division which was based in Orlando, Florida.

### A.  Colonial's Mortgage Warehouse Lending Division (MWLD)

16.     Colonial's MWLD provided short-term, secured financing to various mortgage originators.  The MWLD accounted for approximately 20 percent of Colonial's reported net income from 2005 to 2009 and, as of June 2009, the

MWLD's $5.2 billion in reported assets represented approximately 20 percent of Colonial's total assets.

17.    The MWLD's assets fell mainly into three categories:  (1) mortgage warehouse lines of credit, (2) mortgage loans purportedly held for sale – known as the COLB (acronym for Colonial Bank) facility, and (3) the Assignment of Trade (AOT) facility, which was reported as part of securities purchased under agreements to resell.  TBW was by far the largest customer of the MWLD.  As of June 2009, $3.3 billion of the MWLD's $5.2 billion in total reported assets (63 percent) were attributable to TBW business.

18.    The COLB facility was a loan participation arrangement under which Colonial purportedly purchased a 99 percent participation interest in individual mortgage loans from TBW.  Under the COLB facility, Colonial's customer was required to have takeout investors already committed so that Colonial would receive payment for its participation interest from the sale of the loans to secondary market investors within a relatively short time period, typically 30 to 60 days after closing.  Without committed or pre-approved purchasers, COLB funding was not available.  If the mortgage loans did not meet certain requirements under the controlling agreement, TBW was obligated to repurchase the loan upon request by Colonial.

19.     The AOT facility, introduced in 2004, was set up to purchase participation interests in loan pools that were to be packaged and securitized for sale in the secondary market.  TBW was the only MWLD customer allowed to use the AOT facility.  Colonial purchased a 99 percent participation interest in the loan pools and was to be repaid when the securities backed by the loan pools were sold to the end investor.  Like COLB, an essential condition of an AOT transaction was that the loans in a pool meet the requirements of the end investor and, if the takeout purchase failed, TBW was required to repurchase the pool at Colonial's request.

**B.  The TBW Fraud Against Colonial**

20.     As alleged more fully below, TBW chairman Lee Farkas and treasurer Desiree Brown conspired with at least two MWLD employees, Catherine Kissick (head of the MWLD) and Teresa Kelly (operations supervisor reporting to Kissick) to defraud Colonial by obtaining large amounts of MWLD financing for TBW without providing required collateral, thereby effectively stealing money from Colonial.   The MWLD employees involved in this fraud had completely abandoned the interests of Colonial and were acting solely for their own benefit or the benefit of TBW.

21.     Although Farkas's greed to maintain his lavish lifestyle and mask the insolvency of TBW were the inspirations for the conspiracy, it was Kissick who

invented – and through her assistant Kelly orchestrated – many of the fraudulent details of this conspiracy.

22.   Farkas and Brown, along with Kissick and Kelly and other TBW insiders, were convicted of conspiracy to commit bank fraud and other charges for their role in the ever-increasing and evolving fraud.   At no time did this fraud benefit Colonial; rather, the fraud perpetrated was against Colonial, harmed Colonial, was to the detriment of Colonial and resulted in Colonial lending TBW many hundreds of millions of dollars that were secured by worthless or non-existent loans. These actions also allowed Kissick and Kelly to keep their salaries and bonuses and stay out of jail.

23.   Kissick and Kelly knew that Farkas, their confederate in crime, was not only a criminal, but a pathological liar and fraud who had been expelled from the Fannie Mae mortgage program due to the sale of fake and fraudulent loans to Fannie, and who was stealing money from mortgagor tax and insurance escrow accounts.   Kissick and Kelly repeatedly caught Farkas in lies and fraudulent transactions outside the scope of Plan B, including diverting funds intended to buy mortgages to buy Farkas an expensive jet aircraft, funneling money to pay Farkas's personal expenses and the expenses of his clubs and personal associates, and the use by Farkas of forged documents.

Account Sweeping

12

24.    The Bank's policies and procedures for the MWLD permitted the Bank to approve overdrafts in a customer's account if certain requirements were met.  These requirements included, among other things, the preparation of an overdraft report and its submission to the appropriate person or committee (depending on the size of the overdraft) for approval.  At least as early as 2002, Kissick and Kelly circumvented the Bank's policies and procedures by improperly allowing overdrafts to be paid out of the TBW master operating account with Colonial's MWLD by tens of millions of dollars per day.  These overdrafts, as was known to the TBW conspirators, were used to cover losses and expenses arising in TBW's business and to fund defalcations and benefits for Farkas.  To conceal these overdrafts, and to prevent their appearance on the Bank's overdraft reports, Kissick and Kelly, near the close of business each day, transferred or "swept" funds into the TBW master account to cover the overdrafts.  This is sometimes called "account sweeping."  The source of the transferred funds was a restricted TBW account containing the proceeds of the sales of Colonial's collateral, which was designated to be applied to TBW's indebtedness to Colonial.  The effect of these transfers was the temporary deposit of the Bank's collateral into TBW's master operating account, and the purpose of the transfers was to conceal any overdraft by preventing the overdraft from appearing on an overdraft report.  The overdraft report was generated based on the status of the accounts at the end of each day, and

due to the fraud, the report did not reflect the TBW overdrafts.  After the reports were processed, Kissick and Kelly would transfer Colonial's funds back into the investor funding account and, as new overdrafts appeared, start the process all over again.  The overdrafts grew to over $120 million by December 2003, and Kissick and Kelly diverted a corresponding amount of the Bank's collateral proceeds to conceal the overdrafts.

COLB Plan B

25.     In December 2003 the conspirators implemented "Plan B," which was conceived as a way to steal and convert the Bank's assets through the corruption of the Bank's COLB facility with TBW.  Under Plan B, TBW "sold" mortgage loans to Colonial and used the proceeds to finance its operations rather than to fund mortgages.  However, the loans that Colonial "purchased" under Plan B either did not exist; had been sold or pledged to other banks or investors; were foreclosed, paid off, or charged off loans; or were otherwise unmarketable.  Thus, Plan B loans provided worthless collateral to Colonial in exchange for money advanced by the Bank because the loans had little or no value to Colonial.  Through this scheme, by mid-2005 Kissick and Kelly had helped TBW steal $250 million from Colonial.

AOT Plan B

26.     As the balance of the COLB Plan B loans grew, it became increasingly difficult for the conspirators to avoid detection by Colonial's loan

14

monitoring software which tracked details of COLB loans individually.  But, per Kissick's instructions, the software did not track loans in pools.  In or around December 2004 the conspirators set in motion a new scheme designed to transfer the Plan B deficit (or "hole") from COLB to the AOT facility.  Under the AOT version of Plan B, the conspirators arranged for TBW to sell pools containing fake or greatly impaired loans to Colonial in return for additional funding from the MWLD.  As in COLB, the AOT Plan B loan pools were basically worthless to Colonial because they consisted of nothing more than bogus data purporting to capture the value of real loans or data for loans that TBW had previously sold to other investors, or loans having little or no value.  As a result, there were nonexistent loans in the Plan B AOT pools purchased by Colonial, or the loans had been sold or pledged to other banks or investors; were foreclosed, paid off, or charged off loans; or were otherwise unmarketable.  The amount of Plan B pools held by the MWLD at the end of 2007 is estimated to be at least $561 million.

27.    In order to conceal the AOT Plan B fraud, Kissick and Kelly falsified the Bank's records and placed fictitious loans and loan pools on Colonial's books in recycling round-trip transactions up until the eve of Colonial's failure.

The Continuation of the Fraud and Double and Triple Pledging

28.    Beginning in 2008, and particularly in 2009, TBW and its subsidiary, with the assistance of others, stole almost $1 billion in loans from Colonial by

representing that TBW or its subsidiary would pay Colonial for the loans, but instead pledging or selling the loans to third parties without paying Colonial as promised.

a.      Every phase of the fraud -- sweeping, Plan B COLB, Plan B AOT and the double and triple pledging -- had the same goals:  Cover TBW's losses, fund Farkas's lavish lifestyle, prevent the fraud from being discovered, and avoid the consequences that would occur once it was discovered.

b.      The last phase of the fraud, the double and triple pledging phase, was conducted through the Colonial COLB facility, under which Colonial purportedly purchased 99% participation interests in mortgage loans which TBW arranged to sell to secondary market investors.  In the double and triple pledging phase, TBW stole hundreds of millions of dollars from Colonial to fund TBW's operations by converting the sales proceeds for its own use without paying Colonial.  The Plan B phase of the fraud, described above, in which Colonial provided funds to TBW to purchase loans under the COLB facility or loan pools under the AOT facility that either did not exist, had been sold to others, or were valueless in any event, lasted from late 2003 or early 2004 until the closure of the Bank, the period when PwC and Crowe were conducting some of the audits at issue here.  If the auditors had fulfilled their professional duties, they would have detected and reported the Plan B fraud to Colonial's management and Board, which would have resulted in the

termination of the Bank's relationship with Farkas, TBW and its affiliates, the termination of the COLB facility where the double and triple pledging losses were incurred, and the immediate termination of Kissick and Kelly.  The failure of the Bank's auditors to detect the fraud foreseeably resulted in the continuation of the fraud.  In other words, the audit failures of PwC and Crowe as described herein produced the losses described below in a natural and continuous sequence, unbroken by any new intervening, superseding or independent cause, and without which the injury would not have occurred.

      c.     Moreover, PwC's negligent approval and improper application of sales accounting treatment also caused the losses described below because the sales accounting treatment evaded limitations on loans to one borrower under applicable banking regulations.  Under proper accounting treatment, the funds advanced under the COLB line would have been limited so drastically that the Bank could not have advanced funds on the loans that were double and triple pledged by TBW in 2008 and 2009.  This was a foreseeable result of improper sales accounting treatment because, as PwC knew, the use of sales accounting treatment circumvented the Bank's lending limits and allowed far greater advances to TBW.

      d.     In or around July 2008, Kissick stopped making Plan B advances to TBW, but continued massive efforts to conceal the Plan B phase of the fraud from Colonial's management and directors.  In furtherance of the fraud, Farkas, Brown,

Kissick, Kelly and others carried out sham transactions, which they called "recycling," in which unmarketable Plan B AOT pools were supposedly sold by Colonial and TBW to TBW's affiliate, Ocala Funding ("Ocala"), and Ocala, in turn, supposedly sold to TBW and Colonial "new" Plan B AOT pools that likewise had no value to Colonial.  These sham transactions included the wiring of hundreds of millions of dollars of Colonial funds to Ocala, and Ocala wiring approximately the same amount of funds back to Colonial.  The purpose of the "recycling" transactions was to conceal the fraud by avoiding the scrutiny that would result if AOT pools remained on Colonial's books too long and by falsely making it appear that the fake AOT pools had been sold and replaced by new pools.  These recyclings continued until the conspirators were prevented by the FBI and other law enforcement authorities from continuing the fraud in or around August 2009.

e.      After Kissick informed Farkas in or around July 2008 that the Plan B advances would cease, Kelly grew suspicious of where Farkas was getting funds for TBW now that Kissick had stopped the Plan B advances.  This concern was logical given that TBW had been unable to pay its operating expenses for the last six years without stealing money from Colonial with the aid of Kissick, Kelly and others.  Following discussions with TBW's treasurer (Brown), Kelly believed that Farkas was diverting Colonial's sales proceeds to keep TBW in business and pay its bills.  Kelly says she reported her concerns to Kissick.  In any event, Kissick

and Kelly continued to allow, and in the case of Kissick to approve, Colonial's COLB advances to TBW, through which Colonial purchased 99% participations in loans from TBW that were later sold to Ocala, with LaSalle Bank ("LaSalle") serving as the custodian. Numerous COLB transactions involving TBW and Ocala – the same participants involved in the fraudulent AOT recycling transactions – eventually became double and triple pledged transactions, and alone (not including additional nine-figure Plan B losses after 2002 that also were caused by TBW's frauds against Colonial) resulted in an estimated $898.9 million in losses to the Bank and the FDIC. Specifically, after Colonial purchased its 99% interest in the COLB loans from TBW, the loans were shipped to Colonial, and then from Colonial to LaSalle, as custodial agent in connection with purchases by Ocala, with funds provided by Freddie Mac, the end investor and ultimate owner of the loans. Farkas, used the transactions as a way to steal money from Colonial, just as he had done ever since the fraud began in 2002, this time by directing LaSalle to transfer the sales proceeds from Colonial's loans to TBW or to pay TBW's debts rather than repay Colonial for its 99% interest. Kelly and Kissick knew of and condoned the double and triple pledging fraud. Indeed, when an MWLD employee brought to Kissick's attention concerns about TBW's actions in regards to the sales proceeds, Kissick prevented further investigation into the matter.

