IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE COLONIAL BANCGROUP INC., and KEVIN O'HALLORAN<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP,<br><br>Defendants. | ) | CASE NO. 2:11-cv-746-BJR |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP<br><br>Defendants. | ) | CASE NO. 2:12-cv-957-BJR |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CROWE'S MOTION FOR SUMMARY JUDGMENT REGARDING PLAINTIFF COLONIAL BANCGROUP'S ALLEGED DAMAGES**

## I. INTRODUCTION

Defendant Crowe Horwarth LLP ("Crowe") moves for summary judgment against Plaintiff Colonial BancGroup, Inc. ("CBG"). Dkt. No. 223 ("Mot."). CBG opposes the motion. Dkt. No. 297, ("CBG's Opp."). The Court heard argument on August 10, 2016. Having reviewed the motion and opposition thereto, the record of the case, as well as the relevant legal authority, the Court will GRANT in part and DENY in part the motion.[1] The reasoning for the Court's decision follows.

## II. BACKGROUND[2]

### A. The Fraud

Colonial Bank ("Colonial") was a wholly owned subsidiary of CBG.[3] Beginning in 2002, Cathie Kissick, the director of Colonial's Mortgage Warehouse Lending Division ("MWLD"), and at least one other MWLD employee, Teresa Kelly, conspired with the MWLD's largest customer, Taylor Bean & Whitaker Mortgage ("TBW"), to siphon more than $1.8 billion out of Colonial.[4]

The fraud started in 2002 when TBW began overdrawing its account at Colonial by increasingly larger amounts and Kissick and Kelly conspired with TBW to conceal these overdrafts. In December 2003, the fraudsters transferred TBW's account deficit to "COLB," a mortgage loan purchase facility at MWLD. Under COLB, Colonial paid TBW for 99% participation interests in individual mortgage loans originated by TBW pending resale of the

---

[1] In this motion, Crowe also moves for summary judgment on the claims brought against it by the Federal Deposit Insurance Corporation ("FDIC") as Receiver for Colonial Bank. This Court resolved the motion as to one of two grounds on which Crowe moved to dismiss the FDIC's claims in an order dated July 29, 2016. *See* Dkt. No. 442. For the sake of clarity, the instant order will only address Crowe's arguments pertaining to CBG's claims and will resolve the remainder Crowe's arguments regarding the FDIC's claims in a separate order.

[2] Again, for simplicity, this section is limited to the factual background relevant to CBG's claims against Crowe.

[3] The allegations in this section are drawn from CBG's Amended Complaint at Dkt. No. 285 unless otherwise indicated.

[4] Kissick and Kelly have since pled guilty to federal criminal charges.

loans to investors. Colonial was supposed to be repaid from the sale proceeds. In reality, however, Colonial's interest in the loans was worthless. Thereafter, in mid-2005, TBW's deficit was transferred from COLB to MWLD's Assignment of Trade ("AOT") facility. Under the AOT, Colonial paid TBW 99% participation interest in pools of loans rather than individual loans. Here, too, the conspirators had Colonial purchase fictitious assets, while creating documents that gave the false appearance that the valueless pools of loans were being sold periodically in securitizations.

In late 2008, Kissick allegedly informed TBW's Chairman, Lee Farkas, that she would no longer participate in the fraud.[5] Allegedly unbeknownst to Kissick, Farkas responded by causing TBW to pledge the same COLB loans to both Colonial and other lenders. Colonial advanced funds to TBW that were supposed to be repaid when a TBW affiliate, Ocala Funding, purchased the loans. The loans were shipped to Ocala, but Ocala never bought the loans and Colonial was never paid.

In 2009, CBG applied for funds under the Troubled Asset Relief Program ("TARP"). In August 2009, federal TARP investigators discovered the fraud. The Alabama State Banking Department closed Colonial on August 14, 2009 and named the FDIC as its receiver. CBG filed for bankruptcy on August 25, 2009.

