**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| THE COLONIAL BANCGROUP, INC.,<br>et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:11-cv-00746-BJR |
| | ) | **REDACTED** |
| PRICEWATERHOUSECOOPERS LLP,<br>et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| FEDERAL DEPOSIT INSURANCE<br>CORPORATION AS RECEIVER FOR<br>COLONIAL BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:12-cv-00957-BJR |
| | ) | **REDACTED** |
| PRICEWATERHOUSECOOPERS LLP,<br>et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF FEDERAL DEPOSIT INSURANCE CORPORATION**
**AS RECEIVER FOR COLONIAL BANK'S CONSOLIDATED OPPOSITION TO**
**PRICEWATERHOUSECOOPERS LLP'S MOTION FOR PARTIAL SUMMARY**
**JUDGMENT AND CROWE HORWATH LLP'S SECOND MOTION FOR SUMMARY**
**JUDGMENT ON THE FDIC'S CLAIMS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

STANDARD OF DECISION ............................................................................................ 2

ARGUMENT ..................................................................................................................... 2

I.     The negligence of both PwC and Crowe caused the FDIC-R/Colonial to suffer losses
with regard to the "Shipped Not Paid" fraud. ......................................................... 2

Relevant Factual Background .......................................................................................... 2

The FDIC-R's Theory of Causation with Respect to Shipped Not Paid Damages .................. 4

Procedural History and Legal Standard ........................................................................... 5

    A.  The SNP transactions are part of the same fraud as Plan B and sweeping. ................. 6

    B.  BoA breach of its duties to the Bank does not break the causal chain. ..................... 13

II.    The FDIC-R's claims are all timely. ............................................................................ 19

Legal Standard ................................................................................................................ 19

Relevant Procedural History .......................................................................................... 20

    A.  The FDIC-R's allegations about the 2002-2006 audit years arise out of the same
conduct, transaction or occurrence set out in the SAC and are therefore timely. ........ 21

        1.  The new allegations about the 2002-2006 audit years do not assert new
causes of action. ........................................................................................... 22

        2.  The new allegations about the 2002-2006 audit years are tied to the common
core of operative facts alleged in the earlier complaints. ............................... 24

        3.  PwC was on notice of the general fact situation out of which the 2002-2006
allegations arise. ........................................................................................... 26

        4.  PwC will not be unfairly disadvantaged if the 2002-2006 claims are found to
relate back to earlier complaints. .................................................................. 28

    B.  As to Crowe, the FDIC-R is entitled to seek damages beginning with the March 2006
financial statement. ...................................................................................... 29

III.   The FDIC-R is entitled to recover prejudgment interest. .............................................. 30

    A.  The FDIC-R's damages are capable of being made "certain," such that an award of
prejudgment interest is appropriate. ............................................................... 32

        1.  Courts may base prejudgment interest on damages determined at trial. ....... 33

2.  The FDIC-R's damages are sufficiently certain to justify an award of prejudgment interest. ................................................................... 36

B.  The fact that the FDIC-R's other sources of recovery may reduce the judgment entered against either Defendant has no impact on the ascertainability of the FDIC-R's damages. ........................................................................................... 40

C.  The insurance and liquidated damages cases cited by the Defendants are inapposite.42

IV.  As to PwC, the FDIC-R's wantonness claim (Count VII) is not barred by the doctrine of judicial estoppel. ....................................................................................... 44

Relevant Background ........................................................................................ 45

Legal standard .................................................................................................. 48

Argument ........................................................................................................... 48

A.  PwC should not be allowed to invoke the doctrine of judicial estoppel in this case because it was responsible for the FDIC-R's need to negotiate a settlement with TBW ................................................................................................................ 48

B.  Even if the Court concludes that PwC may invoke judicial estoppel, PwC has not satisfied any of the factors that courts traditionally consider when deciding whether to apply the doctrine. ........................................................................................ 49

1.  The FDIC-R has not taken clearly inconsistent positions. ............................ 49

2.  The FDIC-R did not succeed in persuading the bankruptcy court to accept its position. ..................................................................................................... 51

3.  The terms of the bankruptcy settlement reflect the parties' compromise position and are not a factual position advanced solely by the FDIC-R. ....... 52

V.  Crowe is not entitled to summary judgment on the FDIC-R/Colonial's claims based on terms of the engagement letters that are inapplicable to the FDIC-R. ......................... 53

A.  Because the FDIC-R/Colonial is not a party to the Crowe engagement letters, the consequential damages limitation provisions are not applicable. ................................ 53

B.  Crowe's "Alice in Wonderland" argument wherein the FDIC-R/Colonial is, at Crowe's self-serving whim, simultaneously a party and a non-party to the engagement letters should be wholly rejected. ............................................................ 54

1.  Crowe is asking the Court to rewrite the terms of the engagement letter. .... 55

2.  Crowe is asking the Court to redraft the claims in the FDIC-R's TAC. ....... 56

3.  Crowe cannot make the FDIC-R a party to the engagement letters when it suits Crowe and a non-party to those agreements when it does not. .............. 58

C. Even if the FDIC-R/Colonial is somehow bound to all the terms of the engagement letters, under this Court's Order denying Crowe's motion for summary judgment as to CBG, the FDIC-R's damages are clearly direct and are not be barred by the no-consequential-damages provision. ............................................................. 59

    1. If the FDIC-R/Colonial is bound by the terms of the engagement letters, this Court's Order rejecting Crowe's assertion of the no-consequential-damages clause against CBG applies here. ................................................................ 59

    2. In the alternate universe where the FDIC-R/Colonial is bound by the terms of the engagement letters, Crowe cannot avoid the ramifications of this Court's prior order by arguing that the FDIC-R/Colonial is not a party to those letters. ............................................................................................... 63

VI. As to Crowe, the FDIC-R's claim seeking attorneys' fees and costs for Crowe's clear breach of the Tolling Agreement is well-supported in both fact and law. ................... 65

A. The American Rule does not bar the FDIC-R's efforts to recover damages here. ..... 66

B. The fact that the FDIC-R's request for specific performance is now "moot" in light of this Court's July Order simply affirms the FDIC-R's entitlement to fees and expenses here. ......................................................................................................................... 69

C. The FDIC-R's ever increasing damages can be determined post-trial. ..................... 70

CONCLUSION ................................................................................................ 71

## INDEX OF EXHIBITS

| Ex. | Description | Under Seal |
|---|---|---|
| Ex. 1 | Excerpts from 1/27/16 Brown Deposition | Sealed |
| Ex. 2 | Excerpts from 6/8/15 Emig Deposition | Sealed |
| Ex. 3 | Exhibit 5438 to 1/19/16 Kissick Deposition, FDIC-R-COL-C-E-00002385594-95 | Sealed |
| Ex. 4 | Exhibit 5439 to 1/19/16 Kissick Deposition, FDIC-R-COL-C-E-00001535491-92 | Sealed |
| Ex. 5 | FDIC-R-COL-C-S-00000043136-40 | Sealed |
| Ex. 6 | FDIC-R-COL-C-E-00004186064-65 | Sealed |
| Ex. 7 | Excerpts from 1/19/16 Kissick Deposition | Sealed |
| Ex. 8 | Excerpts from 6/9/15 Wawrzyniak Deposition | Sealed |
| Ex. 9 | Exhibit 12 to 6/9/15 Wawrzyniak Deposition, OCALA-PWC-00009188-9191 | Sealed |
| Ex. 10 | Excerpts from T. Kelly 3/1/16 Deposition | Sealed |
| Ex. 11 | Malek Declaration | Sealed |
| Ex. 12 | Malek Expert Report 7/20/16 | Sealed |
| Ex. 13 | Potter Declaration | Sealed |
| Ex. 14 | Potter Expert Report 7/20/16 | Sealed |
| Ex. 15 | PwC Opposition to Plaintiff's Motion in Limine, Case No. 13-33964 CA 01 (59) 6/23/16 | No |
| Ex. 16 | Excerpts from 10/7/16 Carmichael Deposition | Sealed |
| Ex. 17 | Exhibit 5501 to 1/27/16 Brown Deposition, PWC-CBG-FDIC00921591-1602 | Sealed |
| Ex. 18 | Excerpts from 8/18/15 Bowman Deposition | Sealed |
| Ex. 19 | Excerpts from 8/20/15 Ragland Deposition | Sealed |
| Ex. 20 | Excerpts from 3/31/16 T. Kelly Deposition | Sealed |
| Ex. 21 | Excerpts from 9/26/16 Swecker Deposition | Sealed |
| Ex. 22 | Excerpts from 10/14/15 Roland Deposition | Sealed |
| Ex. 23 | Exhibit 5017 to 10/14/15 Roland Deposition, PWC-CBG-FDIC00929836-38 | Sealed |
| Ex. 24 | Exhibit 5022 to 10/14/15 Roland Deposition, PWC-CBG-FDIC00929845-46 | Sealed |
| Ex. 25 | Exhibit 5018 to 10/14/15 Roland Deposition, PWC-CBG-FDIC00929833-35 | Sealed |
| Ex. 26 | Swecker Expert Report 8/29/16 | Sealed |
| Ex. 27 | Excerpts from 3/3/16 Fite Deposition | Sealed |
| Ex. 28 | Exhibit 3 to 3/3/16 Fite Deposition, FDIC-R-DEPO-PROD-007759-68 | Sealed |
| Ex. 29 | Exhibit 4 to 3/3/16 Fite Deposition, FDIC-R-DEPO-PROD-007769-7770 | Sealed |
| Ex. 30 | Exhibit 5435 to 1/19/16 Kissick Deposition, FDIC-R-COL-C-E-00002099118-20 | Sealed |
| Ex. 31 | Exhibit 5436 to 1/19/16 Kissick Deposition, FDIC-R-COL-PWC- | Sealed |

|  | CROWE-E-00680731_000001-000002 |  |
|---|---|---|
| Ex. 32 | Exhibit 6 to 3/3/16 Fite Deposition, FDIC-R-COL-PWC-CROWE-E-00680731_000001-000002 | Sealed |
| Ex. 33 | Exhibit 5341 to 1/19/16 Kissick Deposition, PWC-CBG-FDIC00918940-50 | Sealed |
| Ex. 34 | Farkas Indictment | No |
| Ex. 35 | Farkas Verdict Form | No |
| Ex. 36 | *United States v. Farkas*, No. 1:10-cr-200 LMB (E.D. Va. Sept. 24, 2010) | No |
| Ex. 37 | Excerpts from 5/4/16 Moore Deposition | Sealed |
| Ex. 38 | 2004-2008 Opinion Letters and Excerpts from 2004-2008 10Ks | No |
| Ex. 39 | Carmichael Expert Report 7/20/16 | Sealed |
| Ex. 40 | CROWE 00009267-9271 | Sealed |
| Ex. 41 | CH 05607-21 | Sealed |
| Ex. 42 | April 17, 2007 Presentation, PWC-CBG-TBW00135525-557 | Sealed |
| Ex. 43 | PwC-CBG-TBW844994-5005 | Sealed |
| Ex. 44 | Exhibit 1043 to W. Kelly Deposition, PWC-CBG-TBW00045033 | Sealed |
| Ex. 45 | FDIC-R-COL-C-E-00001312215, 00001312480 | Sealed |
| Ex. 46 | CH 7569-7767 | Sealed |
| Ex. 47 | CH 08241 | Sealed |
| Ex. 48 | Expert Report of Johnigan 8/29/16 | Sealed |
| Ex. 49 | Complaint from TBW v. PwC, 10/29/13, Case No. 13-33964 CA 01 (59) | No |
| Ex. 50 | OIG Material Loss Review | No |
| Ex. 51 | Exhibit 337 to Gaetano Deposition 9/23/15 PWC-CBG-TBW00153729-770 | Sealed |
| Ex. 52 | Exhibit 379 to Gaetano Deposition 9/23/15 PWC-CBG-TBW00218806-09 | Sealed |
| Ex. 53 | Exhibit 303 to 3/31/16 Jackson Deposition, PWC-CBG-TBW-E-000013693-96 | Sealed |
| Ex. 54 | Excerpts from 4/12/16 Westbrook Deposition | Sealed |
| Ex. 55 | AU 411.06 | No |
| Ex. 56 | Exhibit 112 to 9/16/15 J. Kelly Deposition, PWC-CBG-TBW00168476-78 | Sealed |
| Ex. 57 | Exhibit 127 to 9/16/15 J. Kelly Deposition, PWC-CBG-TBW00275215 | Sealed |
| Ex. 58 | Exhibit 101 to 9/16/15 J. Kelly Deposition, PWC-CBG-TBW01087673-4 | Sealed |
| Ex. 59 | Exhibit 3 to 4/12/16 Westbrook Deposition, PWC-CBG-TBW00385013-022 | Sealed |
| Ex. 60 | Exhibit 332 to 9/23/15 Gaetano Deposition, PWC-CBG-TBW00275110 | Sealed |
| Ex. 61 | Exhibit 379 to 9/23/15 Gaetano Deposition, PWC-CBG-TBW00218806-09 | Sealed |
| Ex. 62 | Exhibit 4 to 4/12/16 Westbrook Deposition, PWC-CBG-TBW-E- | Sealed |

|  | 000001874-85 |  |
|---|---|---|
| Ex. 63 | Exhibit 14 to 11/12/15 Naumann Deposition, PWC-CBG-FDIC00555280-87 | Sealed |
| Ex. 64 | Exhibit 380 to 9/23/15 Gaetano Deposition, PWC-CBG-TBW00561973 | Sealed |
| Ex. 65 | PWC-CBG-TBW01102001-003, 1232968 and embedded document in native format | Sealed |
| Ex. 66 | PWC-CBG-TBW01140425-435, 1234445 | Sealed |
| Ex. 67 | FDIC-R-COL-C-E-1780578-80 | Sealed |
| Ex. 68 | *TSG Water Resources, Inc.* Order on Summary Judgment | No |
| Ex. 69 | *TSG Water Resources, Inc.* Verdict Form | No |
| Ex. 70 | *TSG Water Resources, Inc.* Order on Reconsideration | No |
| Ex. 71 | Excerpts from 2/16/16 Sippial Deposition | Sealed |
| Ex. 72 | Excerpts from 2/17/16 Beville Deposition | Sealed |
| Ex. 73 | Exhibits 4 and 10 to 8/20/15 Ragland Deposition, PWC-CBG-FDIC00932634-38; OCALA-PWC-00008179-97 | Sealed |
| Ex. 74 | Excerpts from 2/12/16 Thomas Deposition | Sealed |
| Ex. 75 | Excerpts from 1/21/16 Stanford Deposition | Sealed |
| Ex. 76 | 2008-09 Risk Assessment and Audit Plan), CBG-BB&T-EMAILSEARCH-147322-147466 | Sealed |
| Ex. 77 | 2007-08 Risk Assessment and Audit Plan, FDICR-0027518-686 | Sealed |
| Ex. 78 | 2006-2007 Risk Assessment and Audit Plan, CROWE 00045001-149 | Sealed |
| Ex. 79 | Exhibit 8 from 8/20/15 Ragland Deposition, FDIC-R-DEPO-PROD-080750 | Sealed |
| Ex. 80 | Intentionally left blank | No |
| Ex. 81 | Excerpts from 10/4/16 Lehn Deposition | Sealed |
| Ex. 82 | Excerpts from 10/7/16 Sauls Deposition | Sealed |
| Ex. 83 | Exhibit 3 to 10/14/16 Malek Deposition, no bates | Sealed |
| Ex. 84 | Exhibit 4 to 10/14/16 Malek Deposition, no bates | Sealed |

The FDIC-R hereby offers this consolidated opposition to Defendant PwC's Motion for Partial Summary Judgment as to the FDIC's Claims, ECF 535, and Defendant Crowe's Second Motion for Summary Judgment on the FDIC's Claims, ECF 537.

## INTRODUCTION[1]

This lawsuit arises out of one of the most extensive and costly audit failures in American history. From at least 2002 to 2009, insiders at Taylor Bean & Whitaker Mortgage Corporation ("TBW"), one of the nation's largest home mortgage loan originators, led by the now-convicted felon Lee Farkas, perpetrated a massive fraud against Colonial Bank ("Colonial" or "Bank"). Many aspects of the TBW fraud were designed and implemented by Colonial insiders Catherine Kissick and Teresa Kelly. Kissick was a senior vice president of Colonial and the head of the Bank's Mortgage Warehouse Lending Division ("MWLD"). Kelly was an operations supervisor at Colonial's MWLD. At all relevant times during this fraud, Crowe and PwC served as the independent internal and external auditors for Colonial and Colonial's parent company, Colonial BancGroup, Inc. ("CBG"). Although for years they were paid millions of dollars for their services, the Defendants failed to detect the fraud. The Defendants' accounting malpractice caused $2.2 billion in losses to the FDIC-R, which was appointed receiver of the Bank after Colonial was closed on August 14, 2009.

Ever seeking to escape liability, however, the Defendants now each move for summary judgment, attempting to foreclose certain of the FDIC-R's claims and to limit its damages. *See* ECF 535, 537. For the reasons set forth below, however, all of those efforts fail, and the FDIC-R should be permitted to pursue all the claims set forth in its Third Amended Complaint ("TAC"),

---

[1] Neither Crowe nor PwC offers any "Statement of Fact," undisputed or otherwise, to the Court. *See generally*, ECF 535 and 537. Nevertheless, where it seemed to be helpful to the Court, the FDIC-R has provided discrete "Relevant Background" sections setting out applicable background facts.

ECF 281, and recover all the damages it seeks, including prejudgment interest.

## STANDARD OF DECISION

Summary judgment is appropriate when the moving party establishes that, based upon the evidence presented, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

**I.      The negligence of both PwC and Crowe caused the FDIC-R/Colonial to suffer losses with regard to the "Shipped Not Paid" fraud.**

Despite ample record evidence demonstrating that the Defendants negligently audited Colonial and that their negligence proximately caused all of the damages that the FDIC-R seeks in this case, the Defendants nonetheless argue that the question of proximate cause should not go to the jury with respect to a subset of those damages—those resulting from the last phase of the TBW fraud known as the "Shipped Not Paid" loans ("SNP").[2] Instead, the Defendants urge the Court to rule on this intrinsically factual determination considering only *their* version of the facts and *their* theory of causation—in direct contravention of the legal standard governing their motions. To avoid liability for a large portion of the damages proximately caused by their negligence, the Defendants argue that the SNP fraud was not a part of an ongoing-yet-evolving bank fraud, but rather a distinct one. Alternatively, the Defendants argue that the actions of Bank of America ("BoA") break the causal chain. Because there is, at the very least, a question of fact as to whether (1) the SNP fraud was simply a continuation of the fraud at issue, (2) the actions of BoA were foreseeable, and (3) the Defendants' audits *were* negligent with regard to the SNP loans, the Defendants' motions are due to be denied.

