IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE COLONIAL BANCGROUP INC., and KEVIN O'HALLORAN<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP,<br><br>Defendants. | ) | ORDER DENYING PRICEWATERHOUSECOOPER'S MOTION TO DISMISS A PORTION OF THE FDIC'S THIRD AMENDED COMPLAINT<br><br>CASE NO. 2:11-cv-746-BJR |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP<br><br>Defendants. | ) | CASE NO. 2:12-cv-957-BJR |

## I. INTRODUCTION

Defendant PricewaterhouseCoopers LLP ("PWC") moves this Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss, in part, the claims asserted against PWC in the Third Amended Complaint [Dkt. No. 281] filed by the Federal Deposit Insurance Corporation as receiver for Colonial Bank ("FDIC"). Dkt. No. 306. The FDIC opposes the motion. Dkt. No.

328. Having reviewed the motion, the opposition thereto, the record of the case, and the relevant legal authority, the Court will deny the motion. The reasoning for the Court's decision follows.

## II. BACKGROUND

The following factual allegations are drawn from the FDIC's Third Amended Complaint ("TAC"), which the Court is required to accept as true when reviewing PWC's motion to dismiss. Dkt. No. 281.

### A. Colonial's Mortgage Warehouse Lending Division and the COLB Facility

Colonial Bank ("Colonial") was a wholly owned subsidiary of Plaintiff Colonial BancGroup, Inc. ("CBG"). *Id.* ¶ 15. It was headquartered in Montgomery, Alabama and had nearly 350 branches throughout the states of Alabama, Georgia, Florida, Nevada and Texas. *Id.* Colonial operated a Mortgage Warehouse Lending Division (the "MWLD") that provided short-term, secured financing to mortgage operators. *Id.* ¶ 16. The MWLD accounted for approximately 20 percent of Colonial's net assets from 2005 through 2009. *Id.* Taylor, Bean & Whitaker Mortgage Corporation ("TBW") was a mortgage originator and the MWLD's largest customer. The FDIC alleges that by 2009, 63 percent of the MWLD's assets were attributable to TBW. *Id.* ¶ 18.

Colonial, through the MWLD, offered a funding product known as the COLB facility (an acronym derived from <u>COL</u>onial <u>B</u>ank). *Id.* ¶ 16. The COLB facility was a loan participation arrangement through which Colonial advanced funds to mortgage originators (such as TBW) who, in turn, loaned the money to homeowners at closing. *Id.* ¶ 18. Under the terms of the COLB facility, Colonial retained a 99% participation interest in the mortgage loan (*i.e.*, the homebuyer's mortgage) and the mortgage originator retained a 1% interest in the mortgage loan. *Id.* Thereafter, the mortgage loan was sold to an investor on the secondary market (typically 30

to 60 days after closing), at which point, Colonial was paid for its 99% participation interest and the mortgage originator was paid for its 1% participation interest.[1] *Id*.

**B. The Fraud at Colonial**

On August 4, 2009, federal regulators raided Colonial and TBW's headquarters and quickly discovered that a massive fraud had been perpetrated against Colonial by TBW Chairman Lee Farkas and treasurer Desiree Brown, along with at least two MWLD employees, Catherine Kissick (head of the MWLD) and Teresa Kelly (MWLD operations supervisor). *Id*. ¶ 20. The fraud, which the FDIC alleges cost Colonial in excess of $2 billion, was centered in the MWDL and took on many permutations or "phases". The FDIC sets forth each phase of the fraud in great detail in the TAC; however, only one phase—the COLB Plan B phase—is relevant to PWC's motion to dismiss currently before this Court.

