IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| THE COLONIAL BANCGROUP INC., and KEVIN O'HALLORAN<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP,<br><br>Defendants. | ORDER REGARDING PLAINTIFF CBG'S AND PLAINTIFF FDIC'S CROSS MOTIONS FOR SUMMARY JUDGMENT AS TO THE OWNERSHIP OF PLAINTIFF CBG'S CLAIMS AGAINST DEFENDANTS PWC AND CROWE<br><br>CASE NO. 2:11-cv-746-BJR |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP<br><br>Defendants. | CASE NO. 2:12-cv-957-BJR |

## I. INTRODUCTION

The genesis of this case is a complex bank fraud that culminated in the failure of Colonial Bank ("Colonial") and Colonial's parent company, The Colonial BancGroup, Inc. The Colonial

BancGroup, Inc. and Kevin O'Halloran, as plan trustee acting on behalf of The Colonial BancGroup, Inc. (collectively "CBG") and the Federal Deposit Insurance Corporation as Receiver for Colonial (the "FDIC") each filed a lawsuit against CBG's outside auditors PricewaterhouseCooper LLP ("PWC") and Crowe Horwath, LLP ("Crowe"), seeking to recover for the auditors' failure to detect the fraud. Presently before the Court are cross-motions for summary judgment in which CBG and the FDIC seek to determine their respective rights to pursue claims against the auditors. CBG moves for summary judgment against the FDIC on the FDIC's counterclaim seeking a declaratory judgment that it is the exclusive owner of CBG's claims for breach of contractual and professional duties against PWC and Crowe. Dkt. No. 523. The FDIC filed a cross motion for summary judgment requesting this Court declare that the FDIC is the exclusive owner of CBG's claims against the auditors or, in the alternative, declare that any recovery obtained by CBG from PWC and/or Crowe is "separate and distinct" from any recovery obtained by the FDIC. Dkt. No. 522. Having reviewed the motions, the oppositions thereto, the record of this case, and the relevant legal authority, the Court will: (1) grant CBG's motion for summary judgment, (2) deny, in part, the FDIC's motion, and (3) defer ruling on the set-off issue until the Court has resolved other currently pending motions filed by the parties. The reasoning for the Court's decision follows.

## II. BACKGROUND[1]

### A. The TBW Fraud in Colonial

These lawsuits are the result of a massive, long-running fraud perpetrated against CBG's wholly owned banking subsidiary, Colonial Bank ("Colonial"). The fraud was initiated in 2002

[1] Unless otherwise noted, the FDIC and CBG do not dispute the factual allegations set forth in this section. Crowe filed a statement indicating that it disputes several of the allegations; however, the allegedly disputed facts raised by Crowe are not material to the instant motions. *See* Dkt. No. 608.

by two Colonial employees and Colonial's customer, Taylor Bean & Whitaker Mortgage Corp ("TBW"), and continued undetected until the State of Alabama Banking Department closed Colonial and appointed the FDIC its receiver on August 14, 2009. Colonial represented 99.3% of CBG's assets; thus, CBG filed for Chapter 11 bankruptcy protection eleven days after the banking authorities closed Colonial. The TBW fraud triggered multiple lawsuits throughout the country, two of which are currently before this Court.

**A. CBG's Lawsuit against PWC and Crowe**

As a publicly traded, bank holding company, CBG was subject to disclosure laws and regulations monitored and enforced by the U.S. Securities and Exchange Commission (the "SEC"). These laws and regulations required CBG to annually file with the SEC a comprehensive summary of CBG's financial performance, as well as an integrated audit of CBG's financial statement and internal controls by an independent auditor. CBG was also required to comply with the Sarbanes Oxley Act of 2002, which seeks to ensure that a public company's financial reporting is materially accurate and that its internal controls over financial reporting are operating effectively.

To that end, in 2007 and 2008, CBG engaged the services of Defendant PWC to serve as CBG's outside independent auditor to perform the required integrated audits of CBG's financial statements and internal controls. For each audit year, CBG and PWC memorialized their agreement in an engagement letter. Colonial was not a signatory on the engagement letters. CBG also engaged Defendant Crowe in 2007 and 2008 to oversee and help implement CBG's internal audit function. Again, for each audit year, CBG and Crowe memorialized their agreement in an engagement letter, and once again, Colonial was not a signatory of the letters.

CBG alleges that during the first two months of 2008, PWC and Crowe provided CBG with "a clean bill of health on its financial condition and internal controls," culminating in "PWC signing an unqualified audit opinion dated February 25, 2008." Dkt. No. 560 at 4. In reality, CBG alleges, by the end of 2007, Colonial was "critically undercapitalized" as a result of the magnitude of the fraud being perpetrated against it by TWB. Dkt. No. 523 at 7. Indeed, CBG charges, $1.5 billion of the assets on Colonial's balance sheet "were completely fictitious" and "internal controls relating to" some aspects of Colonial's funding products were "essentially non-existent." Dkt. No. 560 at 4.

CBG further alleges that PWC's and Crowe's "flawed audits gave [CBG's] audit committee and board of directors the false assurance to proceed with plans to raise funds, incur enormous debt and obligations in connection therewith, downstream funds to Colonial [], make dividend payments to shareholders, and generally continue operations in furtherance of its role as a bank holding company." *Id*. CBG asserts that it incurred damages in the amount of $663,000,000 as a result of its continued operation from January 1, 2008 (the date on which CBG claims that PWC and Crowe should have discovered the fraud) through August 25, 2009 (the date that CBG filed for bankruptcy). *Id*. at 5.

CBG initiated a lawsuit against PWC and Crowe in Alabama State Court, alleging that the auditors breached their respective contractual and professional duties owed to it, by among other things, failing to exercise due care, failing to properly plan the audits, failing to obtain evidential matter to support their audit conclusions and reports, ignoring their own risk assessments and essentially failing to perform any meaningful audit testing whatsoever with regard to TBW's accounts with Colonial. Dkt. No. 523 at 8. CBG seeks the following in damages from PWC and Crowe: (1) $590 million for indebtedness CBG incurred under March

and April 2008 bond and equity offerings, (2) $7 million CBG incurred pursuing a TARP application with the federal government, (3) between $8 to $15 million associated with CBG's pension plan, and (4) $515,063,825 million for funds CBG downstreamed to Colonial between March 27, 2008 and June 30, 2009. PWC and Crowe each vigorously dispute that they breached their respective duties to CBG.

