IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE COLONIAL BANCGROUP INC., and KEVIN O'HALLORAN | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) ) | |
| | ) ) | CASE NO. 2:11-cv-746-BJR |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP, | ) ) ) | |
| Defendants. | ) ) ) | |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:12-cv-957-BJR |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP | ) ) ) | |
| Defendants. | ) | |

**ORDER REGARDING MOTIONS FOR PARTIAL SUMMARY JUDGMENT AGAINST THE FDIC BY PWC AND CROWE**

## I.      INTRODUCTION

Two motions are before the Court: (1) Defendant PricewaterhouseCooper LLP's ("PWC") Motion for Partial Summary Judgment as to the FDIC's Claims and (2) Defendant Crowe Horwath LLP's ("Crowe") Second Motion for Summary Judgment on the FDIC's Claims. Dkt. Nos. 535 and 537, respectively.  The Federal Deposit Insurance Corporation as Receiver for Colonial Bank ("FDIC") filed a joint opposition to the motions. Dkt. No. 567. Having reviewed the motions, the opposition thereto, the record of the case, and the relevant legal authority, the Court: (1) denies PWC's motion as to the FDIC's claims based on PWC's 2002 through 2006 year-end audits;  (2) denies Crowe's and PWC's motions as to the "Shipped Not Paid" damages; and (3) grants Crowe's and PWC's motions as to the FDIC's claim for prejudgment interest.[1] The reasoning for the Court's decision follows.

## II.      BACKGROUND

As this Court has set forth many times over the course of this litigation, Colonial Bank ("Colonial") was the victim of a massive, long-running fraud perpetrated by one of its largest customers, Taylor, Bean & Whitaker ("TBW"), that eventually culminated in Colonial's failure. *See*, *e.g*., Dkt. Nos. 442, 450, 453, 615, and 662. The FDIC was appointed receiver for Colonial by the Alabama state banking authorities in August 2009. Crowe and PWC were the internal and external auditors, respectively, for Colonial's parent company, Plaintiff The Colonial BancGroup, Inc. ("CBG") during the years that Colonial was victimized by the fraud. CBG

---

[1]  The Court also: (1) strikes Crowe's motion as to the FDIC's claim for damages based on the 2005 and 2008 audit years; this argument is moot in light of this Court's Order Denying Crowe's Motion to Dismiss in Part the FDIC's Third Amended Complaint [Dkt. No. 615]; (2) strikes PWC's motion as to the FDIC's wantonness claim; this argument is moot in light of this Court's previous Order Denying PWC's Motion to Dismiss a Portion of the FDIC's Third Amended Complaint [Dkt. No. 582]; and (3) holds in abeyance Crowe's claim that the FDIC seeks only consequential damages that are barred by the terms of the engagement letters that governed Crowe's audit work; the Court will issue a separate order on this claim.

instituted this lawsuit against Crowe and PWC, alleging that they breached the professional

duties they owed CBG. The FDIC sued Crowe and PWC on behalf of Colonial.

As set forth above, with the current motions, Crowe and PWC seek summary judgment as

to some of the FDIC's claims. For the sake of clarity, the Court will follow the parties' lead and

set forth the remaining relevant factual background as to each claim when addressing that

specific claim below.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when the moving party establishes that, based upon the

evidence presented, "there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## IV.    DISCUSSION

### A.    Whether the FDIC's Claims Based on PWC's 2002 through 2006 Year-End Audits Are Time-Barred

PWC moves for summary judgment on the FDIC's claims in the Third Amended

Complaint ("TAC") based on PWC's 2002 through 2006 year-end audits. PWC argues that these

claims were raised for the first time in the TAC, which was filed on November 30, 2015. Dkt.

No. 281. The parties agree that the statute of limitations on the FDIC's tort claims expired on

November 6, 2012 and the limitations period on the FDIC's contract claims expired on

November 6, 2015. Therefore, PWC argues, the newly added claims in the TAC are time-barred

and must be dismissed as a matter of law.

### 1.    Procedural Background

The FDIC initiated this lawsuit against PWC and Crowe on October 31, 2012, asserting

claims for professional negligence, gross negligence, breach of contract (against PWC only), and

negligent misrepresentation. *See* Dkt. No. 1, *Federal Deposit Insurance Corporation v.*

*PricewaterhouseCoopers, LLP, et al.*, 2:12-cv-00957-BJR.[2] The complaint spanned fifty plus pages and detailed the massive fraud committed against Colonial by TBW from 2002 through 2009. *Id.* at ¶ 1. The FDIC filed an amended complaint on January 28, 2013. Case No. 12-957, Dkt. No. 29. The changes in the amended complaint were minimal and only involved four of the 98 paragraphs in the original complaint.

Defendants moved to dismiss the first amended complaint; the Honorable Chief Judge Watkins denied the motion on September 10, 2013.[3] Case No. 12-957, Dkt. No. 52. However, Chief Judge Watkins instructed the FDIC to supplement the first amended complaint to include facts that connected the "Shipped Not Paid" fraud[4] to PWC's conduct. *Id.* at 18. Pursuant to the Court's order, the FDIC filed a second amended complaint on September 20, 2013. Case No. 12-957, Dkt. No. 53. Defendants moved to dismiss the second amended complaint and Chief Judge Watkins denied the motion on July 15, 2014. Case No. 12-957, Dkt. No. 73.

In November 2015, the FDIC sought leave to file the TAC. Dkt. No. 225. Crowe opposed the motion on several grounds, including futility due to untimeliness and prejudice. Dkt. No. 238. Chief Judge Watkins granted the FDIC's motion and the FDIC filed the TAC on February 10, 2016. Dkt. No. 281. The TAC added claims against Crowe based on the 2005 and 2008 audit years and against PWC based on the 2002 through 2006 year-end audits.[5] PWC now moves for summary judgment on those claims, arguing that they are time-barred as a matter of law. *See* Dkt. No. 535 at 3.

---

[2] The case was consolidated with the instant case on September 24, 2014. Dkt. No. 92.

[3] The cases were reassigned to this District Judge on May 27, 2016. Dkt. No. 399.

[4] The "Shipped Not Paid" fraud will be explained in detail later in this order.

[5] Crowe moved to dismiss the newly added claims and this Court denied Crowe's motion to dismiss on December 20, 2016. Dkt. No. 615. In denying Crowe's motion, this Court determined that the claims based on the 2005 and 2008 audit years arose out of the same conduct and transactions as those timely alleged in the original complaint, and as such, relate back to the original complaint pursuant to Federal Rule of Civil Procedure 15. *Id.* at 8.

