**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

THE COLONIAL BANCGROUP, INC., and KEVIN O'HALLORAN,

Plaintiff,

v.

PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP,

Defendants.

Case No. 2:11-cv-00746-BJR
(LEAD CASE)

**REDACTED**

---

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank,

Plaintiff,

v.

PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP,

Defendants.

Case No. 2:12-cv-00957-BJR

**REDACTED**

**PLAINTIFF FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK'S MOTION REGARDING <u>THE USE OF CERTAIN EVIDENCE AT TRIAL</u>**

Pursuant to Federal Rules of Evidence 401, 402, and 403, Plaintiff Federal Deposit Insurance Corporation as Receiver for Colonial Bank ("FDIC-R") moves to preclude defendants PricewaterhouseCoopers LLP ("PwC") and Crowe Horwath LLP ("Crowe") from presenting evidence or testimony (1) regarding certain defenses addressed in the FDIC-R's Motion for Summary Judgment, ECF 516, and (2) suggesting that the fraud was somehow "hard to find" such

that the Defendants' negligence is excused. Any evidence or argument on these two issues would be both irrelevant and unduly time-consuming. *See* Fed. R. Evid. 401 and 403 (noting that only evidence relating to a "fact [] of consequence in determining the action" is relevant and, regadless, that the Court has the discretion to exclude otherwise relevant evidence if it will result in "undue delay" and "wasting time"); *see also Gulf States Util. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981) (under Rule 403, a court clearly has discretion to exclude relevant evidence in a bench trial if it will result in a waste of time).

## BACKGROUND

On October 31, 2016, the FDIC-R moved for summary judgment on certain defenses asserted by the Defendants, ECF 516. That motion is still pending, but this Court has indicated that the issues raised by the FDIC-R are appropriate for summary judgment and that it intends to rule on them in advance of the trial. ECF 641 at 3. The FDIC-R will not repeat its arguments against the applicability of the various defenses here, but will demonstrate how granting the FDIC-R's Motion and excluding this irrelevant evidence and testimony will dramatically reduce the length and complexity of the two upcoming bench trials.

Additionally, the FDIC-R seeks to exclude any evidence or testimony that the Taylor Bean & Whitaker Mortgage Corporation ("TBW") fraud was somehow "hard to find." Several of the defenses addressed in the FDIC-R's Motion for Summary Judgment, ECF 516, assert that the Defendants should not be responsible for their failure to find the fraud because certain Colonial Bank personnel also failed to find the fraud. *See* ECF 516 at 16-30. Likewise, the Defendants intend to offer exhibits and testimony establishing that other entities—such as banking regulators like the Office of the Comptroller of the Currency ("OCC") and the FDIC—also failed to find the TBW fraud, and will argue that these failures somehow absolve PwC and Crowe of their own

liability. All such evidence, however, is irrelevant. The work performed by Colonial Bank personnel and these other entities was *not* the same as the audits both PwC and Crowe were obligated to perform. Moreover, PwC and Crowe's work was governed by specific, exacting standards, inapplicable to these other entities. Thus, the fact that others—performing different work in accordance with different standards—failed to uncover the fraud has no bearing on either Defendant's liability here. To reduce both the length and complexity of the bench trials, the FDIC-R requests that the Court enter an order excluding any evidence or testimony regarding the defenses at issue in ECF 516 or the fact that other individuals and entities failed to uncover the fraud.

## ARGUMENT

### I. This Court should exclude all evidence and testimony in support of the defenses addressed in the FDIC-R's Motion for Summary Judgment, ECF 516, as those defenses are inapplicable in this case and the related evidence and testimony is wholly irrelevant and would unduly and unnecessarily increase the length and complexity of the trials.

