IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE COLONIAL BANCGROUP INC., and KEVIN O'HALLORAN<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP,<br><br>Defendants. | ) | CASE NO. 2:11-cv-746-BJR |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP<br><br>Defendants. | ) | CASE NO. 2:12-cv-957-BJR |

**ORDER GRANTING IN PART AND DENYING IN PART FDIC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSES**

## I. INTRODUCTION

The genesis of these lawsuits is a complex bank fraud that culminated in the failure of Colonial Bank ("Colonial") and Colonial's parent company, The Colonial BancGroup, Inc. The Colonial BancGroup, Inc. and Kevin O'Halloran, as plan trustee acting on behalf of The Colonial BancGroup, Inc. (collectively "CBG") and the Federal Deposit Insurance Corporation as Receiver for Colonial (the "FDIC") each filed a lawsuit against CBG's outside auditors PricewaterhouseCoopers LLP ("PWC") and Crowe Horwath, LLP ("Crowe"), seeking to recover for the auditors' failure to detect the fraud. Presently before the Court is the FDIC's motion for partial summary judgment on the Defendants' Affirmative Defenses. Dkt. No. 516. Having reviewed the motion, the oppositions thereto, the record of this case, and the relevant legal authority, the Court will grant in part and deny in part the motion. The reasoning for the Court's decision follows.

## II. BACKGROUND

### A. The TBW Fraud

These lawsuits are the result of a massive, long-running fraud perpetrated against CBG's wholly owned banking subsidiary, Colonial Bank ("Colonial"). The fraud centered in Colonial's Mortgage Warehouse Lending Division ("MWLD"). Beginning in 2002, the MWLD's largest customer, Taylor Bean & Whitaker Mortgage Corporation ("TBW"), began to be overdrawn on its accounts at Colonial. TBW's Chairman, Lee Farkas, and several other TBW insiders, along with Catherine Kissick, a senior vice president at Colonial and the head of the MWLD, and several other MWLD employees, conspired to hide the overdrafts by "sweeping" funds between accounts. The fraud grew and became more complicated as the years progressed until the State of Alabama Banking Department closed Colonial and appointed the FDIC its receiver on August

14, 2009. By the time the fraud was shut down, it had illegally diverted over $2 billion of Colonial's assets from the bank. CBG filed for Chapter 11 bankruptcy protection eleven days after the banking authorities closed Colonial.

**B. Relevant Banking Laws and Regulations**

As a publicly traded, bank holding company, CBG was subject to disclosure laws and regulations monitored and enforced by the U.S. Securities and Exchange Commission (the "SEC"). These laws and regulations required CBG to annually file with the SEC a comprehensive summary of CBG's financial performance, as well as an integrated audit of CBG's financial statement and internal controls by an independent auditor. CBG was also required to comply with the Sarbanes Oxley Act of 2002, which seeks to ensure that a public company's financial reporting is materially accurate and that its internal controls over financial reporting are operating effectively. *See, e.g.*, 17 C.F.R. § 210.2-01; 12 C.F.R. §§ 363.1 & 363.2.

Federal regulations and policies also required CBG and Colonial to institute "[a]dequate procedures to safeguard and manage assets" and placed the "primary responsibility" for preventing fraud on the bank's board of directors and senior management. 12 C.F.R. Pt. 364, App.; FDIC Manual of Examination Policies § 10.1 at 1 ("To properly execute their fiduciary duties, management must implement internal controls and other safeguards to prevent fraud and theft whether internally or externally perpetrated."). Further, bank management is required to "perform its own investigation and review of the effectiveness of [the bank's] internal controls." 12 C.F.R. Pt. 363, App. A (2005 version).

