IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE COLONIAL BANCGROUP INC., and KEVIN O'HALLORAN<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP,<br><br>Defendants. | ) | CASE NO. 2:11-cv-746-BJR |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK,<br><br>Plaintiff,<br><br>v.<br><br>PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP<br><br>Defendants. | ) | CASE NO. 2:12-cv-957-BJR |

**ORDER GRANTING IN PART AND DENYING IN PART CBG'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSES**

## I. INTRODUCTION

The genesis of these lawsuits is a complex bank fraud that culminated in the failure of Colonial Bank ("Colonial") and Colonial's parent company, The Colonial BancGroup, Inc. The Colonial BancGroup, Inc. and Kevin O'Halloran, as Plan Trustee acting on behalf of The Colonial BancGroup, Inc. (collectively "CBG") and the Federal Deposit Insurance Corporation as Receiver for Colonial (the "FDIC") each filed a lawsuit against CBG's outside auditors PricewaterhouseCoopers LLP ("PWC") and Crowe Horwath LLP ("Crowe"), seeking to recover for the auditors' failure to detect the fraud. Presently before the Court is CBG's motion for partial summary judgment on the Defendants' affirmative defenses. Dkt. No. 524. PWC and Crowe each oppose the motion. Dkt. Nos. 558 and 573. Having reviewed the motion and oppositions thereto, the record of these cases, and the relevant legal authorities, the Court will grant in part and deny in part the motion. The reasoning for the Court's decision is set forth below.

## II. BACKGROUND

### A. The TBW Fraud

These lawsuits are the result of a massive, long-running fraud conducted in CBG's wholly owned banking subsidiary, Colonial. The fraud centered in Colonial's Mortgage Warehouse Lending Division ("MWLD"). Beginning in 2002, the MWLD's largest customer, Taylor Bean & Whitaker Mortgage Corporation ("TBW"), began to overdraw on its accounts at Colonial. TBW's Chairman, Lee Farkas, and several other TBW insiders, along with Catherine Kissick, a senior vice president at Colonial and the head of the MWLD, and several other MWLD employees, conspired to hide the overdrafts by "sweeping" funds between accounts. The fraud grew and became much more complex as the years progressed until the State of Alabama

Banking Department closed Colonial and appointed the FDIC its receiver on August 14, 2009. By the time the fraud was shut down, it had illegally diverted over $2 billion assets from Colonial. CBG filed for Chapter 11 bankruptcy protection eleven days after the banking authorities closed Colonial.

### B. Relevant Banking Laws and Regulations

As a publicly traded, bank holding company, CBG was subject to disclosure laws and regulations monitored and enforced by the U.S. Securities and Exchange Commission (the "SEC"). These laws and regulations required CBG to annually file with the SEC a comprehensive summary of CBG's financial performance, as well as an integrated audit of CBG's financial statement and internal controls by an independent auditor. CBG was also required to comply with the Sarbanes Oxley Act of 2002, which seeks to ensure that a public company's financial reporting is materially accurate and that its internal controls over financial reporting are operating effectively. *See, e.g.*, 15 U.S.C. 78m; 15 U.S.C. § 7262(a).

CBG complied with these laws and regulations in the following ways. First, it employed multiple individuals whose full time job was to prevent fraud within Colonial. For instance, the MWLD was monitored by the Risk Control Group, the Asset Purchase Commitment, and the Mortgage Warehouse Lending Credit Committee. Each of these committees was tasked with mitigating risks in the MWLD, including detecting fraud. Second, CBG engaged the services of Defendant PWC to serve as CBG's outside independent auditor to perform the required integrated audits of CBG's financial statements and internal controls. CBG also engaged Defendant Crowe to help implement CBG's internal audit function. PWC and Crowe served as the independent internal and external auditors for CBG at all relevant times during the TBW fraud.

Despite all of these measures, no one at CBG, Colonial, PWC, or Crowe detected the fraud. Nor did anyone at the Federal Reserve, the FDIC, the Office of the Comptroller of the Currency, or the Alabama State Banking Department (each of whom regulated CBG and/or Colonial at different points during the fraud).

### C. The Parties' Responsibilities under the Terms of the Respective Agreements between CBG, PWC, and Crowe

#### 1. The Agreement between CBG and PWC

As stated above, CBG retained PWC to act as its independent external auditor to perform an integrated audit of CBG's consolidated financial statements and internal controls. To that end, for the years ending December 31, 2007 and 2008, CBG's Audit Committee and PWC entered into contracts that dictated PWC's and CBG's respective responsibilities (hereinafter referred to as the "Engagement Letters"). Dkt. No. 524, Exs. 5 and 6.

