IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


The Colonial BancGroup, Inc.,  )
and Kevin O'Halloran, as Plan  )
Trustee for the Colonial       )   Civil Action
BancGroup, Inc.,               )   No. 2:11-cv-00746 - BJR
                               )
                    Plaintiff, )   BENCH TRIAL
                               )
vs.                            )   Washington, DC
                               )   September 18, 2017
PricewaterhouseCoopers, LLP    )   Afternoon Session
and Crowe Horwath, LLP,        )   Time:  1:30 p.m.
                               )
                    Defendants.)
_____

TRANSCRIPT OF BENCH TRIAL
HELD BEFORE
THE HONORABLE JUDGE BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Plaintiff:        **David C Mullin**
                          Mullin Hoard & Brown LLP
                          500 S. Taylor
                          Suite 800
                          Amarillo, TX 79101
                          (806)372-5050
                          Email: Dmullin@mhba.com
                          **Stephen P. Sorensen**
                          Thomas Alexander Forrester &
                             Sorensen LLP
                          14 27th Ave
                          Venice, CA 90291
                          (310)961-2536
                          Email: Ssorensen@tafsattorneys.com
                          **Ronald T Coleman, Jr.**
                          Parker, Hudson, Rainer & Dobbs LLP
                          285 Peachtree Center Avenue NE
                          1500 Marquis Two Tower
                          Atlanta, GA 30303
                          (404)420-1144
                          Email: Rtc@phrd.com

1          **Nicholas J Dicarlo**
            Dicarlo Caserta McKeighan & Phelps
2          6900 E. Camelback Rd. Suite 250
            Scottsdale, AZ 85251
3          (480)222-0914
            Email: Ndicarlo@dcmplaw.com
4          **John G. Turner, III**
            Mullin Hoard & Brown, LLP
5          P O Box 31656
            Amarillo, TX 79120
6          Email: Jturner@mhba.com

7   For the Defendants:    **Philip S. Beck**
                            **Mark L. Levine**
8                           Bartlit Beck Herman Palenchar & Scott
                            54 West Hubbard Street, Suite 300
9                           Chicago, IL 60654
                            (312)494-4411
10                          Email: Philip.beck@bartlitbeck.com
                            Email: Mark.levine@bartlitbeck.com
11                          **Jameson R. Jones**
                            Bartlit Beck Herman Palenchar & Scott
12                          1899 Wynkoop Street. 8th Floor
                            Denver, CO 80202
13                          Email: Jameson.jones@bartlitbeck.com
                            **Meredith Moss**
14                          King & Spalding LLP
                            1700 Pennsylvania Ave NW
15                          Washington, DC 20006
                            (202)626-2916
16                          Email: Mmoss@kslaw.com
                            **Christopher D. Landgraff**
17                          Bartlit Beck Herman Palenchar & Scott
                            54 W Hubbard St Ste 300
18                          Chicago, IL 60654
                            Email: Chris.landgraff@bbhps.com
19   _____

20  Court Reporter:        Janice E. Dickman, RMR, CRR
                            Official Court Reporter
21                          United States Courthouse, Room 6523
                            333 Constitution Avenue, NW
22                          Washington, DC  20001
                            202-354-3267
23

24

25

1                          INDEX

2

                          WITNESS

3

Kevin O'Halloran
4       Direct Examination by Mr. Sorensen....................149

5                          *   *   *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  *AFTERNOON SESSION*  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

2          THE COURT:  Good afternoon.  And whenever you're

3   ready.

4          MR. BECK:  Thank you, Your Honor.  Gave some more

5   thought over lunch to this stuff we were talking about

6   before.  And I think I might be able to help a little bit.

7   When we left off we were talking about the round tripping of

8   the money where the Bank of New York, as acting as the

9   clearing agent, the X down there, would wire money to

10  Colonial Bank.  I want to make sure Your Honor understood,

11  that was not happening in the early years of the AOT

12  transactions, so I didn't want you to be misled by that.

13         In the early years there was no money flowing into

14  Colonial Bank at all.  There was money flowing from Colonial

15  Bank to TBW in exchange for these fake AOTs.  And so, that

16  made the hole grow so much because there wasn't money coming

17  in.  Later this circular funding thing was put in place and

18  that was called refreshing.  But there's also an aspect

19  of -- and you're going to hear a lot about this, so I

20  thought I would try to --

21         THE COURT:  I'm sure I will.

22         MR. BECK:  So you're going to hear about

23  refreshing and I'll get to what it is in a second.  But

24  first, why they went to such lengths to -- for this

25  circularity later in the game and other steps earlier, and

1    that is because of the concept of aging, when assets are

2    sitting on the books longer than you would expect them to be

3    on there, that can raise a concern.  People say why is that

4    sitting on there if it's supposed to be gone?  Is it

5    actually worth anything?  And --

6            THE COURT:  You may continue.

7            MR. BECK:  Thank you.  And they had -- at Colonial

8    they had an aging report that was another one of these

9    internal controls.  So it would report on how long the

10   different assets had been carried on the books.  And that

11   was monitored by people at the bank, by people at Crowe, by

12   the regulators themselves, and also, you know, PwC would

13   look at that in the annual audit.  As I said, aging refers

14   to how long the thing has been on the balance sheet.  Is it

15   on there for longer than you would expect it to be?

16           Now, just because a loan, for example, is on the

17   balance sheet for a long time, it doesn't mean anything is

18   wrong with the loan, because a banker, you know, might be

19   very happy because the homeowner is making his loans on

20   time, and so the banker is making money, and even though the

21   banker may have intended to sell that mortgage to somebody

22   else, he's in no hurry to do it as long as the loan is

23   current.

24           But, because the -- remember the AOTs now.  First

25   of all, they were a security, or security in process that

1    was supposed to have a third-party purchaser already lined

2    up, that would be like Mesirow, and also because their life

3    cycle was so quick, if they sat on the books for a long

4    time, an AOT sat on the books for a long time, then that

5    could raise concerns.

6           So this refreshing process was a means to take the

7    old-looking AOTs off the books and replace them with new-

8    looking AOTs.  So to make it look like they've gone off to

9    the third purchaser, they would just take them off the

10   books, wire -- TBW would wire the money into Bank of New

11   York, Bank of New York would send the money to Colonial and

12   then it would be replaced with a new AOT, so everything

13   looked like it was current rather than aging.  So it was an

14   ingenious way of phonying up the books and circumventing the

15   internal controls.

16          In the beginning the aging took place -- or, not

17   the aging, the refreshing took place in a different way, and

18   that was that Kissick would just go into a computer and take

19   the AOT that -- let's say it was dated, you know, April

20   30th, and she would go in and some of them she might change

21   the date so now it was dated July 15th, so it wouldn't show

22   up in an aging thing.  Or sometimes they would change the ID

23   numbers of the AOTs.  Or they might do both.  So that, too,

24   was a way that the insiders would circumvent the internal

25   controls.

1          So later on, starting in 2008, Kissick and Kelly

2     insisted that Taylor Bean actually wire money and arrange to

3     have real American money wired into the clearing agent, Bank

4     of America, so --

5          THE COURT:  New York.

6          MR. BECK:  Bank of New York.  I'm sorry.  You are

7     getting this stuff down.

8          -- Bank of New York and then Bank of New York

9     would wire it to Colonial.  And that was a way of creating

10     more fake documentation to make the transactions look real,

11     because now you actually had wire transfers coming in from

12     Bank of New York.

13          THE COURT:  So it looked as if they were really

14     being sold to a third-party?

15          MR. BECK:  Exactly.  So, yeah.  And the money was

16     coming from the exact same place it would have come from if

17     they had sold it to the third-party from the clearing agent,

18     because none of the third parties paid directly.

19          And the third-party -- or the clearing agent, they

20     didn't pay any attention to where the money come, they just

21     get $400 million of instructions to wire it.  So that's what

22     they would do.

23          So during the 2008 audit, the one that they've

24     been attacking all day, PricewaterhouseCoopers checked to

25     see whether there were wires coming from the Bank of New

York, where they were supposed to be coming from, and they saw hundreds of millions of dollars coming from the Bank of New York.

The plaintiffs are focused on the existence of this $1.6 billion in fake assets in 2008. But because of the way they hid the fraud, as I've been trying to explain it, what Colonial's inside monitoring department saw and what PwC saw in 2008 was real money coming in. Real -- you know, hundreds of millions of dollars that came in looking like they were paying for these AOTs.

Now, they say, well, you should have called Mesirow. Mr. Luria, the TW -- TBW bankruptcy trustee, he just called Mesirow and it took five minutes. Why do you suppose he called Mesirow? Because they knew about all the details of the fraud. So after the fact it's easy to call Mesirow. But there really was, in 2008, no reason for the auditors to be calling up Mesirow and be suspicious of Mesirow because Colonial Bank was receiving hundreds of millions of dollars from Mesirow's clearing agent. So the money looked like it was coming in.

The -- so, Farkas and Kissick succeeded in fooling everybody, including the senior management at Colonial. A gentleman named Kamal Hosein was Colonial's treasurer. There was an assistant treasurer name Mary Lou Bathen. They constantly monitored the AOTs, they didn't detect any fraud.

1          Colonial had what was called an asset purchase

2     committee that looked at the size of Taylor Bean's line, how

3     much it was growing, they didn't find any fraud.

4          The Mortgage Warehouse Lending division had a

5     compliance and risk control group.  A man named Terry Brian

6     was in charge of the group.  Here's how he described the

7     mission of that group.  This is internal at Mortgage

8     Warehouse Lending Division.  We monitor and review different

9     processes, both internally and externally, to ensure that

10    our data is correct, complete, and to protect ourselves from

11    fraud.

12         And this group, that that was their mission, their

13    full-time mission just with that division, they would

14    conduct field audits at TBW.  They actually go to TBW and

15    look at their records.  And they hired external folks to do

16    the same thing at TBW.  And when they did this they would

17    review both there and at Colonial the age loan reports, wire

18    drafts, wire transfers; they didn't find the fraud either.

19         The division also had an internal auditor named

20    Pam Vitto.  Her full-time job from 2004 to 2009 was

21    examining the Mortgage Warehouse Lending Division.  Not the

22    whole bank, just the Mortgage Warehouse Lending Division.

23    She examined collateral and loan documentation, looking for

24    anything suspicious.  She didn't find the fraud.

25         The Colonial had an accounting department with

1  over 100 accountants; none of them found it.  Crowe, their

2  internal auditor, they didn't find it.  And then there were

3  the regulators.  For several years Colonial was regulated by

4  the Office of the Comptroller of Currency, the OCC.  They

5  regulated Colonial from 2003 to mid-2008.  That's while it

6  was a national bank.  And on a periodic basis, they would do

7  what's called a targeted examination of the Mortgage

8  Warehouse Lending Division, part of their regulatory work.

9  They did five of those during those years.  They never found

10  the fraud.

11  The FDIC became the regulator when Colonial Bank

12  switched its charter to a state bank in June of 2008.  The

13  FDIC did its own targeted investigation -- or review,

14  rather, of the Mortgage Warehouse Lending Division; they

15  didn't find fraud.

16  Here's a little excerpt from the -- this is from

17  an FDIC memo summarizing its findings in July of 2008, where

18  its targeted examination, they said:  Colonial's risk

19  management practices are acceptable.  So they didn't find it

20  either.

21  Eventually the fraud was discovered, almost by

22  accident.  This is an interesting story, too.  And even the

23  circumstances of its discovery tell us how hard it was to

24  find the fraud.

25  During the financial crisis in both '07 and '08

Colonial Bank, like a lot of other banks, was experiencing

financial problems, and in the fall of '08, October,

November, they applied for TARP funding.  Remember, that's

the Troubled Asset Relief Program.  And in December of '08

Colonial Bank -- actually, it was CBG, the parent, got

approval for 500 million in TARP funding, but it was

conditioned on them getting -- raising, themselves, another

$300 million in equity.

So they said we'll give you 500 million, but

you've got to go out and raise 300 million, strengthen the

company and it will be an indication that outside investors

have some confidence in the bank.  And that was a pretty

common condition for TARP funding back then.  So then in

March of 2009, Colonial BancGroup, together with TBW,

announced that they had entered into a stock purchase

agreement.  And TBW and Farkas were going to invest 250 of

the $300 million that the feds wanted in new equity.

Now, the treasury department was concerned about

this, not because of any suspicion of this, you know, big

fraud that we all know about now with hindsight, it's

because of the concern about, sort of, a different kind of

round-tripping than we've been talking about.

If somebody needs a lot of money in equity

investment and the only folks who are willing to invest are

a great big customer of theirs, the concern of the treasury

1     department is, is the customer really putting its own money

2     in or is the bank funneling money to the customer so that

3     the customer can invest in the bank?

4          THE COURT:  Whatever would make them think that?

5          MR. BECK:  Yeah, right.

6          So then, anytime there would be an arraignment

7     like this they would investigate it to satisfy themselves

8     that there was nothing untoward going on.

9          So what happened is, one week after TBW and

10    Colonial BancGroup announced this stock purchase agreement

11    so that Colonial Bank can get the 500 million, the inspector

12    general for TARP -- and now we're going to start sounding

13    like military terms -- but he's called SIG TARP, so it's

14    like the special inspector general for TARP, SIG TARP,

15    served a subpoena on Colonial Bank; that's how they did

16    their investigations.  And the subpoena asks for any

17    documents that might reflect any kind of round-tripping of

18    the money.

19         So the board now at Colonial BancGroup, they get

20    the subpoena, they decide to do their own due diligence and

21    they hire a law firm to look into this on their behalf and

22    the law firm hires the forensic accounting group at Ernst &

23    Young to help them do their job.

24         Now, the forensic accounting group at Ernst &

25    Young is one of the big -- you know, Ernst & Young, they

1    were one of the Big 4 Accounting Firms also.  They weren't

2    coming in to do an audit, they weren't auditors coming in.

3    They have got special guys, like all of the firms do, who do

4    forensic accounting, where they come in and they look for

5    anything that might be suspicious.  They're trained in

6    detecting that.

7              So beginning in the spring of 2008, both SIG TARP

8    and the bank, through Ernst & Young, are investigating

9    whether there is anything amiss in the relationship between

10   Taylor Bean and Colonial's Mortgage Warehouse Lending

11   Division.

12             In comes the FBI.  They would do interviews on

13   behalf of SIG TARP when they were doing this investigations.

14             THE COURT:  They do this on every bank that's

15   applied for a TARP loan?

16             MR. BECK:  That I don't know.  I don't want to

17   represent that, but my understanding is -- maybe somebody

18   else will be able to give a definitive answer, but my

19   understanding --

20             THE COURT:  That's all right.  I expect at some

21   point I'm going to hear testimony in this case.

