IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| The Colonial BancGroup, Inc., | ) | |
| and Kevin O'Halloran, as Plan | ) | |
| Trustee for the Colonial | ) | Civil Action |
| BancGroup, Inc., | ) | No. 2:11-cv-00746 - BJR |
| | ) | |
| Plaintiff, | ) | BENCH TRIAL |
| | ) | |
| vs. | ) | Washington, DC |
| | ) | September 26, 2017 |
| PricewaterhouseCoopers, LLP | ) | Afternoon Session |
| and Crowe Horwath, LLP, | ) | Time:  1:30 p.m. |
| | ) | |
| Defendants. | ) | |

_____

TRANSCRIPT OF BENCH TRIAL
HELD BEFORE
THE HONORABLE JUDGE BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE

_____

A P P E A R A N C E S

For the Plaintiff:  **David C Mullin**
Mullin Hoard & Brown LLP
500 S. Taylor
Suite 800
Amarillo, TX 79101
(806)372-5050
Email: Dmullin@mhba.com
**Stephen P. Sorensen**
Thomas Alexander Forrester &
    Sorensen LLP
14 27th Ave
Venice, CA 90291
(310)961-2536
Email: Ssorensen@tafsattorneys.com
**Ronald T Coleman, Jr.**
Parker, Hudson, Rainer & Dobbs LLP
285 Peachtree Center Avenue NE
1500 Marquis Two Tower
Atlanta, GA 30303
(404)420-1144
Email: Rtc@phrd.com

```
 1                              Nicholas J DiCarlo
                                DiCarlo Caserta McKeighan & Phelps
 2                              6900 E. Camelback Rd. Suite 250
                                Scottsdale, AZ 85251
 3                              (480)222-0914
                                Email: Ndicarlo@dcmplaw.com
 4                              John G. Turner, III
                                Mullin Hoard & Brown, LLP
 5                              P O Box 31656
                                Amarillo, TX 79120
 6                              Email: Jturner@mhba.com

 7    For the Defendants:       Philip S. Beck
                                Mark L. Levine
 8                              Bartlit Beck Herman Palenchar & Scott
                                54 West Hubbard Street, Suite 300
 9                              Chicago, IL 60654
                                (312)494-4411
10                              Email: Philip.beck@bartlitbeck.com
                                Email: Mark.levine@bartlitbeck.com
11                              Jameson R. Jones
                                Bartlit Beck Herman Palenchar & Scott
12                              1899 Wynkoop Street. 8th Floor
                                Denver, CO 80202
13                              Email: Jameson.jones@bartlitbeck.com
                                Meredith Moss
14                              King & Spalding LLP
                                1700 Pennsylvania Ave NW
15                              Washington, DC 20006
                                (202)626-2916
16                              Email: Mmoss@kslaw.com
                                Christopher D. Landgraff
17                              Bartlit Beck Herman Palenchar & Scott
                                54 W Hubbard St Ste 300
18                              Chicago, IL 60654
                                Email: Chris.landgraff@bbhps.com

19    _____

20    Court Reporter:           Janice E. Dickman, RMR, CRR
                                Official Court Reporter
21                              United States Courthouse, Room 6523
                                333 Constitution Avenue, NW
22                              Washington, DC  20001
                                202-354-3267

23

24

25
```

# Index

Gary Westbrook
     By Mr. Landgraff................................. 1391

*   *   *

1    * * * * * * * AFTERNOON SESSION * * * * * * *

2            THE COURT:  Okay.  Where are we?  Are you ready?

3            MR. LANDGRAFF:  Yes.

4            CROSS-EXAMINATION (Cont.)

5    BY MR. LANDGRAFF:

6    Q.  Mr. Westbrook, when we broke, we were looking at

7    Paragraph 2 of Exhibit A-400, which is the auditing standard

8    AU 316.

9            Do you recall?

10   A.  Yes.

11   Q.  We were talking about Paragraph 2.  Did you help prepare

12   some slides that summarize these bullet points so that we

13   could -- I said march through, and that's what I think led

14   us to the lunch break.  Did you help prepare slides to help

15   walk through that?

16   A.  Yes.

17   Q.  So I've got a slide on the board that contains these

18   bullets from Paragraph 2 of AU 316.  The first -- orient us.

19   The first two bullet points have some general information.

20   And then what -- what's happening there with the rest of

21   Paragraph 2 of AU 316?

22   A.  As you indicated, the first two bullet points are sort

23   of general information.  Then the remaining bullet points

24   are the actual captions from Paragraph 2.  And that's --

25   these are -- these are steps that would be expected in the

1  auditor's work with respect to fraud.

2  Q.  So the first bullet point, description and

3  characteristics of fraud, did your team understand the

4  characteristics of fraud?

5  A.  Yes.

6  Q.  And how do you know that?

7  A.  Well, we -- part of what we do each and every year is

8  that we have a planning meeting.  And in that planning

9  meeting, we discuss specific characteristics of fraud,

10  specific areas of fraud risk.  We have a brainstorming

11  session with respect to where we might consider fraud as a

12  possibility.  I also know that each of our staff has

13  undergone the appropriate technical training in both their

14  college and university work, and at the work -- the training

15  that the firm provides.

16  Q.  The second bullet of Paragraph 2, The Importance Of

17  Exercising Professional Skepticism, can you explain that?

18  A.  Yes.  This has been mentioned a few times in the

19  proceedings here.  It is important for auditors to exhibit

20  professional skepticism.  Again, in our brainstorming

21  session, that particular bullet point is also further

22  discussed.

23  Q.  This third bullet point begins the process that an

24  auditor's to consider, the processes and concepts for an

25  auditor to consider, as part of the consideration of fraud.

1   And this says, "Discussion among engagement personnel

2   regarding risks of material misstatement due to fraud."  And

3   that paragraph in full is on the screen from Paragraph 2 of

4   AU 316.

5           What is -- what is this step in the consideration

6   of fraud process?

7   A.  Well, it's really what I just mentioned, and that is

8   that the audit should have a meeting among engagement team

9   members, and fraud risk, and fraud characteristics, and what

10  our plans are with -- related to fraud should be discussed,

11  including the observations from single-level engagement

12  members as to their perspectives of fraud.  And then we're

13  also seeking input from others, including management from

14  that standpoint, as to -- as to where the risk of fraud may

15  be present.

16  Q.  Did those fraud brainstorming discussions take place

17  every year while you were the engagement partner?

18  A.  Yes.

19  Q.  I want to show you an early planning document, which is

20  A-308.  And what is the title of this work paper that's

21  A-308?

22  A.  Discuss Potential for Material Misstatements on the

23  Engagement.

24  Q.  Is this a work paper evidencing the fraud discussion for

25  the 2004 audit?

1    A.   Yes.

2    Q.   What's the purpose of this work paper?

3    A.   The purpose is to gather thoughts in a coherent memo, so

4    to speak.  It's what we used as a guide when we had

5    discussions with the full engagement team.

6    Q.   I want to go to page 7 of Exhibit A-308, a slide

7    showing -- to be fair, a slide showing Page 7 of Exhibit

8    308.  And what is contained on Page 7 of A-308?

9    A.   This is part of the discussion that we had with the

10   engagement team.  It's entitled, "Potential Fraud Risk

11   Factors and Conditions."  It lists out a number of areas

12   where fraud risk, we believed, could be present.

13   Q.   Were you present at these fraud brainstorming discussions?

14   A.   Yes.

15   Q.   Going through Page 8 of 308, what's shown here?

16   A.   Well, the top part of the -- the top part of the

17   document, is that what you're referring to?

18   Q.   Yeah.

19   A.   That's a -- an item.  It's called incentives for

20   management to commit fraud.  It's where we take a look at

21   how people might be incented to commit --

22             THE COURT:  Could you make it bigger, please?

23             MR. LANDGRAFF:  Sure.

24             Is that better, Your Honor?

25             THE COURT:  Much better.

1    THE WITNESS:  So here, what we're noting is that

2  senior management has compensation plans that are managed on

3  the financial performance of the company.  So certainly,

4  senior management could benefit financially if the financial

5  performance of the company is good.

6    Other than senior management, we also noted that

7  there were no other employees whose compensation was

8  directly related to the financial performance of the company.

9  BY MR. LANDGRAFF:

10  Q.  How does this fraud brainstorming session play into the

11  planning of the audit?

12  A.  Well, this is typically a portion of our overall

13  planning meeting.  For each engagement, we do have a

14  planning meeting that all of the expected members of the

15  engagement team attend.  So, you know, prior to this,

16  usually, the senior manager will have gone through a number

17  of documents and discussions with management, trying to

18  gather our thoughts with respect to what should be presented

19  in the planning meeting.  And then, certainly, this becomes

20  a major element of that planning meeting.

21  Q.  I want to go to the next bullet point after the

22  brainstorming bullet point, "Obtaining the Information

23  Needed to Identify Risks of Material Misstatement Due to

24  Fraud."  And again, this paragraph, this portion of

25  Paragraph 2 of AU 316, spells out four different

1    requirements.

2            Do you see that?

3    A.  Yes.

4    Q.  So this first requirement of this bullet point is

5    "Inquiring of Management and Others Within the Entity about

6    the Risks of Fraud."

7            Can you explain to the Court what that means?

8    A.  Well, it means a couple of things.  First, in our

9    planning, we typically will have detailed discussions with

10   senior level management and others within the organization

11   with respect to where they may have concerns with respect to

12   fraud.

13           We also discussed with them whether they know of

14   any instances of fraud.  We try to elicit information as to

15   how management views its own organization and the risk of

16   fraud that may exist there.

17   Q.  And are these inquiries documented in the work papers?

18   A.  Yes.

19   Q.  So I'm going to show you D-1765.  And I will make it

20   bigger.  I just want to get the title, and then we'll go

21   to -- what's the title of this -- of the work paper that's

22   Exhibit D-1765?

23   A.  "Inquire of Management and Others Regarding Risks of

24   Material Misstatement."

25   Q.  And if we go into Page 4 of Exhibit D-1765, what does

1    this show?

2            MR. SORENSEN:  Objection.  Foundation.

3            MR. LANDGRAFF:  Your Honor, this is an agency work

4    paper.

5            MR. SORENSEN:  Your Honor, it hasn't been

6    established that he actually saw this.  There's a list of

7    reviewers.  Before he speaks about the documents.

8            THE COURT:  Overruled.

9            THE WITNESS:  This is where the year-end

10   discussions with respect to fraud, the discussions that we

11   had with individuals within the organization, this is each

12   of these -- well, the right-hand side represents a Word

13   document where we document those discussions with the

14   individuals.  And then on the left-hand side, there's a

15   reference to other sections of the work paper where those

16   discussions are documented.

17   BY MR. LANDGRAFF:

18   Q.  Who's Mr. Lowder?

19   A.  Mr. Lowder was the CEO and chairman of the company.

20   Q.  Who was Sara Moore?

21   A.  She was the CFO.

22   Q.  Flake Oakley?

23   A.  He was, at this time, the president.

24   Q.  Who is Sheila Moody?

25   A.  Ms. Moody -- this is in 2004.  Ms. Moody was chief

1  accounting officer.

2  Q.  Did you also interview the audit committee?

3  A.  Yes.

4  Q.  How is that executed?  Do you interview them

5  individually or meet with the committee?

6  A.  No.  We -- as I mentioned this morning, we meet with the

7  audit committee at least four times a year.  My recollection

8  is that in every one of those audit committee meetings, we

9  report to the audit committee with respect to our

10  observations of -- if we've seen any fraud, been made aware

11  of any fraud.  And we also ask the audit committee if they

12  have been made aware of any fraud.

13  Q.  You mentioned D-1765 is a year-end work paper.  Were

14  these fraud inquiries made throughout the year?

15  A.  Yes.  During each of the quarters when we're doing our

16  quarterly review work, we had discussions with many members

17  of senior management as part of that work.  And included in

18  those discussions would be discussions directed towards

19  fraud.

20  Q.  Did anyone during their interviews ever tell the PwC

21  that they suspected fraud?

22           MR. SORENSEN:  Objection.  Hearsay.

23           THE COURT:  Overruled.

24           THE WITNESS:  No.

25  BY MR. LANDGRAFF:

1    Q.  Now, these inquiries seem a little counterintuitive.

2    Was it the audit team's expectation that someone would

3    confess to a fraud when they were interviewed about whether

4    there was a fraud going on?

5    A.  I certainly don't think that a reasonable person would

6    necessarily expect someone to raise their hand and say,

7    "Hey, I did it.  You got me."

8           But what we are asking individuals in these

9    interviews is, "Do you have any suspicions?  Has anything

10   come to your attention that you don't think is quite right?

11   Has anyone asked you to do something that you just don't

12   feel that comfortable about?  Now is your chance, you know,

13   let's discuss that."

14          And I will say that, you know, I've heard at least

15   some say that fraudsters, once they're caught, when they're

16   asked, you know, "Why'd you do it?  Why'd you keep doing it?

17   Why didn't you tell somebody?"  There are occasions when

18   they say, "Nobody ever asked."

19   Q.  Back to AU 316, Part B of this bullet talks about

20   considering the results of the analytical procedures

21   performed in planning the audit.

22          What is an analytical procedure?

23   A.  An analytical procedure can take many forms.  The

24   typical analytical procedure is -- one is comparing

25   information, most likely actual information that occurs

1  throughout the organization, maybe comparing it to budget

2  information, to peer company information.  Could be

3  comparing to simply expectations that are -- that are --

4  that exist.  So it can take many forms.  But typically, it's

5  a comparison of actual information to some other dataset.

6  Q.  What are you looking for when you're making the

7  comparison between, say, a budget and what's actually

8  happening, as it relates to a fraud consideration?

9  A.  Well, with respect to fraud consideration, you're

10  typically looking for information that -- if you know

11  that -- if you know that, for example, the loan balances

12  have gone up, then you would necessarily expect that loan

13  interest income would have increased; if, in fact, interest

14  rates were remaining the same.  So it's items like that,

15  that you're trying to make sure that changes in one area

16  would also create changes in another area with your

17  expectation.

18  Q.  Did PwC perform analytical procedures on the Mortgage

19  Warehouse Lending division every year for which you were the

20  engagement partner?

21  A.  Yes.

22  Q.  I'm going to show you Exhibit A-14 and ask you to

23  identify it -- excuse me, A-114.

24  A.  This is performed preliminary analytical procedures.

25  Q.  And what's the purpose of this work paper?

1    A.  Well, again, this is in the planning stages of our

2    audit, so we are trying to -- we're performing these on a

3    preliminary basis; so we're building some level of

4    expectation with respect to what's going on in various

5    balances in the company.

6         We also do these types of analytical reviews at

7    the end of each quarter; so we've got a -- a carrying basis

8    of knowledge that goes on throughout the year.