f.    The double and triple pledging phase not only involved stealing Colonial's sales proceeds, but also defrauded various other lenders by pledging Colonial's interest in COLB loans to them to secure additional funds.  The double and triple pledging fraud constitutes a theft of Colonial's sales proceeds and is analogous to the initial "sweeping" phase of the fraud, in which Colonial's sales proceeds were swept out of Colonial's collateral funding account into the TBW master operating account to cover TBW's overdrafts incurred to pay its operating expenses.

g.    In 2009, Colonial shipped thousands of COLB loans to TBW and/or Ocala for which it had not been paid in the time required under various agreements between TBW and Colonial.  At one point, Cherie Fite ("Fite"), an employee in Colonial's MWLD, sent TBW's Brown an email requesting that certain unpaid loans be returned to Colonial, as was Colonial's right under such agreements. Kissick was informed about Fite's request and Kissick told Fite in an email that she did not want the loans shipped back at that time.  Under the circumstances and based on the significant amounts that TBW then owed Colonial, pursuing the issue could potentially result in exposure of the longstanding, ongoing fraud, although Kissick told Fite that the shipped but unpaid loans that Fite had discovered would be paid that week.  Kissick told Fite that the reason Colonial had not been timely paid was because of funding delays.  Fite responded that she was not aware of

funding delays at the time of this incident.  Colonial still had not received payment by the following week.  Then, on August 4, 2009, after having been interrogated by the FBI in an interview in which she later admitted she was not honest, Kissick emailed TBW, asking that the loans be returned.  To the end, as she had done throughout, Kissick facilitated  and assisted acts, or was willfully blind to acts, by which Farkas and TBW defrauded Colonial and took many millions of dollars of Colonial's money – funds that Colonial would never recover.  As shown, the double and triple pledging fraud was merely the next phase in a continuum of evolving fraud TBW committed against the Bank and would have been prevented had PwC and Crowe properly performed their audits in compliance with applicable professional standards.  The losses suffered by the Bank and the FDIC as a result of the long-term fraud, including but not limited to the theft of COLB loan sales proceeds described above, are at least $2.2 billion.

## C.  PwC's Audit of Colonial – Failure to Uncover Fraud

29.    At all times during TBW's fraud against Colonial, PwC served as Colonial's external, independent auditor under engagement agreements with Colonial's parent company, CBG.  Pursuant to the engagement letters for its audits, PwC was obligated to (a) perform its audits in accordance with standards established by the Public Company Accounting Oversight Board ("PCAOB"), (b) design the audits to obtain reasonable assurance of detecting errors, fraud, or

illegality that would have a material impact on financial statement amounts, and (c) obtain reasonable assurance that effective internal control over financial reporting was maintained in all material respects, which required PwC to obtain an understanding of internal controls over financial reporting, assess the risk that a material weakness existed, and test and evaluate the design and effectiveness of internal controls over financial reporting.  CBG was a single-bank holding company with Colonial as its only asset of any significance.  Accordingly, an audit of CBG consisted of an audit of Colonial.  Upon information and belief, PwC knew that its audits of CBG's consolidated financial statements served as the audit required by 12 U.S.C. § 1831m.  At the conclusion of each audit, PwC reported that PwC had performed its audit work in accordance with applicable professional standards and that CBG's financial statements were fairly stated in all material respects in accordance with Generally Accepted Accounting Principles ("GAAP"), and that effective internal controls over CBG's financial reporting were in place.

30.    In fact, PwC's audits of Colonial's  financial statements for the years ending 2002-2008 fell short of governing professional standards in several respects.  If PwC had performed its audit work properly, it would have discovered the TBW fraud and Colonial would have avoided the damages the FDIC seeks against PwC in this complaint.

## 1.  Applicable Auditing Standards

31.     PwC's 2002 to 2008 audits of the consolidated financial statements of CBG and Colonial and the effectiveness of CBG's internal controls over financial reporting were "integrated audits."  Under PCAOB requirements, integrated audits by a PCAOB-registered public accounting firm such as PwC must be conducted in accordance with PCAOB Auditing Standards.  These standards adopted Generally Accepted Auditing Standards ("GAAS") as they existed on April 16, 2003, subject to amendment or supplementation by the PCAOB.  (For ease of reference, GAAS standards that were adopted by the PCAOB will be referred to as "GAAS" and cited as "AU."  Standards enacted by the PCAOB will be referred to as "AS.").  There are ten GAAS standards applicable to PwC's audit of Colonial, the most important of which for purposes of this case are:

- ▪ The auditor must adequately plan the work and must properly supervise any assistants.

- ▪ The auditor must obtain a sufficient understanding of the entity being audited and its environment, including its internal controls, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.

- ▪ The auditor must obtain sufficient competent evidential matter to afford a reasonable basis for an opinion regarding the financial statements under audit.

32.     GAAS and AS also require the auditor to understand (i) the audit client, customer relationships, industry conditions, economic conditions, regulatory environment, relevant accounting pronouncements, and other external factors; and

(ii) the internal controls that the audit client has in place to determine whether they are designed properly and operate effectively.

33.    To comply with GAAS, the auditor needs to identify risks of material misstatement at appropriate levels of detail, and design appropriate auditing procedures in light of such risks.  Due professional care requires the auditor to exercise professional skepticism – i.e., a questioning mind and a critical assessment of audit evidence based on the assumption that management is neither dishonest nor honest beyond doubt.

34.    Under GAAS and AS requirements, which audit procedures the auditor selects generally depend on the risk of material misstatement.  The higher the auditor's assessment of risk, the more reliable and relevant the audit evidence obtained from tests of the effectiveness of internal controls and substantive audit procedures must be.  The auditor must plan and perform the audit to obtain sufficient competent evidential matter to afford a reasonable basis for an opinion regarding the financial statements and to reduce to a low level the risk that the auditor will fail to detect a material misstatement.  If the auditor is unable to obtain sufficient competent evidential matter, the auditor should express a qualified opinion or a disclaimer of opinion.

### 2.  PwC's Pattern of Professional Negligence

35.     In its audits for the years ending 2002 through 2008, PwC repeatedly violated professional standards.  PwC's work demonstrated an appalling lack of planning, supervision, professional skepticism and due care.   PwC and its inexperienced auditors, who had little or no prior history auditing a mortgage warehouse lender, blindly accepted the assertions of Kissick as a substitute for competent evidential matter, failed to complete audit steps required by professional standards and its own audit programs, and failed to understand and properly characterize the MWLD transactions with TBW.  PwC failed to review COLB loan files, failed to obtain competent evidential matter to confirm the existence of COLB assets, and failed to obtain competent evidential matter to support the existence of investor commitments.  PwC repeatedly failed to properly identify and test internal controls for AOT, failed to perform AOT walkthroughs, failed to review AOT loan files or AOT loan level detail, failed to obtain competent evidential matter to support the existence of the investor commitments, and failed to obtain sufficient competent evidential matter to support AOT transactions and cash receipts or to establish the existence of AOT assets.   PwC failed to exercise professional skepticism and obtain sufficient competent evidential matter to rule out fraud, despite red flags of fraud, including, but not limited to, the termination of TBW from the Fannie Mae program for selling fraudulent loans to Fannie Mae, aged receivables and shipped not paid loans on COLB, and large overdrafts in

TBW's operating account. PwC failed to design and perform the audit in a manner that reasonably addressed the risk of loan originators, such as TBW, committing fraud, despite identifying originator fraud as a serious risk in its workpapers.

36.     PwC understood that one of the biggest risks that a mortgage warehouse lender faces is the risk of fraud by its mortgage originator customers. Where a customer is accused of wrongdoing and is having financial difficulties, the high operational risk that already exists becomes that much greater.  In 2002, PwC learned of the termination of TBW from the Fannie Mae program.  The termination took place in the spring of 2002 and was financially devastating to TBW.   The commencement of the sweeping phase of the TBW fraud coincided with the Fannie Mae termination.   PwC asked Kissick about the TBW termination by Fannie Mae, which Kissick described as being the result of Farkas having to buy loans back from General Motors Acceptance Corporation, and then having mistakenly sold the loans to Fannie Mae.  PwC did nothing to verify anything Kissick had said.  PwC did nothing to determine whether TBW had defrauded Fannie Mae, whether fraud was the cause of TBW's termination by Fannie Mae, or whether Kissick was lying.  If PwC had acted with due care, it would have learned that the answer to all three of these questions was "yes."

### 3.  PwC's Failure To Follow Required Auditing Standards

a.     Failure to Understand Colonial's MWLD and Associated Risks

37.     PwC failed to obtain a sufficient understanding of Colonial's MWLD operations to plan the audits properly, make an accurate assessment of audit risks, and design effective audit procedures.   PwC also relied on tests purportedly performed by others to confirm the effectiveness of internal controls, but it failed to recognize that no such tests had in fact been conducted.  Finally, in a number of specific areas, PwC's execution of planned audit procedures was carried out so carelessly that the audit evidence did not provide a valid basis for its conclusions and its unqualified audit opinion.

38.     PwC violated GAAS during the audit planning process by not giving adequate consideration to significant audit issues and risks stemming from recent adverse developments in U.S. mortgage markets, the very type of transactions underlying MWLD financing for TBW, and the concentration of Colonial's business in TBW.  Deteriorating conditions in the secondary market during 2007 created a risk that Colonial's holding period for loans and loan pools held in the COLB and AOT facilities might extend beyond the expiration date of the takeout investor's commitment or that investors might lose their appetite for these products.  The significant concentration of Colonial's MWLD business with TBW gave rise to additional risks associated with that particular customer.

39.     Throughout 2007 home prices were falling in regions of the country that had recently witnessed major booms, mortgage loan originators were suffering

from eroding markets, homeowners with subprime and other high-rate mortgages were defaulting in increasing numbers and, by the summer of 2007, many markets for mortgage-backed securities ("MBS"), particularly securities backed by residential mortgage loans, had all but frozen.

40.     PwC knew or should have known that TBW's business model depended on its ability to sell mortgage loans to the secondary market, and that the deterioration of that market likely would create financial pressures for TBW and give it a powerful incentive to exploit its relationship with Colonial's MWLD. Operating in this environment significantly increased the risk that Colonial's financial statements could be materially misstated due to fraud.

41.     These circumstances were serious fraud risk factors that significantly increased Colonial's risk of loss from MWLD financing and risk of a material misstatement of MWLD assets.  Yet PwC's audit design was devoid of appropriate procedures to address these risks.

> b.     Failure to Properly Evaluate Internal Controls

42.     For public companies like CBG, Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX 404") makes corporate management responsible for assessing the effectiveness of internal controls over financial reporting.  As part of its integrated audit, AS No. 5 required PwC to render an opinion on the effectiveness of these internal controls.  Moreover, PwC was required to test the effectiveness of

Colonial's internal controls if PwC intended to rely on such controls in order to limit the substantive audit procedures that it performed.

43.     CBG retained Crowe to evaluate internal controls in accordance with management's obligations under SOX 404.  In connection with its integrated audit pursuant to AS No. 5, PwC relied on Crowe's SOX 404 work for purposes of identifying key controls.  PwC knew that walkthroughs would be necessary for significant processes affecting significant accounts, but intended to rely on walkthroughs performed by Crowe for lower risk areas.[3]  PwC anticipated that Crowe would submit its testing plan to PwC for review.  Upon ensuring that Crowe's testing plan satisfied applicable audit standards, PwC would check the quality of Crowe's testing through independent verification.