**B. Crowe Was CBG's Internal Auditor at All Relevant Times**

As a publicly held banking company, CBG was subject to the Sarbanes-Oxley Act of 2002 ("SOX") and other federal regulations designed to ensure that a public company's financial reporting is materially accurate and that internal controls over that financial reporting are operating effectively. *See*, *e.g.*, *Interagency Guidelines Establishing Standards for Safety and Soundness*, 12 C.F.R. Pt. 364, App. A., Pt. II.B. For instance, federal banking regulations

[5] Farkas is now in federal prison.

required CBG to have an internal audit system that provided for, among other things, adequate monitoring of the system of internal controls, adequate testing and review of information systems, and adequate documentation of tests and findings and any corrective actions. *Id*. CBG had the option to either perform these internal audit services itself or outsource the audit services to a vendor: “Some institutions consider entering into [outsourcing] arrangements to enhance the quality of their control environment by obtaining the services of a vendor with the knowledge and skills to critically assess, and recommend improvements to, their internal control systems.” *Interagency Policy Statement on the Internal Audit Function and its Outsourcing*, PR-24-2003 (March 17, 2003). To that end, CBG entered into an outsourcing arrangement with Crowe to provide the internal audit services for CBG.

The scope of Crowe’s and CBG’s obligations with respect to Crowe’s internal audit services were detailed in substantially identical engagement letters signed annually by Crowe and CBG. *See, e.g*. Dkt. No. 223-1, April 15, 2008 Engagement Letter. The engagement letters, governed by Illinois law, incorporated and attached additional terms that also applied to the parties’ relationship and governed any disputes. Relevant to this order, the engagement letters contained the following damages limitation provision:

> NO PUNITIVE OR CONSEQUENTIAL DAMAGES—Any liability of Crowe [] to you shall not include any special, consequential, incidental, punitive, or exemplary damages or loss nor any lost profits, savings, or business opportunity.

*Id*. at Engagement Terms p. 2.

### C. CBG’s Claims Against Crowe

CBG, as post-confirmation debtor and Kevin O’Halloran as Chapter 11 Trustee acting on behalf of CBG, initiated this lawsuit against Crowe and PricewaterhouseCoopers LLP (“PWC”)[6] in Alabama State Court and the matter was removed to this Court on September 9, 2011. Dkt.

[6] PWC was CBG’s external auditor at all times relevant to this lawsuit.

No. 1. CBG asserts two claims against Crowe: breach of contract and accounting malpractice/professional negligence. CBG claims that had Crowe properly performed its duties under the parties' contract as well as those imposed on Crowe by applicable professional standards, the fraud would have been discovered "no later than late 2007 or early 2008." CBG's Amend. Comp. at ¶ 62. According to CBG, because Crowe failed to discover the fraud, CBG, as Colonial's parent, was damaged because it "downstreamed" $734 million to Colonial from the second quarter of 2008 through the second quarter of 2009, when CBG was unaware of the fraud and the true state of its own and Colonial's financial condition. *Id.* at ¶¶ 62-63. CBG also alleges other losses totaling $36.6 million: (a) expenses of approximately $5.5 million that CBG incurred from late 2008 through July 2009 in "pursuing recapitalization through the TARP application and pursuit of equity investment to supplement the TARP application," and (b) $31.1 in "unfunded benefit liabilities and the insurance premiums related thereto." *See* Crowe Ex. 4 at 26, 28 (CBG's initial disclosures).

Crowe moves for summary judgment on CBG's claims for these damages. Crowe asserts that all of the damages described above are consequential damages, and as such, they are barred by the terms of the parties' contract.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the evidence shows that "no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Lamar v. Wells Fargo Bank*, 597 Fed. Appx. 555, 556 (11th Cir. 2014) (quoting *Alvarez v. Poyal Atlantic Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010)).

## IV. DISCUSSION

As discussed above, the relationship between Crowe and CBG was governed by a series of engagement letters that the parties executed at the beginning of each fiscal year. Each engagement letter (*i.e*. contract) contained the following provision:

> NO PUNITIVE OR CONSEQUENTIAL DAMAGES—Any liability of Crowe [] to you shall not include any special, consequential, incidental, punitive, or exemplary damages or loss nor any lost profits, savings, or business opportunity.

Dkt. No. 223-1, the April 15, 2008 Engagement Letter at Engagement Terms p. 2. Crowe argues that this language unambiguously bars recovery of any special, consequential, or incidental damage. Crowe further argues that all of CBG's alleged damages, as articulated above, constitute consequential damages and, as such, are barred as a matter of law.