### *Relevant Factual Background*

---

[2] This last phase of the fraud is also often referred to as the double or triple-pledging phase.

The TBW fraud, which began in 2002 and continued until August 2009, ███████

████████████████████████████████████████████████████████████████████.

Excerpts from Brown Dep., attached as Ex. 1 at 455:16-456:20, 206:5-210:9. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████. *See*

Excerpts from Emig Dep., attached as Ex. 2 at 100:19-103:7; *see also* Ex. 3, Ex. 4, Ex. 5, Ex. 6.

█████████████████████████████████████, Excerpts from Kissick

Dep., attached as Ex. 7 at 33:5-19, █████████████████████████, *id.* at 122:5-

25; 123:15-124:6, ████████████████████, *id.* at 174:8-12; Ex. 1 at 210:10-17,

████████████████████, *id.* at 210:10-17. ████████████████████

████████████████████████████████████

███████████████████████████. *Id.* at 210:10-17; 455:16-456:20.

████████████████████████████████████

████████████████████████████████████████

████████████████████████████, Ex. 7 at 186:3-24; 187:11-19; Excerpts from

Wawrzyniak Dep., attached as Ex. 8 at 88:2-90:8; Ex. 9, ████████████████████

███████████████████. If the Defendants had conducted their audits in conformity with

governing professional standards, they would have uncovered the fraud.

In 2009, the fraudsters engaged in the SNP phase of the fraud. ██████████████

████████████████████████████████████████████████████████████

████████, Ex. 1 at 361:24-365:25, ████████████████████████████████████

████████████████████████████████████████████████████████████

████████. Ex. 1 at 361:24-365:25; Ex. 7 at 201:8-203:15; Excerpts from T. Kelly 3/1/16

Dep., attached as Ex. 10 at 187:3-188:16. ████████████████████████████

████████████████████████████████████████████. *See* Declaration of Kenneth Malek,

attached as Ex. 11, ¶15; *see also* Expert Report of Kenneth Malek, attached as Ex. 12 at 12-17.

████████████████████████████████████████████

████████████████████████████████████████████████████.

Declaration of Harry Potter, attached as Ex. 13, ¶ 7; *see also* Potter Report, attached as Ex. 14 at

14, 20. ████████████████████████████████████

████████████████████████████████████████████

████████████████████[3] *Id.* ████████████████████████. *Id.*

**The FDIC-R's Theory of Causation with Respect to Shipped Not Paid Damages**

The FDIC-R's theory of causation, supported by record evidence and expert testimony, is

as follows: ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████. Ex. 14 at 122-23; Excerpts from Carmichael Dep.,

attached as Ex. 16 at 143:24-145:02; 145:24-146:10; Ex. 7 at 966:5-15. Because the Defendants,

---

[3] Indeed, PwC previously argued that Farkas and his co-conspirators engaged in one, continuous fraud in pleadings it filed in the *Taylor, Bean & Whitaker Plan Trust, et al. v. PricewaterhouseCoopers, LLP*, Case No. 13-33964 CA 01 (59). Specifically, PwC noted that from 2002 until August 3, 2009, TBW "[s]tole money from Colonial Bank, a regional bank that did business with TBW, with the help of Colonial Bank insiders who conspired with TBW's controlling shareholder, senior executives, and directors." PwC Opp'n to Pl's Mot. in Limine, Case No. 13-33964 CA 01 (59), attached as Ex. 15. Moreover, in that pleading, PwC acknowledged that TBW owed over $2.2 billion to Colonial, which would *include* the SNP losses. *Id.* at 5.

as the Bank's auditors, failed to detect the fraud, predictably the fraud was able to continue and

escalate, leaving Colonial with huge losses. As such, the losses sustained by Colonial and CBG

would have been avoided had Crowe and PwC done their jobs.

### Procedural History and Legal Standard

The Defendants all but ignore that the issue of causation has already been litigated by the

parties in this case and that this Court has already ruled that the FDIC-R's theory of causation is

plausible. On January 7, 2013, the Defendants moved to dismiss the FDIC-R's Complaint. Case

No. 12-957, ECF 21-23.[4] The Court denied the Defendants' motion, Case No. 12-957, ECF 52,

but instructed the FDIC-R to amend paragraph 21 of the First Amended Complaint ("FAC") to

include facts that connected the SNP fraud to PwC's conduct. *See id*. at 18. Pursuant to the

Court's order, the FDIC-R filed a Second Amended Complaint ("SAC") on September 20, 2013,

which alleged the additional facts the Court required. Case No. 12-957, ECF 53.

On October 21, 2013, the Defendants moved to dismiss the SAC for lack of causation.

Case No. 12-957, ECF 58-60. The issue before the Court was "whether the [SAC] alleges facts

to support the allegations that Defendants' audits were the proximate cause of the [SNP] losses

suffered by Colonial several months after the completion of the audits." Case No. 12-957, ECF

73 at 4. The Defendants argued then, as now, that the SNP damages "were incurred by Colonial

several months after their auditing services; their auditing services could not have uncovered

such fraud; and thus the damages did not flow continuously from the audits." *Id*.

The Court stated the legal standard that governs the current motions:

> In negligence claims, proximate cause is an act or omission that in a natural and
> continuous sequence, unbroken by any new independent causes, produces the
> injury and without which the injury would not have occurred. A "natural and

---

[4] While the Defendants originally moved to dismiss the FDIC-R's original Complaint, their motions were
later deemed to be directed at the FDIC-R's FAC. Case No. 12-957, ECF 31.

continuous sequence" means "unbroken by any new independent causes." Subsequent causes of injury, such as fraudulent or criminal acts of a third person, are not "new independent causes" that intervene or break the chain of causation, unless those subsequent causes are unforeseeable by the defendant. The notion of foreseeability is key to a proximate cause analysis. There can be no liability where the resulting injury could not have been reasonably anticipated by the defendant. Foreseeability does not require that the *particular* consequence should have been anticipated, but rather that some *general* harm or consequence could have been anticipated.

*Id.* at 4-5 (internal quotations and citations omitted) (emphasis in original). Applying this standard, the Court held the following about the FDIC-R's theory of causation:

FDIC's theory of negligence is not that the defendants failed to detect [SNP] fraud. Rather, FDIC's theory is that the defendants failed to discover existing fraud at the time of their auditing services, which permitted the continuation of the fraudulent scheme, albeit through different means. The facts alleged in the [SAC] support this theory. It is plausible that the defendant auditors should have reasonably anticipated that a general fraudulent scheme would continue if their allegedly faulty auditing services failed to detect existing wrongdoing. Negligence law does not require FDIC to prove that the defendants knew or should have known that the fraud would take the particular form of [SNP]. Accordingly, taken as true at this stage of the case, the facts alleged . . . now show a plausible connection between the defendants' audits and the damages suffered by Colonial Bank as a result of the [SNP] fraud.

*Id.* at 5-6. Despite the Court's ruling, the Defendants now yet again contend that the FDIC-R's theory of negligence fails *as a matter of law* because the SNP phase is a separate and distinct fraud and that BoA, not the Defendants, caused the FDIC-R's damages.

**A.  The SNP transactions are part of the same fraud as Plan B and sweeping.**

The record does not support the Defendants' theory that SNP is a separate fraud distinct from the Plan B and sweeping fraud. As this Court noted, "[l]ike cat-skinning, bank fraud lends itself to multiple approaches." Case No. 12-957, ECF 52 at 3. Here, the sweeping, Plan B fraud and the SNP fraud are all just different facets of the same master fraud. In fact, ███████████████

██████████████████████████████████████████████████████████ .

Ex. 10 at 193:8-16. Moreover, █████████████████████████████████████████

█████████████████████████████████████████████████████. *See* Ex. 17, ¶¶ 4–7; *see*

*also* Ex. 1 at 362:2–363:6. ███████████████████████████████████████████

████████████████████████████████████████████████. *See* Ex. 10 at 190:2-191:13;

Ex. 20 at 471:12-472:21. ████████████████████████████████████████████

█. *See* Ex. 17, ¶ 2. █████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████ *See id.*; *see also* Ex. 1 at 362:2-364:15.

Importantly, SNP, like Plan B, also involved the TBW subsidiary Ocala. ███████

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████. Excerpts from Ragland

Dep., attached as Ex. 19 at 39:13-41:19. ███████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████. Excerpts from Bowman

Dep., attached as Ex. 18 at 217:13-224:22; Ex. 10 at 177:12-178:22, 417:10-418:2; Ex. 1 at

135:15-136:19. █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████. Ex. 19 at 25:7-29:6, 39:13-41:19, 41:20-45:7,

46:15-48:21, 56:4-57:16, 60:20-64:15, and 70:19-73:4; Ex. 73; *see also* Ex. 79.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████. Ex. 10 at 188:7-16; Excerpts from T. Kelly 3/31/16 Dep., attached as Ex. 20 at 471:12-

473:17. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Ex. 10 at 189:17-190:21. ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.[5] Ex. 10 at 190:2-191:13;

Ex. 20 at 471:12-472:16. ███████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████.

Ex. 10 at 191:15-193:16.

At the very least, this testimony proves Kissik was willfully blind. █████████████

████████████████████████████████████████████████████████████████

---

[5] Willful blindness is the legal equivalent to knowledge. *See, e.g., Watson, Watson, Rutland/Architects, Inc. v. Montgomery County Bd. of Educ.*, 559 So. 2d 168, 174 (Ala. 1990) (holding that "an architect cannot close his eyes on the construction site and refuse to engage in any inspection procedure whatsoever and then disclaim liability for construction defects that even the most perfunctory monitoring would have . . . prevented"); *Chaney v. Dreyfus Service Corp.*, 595 F.3d 219, 236 (5th Cir. 2010) (willful blindness is equivalent to actual knowledge); *U.S. v. Benjamin*, 328 F.2d 854, 863 (2d Cir.1964) (accountants could not "escape criminal liability on a plea of ignorance when they have shut their eyes to what was plainly to be seen or have represented a knowledge they knew they did not possess"); *see also Fish v. Greatbanc Trust Co.*, 2013 WL 1768692 (N.D. Ill. 2013) (willful blindness is equivalent to actual knowledge); *A.L.L. Masonry Const. Co., Inc. v. Omielan*, No. 07 C 5761, 2009 WL 2214026, at *7 (N.D. Ill. July 23, 2009) (same); *Jalbert v. Grautski*, 554 F. Supp. 2d 57, 72 (D. Mass. 2008) (same).



. Excerpts of Roland Dep., attached as Ex. 22 at 238:6-243:6; *see also* Ex. 23. ███████████████████████████████████████. Ex. 22 at 308:6-312:13; Ex. 24; Ex. 25. ████████████████████████████████████████████. Excerpts from Fite Dep., attached as Ex. 27 at 277:3-278:10; *see also* Ex. 28. ████████████████████████████████████████████████████████████ Ex. 27 at 279:3-282:18; see also Ex. 29; *see also* Ex. 30, Ex. 31. ████████████████████ Ex. 27 at 282:22-284:20; *see also* Ex. 32. From this evidence a reasonable factfinder could conclude that, at the very least, Kissick was running interference for Farkas and TBW so that the SNP phase of the fraud would not be discovered.

_____

[6]



[7] *See* Ex. 33, ¶¶ 7-14.

. *See* Ex. 1 at 178:19-180:23; Ex. 17; *see also* Ex. 10 at 190:2-191:13; Ex. 20 at 471:12-472:21.

.

Indeed, Farkas is serving a 30-year prison sentence because a jury, a federal district court, and a federal circuit court of appeals took the very same view of the fraud as put forward by the FDIC-R and its experts. Farkas was charged and convicted of a *multi-year, ongoing, evolving* "Scheme to Defraud," which encompassed the sweeping, Plan B (both COLB and AOT), **and** the SNP frauds. *See* Indictment, attached as Ex. 34, ¶¶ 13-37; Verdict Form, attached as Ex. 35.

In a pre-trial ruling, the district court overseeing the criminal case against Farkas described the government's conspiracy allegations as follows:

> [B]eginning in 2002, TBW experienced serious cash flow problems. Conspiring with TBW and Colonial Bank employees, Farkas allegedly devised a scheme to misappropriate funds from Colonial Bank. Among the alleged fraudulent acts were the transfer of money between accounts to hide overdrafts and the sale of Colonial Bank mortgage loans that did not exist. Using Ocala Funding, LLC, a

---

[7]

*See* Ex. 13 at 8.

> TBW subsidiary, Farkas and his co-conspirators allegedly sold loans owned by Colonial Bank to Freddie Mac, without paying Colonial for the loans.

*United States v. Farkas*, No. 1:10CR200 LMB (E.D. Va. Sept. 24, 2010), attached as Ex. 36 at 2-3. Later, the same district court approved a forfeiture order of $38,541,209.69 from Farkas, which stated that the fraud "evolved over several stages." *United States v. Farkas,* 1:10CR200 LMB, 2011 WL 5101752, at *1 (E.D. Va. Oct. 26). The Court of Appeals, in affirming Farkas' conviction, stated that the fraud was "a multi-stage fraud scheme between 2002 and 2009." *United States v. Farkas*, 474 F. App'x. 349, 351 (4th Cir. 2012).

While the FDIC-R does not need to rely on the findings of the Farkas jury, which applied the "beyond a reasonable doubt" legal standard, or the opinions of the two federal courts that presided over his conviction, those court proceedings illustrate that the FDIC-R's theory of a single ongoing, evolving fraud that encompassed sweeping, Plan B, and SNP is wholly reasonable and supported by the evidence. Of course, this Court has already ruled that the FDIC-R's theory of causation meets the applicable pleading standards, which require a plaintiff to state a claim to relief that is plausible on its face. Case No. 12-957, ECF 73 at 5-6.

The Defendants argue, however, that the Court's ruling would be different in light of "what the undisputed summary judgment evidence now shows," ECF 537 at 21, n.8, which, according to the Defendants, is that they did not engage in any culpable conduct with respect to the SNP loans, specifically.[8] *Id.* at 17-18. That bold assertion, however, is far from an undisputed

---

[8] Additionally, both Crowe and PwC were aware of substantial issues with respect to aged loans (which can be an indicator of problems in connection with the shipped not paid issue and double pledging) with respect to the COLB transactions. Moreover, there is evidence that the Defendants *did* engage in culpable conduct with respect to SNP loans. ████████████████████████████████████████████████████████

fact. 

Excerpts from Moore Depo, attached as Ex. 37 at 47:2-51:12. PwC, which falsely certified the effectiveness of Colonial's internal controls from 2004-2008, *see* Ex. 38,

Carmichael Report, attached as Ex. 39 at 15-16; Ex. 16 at 138:18-139:15, 144:4-145:15, 221:3-9, 221:20-222:3.

*See* Ex. 41 at 05612, 05614-5; Ex. 42 at 87-88. But the FDIC-R's theory of negligence does not depend at all on whether the Defendants committed negligent acts or omissions with respect to the SNP loans (although they did); the SNP loans were a *foreseeable* result of the Defendants' failure to detect the fraud. Indeed, the Defendants' causation argument makes sense only if the Court adopts the *Defendants'* narrow characterization of the SNP phase as a wholly separate, "different species of fraud" as a matter of law, *see* ECF 537 at 18, which, of course, would be contrary to the legal standard governing a motion for summary judgment.

In any event, the Defendants do not actually cite any record evidence in support of their theory that the SNP fraud was of a "different species," relying instead on the Court's summary of facts from its August 25, 2016 order. ECF 537 at 11 (citing ECF 450 at 2). As summarized by

the Defendants, in that order, the Court stated that "Kissick *allegedly* informed" Farkas that "she would no longer participate in the fraud," and "*[a]llegedly* unbeknownst to Kissick," Farkas engaged in the SNP phase of the fraud. *Id.* (quoting ECF 450 at 3). Although the FDIC-R has established that there is at least a question of fact whether Kissick actively participated in the SNP phase of the fraud, the FDIC-R is not required to prove Kissick's involvement in order to prove causation. Indeed, even if Kissick knew nothing of the last phase of the fraud, and even if there were support for the Defendants' theory that different manifestations of the fraud somehow constituted legally distinct frauds, a *jury* still must decide the question of whether damages stemming from the SNP fraud were a foreseeable consequence of the Defendants' failure to discover the earlier phases of the fraud.

### B. BoA breach of its duties to the Bank does not break the causal chain.

The Defendants argue that BoA's repeated breaches of its duties were an intervening cause of the SNP losses. ECF 537 at 20-24. In Alabama, for conduct to be an intervening cause sufficient to insulate a defendant from liability, the conduct must be unforeseeable to the defendant at the time the defendant acts and also sufficient to be the sole proximate cause of the plaintiff's injury. *See Gilmore v. Shell Oil Co.*, 613 So. 2d 1272, 1275 (Ala. 1993). No misconduct on the part of BoA satisfies these requirements. The Defendants nonetheless spend a great deal of space discussing allegations and legal argument presented in a separate case—the FDIC-R's suit against BoA related to BoA's improper transfer of SNP loans for which Colonial was never paid ("BoA Case").[9] ECF 537 at 14-16. The Defendants fail to recognize, however, that multiple wrongful actions may be the proximate cause of the same injury. The FDIC-R in no

---

[9] As discussed in this section, whether the allegations in the BoA case are consistent with FDIC-R's theory of causation here is a red herring. In any event, allegations in one case are not binding admissions in a different case. *In re Raiford*, 695 F.2d 521, 523 (11th Cir. 1983) ("Normally judicial admissions are binding for the purpose of the case in which the admissions are made, not in separate and subsequent cases.").

way contradicts itself by alleging proximate cause in different actions against different defendants. Under Alabama law, "an act or omission does not have to be the sole proximate cause but only a proximate cause of the injury." *Collins Signs, Inc. v. Smith*, 833 So. 2d 636, 639 (Ala. Civ. App. 2001) (citing *Kyle v. Selma Medical Ctr. Hosp., Inc.*, 534 So. 2d 589, 591 (Ala. 1988) (proximate cause not equated with sole cause)). The "long-standing rule in Alabama is 'if two causes operate at the same time to produce a result which might be produced by either, . . . each is a proximate cause'" *Id*. (quoting *Shepherd v. Gardner Wholesale, Inc.*, 256 So. 2d 877, 880 (Ala. 1972)).[10]

Further, under Alabama law, concurrent tortfeasors who act jointly or entirely independent of each other may be held jointly and severally liable for the injury they cause: "Alabama law is clear that on such occasions, where the actions of two or more tortfeasors combine, concur, or coalesce to produce an injury, each tortfeasor's act is considered to be the proximate cause of the injury, and each tortfeasor is jointly and severally liable for the entire injury." *Gen. Motors Corp. v. Edwards*, 482 So. 2d 1176, 1195 (Ala. 1985), *overruled on other grounds by Schwartz v. Volvo North America Corp.*, 554 So. 2d 927 (Ala. 1989). As such, "no concurrent tortfeasor may assert the culpability of any other tortfeasor as a defense to his own liability. In other words, because the actions of each tortfeasor contributed, as a 'cause in fact,' to produce the injury, no tortfeasor may assert that the actions of another tortfeasor, and not his own, caused the injury." *Id*. (citations omitted). Defendants present no evidence that the

---

[10] The "at the same time" language quoted above is not construed literally. *See e.g.*, *Springer v. Jefferson County*, 595 So. 2d 1381,1384-85 (Ala. 1992) (plaintiff provided substantial evidence that county's negligence in its design and maintenance of the road was a concurrent proximate cause along with the negligent motorist involved in the car accident); *Marshall Cty. v. Uptain*, 409 So. 2d 423,425-26 (Ala. 1981) (driver defendant's negligence causing automobile accident with plaintiff along with county defendant's failure to properly maintain stop sign that had been knocked down two years prior to the accident were concurrent proximate causes); *Thomas v. Jim Walter Homes, Inc.*, 918 F. Supp. 1498, 1505 (M.D. Ala. 1996) (plaintiffs' loss resulting from tax sale of their home was conceivably caused by one defendant's improper recordation of the deed and the subsequent failure of another defendant to notify plaintiffs of tax notices).

misconduct of BoA is sufficient to be the *sole* proximate cause of the FDIC-R's injury.