The COLB Plan B phase of the fraud worked as follows. As discussed above, Colonial extended short-term funding to mortgage originators through the COLB facility and in return, Colonial was supposed to receive a 99% participation interest in the home mortgages (*i.e*., the mortgages that were funded with the COLB funds) as collateral. Colonial was then paid for its 99% participation interest after the home mortgages were sold on the secondary market. The COLB facility operated as it was intended at least some of the time (indeed, as is discussed in more detail later in this order, TBW had $694 million worth of mortgages in its possession at the time of its bankruptcy that had been funded with COLB money), but the FDIC alleges, at some point beginning in 2002, Farkas and his co-conspirators began to manipulate the COLB facility to steal funds from Colonial. *Id*. ¶ 20. The FDIC claims that TBW would take COLB money

[1] Under the terms of the COLB facility, funding was not supposed to be available to loan originators unless a "committed or pre-approved purchaser[]" for the mortgage loan already existed in the secondary market. Dkt. No. 281 ¶ 18. In addition, if the mortgage loans did not meet certain requirements under the terms of the COLB facility, the loan originator was obligated to repurchase the loan upon request by Colonial. *Id*.

from Colonial, but instead of using the money to fund legitimate home mortgages, TBW would pocket the funds. TBW would then provide Colonial with a 99% participation interest in fake mortgages, mortgages that had already been pledged to other banks, or mortgages that were otherwise unmarketable. *Id*. ¶ 25. In other words, the FDIC charges, TBW provided Colonial with entirely "worthless collateral." *Id*. The FDIC claims that TBW stole at least "$250 million from Colonial" by employing the COLB Plan B phase of the fraud. *Id*.

**D. PWC's Audit Role in the COLB Plan B Phase of the Fraud**

At all times during which TBW's fraudulent activities were taking place, PWC served as Colonial's external, independent auditor under agreements with Colonial's parent company, CBG. *Id*. ¶ 29 (alleging that "CBG was a single-bank holding company with Colonial as its only asset of any significant. Accordingly, an audit of CBG consisted of an audit of Colonial").[2] The FDIC alleges that one of the reasons TBW was able to steal millions from Colonial during the COLB Plan B phase of the fraud was PWC's failure to properly account for the monetary advances Colonial extended to TBW under the COLB facility. The FDIC alleges that proper accounting required PWC to treat these advances as loans rather than sales for accounting purposes. *Id*. ¶ 72.

Requisite to understanding this allegation is the knowledge that federal banking regulations limit the amount of credit a bank may extend to one borrower. The FDIC refers to this as the "loan-to-one-borrow" limit. *See*, *e.g*., Dkt. No. 328 at 6. The purpose of this limitation is to protect the soundness and integrity of the banking system.[3] Because loans are inherently more risky than outright sales, the regulations limit the amount of credit a bank may extend to a single creditor. One way federal regulators ensure that banks are in compliance with the loan-to-

---

[2] The exact nature of the relationship between the parties in this lawsuit is the subject of pending motions.

[3] https://www.occ.gov/topics/credit/commercial-credit/lending-limits.html last accessed on 11/29/16.

one-borrow limit is to require banks to disclose all financial transfers in their annual financial disclosures. These disclosures, in turn, must comply with financial accounting and reporting standards. One such standard that is of particular importance to the instant motion is Financial Accounting Standard No. 140 ("FAS 140"), which sets forth the criteria for when a financial transfer may be listed as a sale (as opposed to a loan) in a bank's financial disclosures.[4] If a financial transfer qualifies as a sale under FAS 140, the transfer does not count against the loan-to-one-borrower limit.[5]

In this case, the FDIC alleges that the loan-to-one-borrower limit should have acted as a check on the amount of credit Colonial extended to TBW under the COLB facility. However, the FDIC alleges, Farkas and his conspirators—with assistance from PWC—were able to work around the lending limit by falsely labeling the COLB advances as sales under FAS 140. "From the inception of the COLB [facility] in 2002 through 2009, PWC worked alongside [the conspirators] advocating the application of sales accounting" to the COLB advances so that TBW and Colonial could "circumvent" the federal lending limits. *Id.* ¶ 60. The FDIC charges that PWC treated the COLB advances as sales rather than loans even though any competent auditor would know that the advanced funds did not qualify as sales under FAS 140.