PWC and Crowe removed CBG's lawsuit to federal court in the Middle District of Alabama on September 9, 2011. Thereafter, the FDIC moved to intervene in the lawsuit, arguing that CBG's claims against PWC and Crowe are shareholder derivative claims and, as such, belong to the FDIC pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). The FDIC does not assert ownership over CBG's claims related to the TARP expenses, termination of CBG's pension plan, or CBG's March and April 2008 bond and equity offerings, conceding that these claims are direct claims that belong to CBG. Dkt. No. 562 at 11, fn. 5. However, the FDIC claims ownership over the downstream damages, arguing that such damages arise from a claim that constitutes a derivative shareholder claim under Alabama law.

Thereafter, CBG and the FDIC entered into a stipulation whereby the FDIC was allowed to intervene in CBG's action, but the parties expressly agreed that "the intervention is without prejudice to [CBG's] assertion that [it has] a legal right to assert [its] claims … that [its] losses are not derivative of Colonial Bank's losses and without prejudice to [the FDIC's] position that [CBG's] claims are derivative of Colonial Bank's loses." Dkt. No. 88 at ¶ 2. In other words, CBG and the FDIC preserved the issues raised in the instant cross summary judgment motions.

### B. The FDIC's Lawsuit against PWC and Crowe

The FDIC also filed suit against PWC and Crowe on behalf of Colonial, arguing that, at all relevant times, PWC also acted as Colonial's external auditor and Crowe also provided internal audit services to Colonial. Case No. 2:12-cv-00957-BJR, Dkt. No. 281 ¶ 2. The FDIC charges that PWC and Crowe were grossly negligent "in failing to uncover the TBW fraud in the course of their audit work," and that PWC acted wantonly in characterizing certain of Colonial's transactions with TBW in such a manner as to allow Colonial to circumvent federal loan-to-one-borrower limits. The FDIC alleges that "[i]n the absence of PWC's and Crowe's wrongful acts, the TBW fraud would have been discovered many years before it was discovered, and losses currently estimated to exceed $2.2 billion would have been avoided" by Colonial. *Id.* ¶ 10.

The FDIC asserts the following claims against PWC: (1) professional negligence, (2) gross negligence, (3) breach of contract (alleging that Colonial was a third-party beneficiary of the contracts between CBG and PWC), (4) negligent misrepresentation, and (5) wanton disregard of its duties. The FDIC asserts the following claims against Crowe: (1) professional negligence, gross negligence, and negligent misrepresentation.[2] PWC and Crowe each deny that they owed any duties to Colonial, or if they did, that they breached those duties.

On September 24, 2014, Judge Watkins consolidated the FDIC's lawsuit with CBG's lawsuit for discovery purposes. The case was reassigned to this district judge on May 27, 2016.

## III. LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes that, based upon the evidence presented, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[2] The FDIC also asserted breach of a tolling agreement claim against each auditor, but those claims have since been dismissed.

## IV. DISCUSSION

### A. Whether CBG's Claims against the Auditors Belong to the FDIC under FIRREA

Under FIRREA, when the FDIC takes over a failed bank, it acquires "all rights, titles, powers, and privileges of the [bank], and of any stockholder, member, accountholder, depositor, officer, or director of said [bank] with respect to the [bank] and the assets of the [bank]." *Levin v. Miller*, 763 F.3d 667, 669 (7th Cir. 2014) (quoting 12 U.S.C. § 1821(d)(2)(A)(i)). FIRREA also "grants the FDIC ownership over all shareholder derivative claims" brought on behalf of the failed bank because such claims "enforce [the bank's] cause of action," and any recovery is "in favor of the [bank]." *Lubin v. Skow*, 382 F. App'x 866, 870 (11th Cir. 2010) (quoting *Price v. Gurney*, 324 U.S. 100, 105 (1945)). On the other hand, FIRREA does not authorize the FDIC to bring direct shareholder claims because recovery for those claims belongs to the shareholder, not the bank. *Id.* at 871.

Therefore, the question before this Court is whether CBG's claims against PWC and Crowe constitute direct breach of contract and professional negligence claims that belong to CBG or whether the claims constitute derivative claims that belong to Colonial (and, therefore, the FDIC).

### B. Derivative versus Direct Shareholder Claims

In general terms, a derivative action is a suit brought by one or more shareholders on behalf of a corporation to redress an injury sustained by, or to enforce a duty owed to, the corporation. *Altrust Financial Services, Inc. v. Adams*, 76 So.3d 228, 250, fn. 8 (Ala. 2011); *Keller v. Estate of McRedmond*, 495 S.W.3d 852, 867-68 (Tenn. 2016). However, if a shareholder has an individual or primary claim that belongs to him, he may file a direct action and any recovery belongs to the shareholder, not the corporation. *Keller*, 495 S.W.3d at 869.

While the distinction between a shareholder derivative and direct action is not hard to state in general terms, in practice, applying the distinction often proves difficult. *Id*. (citing 12B Fletcher Cyc. Corp. § 5911 (updated through Sept. 2015) (noting that "borderline cases" can "be hard to classify")); John W. Welch, *Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation*, 9 J. Copr. L. 147, 153-54 (1984) ("[A]s the community of interests between shareholders and their closely held corporation becomes more tightly interwoven, the basis upon which one differentiates derivative from individual actions becomes more critical and, as a consequence, the cases become less self-evident."). This is particularly true when a shareholder has separate injuries "that mirror or overlap the injuries suffered by the corporation." *Keller*, 495 S.W.3d at 869 (citing Deborah A. DeMott et al., Shareholder Deriv. Actions L. & Prac. § 2:4 (2015-16)).

There is no "comprehensive rule" governing the distinction between derivative and direct claims. *Id*. at 869-70 (noting that the question of whether a particular claim is derivative or direct is not addressed by the revised Model Corporation Act or by state statutes governing corporations, rather the question must be answered by the law of the state in which the corporation is incorporated). Nevertheless, three approaches have emerged from decisions in which courts have grappled with this issue. *Id*. at 870, *see also Dinuro Investments, LLC v. Camacho*, 141 So.3d 731 (Fla. Dist. Ct. App. 2014).

The first method is referred to as the "direct harm" approach. "Under this approach, the court asks 'whether the harm from the alleged wrongdoing flows first to the company and only damages the shareholders or members due to the loss in value of their respective ownership interest in the company, or whether [conversely] the harm flows 'directly' to the shareholder or member in a way that is not secondary to the company's loss.'" *Keller*, 495 S.W.3d at 870

(quoting *Dinuro Invs.*, 141 So.3d at 735). Thus, a court applying this approach asks who suffered the alleged harm and who would receive the benefit of any recovery. *Id*. (citing *Tooley* v. *Donaldson, Lufkin & Jenrette, Inc*., 845 A.2d 1031, 1033 (Del. 2004)). The "direct harm" approach is the most commonly used method for ascertaining whether a shareholder claim is direct or derivative. *Id*. (citing *Dinuro Invs*., 141 So.3d at 735).