### 2.      Federal Rule of Civil Procedure 15(c)

A claim added to an amended complaint relates back to the claims asserted in the original complaint—for statute of limitations purposes—if it arises out of the same conduct set forth in the original complaint. Fed. R. Civ. P. 15(c); *see also*, *Forzley v. AVCO Corp. Elec. Div*., 826 F.2d 974, 981 (11th Cir. 1987) ("Rule 15(c) is based on the concept that a party who is notified of the litigation concerning a given transaction or occurrence has been given all the notice that the statutes of limitation are intended to afford."); *Simmons ex rel. Elliott v. United States*, 225 F.R.D. 688, 692 (N.D. Ala. 2004) (noting that relation back under Rule 15 is "permissive"); *Brown v. Montgomery Surgical Ctr.*, 2013 WL 1163427, at *7 (M.D. Ala. Mar. 20, 2013) ("[T]he critical issue in Rule 15(c) determinations is whether the original complaint gave notice to the defendant of the claims now being asserted."). On the other hand, "[w]hen new or distinct conduct, transactions, or occurrences are alleged as grounds for recovery, there is no relation back, and recovery under the amended complaint is barred by limitations if it was untimely filed." *Brown*, 2013 WL 1163427, at *7 (quoting *Moore v. Baker*, 989 F.2d 1129, 1131 (11th Cir. 1993) (citation and internal quotation marks omitted)).

### 3.      The Claims Based on PWC's 2002-2006 Year-End Audit Work Relate Back to the Original Complaint under Federal Rule of Civil Procedure 15

"The text of Rule 15 makes explicit Congress' intent that leave to amend a complaint 'shall be freely given when justice so requires.'" *Seigel v. Converters Transp., Inc*., 714 F.2d 213, 216 (2d Cir. 1983) (quoting Fed. R. Civ. P. 15(a)). Rule 15 "'provide[s] [the] maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities.'" *Id*. (quoting 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1471, at 359 (3d ed. 1971)). The purpose of Rule 15 is "to ameliorate the effect of the statute of

limitations." *Id*. (quoting 6 Wright et al., *supra*, § 1471, at 495 (footnote omitted)). To this end, Fed. R. Civ. P. 15(c) states:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

Here, the parties agree that the FDIC's claims arising out of PWC's 2002 through 2006 year-end audits are barred by the statute of limitations unless the claims relate back to the original complaint. Thus, this Court must start its analysis with the original complaint. In paragraph one of the original complaint, the FDIC asserts that Colonial was the victim of "a massive, multi-year fraud" perpetrated by Colonial's "largest mortgage banking customer, [TBW]." Case No. 12-00957, Dkt. No. 1 ¶ 1. The FDIC further alleges that at "all relevant times during this fraud [PWC] served as [Colonial's] external auditor [.]" *Id*. ¶ 2. The FDIC claims that "[a]ll the time that TBW was carrying out" this fraud, PWC "never realized that many hundreds of millions of dollars of [Colonial] assets did not exist, had been sold to others, or were worthless." *Id*. Instead, the FDIC alleges, "PWC repeatedly issued unqualified opinions that Colonial's financial statements were fairly stated and effective internal controls were in place[.]" *Id*. The complaint further charges that "PWC [] continued to perform auditing services for Colonial without ever detecting the TBW fraud. Had [PWC] performed [its] auditing work in accordance with applicable professional standards, [it] would have learned of the TBW fraud in time to prevent additional losses suffered by Colonial at the hands of TBW." *Id*. The complaint claims that but for the "acts and omissions constituting professional malpractice, gross negligence, breach of contract, and negligent misrepresentation committed by PWC in connection with its year-end 2007 audit engagement, subsequent quarterly reviews, and

consulting for [Colonial]," the TBW fraud "would have been discovered by 2007 or early 2008, and losses currently estimated to exceed $1 billion would have been avoided." *Id.* ¶ 3.

This Court concludes that the new allegations in the TAC concerning PWC's 2002 through 2006 audit work arise out of the same conduct alleged in the original complaint—that from 2002-2009, PWC, as Colonial's external auditor, failed to detect the massive TBW fraud that infested Colonial. As set forth in the preceding paragraph, the FDIC's original complaint alleged that PWC was Colonial's auditor "*at all relevant times*" during "the massive, *multi-year* fraud" and that "*[a]ll the time* that TBW was carrying out" its fraud, PWC "never realized" TBW was stealing hundreds of millions of dollars from Colonial, instead PWC "*repeatedly* issued unqualified *opinions* that Colonial's financial statements were fairly stated and effective internal controls were in place." *Id.* ¶ 2 (emphasis added). The original complaint also alleges that PWC's audit work "fell short of governing professional standards" in 2007 "*and other years*". ¶ 23 (emphasis added) (parenthetical omitted). These allegations were sufficient to place PWC on notice that its entire relationship with Colonial was at issue. Given the breadth of the allegations in the original complaint, PWC "ought to have been able to anticipate or should have expected that … other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question." 6A Charles Alan Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1471 (3d ed. 1971)); *see also*, *Seigel*, 714 F.2d at 216 ("When a suit is filed in a federal court under the Rules, the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be.").

Indeed, the factual allegations in the TAC are nearly identical to those in the original complaint (except for the specific years alleged and the amount of damages claimed). *See*, *e.g.*, Dkt. No. 1 ¶ 3 compared to Dkt. No. 281 ¶ 10; Dkt. No. 1 ¶ 22 compared to Dkt. No. 281 ¶ 29;

Dkt. No. 1 ¶ 23 compared to Dkt. No. 281 ¶ 30; Dkt. No. 1 ¶ 92 compared to Dkt. No. 281 ¶ 130; and Dkt. No. 1 ¶ 96 compared to Dkt. No. 281 ¶ 134. Likewise, for purposes of this motion, the TAC does not assert any new causes of action—both pleadings assert professional negligence, gross negligence, negligent misrepresentation, and breach of contract claims against PWC.[6] Indeed, the claims based on the 2002-2006 year-end audits are based on the same theory of liability as asserted in the original complaint: if PWC's audit work had adhered to the required professional standards, then it would have discovered the TBW fraud and prevented Colonial from incurring additional losses. The contractual and professional standards that the FDIC alleges PWC breached with respect to the 2007 year-end audit are substantially similar to PWC's obligations for the 2002-2006 year-end audits.