#### A. These defenses are inapplicable in this case.

As the FDIC-R set out in detail in its motion, ECF 516, this Court should grant the FDIC-R's summary judgment motion and rule that the Defendants are not entitled to raise certain defenses based on the alleged failures or misdeeds of others. *See generally id*. Specifically, the Defendants are not entitled to raise the following defenses: (1) the *Hinkle* rule, (2) *in pari delicto*, (3) fraud, (4) unclean hands, (5) fraudulent inducement, (6) estoppel, (7) waiver, (8) ratification, (9) failure to mitigate damages, (10) contributory negligence, (11) assumption of risk, and (12) intervening and superseding cause.[1] *See id.* at 7-8. All of these defenses turn on the alleged

[1] On July 14, 2017, this Court held that the foreseeability of Bank of America's ("BoA") contractual breaches is a question for the factfinder, precluding an entry of summary judgment for the Defendants on that issue. ECF 677 at 19. That ruling does not, however, foreclose the granting of the FDIC-R's summary judgment motion because the FDIC-R also argued that BoA's misconduct cannot, as a matter of law, be a

misconduct of others—Colonial Bank personnel, BoA, or various regulators—in either perpetrating the fraud or failing to discover it. Any such failings, however, are irrelevant to the issues of this case.

The Defendants cannot avoid liability by pointing the finger elsewhere. As the innocent receiver, the FDIC-R is protected, as a matter of law, from all such imputation-based defenses. *Id.* at 9-16. Moreover, the criminal conduct of certain Colonial Bank employees was beyond the scope of their agency and cannot be imputed to Colonial Bank. *Id.* at 16-30. Additionally, any alleged intervening cause was insufficient to be the sole proximate cause of the FDIC-R's injuries. *Id.* at 22-36. The Defendants simply cannot rely on the failure of others to find the very fraud they were hired to detect to escape liability for their own malpractice. Because none of these defenses is applicable on the facts of this case, the Defendants should not be permitted to waste this Court's time and resources presenting evidence or testimony regarding any of them.

**B. Excluding testimony and evidence regarding these defenses will dramatically reduce the length and complexity of trial.**

The time saved by excluding this testimony and evidence will be tremendous. Specifically, granting the FDIC-R's Motion and excluding testimony and evidence related to these irrelevant defenses will make many witnesses whose deposition testimony has been designated completely unnecessary. Specifically, four witnesses in the PwC case and seven witnesses in the Crowe case (including one expert witness), comprising nearly 800 and 1200 pages of designated testimony, respectively, will not need to be considered by the Court. *See* Chart attached as Exhibit. A. In addition to the testimony that would be omitted, the FDIC-R has identified approximately 340

---

superseding, intervening cause because it could not have been the sole, proximate cause of Colonial Bank's losses. *See* ECF 516 at 32-34. Accordingly, it is appropriate for the Court to grant the FDIC-R's summary judgment motion and exclude from trial all evidence and testimony regarding BoA's conduct as irrelevant and unnecessary, notwithstanding its July 14th order.

exhibits designated by Crowe and 250 exhibits designated by PwC that it intends to object to as irrelevant, a large proportion of which relate to these issues. Finally, as it relates to trial the FDIC-R believes that a number of witnesses that will be called by PwC and Crowe will be unnecessary, including experts. Accordingly, the length and complexity of both bench trials will be greatly reduced if the Court excludes this irrelevant evidence and testimony.

## II. This Court should exclude all evidence that the TBW fraud was "hard to find" as such evidence is wholly irrelevant to the claims before the Court and its presentation will dramatically increase the length and complexity of the trials.

Both PwC and Crowe have indicated that they plan to present evidence that other entities (namely regulators) and Colonial Bank personnel also failed to uncover the fraud, purportedly demonstrating that the fraud was "hard to find" and that the Defendants' negligence is somehow excusable. These other entities and individuals, however, were serving in different roles, performing different services, and were subject to different guidelines and regulations. What they did or did not uncover is wholly irrelevant to the claims before this Court. Accordingly, any testimony or evidence that the fraud was "hard to find" because others failed to discover it should be excluded from the trial as irrelevant and unnecessarily time consuming. *See* Fed. R. Evid. 403; *Gulf States Util. Co.*, 635 F.2d at 519 (it is "clearly proper" to "[e]xclud[e] relevant evidence in a bench trial because it is cumulative or a waste of time").