CBG and Colonial complied with these laws and regulations in the following ways. First, they employed multiple individuals whose full time job was to prevent fraud within Colonial. For instance, the MWLD was monitored by the Risk Control Group, the Asset Purchase

Commitment, and the Mortgage Warehouse Lending Credit Committee. Each of these committees was tasked with mitigating risks in the MWLD, including detecting fraud. Further, in 2004, CBG retained a senior risk officer, to assess the risks posed by the MWLD's operations, policies, and procedures. Second, CBG engaged the services of Defendant PWC to serve as CBG's outside independent auditor to perform the required integrated audits of CBG's financial statements and internal controls. CBG also engaged Defendant Crowe to oversee and help implement CBG's internal audit function. PWC and Crowe served as the independent internal and external auditors for CBG at all relevant times during the TBW fraud.

Despite all of these measures, no one at CBG, Colonial, PWC, or Crowe detected the fraud. Nor did anyone at the Federal Reserve, the FDIC, the Office of the Comptroller of the Currency, or the Alabama State Banking Department (each of whom regulated CBG and/or Colonial at different points during the fraud).

### C. The Parties Claims and Defenses

CBG and the FDIC each filed suit against PWC and Crowe; the lawsuits were consolidated on September 24, 2014. Dkt. No. 84. CBG and the FDIC claim that each of the auditors failed to comply with their respective contractual and professional obligations when they performed the audit services for CBG and Colonial. They further charge that if the auditors had complied with their obligations, they would have discovered the TBW fraud, the fraud would have been stopped, and CBG's and Colonial's damages would have been limited.

PWC and Crowe counter that CBG and Colonial were the principal parties responsible for detecting and preventing the TBW fraud. They further charge that both CBG and Colonial had superior knowledge of the risks TBW posed to the MWLD and were in a better position than either PWC or Crowe to prevent and detect the fraud. Therefore, the auditors assert the following

affirmative defenses against CBG and the FDIC: (1) Alabama's *Hinkle* rule (which precludes recovery by a plaintiff who knowingly and intentionally participated in a crime involving moral turpitude); (2) *in pari delicto* (*i.e*., equal in fault); (3) fraud; (4) unclean hands; (5) fraudulent inducement; (6) estoppel; (7) waiver; (8) ratification; (9) failure to mitigate damages; (10) contributory negligence; and (11) assumption of risk. The gravamen of all of these defenses is the same—they are based on the fraudulent conduct of Colonial employees who conspired with TWB and/or on the fact that CBG and Colonial employees failed to detect the fraud, and that this conduct should be imputed to the FDIC to prevent its recovery.

### D. The FDIC's Motion for Partial Summary Judgment on PWC's and Crowe's Affirmative Defenses

The FDIC moves for summary judgment on each of PWC's and Crowe's affirmative defenses. It argues that the defenses fail as a matter of law because: (1) public policy and equitable principles preclude imputing the misconduct of Colonial or Colonial agents to claims brought by the FDIC as an innocent receiver, (2) well-settled agency principles prevent the imputation of Colonial's employees' misdeeds to Colonial because those employees acted outside the interest of Colonial, and (3) PWC and Crowe may not rely on the very fraud and negligence that they were hired to detect to escape liability for their own malpractice.

## III. LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes that, based upon the evidence presented, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## IV. DISCUSSION

### A. Whether the Pre-Receivership Actions of Colonial's Employees Are Imputed to the FDIC

In an action brought by the FDIC as the receiver for a failed institution, state law governs the imputation of pre-receivership misconduct of the failed institution's employees to the receiver. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 84-85 (1994); *Grant Thornton, LLP v. FDIC*, 535 F. Supp. 2d 676, 718-19 (S.D.W.VA. 2007), *rev'd on other grounds Ellis v. Grant Thornton*, *LLP* 530 F.3d 280 (4th Cir. 2008). Accordingly, Alabama law controls on this issue. The Supreme Court of Alabama has not yet taken a position on whether the actions of a failed institution's employees can be attributed to the FDIC as the receiver for the failed institution. Thus, this Court must attempt to predict how the Alabama Supreme Court would rule if faced with such a question. *Grant Thornton*, 535 F. Supp. 2d at 716; *Illinois Union Ins. Co. v. NRI Const. Inc*., 846 F. Supp. 2d 1366, 1374 (N.D. Ga 2012) (noting that on a matter of first impression in state law, the district court must endeavor to predict how the supreme court of that state would decide the issue).