Under the terms of the Engagement Letters, PWC was responsible for performing two types of audits at CBG: (1) a financial statement audit, and (2) an audit of CBG's internal control over its financial reporting. Ex. 5 at 1-2. Both audits were to be done in accordance with the standards established by the PCAOB.[1] *Id*. The Engagement Letters state that the objective of the financial statement audit is for PWC to "express[] [] an opinion on the financial statements," while the objective of the internal control audit is for PWC to be able to "express[] [] an opinion on the effectiveness of [CBG's] internal control over financial reporting." *Id*. at 2. The Engagement letters further required PWC to "design [the] audits to obtain reasonable, but not absolute, assurances of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts, and of identifying material weaknesses in internal control over financial reporting." *Id*.

[1] Public Company Accounting Oversight Board

However, the Engagement Letter cautioned that PWC "cannot ensure that errors, fraud or other illegal acts, if present, will be detected." *Id*. at 3.

Under the terms of the Engagement Letters, CBG was "responsible" for its "financial statements" and "maintaining adequate control over financial reporting." *Id*. at 3. CBG was also "responsible for establishing policies and procedures" for "safeguarding [CBG's] assets." *Id*. CBG was further responsible for "the design and implementation of programs and controls to prevent and detect fraud, and for informing [PWC] (i) about all known or suspected fraud affecting the entity … or (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the entity[.]" *Id*. Finally, CBG was responsible for: (1) the effectiveness of CBG's internal control over financial reporting, and (2) evaluating the effectiveness of CBG's internal control over financial reporting. *Id*. at 4.

### 2. The Agreement between CBG and Crowe

Just as with PWC, CBG entered into a series of Engagement Letters that delineated the parties' respective duties with regard to Crowe's "risk-based internal audit" services that it provided CBG in 2007 and 2008. Dkt. No. 524, Exs. 16 and 17. Under these agreements, Crowe was required to "assist" CBG's management to develop "an annual risk-based internal audit services plan." Dkt. No. 524, Ex. 16 at 1. The plan was to be "approved" by CBG's Audit Committee but "executed" by Crowe, which meant that Crowe would "direct, review, and supervise the day-to-day performance" of the "annual risk-based internal audit services plan." *Id*. This included "review[ing] [the] key internal controls and detail testing of a sample of transactions." *Id*. at 2. In doing so, Crowe promised to comply with AICPA,[2] SEC, PCAOB, and

[2] The American Institute of Certified Public Accountants

"other regulatory independence guidance." *Id*. at 1. However, the Engagement Letters also note that Crowe may not detect all errors or irregularities that may exist. *Id*. at 2.

The Engagement Letters clarified that CBG was "responsible for determining and approving the risk, scope, and frequency of [the] internal audit services activities." Ex. 16 at 3. In addition, CBG's Audit Committee and senior management was required to "maintain ownership of the internal audit function and provide active oversight of the internal audit activities." *Id*. The Audit Committee and senior management were also "responsible for having an effective system of internal control and an effective internal audit function in place" and "for ensuring that the importance of internal control is understood and respected throughout [CBG]." *Id*.

**D. Defendants' Imputation-Based Affirmative Defenses**

CBG faults PWC and Crowe for not discovering the TBW fraud and seeks to recover hundreds of millions of dollars in damages from the auditors. PWC and Crowe counter that CBG's officers and agents acted negligently, if not fraudulently, and thus, caused CBG's damages. As such, both PWC and Crowe assert the following fault-based affirmative defenses in their respective Answers: (1) contributory negligence, (2) intervening actions of others, (3) *in pari delicto* and the *Hinkle* Rule, and (4) unclean hands.

CBG moves for partial summary judgment on each of these affirmative defenses. With respect to the auditors' contributory negligence defense, CBG argues that the defense should be precluded as a matter of law except to the extent that PWC and Crowe can establish that CBG interfered with their ability to properly perform their audit duties. CBG also argues that the contributory negligence defense is not applicable to CBG's breach of contract claims. Next, CBG argues that its employees' and the regulators' failure to detect the TBW fraud cannot constitute an intervening cause that extinguishes the auditors' liability because the failures were

either foreseeable or irrelevant to whether PWC and/or Crowe complied with their auditing responsibilities.