22             MR. BECK:  Yeah, yeah.  So whether that's normal

23   or abnormal --

24             THE COURT:  It's okay.

25             MR. BECK:  -- I can't say.  But what I can say is

1    that FBI agents began interviewing people.  Teresa Kelly was

2    one of the people that they interviewed.  And at first she

3    gave them a little information, but she wasn't very

4    forthcoming.  Then she lawyered up, and she must have got

5    good advice because she went back to the FBI and said, you

6    know, I've got some more information to tell you, and then

7    she basically blew the whistle on the AOT situation and she

8    gave them her laptop computer that had a secret spreadsheet,

9    the smoking gun, that showed these phoney transactions.

10    They put a wire on her to record her conversations

11    with Farkas and Kissick.  And then on the evening of Friday,

12    July 31st, 2009, Kissick is leaving work, she's going to go

13    on vacation -- it's like a TV show, she's going to her car,

14    the FBI agents pull her out, throw her in the back of the

15    van, question her for four hours, and then she starts

16    telling the truth, as well.  Friday, July 31, 2009.

17    Monday, August 3rd, 2009 SIG TARP and the FBI raid

18    the Mortgage Warehouse Lending Division office in Orlando

19    and simultaneously raid Taylor Bean in Ocala, Florida.

20    So at the same time this is happening Ernst &

21    Young, remember them, they're conducting their forensic

22    examination.

23    In this litigation, what the plaintiffs have said,

24    and you'll hear it as we go forward; well, yeah, but Ernst &

25    Young didn't do a GAS audit.  That's exactly right, they

1    didn't do a GAS audit.  A GAS audit is directed toward

2    whether the auditor has reasonable assurance that the

3    financial statements of the company as a whole are free from

4    material statements.

5         Here the audits were of the entire Colonial

6    BancGroup, of which the Mortgage Warehouse Lending Division

7    was just one part.  Never got more than -- say, 10 to 20

8    percent of the business of the bank was in that division.

9    Ernst & Young's job as forensic accountants was much more

10   specific.  Instead of doing a financial audit, they were

11   doing a forensic examination by a bunch of guys specially

12   trained in finding hidden frauds.

13        And also, the Ernst & Young folks were focusing on

14   a specific division in the bank, the Mortgage Warehouse

15   Lending Division; they were focused on a specific customer

16   of that division, Taylor Bean, and they were focused on a

17   specific question, and the specific question, what Ernst &

18   Young is trying to answer, is whether Colonial BancGroup was

19   improperly diverting money back to Taylor Bean.  That was

20   the exact issue that they're looking at.

21        So in one of the most amazing bits of timing I've

22   ever seen, on April 5th, 2009, two days after the raids, the

23   lawyers who had hired Ernst & Young release their report and

24   as part of their report they also release the Ernst & Young

25   findings of their forensic examination, and here they are:

1          Based on the documents reviewed to date and E&Y's

2     financial analysis and oral report to us relative to such

3     documents, the undersigned did not find any credible

4     evidence of any illegal acts by individuals employed by

5     Colonial National Bank and the Mortgage Warehouse Lending

6     Division as to their relationship with Taylor Bean.

7          So after four months of work by Ernst & Young,

8     they reviewed 67,000 e-mails, they spent 3,000 hours focused

9     on this specific question.  After all this they found no

10    credible evidence of any illegal acts.

11         And we're not criticizing Ernst & Young here, they

12    did, in fact, an excellent job.  This fraud was almost

13    impossible to detect.  And even the FBI -- remember I said

14    they found it almost by accident -- even the FBI didn't

15    figure it all out when Kelly confessed.  After the raids,

16    the government went out and they hired their own forensic

17    accounting firm.  That firm took 10,000 hours to unravel

18    this whole thing.

19         Here's how hard it was to figure out what was

20    going on:  Plaintiffs have said today that because the AOT

21    contracts were unsigned, this should have alerted PwC that

22    the AOT deals were fake.

23         Well, you know, the folks here took the deposition

24    of Teresa Kelly, one of the fraudsters, she was deeply

25    involved in the AOT fraud, and she was shown some of these

1  unsigned contracts from Mesirow.  And here's her testimony

2  on that.

3           Starting at the bottom of that top page:

4           "QUESTION:  All right.  Does the fact that you're

5  sending these Mesirow AOTs to them, does that tell you

6  whether or not the trade assignments are real or fake?

7           "ANSWER:  It tells me that it was a real AOT.

8           "QUESTION:  Okay.  Even though this is a real AOT,

9  it's unsigned, correct?

10          She says, "To the buyer, yes.

11          "And the buyer is Mesirow, correct?

12          "Yes, it is.

13          "All right.  In each of these, looking at the

14 exhibits, before you put it away, each of these trade

15 assignments agreements were also signed by Lee Farkas,

16 correct?

17          "Yes."

18          So she's looking at unsigned deals and she said

19 "These ones look like they're legit to me."

20          This is one of the architects of the fraud and she

21 couldn't tell a real from a fake transaction just because a

22 particular document didn't have a signature on it.

23          Plaintiffs also talked about Ms. Kelly.  You

24 remember the gig is up slide; you know, if only they had

25 asked for this, the gig would have been up.  She's an

interesting case.  We talked about her a little this morning

and what motivated her at the beginning.

At her sentencing hearing she identified PwC

specifically as one of the victims of the fraud and she

apologized to PwC.  And PwC is identified in the indictments

brought by the Department of Justice as one of the victims

of the fraud.  The fraud was designed to mislead PwC,

specifically so.  And she's come clean, pretty much, about

the lengths she went to in order to cover-up her illegal

conduct.  And so it's a little bit hard to believe that if

somebody had just said, gee whiz, can I have this piece of

information? that back in the day she would have thrown her

hands up, rather than figured out a way to stonewall or

create more fake documentation.

And as I think about it, I think her thing about

the gig is up, it may be just some sort of psychological

defense mechanism.  She spent eight years in a federal

penitentiary agonizing over what she did.  And if she can

tell herself that she would have stopped if only somebody

would have asked the right question, you know, that's kind

of a way that she can absolve herself of some measure of her

responsibility.

So let me move now to the audit issues, Your

Honor.  I know I spent a great deal of time on this fraud

and the difficulty of uncovering it, and I did that for a

1    couple of reasons.

2    First, I anticipated that the plaintiffs' lawyers

3    would not discuss the fraud in any detail, and they didn't.

4    And I don't blame them, because the better understanding

5    somebody has of the nature of the fraud, the greater

6    appreciation he or she has about how hard it would be to

7    figure it out.

8    And secondly, ultimately, the core issue in the

9    case is whether PwC alone, among everybody else in the

10   world, should have figured this fraud out.  And if that's

11   the core issue, as they say it is, then an understanding of

12   the details of the fraud, I think, is pretty important.

13   So on the auditing issues I'm going to spend a few

14   minutes on the proper role of an auditor and then move to

15   the FAS 140 issues that the plaintiffs' lawyers discussed

16   this morning.

17   First I want to start with a slide that they

18   showed.  This is the gatekeeper, where you see the little

19   lock on the gate.  And there's the office of the Comptroller

20   of the Currency, that's the blue circle, they're locked out

21   and the FDIC is locked out, and the only guys who can unlock

22   the gate are PwC, except that's not what happened in real

23   life.  Because when the office of the Comptroller of

24   Currency was the regulator, they had an office inside the

25   bank, and the FDIC oversaw the bank, and they were both

1    entitled to any information they wanted from the bank.  So

2    they weren't locked outside.

3            So I had some fun with our slide last night.  And

4    you know, whatever one may say about some public shareholder

5    or something like that, the regulators were not locked out,

6    they had their own access to information.

7            THE COURT:  Watchdog?

8            MR. BECK:  Yes.

9            THE COURT:  You said shareholder, and I think

10   we're calling you a public watchdog.

11           MR. BECK:  Right.  Yeah, and that's fine.  They

12   could have had a slide with a watchdog, I suppose.  But if

13   the OCC is inside the house, the watchdog -- I don't know,

14   the metaphor gets stretched at some point.  But let me go

15   back to the auditor's role and away from their gatekeeper

16   slide.

17           By the end of today, you will have heard two very

18   different competing versions of what a financial statement

19   auditor does.  Ours is grounded in the governing standards

20   that auditors had to comply with in real life.

21           The plaintiffs, they pay lip service to those

22   standards, but they really -- and I'll show you in a little

23   bit -- distort those to leave the impression that an auditor

24   is all that guarantees that no fraud has taken place.

25           So let's start with the engagement letters.

1    The -- they make clear, and I don't think you heard this

2    this morning, in the engagement letter, that management is

3    responsible for the financial statements.  And that

4    management is also responsible for the design and

5    implementation of programs and controls to prevent and

6    detect fraud.

7            Mr. Mullin said you can't contract away -- you

8    know, a public accountant can't contract away its

9    responsibilities.  And that's true, that the engagement

10   letters really just mirror what's in the auditing standards.

11           The auditing standard, section 110.03 says -- and

12   these are the standards by the regulators -- the financial

13   statements are the management's responsibility, the

14   auditor's responsibility is to express an opinion on the

15   financial statements.  And they say -- although this section

16   focuses on the auditor's consideration of fraud in an audit

17   of financial statements:  It is management's responsibility

18   to design and implement programs and controls to prevent,

19   deter and detect fraud.

20           Now, both the engagement letters and the auditing

21   standards speak about reasonable assurance, and the

22   plaintiffs showed you some slides on that.  I'll use one of

23   their slides.

24           It gets to look like a ransom note at some point,

25   with the red, blue, yellow, and white.  But if you cut

1    through all of that, the words are accurate.  Although not

2    absolute assurance, reasonable assurance is, nevertheless, a

3    high level of assurance.

4            And so without all the drama, the question is, you

5    know, what does that mean?  Our audit expert in this case is

6    Sandra Johnigan and she's here in the courtroom today.

7            Miss Johnigan, could you stand up and wave to the

8    court?  Here is Ms. Johnigan.

9            Here is just a slide on her background.  And I'm

10   not going to go through everything on here, you'll hear

11   about it when she takes the stand.  Suffice it to say that

12   she's one of the very top people in the field and she looks

13   forward to sharing her analysis with Your Honor.

14           Plaintiffs also have an expert, he's Professor

15   Douglas Carmichael of the Baruch College in New York.  And

16   this morning -- yes, professor.  And so you'll be hearing

17   from him as well.  And he's got great credentials, too.  But

18   with no disrespect to the professor, but there's a

19   significant difference in the experience between Miss

20   Johnigan and Professor Carmichael.

21           Miss Johnigan has about two decades of real life

22   experience as an auditor at a Big 4 Accounting Firm.  She is

23   a bit of a trailblazer.  She was an auditor and a partner at

24   Ernst & Young for 19 years.  She was a partner in Ernst &

25   Young's national office for seven years.  She served as the

cochair of the Financial Services Group.  Also served as the chair of Ernst & Young's Thrift Industry Group and Real Estate Industry Group.  So she's got a lot of experience with banks and financial institutions.

In contrast, when Professor Carmichael was a newly-minted auditor back in the day, he spent three or four years as an assistant to a solo practitioner and then he consulted for four months with a firm that's now called Deloitte.  Other than that, he's not been an employee or a partner in a firm that does real-life audits.

A couple of the slides that they put up showed those signed audit opinion letters.  The signing is done by the partner in charge of the audit.  It's a significant responsibility and the auditors take it very seriously.  Miss Johnigan has signed lots and lots of those final audit letters.  And I don't believe -- we'll ask him, but I don't believe Professor Carmichael has ever signed one of those letters in his entire career.

So back to the language of the engagement letters and the auditing standards.  Not absolute assurance, reasonable assurance is still a high level.  So what does that mean?

Miss Johnigan will explain that the SEC has given guidance on the meaning of these terms and the SEC has explained.  And what this means, it means that when

1    someone -- that somebody is supposed to obtain the degree of

2    assurance that would satisfy prudent officials in the

3    conduct of their own affairs.  So that's something that

4    sounds kind of familiar in terms of the world of the law.

5    And she'll explain her opinion that PwC met this standard

6    when planning and conducting its audit.  We're going to come

7    back to how PwC met this standard in a little bit.  But I

8    want to do one last thing on reasonable assurance.

9           Here's another one of their slides.  Mr.

10   Westbrook, they say, said our audits are not designed to

11   find fraud.

12          Another one, they juxtaposed that testimony by

13   Mr. Westbrook with language from -- that would be an

14   engagement letter, which of course mirrors the language from

15   the standards.  And they claim that Mr. Westbrook disavowed

16   the standard, didn't do what the standards say you're

17   supposed to do.

18          So let me introduce you to Gary Westbrook, he's

19   here at our table.  Mr. Westbrook is retired from our firm

20   but he's agreed to be here during the trial and to serve as

21   our court representative.  He came from Alabama because the

22   plaintiffs said they wanted to examine him during their

23   case.  You're going to hear from him later this week.

24          I'm going to show you in a minute or so Mr.

25   Westbrook's testimony that was about this.  To set the

1    scene, plaintiffs' lawyers asked him to read that same

2    newspaper article that they showed this morning where -- was

3    it Mr. Nally from PwC was talking about an auditor's

4    responsibility to detect fraud.  And then they were

5    confronting Mr. Westbrook and asking him about that.  And

6    here's what Mr. Westbrook said -- and I think that I might

7    have to pause for a moment while something happens so that

8    Heather gets to hear this as well.

9         MR. CRAMER:  We should be ready, hopefully.

10        (Playing video of Mr. Westbrook's testimony.)

11        MR. BECK:  So he's a precise man, as many auditors

12   are, and the same is true for the other gentlemen that they

13   quoted and that it -- they know the standards, they live by

14   the standards.  And when a lawyer asks them a leading

15   question that subtly misstates the standard, they're not

16   going to go along with it.  And that's all that happened here.

17        Now, the engagement letters also talk about the

18   difficulty of finding fraud because of the characteristics

19   of fraud, particularly those involving concealment through

20   collusion, falsified documentation and management's ability

21   to override controls.

22        An audit designed and executed in accordance with

23   standards established by the PCAOB may not detect material

24   fraud.  So that's what we say in our engagement letters.

25   But once again, this reflects what's in the standards

1    themselves.

2         The first one is AU section 316.10:  Fraud may be

3    concealed through collusion among management, employees, or

4    third parties.  Collusion may cause the auditor who has

5    properly performed the audit to conclude that evidence

6    provided is persuasive when, in fact, it's false.

7         Section 316.12 talks about how the auditor has the

8    responsibility to plan and perform the audit, just as Mr.

9    Westbrook said, to obtain reasonable assurance about whether

10   the financial statements are free of material misstatements.

11   It's like they're quoting Mr. Westbrook.

12        And they say:  However, absolute assurance is not

13   attainable and, thus, even a properly planned and performed

14   audit may not detect a material misstatement resulting from

15   fraud.