9    Q.  It's a lengthy document.  I want to show a couple of

10   examples of the work that was done.  This is from Page 61 of

11   Exhibit A-114.

12        Let me go back and just ask you:  What is this

13   page showing here?  And I'm going to cull it out so it's a

14   little bigger.

15   A.  I think if you went back to the beginning of this

16   section, you would see that what is being evaluated here,

17   what's being analyzed, is -- I think it's interest income

18   and fees.  And so we -- we've gone through each sort of

19   major area of -- that generates interest income and fees and

20   are trying to see what sort of trends are going on and

21   whether those trends make sense in the broader sense.

22   Q.  So let's look at the Mortgage Warehouse Lending piece of

23   this portion of A-114.  Explain what's shown there, and then

24   what the expectation, defined difference, and compute

25   difference tells you.

1  A. Well, what this indicates is that during this period,

2  fed fund rates were increasing, which generally should also

3  impact, ultimately, mortgage rates, and that our expectation

4  would be that because of these rising interest rates, that

5  there should be associated increases in interest and fee

6  income associated with Mortgage Warehouse Lending.

7  Q. So does that show that there was an increase in fees?

8  A. Yes.

9  Q. What does that indicate to the auditor?

10  A. Well, what it indicates to the auditor is that, yes,

11  they are showing revenues that would be in a consistent

12  directional relationship to the -- to the interest rate

13  environment.

14  Q. If the analytical procedure indicates that the

15  expectation, such as rising fees in a rising interest rate

16  environment isn't met, if that expectation isn't met, what

17  does the auditor do with that information?

18  A. Well, if the expectation isn't met, then the auditor

19  should, you know, delve further into that area, discussing

20  with management exactly what's going on and what's creating

21  some expectation that's not being met.

22  Q. We're to Paragraph C now of this "Obtaining Information

23  Needed to Identify the Risks of Material Misstatement Due to

24  Fraud on an AU 316." This Subpart C says, "Considering

25  Fraud Risk Factors."

1       Did the audit teams consider fraud risk factors?

2   A.  Yes.

3   Q.  Showing you A-219.  And again, just to orient us, what

4   is A-219?

5   A.  This is a 2008 work paper.  It's entitled, "Fraud Risk

6   Assessment Memo."  What it is, is that in -- all of these

7   fraud steps are retained in each of the databases that are

8   under review here.

9       In 2000 or so, or in 2008, we introduced a new

10  tool, so to speak, this Fraud Risk Assessment Memo, where

11  we, essentially, accumulated all of the fraud areas or all

12  the fraud work that was done in this -- like this one

13  document.

14  Q.  And going to Page 8 of Exhibit A-219, what is this part

15  that's culled out, Paragraph C, show?  Let me make that

16  bigger.  Did I make it too big?

17      THE COURT:  Too big?  No.  Not at all.

18  BY MR. LANDGRAFF:

19  Q.  What is Paragraph C, if I didn't cut it off,

20  Mr. Westbrook?

21  A.  This is a discussion of fraud risk factors that could

22  exist.  Typically, in -- with respect to fraud, you're

23  looking at incentives and pressures that may exist for

24  someone to commit fraud.  You're looking for -- if

25  opportunities exist for people to commit fraud.  And then

1    you're also looking at does the company have a tone of --

2    or, attitude of rationalization or they just don't take it

3    seriously, that's a risk factor.

4    Q.  Back to this bullet point, "The final requirement is

5    considering certain other information," what does that mean?

6    A.  I think it means, really, looking at items from a macro

7    standpoint.  It could be making sure that in your fraud

8    assessment, you're taking into account what's going on in

9    the economy.  You're taking into account what you might know

10   from individuals and what's going on in their lives and

11   their world.  So it could mean a lot of different things.

12   Q.  If we go back to A-219 at Page 8, is there a portion of

13   the work paper where the Fraud Risk Assessment Memo

14   discusses this "Considering Other Certain Information"?

15   A.  Yes.

16   Q.  Let's go back to Paragraph 2 bullets.  In the next

17   bullet that you're supposed to consider is "Identifying

18   Risks that May Result in a Material Misstatement Due to Fraud."

19          Did PwC do that?

20   A.  Yes.

21   Q.  If you go to the section, the actual text of Paragraph 2

22   of AU 316, it refers to audit committee, internal audit

23   function, and the existence of a formal code of conduct.

24          Do you see that?

25   A.  Yes.

1  Q.  You talked -- testified earlier, when Mr. DiCarlo was

2  asking you questions, about the audit committee.  And your

3  view was, I believe you testified, that it was effective; is

4  that right?

5  A.  Yes.

6  Q.  What was the role of the audit committee?

7  A.  The audit committee was a subcommittee of the board of

8  directors.  It operated under a written charter.  That

9  charter called for the committee to have oversight

10 responsibility for the company's financial controls,

11 oversight for the company's internal audit functions.  It

12 oversaw the company's hotline and whistleblower activities.

13        It also would have -- at its meetings, it would

14 have discussions and presentations from senior level

15 managers on a variety of subjects.  And, I guess, finally,

16 it has under the -- under its charter the ability to hold

17 investigations, if that ever became necessary.

18 Q.  Did the regulators -- or, the SEC, does someone set

19 standards for qualifications for someone to serve on the

20 audit committee of a publicly traded company?

21 A.  Yes.  The New York Stock Exchange has certain rules.

22 The SEC has certain rules.

23 Q.  Can you describe those rules at a high level of what the

24 qualifications need to be for someone to sit on that

25 committee?

1    A.  The audit committee should consist of what's called

2    independent directors, and that means that those directors

3    do not have a significant financial tie or familial tie to

4    the company or to the senior leaders of the company.

5            The rules also speak to financial literacy.

6    Financial literacy is defined as someone having the

7    necessary skills to read and understand a set of financial

8    statements as prepared.

9            And then there is a concept of financial expert,

10   financial statement expert -- I guess it's financial expert,

11   where that goes a little bit deeper and would typically be

12   someone or ones who have particular expertise in either

13   preparing financial statements or supervising those who

14   prepare financial statements.

15   Q.  I want to show you a proxy from 2008 which is

16   defendant's -- or D-1419, 1419.  I'll cull out -- I can make

17   that bigger.  And what does the highlighted section tell us

18   about the audit committee members?

19   A.  This is from the company's definitive proxy, I think,

20   from 2007.  And what this indicates is that the board has

21   determined that all members of the audit committee are

22   independent and that each member of the audit committee

23   satisfies the experience and financial literacy requirements

24   established by the New York Stock Exchange.

25           In addition, the board has determined that two of

1   its members, Lewis E. Beville and Hubert L. Harris, Jr.,

2   qualify as audit committee financial experts as defined by

3   the New York Stock Exchange and the SEC rules.

4   Q.  And we saw that this bullet point also mentioned

5   internal audit -- that's not what I wanted to do.  Mentioned

6   internal audit as a function to consider.  What was the

7   internal audit function at Colonial Bank?

8   A.  When Colonial Bank had an executive level officer, it

9   was entitled the general auditor.  And that individual was

10  responsible for essentially coordinating the internal audit

11  function on behalf of the audit committee and management.

12         The general auditor and the audit committee

13  actually hired an outside firm, Crowe Chizek.  And Crowe

14  Chizek actually performed the various internal audits on

15  behalf of management, reported directly to the auditor who

16  then reported directly to the audit committee.

17  Q.  Before we get to Crowe, what is the name of the general

18  auditor for most of the years that you served as the

19  engagement partner?

20  A.  Young Boozer.

21  Q.  And I believe the judge heard of Mr. Boozer before.

22         Did he have someone who reported to him in his

23  internal audit group who was devoted to Mortgage Warehouse

24  Lending?

25  A.  Yes.  They had an individual.  Her name was Pam Vitto,

1    who actually resided in Orlando and worked on internal audit

2    projects with respect to Mortgage Warehouse Lending on an --

3    on an -- well, a continuous basis.

4    Q.  Was she a full-time internal auditor of Mortgage

5    Warehouse Lending?

6    A.  Well, she was a full-time internal auditor for Colonial

7    Bank.  She was housed in Mortgage Warehouse Lending.

8    Q.  Fair enough.

9        To whom did she report?

10   A.  She reported to Mr. Boozer and Mr. Stan Julian, who was

11   the chief compliance officer for the bank.

12   Q.  Did Ms. Vitto report to Ms. Kissick?

13   A.  No.

14   Q.  You mentioned Crowe.  Who is Crowe Chizek?  We've heard

15   their name.  Who are they?

16   A.  Well, the Court has heard big four accounting firms.

17   Crowe, I would say, is sort of the next level, regional

18   firm.  There're three actually, I think, based in Chicago.

19   They've got operations throughout the country.  They're a

20   big firm, with a variety of clients and operations.

21   Q.  Did Crowe have experience in banking?

22   A.  Yes.

23   Q.  How do you know that?

24   A.  Well, I knew some of the individuals who worked on the

25   account from prior exposure.  But we also -- each year, we

1   would evaluate the competency and effectiveness of Crowe.

2   And that would include reviewing résumés and having

3   discussions with Crowe's employees.

4   Q.  Did Crowe issue reports on its work, written reports?

5   A.  Yes.

6   Q.  Did they test control areas of the bank?

7   A.  Yes.

8   Q.  What controls did Crowe test?

9   A.  Well, Crowe tested controls in, really, every area of

10  the bank.  They also tested not only financial reporting

11  controls, but also controls over compliance.  And they also

12  looked at processes of the company in the course of their

13  internal audits.

14          But their scope was:  Throughout the banking

15  organization, they tested all of the company's key internal

16  controls of the financial reporting.

17  Q.  They tested all of them?

18  A.  Yes.

19  Q.  Did they do that every year?

20  A.  Yes.

21  Q.  I'm going to show you an internal audit plan from Crowe;

22  it's Exhibit A-259.  I'm showing you the first page.

23          Can you identify what A-259 is?

24  A.  This is a -- this is sort of a joint document.  It

25  represents the internal audit department's working with

1    management and coming up with its 2008-2009 risk assessment

2    for the organization and then also includes the internal

3    audit plan for the organization.  And you'll note that the

4    period covered here, they had a fiscal year on which they

5    did their internal audits, so this goes from April 1 of '08

6    through March of '09.  And this document was presented to

7    the audit committee.

8    Q.  Does that mean you would have received it as part of the

9    audit committee package?

10   A.  Yes, this was included in the audit committee package.

11   Q.  I want to go to the part of the plan where they break

12   out their budget.  This is Page 110 of Exhibit A-259.  And

13   just to get to the bottom line, how many hours did Crowe

14   budget to spend on its internal audit work on these controls

15   for this Fiscal Year '08?  Oh, I'm sorry.  I said "fiscal."

16   For their Internal Audit Year '08?

17   A.  17,933 hours.

18   Q.  Does that include Ms. Vitto's time?

19   A.  No.

20   Q.  How does that 17,933 hours compare with the number of

21   hours that PwC spent on conducting its financial statement

22   audit of Colonial?

23   A.  I think that we are -- our typical budget was somewhere

24   around 3,500 to 4,000 hours; so it represented more than

25   four times the number of hours.

1  Q.  Was Crowe onsite every day at Colonial?

2  A.  Yes.

3  Q.  Did Crowe have internal auditing members devoted

4  entirely to Colonial full-time throughout the year?

5  A.  Yes.

6  Q.  Did Crowe review the Mortgage Warehouse Lending

7  Division?

8  A.  Yes.

9  Q.  How often did they do that?

10  A.  At least annually.

11  Q.  And was PwC given copies of Crowe's reports on Mortgage

12  Warehouse Lending as a matter of course?

13  A.  Yes.

14  Q.  And we'll discuss those when we go through the controls

15  part of the audit.

16          But did Crowe ever alert PwC to finding fraud in

17  the Mortgage Warehouse Lending division while you were the

18  engagement partner?

19  A.  No.

20  Q.  The final part of this paragraph that I wanted to go

21  through with you is the -- AU 316, Paragraph 2 on this

22  bullet.  It talks about formal code of conduct.  Did

23  Colonial have a formal code of conduct?

24  A.  Yes.

25  Q.  What is it?  What is a formal code of conduct?  What's

1  the point?

2  A.  Well, the point is for employees to have a document

3  which expresses senior management and board's views as to

4  how they should be expected to conduct themselves on a

5  day-to-day basis in the transactions of the bank.  It really

6  kind of lays out the tone and the attitude senior management

7  has in -- it mentions here "existence and enforcement of a

8  formal code of conduct."  The bank had employed processes in

9  which it required employees to annually certify that they

10  had read, understood, and complied with the code of conduct.

11  Q.  I want to go to a work paper that's Exhibit A-116 and

12  ask you to identify it.  And we'll look at the code of

13  conduct.

14       What is A-116?

15  A.  This is a 2004 work paper.  It's Management's Antifraud

16  Programs and Related Controls.

17  Q.  If we go into the document itself, showing Page 4 of

18  Exhibit A-116, what does this document show?

19  A.  In general, it discusses what -- the code of conduct and

20  ethics that exist, how it's put together.  This is a

21  description of the overall control environment of the

22  company.

23  Q.  I want to go to one page in particular -- sorry -- one

24  part in particular, Page 6, cull it out.  This ethics

25  hotline and whistleblower program, what is -- what's the

1  hotline and whistleblower program?

2  A.  The company had a system.  It was an outside vendor

3  called EthicsPoint.  It provided two things.  One was a

4  internet-based way for employees to -- that if they had

5  concerns with respect to the code of conduct or other

6  matters related to doing their job, that they could report

7  that on an anonymous basis.  There was also a telephone

8  hotline that they could also call and report such things on

9  a anonymous or a named basis.

10  Q.  Was PwC made aware of reports on the ethics hotline?

11  A.  Yes.

12  Q.  How were you made aware?

13  A.  The way the system was set up is that EthicsPoint would

14  report any matters that had come through to the general

15  auditor, Mr. Boozer.  Mr. Boozer would then make

16  determination as to what needed to be done with respect to

17  the -- to what had been reported.  And then Mr. Boozer would

18  make reports to the audit committee as to any reports that

19  had come through and what had been done with respect to

20  those reports.  And then we would get those in the course of

21  attending the audit committee meetings.

22  Q.  Was there ever a call or report on the ethics hotline

23  relating to the fraud in the Mortgage Warehouse Lending

24  Division?

25  A.  No.

1    Q.  I'll go back to AU 316, the next bullet, "Assessing the

2    Identified Risks After Taking into Account an Evaluation of

3    the Entity's Programs and Controls."  We go to that part of

4    the guidance.  It talks about assessing the risk --

5    evaluating the entity's programs and controls.  We'll get

6    into detail about the internal controls evaluation later.

7            But did PwC evaluate internal controls every year

8    at Colonial?

9    A.  Yes.

10   Q.  The next bullet is "Responding to the Results of the

11   Assessment."  And that section culls out some points of

12   emphasis.