44.     PwC knew that Colonial's Treasury and Securities Purchased Under Agreements to Resell (which included $1.5 billion in AOT financing for TBW at December 31, 2007) was a "Significant Process" for which it would test controls. During the actual audit, however, PwC excluded AOT entirely from the key controls that it tested despite AOT's significant account balance and distinct class of transactions (all with TBW) that called for transaction-specific controls.  PwC did not perform any AOT walkthroughs.  Upon information and belief, PwC

---

[3]   A walkthrough consists of following a transaction from origination through the company's processes, including information systems, until it is reflected in the company's financial records, using the same documents and information technology that company personnel use.

skipped this crucial step because key controls relating to AOTs were not properly identified by Crowe, and/or PwC did not properly assess the inherent risks regarding the existence and validity of AOT assets. PwC instead decided that it would rely on Crowe to perform all AOT walkthroughs.

45.     PwC was required to review Crowe's work product, and PwC did so. Crowe, however, never identified or performed any evaluation of internal controls specifically relating to the AOT facility, and there was no documentation suggesting otherwise.   Nonetheless, PwC concluded that internal controls for Colonial's Treasury (including AOT) operation were effective and could be relied upon by PwC to reduce its substantive audit procedures for the MWLD's AOT facility. PwC reached this conclusion in the absence of any evidence that Crowe (or anyone else) had tested any internal controls for AOT – a clear violation of AS No. 5.

46.     Had PwC properly performed AS No. 5 audit procedures as it was required to do, it would certainly have discovered that Crowe never performed any evaluation of internal controls relating to the AOT facility, precluding reliance on the effectiveness of such controls and triggering a need for additional audit procedures, including confirmation of AOT trades directly with end investors. Given the high percentage of fraudulent Plan B trades in the AOT facility (estimated at 40 percent of the total value of outstanding trades), confirmation with

AOT end investors would have uncovered the TBW fraud, leading to a cessation of lending to TBW which, in turn, would have avoided the losses Colonial incurred thereafter.

c.      Failure to Audit Colonial's AOT Account Balance

47.    The main substantive audit procedure PwC performed to test the $1.5 billion AOT balance at December 31, 2007, was to obtain a written confirmation from TBW for the entire balance.  This procedure totally disregarded potential fraud risk and based PwC's unqualified audit opinion on unreliable evidence. Professional standards required the application of more robust audit procedures for the AOT facility, such as confirming with end investors the validity of takeout commitments or subsequent-events testing to trace funds coming from end investors after year-end and comparing such cash receipts to the underlying settlement documents and cash receipts records.  Instead, PwC effectively treated the AOT facility as a loan to TBW and simply confirmed the entire $1.5 billion outstanding balance with TBW alone.

48.    PwC planned to count and verify the AOT collateral, but as the audit was conducted PwC failed to do this because of a representation from management that CBG had incurred no losses in the MWLD.  On its face, this justification for abandoning a planned audit procedure makes no sense.  Furthermore, this representation of no losses was highly suspect given the significant number of

mortgage loans financed by the MWLD, the well-known decline in credit markets during 2007, and evidence obtained by PwC that large numbers of COLB loans were defective and increasingly could not be sold in the secondary market. Under these circumstances the suggestion of no loss should have been seen as a potential indication of fraud. PwC's failure to verify AOT collateral violated AU Sections 316 and 326.

49.    PwC breached its duty under GAAS to exercise appropriate professional skepticism by failing to question how Colonial, particularly during an unfolding economic crisis in credit markets, had funded billions of dollars of mortgages over the years without ever experiencing a loss. Had PwC attempted to count collateral to verify its existence, such as by examining documents underlying AOT trades, it would have discovered fraudulent AOT transactions given that an estimated 40 percent of them had no collateral. This was yet another missed opportunity by PwC to put itself in a position to detect the TBW fraud by following required audit procedures. This failure was a violation of AU Sections 230, 316, and 326.

50.    PwC determined that reconciliations of Colonial's Treasury accounts were a key control, and thus PwC selected for testing a general ledger account within which AOT was a significant sub-account. PwC ultimately concluded that key controls relating to this reconciliation process were effective. But PwC had no

supporting documentation to rely upon to reconcile general ledger account balances. Proper supporting documentation typically involves a detailed trial balance listing all of the individual items (in this case, all AOT pools) that make up the total balance of the account. PwC simply relied on a report with a single line entry for the entire $1.5 billion TBW AOT account balance. Given that this report lacked any detail about the individual loan pools (or trades) purportedly comprising the total AOT balance, the documentation that PwC relied on provided neither reliable nor reasonable support for its unqualified opinion in violation of AU Section 326.

51.    If PwC had obtained detailed support for Colonial's AOT trades, it is doubtful that any reliable or reasonable evidence could have been provided, because an estimated 40 percent of AOT trades were bogus. Insisting upon appropriate detail to conduct these reconciliations is yet another audit procedure that, had PwC used it, would have led PwC to discover the TBW fraud during its 2007 audit.

52.    PwC also planned to select mortgage loans from a detailed list of all loans held for sale or investment and test them against appropriate supporting documentation, such as wire transfer documents or mortgage notes. Instead of carrying out this procedure, PwC relied on a report created by Kissick purporting to list 107 AOT trades totaling over $584 million as of year-end 2007 that TBW

supposedly repaid through re-sale or securitization of the loans during January 2008.  PwC failed to select any items from this report to confirm with supporting documentation (such as Trade Assignment Agreements, payment records, or confirmations from end investors).  Nor did PwC trace any of the individual trades that Kissick listed to an entire listing of all trades making up the $1.5 billion AOT balance at year-end 2007.

53.   PwC also planned to select from details making up a financial statement entry and then obtain appropriate and reliable audit evidence to support the reasonableness of the test selection.  PwC ignored both of these planned procedures, causing it to rely on insufficient audit evidence to support its unqualified opinion in violation of AU Section 326.  Had PwC attempted to verify the securitization and sale of AOT pools, it would have been unable to do so given that fake pools made up an estimated 40 percent or more of the total AOT balance, resulting in discovery of the TBW fraud.

d.   <u>Failure to Investigate Material Confirmation Discrepancy</u>

54.   In response to an audit confirmation request regarding TBW's mortgage warehouse line, TBW reported that its total mortgage warehouse line was $105.7 million – almost $20 million less than the $125.3 million total on

Colonial's books.[4]  Such a material difference cannot be accepted by the auditor without further analysis but, inexplicably, PwC completely missed this material difference and concluded that TBW's confirmation agreed to CBG's general ledger.  In violation of applicable professional standards, PwC failed to investigate this audit exception, failed to increase its assessment of risk, and failed to implement additional substantive audit procedures in light of the heightened risk. Follow-up procedures would have revealed that the TBW balance could not be confirmed.

55.    PwC's audit confirmation procedures also were grossly deficient in light of the potential fraud risks relating to TBW.  (AU Section 316).  The confirmation evidence that PwC obtained was unreliable. (AU Section 326).  PwC violated GAAS with respect to confirmation control (AU Section 330), proficiency of its auditors (AU Section 210), lack of supervision by senior auditors (AU Section 311), and the failure to exercise due professional care and appropriate professional skepticism. (AU Section 230).

e.    Failure to Investigate Stale TBW Loans in COLB Account

56.    A year-end 2007 aging analysis of COLB loans under the COLB agreements in effect at the time showed that loans totaling $166 million had

---

[4]    This was an additional line of credit for financing that the MWLD extended to TBW. TBW's confirmation also identified the "CB Portion" of the total line at nearly $6.6 million, compared with Colonial's records that showed the balance at $19.5 million, another material difference.

origination dates before July 1, 2007, meaning they had been on Colonial's books for more than six months.  (PwC also had access to Crowe's workpapers which revealed that (1) in April 2006, the Bank had $272.7 million of outstanding TBW loans under the COLB facility that were more than 120 days old when the loans should have been paid for or repurchased within 60 days and (2) the Bank was not sending violation notices for not being paid timely for loans that the Bank had sold and shipped.  *See* Paragraphs 73-74, *infra*.)  Kissick admitted that virtually all (99.6 percent) of the $166 million in loans had been originated by TBW.  Because COLB loans should have been sold within a short period (30-60 days), this was a clear sign of a serious potential problem.  Kissick told PwC that these loans had not been sold due to documentation exceptions that disqualified them for sale to the secondary market.  PwC never questioned why large numbers of aged and defective mortgage loans from TBW were being held for sale by Colonial in the COLB facility rather than being put back to TBW in accordance with the Loan Participation and Sale Agreement requiring TBW to repurchase such loans.  PwC justified its failure to investigate this serious potential problem on the grounds that it perceived no valuation issues specific to the loans.  This "justification" strains credulity because if these loans could not be sold due to documentation deficiencies as Kissick had represented, simple logic suggests that their valuation was in question if not impaired.  A reasonable auditor with appropriate skepticism

would not have let the matter drop, yet PwC did in violation of AU Sections 210, 230, and 316.

57.    With very large numbers of loans acknowledged to be defective, PwC should have suspected a serious breakdown in internal controls designed to prevent loans from being warehoused indefinitely on the COLB facility.    Accepting management's explanation that no valuation issues arose from such aged loans in a facility designed to keep loans for only 30-60 days is demonstrative of PwC's failure to exercise due professional care in the performance of the audit and obtain sufficient competent evidential matter in violation of AU Sections 230 and 326.  At the very least, PwC should have made a fair-value determination for a representative sample of these defective loans.  Had it done so, it would have discovered substantial valuation issues that would have necessitated a more extensive investigation of the MWLD's dealings with TBW, leading to the discovery of the TBW fraud.

58.    For each audit year, PwC issued its unqualified audit opinion, misrepresenting to Colonial and CBG that the consolidated financial statements were presented fairly in all material respects.

## D.  PwC's Audit of Colonial – Failures in Relation to Sales Accounting

59.    Lending under TBW's mortgage warehouse line was subject to legal lending limits, meaning that there was a limit to how much money Colonial could

lend to TBW.  The only reason that TBW was able to obtain additional funding under the COLB facility was because advances under this facility were treated as "sales" for accounting purposes pursuant to FAS 140.  An advance under the COLB facility could be treated as a sale so long as all of the following three conditions were met:

      (1)    The transferred assets have been isolated from the transferor. Isolation means that the transferred assets are beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership.

      (2)    The transferee has the unconstrained right to pledge or exchange the transferred asset.

      (3)    The transferor does not maintain effective control over the transaction through (a) an agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity; or (b) the ability to unilaterally cause the holder to return specific assets, other than through a type of transaction not at issue in this case.

      60.    From the inception of the COLB product in 2002 through 2009, PwC worked alongside Kissick advocating the application of sales accounting even as PwC itself understood that the advances made under COLB were in substance nothing more that short term loans.  Notably, in 2002 and 2003, Kissick used the COLB facility as a vehicle to hide the growing TBW overdrafts by making

advances to allegedly "purchase" interests in individual loans that had already been sold or pledged to other investors and that provided no collateral to Colonial. Application of sales accounting enabled TBW to circumvent the legal lending limits on its warehouse facility and also served to enable and expand the fraud. In other words, PwC played a major role in expanding Colonial's relationship with TBW and the risk of loss associated with TBW's fraud. PwC, however, never expanded its audit procedures to address these risks.

     a.    <u>PwC Repeatedly Failed to Obtain Adequate Audit Evidence.</u>

61. In November 2002, PwC represented to CBG that the Bank's COLB transactions qualified for sales accounting under FAS 140. The November 14, 2002 letter from PwC to Sheila Moody, Chief Accounting Officer of CBG, stated:

"█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████

████████████" Despite PwC's statement that COLB would only qualify for FAS 140

sales accounting if investor commitments were in place for each underlying mortgage loan, PwC repeatedly failed to take any audit steps to verify the existence of the investor commitments (and therefore the validity of FAS 140 sales accounting).