CBG raises multiple defenses to this argument. First, it argues that Judge Watkins already determined that the damages it seeks are direct, not consequential damages, and as such, this Court should deny Crowe's motion on this basis alone.[7] If, however, CBG argues, the Court decides to address the merits of Crowe's argument, the summary judgment motion should be denied because CBG's damages are direct and therefore are not barred by the damages limitation provision in the engagement letters. Moreover, CBG argues, even if this Court were to determine that its damages are consequential damages, the damage limitation provision in the engagement letters is ambiguous, and therefore, this issue is not appropriate for summary judgment. CBG also claims that the damage limitation provision does not apply to services Crowe provided that are not described in the engagement letters, such as audit work done pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). In addition, CBG argues that the damages limitation provision does not apply to its professional negligence claim against Crowe. Lastly, CBG argues that even if

[7] This case was originally assigned to the Honorable Chief Judge William Keith Watkins. It was reassigned to this district judge on May 27, 2016. Dkt. No. 399.

Crowe's reading of the limitations provision is correct, the provision would violate Alabama public policy and is, therefore, unenforceable. The Court will address each argument in turn.

**A. Crowe's Motion Is Not Barred by Judge Watkins' Prior Ruling**

CBG begins by arguing that Judge Watkins "already considered and rejected" Crowe's argument regarding consequential damages when he denied a motion to dismiss filed by Crowe at the beginning of this lawsuit. CBG even goes so far as to argue that "Crowe is making an untimely motion for reconsideration." CBG's Opp. at 1, 2.This argument is easily disposed of. It is hornbook law that when considering a motion to dismiss, a court must accept all well-pled factual allegations in the complaint as true, construing the allegations and drawing all reasonable inferences in the light most favorable to the plaintiff. *Castro v. Sec'y of Homeland Sec.*, 472 F.3d 1334, 1336 (11th Cir. 2006) (quoting *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003)). This, of course, is exactly what Judge Watkins did in denying Crowe's motion to dismiss based on the damages limitation provision in the parties' contract: "*Taken as true*, the allegations of the Amended Complaint state a claim for direct damages proximately caused by Crowe's alleged breach and negligence." Dkt. No. 72 at 12 (emphasis added). Nothing prevents Crowe from moving for summary judgment on this same issue now that the parties are well into the discovery phase of this litigation. *See, e.g., Windham v. City of Fairhope*, 597 F. Appx. 1068, 1073 n. 7 (11th Cir. 2015); *Vintilla v. United States*, 931 F.2d 1444, 1447 (11th Cir. 1991) (stating that the district court's denial of an initial motion to dismiss does not restrict the court's ability to reconsider its ruling at the summary judgment stage). Indeed, Judge Watkins recognized that the Court may have to "revisit the issue" at a later point in the litigation. Dkt. No. 72 at 12. That time has come and this Court will address the merits of the parties' arguments.

### B. Whether CBG's Alleged Damages Are Direct Damages

Next CBG argues that its alleged damages are direct—not consequential—damages. As discussed above, CBG brings two claims against Crowe: breach of contract and professional malpractice. The engagement letters have an Illinois choice-of-law provision, so the parties agree that the contract claim is governed by Illinois law. Likewise, the parties agree that the negligence claim is governed by Alabama law. Illinois and Alabama are by and large in accord on what constitutes direct damages: direct damages are damages that "naturally and necessarily flow from a wrongful act." *Crommelin v. Montgomery Indep. Telecasters*, 194 So. 2d 548, 551 (Ala. 1967); *Westlake Financial Group, Inc. v. CGH-Delnor Health Systems*, 25 N.E.3d 1166, 1174 (Ill. App. 2015) (direct damages are "[d]amages that the law presumes follow the type of wrong complained of.") (quoting Black's Law Dictionary 394 (7th ed. 1999)). Consequential damages, on the other hand, "means loss or injury that does not flow directly and immediately from the wrongful act of a party but are the consequences or result of such an act." *Hartford Acc. & Indem. v. Case Foundation Co*., 294 N.E.2d 7, 14 (Ill. Ct. 1973); *see also*, *Crommelin*, 194 So. 2d at 551 (consequential damages are damages that do "not necessarily" flow from the wrongful act). Therefore, the difference between direct and consequential damages lies "in the degree to which the damages are foreseeable (that is, a highly probable) consequence of a breach." *Rexnord Corp. v. DeWolff Boberg & Assoc., Inc*., 286 F.3d 1001, 1004 (7th Cir. 2002).