In any event, that Farkas would trick BoA into sending Colonial's collateral proceeds to TBW or other TBW creditors was a foreseeable consequence of the Defendants' negligence. As the Alabama Supreme Court has instructed, foreseeability is "the cornerstone of proximate cause." *Id.* at 1194. Under Alabama law, defendants are "legally responsible for ***all consequences*** which a prudent and experienced person, fully acquainted with all the circumstances, at the time of his negligent act, ***would have thought reasonably possible to follow that act*** . . ." *Id.* Such consequences include those brought about by the reasonably foreseeable actions of others. *Id.*

To decide what damages are foreseeable due to a negligent audit requires an understanding of the role of the auditor. "The very nature of an audit is that an accountant opines on the fairness of an entity's financial statements. Thereafter, in reliance on that audit, an entity makes business decisions to act or not act in certain ways." *See Grant Thornton, LLP v. F.D.I.C.*, 535 F. Supp. 2d 676, 712 (S.D.W. Va. 2007), *reversed as to non-FDIC plaintiff on other grounds by Ellis v. Grant Thornton, LLP*, 530 F.3d 280 (4th Cir. 2008). For this reason, courts recognize that where the wrongful act is a failure to perform a duty appropriately, and proper performance of the duty would have prevented the harm, causation is established where the harm was a reasonably foreseeable result of a performance failure. *See Lincoln Grain, Inc. v. Coopers & Lybrand*, 345 N.W.2d 300, 308-09 (Neb. 1984) (noting that "the doctrine that an intervening act cuts off the liability of a tort-feasor . . . does not apply [when] it is foreseeable that the negligent failure to detect falsifications will likely result in continued falsifications"); *see also In re Gouiran Holdings, Inc.*, 165 B.R. 104, 106 (E.D.N.Y. 1994) (holding that proximate cause was sufficiently pleaded by allegations that (1) the auditor was in a position to know of past

embezzlements by the company's principals and (2) the continued embezzlement after a clean audit was foreseeable to the auditors). ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Excerpts from Sippial Dep., attached as Ex. 71 at 320:12-324:16; *see also* Excerpts from Beville Dep., attached as Ex. 72 at 448:18-462:5.

The Defendants nonetheless argue that the SNP phase of the fraud was not foreseeable because the Defendants were no longer working on the SNP loans when the SNP phase of the fraud began. *See* ECF 537 at 23. But just because time passes between the negligent act and the harm caused by that act, does not mean that the negligence was not the proximate cause of the harm. For example, in *Mobile Gas Serv. Corp. v. Robinson*, 20 So. 3d 770 (Ala. 2009), the defendant gas company had negligently provided gas to a dwelling despite the fact that in 1999 and again in June 2004 the gas company had determined that a central heating unit in the house was defective and "red tagged" it. In December 2004, the landlord and a contractor he hired turned on the defective heating unit, and within a few hours the plaintiff's mother was asphyxiated. Despite the temporal gap and the intervening misconduct of the landlord and his contractor, the Court stated that a "*foreseeable* intervening act does not break the causal relationship between the defendants' actions and the plaintiffs' injuries." *Id.* at 780-81 (internal brackets and quotation marks omitted) (emphasis in original). "In other words, it was not unforeseeable as a matter of law that the [heating unit] would be placed back in service in the same unrepaired and hazardous condition in which it was last observed by the Company's service technician in June 2004. Whether the activities of [the landlord and a contractor] were, therefore, an intervening cause of the accident could not be answered as a matter of law." *Id.* at 781.

The Defendants allowed Farkas and his co-conspirators to go undetected. It was foreseeable that they would continue to harm the Bank in ever-evolving ways, including the SNP phase of the fraud. Indeed, the Defendants' negligence caused significant harm to Colonial every day the Bank continued its harmful relationship with its rogue customer, TBW, and its chief fraudster, Farkas. In another audit malpractice case, *Grant Thornton*, the FDIC alleged that the auditor's failure to discover the fraud and insolvency of the bank resulted in the improper prolonging of the bank's life, causing continued operating losses. *Grant Thornton*, 535 F. Supp. 2d at 710. After a lengthy bench trial, the court determined that injury was foreseeable for purposes of the proximate cause analysis:

> [The auditor's] negligence in failing to discover the fraud at [the bank] allowed that fraud to continue, and the losses the FDIC seeks to recover are the foreseeable result of that ongoing fraudulent scheme. As [the auditor's] expert conceded, it is certainly foreseeable from the standpoint of a reasonably prudent auditor that the failure to discover fraud will result in the continuation of the fraud.

*Id*. at 711.

Similarly, in *Comeau v. Rupp*, 810 F. Supp. 1172 (D. Kan. 1992), the court held that the issue of proximate cause should go to the jury, explaining that the proper inquiry was "whether it was reasonably foreseeable to the Accountants that the lending and/or loan servicing practices of [the bank], if unchecked, could be expected to result in loan losses of the type sustained by [the bank]." *Id.* at 1177-78; *see also Bd. of Trustees of Cmty. Coll. Dist. No. 508, Cty. of Cook v. Coopers & Lybrand, L.L.P.*, 775 N.E.2d 55, 61-64 (Ill. App. 2002), *aff'd in part, rev'd in part sub nom.* 208 Ill. 2d 259, 803 N.E.2d 460 (2003). Finally, in *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314 (S.D.N.Y. 1982), the court held that the auditor's failure to alert the company to various problems regarding one of its business associate's questionable business practices proximately caused the company's damages even though the company

17

exercised independent discretion to engage the associate. The court concluded that the auditor's failure to fulfill its responsibility "pretermitted [the company]'s discovery of the fraud [by the associate] and lulled [the company] into a false sense of security." *Id.* at 1358.

Here, the Defendants' negligence allowed Farkas to continue to defraud Colonial, which was more than enough to make the SNP phase foreseeable at the time of the failed audits. If the Defendants had done their jobs properly, the fraud would have been discovered and stopped at a much earlier point, and the subsequent, foreseeable losses from the continuing theft would have been avoided. The Defendants certainly have not proven otherwise as a matter of law. Moreover, in Alabama, proximate cause is considered to be an intrinsically factual determination that a court should be hesitant to decide as a matter of law. *See Marshall Cty. v. Uptain*, 409 So. 2d 423, 425 (Ala. 1981). Indeed, "[i]t is well established that the question of proximate cause is **almost always** a question of fact to be determined by the jury, and that the question must go to the jury if reasonable inferences from the evidence support the plaintiff's evidence." *Swanstrom v. Teledyne Cont'l Motors, Inc.* 43 So. 3d 564, 584 (Ala. 2009) (finding that lower court erred in entering summary judgment for the defendant on the issue of proximate cause); *see also Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.,* 124 F. Supp. 2d 1228, 1234 (M.D. Ala. 2000) ("The question of proximate cause is typically one for the jury to decide.") (citing *Davison v. Mobile Infirmary,* 456 So. 2d 14, 24 (Ala. 1984)).

There is sufficient record evidence and expert testimony to establish that the SNP phase of the fraud was part of a single ongoing, evolving fraud against Colonial as a natural and foreseeable continuation of TBW's systematic looting of Colonial—looting that the Defendants negligently failed to discover. While the Defendants may be entitled to rebut this evidence at trial, they certainly have failed to carry their heavy burden on summary judgment. The FDIC-R

18

has presented a legitimate, disputed question of fact for the jury, and the Defendants' motion is due to be denied.

## II.     **The FDIC-R's claims are all timely.**

Both PwC and Crowe improperly seek to limit the temporal scope of the FDIC-R's claims. PwC contends that claims related to the 2002-2006 year-end audits are time-barred. ECF 535 at 3-17. Crowe argues that the FDIC-R is not entitled to seek damages prior to March 2007. ECF 537 at 8-10. Neither argument, however, has merit. Indeed, neither Defendant has pleaded, much less proven, that it will be prejudiced in any way by the addition of these audit years, and both Defendants were clearly on notice as, in accordance with Rule 15, the claims for the additional audit years "arose out of the [same] conduct, transaction or occurrence" as those previously pled.

### *Legal Standard*

An amended complaint relates back to an earlier pleading if it "asserts a claim or defense that arose out of the conduct, transaction or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).[11] The relation-back principle of Rule 15(c) allows otherwise untimely claims "to defeat the bar of statute of limitations." *Rural Fire Prot. Co. v. Hepp*, 366 F.2d 355, 362 (9th Cir. 1966). New allegations relate back to the original pleading if the original pleading "gives fair notice of the general fact situation out of which the claim . . . arises." *Forzley v. AVCO Corp. Elecs. Div.*, 826 F.2d 974, 981 (11th Cir. 1987); *see also Glover v. F.D.I.C.*, 698 F.3d 139, 146 (3d Cir. 2012). "[S]o long as the original and amended complaints state claims that are tied to a common core of operative facts, relation back

---

[11] In this case, the FDIC Extender Statute, not state law, provides the applicable statute of limitations, so Rule 15(c)'s incorporation of state law relation-back rules is inapplicable. *Cf.* ECF 238 at 15, n.6. Nevertheless, the relevant portions of Rule 15(c) in the federal and state rules are substantially similar. *Compare* Fed. R. Civ. P. 15(c)(1)(B) *with* Ala. R. Civ. P. 15(c)(2).

will be in order." *Brown v. Montgomery Surgical Ctr.*, No. 2:12-CV-553-WKW, 2013 WL 1163427, at *7 (M.D. Ala. Mar. 20). Rule 15 is to be "liberally applied," particularly when "no disadvantage will accrue to the opposing party." *Rural Fire Prot. Co.*, 366 F.2d at 362; *see also, e.g.*, *Woods Expl. & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1298-300 (5th Cir. 1971).

### *Relevant Procedural History*

The FDIC-R initiated this lawsuit in October 2012. *See* Case No. 12-957, ECF 1. In its Complaint, the FDIC-R detailed the fraud committed on Colonial by TBW from 2002 through 2009 and alleged that "[a]t all times during TBW's fraud against Colonial, PwC served as Colonial's external, independent auditor," *Id.* ¶ 22, and that "[a]t all relevant times during this fraud . . . [Crowe] provided internal audit services to the Bank," *id.* ¶ 2. Based on PwC's and Crowe's failure to detect the fraud, the FDIC-R asserted claims against both parties for professional negligence, gross negligence, breach of contract (as to PwC), and negligent misrepresentation. *Id.* at ¶¶ 78-98.

On January 28, 2013, twenty-one days after the Defendants moved to dismiss the original complaint, the FDIC-R filed a FAC. Case No. 12-957, ECF 29. The changes in the FAC were minor and involved only four paragraphs of the 98-paragraph complaint. *See id.*; *see also* Case No. 11-746, ECF 225 at 3. The Court denied motions to dismiss the FAC on September 10, 2013. Case No. 12-957, ECF 52. In the course of denying the motions, the Court instructed the FDIC-R to amend paragraph 21 of the FAC to include facts that connected the SNP fraud to PwC's conduct. *See id.* at 18. Pursuant to the Court's order, the FDIC-R filed a SAC on September 20, 2013, which alleged the additional facts the Court required. Case No. 12-957, ECF 53. Once again, the Defendants filed motions to dismiss the SAC, Case No. 12-957, ECF

58-60, which the Court denied on July 15, 2014. Case No. 12-957, ECF 73.

On November 30, 2015, the FDIC-R sought leave to file a TAC. Case No. 11-746, ECF 225. As in all earlier complaints, the TAC continued to assert claims against both PwC and Crowe for professional negligence, gross negligence, breach of contract (only as to PwC), and negligent misrepresentation, but added "additional factual detail supporting its claims, including additional detail about certain aspects of the Defendants' misconduct that have been uncovered through discovery." *Id.* at 4-5.[12] Specifically, this included allegations against PwC for its faulty audit work in audit years 2002-2006,[13] as well as allegations against Crowe for its faulty audit work in audit years 2005 and 2008. PwC did not oppose the FDIC-R's motion for leave to file a TAC, but expressly reserved any defenses it may have. ECF 237 at 1. Crowe did oppose the FDIC-R's motion on several grounds, including futility due to untimeliness and prejudice. *See* ECF 238. After careful consideration of Crowe's arguments, however, the Court granted the FDIC-R leave to file its TAC, ECF 279, which the FDIC-R filed on March 10, 2016. ECF 281. Crowe subsequently moved to dismiss claims based on the 2005 and 2008 audit years. ECF 318. That Motion to Dismiss is fully briefed and pending before the Court. *See* ECF 318, 352 and 369.

**A. The FDIC-R's allegations about the 2002-2006 audit years arise out of the same conduct, transaction or occurrence set out in the SAC and are therefore timely.**

---

[12] The TAC also added two new claims against PwC for wantonness and breach of the tolling agreement. *See* ECF 281, ¶¶ 139-140 and 144-46. PwC does not claim that those new claims are time-barred. *See* ECF 535 at 3 n.3.

[13] PwC asserts that because the FDIC-R has conceded that § 522 governs its negligence claims, the FDIC-R "has only one negligence claim against PwC, and that claim, however denominated, requires proof of a PwC misstatement." ECF 535 at 13-14 n.30. Chief Judge Watkins has already rejected this assertion: "Defendants have cited no binding authority to support their position that, in adopting § 552 as the standard for who may bring a professional negligence claim against an accountant, Alabama courts eliminated professional negligence claims based on theories of negligence other than negligent misrepresentation. Accordingly, the claims for negligence and gross negligence—already closely related to the claim for negligent misrepresentation—will go forward." Case No. 12-957, ECF 52 at 14.

PwC wrongly argues that the FDIC-R's claims against it based on the 2002 through 2006 year-end audits are time barred because they do not relate back to the FDIC-R's SAC, which did not specifically refer to audit years 2002-2006. ECF 535 at 3-17. The FDIC-R's claims against PwC based on the 2002-2006 audit years, however, are timely because, to the extent they were not asserted in the SAC, they arose from the same conduct, transaction or occurrence alleged in the original complaint and therefore relate back pursuant to Federal Rule of Civil Procedure 15.

> 1. *The new allegations about the 2002-2006 audit years do not assert new* *causes of action.*

The FDIC-R's allegations about the 2002-2006 audit years satisfy Rule 15. At the outset, the TAC, like all prior complaints, asserts claims against PwC for professional negligence, gross negligence, and negligent misrepresentation. ECF 281, ¶¶ 112-18, 125-27, 133-35. The new allegations therefore do not assert any new causes of action. Even "an amendment that states an entirely new claim for relief will relate back as long as it satisfies the test embodied in Rule 15(c)(1)(B)." 6A Arthur R. Miller, Mary Kay Kane & A. Benjamin Spencer, Fed. Prac. & Proc. Civ. § 1497 (3d ed.). But "[w]here no new cause of action is alleged, as here," relation back should be particularly liberal. *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 87 (2d Cir. 1999).

PwC argues that the fact that the FDIC-R expanded its allegations to include the year-end audits from 2002 to 2006 "literally changes the contracts upon which the FDIC-R's breach-of-contract claim relies." ECF 535 at 13. But adding additional audit years does not create new, separate causes of action for each year. *See, e.g., Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08 CV 1713 ERK WDW, 2012 WL 601448, at *12 (E.D.N.Y. Feb. 23) (concluding that amended complaint related back because the "claims were not new causes of action, they simply added a Certificate to the already

existing . . . claims alleged in the original complaint" and they "rel[ied] on the same core factual

allegations contained in the initial . . . complaint with regard to the central issues of the claim")

(internal quotation marks omitted); *New Jersey Carpenters Vacation Fund v. Royal Bank of*

*Scotland Grp., PLC*, 720 F. Supp. 2d 254, 266-67 (S.D.N.Y. 2010) ("Although Plaintiffs

included more Harborview Trusts that had Offering Documents that allegedly contained material

misstatements and omissions, it shares the same core factual allegations contained in the initial,

state court complaint with regard to the central issues of the claim . . . ."), *on reconsideration sub*

*nom. New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 5093 HB,

2013 WL 1809767 (S.D.N.Y. Apr. 30, 2013); *F.D.I.C. v. Conner*, 20 F.3d 1376, 1385-86 (5th

Cir. 1994) (applying Rule 15 to allow FDIC as receiver to amend its complaint to bring claims

on additional loans not listed in the original complaint because the amendment "seeks to identify

additional sources of damages that were caused by the same pattern of conduct identified in the

original complaint" and "the defendants could not have been unduly prejudiced by the

amendment"). Indeed, paragraph 92 of the SAC and paragraph 130 of the TAC use virtually

identical language to state the FDIC-R's cause of action for Breach of Contract against PwC.[14]

    To be sure, earlier complaints specifically referred to PwC's year-end 2007 audit

engagement, but neither the allegations nor the claims against PwC in the earlier complaints

---

[14] Both paragraphs state:

> As detailed above, PwC was obligated under its engagement letters to (a) perform its audit in accordance with standards established by the PCAOB, (b) design the audit to obtain reasonable assurance of detecting errors, fraud, or illegality that would have a material impact on financial statement amounts, and (c) obtain reasonable assurance that effective internal control over financial reporting was maintained in all material respects, which required PwC to obtain an understanding of internal controls over financial reporting, assess the risk that a material weakness existed, and test and evaluate the design and effectiveness of internal controls over financial reporting. PwC failed to comply with these contractual duties and related professional standards in numerous material respects and thus breached the obligations of the engagement agreements.