The FDIC further charges that in April 2008, after PWC had already issued multiple clean audit opinions approving sales accounting treatment for the COLB advances in CBG's

---

[4] FAS 140 was promulgated by the Financial Accounting Standards Board ("FASB"), which is an independent, private-sector, not-for-profit organization that establishes financial accounting and reporting standards for public and private companies and not-for-profit organizations that follow Generally Accepted Accounting Principles. The FASB is recognized by the Securities and Exchange Commission as the designated accounting standard setter for public companies. *See* http://www.fasb.org/facts/, last accessed 11/29/16.

[5] Under FAS 140, a financial asset transfer can be treated as a sale for accounting purposes only if the following conditions are met: (1) the transferred assets have been isolated from the transferor, meaning the transferred assets are beyond the reach of the transferor and its creditors, even in bankruptcy or other receivership; (2) the transferee has the unconstrained right to pledge or exchange the transferred asset; and (3) the transferor does not maintain effective control over the transaction through (a) an agreement that both entitles and obligates the transferor to repurchase or redeem them before maturity or (b) the ability to unilaterally cause the holder to return specific assets. TAC ¶ 59. The Court is not required to determine whether the COLB advances qualified for sales treatment under FAS 140 in order to resolve PWC's motion to dismiss.

financial disclosures, the Office of the Comptroller of the Currency ("OCC") challenged PWC's conclusion that sales accounting for the COLB advances was proper. *Id.* ¶ 63. The FDIC claims that the OCC's challenge to PWC's sales accounting conclusions "caused major alarm within PWC." *Id*. According to the FDIC, "PWC immediately realized that if [the] sales accounting was not proper, CBG's financial statements for at least the three previous years would have to be restated" and PWC would be "exposed to billions of dollars in liability for its past negligent advice." *Id*.

According to the FDIC, instead of complying with its professional obligations and telling CBG, Colonial, and the banking regulators that the sales accounting was inappropriate, PWC concocted a plan to create evidence to justify its treatment of the COLB transactions to the OCC. *Id.* ¶ 68. The FDIC alleges that the PWC's misrepresentation of the COLB transactions allowed TBW to continue to defraud Colonial until the bank was closed by the Alabama State Banking Department on August 14, 2009. *Id.* ¶ 69. The FDIC specifically charges that any losses attributed to the TBW fraud after February 2008 would have been avoided if PWC had fulfilled its duty as an independent, exercised objective professional judgment, and properly applied appropriate professional and federal banking regulations. *Id.* ¶ 72.

**F. The FDIC's Actions in the TBW Bankruptcy**

As discussed earlier, the FBI raided TBW and Colonial on August 4, 2009 and uncovered TBW's fraud against Colonial. On August 14, the Alabama State Banking Department closed Colonial and appointed the FDIC as its receiver. TAC ¶ 1. TBW filed for bankruptcy ten days later. At the time of TBW's filing, $694 million in mortgages that had been funded through the COLB facility remained in TBW's possession, waiting to be sold to investors in the secondary market. However, unlike the falsified or otherwise unmarketable mortgages that TBW provided

Colonial under the COLB Plan B phase of the fraud, these mortgages represented real, marketable assets (in other words, TBW had used the COLB funds to fund legitimate home mortgages and Colonial had a 99% participation interest in those mortgages). Therefore, the FDIC filed a proof of claim in TBW's bankruptcy, alleging that it had a 99% ownership interest in the mortgages.

PWC claims that the FDIC's argument before the bankruptcy court was that Colonial owned the participation interest in the mortgages, and based on that argument, the bankruptcy court awarded the FDIC 99% ownership in the mortgages. However, PWC argues, in this lawsuit, the FDIC seeks to recover from PWC on the theory that the COLB transactions did not meet the criteria for sales treatment, but rather, should have been treated as loans in Colonial's financial disclosures. PWC asserts that the FDIC should be judicially estopped from arguing in this Court a "completely contrary" position to that which it advanced and prevailed on in the bankruptcy court (*i.e*. arguing in the bankruptcy court that Colonial *owned* the mortgages, but arguing in this Court that the transactions should have been accounted for as *loans*). *Id*. Therefore, with the instant motion, PWC moves to dismiss those portions of the Third Amended Complaint that are based on the FDIC's claim that PWC improperly treated the COLB advances as sales.