The second method is known as the "special injury" approach. Under this approach, "a claim is direct only if the shareholder has suffered an injury that is separate and distinct from any injury suffered by the corporation." *Keller*, 495 S.W.3d at 870 (quoting Elizabeth J. Thompson, Note, *Direct Harm, Special Injury, or Duty Owed: Which Test Allows for the Most Shareholder Success in Direct Shareholder Litigation?*, 35 J. Corp. L. 215, 218 (Fall 2009)). A few jurisdictions have "added a requirement that the plaintiff must allege a special injury that is not only … distinct from an injury suffered by the corporation, but also from any injury suffered by all other shareholders of the corporation." *Id*.; *see also, Dinuro Invs*., 141 So.3d at 736-37. In other words, the alleged injury must be unique to the shareholder. *Altrust*, 76 So.3d at 247.

The third method is the "duty owed" approach. This approach requires a court to first decide whether a duty was breached and, if so, determine to whom that duty was owed. *Keller,* 495 S.W.3d at 871 (citing Thompson, 35 J. Corp. L. at 222). Under the duty owed test, a claim is direct if the right asserted by the shareholder flows from the breach of a duty owed directly to the shareholder "independent of [his] status as a shareholder … of the corporation." *Branch v. Ernst & Young*, 1995 WL 791941, at *4 (D. Mass. Dec. 22, 1995).

**C. The Derivative versus Direct Claim Analysis under Alabama Law**

The parties agree that Alabama law governs the question of whether CBG's claims are direct or derivative claims. Thus, this Court must determine which of the above methods

Alabama law employs to ascertain the status of a shareholder's claim. Until 2011, the answer to this question was unclear because the Alabama Supreme Court was inconsistent in its approach. For instance, in *Green v. Bradley Constr., Inc*., the Alabama Court appeared to require that a shareholder satisfy both the "direct harm" and "special injury" approaches. 431 So.2d 1226, 1229 (Ala. 1983). In that case, the plaintiff, a former shareholder of Bradley Construction, Inc. ("Bradley"), brought a claim against Bradley and three of its shareholders, alleging that they had fraudulently converted for their personal use funds that should have accrued to the plaintiff. The defendants moved to dismiss the complaint, arguing that the plaintiff did not have standing to bring a derivative action because he was no longer a Bradley shareholder. The lower court granted the motion and the plaintiff appealed. He argued before the Alabama Supreme Court that his claims were not derivative, but instead were direct claims based on fraudulent conversion. The Alabama Supreme Court rejected the plaintiff's argument, stating that "[i]t is only when a stockholder alleges that certain wrongs have been committed by the corporation as a *direct fraud upon him*, and such *wrongs do not affect other stockholders*, that one can maintain a direct action in his individual name." *Id*. at 1229 (emphasis added).

Likewise, in *Shelton v. Thompson*, 544 So.2d 845, the Alabama Supreme Court affirmed the trial court's decision to dismiss the individual claims of shareholders against certain officers and directors of a corporation based, in part, on its conclusion that "the alleged wrongs were to the corporation." *Id*. at 847. The Alabama Court concluded that "[w]hatever damages the plaintiffs may have suffered were incidental to their status as stockholders and whatever recovery may be effected by the derivative action inures to the benefit of all innocent stockholders and not to the plaintiff stockholders individually." *Id*. (quoting *Green*, 431 So.2d at 1229); *see also*, *McLaughlin v. Pannell Kerr Forster*, 589 So.2d 143 (Ala. 1991) (affirming a

summary judgment entered in favor of defendant by the lower court, based in part on the fact that "the alleged wrongs were to the corporations").

However, in *Boykin v. Arthur Andersen & Co*., 639 So.2d 504 (Ala. 1994), the Alabama Supreme Court appeared to drop the "special injury" requirement. In that case, the plaintiffs, two shareholders in Secor Bank, sued certain officers of the bank, as well as the bank's independent auditors, for fraud, conspiracy, professional negligence, and breach of fiduciary duty, alleging that they had been harmed because they "purchase[d], ret[ained], and/or [sold] stock with a fair market value substantially less than that represented by the defendants, and on the diminution of value of [their] stock." *Id*. at 506. The outside accounting firm moved to dismiss the claims, arguing that the only harm suffered by plaintiffs was the diminution in value of their corporate stock, which is a derivative claim. The trial court granted the motion, but the Alabama Supreme Court reversed, holding that plaintiffs' claims were not derivative because plaintiffs did "not seek compensation for injury to the [corporation] as a result of negligence or mismanagement," but instead sought damages for the harm they suffered by relying on the accountants "inaccurate financial reports" that the accountants knew "were to be specifically directed and addressed to the shareholders of the [corporation]." *Id*. at 507.

Therefore, the Alabama Supreme Court appeared to reject the "special injury" requirement, something that was substantiated by the dissent Justice Maddox wrote in *Boykin*. In his dissent, Justice Maddox stated that he believed the trial court correctly determined that the plaintiffs lacked standing to file a direct action against the auditors. "[The plaintiffs'] alleged harm is the diminution in the value of their stock in the corporation; *this harm is not unique to them. This alleged harm is equally suffered by all other shareholders*. …Therefore, these claims

are not properly brought by these plaintiffs acting in an individual capacity." *Id*. at 511 (emphasis added).

However, in *Pegram v. Hebding*, 667 So.2d 696 (Ala. 1995), a case decided after *Boykin*, the Alabama Supreme Court once again embraced the "special injury" requirement. In *Pegram*, the Court rejected a shareholder's attempt to bring a direct claim against the officer of a corporation, finding that the shareholder's alleged damages were "incidental" to his status as a shareholder in the corporation, and therefore, his claim must be brought on behalf of the corporation. *Id*. at 702 ("Whatever recovery might be effect by … [the claim] would inure to the benefit of all innocent [company] stockholders and not to [the plaintiff] individually.").

Thereafter, in 2011, the Alabama Supreme Court clarified its position when it decided *Altrust Financial Services, Inc. v. Adams*, 76 So.3d 228 (Ala. 2011). In that case, a publicly held company, Altrust, sought to reorganize into a privately held company and issued a proxy statement in which it offered to purchase plaintiff-shareholders' stock at $17.25 per share. The proxy statements included reference to Altrust's financial reports that had been audited by an outside accounting firm retained by Altrust. The plaintiff-shareholders ultimately declined to sell their shares to Altrust at the offered price. They alleged that their decision not to sell their shares was based least in part on their reliance on Altrust's financial reports. Later the plaintiff-shareholders learned of "instances of mismanagement, self-dealing, interested-party transactions, and skewing of company liabilities" that they claim were not disclosed in Altrust's financial statements and that meant that the value of their shares in Altrust was far less than $17.25.