PWC argues that the claims arising out of its 2002-2006 year-end audits cannot relate back to the date of the FDIC's original complaint because courts have recognized that audits performed by an accountant in different years are separate and distinct transactions and do not relate back to an original complaint that asserts claims based on other audit years. PWC's argument is misplaced. Of the cases PWC cites for this proposition, only two involve the relation back doctrine under Rule 15. The first case, *Moore v. Baker*, is easily distinguishable from this case. *Moore*, 989 F.2d 1129. In *Moore*, a patient sued her surgeon for an alleged lack of informed consent and later sought to amend the complaint after the statute of limitations expired, to add claims for negligence related to her surgery and postoperative care. *Id*. at 1131. The district court originally granted the plaintiff's motion to amend, but later vacated the order and granted summary judgment to the surgeon. The plaintiff appealed the denial of her motion to

---

[6]  The TAC added a claim for wantonness and a claim for breach of the tolling agreement between the FDIC and PWC; however PWC's statute-of-limitations argument is not directed at those two claims, both of which have been addressed by this Court's prior orders. *See* footnote 1 *supra*.

amend the complaint as well as the grant of summary judgment. The Eleventh Circuit affirmed the district court on both counts. With respect to the motion to amend, the Eleventh Circuit noted "[t]he critical issue in Rule 15(c) determinations is whether the original complaint gave notice to defendant of the claim now being asserted." *Id*. (citing *Wood Exploration & Producing Co., Inc. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1299-1300 (5th Cir. 1971)). The Eleventh Circuit determined that the plaintiff's original complaint did not put the surgeon on notice that "new claims of negligence might be asserted." *Id*. at 1132. The Court noted that the original complaint focused on the surgeon's actions before the plaintiff decided to have surgery, while the amended complaint focused on the surgeon's actions during and after the surgery. The Court further noted that in order for the plaintiff to recover on her negligence claims, she would have to "prove completely different facts than would otherwise have been required to recover" on her original complaint. *Id*.

Here, unlike the plaintiff in *Moore*, the FDIC would not need to "prove completely different facts" in order to recover damages based on PWC's 2002-2006 year-end audits. The FDIC's claims based on the 2002-2006 audits rely on the same factual allegations and legal standards on which the FDIC's claims related to the 2007 audit are based.

PWC also cites *St. Paul Fire & Marine Ins. Co. v. Touche Ross & Co*., 507 N.W.2d 275 (Neb. 1993), a non-binding state court case from Nebraska. *St Paul Fire* is easily distinguishable from the present case. In *St. Paul Fire*, the plaintiff asserted claims that defendant accountant had negligently examined and reported on the financial condition of a third party for the fiscal years ending in 1982-85. *Id*. at 278. Plaintiff sought to amend the complaint to add a fraud claim for the years previously pled as well as for the fiscal year 1981. The trial court barred the claims as untimely and the plaintiff appealed. *Id*. In addressing the appeal, the Nebraska Supreme Court

started with the unremarkable proposition that "[t]he general rule is that for limitations purposes, an amended pleading in the same cause of action ordinarily relates back to the original pleading." *Id*. at 281, 284 (citing *Forker Solar, Inc. v. Knoblauch*, 396 N.W.2d 273 (Neb. 1986) ("[F]raud alleged for the first time in an amended petition related back to the original petition where the alleged misrepresentations were nearly identical to those alleged in the original petition.")). The Nebraska Supreme Court then concluded that, with the exception of the 1981 audit year, the plaintiff's amended claims related back to the original complaint. *Id*. at 282. The *St. Paul Fire* Court determined that the 1981 audit year did not relate back because "no mention" of that year was made until the filing of the amended complaint.

Here, PWC cannot credibly argue that the 2002-2006 year-end audits were not "mentioned" in the FDIC's original complaint. As discussed above, the original complaint detailed a seven-year fraud and alleged that PWC was Colonial's external auditor throughout the entire fraud. In addition, the TAC claims based on the 2002-2006 year-end audits are based on the same factual allegations asserted in the original complaint. Thus, unlike in *St. Paul Fire*, it cannot be said here that the 2002-2006 year-end audits were not mentioned in the original complaint. Accordingly, this Court finds that relation back under Rule 15(c) is appropriate. *Stevelman v. Alias Research Inc*., 174 F.3d 79, 87 (2d Cir. 1999) (noting that courts should be particularly liberal in granting relations back under Rule 15 "[w]here no new cause of action is

alleged"). PWC's 2002-2006 year-end audits relate back to the FDIC's original claims under Rule 15 and are not time-barred.[7,8]

**B.      Whether Crowe and PWC Are Liable for Colonial's "Shipped Not Paid" Losses**

One category of damages that the FDIC seeks to recover in this lawsuit relates to losses that Colonial suffered as a result of what the parties refer to as the "Shipped Not Paid" fraud. Crowe and PWC move for summary judgment as to those damages, arguing that even if the FDIC successfully establishes that they negligently performed their audit duties, such negligence did not cause the "Shipped Not Paid" damages as a matter of law. They claim that the undisputed evidence demonstrates that their alleged negligence was not the proximate cause of Colonial's "Shipped Not Paid" losses. The FDIC counters that the auditors' alleged negligence did cause the "Shipped Not Paid" losses or, at a minimum, a question of fact exists as to whether the auditors' actions were the proximate cause of the damages. Before discussing the merits of the parties' arguments, it is necessary to understand what the "Shipped Not Paid" fraud is.

---

[7]   The remainder of the cases cited by PWC do not involve the relation back doctrine under Rule 15. Two of the cases—*FDIC v. Deloitte & Touche*, 834 F. Supp. 1129 (E.D. Ark. 1992); and *Williamson ex rel. Lipper Convertibles, LLP v. PricewaterhouseCoopers LLP*, 872 N.E.2d 842 (N.Y. 2007)—involved the continuous-treatment tolling doctrine. In other words, in each of those cases, the plaintiff had not filed a timely claim that it later sought to amend with allegations that would be time-barred but for the relation back doctrine under Rule 15. Rather, the plaintiffs attempted to argue that their original claims were timely because the statute of limitations had been tolled pursuant to the continuous treatment doctrine. *See, e.g.*, *Deloitte & Touche*, 834 F. Supp. at 1147. The courts in those cases declined to toll the statute of limitations, holding that the continuous-treatment doctrine was not applicable to audits performed in consecutive years. *Id*. at 1150. However, the continuous-treatment doctrine is not applicable to the case at hand. The FDIC does not argue that the statute of limitations in this case was tolled due to the ongoing relationship between Crowe and Colonial. Rather, the FDIC argues that the amended claims based on the 2002-2006 year-end audits arose out of the same conduct, transactions, or occurrences as those timely alleged in the original complaint, and as such, relate back to the original claims under Rule 15.

[8]   PWC repeatedly references statements made by the FDIC on its webpage as well statements the FDIC allegedly made during an October 22, 2013 banking conference. *See, e.g.* Dkt. No. 535 at 5-6. These statements are not relevant to the question of whether "the original *complaint* gave notice" to PWC of the claims based on the 2002-2006 year-end audit. *Moore*, 989 F.2d 1129 at 1131 (emphasis added).

### 1.      The "Shipped Not Paid" Fraud

As previously discussed, TBW operated a massive, multi-year fraud that ultimately misappropriated over $2 billion from Colonial. The fraud centered in Colonial's Mortgage Warehouse Lending Division ("MWLD"), a funding operation that provided short-term, secured financing to mortgage originators. TBW was the MWLD's largest customer. The fraud began in 2002 when Lee Farkas, TBW's chairman, convinced two Colonial employees, Catherine Kissick and Teresa Kelly, to "sweep funds" between accounts TBW maintained at Colonial in order to hide overdrafts in TBW's master account. The fraud then evolved beyond masking overdrafts by TBW to stealing money from Colonial. The conspirators achieved this by causing Colonial to extend financing to TBW through the MWLD, but instead of receiving collateral in viable mortgages, Colonial received a participation interests fake mortgages, mortgages that had already been pledged to other banks, or mortgages that were otherwise unmarketable. The fraudsters also arranged for TBW to sell pools of loans to Colonial that contained either fake or greatly impaired loans in return for additional funding from the MWLD.