### A. Any evidence regarding the pre-receiver conduct of banking regulators is irrelevant.

As an initial matter, there is no question that a defendant cannot raise an affirmative defense based on the pre-receivership conduct of a banking regulator. *See Grant Thornton, LLP v. FDIC*, 535 F. Supp. 2d 676, 722 (S.D.W.Va. 2007), *rev'd on other grounds sub nom. Ellis v. Grant Thornton LLP*, 530 F.3d 280 (4th Cir. 2008) (collecting cases and concluding that "[c]ourts have uniformly held that claims or defenses based upon pre-receivership actions of regulators are legally

insufficient"); *cf. FDIC v. Ornstein*, 73 F. Supp. 2d 277, 281 (E.D.N.Y. 1999) (striking bank director and officer affirmative defense that seeks to shift blame for their conduct to pre-receivership actions of bank regulatory agencies). Thus, since neither PwC nor Crowe can raise an affirmative defense based on the pre-receiver conduct of a banking regulator, they should not be able to point to the pre-receiver conduct of a banking regulator in an attempt to excuse their own negligence.

Indeed, in the similar accounting malpractice case of *Grant Thornton, LLP*, Grant Thornton argued "that regulators had been examining the Bank for several years and had not found the fraud, and thus it is unfair and unreasonable to expect Grant Thornton to have uncovered the fraud in a comparatively short period of time." *Grant Thornton*, 535 F. Supp. 2d at 720. The Court rejected the argument as "legally irrelevant to the issue of whether Grant Thornton breached its professional duties," and determined that "[no]thing the regulators did or failed to do in their regulatory capacity should operate to reduce or defeat the FDIC's claim against Grant Thornton in this case so long as the regulators did not actually interfere with Grant Thornton's undertakings." *Id.* at 720-21. There are no allegations of regulator interference in this case. Accordingly, any evidence about what the regulators did or did not do pre-receivership is wholly irrelevant and should be excluded from trial.

### B. PwC cannot avoid its obligations by pointing to the failures of others, and any such evidence should be excluded.

#### 1. As a "public watchdog," PwC's responsibility extended well beyond Colonial Bank to the general public.

PwC cannot avoid liability by pointing to the failure of others, particularly when it clearly owes a responsibility to the general public. The Supreme Court has characterized PwC's role as an external auditor as that of a "public watchdog" with an obligation not just to Colonial Bank but to the public at large. *United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984) ("By

certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a *public* responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust."); *see also Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1044 (11th Cir. 1986) (noting that auditors have a "special relationship of trust" with the public: "Where it gives an opinion or certifies statements, an auditing firm publicly assumes a role that carries a special relationship of trust vis-a-vis the public. The auditor in such a case holds itself out as an independent professional source of assurance that the audited company's financial presentations are accurate and reliable . . . ." (citation omitted)).

Even PwC admits the public depends on it to do its very important job. In PwC's own words: "For the people at PwC, the word 'trust' has special meaning. In the first instance, trust is a core element of our business, which is to build the *public's confidence* in the fair and efficient functioning of the capital and financial markets around the world." PwC Global Annual Review 2010, attached as Exhibit B at 11 (emphasis added).

Indeed, the Public Company Accounting Oversight Board ("PCAOB"), which sets the standards governing PwC as a certified public accounting firm acting as an external auditor, also recognizes PwC's weighty responsibilities as a "public watchdog":

> A distinguishing mark of a profession is acceptance of its responsibility to the public. **The accounting profession's public consists of clients, credit grantors, governments, employers, investors, the business and financial community, and others who rely on the objectivity and integrity of certified public accountants to maintain the orderly functioning of commerce. This reliance imposes a public interest responsibility on certified public accountants.** The public interest is defined as the collective well-being of the community of people and institutions the profession serves.

American Institute of Certified Public Accountants Code of Professional Conduct ET § 53.01, which has been adopted by the PCAOB, attached as Exhibit C (emphasis added). Likewise, the very requirement that a public company's financial statements be audited by a certified public accounting firm *before* those financial statements are publicly released is manifestly an effort to protect the public. *See* 15 U.S.C. § 77a et seq. Thus, PwC, and PwC alone, was the "gatekeeper" or "public watchdog" charged with protecting the public from misstated financial statements. It cannot shirk that responsibility by shifting blame to others.