The Alabama Supreme Court has held that "[g]enerally speaking, the receiver of a defunct bank, appointed to wind up its affairs and make due distributions of its assets, stands in the shoes of the bank, and has no greater rights, nor does he stand in any more favored position than the bank he represents." *Day v. Farmers' & Merchants' Bank of Hartselle*, 157 So. 439, 443 (Ala. 1934). However, the Alabama Supreme Court has demonstrated a willingness to read exceptions into this general principle. For instance, in *Day*, the receiver for a defunct bank sought to enforce a promissory note that had been executed without consideration. The promisor objected, claiming the note was unenforceable due to lack of consideration. The receiver put forth evidence demonstrating that the promisor executed the note for the purpose of defrauding

the bank's creditors and, therefore, should be barred from arguing that the note was unenforceable. The *Day* Court agreed. It noted that "although the circumstances may have been such that the bank itself could not have collected the securities," the receiver "represents the general creditors", and therefore, "the spirit of morality, common honesty, and justice" require that the receiver "may avoid transactions in fraud of their rights." *Id*. at 443-44.

PWC and Crowe concede that the *Day* decision created an exception to the general principle that a receiver stands in no better position than the failed institution it represents, but argue that this is the only exception recognized by the Alabama Supreme Court. Therefore, the auditors argue, because there is no allegation in the instant cases that PWC and/or Crowe intentionally entered into transactions to defraud Colonial's creditors, the exception does not apply, and the general rule—"that a receiver stands in no better position than the failed bank—governs the parties in this matter." Dkt. No. 558 at 39.

This Court disagrees with PWC and Crowe. There is no indication in *Day* that the Alabama Supreme intended that the "intent to defraud creditors" exception be the *only* exception to the general rule that receivers stand in no better position than the failed institutions they represent. Indeed, the Court prefaced this rule with the word "Generally." *Day*, 157 So. at 443. And, importantly, the Alabama Supreme Court has since stated another exception to this general rule. In *Resolution Trust Corporation v. Mooney*, 592 So.2d 186 (Ala. 1991), the Alabama Supreme Court considered whether the Resolution Trust Corporation ("RTC"), a federal receiver with duties identical to those of the FDIC, was subject to punitive damages based on the misdeeds of the of failed institution it took over. The Court determined that RTC was not subject to punitive damages, reasoning:

> A receiver operates for the benefit of creditors, unsecured depositors and the federal tax payer. However, punitive damages are imposed to punish the wrongdoer and to

> deter others. Where the wrongful party is in receivership and the damages are to be paid by innocent creditors, punitive damages create an inequitable result and are therefore improper. [The bank] no longer exists and thus cannot be punished. The deterrent value of the punitive damages is likewise diminished and must be weighed against the realization that innocent parties will be required to bear the burden imposed by those damages. It is improper to impose punitive damages upon RTC for conduct attributable to the failed [bank] before RTC was appointed receiver. Imposing punitive damages against RTC would not accomplish the purposes which punitive damages are meant to serve.

*Id*. at 190 (citations and quotations omitted).

The *Mooney* decision is significant for at least two reasons. First, the *Mooney* Court determined that RTC—an innocent receiver—stood in a more favorable position than the failed bank. Second, the *Mooney* Court, like the *Day* Court, considered principles of equity and policy objectives in determining that the pre-receivership conduct of wrongdoers at the failed bank should not be imputed to RTC.