CBG also claims that the doctrine of *in pari delicto* and the *Hinkle* Rule are not applicable to its claims because those doctrines only apply to "a narrow set of cases where both the plaintiff and defendant come to court as joint tortfeasors or when they both participate in an illegal act or scheme." *Id*. at 3. Lastly, CBG argues that these defenses are not applicable to CBG's claims because the "criminal fraudulent conduct of the few Colonial [] employees who engaged in" the TBW fraud cannot be imputed to CBG as a matter of law. *Id*.

## III. LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes that, based upon the evidence presented, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## IV. DISCUSSION

### A. Whether the Audit Interference Rule Limits Contributory Negligence Defenses against Auditors under Alabama law

Alabama is one of only three states (plus the District of Columbia) that follows the traditional rule that a plaintiff's negligence serves as a complete bar to recovery. *See Williams v. Delta Int'l Mach. Corp*., 619 So.2d 1330, 1333 (Ala. 1993) (explaining that contributory negligence "has been the law in Alabama for approximately 162 years"); 1 Best, Comparative Negligence Law and Practice § 1.00 (Matthew Bender, Rev. Ed.). Despite being a pure contributory negligence state, the Alabama Supreme Court has recognized that the doctrine of contributory negligence is not unlimited and may be narrowed to account for the duties and responsibilities owed by the defendant. For instance, in *Dennis v. Amer. Honda Motor Corp*., 585 So.2d 1336, 1339 (Ala. 1991), a seriously injured motorcyclist brought an action against a

manufacturer under Alabama's Extended Manufacturer's Liability Doctrine ("AEMLD") claiming his injury was the result of a defect in his helmet. The Alabama Supreme Court held that a "plaintiff's mere inadvertence or carelessness in causing an accident should not be available as an affirmative defense" with respect to claims premised on a defective product. 585 So.2d at 1339. Rather, the Court held, "[t]he defense of contributory negligence in an AEMLD action should be limited to assumption of the risk and misuse of the product." *Id*.

CBG argues that if given the opportunity, the Alabama Supreme Court would likewise limit the availability of contributory negligence in the context of an audit malpractice case. In support of this claim, CBG cites to Justice Murdock's concurring opinion in *Tucker v. Ernst & Young*, 159 So.3d 1263 (Ala. 2014). *Tucker* arose out of an arbitration between shareholders of Healthsouth Corporation and Ernst & Young. The shareholder plaintiffs had asserted derivative claims against Ernst & Young on behalf of Healthsouth, including a claim for malpractice premised, in part, on Ernst & Young's failure to discover an accounting fraud in Healthsouth. *Id*. at 1265-66. Ernst & Young had asserted defenses of contributory negligence and *in pari delicto*, which the arbitration panel ruled barred any recovery by Healthsouth. The shareholder plaintiffs appealed the arbitrators' ruling. Constrained by the provisions of the Federal Arbitration Act ("FAA"), the Alabama Supreme Court ruled that it could not review the merits of the arbitrators' decision, assess whether the arbitration panel abused its discretion, or even whether the panel's ruling constituted a "manifest disregard of the law." 159 So.3d at 1271, 1274, 1279.

Justice Murdock agreed that the FAA constrained the Alabama Supreme Court's ability to assess the merits of the arbitration panel's decision. Nevertheless, Justice Murdock wrote a concurring opinion to note that the arbitration panel's decision to allow Ernst & Young to invoke contributory negligence by Healthsouth "even if an auditor fails to meet its required standard of

care to discover and report … misstatements and fraud" was erroneous and "made illusory the very obligation undertaken" by Ernst & Young, particularly "the obligation to use due care and discover and report that very fraud." *Id*. at 1280. Justice Murdock further stated:

> What is at issue in the present case is whether *a principal may hold a third party liable for a tort committed against the principal by the third party*, notwithstanding, or perhaps in conjunction with, a breach of duty owed the principal by the principal's agent. *As to that issue, the law is well settled that such actions are viable under the appropriate circumstances: the agent's wrongful conduct or knowledge is not always imputed to the principal so as to preclude the principal from recovering against a third party*.

*Id*. at 1280-81 (emphasis in original).