16        And, they go on to say in section 230.12, this is

17   a very important one:  Because of the characteristics of

18   fraud, a properly planned and performed audit may not detect

19   a material misstatement.  Characteristics of fraud include,

20   A, concealment through collusion among management, employees

21   or third parties ; B, withheld, misrepresented or falsified

22   documentation, and; C, the ability of management to override

23   or instruct others to override what otherwise appears to be

24   effective controls.

25        So the standards recognize that you can do a good

1       job, but because of the nature of fraud you may not find it.

2              Professor Carmichael, he has an opening report in

3       this case that was 131 pages long.  I read through it pretty

4       carefully.  I couldn't find a single reference to those

5       standards, or any acknowledgment in his opening report that

6       fraud can be hard to find or any description of the

7       characteristics of a fraud that might make it hard to find.

8              But what we know is that the fraud at Colonial had

9       all three of these hallmarks of the fraud that might not be

10      discovered.  There was concealment through collusion.  Here

11      it was almost diabolical because it was collusion with a

12      customer and insiders at the bank.  There was falsified

13      documentation, including fake wire transfer reports, all

14      sorts of documentation like that, and there was this

15      overriding of internal controls, the sweeping that started

16      it all to avoid the midnight reports on overdrafts.  Kelly

17      making the COLB entries saying that the mortgage documents

18      had been received when they hadn't been received.  All sorts

19      of overriding of the controls.

20             So with these standards in mind, what did PwC do

21      to attain reasonable assurance?  And I emphasize here, what

22      PwC did do, because it's easy with hindsight to say, gee

23      whiz, if you had only done this one procedure, maybe that

24      would have unraveled the whole fraud.  Of course that's

25      perfect hindsight.  Once you know exactly how the fraud took

place, you can always find a procedure that if it hadn't
been circumvented, somehow, maybe that would have led to the
discovery.  And that's one of the real weaknesses in
Professor Carmichael's analysis.  You'll be hearing from him
in a few days.  Whether intentionally or not, and really
it's human nature, but he always manages to pick the
procedures that with perfect hindsight knowledge of the
fraud might have been likely to uncover.

But in real life auditors exercise discretion
about what audit procedures will best provide reasonable
assurance, given the circumstances as they're known at the
time to be, and as they appear to be at the time.

So what did PwC do?  First, what we did is called
a controls-based audit.  And I don't think you heard about
that this morning.  A financial audit of a bank is really
based on identifying and testing controls that are in place
of the bank's -- you know, that make sure of the integrity
of the bank's processes.

The nature of a bank makes it impossible to
examine all of the transactions that take place or even a
substantial sample.  Colonial, for example, engaged in
millions of transactions every year.  The Mortgage Warehouse
Lending Division itself engaged in hundreds of thousands of
transactions every year.  In dollar terms it was like
$70 billion worth of transactions in the later years.

1          So what the auditors do is they test the controls

2     that are in place at the bank to make sure that the bank

3     systems are operating effectively, and to make sure that

4     checks and balances are in place and working, so that the

5     financial statements are fairly stated.

6          Here, the mortgage warehouse lending division had

7     robust controls that PwC tested.  The controls included

8     activities by scores of division employees, the collateral

9     analysts we talked about, compliance employees, internal

10    auditors, oversight committees, people who were running the

11    IT systems, and PwC identified those controls and tested

12    them according to the auditing standards.

13         Colonial also had many employees whose principal

14    responsibility was to prevent and detect fraud.  And this by

15    itself is an important internal control that helped to give

16    PwC reasonable assurance.

17         Now, in addition to the controls testing, PwC did

18    what auditors call substantive testing.  And a key type of

19    substantive testing is something called confirmation.  PwC

20    received third-party confirmation, that's from the customers

21    of Colonial Bank, they received that confirmation directly,

22    confirming that the account balances on Colonial's books

23    matched with the account balances on the customers' books.

24         And the auditing standards say that this type of

25    third-party confirmation is among the most reliable types of

1    evidence because third-parties typically have no incentive

2    to confirm obligations that aren't real.  You know, if there

3    is a fraud going on by insiders at the bank, looting the

4    bank, and they're phonying up the books to make it look like

5    they sent money to a customer when in fact they sent money

6    to their account in the Bahamas, then you ask the customer,

7    gee, the bank says the balance is X, what do you say the

8    balance is?  So they did that.

9           But of course the problem here is that PwC was

10   being shown false documentation by the insiders, who were in

11   on the fraud, or documentation that had been altered by them

12   that was then being shown to us by innocent folks at the

13   bank, and then we would go and do our third-party

14   confirmations with TBW and they would say, yes, that's

15   right, that's the right amount, because they were in on the

16   fraud, too.  Because that's exactly the kind of fraud the

17   audit standards say can be successfully concealed even from

18   a well-done audit.

19          There's lots of other evidence you're going to

20   hear concerning the things that we did to gain reasonable

21   assurance.  And if Your Honor agrees with us on that at the

22   end of the day, that's going to be the end of this case.  If

23   you decide that we came up short in any particular year,

24   then you're going to have to decide our audit interference

25   defense.  Obviously, it only comes into play if you felt

1    that, as I said, we fell short in one year or another.

2          Your Honor has ruled, much to my chagrin, that

3    this defense is not available against FDIC.  That's the

4    imputation issues.  So there's no form of contributory

5    negligence at all that's available to us in this trial

6    against FDIC.

7          As to KGB, as Your Honor well knows, you said,

8    well, the general contrib -- KGB, I'm sorry.  Dr. Freud.

9    CBG.  Your Honor has held that the broad contributory

10   negligence defense is not available and that we're limited

11   to the so-called audit interference defense.  And, of

12   course, what that means is did the folks at CBG do something

13   that interfered with our ability to perform the audit and,

14   thus, our ability to discover the fraud?

15         Now, much of the evidence that I've already

16   discussed relates to the audit interference issue.  The

17   conduct of Kissick and Kelly was clearly negligent and

18   clearly interfered with our audits.  The only real question

19   there is whether their conduct should be imputed to CBG.

20   And CBG says no, because they were acting wholly for their

21   own personal gain and weren't acting on our behalf and,

22   therefore, we're not responsible.  We say they were engaging

23   in a misguided effort to help Colonial and CBG by keeping

24   their largest customer afloat, and we're confident that when

25   you hear that evidence, you'll agree with us.

1       But, how ever Your Honor decides the Kissick,

2  Kelly issue, there were others at Colonial and CBG who, by

3  not telling PwC about warning signs, they interfered with

4  our ability to perform our audits and discover the fraud.

5       Starting with sweeping.  As I mentioned, Art

6  Barksdale was Kissick's boss, and he was a CBG employee as

7  well as an officer at Colonial Bank.  He knew about the

8  sweeping but he didn't tell us.  And he was required to tell

9  us.  Same with Michelle Carroll.  She was an operations

10  manager at the Mortgage Warehouse Lending Division.  And

11  several other people at the Mortgage Warehouse Lending

12  Division participated in the sweeping.  They knew about it.

13  None of them ever told PwC.  And as I said earlier, if

14  somebody had, this thing would have been stopped dead in its

15  tracks early on.

16       So the sweeping was early in the life of the

17  fraud.  And skip forward to fall of 2007.  Colonial had some

18  of these aged COLB loans that I talked about before, they

19  had been -- the loan had been on the books for longer than

20  one would expect, and the OCC, the Officer of the

21  Comptroller of the Currency, the regulator at the time, they

22  expressed concerns about the age of these loans.

23       So Kamal Hosein, I mentioned him before, he was

24  the Colonial Bank treasurer and also an employee of CBG.  So

25  he's got these concerns coming in from the OCC.  He directed

Kissick to move hundreds of millions of dollars of these

COLB mortgages over to the AOT facility, even though they

didn't have any end purchaser lined up.  Remember the AOT,

you have that third-party purchaser lined up.  They had no

third-party purchaser lined up for these aging COLB loans,

but he told Kissick, move them over there anyway.

Now, why would that help them?  Remember I told

you, once you get in the AOT, because they're focused on

securities, they don't track the details of individual

loans, so the aging of the loans would escape detection, and

Mr. Hosein knew that.

So by telling Kissick to transfer these loans

over, Hosein was able to hide the loans from the OCC.  And

of course Mr. Hosein, he never told Pricewaterhouse about

any of this.  To the contrary, we interviewed Mr. Hosein and

he told us that the COLB transactions looked very clear to

him.

Moving forward to 2008.  A lady named Pam Vitto

was the internal auditory for the Mortgage Lending Division.

I'm not going to try to read every word of this, but this is

an e-mail where she's expressing concern about possible

fraud involving some Taylor Bean transactions that appeared

suspicious to her.

She told Mary Lou Bathen about this.  Miss Bathen

was Colonial's assistant treasurer.  She was also an

employee of Colonial BancGroup.  Neither one of them ever told PwC about these concerns.

Also in 2008, moving into 2009, a woman named Sara Roland (ph.) worked in that compliance risk control group that I talked about before.  She discovered some anomalies in the process by which Taylor Bean's transactions were being paid down.

Now, she noticed that Taylor Bean was not providing the required purchase advices from end investors and that certain loans were being paid down that should not have been paid down.  According to Miss Kelly in her deposition, when she was asked about what Miss Roland found, Miss Kelly said that Miss Roland was knocking on the door of the fraud.

Miss Roland told her superiors about it, including Mary Lou Bathen, the assistant treasurer, but neither Roland or Bathen or anybody else saw fit to inform their outside auditors, PricewaterhouseCoopers.

So this evidence and a lot of other evidence that's like it, that's just a sampling, shows not only audit interference, it also shows us to CBG, that they didn't live up to their contractual obligations.  Under the contract, the engagement letter, management is responsible for informing PwC of suspected fraud.  They have an absolute contractual obligation.  They didn't do that.  And if they

1    don't live up to their contract, they can't recover because

2    of any claimed breach of contract by us.

3           Finally, all this other evidence more broadly

4    relates to that threshold question of whether our audits

5    were negligent in the first place.  Professor Carmichael

6    criticizes PwC for not treating things like aged loans or

7    unsigned AOTs or the lack of loan level detail, he says,

8    well, those should have been an indication of fraud.

9           But the Colonial Bank had employees whose

10   full-time job was to look for fraud and who saw these very

11   things.  But because of the way the scheme had been

12   disguised, they didn't take these things as signs of fraud.

13   And that, we say, really confirms that Professor Carmichael's

14   analysis, and, really, plaintiff's entire case is built on

15   hindsight.  Once you know what happened, it's easy to say

16   this is what you should have done to discover it.

17          So now I turn to FAS 140.  That's the audit issue

18   that the plaintiffs spent most of their time on this

19   morning.  And I hope that Your Honor understood, this

20   principally related to COLB transactions, not to AOT.  And

21   the issue here is not whether the COLB transactions were

22   fraudulent or legitimate.  The question is what is the

23   proper accounting treatment for legitimate COLB transactions?

24          The -- so it's -- there were lots and lots of

25   legitimate COLB transactions with other customers, dozens of

1   them, and with -- even with the TBW itself.  What they're

2   criticizing is the accounting treatment of the legitimate

3   COLB transactions.  And this issue is involved in every one

4   of the audit years, so Your Honor is going to have to

5   resolve it, and it's also the basis for the FDIC's punitive

6   damages claim, where they say what we did was outrageous and

7   wanton.

8          Plaintiffs this morning told a story that I'm

9   going to get to in a little bit about the effects of

10  FAS 140, that lending limits issue that they talked about.

11  They didn't actually spend too much time on the accounting

12  issue itself, and that is whether these COLB transactions

13  are properly treated as sales or whether they're properly

14  treated as loans.

15         And the main point in dispute, as you'll hear

16  later this week, is whether Colonial had sufficient control,

17  once the mortgage came from TBW to Colonial, did Colonial

18  have sufficient control over that mortgage, do with it what

19  they wanted, that it would be considered their property and

20  thus a sale, or did they not have sufficient control over it

21  so that it really should be considered the mortgage

22  originator's property and they're just holding it as

23  collateral for security for a loan.

24         So that's the basic issue; is this something that

25  belongs to Colonial or is it something that still belongs to

1    the mortgage originator and Colonial is just holding it as

2    collateral, as security for the loan?

3          And the way that this is analyzed and the core

4    issue on this in the case, is whether Colonial had -- and

5    this is just under one of the auditing standards -- this is

6    the reason it's the key, whether Colonial had sufficient

7    control that if the mortgage originator ever went into

8    bankruptcy, a bankruptcy court would determine that these

9    assets are isolated in Colonial and, therefore, not the

10   property of the mortgage originator who went bankrupt, or we

11   can call him TBW.

12         So the issue is if poor old TBW or somebody else

13   is put into bankruptcy, are they going to be able to pull

14   these loans out from the bank and say these belong to us,

15   you were holding as collateral, too bad for you; you know.

16   You lose out, like a lot of people lose out in bankruptcy,

17   or had they really sold them to the bank so that Colonial

18   couldn't claw back in bankruptcy.  That's the key issue, the

19   key accounting issue.

20         An interesting accounting issue, you're going to

21   hear a lot about it, but we really don't need to debate a

22   hypothetical question about whether the COLB mortgages would

23   be isolated and treated as Colonial property if there were

24   ever a bankruptcy of one of its customers, because there was

25   a bankruptcy of one of its customers and that was Taylor

Bean.  And the COLB mortgages were a big question there.
Who owned them?

Did they belong to Taylor Bean and Colonial was
only holding them as collateral?  Because these are valuable
mortgages.  Remember, they're not the fakes, these are worth
a lot of money.  Or did they belong to Colonial and too bad
for the bankruptcy estate?

Well, the bankruptcy court resolved that and these
mortgages were treated as Colonial's property, because a
sale had taken place and not a loan.  And that should end
the matter.

You know, Professor Carmichael may find the
academic debate interesting, but the real-world issue has
been decided; there has been a bankruptcy, they were found
to have been isolated.

Second, everybody in the world, except for
Professor Carmichael and the folks who hired him, agrees
that the sale accounting under FAS 140 was appropriate.

Here we go.  This is actually kind of a partial
list of folks who treated these COLB transactions as sales
and not loans.  Make a few comments on some of these entities.

First, CBG itself, whose lawyers are standing up
here and saying the accounting treatment was an outrage; it
was their accounting treatment, they're responsible for the
financial statements and they're the ones who set this up so

1    that they would be treated as sales and not loans.  And it

2    wasn't fake.  Their former executives have testified, under

3    oath, that they believed these things to be sales at the

4    time and they believe them to be sales today.

5         Deloitte -- yeah, Deloitte and Touche, they were

6    TBW's auditors.  They treated these transactions as sales

7    and not loans.  I mentioned Taylor Bean bankruptcies, and

8    the trustee is not on there.  The Taylor Bean bankruptcy

9    trustee, he had a fiduciary duty to garner all the assets he

10   possibly could that belonged to TBW.  But he agreed that the

11   COLB transactions were sales to Colonial and, therefore, the

12   mortgages belonged to Colonial rather than Taylor Bean.