13           Can you explain what this section of AU 316 is

14   discussing?

15   A.  This is simply telling the auditor that when the risk of

16   fraud exist, that there's certain responses that should be

17   made.  And this is giving guidance with respect to those

18   responses.

19   Q.  Is this basically talking about how you're going to

20   execute the audit plan?

21   A.  Yes.

22   Q.  And the next slide I put up is from A-117, Page 3.  What

23   does this indicate?

24   A.  This is indicating how we respond to the results of the

25   assessment.  It indicates that certainly we're having

1    frequent meetings with senior management, discussing plans,

2    action performance versus budget, any notable items or

3    expectations.  We do disaggregating analytical reviews with

4    respect to income statement.  We're looking at those trends

5    that we talked about earlier.

6    Q.  The next bullet, Paragraph 2 of AU 316, "Evaluating

7    Audit Evidence."  And, again, this gives -- this section of

8    Paragraph 2 gives a little more guidance about assessing

9    that evidence.

10           Can you explain what's being described here?

11   A.  This is giving the auditor guidance with respect to

12   matters that we may come across during the course of an

13   audit.  Specifically, if we discover a misstatement,

14   whether -- that -- that you're also supposed to evaluate

15   whether a misstatement may have occurred because of some

16   kind of fraud; is it indicative of fraud?

17   Q.  Is this evaluation -- when is this evaluation done?

18   A.  Typically, this evaluation -- well, it's done

19   continuously.  But certainly, you reach conclusions near the

20   end of the audit.  You're evaluating your audit evidence

21   that you've obtained on both the financial -- financial

22   statements and the controls work that you've done.

23   Q.  And I'm showing an excerpt.  It's actually a table of

24   contents from Exhibit A-219.  It's Page 6.  And does the

25   Fraud Risk Assessment Memo provide an overall framework for

1    evaluating the evidence that the auditors have encountered?

2    A.  Yes.

3    Q.  I'm going to go to the second-to-the-last bullet, the

4    penultimate bullet in Paragraph 2 of AU 316.  It talks about

5    communicating about fraud to management, the audit

6    committee, and others.

7         When, if at all, is that communication conducted?

8    A.  Well, we certainly communicate, I would say, constantly

9    about fraud.  But formally, we do what's called a SAS 61

10   communication.  It's a -- auditor's required communications

11   to the audit committee.  That's done every quarter and at

12   year-end.  One of the matters that is always discussed in

13   those SAS 70 communications is direct communication to the

14   audit committee as to what we've seen with respect to fraud.

15   It also gives us an opportunity to have direct conversations

16   with the committee about the subject of fraud and what their

17   views are.

18   Q.  So I'm showing you a cover page, which is D-1741.  Can

19   you -- or, just explain what this is.

20   A.  This looks to be a quarterly review external file.

21   Q.  And it's a lengthy document.  We've got excerpts from

22   it.  Page 184 of Exhibit 1741, what is that?

23   A.  This is a cover letter that we would typically include

24   in our presentation of the audit committee.  It lays out our

25   SAS 61 communications.

1    Q.  What is a -- please explain to the Court, and me, what's

2    a SAS 61 communication?

3    A.  That's these required communications that I just talked

4    about.

5    Q.  So if we go to Page 189 of Exhibit D-1741, there's this

6    cull-out on "Fraud and Illegal Acts."

7             What is shown here?

8    A.  This is just laying out, particularly on the left-hand

9    side, particular areas that we have specific communications

10   to the audit committee on.  This is for the third quarter of

11   '04.  And this is consistent with what we would have in

12   other quarters in year-end.

13            This on -- the right-hand side, it's giving the

14   committee our views in a very broad stroke on fraud and

15   illegal acts and what we've seen to date with respect to

16   those subjects.

17   Q.  And then a few pages later in this letter, there's

18   another mention, another cull-out of fraud and illegal acts.

19   And it refers to this third-quarter accounting and reporting

20   matters for further discussion.

21            Do you see that?

22   A.  Yes.

23   Q.  That's on Page 192 of Exhibit D-1741.

24            What is the third-quarter accounting and reporting

25   matters?  Why is that related to fraud and illegal acts?

1    A.  Well, that's -- that's just a discussion that we just

2    had there.  But this is noting that we've noted no fraud or

3    any illegal acts at this date.

4             THE COURT:  How are we doing, Counsel?  Are we

5    almost through with this?

6             MR. LANDGRAFF:  Yes.

7             THE COURT:  Okay.  Because you said there was one

8    more?

9             MR. LANDGRAFF:  There's one more bullet.

10            THE COURT:  Okay.

11            MR. LANDGRAFF:  We're getting there.

12   BY MR. LANDGRAFF:

13   Q.  What is this letter, this -- that was referred to in

14   the -- sorry, not letter.  This third-quarter accounting and

15   reporting matters, why are you bringing that to the audit

16   committee's attention in this quarterly report?

17   A.  These are items that we noticed during the course of our

18   review that could have a significant impact on the bank and

19   its operations.  We see some transactions that we noted.  We

20   see some hurricane losses that we talk about.  We've got

21   some branch closings.  We've got some information with

22   respect to the loan-loss allowance.

23   Q.  The final bullet of Paragraph 2 of AU 316, "Documenting

24   the Auditor's Consideration of Fraud," where is that done?

25   A.  In the 2008 work papers I mentioned, that was all done

1   in that one document, the FRAM, as it was called.  In other

2   years it was documented in -- principally, in critical

3   matters and in other areas of the work papers.

4   Q.  Did PwC plan and perform its audit of Colonial's

5   year-end financial statements in accordance with the

6   organization of AU 316?

7   A.  Yes, we did.

8   Q.  Is there anything that came to your attention during

9   your time as the engagement partner that led you to suspect

10  that there was fraud going on in the Mortgage Warehouse

11  Lending Division?

12  A.  No.

13  Q.  Is there anything that came to your attention during

14  those audits in which you were the engagement partner that

15  led you to suspect that Taylor Bean was engaging in a fraud?

16  A.  No.

17  Q.  I'm going to move on to the controls discussion, and

18  that was one of the audit strategies and approaches you

19  mentioned.  It was also one of the items that you consider

20  as part of the fraud consideration; is that right?

21  A.  Yes.

22  Q.  Let's first talk about what you saw at Mortgage

23  Warehouse Lending and within Colonial itself.  How many

24  employees did the Mortgage Warehouse Lending Division have?

25  A.  I think it was probably 80 to 100.

1    Q.  We've heard it was located in Orlando.  Did it concern

2    you that Mortgage Warehouse Lending was located outside of

3    the bank's headquarters in Montgomery?

4    A.  No.

5    Q.  Why not?

6    A.  Well, as we talked before, the bank had operations in

7    several different places throughout the United States.

8    Mortgage Warehouse Lending just happened to be in Orlando.

9    Q.  When you came on board as the engagement partner, what

10   did you learn about Cathy Kissick's experience in the

11   Mortgage Warehouse Lending industry?

12   A.  My understanding was that Ms. Kissick and some of her

13   team were actually hired away from a competitor of the bank

14   to start the Mortgage Warehouse Lending area for the -- for

15   Colonial.  It's my understanding that Ms. Kissick was a

16   seasoned individual in Mortgage Warehouse Lending, that she

17   had lots of prior experience.

18   Q.  Did Ms. Kissick make a presentation to the audit

19   committee meeting that you attended?

20   A.  Yes.

21   Q.  I want to show you Exhibit A-279.  Can you identify what

22   this document is?

23   A.  This was a presentation Ms. Kissick made at the April

24   17th, 2007 audit committee meeting.  It was included in the

25   documents that were prepared for the audit committee, a copy

1    of which we got.

2    Q.  Were you present at that audit committee meeting?

3    A.  Yes.

4    Q.  If we go to Page 5 of Exhibit A-279, it lists, "Business

5    Overview Asset Types."  Are these asset types, the big four

6    items listed there, is that consistent with your

7    understanding of the various forms of transactions for the

8    funding of mortgages that Colonial was engaged in?

9    A.  Yes.

10   Q.  I want to go to the "Mortgage Loans Held For Sale"

11   portion and walk through that.  And that's COLB, right?

12   You've heard that?

13   A.  That's right.

14   Q.  It says, first bullet, "Mortgage Loans Purchased from

15   Mortgage Warehouse Lending Customers."  What did that tell

16   you?

17   A.  Well, it told me that the bank was purchasing mortgages

18   from their customers.

19   Q.  And TBW was one of the customers, right?

20   A.  Yes.

21   Q.  The second bullet, explain that, please.

22   A.  This describes for the audit committee that the bank

23   would typically buy 99 percent of participation interest in

24   the underlying mortgage loan.

25   Q.  The third bullet, "Colonial Benefits."  Let's take these

1    one at a time.  First, "A 50 Percent Risk Work Weight," what

2    does that mean?

3    A.  The regulators have risk weights that are applied to

4    various line items within the balance sheet, various asset

5    types.  The COLB, because it represented a participation

6    interest in an underlying mortgage loan, was assigned less

7    risk weight than, say, a loan under the working capital

8    loan.  And so what it meant was that the regulator's view of

9    these types of assets, it is considered, from a regulator's

10   standpoint, less risky for the bank to hold those types of

11   assets and, therefore, they require them to hold less

12   capital in support of those assets.

13   Q.  And it says, "No loan loss reserves, less risk

14   concentration since asset is a loan to individuals," what

15   does that mean?

16   A.  Well, it means that rather than a concentration -- let's

17   say you've got a loan to an individual company for a million

18   dollars.  Rather than having a concentration -- a credit

19   risk to that company for a million dollars, what you've

20   acquired is an asset that puts your risk at, say, ten loans

21   of $100,000 each for that same million dollars.

22   Q.  This last bullet, "Customer benefit off balance sheet

23   treatment," what does that mean?

24   A.  Well, it means that in these transactions, because

25   they're purchases and sales, the customer takes those assets

1    off of its balance sheet when they are acquired by Colonial.

2    Q.  Ms. Kissick also talked about securities process

3    purchased under agreement to resell or AOT; do you see that?

4    A.  Yes.

5    Q.  And explain this first bullet.  You talked about COLB --

6    Ms. Kissick talked about it having a 50 percent risk weight.

7    Explain the AOT risk weight.

8    A.  It's a similar concept.  Except under regulatory rules,

9    what she's saying is that for these types of assets, the

10   regulators require only a 20 percent risk weight.  Meaning

11   that from a regulatory standpoint, they're viewed as less

12   risky from a credit standpoint.

13   Q.  And what did that mean practically for the bank, as far

14   as its capital reserve requirements, when something got a

15   lower risk weight, in the eyes of a regulator?

16   A.  Well, it meant that Colonial's capitol could be deployed

17   elsewhere, if necessary.

18           THE COURT:  Is that because they didn't have to

19   keep a backup amount?

20           THE WITNESS:  Yes, ma'am.

21           THE COURT:  What's MBS?

22           THE WITNESS:  Mortgage-backed security.

23           THE COURT:  Okay.

24   BY MR. LANDGRAFF:

25   Q.  On Page 8 of Ms. Kissick's audit committee presentation

1  she goes through some of the characteristics of the loans in

2  the COLB program that were being purchased.  Can you explain

3  what these mean:  The A jumbo paper, Alt-A, A-Minus, what

4  that indicated about the nature of the loans that were being

5  purchased?

6  A.  Yeah, I think it probably would be worthwhile to kind of

7  right-size where we are here.  I mean, this is April of '07.

8  There's the beginnings of, certainly, stress in the market

9  over subprime lending.  And the audit committee did have

10  specific questions and concerns with respect to whether

11  Colonial was entering into transactions that equated to

12  subprime lending.  So what Ms. Kissick is informing the

13  committee here is that they -- or, they either -- well, they

14  either lend to their customers amounts so that they can

15  originate A-rated paper on jumbo loans, or they're

16  purchasing in the COLB and AOT products mortgage loans that

17  would be rated A because they're being underwritten under

18  the requirements of Fannie Mae, Feddie Mac, and Ginnie Mae.

19       She is saying that they do have some Alt-A

20  products, but she qualifies that, that that's typically --

21  the ones that they would accept would be of a high credit

22  nature; she says an average of in the 700 FICO range.  But

23  that in those cases, they may be looking at some form of

24  alternate documentation.  She does say that they've got some

25  A-minus product, and then that they've got some interest-only

1   adjustable rate mortgages.

2   Q.  And she talked about credit risk management at Page 13

3   of A-279.  And there's this mention of "independent

4   third-party operations audit."  What is that?

5   A.  Mortgage Warehouse Lending, as a part of its processes

6   and its control structure, on any new company relationship,

7   they would require independent third-party operations

8   audits.  They employed a company by the name of Mortgage

9   Dynamics, Inc., MDI.  And each year it was their -- it was

10  their policy to have Mortgage Dynamics, Inc. perform an

11  on-site operations review of their individual Mortgage

12  Warehouse Lending customers.

13  Q.  On Page 17 of the presentation Ms. Kissick gave the

14  audit committee, she talks about "Risk of warehouse client

15  fraud or mortgagee fraud" and then lists "risk mitigants."

16          What type of fraud was Ms. Kissick discussing at

17  the audit committee?

18  A.  Well, she's discussing fraud committed against the bank

19  from their customers, principally, and all of the things

20  that they believe they had in place to help mitigate those

21  risks.

22  Q.  And are those risk mitigants part of the internal

23  controls that were in place at Colonial?

24  A.  Yes.

25  Q.  What's the first one, the third-party operations review?

1  Is that the same thing that we just saw?

2  A.  Yes, MDI reviews.

3  Q.  Underwriting, what is this control that was in place?

4  A.  Mortgage Warehouse Lending had a group that were called

5  Collateral Analysts.  And it was the Collateral Analyst's

6  job to ensure that proper collateral was being received for

7  each and every one of the assets that Colonial was bringing

8  on board.

9  Q.  We've heard some mention of ProMerit.  Can you explain

10  to the court what ProMerit is?

11  A.  ProMerit was the computer system, the software system

12  that Mortgage Warehouse Lending used to record its various

13  Mortgage Warehouse Lending activities.

14  Q.  Was that a -- an internal control?

15  A.  Well, certainly, just having the software is not an

16  internal control, but designed inside the software were

17  certain edit checks that represented computer controls, edit

18  checks on various things as listed here.

19  Q.  So I want to step back now.  Were there -- did the

20  Mortgage Warehouse Lending Division have committee oversight

21  over it?

22  A.  Yes.

23  Q.  What committees at Colonial had oversight responsibility

24  for Mortgage Warehouse Lending?

25  A.  Well, there were several.  The first was -- I think it

1  was entitled the Mortgage Warehouse Lending Credit

2  Committee.  That consisted of some of the MWL leadership,

3  Ms. Kissick specifically.  It also included others from

4  within the organization, which would be the chief credit

5  officer, I think the treasurer, the assistant treasurer, I

6  think the chief lending officer for the State of Florida.