62.    PwC repeatedly misapplied FAS 140 sales accounting to the TBW COLB transactions and facilitated the violation of the lending limits by Colonial on its extensions of credit to TBW.  PwC knew the Bank never recovered more than its principal advance plus interest on the COLB transactions (even when the loans were sold by TBW at a profit) which further demonstrated that the transactions were loans rather than sales.  Colonial did not pay fair value (i.e., it paid less for its participation interest than it was worth) for its supposed participation interest as required for the transaction to be accounted for as a sale instead of a loan.  PwC thus knew the COLB transactions were loans and referred to them as "loans" and COLB as "a lending product" in its workpapers.  When referring to the Bank's supposed purchase of participations in loans as part of the COLB transactions, PwC usually put the word "buy" in quotes, thus demonstrating its reckless willingness to circumvent federal loan-to-one-borrower limits, which were designed to protect Colonial from the very thing that happened in this case, where extensions of credit by the Bank to TBW were approximately 500% of the Bank's lending limits.  PwC repeatedly ignored aspects of COLB that disqualified

it for sales accounting treatment, including the lack of fair value paid by Colonial, the constraint on the Bank's rights created by the investor commitments and the Bank's agreement to provide the loan documents to the investor upon the direction of TBW. Moreover, PwC knew for years that Colonial lacked the required true sale opinion, and even when the Bank finally obtained a true sale opinion, the opinion simply assumed fair value and that the transactions qualified for FAS 140 treatment and thus was based on circular unsupported assumptions that rendered the opinion meaningless.

       b.    <u>PwC Manufactures Audit Evidence to Support its Faulty Conclusion.</u>

63.    In April 2008, after PwC had issued multiple clean audit opinions approving sales accounting treatment for the Bank's COLB transactions, the OCC challenged PwC's conclusion that sales accounting for COLB was proper. According to PwC's lead auditor: "█████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████" The OCC's challenge to PwC's sales accounting conclusions caused major alarm within PwC. PwC immediately realized that if sales accounting was not proper, CBG's financial statements for at least the previous three years would have to be restated, that CBG's proposed effort to raise

$600 million in new capital in the public markets would be futile, and that Colonial's credit extensions to TBW would be billions of dollars in excess of the Bank's lending limits. PwC recognized that it was exposed to billions of dollars in liability for its past negligent advice and immediately assembled a consultation group of more than a dozen people within PwC, including risk management, sales accounting, and regulatory experts, as well as high level PwC officials, to address whether COLB qualified for sales accounting treatment under FAS 140. One of the leaders of the PwC consulting group was Frank Gaetano, from PwC's New York City office.

64.     Upon reviewing the available materials on sales accounting within the possession of PwC and Colonial, Gaetano concluded that PwC did not have sufficient support for its multiple prior opinions that COLB qualified for sales accounting. Gaetano also determined that based on the existing evidence, the COLB transactions did not comply with FAS 140 because the COLB transactions were not at fair value, which is a requirement to qualify for sale accounting treatment. Upon reaching these two conclusions, PwC should have withdrawn from the engagement and admitted to CBG and the Bank that PwC had failed to follow professional standards in the past and failed to properly apply FAS 140 to COLB. Simply stated, PwC was no longer independent, within the meaning of the applicable accounting standards, because it had enormous financial exposure to

CBG and the Bank for its previous tortious actions and breaches of contract. Instead of complying with its professional obligations, PwC decided to engage in deception, create false audit evidence, and mislead CBG, the Bank and its regulators.

65.     Instead of telling CBG, the Bank and its regulators that sales accounting was inappropriate, PwC created out of thin air terms of the COLB transactions that did not exist and that in fact were expressly negated and rejected by the written COLB agreement in order to support its previous conclusions.  In an April 12, 2008 e-mail exchange amongst some of the PwC consulting group discussing the FAS 140 issue, ███████████████████████████████

██████" was discussed.  The concept of a "call option" arose because as Gaetano noted"███████████████████████████████████████

███████████████████████████████████████████."

Later that day, Gaetano e-mailed Colonial and suggested "███████████

███████████████████████████████████████████

██████"  Gaetano continued "█████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████"  Clearly, PwC was not interested in what the true facts were and was

instead suggesting some clever accounting trickery that would get around the problem it found itself in.

66.     The fundamental problem in this regard is that an auditor needs to take a transaction as it exists and apply FAS 140 to that transaction.  An auditor should not try to make the transaction fit the requirements of FAS 140.  Indeed, this was specifically recognized by SEC Deputy Chief Accountant Scott A. Taub in a speech at the 2003 AICPA SEC Conference where he cautioned auditors, "[i]f you find yourself working on a transaction that has been initiated or deliberately restructured in order to obtain an accounting result that would not otherwise be obtained, think very critically about what you're doing.  Often, this structuring is indicative of a goal using accounting that reflects more positively on the company than the substance of the transaction warrants.  In other words, these transactions often are set up to frustrate the goal of telling the truth and providing transparent financial information."   Despite defying this teaching in its 2008 review of Colonial's COLB transactions under FAS 140, PwC subsequently incorporated it verbatim into its 2013 internal guidance.

67.     The enormity of PwC's deception is shown by its own workpapers for the last six years which repeatedly stated that there was no seller's call option in the COLB transactions.   Indeed, PwC had previously told the Bank that a seller's call option in the COLB agreement would bar FAS 140 sales accounting by

allowing the supposed seller (such as TBW) to retain control of the mortgage loans and by imposing a restraint on the Bank's rights.  Morevoer, memoranda drafted by the Bank after the OCC raised the sales accounting issue and provided to PwC in April 2008 repeatedly stated that there was no seller's call option in COLB. Most importantly, the relevant COLB agreement specifically provided that the Seller did not have a call option.

68.    Undeterred by the true facts, PwC pressed forward and requested that the Bank's attorneys issue an opinion that the COLB transactions were at fair value and that Colonial had granted its customers "seller's call options" that the Bank could "net settle."  No such opinion was issued.  When PwC failed in its attempts to get the Bank's attorneys to issue these opinions, it then turned to the Bank's customers, a far more vulnerable target, because their very existence depended on the continuation of COLB.  PwC requested the Bank's COLB customers to provide the opinions the Bank's attorneys would not provide.  The customers essentially had no choice but to sign the complex and convoluted "confirmations" or face having their over lending limits loans called, and their businesses destroyed.  PwC used these confirmations to justify its false representation that sales accounting for COLB was appropriate.  Yet each one of these confirmations from the COLB customers was flawed on its face because it contained an obvious and significant misstatement of fact that PwC knew to be untrue.  Specifically, the confirmations

stated that substantially all of the purported seller's call options had been net settled in cash when, in fact, few if any had been. This misstatement demonstrated beyond a doubt that the customer confirmations did not constitute reliable audit evidence. The fact that PwC did not question the flawed confirmations shows that the "evidence" being assembled was nothing more than paper aimed at supporting a pre-determined conclusion. In specific response to the OCC's inquiry regarding the appropriateness of sales accounting, it was represented to the OCC as follows as it relates to FAS 140:

> Colonial purchases participation interests in mortgage loans and the related servicing rights at fair value and simultaneously implicitly sells, for fair value, a call option to Seller allowing the Seller to purchase both the participation interests and the servicing rights from Colonial at the initial purchase price. When the Seller notifies Colonial of its intent to exercise the call option, Colonial in its sole discretion may either net settle the call option in cash (LPSA Sections 18A & 18B) or agree to the sale of the Participation Interest.

69. This false representation regarding sales accounting was made to CBG, to the Bank, to the Bank's regulators, and was implicit in and infected the public filings supporting the CBG capital raise. PwC knew these representations would be relied upon by CBG, the Bank, and the Bank's regulators to allow Colonial to continue to engage in COLB transactions with TBW. In making these representations, PwC acted wantonly which resulted in the continuation of COLB transactions with TBW that were not authorized by federal lending limits and

caused a substantial portion of the losses sought herein. PwC was motivated by its own economic interests in making these representations and in securing the false audit evidence that it recklessly and wantonly used to support them.

70.     PwC's glowing performance review of Gaetano reflects that PwC orchestrated the complex ( but false) justification for COLB sales accounting and that Colonial's management deferred to PwC: "███████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████" (emphasis added).

71.     Additionally, the deceptive actions of PwC's consulting group were ratified at the highest levels of PwC as evidenced by the following:

In a May 6, 2008 e-mail from Woody Wallace, PwC's head of Risk Management, he states "



."

In an April 20, 2008 email from PwC Chairman Samuel DiPiazza he notes "██████████████████████████████████████████████████████████████████████████████."

Such ratification amply demonstrates the wanton nature of PwC's conduct and that the wanton conduct reached the highest level at PwC.

72.     Had COLB transactions properly been recorded as loans instead of sales for accounting purposes, Colonial would have had to restate several prior years' financial statements and likely would have incurred serious economic consequences – facts of which PwC was certainly aware. Moreover, Colonial's legal lending limits to a single borrower would not have allowed Colonial to continue lending money to TBW after February 2008.  Thus, losses attributed to the TBW fraud after February 2008 would have been avoided if PwC had (a) fulfilled its duty to be independent, (b) exercised objective professional judgment (without subordinating its judgment to its client's wishes), (c) exhibited an appropriate level of professional skepticism of management's representations and application of accounting standards, and (d) evaluated the sales treatment issue properly.

**E.  Crowe's Engagement and Failure to Follow Professional Standards**

73.     Pursuant to annually executed engagement letters with CBG, Crowe agreed to provide internal audit services for Colonial that included (a) meeting

with management and assisting in developing an annual risk-based internal audit services plan, (b) assisting the Internal Audit Liaison in determining risks to be reviewed and recommending testing procedures, (c) assisting in developing control risk assessments, audit plans, audit programs, and audit reports, (d) developing key internal controls for significant financial statement accounts and performing tests to assess the effectiveness of key controls as required by Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX 404"), (e) reviewing key internal controls for all significant accounts and performing detail testing of a sample of transactions, and (f) directing, reviewing, and supervising the day-to-day execution of the internal audit plan.  In particular, the services provided by Crowe included SOX 404 testing of internal controls for all significant accounts identified by Crowe, which included Colonial's AOT facility.

74.    As a member of the AICPA, Crowe was required to comply with the AICPA Code of Professional Conduct and the AICPA Consulting Standards (collectively, "AICPA Standards") with respect to outsourced internal audit services it provided to CBG and Colonial.  These standards required Crowe to (a) exercise due professional care, which requires a member to plan and supervise adequately any professional activity for which he or she is responsible, (b) undertake only those professional services that the member or the member's firm can reasonably expect to be completed with professional competence, (c) obtain

sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed.  In addition, pursuant to the AICPA Consulting Standards, Crowe was obligated to establish with CBG an understanding about the responsibilities it was undertaking and the nature, scope, and limitations of services to be performed and to modify that understanding if circumstances required a significant change during the engagement.

75.    In connection with providing internal audit services to CBG and Colonial, Crowe was obligated to perform risk assessments and make a determination of risks for Colonial under the terms of its engagement and applicable professional standards, including the AICPA Standards and The Institute of Internal Auditors Standards for the Professional Practice of Internal Auditing ("IIA Standards").  In addition, the Risk Assessments and Internal Audit Plans that Crowe prepared required Crowe to discuss with management "the risks of the organization."   The focus of the risk assessments was to include the "business changes" and "business profile" of Colonial, and was to "determine the risks of the organization" and to "customize the annual audit approach to the particular risks and needs of the organization."

76.    Pursuant to the Crowe engagement letter, AICPA Standards, IIA Standards, and Crowe's own statements, Crowe was responsible for: (1)

identifying risks relating to Colonial's AOT loan pools, (2) informing management of those risks and the controls needed to address them, (3) recommending internal audit tests to determine if such controls were in place and effective, (4) making sure that, if Crowe itself was not performing any such tests, management was so informed, and (5) ensuring that internal audit tests of Colonial's AOT loan pools were adequately performed (whether or not Crowe performed the testing) and the results communicated to management.  In addition, Crowe had to give its overall assessment of risk in Colonial's operations and meet the needs of management.

77.    Colonial's reported MWLD assets grew to more than $3.3 billion by year-end 2007 and comprised 13 percent of Colonial's assets.  The rapid growth of the MWLD increased Colonial's fraud risks, especially in light of the falling real estate markets and the collapse of the private secondary market, yet Crowe paid little attention to the risks and internal controls affecting that division.