#### 1. The Downstream Transfers

As discussed above, CBG's alleged damages can be broken down into three categories: (1) $734 million that CBG purportedly invested into Colonial from late March 2008 through June 2009 ("the downstream transfers"); (2) approximately $5.5 million in fees and expenses that CBG allegedly incurred from late 2008 through July 2009 in "pursuing recapitalization" through

a TARP application (the "TARP related damages"); and (3) $31.5 million in the "unfunded portion of pensions for CBG employees that accrued since its bankruptcy filing" (the "unfunded benefit liabilities"). Crowe charges that all of these damages are consequential damages, and therefore, barred by the parties' contracts.

With respect to the downstream transfers, Crowe argues that these do not constitute direct damages because the allegedly "wrongful conduct" that supposedly caused the transfers occurred "for years" and "continued throughout [Crowe's] representation of [CBG], from its 2002…engagement through its 2008-2009…engagement." Mot. at 19. As a result, Crowe argues, these transfers are plainly consequential damages because they did "not flow directly and immediately from the [alleged] wrongful act[s]," which occurred as long as six years earlier. *Id*. In addition, Crowe alleges, the transfers are not direct damages because they did not necessarily flow from Crowe's alleged wrongful conduct. According to Crowe, during each year between 2002 and 2007, CBG "pulled millions out of [Colonial] on a net basis in the form of dividends" (Crowe claims that in 2006 and 2007 alone, CBG pulled $900 million out of Colonial). *Id*. Crowe argues that it was neither foreseeable nor an "invariable result" of its allegedly wrongful conduct that CBG would suddenly change course 2008 and begin transferring money to Colonial. *Id*. at 19-20.

CBG counters that the downstream transfers are direct damages. CBG argues that it retained Crowe to provide CBG's internal audit functions in compliance with SOX and the federal regulations. As part of this work, Crowe was responsible for helping to identify and assess business risks within Colonial's various activities and to evaluate and test the effectiveness of controls to ensure that CBG's financial reporting was materially accurate. CBG further asserts that the scope of Crowe's work was specifically designed to ensure that CBG had

"the best and most accurate information as a basis for making financial management and [other] important business decisions." CBG's Opp. at 17-18. CBG claims that this information was critically important because, as a bank holding company, it had "an obligation to serve as a source of managerial and financial strength to [Colonial]," but as a public company, CBG also had an obligation to its shareholders, and therefore, had to "balance the capital needs of [Colonial] with the financial interests of its *own* shareholders and creditors." *Id*. at 18 (emphasis in original).

CBG claims that "Crowe's blown internal audits served to conceal and perpetuate the TBW fraud" and "as a direct result of Crowe's wrongful conduct, CBG … continued down-streaming funds to Colonial [] and funding expenses relating to Colonial['s] operations at a time when, unbeknownst to CBG's Board of Directors and Audit Committee, [Colonial] was infected with a massive fraud and was in financial peril." *Id*. Therefore, CBG argues, the losses associated with the downstream transfers flowed naturally from Crowe's breach of duties that it owed to CBG.

The Court is persuaded that the downstream transfers are direct damages. As counsel for both parties conceded at oral argument, there is no set definition that this Court can apply to the facts of this case to determine what constitutes direct damages. As early as 1927, Judge Benjamin Cardozo recognized that the distinction between direct and consequential damages is not absolute: "There is need to keep in mind that the distinction is not absolute, but relative. To put it in other words, damage which is [direct] in relation to a contract of one kind may be classified as [consequential] in relation to another." *Kerr S.S. Co. v. Radio Corp. of America*, 157 N.E. 140, 141 (N.Y. 1927).

Nevertheless, with respect to a breach of contract claim, direct damages are at a minimum defined as "the benefit of the bargain that the party lost from the contract itself." *Westlake*, 25 N.E.3d at 1175 (citing *Penncro Assoc., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007) (noting that "[d]irect damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain…[.]")); 24 Williston on Contracts § 64:12 (4th ed.) (May, 2016) (stating that direct damages are sometimes called "loss of bargain" damages, because they reflect a failure on the part of the defendant to live up to the bargain it made). Therefore, it is necessary for this Court to ascertain what was the "benefit of the bargain" that CBG reasonably expected to receive by engaging Crowe to perform internal audit services.