Case No. 12-957, ECF 53 at ¶ 92; Case No. 11-746, ECF 281 at ¶ 130. The only differences between the two paragraphs is that, in Paragraph 130 of the TAC, the word "audit" is plural in subparts (a) and (b), while it is singular in Paragraph 92 of the SAC.

were limited to year-end 2007 audit work. For example, the SAC alleged that, throughout TBW's seven-year fraud, PwC "never realized that many hundreds of millions of dollars of Bank assets did not exist, had been sold to others, or were worthless," and "repeatedly issued unqualified opinions that Colonial's financial statements were fairly stated and effective controls were in place." Case No. 12-957, ECF 53, ¶ 2. Later, the FDIC-R alleged that, "[a]t the conclusion of *each* audit, PwC reported that PwC had performed its audit work in accordance with applicable professional standards and that BancGroup's financial statements were fairly stated in all material respects." *Id*. ¶ 22 (emphasis added). And, "[i]n fact, PwC's audit of Colonial's 2007 financial statements (***and other years***) fell short of governing professional standards in several respects." *Id*. ¶ 23 (emphasis added).[15] For these reasons, the new allegations in the TAC that specifically mention 2002-2006 simply added to the FDIC-R's existing claims against PwC and relied on the same core factual allegations found in the earlier complaints.

## 2. *The new allegations about the 2002-2006 audit years are tied to the common core of operative facts alleged in the earlier complaints.*

The new allegations that include audit years 2002-2006 clearly arise out of the same conduct alleged in the earlier complaints—that, from 2002-2009, PwC failed, as the external auditor, to detect the seven-year fraud TBW committed against Colonial. In fact, the factual allegations against PwC in both complaints are nearly identical except for the specific years alleged and amount of damages claimed. The comparison of the paragraphs in the SAC and the TAC that PwC includes in its motion only demonstrates how minor the differences are. *See* ECF 535 at 8-9.

---

[15] Likewise, the SAC alleges that PwC failed to adequately review Crowe's 2006 audit of Colonial's internal controls. 12-957, ECF 53, ¶¶ 33-37 (describing duty to review Crowe's work), 56-77 (describing deficiencies in Crowe's audit work which included 2006 audit cycle), 79h (alleging PwC breached its duties by failing to recognize deficiencies of Crowe's work). There were therefore specific allegations against PwC in the SAC that mentioned audit years other than 2007.

PwC does not argue (because it cannot) that the allegations regarding 2002 through 2006 are unrelated to the same operative facts pleaded in the original complaint. Instead, PwC attempts to avoid relation back by arguing that each audit year is distinct and therefore claims related to audit years not explicitly mentioned in the earlier complaints do not relate back as a matter of law. This argument is unavailing. PwC relies on *St. Paul Fire & Marine Ins. Co. v. Touche Ross & Co.*, 507 N.W. 2d 275 (Neb. 1993). ECF 535 at 14-15. In that case the court found that the plaintiff's new claims related back, with the exception of a single audit year "which was not mentioned in the original petition." *Id.* at 285 (emphasis added). Here, in contrast, the FDIC-R's original complaint extensively detailed a seven-year fraud spanning from 2002 to 2009, alleged that PwC served as Colonial's external auditor throughout the entire fraud, and alleged that PwC had been negligent in every audit year. The causes of action in the Original Complaint were not limited to 2007 and 2008, and the allegations in the TAC relating to 2002 through 2006 are based on the same core factual allegations contained in the earlier complaints. Thus, unlike in *St. Paul*, it cannot be said here that the additional audit years were not mentioned in the original complaint.

The remainder of PwC's cases are inapposite. Two of the cases—*F.D.I.C. v. Deloitte & Touche*, 834 F. Supp. 1129 (E.D. Ark. 1992) and *Williamson ex rel. Lipper Convertibles, L.P. v. PricewaterhouseCoopers LLP*, 872 N.E.2d 842 (N.Y. 2007)—involved the continuous-treatment tolling doctrine under state law, which has nothing to do with whether an amended pleading relates back under Rule 15. Instead, the continuous-treatment tolling doctrine concerns when the statute of limitations begins to run. It originated in the medical malpractice context and provides that, where there has been continuous "treatment" for the same or related problems, the statute of limitations does not begin to run on a malpractice claim until the treatment is concluded. *See*

*Williamson*, 872 N.E.2d at 845-46. As applied in the accounting-malpractice context, the continuous-treatment doctrine sometimes has been held to turn on whether annual accounting audits were separate engagements as part of a general accountant-client relationship or part of a continuous course of treatment for a specific problem. *See Williamson*, 872 N.E.2d at 845-47; *Deloitte & Touche*, 834 F. Supp. at 1148-49. The relation-back doctrine, in contrast, does not consider whether annual accounting audits were separate engagements. The only requirement is that the newly asserted claims arise out of the same conduct, transaction, or occurrence alleged in the original complaint. *See* Fed. R. Civ. P. 15(c). As explained above, the allegations based on the 2002-2006 audit years clearly satisfy this requirement.

Similarly, *Moore v. Baker*, 989 F.2d 1129 (11th Cir. 1993), is nothing like the case here. ECF 535 at 15-16. In *Moore*, a patient sued her surgeon for an alleged lack of informed consent and sought to amend the complaint to add claims of negligence in surgery and postoperative care. The Eleventh Circuit held that Moore's newly added claims for medical malpractice did not arise out of same conduct, transaction, or occurrence as her original claim for lack of informed consent. As previously noted, unlike in *Moore*, the FDIC's TAC did not add new causes of action. Moreover, the defendant in *Moore* was not put on notice that his actual medical treatment of the patient was at issue when his patient sued him for lack of informed consent.

### 3.   *PwC was on notice of the general fact situation out of which the 2002-2006 allegations arise.*

PwC makes no attempt to argue that it was not on notice of the general fact situation out of which the 2002-2006 allegations arise. The allegations in the earlier complaints were more than sufficient to put PwC on notice that its entire course of misconduct as the Bank's external auditor was at issue. The earlier complaints described in detail the seven-year fraud that TBW committed against Colonial from 2002 through 2009, *see* Case No. 12-957, ECF 1, ¶¶ 17-21, and

specifically alleged that "[a]t all relevant times during this fraud, [PwC] served as the Bank's external auditor," *id*. ¶ 2; *see also* Case No. 12-957, ECF 53 at ¶¶ 2, 17-21. "When a suit is filed in a federal court under the Rules, the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be." *Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir. 1983); *see also Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984) ("[A] party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide.").

Here, the earlier complaints clearly put PwC on notice that "the gravamen of [the FDIC-R's] case" was PwC's negligence in failing to detect the TBW fraud during its audits of the Bank, which included audit years 2002-2006. *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 602-03 (D.N.J. 2001). The FDIC-R's "clarification . . . of some of [its] claims upon further investigation" is simply "par for the course." *Id.* at 602. Given the breadth of the allegations in the Original Complaint, PwC "ought to have been able to anticipate or should have expected that . . . other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question." 6A Miller, Kane & Spencer, Fed. Prac. & Proc. Civ. § 1497.

As discussed above, the allegations in all of the FDIC-R's complaints have relied on the same "common core of operative facts," the TBW fraud. *See Brown*, 2013 WL 1163427, at *8. For this reason, the claims based on the 2002-2006 audit years in the TAC are based on the same theory of liability as asserted in the prior complaints: if PwC's audit work had adhered to the required professional standards, then it would have discovered the TBW fraud and prevented Colonial from incurring additional losses. The contractual and professional obligations that the FDIC-R alleged PwC violated with respect to the year-end 2007 audits are identical to PwC's

obligations for every other audit during the fraud, including audit years 2002-2006.[16] *Compare* ECF 281, ¶ 29 with Case No. 12-957, ECF 53, ¶ 22. And earlier complaints listed all of the same accounting standards that the FDIC-R contends PwC violated in the TAC. *Compare* ECF 281, ¶ 114 *with* Case No. 12-957, ECF 53, ¶ 80. PwC was therefore "on clear notice" of the FDIC-R's claims. *See In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 (CPS), 2005 WL 2277476, at *24 (E.D.N.Y. Sept. 19) (noting that "defendants in this case were on clear notice . . . that plaintiffs[] alleged that their accounting practices were fraudulent because they were not in compliance with GAAP."). Because the allegations in the original complaint gave PwC ample notice of the matters raised in the TAC, relation back is in order.[17]

> 4. *PwC will not be unfairly disadvantaged if the 2002-2006 claims are <u>found to relate back to earlier complaints</u>.*

PwC does not attempt to argue that it will be unfairly disadvantaged if the FDIC-R proceeds on these claims. *See Rural Fire Prot. Co.*, 366 F.2d at 362. The FDIC-R added the new allegations before the close of fact discovery, and both PwC and the FDIC-R have taken extensive discovery on the earlier time period. For this reason, PwC cannot and does not claim that it is unable to defend itself against the new allegations. Quite to the contrary, PwC has been defending its audit work from years 2002-2006 since the beginning of this litigation. Indeed, after the FDIC-R sought leave to file its TAC, PwC had four and a half months to take fact depositions, seven months to take written discovery and a full nine months to select and prepare its experts regarding the 2002-2006 audits. *See* ECF 224, 241, 413. Additionally, PwC's primary

---

[16] While it is true that the PCAOB standards and the requirement for an audit of internal control over financial reporting first went into effect in 2004, in its 2004 certification PwC represented that its audits for 2002 and 2003 met PCAOB standards. Ex. 38 at 789778 (2004 10-K).

[17] Moreover, CBG sued PwC on other audit years from the very beginning of this litigation, *see* Case No. 11-746, ECF 28, and that original case has been consolidated with this one since September 24, 2014, ECF 85—spanning the entire discovery phase. *See* ECF 117 (Dec. 4, 2014 Order stating "parties may begin formal document discovery … on all issues pursuant to [FRCP] 34); ECF 122 (Jan. 22, 2015 Uniform Scheduling Order).

expert on the audits, ██████████████████████████████████████████████████████

████████████████████████████████████████████. Finally, simultaneously with

this action, PwC defended itself at trial in a case brought by TBW raising similar allegations of

negligence for the *same audit years*. *See* Ex. 49. PwC had no problem defending itself in that

action and neither sought a continuance nor claimed it was not ready for trial. PwC is perfectly

capable of defending itself regarding the 2002-2006 audit years and has been doing so for at least

a year now.

In its motion, PwC notes by way of background that the FDIC-R did not refer to pre-

2007 audit work in court papers and public documents about this litigation until "the very last

day to seek leave to amend its pleadings under the scheduling order." ECF 535 at 7. That is

untrue as stated above, and there is nothing sinister about moving for leave to amend the

pleadings within the Court's scheduling order, which the Court granted over Crowe's objections

of futility and prejudice. *See* ECF 279. PwC's point is unclear, as it has put forward no evidence

that it was prejudiced by the FDIC-R's amended allegations or that it detrimentally relied on

earlier pleadings.

The FDIC-R's pre-2007 claims are timely against PwC. PwC's motion should be denied.

**B. As to Crowe, the FDIC-R is entitled to seek damages beginning with the March 2006 financial statement.**

Apparently proceeding as though the TAC does not exist, Crowe seeks a summary

judgment ruling that the FDIC-R is not entitled to seek damages prior to March 2007 based on

the allegations of the SAC. *See* ECF 537 at 8. The addition of the 2005 and 2008 audit years

against Crowe in the TAC, however, was proper as those years clearly relate to the same

"conduct, transaction, or occurrence" as the 2006 and 2007 audit years. *See* Fed. R. Civ. P.

15(c)(1)(B).[18] Moreover, Crowe has failed to argue, much less prove, that it would be prejudiced by the addition of the 2005 and 2008 audit years.[19]

In any event, Crowe concedes that if this Court denies its Motion to Dismiss, the FDIC-R is entitled to seek damages beginning with the March 2006 financial statement, *i.e.*, the conclusion of the 2005 audit year. *See* 537 at 9, n.4. The parties are in agreement on this point.

███████████████████████████████████████████████████████████

███████████████████████████████████ *See* Ex. 11, ¶ 14; ECF 281, ¶¶ 5, 134. ██

███████████████████████████████████████████████████████████

████████████████████ Ex. 11, ¶14; *see also* ECF 281, ¶ 137. Presuming this Court holds to its prior determination (when it allowed the FDIC-R to amend its complaint), ECF 279, that the 2005 and 2008 audit years relate back to the prior complaint, the FDIC-R agrees with Crowe that it can only seek damages beginning with the March 7, 2006 (the conclusion of the 2005 audit year) financial report.

### III.   The FDIC-R is entitled to recover prejudgment interest.

"Prejudgment interest, as a legal matter, is intended to compensate injured parties both for the time value of lost money as well as for the effects of inflation. Thus, prejudgment interest is an element of complete compensation." *King v. CVS Health Corp.*, No. 1:12-CV-01715-KOB, 2016 WL 4157337, at *8 (N.D. Ala. Aug. 2, 2016) (quoting *Garner v. G.D. Searle Pharm. & Co.*, No. 290CV688-MHT, 2013 WL 568871, at *5 (M.D. Ala. Feb. 14); *Loeffler v. Frank*, 486

---

[18] In earlier briefing, Crowe argued that the FDIC-R "has stated that the relevant portions of the federal and Alabama relation-back rules are 'substantially similar.'" *See* ECF 369 at 10 n.5. Although the FDIC-R did note that federal and Alabama rules were similar, it unequivocally stated that federal, not Alabama, law applies to this question. *See* ECF 248 at 19 n.10. For this reason, the Alabama authority that Crowe relies upon is non-binding. *See, e.g.,* ECF 369 at 10 (citing *U.S. Steel Corp. v. McGehee*, 80 So. 2d 256, 258 (Ala. 1955)).

[19] Indeed, as the FDIC-R pointed out in its Reply in Support of its Motion for Leave to File the TAC, ECF 248, the FDIC-R did not have Crowe's workpapers in a searchable form until August 2015, just three months before the FDIC-R sought leave to amend its complaint. *See id.* at 4-5.

U.S. 549, 558 (1988)). Like other elements of compensatory damages, prejudgment interest is "designed to make the plaintiff whole by reimbursing him or her for the loss or harm suffered." *Ex parte Goldsen*, 783 So. 2d 53, 56 (Ala. 2000) (internal quotation marks omitted). Without prejudgment interest, the FDIC-R cannot be made whole. *See Carrier Exp., Inc. v. Home Indem. Co.*, 860 F. Supp. 1465, 1488 (N.D. Ala. 1994) ("The plaintiff has been deprived of the use of its money due to defendant's conduct, and prejudgment interest must be awarded in order to restore plaintiff to the position in which it would have been but for defendant's wrongful conduct.").

Under Alabama law, regardless of whether a claim sounds in tort or in breach of contract, prejudgment interest is proper where the damages are capable of being made certain. *See Braswell v. Conagra, Inc.*, 936 F.2d 1169, 1177 (11th Cir. 1991) (applying Alabama law) ("[P]rejudgment interest may be awarded on compensatory damages in fraud or breach of contract claims so long as the damages are a sum capable of being made certain."); *see also* ECF 535 at 21 (quoting *Nelson v. AmSouth Bank, N.A.*, 622 So. 2d 894, 895 n.1 (Ala. 1993) ("[T]he contract and tort rules governing the payment of prejudgment interest are substantially the same."). Accordingly, the only question before the Court is whether the FDIC-R's damages "are capable of being made certain." *See Nelson*, 622 So. 2d at 895, n.1 (Contract and tort claims "both require as a prerequisite to the payment of prejudgment interest that the damages be certain or that they be capable of being made certain."). In this case, where the FDIC-R, as a result of its reasonable reliance on the Defendants' negligent conduct, suffered damages that are "capable of being made certain," an award of prejudgment interest is entirely appropriate. *See U.S. Bank Nat'l Ass'n N.D. v. Tompkins & Somma LLC*, No. 2:09-CV-1823-AKK, 2012 WL 4343821, at *5 (N.D. Ala. Sept. 13) ("Given that the very nature of mortgage fraud concerns a lender extending a sum certain of money due to reasonable reliance on misrepresentations,

compensatory damages fit within the paradigm of *Braswell* and *Lapeyrouse*" meriting an award of prejudgment interest.).

### A. The FDIC-R's damages are capable of being made "certain," such that an award of prejudgment interest is appropriate.

The Defendants' basic argument is that, because the FDIC-R's damages are purportedly difficult to calculate, the FDIC-R is not entitled to prejudgment interest. *See* ECF 535 at 22-30; ECF 537 at 24-27.[20] That is not the law. *See, e.g.*, *Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 397 (3d Cir. 2016) ("[W]hile we are not unmindful of the challenges related to calculating prejudgment interest in this case . . . difficulty in calculating prejudgment interest is generally not a basis to deny an interest award."); *Hutchison v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1047 (7th Cir. 1994) (holding that "uncertainty" in calculating prejudgment interest does not "defeat the presumption in favor of prejudgment interest" and "[i]t is not within the district court's discretion to deny the whole award of interest because of . . . calculational ambiguities"); *Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1299 (7th Cir. 1987) ("No purpose would be served by allowing the wrongdoer to keep the entire time value of the money, just because the exact amount is subject to fair dispute. Once we know that [damages are] at least some minimum, it is safe to award interest on that amount."); *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996) ("To deny prejudgment interest based on calculation difficulties alone would be error.").

---

[20] PwC relies on *Martin v. Tolson*, 562 So. 2d 217 (Ala. 1990), in support of its assertion that Malek's "extensive accounting [] defeats a claim for prejudgment interest." *See* ECF 535 at 24. The court in *Tolson*, however, declined to award prejudgment interest as a matter of equities because "there was evidence that much of the delay involved was attributable to the [plaintiffs] and that the [plaintiffs] did not elect to take prejudgment interest until almost three years after the dissolution. . . . It would be inequitable to force [the defendant] to pay over three years' interest on a sum that had been uncertain until judgment, where he was not responsible for the delay." 562 So. 2d at 220. Additionally, the *Tolson* court expressly noted that "*the question whether interest should be allowed or disallowed depends to a large extent upon the circumstances of the particular case*, and no unbending rule can be laid down which will not in individual cases work great injustice . . . ." *Id.* at 219. Similar facts are not present here.