## III. STANDARD OF REVIEW

The standard of review for a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) is well-known. A Rule 12(b)(6) motion tests the legal sufficiency of a complaint; thus, in assessing the merits of a Rule 12(b)(6) motion, the court must assume that all the factual allegations set forth in the complaint are true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## IV. DISCUSSION

### A. Judicial Estoppel

"Judicial estoppel is an equitable doctrine invoked at a court's discretion, designed to protect the integrity of the judicial process." *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 430 F.3d 1326, 1335 (11th Cir. 2005) (citing *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)). "The doctrine may be applied to prevent a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Transamerica*, 430 F.3d at 1335. "[A]lthough the circumstances under which judicial estoppel should be invoked are not reducible to a general formulation of principle, courts have traditionally looked at three basic factors: 1) whether a party's later position was clearly inconsistent with its earlier position; 2) whether the party succeeded in persuading a court to accept the party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and 3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (citing *New Hampshire*, 532 U.S. at 750–51).

### B. Whether the FDIC Should Be Judicially Estopped from Pursuing Claims against PWC Based on Its Treatment of the COLB Advances under FAS 140

PWC urges this Court to judicially estop the FDIC from arguing that the COLB advances did not qualify for sales treatment under FAS 140. The FDIC counters that judicial estoppel is not appropriate in this case. First, it argues that it would be inequitable to allow PWC to invoke

the doctrine of judicial estoppel under the circumstances that gave rise to this case. Second, the FDIC contends that even if the Court were to determine that PWC is not barred from invoking judicial estoppel, PWC has not established that it is entitled to the relief requested because it has not demonstrated that the FDIC took an inconsistent position in TBW's bankruptcy. The Court will address each of these arguments in turn.

**1. PWC's Alleged Wrongdoing Does Not Bar PWC from Invoking the Doctrine of Judicial Estoppel**

The FDIC argues that PWC should be barred from invoking the doctrine of judicial estoppel in this case because PWC is the very reason that the FDIC had to negotiate a settlement agreement with TBW in the first place. According to the FDIC, "PWC's negligent and wanton conduct allowed Colonial [] to lend far more to TBW than it otherwise could have had the COLB facility been accounted for properly … [i]f not for PWC's conduct, Colonial [] could not have exceeded its loan-to-one borrower limits with TBW to the extent it did, and the FDIC-R would not have been required to negotiate over the COLB loans on TBW's books at closing." Dkt. No. 328 at 6. Indeed, the FDIC argues, it would undermine the integrity of the judicial process to allow PWC to use equitable estoppel as a shield against liability under the circumstances of this case.

The FDIC's argument is misplaced. PWC's alleged misconduct has no bearing on whether judicial estoppel is appropriate in this case. That is because the doctrine of judicial estoppel is designed to protect the judicial system, not litigants. Thus, the focus in the application of judicial estoppel is upon the actions of the party to be estopped and the effect those actions have on the judicial system, not on whether the party invoking the doctrine has "clean hands." *See e.g. Helson v. Nuvell Financial Services Corp.*, 2006 WL 1804583, *4 (M.D. Fl. June 27, 2006) (a party may succeed on the grounds of judicial estoppel without proving that he has

"clean hands"); *In re Tower Park Properties, LLC*, 2013 WL 3791462, *3 (C.D. Cal. July 18, 2013) (a party's unclean hands cannot prevent the Court from invoking judicial estoppel). Accordingly, PWC is not barred from invoking the doctrine of judicial estoppel simply because the FDIC has accused it of wrongdoing in connection with the COLB audit.