The plaintiff-shareholders sued the outside accounting firm, among others, alleging that the misrepresentations and omissions in the proxy statement harmed them because they would have accepted Altrust's offer had they known the true state of affairs of at the company. The

outside accounting firm moved to dismiss the claims against it, arguing that the plaintiff-shareholders did not have standing to bring the claims because they were derivative claims belonging to Altrust. The lower court agreed and dismissed the claims. The plaintiffs appealed and the Supreme Court of Alabama affirmed the lower court's decision, stating that the "substantial harm alleged to be suffered by the plaintiffs as a result of [the outside accounting firm's] breach of duty is not unique to the plaintiffs and is suffered equally by all remaining eligible shareholders in Altrust." *Altrust*, 76 So.3d at 247. "[T]he only harm suffered by the plaintiffs is the diminution in value of their corporate stock, which is not a personal harm, but a harm to the corporation." *Id*. Therefore, the Court concluded, the claims are derivative and belong to Altrust.

In reaching its decision, the Alabama Supreme Court noted that the majority opinion in *Boykin* "was a divergence in the law as it pertains to shareholder standing to bring a direct action alleging fraud against a corporation and its officers and directors." *Altrust*, 76 So.3d at 245. The *Altrust* Court stated:

> [t]he main opinion in *Boykin* offered no guidance or analysis on how that decision might be reconciled with the contrary [Alabama] authority. Specifically, the main opinion in *Boykin* failed to discuss how the damage suffered by the plaintiffs as a result of the alleged fraud by officers, directors, and accountants differed from the damage suffered by other shareholders and whether the plaintiff suffered an injury unique to them. Our research indicates that the decision in *Boykin* has not been followed as it pertains to this point of law.

*Altrust*, 76 So.3d at 245. Accordingly, the *Altrust* Court overruled *Boykin* and adopted Justice Maddox's reasoning, confirming that "[i]t is only when a stockholder alleges that certain wrongs have been committed by the corporation as a *direct fraud upon him, and such wrongs do not affect other stockholders*, that one can maintain a direct action in his individual name." *Id*. at 241 (quoting *Green*, at 431 So.2d at 1229). Thus, the *Altrust* Court confirmed that Alabama law

requires both a "direct harm" and a "special injury" before a shareholder can maintain a direct action. *See Dinuro*, 141 So.3d at 738 (noting that *Altrust* employs a "two-pronged approach" to the derivative versus direct claim analysis).

### D. Whether CBG's Claims Are Direct or Derivative Claims under Alabama Law

#### 1. CBG Cannot Satisfy the "Direct Harm" and "Special Injury" Requirements under *Altrust*

As set forth above, CBG claims that it retained PWC and Crowe to review CBG's finances and internal controls to ensure the accuracy of the financial disclosures CBG issued in compliance with federal banking laws and regulations. To that end, CBG alleges that during the first two months of 2008, PWC and Crowe provided CBG with "a clean bill of health on its financial condition and internal controls." Dkt. No. 560 at 4. However, CBG alleges that the auditors' reassurances were materially false and that Colonial was "critically undercapitalized" by the end of 2007. Dkt. No. 523 at 7.

CBG claims that as a result of the auditors' false reassurances, it downstreamed $515,063,825 million to Colonial between March 2008 and June 2009, but because Colonial was so significantly undercapitalized, the funds were lost as soon as they were received by the bank. In essence, CBG argues that it threw good money after bad based on the auditors' reassurances. CBG maintains that the auditors are liable to it based on a straight-forward breach of contract theory: CBG and the auditors entered into a contractual relationship under which the parties agreed to perform certain obligations, the auditors allegedly breached their obligations to CBG, CBG was damaged as a result of the alleged breaches; therefore, CBG is entitled to recover from the auditors for its damages. CBG points out that it is a fundamental principle of contract law that parties to a contract are bound by the contract terms, and have a corresponding right to

enforce the terms. Therefore, CBG argues, its claims against PWC and Crowe are simple breach of contract claims and the FDIC's attempt to shoehorn the claims into a derivative action on behalf of Colonial is misplaced.

The FDIC counters that under Alabama law, this Court must look to the nature of the alleged wrong rather than the designation used by CBG in order to determine whether the claims against PWC and Crowe are derivative and, thus, belong to the FDIC. Here, the FDIC argues, the wrong alleged by CBG is that PWC and Crowe failed to detect the TBW fraud in Colonial before the bank failed and CBG lost the funds it downstreamed (*i.e.*, invested) in Colonial as a result of the bank's failure. Therefore, the FDIC argues, the alleged harm—the auditors' failure to detect the TBW fraud before Colonial failed—directly harmed Colonial, and CBG's injury—its lost investment in Colonial—flowed from the harm to Colonial and is incidental to CBG's status as Colonial's shareholder. The FDIC further argues that if there had been other Colonial shareholders, they, too, would have lost their investment in Colonial when the bank failed. Thus, CBG's injury is not "unique" and cannot form the basis for a direct shareholder action under Alabama law as set forth in *Altrust*.

Before addressing CBG's argument as to its contract claims, the Court will first address the FDIC's argument regarding whether CBG can meet the "direct harm" and "special injury" requirements to maintain direct claims under existing Alabama law. The Court concludes that CBG cannot satisfy these requirements. The nature of the harm CBG alleges it suffered is that it lost its capital investment—the downstreamed funds—in Colonial. The reason it lost the investment is because Colonial was consumed by the TBW fraud, a fraud that both the FDIC and CBG allege PWC and Crowe would have discovered if the auditors had not breached their

contractual and professional obligations to CBG.[3] Presumably CBG would not have transferred the money had the auditors warned it of Colonial's financial instability, but Colonial would not have been in such a financially precarious position in the first place if the auditors had performed their contractual and professional obligations (at least according to CBG and the FDIC). Thus, the Court concludes that CBG's injury—the lost capital investment—flows directly from the auditors' alleged harm to Colonial. As such, CBG cannot satisfy Alabama's "direct harm" requirement. Nor can CBG satisfy Alabama's "special injury" requirement. This is because once CBG transferred the funds to Colonial, they became Colonial's assets. The FDIC alleges, and CBG does not dispute, that once the funds were transferred to Colonial, CBG retained no further control of them and the monies were to be used by Colonial as it saw fit. Thus, when the funds were lost due to the TBW fraud, they were Colonial's assets. Indeed, the FDIC includes the downstreamed funds in the approximately $2.2 billion it is seeking from the auditors in this lawsuit.