The "Shipped Not Paid" aspect of the fraud began in late December 2008, at the earliest, and functioned as follows. Colonial would advance funds to TBW through the MWLD in exchange for a 99% participation interest in individual mortgage loans. The loans were then sent to Bank of America ("BOA") pursuant to a Custodial Agreement and a Bailee Letter executed by BOA, TBW, and Colonial on or about July 2008.[9] Under the Custodial Agreement and Bailee Letter, BOA agreed to hold the loans "in trust as Colonial's bailee" pending resale of the loans to a TBW affiliate, Ocala Funding ("Ocala"). BOA was not supposed to transfer the loans to Ocala

---

[9]  The loans were actually sent to LaSalle Bank, which was a party to the Custodial Agreement and Bailee Letter. BOA later acquired LaSalle; therefore, this Court refers to BOA as the Custodian/Bailee of the "Shipped Not Paid" loans.

until BOA received payment from Ocala; when it did, BOA was required to send the money to Colonial (thereby repaying Colonial the original amount loaned to TBW). *Id*. ¶ 6. BOA was obligated either to remit the money to Colonial within 45 days of Colonial extending the loan to TBW or to return the collateral.

The parties agree that BOA initially complied with its obligations under the Custodial Agreement and Bailee Letter. *See*, *e.g*., Dkt. No. 535, Ex. 4 Expert Damages Report of Kenneth K. Malek dated July 20, 2016 ("Malek Report") at 16, 38 (stating that the Shipped Not Paid "phase of the fraud began in April of 2009" and the "Shipped Not Paid damages began accruing in May 2009"). The parties also agree, however, that beginning in April 2009, when Ocala purchased one of the loans, instead of sending the funds to Colonial as it was supposed to do under the Custodial Agreement and Bailee Letter, BOA sent the money to TBW or other third parties. BOA did this pursuant to TBW's instructions. Thus, while Colonial funded the loans through its MWLD, Colonial was not paid when the loans were sold to Ocala. "The absence of payment to Colonial is the basis for the Shipped Not Paid damages." *Id*. at 41. By the time Colonial closed in August 2009, there were approximately 4,800 Shipped Not Paid loans, with unpaid balances totaling approximately $900 million, for which Colonial has never been paid. *Id*. at 41-42, Malek Rebuttal Report at 29-30.

## 2.     Crowe's and PWC's Audit Work

As stated earlier, Colonial's parent company, CBG, retained Crowe to act as its internal auditor. As part of that work, Crowe audited Colonial's MWLD "on a biennial basis." Dkt. No. 537, Ex. 9, Part 2 at 93. Crowe performed audit work in the MWLD in 2008, including auditing the "Shipped Not Paid" report in August 2008. *Id*. at Ex. 11 At that time, the report listed 53 unpaid loans that had been shipped at least 45 days earlier (recall that per the terms of the

agreement between Colonial and TBW, within 45 days of loaning funds to TBW, Colonial was either to be repaid or the value of the mortgage loan would be assigned to Colonial). *Id*. The parties agree that Crowe tested ten of the loans and noted no reportable exceptions as to those loans. *Id*. Of the ten loans Crowe tested, four were TBW loans. *Id*. at Exs. 11 and 12. On those four loans, "Crowe's testing determined that two of the loans had been returned to [Colonial] so there was no need for management to send a follow-up letter to the would-be investors, while the other two [loans] had been purchased by investors on August 1, 2008, so again there was no need for management to follow-up." *Id*. at 14 (citing Ex. 12). Crowe claims that the FDIC does not challenge its work with respect to the "Shipped Not Paid" loans. *Id*. ("Plaintiffs' liability expert … neither challenges nor criticizes [Crowe's] work."). Finally, the parties agree that Crowe did not perform any audit work on the MWLD in 2009.

Likewise**,** PWC claims that it last performed audit work for CBG on March 2, 2009 (the date of its 2008 year-end report), over two months prior to when the FDIC's experts claim Colonial suffered its first "Shipped Not Paid" losses. PWC also claims that the FDIC's causation expert has not identified any steps PWC should have taken in the 2008 year-end audit that would have detected the "Shipped Not Paid" fraud.

### 3.   Whether Crowe and/or PWC Are Liable for Colonial's "Shipped Not Paid" Damages

The parties agree that Alabama law governs the question of causation as to the "Shipped Not Paid" damages. Under Alabama law, "[f]or an act to constitute actionable negligence, there must be not only some causal connection between the negligent act complained of and the injury suffered, but also the connection must be by a natural and unbroken sequence, without intervening, efficient causes, so that, but for the negligence of the defendant, the injury would not have occurred." *City of Mobile v. Havard*, 263 So.2d 805, 810 (Ala. 1972). In other words,

the existence of a causal connection between the defendant's action and the injury is not

sufficient to establish liability; the defendant's action must also have been the proximate cause of

the injury in order for liability to attach to defendant. *Id*. Proximate cause exists if the "injury [is

the] natural and probable consequence of the negligent act [] which an ordinarily prudent person

ought reasonably to foresee would result in injury." *Vines v. Plantation Motor Lodge*, 336 So.2d

1338, 1339 (Ala. 1976).

If, between the alleged negligent act and the injury, there occurs an independent,

intervening, unforeseeable event, the causal connection between the alleged negligence and the

injury is broken. *Id*. (citing *Mobile City Lines, Inc. v. Proctor*, 130 S.2d 388 (Ala. 1961)). As the

Alabama Supreme Court has stated: "[A] person, who by some act or omission sets in motion a

series of events, is not responsible for consequences of intervention of another agency, unless at

the time of his original act or omission, the act of the intervening agency could reasonably be

foreseen. If so, the causal chain is not broken. If the injury results from an independent

intervening, efficient cause, not reasonably foreseeable, the original negligent act or omission is

not the proximate cause of injury." *Id*. (citing *Liberty Nat'l Life Ins. Co. v. Weldon*, 100 So.2d

696 (1958)).

### a. Whether There Is a Causal Connection Between Crowe's and PWC's Alleged Negligence and the "Shipped Not Paid" Losses

Crowe and PWC argue that there is no causal connection between their actions and the

"Shipped Not Paid" losses. They contend that the evidence in this case conclusively

demonstrates that: (1) Crowe last performed audit services for the MWLD in October 2008, (2)

when Crowe reviewed a sample of loans from the "Shipped Not Paid" Report that were 45 days

or older in October 2008, Crowe accurately determined that there were no problems with how

Colonial was handling those loans, (3) PWC last performed audit services for the MWLD on

March 2, 2009, (4) BOA did not breach its custodial and bailee duties with respect to the "Shipped Not Paid" loans until April 2009, (5) the damages associated with those breaches did not begin to accrue until May 2009, and (6) the FDIC's experts do not identify any steps that Crowe and/or PWC should have taken that would have prevented the "Shipped Not Paid" fraud. Therefore, Crowe and PWC maintain, the FDIC cannot point to any evidence in the record that establishes that either auditor caused Colonial's "Shipped Not Paid" losses.