**2. The PCAOB standards, which do not apply to regulators or to individuals working at Colonial Bank, required *PwC* to examine the bank's books and records for indicators of fraud.**

As certified public accountants acting as Colonial Bank's external auditors, PwC was governed by the standards promulgated by the PCAOB. Specifically, PwC was supposed to follow Generally Accepted Auditing Standards ("GAAS") at all times. *See* Expert Rebuttal Report of Robert D. Hawkins, attached as Exhibit D at 14. Under those standards, PwC was supposed to "assess risks and apply procedures directed specifically to the *detection* of a *material, fraudulent misstatement* of the financial statements." PCAOB Release No. 2007-001, January 22, 2007, attached as Exhibit E at 2 (emphasis added). PwC had "[redacted] PCAOB AU § 316, attached as Exhibit F at 1 (emphasis added). "Reasonable assurance" is defined as a "high level of assurance." PCAOB Auditing Standard No. 2, attached as Exhibit G at ¶ 17 ("Although not absolute assurance, reasonable assurance is, nevertheless, a high level of assurance."). Thus, while PwC was not required provide a *guarantee* that there was no fraud, its work was supposed

to provide a "*high level* of assurance" that there was no material misstatement due to fraud. *Id.* (emphasis added). In other words, according to the PCAOB, PwC had a duty to detect fraud.

In a March 2007 public statement in *The Wall Street Journal* that was later incorporated into PwC training materials, PwC's own Chairman confirmed that PwC had a duty to detect fraud:

[redacted]

PwC Fraud Execution and Planning, PwC-CBG-FDIC00972135-00972157, attached as Exhibit H at 00972147 (emphasis added).[2]

Conversely, the OCC, FDIC, members of Colonial Bank's management and its audit committee, and anyone else upon whom PwC seeks to lay blame were *not* governed by PCAOB standards, were *not* providing GAAS compliant audits, and were not providing a "high level" of assurance that Colonial Bank's financial statements were fraud free.[3] In fact, government regulators like the OCC and the FDIC reasonably assumed that PwC properly performed its audits

---

[2] Although Mr. Nally's statement was unequivocal, PwC is now trying to reverse its position. The PwC partner in charge of the Colonial Bank audits, Gary Westbrook, said PwC [redacted] Excerpts from the Deposition of Gary Westbrook, attached as Exhibit I at 22:24-23:6. In fact, PwC admits that it [redacted]. *See* Excerpts from the Deposition of Wes Kelly, attached as Exhibit J at 45:6-8 ( [redacted] Thus, even though PwC signed *seven* audit reports representing that it had a **high level** of assurance that Colonial Bank's financial statements were "fairly presented," it now says it was not its job to try to detect fraud and that it cannot be blamed for the fact that Colonial Bank's financial statements were grossly misstated.

[3] While regulators are supposed to watch for indicators of fraud and follow-up if such indicators arise, the detection of fraud is not part of the examination process. *See* Ex. D at 8, n.4.

and relied heavily on that work in performing their own review. *See* Ex. D at 12. Accordingly, any evidence or argument regarding whether other entities or persons failed to detect the TBW fraud is irrelevant to whether *PwC* satisfied its standard of care.

Only relevant evidence is admissible at trial. Fed. R. Evid. 402. Relevant evidence is defined as evidence having any tendency to make the existence of any fact that is of consequence in determining the action more or less probable than it would be without the evidence. Fed. R. Evid. 401. Thus, in order to present evidence regarding the failure of others besides PwC to detect the TBW fraud, PwC must demonstrate that it relates to an actual "fact of consequence." That other entities or persons, which indisputably were neither performing the same task as PwC (namely, PCAOB-required audits) nor subject to the same standard of care, failed to detect the TBW fraud simply does not bear on whether PwC should have detected it in performing its unique, statutorily-required duties. Unlike government regulators, other accountants serving in different roles, or Colonial Bank personnel, PwC certified every year that it had conducted an integrated audit of Colonial Bank's financial statements and internal control over financial reporting in accordance with PCAOB standards. *See* Excerpts from Form 10-Ks, attached as Exhibit K. Because the question in this case is whether PwC complied with its specific standard of care as a professional, independent auditor, evidence regarding what a generic "reasonable person would have believed" is simply irrelevant. *See* ECF 583 at 2 (PwC argues that evidence regarding the OCC and FDIC's failure to detect the TBW fraud is relevant because it shows "what a reasonable person would have believed about Colonial's . . . accounting"). Regardless of whether it was "hard" for a "reasonable person" or anyone else to find the TBW fraud, that would not help the Court answer the question of whether *PwC*—which had an entirely different role and was subject to standards inapplicable to those other persons or entities—could and should have found it.