The purpose of *in pari delicto* and similar equitable doctrines is to bar "a party that has been injured as a result of its own intentional wrongdoing from recovering for those injuries from another party whose equal or lesser fault contributed to the loss." *In re Lehr Construction Corp*., 551 B.R. 732, 738 (S.D.N.Y. 2016) (quoting *Rosenbach v. Diversified Group, Inc*., 926 N.Y.S.2d 49 (N.Y. App. Div. 2011)). Thus, the Alabama Supreme Court has stated that the doctrine should be applied only in situation where to allow a plaintiff relief "would contravene public morals and impair the good of society." *Van Antwerp v. Van Antwerp*, 5 So.2d 73, 79 (Ala. 1941) (noting that *pari in delicto* "should not be applied in a case in which to withhold the relief would to a greater extent offend public morals"). Here, PWC and Crowe contend that even if they failed to comply with their professional duties when they audited Colonial, they cannot be held liable because the conduct of Colonial employees—the very conduct that PWC and Crowe were hired to examine and verify—was fraudulent and/or negligent. This Court does not believe

the Supreme Court of Alabama would reach such a conclusion. Imputation is a flexible, equitable doctrine, the primary purpose of which is to preclude suits that would benefit wrongdoers. Therefore, under the facts of this case, where the FDIC brings suit on behalf of innocent third parties who played no role in the TBW fraud and where Colonial is in receivership and no longer exists (thus it will not benefit from any recovery by the FDIC), this Court concludes that the Alabama Supreme Court would decline to impute the misdeeds and/or negligence of Colonial employees to the FDIC. *See, e.g.*, *Scholes v. Lehmann*, 56 F.3d 750, 754-55 (7th Cir. 1995) (Illinois law) (rejecting the *in pari delicto* defense against receiver: "[t]he appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys—for the benefit not of Douglas but of innocent investors—that Douglas had made the corporations divert to unauthorized purposes"); *Hays v. Paul, Hastings, Janofsky & Walker LLP*, No. CIV.A.106CV754-CAP, 2006 WL 4448809, at *10 (N.D. Ga. Sept. 14, 2006) ("If the court were to apply the doctrine of *in pari delicto* in this case, the result would be the protection of the alleged wrongdoers and the punishment of the innocent victims. Thus, the court concludes that Georgia courts would look to the equities of the situation and refuse to bar relief where the one *in pari delicto*, here Lomas, is eliminated from the suit and the recovery would ultimately go to innocent victims."); *Harmelin v. Man Fin., Inc.*, No. Civ. A. 06-1944, 2007 WL 2874043, at *7 (E.D. Pa. Oct. 2, 2007) (refusing to impute wrongdoing of company to its receiver representing innocent shareholders and creditors).

In reaching this conclusion, the Court finds the Ninth Circuit decision in *FDIC v. O'Melveny & Myers*, 61 F.3d 17 (9th Cir. 1995) instructive. When faced with a situation similar to the issue presently before this Court, the *O'Melveny* Court stated:

We recognize that, in general, a receiver occupies no better position than that which was occupied by the person or party for whom he acts ... and any defense good against the original party is good against the receiver. However, this rule is subject to exceptions; defenses based on a party's unclean hands or inequitable conduct do not generally apply against that party's receiver. While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law. Moreover, when a party is denied a defense under such circumstances, the opposing party enjoys a windfall. This is justifiable as against the wrongdoer himself, not against the wrongdoer's innocent creditors. As we noted in our earlier opinion:

> A receiver, like a bankruptcy trustee and unlike a normal successor in interest, does not voluntarily step into the shoes of the bank; it is thrust into those shoes. It was neither a party to the original inequitable conduct nor is it in a position to take action prior to assuming the bank's assets to cure any associated defects or force the bank to pay for incurable defects. This places the receiver in stark contrast to the normal successor in interest who voluntarily purchases a bank or its assets and can adjust the purchase price for the diminished value of the bank's assets due to their associated equitable defenses. In such cases, the bank receives less consideration for its assets because of its inequitable conduct, thus bearing the cost of its own wrong.

Also significant is the fact that the receiver becomes the bank's successor as part of an intricate regulatory scheme designed to protect the interests of third parties who also were not privy to the bank's inequitable conduct. That scheme would be frustrated by imputing the bank's inequitable conduct to the receiver, thereby diminishing the value of the asset pool held by the receiver and limiting the receiver's discretion in disposing of the assets.