Justice Murdock went on to reference Comment b to § 5.04 of Restatement (Third) of Agency (2006), which sets forth an exception to the rule that the acts of an agent are imputed to the principal, and quoted it as follows:

> *A principal may retain a service provider on terms or for tasks that make imputation of agents' knowledge irrelevant to subsequent claims that the principal may assert against the service provider. For example, a principal may retain a service provider to assess the accuracy of its financial reporting or the adequacy of its internal financial controls or other internal processes, such as its processes for reporting and investigating complaints of harassment in the workplace. If the service provider fails to detect or report deficiencies, the principal's claim against the service provider should not be defeated by imputing to the principal its agents' knowledge of deficiencies in the processes under scrutiny*.

*Id*. at 1283 (emphasis added by Justice Murdock).

CBG argues that Justice Murdock's analysis is directly on point to the case at hand. It claims that as its independent external auditor, PWC was required to perform its audits to gain a high level of assurance that CBG's financial statements were not materially misstated as a result of error or fraud and that CBG's internal controls were operating effectively to prevent material misstatements whether caused by fraud or error. Likewise, CBG argues, Crowe was retained to perform testing to ensure that all key internal controls within all significant accounts were

operating effectively in compliance with SOX so as to prevent a material misstatement resulting from error or fraud. Thus, CBG argues, PWC and Crowe should not be allowed to escape liability for their negligence simply because conditions they were hired to detect—negligence and fraud—actually existed. Indeed, CBG, argues, the role of the auditor is to "*assume[] the very possibility* that the negligence of the audit client's own personnel could result in the failure to detect a material error." Dkt. No. 524 at 18 (emphasis in original).

CBG claims that courts in other jurisdictions that follow contributory negligence have recognized what has become known as the "audit interference rule" to "ameliorate the unfair and harsh results that could occasion use of the doctrine in an audit malpractice case." *Id*. at 18 (citing *National Surety. Corp. v. Lybrand*, 9 N.Y.S.2d 554, 563 (N.Y. 1939) ("We are, therefore, not prepared to admit that accountants are immune from the consequences of their negligence because those who employ them have conducted their own business negligently . . . . Accountants…are commonly employed for the very purpose of detecting defalcations which the employer's negligence has made possible. Accordingly, we see no reason to hold that the accountant is not liable to his employer in such cases. Negligence of the employer is a defense only when it has contributed to the accountant's failure to perform his contract and to report the truth."); *Lincoln Grain, Inc. v. Coopers & Lybrand*, 345 N.W.2d 300, 307 ("[C]ontributory negligence of the client is a defense only where it has contributed to the accountant's failure to perform the contract and to report the truth."); *Stroud v. Arthur Andersen & Co*., 37 P.3d 783, 789, 790 (Okla. 2001) ("An accountant cannot defend his/her deficient professional conduct by asserting that its client was also negligent unless the client's conduct can be proven to have interfered with the accountant's provision of professional service."); *Comeau v. Rupp*, 810 F. Supp. 1172, 1183 (D. Kan. 1992) (same)). CBG acknowledges that the Alabama Supreme Court

has not yet had the opportunity to adopt the audit interference rule, but argues that if faced with a fact pattern similar to those of these cases, it would.

This Court agrees with CBG. The Alabama Supreme Court has already demonstrated a willingness to deviate from strict compliance with contributory negligence in *Dennis* where it held that a driver's negligence related to the accident could not be used as a total bar in a defective product case. *Dennis*, 585 So.2d at 1339; *see also Culpepper v. Weihrauch*, 991 F. Supp. 1397, 1400 (M.D. Ala. 1997) ("Although contributory negligence serves as a total bar against recovery in AEMLD cases, the Alabama Supreme Court diminished its effect in *Dennis*, where the court held that contributory negligence related to accident causation was an invalid defense."). Moreover, Justice Murdock's concurring opinion in *Tucker* appears to be a clear indication that Alabama Supreme Court would adopt the audit interference rule if given the opportunity. Justice Murdock was clearly uncomfortable with the notion that an auditor could escape liability for failing to detect the very condition that it was hired to detect simply because that condition existed. The professional duties and responsibilities owed by PWC and Crowe presuppose the possibility that a material misstatement arising out of negligence, fraud, and/or a material weakness in internal controls necessary to prevent such a misstatement might exist and not be detected by management. *See e.g. In re Cendant Corp., Litig*, 139 F. Supp. 2d 585, 607 (D.N.J. 2001) (noting that an auditor "necessarily [must] anticipate[] the possibility it would receive inaccurate financial information from [its client]."). Invoking the audit interference rule is a logical balance between Alabama's pure contributory negligence rule and the concerns raised by Justice Murdock.