13        I didn't list the bankruptcy judge on here, but

14   the bankruptcy judge resolved that in favor of being a sale.

15   And then there's the regulators.  OCC, when they did its

16   targeted -- or, their targeted investigation or review of

17   Colonial, they asked questions, specific questions about the

18   FAS 140 issue.  And that's what led to the PwC's involvement

19   of the national office.  Remember, they had those silly

20   slides with panic buttons and airplanes flying back and

21   forth between New York and -- maybe they didn't make an

22   impression on Your Honor, but --

23        THE COURT:  It was so long ago.  This morning, I

24   mean.

25        MR. BECK:  And there was so many of them.  But

1    anyway, in 2008, when the office of the Comptroller of

2    Currency raised concerns, you know, if it was a proper thing

3    for our national office to get involved.  And there was no

4    cover-up going on.  These were accountants and auditors

5    taking a hard look at a complicated question to see what the

6    proper resolution was.

7              And then once Colonial and PwC explained the

8    FAS 140 treatment to the OCC, the OCC raised no more

9    concerns about it.  They had some other issues, but they

10   didn't raise any more concerns about that.

11             And then, around that time, the bank became a

12   state bank instead of a national bank, and so regulatory

13   oversight moved from OCC to the FDIC.  And when they became

14   the regulator, they wanted to satisfy themselves without the

15   propriety of the FAS 140 treatment.

16             So when the FDIC was acting as a regulator rather

17   than a litigant, asking for punitive damages, the FDIC

18   agreed with the FAS 140 accounting treatment.

19             This is a excerpt from some minutes of the August

20   2008 CBG audit committee.  And they say:  On the

21   Pricewaterhouse issue of accounting for the held-for-sale

22   loans, that's this FAS 140 issue, the regulators, that's the

23   FDIC, the regulators were complimentary of the memos and

24   documentation on those accounting policies.  That stuff was

25   shared with the FDIC and the FDIC was complimentary.

1          Now, this isn't somebody lying to the audit

2    committee, because in this case a woman named Mary Ann

3    Lester, who was the FDIC's examiner-in-chief, she was asked

4    about these audit committee letters where she agreed.  And

5    here's what she said:  So someone is showing her the thing I

6    just showed you on the Pricewaterhouse issue of accounting

7    for the held-for-sale loans, regulators were complementary,

8    etcetera.

9          And then she was asked:

10          "Is that consistent with your own recollection?

11          She said, "Yes.

12          "Are both sentences consistent with your

13    recollection?

14          "Yes."

15          She remembered the examiner in chief at the FDIC.

16    She was complimentary of the FAS 140 accounting treatment.

17    And they talked today, one of them, about who is not showing

18    up, she's not showing up.

19          The FDIC isn't calling any of the people who were

20    involved in the examination of Colonial's FAS 140 treatment.

21    They had a bunch of people, internal examiners, who blessed

22    the treatment and agreed with it back then, so now they pay

23    an expert to come in instead.

24          I'm losing something here.

25          MR. CRAMER:  You lost power.

1          MR. BECK:  I lost power.  That must be because

2     it's unplugged.  May I introduce Mr. Negrete.  I think you

3     might be seeing a lot of him if I keep having problems here.

4     I guess it's going to take a minute to reboot.

5          THE COURT:  Should we keep going anyway?

6          MR. BECK:  Yes.  Yes, I will.

7          So that was during the examination.  Even in

8     the -- I have to unlock the computer.  I think I'm -- here

9     we go.

10          Even in the litigation, other than in this case,

11     the FDIC has said that Colonial owned the mortgages, that

12     they have been sales and they own the mortgages.  This was

13     the FDIC's position in the Taylor Bean bankruptcy.  They,

14     you know, filed a claim in the bankruptcy -- or, not filed a

15     claim, they said these loans belong to us, keep your hands

16     off.  That's the position -- us being Colonial Bank --

17     that's the position that they took in the bankruptcy.  It's

18     also the position that they took in the Bank of America

19     litigation that Your Honor is familiar with and we'll

20     explain more of that later.

21          But the FDIC, having successfully taken that

22     position, that these were sales and owned by Colonial Bank,

23     they took that position in two other pieces of litigation

24     and they prevailed and they collected a billion dollars.

25          THE COURT:  How much?

1          MR. BECK:  A billion, with a B.

2          And now they come in here and Mr. Mullin wraps

3     himself in the American flag and says I'm here speaking on

4     behalf of the American public and you must find that these

5     were not sales.

6          So part of this was this implied seller's call

7     option that you heard about.  Mr. Mullin tried to explain

8     that when Your Honor had questions.  If you would like, I'll

9     take a crack at it.

10         THE COURT:  It would be nice to hear it again.

11         MR. BECK:  Okay.  Okay.  Again, this involved COLB

12    transactions, not AOT.

13         THE COURT:  Real ones?

14         MR. BECK:  Yeah.  Well, real ones and unreal ones.

15    My point is these are loan issues -- mortgage issues,

16    rather, not the securities involved in the AOT.

17         So, the seller's call option was, you know,

18    something that came in the accounting in 2008, that they say

19    was fabricated and it was all, you know, deceptive and it

20    involved an effort to cover something up.  It wasn't that at

21    all.

22         The seller's call option was really an accounting

23    issue where Colonial was recognizing that a piece of the

24    transaction that had been occurring all along, but it hadn't

25    been documented the proper way in the contracts.  And it

1    applied to all, as I said, all of the COLB transactions, not

2    just the fake TBW transactions.  So it's kind of like FAS 140,

3    it's an accounting issue, not a fraud issue.

4         And here's how this worked.  I hope this helps.

5    We got a mortgage originator who writes a mortgage to Frank

6    Jones for $100.  And Colonial -- and then the mortgage

7    originator transfers a 99 percent interest in that mortgage

8    to Colonial Bank.  And that's for a short-term because the

9    expectation is that Colonial -- they didn't always do it, but

10   they often would turn around and sell that to a third party.

11        So Colonial buys a 99 percent interest in this

12   $100 mortgage for $99.  And at the end of the short period

13   of time, they sell the mortgage to a third-party, say

14   Freddie Mac, but they sell the mortgage to Freddie Mac for

15   $102, because people are trying to make money along the way.

16        So here we've got 99 percent interest, sold to

17   Colonial, transferred to Freddie Mac for $102.  Who gets the

18   $3?  That's what the question was all about.

19        And the way that the cash flow worked in these

20   transactions, from the very beginning of the COLB program,

21   was that it was the mortgage originator, in other words TBW,

22   who ended up getting the $3.  And this was called a seller's

23   call; seller being TBW, the mortgage originator, because

24   they had the right to exercise something on their -- where

25   they could get the whole 102 and transfer out the mortgage.

1        So they ultimately were the one who could --

2                THE COURT:  Why would you call -- in a situation

3        like that you have another sub.  You have Colonial selling

4        it to --

5                MR. BECK:  Yeah.  And I can't answer why the

6        terminology worked that way, but I'm saying that the way the

7        cash flows worked from day one --

8                THE COURT:  It was the seller's call and it was

9        the original seller, TBW?

10               MR. BECK:  Yes.  But that part wasn't written down

11       in the deal, that's why they call it the implied or

12       complicit seller's call.

13               When you saw some memo that Mr. Westbrook edited,

14       what he was actually doing was making sure that the

15       regulators who would be looking at this understood that this

16       was an implied call option and not one that was, you know,

17       expressed in the language of the document.

18               And what PwC did in its accounting on this, they

19       did exactly -- or, auditing on this, they did exactly what

20       auditors are supposed to do, and that is to make sure that

21       the accounting reflects the reality of the transaction.

22       This was 2008, these things have been around since 2002.

23       They were always handled that way.  And so the important

24       thing was that the accounting reflect the reality of who is

25       getting the $3.  And that's one of the reasons why the FDIC

was complimentary of the auditing issue.  Remember I showed

you the minutes?

THE COURT:  Um-hum.

MR. BECK:  That's what they were complimenting him

about.  They said, yeah, you got it right.  It's

complicated.  It's very -- and, you know, for us, we're not

accountants, you know, it's hard to get your head around,

and it was a complicated issue even for auditors and

accountants.  But the FDIC, that's why they were so

complimentary of the work that had been done, first by

Colonial Bank on the accounting and assisted by PwC.

The -- so I hope that's helpful.  My guess is

you'll have to hear that a couple of times before you've got

it baked in, but that's a start anyway.

So now --

THE COURT:  Let me just ask you a question because

I'm trying to line up --

MR. BECK:  Sure.

THE COURT:  -- at the same time I'm listening to

all of you, which things you are actually disputing and

which things you agree on.

Is there a dispute as to whether the allocation of

the $3 -- let's stick with your example -- is correct or

not?  Is there a dispute about that?  Do the plaintiffs

think the $3 should have gone to Colonial rather than to TPW?

```
 1              MR. BECK:  I'm afraid I'll get that wrong or

 2     confuse it if I try to answer.  We might have to hear from

 3     Professor Carmichael.

 4              THE COURT:  I can wait.  The suspense is not

 5     killing me.

 6              MR. BECK:  And there's only so much of this I can

 7     hold in my head at one time.

 8              THE COURT:  And you haven't listened to it for a

 9     whole day.

10              MR. BECK:  Yeah, I know.

11              The FDIC also, on this FAS 140, showed several

12     slides --

13              THE COURT:  Wait a minute.  This $3, this implied

14     or implicit seller's call, how does that come under the 140?

15     I thought the 140 dealt with whether it was a loan or a sale?

16              MR. BECK:  Yeah, and that's implicated in a way

17     that I'm not sure we'd finish this afternoon if I tried to --

18              THE COURT:  Okay, don't.  Probably hearing it

19     explained once by an expert will be quite enough.

20              MR. BECK:  You'll probably hear it at least twice

21     by two different experts.

22              THE COURT:  More than enough.

23              MR. BECK:  Another aspect of FAS 140, the FDIC

24     showed -- and this is the lending limits.  You know, their

25     claim was you guys treated these as sales rather than loans
```

1    so that you could evade the lending limits.  And they had

2    several fun slides on that.  The -- so this was -- fraud was

3    limited by the federal lending limits.

4         And then they had another one where they said --

5    and PwC covered it up -- and right after this slide they

6    showed this one where they say if there weren't any lending

7    limits because it was treated as a sale, the fraud could

8    continue.  But if it was treated as a loan, they would run

9    up against the lending limits so the fraud would have to

10   stop.  And they said because it didn't stop -- I'm not sure

11   what this showed.

12        But in -- so, their thing is PwC was complicit in

13   calling something that should have been a loan a sale and

14   that allowed Colonial to sneakily evade lending limits.

15        But -- and they said that it was in 2003, they

16   claimed, that Farkas and Kissick decided they needed to

17   evade these limits so that they did something to the COLB

18   transactions so they would be treated as sales instead of

19   loans.  That's just flat wrong.

20        The COLB program was set up in 2002.  The

21   transactions were treated as sales from day one.  Every one

22   of them were treated as sales.  And more importantly than

23   that, the regulators knew about this from day one.  They

24   knew two things:  One was that the transactions were being

25   treated as sales, not loans.  And, number two, that this

1    meant that they weren't subject to the lending limits.  So

2    back in 2003 the Federal Reserve was Colonial's regulator,

3    and Colonial Bank provided the Federal Reserve with this

4    explanation.

5        So this is a document provided by Colonial Bank to

6    the Federal Reserve, its regulator at the time, explaining

7    the COLB transactions.  And they said Colonial Bank has

8    established a loan purchase program to accommodate Mortgage

9    Warehouse Lending customers whose potential business exceeds

10   the credit limits established for lending relationships.

11       So they told them up front in 2003.  So this was

12   transparent.

13       From 2004 to 2008, the OCC was Colonial's

14   regulator, and a man named Brent Spencer was the lead

15   examiner for the OCC when they regulated TBW, and he

16   testified about what the OCC knew back at the time when they

17   were regulating Colonial.

18       So one of the lawyers to the OCC examiner:

19       "Can you explain that, please?

20       "ANSWER:  The legal lending limit to one borrower

21   is limited to a certain percentage of capital, and if this

22   was not a sale, then it could exceed the legal lending

23   limit, triggering a violation of the legal lending limits."

24       Now, part of the FAS 140 treatment involved this

25   implicit call option that I talked about before, and they

showed you a slide that indicated that the -- that the --

that Miss Kissick, the lady who went to prison for eight

years, thought that the implicit call option was stupid.

The FDIC, when it was the regulator, Mr. Mullin's client,

they said something else.

So this is a review of the Mortgage Warehouse

Lending Division -- or, document that was provided to them.

As I sit here now I'm drawing a blank on it, but it says:

Interest rate risk within the mortgage warehouse lending

division is low and well managed, yet it's the FDIC

management utilizes forward rate commitments and best

efforts for all mortgage activity, all purchase

participants, which include COLB and AOT are interest-rate-

risk mitigated through the use of sale embedded call

options.

It goes on to say:  The implied cost of the option

is reflected in the price paid to the seller.  We're going

to hear all about that.

And then lastly, they explain that this was put in

to place after a determination had been made that some form

of hedge accounting was mistaken, so this thing was to cure

that.

So the -- this seller's call option that Miss

Kissick thought was so dumb, the FDIC understood it had a

perfectly legitimate purpose.  And remember, please, that,

1  of course, it's the FDIC were complimentary of the FAS 140

2  treatment.

3          So the plaintiffs here are acting as if there was

4  something secret about the FAS 140 accounting.  And you

5  don't need to understand the accounting to know that it

6  wasn't a secret, that the regulators had the information

7  about how this was being accounted for and what the

8  consequences were in terms of lending limits.

9          And the most important thing, though, as I

10  discussed earlier, is that the accounting was proper.  These

11  were properly accounted for as sales and not as loans.  And

12  everybody who has looked at this issue has agreed, except

13  the expert that they are paying $600 an hour to take the

14  opposite position.

15          THE COURT:  Careful throwing that figure around,

16  Counsel.  Okay, you're finished with the --

17          MR. BECK:  Yeah.  And I've got just a little bit

18  more.

19          THE COURT:  About how much?

20          MR. BECK:  I need to talk to you a little bit

21  about Bank America, but it will just be brief.  I think it

22  may be seven, eight minutes, something like that, ten maybe.

23  Now that I see that seven or eight is okay -- I don't know,

24  I got this much left (indicating).

25          I'm going to finish soon.

1          THE COURT:  I better not smile when you say seven

2     or eight.

3          MR. BECK:  That's like I learned early on, never

4     to say, "One more question."

5          THE COURT:  Let's do it.

6          MR. BECK:  So, Bank of America, they took the

7     position that the COLB mortgages were owned by Colonial

8     Bank, i.e., a sale had taken place.  Your Honor presided

9     over that litigation and knows a lot more about it than I do.