7  And there may have been one or two others.

8  Q.  So that's the Mortgage Warehouse Lending Credit

9  Committee; is that right?

10  A.  Right.

11  Q.  Was there a committee that was more senior than that, if --

12  A.  Yes.  That committee had authority to approve

13  relationships or increases in relationships to $25 million.

14  If a relationship exceeded $25 million, then that got kicked

15  up to the senior lending committee.  Senior lending

16  committee was made up of the CEO of CBG, chief credit, the

17  chief credit officer, and I think -- I think three board

18  members.

19  Q.  Was there something called the Asset Purchase Committee?

20  A.  Yes.  The Asset Purchase Committee was formed, I

21  believe, in 2005.  And that was a subcommittee of what was

22  called the Asset Liability Committee that was specific --

23  that was for Colonial Bank as a whole.  The Asset Purchase

24  Committee, however, was formed to provide oversight

25  specifically for Mortgage Warehouse Lending and dealing

1    with -- with how much the bank was effectively willing to

2    purchase of Mortgage Warehouse Lending assets.  So it had

3    general oversight with respect to both lending and the asset

4    purchases.

5    Q.  What's the purpose of these committees?  Explain to the

6    Court what they were supposed to be doing.

7    A.  Well, the purpose is to oversee and supervise the people

8    within Mortgage Warehouse Lending, to ensure that they're in

9    compliance with the expected policies and procedures that

10   have been laid out for the bank and for that -- in that

11   operation.  It's ensuring that the Mortgage Warehouse

12   Lending Division has proper oversight.

13   Q.  I'll go back now and talk in a little more detail about

14   Ms. Vitto.  You mentioned that she reported to the general

15   auditor, not to Ms. Kissick; is that right?

16   A.  That's right.

17   Q.  Why did she report to the general auditor and not to the

18   head of Mortgage Warehouse Lending?

19   A.  Certainly it's best practices that internal auditors not

20   report to members of management on which they'll be

21   performing audits.

22   Q.  And what was Ms. Vitto's focus?  Where did she work?

23   A.  At Mortgage Warehouse Lending.

24   Q.  Did she issue written reports on her work?

25   A.  Yes.

1    Q.  How often did she issue reports?

2    A.  She was auditing continuously, and she reported

3    continuously.  I think that she summarized her reports

4    monthly or quarterly.  But she was issuing reports frequently.

5    Q.  And were those reports provided to the audit committee

6    that she compiled?

7    A.  Yes.

8    Q.  Does that mean they would have been included in the

9    packages that you received?

10   A.  That's right.

11   Q.  Okay.  Did you review Ms. Vitto's reports?

12   A.  Yes.

13   Q.  In your notebooks -- I don't think you need to go

14   through them.  I'll put the pages up.  But exhibit D-435 --

15   A.  And I should say, either I would review them or my staff

16   would review them.

17   Q.  Okay.  But the reports were made available to PwC?

18   A.  Yes.

19   Q.  So Exhibit D-435 is a compilation of her 2005 reports.

20   And I believe D-48 [sic] is a compilation of her 2008

21   reports.  I want to show you a page out of -- sorry.  And

22   D-436 are her 2006 reports.  I want to first show you one of

23   her reports from 2006.  I'll just ask you to identify it.

24   A.  It's dated March 2006.  It says, "Quarterly Risk

25   Management Report."  It's addressed to Stan Julian and Young

1  Boozer from Pam Vitto.

2  Q.  So Mr. Boozer was the general auditor.  Who was Stan

3  Julian?

4  A.  He was the chief compliance officer for the bank.

5  Q.  What was his job?

6  A.  He had overall responsibility for ensuring that the bank

7  complied with various banking regulations and that sort of

8  thing.

9  Q.  If we go to Page 15 of Exhibit D-436, which is just the

10  third page of this March memo, cull-out "Collateral Review."

11  We can all read that.  Tell us what Ms. Vitto did and what

12  she concluded.

13  A.  She indicates here that she took approximately 20

14  collateral files from both the Warehouse and COLB lines,

15  that this was performed during the period under audit.  And

16  she says, "In all cases, proper documentation was on file,

17  and it was complete."  She additionally says, "That

18  mortgages were found to be in proper sub-limit based on FICO

19  scores and lien positions."  And she noted "No exceptions."

20  Q.  What did that tell the auditors?  What did Ms. Vitto's

21  conclusion tell the auditors?

22  A.  It told us that she was getting, you know, positive --

23  positive results from her audit.

24  Q.  I'm going to show you a report from 2005.  This is

25  D-435.  And Page 4 of D-435 is a February 4th, 2005 report

1    to -- this time to Mr. Julian, from Mr. Boozer.

2              Do you see that?

3    A.  It's from Ms. Vitto.  It's copied to Mr. Boozer.

4    Q.  Sorry.  I got turned around.

5              Again, if we go to the third page here, she's got

6    a section called "Collateral."  And what was the scope of

7    Ms. Vitto's review here in this February 2005 report?

8    A.  She says that she's reviewing policies and procedures

9    and the handling of the collateral to ensure that the bank

10   is adequately secured and that individuals assigned to

11   authorize advances are knowledgeable of the process.

12             She discusses the job of collateral analysts and

13   what they're doing in doing their job.

14             She talks about a manual that is supplied to the

15   customers with respect to what they're supposed to do

16   collateral-wise.

17             And then she indicates that she did a review of

18   collateral documentation and didn't find any exceptions.

19   Q.  What did that tell the auditors?

20   A.  Well, it -- again, it told us that in her review, she

21   was not finding exceptions with respect to collateral.

22   Q.  We'll look at a March report from 2005, just to see

23   whether she reviewed any COLB materials.  Can you tell us

24   what's on Page 23 of Exhibit 435?

25   A.  This is a March of 2007 report.  It's a quarterly risk

1    management report to Mr. Julian from Pam Vitto, copied to

2    Mr. Boozer.

3    Q.   Again, if we go to Page 3 of the report, which is

4    Page 25 of Exhibit 435, what did Ms. Vitto review and what

5    did she find?

6    A.   Here, she is indicating that the work of -- she's

7    describing the work of compliance specialist with respect to

8    loans held for sale in general leger account.  She also

9    indicates that on a monthly basis, the collateral analyst

10   conducts an audit of all collateral held to verify existence.

11   Q.   What did that tell the auditors?

12   A.   It told us that, again, she was finding in her work

13   surrounding collateral; in this instance, that she wasn't

14   finding exceptions.

15   Q.   One final report, just want to show in 2008.  This is

16   Exhibit D-438, which are her 2008 reports.  If we go to

17   Page 26 of Exhibit D-438, what is this?

18   A.   This is a semiannual risk management audit dated June of

19   '08 from Ms. Vitto to Tommy Tynes.

20   Q.   Who's Mr. Tynes?

21   A.   Mr. Tynes.  Mr. Boozer had left the bank at this point

22   in time, and Mr. Tynes took his place.

23   Q.   Go a few pages into her report, on Page 28 of the

24   exhibit.  What did she do?

25   A.   She indicates that she had selected 30 collateral files.

1  Two of the construction files reviewed for Taylor Bean

2  showed that both had not had any disbursements in over 12

3  months.  She notes that, "Of the nine construction loans

4  reviewed, 11 had been returned from the original investor."

5  She found that all files were complete and within funding

6  guidelines.

7  Q.  Did Ms. Vitto ever tell you that there was collateral

8  missing in any of the reports that you saw with respect to

9  Mortgage Warehouse Lending?

10 A.  No.

11         THE COURT:  Excuse me.

12         What does it mean for a loan to be returned from

13 the original investor?

14         THE WITNESS:  What it means is that a -- an

15 investor has returned the loan for some reason.  It could be

16 a documentation problem.  It could be a number of things.

17 BY MR. LANDGRAFF:

18 Q.  But did she find that all files were complete within the

19 funding guidelines?

20 A.  Yes.

21 Q.  Did she ever suggest to the auditors that there was an

22 override of controls happening in Mortgage Warehouse Lending?

23 A.  No.

24 Q.  Did Ms. Vitto ever suggest that there was fraud

25 happening in Mortgage Warehouse Lending?

1    A.  No.

2    Q.  Did she ever indicate that collateral files were

3    incomplete?

4    A.  No.

5    Q.  What if she had?  What would you have done?

6    A.  Well, if she had --

7         MR. DiCARLO:  Objection, Your Honor.  Lack of

8    foundation.  There's no evidence that Ms. Vitto -- there's

9    no evidence whatsoever that Ms. Vitto was aware of the

10   fraud, which is the implication of the question.

11        MR. LANDGRAFF:  I asked what she would have done

12   if he had identified missing collateral, which is her job to

13   look at.

14        MR. DiCARLO:  I'm not sure that was the question.

15        THE COURT:  That is the question.  What would he

16   have done had she informed him of missing collateral from

17   the funds?

18        MR. DiCARLO:  I want to also make clear that

19   Mr. Westbrook, I don't believe, ever spoke to Ms. Vitto.

20        THE COURT:  Well, let's say she had.  The whole

21   thing is hypothetical anyway.  So let's say Vitto told him

22   or somebody close to him.

23        THE WITNESS:  If Ms. Vitto had told us that there

24   was something untoward going on or if there was missing

25   collateral, we would have certainly inquired of management

1    as to what was going on.  And we would have expected to get

2    answers to that.  Where it went from there would be

3    depending upon what answers we got.

4    BY MR. LANDGRAFF:

5    Q.  You mentioned the compliance group.  Was there a

6    compliance group within Mortgage Warehouse Lending?

7    A.  Yes.

8    Q.  Who sat on the compliance group for Mortgage Warehouse

9    Lending?

10   A.  Who sat on it?

11   Q.  Yeah.  What was it comprised of?

12   A.  Well, it was comprised of four or five individuals who

13   had overall responsibility.  With respect to the customers

14   of Mortgage Warehouse Lending, they had -- their jobs were

15   to -- or, their job was to make sure that the customers were

16   complying with -- with their limits and sublimits, and that

17   they're doing the things that they're supposed to do.

18   Q.  Did anyone from the Mortgage Warehouse Lending

19   compliance group ever provide PwC with information

20   indicating that anything was amiss at Mortgage Warehouse

21   Lending?

22   A.  No.

23   Q.  So I want to talk about -- move on to Crowe now with

24   respect to Mortgage Warehouse Lending.

25           Did the PwC audit team read the Crowe reports on

1    Mortgage Warehouse Lending?

2    A.   Yes.

3    Q.   And how often did Crowe do an -- let me step back.

4         What is it that Crowe did with respect to Mortgage

5    Warehouse Lending?

6    A.   Crowe Chizek, in their audit plan every year would visit

7    Mortgage Warehouse Lending and perform various internal

8    audit steps associated with Mortgage Warehouse Lending.  And

9    then they would also test financial reporting controls.

10   Q.   How did the presence of Crowe affect the PwC audit

11   team's view of the Mortgage Warehouse Lending Division?

12   A.   Well, it certainly went into the total mix of

13   information that we used in drawing our observations on risk

14   associated with Mortgage Warehouse Lending.

15   Q.   In any of the years that you were the engagement

16   partner, did Crowe have any significant findings of problems

17   in Colonial Bank's Mortgage Warehouse Lending Division?

18   A.   No.

19   Q.   Did Crowe ever find fraud in the Mortgage Warehouse

20   Lending Division?

21   A.   Not to my knowledge.

22   Q.   Let me just ask you to brief -- I don't know if you have

23   your notebooks available.  A-36 are the 2004 Mortgage

24   Warehouse Lending reports from Crowe.  D-426 are the 2005

25   reports from Crowe.  And D-429 are the 2008 reports from

1    Crowe.  I want to show you -- I'll put it up on the screen.

2    A.  Okay.

3    Q.  I'll show you one from 2005.

4         THE COURT:  Can we pick one from the three of

5    them, please?

6         MR. LANDGRAFF:  Yes, I'll pick one.

7         THE COURT:  Okay.

8    BY MR. LANDGRAFF:

9    Q.  D-426 is a -- just identify it for us, Mr. Westbrook.

10   A.  This is an Internal Audit Report from Crowe Chizek.  It

11   has do with Mortgage Warehouse Lending.  It's for the

12   Internal audit Year of '05/'06.

13   Q.  Go to Page 3 of 426.  Can you tell us what this shows?

14   A.  This indicates that during the weeks ending June of

15   2004, Crowe Chizek staff performed an internal audit in the

16   Mortgage Warehouse Lending area of Colonial Bank.  As of

17   April 30th, it indicates their work was directed towards

18   bank policies and procedures based on the risk assessment.

19   That's just sort of a general overview of what they were

20   doing.

21   Q.  Blow up this last sentence here.  What's the last

22   sentence of Page 3 of Exhibit 426 indicate?

23   A.  This indicates that during their internal audit of

24   Mortgage Warehouse Lending, the internal audit department

25   found no findings.

1    Q.   What does that mean?  What does "no findings" mean?

2    A.   It means that they did not have any exceptions to their

3    testing.

4    Q.   If you go to Page 5 --

5              THE COURT:  Does that mean they didn't find

6    anything?

7              THE WITNESS:  That means that, too, yes.

8    BY MR. LANDGRAFF:

9    Q.   We go to Page 5 of their conclusions and cull out the

10   second bullet.  What does that indicate to you that Crowe

11   did?  What was the step they performed?

12   A.   It indicates that they're looking at 25 aged loans, and

13   they verified that it had, in fact, exceeded the warehouse

14   period, that they were placed in the proper sublimits for

15   aged assets.  And that they reviewed 25 shipped-not-paid

16   loans greater or equal to 75 days for proper sublimits and

17   customer follow-up.

18   Q.   And what's the point of this step?

19   A.   Well, the point is to make sure that if, in fact, there

20   is an aged loan or an aged asset within the Mortgage

21   Warehouse Lending, that there's proper processes and

22   procedures in Mortgage Warehouse Lending to do two things.

23   The first is to move that asset into the proper sublimit so

24   that the right amount of interest is being charged.  And

25   two, that there's proper follow-up with the bank's customer

1  to ensure that these aged loans are being taken care of.

2  Q.  Did Crowe, in its targeted reviews of Mortgage Warehouse

3  Lending during the years that you were the audit partner,

4  ever indicate that they found any signs of fraud?

5  A.  No.

6  Q.  Let's talk about the regulatory structure that was in

7  place during your years of the engagement -- as the

8  engagement partner.  Which governmental agencies were

9  responsible for regulating the bank during your audit years?

10  A.  The Federal Reserve.

11  Q.  And who was responsible for regulating Colonial Bank?

12  A.  2004 through mid-2008, that was the Office of the

13  Comptroller of the Currency, or the OCC.  And then in

14  mid-2008, the State of Alabama Banking Department became the

15  regulator and the FDIC became the primary federal regulator.