## 1.  Negligent Failure To Understand and Address Risks Affecting AOT Loan Pools

78.    The rapidly increasing AOT account balance was $605.9 million at the end of 2006 and $1.55 billion at the end of 2007.  Although AOT was a significant part of MWLD's business and was concentrated in one customer (TBW), AOT loan pools were excluded entirely from the scope of the internal audit procedures that Crowe performed.  Crowe's work papers for its internal audit reports on the MWLD for  2005, 2006, 2007, and 2008 reveal that Crowe failed to

appreciate that AOTs were different from any other type of transaction within Colonial.   Unlike COLB loans, for example, the details of the individual loans comprising the mortgage pools (or trades) were not maintained on the Bank's Pro-Merit loan-tracking software system.   Thus, internal controls appropriate for COLB loans were not appropriate for risks arising from AOTs.   Crowe failed to grasp this crucial point.

79.    None of the MWLD process diagrams in Crowe's work papers depict transactions or the flow of funds and collateral relating to Colonial's AOT transactions.   The complete lack of documentation in Crowe's work papers for such a significant and distinct line of Colonial's business demonstrates that Crowe failed to evaluate the risks of AOTs and the related controls as part of its overall assessment of Colonial's operations and design of internal audit plans in violation of IIA Standards, including, but not limited to, 1220, 2010, 2110, 2120, 2201, and AICPA Standards ET 201 and CS 100.

## 2.  Negligent Failure to Identify Key Controls Relating to AOT

80.    In conformity with SOX 404 requirements, Crowe prepared a Financial Statement Internal Controls Map ("Internal Controls Map"), which identified Colonial accounts for which the risk of financial misstatement could be significant.   The accounts were to be analyzed to identify applicable controls that would address risks specifically relating to the potential misstatement of the

corresponding financial statement balance.  The control procedures were then to be "mapped" to the operations of the Bank where controls had been (or should have been) implemented so that SOX 404 tests of the effectiveness of key controls could be performed by Crowe.   The Internal Controls Map identified "Securities purchased under agreement to resell" (an asset reported on CBG's Balance Sheet consisting primarily of AOTs) as a significant area for potential misstatement. Despite Crowe's recognition of the risk of misstatement as reflected in the Internal Controls Map, Crowe failed to analyze this "significant" and unique class of transactions to identify (a) the controls that would address the risk of financial statement misstatement and (b) each area of the Bank where such controls should have been implemented.  In the 2005, 2006, 2007 and 2008 internal audits, Crowe failed to identify any key controls specifically relating to AOTs and failed to perform any SOX 404 tests to determine if appropriate internal controls were in place and were operating effectively.

81.   Although Crowe's internal audit program for Colonial essentially ignored AOTs, Crowe did identify several risk factors and internal controls for SOX 404 testing of controls generally for secondary market lending operations. Those controls would be relevant to Colonial's AOT facility because AOTs were sold to investors in the secondary market.  The procedures Crowe identified for secondary market lending operations included confirming trades with end investors

53

and conducting appropriate follow-up on unconfirmed trades and confirmation discrepancies. However, Crowe dismissed these risks and deemed the controls not to be applicable to Colonial based on the uncorroborated representations of the head of Colonial's MWLD. In violation of professional standards, including, but not limited to, IIA Standards 1220, 2010, 2110, 2120, 2201 and AICPA Standards ET 201 and CS 100, Crowe performed no analysis of the AOT operation to reach this conclusion and failed to identify or test the very controls that Crowe mentioned for transactions involving sales to the secondary market.

82.     Had Crowe recommended that specific controls were necessary for Colonial's AOTs and had Crowe tested controls relating to the confirmation of AOT trades with end investors, the fraudulent AOTs on Colonial's books would have been discovered given that an estimated 40 percent of AOT trades had no end investors because the trades were fraudulent.

### 3. Negligent Failure to Test AOT Loan Collateral

83.     Crowe's internal audit program also included procedures to test mortgage loan collateral by selecting loans from "Pipeline Reports" generated by Colonial's ProMerit loan management and database software system and examining the corresponding collateral packages for each loan selected.[5]     As

---

[5]   Pipeline Reports provided loan-level detail for individual mortgage loans securing warehouse lines of credit and loans in the COLB facility, but they contained no such loan level detail for AOT loan pools.

previously noted, the loan monitoring software (from which the Pipeline Reports were generated) did not track individual loan details for loans in AOT pools. Rather than perform collateral testing procedures tailored specifically for AOT loans, such as obtaining the loan-detail information from Colonial and examining the collateral, assignment of trade agreements, trade confirmations, and other supporting documents, Crowe excluded AOT loan collateral from these procedures entirely.  As a result, no collateral testing was conducted for the AOT facility that totaled approximately $1.5 billion at year-end 2007 and related entirely to mortgages purportedly originated by TBW.

84.    Having acknowledged the necessity of testing controls for collateral supporting MWLD loans maintained in the ProMerit loan management system, Crowe's failure to conduct reasonably equivalent procedures for loan collateral relating to AOTs was a critical error that violated professional standards, including, but not limited to, IIA Standards 1220, 2010, 2110, 2120, 2201 and AICPA Standards ET 201 and CS 100.  Had AOT loan collateral been tested in 2006 or 2007, Crowe would have discovered the TBW fraud because there was no collateral for an estimated 40 percent of the AOT pools.

### 4. Negligent Reconciliation of the AOT Account Balance

85.    In 2006, Crowe identified $589.8 million of AOTs recorded in a Colonial account for Reverse Repurchase Agreements.  Crowe purported to

reconcile this account balance to an unspecified report prepared by the MWLD. The only report Crowe referenced as support for the balance of the AOTs was a loan monitoring subsidiary report which provided only a summary entry consisting of a single line item that gave the total amount of all AOTs financed for TBW. Because this "report" contained no details of the individual loans or of the separate loan pools that made up the total AOT balance, by its nature it was not, nor could it have been considered by a technically proficient internal auditor to have been, reliable or reasonable support for the balance recorded in the Reverse Repurchase Agreements account.  It provided no information beyond the account balance itself, and thus Crowe's reliance on it violated IIA Standards, including, but not limited to, 1210, 1220 and AICPA Standards ET 201 and CS 100.  These were repeat violations in that Crowe engaged in similar conduct with respect to reconciling the lead schedule of AOTs in 2005, and Crowe then repeated the same violations in 2007.

86.    To comply with applicable professional standards requiring sufficient relevant data to provide a reasonable basis for conclusions regarding risks and internal controls, Crowe should have requested details for AOT trades, such as the underlying Trade Assignment Agreements and information concerning the separate loan pools aggregated into the total AOT balance.  Crowe was negligent in failing to insist upon appropriate documentation to test the reconciliation controls relating

to this major account balance.  Had Crowe performed tests to properly assess the effectiveness of Colonial's AOT reconciliation controls, it would have led to the discovery of the TBW fraud because individual mortgage loans did not exist for an estimated 40 percent of AOTs.

### 5. Crowe's Negligent Failure to Assess Risks and Internal Control Deficiencies Identified by CBG's In-House Internal Auditor

87.     In 2004, Pam Vitto was hired as a full-time Senior Risk Officer reporting directly to the General Auditor in Montgomery.  Her responsibilities included auditing the MWLD's controls, including controls over the AOT facility created for TBW in late 2004.

88.     Applicable professional standards and the terms of Crowe's engagement with CBG imposed a duty on Crowe to evaluate Colonial's AOT controls, and Crowe failed to fulfill this obligation.  In particular, under AICPA Standards ET 201 and CS 100, Crowe was required to exercise due professional care in the performance of professional services, adequately plan and supervise the performance of professional services, and obtain sufficient relevant data to afford a basis for any conclusions.  In addition, Crowe was responsible not only for reviewing Vitto's internal audit activities, but Crowe should have also considered the results and findings of her work as part of its assessment of controls needed by the Bank and advised the CBG Audit Committee of any weaknesses noted by Vitto.  Crowe failed to do this in violation of AICPA consulting standards that

required Crowe to serve the client's interest by accomplishing objectives established through an understanding with the client (for example, AICPA CS 100.07), including the direct review and day-to-day supervision of the audit plan, as set forth in Crowe's engagement letter.

89.    Crowe knew or should have known about any irregularities questioned by Vitto and the fact that she performed no procedures specific to AOT, yet Crowe failed to take any action to address these fraud risks, and the Risk Assessments and Audit Plans prepared by Crowe make no mention of such serious fraud risks.   Crowe's failure to assess risks and internal control deficiencies identified by Vitto was negligent and violated professional standards, including, but not limited to, IIA Standards 1220, 2010, 2110, 2120, 2201 and AICPA Standards ET 201 and CS 100.   Had Crowe performed appropriate review and follow-up of Vitto's concerns, issues concerning Kissick's circumvention of Colonial's internal control procedures would have come to light and the TBW fraud would have been discovered.

### 6.  Negligent Failure to Identify and Address the Risks of Aged COLB Loans and Loans Shipped Not Paid

90.    Crowe's MWLD internal audit plan incorporated various procedures to test aged loans to ensure that key controls were in place and were operating effectively.   After performing the procedures in 2006, Crowe found "no exceptions" worthy of reporting to CBG's Audit Committee.   Yet Crowe's own

work papers contradict this conclusion.  During the 2006 audit, Crowe discovered

serious internal control issues, including:

    a.    Colonial was improperly parking in a "held for sale" account (i.e., the COLB facility) loans that had been rejected by end investors instead of putting the loans back to the originator (such as TBW), as it had a contractual right to do, and

    b.    Violation notices that were supposed to be sent to end investors for loans Colonial had "shipped" but for which Colonial was not paid after 60 days were not being sent.  Instead of reporting this serious issue to management, Crowe simply accepted Kissick's explanation that the notices did not have to be sent within a specific period of time frame because, in light of economic pressures, the MWLD was trying to accommodate customers that were having difficulties selling loans by not imposing strict policies and penalties.

91.    Aged-loan reports for April 2006 given to Crowe showed $272.7

million of outstanding TBW loans under the then existing COLB facility that were

aged over 120 days, when the loans normally were to have been repaid by TBW or

an end investor within 60 days.  Crowe's own work papers thus establish that

Crowe in fact was aware that there were significant concerns relating to unsold and

aged loans as well as loans sold without payment to Colonial under the then

existing COLB facility.  Crowe failed to cite these as exceptions and to question

why Colonial would hold for sale defective loans rather than put them back to

TBW as it had a contractual right to do.  These failures violated IIA Standards

1220, 2010, 2110, 2120, 2201, 2400 and AICPA Standards ET 201 and CS 100.

At the very least, Crowe should have reported such significant problems as an

exception, but it did not do so.  Under the then existing COLB facility, Colonial incurred significant losses from the TBW fraud for loans pledged to multiple parties that Colonial shipped to investors but for which Colonial was not paid.

92.     Crowe failed to recognize the significant risks resulting from the substantial amount of aged TBW loans accumulating in the then existing COLB facility.  Crowe had evidence that the MWLD was circumventing Colonial's internal controls relating to shipped but not paid loans and to TBW's mortgage warehouse credit line by not requiring timely payment for shipped loans and allowing impaired and unmarketable TBW mortgage loans to be warehoused in the COLB facility as Loans Held for Sale.  Crowe was negligent in failing to report to higher management serious material control weaknesses and steps taken to override key controls relating to aged COLB loans.   These failures violated Crowe's obligations under AICPA Standard CS 100.07 to communicate significant engagement findings, as well as IIA Standards set forth in Section 2400 requiring Crowe to "communicate the engagement results promptly."  If Crowe had reported these violations, the Bank could have invoked its rights under agreements with TBW and demanded timely payment for shipped loans and the repurchase of the significantly aged TBW loans in the then existing COLB facility.  TBW would not have been able to comply, the risk of double and triple pledging of loans would

have arrested, and the defective nature of the aged loans would have been discovered earlier, reducing Colonial's losses from the TBW fraud.