After reviewing the engagement letters for each of the relevant years, the Court concludes that the benefit of the bargain to CBG was that Crowe promised to "perform periodic internal audit services" that would "include a review of key internal controls and detail testing of a sample of transactions" and that "[h]igher risk areas [would] be covered in more detail and with greater frequency." Dkt. No. 223-1, the April 15, 2008 Engagement Letter at 2. Crowe further promised to comply with "applicable AICPA, U.S. Securities and Exchange Commission (SEC), Public Company Accounting Oversight Board (PCAOB), and other regulatory independence guidance" in performing the audit work. *Id*. at 1. In other words, Crowe was obligated to test CBG's internal controls with a greater focus on those areas that constituted a greater risk of fraud. And Crowe was obligated to comply with regulatory guidance while performing its duties.

CBG charges that Crowe did not meet its obligation (a fact that is not in dispute for purposes of this motion). Specifically, CBG claims that Crowe identified the operational risk for Colonial's MWLD as being "high" due in part to the potential for fraud by MWLD customers who might "double pledge" loans or produce fraudulent loans. CBG's Opp. at 6 (citing the Risk

Assessment and Internal Audit Plans jointly prepared by Crowe and CBG); *see also* Dkt. No. 285, CBG's Amend. Comp., at ¶¶ 144, 146. Despite recognizing that the MWLD represented a high risk for potential fraud, CBG claims that Crowe never tested any of the collateral allegedly backing the COLB and AOT facilities in the MWLD. According to CBG, the "MWLD's AOT line of credit with [TBW] … totaled more than $1.5 billion by 2007." Dkt. No. 285, CBG's Amend. Comp., at ¶ 146. Nevertheless, "despite the fact that [TWB] was the only mortgage broker who had access to the AOT facility and … billions of dollars in [CBG's] reported AOT and COLB assets were tied directly to transactions with [TBW]" Crowe did not perform any testing of the AOT facility and the loans that purportedly served to collateralize that "huge balance." *Id*. at. ¶¶ 151, 153. In fact, CBG charges, "Crowe's accountants *never* performed *any* testing relating to TBW's AOT and COLB facilities." CBG's Opp. at 10 (emphasis in original).

CBG argues that if Crowe has simply tested the loan collateral allegedly securitizing the AOT and COLB facilities, they would have discovered the fraud. "In the words of Cathie Kissick, now incarcerated for assisting Farkas in the TWB fraud, neither Crowe nor PWC ever asked to see or confirm the existence of loan level information and documentation to see or confirm what was really backing TWB's AOT facility …[.] Ms. Kissick testified that had they simply requested to see that information they would have found *nothing* and 'the jig would be up.'" CBG's Opp. at 10 (quoting Deposition of Cathie Kissick, 01/19/16. Exh. 15, p. 849) (emphasis in original).

Assuming, as the Court must for purposes of this motion (again, because Crowe does not challenge these allegations in its motion), that Crowe did not perform any tests of the AOT and COLB facilities, the Court finds that the downstream transfers represent "the benefit of the bargain that [CBG] lost from the contract itself." *Penncro*, 499 F.3d at 1156. As a bank holding

company, CBG is required to serve as a source of financial strength to Colonial. *See, e.g., MCorp Financial, Inc. v. Board of Governors of the Federal Reserve System*, 900 F.2d 852, 860 (5th Cir. 1990), *rev'd on other grounds*, 502 U.S. 32 (1991); Federal Banking Law Reporter Regulatory Developments, ¶ 86,460, Federal Reserve Board, (Nov. 14, 1985) ("A fundamental principal underlying the Federal Reserve's supervision and regulation of bank holding companies is that bank holding companies should serve as a source of managerial and financial strength to their subsidiary banks."); 12 USC § 1831o-1(a) ("A [bank holding company] must serve as a source of ***financial strength*** for any bank or other depository institution subsidiary of that [bank holding company]." (emphasis in original). As such, it was entirely foreseeable that CBG would downstream funds to Colonial when Colonial began to struggle financially. In fact, it was required to do so. Because Crowe failed to test the loan securitization for the AOT and COLB facilities, the fraud was able to continue for years, ultimately—indeed inevitably—leading to Colonial's financial struggle, thereby triggering CBG's obligation to stabilize its subsidiary by downstreaming funds to it. Those advanced funds are the direct damages of Crowe's breach.