Thus, so long as the FDIC-R's damages "are capable of being made certain," the FDIC-R is entitled to an award of prejudgment interest. Indeed, as set out below, under Alabama law, a plaintiff's damages need not be quantified in the complaint, free from factual disputes or fixed before trial to justify an award of prejudgment interest. It is entirely appropriate for the calculation to necessitate that an expert make reasonable estimates, the jury make factual determinations, or the Court render legal rulings. *See, e.g.*, Ala. Code § 8-8-8 (allowing prejudgment interest on "[a]ll contracts, express or implied, for the payment of money, or other thing, or for the performance of any act or duty . . . from the day such money, or thing, *estimating* it at its money value, should have been paid, or such act, *estimating* the compensation therefor in money, performed") (emphasis added). ███████████████████████

████████████████████████████████████████████████████

███

### 1.   *Courts may base prejudgment interest on damages determined at trial.*

To justify an award of prejudgment interest, a plaintiff's damages need not be quantified in the complaint, free from factual disputes, or fixed before trial. *See, e.g.*, *S. GEO-Envtl. Consultants, Inc. v. Herzog*, No. CIV. A. 09-0127-WS-N, 2009 WL 3756988, at *1 (S.D. Ala. Nov. 5, 2009) (awarding prejudgment interest in a case in which the complaint's "ad damnum clause for the contract claim reflected that plaintiffs sought 'compensatory damages in excess of the jurisdictional minimum,' as well as interest, fees and costs; meanwhile, the tort claims included demands for all of those categories of relief, plus punitive damages"); *Carrier Exp., Inc. v. Home Indem. Co.*, 860 F. Supp. 1465, 1487 (N.D. Ala. 1994) ("That a question of fact existed for the jury to decide regarding the amount, if any, to which Carrier was entitled does not

extinguish the plaintiff's right to prejudgment interest.").[21]

On the contrary, prejudgment interest can be awarded even if the jury must decide certain key facts *before* the damages calculation can be completed. For instance, in *Lapeyrouse Grain Corp. v. Tallant*, a group of farmers brought suit against two grain corporations for selling the farmers' grain without allowing the farmers to select the date of sale. 439 So. 2d 105, 107 (Ala. 1983). At trial, the farmers presented evidence of "wheat prices per bushel between the date of the cause of action and the trial date," and "the jury reached a factual conclusion from the evidence as to the price differential" between the price the farmers received and the price they might have received by selling their wheat on a different date. *Id.* at 109, 112. After the factual determination was made by the jury, "the compensatory loss could be fixed by a simple mathematical computation." *Id.* at 112. Thus, despite this need for a factual determination prior to the mathematical computation, the Court found that prejudgment interest was appropriate. *Id.*

Indeed, prejudgment interest can be awarded even if the damages calculation depends on the result of other cases. In *Nelson v. AmSouth Bank, N.A.*—which the Alabama Supreme Court found to be "materially indistinguishable from *Lapeyrouse Grain Corp. v. Tallant*"—the plaintiff

---

[21] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████ *See Maddox v. Alfa Mut. Ins. Co.*, 577 So. 2d 457, 459 (Ala. 1991) (reversing a judgment for failure to award prejudgment interest after the amount of disputed damages was determined at trial); *Hand Arendall, LLC v. Joiner*, No. CIV.A. 10-0150-KD-C, 2012 WL 4323190 (S.D. Ala. Sept. 20) (awarding prejudgment interest because damages were "reasonably certain" after court ordered plaintiff to amend its request for damages to conform to the court's findings).

███ Again, complexity does not equal uncertainty, ECF 535 at 23-25. *See State ex rel. Hayes v. Hayes*, 620 So. 2d 49, 53 (Ala. Civ. App. 1993) *abrogated on other grounds by T.L.D. v. C.G.*, 849 So. 2d 200 (Ala. Civ. App. 2002) ("Mrs. Hayes contends that it is possible to calculate the interest which accrued on the judgments and that the complexity of the task should not deprive her of her statutory right to judgment interest. We agree.").

sought 100% of the proceeds of a bank account. 622 So. 2d at 896. The amount to which the plaintiff was entitled remained in dispute until a decision was reached in a related case and the plaintiff was awarded 50% of the proceeds of the account. *Id.* Based on the result in the related case, the Alabama Supreme Court determined the plaintiff was entitled to prejudgment interest on 50% of the proceeds because the amount of interest could be made certain by calculation. *Id.* As in *Nelson*, the composition of the FDIC-R's recovery in this case may depend to some degree on verdicts and settlements reached in other cases, but it is nevertheless "capable of being made certain."

Prejudgment interest also can be awarded where damages calculations are complicated by factual issues. In *Miller & Co. v. McCown*, a landowner brought suit against a timber company for breaching a contract that required the company to harvest timber in a particular manner. 531 So. 2d 888, 888-89 (Ala. 1988). The trial court appointed a special master to determine damages "due to the 'complicated' and 'exceptional' issues and 'specific problems in the area of timber cruises and the timber business.'" *Id.* at 889. The special master's report acknowledged that the plaintiff and defendant put forth damages estimates with "extreme differences," but concluded that the plaintiff's survey would allow him to calculate a "reasonably accurate" damages assessment. *Id.* The Alabama Supreme Court affirmed the award of prejudgment interest to the landowner because "[o]nce the master reached the factual conclusion from the evidence as to the volume of unmarked and unauthorized trees cut, the loss to the landowners could be fixed by a simple mathematical computation . . . ." *Id.* at 889-90.

In *Braswell v. ConAgra*, chicken growers brought suit against ConAgra for manipulating a weighing process that determined how much the growers were paid. 936 F.2d at 1172.

> ConAgra employees used the following procedure to determine the payment due each grower: (1) they weighed the truck to obtain the 'gross weight'; (2) they

> removed the broilers and weighed the truck again to establish the 'tare weight'; and (3) they subtracted the tare weight from the gross weight to determine the 'net weight' of the broilers. ConAgra then paid the growers according to the net weight, using a formula that accounted for the weight gained by the broilers and the amount of feed used by the grower.

*Id.* To calculate the compensatory damages due to the growers, the growers' expert, Dr. Davis,

> analyzed more than 45,000 ConAgra weight tickets to determine a 'reasonable' tare weight for each truck and used that figure to estimate the total amount of misweighing. He then averaged all other loads for that particular trailer and subtracted the reasonable tare from the average load to arrive at the average amount misweighed per load. Dr. Davis then multiplied the average amount misweighed per load by the total number of loads to arrive at the total pounds of broilers allegedly misweighed.

*Id.* at 1175.[22] ConAgra argued on appeal that prejudgment interest should not have been awarded to the growers because "the compensatory damages were not a sum capable of being certain." *Id.* at 1177. The Eleventh Circuit, however, agreed with the trial court's finding that, despite "misweighing scenarios presented by the plaintiffs and the defendant [that] differed sharply over the alleged volume of misweighing, once the jury heard the evidence and determined the volume of misweighing, the jury could ascertain compensatory damages by simply using the contract formula ConAgra employed to pay the growers." *Id.* Accordingly, the Eleventh Circuit affirmed the award of prejudgment interest because the jury was able to assess the evidence of damages and expert opinions offered by the parties and then "calculate compensatory damages by the application of a mathematical formula." *Id.*

<blockquote>2. <em>The FDIC-R's damages are sufficiently certain to justify an award of <u>prejudgment interest</u>.</em></blockquote>

Accordingly, prejudgment interest is appropriate even if the damages calculation requires experts to make reasonable estimates, juries to make factual determinations, or courts to issue

---

[22] ████████████████████████████████████████████████████████████████████████████████████ .

legal rulings. Under this framework, the FDIC-R's damages are clearly certain enough to support an award of prejudgment interest. *See* Malek Report, attached as Ex. 12.



The Defendants should not benefit from allowing a large, complex fraud to flourish, rather than a small, simple fraud in which damages might have been more easily calculated.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████.[24]

Thus, while Malek's calculations may depend on certain factual and legal determinations, the calculations themselves are simple and will enable the factfinder to determine the FDIC-R's damages with reasonable certainty such that the FDIC-R is entitled to an award of prejudgment interest.

Furthermore, the vast majority of Malek's calculations of the FDIC-R's damages are also not in dispute. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[24] ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████



criticism does not create any legitimate dispute over the extent of the FDIC-R's damages.

27 The Defendants also make much of the fact that the FDIC-R's ultimate damages calculation differed from its Rule 26 disclosures, but that is no basis to deny prejudgment interest. As discovery proceeded and the professionals had the time to review the underlying data, more precise and accurate calculations of damages were possible.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████ The Defendants

cannot evade prejudgment interest because the FDIC-R's damages expert carefully and

thoroughly calculated reductions in the FDIC-R's damages—reductions that are not even

contested.

**B. The fact that the FDIC-R's other sources of recovery may reduce the *judgment* entered against either Defendant has no impact on the ascertainability of the FDIC-R's *damages*.**

Both Crowe and PwC argue that the FDIC-R is not entitled to an award of prejudgment interest because the FDIC-R may recover money from other sources. *See* ECF 535 at 26-28; ECF 537 at 26-27. Aside from only going to whether the FDIC-R's damages are "unliquidated," which is irrelevant to the prejudgment interest analysis under Alabama law, *see infra* Section III.C, both Defendants confuse a determination of *damages* with the amount of an ultimate *judgment*. *See id.* While the final *judgment* entered against each Defendant (*i.e.* the amount of money owed) may be impacted by the FDIC-R's ability to recover money from other sources, the *damages* caused by the Defendants' negligence is not. The question with regard to prejudgment interest is the ascertainability of *damages*, not the judgment.[28] The fact that either of the Defendants may enjoy a reduction in the final judgment entered against it based on a setoff has nothing to do with whether the FDIC-R's damages are capable of being made certain.[29]

---

[28] PwC's reliance on cases from *comparative* fault jurisdictions, *i.e.*, *Imark Indus., Inc. v. Arthur Young & Co.*, 414 N.W.2d 57 (Wis. Ct. App. 1987), *rev'd in part*, 436 N.W.2d 311 (1989)*; Chevron Chem. Co. v. Deloitte & Touche*, 483 N.W.2d 314 (Wis. Ct. App. 1992), *aff'd and remanded*, 501 N.W.2d 15 (1993), *see* ECF 535 at 27-28, is wholly misplaced. While a rule that "preverdict interest is prohibited in cases where the existence of multiple defendants prevents any single defendant from knowing prior to trial the precise amount of his ultimate liability" might make sense in a comparative fault jurisdiction, such a rule has no force, persuasive or otherwise, in a joint-and-several-liability jurisdiction like Alabama. *See* Wis. Stat. Ann. § 895.045(1) ("The liability of each person found to be causally negligent whose percentage of causal negligence is less than 51% is limited to the percentage of the total causal negligence attributed to that person."). In Alabama, one defendant among many need not worry about the "precise amount of his ultimate liability." *Imark Indus.*, 414 N.W.2d at 68. In this state, "[i]f the separate acts of two or more tortfeasors combine to cause an indivisible injury, then all actors are jointly and severally liable for that entire injury." *Admiral Ins. Co. v. Price-Williams*, 129 So. 3d 991, 1002-03 (Ala. 2013).

[29] PwC also relies on a 1922 case for the proposition that prejudgment interest can only be awarded when the "amount due and time of payment [are] known to the debtor." ECF 535 at 28-29 (citing *Grand Bay Land Co. v. Simpson*, 92 So. 789, 791 (Ala. 1922)). *Simpson*'s "known to debtor" requirement, however, appears to apply, if at all, only in the context of a contract claim. *See Jernigan v. Happoldt*, 978 So. 2d 764, 767 (Ala. Civ. App. 2007) (mentioning the "known to debtor" standard in the context of interest on a breach of contract claim). Regardless, it makes no sense in this case or a host of other scenarios where prejudgment interest is clearly appropriate. Again, the fact that the damages are difficult to ascertain does not make them unascertainable, and the fact that the amount a defendant ultimately *owes* may be reduced by a setoff does not change the amount of the FDIC-R's damages—the only relevant inquiry for purposes of determining whether a party is entitled to an award of prejudgment interest.

PwC's other cases, *Roe v. Baggett Transp. Co.*, 326 F.2d 298 (5th Cir. 1963); *Belcher v. Birmingham Trust Nat'l Bank*, 488 F.2d 474 (5th Cir. 1973); and *Goolesby v. Koch Farms, LLC*, 955 So. 2d 422 (Ala. 2006), ECF 535 at 29-30, are likewise unhelpful. *Roe* involved circumstances in which damages were determined not by calculation, but by *settlement*. *See Roe*, 326 F.2d at 300-01. In similar but more extreme examples, the plaintiffs in *Belcher* and *Goolesby* were denied prejudgment interest because they failed to calculate their damages or introduce essential evidence as to the amount of damages. *See Belcher*, 488 F.2d at 477 ("Nevertheless the problem remains: we are

### C. The insurance and liquidated damages cases cited by the Defendants are inapposite.

In an attempt to confuse the issue, the Defendants rely on inapposite insurance and liquidated damages cases. First, the Defendants rely on *U.S. Fid. & Guar. Co. v. German Auto, Inc.,* 591 So. 2d 841 (Ala. 1991), for the prejudgment interest standard. *See, e.g.*, ECF 535 at 21-22, 29 (citing *Alfa Mut. Ins. Co. v. Beard*, 597 So. 2d 664 (Ala. 1992) and *German Auto, Inc.,* 591 So. 2d 841 (Ala. 1991)); ECF 537 at 26 (citing *German Auto*). These cases involve *insurance claims* and are clearly inapplicable.[30] The *German Auto* court "rel[ied] on the rationale of the Court in *LeFevre*," which in turn based its holding on *State Farm Mut. Auto. Ins. Co. v. Reaves*, 292 So. 2d 95, 96 (Ala. 1974), *overruled by State Farm Mut. Auto. Ins. Co. v. Wallace*, 743 So. 2d 448 (Ala. 1999), and *State Farm Mut. Auto. Ins. Co. v. Bradley*, 309 So. 2d 826, 827 (Ala. 1975). *See German Auto*, 591 So. 2d at 843; *LeFevre v. Westberry*, 590 So. 2d 154, 163 (Ala. 1991). *Reaves* and *Bradley*, like *LeFevre*, dealt solely with uninsured motorist coverage. *See Reaves*, 292 So. 2d at 96 ("The primary question presented by this appeal is whether the trial court erred in ruling that the policy exclusion of uninsured motorist coverage . . . is void as violative of Alabama's Uninsured Motorist Statute . . . ."); *Bradley*, 309 So. 2d at 827 ("This case involves the question of 'stacking' uninsured motorist coverage . . . ."); *LeFevre*, 590 So. 2d

---

unable to conclude that the district court did not consider the unsupported $16,000 in reaching its conclusion to award a total of $58,300."); *Goolesby*, 955 So. 2d at 429 ("On appeal, the Goolesbys argue that the amount of their loss was determinable at the time of breach. However, they neither identify that amount nor explain how the parties should have been able to determine it at the time of breach.").

[30] The Defendants, particularly Crowe, also misstate the holding in *German Auto* in claiming that, ███████ ████████████████████████████████████████████████████ *See* ECF 537 at 26. Nothing in *German Auto*, 591 So. 2d 841, however, holds that documents discovered as part of a fraud cannot be used in calculating damages. █████████████████████████████████████████████████████████████████████████████████████

at 155 ("This is an uninsured motorist case."). In Alabama, uninsured motorist coverage is an area of law unto itself for which the Alabama Supreme Court has fashioned unique rules governing awards of prejudgment interest. *See Wallace*, 743 So. 2d at 450 (overruling *Reaves* and establishing narrow limits for awarding prejudgment interest under uninsured and under-insured motorist policies). The precepts developed in the context of uninsured motorist insurance are not applicable to contract and tort claims generally.

Moreover, as a general matter, a claim on an insurance policy clearly involves multiple variables that cannot be "made certain." For instance, the jury may be tasked with determining what items of loss are covered under the policy, how much a given loss is worth, whether the insured is entitled to unquantifiable personal relief like mental distress or loss of consortium damages and, if so, the amount of such awards. Indeed, PwC's own citation to *German Auto* shows that, in that case, the damages were not capable of being made certain because the parties disputed which "items of loss" were recoverable under the policy. ECF 535 at 21-22; *see also LeFevre*, 590 So. 2d at 163 (agreeing that "because of the *many variables* involved in evaluating and agreeing upon a settlement involving compensation for personal injuries that the amount, if any, owed by the defendant under the uninsured motorist coverage of plaintiff's insurance policy was not capable of being ascertained at the time State Farm received notice of the claim and that no prejudgment interest is or was due to plaintiff") (emphasis added). Similar variables are not present here. The FDIC-R is not seeking various types of unquantifiable damages under an insurance policy. On the contrary, it is seeking damages for the losses it sustained as a result of the Defendants' failure to detect the underlying fraud, which "is capable of being ascertained."

In a further attempt to obfuscate the applicable test, the Defendants argue that damages must be liquidated for prejudgment interest to be appropriate. ECF 535 at 21-22; ECF 537 at 25-

27. That is not true. *See Braswell*, 936 F.2d at 1177 ("Alabama law also permits an award of prejudgment interest in cases of fraud where the *unliquidated damages* may be ascertained by mere computation or where the damages are complete at a given time so as to be capable of determination at such time in accordance with known standards of value.") (emphasis added); *Mobile & O.R. Co. v. Williams*, 121 So. 722, 730 (Ala. 1929) ("It is often stated that interest is not allowed on unliquidated demands. But this is not in all cases an accurate statement, for upon unliquidated demands interest is allowed before judgment when (a) the amount is capable of ascertainment by mere computation; and (b) whenever it appears that the damage was complete at a particular time and is to be determined as of such time in accordance with fixed rules of evidence and known standards of value."). "[P]rejudgment interest may be awarded on compensatory damages in fraud or breach of contract claims so long as the damages are a sum capable of being made certain." *Tompkins & Somma LLC*, 2012 WL 4343821, at *4. Accordingly, the Defendants' citation to *Grant Thornton, LLP v. FDIC*, 435 F. App'x 188 (4th Cir. 2011), ECF 535 at 27-28; ECF 537 at 27, is misplaced. The court in *Grant Thornton* was applying **West Virginia** law—specifically, a West Virginia statute that allows prejudgment interest *only* on liquidated or special damages. *See* 435 F. App'x at 208-09 (citing W.Va. Code § 56-6-31). Alabama law does not have a similar restriction.

The FDIC-R's damages can, in fact, be calculated using a known standard. Accordingly, prejudgment interest can and should be awarded under Alabama law to make the FDIC-R whole.