**2. The FDIC Has Not Taken Inconsistent Positions**

As discussed above, the FDIC submitted a proof of claim in TBW's bankruptcy asserting that Colonial owned 99% participation interests in each of the $694 million worth of mortgages remaining in TBW's possession at the time of its bankruptcy filing. Ultimately, TBW and the FDIC entered into a settlement agreement that expressly recognized the FDIC's ownership interest in the mortgages. The settlement agreement delineated that TBW's Plan of Liquidation "shall provide that the FDIC-R's ownership of 99% participation interests in the mortgage loans purchased pursuant to the COLB Agreements … shall be recognized." Dkt. No. 307, Ex. D § 1.2. The bankruptcy court approved the settlement on September 14, 2010. *Id*. Ex F at 2. Based on this, PWC argues that the FDIC successfully convinced the bankruptcy that Colonial "*purchased* a 99% interest" in the mortgages and "that those transactions *were* properly accounted for as purchases" in Colonial's financial disclosures. Dkt. No. 307 at 1 (emphasis in original). However, PWC argues, in this lawsuit, the FDIC alleges that PWC "acted negligently, grossly, and wantonly" in treating the transactions as purchases. According to PWC, "[t]he FDIC cannot have it both ways. As a result of its success in the bankruptcy proceedings, the FDIC is judicially estopped, as a matter of law, from arguing in this case that [the COLB transactions were not] purchases." *Id.*

PWC misconstrues the nature of the FDIC's position in the bankruptcy proceedings versus its position in this case. In the bankruptcy proceedings, the issue was which entity,

Colonial or TBW, own the 99% participation interests in the mortgages that remained in TBW's possession at the time of its bankruptcy. The FDIC asserted that Colonial owned the interests. In making this claim, the FDIC did not represent to the bankruptcy court that the transactions that gave rise to Colonial's ownership interest qualified for sales accounting under FAS 140—it was PWC's job to make that determination (according to the FDIC). Rather, the FDIC simply asserted that under the transactions as set up by Colonial, TBW, and PWC, Colonial had a ownership interest in the mortgages vis-à-vis TBW.

Here, the FDIC does not dispute that Colonial owns a 99% participation interest in any mortgages funded by COLB advances; rather, it claims that PWC should never have allowed the COLB advances to be treated as sales for accounting purposes. In other words, the FDCI does not dispute that Colonial purportedly purchased the 99% participation interests in all COLB funded mortgages, but it does contend that it was PWC's responsibility to determine that the transactions did not qualify as sales under FAS 140, and that if PWC had fulfilled its duties, Colonial would not have exceed its loan-to-one-borrow limit with TBW by nearly 500%. The FDIC is pursuing PWC in this case because, according to the FDIC, PCW allowed, advocated for, and even created evidence to support the treatment of the transactions as sales under FAS 140 when PWC knew or should have known that the regulations required the transactions to be treated as loans.

This narrative is entirely consistent with the FDIC's position in TBW's bankruptcy. Colonial did have an ownership interest in the mortgages vis-à-vis TBW. Indeed, the FDIC alleges, both Colonial and TBW wanted such an arrangement so that they could circumvent the federal lending limits imposed on national banks. On the other hand, the ownership arrangement between Colonial and TBW is not at issue in this lawsuit. Indeed, here, there are no mortgages to

claim ownership over because, according to the FDIC, all Colonial's collateral under the COLB Plan B phase of the fraud was either falsified or otherwise unmarketable. Rather, in this lawsuit, the FDIC maintains that as CBG's external auditor, PWC breached its professional obligations and accounting standards by failing to recognize (or actively hiding) that the COLB advances did not qualify for sales accounting under FAS 140. As such, there is no inconsistency between the FDIC's position in the TBW bankruptcy and the FDIC's allegations in this case.