CBG argues that its injury is in fact separate and distinct from that suffered by Colonial because, according to CBG, the FDIC cannot pursue a claim to recover the downstreamed funds from the auditors on behalf of Colonial. CBG argues that the FDIC is unable to pursue such a claim because Colonial actually benefited from receiving the funds. CBG relies on a case from the Seventh Circuit, *Levin v. Miller,* 763 F.3d 667 (7th Cir. 2014), to make this argument. In *Levin*, a bank holding company entered into bankruptcy when its bank subsidiaries failed and were placed into receivership with the FDIC. The holding company sued three of its directors and officers, alleging among other claims, that they "breached their duties of care and loyalty" to the holding company when they "capitulated" to the FDIC and caused the holding company to

---

[3] The FDIC contends that the auditors also owed those duties to Colonial, a point sharply contested by PWC and Crowe However, it is not necessary for the Court to reach this issue in order to resolve the present motion.

downstream millions of dollars in new capital to the subsidiary banks. *Id*. at 670. The holding company asserted that the directors and officers "knew, or should have known, that this was the equivalent to throwing money away." *Id*. The district court dismissed the holding company's claims, concluding that the claims were derivative and belonged to the FDIC under FIRREA. The holding company appealed and the directors and officers defended the district court's decision. Interestingly, the FDIC did not defend the district court's decision, instead conceding that the claims belong to the holding company. *Id.*

The Seventh Circuit reversed the district court. In doing so it stated:

> Fundamentally [the holding company] alleges that [it] threw good money after bad. Again this is based on injury that [the holding company] sustained in its own right, a claim that the FDIC could not pursue as [the subsidiary banks'] successor. (Counsel for the FDIC agreed with the proposition at oral argument.) [The holding company's] loss does not depend on injury to [the subsidiary banks]; to the contrary, [the holding company's] investment would have made the Banks better off. But since they were under water (so the complaint alleges) at the time of the investment, [the holding company] suffered an immediate and irreparable loss.

*Id*. at 671-672 (modifications added, parentheticals in original). Therefore, the Seventh Circuit concluded, the claims were direct claims that belonged to the holding company. CBG argues that here, just like in *Levin*, the FDIC cannot pursue reimbursement for the approximately $500 million CBG downstreamed to Colonial because Colonial benefited from receipt of those funds. Therefore, CBG argues, its injury must be separate and distinct from Colonial's injury.

CBG's reliance on *Levin* is misplaced for at least two reasons. First, *Levin* involved Indiana law, which applies the direct harm approach for determining whether a claim is direct or derivative. Id. at 670 ("Indiana treats a stockholder's claim as derivative if the corporation itself is the loser and the investor is worse off because the value of the firm's stocks declines."). In other words, the *Levin* court did not need to address whether the injury was also a "special injury" (*i.e*., not shared by the corporation or any other shareholders), the second requirement

under Alabama law. The *Levin* court accepted, without any analysis, the parties' contention that the banking subsidiaries were "better off" because of the holding company's investment. Thus, because the holding company's injury did not flow from damage to its subsidiaries (it could not have if the subsidiaries were not harmed), the *Levin* court concluded that the holding company was entitled to proceed directly against the defendants. However, the *Levin* court did not address whether the holding company's claim would satisfy the "special injury" requirement (again, because this is not a requirement under Indiana law). If it had, it very well might have concluded that the holding company could not meet that requirement because its loss of investment in the subsidiary banks would have been suffered equally by the subsidiary banks and any other shareholders.

Second, in *Levin*, the FDIC conceded that it could not pursue the holding company's claim as the subsidiary banks' receiver. *Levin*, 763 F.3d at 672. Therefore, the *Levin* court noted that if the holding company's claim was dismissed "the FDIC cannot gain; it owns the [subsidiary] [b]anks and all of their assets, but the [b]anks cannot collect from the [m]anagers for their shortcomings in the services that they rendered to [the holding company]." *Id*. at 671. Thus, the *Levin* court maintained, if the holding company was not able to pursue the claim against the defendants, it would simply "vaporize", something that Congress did not intend in adopting FIRRREA. *Id*. The same is not true in the instant lawsuit. Once again, the FDIC alleges that the downstreamed funds became Colonial's asset the moment the monies were transferred. Colonial then used those funds as part of its operation and they were swept up in the TBW fraud. The FDIC seeks to recover the downstreamed funds as part of the damages it is pursuing against the auditors for their alleged breaches. Therefore, the claim to the downstreamed funds would not "vaporize" if CBG is not able to pursue it directly.

CBG also relies on *Branch v. Ernst & Young U.S.*, a federal district court case from Massachusetts. 1995 WL 791941 (D. Mass. Dec. 22, 1995). At first glance, *Branch* is remarkably similar to the instant case; it also involves claims brought by a holding company against its auditors to recover for funds the holding company transferred to its subsidiary banks when the auditors failed to disclose that the banks "were hopelessly insolvent." *Id*. at *1. The auditors moved to dismiss the claims, arguing that the claims were derivative and belonged to the subsidiary banks. However, just like the *Levin* court, the *Branch* court determined that the subsidiary banks benefitted from the transfers and, as such, the claims could not be considered derivative, because the corporation could not itself enforce the claims in court. *Id*. at *6 (citing *Howard v. Haddad*, 916 F.2d 167 (4th Cir. 1990)). Once again, here, the FDIC seeks the downstreamed funds as part of its damages claim against PWC and Crowe. Thus, just like in *Levin*, the basis for the *Branch* court's determination that the holding company owned the claims in that case does not exist in this case.[4]

For the foregoing reasons, this Court concludes that CBG cannot satisfy the "direct harm" and "special injury" requirements for maintaining a direct shareholder claim against PWC and Crowe under Alabama law as it currently exists. However, for the reasons discussed below, this Court further concludes that CBG still may pursue its claim directly against the auditors.

### 2. The Alabama Supreme Court Would Recognize an Exception to the "Direct Harm" and "Special Injury" Requirement Based on the Existence of a Direct Duty Owed to the Shareholder

As stated above, CBG cannot satisfy Alabama's "direct harm" and "special injury" requirements for maintaining a direct shareholder action as set forth in *Altrust*. Nevertheless, the

[4] The Court also notes that like *Levin*, *Branch* also applied a different analytic framework than that mandated by Alabama law to determine whether the claims were derivative. *See Branch v. Ernst & Young U.S.*, 1995 WL 791941, at * 4 (D. Mass. Dec. 22, 1995) (applying the "duty owed" analysis).