The FDIC counters that the "TBW fraud, which began in 2002 and continued until 2009, was one massive, continuous fraud" and the "Shipped Not Paid" scheme was "just [a] different facet[] of the same master fraud." Dkt. No. 567 at 3, 6. The FDIC points out that the "Shipped Not Paid" aspect of the fraud involved the same victim (Colonial), the same Colonial customer (TBW), was run through the same Colonial division (the MWLD), was masterminded by the same individual (Farkas), and was meant to achieve the same purpose (to cover up TBW's overdrafts). The FDIC also points to testimony from Teresa Kelly (one of the Colonial employees who was involved in the TBW fraud) in which she states that the scheme was "one very big fraud" meant to disguise TBW's overdrafts. *Id.* Ex. 10, Teresa Kelly Dep. 193:8-26, Mar. 1, 2016. Likewise, Catherine Kissick (another Colonial employee involved with the fraud) testified that if the auditors had simply asked to see any of the loan documentation, the entire fraud would have immediately unraveled. Dkt. No. 297, Ex. 15, Catherine Kissick Dep. 849:3-21, Jan. 20, 2016 (stating that if Crowe or PWC had ever asked to see the loan documentation for the AOT facility "[t]he jig would be up"). Therefore, the FDIC argues, any culpable conduct by the auditors related to the earlier permutations of the TBW fraud, are also the basis for PWC's and Crowe's liability for Colonial's "Shipped Not Paid" damages.

The FDIC's experts and other witnesses are prepared to testify that each of the auditors breached their professional duties while performing their auditing duties. *See*, *e.g*., Dkt. No. 567, Ex. 13 Declaration of Harry James Potter; Ex. 39 Expert Report of Douglas R. Carmichael; Ex. 81 at 320:12-324:16, Excerpts from Simuel Sippial Deposition. The FDIC's experts and witnesses are further prepared to testify that if PWC and Crowe had properly performed their duties, the TBW fraud would have been discovered before BOA began to breach its duties in April 2009. *See*, *e.g*., Dkt. No. 567, Expert Report of Harry Potter, Ex. 14 Section II, ¶¶ 1, 3 (opining that PWC should have discovered the TBW fraud as early as 2002); Expert Report of Ralph Summerford, Dkt. No. 539, Ex. K, pp. 78-94. Lastly, the FDIC experts and witnesses are prepared to testify that if the TBW fraud had been discovered earlier, it would have resulted in cessation of business by Colonial with TBW and the prevention of further losses, including the "Shipped Not Paid" losses. *See*, *e.g*., Expert Report of Harry Potter, Ex. 14 Section II, ¶ (discovering the fraud earlier "would have [] prevented significant future damages to [Colonial] and CBG). Thus, this Court concludes that a trier of fact could reasonably find that there is a causal connection between the auditors' alleged negligence and Colonial's "Shipped Not Paid" damages.

### b.      Whether BOA's Breaches Constitute an Intervening Cause

As discussed above, the presence of a causal connection between Crowe's and/or PWC's alleged negligence and the "Shipped Not Paid" damages is not sufficient to impose liability on the auditors. Rather, the auditors' alleged negligence must also be the proximate cause of the alleged injury in order to establish liability. *Vines*, 336 So.2d at 1339. Crowe and PWC argue that their alleged negligence was the not proximate cause of Colonial's "Shipped Not Paid" losses because BOA's breaches of the Custodial Agreement and Bailee Letter constitute an

intervening cause that relieved them of their liability for the "Shipped Not Paid" losses. The issue of whether BOA's breaches constitute an intervening cause that breaks the causal relationship between the auditors' alleged negligence and the "Shipped Not Paid" losses turns on whether BOA's action were foreseeable because "a *foreseeable* intervening [act] does not break the causal relationship between the defendants' actions and the plaintiffs' injuries." *Mobile Gas Service Corp. v. Robinson*, 20 So.3d 770, 780 (Ala. 2009) (quoting *Kelly v. M. Trigg Enters., Inc.*, 605 So.2d 1185, 1190 (Ala. 1992)) (emphasis in original).

Crowe and PWC argue that this Court must find as a matter of law that BOA's breaches were not foreseeable because the undisputed evidence demonstrates that BOA was not breaching its duties when the auditors last performed auditing services in the MWLD. The auditors point out that they last audited the MWLD in December 2008 (Crowe) and March 2, 2009 (PWC) and the FDIC's experts opine that BOA did not begin to breach its duties until April 2009 and Colonial did not begin to incur losses as a result until May 2009. Therefore, Crowe and PWC argue, no trier of fact could reasonably find that it was foreseeable at the time of the auditors' alleged negligence that BOA would breach its obligations.

This Court disagrees with the auditors. The question of whether an intervening act is unforeseeable and thus a superseding cause is normally a question for the trier of fact. *Lemond Const. Co. v. Wheeler*, 669 So.2d 855, 862 (Ala. 1995) (it is well established that the question of proximate cause is almost always a question of fact to be determined by the jury, and that the question must go to the jury if reasonable inferences from the evidence support the plaintiff's evidence); *Garner v. Covington Cty.*, 624 So.2d 1346, 1349 (Ala. 1993) (same); *Thetford v. City of Clanton*, 605 So. 2d 835, 841 (Ala. 1992) ("Foreseeability is an issue for the jury to resolve."); *Kelly v. M. Trigg Enter., Inc.*, 605 So.2d 1185, 1190 (Ala. 1992) (trial court erred in granting

summary judgment on the issue of the foreseeability of an intervening cause). The question of foreseeability becomes a legal question only when "the facts of the cause are not conflicting, and where there can be no reasonable difference of opinion as to the conclusion to be reached upon them." *Ala. Power Co. v. Moore*, 899 So.2d 975, 979 (Ala. 2004) (quoting *Hercules Powder Co. v. DiSabatino*, 188 A.2d 529, 535 (Del. 1963)).