Allowing such evidence would greatly increase both the complexity and the length of the trial. It would necessitate substantial background and contextual information regarding the role and conduct of these other entities and persons, and would implicate numerous additional exhibits, witnesses and testimony. The report of PwC's substitute expert William M. Isaac provides an example. His testimony and opinions regarding the conduct of the OCC and FDIC entail lengthy background information about banking regulations and regulators generally, *see* Expert Report of William M. Isaac, attached as Exhibit L at 4-9, and extended discussion of the regulatory history of Colonial Bank from 2003 to 2009, *id*. at 9-18, as well as the presentation of rebuttal evidence by the FDIC-R, *see* Ex. D. *See also* ECF 583 at 3-10 (PwC brief, which includes nearly seven pages of factual background to argue that evidence regarding the conduct of the OCC and FDIC is relevant). This type of extraneous evidence would be an unnecessary, distracting sideshow from the questions to be determined regarding the *Defendants'* misconduct, and "[e]xcluding relevant evidence in a bench trial because it is cumulative or a waste of time is clearly a proper exercise of the judge's power" under Rule 403. *Gulf States Util.*, 635 at 519.

**C. Crowe cannot avoid its obligations by pointing to the failures of others, and any such evidence should be excluded.**

Similarly, Crowe cannot avoid liability for failing to detect the fraud by blaming others, as those other entities and individuals were performing different work, in accordance with different standards, and often directly relied on Crowe's work in doing their own. In other words, whether others failed to detect the fraud is not a "fact of consequence" as to Crowe's liability here, rendering such evidence irrelevant and unnecessary. *See* Fed. R. Evid. 401 and 403. As Colonial Bank's outsourced, internal auditor, Crowe's audits were governed by the standards of the American Institute of Certified Public Accounts and The Institute of Internal Auditors Standards of Professional Practice of Internal Auditing. *See* Ex. D at 14.

Crowe was charged with providing an internal audit of Colonial Bank's systems and protocols compliant with those standards, and the question before the Court is whether *Crowe* failed to do so.

Bank regulators, on the other hand, are *not* governed by either the American Institute of Certified Public Accounts or the Institute of Internal Auditors Standards of Professional Practice of Internal Auditing. *Id.* Nor are they charged with ensuring that an internal auditor has complied with those standards. *See* Comptroller's Handbook, attached as Exhibit M at 47 (A "review is not an 'audit of the auditor,' nor is it designed to determine whether the audit conforms to AICPA professional standards."). Moreover, in examining a bank, regulators are not duplicating the function of an internal audit. An internal audit utilizes specific testing, validating, confirmation, and account reconciliation techniques to assess the bank on a granular level. Ex. D at 11. Conversely, a regulator's examination relies heavily on the detailed work of both the internal and external auditors and focuses on the bank's *broader* picture—assessing the internal audit process, evaluating bank policies, and gauging the role and involvement of a bank's board, audit committee, and internal audit manager. *Id.* at 7. Regulators do not check the accuracy of the internal auditor's work, but rather use the internal auditor's conclusions to make more general assessments about the health of the bank. If an internal auditor fails to uncover a massive fraud, it is unlikely that a regulator's subsequent work will do so. *Id.* Accordingly, the fact that regulators failed to uncover the TBW fraud here has no bearing on whether Crowe met its professional obligations, and this irrelevant evidence should be excluded from trial.