In light of these considerations, we conclude that the equities between a party asserting an equitable defense and a bank are at such variance with the equities between the party and a receiver of the bank that equitable defenses good against the bank should not be available against the receiver. To hold otherwise would be to elevate form over substance-something courts sitting in equity traditionally will not do. Of course, it does not necessarily follow that equitable defenses can never be asserted against ... a receiver; we hold only that the bank's inequitable conduct is not imputed to FDIC.

*Id*. at 19 (quoting *FDIC v. O'Melveny & Myers*, 969 F.2d 744, 751-752 (9th Cir. 1992)) (quotations and citations omitted).[1] Similarly, the Fourth Circuit recently affirmed the dismissal of an auditor's attempts to assert the "affirmative defenses of *in pari delicto*, comparative negligence, [and] other defenses [] that relied on imputation of the [failed institution's] management to the FDIC." *Grant Thornton, LLP v. FDIC*, 435 F. App'x 188, 201 (4th Cir. 2011).

For the foregoing reasons, this Court concludes that the Alabama Supreme Court would determine that under the facts of this case, Colonial's employees' misconduct and/or alleged negligence that occurred pre-receivership is not attributable to the FDIC.[2]

### B. Whether the Auditors Can Pursue Legal Affirmative Defenses against the FDIC

PWC and Crowe argue that if this Court is inclined to restrict the imputation of Colonial's pre-receivership actions on the FDIC, such a restriction should only limit the auditors'

[1] PWC seeks to limit the Ninth Circuit's holding in *O'Melveny* to cases involving defendant fiduciaries. Dkt. No. 558 at 45 (citing *In re Bartoni-Corsi Produce, Inc*., 130 F.3d 857, 862 (9th Cir. 1997). *Bartoni-Corsi* involved a bankruptcy trustee's conversion action against a bank that improperly accepted for deposit checks that had not been properly endorsed. The bank alleged that it was authorized to deposit the checks by the actions of the bankrupt corporation's employees. The trustee had argued that the corporation was not bound by the employees' actions because they were detrimental to the corporation. The *Bartoni-Corsi* Court "declined to extend the policy, recognized by *O'Melveny*, that a corporation is not bound by those acts of its agents which are detrimental to the corporation, to situations in which a 'third-party non-fiduciary is liability to a corporation.'" *Stanford University Hosp. v. Federal Ins. Co*., 174 F.3d 1077, 1084 (9th Cir. 1999) (quoting *Bartoni-Corsi*, 130 F.3d at 862). However, *Bartoni-Corsi* did not involve the FDIC, and therefore, did not implicate the policy considerations *O'Melveny* invoked in refusing to impute misconduct by a failed corporation to the FDIC. As such, there is no reason to assume that *O'Melveny's* holding has been limited as it pertains to imputing pre-receivership misconduct to the FDIC.

[2] This Court acknowledges that courts in other jurisdictions have not been universal in refusing to impute a failed institution's misconduct and/or negligence to the receiver. However, these cases are either distinguishable from the instant cases or the Court is not persuaded by their reasoning. *See e.g*., *Stewart v. Wilmington Tr. SP Servs., Inc*., 112 A.3d 271 (Del. Ct. Chan. 2015) (denying, in part, insurance commissioner's motion to dismiss defendant auditors' *in pari delicto* defense based on Delaware law and the Delaware insurance regulatory scheme); *Knauer v. Johnathon Roberts Financial Group, Inc*., 348 F.3d 230 (7th Cir. 2003) (applying Indiana law) (receiver sought to recover funds, not for the benefit of innocent victims, but for the benefit of an institution that was "deeply complicit" in a Ponzi scheme); *Nat'l Credit Union Admin. v. First Union Capital Mkts. Corp*., 189 F.R.D. 158 (D. Md 1999) (defendants alleged that the receiver caused the failed institution's damages); *FDIC v. Refco Group, Ltd*., 989 F. Supp. 1052 (D. Colo. 1997) (the district court explicitly limited its analysis under Colorado law to the "circumstances of the case" before it).

equitable defenses, not their legal defenses. PWC argues that such a limitation "makes sense because courts' reasoning for limiting" imputation-based defenses against the FDIC is primarily based on equitable considerations. Dkt. No. 558 at 48. In support of this argument, PWC cites to *Williams v. Chubb Grp. of Ins. Cos*., 1996 WL 68234, at 1 (9th Cir. Feb. 16, 1996), an unpublished decision from the Ninth Circuit which stated that *O'Melveny* does not apply to legal defenses.