Indeed, the Alabama Supreme Court stated in *dicta* that contributory negligence would not be applicable in a medical malpractice case where the defendant "was charged with failure to

diagnose a disease and attempted to defend on the basis that the patient had been contributorily negligent in contracting the disease." *Lyons v. Walker Regional Medical Center, Inc.*, 868 So.2d 1071, 1085 (2003) (stating that such a situation would be analogous to the situation in *Dennis* in which the helmet manufacturer attempted to avoid liability because the plaintiff's negligence caused the accident). Such is the case here. PWC and Crowe are attempting to escape liability for failing to detect misstatements in CBG's financial statements by arguing that CBG was contributorily negligent for the existence of those misstatements.

The Court finds unpersuasive PWC's and Crowe's arguments that this Court should disregarding Justice Murdock's concurrence in *Tucker* because no other Alabama Supreme Court justice joined in the concurrence. The Court agrees that Justice Murdock's concurrence is of limited precedential value, as all concurrences are, but the fact remains that it is the only directly on point evidence of the Alabama Supreme Court's proclivity towards this issue. *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011) (noting that where highest court in a state has not spoken on an issue, a federal court "must predict how the highest court would decide" the issue). Nor is this Court persuaded by PWC's and Crowe's claim that Justice Murdock's analysis was limited to whether fraudulent conduct could be imputed to the auditor's clients. Justice Murdock's analysis was not limited to allegations of fraud. Instead, Justice Murdock defined the issue in *Tucker* broadly enough to include both negligence and fraud, noting that the issue was "whether a principal may hold a third party liable for a tort committed against the principal by the third party, notwithstanding, or perhaps in conjunction with, a breach of duty owed the principal by the principal's agent." *Tucker*, 159 So.3d at 1279-80.

Likewise, this Court is unpersuaded by PWC's and Crowe's argument that forty-four states do not apply the audit interference rule. As stated earlier, less than a handful of

jurisdictions apply a pure contributory negligence rule; the remainder of states have adopted a comparative fault system where juries are permitted to weigh the respective duties and conduct of the parties and allocate fault proportionately. Thus, the rational for applying the audit interference rule does not exist in a comparative fault system. Indeed, this point is emphasized as the reason for not adopting the audit inference rule in nearly every case the Defendants cite. *See*, *e.g*., *Standard Chartered Bank PLC v. Pricewaterhouse*, 945 P.2d 317, 352 (Ariz. 1996) ("[T]he rational of *National Surety* [which employed the audit interference rule] is incompatible with Arizona law. In New York, at the time of *National Surety*, contributory negligence was a complete defense…we are now a state of several liability and comparative fault."); *Devco Premium Fin. Co. v. North River Ins. Co.*, 450 So.2d 1216, 1220 (Fla. Dist. Ct. App. 1984) (rejecting adoption of the audit interference rule because *National Surety* "was decided on principals of contributory negligence, a doctrine which has been repudiated in [Florida]."); *Paul Harris Stores, Inc. v. PricewaterhouseCoopers, LLP*, 2006 WL 2859425, *7 (S.D. Ind. Oct. 4, 2006) (noting that the rational for adopting the audit interference rule did not exist under Indiana law, which adopted comparative negligence).

Nor is the Court persuaded by PWC's and Crowe's claim that only the Alabama Legislature can make any changes to Alabama's doctrine of contributory negligence. Defendants rely on *Golden v. McMurry*, 392 So.2d 815 (Ala. 1980) for this argument. However, the issue raised in *Golden* was whether to "abolish the common law rule of contributory negligence and replace it with the rule of comparative negligence." *Id*. at 816. The Alabama Supreme Court stated that such a drastic change to Alabama's common law—abandoning entirely as defense that has been available in the state since the 1800s—should be left to the state's legislature. *Id*. at

817. On the other hand, as demonstrated in *Dennis*, the Alabama Supreme Court is willing to limit the scope of the doctrine.