10          Our position though, as to Bank of America's

11     conduct, is getting away from their position on FAS 140.  So

12     our position on the Bank of America's conduct is that what

13     Bank of America did was an intervening cause that caused a

14     huge portion of the claimed damages in this case.

15          And Bank of America's misconduct was late in the

16     day, it was after any conduct of PwC's that might be claimed

17     to be negligent.  The Bank of America's misconduct caused

18     $900 million in ship not paid, losses that the FDIC is

19     claiming against us in this case.  And even with credits for

20     settlements in the bankruptcy recovery, the FDIC's claimed

21     damages for these ship-not-paid transactions would amount to

22     somewhere between 400 and $500 million of their claims.  So

23     this is a big deal.

24          And as we discussed last week with Your Honor,

25     we'll prove our case on this through our cross-examination

1      of Mr. Malek, the FDIC damages' expert.  And you'll be happy

2      to know I'm not going to get into the details of this issue.

3              But Your Honor agreed last week, when we were

4      talking about should this be in the damages phase, if we

5      ever get there, or should it be in the liability phase?  And

6      they said it should be in the -- they, being the FDIC -- it

7      belongs in the liability phase.  And we said fine, but we

8      need to get to cross-examine Mr. Malek, who is your damages,

9      expert so you've got to bring him.

10             And Your Honor said:  I think logically it belongs

11     in the liability phase, but PwC absolutely has the right to

12     examine Mr. Malek.  So it's up to you, FDIC, if you want it

13     in liability, then bring Mr. Malek so they can cross-examine

14     him.  If you don't want to bring Mr. Malek, it will be in

15     damages and they can examine him then.

16             THE COURT:  Where does it stand now?

17             MR. BECK:  Here's where it stands now:  On Friday

18     we filed our witness list saying we want to examine Malek in

19     the liability phase because that's what FDIC should happen,

20     and that's what Your Honor should happen.  And their

21     response was, You never get to examine Dr. Malek, sorry.  So

22     I just want to flag that.

23             THE COURT:  You never get to examine?

24             MR. BECK:  No, on this issue.  They said we're not

25     bringing Malek because this was outside the scope of his

1   report.  So I'm just flagging this because Your Honor is

2   going to have to decide -- and I'm sure that they'll want to

3   be heard on it, Your Honor is going to have to decide

4   whether, if they don't bring Malek -- it's okay with us if

5   they don't bring Malek.

6           THE COURT:  No, no.  Why do you need Malek for this?

7           MR. BECK:  Malek is the person we're best able to

8   prove the misconduct of the Bank of America through, and he

9   had stuff in his report about Bank of America.

10          THE COURT:  Wait a minute.  Isn't there an

11  agreement on what Bank of America did?  Do you need a

12  witness for that?

13          MR. BECK:  Yeah, we do.

14          THE COURT:  It should not pay damages,

15  everybody -- no?  Is there a dispute between these parties?

16  I realize Bank of America might feel differently.

17          MR. BECK:  All I can say is that we thought it was

18  resolved, that the question was not if, but when.  And I

19  take it from what they've filed they say never.

20          THE COURT:  I have a feeling that -- before I get

21  into one of our, hopefully, last, sort of, pretrial

22  disputes, are you finished?

23          MR. BECK:  With this I am.  And I've got a few

24  more minutes.  All I wanted to do was flag that issue.

25          THE COURT:  Well, I want to hear from Mr. Mullin.

1  I'm sure there's an answer to this and we can resolve it

2  probably in a minute.  But I'm just debating whether to let

3  you go run the whole course of your opening.

4      MR. BECK:  I would like to do that, Your Honor.  I

5  don't have very much left.  And if we want to take -- we

6  don't need to take it up today.

7      THE COURT:  No, no, I want to take it up today.  I

8  want to get it resolved.

9      MR. BECK:  And on the substance of all of this,

10  of what would Mr. Malek say, one of my colleagues is better

11  able than I am to do that.

12      THE COURT:  It's simply a matter of timing.  I do

13  have a strong preference, but I don't even know what Mr.

14  Mullin is saying.  I can tell from body language that he

15  disagrees with your version of what he said.

16      MR. BECK:  Maybe they're indicating that it's okay

17  with them.

18      THE COURT:  Okay, tell you what.  Sit, please, and

19  let's hear from Mr. Mullin.  Let's get this resolved.

20  Thanks.

21      Mr. Mullin, what about Mr. Malek?

22      MR. MULLIN:  You know, I'm not fat, but this is

23  pretty tight here.

24      THE COURT:  I think you guys are going to have to

25  do some interior decorating here.

1          MR. MULLIN:  Your Honor, Mr. Malek -- let me just

2    state, Mr. Malek is our damages expert.

3          He was deposed in the case and at his deposition

4    they asked him -- started asking him questions about POA.

5    Mr. Heftman, FDIC counsel, was objecting and objecting and

6    saying this is outside the scope.  But, you know, in a

7    deposition we're supposed to let the questioning go on and

8    bring it to the Court later, if there's a problem.  And so

9    we let the questioning go on, but we objected and objected

10   and said this is outside of the scope of his report.

11         So we had not planned to call Mr. Malek at this

12   trial unless something completely unforeseen came up.  You

13   know, he's -- if there would be a reason to call him.  So,

14   we didn't have a reason to call him.  But, no, they say they

15   want to call him and they want to ask him something he

16   wasn't designated an expert on.

17         THE COURT:  Okay.  Let me interrupt you.  I think

18   the Bank of America question of whether it's an intervening

19   cause should be resolved in the liability portion of the

20   case.  I'm more convinced of that, somehow, after hearing

21   all of the opening.

22         I don't know who the person is who is going to

23   address that question for either side.  I don't even know if

24   you disagree.  I'm not even sure -- I am somehow not even

25   sure there was a disagreement.  I realize there was a

1    disagreement as to whether it's an intervening cause, but as

2    to the behavior of the Bank of America, I somehow have the

3    idea they did something they shouldn't have done, right?

4            MR. MULLIN:  I mean, they behaved stupidly.

5            THE COURT:  Well, we're not saying they should go

6    to jail, I'm just saying we all agree they did something

7    really unusual, shall we say, for a bank.  So what is

8    left -- okay.  Who would the FDIC put on on the question of

9    intervening cause?

10           MR. MULLIN:  We have an expert.  And I don't know

11   for sure if it's going to cover exactly what they have, but

12   we have another expert we're putting on that would go next

13   week that we think may touch on this.  But we don't know how

14   far they're trying to go.  I don't know what their cross-

15   examination is.  That's what I'm saying --

16           THE COURT:  I have a suggestion.  Let's finish the

17   opening statement.  Why don't we try, make a noble effort to

18   discuss this in a polite and cooperative manner.  You know

19   what I want.  I want to know who -- there's a question of

20   intervening laws.  I've said it's a question of fact, you've

21   all said it's a question of fact.  If it's a question of

22   fact, we need witnesses on both sides.

23           So if your witness would fit the bill for what

24   they were hoping to get from Malek, then maybe we can

25   substitute that witness for Malek.  If they really need to

1  call Malek because he has some peculiar point of view or

2  some peculiar expertise that they can only get from Malek --

3  you can tell I don't have a clue what I'm talking about

4  here -- then you get to call Malek.  I want to hear it next

5  week.  I want to get everything on liability out.

6  So if the two of you could talk about it, see what

7  witnesses you need, and let's bring them here next week.

8  Doesn't have to be Malek.  I mean, this is not -- don't turn

9  this into a major thing, we just need somebody to talk about --

10  MR. BECK:  We will get together and try to resolve

11  it, Your Honor.

12  THE COURT:  You really have been -- I mean, I'm

13  sort of joshing you because you really have for, the most

14  part, worked very cooperatively, all three parties, so I'm

15  sure you can work this out.

16  MR. BECK:  Thank you.

17  THE COURT:  You're going to finish up so our court

18  reporter can take a break, and all of us?

19  MR. BECK:  I am.  I am.

20  THE COURT:  And you should let Lynn know whether I

21  should put the air conditioning back on.

22  MR. BECK:  I hope so.

23  THE COURT:  It's hard to get this going right.

24  When they put the air conditioning on it tends to gets very,

25  very cold, they might turn it off.  Right now I think it's

1    very, very warm.  But we'll work on this.  We've got a week

2    to do it.

3            MR. BECK:  Yes.  So my last point is really to

4    remind Your Honor of the importance of evaluating PwC's

5    audits on a year-by-year basis, because there's kind of a

6    tendency sometimes to treat it as a binary issue of up or

7    down.

8            Speaking of Mr. Malek, I'm just going to put up

9    a -- and I'm not going to argue damages at all, but I'm

10   going to put up a -- just a page from his report so you can

11   get an appreciation of why it's important to treat this on a

12   year-by-year basis.  So this -- this row down here that I'm

13   going to highlight in yellow -- and let me say, I'm not

14   representing that the FDIC swears that this is their current

15   damage figure, we don't agree with the numbers, but this is

16   Mr. Malek talking about net recovery damages, and you can

17   see the years are up top.  And whether the numbers get

18   tinkered with or not, my point is simply you can see the

19   magnitude of the difference, depending on when one would

20   claim that some audit failure took place.

21           So that if the Court were to find that we should

22   have discovered the fraud in the early years, then the

23   damages are way, way higher than in the later years.  But

24   meanwhile, of course, their evidence is the weakest of the

25   early years, and there's some indication of that today,

1    because all they talk about was 2008, where the damages --

2              THE COURT:  That's all CBT?

3              MR. BECK:  All they talk about.

4              THE COURT:  Not all that FDIC talked about.

5              MR. BECK:  Yes, you're right about that.  So we

6    don't think they can prove liability in any of the audit

7    years, but we think their claims get worse and worse and

8    worse the farther back in time you go.

9              And it's interesting in this regard, that the FDIC

10   filed their suit in 2012 and they focused on 2007 and 2008

11   audit years.  That's when AOT was, you know, hiding this big

12   hole.  And the FDIC had the benefit of Miss Kelly's

13   confession and the FBI investigation, the criminal

14   indictments, the guilty pleas, where the defendants all

15   described what they did.  And with all that, they focused on

16   2007 and 2008, and it took them several years, even with

17   perfect hindsight, before they felt they had enough evidence

18   to amend their complaint and claim that earlier audit

19   failure.  Yet now they say that we should have discovered

20   all of this from day one.

21             So, I mentioned hindsight several times today, we

22   all suffer from it, it's human nature.  I don't know if Your

23   Honor has ever heard of a fellow named Nat Silver.  He used

24   to write for the New York Times.  He became very well known

25   because he's the guy who predicted every single one of the

1    states that President Obama carried in 2008.  He wrote a

2    book, it's really interesting, called *The Signal and the*

3    *Noise* and he had an illustration that I stole for this case,

4    and I'm just hoping that it falls within the fair use or

5    some other defense under the copyright laws.

6          He talks about how whatever the situation is,

7    there's a jungle of information beforehand.  And there's,

8    like, 20 computing lines in here and nobody knows what the

9    truth is.  But then after the fact, after the FBI raids and

10   everything else, somebody can see what it was.  And then

11   that's fine, except the problem is that the more you look at

12   that line in hindsight, the more you convince yourself that,

13   boy, you could see it all along, anybody could see that that

14   was the right line, once you had perfect hindsight.

15         And as I said, it's human nature and it's hard to

16   put it out of your mind.  And it takes -- it takes effort, I

17   think, to remind one's self that people didn't know all of

18   this back in the day, that the things that appear so obvious

19   today, you know, weren't obvious at all and, in fact, they

20   may have been completely obscured back in the day.  It takes

21   some humility to recognize that as well, because we all like

22   to think that we're smart enough, if only we'd been

23   involved; if only I had been the auditor, I would have done

24   all these different things.  So we're going to ask Your

25   Honor to keep that in mind.  Thank you.

```
 1          THE COURT:  Thank you.  We're going to take 15

 2   minutes.  Would that leave you ready to put on your first

 3   witness?

 4          MR. MULLIN:  Yes, we are, Your Honor.

 5          THE COURT:  Can I give you an extra -- I'll tell

 6   you what, don't talk about the Malek situation now.  Wait

 7   until 4:30 and do that.  Let's do our 15 minutes, and see

 8   you back here then.  Okay.

 9          (Recess.)

10          THE COURT:  Counsel, ready to call your first

11   witness?

12          MR. SORENSEN:  Yes, Your Honor.  Plaintiffs call

13   Kevin O'Halloran.

14                    KEVIN O'HALLORAN,

15   was called as a witness and, having been first duly sworn,

16   was examined and testified as follows:

17          MR. SORENSEN:  Your Honor, may we approach the

18   witness with binders that we're going to be using?

19          THE COURT:  Sure.  Please.

20          MR. SORENSEN:  We have some for you, too, and

21   they'll be on the screen.

22          THE COURT:  We're all set.

23                    DIRECT EXAMINATION

24   BY MR. SORENSEN:

25   Q.  Good afternoon, Mr. O'Halloran.
```

1    A.  Good afternoon.

2    Q.  Are you the trustee for the -- the plan trustee for the

3    BancGroup, Inc.?

4    A.  I am.

5    Q.  How long have you been the plan trustee for the

6    BancGroup?

7    A.  Since July, 2011.

8    Q.  And there have been a lot of acronyms going on here.  Is

9    it okay if I refer to the BancGroup as CBG?

10   A.  Yes, sir.

11   Q.  And Colonial Bank, when I use that term I'm referring to

12   Colonial Bank.  That's okay with you?

13   A.  Yes, sir.

14   Q.  Before you became the plan trustee of CBG, did you serve

15   as the chief recovery officer for CBG?

16   A.  I did.

17   Q.  And when did you assume that position?

18   A.  August, 2009.

19   Q.  And was that on around August -- was it August 24th, 2009?

20   A.  Yes, sir.

21   Q.  And for both of those positions, was your appointment

22   approved by the bankruptcy court down in Alabama?

23   A.  It was.

24   Q.  And as part of your duties as the plan trustee, as well

25   as previously as the chief recovery officer, did you have

1    certain duties?

2    A.  Yes, sir.

3    Q.  And what kind of duties did you have?

4    A.  My duties included marshalling the assets of the

5    corporation and delivering information with regard to

6    investigations that were necessary to advise creditors,

7    courts, regulators of the status of the corporations.

8    Q.  And did you have statutory duties under the bankruptcy

9    code?

10   A.  I did, yes.

11   Q.  And did one of those duties include the duty to

12   investigate the financial affairs of CBG and Colonial Bank?

13   A.  Yes, sir.

14   Q.  And have you been doing that since you were appointed

15   back in August of 2009?

16   A.  Yes, sir.

17   Q.  And is it fair to say that since August 24th of 2009,

18   you've been in charge of CBG?

19   A.  That's correct.

20   Q.  And did you have all of the -- all of the rights and

21   responsibilities of a chief executive officer?

22   A.  That's a fair statement, yes, sir.

23   Q.  And did you also have the duties and the fiduciary

24   duties of chief executive officer?