16  Q.  When the OCC was the primary federal regulator of the --

17  of Colonial Bank, how often were they at the bank?

18  A.  They were there all the time.

19  Q.  What do you mean?

20  A.  Well, they had office space there.  And so their

21  examiners were there virtually every day.

22  Q.  What bank documents did the OCC have access to?

23  A.  They had access to anything they wanted, as far as I know.

24  Q.  Did the regulators conduct targeted examinations of the

25  Colonial Bank's Mortgage Warehouse Lending Division?

1        MR. SORENSEN:  Objection.  Foundation.

2        THE COURT:  Sustained.  You have to lay a

3   foundation how he knows.  How did he know?

4   BY MR. LANDGRAFF:

5   Q.  Were you -- were you aware of the work that the OCC was

6   doing while they were the regulator at Colonial Bank?

7   A.  I was aware that the OCC would perform various

8   examinations throughout the bank.

9   Q.  And were you aware of particular examinations that the

10  OCC performed with respect to Mortgage Warehouse Lending?

11  A.  Yes.

12  Q.  Were you provided with the results of targeted

13  examinations?

14  A.  Yes.

15  Q.  How often were targeted examinations of Mortgage

16  Warehouse Lending performed?

17  A.  They were done every year, that I can recall.

18  Q.  And then when did the FDIC become Colonial Bank's

19  primary federal regulator?

20  A.  Sometime in mid-2008.

21  Q.  Were you provided with the results of a targeted

22  examination of the Mortgage Warehouse Lending Division

23  performed by the FDIC after they became the primary federal

24  regulator in 2008?

25  A.  Yes.

1  Q.  Before early 2008 when the OCC raised questions about

2  the hedge accounting and the FAS 140 accounting that we'll

3  talk about in some detail, up to that point, what were the

4  results, in a general sense, of the OCC's examinations that

5  were provided to you?

6          MR. SORENSEN:  Objection.  Hearsay.

7          THE COURT:  Overruled.

8          THE WITNESS:  In both the written reports that

9  were provided to us and oral reports that were given to the

10  audit committee on occasion, the OCC represented to us,

11  expressed views that the Mortgage Warehouse Lending area was

12  well run and had good processes and procedures.

13  BY MR. LANDGRAFF:

14  Q.  Putting on the screen Exhibit D-40.  I would ask you to

15  identify -- once I cull it out and make it big enough.

16  A.  This is an audit committee meeting held on September the

17  19th, 2007.

18  Q.  Were you in attendance?

19  A.  Yes.

20  Q.  And it looks like Brent Spencer was there as well.  His

21  name is right above yours.

22          Do you see that?

23  A.  Yes.

24  Q.  Who was Mr. Spencer?

25  A.  He was the lead examiner in charge of Colonial.

1   Q.  I have culled out a Page 2 paragraph where the minutes

2   reflect Mr. Spencer spoke about Mortgage Warehouse Lending.

3   What did he say during the audit committee meeting in 2007?

4   A.  This records that he said that he saw no indications

5   that there's any collapse in the Mortgage Warehouse Lending

6   department.  Again, the timing of this is the fall of 2007

7   and there's stress in the market.  He indicates that, "It

8   continues to be a sound and profitable operation."  Stated

9   that they "have made a thorough examination, and the

10  Mortgage Warehouse Lending operation is a very well-run

11  organization with strong operational and collateral

12  controls."

13  Q.  When you attended this meeting, what did you understand

14  Mr. Spencer to be talking about when he referred to "strong

15  operational and collateral controls"?

16  A.  Well, what I thought he was indicating is that they were

17  favorably impressed with how the Mortgage Warehouse Lending

18  operation was being run.

19  Q.  And were the controls -- the collateral controls similar

20  controls that the audit team assessed during its audits

21  while you were the engagement partner?

22          MR. SORENSEN:  Objection.  Foundation.

23          THE COURT:  Sustained.

24  BY MR. LANDGRAFF:

25  Q.  When you were at the audit committee, what did you

understand Mr. Spencer to be talking about when he --

        THE COURT:  No, that's not the lack of foundation.
It was your comparison that was being objected to.

        MR. LANDGRAFF:  Correct.  I wanted to elicit --

        THE COURT:  Are they the same collateral controls
that who did?

        MR. LANDGRAFF:  That PwC reviewed as part of their
audits.

        THE COURT:  Well, isn't that what we're talking
about, what collateral controls they reviewed?

        MR. LANDGRAFF:  We're going to -- yes, Your Honor.
I'll move on.

BY MR. LANDGRAFF:

Q.  Let's talk about the -- having the control environment
in place now, just as you approached the audit from an order
of magnitude, what was the volume of the transactions that
flowed through Mortgage Warehouse Lending every month?

A.  I think it was probably in the magnitude of 6 to 8 billion.

Q.  $6 to 8 billion a month?

A.  Yes, that's what I recall.

Q.  What about number of transactions?  Again, it's in order
of magnitude.  I won't hold you to a particular number.

        How many transactions were flowing through
Mortgage Warehouse Lending every month?

A.  Well, with respect to originations, I think it was

1    something on the magnitude of, like, 14,000.

2    Q.  So how did that volume affect the audit approach?

3    A.  Again, it affects the audit approach because you've got

4    a lot of transactions going through.  You can't audit each

5    and every transaction, so you typically lean towards a

6    control-based audit.

7    Q.  So let's talk about the beginning of the audit work done

8    on controls at Mortgage Warehouse Lending.  I first want to

9    show you Exhibit A-133 and just ask you to identify it.  I

10   believe the Court has seen documents like this, which is a

11   file folder.  But just identify for Her Honor what this is.

12   A.  This is what's called an external work paper, Your

13   Honor.  It contains, in this pocket, management

14   documentation.  It's information with respect to --

15            THE COURT:  Excuse me.  Am I missing something?

16   Didn't we spend about an hour going through all the control

17   base that they did and what they looked at and who they

18   spoke to?

19            MR. LANDGRAFF:  We're going to go through -- we

20   went through all the controls that were in place from

21   management, from Crowe, from the regulators, and from the

22   internal audit function that was part of the bank that was

23   there.

24            THE COURT:  But you also went through a lot of

25   their stuff about the planning.

1          MR. LANDGRAFF:  Exactly.

2          THE COURT:  You know, the engagement group got

3     together and they put together the controls.  Are you going

4     to do that again?

5          MR. LANDGRAFF:  No.  I'm going to show you the

6     controls testing.  That was the fraud planning and all the

7     fraud work that was done.  One of the fraud items that

8     affects both the audit and the existence of the materials is

9     the controls testing, and that also relates to the fraud.

10    But no, we're going to go through the controls and all the

11    testing that was done.

12         THE COURT:  Okay.  Well, we're going to take a

13    break first.

14         MR. LANDGRAFF:  Okay.

15         THE COURT:  We'll be in recess for 15 minutes.

16         (Recess.)

17         THE COURT:  Whenever you're ready, Counsel.

18         MR. LANDGRAFF:  Thank you, Your Honor.

19         THE COURT:  Counsel, I have a suggestion.  I'm

20    trying to think of a way to make this go a little more

21    efficiently without cutting into your proof.  I know you're

22    going to want to use a -- an exhibit with every point that

23    you're making.  Perhaps you could just let me read the

24    exhibit.  You don't have to read it to me.  Okay?  Just give

25    me a cite to the exhibit and the page number.  And I can

1   read it really fast.  And if I have any questions about what

2   it means, I can ask you or ask Mr. Westbrook.  Okay?

3            MR. LANDGRAFF:  Okay.  With respect, Your Honor,

4   I'd also like to ask the witness what his understanding of

5   the document is.  They spent over six hours with him.  I've

6   had him about two, and we need to be able to put in our case.

7            THE COURT:  Counsel, I'm not trying to stop you

8   from putting on your case.

9            MR. LANDGRAFF:  I understand.

10           THE COURT:  I'm just pointing out to you that it

11  is getting a bit repetitious.  And I'm trying to get it to

12  be more effective, at least where the Court is concerned.

13  And since I'm the one -- I'm just trying to help you.  I'm

14  not trying to stop you from putting on your case.  And I

15  wish you wouldn't keep putting it that way and have Mr. Beck

16  keep putting it that way, as if somehow I'm trying to keep

17  you from putting on your case.  I was making a suggestion.

18  If you want to go through it with the witness to see what it

19  meant to the him, go ahead and do it.

20           MR. LANDGRAFF:  Thank you.

21  BY MR. LANDGRAFF:

22  Q.  Mr. Westbrook, we were looking at Exhibit 133 when we

23  broke.  And you're explaining this is an external work paper.

24           What is this?

25  A.  This is information we gathered from management,

1    Mortgage Warehouse Lending.

2    Q.  And what type of information do you gather at the

3    beginning of an audit from the customer?  What's limited to

4    Mortgage Warehouse Lending?

5    A.  I think that this is generally their documentation of

6    their own processes and procedures, their organization, how

7    they do things.

8    Q.  And what's the purpose of gathering that information

9    before the audit?

10   A.  To help us understand how their processes work.

11   Q.  Did Mortgage Warehouse Lending have the same controls in

12   place for all of the different facilities and products it

13   offered to its customers?

14   A.  Yes.

15   Q.  For example, did the same controls that apply to a

16   Warehouse loan also apply to COLB and AOT?

17   A.  The same key controls, yes.

18   Q.  And why do those -- why did they have similar controls

19   for different facilities or products?  Can you explain how

20   that works?

21   A.  Well, principally, because the business of Mortgage

22   Warehouse Lending is financing or funding the origination of

23   mortgage loans that their customers are originating.

24   Q.  And so explain that a little further.  So what does

25   that -- what does that mean, as far as the process of

1    Mortgage Warehouse Lending with respect to each of the

2    facilities underneath it?

3    A.  Well, it means that each facility undergoes

4    authorization approvals, that when the mortgage -- or, the

5    mortgage customer, the warehouse customer, when they are in

6    the process of originating mortgage loans and either

7    providing them as collateral to Colonial or selling them to

8    Colonial, that the compliance officers are doing what

9    they're supposed to do, regardless of the type of product,

10   and the collateral analysts are doing what they're supposed

11   to do, regardless of the product.  And it also means that

12   management that oversees these operations are doing their

13   monitoring irrespective of the product type.

14   Q.  So putting up Exhibit A-15 on the screen, what is this?

15   A.  This is a work paper specific to the Mortgage Warehouse

16   Lending area, 2004.

17   Q.  I think -- can you tell us what the -- what the content

18   of the work paper is?

19   A.  This is the approach that we take to --

20            THE COURT:  What is this exhibit again?

21            MR. LANDGRAFF:  This is Exhibit A-15, Your Honor.

22   And I just showed him Page 3 of it, to ask him what the

23   topic of the work paper is.

24            THE WITNESS:  It's -- I'm sorry.

25            THE COURT:  Go ahead.

1    THE WITNESS:  It's our process to do a walkthrough.

2    BY MR. LANDGRAFF:

3    Q.  So I'll go to Page 8 of A-15.  What is shown here on

4    Page 8 of A-15?

5    A.  Well, this is -- this is an actual walkthrough that was

6    performed in 2004 by Mr. Rivers.  It's got several columns.

7    The first one is the -- lists out the process of the control

8    that's going on.

9         We indicate in the second whether that's a key

10   control or process.  We then determine what our walkthrough

11   plan will be with respect to that control.  And then the

12   final two columns indicate what's happened with the

13   walkthrough.

14   Q.  Okay.

15        THE COURT:  So what exactly is a walkthrough?

16        THE WITNESS:  It's a step that the auditor takes

17   in just trying to understand the transaction, trying to

18   understand exactly how the client does things.  So generally

19   what you do is you take a single transaction, and you, so to

20   speak, walk it through the process so that you see what's

21   happening.

22        THE COURT:  So as an example, this one, were you

23   going to ask him about this one in particular?

24        MR. LANDGRAFF:  Yes, I was.

25        THE COURT:  Why don't you do a walkthrough with

1    this one as an example.

2              THE WITNESS:  Okay.

3              MR. LANDGRAFF:  Okay.

4              THE COURT:  Do it however you want to do it.  Lead

5    into it.

6    BY MR. LANDGRAFF:

7    Q.  Okay.  So the process or control -- first of all, what's

8    the difference between -- I mean, what's the difference

9    between a process or control?

10   A.  A process is just how something gets done.

11             A control should provide some level of, as it

12   says, control over that process.  Something is going on that

13   helps make sure that process functions properly.

14   Q.  Let's step all the way back to make sure this is clear.

15   What is being walked through?  What is it that we're walking

16   through?

17   A.  In this case, it's a transaction with AmeriFirst, one of

18   the customers of Mortgage Warehouse Lending.

19   Q.  So is the walkthrough meant to follow each step in the

20   process through what?  Explain what we're walking through

21   and what it is you're trying to determine.

22   A.  So in this walkthrough, we've selected a customer; in

23   this case, AmeriFirst.  And you see the first control here

24   is with respect to authorization.  So we're looking to make

25   sure that the proper committee has authorized the AmeriFirst

1  relationship, and that's with respect to that committee that

2  we talked about earlier.

3  Q.  And so is that the very first step in the funding

4  process that would occur at Colonial?

5  A.  Right.

6         We have to ensure that your customer and its

7  relationship has been approved by the proper overriding

8  committees.

9  Q.  So what is Control No. 2, and how does that relate to

10  this process?

11  A.  This is ensuring that if the -- that if the relationship

12  is in excess of $25 million, then the approval must be

13  granted from the senior loan committee.

14         THE COURT:  Okay.  So this loan that we're looking

15  at is a loan from Colonial to somebody?

16         THE WITNESS:  Yes.

17         THE COURT:  It's not dealing with a loan

18  originator, right?

19         THE WITNESS:  No, AmeriFirst is a loan originator.

20         THE COURT:  So you say the lender prepares a term

21  sheet.  What lender?  Who?

22         THE WITNESS:  In this case, it's Colonial.

23         THE COURT:  Colonial is the lender to AmeriFirst?

24         THE WITNESS:  Yes, in evaluating the relationship;

25  that's right.

1    So, Judge, let me explain.  In a typical warehouse

2    loan, in this case Colonial would be making a loan to

3    AmeriFirst.  AmeriFirst then takes those monies and

4    originates homeowner loans.

5         THE COURT:  And then sells them back to Colonial?

6         THE WITNESS:  It depends on which -- which

7    sublimit they're in.  If we're talking about a COLB

8    transaction, then Colonial is making the loan directly to

9    the mortgagor, effectively, the homeowner; so they're buying

10   that asset.