### 7.  Deficient Reports and Erroneous Conclusion That Controls in Place in the MWLD Were Adequate

93.    Given that Colonial's AOTs were a separate class of MWLD transactions extended to TBW alone, Crowe was required by applicable professional standards to obtain an understanding of AOT transactions and related internal controls as part of its risk assessment and design of an audit plan that would enable CBG management to comply with its SOX 404 requirements. Furthermore, if Crowe understood that these or any other transactions were not within the scope of its MWLD Internal Audit, applicable professional standards such as IIA Standard 2020 and AICPA Standard CS 100.07 required Crowe to communicate that understanding to CBG management to avoid any confusion or erroneous belief that Crowe would test such transactions and controls.  In addition, Crowe also was required to communicate the serious risks and violations of internal controls relating to the aged COLB loans and loans shipped not paid.

94.    Crowe's 2005, 2006, 2007 and 2008 Internal Audit Reports for Colonial's MWLD and Treasury operations failed to communicate any risks or control issues regarding AOT and ignored the risks that Crowe had discovered relating to aged COLB loans and loans shipped not paid.  Similarly, Crowe's Risk Assessment and Internal Audit Plans for 2005, 2006, 2007 and 2008 also made no

mention of specific risks or controls relating to Colonial's AOTs.  Nor did they discuss any particular audit plan or audit procedures to address risks of which Crowe was or should have been aware, including (1) significantly aged loans in the then existing COLB facility, (2) loans shipped not paid for extended periods of time, (3) concerns regarding irregularities in loan aging reports, or (4) evidence indicating loan resetting on AOT pools.  Had Crowe properly evaluated and tested the risks and controls relating to AOTs and reported the internal control deficiencies that it did observe (and others it should have observed), the fraudulent loans and loan pools would have been discovered no later than December 31, 2005.

**F.     The FDIC's Claims Against Crowe Are Timely.**

95.     The FDIC and Crowe entered into a Tolling Agreement effective August 9, 2012, pursuant to which the FDIC and Crowe expressly agreed to toll and suspend all timing defenses and statutes of limitations.  Under this Tolling Agreement, the time period beginning on the Effective Date of August 9, 2012, and ending on October 10, 2012 (the "Termination Date") was defined as the "Tolling Period."  The Termination Date was later extended from October 10, 2012, to October 31, 2012, under an "Extension of Tolling Agreement" executed on August 31, 2012, thereby also extending the Tolling Period to October 31, 2012.  The Tolling Agreement and the Extension to the Tolling Agreement entered

into between the FDIC and Crowe shall be referred to collectively as the "Crowe Tolling Agreement."

96.    Pursuant to the Crowe Tolling Agreement, the FDIC and Crowe agreed that "[a]ny and all statutes of limitation or repose that would have otherwise expired or lapsed at any time during [the Tolling Period] shall be tolled, suspended, and not expire or lapse until after the Termination Date."  In addition, the FDIC and Crowe agreed that "[a]ll claims, defenses, cross-claims, or counterclaims that either Party could have asserted against the other Party at any time on or before the Effective Date shall be preserved without any prejudice during the Tolling Period."

97.    The FDIC was appointed Receiver of Colonial on August 14, 2009. Because the Effective Date of the Tolling Agreement was August 9, 2012, and Crowe agreed and promised under the Tolling Agreement that for the time between August 9, 2012, and October 31, 2012 (the Tolling Period), any and all statutes of limitations or repose that would have otherwise expired or lapsed at any time during the Tolling Period were tolled, suspended, and would not expire or lapse; and, because the FDIC and Crowe agreed separately and affirmatively that all claims, defenses, cross-claims, or counterclaims between them shall be preserved without any prejudice during the Tolling Period, the FDIC's October 31, 2012, filing of its claims against Crowe in this lawsuit was timely.  The Crowe Tolling Agreement is an enforceable agreement, the FDIC complied with it in filing its

claims in this lawsuit against Crowe when it did, and the FDIC's claims asserted in this lawsuit against Crowe are timely.

98.     In addition to the agreement to toll and suspend any and all statutes of limitations or repose, the FDIC and Crowe separately agreed and promised that the Tolling Period (August 9, 2012, through October 31, 2012) was not be included in any calculation of time for "any timing defense…and any defense related to, or predicated upon, the passage of time, including, without limitation, the defense of laches," in response to the claims asserted by the FDIC against Crowe in this lawsuit.  This is so because the FDIC and Crowe defined the term "Statute of Limitations" in the Tolling Agreement to include "any timing defense, and any statutory, common law, equitable, or contractual time period of limitations or repose of claims and any defense related to, or predicated upon, the passage of time, including, without limitation, the defense of laches, with respect to the FDIC Claims and/or any claims or counterclaims that Crowe might have against the FDIC."  Crowe, therefore, is prohibited by this separate promise and agreement from raising any defense to the claims asserted by the FDIC in this lawsuit, which includes the time period contained within the Tolling Period.   Any defense that may be asserted by Crowe to the timeliness of the FDIC's filing of its claims against Crowe in this lawsuit predicated upon the time included in the Tolling Period is completely without merit.

99.   Moreover, Paragraph 11 of the Crowe Tolling Agreement states "[Crowe] stipulates, agrees, and warrants to the [FDIC] . . . that it will not challenge or in any way contest the capacity of either [Crowe or the FDIC] to make agreements, covenants, stipulations and warranties herein set forth."   Crowe expressly agreed not to challenge the FDIC's authority to enter into the tolling agreement, and the argument that the tolling agreement is unenforceable under the extender statute violates this representation and warranty.

100.   In addition, or in the alternative, Crowe is equitably estopped from asserting any timing defense of limitations or the like to the FDIC's claims.  Crowe and the FDIC negotiated and executed the Crowe Tolling Agreement prior to the expiration of any applicable statute of limitations or repose for the purpose of engaging in and continuing pre-suit settlement negotiations.  The Crowe Tolling Agreement is limited in scope (which the parties agreed was reasonable), it was executed between two parties of equal bargaining strength, and its purpose was to facilitate a strong public policy of encouraging settlements.  Further, the FDIC reasonably relied upon the promises and agreements made by Crowe in continuing settlement negotiations rather than breaking off negotiations and filing suit during the Tolling Period.  Indeed, the Crowe Tolling Agreement specifically states that "the Parties have indicated a desire to continue the discussions during the Tolling Period (as defined below) regarding whether the FDIC Claims . . . should be

brought or otherwise resolved; . . ."   The FDIC also agreed not to file its claims prior to October 24, 2012.   Finally, the FDIC agreed not to seek to take any administrative actions against Crowe (including, without limitation, the initiation or enforcement of administrative discovery) or seek to impose any new obligations during the Tolling Period.

101.   The FDIC honored all of these provisions of the Crowe Tolling Agreement.   As a result, the parties were afforded the opportunity to continue discussions concerning a potential settlement of the FDIC's claims during the Tolling Period prior to the FDIC's filing of suit, the stated purpose of the Crowe Tolling Agreement.   And, the FDIC refrained from filing suit against Crowe before October 24, 2012, as promised in the Tolling Agreement. Finally, the FDIC did not seek to take any administrative actions against Crowe during the Tolling Period. The FDIC reasonably relied upon the agreements and promises made by Crowe in the Crowe Tolling Agreement, which constitute an affirmative inducement to the FDIC to delay bringing its claims against Crowe.   An injustice will result from allowing Crowe to assert any timing defense predicated upon the Tolling Period agreed upon and provided in the Crowe Tolling Agreement.   Therefore, and notwithstanding the enforceability of the Crowe Tolling Agreement with respect to the parties' agreement to toll and suspend any and all statutes of limitations or repose during the Tolling Period and Crowe's agreement not to challenge the

authority of the FDIC to enter into the Crowe Tolling Agreement, Crowe is equitably estopped from including the time included in the Tolling Period (August 9, 2012, to October 31, 2012) in any defense related to, or predicated upon, the passage of time.

102.   In addition, or in the alternative, Crowe has waived any time-related defense of limitations or the like to the FDIC's claims dependent upon the inclusion of the timeframe agreed by the parties to comprise the Tolling Period in the Crowe Tolling Agreement.   Crowe freely and intentionally agreed to relinquish any such defense in the Crowe Tolling Agreement, which Crowe cannot dispute was known to it at the time it executed the Crowe Tolling Agreement, for the period of time tolled under it in the Tolling Period.   Therefore, and notwithstanding the enforceability of the Crowe Tolling Agreement with respect to the parties' agreement to toll and suspend any and all statues of limitations or repose during the Tolling Period, Crowe has waived any right it otherwise may have had to include the time defined as the Tolling Period (August 9, 2012, to October 31, 2012) in any defense related to, or predicated upon, the passage of time.

## G.   The FDIC's Claims Asserted Against PwC are Timely.

103.   The FDIC and PwC entered into a Tolling Agreement effective August 9, 2012, pursuant to which the FDIC and PwC expressly agreed to toll and suspend all timing defenses and statutes of limitations.   Under this Tolling

Agreement, the time period beginning on the Effective Date of August 9, 2012, and ending on October 10, 2012 (the "Termination Date") was defined as the "Tolling Period." The Termination Date was later extended from October 10, 2012, to October 31, 2012, under an "Extension of Tolling Agreement" executed on August 31, 2012, thereby also extending the Tolling Period to October 31, 2012. The Tolling Agreement and the Extension to the Tolling Agreement entered into between the FDIC and PwC shall be referred to collectively as the "PwC Tolling Agreement."

104. Pursuant to the PwC Tolling Agreement, the FDIC and PwC agreed that "[a]ny and all statutes of limitations or repose with respect to, arising out of or in any way connected with the FDIC Claims that would have otherwise expired or lapsed at any time during [the Tolling Period] shall be tolled, suspended, and not expire or lapse until after the Termination Date." In addition, the FDIC and PwC agreed that "[a]ll claims, defenses, cross-claims, or counterclaims with respect to, arising out of or in any way connected with the FDIC Claims that either Party could have asserted against the other Party at any time on or before the Effective Date shall be preserved without any prejudice during the Tolling Period."

105. The FDIC was appointed Receiver of Colonial Bank on August 14, 2009. Because the Effective Date of the Tolling Agreement was August 9, 2012, and PwC agreed and promised under the Tolling Agreement that for the time

between August 9, 2012, and October 31, 2012 (the Tolling Period), any and all statutes of limitations or repose that would have otherwise expired or lapsed at any time during the Tolling Period were tolled, suspended, and would not expire or lapse; and, because the FDIC and PwC agreed separately and affirmatively that all claims, defenses, cross-claims, or counterclaims between them shall be preserved without any prejudice during the Tolling Period, the FDIC's October 31, 2012, filing of its claims against PwC in this lawsuit was timely.  The PwC Tolling Agreement is an enforceable agreement, the FDIC complied with it in filing its claims in this lawsuit against PwC when it did, and the FDIC's claims asserted in this lawsuit against PwC are timely.

106.   In addition to the agreement to toll and suspend any and all statutes of limitations or repose, the FDIC and PwC separately agreed and promised that the Tolling Period (August 9, 2012, through October 31, 2012) was not be included in any calculation of time for "any timing defense…and any defense related to, or predicated upon, the passage of time, including, without limitation, the defense of laches," in response to the claims asserted by the FDIC against PwC in this lawsuit.  This is so because the FDIC and PwC defined the term "Statute of Limitations" in the PwC Tolling Agreement to include "any timing defense, and any statutory, common law, equitable, or contractual time period of limitations or repose of claims and any defense related to, or predicated upon, the passage of

time, including, without limitation, the defense of laches, for any purported claims pertaining to any activities or PwC in connection with Colonial."  PwC, therefore, is prohibited by this separate promise and agreement from raising any defense to the claims asserted by the FDIC in this lawsuit, which includes the time period contained within the Tolling Period.   Any defense that may be asserted by PwC to the timeliness of the FDIC's filing of its claims against PwC in this lawsuit predicated upon the time included in the Tolling Period is completely without merit.

107.   Moreover, Paragraph 11 of the PwC Tolling Agreement states "[PwC] stipulates, agrees, and warrants to the [FDIC] . . . that it will not challenge or in any way contest the capacity of either [PwC or the FDIC] to make agreements, covenants, stipulations and warranties herein set forth."  PwC expressly agreed not to challenge the FDIC's authority to enter into the tolling agreement, and the argument that the tolling agreement is unenforceable under the extender statute violates this representation and warranty.