The Court finds the holding of *Grant Thornton LLP v. FDIC*, 535 F. Supp. 2d 676 (S.D. W. Va. 2007), *aff'd in pertinent part*, 435 Fed. Appx. 188 (4th Cir. 2011) instructive. Like the instant case, in *Grant Thornton*, Keystone Bank was the victim of insider fraud that ultimately rendered the bank insolvent. Prior to its insolvency, the bank had retained Grant Thornton to conduct the bank's internal audits. After the bank failed, the FDIC as receiver for the bank, along with an officer of the bank, brought accounting malpractice claims against Grant Thornton. The trial court held that "[t]he very nature of an audit is that an accountant opines on the fairness of an entity's financial statements" and in reliance on that opinion the "entity makes business decisions to act or not act in certain ways. *Id*. at 712. Therefore, the trial court held, "[i]t was

highly foreseeable that [the bank] would continue to pay interest expense on deposits, dividends, legal fees, consulting fees, salaries, and other routine operating expenses." *Id*. at 713. Accordingly, the trial court concluded, "losses stemming from these natural and foreseeable events are an appropriate component of damage attributable to Grant Thornton's negligent audit that failed to uncover the Bank's true state of affairs." *Id.* Although the audit firm in *Grant Thornton* did not raise the "direct" versus "consequential" damages distinction, the court clearly considered the "net additional costs of operations," as well as the dividends paid by the bank from the time of the negligent audit to be "direct" damages. Like the damages in Grant Thornton, CBG's downstream transfers are foreseeable, direct damages.

Nor is the Court persuaded by Crowe's argument that the downstream transfers cannot constitute direct damages because it was not "invariable" that CBG would make the transfers. Crowe points out that the fraud was going on for the entire time it audited CBG, yet the fraud was not discovered until the seventh year of Crowe's engagement. According to Crowe, it breached its contract with CBG each year that it conducted its audit and the fraud went undiscovered (again Crowe makes this argument only for purposes of this motion). In other words, it breached the contract six times prior to the discovery. Yet, CBG did not downstream money to Colonial during those years. To the contrary, it withdrew millions of dollars from Colonial during those times. This, Crowe argues, "proves conclusively that downstreaming was not the invariable and immediate result of every alleged breach by Crowe[.]" Dkt. No. 314.

The problem with Crowe's argument is that for the first six years of the fraudulent scheme, Colonial appeared to be financially stable. It was only when the house of cards upon which the AOT and COLB facilities were built began to come crashing down—as all frauds inevitably do—that CBG's responsibility to be a source of financial strength was triggered.

Based on the foregoing, the Court concludes that the $734 million in downstream transfers from CBG to Colonial constitute direct damages.

**2. CBG's Other Alleged Damages**

As discussed above, CBG also seeks to recover approximately $5.5 million in fees and expenses that CBG allegedly incurred from late 2008 through July 2009 in pursing recapitalization through a TARP application (the "TARP damages") and approximately $31.5 million in the unfunded portion of pensions for CBG employees that accrued since its bankruptcy filing as well as unpaid insurance premiums related thereto (the "unfunded benefits liabilities"). As for the TARP damages, Crowe argues that these damages clearly did not "flow directly and immediately" from Crowe's allegedly wrongful conduct from 2002 to early 2008 because the TARP program "did not even exist until October 3, 2008." Mot. at 20. With respect to the unfunded benefits liabilities, Crowe contends that such damages are "collateral losses following the breach" and alleged "economic harm beyond the immediate scope of the contract." *Id.* at 21.

CBG does not challenge Crowe's characterization of the TARP damages and unfunded benefits liabilities as consequential damages, and for good reason. The TARP program did not exist until October 3, 2008 and CBG contends that Crowe should have discovered the fraud much earlier—at the latest, by "late 2007 or early 2008." Therefore, the TARP damages could not be a foreseeable result of the breach as the breach occurred before the TARP program was created.[8] Likewise, the Court finds that CBG's alleged unfunded benefits liabilities are not a direct loss from Crowe's breach, but rather are economic harm beyond the immediate scope of the contract between CBG and Crowe. CBG asserts that these alleged damages accrued since CBG file bankruptcy, as such, these losses cannot be said to have flowed directly from Crowe's

[8] *See* Pub. L. No. 110-343, § 101 *et seq.*, 122 Stat. 3765, 3767 (Oct. 3, 2008) (codified at 12 U.S.C.A. § 5211 *et seq.*).