## IV.    As to PwC, the FDIC-R's wantonness claim (Count VII) is not barred by the doctrine of judicial estoppel.

PwC argues that the FDIC-R's wantonness claim (Count VII), as well as the FDIC-R's claims for professional negligence, gross negligence, breach of contract, and negligent misrepresentation to the extent they are based on the argument that accounting for COLB

transactions as asset purchases was improper, are due to be dismissed or subject to summary judgment in PwC's favor under the equitable defense of judicial estoppel. ECF 535 at 18-19. PwC first made this argument in its Motion to Dismiss the FDIC-R's TAC, which is now fully briefed and incorporated into PwC's motion for summary judgment. *Id.* at 19 (incorporating memorandum, exhibits and reply in support of motion to dismiss, ECF 306, 307 and 379).

As the FDIC-R argued in its opposition to PwC's motion to dismiss, ECF 328 (which the FDIC-R fully incorporates here), however, PwC may not raise judicial estoppel as a defense. And, even if PwC could invoke judicial estoppel, it has failed to show that the FDIC-R took a clearly inconsistent position in the TBW bankruptcy proceedings or that the court in those proceedings actually accepted any position of the FDIC-R.

### *Relevant Background*

Colonial Bank's MWLD provided short-term, secured financing to various mortgage originators. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Ex. 39 at 121-22; Ex. 51. The PCAOB standards state: "Generally accepted accounting principles recognize the importance of recording transactions and events in accordance with their substance. **The auditor should consider whether the substance of transactions or events differs materially from their form**." Ex. 55 (emphasis added). Thus, PwC had a responsibility to consider the substance of the COLB transactions before determining how FAS 140 applied to those transactions.

As the FDIC-R learned in discovery in this case, ████████████████



███████████████████████████████████

In other words, in economic substance, the transaction was a loan and PwC knew it. ██

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

As PwC well knew, its cover-up of the truth enabled Colonial to continue its disastrous relationship with TBW and allowed that relationship to grow over $2 billion larger than it would have been had PwC applied FAS 140 correctly. When the Colonial-TBW relationship ended in the failure of Colonial and the bankruptcy of TBW shortly thereafter, PwC's wanton conduct had resulted in Colonial being TBW's largest creditor.

Less than two weeks after Colonial closed and the FDIC was appointed receiver, TBW filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division. *See In re Taylor, Bean & Whitaker Mortg. Corp.*, Case No. 3:09-bk-7047 (Bankr. M.D. Fla.), petition filed August 24, 2009. TBW's largest creditor, the FDIC-R, filed a Proof of Claim in the bankruptcy proceedings. ECF 307-3 at 6:20-23; ECF 307-2. The Proof of Claim asserted the legal terms of the COLB ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

47

████████████████  Alternatively, the FDIC-R asserted a 99% secured interest in the loans. ECF 307-2, ¶ 8.

The FDIC-R and TBW negotiated a settlement over the COLB loans, among other assets. As part of the settlement, TBW agreed not to dispute that the FDIC-R was entitled to the 99% participation interest in COLB loans. ECF 307-5, § 1.2. TBW moved the bankruptcy court to approve the settlement agreement. ECF 307-6. After a hearing on TBW's motion, ECF 307-3, the bankruptcy court approved the settlement agreement, ECF 307-7.

### *Legal standard*

For judicial estoppel to apply, PwC must establish that: (1) the FDIC-R's "position" in this case was clearly inconsistent with its "position" in the TBW bankruptcy proceedings; (2) the FDIC-R "succeeded" in persuading the bankruptcy court to accept its position; and (3) the FDIC-R derives an unfair advantage or imposes an unfair detriment on PwC if not estopped. ECF 328 at 4-5. For the reasons stated below and in the FDIC-R's opposition to PwC's Motion to Dismiss, ECF 328, PwC cannot satisfy these requirements.

### *Argument*

The FDIC-R's efforts to recover COLB loans in TBW's bankruptcy should not judicially estop the FDIC-R's pursuit of the damages PwC caused when it negligently and wantonly accounted for the COLB loans as sales under FAS 140—damages that are entirely independent of the COLB loans that the FDIC-R recovered from TBW when it went bankrupt.

> **A. PwC should not be allowed to invoke the doctrine of judicial estoppel in this case because it was responsible for the FDIC-R's need to negotiate a settlement with TBW.**

Because PwC is responsible for the FDIC-R's presence at the negotiating table with TBW, it would be unfair to allow PwC to raise the defense of judicial estoppel to relieve it of

liability for wanton conduct that caused billions in damages to the FDIC-R. *See* ECF 328 at 6-8. PwC concedes that judicial estoppel is an equitable defense, ECF 379 at 2-3, but nonetheless argues that the Court should ignore PwC's own misconduct and apply judicial estoppel as "a sword of the defense bar, rather than a shield of judicial integrity." *Thompson v. Quarles*, 392 B.R. 517, 529 (S.D. Ga. 2008).

PwC attempts to distract from its own culpability by implying that, because the FDIC-R recovered $700 million in assets in the TBW bankruptcy, any recovery in this lawsuit must be unfair. ECF 379 at 1-2; ECF 535 at 19. To be clear, the FDIC-R does not seek a windfall or double recovery here. The $2 billion in damages that the FDIC-R seeks to recover in this case is entirely separate from what the FDIC-R was able to recover from TBW through settlement negotiations. Because Alabama law requires that PwC must be held accountable for the damages it proximately caused as a result of its malpractice, PwC should not be allowed to raise the equitable defense of judicial estoppel. *Colonial BancGroup, Inc. v. PricewaterhouseCoopers, LLP*, No. 2:11-CV-746-WKW, 2014 WL 4444148, at *3 (M.D. Ala. Sept. 9) ("Alabama law imposes on accountants a 'duty to exercise reasonable professional care . . . .'") (quoting *Blumberg v. Touche Ross & Co.*, 514 So. 2d 922, 925 (Ala. 1987)).

> **B.   Even if the Court concludes that PwC may invoke judicial estoppel, PwC has not satisfied any of the factors that courts traditionally consider when deciding whether to apply the doctrine.**

> *1.   The FDIC-R has not taken clearly inconsistent positions.*

Judicial estoppel also does not apply because the FDIC-R has not taken clearly inconsistent positions in the TBW bankruptcy and this case. *See* ECF 328 at 8-9. The FDIC-R filed a proof of claim in the TBW bankruptcy that asserted legal rights that appeared on the face of the COLB agreements, along with other theories of recovery. ECF 307-2. The FDIC-R, in this

case, asserts that PwC was wanton and negligent when it failed to appropriately consider the economic substance of the COLB transactions and instead manufactured false audit evidence to support a foregone conclusion that the transactions satisfied FAS 140. ECF 281, ¶¶ 4-10, 59-72, 113(c)-(d), 115-18, 139-40. The two positions are neither in conflict nor mutually exclusive, as the FDIC-R's legal rights under the agreements are separate and apart from the economic substance of those agreements. In other words, the dispute between the FDIC-R and the TBW trustee was not about sales accounting, it was about who had superior rights to the COLB loans in bankruptcy. It was certainly conceivable that the FDIC-R could have superior rights to the COLB loans to those of the TBW trustee without the COLB loans qualifying for sales accounting treatment.

Moreover, contrary to what PwC argues, the FDIC-R's wantonness and malpractice claims against PwC in no way undermine or threaten to unravel the settlement agreement the FDIC-R reached with TBW. *See* ECF 379 at 8 (noting the "need for finality" in bankruptcy proceedings). If the FDIC-R succeeds in this lawsuit, the rights of TBW or its creditors are not implicated or undermined in any way. Contrary to what PwC argues, *Adelphia Recovery Trust v. Goldman, Sachs & Co.*, 748 F.3d 110 (2d Cir. 2014), does not hold otherwise. ECF 379 at 7-8. In that case, a successor to a debtor claimed to own assets that the debtor had never claimed to own in its bankruptcy proceedings. For the successor to succeed on its claim to those assets, various schedules and the Chapter 11 plan that the debtor had agreed to in proceedings that had long since closed would have to be unraveled. That is not the case here. Here, the FDIC-R does not seek to renege on the settlement agreement that it reached with TBW or unravel the bankruptcy plan. In fact, the outcome of this litigation has no impact whatsoever on the size or finality of TBW's estate. The TBW bankruptcy settlement is only relevant to this case because PwC has

invoked it as a sword in defense of its own liability.

> 2. *The FDIC-R did not succeed in persuading the bankruptcy court to* <u>*accept its position*</u>.

Even if the FDIC-R did take an inconsistent position in the TBW bankruptcy, the FDIC-R did not succeed in persuading the bankruptcy court to accept its position. ECF 328 at 10-12. A review of the relevant bankruptcy court orders quickly reveals that it is simply untrue that the bankruptcy court "endorsed" any position of the FDIC-R's, much less a position related to the accounting treatment of the COLB transactions, as PwC claims. *See* ECF 379 at 9. PwC concedes that "**the bankruptcy court never made an independent legal finding that the COLB transactions were purchases**." *Id*. (emphasis added). The only "position" advocated by the FDIC-R that the bankruptcy court ruled on was that the settlement agreement satisfied the requirements of Bankruptcy Rule 9019. *See* ECF 328 at 11-12.

Contrary to what PwC claims, the Eleventh Circuit's decision in *Ward v. AMS Servicing, LLC,* 606 F. App'x 506 (11th Cir. 2015), does not control here. ECF 379 at 10-12. In *Ward*, the plaintiff had renegotiated the terms of her monthly mortgage payments with the owner of her mortgage when she was a debtor in Chapter 13 bankruptcy proceedings. Under the terms of the parties' consent decree, Ward, the debtor, agreed to make monthly payments of $1,319.50. Soon thereafter, Ward sued the servicer of her mortgage for overcharging her. Ward argued that her monthly payment was supposed to be only $1,182.89, but the mortgage servicer charged her $1,319.50. The servicer moved to dismiss Ward's complaint because she had stipulated and consented to the amount of her monthly payments in her bankruptcy proceeding. Relying on judicial estoppel, the district court dismissed Ward's claim, and the Eleventh Circuit affirmed.

*Ward* is hardly "on point," as PwC argues. *See* ECF 379 at 10. An analogous situation would be if TBW sued the FDIC-R based on allegations that are expressly contradicted by the

terms of the stipulated settlement agreement that the parties reached in TBW's bankruptcy. Applying judicial estoppel on those facts would be fair and equitable. Unfortunately for PwC, the situation in *Ward* is not at all the situation in this case.[31]

### 3. The terms of the bankruptcy settlement reflect the parties' compromise position and are not a factual position advanced solely by the FDIC-R.

PwC ignores entirely the FDIC-R's argument that the terms of the TBW settlement were a product of compromise and not a factual "position" advanced solely by the FDIC-R. ECF 328 at 13-15. Counsel for the FDIC-R described the settlement negotiations with TBW this way: "potential litigants work[ed] through the process without the necessity of discovery, without motion practice and pleadings, and basically [came] to what the parties believed would be a fair and reasonable resolution without the necessity of actual litigation." ECF 307-3 at 44:16-22. Importantly, the FDIC-R did not know of the FAS 140 issue as an act of malpractice by PwC at the time of the settlement and was not yet aware of the evidence cited above demonstrating that the COLB transactions were loans instead of sales, ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████ PwC should not be allowed to stretch the equitable doctrine of judicial estoppel to such a degree.

---

[31] Nor is *Austin v. Alabama Check Cashers Ass'n*, 936 So. 2d 1014 (Ala. 2005) "on nearly all fours" as PwC claims. ECF 379 at 10 n.5. In that case, the State Banking Department sought to enforce the terms of a statute that it had previously agreed did not apply to check cashers. *Id.* at 1040. The Court applied judicial estoppel to prevent the Department from repudiating its earlier enforcement position to the "an unfair detriment on the check cashers." Similarly, *Bistro Exec., Inc. v. Rewards Network, Inc.*, No. CV 04-4640 CBM MCX, 2006 WL 6849825 (C.D. Cal. July 19, 2006), is not persuasive because the court there relied on the fact that the New Hampshire Supreme Court had "adopted almost verbatim" the defendants' description of certain transactions that they provided the court in its appellate brief. *Id.* at *4. Here, as PwC admits, the bankruptcy court made no such finding when it approved the settlement agreement.

In conclusion, PwC, the party responsible for billions of dollars in losses and the FDIC-R's need to negotiate with TBW as its largest creditor, should not be allowed to invoke the doctrine of judicial estoppel. PwC has failed to show that this Court should exercise its discretion to judicially estop the FDIC-R from arguing that PwC erroneously applied FAS 140 to the COLB transactions in this case. The Court should therefore decline to exercise its discretion to apply judicial estoppel and deny PwC's motion.

## V.   Crowe is not entitled to summary judgment on the FDIC-R/Colonial's claims based on terms of the engagement letters that are inapplicable to the FDIC-R.

Ever wanting to have its cake and eat it too, Crowe offers to take the Court to an alternate reality where, by its *own conduct*, Crowe has forced the FDIC-R/Colonial to become a "party" to Crowe's engagement letters (bound by all their terms) but also a "non-party" to those letters such that any damages the FDIC-R/Colonial sustained in reliance on Crowe's work were "not foreseeable" and, therefore, consequential and barred by the terms of the letters. *See* ECF 537 at 43-8. The FDIC-R/Colonial, however, cannot be a "party" to the contracts such that it is bound by their terms but then a "non-party" for the purposes of actually determining the effect of those terms on it. Crowe cannot have it both ways; either the FDIC-R/Colonial is "in" or it is "out." Here, there is no question that the FDIC-R/Colonial is "out" of the engagement letters, but, even if it were "in," its damages are clearly direct and Crowe's motion is due to be denied.

### A. Because the FDIC-R/Colonial is not a party to the Crowe engagement letters, the consequential damages limitation provisions are not applicable.

Crowe's entire argument—that it is entitled to summary judgment because the FDIC-R seeks only consequential damages—is premised on the FDIC-R/Colonial being bound by the terms of the engagement letters. The FDIC-R/Colonial, however, is not party to those agreements, as this Court has already determined in rejecting Crowe's first motion for summary

judgment against the FDIC-R based on the no-reliance provision. *See* ECF 453 at 6-7. Crowe, however, has filed a "Motion to Rule" seeking an order that the FDIC-R/Colonial is automatically bound by the terms of the engagement letters if waiver is found. ECF 479.[32] Thus, Crowe is first asking this Court to hold that, *through its own actions* in waiving its right to enforce the no-reliance provision, Crowe forced the FDIC-R/Colonial to accept all the terms of the engagement letters that it indisputably never signed. And then, even more incredibly, Crowe is asking this Court to insulate it from any liability because the FDIC-R/Colonial was *not* a party to the contract (so it cannot bring a breach-of-contract claim for direct damages) but, nevertheless, *is* bound by the no-consequential-damages provision such that its damages (which are consequential because it is not party to the contract) are barred. This party/non-party, "gotcha" argument should not be countenanced by the Court.

### B. Crowe's "Alice in Wonderland" argument wherein the FDIC-R/Colonial is, at Crowe's self-serving whim, simultaneously a party *and* a non-party to the engagement letters should be wholly rejected.

Crowe's own introductory paragraph illustrates the sheer incongruity of its argument. Crowe first notes that if the no-reliance provision is waived, "the FDIC must be bound by all of the contract terms"—*i.e.* it is a *party* to the agreement. ECF 537 at 3. Then, in its next breath, Crowe argues that the FDIC-R's damages are barred "for two fundamental reasons": (1) the FDIC-R/Colonial is a "*third party*"—*i.e.* now *not* a party to the agreement, and (2) the (previously waived) no-reliance clause means that it was not "highly probable" or "foreseeable"

---

[32] Crowe's "Motion to Rule" is meritless and should be denied for the reasons set out in the FDIC-R's Opposition, ECF 541, which the FDIC-R incorporates here by reference. Because the no-consequential-damages provision is irrelevant if it does not apply to the FDIC-R, denying Crowe's Motion to Rule will moot Crowe's motion here. Irrespective of Crowe's repeated protestations to the contrary, *see* ECF 544 at 1, n.1, the "Motion to Rule" is clearly a motion for summary judgment as Crowe is now trying to leverage a ruling on that issue into the dismissal of the FDIC-R's entire case against it. *See* ECF 537 at 8 ("If the FDIC is permitted to rely on Crowe's work, then its request for those damages are barred by the no-consequential-damages provision in Crowe's engagement letters.").

that Crowe would owe damages to Colonial, now a *non-party* to the agreement. *Id.* at 4. In other words, the FDIC-R/Colonial is a *party* to the engagement letters and bound by all terms when considering the restrictions and limitations of the contract but is a *non-party* to the engagement letters when considering the benefits of the agreement. Crowe cannot have it both ways. Moreover, Crowe's argument is, in effect, asking this Court to redraft both the terms of the engagement letters as well as the claims of the FDIC-R's TAC.

### 1. *Crowe is asking the Court to rewrite the terms of the engagement letter.*

As set out more fully in its Opposition to Crowe's "Motion to Rule," ECF 541, the fact that Crowe may have waived its right to enforce the no-reliance provision does not magically modify the terms of its engagement letters with CBG. The Court's has already ruled that the FDIC-R/Colonial is not a party nor a third-party beneficiary of those letters.[33] *Id.* at 4-6. Crowe's decision to *waive* its right to enforce a single term (the no-reliance provision) that might have otherwise blocked the FDIC-R's claims here does not somehow *alter* the terms of the agreement such that the FDIC-R/Colonial is pulled into the entire agreement.[34] The waiver simply paves the

---

[33] For the first time in its Reply in Support of its Motion to Rule, ECF 544, Crowe makes a veiled reference that perhaps the FDIC-R/Colonial was a third-party beneficiary of the engagement letters. *Id.* at 8. Crowe points to this Court's conclusion that there is evidence that Crowe "knowingly provided Colonial with its audit work with *the intent* that Colonial would rely on it." *Id.* (emphasis in original). Although Crowe does not elaborate on its position, it appears to be arguing that Crowe's *post-contract* conduct evidencing its *intent* that Colonial rely on its work somehow satisfies the stringent requirement that *both parties* to the contract intended <u>at the time the contract was created</u> to bestow a direct benefit on a third party. *See Locke v. Ozark City Bd. of Educ.*, 910 So. 2d 1247, 1250 (Ala. 2005). The Court has ruled that the *intent* of CBG and Crowe *at the time of contracting* is shown by the inclusion of the no-reliance provision—expressly foreclosing the possibility of a third-party beneficiary. Indeed, Crowe's own admission that it "does not" "accept[] all this" acknowledges that the Court's previous ruling forecloses the argument that the FDIC-R was an intended, third-party beneficiary of the engagement letters. ECF 544 at 8.