The cases PWC relies on to urge this Court to exercise its discretion and apply judicial estoppel are easily distinguishable from the present situation. For instance, PWC relies on *Adelphia Recovery Trust v. Goldman Sachs & Co*. for the proposition that "at least one federal appellate court has stressed the special importance of judicial estoppel in the bankruptcy context." Dkt. No. 379 at 7 (citing *Adelphia*, 748 F.3d 110 (2nd Cir. 3024)). However, *Adelphia* serves to demonstrate why the Supreme Court has cautioned that the application of the judicial estoppel doctrine depends heavily on the "specific factual context[]" before the court. 748 F.3d at 116 (quoting *New Hampshire*, 532 U.S. at 751). In *Adelphia*, the defendant, a successor entity to a bankrupt debtor corporation, brought a fraudulent conveyance claim seeking damages as a result of allegedly unauthorized payments from a particular account in the bankrupt estate. Success on the fraudulent conveyance claim would have required the Second Circuit to reverse the bankruptcy court's prior determination regarding the ownership of that account. The Second Circuit held that defendant was judicially estopped from contesting the ownership of the account years after the bankruptcy plan was confirmed. The central reason the Second Circuit determined that judicial estoppel was appropriate in that case was because the defendant was "tak[ing] a position," that if successful, would require the "unravel[ing] [of a] previously closed proceeding." *Id*. at 117, 120. The Court further noted that the allocation of ownership of the

account in question "was [a] cornerstone of the bankruptcy plan" and "unraveling" that determination would require recalling at least $63million in previously paid out assets. *Id.* at 119.

The same is not true in the case at hand. No part of the TBW bankruptcy would have to be unraveled if the FDIC is successful on its claims in this case. Again, the FDIC is not requesting that this Court determine whether Colonial had an ownership interest in the mortgages that remained in TBW's possession at the time of its bankruptcy. That determination has already been made. Rather, the gravamen of the FDIC's case, here, is that PWC breached its duties to Colonial when it allowed COLB advances to be treated as sales for accounting purposes. The outcome of that determination, one way or the other, will not impact the bankruptcy court's ownership determination.

Likewise, the Eleventh Circuit's decision in *Ward v. AMS Servicing, LLC*, 606 Fed. App'x 506 (11th Cir. 2015) offers no support for PWC's contention that the FDIC has taken inconsistent positions regarding the COLB advances. In *Ward*, the plaintiff conceded that her position in bankruptcy court was inconsistent with her assertion in the instant case, thus the issue was not considered by the Eleventh Circuit. *Id.* at 509-510. Nor does PWC find support in *Bistro Exec., Inc. v. Rewards Network, Inc.*, 2006 WL 6849825 (C.D. Cal. July 19, 2006). In *Bistro*, the district court rejected the defendant's attempt to take a "clearly inconsistent" position regarding "identical transactions." 2006 WL 6849825, *6. Once again, in this case, the FDIC's the positions are not inconsistent.[6]

One of the stated purposes of judicial estoppel is protect the integrity of the judicial system by prohibiting litigants from "deliberately changing positions according to the exigencies

[6] PWC also relies on *In re Bales*, an unpublished, one-page decision with limited discussion of the factual and legal issues before the Court. 117 F.3d 1424 (9th Cir. 1997). In fact, the discussion is so limited that this Court is unable to ascertain the factual circumstances of that case, thus rendering the case's holding meaningless for purposes of this case.

of the moment," thereby leading to conflicting decisions among courts. *New Hampshire,* 532 U.S. at 750 (quoting *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993)). For the reasons stated above, this case does not give rise to such a concern. Nothing this Court does in this case will impact, let alone, conflict with the bankruptcy court's prior decision. Accordingly, judicial estoppel is not appropriate.[7]

## V. CONCLUSION

For the foregoing reasons, the Court HEREBY DENIES PWC's Motion to Dismiss a Portion of the FDIC'S Third Amended Complaint [Dkt. No. 306].

Dated this 6th day of December, 2016.

Barbara Jacobs Rothstein
U.S. District Court Judge

[7] Because the Court concludes that the FDIC has not advocated inconsistent positions in this Court and the bankruptcy court, it is not necessary for this Court to address whether the FDIC "succeed in persuading the bankruptcy court to accept its position" for purposes of judicial estoppel. Dkt. No. 328 at 10.