Court's analysis cannot end there due to one salient fact: PWC and Crowe each had independent contractual obligations to CBG. This fact adds a layer of complexity to the instant case that is not addressed in the *Altrust* decision. And as CBG points out, a recent case from Delaware, *NAF Holdings, LLC v. Li & Fung (Trading) Limited*, 118 A.3d 175 (Del. 2015), is directly on point. In that case, a parent-company ("NAF") entered into a contract with a third party ("Li & Fung") under which Li & Fung agreed to provide services to NAF's subsidiaries. Li & Fung failed to provide the services, which allegedly resulted in a $30 million loss to the subsidiaries. NAF sued Li & Fung for breach of contract, seeking damages based solely on the diminution in the value of the stock of its subsidiaries.

Delaware applies the "direct harm" approach to determine whether a shareholder claim is direct or derivative. *See Tooley*, 845 A.2d at 1035-36. Based on this, Li & Fung moved to dismiss NAF's claim, arguing that NAF's injuries flowed from the harm to its subsidiaries, and as such, the claim belonged to the subsidiaries. The district court accepted Li & Fung's contention that NAF must satisfy Delaware's "direct harm" requirement in order to maintain its breach of contract claim directly against Li & Fung. The district court concluded that "because NAF was injured in its capacity as 100% owner of the NAF Subsidiaries, which had directly incurred the losses, NAF's contract claim against Li & Fung could not be maintained as a direct suit." *Id.* at 177.

NAF appealed to the Second Circuit, arguing that the district court erred in analyzing its breach of contract claim under Delaware's derivative versus direct claim framework. *Id.* at 178. NAF maintained that it had a straight-forward breach of contract claim against Li & Fung and, as such, it was entitled to proceed against Li & Fung under standard contract law. *Id.* The Second

Circuit sought guidance from the Delaware Supreme Court through a certified question. *Id*. at 179.

The Delaware Supreme Court clarified that Delaware's "direct harm" requirement "[was] never intended to" apply in a situation in which the shareholder had a "commercial contract action[]" against a third party. *Id*. (emphasis added). The court further clarified that when a party is seeking to enforce the terms of a commercial contract, "an initial question had to be answered: does the plaintiff seek to bring a claim belonging to her personally or one belonging to the corporation itself?" *Id*. at 180. If the plaintiff seeks to enforce a claim that belongs to her personally, she does not need to satisfy the direct harm requirement (*i.e.*, her injury does not need to be independent of any alleged injury to the corporation). The court concluded that in the case before it, because NAF sought to bring a claim that belonged to itself, it was improper for the district court to hold that the claim was derivative just because its injury was not independent of its subsidiaries' injuries. To so require, the Delaware Supreme Court concluded, would be "alien" and "inconsistent with Delaware law, which seeks to ensure freedom of contract and allow parties to enforce their bargains in our courts. It is a fundamental principle of contract law that the parties to a contract are bound by its terms, and have a corresponding right to enforce them." *Id*.

CBG argues that per the *NAF Holdings* decision, this Court should not reach the direct versus derivative analysis under *Altrust* because the circumstances of this case do not give rise to such an analysis. According to CBG, the salient fact in this case—a fact that is missing from *Altrust* and every other case cited by the *Altrust* Court and the FDIC—is that CBG had direct contractual relationships with PWC and Crowe. Therefore, CBG argues, its claims against the

auditors constitute straight-forward breach of contract claims between contracting parties and CBG is entitled to proceed directly with its claims.

The FDIC counters that *NAF Holdings* is inapplicable to the instant action because the holding in that case turned on to whom the contractual claim "belonged", the shareholder or the corporation. The FDIC charges that this inquiry is irrelevant under Alabama law; rather, Alabama law focuses on the alleged injury in determining whether a claim is direct or derivative. In other words, the FDIC argues, it does not matter to whom the duty is owed, this Court may only look to the nature of CBG's alleged injury—whether it flows from harm to Colonial and whether it is distinct from the harm suffered by Colonial and its other shareholders (if there had been any)—to determine whether CBG's claims are direct or derivative.

The Court agrees that Delaware and Alabama apply different standards to determine whether a shareholder's claim is direct or derivative. Nevertheless, this Court does not read *Altrust* as requiring it to simply ignore the fact that CBG had contractual relationships with PWC and Crowe. To the contrary, this Court concludes that if the present case were before the Alabama Supreme Court, the Alabama Court would create an exception to the "direct harm" and "special injury" requirements based on the existence of the duty owed directly to CBG by PWC and Crowe. *See Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011) (when a federal court applies a state's substantive law and the state's highest court has not spoken on the issue at hand, the federal court "must predict how the highest court would decide [the] case").

The Court makes this determination based on the fact that a number of courts in other jurisdictions have already recognized such an exception. Each of these courts has held that a shareholder can sue for breach of contract to which it is a party, even if the shareholder did not

suffer an injury separate and distinct from that suffered by other shareholders or the corporation itself as a result of the breach. *See, e.g.*, *Hikita* v. *Nichiro Gyogyo Kaisha, Ltd*., 713 P.2d 1197, 1200 (Alaska 1986) (stating that "the majority of jurisdictions" recognize that a shareholder can sue in his own name even if his injury is not separate and distinct from the corporation or its other shareholders "where the wrongful acts are … violations by the wrongdoer of a duty arising from contract or otherwise, and owing directly [] to the [shareholder]."); *Buschmann v. Professional Men's Ass'n*, 405 F.2d 659, 663 (7th Cir. 1969) ("Notwithstanding the fact that the corporation has a cause of action against the defendant for mismanagement, [shareholder] has a personal cause of action against the defendant to recover damages for breach of the contract, even though the corporate cause of action and [shareholder's] cause of action result from the same [breach of contract]."); *Keller*, 495 S.W.3d at 871 (noting that some courts find "an exception to the general rule requiring either direct harm or special injury" if a direct duty is owed by the wrongdoer to the shareholder); *Harrington v. Batchelor*, 781 So.2d 1133, 1135 (Fla. 3d DCA 2001) (stating that an exception to the general rule that a shareholder may not sue for injuries to the corporation exists "where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder"); *Dinuro*, 141 So.3d at 737 (noting that "[m]any courts have" found "an exception to the general rule requiring either direct harm or special injury" when the wrongdoer owes a direct duty to the shareholder); *Ring v. Kaplan*, 2012 WL 763582, *4 (Minn. App. March 9, 2012) (quoting *Hikita*, 713 P.2d at 1200) (citing to the "notable authority establishing that a shareholder's status as a party to a contract also benefitting the corporation entitled the shareholder to maintain a separate direct action" even if the shareholder did not "suffer an injury separate and distinct from that suffered by other shareholders"); *Nicholson v. Ash*, 800 P.2d 1352, 1356 (Colo. App.1990) ("Of course, if the