This is not such a case. The auditors assume that a trier of fact will look at the "Shipped Not Paid" scheme in a vacuum and determine that because BOA was not breaching its obligations at the time that Crowe and PWC last performed their audit duties in 2008, it was unforeseeable that BOA would suddenly begin to breach its duties in 2009. The auditors' argument would be compelling, and, indeed, perhaps determinative, if the trier of fact limited its analysis to the end of 2008 and beginning of 2009. However, such an artificially limited review is not reasonable in light of the fact that the TBW fraud started six years prior, evolved significantly over that time period, and the auditors each failed to detect any aspect of the fraud during that time. The FDIC has presented evidence that if the auditors had uncovered the fraud at any point in 2002, 2003, 2004, 2005, 2006, 2007, or 2008, Colonial's relationship with TBW would have been terminated and the "Shipped Not Paid" scheme never would have developed. Based on the long-term, evolving nature of the fraud, the Court finds that a trier of fact could reasonably conclude that it was foreseeable that TBW would convince BOA to breach its duties under the Custodial Agreement and Bailee Letters.

### C.      Whether the FDIC Is Entitled to Prejudgment Interest

The FDIC seeks prejudgment interest on the damages it claims Colonial incurred as a result of PWC's and Crowe's alleged breaches; Crowe and PWC argue that the imposition of

prejudgment interest is not warranted in this case. The parties agree that Alabama law governs this issue.

### 1.        The Award of Prejudgment Interest under Alabama Law

Alabama law allows for the imposition of prejudgment interest in both contract and noncontract cases. Contract cases are governed by Alabama Code Section 8-8-8, which authorizes prejudgment interest in:

> All contracts, express or implied, for the payment of money, or other thing, or for the performance of any act or duty bear interest from the day such money, or thing, estimating it at its money value, should have been paid, or such act, estimating the compensation therefor in money, performed.

The Alabama Supreme Court has interpreted Section 8-8-8 to mean that prejudgment interest is allowed only if the alleged damages are certain or capable of being made certain at the time of the breach. *Braswell v. Conagra*, *Inc*., 936 F.2d 1169, 1177 (11th Cir. 1991) (applying Alabama law); *see also*, *Miller & Co., Inc., v. McCown*, 531 So. 2d 888, 889 (Ala. 1988) ("This statute has been interpreted to mean that 'in contract cases, where an amount is certain or can be made certain as to damages at the time of breach, the amount may be increased by the addition of legal interest from that time until recovery.'"); *Goolesby v. Koch Farms, LCC*, 955 So. 2d 422, 429 (Ala. 2006) ("Prejudgment interest may be available in a breach-of-contract case [], but only if damages were reasonably certain at the time of the breach.").

Alabama common law governs prejudgment interest in noncontract cases. It allows for the imposition of prejudgment interest if: (1) the damages can be ascertained by mere computation, or (2) the damages are complete at a given time so as to be capable of determination at such time in accordance with known standards of value. *Nelson v. AmSouth, N.A.*, 622 So. 2d 894, 895 (Ala. 1993); *see also*, *Use & Ben. of Roper v. Reiz*, 718 F.2d 1004, 1008 (11th Cir. 1983) (applying Alabama law) (same). Therefore, under Alabama law, "whether

the theory of recovery is breach of contract or fraud, an award of prejudgment interest is proper only if the compensatory damages are certain or capable of being made certain." *Braswell*, 936 F.2d at 1177 (citing *C.E. Sawyer's Indus. Sheet Metal Fabricators, Inc. v. Cent. Rigging & Contracting Corp.*, 653 F.2d 956, 958 (5th Cir. 1981)), *see also*, *Nelson*, 622 So. 2d at 895, n. 1 ("[T]he contract and tort rules governing the payment of prejudgment interest [in Alabama] are substantially the same, in that they both require as a prerequisite to the payment of prejudgment interest that the damages be certain or that they be capable of being made certain.").

In addition, the Alabama Supreme Court has made it clear that damages are considered "certain or capable of being made certain" for purposes of prejudgment interest only if they can be "fixed by a simple mathematical computation." *Lapeyrouse Grain Corp. v. Tallant*, 439 So. 2d 105, 112 (Ala. 1983) (affirming the award of prejudgment interest because of the "ease and certainty with which [the] damages [could] be ascertained. . .the compensatory loss could be fixed by a simple mathematical computation"); *see also*, *McCown*, 531 So. 2d at 890 (affirming award of prejudgment interest because "the loss to the [plaintiffs] could be fixed by a simple mathematical computation by reference to the liquidated damages provisions of the contract"); *Nelson*, 622 So. 2d at 896 (same); *U.S. Fidelity & Guar. Co. v. German Auto, Inc.*, 591 So. 2d 841 (Ala. 1991) (reversing award of prejudgment interest because of the "uncertain[ies]" and "difficult[ies] [in] ascertain[ing]" the loss sustained by plaintiff).

Relying on this guidance from the Alabama Supreme Court, other courts applying Alabama law have likewise required that the damages must be readily ascertainable through simple calculation in order to allow for prejudgment interest. *See*, *e.g.*, *Braswell*, 936 F.2d at 1177 (affirming award of prejudgment interest because "the jury was able to calculate compensatory damages by the application of a mathematical formula"); *Richards v. Gen. Motors*

*Corp.*, 461 So. 2d 825, 827 (Ala. Civ. App. 1984) (denying prejudgment interest because the "amount due the plaintiff was neither certain nor capable of being made certain by mere computation"); *Use & Ben. of Roper*, 718 F.2d at 1008 (prejudgment interest was not available to plaintiff because "the amount of damages was not ascertainable simply by computation"); *Belcher v. Birmingham Tr. Nat. Bank*, 488 F.2d 474, 477 (5th Cir. 1973) (applying Alabama law) (damages must be ascertainable "by mere computation").

> **2.      Whether the Alleged Damages Are Certain or Capable of Being Made Certain**

The FDIC alleges that its damages "are equal to the economic harm to [Colonial] attributable to the frauds that would have been stopped had proper audit services been provided by PWC and Crowe." Dkt. No. 535, Ex. 4 Malek Report at 5. The amount of alleged "economic harm" to Colonial as a result of PWC's and Crowe's alleged breaches is neither stipulated by the parties nor specified in an agreement between them. Thus, in order to qualify for prejudgment interest, the FDIC must establish that its alleged damages are "certain or capable of being made certain" by mere computation.

PWC and Crowe argue that the FDIC cannot meet this standard; they contend that the FDIC's alleged damages have been a moving target, ever evolving, shifting, and fluctuating—in other words, neither "certain or capable of being made certain." The auditors point out that the FDIC's complaint has been amended four times and over the course of those amendments, the FDIC's claimed damages have increased by over a billion dollars. Similarly, the auditors highlight that the FDIC's initial and amended Rule 26 damages disclosures include nine-figure fluctuations in the FDIC's alleged damages.

PWC and Crowe also emphasize that it has taken the FDIC's damages expert, Kenneth Malek, and his 15-person team more than 9,000 hours at the cost of more than $4.5 million to

attempt to calculate the FDIC's alleged damages. PWC claims that in order to arrive at a damages figure, "Mr. Malek and his team obtained data from six separate information technology systems; used a two-phased approach to build custom analytics databases and to perform data analysis; identified transaction identifiers for the transactions that comprised the fraudulent schemes; measured the cash outflows from the fraudulent schemes, as well as the cash inflows; quantified the FDIC's recoveries after [Colonial] closed; measured the income that Colonial [] received from its relationship with TBW and allocated corresponding expenses to that income; and estimated Colonial's [] share of PWC's audit fees." Dkt. No. 535 at 24, n. 51.