Crowe also seeks to shift blame to certain Colonial Bank personnel, citing Interagency Policy Statement on the Internal Audit Function and its Outsourcing, attached as Exhibit N, as stating that the bank's board and senior management could not delegate their ultimate

responsibility "for ensuring that the system of internal control operates effectively." *See* ECF 573 at 1-2, 5-6; *see* also Ex. N at 1. The Policy Statement makes clear, however, that Colonial Bank had every right to outsource its internal audit function and rely on Crowe to provide the "testing and assessment of internal controls" and to complete its work in accordance with the prevailing professional standards. Ex. N at 3. Indeed, in accordance with the Policy Statement, Colonial Bank properly determined that outsourcing this function to Crowe would "enhance the quality of [its] control environment," as Crowe had the "knowledge and skills [necessary] to critically assess, and recommend improvements to, their internal control system."[4] *Id.* at 7.

Crowe owed a clear obligation to Colonial Bank to perform its work in accordance with governing standards, and Colonial Bank is not abdicating its ultimate responsibility for "ensuring that the system of internal control operates effectively" by holding Crowe responsible for its failings. Colonial Bank was entitled to rely on Crowe, actually relied on Crowe, and suffered massive losses as a proximate result. Crowe cannot avoid liability by shifting the focus to what Colonial Bank's management or audit committee did or did not do. The question before the Court is whether *Crowe* neglected its professional responsibilities to Colonial Bank resulting in catastrophic losses. As such, any evidence that Colonial Bank personnel failed to uncover the fraud should be excluded from trial as irrelevant.

**CONCLUSION**

The FDIC-R seeks an order, pursuant to Federal Rules of Evidence 410, 402, and 403, precluding evidence or argument (including in the examination of witnesses) regarding the defenses addressed in the FDIC-R's Motion for Summary Judgment, ECF 516, and the failure of entities or persons other than PwC or Crowe to detect the TBW fraud.

---

[4] Crowe's argument only holds water if the mere fact that management hired Crowe means that management automatically failed to discharge its duties. Crowe has not and cannot make this argument.

Dated: July 26, 2017.

Respectfully submitted,

**SPOTSWOOD SANSOM & SANSBURY LLC**
Robert K. Spotswood (SPO 001)
Michael T. Sansbury (SAN 054)
Grace L. Kipp (LON 049)
Mary G. Menge (MEN 014)
One Federal Place
1819 Fifth Avenue North, Suite 1050
Birmingham, Alabama 35203
Telephone: (205) 986-3620
Facsimile: (205) 986-3639
Email: rks@spotswoodllc.com
msansbury@spotswoodllc.com
gkipp@spotswoodllc.com
mmenge@spotswoodllc.com

**RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.**
Dennis Bailey (ASB-4845-171D)
J. Evans Bailey (ASB-9995-J61B)
184 Commerce Street
Post Office Box 270
Montgomery, Alabama 36101-0270
Telephone: (334) 206-3234
Facsimile: (334) 481-0031
Email: DRB@rsjg.com

**MULLIN HOARD & BROWN, LLP**
David Mullin (TX Bar No. 14651600) *PHV*
John M. Brown (TX Bar No. 3142500) *PHV*
John G. Turner, III (TX Bar No. 20320550) *PHV*
Robert Bell (TX Bar No. 00787062) *PHV*
Clint Latham (TX Bar No. 24013009) *PHV*
Anthony W. Kirkwood (TX Bar No. 24032508) *PHV*
Richard Biggs (TX Bar No. 24064899) *PHV*
500 South Taylor, Suite 800
Amarillo, Texas 79101
Telephone: (806) 372-5050
Facsimile: (806) 372-5086
Email: dmullin@mhba.com
jobrown@mhba.com
jturner@mhba.com

rbell@mhba.com
clatham@mhba.com
tkirkwood@mhab.com
rbiggs@mhba.com

*Attorneys for Plaintiff Federal Deposit Insurance Corporation as Receiver for Colonial Bank*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 26, 2017, a redacted version of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record as of that date, and an unredacted version was filed with the Clerk of Court under seal and served on counsel of record for the parties by electronic mail.

OF COUNSEL