This Court fails to see why the policy considerations that shield the FDIC from imputation-based equity defenses are any less applicable to legal defenses. Imputation is not warranted in this case because the FDIC is an innocent party who was forced into the role of Colonial's receiver through "an intricate regulatory scheme designed to protect the interests of third parties who also were not privy to the bank's inequitable conduct." *O'Melveny*, 61 F.3d at 19 (citation omitted.) If Colonial's misdeeds and alleged negligence could be imputed to the FDIC, this "scheme would be frustrated" and "the value of the asset pool held by the receiver" would be diminished. *Id*.; *see also Grant Thornton*, 535 F. Supp. 2d at 719 ("Any recovery by the FDIC will ultimately inure to the benefit of the public. If the FDIC's claims were barred or diminished by virtue of imputation, the FDIC and thus the public would be deprived a recovery while [the accounting firm] would enjoy a free pass for its negligent accounting work."). This is true whether the affirmative defense sounds in equity or law. Accordingly, this Court concludes that Defendants' imputation-based defenses, whether legal or equitable, fail as a matter of law with respect to the FDIC. [3,4]

---

3 The parties dispute which of the affirmative defenses are legal versus equitable. This distinction is immaterial to the Court. Under the circumstances of this case, the imputation-based defenses are not applicable to the FDIC, regardless of whether they are based in law or equity.

4 Because the Court concludes that the FDIC is not subject to imputation-based defenses, the Court does not need to address whether Kissick's actions and the actions of other Colonial employees were adverse to Colonial's interest, and therefore, cannot be imputed to the FDIC, or whether Alabama law recognizes an audit interference rule. The

**C. Defendants' Allegations of Intervening Causes**

PWC and Crowe also assert that certain of the FDIC's and CBG's damages were the result of intervening causes (*i.e.*, breaches by Bank of America, the financial crisis, and alleged negligence by CBG's and Colonial's federal or state regulators). The FDIC argues that these defenses fail as a matter of law and also must be dismissed. This Court does not agree that intervening and superseding causes are defenses; rather, they relate to whether the FDIC can establish that PWC's and/or Crowe's alleged negligence was the proximate cause of Colonial's damages. Whether something is an intervening cause that breaks the chain of causation between PWC's and/or Crowe's alleged negligence and Colonial's damages hinges on foreseeability. *Springer v. Jefferson Cty*., 595 So.2d 1381, 1384 (Ala. 1982). Foreseeability is ordinarily a question for the trier of fact. *Ala. Power Co. v. Moore*, 899 So.2d 975, 979 (Ala. 2004) (quoting *Sly v. South Cent. Bell Tel. Co*., 387 So.2d 137, 140 (Ala. 1980)). It becomes a legal question only when "the facts of the cause are not conflicting, and where there can be no reasonable difference of opinion as to the conclusion to be reached upon them." *Id*. (quoting *Hercules Powder Co. v. DiSabatino*, 188 A.2d 529, 535 (Del. 1963)). This Court has already ruled that whether Bank of America's breaches constitute an intervening cause is a question for the trier of fact. *See* Dkt. No. 677. Likewise, Defendants are entitled to present evidence of other potential intervening causes at trial.

---

Court will address these arguments in the forthcoming order related to CBG's motion for partial summary judgment regarding Defendants' affirmative defenses [Dkt. No. 524].

## IV. CONCLUSION

For the foregoing reasons, the Court hereby GRANTS in part and DENIES in part the FDIC's motion for partial summary judgment on Defendants' affirmative defenses.

Dated this 18th day of August, 2017.

Barbara Jacobs Rothstein
U.S. District Court Judge