The only case applying Alabama law to which Defendants cite in support of their claim that the Alabama Supreme Court would not adopt the audit inference rule if given the opportunity is *Dapremont v. Overcash, Walker & Co*., 2000 WL 1566532 (S.D. Ala. Oct. 4, 2000). However, *Dapremont* is a tax case, not an audit malpractice case. It did not address the scope of Alabama's contributory negligence defense in the context of an audit malpractice dispute and is, therefore, of little precedential value to the cases at hand. Moreover, the *Dapremont* court is not an Alabama state court decision, but another federal district court decision applying Alabama law. *See Horace Mann Ins. Co. v. Fore*, 785 F. Supp. 947, 950 at fn. 5 (M.D. Ala. 1992) (noting that when there is no controlling decision handed down by Alabama's highest court, the court must make its best prediction of how the Alabama Supreme Court would decide the issue and, in doing so, the court "is not bound by the prediction of another federal district court exercising diversity jurisdiction in the forum state[.]"). Accordingly, this Court concludes that if faced with a similar factual and legal situation as these cases, the Alabama Supreme Court would adopt the audit interference rule as a limitation on Alabama's pure contributory negligence defense.

In addition, the Court concludes that contributory negligence is not a defense to CBG's breach of contract claims, an argument that PWC concedes, but that Crowe challenges. More specifically, Crowe concedes that contributory negligence is not applicable to breach of contract claims under Alabama law, but asserts that the breach of contract claims against it are governed by Illinois law (due to the choice of law provision in its Engagement Letters) and under Illinois law, Crowe claims, contributory negligence is a defense to breach of contract claims. The

problem with Crowe's argument, however, is that it fails to cite a single Illinois case for this proposition. On the other hand, CBG cites to Illinois case law establishing that contributory negligence is not a viable defense to a claim for breach of contract. *See Chamberlain Mfg. Corp. v. Maremont Corp*., 1993 WL 535420, *6 (N.D. Ill. Dec. 19, 1993). Accordingly, this Court concludes that Defendants' contributory negligence defense is not a viable defense against CBG's breach of contract claims.

**B. Whether Intervening Actions by Bank Personnel and/or Bank Regulators Are Superseding Intervening Causes**

Defendants argue that the failure of CBG personnel and/or bank regulators, including the Alabama Department of Insurance, the OCC, the Federal Reserve, and the FDIC, to detect the TBW fraud broke the casual chain between Defendants' alleged liability and CBG's damages. Under Alabama law, in order for conduct to be an intervening cause that cuts off liability of a defendant, the conduct must meet the following three criteria: (1) it must have occurred after the defendant's actions giving rise to the negligence claim, (2) it must have been unforeseeable to the defendant at the time of the defendant's wrongful acts, and (3) it must have been sufficient to be the sole proximate cause of plaintiff's injury. *Gilmore v. Shell Oil Co*., 613 So.2d 1272, 1275 (Ala. 1993).

**1. Alleged misconduct by CBG personnel**

CBG argues that the three criteria necessary to establish an intervening cause are not satisfied with respect to the bank personnel's alleged misdeeds. It claims that PWC and Crowe were each "obligated to perform their audits assuming the very possibility that errors or fraud might go undetected by [bank personnel]." Dkt. No. 524 at 24. Therefore, CBG argues, its personnel's failure to detect the TBW fraud—whether negligent or otherwise—was clearly

foreseeable to PWC and Crowe at the time they performed their services and cannot, as a matter of law, constitute an intervening cause that absolves the Defendants of liability.

Whether the bank personnel's negligence was foreseeable at the time of PWC' and Crowe's alleged breaches is a question of fact generally reserved for the trier of fact. *Alabama Power Company v. Moore*, 899 So.2d 975, 979 (Ala. 2004) (noting that it is ordinarily a question for the trier of fact whether an action is foreseeable). As such, the Court finds that this determination is best made after the conclusion of trial and, therefore, denies CBG's motion for summary judgment on this issue.

**2. The banking regulators' failure to detect the TBW fraud**

As for the banking regulators' failure to detect the TBW fraud, CBG argues that given that the regulators are not auditors and are not subject to "the same standards of professional auditors," the regulators' failure to uncover the TBW fraud is not relevant to whether PWC and Crowe "should have and would have detected the fraud had they discharged their own professional responsibilities" appropriately. *Id*. at 24, 25. Thus, CBG argues, the "conduct of the regulators was not and could never be a cause of the losses suffered by [CBG] at the hands of PWC and Crowe." *Id*.

Defendants counter that the regulators' failure to detect the fraud is relevant as to whether PWC and/or Crowe exercised due diligence in performing their duties. In particular, Crowe claims that the regulators reviewed CBG's internal audit function, including the quality of Crowe's work, and did not find significant deficiencies. According to Crowe, this "contemporaneous evidence is relevant both to whether Crowe's work was deficient and whether Crowe should have discovered the fraud." Crowe Opp. at 22-23. This Court agrees with PWC

and Crowe. The fact that the regulators also did not discover the fraud is probative as to whether the auditors acted diligently in executing their duties.