25   A.  Yes, sir.

1    Q.  And when you mentioned investigate, I would just like to

2    ask you a little bit about the scope of the investigation.

3              Did your investigation include investigation into

4    the failure of both CBG and Colonial Bank?

5    A.  It did.

6    Q.  And did you investigate the causes of those failures?

7    A.  I did.

8    Q.  Did you also investigate the fraud that was committed by

9    Farkas and Kissick against the bank?

10   A.  I did.

11   Q.  Did you also do an investigation into why the audited

12   financial statements certified by PwC were materially

13   misstated?

14   A.  I did.

15   Q.  Did you also investigate whether the assets that were

16   recorded on CBG's balance sheet, whether those were real or

17   fake?

18   A.  I did.

19   Q.  Did you also investigate whether the transactions

20   between Colonial Bank and TBW, whether those complied with

21   federal lending limits?

22   A.  I did.

23   Q.  And did you also investigate the interactions between

24   CBG, Colonial Bank and its -- and their banking regulators?

25   A.  Yes, sir.

1   Q.  And did those regulators include the Federal Reserve Board?

2   A.  It did.

3   Q.  Did they also include the office of the Comptroller of

4   the Currency?

5   A.  Yes, sir.

6   Q.  Did it also include the FDIC and the Alabama State

7   Banking Department?

8   A.  Correct.

9   Q.  In connection with your investigation, did you also have

10  a reason to look at the call reports that Colonial Bank and

11  CBG filed with the federal banking regulators?

12  A.  I did.

13  Q.  I would like to take you back to 2009.  And if you could

14  tell the Court, when did you first -- when were you first

15  contacted about the situation at Colonial -- at CBG and

16  Colonial Bank?

17  A.  I was contacted in and around the middle of August, 2009.

18  Q.  And who contacted you?

19  A.  Simuel Sippial, the chairman of the board of directors.

20  Q.  And what did you -- what did you understand they were

21  looking for from you?

22  A.  Mr. Sippial was looking for somebody who would be an

23  independent voice, who would take control of the situation

24  regarding the Colonial BancGroup.  It was expected that the

25  corporation would file for bankruptcy and he needed somebody

1    who had experience in bankruptcy, as well as somebody who

2    had experience dealing with substantial fraud cases, as well

3    as somebody who had experience dealing with regulators,

4    investigators, government policing agencies, organizations

5    like that.

6    Q.  And did you travel to Montgomery, Alabama in August 2009?

7    A.  I did.

8    Q.  And roughly, when were you -- when were you first

9    on-site in Montgomery?

10   A.  Maybe 15th, 16th of August.

11   Q.  And just to be clear, that was about ten days after the

12   FBI raid on Colonial?

13   A.  Yes, sir.  It was shortly after the bank was taken over.

14   Q.  And when you were in Montgomery, Alabama, was there

15   still a law enforcement presence?

16   A.  Yes, sir, there was.

17   Q.  And why was that?

18   A.  The regulators that had taken control of the bank were

19   making sure that no records left the Colonial BancGroup,

20   Colonial Bank premises in Montgomery without the proper

21   authorization.

22   Q.  And back in that timeframe when you were first

23   contacted, did you start to investigate the situation at CBG

24   and Colonial Bank?

25   A.  I did, yes, sir.

1    Q.  And how did you go about getting information about what

2    the situation was?

3    A.  I started looking at records, including publicly filed

4    10-Ks, audited financial statements, 8-Ks, publicly

5    available information like that.

6    Q.  And you should have a series of binders next to you.  If

7    you could find volume 5, please.  And they should be in

8    order by exhibit number.  If you would turn to Exhibit

9    D-1463, please.

10   A.  Yes.

11   Q.  Okay.  Are you there?

12   A.  I am.

13   Q.  Okay.  Do you recognize this document?

14   A.  I do.

15   Q.  What is this document?

16   A.  This is an 8-K document filed publicly on the EDGAR system.

17   Q.  Is the file date on this August 7th, 2009?

18   A.  It is.

19   Q.  Was this filed by CBG on August 7th, 2009?

20   A.  It was.

21            MR. SORENSEN:  At this time, Your Honor, we would

22   move this into evidence.

23            THE COURT:  Hearing no objection.  But I thought

24   we were going -- never mind.  Just keep going.  We'll talk

25   about it at the end.  It will be admitted.

1    BY MR. SORENSEN:

2    Q.  Mr. O'Halloran, you can either look at the screen or

3    hard copy.

4           MR. BECK:  To speed things up, we don't have any

5    objection to any of the documents that they told us they're

6    going to use.  We may have an objections about whether this

7    witness has any basis to testify about particular documents,

8    but we're not going to be objecting on documents, so...

9           MR. SORENSEN:  Okay.  That being said, then I

10   won't -- I wasn't -- I wasn't sure if there were going to be

11   remaining objections, but that makes it easy.

12          THE COURT:  Okay.

13   BY MR. SORENSEN:

14   Q.  Did you review this 8-K filing back in August, after you

15   spoke to Mr. Sippial?

16   A.  Yes, sir.

17   Q.  And if you would turn with me to page 3 of the 8-K?

18   A.  Yes, sir.

19   Q.  And do you see there's a reference in the paragraph

20   there to federal criminal investigation relating to the

21   company's Mortgage Warehouse Lending Division?

22   A.  I do.

23   Q.  And at the time, what was your understanding of what had

24   happened at the Mortgage Warehouse Lending Division?

25   A.  That the government authorities, and cooperation with

1    others, had become aware of a fraud that had been

2    perpetrated at the Colonial BancGroup offices of Colonial

3    Bank -- subsidiary of Colonial Bank, and that fraud was

4    perpetrated between TBW and people at Colonial Bank.

5    Q.  Did you understand at the time that there was -- that

6    there were concerns about the audited financial statements

7    of CBG?

8    A.  Yes, there were.

9    Q.  Is that reflected here in the filing?

10   A.  It is.

11   Q.  And it says:  The alleged accounting irregularities

12   relate to more than one year's audited financial statements.

13   Do you see that?

14   A.  Yes, sir.

15   Q.  And did you understand at the time that the audited

16   opinions that had been issued by PwC were being called into

17   question?

18   A.  I did.

19   Q.  And going back to Mr. Sippial.  Did Mr. Sippial and CBG

20   ultimately hire you as the chief recovery officer?

21   A.  They did.

22   Q.  Did you sign an engagement letter with them?

23   A.  I did.

24   Q.  And after you were engaged as the chief recovery

25   officer, did that require you to temporarily relocate to

1    Montgomery?

2    A.  Yes, sir.

3    Q.  Roughly how much time were you spending in Montgomery,

4    starting in mid-August of 2009?

5    A.  August 20th or so, I was in Montgomery every day, Monday

6    to Friday, and sometimes over the weekend.

7    Q.  And if you would turn to volume 2.  I apologize, we're

8    going to have to go to another volume here.  And turn to

9    Exhibit A-69.

10   A.  Yes, sir.

11   Q.  And is this the 10-K that CBG filed for the year end 2008?

12   A.  It is.

13   Q.  And did you -- is this one of the documents that you

14   reviewed in August, when you were trying to understand what

15   the situation was at CBG?

16   A.  Yes, sir.

17   Q.  And why did you turn to the 10-K?

18   A.  Well, first of all, it's got -- always has the audited

19   financial statements.  I wanted to see what the opinions

20   stated, what the numbers indicated.

21          And then there are generally paragraphs of

22   information in there, not only notes, the financial

23   statement, but also information pertaining to the

24   corporation's activities.

25   Q.  And if you would turn to page -- it's page 82 of the

1    document.  And it may be easier if we pull it up on the

2    screen here.  Thank you.

3    A.  Yes, sir.

4    Q.  And what is page 82?  What is this?

5    A.  Page 82 is the report of the independent registered

6    public accounting firm, otherwise known as the auditor's

7    opinion letter.

8    Q.  You see at the bottom it has PricewaterhouseCoopers'

9    signature and a date?

10   A.  I do.

11   Q.  What do you understand this opinion to be?

12   A.  This opinion issued on March 2nd is a clean opinion.

13              THE COURT:  Is what?

14              THE WITNESS:  Is a clean opinion, Your Honor.

15   BY MR. SORENSEN:

16   Q.  Would you explain to the Court, what does a clean

17   opinion mean, when you're talking about clean opinion?

18   A.  Clean opinion is the best form of sign-off that you can

19   get from an auditing firm.

20   Q.  If you look at the opinion, where does it say that it's

21   clean?  What are the words that are used to mean clean?

22   A.  It's at the end of the first line, where it says:

23   Present fairly in all material respects the financial

24   position of the Colonial Bank Group, Inc. and its

25   subsidiaries at the December 31, 2007 and 2008.

1    Q.  And if you would turn to the next page.

2           Rami, if you could go to the next page, please.

3    A.  Yes, sir.

4    Q.  Is this the balance sheet of CBG certified by PwC as of

5    year-end 2008?

6    A.  It is.

7    Q.  And down at the bottom -- these are the assets.

8           And if you see at the bottom, what are the assets

9    of CBG as of -- certified by PwC as of the end of 2008,?

10   A.  The PwC certified asset total 25,816,306?

11   Q.  And just based on your experience, were you looking at a

12   very large bank here?

13   A.  Yes, sir.

14   Q.  And if you would turn back to the previous page, 83,

15   please.  If you see at the bottom the date is March 2nd, 2009?

16   A.  Yes, sir.

17   Q.  Why is there -- why is there a 3-month difference

18   between year-end and the audit date, or the date of the

19   opinion?

20   A.  The date it's signed here is the date that the auditors

21   are certifying the numbers as of -- post 12-31 and up to

22   March 2nd they were working on the audit testing, the

23   different aspects of the audit that they were supposed to test.

24   Q.  And if we could go back to the balance sheet, please.

25   A.  Yes, sir.

1    Q.  Roughly how much of the $25 billion of assets that's on

2    the CBG balance sheet, how much of that was Colonial Bank?

3    A.  Well, over 90 percent of the total assets was based in

4    Colonial Bank.

5    Q.  And of the Colonial Bank portion, roughly how much --

6    did you have an idea of what the Mortgage Warehouse Lending

7    Division, what the size of it was?

8    A.  Yes, sir.

9    Q.  And maybe if we turn to page 53 of the 10-K, that may help.

10   A.  Yes, sir.

11   Q.  And, Rami, if you could blow out the middle section that

12   says:  A summary of the mortgage.  There it is:  A summary

13   of the major components of mortgage warehouse assets.

14          What does this show, the size of the balance sheet

15   or the amount of assets that the Mortgage Warehouse Lending

16   Division supposedly had as of the end of 2008?

17   A.  It certifies here to 4,262,987 in the Mortgage Warehouse

18   Division.

19   Q.  If the Mortgage Lending Warehouse Division had been a

20   standalone bank, would a bank of $4.2 billion -- is that a

21   sizeable bank, in your experience?

22   A.  Yes, sir.

23   Q.  When you saw that you were dealing with a division that

24   was $4 billion, and given that there were allegations of

25   potential fraud, did you have an understanding at the time

1  of what you might be dealing with?

2  A.  Yes, sir.

3  Q.  And what was your understanding?

4  A.  That the impact of anything substantial in the Mortgage

5  Warehouse Division could have a devastating, and did have a

6  devastating impact on Colonial Bank and Colonial BancGroup.

7  Q.  And if you would turn back to the balance sheet.  Let's

8  go back to the balance sheet.

9  A.  Yes, sir.

10 Q.  I think it's 83.  And if you could pull out the asset

11 section again, please.

12         Now, you've heard discussion about AOT and COLB

13 this morning and you're familiar with those terms as they're

14 used to apply to assets here?

15 A.  I am.

16 Q.  And if you would, could you identify which line on here

17 refers to AOT?

18 A.  AOT is the fourth line item down:  Securities purchased

19 under agreements to resell.

20 Q.  And so that's what people -- when people are referring

21 to AOT transactions or AOT assets, they're referring to this

22 line?

23 A.  They are, yes, sir.

24 Q.  And what's the amount of AOT assets that PwC certified

25 existed as of the end of 2008?

1    A.  PwC certified to there being in existence 1,556,157 in

2    AOT assets.

3    Q.  And these AOT assets, was there any part -- any

4    counterparty to these other than TBW?

5    A.  No, sir.

6    Q.  I wanted to make sure I was clear on my question.

7            Did anyone other than TBW, have an AOT facility

8    with Colonial Bank at this time?

9    A.  No, sir.

10   Q.  So the entire -- is it fair to say the entire 1.556

11   billion, that's all AOT transactions with TBW?

12   A.  It is.

13   Q.  And where on the balance sheet would we find what people

14   call the COLB transactions?

15   A.  The COLB is three further lines down, loans held for

16   sale.  Includes 1,950,445 measured at fair value at December

17   31, 2008.

18   Q.  And what's the amount of COLB assets that PwC certified

19   as existing as of December 31st, 2008?

20   A.  That PwC certified the number at 2,082,248.

21   Q.  And how much of that was attributable to the

22   transactions with TBW?

23   A.  Approximately $1.1 billion.

24   Q.  When you became the chief recovery officer, did you have

25   responsibility for these financial statements?

1    A.  I assumed responsibility for those, yes, sir.

2    Q.  And at the time, did you have to make a determination as

3    to whether these needed to be restated?

4    A.  That was one of the questions I had, yes, sir.

5    Q.  And at the time you took over, who was your auditor?

6    A.  PwC.

7    Q.  PricewaterhouseCoopers haven't resigned, have they?

8    A.  Not to my knowledge.  No.

9    Q.  And did you try to get any advice from

10   PricewaterhouseCoopers back in August about whether you

11   needed to restate these financial statements?

12   A.  We did, yes, sir.

13   Q.  Did you speak with PwC?

14   A.  We got no response from PwC's Birmingham office.

15   Q.  Did PwC ever withdraw its clean audit opinion on these

16   financial statements?

17   A.  Not that I'm aware of.

18   Q.  Did it every withdraw its audit opinion on any CBG

19   financial statements?

20   A.  Not that I'm aware of.

21   Q.  After you took over as the chief recovery officer, did

22   you have to have interactions with federal government

23   regulators?

24   A.  I did, yes.

25   Q.  And who did you have to talk to at the time?

1    A.   The primary regulator for the Colonial BancGroup was the

2    Federal Reserve Bank, so we had contact with them.

3    Q.   Now, CBG was a public company, it had to make filings

4    with the SEC.  Did you have contact with the Securities and

5    Exchange Commission?

6    A.   We did.

7    Q.   What was the nature of your contact with the SEC at that

8    time?

9    A.   As a publicly traded company, they were very keen to

10   know what to inform the public markets about how to deal

11   with the stock listing of the Colonial BancGroup, as well as

12   the bond holdings of the Colonial BancGroup and the

13   previously issued and currently standing financial statements.