11        THE COURT:  Yeah.  But this isn't like that.  This

12   is a different thing, right?  This is a loan --

13        THE WITNESS:  No.  It's -- it's actually --

14   this -- this has to do with establishing a customer

15   relationship.

16        THE COURT:  Okay.

17   BY MR. LANDGRAFF:

18   Q.  Would these steps, in terms of Control 1 and Control 2,

19   reviewing the application and ensuring that the right

20   committee's approving the amount depending on if it's under

21   or over 25 million, would those steps apply to any

22   transaction in the Mortgage Warehouse Lending Division?

23   A.  Yes.

24   Q.  Would they apply to all transactions in the Mortgage

25   Warehouse Lending Division?

1    A.  Yes.

2    Q.  Okay.  So what is Mr. Rivers trying to do with -- in

3    Steps 1 and 2, at the very outset of the -- whatever the

4    transaction is?

5    A.  What he's attempting to do for this one customer,

6    AmeriFirst, he's trying to make sure that the proper

7    committees have given their approval for that relationship

8    and those particular sublimits within that relationship.

9    Q.  And so in the actual transaction that's going on, are

10   these the initial steps that the Colonial Bank goes through

11   when someone says, "I want some money," either to fund

12   mortgages or to borrow from you?

13   A.  Yes.

14   Q.  Okay.  And this next cell has a process.  What is this

15   step in the transaction?

16   A.  This is simply an internal process whereby when the

17   customer is approved, Colonial set up certain bank accounts

18   with respect to that customer.

19   Q.  We go to the next page.  There's a process involving

20   ProMerit.  Can you explain what this means and where we are

21   in the cycle of a Mortgage Warehouse Lending transaction?

22   A.  This is a process whereby when the bank gets notice that

23   the transaction is taking place with a specific originating

24   mortgage loan, then that information on the underlying

25   mortgage loan is placed into the ProMerit system.

1    Q.  Control 5 is a key control.  What is this step in the

2    transaction?  And what is Mr. Rivers trying to understand

3    here?

4    A.  What we're trying to understand is how the collateral

5    analysts go about doing their job with respect to monitoring

6    the collateral documents that are received.  They should be

7    received in a timely manner and in a complete manner.

8    Q.  What's the purpose of Control No. 5?

9    A.  Well, that control is what we just talked about.  It's

10   making sure that the collateral documents are coming to the

11   bank and properly housed.

12   Q.  Do you know how many collateral analysts worked in the

13   Mortgage Warehouse Lending Division at Colonial?

14   A.  I think there were, like, 20.

15   Q.  20?

16   A.  I think that's right.

17   Q.  Okay.  The next key control mentions the compliance

18   group.  So after the collateral analysts monitoring and

19   receiving the documents in a timely manner, what's the next

20   step in the process?  And what is Mr. Rivers trying to

21   understand with respect to Control 6?

22   A.  The company had a compliance team at Mortgage Warehouse

23   Lending.  And these individuals were responsible for

24   continually assessing the relationship with the customer,

25   ensuring that transactions that are entered into are placed

1   in the proper sublimits of the -- that have been established

2   in the original setting up of the account; that for agings,

3   that those go in the right buckets within ProMerit.  And

4   that's so the bank can charge the right fees and the right

5   interest and that sort of thing.  And then they are also

6   monitoring, overall, the customer relationship periodically

7   in various ways.

8   Q.  So at this point, in Control 6 and even Control 5, has

9   the funding already been provided by Colonial?

10  A.  Yes.

11  Q.  Okay.  Let me go to Control 7, another key control.  And

12  please explain this control.

13  A.  Again, this is a -- this is a compliance feature.  What

14  they're doing is looking at various ProMerit reports and

15  analyzing aging within the various sublimits of the

16  agreement.

17  Q.  What's this process under No. 8, referring to collateral

18  documents received?  What is being walked through there?

19  A.  This is the Mortgage Warehouse Lending area's simply

20  ensuring that all of the various documents have been

21  received.  This indicates once its been declared dry,

22  meaning all the documents are in, that they are, in fact, in.

23  Q.  And if we go to the next page, there's a process about

24  shipping collateral.

25  A.  Right.

1   Q.  Explain that, please.

2   A.  This is when Colonial will -- when Colonial will have

3   sold its -- its COLB loan or its AOT-owned assets or the --

4   or the end investor is taking out loans with respect to

5   other warehouse lending, that the collateral is properly

6   shipped to where it needs to go.

7   Q.  The next process before that last control?

8   A.  Yes.  I mean, this is -- this is a program procedure,

9   and that the program system is calculating the interest and

10  fees and so forth correctly.

11  Q.  To make sure the bank actually gets paid?

12  A.  Right.

13  Q.  Okay.  The final control, explain the final control.

14  A.  Well, the compliance officers, their duties include,

15  periodically, at least annually, reviewing the Mortgage

16  Warehouse customer, in this case AmeriFirst, reviewing its

17  operations and its financials and other items of interest to

18  ensure that it's a customer that they want to continue to do

19  business with.  And then this also includes an on-site

20  review by the compliance analysts or compliance officers for

21  commitments over 5 million.  So they are actually going out

22  to their customers' locations and performing an analysis

23  of those operations then.

24  Q.  Now, this work paper identified the controls in Mortgage

25  Warehouse Lending.  Did the audit team actually test these

1    controls to satisfy itself that they were working?

2    A.  Yes.

3    Q.  Let me show you A-16 and ask you to identify this.  I'll

4    cull out the title, if that helps you.

5    A.  Well, again, this is a 2004 work paper.  It's entitled,

6    "Evaluate and Validate the Operating Effectiveness of

7    Control Selected for Testing."  So this is where we do our

8    testing of the controls.

9    Q.  We go to Page 4 of Exhibit -- this is A-16, Your Honor.

10           What is this spreadsheet on Page 4 of Exhibit A-16?

11   A.  This lists out the six key controls as identified in the

12   walkthrough.  The numbers 3 through 6 are those that we

13   determined we would perform.  "We" being PwC.  Numbers 1 and

14   2 we did not perform independently.  We did rely on the work

15   of the internal auditor on that.

16   Q.  What were the results of the test?  Let me just back up.

17           Does each page, then, in the work paper go through

18   the various results of the testing of each control?

19   A.  Yes.

20   Q.  And what was the -- what were the final results of the

21   controls testing?

22   A.  We did not find exceptions to the control testing.

23   Q.  What kind of coverage -- in terms of transactions going

24   through Mortgage Warehouse Lending, you heard Dr. Carmichael

25   say there would be no way to test every transaction going

1    through on a sample basis. You were here for that testimony,

2    right?

3    A. Yes.

4    Q. On a controls test and a controls approach, what kind of

5    coverage do you get by identifying the controls and the

6    steps of the process and then testing those? What kind of

7    coverage do you get as far as what you're able to tell about

8    all of the transactions going through Mortgage Warehouse

9    Lending?

10    A. Well, certainly, you're not testing a huge number of

11    transactions. And we've got -- as this work paper indicates

12    in the upper left-hand area, the firm had guidance with

13    respect to, you know, what the number of your sample should

14    be based on how the control works, how frequently the

15    control works, and so forth.

16         So, anyway, once you do your testing, those

17    results really apply to the population as a whole.

18    Q. And what does that mean?

19    A. Well, it means that the auditor gains comfort that if

20    controls are operating effectively for those that had been

21    sampled, then the auditor can gain comfort over the entire

22    population that those same controls worked effectively over

23    the rest of the population.

24    Q. Did PwC engage in this exercise each year of identifying

25    key controls in Mortgage Warehouse Lending and then testing

1    them?

2    A.  Yes.

3    Q.  It's A-149 and A-19 are for 2005.  And A-32 relates to

4    2008.

5         How did the results of the testing of controls

6    affect the opinions that PwC reached on the presentation of

7    Colonial Bank Group's financial statements?

8    A.  Well, it certainly affected the opinions in a large way.

9    These are -- this is an example of the controls being

10   tested.  As I indicated, there's well over 200 controls that

11   operated as key controls throughout the bank -- the

12   organization.  Based on the testing of all of those

13   controls, we were able to render our opinion with respect to

14   the proper design and effectiveness of the internal

15   controls.  And then with respect to the financial statement,

16   report, we were, in part, relying on these controls to

17   provide evidence that the financial statements are fairly

18   representation.

19   Q.  Should the controls that were identified and tested,

20   should those have detected if Taylor Bean or another Colonial

21   customer was failing to provide required documentation?

22   A.  Yes.

23   Q.  How?  How would those controls have caught that?

24   A.  Well, in a few ways.

25        The first is that -- the first is that you've got

1  these collateral analysts that are supposed to be evaluating

2  the accuracy of the collateral and the receipt of collateral

3  documents.  And then you've got these compliance officers

4  who are following up on aging issues, they're following up

5  on the various pipeline reports of the customers.

6         They are also doing on-site visits of their

7  customers and trying to gain a more in-depth understanding

8  of those operations of their various customers.

9         So those are two that strike me as something --

10  something was overridden.

11  Q.  And why didn't the controls detect the fraud here?

12  A.  I can only speculate.  But as I said, I think they had

13  to be overridden in some way.

14  Q.  Did the audit team rely exclusively on the controls

15  testing it performed on Mortgage Warehouse Lending?

16  A.  No.

17  Q.  We've heard reference to -- some people said

18  "substantive."  Some say "substantive."  What do you call

19  those procedures that are not exclusively controls related?

20  A.  I usually say substantive.

21  Q.  Okay.  Are confirmations a substantive procedure?

22  A.  Yes.

23  Q.  Why is it a substantive procedure?  And remind us

24  quickly of what it is.

25  A.  It's a substantive procedure because you're gaining

1  evidence that's not related to internal controls.

2  THE COURT:  If you're leaving controls for a

3  minute, let me back up and ask you a question.

4  When you check controls -- by "you," I mean PwC --

5  checks controls, do you go in and do it yourself?  Or do you

6  look at what the others have done?

7  THE WITNESS:  At what --

8  THE COURT:  Well, do you look at whatever the

9  control -- for instance, the collateral analysis.  When

10  they're checking on collateral, presumably they produce a

11  report that says, "All the collateral is okay."  So do you

12  look at their report?  Or do you go behind it and do your

13  own collateral analysis?

14  THE WITNESS:  No.  We're looking at what they're

15  doing in order to perform their function.  We're not going

16  in and looking at the actual collateral.  We are making sure

17  that they are doing that job with respect to how they're

18  evaluating these various customers.

19  BY MR. LANDGRAFF:

20  Q.  So in the Judge's example of the collateral analysts,

21  were there audit team members in Orlando performing this

22  test of that control?

23  A.  Yes.

24  Q.  And what would they be doing?

25  A.  They would be looking at the various reports, the

1  pipeline reports and the ProMerit reports that collateral

2  analysts use to follow the collateral through the process.

3  When collateral comes in, it gets classified in one area.

4  When it's in the law, it's supposed to be classified in

5  another way on these various reports.  And so if they've got

6  missing documents, it's their job to follow up and ensure

7  that those missing documents are received and they stay

8  on -- you know, on an unreceived report until they are

9  actually received.

10  Q.  I want to move on to confirmations.  And first, I'll put

11  on the screen Exhibit D-2539.  And I'm showing Page 3 of

12  that exhibit, which is AU 330, entitled, "The Confirmation

13  Process."

14          What's the subject of this standard?

15  A.  This is essentially providing auditors guidance on the

16  confirmation process.

17  Q.  And I've culled out Paragraph 6 of AU 330.  That's

18  D-2539.  It's on Page 4.  And we can read it.

19          The question I want to ask you is about this

20  sentence.  "An evidential matter can be obtained from

21  independent sources outside an entity, it provides greater

22  assurance of reliability for the purposes of an independent

23  auditor than that secured solely within the entity."

24          My question is:  What is an "independent source"?

25  A.  Well, I think from this standard, an independent source

1   would be viewed as a knowledgeable individual or corporation

2   that's outside of the -- of the -- in this case, Colonial

3   BancGroup or one of its subsidiaries.

4   Q.  Did the audits under your direction include confirmation

5   procedures in every year that you were the engagement

6   leader?

7   A.  Yes.

8   Q.  And did the PwC team, either on its own or through Crowe

9   Chizek, confirm balances with Taylor Bean every year?

10  A.  Yes.

11  Q.  What percent of Colonial AOT and COLB balances was PwC

12  able to confirm by sending confirmations to Taylor Bean

13  during the years that you were the audit partner?

14  A.  Well, because Taylor Bean was the only customer with the

15  AOT product where there was 100 percent of the AOT assets.

16  With respect to COLB, certainly well in excess of 50 percent

17  in each year.

18  Q.  What about with respect to Taylor Bean's COLB balance?

19  What percentage --

20  A.  Oh, 100 percent of Taylor Bean's COLB.

21  Q.  Okay.  So did the confirmations that were obtained from

22  TBW confirm the outstanding balances on both the -- the

23  entire outstanding balances of both AOT and COLB?

24  A.  For Taylor Bean, yes.

25  Q.  I want to look at the 2004 confirmation.  And this is

1    the first page of Exhibit A-17.  Cull out the top there.

2           What is shown on A-17?

3    A.  This is an external work paper.  It's with respect to

4    Taylor Bean.  It's for Reverse Repurchase Agreement.

5    Q.  And you've seen this before.  But this is an e-mail --

6    why don't you identify it.

7    A.  This is the e-mail the auditor, Phillip Rivers, received

8    from Mr. Lee Farkas of Taylor Bean, dated January 19th of

9    '05.  We asked Mr. Farkas to confirm -- through another

10   e-mail that Mr. Rivers sent to Mr. Farkas, to confirm

11   various balances as of October 31st, through 12-31 and 11-30.

12   Q.  And what do the handwritten notes here indicate?

13   A.  That's a reference to other work papers in the database

14   where those balances are tied in to the underlying records

15   at Colonial Bank.

16   Q.  Is that what the PwC engagement team did with the

17   confirmation provided by Mr. Farkas?

18   A.  Yes.

19   Q.  What did it mean, from an audit perspective, for the

20   numbers on the confirmation -- well, let me step back.

21          Did you know -- was there any indication that the

22   numbers didn't match what was on Colonial's books?

23   A.  No.

24   Q.  How do you know that?

25   A.  Well, because I've looked at these work papers.  And I

1  know that those tie into the underlying records of Colonial.

2  Q.  So what did it mean, from an audit perspective, for

3  these numbers on Taylor Bean's confirmation to match what

4  was on Colonial's books?

5  A.  Well, it means that a knowledgeable third-party has

6  provided the auditor with evidence that they're in agreement

7  with the amounts presented here.

8  Q.  And did you hear Professor Carmichael take issue with

9  the fact that the confirmation was sent to Mr. Farkas?