108.  In addition, or in the alternative, PwC is equitably estopped from asserting any timing defense of limitations or the like to the FDIC's claims.  PwC and the FDIC negotiated and executed the PwC Tolling Agreement prior to the expiration of any applicable statute of limitations or repose for the purpose of engaging in and continuing pre-suit settlement negotiations.  The PwC Tolling

Agreement is limited in scope (which the parties agreed was reasonable), it was executed between two parties of equal bargaining strength, and its purpose was to facilitate a strong public policy of encouraging settlements.  Further, the FDIC reasonably relied upon the promises and agreements made by PwC in continuing settlement negotiations rather than breaking off negotiations and filing suit within the Tolling Period.  Indeed, the FDIC attended a pre-suit mediation session with PwC concerning the FDIC's claims on October 18, 2012, at a time that fell squarely within the Tolling Period.  In the PwC Tolling Agreement, the FDIC also agreed not to file its claims prior to October 24, 2012.

109.  The FDIC honored all of these provisions of the PwC Tolling Agreement.  As a result, the parties were able to continue discussions concerning a potential settlement of the FDIC's claims, up to and including the October 18, 2012 mediation prior to the FDIC's filing of suit, the stated purpose of the PwC Tolling Agreement.  And, the FDIC refrained from filing suit against PwC before October 24, 2012, as promised in the PwC Tolling Agreement. The FDIC reasonably relied upon the agreements and promises made by PwC in the PwC Tolling Agreement, which constitute an affirmative inducement to the FDIC to delay bringing its claims against PwC.  An injustice will result from allowing PwC to assert any timing defense predicated upon the Tolling Period agreed upon and provided in the PwC Tolling Agreement.  Therefore, and notwithstanding the

enforceability of the PwC Tolling Agreement with respect to the parties' agreement to toll and suspend any and all statutes of limitations or repose during the Tolling Period and PwC's agreement not to challenge the authority of the FDIC to enter into the PwC Tolling Agreement, PwC is equitably estopped from including the time included in the Tolling Period (August 9, 2012, to October 31, 2012) in any defense related to, or predicated upon, the passage of time.

110.   In addition, or in the alternative, PwC has waived any time-related defense of limitations or the like to the FDIC's claims dependent upon the inclusion of the timeframe agreed by the parties to comprise the Tolling Period in the PwC Tolling Agreement.   PwC freely and intentionally agreed to relinquish any such defense in the PwC Tolling Agreement, which PwC cannot dispute was known to it at the time it executed the PwC Tolling Agreement, for the time period tolled under it in the Tolling Period.   Therefore, and notwithstanding the enforceability of the PwC Tolling Agreement with respect to the parties' agreement to toll and suspend any and all statues of limitations or repose during the Tolling Period, PwC has waived any right it otherwise may have had to include the time defined as the Tolling Period (August 9, 2012, to October 31, 2012) in any defense related to, or predicated upon, the passage of time.

H.   **The Discovery Rule Applies to Claims Against PwC and Crowe.**

111.   Colonial did not discover, and should not have discovered, that PwC's and Crowe's audit work was deficient, including PwC's sales accounting work, and that its audit opinions were erroneous and not based on sufficient and competent audit evidence until the underlying fraud came to light in August 2009.

## IV. CLAIMS FOR RELIEF

### Count I
Professional Negligence
(Against PwC)

112.   The FDIC incorporates paragraphs 1-111 into this claim for relief.

113.   PwC owed Colonial a duty to perform its audits and professional services in accordance with applicable professional standards.  As alleged more fully herein, PwC breached its duty in at least the following ways, among others:

a. failing to obtain a sufficient understanding of Colonial's mortgage warehouse lending line of business to properly plan the audit and design effective audit procedures to address specific risks of material misstatement due to fraud, reduce audit risk to an acceptably low level, and obtain sufficient competent evidential matter to support its audit opinion;

b. failing to consider the significant increase in fraud risks relating to Colonial's mortgage warehouse lending line of business caused by the financial and economic crisis in the U.S. that was adversely impacting liquidity in the mortgage markets;

c. approving and advocating for sales treatment accounting for loans in the MWLD COLB facility when accounting standards required that such loan "purchases" be treated as a financing transaction (i.e. loans to Colonial's mortgage banking customers that utilized the COLB facility instead of Colonial loans held for sale);

d.  fabricating evidence for, and ultimately approving a false accounting narrative under FAS 140 aimed at achieving a desired accounting conclusion that was contrary to existing evidence so that Colonial could appear to be in compliance with federal loan-to-one-borrower regulations and PwC could avoid the consequences of disclosing that its conclusions in prior years were erroneous;

e.  failing to count or verify the collateral securing loan pools in the AOT facility;

f.  failing to investigate why Colonial was holding a significant volume of stale loans purchased from TBW rather than requiring TBW to repurchase the loans;

g.  failing to employ appropriate audit procedures for Colonial's AOT account;

h.  failing to identify reportable conditions and material weaknesses in CBG's internal control over financial reporting, particularly with respect to the manner in which Colonial's Treasury area maintained control over AOT collateral and reconciled the balance of AOTs recorded as Securities Purchased Under Agreements to Resell;

i.  failing to recognize that the scope of work performed by Crowe was not sufficient to meet the requirements of SOX 404 and, in particular, did not adequately address key controls in the Treasury area relating to maintaining control over AOT collateral and reconciling the balance of AOTs recorded as Securities Purchased Under Agreements to Resell;

j.  failing to require sufficiently persuasive evidence to support its conclusions and Colonial management's material accounting estimates and representations;

k.  failing to investigate a material discrepancy in TBW's confirmation response;

l.  failing to design more effective and robust audit procedures in response to inconsistencies observed during its audit;

m. failing to corroborate management's explanations and representations concerning material matters, in spite of the fact that certain of these representations were patently unreasonable on their face.

114.   Each of PwC's cited failures above violated one or more of the following applicable professional standards:

- AU 210 – Training and Proficiency of the Independent Auditor

- AU 220 – Independence

- AU 230 – Due Professional Care in the Performance of Work

- AU 311 – Planning and Supervision

- AU 312 – Audit Risk and Materiality in Conducting an Audit

- AU 316 – Consideration of Fraud in a Financial Statement Audit

- AU 317 – Illegal Acts by Clients

- AU 322 – The Auditor's Consideration of the Internal Audit Function in an Audit of Financial Statements

- AU 325 – Communication of Internal Control Related Matters Noted in an Audit

- AU 326 – Evidential Matter

- AU 328 – Auditing Fair Value Measurements and Disclosures

- AU 330 – The Confirmation Process

- AU 332 – Auditing Derivative Instruments, Hedging Activities, and Investment Securities

- AU 333 – Management Representations

- AU 336 – Using the Work of a Specialist

- AU 342 – Auditing Accounting Estimates

- AU 350 – Audit Sampling

- AU 380 – Communications With Audit Committee

- AU 410 - Adherence to Generally Accepted Accounting Principles

- AU 411 – The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles

- AU 508 – Reports on Audited Financial Statements

- AU 560 – Subsequent Events

- AU 561 – Subsequent Discovery of Facts Existing at the Date of the Auditor's Report

- AU 722 – Interim Financial Reporting

- AS No. 3 – Audit Documentation

- AS No. 5 – An Audit of Internal Control Over Financial Reporting That is Integrated with an Audit of Financial Statements

115.   In addition, the following violations of applicable professional standards and SEC Rules governing Auditor Independence occurred as a result of the improper sales accounting identified in subparagraphs c and d above:

- AICPA Code of Professional Conduct: ET § 52 Article I – Responsibilities, ET § 53 Article II – The Public Interest, ET § 54 Article III – Integrity, ET § 55 Article IV – Objectivity and Independence, ET § 56 Article V – Due Care, ET § 201 General Standards, ET § 202 Compliance With Standards, ET § 203 Accounting Principles, ET § 501 Acts Discreditable

- PCAOB Rule 3502 – Responsibility Not to Knowingly or Recklessly Contribute to Violations, Rule 3520 Auditor Independence

- Rule 2-01 of Regulation S-X Under the Securities and Exchange Act of 1934.

116.  PwC's work violated governing professional standards in many significant ways, and thus it missed several opportunities to identify one or more aspects of the TBW fraud.

117.  Had PwC complied with applicable professional standards, it would have detected the TBW fraud several years before it was ultimately uncovered.  It would have been required to promptly communicate such fraud to Colonial and CBG, which disclosure would have prompted immediate action by Colonial to terminate its relationship with TBW, thus avoiding or significantly reducing the losses that Colonial sustained.  Specifically, the losses Colonial sustained by continuing to advance money to TBW in return for nothing of value would have ceased had PwC performed its audits in accordance with professional standards and reported the resulting findings to Colonial.

118.  As a direct and proximate result of PwC's negligence, Colonial sustained significant damages in an amount to be proven at trial, but currently estimated to exceed $2.2 billion.

**Count II**
Professional Negligence
(Against Crowe)

119.   The FDIC incorporates paragraphs 1-118 into this claim for relief.

120.   Crowe owed Colonial a duty to perform its audits and professional services in accordance with applicable professional standards.  As alleged more fully herein, Crowe breached its duty in at least the following ways, among others:

a.  failing to understand and address risks affecting AOT loan pools;

b.  failing to identify any key controls relating to AOT;

c.  failing to test AOT loan collateral;

d.  failing to properly reconcile the AOT account balance;

e.  failing to assess risks and internal control deficiencies identified by Pam Vitto;

f.  failing to identify and address the risks of aged COLB loans and loans shipped not paid;

g.  erroneously concluding and reporting that internal controls in Colonial's MWLD and Treasury area were adequate;

h.  failing to communicate to management its alleged belief that certain work critical to an accurate assessment of CBG's internal controls was not within the scope of its work;

121.   Each of Crowe's cited failures above violated one or more of the following applicable professional standards:

- AICPA Code of Professional Conduct: ET § 56 Article V – Due Care, ET § 201 General Standards

- AICPA Consulting Standards CS 100 Consulting Services: Definitions and Standards

- IIA Standards 1210 – Proficiency

- IIA Standards 1220 – Due Professional Care

- IIA Standards 2010 – Planning

- IIA Standards 2020 – Communication and Approval

- IIA Standards 2110 - Risk Management

- IIA Standards 2201 – Planning Considerations

- IIA Standards 2210 – Engagement Objectives

- IIA Standards 2220 – Engagement Scope

- IIA Standards 2340 – Engagement Supervision

- IIA Standards 2400 – Communicating Results

- IIA Standards 2420 – Quality of Communications

122.   Crowe's work violated governing professional standards in many significant ways, and thus it missed several opportunities to identify one or more aspects of the TBW fraud.

123.   Had Crowe complied with applicable professional standards, it would have detected the TBW fraud several years before it was ultimately uncovered.  It would have been required to promptly communicate such fraud to Colonial and CBG which disclosure would have prompted immediate action by Colonial to terminate its relationship with TBW, thus avoiding or significantly reducing the losses that Colonial sustained.   Specifically, the losses Colonial sustained by continuing to advance money to TBW in return for nothing of value would have

ceased had Crowe performed its internal audit work in accordance with professional standards and reported the resulting findings to Colonial.

124.   As a direct and proximate result of Crowe's negligence, Colonial sustained significant damages in an amount to be proven at trial, but currently estimated to exceed $2.2 billion.

**Count III**
Gross Negligence
(Against PwC and Crowe)

125.   The FDIC incorporates paragraphs 1-124 into this claim for relief.

126.   PwC's misconduct alleged herein was reckless and constituted such an extreme departure from professional standards as to constitute gross negligence. Crowe's misconduct alleged herein was reckless and constituted such an extreme departure from professional standards as to constitute gross negligence.

127.   As a direct and proximate result of PwC's and Crowe's gross negligence, Colonial sustained significant damages in an amount to be proven at trial, but currently estimated to exceed $2.2 billion.