alleged breach. Accordingly, the Court concludes that the TARP damages and the unfunded benefits liabilities constitute consequential damages.[9]

### C. The SOX Work Was Covered by the Engagement Letters

CBG next argues that the engagement letters do not cover the work Crowe did pursuant to SOX and therefore, "do not limit damages resulting from" that work. CBG's Opp. at 23-24. This argument is a red herring. In CBG's nearly sixty page complaint, it mentions SOX exactly once, in passing. *See* CBG's Amend. Comp. at ¶ 174. What is more, the engagement letters state: "These terms are part of our engagement letter *and apply to all further services*, unless a specific engagement letter is entered into for those services." Dkt. No. 223-1, the April 15, 2008 Engagement Letter at Engagement Terms p. 1(emphasis added). It is undisputed that there is no separate engagement letter for the SOX work. Therefore, even if the SOX work was not part of the engagement letters, the terms of the engagement letters would still apply to the SOX work.

### D. The Damage Limitations Provision Applies to CBG's Negligence Claim and Is Not Against Alabama Public Policy

CBG argues that the damage limitation provision does not apply to its negligence claim as a matter of law. The parties agree that Alabama law applies to CBG's tort claim. According to CBG, Alabama "law does not permit Crowe to rely upon its contract to circumvent liability for breaches of its separate tort duty to exercise reasonable professional care." CBG's Opp. at 24. Crowe also argues that the damage limitation provision cannot reasonably be construed to apply to negligence claims because the provision refers to contract as opposed to tort damages.

[9] CBG tries to create an ambiguity in the NO PUNITIVE OR CONSEQUENTIAL DAMAGES provision of the engagement letters by urging the Court to conflate that provision with another provision in the engagement letters, the LIMIT OF LIABILITY provision. However, the provisions are clearly distinct and meant to be read separately. As such, the Court rejects CBG's argument that the limitation on consequential damages is ambiguous and therefore unenforceable.

CBG misstates Alabama law. Contract provisions that bar consequential damages, but do not eliminate all other damages, are fully enforceable in Alabama against negligence claims. *Sears Termite & Pest Control v. Robinson*, 883 So. 2d 153, 154, 158 (Ala 2003) (plaintiff asserted claims for breach of contract and negligence, among others; court enforced contractual provision that capped recovery for damage to a residence at $250,000, excluding liability for "indirect expenses or consequential damages[.]"); *Saia Food Distribs. v. SecurityLink*, 902 So. 2d 46, 50, 55 (Ala 2004) (enforcing a limit of liability clause as to damages arising from alleged breach of contract and negligence); *Puckett, Taul & Underwood, Inc. v. Schreiber Corp.*, 551 So. 2d 979, 982-82 (Ala. 1989) (stating that commercial parties may contract freely to limit the remedies available to them; thus, the clear public policy in Alabama is to allow a seller to limit the remedies available to a buyer).

Nor is the damage limitation provision against Alabama public policy as CBG argues. The error in CBG's argument is that it conflates exculpatory clauses with limitation of liability clauses. While an exculpatory clause may indeed be against Alabama public policy (a decision the Court need not reach), damage limitation claims are not. The Alabama Supreme Court made this distinction clear over a decade ago: "[i]n *Morgan*, this Court addressed exculpatory clauses," which "'reliev[e] a party from liability.'" *Fox Alarm Co. v. Wadsworth*, 913 So. 2d 1070, 1076 (Ala. 2005). "At issue in this case, however, is a limitation-of-liability clause, not an exculpatory clause. Thus, [plaintiff's] reliance on *Morgan* is misplaced." *Id*. at 1076-77 (holding that the limitation-of-liability clause found in the contract is enforceable).

## V. CONCLUSION

For the foregoing reasons, this Court HEREBY GRANTS in part and DENIES in part Crowe's motion for summary judgment [dkt. no. 222] as to CBG's damages. The Court

concludes that CBG's downstream transfers to Colonial constitute direct damages and therefore are not barred by the terms of the engagement letter. However, the Court concludes that CBG's TARP damages and unfunded benefits liabilities are consequential damages and therefore are barred by the terms of the engagement letter.

Dated this 24th day of August, 2016.

Barbara Jacobs Rothstein
U.S. District Court Judge