[34] In its Reply in Support of its Motion to Rule, ECF 544, Crowe claims that a party can be bound by the terms of a contract it never signs, *id.* at 2-3. The cases it cites, however, merely stand for the unremarkable proposition that a contract need not be reduced to a signed writing to be enforceable. *See, e.g.*, *Rush v. Atomic Elec. Co.*, 384 So. 2d 1067, 1068 (Ala. 1980) (finding a valid contract where there was a *signed* agreement between the agents of the corporations and clear conduct from the parties *ratifying* and *confirming* the contract); *Ex parte Rush*, 730 So. 2d 1175, 1178 (Ala. 1999) (finding that the plaintiffs' conduct showed acceptance of the terms of the contract even though they never signed it); *S. Energy Homes, Inc. v. Ard*, 772 So. 2d 1131, 1134 (Ala. 2000) (same). These cases certainly *do not* eviscerate black letter law that there must be both an offer and an acceptance—a

way for the FDIC-R's § 552 *tort* claim; it does not change the terms of the underlying agreement such that they now apply to the FDIC-R, nor does it somehow convert the FDIC-R's tort claims into contract claims such that the FDIC-R must prove that its damages fall within the "immediate scope" of that agreement. *See* ECF 537 at 4-8.

### 2. *Crowe is asking the Court to redraft the claims in the FDIC-R's TAC.*

Not only does Crowe's tortured argument require this Court to rewrite the engagement letters, but it also necessitates the redrafting of the FDIC-R's complaint, which clearly and properly asserts *tort* claims pursuant to § 552 of the Restatement (Second) of Torts. ECF 281, ¶¶ 119-127, 136-138. The FDIC-R proceeded under § 552 because Crowe supplied Colonial, a non-party to the contract, with audit work on which Crowe clearly knew Colonial would rely.[35] *See* ECF 453 at 9-10 (discussing § 552 standard under Alabama law and noting that an "accountant may be liable for negligently supplying false or incorrect information if a plaintiff justifiably relied on the information, and in so doing, suffered a loss").

Crowe, however, asks this Court to analyze the FDIC-R's damages as though they were

---

"meeting of the minds"—before there is a contract. *See Christian v. Rabren*, 273 So. 2d 459, 464 (1973) ("no binding contract can come into being until there is a meeting of the minds."). Here, where the Court has found that the engagement letters expressly exclude anyone other than the signatories, there could be no "meeting of the minds" with regard to anyone else. Per the Court's previous ruling, Crowe could not and did not make a formal, contractual "offer" to Colonial, and Colonial did not accept it. While it may be true that a valid, enforceable contract need not be reduced to a signed writing, that does not mean a party can be bound by the terms of an agreement it never accepted. Indeed, Crowe seems to agree that a contract is only enforceable if "it is *accepted*." ECF 544 at 2 (emphasis added). Additionally, Crowe disingenuously cites *Ex parte Dyess*, 709 So. 2d 447 (Ala. 1997), claiming that the court applied an arbitration provision to non-parties alleging tort claims. ECF 544 at 4. In truth, the *Dyess* Court held that the plaintiff was an *intended, third-party beneficiary* of the insurance policy such that he was bound by the provision. 709 So. 2d at 450-51. The *Dyess* Court did not apply the arbitration provision to a true non-party.

[35] ████████████████████████████████████████████████████████████████

*breach-of-contract* damages, citing back to this Court's order regarding *CBG's* damages—which clearly flow from Crowe's breach of "the only contracts that Crowe signed." *See* ECF 537 at 4-8. Indeed, Crowe cites *Westlake Fin. Grp., Inc. v. CDH-Delnor Health Sys.*, 25 N.E.3d 1166 (Ill. App. Ct. 2015) for the proposition that "economic harm beyond the immediate scope" of the contract constitutes "consequential damages." ECF 537 at 4 (quoting *Westlake*, 25 N.E.3d at 1175).[36] This may be true in a *breach-of-contract* case—which *Westlake* was—but has no bearing on a § 552 *tort* claim. Crowe is attempting to foist not only the terms of the engagement letters on the FDIC-R, but also the burdens of proving a *breach-of-contract* claim. Accordingly, it is of no moment whether the "damages that the Bank allegedly incurred derive precisely from 'economic harm beyond . . . the immediate scope' of the only contracts that Crowe signed—with CBG." ECF 537 at 4. That is the test for whether damages are consequential in a breach-of-contract claim. The FDIC-R asserted *tort* claims under § 552, and Crowe cannot recast the FDIC-R's allegations to better fit its defense strategy.

Indeed, the entire purpose of § 552 is to allow a *non-party* to a contract to bring suit against a professional when that professional "negligently suppl[ies] false or incorrect information" and the non-party "relied on the information, and in so doing, suffered a loss." ECF 453 at 10 (citation omitted). Section 552 exists to fill the gap when a plaintiff *does not* have a contractual remedy against a professional.[37] And, while Crowe may be able to cite cases where

---

[36] Crowe's other case similarly deals with the standard for proving damages on a *breach-of-contract* claim. *See* ECF 537 at 4-5 (citing *Atlantic City Assocs. v. Carter & Burgess Consultants*, 453 F. App'x 174, 179 (3d Cir. 2011).

[37] While it is certainly true that § 552 exists to allow a plaintiff with no contractual remedy to sue a professional for negligence, under Alabama law, a plaintiff who is party to a contract may bring *both* a breach of contract claim and a claim under § 552 for a professional's negligence. *See* ECF 72 at 8 (citing *Blumberg v. Touche Ross & Co.*, 514 So. 2d 922, 925 (Ala.1987) ("In Alabama, one who contracts with another and expressly promises to use due care is undoubtedly liable in both tort and contract when his negligence results in injury to the other party. He is liable in contract for breaching an express promise to use care. He is liable in tort for violating the duty

similar no-reliance provisions *block* a § 552 claim, it cites no cases where a party is permitted to proceed under § 552 and yet bound by the terms of an underlying contract to which the Court has ruled it was not a party or intended beneficiary.

> 3. *Crowe cannot make the FDIC-R a **party** to the engagement letters when <u>it suits Crowe and a **non-party** to those agreements when it does not.</u>*

Down the rabbit hole we go. After redrafting both the engagement letters and the FDIC-R's complaint, in a tortuous feat of logic, Crowe would have this Court find the FDIC-R is a *party* to the engagement letters for purposes of binding it to all restrictions but a *non-party* for purposes of considering its damages request. In other words, if Crowe waived the no-reliance provision (by its own conduct) such that Colonial is permitted to rely on its work, then the FDIC-R/Colonial (through no fault of its own) is a "party" to the engagement letters bound by all their terms (including the no-consequential-damages provision). ECF 537 at 3. But when it comes to actually considering the FDIC-R/Colonial's damages claims, Crowe would have the previously waived, no-reliance provision spring to life again such that the FDIC-R/Colonial is a non-party to the engagement letters with its reliance on Crowe's work unforeseeable and its damages barred as consequential. See ECF 537 at 4. When it suits Crowe, the FDIC-R is party to the engagement letters, but when it does not, the FDIC-R is a stranger to those contracts.

Such tortured machinations—featuring Crowe's "waived-but-not-waived" no-reliance provision—should clearly be rejected. The FDIC-R is either party to the contract—with all the benefits and burdens thereto—or not. It cannot be both at Crowe's behest. Section 552 expressly exists to provide relief when a *non-party* to a professional engagement relies to its detriment on that professional's negligent misrepresentations. That reliance does not drag the plaintiff into the

---

imposed by law on all people not to injure others by negligent conduct. The injured party has the choice of remedies when a contract contains an express promise to use due care.")).

underlying terms of the professional's agreement, and Crowe has offered no caselaw even suggesting otherwise.[38]

> ### C. Even if the FDIC-R/Colonial is somehow bound to all the terms of the engagement letters, under this Court's Order denying Crowe's motion for summary judgment as to CBG, the FDIC-R's damages are clearly direct and are not be barred by the no-consequential-damages provision.

While Crowe's attempts to foist the terms of its engagement letters on the FDIC-R should be rejected outright, even if the terms could somehow bind the FDIC-R/Colonial, they do not bar the FDIC-R's claims, which seek only *direct* damages from Crowe. Indeed, the Court's Order denying Crowe's summary judgment motion as to CBG's downstreaming damages based on the same clause, ECF 450, leads to that conclusion. While Crowe attempts to minimize this Court's prior opinion, ECF 537 at 4-7, its efforts ultimately fail.

> ### 1. If the FDIC-R/Colonial is bound by the terms of the engagement letters, this Court's Order rejecting Crowe's assertion of the no-consequential-damages <u>clause against CBG applies here</u>.

Even if this Court indulges Crowe's argument that, by waiving its right to enforce the no-reliance provision against the FDIC-R, Crowe somehow pulled the FDIC-R/Colonial under all

---

[38] The closest Crowe comes to supporting its position that the no-consequential-damages provision can be applied to a non-party to a contract is its citation to *TSG Water Res., Inc. v. D'Alba & Donovan Certified Pub. Accountants, P.C.*, 260 F. App'x 191 (11th Cir. 2007), ECF 537 at 5-6, wherein Crowe claims that the Eleventh Circuit affirmed a district court's invocation of a no-consequential-damages provision to bar the claims of "investor plaintiffs [who] were not parties to the contract between the auditor and TSG." *See* ECF 537 at 5-6. Although somewhat ambiguous from the Eleventh Circuit's decision, a close examination of the record makes clear that the Eleventh Circuit was *not* applying the contractual exculpatory clause to the non-party investors, but rather to *TSG*, the company that had contracted with the auditors. Indeed, the district court dismissed the non-party investors' claims on other grounds much earlier at *summary judgment*, and they did not proceed to trial. *See* Order on Summary Judgment, attached as Ex. 68 at 23-27; Jury Verdict, attached as Ex. 69. Accordingly, only *TSG*'s claims on negligence and breach of contract were put to the jury. *Id.* Post-trial, the auditors asked the Court to reconsider its order granting judgment, and it did, agreeing with the auditors that "[t]he consequential damages clause bars . . . *TSG*'s damages." Order on Reconsideration, attached as Ex. 70 at 7-13 (emphasis added)). *That* order was the subject of the Eleventh Circuit's review. *See* 260 Fed. App'x at 203 (noting that it is considering whether the "District Court erred in granting judgment as a matter of law in favor of [the auditors] on the claims of professional negligence, ordinary and/or gross negligence, and breach of contract following trial"). *TSG Water Resources*, therefore, stands for the unremarkable proposition that <u>*CBG*</u> can be bound by the consequential damages clause in the engagement letters that it signed. It provides no support, however, for Crowe's argument that those provisions should be applied to a plaintiff that the Court has ruled is not a party to those letters like the FDIC-R/Colonial.

the terms of the engagement letters, this Court's prior opinion denying Crowe's attempts to use the no-consequential-damages clause against CBG, ECF 450, applies with equal force to block Crowe's motion now. The reason is simple: the only way the FDIC-R/Colonial could be bound by the no-consequential-damages provision would be if it were a party to the contract, and if it were a party to the contract, then it would be entitled to the exact same "benefit of the bargain" that this Court held CBG was entitled to under the contract. *Id.* at 11. Accordingly, this Court's prior analysis regarding the "benefit of the bargain" CBG struck with Crowe, including its analysis of the *direct* damages flowing from Crowe's breach of that "bargain," would be fully applicable to the FDIC-R. *Id.* at 11-15.

As set out in this Court's Order, "the benefit of the bargain" under the engagement letters was essentially that Crowe would perform audit services in accordance with regulatory guidance, including testing internal controls with a focus on areas where there was a greater fraud risk. Specifically, this Court explained:

> the benefit of the bargain to CBG was that Crowe promised to "perform periodic internal audit services" that would "include a review of key internal controls and detail testing of a sample of transactions" and that "[h]igher risk areas [would] be covered in more detail and with greater frequency." Dkt. No. 223-1, the April 15, 2008 Engagement Letter at 2. Crowe further promised to comply with "applicable AICPA, U.S. Securities and Exchange Commission (SEC), Public Company Accounting Oversight Board (PCAOB), and other regulatory independence guidance" in performing the audit work. *Id*. at 1. In other words, Crowe was obligated to test CBG's internal controls with a greater focus on those areas that constituted a greater risk of fraud. And Crowe was obligated to comply with regulatory guidance while performing its duties.

ECF 450 at 11.

After setting out the "benefit of the bargain" that CBG was due under the engagement letters, this Court explained that CBG claimed that Crowe failed to live up to its contractual obligations when it failed to test aspects of Colonial's MWLD, COLB, and AOT facilities:

CBG claims that Crowe identified the operational risk for Colonial's MWLD as being "high" due in part to the potential for fraud by MWLD customers who might "double pledge" loans or produce fraudulent loans. CBG's Opp. at 6 (citing the Risk Assessment and Internal Audit Plans jointly prepared by Crowe and CBG); *see also* Dkt. No. 285, CBG's Amend. Comp., at ¶¶ 144, 146. Despite recognizing that the MWLD represented a high risk for potential fraud, CBG claims that Crowe never tested any of the collateral allegedly backing the COLB and AOT facilities in the MWLD. According to CBG, the "MWLD's AOT line of credit with [TBW] … totaled more than $1.5 billion by 2007." Dkt. No. 285, CBG's Amend. Comp., at ¶ 146. Nevertheless, "despite the fact that [TBW] was the only mortgage broker who had access to the AOT facility and … billions of dollars in [CBG's] reported AOT and COLB assets were tied directly to transactions with [TBW]" Crowe did not perform any testing of the AOT facility and the loans that purportedly served to collateralize that "huge balance." *Id.* at. ¶¶ 151, 153. In fact, CBG charges, "Crowe's accountants *never* performed *any* testing relating to TBW's AOT and COLB facilities." CBG's Opp. at 10 (emphasis in original).

CBG argues that if Crowe has simply tested the loan collateral allegedly securitizing the AOT and COLB facilities, they would have discovered the fraud. "In the words of Cathie Kissick, now incarcerated for assisting Farkas in the TBW fraud, neither Crowe nor PWC ever asked to see or confirm the existence of loan level information and documentation to see or confirm what was really backing TBW's AOT facility …[.] Ms. Kissick testified that had they simply requested to see that information they would have found *nothing* and 'the jig would be up.'" CBG's Opp. at 10 . . . .

ECF 450 at 11-12. As shown in its TAC, the FDIC-R's claims against Crowe similarly arise out of Crowe's failure to uncover the massive TBW fraud occurring in Colonial's MWLD, AOT, and COLB facilities. ECF 281, ¶¶ 119-27, 136-38.

Clearly, then, the "benefit of the bargain" of the engagement letters to which Crowe seeks to bind the FDIC-R/Colonial was that Crowe would properly audit Colonial facilities so as to uncover financial irregularities, like the multi-billion dollar TBW fraud. █████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███   *See* Ex. 74 at 83:5-85:17, 238:7-241:20; Ex. 75 at 160:23-163:2; Ex. 41 at 05612, 05614-5; Ex. 76 at 147407; Ex. 77 at 27609; Ex. 78 at 0045083; *see also* ECF 279, Ex. 9 at 222-24, 226-27; ECF 297, Ex. 8 at 94:6-16, 118:23-119:7; ECF 297, Ex. 15 at 849. Obviously, Crowe's failure to perform that work and uncover the fraud had direct and devastating consequences for Colonial.

Similarly, the damages resulting from the so-called SNP loans, which are addressed in detail in Section I, would also be direct because the SNP scheme was merely a continuation of the TBW fraud that Crowe failed to detect. The benefit of the bargain struck in the engagement letters was that Crowe would perform adequate testing in the MWLD, AOT, and COLB facilities, and Crowe's failure to do so allowed the fraud to continue through the SNP scheme. Had Crowe performed its contractual duties and reported the TBW fraud to Colonial, then Colonial would have acted to stop the TBW fraud, which would have directly prevented the SNP scheme. *Cf. In re: £E.S. Bankest, L.C.*, No. 04-17602-BKC-AJC, 2010 WL 1417732, at *1 (Bankr. S.D. Fla. Apr. 6, 2010) ("Similarly, although BDO argues that as a matter of law it is not foreseeable that BDO's failure to detect the fraud would proximately cause damages, this Court already held that it is foreseeable that the 'negligent failure to detect falsifications will likely result in continued falsifications.'"). Crowe's arguments to the contrary, ECF 537 at 7-8, miss the mark.

Accordingly, assuming that the FDIC-R is somehow a party to the contract, then there is no question that its damages flow *directly* from Crowe's failure to deliver on the "benefit of the bargain"—a full and accurate audit of Colonial's MWLD facility.[39] As such, the no-

---

[39] Crowe's reliance on *Silverpop Sys., Inc. v. Leading Mkt. Tech., Inc.*, 641 F. App'x 849 (11th Cir. 2016), ECF 537 at 6, is misplaced. *Silverpop* considered the lost value of a firm's customer email list due to a data breach of the company that provided the firm with digital marketing services. *Id.* at 850-55. The Court affirmed the district

consequential-damages provision is irrelevant, and Crowe's motion for summary judgment should be denied.

> 2. *In the alternate universe where the FDIC-R/Colonial is bound by the terms of the engagement letters, Crowe cannot avoid the ramifications of this Court's prior order by arguing that the FDIC-R/Colonial is not a party to those* <u>*letters.*</u>

As set out *supra*, the FDIC-R is either "in" the engagement letters or "out." If it is "in," it is "all in." Crowe, nevertheless, tries to avoid the ramifications of this Court's prior Order denying Crowe's motion for summary judgment as to CBG, by arguing that the FDIC-R is "in, but also out." *See* ECF 537 at 5-8.[40]

First, Crowe argues that the engagement letters did "not contemplate a potential claim by the Bank at all" and that "the Bank was not entitled to rely on Crowe's work"—meaning that the Bank's claims were unforeseeable or not "highly probable" under the terms of the contract. ECF 537 at 5, 7. In fact, Crowe goes so far as to argue—despite its repeated protestations that the FDIC-R is bound by the terms of the agreement—that "it was certainly not 'highly probable' that the FDIC, *standing in the shoes of a third party to the contract*, would be permitted to sue Crowe at all, given the unambiguous no-third-party-reliance provision." *Id.* at 7-8. Of course, this

---

court's finding that such damages would be consequential under the contract at issue in that case because "the parties' agreement was not one for the safeguarding of the LMT List. Rather, the parties contracted for the providing of e-mail marketing services." *Id.* at 856. As a result, the Eleventh Circuit explained that "considering the purpose of the parties' agreement, the damages LMT seeks are not the type that 'arise naturally and from the usual course of things.'" *Id.* Assuming, *arguendo*, that the Crowe engagement letters were found to apply to the FDIC-R, the FDIC-R's damages claims would clearly be direct under the reasoning of *Silverpop* since they arose naturally and directly from Crowe's failure to audit Colonial facilities as it had promised to do in those letters.