stockholder is a party to a contract, whether express or implied, with the directors or some other third party, he may maintain a personal suit against that third party."); *Waller v. Waller*, 49 A.2d 449, 453 (1946) ("Unquestionably a stockholder may bring suit in his own name to recover damages from an officer of a corporation for acts which are violations of a duty arising from contract or otherwise and owing directly from the officer to the injured stockholder, though such acts are also violations of duty owing to the corporation."); 12B William M. Fletcher, Fletcher Cyclopedia of the Law of Corporations § 5916 at 479–81, at 470 (rev.vol.2000) ("A shareholder may sue as an individual on contracts made as an individual with corporate officers, other shareholders, or third persons.... In such cases the status of shareholder is of no importance, since the shareholder sues in an individual capacity.").

The Court finds the reasoning in *Hikita v. Nichiro* instructive. 713 P.2d 1197 (Alaska 1986). That case involved a corporation, Adak Aleutian Processors, Inc. ("AAP"), which was owned by several shareholders, including Alaska Foods, Nichiro Gyogyo Kaisha, Ltd. ("NGK"), and Market Place. The shareholders entered into a shareholders agreement whereby they collectively agreed to "exert their best efforts to achieve the corporate and business purposes of AAP." *Id*. at 1198. Ultimately AAP failed and Alaska Foods sued NGK, alleging that NGK violated the shareholders agreement by failing to "'exert its best efforts' to turn [AAP] into a successful venture." *Id*. at 1199. NGK moved for summary judgment, arguing that Alaska Foods' claim was a derivative as opposed to direct claim. The lower court granted the motion, concluding that Alaska Foods did "not have the right to pursue any of the alleged contract actions on its own," but instead must proceed with "a derivative action brought on behalf of [AAP]." *Id*. Alaska Foods appealed.

The Alaska Supreme Court reversed the lower court. In doing so, it acknowledged that "[i]n general, a shareholder has no individual cause of action for injuries to his corporation." *Id*. However, it noted that there is a "major" exception to the general rule: "where there is a special duty, such as a contractual duty, between the alleged wrongdoer and the shareholder."[5] *Id*. The Alaska Supreme Court determined that under this exception, "a shareholder can sue for breach of contract to which he is a party, even if he has not suffered an injury separate and distinct from that suffered by other shareholders" or the corporation. *Id*. at 1200 (citing W. Fletcher, § 5913 at 470) ("Where the wrongful acts are not only wrongs against the corporation but are also violations by the wrongdoer of a duty arising from contract or otherwise, and owing directly to the shareholders, individual shareholders can sue in their own right.")). Therefore, the Alaska Supreme Court concluded, because NGK violated a contractual duty owed directly to Alaska Foods, Alaska Foods was entitled to proceed with a direct action against NGK even though Alaska Foods did "not suffer an injury separate and distinct from that suffered" by AAP or AAP's other shareholders because NGK failed to uphold its contractual obligations. *Id*. 1200.

Likewise, the Seventh Circuit's reasoning in *Buschmann v. Professional Men's Ass'n* is illustrative. 405 F.2d 659 (7th Cir. 1969). In that case, two individuals and a bank entered into a contract whereby one of the individuals, Buschmann, agreed to form a corporation (the "New Corporation"), transfer assets to the New Corporation in exchange for its common stock, and to guarantee the indebtedness of the New Corporation to the bank. In return, the defendant agreed to operate and manage the New Corporation. Buschmann sued the defendant, alleging that he breach the contract by mismanaging the New Corporation and by diverting its assets to his own

[5] The *Hikita* Court also noted that there is a second exception, "where the shareholder suffered an injury separate and distinct from that suffered by other shareholders," but decided the case exclusively relying on the exception noted above. 713 P2d at 1199.

use. The lower court granted the defendant's motion to dismiss, finding that the cause of action belonged to the New Corporation.

Buschmann appealed and the Seventh Circuit reversed the lower court stating:

> Notwithstanding the fact that the corporation has a cause of action against the defendant for mismanagement, *Buschmann has a personal cause of action against the defendant to recover damages for breach of the contract, even those the corporate cause of action and Buschmann's cause of action result from the same wrongful acts*. The defendant made promises directly to Buschmann the breach of which gave rise to a cause of action. Buschmann's cause of action is manifestly personal and not derivative since his liability to pay the corporation's indebtedness to the [b]ank, which is his principle item of damage, does not arise from his status as a stockholder of the corporation.

*Id*. at 663 (emphasis added). Therefore, the Seventh Circuit concluded, Buschmann could bring a claim in his individual capacity, notwithstanding the fact that the corporation was also harmed by the defendant's breach of the contract. *Id*. at 662 ("It is well settled that an individual cause of action can be asserted when the wrong is both to the stockholder as an individual and to the corporation.").[6]

Lastly, the Court finds the Delaware Supreme Court's decision in *NAF Holdings* instructive. Admittedly, as the FDIC points out, Delaware only applies the "direct harm" test, as opposed to Alabama's requirement that there be a "special injury" in addition to a "direct harm." *See Tooley,* 45 A.2d at 1035-36 ("The analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?"). Nevertheless, *NAF Holdings* remains pertinent because the Delaware Supreme Court determined that the shareholder in that

---

[6] However, the Seventh Circuit noted that Buschmann sought damages that "were not sustained by New Corporation and thus could not have been asserted by New Corporation in an action against the defendant," a distinguishing factor from the case at hand. *Buschmann*, 405 F.2d at 663. Nevertheless, this Court finds Buschmann persuasive for the Seventh Circuit's general proposition that a shareholder has a direct breach of contract claim even though the corporation's and the shareholder's claims arise from the same wrongful conduct. *Id*.

case could maintain a direct action, not because it suffered a direct harm, but rather, because the shareholder had a direct contractual relationship with the alleged wrongdoer. The Court determined that "[i]t is a fundamental principle of contract law that the parties to a contract are bound by its terms, and have a corresponding right to enforce them." *NAF Holdings*, 118 A.3d at 180-81. As such, the Court stated, the direct versus derivative analysis is inapplicable: if the shareholder "itself possesses" the "contract claims," it may bring a "breach of contract action directly[.]" *Id*. at 181.