In addition, PWC argues that Malek's damages calculations are "judgment-laden." For instance, PWC claims that Malek "exercised judgment when he used an average cost of funds, rather than the actual cost of funds, when performing his calculations. *Id.* at 25-26. He also used bank statements for two months each year as proxies for account balances throughout the year, and he made estimates and subjective allocations when calculating variable salary and benefit costs." *Id*. PWC argues that each of these "judgment calls", combined with the overarching complexity of Malek's damages calculations, negates any argument that the FDIC's alleged damages are certain or can be ascertained by a simple mathematical calculation. *Id*. at 26.

The FDIC counters that prejudgment interest is appropriate in this case. It admits that the damage calculation in this case is complex, but argues that "complexity does not equal uncertainty." Dkt. No. 567 at 34, fn. 21. The FDIC claims that contrary to what PWC suggests, Alabama law does not require a plaintiff to precisely quantify its damages—free from any factual dispute—at the initial stages of a case. Rather, the FDIC argues, Alabama courts have awarded prejudgment interest in cases where the triers of fact had to make factual determinations before the damages could be calculated.

Moreover, the FDIC maintains, despite the fact that the damages calculation in this case is "complicated," Malek's "actual method of calculating the FDIC's damages is very straightforward." *Id*. at 37. The FDIC claims that Malek "simply identified and measured the aggregate net cash outflow amounts from the TBW Fraud Scheme to calculate the 'Net Fraud Loss.' From the Net Fraud Loss [he] then subtracted the net profits from interest and fees that Colonial made from its relationship with TBW, along with the recoveries FDIC received after [Colonial] closed that represented compensation for the New Fraud Loss, and added the audit fees paid to PWC for the improper audits." *Id*. at 37-38 (citing Ex. 12, Malek Report at 4, 6) (internal citations omitted). According to the FDIC, "[u]sing this simple calculation, Malek was able to determine damages on an annual basis from March 2003 until March 2009 to account for various scenarios that may be proved at trial." *Id*. at 38. The FDIC contends that in this case, once the trier of fact determines when "the fraud against Colonial would have been discovered but for PWC['s] and Crowe's negligence," Malek's formula can be applied to calculate Colonial's damages. *Id*.

The FDIC also argues that the "vast majority of Malek's calculations" are not in dispute. *Id*. at 38. It claims that Malek's calculations are not estimates, but precise figures based on loan-by-loan and trade-by-trade analyses tied to Colonial's Promerit loan tracking system and Colonial account statements for TBW's Master Advance Account and Investor Funding Account. According to the FDIC, PWC's and Crowe's opposing experts have "found no material differences with Malek's calculations." *Id*. at 39.

This Court agrees with PWC and Crowe that the FDIC is not entitled to prejudgment interest on its alleged damages. Simply put, the FDIC's damages are not certain, nor are they capable of being made certain by mere computation. The FDIC argues that its damages can be

ascertained by straightforward mathematical calculations, even going so far as to argue that PWC's expert, Kenneth Lehn, agreed the FDIC's damages can be calculated in a mathematically precise manner. The FDIC unfairly characterizes Lehn's testimony. While it is correct that the FDIC's counsel repeatedly asked Lehn whether he agreed that Malek "correctly" performed his mathematical calculations and Lehn did not "take issue with [Malek's] mathematical calculation[s]," Lehn also clearly stated that he did take issue with the "factors" Malek took "into consideration" when he attempted to calculate the FDIC's damages. *See* Dkt. No. 567, Ex. 81 Lehn Dep. Excerpts 59:9-14, Oct. 4, 2016 ("[Malek] didn't do his homework and for that reason his estimates are unreliable, among others"); 60:15-20 ("I'm just saying more generally, that regardless of whether [Malek] did the math correct for discrete purposes, to go from that and say therefore it's not an estimate of damages, it's a mathematical calculation, is wholly wrong."), *see also*, 17:15-18:20; 22:10-15. Simply because PWC's expert did not take issue with the actual mathematics Malek performed does not mean that Lehn agrees with the formula Malek employed or even that the FDIC's damages can be computed with any sort of mathematical precision.

What is more, it is clear that Malek's damages calculation requires all sorts of judgment calls and estimates. The FDIC attempts to characterize Malek's calculations as a simple mathematical formula into which Malek was able to plug in a series of numbers in order to come up with a dollar figure for the FDIC's alleged damages. However, a number of the variables in Malek's formula are either uncertain or subject to competing expert testimony as to whether they should be included in the FDIC's loss calculation. For instance, PWC points out that its own expert opines that Malek made the following errors, among others: (1) he failed to reduce Colonial's alleged damages by $456 million to account for downstream transfers it received from

its parent company; (2) he included up to $405 million in "Junk AOT" losses on loans originally acquired outside the AOT facility; (3) he included up to $242 million in "Junk AOT" losses after August 2009; and (4) he includes "inherently uncertain audit fee estimates" in his damages calculation. *Id*. at 24-25. PWC also points out that rather than identify "a date certain" when Colonial's damages began to accrue as a result of the auditors' alleged breaches, Malek selected a 'damages start date' in connection with each allegedly negligent PWC audit" but "concedes that this date is nothing more than an 'assumption' or 'proxy date' that was 'selected on a judgmental basis.'" *Id*. (quoting Malek Report at 8; Ex. 11 Kenneth Malek Dep. 290:19-21, Oct. 14, 2016).

Each of these disputes of fact must be resolved by the trier of fact before the FDIC's damages, if any, can be accurately calculated. The Eleventh Circuit and other courts applying Alabama law, however, repeatedly have held that when damages are not certain until a jury sets them, prejudgment interest is not available. *See Use & Ben. of Roper*, 718 F.2d at 1007-8 ("The damages responsibility and amount were jury questions; therefore, the claim was not subject to a prejudgment interest calculation."); *Richards*, 461 So. 2d at 827 (prejudgment interest not available because damages could not be made certain until jury determined value of plaintiff's use of vehicle, which had to be deducted from damages); *Fed. Ins. Co. v. Dean Constr. Co.*, 432 F. Supp. 2d 1256, 1261 (M.D. Ala. 2006) (prejudgment interest not available if damages are "not certain until jury determined them").