However, the question of whether the regulators' failure to detect the TBW fraud was a superseding intervening cause sufficient to extinguish PWC's and Crowe's liability is a question that must be reserved for trial. The current record is not sufficient to allow the Court to ascertain whether the regulators' failure occurred after PWC's and/or Crowe's alleged breaches, whether the regulators' failure was foreseeable at the time of PWC's and Crowe's alleged breaches, and whether the regulators' failure was sufficient to be the sole proximate cause of CBG's injuries. Therefore, the Court denies CBG's motion for summary judgment on this issue.

### B. Whether the *In Pari Delicto* Doctrine and *Hinkle* Rule are Applicable to CBG's Claims

CBG moves to dismiss Defendants' affirmative defenses based on the doctrine of *in pari delicto* and on Alabama's *Hickle* Rule, arguing that these defenses are inapplicable to CBG's claims. The doctrine of *in pari delicto*, which applies to both contract and tort actions, "bars recovery by a plaintiff who is equally as guilty as the defendant in the breach of the law." *Ex part W.D.J.*, 785 So.2d 390, 393 (Ala. 2000). The twin rationales for the doctrine are: "courts should not lend their good offices to mediating disputes among wrongdoers," and "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Bateman Eichler, Hill Richars, Inc. v. Berner*, 472 U.S. 299, 306 (1985).

The *Hickle* Rule, which originates from the Alabama Supreme Court case *Hinkle v. Ry. Express Agency*, 6 So.2d 417, 421 (Ala. 1942), stands for the proposition that "[a] person cannot maintain a cause of action if, in order to establish it, he must rely in whole or in part on an illegal or immoral act or transaction to which he is a party." The *Hinkle* Rule "derives principally not from consideration for the defendant, but from a desire to see that those who transgress the moral

or criminal code shall not receive aid form the judicial branch of government." *Oden v. Pepsi Cola Bottling Co.*, 621 So.2d 953, 955 (Ala. 1993) (internal quotation marks omitted). The Rule applies to both contract and tort claims. *Hinkle*, 6 So.2d at 421.

CBG claims that the *in pari delicto* doctrine and *Hickle* Rule are identical "in sum and substance" and that neither of the defenses is applicable to its claims. CBG argues that Alabama courts invoke the *in pari delicto* defense only with respect to: (1) claims for indemnification between joint tortfeasors, (2) to prevent one party from recovering from a counterparty to a void or illegal contract, or (3) where a plaintiff's claim arises out of an illegal transactions such as a fraudulent conveyance. CBG further claims that Alabama courts only apply the *Hickle* Rule when the plaintiff's injuries are the direct result of the plaintiff's knowing and intentional participation in a crime involving moral turpitude. CBG argues that none of these circumstances exists in these cases: CBG is not a joint tortfeasor with PWC and/or Crowe, it is not seeking to enforce an illegal contract with the auditors, it did not participate in an illegal transaction with the auditors, nor were CBG's injuries caused by its participation in a crime involving moral turpitude. Therefore, CBG argues, the *in pari delicto* and *Hickle* defenses are not applicable to its claims as a matter of law.

CBG also argues that each of these defenses fails because they require establishing that CBG was complicit in the TBW fraud due to the misdeeds of Kissick, Kelly, and the other CBG agents who were involved in the fraud. According to CBG, Alabama law does not allow for the imputation of the misdeeds of an agent to the principal if the agent was acting adversely to the principal's interest. CBG argues that it is indisputable that Kissick and Kelly were acting adversely to CBG's interest. Both pled guilty to conspiracy to commit bank fraud, securities

fraud, and wire fraud, and both were sentenced to prison for their criminal conduct. In addition, both admitted to acting against CBG's interest when they were deposed in these cases.[3]

PWC and Crowe counter as follows. First, they challenge CBG's contention that the defenses of *in pari delicto* and the *Hickle* Rule are limited to cases involving joint tortfeasors, illegal or void contracts, or joint criminal activity. They point out that no Alabama case has ever held that the defenses are limited to those categories. To the contrary, they argue, the Alabama Supreme Court has allowed the application of those defenses outside those categories on several occasions. PWC and Crowe next argue that the question of whether the misdeeds of Kissick, Kelly, and other bank personnel can be imputed to CBG cannot be resolved on summary judgment because a question of fact exists as to whether the individuals intended to act adversely to CBG's interests.