14   Q.   And was the SEC doing an investigation at that time?

15   A.   Yes, sir.

16   Q.   And did you --

17        MR. BECK:  Your Honor, I object on relevance

18   grounds.  I don't think -- first of all, my understanding is

19   damages have been bifurcated, but I don't see what this has

20   to do with any claims against PwC.

21        THE COURT:  I think -- I think it's just

22   background information on who he was speaking with and what

23   he was doing in his investigation at the time, so I'll

24   overrule the objection.

25   BY MR. SORENSEN:

1    Q.  And did you also speak to -- have any contact with any

2    of the investigators from the Justice Department who were

3    investigating the situation at Colonial and TBW?

4    A.  I did.

5    Q.  Did you cooperate with their investigation?

6    A.  Absolutely.

7    Q.  Previously you mentioned the banking regulators, the

8    Federal Reserve Board.  Maybe you could explain to the

9    Court, why were there separate regulators for CBG versus

10   Colonial Bank?

11   A.  Yes, sir.  CBG, as a bank holding company, was regulated

12   primarily by the Federal Reserve Bank and we dealt primarily

13   with the offense office of the Federal Reserve Bank.

14   Colonial Bank was primarily regulated by -- for a period of

15   time the office of the Comptroller of the Currency and

16   later, from 2008, by the Alabama Banking Regulators.  And

17   through all this period, the bank was also regulated and the

18   bank holding company had interaction with the Federal

19   Deposit Insurance Corporation.

20   Q.  And back in 2009, after you took over as the chief

21   recovery officer, did you have discussions with the Federal

22   Reserve Board?

23   A.  I did.

24   Q.  And what were the -- what were the -- what was the topic

25   of the discussions that you had?

1    A.  The topic related to going forward with information that

2    the holding company may or may not be required to file, as

3    well as dealing with previously filed reports, which

4    obviously at that time we knew to be incorrect, and whether

5    and how they would be corrected.

6    Q.  And the reports that you're talking about, that are made

7    to the Federal Reserve, are those called call reports?

8    A.  Yes, sir, they're referred to as call reports.

9    Q.  If you could explain to the Court, what is the call

10   report for a bank holding company like CBG?

11            THE COURT:  What was that?

12            MR. SORENSEN:  Call report, C-A-L-L.

13   A.  The call report is developed by the banking regulators

14   and it is a form that needs to be completed that provides a

15   detailed financial analysis covering all kinds of topics,

16   from capital to the types of loans, the types of deposits,

17   etcetera, and to perform an analysis on the bank.  And it's

18   provided to all of the bank regulators, the Federal Reserve

19   Bank, the Office of the Comptroller of the Currency, as well

20   as the Federal Deposit Insurance Corporation.

21   BY MR. SORENSEN:

22   Q.  Earlier today there was some discussion of federal

23   lending limits.  I think you were here when that was

24   discussed, right?

25   A.  Yes, sir.

1    Q.  And is the call report, is that how -- the information

2    in there used to calculate lending limits?

3    A.  It can be, yes, sir.

4    Q.  Now, when you took over as the chief recovery officer,

5    did you gain an understanding of CBG's and Colonial Bank's

6    businesses?

7    A.  Yes sir.

8    Q.  Did Colonial Bank have relationships with federal

9    agencies or quasi government agencies?

10   A.  It had relationships with a number of government

11   entities.

12   Q.  Did those entities include Freddie Mac and Ginnie Mae?

13   A.  Yes, sir.

14   Q.  What was the relationship between Colonial Bank and

15   those federal agencies, Freddie Mac and Ginnie Mae?

16   A.  Colonial Bank, through its Mortgage Warehouse Division,

17   had the opportunity to do business with both of those

18   entities, to work on the packaging of mortgage loans that

19   Ginnie Mae and Freddie Mac would turn into mortgage-backed

20   securities for further sale.

21   Q.  As a condition of doing business with Ginnie Mae and

22   Freddie Mac, was Colonial Bank required to provide a clean

23   audit opinion from PwC?

24   A.  Yes, sir.

25   Q.  Back in -- towards the end of August, did you start to

1  come to some understanding of what the situation was at

2  Colonial Bank and at CBG?

3  A.  I did.

4  Q.  And how did you gain an understanding of what was

5  happening?

6  A.  I started to gain an understanding by gathering records

7  from as many sources as I could; so, records that were in

8  the Montgomery offices, records from the bankruptcy estate

9  of TBW, and meetings and interviews of employees, former

10  employees.  I gathered information from counsel that

11  previously worked on matters relating to the corporations

12  and as many sources as I could get information from.  That

13  took -- you know, some I could get immediately.

14  Q.  Did you have discussions with members of the CBG board

15  of directors?

16  A.  I did, yes.

17  Q.  And did you have discussions with employees and officers

18  of CBG and Colonial Bank?

19  A.  I did, yes.

20  Q.  And if we could -- if you could turn to the balance

21  sheet again.  I think you still have it in front of you

22  there, Exhibit A-69.  By the end of August of 2009, what did

23  you discover about this line item called Securities

24  Purchased Under Agreements to Resell the AOT Assets?

25  A.  That was still a number that was -- the AOT assets were

1    still approximately $1.5 billion or so.

2    Q.  And did you -- at the end of August, did you reach any

3    preliminary conclusions about whether this $1.5 billion of

4    supposed AOT assets, whether those were real or not?

5    A.  Yes, sir.

6    Q.  And what was -- what was your determination at that

7    time?

8    A.  That preliminary conclusion in August was that the

9    substantial portion of these assets were nonexistent.

10   Q.  Okay.  We can put that down.  You can close that binder

11   for now, Mr. O'Halloran.  I would like to circle back and

12   just talk about your background a little bit.

13           Could you just give the Court a little bit of

14   background about where you're from and your educational

15   background, up to college?

16   A.  Yes, sir.

17   Q.  Thank you.

18   A.  I was born and raised in Ireland, Your Honor.  I have a

19   college degree from University College Dublin, economics,

20   math, and politics.  I also took the examinations of the

21   Institute of Bankers in Ireland, as well as the UK-based

22   institute.

23           THE COURT:  Slow down.  Our court reporter.

24           THE WITNESS:  My apologies Institute of Bankers in

25   Ireland, as well as the UK-based Institute of Chartered

1    Secretaries and Administrators.

2         I have a Master's in Management from the

3    Massachusetts Institute of Technology.  And I have worked

4    and lived in Ireland and the UK and Japan and the United

5    States.  I'm a citizen of both the Republic of Ireland and

6    the United States.

7    BY MR. SORENSEN:

8    Q.  Let me just go back to your college degree.  What was

9    your college degree?  What did you have? a concentration or

10   anything you specialized in in college?

11   A.  In undergraduate and UCD I studied economics, math, and

12   politics.

13   Q.  And turning to MIT, did you get a master's from MIT?

14   A.  Yes, sir.

15   Q.  Did you have a concentration when you were there?

16   A.  Yes, sir.

17   Q.  What was that?

18   A.  A number of concentrations, the primary ones being in

19   operations, finance, accounting and strategy.

20   Q.  And after you graduated from MIT, what did you do?

21   A.  After graduation I worked at the accounting firm of

22   Coopers & Lybrand in their financial restructuring group.

23   Q.  That's a predecessor to PricewaterhouseCoopers, the

24   defendant here?

25   A.  It's one of them, yes, sir.

1    Q.  What did you do for Coopers at that time?

2    A.  I was in their financial restructuring group based in

3    Boston, Massachusetts.

4    Q.  How long did you stay there?

5    A.  I was there approximately three years.

6    Q.  What did you do next?

7    A.  Then I worked for a company in Atlanta, Georgia called

8    ABBS.  I was in the area of being responsible for a couple

9    of distressed companies and helping the organization deal

10    with those corporations.

11    Q.  And just timeframe, is this the 1990s?

12    A.  Yes, sir.  1995 is when I left Coopers & Lybrand, after

13    approximately three years.  I joined APPS immediately, and

14    then in September, October 1996, I became involved in a

15    company called G&W Asset Management and ultimately became

16    their CEO as that company went through bankruptcy.

17    Q.  And since the 1990s, have you been working with

18    financially troubled companies?

19    A.  Exclusively, yes, sir.

20    Q.  And how many times have you been appointed as a trustee

21    for a failed company?

22    A.  I don't know the exact number, but probably in excess of

23    20 times.

24    Q.  And roughly, how many times have you been in court,

25    appointed as a receiver or liquidator by a court?

1    A.  I was appointed once as a liquidator by the Grand Court

2    of the Cayman Islands, and I've been appointed, again, 20-

3    plus times by state and federal district courts as a

4    receiver.

5    Q.  And have you had experience in the past dealing with a

6    situation like this where there's been a fraud and someone

7    needs to come in and untangle the fraud?

8    A.  Yes, sir, a number of times.

9    Q.  And have you also -- in the context of dealing with the

10   company that's failed due to fraud, have you dealt with the

11   DOJ as it was investigating frauds?

12   A.  I have, yes, sir.

13   Q.  And have you dealt with the SEC as they were doing

14   investigations?

15   A.  Yes, sir.

16   Q.  And have you been a trustee or receiver in cases where

17   there was an alleged Ponzi schemes?

18   A.  Yes, sir.

19   Q.  What about mortgage companies, do you have experience

20   working as a trustee where the company that failed was a

21   mortgage company?

22   A.  Yes, sir.

23   Q.  What matter was that?

24   A.  I was appointed as confirmation trustee for a company

25   called Mortgages Limited.  It was a bankruptcy case filed in

1    Phoenix, Arizona.

2    Q.  Did that case involve mortgage loans as collateral,

3    similar to the situation here?

4    A.  Yes, sir.

5    Q.  And if you would, I would like to show you the

6    engagement letter we referenced earlier.  If you could turn

7    to Exhibit D-253.  It should be in volume four on the side

8    there.

9         THE COURT:  You know, if you're going to show it

10   to him, he really doesn't have to --

11        MR. SORENSEN:  That's an excellent point.  You can

12   ignore the binders, please.

13        THE COURT:  Is it showing on your screen?

14        THE WITNESS:  It is, Your Honor.

15        THE COURT:  Good.  It's easy for you to see.

16   We'll try to work with it.  And it's showing, of course, on

17   defendant's -- all right, very good.

18   BY MR. SORENSEN:

19   Q.  Okay.  Is Exhibit D-253, is that the engagement letter

20   between you and CBG from August 2009?

21   A.  It is.

22   Q.  Okay.  If we just go to the last page.  Have you

23   signed -- there it is.  Is that your signature there?

24   A.  It is.

25   Q.  And if you could, Rami, please go back to the first page

1    and highlight the first paragraph.

2           Mr. Sippial, he was the chairman of the board at

3    the time?

4    A.  That's correct.

5    Q.  Then you said at some point you became the plan trustee.

6    So at this time back in August you were the recovery officer

7    and in June of 2011 you became the plan trustee?

8    A.  That's correct.

9    Q.  Let's take a look at the agreement that you signed then.

10   That's Exhibit B-235.  It should be B-235.

11          Thank you.

12          And if we could call out the top part.  Do you see

13   there's a reference in the first paragraph to a second

14   amended Chapter 11 plan of liquidation?

15   A.  Yes, sir.

16   Q.  Okay.  What is that a reference to?

17   A.  That is a plan of liquidation, the agreed format through

18   which -- and the rules through which the liquidation -- in

19   this case of the Colonial Bank Group -- would take place,

20   having been approved by the bankruptcy court and voted upon

21   by the creditors.

22   Q.  And if you would -- we're going to go to page 23 of the

23   exhibit, section 8.4.  If you keep going down, it's 23 of

24   the actual document.

25          My mistake.  I apologize.  I was one document

1    ahead.  Page 2.  I'm sorry.  Page 2.  And if you could call

2    out section 2.

3              Mr. O'Halloran, it says:  As the plan trustee,

4    O'Halloran shall have the powers, duties, rights and

5    obligations set forth in the plan and confirmation order.

6    A.  That's what it says, yes, sir.

7    Q.  To understand what your powers and duties were, we would

8    have to refer to the bankruptcy plan?

9    A.  Correct.

10   Q.  Let's take a look at that now.  That's B-234.  Is this

11   the -- this is the plan that was filed and ultimately

12   approved by the bankruptcy court?

13   A.  I believe so, yes, sir.

14   Q.  And if you look at section 8.4, page 23, under plan

15   trustee.

16   A.  Yes, sir.

17   Q.  The first -- the first sentence mirrors what we just

18   saw, your engagement letter.  It says you'll have all the

19   duties under the plan.  And I just want to turn to the next

20   page.  It's also 8.4.

21             If we could have Rami, if you could, call that up,

22   please, up at the top part of that big paragraph there.  I

23   just want to highlight the point that said, "Without

24   limiting the generality of the foregoing," it says, "the

25   plan trustee, acting on behalf of the debtor, shall have the

1    rights, powers, and duties of a trustee under section 704."

2    And it goes on to say the bankruptcy code.

3         When you talked about the statutory duty you had

4    to investigate, is that where it comes from?

5    A.  Yes, sir.  Section 704 is specifically about statutory

6    duties to investigate.

7    Q.  And earlier you mentioned your investigative -- the

8    start of your investigation, collecting documents.  Where

9    did you collect -- where did you collect documents?  From

10   whom did you get them?

11   A.  I got documents from as many sources as I could get them

12   from, starting at the company's offices in Montgomery,

13   Alabama.  I obtained them from the bankruptcy trustee from

14   TBW, from the Department of Justice's court case in

15   Virginia.  I also got documents from the directors, from

16   previous employees of Colonial Bank, Colonial BancGroup, I

17   got some information from Colonial Brokerage; as much

18   information as I could get.

19   Q.  And since you had the documents from both Colonial Bank

20   and TBW, did that give you a full picture of the nature of

21   the transactions and -- the nature of the transactions

22   between them?

23   A.  Yes, sir.

24   Q.  In the course of your investigation, did you develop an

25   understanding of how the transactions between TBW and

1    Colonial Bank were supposed to work?

2    A.  I did, yes, sir.

3    Q.  And during the course of your investigation, did you

4    develop an understanding of what actually happened?

5    A.  I did, yes, sir.

6    Q.  And you saw that we were using this magnet board up here

7    earlier?

8    A.  I did.

9    Q.  Would it be helpful to you to explain to the Court how

10   the transactions worked to use the board?

11   A.  Yes, sir.

12   Q.  Okay.  With Your Honor's permission, I would ask Mr.

13   O'Halloran to step down.

14         MR. BECK:  Your Honor, I think this is all going

15   to be hearsay.  And if it's just -- it's just background on

16   how the transactions generally were structured, that's one

17   thing.  But if he's going to start testifying about who did

18   what and what he says he found in his investigation, that's

19   a whole different kettle of fish here.