10  A.  Yes.

11  Q.  During the time of the audits, who did you understand

12  Mr. Farkas to be?

13  A.  I understood Mr. Farkas to be the chairman and CEO and

14  primary -- or, majority stockholder of Taylor Bean &

15  Whitaker.

16  Q.  Was it your understanding that he was knowledgeable

17  about the balances that he personally confirmed?

18  A.  Yes.

19       Now, I would certainly expect that a CEO providing

20  confirmations to an auditor would involve his staff in

21  making sure that the information he's providing is complete

22  and accurate.  But I, frankly, took -- I sort of liked the

23  fact that it was coming from this senior of an executive.

24  Q.  And at the time of the audits, what did you know about

25  Mr. Farkas?  I've just put Page 39 of Exhibit A-123 on the

1       screen.

2                   What is this document?

3       A.  This is a work paper, I think, where our team discusses

4       Taylor Bean & Whitaker as a company.

5       Q.  And what did you know about Mr. Farkas at the time of

6       these audits?

7       A.  This is coming from information that our team gathered

8       from Colonial, from Mortgage Warehouse Lending.  This is

9       from some of the their reviews of Taylor Bean & Whitaker.

10      This indicates Mr. Farkas owns 79 percent of the company and

11      that another company owns the remaining 21 percent of stock,

12      and that Mr. Farkas has had the company since 1991.

13                  THE COURT:  You don't have to read the rest of it.

14      I've got it.

15                  THE WITNESS:  Okay.

16      BY MR. LANDGRAFF:

17      Q.  You believe he knew his own business, right?

18      A.  Yes.

19      Q.  So back to the confirmation from 2004.  What did this

20      confirmation from Taylor Bean tell you about whether -- tell

21      the audit team about whether the Mortgage Warehouse Lending

22      assets to Taylor Bean were fake or real?

23      A.  Well, it certainly provided evidence to us that this

24      third-party was telling us that they were real.

25      Q.  2005, I'm showing you Exhibit A-18.  Did you again

1  confirm balances with Taylor Bean?

2  A.  Yes.

3  Q.  And what is Exhibit A-18 that I put on the screen?

4  A.  It's a 2005 work paper entitled "Securities Purchased

5  Under Agreements to Resell."  It's a lead sheet.

6  Q.  What's a lead sheet?

7  A.  Typically, each audit area will contain what we call a

8  lead sheet that provides balances of that given area.

9  Q.  We go to Page 13 of Exhibit A-18.  What do we have?

10  A.  This is a confirmation request that was actually sent by

11  Crowe Chizek.  And this year we were using the confirmations

12  that were prepared and sent by Crowe Chizek.  And this is

13  with respect to Taylor Bean.

14  Q.  In 2005, was it acceptable to rely on the internal

15  auditor to send the confirmations?

16  A.  Yes.

17  Q.  And did the information that Taylor Bean confirmed here

18  match what was in the Colonial's books and records for the

19  same dates?

20  A.  Yes.

21  Q.  We see the outstanding balance here in the middle of the

22  page; is that right?

23  A.  Right.

24  Q.  And who signed the confirmation in 2005 on behalf of

25  Taylor Bean?

1    A.  This is the CFO of the company.  His name was Mr. Delton, I

2    think.

3    Q.  And I believe we looked at this page yesterday.  But how

4    did the audit team tie the Colonial records indicating the

5    outstanding balance to what Taylor Bean & Whitaker had

6    confirmed?  In other words, how did the audit team match the

7    numbers up to make sure they were getting complete coverage

8    here?

9    A.  Well, there's a pipeline report that includes all the

10   various sub-lines associated with Taylor Bean.  And that's

11   what this balance of 1-billion-732 relates to.

12   Q.  So going to Page 12 of Exhibit A-18.  It's hard to see.

13            What is shown here?

14   A.  This is that -- what's called the Account Usage Report.

15   It's coming off the ProMerit system.  And as you can see,

16   the handwritten note at the top, this outstanding balance

17   represents all of the sublimits of Taylor Bean.  And they

18   total up to this total of a billion 732, which was the

19   amount subject to the confirmation.

20   Q.  What did this confirmation, Exhibit A-18, from Taylor

21   Bean tell you about whether the Mortgage Warehouse Lending

22   assets were real in 2005 -- real or fake in 2005?

23   A.  Well, again, it tells us that at this date, we've got a

24   third-party knowledgeable individual confirming to us that

25   these -- these items are real.

1  Q.  The last confirmation I want to show you is Exhibit

2  A-249.  And can you identify A-249 for us?

3  A.  This is an e-mail that our auditor, Susan Thompson,

4  received from a Melissa Spata on January the 21st, '09 with

5  respect to the confirmation for TBW.

6  Q.  And we go to Page 2 of Exhibit A-249.

7       What does it show?

8  A.  This shows that the various balances that we asked TBW

9  to confirm, that, in fact -- in this case, Mr. Farkas did,

10  in fact, confirm those balances.

11  Q.  Did he confirm COLB and AOT?

12  A.  Yes.  And then also a working capital line.

13  Q.  What did the confirmation from Taylor Bean in 2008 tell

14  you about whether or not the Mortgage Warehouse Lending

15  assets were real or fake as it related to Taylor Bean?

16  A.  This tells the auditor that the third-party

17  knowledgeable individual has confirmed that those exist.

18  Q.  I want to move on to discuss FAS 140 for a few minutes.

19       Did you review, during your audits, the Loan

20  Participation and Sales Agreements that were in place from

21  time to time with respect to the COLB transaction?

22  A.  Yes.

23  Q.  I'll show you Exhibit D-1537.

24       Can we just identify what D-1537 is?

25  A.  This is one of the Loan Participation and Sale

1    Agreements.  This is specific to construction loan COLB

2    program.  And it's for Taylor Bean.

3    Q.  Taylor Bean.

4         And if we go to Page 3 of Exhibit 1537, it says,

5    "The loan participation is the sale by the seller to the

6    buyer and a purchase by the buyer from the seller of

7    participation interests in the mortgage loans."

8         Who is the seller?

9    A.  In this case, Taylor Bean.

10   Q.  Who is the buyer?

11   A.  Colonial Bank.

12   Q.  Did PwC draft this language?

13   A.  No.

14   Q.  Who did?

15   A.  Attorneys working on behalf of Colonial.

16   Q.  Do you recall, when Mr. Sorenson was examining you,

17   briefly showing a document stating that Deloitte, the

18   auditor for Pinnacle, a COLB customer of Colonial, had

19   questions about the FAS 140 treatment of COLB transactions?

20   A.  Yes.

21   Q.  And there was some impression created that Deloitte had

22   questions about this; do you recall that?

23   A.  Yes.

24   Q.  What really happened with respect to the Pinnacle

25   question from Deloitte?

1    A.  Well, what happened is that -- and, Judge, it's probably

2    helpful for your purposes that the sellers on these types of

3    transactions, they have to make their own conclusion with

4    respect to whether it's a sale or a purchase.

5          My understanding is that Deloitte and Touche was

6    the auditors of this customer, Pinnacle.

7          Wes Kelly got an e-mail or had a conversation with

8    Ms. Kissick who indicated -- and I think this was in 2004 --

9    that she had had a discussion with her Pinnacle counterpart.

10   And he indicated that Deloitte had questions about the

11   proper treatment under 140, and she was asking Mr. Kelly

12   what his views were.

13         Mr. Kelly contacted Tim Kviz, who we've talked

14   about, and relayed that information to Mr. Kviz.  Mr. Kviz

15   looked at the language that Ms. Kissick had provided to

16   Mr. Kelly and said, "Yeah, that's a problem."  But while

17   that was going on, Wes Kelly had gotten the actual signed,

18   final documents from Colonial with respect to the Pinnacle

19   transaction, the Pinnacle Loan Participation Agreement.  And

20   it turned out that the Pinnacle person was using the

21   wrong -- not the final contract.  And so once the final

22   contract was made available to Deloitte -- or, to Pinnacle,

23   that we never heard other questions about that.

24         THE COURT:  The final contract, being the contract

25   that eliminated Paragraph 17?

1          THE WITNESS:  Right.  And then -- excuse me.  And

2   then --

3          THE COURT:  So Deloitte's objection to Paragraph

4   17 was a valid one?

5          THE WITNESS:  Yes.  Yes.

6   BY MR. LANDGRAFF:

7   Q.  Was Deloitte looking at the final agreement when they

8   raised the question with Pinnacle?

9          MR. SORENSEN:  Objection.  Speculation.

10         THE COURT:  Does it matter?  I mean, we all agree

11   that the way it was drafted with Paragraph 13, it didn't

12   work.  They took it out.

13         MR. LANDGRAFF:  Yeah.  There was an impression

14   created through questioning of Mr. Westbrook that Deloitte

15   had a question after, in the 2004.  And I want to clear that

16   up because Deloitte was looking at the wrong agreement.

17         THE COURT:  No impression like that was given.

18   I'm glad you cleared it up.

19         MR. LANDGRAFF:  Thank you.

20   BY MR. LANDGRAFF:

21   Q.  And you heard Mr. Carmichael say that there weren't any

22   FAS 140 work papers in the files between 2002, after

23   Mr. Jackson issued his opinion letter that we've seen, and

24   2008.  Do you recall that?

25   A.  Yes.

1    Q.  Is that correct?

2    A.  No.

3    Q.  Let's just look at Exhibit A-315.  I would ask you to

4    identify Exhibit A-315.

5    A.  This is a memo regarding Mortgage Warehouse Lending;

6    it's housed in some e-mail work papers that we retained.

7    Q.  And on Page 2 of Exhibit A-315, what do we see?

8    A.  This is a discussion that Mr. Kelly had with Mr. Kviz

9    regarding a Mortgage Warehouse Lending issue.

10    Q.  Is this from 2005?

11    A.  Well, it's for 2004.  But it's in the file -- I mean, it

12    got put in the file in February of '05.

13    Q.  And there's a memo attached; is that right?

14    A.  Yes.

15    Q.  If we go to --

16    THE COURT:  You have to make that bigger.

17    BY MR. LANDGRAFF:

18    Q.  Let me just go back, sir.

19    What was the subject of the conversation with Mr.

20    Kviz?

21    A.  If memory serves me correctly, this one, I think the

22    client had inquired if -- that they were looking at possibly

23    changing some of the terms of the -- of the Loan

24    Participation Sale Agreement.  And they were asking the

25    question as to what our views would be if they, in fact,

1   changed some of the -- some of the terms.

2   Q.  I'm going to show you Exhibit D-1871 and ask you to just

3   identify what the nature of this work paper is.

4   A.  This is a second-quarter work paper.  It would have been

5   in our second quarter 2005 files.

6   Q.  If we go to Page 45 of Exhibit D-1871, what is this

7   document?

8   A.  It's a very similar -- it's a very similar document.

9   Again, Mortgage Warehouse Lending was looking at possibly

10  amending the terms of some of the loan participation

11  agreements and was, again, seeking our views on that.

12  Q.  So is it true that there wasn't any work in the work

13  papers between 2002 and 2008 with respect to the FAS 140

14  treatment of the COLB program?

15  A.  None.

16          THE COURT:  Wait.  Is it true there weren't any

17  changes?  And you're saying "no."  You mean yes, don't you?

18          MR. LANDGRAFF:  I asked if there are any -- the

19  statement from Mr. Carmichael --

20          THE COURT:  No.  It's prefacing the question with

21  "is it true" because I can't tell whether he's saying --

22          MR. LANDGRAFF:  I'm sorry.  I'll rephrase it, or

23  I'll let you ask.  I apologize.

24          THE COURT:  Thank you.

25          MR. LANDGRAFF:  Do you want me to rephrase?

1    THE COURT:  (Nods head.)

2    BY MR. LANDGRAFF:

3    Q.  Were there work papers relating to the FAS 140 treatment

4    of the COLB program?  Were there work papers in the files

5    between 2002 and 2008?

6    A.  Yes.

7    Q.  We talked about a legal opinion.  And Mr. Jackson was

8    asked about whether there was a legal opinion.  In your

9    view, was a legal opinion required under the auditing

10   literature to apply FAS 140 to the COLB transactions?

11   A.  No.

12   Q.  Why not?

13   A.  Well, my understanding when these transactions were

14   first entered into in 2002 -- and I think Mr. Jackson

15   testified to this as well -- that Colonial engaged attorneys

16   to draw up documents to -- driven to achieve a certain goal,

17   and that goal would be to have a purchase and sale

18   transaction.  That's -- that's the reason that they were

19   engaged to do that.

20        There's -- there's language throughout these

21   documents that clearly indicates what the intentions of the

22   parties were and what the intentions of the attorneys were.

23   Certainly, in 2002, the client had not requested, nor did we

24   insist on a separate opinion from those same attorneys who

25   drafted these documents.

1  Q.  Did PwC ever review a legal opinion related to the COLB

2  transactions?

3  A.  Yes.

4  Q.  When?

5  A.  I think in 2006.  It was either '5 or '6.

6  Q.  Do you know why Colonial got a legal opinion from the

7  COLB transactions in 2005 or '6?

8  A.  I think, perhaps, a couple of reasons.  As I mentioned,

9  these customers also had to make their own conclusions with

10  respect to proper application of 140.  I don't know if one

11  of these customers or more than one of these customers

12  requested to get legal opinions.  But also in the creation

13  of a conduit, whereby Colonial was intending to sell some of

14  these mortgage warehouse assets into a securitization

15  conduit, that those legal opinions were available for that

16  as well.

17  Q.  Did the legal opinion, the one that you're referring to

18  in 2006, require any changes be made to the Loan

19  Participation Sale Agreement or cast any doubt on the

20  applicability of FAS 140 to those transactions?

21  A.  None.

22  Q.  Let's talk about the April 2008 FAS 140 national

23  consultation.  We've heard about the questions from the OCC

24  leading you to consult the national office; is that a fair

25  statement?

1    A.  Yes.

2    Q.  And I want to show you Exhibit D-2375, which is -- would

3    you identify what the first page is?  And then we'll get to

4    the attachment.

5    A.  This was a list of OCC questions that Mr. Hicks, who was

6    then the chief accounting officer of Colonial, communicated

7    to myself and Mr. Kelly on April the 2nd.

8    Q.  If we go to Page 3 of Exhibit D-2375, there's this memo

9    from Rusty Thompson to Brent Spencer from April 2nd, 2008.

10            Who are these gentlemen?

11   A.  Well, Brent Spencer has been identified previously as

12   the -- he's a national bank examiner and was the examiner

13   responsible, chiefly, for Colonial.

14            Mr. Thompson, Rusty Thompson was the assistant

15   chief accountant of the OCC.

16   Q.  And Mr. Thompson notes that, "Presented below are the

17   accounting issues we discussed with the bank and

18   PricewaterhouseCoopers earlier today."

19            Did you attend a meeting on or around April 2nd

20   where the OCC regulators had a discussion with you and

21   people at the bank?