**Count IV**
Breach of Contract-Audit Services
(Against PwC)

128.   The FDIC incorporates paragraphs 1-127 into this claim for relief.

129.   PwC entered into engagement agreements with Colonial's parent company, CBG, under which it committed to conduct its audits in accordance with

governing professional standards.  As noted above, upon information and belief, PwC knew (a) that its audits of CBG's consolidated financial statements served as Colonial's required audits under 12 U.S.C. § 1831m, and that Colonial's primary banking regulators  relied on it for that purpose, and (b) that CBG intended to deliver PwC's audit reports to Colonial and that Colonial would rely on it. Colonial was thus a known and intended third party beneficiary of CBG's agreements with PwC.

130.   As detailed above, PwC was obligated under its engagement letters to (a) perform its audits in accordance with standards established by the PCAOB, (b) design the audits to obtain reasonable assurance of detecting errors, fraud, or illegality that would have a material impact on financial statement amounts, and (c) obtain reasonable assurance that effective internal control over financial reporting was maintained in all material respects, which required PwC to obtain an understanding of internal controls over financial reporting, assess the risk that a material weakness existed, and test and evaluate the design and effectiveness of internal controls over financial reporting. PwC failed to comply with these contractual duties and related professional standards in numerous material respects and thus breached the obligations of the engagement agreements.

131.   PwC's breach of contract proximately caused significant damage to Colonial in an amount to be proven at trial, but currently estimated to exceed $2.2 billion.

132.   Upon information and belief, CBG performed, or substantially performed, its material obligations under the engagement letters.

## Count V
Negligent Misrepresentation
(Against PwC)

133.   The FDIC incorporates paragraphs 1-132 into this claim for relief.

134.   As detailed above, PwC's 2002 through 2008 audit opinions negligently misrepresented that CBG's financial statements were fairly stated in all material respects and that effective internal controls over financial reporting were in place when, in reality, the financial statements were grossly misstated, and the internal controls were deficient.

135.   For the reasons set forth above, PwC's misrepresentations were negligent and grossly negligent.  Colonial was a known and intended recipient and user of PwC's audit opinions, and PwC knew that Colonial would rely on its opinions.  In justifiable reliance on PwC's opinions, Colonial was deprived of the opportunity to take steps that it would have taken to mitigate losses if PwC's opinions had been accurate and prepared in conformity with applicable professional standards.  PwC's negligent and grossly negligent misrepresentations

proximately caused significant damage to Colonial in an amount to be proven at trial, but currently estimated to exceed $2.2 billion.

**Count VI**
Negligent Misrepresentation
(Against Crowe)

136.   The FDIC incorporates paragraphs 1-135 into this claim for relief.

137.   As detailed above, Crowe's 2005, 2006, 2007 and 2008 internal audit reports negligently misrepresented that it had evaluated internal controls over mortgage warehouse lending, and that there were "no findings."  In fact, Crowe did nothing to evaluate controls over AOTs – a significant component of Colonial's mortgage warehouse lending.  Accordingly, Crowe's report of "no findings" gave the false impression that MWLD controls – including controls over AOTs – were in place and functioning effectively.   Moreover, Crowe discovered that (a) Colonial was improperly parking in a "held for sale" account loans that had been rejected by end investors, (b) violation notices were not being sent to end investors that had not paid for loans that Colonial had shipped, and (c) $272.74 million of TBW loans were aged over 120 days when they should have been sold to an end investor within 60 days.  Crowe's representation of "no findings" with respect to the MWLD was false.

138.   For the reasons set forth above, Crowe's misrepresentations were negligent and grossly negligent.  Colonial was a known and intended recipient and

user of Crowe's reports, and Crowe knew that Colonial would rely on its reports. In justifiable reliance on Crowe's reports, Colonial was deprived of the opportunity to take steps that it would have taken to mitigate losses if Crowe's reports had been accurate and prepared in conformity with applicable professional standards. Crowe's negligent and grossly negligent misrepresentations proximately caused significant damage to Colonial in an amount to be proven at trial, but currently estimated to exceed $2.2 billion.

### Count VII
Wantonness
(Against PwC)

139.   The FDIC incorporates paragraphs 1-138 into this claim for relief.

140.   PwC acted wantonly in the spring of 2008 when, in an effort to hide its prior negligence, it (a) suggested that Colonial management recognize an implied call option so that the COLB transactions could be accounted for as sales despite knowing that a call option did not exist and that the COLB transactions were in fact loans under FAS 140 and (b)  encouraged management to solicit and fabricate evidence for this knowingly false narrative. In taking these actions, PwC placed its own economic interests above the interests of Colonial.  PwC took these actions consciously and deliberately, and with reckless disregard of the rights of Colonial.  In taking these actions, PwC acted with the knowledge that harm would likely or probably result.    That likely or probable harm consisted of the

continuation by Colonial of COLB transactions with TBW, which were not authorized by federal lending limits and caused extensive additional losses to Colonial. PwC's wanton actions proximately caused significant damage to Colonial in an amount to be proven at trial but currently estimated to exceed $1 billion, which is a subset of the damages sought herein. Because PwC's actions were wanton, the FDIC is also entitled to an award of punitive damages.

**Count VIII**
Breach of Contract-Tolling Agreement
(Against Crowe)

141.   The FDIC incorporates paragraphs 1-140 into this claim for relief.

142.   The FDIC has a valid contract binding the FDIC and Crowe in the Crowe Tolling Agreement.   The Crowe Tolling Agreement specifically provides that it was agreed to by the Parties in order to allow them  the opportunity to continue discussions during the Tolling Period regarding whether the FDIC Claims (and/or any claims or counterclaims that Crowe might have against the FDIC) should be brought or otherwise resolved.   The FDIC performed under this contract by, among other things, (a) not filing suit against Crowe during the time agreed to in the Crowe Tolling Agreement, and (b) not seeking to take any administrative actions against Crowe or imposing any new obligations against Crowe during the Tolling Period.  Crowe failed to perform under and/or breached the Crowe Tolling Agreement by pleading a timing defense and/or timing defenses

that expressly or implicitly include the Tolling Period under the Crowe Tolling Agreement.

143.   As a result of Crowe's failure to perform and breach of the Crowe Tolling Agreement, the FDIC has been damaged in an amount to be proven at trial, which includes, without limitation, the FDIC's expenses and attorneys' fees incurred in having to respond to Crowe's assertion of its timing defense(s) relating to the time defined as the Tolling Period in the Crowe Tolling Agreement.   In addition, or in the alternative, the FDIC seeks Crowe's specific performance under the Crowe Tolling Agreement by not asserting any timing defense(s) in response to the FDIC's claims that include(s) the Tolling Period that Crowe agreed to in the Crowe Tolling Agreement.

### Count IX
#### Breach of Contract-Tolling Agreement
#### (Against PwC)

144.   The FDIC incorporates paragraphs 1-143 into this claim for relief.

145.   The FDIC has a valid contract binding the FDIC and PwC in the PwC Tolling Agreement.   The FDIC performed under this contract by, among other things, (a) continuing settlement negotiations with PwC during the time period tolled under the PwC Tolling Agreement, including, without limitation, attending the October 18, 2012, mediation session; and (b) not filing suit against PwC during the time agreed to in the PwC Tolling Agreement.   While PwC has, to date, not

filed any motion or asserted a defense specifically including the time included in the Tolling Period in the PwC Tolling Agreement as a bar to the claims asserted by the FDIC against PwC, PwC has, generally, asserted defenses based upon the statute of limitations and laches.   In the event that PwC relies upon the time included in the Tolling Period in support of any timing defense as a bar to the FDIC's claims asserted herein, then PwC is in breach of the PwC Tolling Agreement.

146.   To the extent that the timing defense asserted by PwC includes the time defined as the Tolling Period in the PwC Tolling Agreement, the FDIC will be damaged in an amount to be proven at trial.   The FDIC's damages will include, without limitation, the FDIC's expenses and attorneys' fees incurred in having to respond to PwC's assertion of its timing defense(s) relating to the time defined as the Tolling Period in the PwC Tolling Agreement.   In addition, or in the alternative, the FDIC seeks PwC's specific performance under the PwC Tolling Agreement by not asserting any timing defense(s) in response to the FDIC's claims that include(s) the Tolling Period that PwC agreed to in the PwC Tolling Agreement.

## V. PRAYER FOR RELIEF

For these reasons, the FDIC requests that the Court award the FDIC judgment against PwC and Crowe for:

a.   actual damages in an amount to be proven at trial;

b.   prejudgment and post judgment interest as allowed by law;

c.   punitive damages against PwC based on its wanton conduct;

d.   costs of court;

e.   return of any and all fees paid that Colonial paid to PwC and Crowe for the negligent audits;

f.   attorneys' fees and expenses;

g.   specific performance not to assert any timing defense(s) in response to the FDIC's claims that include(s) the Tolling Period that PwC and Crowe agreed to in the respective tolling agreements; and

h.   any other relief allowed by law and deemed appropriate by the Court.

## VI.  JURY DEMAND

Plaintiff demands a jury trial in this matter.

Respectfully submitted this 10th day of February, 2016.

Respectfully submitted,

**RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.**
Dennis Bailey (4845-171D)
184 Commerce Street
Post Office Box 270
Montgomery, Alabama 36101-0270
Telephone:  (334) 206-3234
Facsimile:   (334) 481-0031
Email:        DRB@rsjg.com

Robert K. Spotswood (SPO 001)

Michael T. Sansbury (SAN 054)
Grace L. Kipp (LON 049)
SPOTSWOOD SANSOM & SANSBURY LLC
One Federal Place
1819 Fifth Avenue North, Suite 1050
Birmingham, Alabama 35203
TEL:  (205) 986-3620
FAX: (205) 986-3639
E-mail:     rks@spotswoodllc.com
            msansbury@spotswoodllc.com
            gkipp@spotswoodllc.com


/s/ David Mullin
David Mullin (TX Bar No. 14651600)
*pro hac vice*
John M. Brown (TX Bar No. 3142500)
*pro hac vice*
John G. Turner, III (TX Bar No. 20320550)
*pro hac vice*
Robert Bell (TX Bar No. 00787062)
*pro hac vice*
Clint Latham (TX Bar No. 24013009)
*pro hac vice*
Anthony W. Kirkwood (TX Bar No. 24032508)
*pro hac vice*
Richard Biggs (TX Bar No. 24064899)
*pro hac vice*

**MULLIN HOARD & BROWN, LLP**
500 South Taylor, Suite 800
Amarillo, Texas  79101
Telephone:  (806) 372-5050
Facsimile:  (806) 372-5086
Email:  dmullin@mhba.com
        jobrown@mhba.com
        jturner@mhba.com
        rbell@mhba.com

clatham@mhba.com
tkirkwood@mhab.com
rbiggs@mhba.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically served on February 10, 2016, by transmission of Notices of Electronic Filing generated by CM/ECF to persons registered as of issuance of filing as set forth below:

Drew D. Dropkin (ddropkin@kslaw.com)
Elizabeth V. Tanis (etanis@kslaw.com)
James H. Anderson (anderson@copelandfranco.com)
Jonathan C. Medow (jmedow@mayerbrown.com)
Stanley J. Parzen (sparzen@mayerbrown.com)
Tabor R. Novak, Jr. (tnovak@ball-ball.com)
Andrew P. Campbell (Andy.Campbell@Campbellguin.com)
Caroline Smith Gidiere (Caroline.Gidiere@Campbellguin.com)
Justin Glyien Williams (Justin.Williams@Campbellguin.com)
Nicholas J. DiCarlo (ndicarlo@dcmplaw.com)
Christopher A. Caserta (ccaserta@dcmplaw.com)
C. Edward Dobbs (ced@phrd.com)
Ronald T. Coleman, Jr. (rtc@phrd.com)
Rufus T. Dorsey, IV (rtd@phrd.com)
James N. Gorsline (jgorsline@kslaw.com)
Juanita Passyn Kuhner (jkuyner@kslaw.com)
Bradley J. Lingo (blingo@kslaw.com)
Geoffrey M. Ezgar (gezgar@kslaw.com)
David Tetrick, Jr. (dtetrick@kslaw.com)
Meredith Moss (mmoss@kslaw.com)
Richard T. Marooney, Jr. (rmarooney@kslaw.com)


/s/David Mullin