[40] Crowe's own citation to *Validsa, Inc. v. PDVSA Servs., Inc.*, 424 F. App'x 862 (11th Cir. 2011), ECF 537 at 6, demonstrates that this case is inapposite: "[c]onsequential damages do not arise directly from the transaction *between parties to a contract*." *Id.* (citing 424 F. App'x at 877). If the FDIC-R is bound by the no-consequential-damages provision, it is a *party* to the contract, and its claimed damages arise "directly from the transaction between the parties to the contract"—Crowe contracted to perform a full scope audit of the MWLD division, it failed to do so and, as a direct result, the FDIC-R was damaged. Moreover, in *Validsa*, the Eleventh Circuit merely affirmed the trial court's determination that a beef seller's claims for damages were barred under Florida's Uniform Commercial Code. *Id.* at 876-877. *Validsa*, therefore, explains and applies the standard for consequential damages under Florida's U.C.C. to damages claims based on the sale of goods. The decision has no bearing in this action that does not involve the sale of goods or arise under Florida's U.C.C.

argument merely recaps what this Court has already found: that the FDIC-R/Colonial was *not* a party to the engagement letters, was *not* bound by the terms of those letters, and properly pleaded its claims as tort claims under § 552. Nevertheless, if this Court somehow determines that the FDIC-R/Colonial is bound by the terms of the contract, then the re-written contract must necessarily have contemplated a claim by Colonial. Again, the FDIC-R is either "in" or it is "out." And, while this Court should not re-write the contract at all, it certainly should not re-write it so that the FDIC-R/Colonial is bound by the provisions that favor Crowe yet unable to raise claims when it is directly harmed by Crowe's failure to perform its obligations under the contract.

Second, Crowe tries to distinguish this Court's prior opinion by arguing that "the Bank's purported damages were the product of its dealings with others" and therefore could not flow directly from Crowe's breach of its obligations under the engagement letters. ECF 537 at 5. ████

████████████████████████████████████████

████████████████████████████████ ECF 297; Ex. 9 at 226-27. Yet again, if Crowe succeeds in pulling the FDIC-R/Colonial into the contract, then the damages that the FDIC-R now seeks would flow directly from Crowe's failure to perform its obligations under the contract.

Finally, Crowe attempts to distinguish this Court's prior opinion by noting that CBG's damages were for the loss of funds that it was legally required to downstream into Colonial. ECF 537 at 6-7. Crowe tries to distinguish the FDIC-R/Colonial, arguing that it was not "required" to enter into the transactions from which its damages stem. *Id.* at 7. This is a non-starter. Clearly, had Crowe performed its contractual duties under the engagement letters and provided an adequate audit of Colonial's MWLD, these transactions would have ceased. Instead, because of

Crowe's failures, the FDIC-R/Colonial was not only oblivious to the fraud, but actively misled by Crowe into believing that everything was fine. But for Crowe's breach of the contract— assuming we are still in the alternate universe where the FDIC-R/Colonial is bound by the engagement letters—the FDIC-R/Colonial would have ceased the fraudulent transactions. The damages the FDIC-R/Colonial sustained as a result of Crowe's breach, therefore, were direct and fully recoverable (assuming, of course, that the FDIC-R is deemed party to the engagement letters).

### VI.    As to Crowe, the FDIC-R's claim seeking attorneys' fees and costs for Crowe's clear breach of the Tolling Agreement is well-supported in both fact and law.[41]

Contrary to Crowe's argument, the FDIC-R is plainly entitled to recover its attorneys' fees and costs resulting from Crowe's indisputable, deliberate breach of the Tolling Agreement. Although Crowe expressly promised that it would *not* (1) assert any statute of limitations or other timing-related defenses based on the period covered by the Tolling Agreement, or (2) challenge the authority of the FDIC-R to enter into the Tolling Agreement, it did both. *See* ECF 223 at 8-11. It filed a motion for summary judgment arguing that the Tolling Agreement was invalid under *National Credit Union Administration Board v. Barclays Capital Inc.*, 785 F.3d 387 (10th Cir. 2015), in which the Tenth Circuit interpreted FIRREA as prohibiting tolling agreements. *Id*. According to Crowe, the supposed invalidity of the Tolling Agreement made the FDIC-R's claims untimely and due to be dismissed. *Id*.

On July 29, 2016 ("July Order"), this Court correctly rejected Crowe's attempt to invalidate the Tolling Agreement based on *Barclays*. ECF 442. It held not only that "the

---

[41] The FDIC-R does not dispute that PwC is entitled to summary judgment on Count IX. *See* ECF 535 at 30-33. The FDIC-R asserted this Count in the event PwC asserted a statute-of-limitations defense based on the Tolling Agreement at some point in this litigation. The time to do so has passed, and PwC has not asserted such a defense.

overwhelming weight of authority does not support Crowe's interpretation of" FIRREA, *id*. at 7-8, but also "that principles of equity bar Crowe from asserting a statute of limitations defense" because "Crowe voluntarily entered into the Tolling Agreement with the FDIC and even agreed to extend the tolling period by another twenty-one days," and the "stated purpose of the Agreement was to give the parties further opportunity to attempt to amicably resolve the FDIC's potential claims against Crowe." *Id*. at 9. As this Court summarized, "Crowe promised that it would not include the time elapsed during the tolling period in any time-based defense," and it was "reasonable to infer that this promise induced the FDIC to delay filing suit." *Id*. Consequently, even if the Court were "to determine that the Tolling Agreement is not enforceable under [FIRREA], the doctrine of equitable estoppel still precludes Crowe from asserting that the FDIC's claims are time-barred." *Id*.

Having failed to invalidate the Tolling Agreement, Crowe now asks this Court to immunize it from its blatant breach of the agreement by denying the FDIC-R's efforts to recover its attorneys' fees and costs—damages the FDIC-R incurred solely and directly from Crowe's breach. ECF 537 at 27-30. Unsurprisingly, the law does not support Crowe's position. Crowe raises three arguments against the FDIC-R's breach-of-contract claim, none of which has merit.

### A. The American Rule does not bar the FDIC-R's efforts to recover damages here.

Crowe argues that attorneys' fees and expenses are not recoverable based on the American Rule. ECF 537 at 28-29. The FDIC-R is not, however, seeking typical attorneys' fees incurred in an attempt to enforce the terms of a contract. On the contrary, the fundamental purpose of the Tolling Agreement was to avoid the time and expense of litigating timing defenses based on the tolled period. Crowe's flagrant breach of that agreement deprived the FDIC-R of the benefit of its bargain. Specifically, by raising arguments it had *expressly* promised

66

not to raise, Crowe forced the FDIC-R to expend—indeed, continue to expend—the very time, energy, and expenses the FDIC-R had bargained to avoid. Crowe's argument ignores this key distinction.

The FDIC-R has every right to be returned to the position it would have occupied had Crowe not blatantly disregarded its contractual promises, and the only way to do that is to allow the FDIC-R to recover the attorneys' fees and costs it incurred—and continues to incur—due to Crowe's breach. The FDIC-R's fees and costs are fully recoverable here. *See Cobbs v. Fred Burgos Const. Co.*, 477 So. 2d 335, 338 (Ala. 1985) ("It is well settled that damages awarded for breach of contract should return the injured party to the position he would have been in had the contract been fully performed.") (citing *Comeq, Inc. v. Mitternight Boiler Works, Inc.,* 456 So. 2d 264 (Ala. 1984)); *In re Monetary Grp.*, 2 F.3d 1098, 1104 (11th Cir. 1993) ("Generally, a party injured by a breach of an obligation imposed by law or agreement is entitled to compensatory relief."). Even if one puts aside the special circumstances of Crowe's breach and applies the usual standards governing an award of attorneys' fees, the FDIC-R is still entitled to recover. "Under the American rule, the parties to a lawsuit bear the responsibility of paying their own attorney fees. However, the law recognizes certain exceptions to this rule, and attorney fees are recoverable when authorized by statute, when provided by contract, or when justified by special equity." *Ex parte Horn*, 718 So. 2d 694, 702 (Ala. 1998). Crowe completely ignores the statutory support for the FDIC-R's efforts to recover fees and expenses here pursuant to the Alabama Litigation Accountability Act ("ALAA"), Ala. Code § 12-19-270, *et seq. See* ECF 537 at 27-30. Because Crowe *expressly* agreed *not* to assert timing arguments based on the tolled period in the Tolling Agreement, Crowe's subsequent assertion of a statute of limitations defense was "without substantial justification" and "frivolous, groundless in fact [and] in law, …

67

vexatious, [and] interposed for . . . improper purpose[s], including . . . to cause unnecessary delay [and] needless increase in the cost of litigation," all in direct violation of the ALAA. *See* Ala. Code § 12-19-271 (defining "without substantial justification"), § 272 ("the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorneys' fees and costs against any attorney or party, or both, who has … interposed a defense, that a court determines to be without substantial justification, either in whole or in part"); *see also, e.g., Fields v. Primerica Life Ins. Co.*, No. CIV.A. 97-D-1637-E, 2002 WL 31059371, at *1 (M.D. Ala. July 30) (awarding attorneys' fees under the ALAA).[42]

Moreover, the FDIC-R is entitled to an award of attorneys' fees on equitable grounds, as well. "The 'special-equity' exception [to the American Rule], often called the 'common-fund' or 'common-benefit' exception, was originally established to permit an award of fees in a case in which one of the parties had acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *James v. James*, 768 So. 2d 356, 361 (Ala. 2000). The common-benefit exception "allows the court to award an attorney fee in a situation 'where . . . the efforts of the plaintiff's attorneys render a public service or result in a benefit to the general public in addition to serving the interests of the plaintiff.'" *Id.* (quoting *Ex parte Horn*, 718 So. 2d at 702). Crowe acted in bad faith, vexatiously, wantonly, and for oppressive reasons by asserting a statute of limitations defense that flouted Crowe's express commitment under the Tolling Agreement and was contrary to "the overwhelming weight of authority" and the principles of equity. ECF 442 at 7, 9. By seeking enforcement of the Tolling Agreement, the FDIC-R is highlighting the good faith necessary to the amicable resolution of disputes like this—without the resort to litigation—and

---

[42]   The FDIC-R reserves the right to file a motion seeking attorneys' fees under the ALAA at the appropriate time. *See* Ala. Code § 12-19-272(c) (providing that the court shall assess attorneys' fees and costs under ALAA "upon the motion of any party or on its own motion").

serving "to maximize potential recoveries by the Federal Government." *Id.* at 8 (quoting 135 Cong. Rec. S10205 (daily ed. Aug. 4, 1989)). Promoting negotiation and mediation in the course of unwinding failed financial institutions and safeguarding the public fisc are both public benefits sufficient to justify an award of attorneys' fees on equitable grounds.

### B. The fact that the FDIC-R's request for specific performance is now "moot" in light of this Court's July Order simply affirms the FDIC-R's entitlement to fees and expenses here.

Crowe argues that the FDIC-R's request for specific performance under the Tolling Agreement is moot in light of this Court's July Order, which determined that the Tolling Agreement was valid and enforceable. ECF 537 at 29-30. Of course, the only reason that the FDIC-R's request for specific performance is moot is because this Court rejected the very arguments that constituted Crowe's breach and upheld the Tolling Agreement. ECF 442. In truth, because this Court's July Order upheld the Tolling Agreement, including Crowe's promise not to raise a statute of limitations defense based on the tolled period, it effectively found that Crowe breached the agreement by raising such a defense. The FDIC-R is entitled to recover damages for that breach.

But yet again, Crowe wants to have its cake and eat it too—having breached the Tolling Agreement in its efforts to invalidate it, Crowe now wants to avoid the consequences of that breach by pointing to the fact that the FDIC-R emerged victorious. That victory, however, was both unnecessary and hard fought. Clearly, it would be wholly inequitable for Crowe to be able to deny the FDIC-R compensation for the fees and expenses it incurred in fighting a battle Crowe contractually promised it would never wage.

Fortunately, the law gives this Court the power to counter such an inequitable result since "[i]t is within the sound judicial discretion of the trial judge to make findings regarding

69

incidental damages when balancing the equities between the parties in specific performance cases." *Aldridge v. Olive*, 876 So. 2d 1130, 1133 (Ala. 2003) (quoting *Anderson v. Wooten*, 549 So. 2d 40, 44 (Ala. 1989)). Since the FDIC-R requested specific performance, this is a specific performance case, and, as noted, this Court's Order rejecting Crowe's *Barclays* defense could be construed as granting the FDIC-R's request for specific performance and, by implication, finding Crowe liable for breach of the Tolling Agreement. Accordingly, consistent with *Aldridge*, this Court has the discretion to award the FDIC-R attorneys' fees and costs as incidental damages in balancing the equities between Crowe and the FDIC-R. Given Crowe's blatant breach of the Tolling Agreement and its on-going efforts to avoid any consequences flowing from that breach while simultaneously forcing the FDIC-R to continue to accumulate attorneys' fees and expenses that it would not incur but for the breach, the FDIC-R submits that, as a matter of equity, it is clearly entitled to an award of the attorneys' fees and expenses incurred as a *direct* result of Crowe's breach.

**C.  The FDIC-R's ever increasing damages can be determined post-trial.**

Crowe argues that the FDIC-R should not be entitled to recover its attorneys' fees and expenses because it did not include them as part of its damages disclosures. ECF 537 at 28. Those fees and expenses, however, are clearly ongoing and ever-increasing as counsel for the FDIC-R drafts this very argument. Thus, as with any consideration of attorneys' fees or expenses, the inquiry is more appropriately reserved for post-trial. *See Sweetwater Inv'rs, LLC v. Sweetwater Apartments Loan LLC*, 810 F. Supp. 2d 1288, 1296 n.7 (M.D. Ala. 2011) (noting that attorneys' fees should be addressed post-trial); *see also Ramsey v. Chrysler First, Inc.*, 861 F.2d 1541, 1542 (11th Cir. 1988) (affirming award of attorneys' fees following district court's post-trial hearing on the issue); *Goodson v. City of Atlanta*, 763 F.2d 1381, 1384 (11th Cir. 1985)

70

(same). As there is no question that Crowe is on notice that the FDIC-R will, at the appropriate time, seek the attorneys' fees and expenses it suffered—and *continues* to suffer—on account of Crowe's breach of the Tolling Agreement, the fact that the FDIC-R did not include attorneys' fees and costs in its damages disclosures is no barrier to the FDIC-R's recovery of those sums.[43]

## CONCLUSION

Accordingly, for all the reasons stated above, the FDIC-R requests that this Court deny both Defendant PricewaterhouseCoopers LLP's Motion for Partial Summary Judgment as to the FDIC's Claims, ECF 535, and Defendant Crowe Horwath LLP's Second Motion for Summary Judgment on the FDIC's Claims, ECF 537.

---

[43] If the Court finds that, because of the particular nature of the attorneys' fees sought by the FDIC-R, damages calculations should be disclosed before trial, then the FDIC-R stands ready to make an immediate disclosure. In this case, barring evidence of the FDIC-R's damages would be tantamount to dismissing the FDIC-R's claim with prejudice, which Crowe has implicitly acknowledged by seeking summary judgment. *See* ECF 537 at 32; *see also Justice v. United States*, 6 F.3d 1474, 1481-82 (11th Cir. 1993) (treating as equivalent dismissals with prejudice that are made "explicitly or in effect"). "[A] district court may impose the severe sanction of dismissal of a claim with prejudice only where the party's noncompliance is willful or in bad faith." *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1366 (11th Cir. 2008). The FDIC-R's delay in providing a supplemental disclosure is, at worst, a result of excusable neglect. Crowe has not requested discovery on the FDIC-R's damages related to the breach or filed a motion to compel, and the Court has not issued a discovery order on this issue with which the FDIC-R has failed to comply. *See United States v. Certain Real Prop. Located at Route 1, Bryant, Ala.*, 126 F.3d 1314, 1318 (11th Cir. 1997) (concluding that "the absence of either a motion to compel filed by the government or an order of the court compelling discovery . . . rendered inappropriate" the dismissal of the claimants' claims). The FDIC-R has not displayed bad faith, and "cutting off a plaintiff's potentially meritorious action is an unduly harsh sanction . . . , absent willful or contumacious conduct." *Justice v. United States*, 6 F.3d 1474, 1481 (11th Cir. 1993).

Dated: November 29, 2016

**SPOTSWOOD SANSOM & SANSBURY LLC**
Robert K. Spotswood (SPO 001)
Michael T. Sansbury (SAN 054)
Grace L. Kipp (LON 049)
Mary G. Menge (MEN 014)
One Federal Place
1819 Fifth Avenue North, Suite 1050
Birmingham, Alabama 35203
Telephone: (205) 986-3620
Facsimile: (205) 986-3639
Email: rks@spotswoodllc.com
        msansbury@spotswoodllc.com
        gkipp@spotswoodllc.com
        mmenge@spotswoodllc.com


**RUSHTON, STAKELY, JOHNSTON
 & GARRETT, P.A.**
Dennis Bailey (ASB-4845-171D)
J. Evans Bailey (ASB-9995-J61B)
184 Commerce Street
Post Office Box 270
Montgomery, Alabama 36101-0270
Telephone: (334) 206-3234
Facsimile: (334) 481-0031
Email: DRB@rsjg.com


**MULLIN HOARD & BROWN, LLP**
David Mullin (TX Bar No. 14651600)
*pro hac vice*
John M. Brown (TX Bar No. 3142500)
*pro hac vice*
John G. Turner, III (TX Bar No. 20320550)
*pro hac vice*
Robert Bell (TX Bar No. 00787062)
*pro hac vice*
Clint Latham (TX Bar No. 24013009)
*pro hac vice*
Anthony W. Kirkwood (TX Bar No. 24032508)
*pro hac vice*
Richard Biggs (TX Bar No. 24064899)

*pro hac vice*
500 South Taylor, Suite 800
Amarillo, Texas 79101
Telephone: (806) 372-5050
Facsimile: (806) 372-5086
Email: dmullin@mhba.com
      jobrown@mhba.com
      jturner@mhba.com
      rbell@mhba.com
      clatham@mhba.com
      tkirkwood@mhab.com
      rbiggs@mhba.com

**SCHIFF HARDIN LLP**
Lawrence H. Heftman (IL Bar No. 6283060)
*pro hac vice*
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
Telephone: (312) 258-5500
Facsimile: (312) 258-5600
Email: lheftman@schiffhardin.com

*Attorneys for Plaintiff Federal Deposit Insurance Corporation as Receiver for Colonial Bank*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically served on November 29, 2016, by transmission of Notice of Electronic Filing generated by CM/ECF to all counsel of record as of the date of filing.

*/s/ Grace L. Kipp*
OF COUNSEL