This Court believes that the Alabama Supreme Court would follow the reasoning of the foregoing cases and find an exception to Alabama's "direct harm" and "special injury" requirements if the shareholder is owed a direct contractual duty by the wrongdoer. Just like the shareholders in those cases, here, the alleged wrongdoers, PWC and Crowe, directly owed contractual obligations to the shareholder, CBG, and they allegedly breached those duties. As the Court has already indicated, it is black letter law that parties to a valid contract can enforce the terms of that contract. *NAF Holdings* is nothing more than a restatement of this fundamental principle. *See Hikita*, 713 P.2d at 1200 (quoting the Restatement (Second) of Contracts, § 305(1) (1981) ("A promise in a contract creates a duty in the promisor to the promise to perform the promise even though he also has a similar duty to an intended beneficiary.")).

Nor is the Court persuaded by the FDCI's claim that CBG cannot maintain a direct cause of action against the auditors based on its direct contractual relationship with them because Colonial was the intended beneficiary of the contracts (at least in the case of the CBG's contract with PWC) and Colonial was harmed by the auditors' alleged breach. The FDIC argues that the "undisputed facts" establish that "Colonial and CBG received the exact same defective reports from [PWC and Crowe] through their joint Audit Committee, which led both Colonial and CBG

to falsely believe that Colonial[] … [was] financially sound when [it was] in fact being looted by the TBW fraud. As a result, both Colonial and CBG continued business as usual as a bank and a holding company respectively until the fraud was discovered by federal authorities and both entities failed." Dkt. No. 590 at 9-10.

This argument lacks merit. First, the Court notes that in each of the cases discussed above, the corporation was the intended beneficiary of the breached contract and the corporation was harmed by the defendants' breaches of those contracts. Moreover, a district court interpreting Alabama law recently rejected a similar argument in *ECR Properties, LLC v. Camden County Development, LLC*, 998 F. Supp. 2d 1295 (M.D. Ala. 2014). In that case, ECR entered into an operating agreement with the defendant to form a third entity known as Rivers Reach Development Company, LLC ("Rivers") for the purpose of developing a subdivision in Alabama. Under the terms of the operating agreement, ECR was to make a capital contribution to Rivers and in return, defendant was supposed to transfer title for certain land to Rivers for the use in the subdivision. ECR made the capital contribution, but the defendant never transferred title to the land to Rivers. ECR eventually sued the defendant for breach of contract, among other claims.

The defendant moved to dismiss the complaint, arguing that ECR did not have standing to bring its breach of contract claim against it because the claim must be brought as derivative suit on behalf of Rivers. The district court disagreed. Citing *Altrust*'s mandate that courts must "look to the nature of the wrong alleged" in "analyzing whether a claim is derivative or direct," the court determined that the nature of the wrong alleged by ECR was "for harms directly inflicted against ECR by [the defendant]. ECR does not allege merely that [the defendant] diminished the value of its [Rivers] shares through fraud or mismanagement of Rivers" by failing

to transfer the property to Rivers. *Id*. at 1310. "Rather, ECR alleges that [the defendant] induced ECR to enter into the Operating Agreement with the promise of transferring the properties in exchange for $700,000, but that [the defendant] had no intention of transferring the properties." *Id*. Thus, the court concluded, the "'nature of the wrong' as ECR sees it, is that it *entered into the Operating Agreement at all*—not that [defendant's] nonperformance is harming the value of its shares." *Id*. (quoting *Altrust*, 76 So.3d at 238) (emphasis in original). In other words, the *ECR Properties* court determined that ECR had standing to bring a direct action against the defendant despite the fact that contract between ECR and the defendant was intended to benefit the corporation and the defendant's breach harmed the corporation.

**E. Whether PWC and Crowe Can Set-off Any Damages Awarded to CBG against Any Damages Awarded to the FDIC**

The FDIC argues that if this Court concludes that CBG may directly pursue its claims against PWC and Crowe, then the Court should "enter summary judgment that any damages sought by CBG are necessarily distinct from the damages sought by the FDIC[] and that the Auditors are not entitled to reduce any damages awarded to the FDIC[] by any damages awarded to CBG." Dkt. No. 522 at 17. CBG does not object "to a finding that the claims are not 'duplicative,'" however, CBG argues, to the extent that the FDIC[] is in reality seeking a more expansive ruling that assets transferred by [CBG] during 2008 and 2009 are, or are not, properly considered a 'benefit' to Colonial Bank that should be taken into account as a part of the FDIC[] damage calculation, [CBG] objects to the FDIC[]'s request as being beyond the scope of the relief sought in its counterclaim for declaratory judgment and not a necessary element of granting relief in favor of CBG." Dkt. No. 571 at 2.

Not surprisingly, PWC and Crowe object to the FDIC's request. They do not take a position as to whether CBG may directly pursue its claims against them, but they do argue that if

this Court determines that CBG may do so, any recovery CBG receives for the downstreamed funds must be offset against the FDIC's damages. Otherwise, PWC and Crowe argue, they will be forced to pay twice for the same alleged injury.

Currently, there are a number of substantive motions pending before this Court. At least two of the pending motions relate to whether PWC and/or Crowe are liable for Colonial's alleged damages and, as such, have the potential to moot the issue of whether any recovery by CBG must be off-set against any recovery by the FDIC. Therefore, the Court will reserve that issue until after it has resolved the motions regarding the auditors' obligations, if any, to Colonial.

Lastly, in ruling on the instant cross motions for summary judgment, the Court accepted, without question, several factual allegations by the FDIC and/or CBG. It accepted the allegations for purposes of these motions only and did so either because a dispute did not exist between the FDIC and CBG regarding the particular factual allegations or, if the FDIC and CBG did dispute a particular allegation, the dispute was not material to the motions currently before this Court. However, it is important to note that in accepting the factual allegations as presented by the FDIC and CBG for purpose of the instant motions, the Court did not make a determination as to the veracity of the allegations. Indeed, the Court has not reached many significant issues that are the subject matter of the pending motions referenced in the preceding paragraph. For instance, the Court has not determined whether Colonial was a third-party beneficiary of the engagement letters between PWC and CBG, whether Crowe and/or PWC owed Colonial professional obligations and, if so, whether one or both of the auditors breached those obligations, nor whether the TBW fraud caused Colonial to fail. These issues are left for another day.

## V. CONCLUSION

For the foregoing reasons, this Court hereby GRANTS CBG's Motion for Summary Judgment against the FDIC on Its Request for Declaratory Judgment [Dkt. No. 523] and DENIES, in part, the FDIC's Motion for Summary Judgment as to the Ownership of CBG's Claims and defers ruling on the set-off issue. [Dkt. No. 522].

Dated this 18th day of April, 2017.

Barbara J Rothstein

Barbara Jacobs Rothstein
U.S. District Court Judge