The FDIC argues that prejudgment interest may be awarded in cases even when the damages determination is left to the jury. However, the cases to which the FDIC cites in support of its argument bear no resemblance to this case. In each of the cases cited by the FDIC, the damages at issue were capable of a simple mathematical computation, with the jury needing to

decide only one disputed variable in an otherwise fixed damages formula. Indeed, three of the cases involved contractual liquidated-damages clauses that provided for damages on a per-unit basis, with the jury merely resolving a dispute about the number of units or the price per unit. *See Lapeyrouse*, 439 S. 2d at 107 (price of bushels of wheat); *McCown*, 531 So. 2d at 888-89 (number and location of trees cut); *Braswell*, 936 F.2d at 1172 (weight of chickens). The fourth case dealt with whether a father-daughter bank account was a joint tenancy with right of survivorship (*i.e.*, there was a dispute as to whether the daughter owed 50% or 100% of the account upon her father's death). Once this determination was made, it was a simple mathematical calculation to determine the daughter's damages (*i.e.*, 50% of the account balance). *Nelson*, 622 So. 2d at 896. The last case the FDIC cites was an insurance coverage case in which the jury had to decide what percentage of the insured's prior settlement was for the insured's benefit rather than the benefit of its parent company's parent company. *Carrier Exp., Inc. v. Home Indem. Co.*, 860 F. Supp. 1465, 1487-88 (N.D. Ala. 1994).

Instead, the Court finds the Alabama Supreme Court's decision in *German Auto* to be much more in line with the instant case. *German Auto*, 591 So. 2d 841. That case involved a claim for business interruption that plaintiff sustained as a result of a fire in its place of business. Plaintiff and its insurer had agreed to submit plaintiff's claim to an arbitrator. The arbitrator determined that plaintiff's business interruption loss totaled approximately $500,000. Plaintiff moved for an entry of judgment on the arbitrator's award in state court and for an award of prejudgment interest. The trial court awarded prejudgment interest on plaintiff's loss and the insurer appealed. The Alabama Supreme Court reversed the award of prejudgment interest. The Court noted that the business interruption claim was subject to five separate analyses, which resulted in five "widely disparate sums." *Id*. at 843. The Court further noted that determining

plaintiff's loss involved "difficult, varied, and complex factors," including "competing position about various items of loss and . . . difference of opinion about calculation the loss," which made the value of the claim "uncertain and difficult to ascertain." *Id*. Therefore, the Alabama Supreme Court concluded, "[t]he loss [] represented 'unliquidated' damages until the arbitrator made the final determination" and, consequently "no interest was due until a judgment or award was judicially entered." *Id*.

Likewise, here, the FDIC's damages are "uncertain and difficult to ascertain because of competing positions about various items of loss and because of difference of opinion about calculating the loss."[10] *Id*.; *see also*, *Use & Ben. of Roper*, 718 F.2d at 1007-8 (prejudgment interest not available because the parties disputed whether the defendants caused a delay in construction project and the "cost per day" for the alleged delay was not in evidence; therefore, the amount of alleged damages was not ascertainable "simply by computation"). Accordingly, the FDIC is not entitled to prejudgment interest on its damages claim.[11]

---

[10]   The FDIC argues that the reasoning of *German Auto* is not applicable to this case because the case involved an insurance claim and relied on law involving uninsured motorist coverage, "an area of law unto itself." Dkt. No. 567 at 42-43. This Court disagrees. *German Auto*, itself, is not an uninsured motor case, and its prejudgment interest analysis relied on non-insurance cases. Furthermore, the Alabama Supreme Court and other courts applying Alabama law have relied on *German Auto's* prejudgment interest analysis in non-insurance cases. *See*, *e.g.*, *Nelson*, 622 So. 2d at 895, n. 1; *Huntsville Golf Dev., Inc. v. Brindley Constr. Co*., 847 F. Supp. 1551, 1558 (N.D. Ala. 1993).

[11]   The Court also finds persuasive that Malek's damages calculation relies on data from an offline database that was not available to the auditors during their audit work. *See* Dkt. No. 567, Ex. 12 at 16 (noting that Teresa Kelly maintained an "Offline Database to track the fraudulent Junk AOT transaction. The database contained a listing of (i) the junk loans, (ii) the trade or pool to which each loan was assigned, and (iii) additional loan and borrower information."); Ex. 11 at ¶ 9 (noting that Malek tested the data from the offline data base as part of his damages calculation). PWC argues that in order to be eligible for prejudgment interest, Alabama law also requires that the amount due and time of payment must be known to the debtor. Dkt. No. 589 at 19 (quoting *Grand Bay Land Co. v. Simpson*, 92 So. 789, 791 (Ala. 1922)). In other words, PWC argues, the debtor must know the amount of the potential damages at the time of the alleged breach. PWC claims that it was impossible for the auditors to be aware of the amount of their alleged liability at the time of their alleged breaches because Malek's damages calculation relies on data from an "offline" database that was hidden from the auditors during their audit work. The FDIC does not dispute that the Malek relied on data from the hidden data base or that the auditors did not have access to such information at the time of their audit work. Instead, it suggests that the *Grand Bay* standard is not applicable to this case. This Court disagrees with the FDIC. The standard for imposing prejudgment interest as set forth in *Grand Bay*—an Alabama Supreme Court decision—has been applied by a number of state and federal courts applying Alabama law. *See*, *e.g.*, *Roe v. Baggett Transp. Co*., 326 F.2d 298 (5th Cir. 1963); *Mitchell Co., Inc. v. Campus*, 2009 WL 2567889, at *20 (S.D. Ala. Aug. 8, 2009); *Jernigan v. Happoldt*, 978 So. 2d 764, 767 (Ala. Civ. App.

## V.   CONCLUSION

For the foregoing reasons, the Court HEREBY GRANTS in part and DENIES in part PWC's Motion for Partial Summary Judgment as to the FDIC'S Claims [Dkt. No. 535] and GRANTS in part and DENIES in part Crowe's Second Motion for Summary Judgement on the FDIC's Claims [Dkt. No. 537]. Specifically, the Court concludes that:

1. The FDIC's claims based on PWC's 2002 through 2006 year-end audits relate back to the FDIC's original complaint pursuant to Federal Rule of Civil Procedure 15 and, therefore, are timely;

2. There is a dispute of material fact as to whether BOA's breaches were an unforeseen intervening action that broke the causal chain between Crowe's and PWC's alleged negligence and Colonial's "Shipped Not Paid" losses, rendering summary judgment on this issue; and

3. The FDIC is not entitled to prejudgment interest.

Dated this 14th day of July, 2017.

Barbara Jacobs Rothstein
U.S. District Court Judge

---

2007). The primary treatise on damages in Alabama recognizes it. *See* J. Marsh, Alabama Law of Damages, § 8:2, n. 2 (6th ed. 2016). Indeed, even when the Alabama Supreme Court has not cited the *Grand Bay* standard, it still has specifically stated that the damages must be "certain or can be made certain [] at the time of the breach" in order to impose prejudgment interest. *McCown*, 531 So. 2d at 889 (emphasis added); *see also*, *Goolesby, LLC*, 955 So. 2d at 429 (same). Therefore, this Court concludes that because the auditors did not have access to the offline database at the time of their alleged breaches, they were unable to ascertain their potential liability at that time, which is another reason prejudgment interest is not available in this case.