The Court agrees that a dispute of fact exists as to whether the CBG employees were acting in CBG's interest. CBG argues that it does not matter whether there is a question of fact because the employees' behavior necessarily cannot be imputed to it as a matter of law. CBG asserts that these employees actively participated in a fraud that they knew was illegal, thus they necessarily must have been acting adversely to CBG. The Court agrees that there is some attraction to CBG's argument as it is difficult to see how an employee actively enabling a third party to steal billions of dollars from its employer is acting in the best interest of the employer. However, this Court has reviewed the transcripts for both Kissick and Kelly, as well as the plea agreements in their criminal cases, and the testimony is conflicting. On the one hand, both

---

[3] CBG also argues that Judge Watkins already determined that Kissick and Kelly acted adversely to CBG when he denied PWC's motion to dismiss, therefore, the issue has been resolved in this case. This Court disagrees with CBG. Judge Watkin's analysis was done in the context of a motion to dismiss and without the benefit of a record developed through discovery. As discussed below, that record clearly demonstrates that there is an issue of fact as to Kissick's and Kelly's motivation for participating in the TBW fraud.

Kissick and Kelly admit that they knew that they were involved in illegal activity, but on the other hand, both also stated that they continued to participate in the TBW fraud so that Colonial would not be stuck with the "hole" that was created by the fraud. In other words, they kept the fraud going in a desperate—albeit misguided—attempt to recoup Colonial's funds from TBW. Moreover, PWC and Crowe present evidence that far more CBG employees than just Kissick and Kelly were involved in covering up the TBW fraud. For instance, they present evidence that Colonial's treasurer and assistant treasurer assisted in hiding aging loans on the AOT facility so that the bank's regulators would not be aware of the aged loans. The Court is not able to, from the limited record currently before it, ascertain exactly which employee were involved in the fraud, the extent of their involvement in the fraud, or their motivation for participating in the fraud. As such, it is inappropriate for the Court to determine at this time whether these employees' actions can be imputed to CBG or to what extent the defense of *in pari delicto* or the *Hickle* Rule are applicable to CBG's claims. Therefore, summary judgement must be denied as to these defenses[4,5]

## V. CONCLUSION

For the foregoing reasons, the Court HEREBY GRANTS in part and DENIES in part CBG's motion for partial summary judgment on Defendants' affirmative defenses [Dkt. No. 524]. Specifically, the Court rules that:

---

[4] The parties dispute the degree to which the employee must have acted against CBG's interest in order to escape imputation of the employee's misdeeds to CBG. CBG argue that the employee simply must have engaged in a transaction in which she "is interested adversely to his principal or is engaged in a scheme to defraud the latter," while PWC and Crowe argue that the employee must have "wholly abandoned any corporate purpose." Dkt. No. 524 at 29, Dkt. No. 558 at 30. The Court will wait to resolve this issue, if it remains pending, during post-trial briefings.

[5] CBG's motion indicates that it seeks summary judgment on PWC's and Crowe's unclean hands defense, but never specifically addresses the defense in its motion. Nevertheless, the Court concludes that its analysis with respect to imputation for purposes of the *in pari delicto* and *Hickle* Rule defenses applies equally to the doctrine of unclean hands.

1. The Alabama Supreme Court would adopt the audit interference rule to limit the defense of contributory negligence in an audit malpractice case such as in these cases. Therefore, CBG's motion is granted as to its request to limit PWC's and Crowe's contributory negligence defense accordingly. However, a dispute of fact exists as to whether CBG's employees were negligent and whether such negligence interfered with PWC's and Crowe's ability to perform their duties;
2. The contributory negligence defense is not applicable to CBG's breach of contract claims;
3. CBG's motion is denied as to whether its employees' failure to detect the TBW fraud and/or the bank regulators' failure to detect the fraud is an intervening cause of CBG's damages; and
4. A question of fact exists as to whether the CBG personnel's misdeeds can be imputed to CBG; therefore, CBG's motion is denied as to PWC's and Crowe's *in pari delicto*, *Hickle* Rule, and unclean hands defenses.

Dated this 11th day of September, 2017.

Barbara J Rothstein

Barbara Jacobs Rothstein
U.S. District Court Judge