20         THE COURT:  I think for now he's just going to

21   describe, probably, a lot of what was described in the

22   opening statements, although this is actually a witness

23   rather than an attorney.

24         MR. BECK:  But he's actually a witness with no

25   personal knowledge.

1        THE COURT:  Well, he reviewed the documents.

2        MR. BECK:  So did I.

3        THE COURT:  But he's an expert.  Sorry about that.

4   But --

5        MR. BECK:  Well, but he wasn't designated as an

6   expert.  My point is, if he's just going to talk about how

7   the transaction was structured, that's one thing.  But from

8   the documents that they gave us, it looks like he's going to

9   be the celebrity spokesman for their case and he's going to

10  say here's Miss Kissick and she wrote an e-mail to this

11  person, that kind of thing, which is crazy.

12       MR. SORENSEN:  It's not -- he has a statutory duty

13  to investigate.  He does have personal knowledge of

14  everything he found in his investigation, and this issue

15  actually came up in Florida, where PwC tried to exclude the

16  testimony of the trustee there, and the Court would know a

17  trustee has personal knowledge of the results of their

18  investigation, and every time you have a big fraud like this

19  you bring in a trustee and the trustee has to explain what

20  happened.

21       THE COURT:  Let's start with his testimony and

22  we'll see if you have specific objections.

23       MR. SORENSEN:  Is he going to need another mic for

24  that?

25       MR. CRAMER:  That's the only one we have and I

1  think you have it muted.  I don't think it's on.

2  BY MR. SORENSEN:

3  Q.  Okay.  Mr. O'Halloran, are you ready?

4  A.  Yes, sir.

5  Q.  Let's start with -- let's start with the parties' --

6  let's focus on the AOT transaction and let's focus on the

7  parties.  Who were the parties to the AOT transaction?

8  A.  There are two parties to the AOT transaction.  There's

9  TBW and there's the Colonial Bank.  This is where it starts.

10 Q.  I should be clear.  There's -- are there two steps to

11 this -- these AOT transactions?

12 A.  There are.

13 Q.  Which step -- you're talking about the first step?

14 A.  This is where it starts, these two parties come together.

15 Q.  Okay.  And what -- on the first step, what was supposed

16 to be happening in these AOT transactions?

17 A.  So in the first step, TBW is originating individual

18 mortgages, and it originates those in the general

19 marketplace.  It then gathers the mortgages together and

20 tells the bank that it has a participation certificate.

21 Q.  Okay.  Let me just stop you there.

22        What is the participation certificate in the

23 context of these -- what was it supposed to be in the

24 context of these AOT transactions?

25 A.  The participation certificate is what Colonial Bank is

1    getting to show that it is the owner of the subsequent pool

2    of mortgages that's going to be attached to this

3    participation certificate; it's ownership rights.

4    Q.  Were there any other documents that were required in

5    this first step in the transaction?

6    A.  Yes, sir.  There's supposed to be a list of them.

7    Supposed to be a list of loans that go with this

8    participation certificate (indicating).

9    Q.  And do you have an icon for that there?

10   A.  No, sir.

11   Q.  And the list of -- the participation certificate and the

12   list of loans -- strike that.

13            It may be in that box there.

14            THE COURT:  That's all right.  I would rather just

15   hear him go along.

16            THE WITNESS:  Okay, Your Honor.

17            THE COURT:  He'll be on tomorrow.

18   BY MR. SORENSEN:

19   Q.  And the participation certificate and the list of loans,

20   if the transactions were working the way they were supposed

21   to be, where were those documents supposed to be delivered?

22   A.  If they were working the way it's supposed to be,

23   they're supposed to go into the vault at Colonial Bank in

24   Orlando, Florida.

25   Q.  When you talk about the vault, where was the vault

1    located?

2    A.  The vault was located in the basement of the building in

3    Orlando, Florida that also housed the Mortgage Warehouse

4    Division, and the vault was in the Trust Department, the

5    Custodial Trust Department.

6    Q.  You said the Trust Department.  When you talk about the

7    Trust Department, is that also referred to as the Custodial

8    Department?

9    A.  It is.

10   Q.  Was that the department that was charged with keeping

11   track and securing the original documents for these

12   transactions?

13   A.  Yes, when they received them.

14   Q.  And the Trust Department, was the Trust -- was anyone in

15   the Trust Department engaged in any fraud here?

16   A.  No, sir.

17   Q.  And --

18           MR. BECK:  Now we're getting into this witness

19   proclaiming who was involved in the fraud and who wasn't.

20   It really is hearsay.  We're not talking about how a

21   transaction was structured.  This witness is saying who is

22   involved in fraud and who wasn't involved in fraud, and it's

23   rank hearsay, and there is no exception under Federal Rules

24   of Evidence, no matter what they happened to manage to get

25   in in Florida.

1          MR. SORENSEN:  Your Honor, it's not hearsay and I

2     have five federal cases here that say a trustee may testify

3     as to his personal knowledge of the results of his

4     investigation.

5          THE COURT:  For now I'll allow it, and you can

6     give the citations to the clerk at the end of the day, we'll

7     take a look at them.

8          MR. SORENSEN:  Thank you.

9          MR. BECK:  Could we get those as well, Your Honor?

10          THE COURT:  Sure.

11     BY MR. SORENSEN:

12     Q.  Turning back to the first step of the transaction.  I

13     think you said the participation certificate and the list of

14     loans that needed to be delivered to the trust department?

15     A.  Yes, sir.

16     Q.  Okay.  And the trust department was -- that was a

17     separate department from Cathy Kissick's group in the

18     Mortgage Warehouse Lending Division?

19     A.  Yes.  Miss Kissick had no control over that department.

20          THE COURT:  The Trust Department and Custodial

21     Department is separate or together?

22          THE WITNESS:  The Trust Department, Your Honor,

23     they're referring to as the Trust Department or the

24     Custodial Department.

25     BY MR. SORENSEN:

1    Q.  What about the mortgages themselves, where were they

2    supposed to be delivered?

3    A.  They were also supposed to be delivered to the custodial

4    department.

5    Q.  And when you say mortgage documents, what are you

6    referring to?  What needed to be delivered to the trust

7    department?

8    A.  The main document that needed to be delivered was the

9    original promissory note, the initial one that started the

10   transaction off.

11   Q.  And is that -- just to be clear, is that the note that

12   someone that's buying a house and taking out a mortgage?

13   That's the note that they sign?

14   A.  That's what I'm referring to, yes, sir.

15   Q.  Okay.  And why is that document, why is that significant

16   in this transaction?

17   A.  Possession of that document gives significant rights to

18   the holder.

19   Q.  And why does Colonial Bank need the original note?

20   A.  So that it has those significant rights.

21          THE COURT:  And by rights, you mean the ability to

22   foreclose if their payment is not coming?

23          THE WITNESS:  Yes.  Yes, Your Honor.

24   BY MR. SORENSEN:

25   Q.  And just turning back to the participation certificate

1   and the list of loans, was the list of loans supposed to be

2   attached to the participation certificate?

3   A.  It was.

4   Q.  So if you had a participation certificate that had a

5   pool ID on it, did you -- would you know from the list of

6   loans which individual loans were in the pool?

7   A.  Yes, it would list them all out.

8   Q.  And at this stage -- let me ask this question:

9           When would the money start to flow from Colonial

10  Bank to TBW?  Did it happen at this point?

11  A.  No.

12  Q.  Were there additional steps that were required before

13  advances could be made to TBW?

14  A.  If it was carried out in accordance with the agreements,

15  yes.

16  Q.  What were -- what additional documents were required?

17  A.  So, the next steps would require a takeout commitment

18  and a confirmation and an assignment.

19  Q.  Why don't we take those one at a time, and I think

20  you're going to introduce another party here.  Who is the

21  takeout investor or the end investor that you're talking

22  about?

23  A.  Yes, sir.  The end investor is somebody who is going to

24  ultimately purchase the mortgage-backed security and pay

25  that money into the benefit of Colonial Bank.

1    Q.  And just want to be perfectly clear about the sequence

2    here.

3         Colonial Bank is supposed to be buying pools of

4    loans from TBW in the AOT; is that correct?

5    A.  That's correct.

6    Q.  What would happen to the those pools of loans?  How

7    would they become -- how would they end up with the security

8    at the end, after the second step of the transaction?

9    A.  Assuming all the paperwork was in place with the end

10   investor, the pool of loans would be authenticated and then

11   sent to the benefit of one of the government entities, who

12   would then issue mortgage-backed security.

13   Q.  And the government entities are Ginny Mae and Freddie

14   Mac?

15   A.  Yes.

16        THE COURT:  Let me interrupt you for a moment.  So

17   the end investor or the takeout commitment, is it buying the

18   participation agreement in the pool or is it buying the

19   security that is issued for that?

20        THE WITNESS:  It will ultimately buy the security,

21   Your Honor, 30 to 45 days after all the paperwork is put in

22   place; within 30 to 45 days.

23        THE COURT:  Okay.  So ultimately they're not

24   dealing with the documents you're talking about, ultimately

25   there's another document called a security?

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  And that's what the end investor

3     purchases?

4          THE WITNESS:  Correct.

5          THE COURT:  But it's secured by the pool?

6          THE WITNESS:  Correct, Your Honor.

7     BY MR. SORENSEN:

8     Q.  Going back to the end investor.  What were the required

9     documents for the second step of the transaction?  That is,

10    the -- what's called the takeout by the end investor.

11    A.  So we needed the end investor confirmation of a takeout

12    commitment, and that would be where the end investor would

13    confirm that they intended to buy the mortgage-backed

14    security that would be issued for this pool of loans.

15    Q.  And focusing on the takeout commitment, I think earlier

16    Your Honor had a question about the takeout commitment.

17    That's a contract between which parties?

18    A.  The takeout commitment is a contract between the end

19    investor and TBW.

20    Q.  And if the contract -- if the AOT was working the way it

21    was supposed to be, how was it that Colonial Bank could get

22    the benefit of that contract?

23    A.  Colonial Bank would receive an assignment of that

24    takeout commitment that was entered into between the end

25    investor and TBW.

1    Q.  And at this point, once all of these documents were in

2    place, is that when money could be advanced to TBW?

3    A.  That's correct.

4    Q.  And taking the second -- the first step, all of these

5    documents have to be in place, money is advanced to TBW.  On

6    the second step how does that conclude?  What's the flow of

7    money at that point?

8    A.  The flow of money at this point, if it is a true

9    transaction, there is a separate agreement that has an

10   intermediary that the funds from the end investor are placed

11   in escrow, and when they are satisfied that the fund part of

12   the transaction has been met, they then release those funds

13   to Colonial Bank and they release the security to the end

14   investor.

15   Q.  And is everything that you've talked about up there at

16   the board, is that reflected in the contracts that govern

17   the AOT?

18   A.  Yes, sir.

19   Q.  I see you have some magnets in your hand there.  Were

20   you going to put something else up on the board?

21   A.  Yes, sir.

22   Q.  Okay.  What?

23   A.  So when all the paperwork is in place, when the

24   documents have been placed into the vault in the custody of

25   the department, the funds are sent by Colonial Bank to TBW.

1    Then within 30 to 45 days, after this transaction is in

2    place and the securities have been placed in here -- the

3    participation certificate has been placed in here, I should

4    say, and the mortgage documents, then the funds are sent by

5    the end investor down to the escrow or clearing agent, and

6    then the funds are ultimately transferred across here to

7    Colonial Bank's benefit from the clearing house and the end

8    investor is assigned the ownership interest in the mortgage-

9    backed security that TBW has arranged with the government

10    entity to initiate.

11    Q.  And there was some discussion earlier about the clearing

12    house.  Who was the clearing agent for that last step in

13    these transactions?

14    A.  The agreement is between the two parties and the Bank of

15    New York.

16    Q.  And I think you -- maybe you heard PwC say that Bank of

17    New York didn't care where the money was coming from; is

18    that true?

19    A.  I don't believe that's correct.

20    Q.  And did Bank of New York need to know whether the money

21    was coming from the right end investor?

22    A.  Yes, they have escrow responsibility so they would have

23    cared about where the money came from and where it was

24    supposed to go to.

25    Q.  Did Bank of New York have to report to Colonial Bank

1    where the money was coming from?

2    A.  Yes, sir.

3    Q.  I think we're done at the board, so if you could take

4    your seat.

5        THE COURT:  Okay.  I just have a quick question.

6    The original takeout commitment, you said, went from the end

7    investor to TBW, not to Colonial Bank?

8        THE WITNESS:  That's correct, Your Honor.  It was

9    between the end investor and TBW.

10       THE COURT:  So how does it turn out that

11   eventually the end investor ends up paying Colonial Bank?

12   You said there's an assignment.  Tell me about that again.

13       THE WITNESS:  The assignment, Your Honor, is where

14   the end investor agrees to give the money to the clearing

15   agent and TBW agrees that the funds can go to the clearing

16   agent for the benefit of Colonial Bank.

17       THE COURT:  I see.  Okay.  So although the

18   original arrangement is between the end investor, whoever

19   that is, and TBW, the assignments that take place

20   subsequently enable the money to -- if it were all going to

21   be the way it should go, Colonial Bank pays for the pool?

22       THE WITNESS:  Yes, Your Honor.

23       THE COURT:  And then the end investor pays

24   Colonial Bank?

25       THE WITNESS:  Yes.

1      THE COURT:  Because TBW would have assigned its

2   right to receive the money from the end investor to Colonial?

3      THE WITNESS:  That's correct, Your Honor.

4   Colonial Bank wants to know how it's going to be paid and it

5   enters into all the documents to make sure it is going to be

6   paid.  And the end investor agrees that it will pay for that

7   mortgage-backed security when it's generated.

8      MR. SORENSEN:  I was going to say we're about to

9   move into an area that will take some time.

10      THE COURT:  It will be a good place to break.

11      MR. SORENSEN:  Good place to break.

12      THE COURT:  I think everybody is glad to say that.

13   It's been a long day.  And rest assured, we have the air

14   conditioning going.  I don't know if you can tell, but it is

15   getting cooler.

16      See you back here and we'll start at 9:00 o'clock

17   tomorrow morning.  We'll all be in our places.  Counsel, if

18   you'll take a minute and discuss any problems that you

19   foresee coming up tomorrow, including the one we talked

20   about earlier.  We'll make the -- this day went, I think,

21   very smoothly and I would like tomorrow to do the same.

22      You may step down if you would, please.

23      THE WITNESS:  Thank you, Your Honor.

24      THE COURT:  Court will be adjourned for the day.

                    *   *   *

25

1

CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above
and foregoing constitutes a true and accurate transcript of
4    my stenograph notes and is a full, true and complete
transcript of the proceedings to the best of my ability.
5                          Dated this 19th day of September, 2017.

6

                          /s/_____
7                          Janice E. Dickman, CRR, RMR
                          Official Court Reporter
8                          Room 6523
                          333 Constitution Avenue NW
9                          Washington, D.C. 20001

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25