22   A.  I was on the phone call in that regard.

23   Q.  It was a telephone call?

24   A.  Yes.

25   Q.  Who from the bank was on the call?

1    A.  I believe it was Mr. Hicks and Ms. Moore, the CFO.

2    Q.  And have you had a chance to review this memorandum?

3    A.  Yes.

4    Q.  Does it accurately reflect the questions that the OCC

5    raised?

6    A.  Yes, I think so.

7          I think they added a couple of things in the

8    letter that weren't necessarily discussed on the phone.  But

9    from a general standpoint, it's reflective of what was

10    discussed.

11    Q.  And the first general topic is in Paragraph 1.  Just

12    quickly identify this for us.

13    A.  Well, essentially, the OCC is asking the question:  "If

14    there's an end investor commitment in place and Colonial is

15    required to deliver to that end investor, does that

16    constrain Colonial?  Does it keep it from having control of

17    that asset?  So they're asking questions under that FAS 140,

18    Paragraph 9, that there's some discussion about.

19    Q.  And that's the FAS 140 question we've been discussing

20    when we've been talking about the 2008 FAS 140 question; is

21    that a fair representation?

22    A.  Yes.

23    Q.  What's the second question, we haven't heard as much

24    about?  What was that about?

25    A.  Well, the second question goes to the fact that Colonial

1  had designated these end investor commitments as an

2  effective hedge on the purchased assets that they had under

3  the COLB transactions.  What the OCC is asking is, well, if

4  this is a sale treatment, how is it possible that these end

5  investor commitments can qualify for hedge accounting under

6  FAS 133.

7  Q.  And this Question 2, does it continue on Page 4 of the

8  Exhibit D-2375?

9  A.  They're asking what -- PwC's position, on a March 2008

10  memo, that says "COLB embedded derivative analysis," and

11  then if we were in agreement with that.  There's some

12  questions there.

13        At this point I had not seen this memo that they

14  were referring to, I don't think, or I had just seen it, I'm

15  not sure.

16  Q.  Did you know what they were talking about?

17  A.  Well, I either knew -- I either got a copy of that draft

18  memo right around this time, but I don't think that I had

19  read it, or I got it soon after this time.  But what it was,

20  was Mr. Hicks had generated a memo that was attempting to

21  address the OCC's questions, and apparently had provided

22  that memo to the OCC.

23  Q.  I'm going to put up on the screen Exhibit D-51 and ask

24  you to identify it once I make it big enough.

25        What is D-51?

1    A.  This is a memo to me and to Mr. Kelly from Mr. Hicks.

2    And I think this is that memo that we were just referring to.

3    Q.  So if we go to the attachment of Exhibit D-51, we're

4    looking at Page 2 of it now, made a little bigger, what is

5    this?

6    A.  This is a draft document prepared by Mr. Hicks that

7    talks about COLB embedded derivative analysis.

8    Q.  Did PwC have any hand in drafting this?

9    A.  No.

10   Q.  What is the COLB embedded derivative analysis?

11   A.  Mr. Hicks was attempting to provide his views and the

12   bank's views on how it had accounted for, actually, the

13   hedge-related item that was referred to in the OCC's

14   questions.

15   Q.  I've culled out a paragraph on Page 2 of Exhibit D-51.

16   Can you explain for the Court what Mr. Hicks is saying

17   Colonial held?

18   A.  Mr. Hicks is trying to explain that he believed they

19   held two items with respect to these contracts.  The first

20   is referred to in FAS 133 as a host contract.  That would be

21   the Loan Participation and Sale Agreement.  Or, in this

22   case, it would the COLB asset.  And then he believed that

23   they also held an embedded derivative.  And he defines what

24   he believes this embedded derivative is doing, and that that

25   derivative, although not specifically called out in the Loan

1  Participation and Sale Agreement, does, in fact, exist in an

2  embedded form.

3  Q.  And why -- what does this have to do with hedge

4  accounting and the question that the OCC was asking with

5  respect to hedge accounting?

6  A.  Well, with respect to hedge accounting, he's attempting

7  to explain the real economics of the transaction and how

8  those economics are fulfilled during the course of this

9  transaction.

10  Q.  And does he go through an analysis of how this embedded

11  derivative works?

12  A.  Yes.

13  Q.  And this second bullet from the bottom, in Mr. Hicks'

14  memo that the OCC was asking about at the April meeting,

15  says, "The net settlement determined at the sale or other

16  disposition of the participation loan into the secondary

17  market."

18          What is that talking about?

19  A.  Well, he's talking about how, in practice, there can be

20  net settlement of this type of derivative.

21  Q.  Did that relate to the FAS 140 question of control?

22  A.  No.  It had to do with -- with net settlement of the

23  derivative.

24  Q.  Let's go back to the OCC's letter, which is D-2375.

25          THE COURT:  Is this helping to make it clearer?

1    Is this aimed to help make it clearer?

2              MR. LANDGRAFF:  Yes.  We're going to go back to

3    the OCC's questions.

4              THE COURT:  Thanks, because that didn't -- that

5    interchange --

6              MR. LANDGRAFF:  There's a lot of steps.

7    BY MR. LANDGRAFF:

8    Q.  Mr. Hicks' memo that they were asking whether PwC agreed

9    with, what was the ultimate goal of his memo in terms of --

10   as you read it, in terms of what he was trying to explain?

11             MR. SORENSEN:  Objection.  Foundation.

12   Speculation.

13             THE COURT:  No.  Let's just get his understanding

14   of it.  Okay.  Who knows what Mr. Hicks knows.

15             THE WITNESS:  My understanding is that Mr. Hicks

16   was attempting to lay out the company's position with

17   respect to the OCC's questions.  He was attempting to

18   explain why the company believed that both 140 sales

19   accounting was appropriate and why he believed FAS 133 had

20   been applied properly.

21   BY MR. LANDGRAFF:

22   Q.  So what did Colonial do in response to these questions

23   raised by the OCC about FAS 140 and FAS 133, as well as some

24   additional questions about COLB and how it was aging?  What

25   did Colonial do?

1    A.  They effectively rounded up the troops and got busy

2    trying to answer the questions for the OCC.

3    Q.  What did you do in response to the questions raised by

4    the OCC?

5    A.  When I had an initial phone call with the OCC, which

6    took place before getting these questions -- and I think

7    that phone call was sometime in late March -- I believe that

8    I wanted to get some national assistance with the questions.

9    One, because the OCC was the one asking the questions.  And

10   I think that it's important when a client's regulator is

11   asking serious questions, that they be given serious

12   consideration.  So I contacted several people in our

13   national consultation group and was seeking some help.

14            THE COURT:  You know, I think what you've all

15   studiously avoided is getting involved in 133.  I think

16   there may be a reason there.  And I may be sorry I'm asking.

17   But is it going to be necessary for me to understand that,

18   to understand this?

19            MR. LANDGRAFF:  And we have Mr. Lucas and

20   Mr. Naumann who are going to explain that, explain why that

21   was important.

22            THE COURT:  Okay.  Because it seems to be sort of

23   in there.  But most of the discussion so far has centered

24   around 140.

25            MR. LANDGRAFF:  That's right.

1    THE COURT:  Okay.  That will be good.  Thank you.

2    BY MR. LANDGRAFF:

3    Q.  And just a preview.  Can you explain the distinction

4    between the 140 issue and the 133 issue?

5    A.  The 140 issue was simply a question as to whether or not

6    the transaction resulted in a sale or a financing

7    transaction.

8         The 133 question is, after that conclusion is made

9    and it is a sale, has hedge accounting been properly applied

10   in this situation?

11   Q.  Hedge accounting applied to what?  What part of the

12   transaction was the OCC focusing on in their questions about

13   FAS 133?

14   A.  They were, effectively, focusing on the end investor

15   commitment and the fact that what -- and, Your Honor, what

16   the bank was attempting to do was to hedge its exposure to

17   these fluctuations in value of these COLB loans.  And that --

18        THE COURT:  By getting a third-party commitment?

19        THE WITNESS:  Right.

20        And so -- and so by having that third-party

21   commitment, they have effectively hedged their exposure to

22   interest rate fluctuations.

23        So the question was -- there wasn't any question

24   with respect to how the economics were working.  They were,

25   in fact, being hedged.  But the question that the OCC raised

1  was:  Has hedge accounting been applied properly in this

2  situation?  Specifically, their question was:  If Colonial

3  is not a direct party to those end investor commitments, can

4  it really apply hedge accounting the way they had been

5  applying it?

6  THE COURT:  Okay.  I know I've been -- I've had

7  enough explained to me about the difference between who has

8  really made the third-party agreement, because it was really

9  TBW and the third-party, not Colonial.

10  THE WITNESS:  That's correct.

11  THE COURT:  Colonial, I guess, is trying to take

12  advantage of it.

13  THE WITNESS:  Well, they were making advantage of

14  it.  I mean, the actual economics of the transaction, it

15  worked as an effective economic hedge.  But the rules of 133

16  are very specific as to when you can account for something

17  as a hedge, regardless of the economics.

18  THE COURT:  Okay.  That's the part that hasn't

19  been explained to me yet, what 133 is, this whole hedge

20  accounting business.  I mean, we're using the word as a

21  hedge in almost a colloquial sense; there is a hedge that

22  prevents the fluctuations.  But I have a feeling there's

23  some more technicalities that I haven't been exposed to yet.

24  Am I right?

25  MR. LANDGRAFF:  I think that's correct.

```
1            THE COURT:  And we're not going to do it with this
2     witness.
3            MR. LANDGRAFF:  I was trying to give you a preview
4     of the coming attractions -- or the coming testimony,
5     whether it's attractive or not.
6            THE COURT:  I can hardly wait.  You've whetted my
7     curiosity.  Keep going.
8            MR. LANDGRAFF:  Okay.
9            THE COURT:  Well, actually, are you at a stopping
10    place?  You only have a few more minutes to keep going.  If
11    you need to wrap something up, please do it.
12            MR. LANDGRAFF:  I was going to get into the work
13    that the national office did.  So I can --
14            THE COURT:  This is Mr. Kviz?
15            MR. LANDGRAFF:  No, this will be Mr. Naumann, who
16    was a partner in the national office.  He's going to testify
17    live.  So I'm not going to duplicate what Mr. Naumann is
18    going to testify.  But I'm going to go through with
19    Mr. Westbrook the mechanics of what happened in 2008, as he
20    was the audit partner.  But this is a fine breaking point.
21            THE COURT:  It is?
22            MR. LANDGRAFF:  Yes, Your Honor.
23            THE COURT:  All right.  Right now, just take a
24    little stock here.  About how much more do you have with
25    this witness?
```

1          MR. LANDGRAFF:  I think I have probably at least

2     another hour and a half.

3          THE COURT:  And how much do you have?

4          MR. SORENSEN:  About -- well, it depends on what

5     the extra hour and a half is.  But I would say an hour at

6     most.  It may change, depending on what he covers.

7          MR. DiCARLO:  Your Honor, we're try to coordinate

8     so that we're not duplicative.

9          THE COURT:  Can we finish with him by tomorrow

10    morning?

11         MR. LANDGRAFF:  That's my hope, Your Honor.  And

12    then we have Patrick Cox who's coming in from Alabama to try

13    and ease the pressure that last week.  So he's going to be

14    called after Mr. Westbrook is finished.  He's another one of

15    the auditors that you're aware of.

16         THE COURT:  Okay.  And then what happens for the

17    rest of the week?

18         MR. LANDGRAFF:  Then we have Mr. Lucas, who is the

19    author of FAS 140 and is our expert on that, who is going to

20    explain the details of that and the analysis.  And then

21    Mr. Naumann, if we have time for him.  They're shorter, we

22    think.

23         THE COURT:  We'll see how far we get on Thursday.

24    I'm still not willing to give up reading time on Friday yet.

25    I'm hoping that we can finish.  Sounds a little ambitious to

1    finish all of these people by the end of business on

2    Thursday, but we'll try.

3           MR. LANDGRAFF:  We'll try.

4           And Mr. Naumann is in from LA.  So to the extent

5    we can get him on, we'll do our best because we brought him

6    in to be available.

7           THE COURT:  Well, yes, maybe we should switch.

8    Can we switch?

9           MR. LANDGRAFF:  I think it will be more helpful,

10    Your Honor, to have Mr. Lucas go first.  So if we may, we'll

11    do that.  And we'll fly him back, if he needs to come back.

12           THE COURT:  Okay.  Meanwhile, I am expecting -- we

13    haven't gotten a brief yet.  I just wanted to check with

14    Heather.  And it seems like we haven't -- we're expecting a

15    brief at some point?

16           MR. TURNER:  Yes, you'll get it in the next 30

17    minutes.

18           THE COURT:  The next 30 minutes.  Okay.  I'm

19    waiting with bated breath for that.

20           MR. BECK:  And, Your Honor, I indicated this

21    morning when you expressed a desire to have the damages

22    trial the week of October 30th, I needed to check with our

23    experts.  We have two experts.  Mr. Riddiough is available.

24    Mr. Lane is returning from Vietnam on October 29th.

25           THE COURT:  Probably see him at the airport.  Just

1  kidding.

2      MR. BECK:  So long as we have -- and he's leaving

3  for Vietnam before this trial ends.  So long as we have a

4  few days to get him up to speed, we should be okay.

5      So all I would ask, Your Honor, is if they go very

6  fast and are done in a day, that if we have to have a dead

7  day or so, if we could put him on toward the -- more towards

8  the end of the week, rather than the beginning of the week,

9  so that he can orient himself and --

10     THE COURT:  As long as we put him on in time to

11 finish.  There seems to be this trial coming right after

12 yours, you may have heard of, or take some notice of that.

13 But --

14     MR. BECK:  And we should have no problem with

15 that.  I think they indicated their case would just be,

16 what?  A day or two, or three?

17     MR. MULLIN:  Ours won't be very long, but I think

18 you have to ask CBG how long their case is.

19     MR. BECK:  CBG, how long?

20     MR. DiCARLO:  Well, we have two witnesses, perhaps.

21     THE COURT:  He's going to go on before the end of

22 the week?

23     MR. BECK:  Yeah, as long as we have --

24     THE COURT:  We'll make sure he doesn't.  Okay?

25 Even if they somehow finish early, let's just -- he won't go

1    on before Thursday.

2            MR. BECK:  That would be great.  I appreciate it,

3    Your Honor.

4            THE COURT:  Okay.  So I'll see you back here

5    tomorrow.

6            Court will now be in recess.

7                            *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4         I, JANICE DICKMAN, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of

6    my stenograph notes and is a full, true and complete

7    transcript of the proceedings to the best of my ability.

8                   Dated this 26th day of September, 2017.

9

10

11                        /s/_____

12                        Janice E. Dickman, CRR, RMR
                         Official Court Reporter
13                        Room 6523
                         333 Constitution Avenue NW
14                        Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25