IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

The Colonial BancGroup, Inc.,    )
and Kevin O'Halloran, as Plan    )
Trustee for the Colonial         )   Civil Action
BancGroup, Inc.,                 )   No. 2:11-cv-00746 - BJR
                                 )
                    Plaintiff,   )   BENCH TRIAL
                                 )
vs.                              )   Washington, DC
                                 )   September 27, 2017
PricewaterhouseCoopers, LLP      )   Afternoon Session
and Crowe Horwath, LLP,          )   Time:  1:30 p.m.
                                 )
                    Defendants.  )
_____

TRANSCRIPT OF BENCH TRIAL
HELD BEFORE
THE HONORABLE JUDGE BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Plaintiff:    **David C Mullin**
                      Mullin Hoard & Brown LLP
                      500 S. Taylor
                      Suite 800
                      Amarillo, TX 79101
                      (806)372-5050
                      Email: Dmullin@mhba.com
                      **Stephen P. Sorensen**
                      Thomas Alexander Forrester &
                          Sorensen LLP
                      14 27th Ave
                      Venice, CA 90291
                      (310)961-2536
                      Email: Ssorensen@tafsattorneys.com
                      **Ronald T Coleman, Jr.**
                      Parker, Hudson, Rainer & Dobbs LLP
                      285 Peachtree Center Avenue NE
                      1500 Marquis Two Tower
                      Atlanta, GA 30303
                      (404)420-1144
                      Email: Rtc@phrd.com

1      **Nicholas J DiCarlo**
       DiCarlo Caserta McKeighan & Phelps
2      6900 E. Camelback Rd. Suite 250
       Scottsdale, AZ 85251
3      (480)222-0914
       Email: Ndicarlo@dcmplaw.com
4      **John G. Turner, III**
       Mullin Hoard & Brown, LLP
5      P O Box 31656
       Amarillo, TX 79120
6      Email: Jturner@mhba.com

7  For the Defendants:    **Philip S. Beck**
                          **Mark L. Levine**
8                         Bartlit Beck Herman Palenchar & Scott
                          54 West Hubbard Street, Suite 300
9                         Chicago, IL 60654
                          (312)494-4411
10                        Email: Philip.beck@bartlitbeck.com
                          Email: Mark.levine@bartlitbeck.com
11                        **Jameson R. Jones**
                          Bartlit Beck Herman Palenchar & Scott
12                        1899 Wynkoop Street. 8th Floor
                          Denver, CO 80202
13                        Email: Jameson.jones@bartlitbeck.com
                          **Meredith Moss**
14                        King & Spalding LLP
                          1700 Pennsylvania Ave NW
15                        Washington, DC 20006
                          (202)626-2916
16                        Email: Mmoss@kslaw.com
                          **Christopher D. Landgraff**
17                        Bartlit Beck Herman Palenchar & Scott
                          54 W Hubbard St Ste 300
18                        Chicago, IL 60654
                          Email: Chris.landgraff@bbhps.com
19     _____

20  Court Reporter:       Janice E. Dickman, RMR, CRR
                          Official Court Reporter
21                        United States Courthouse, Room 6523
                          333 Constitution Avenue, NW
22                        Washington, DC  20001
                          202-354-3267
23

24

25

# Index

Gary Westbrook
    Recross-Examination by Mr. Landgraff..............1621

Patrick Cox
    Direct Examination by Mr. Mullin..................1628
    Cross-Examination by Ms. Moss.....................1672

*   *   *

* * * * * * * AFTERNOON SESSION * * * * * * *

THE COURT:  Good afternoon, Counsel.

MR. LANDGRAFF:  Good afternoon, Judge Rothstein.

THE COURT:  Let's see, I think it's your turn.

MR. LANDGRAFF:  Thank you, Your Honor.  And before I resume with Mr. Westbrook, we have the offer of proof that you had requested with respect to Mr. Malek.

THE COURT:  And you've given it to the other --

MR. LANDGRAFF:  I believe we have, yes.  And it's being e-mailed to Heather at the moment.  And I have two copies for the Court, if I may approach.

THE COURT:  Please.  Thank you.

Wherever you're ready to finish with this witness.

RECROSS-EXAMINATION

BY MR. LANDGRAFF:

Q.  Mr. Westbrook, on the question of what Ms. Vitto's job was as the PwC corporate representative, did you -- did you review the FDIC complaint in this action?

A.  Yes.

Q.  And I'm going to show you the first page of Exhibit D-3017.  This is the FDIC's third amended complaint.  And if you look at Section 5, Paragraph 87, what does the FDIC itself say about what Ms. Vitto's job responsibilities were?

A.  It says, under 87:  In 2004, Pam Vitto was hired as a full-time senior risk officer, reporting directly to the

1    general auditor in Montgomery.  Her responsibilities

2    included auditing the MWLD's controls, including control

3    over the AOT facility created for TBW in late 2004.

4    Q.  Who was the general auditor in Montgomery?

5    A.  Mr. Young Boozer.

6    Q.  He was the head of internal audit?

7    A.  Yes.

8    Q.  Were you present at an audit committee meeting at which

9    Ms. Vitto made a presentation?

10   A.  Yes.

11   Q.  I'm going to show you D-227.  And we'll pull it out so

12   you can identify it.

13          What is D-227?

14   A.  It's a meeting of the audit committee, December 20th, 2006.

15   Q.  And Ms. Vitto was there, right?

16   A.  Yes.

17   Q.  And you and Mr. Kelly were there from PwC?

18   A.  Correct.

19   Q.  Do you recall Mr. Beville -- or, do you recall Ms. Vitto

20   making a presentation?

21   A.  I have a vague recollection of it.

22   Q.  Let me see if I can refresh it.  I want to show you the

23   audit committee meeting materials, Exhibit D-228.

24          Can you just identify from this cover page what

25   D-228 is?

1    THE COURT:  You just told him.  That's okay.

2    MR. LANDGRAFF:  Okay.  Trying to move things

3    along, Your Honor.

4    BY MR. LANDGRAFF:

5    Q.  On page, I believe it is 4 of 5, of D-228, the audit

6    committee materials, what is shown here?

7    A.  I think this is the beginning of Ms. Vitto's prepared

8    documents; risk management, mortgage warehousing.

9    Q.  Did the page on internal review process remind you of

10   what Ms. Vitto was talking about?

11   A.  Yeah.  I mean, this is what she described that she was

12   doing.

13   Q.  What was your understanding of Ms. Vitto's job

14   responsibilities?

15   A.  My understanding was that she was effectively serving in

16   the internal audit role, specific to Mortgage Warehouse

17   Lending.

18   Q.  On Page 10 of Exhibit 228, what did Ms. Vitto tell the

19   audit committee about her responsibilities with respect to

20   collateral?

21   A.  With respect to collateral, she indicated that she was

22   doing testing to ensure documentation had been obtained to

23   adequately secure the loan.

24   Q.  I want to talk about the questions that Mr. Sorensen

25   asked you about the trust department at Colonial.

1    Do you remember that just before lunch?

2    A.  Yes.

3    Q.  First, who is the custodian responsible for the COLB

4    collateral that's at issue in this case?  Who did those

5    people in the custody department report to?

6    A.  Ms. Shultz.

7    Q.  And who did she report to?

8    A.  Ms. Kissick.

9    Q.  Now, if Colonial was acting as a custodian for third

10   parties, holding documents for third parties, or holding

11   their valuables like a safety deposit box, is that something

12   that the auditor would be interested in?

13   A.  Not necessarily.  That's a -- that's a fee-for-service

14   type arrangement, so the bank would have been charging fees

15   for those services.

16   Q.  Are those materials assets of the bank, if they're

17   holding -- if they're acting as a custodian, holding

18   materials for a third-party for a fee?

19   A.  No.

20   Q.  We reviewed -- or, you were asked about an e-mail that

21   you sent Mike Thomas of Crowe Chizek in 2005.

22           Do you recall that?

23   A.  Yes, sir.

24   Q.  Let me put that up on the screen.

25           Is this the e-mail that Mr. Sorensen asked you

1    about before the lunch break?

2    A.  Yes.

3    Q.  What was the context of -- what was the general context

4    that was -- that led you to write this e-mail to Mr. Thomas?

5    A.  I had reviewed a document that was prepared by Crowe for

6    the benefit of management in which Crowe was evaluating

7    controlled efficiencies that had been identified in their

8    work.  And essentially, they list out the control

9    deficiencies, and then what's happened to those control

10   deficiencies and all of that is being done under the context

11   of the guidance of AS 2, that had been recently issued.  And

12   this was the first year in which it was being applied on

13   public company audits.

14          So, my review of that and the review that had

15   previously been by Brent Hicks, when he was working for us,

16   we had questions with respect to some of the documentation

17   that we found in that document.  So, we were asking

18   questions specifically with respect to that documentation.

19   I think I say here in this letter that I'm assuming this is

20   the first -- a first cut at this document, but that in my

21   view, there had to be improvements in the documentation.

22   And I wanted to make sure that we had full transparency to

23   everything that Crowe had done in this area.

24   Q.  Did Crowe respond to your e-mail in terms of improving

25   the documentation?

1    A.   They did.

2    Q.   What did they do?

3    A.   Well, they addressed each of the areas, some of which I

4    think we later found out that this was, in fact, the first

5    cut and they were doing some of this documentation

6    simultaneously.  But, they ultimately presented a document

7    which represented management's evaluation of their control

8    deficiencies that we felt did in fact meet the guideline

9    requirements of AS 2.

10   Q.   Were you satisfied with the level of Crowe's

11   documentation before the issuance of the 2004 10-K?

12   A.   Yes.

13   Q.   Was this an issue in later years?  Did you ever have a

14   complaint to Crowe about the first draft of documentation?

15   A.   I mean, we certainly had comments in later years that we

16   didn't always agree with exactly the way things had been

17   documented and we would make suggestions or edits or ask for

18   additional information when the need arose.

19   Q.   What was your goal with respect to communicating with

20   Crowe in that way?  What were you trying to accomplish?

21   A.   Trying to get it right.

22            THE COURT:  What's the exhibit number?

23            MR. LANDGRAFF:  That is Exhibit P-1462.

24   BY MR. LANDGRAFF:

25   Q.   Last thing I want to ask you about is Exhibit P-2436.

1    And this is the prayer e-mail between you and Mr. Jackson.

2         You've seen this on a slide, right?

3    A.  Yes.

4    Q.  Do you care to explain it?

5    A.  I had sent -- I had sent Mr. Jackson a response on the

6    4th of April -- I mean, on the 8th of April.  He had said,

7    Anything else I can do, anything that I can help you do with

8    this?  I told him -- I told him pray.  I said things are

9    going really slowly, that our national consultants had

10   raised a lot of questions that I had not expected and that

11   things were taking a direction that I didn't know where they

12   were going to go.

13        It was a -- you know, at this point in time, our

14   consultants were doing what our consultants are supposed to

15   do, they're asking a lot of questions and delving into the

16   matter and I'm just saying, look, there's not a lot we can

17   do right now except go through the process.

18        MR. LANDGRAFF:  Thank you.  I don't have any

19   further questions.

20        MR. DiCARLO:  Nothing further.

21        THE COURT:  You'll be very glad to hear, Mr.

22   Westbrook, that at long last you can leave us.

23        THE WITNESS:  Thank you.

24        THE COURT:  If you want.  I mean, they may want

25   you to stay.  As far as the Court is concerned, you can leave.

1    MR. LANDGRAFF:  He can come all the way over here,

2    to this table.

3         THE COURT:  Well, not very far.

4         MR. MULLIN:  Excuse me.  Getting rid of some of

5    this stuff.  We want to get to the point where we can see

6    the witness.

7         We're calling as our next witness Mr. Cox, Patrick

8    Cox.  And do you have his notebooks up there?

9         Mr. Cox?

10        MS. MOSS:  He's coming.

11        THE COURT:  If you'll step forward, Mr. Cox, to be

12    sworn by the deputy.

13                    PATRICK COX,

14    was called as a witness and, having been first duly sworn,

15    was examined and testified as follows:

16                 DIRECT EXAMINATION

17    BY MR. MULLIN:

18    Q.  Mr. Cox, are the lawyers from King and Spalding your

19    attorneys in this case?

20    A.  Yes, I believe so.

21    Q.  And how long have they been your attorneys?

22    A.  Since the beginning.

23    Q.  Since 2009?

24    A.  No.  Since -- I think it was two years ago when I was

25    first contacted.

1    Q.  And those lawyers from King and Spalding have represented

2    you in several depositions?

3    A.  Yes, sir.

4    Q.  And did you meet with the lawyers from King and Spalding

5    yesterday?

6    A.  Yes, sir.

7    Q.  And have you met with them within the last couple

8    months, other times?

9    A.  Yes, sir.

10   Q.  How many times?

11   A.  Twice.  Twice, I think.

12   Q.  And for what total number of days?

13   A.  It was probably a day apiece, roughly.

14   Q.  When were you last employed by PwC?

15   A.  April of 2004.

16   Q.  And is PwC paying your legal fees in this proceeding?

17   A.  Yes.  Or, I haven't gotten a bill.

18   Q.  What was the last time you reviewed the work papers from

19   your 2002 and 2003 audits of Colonial?

20   A.  In totality or preparation?

21   Q.  Well, in preparation.

22   A.  Probably the last time we met.  This -- a month ago or so.

23   Q.  Did you review work papers yesterday?

24   A.  No -- oh, I'm sorry, yes.  I mean -- yes, I'm sorry.

25   Q.  Did you review the work papers some more this morning?

1  A.  No, sir.

2  Q.  Have you read your depositions in this case?

3  A.  Yes.

4  Q.  And did you read your deposition in the TBW case?

5  A.  It's been a while, but yes.  Well, I flipped through it,

6  yes.

7  Q.  Have you read any other depositions that were taken in

8  either case?

9  A.  No, sir.

10  Q.  Have you read any of the trial testimony that's been

11  given in this trial so far?

12  A.  There was one snippet from Phillip Rivers.

13  Q.  Phillip Rivers.  Did you read any of Mr. Jackson's

14  testimony?

15  A.  No, sir.

16  Q.  And have you reviewed any of the trial exhibits to

17  prepare for testimony?

18  A.  The -- I'm not trying to be evasive, but the things with

19  the little labels on them?

20  Q.  Exhibit stickers, yes.

21  A.  (Nods head.)

22  Q.  Mr. Westbrook testified just before the lunch hour that

23  it was PwC's responsibility to design and perform tests that

24  are directed at detecting fraud.  Do you think that's a fair

25  representation of what PwC's responsibilities were?

A.   Reasonable design to perform audits for reasonable

assurance, yes, sir.

Q.   I understand the goal is reasonable assurance, but the

way that I think Mr. Westbrook was discussing it, was the

way to obtain reasonable assurances to design and perform

tests detecting fraud; do you agree with that?

          MS. MOSS:  I'm sorry.  He's asking him to comment

on a paraphrasing about a witness's testimony?

          MR. MULLIN:  It's pretty close to the witness's

exact words, but --

          THE COURT:  And what's your objection?

          MS. MOSS:  He didn't hear it.  It's been proffered

as, "this witness," and counsel's summary of testimony given

by another witness.

          THE COURT:  If he doesn't agree with the

description, he can tell you.  You've been asking all of

these witnesses, do they agree with statements, things put

up on the board.

          Overruled.  Let's go.

A.   Could you repeat the question?

BY MR. MULLIN:

Q.   Yeah.  I said that I understand that the goal is

reasonable assurance, but what I'm asking you is, in order

to obtain these reasonable assurances, it's the auditor's

responsibility to design and perform tests that are directed

1  at detecting fraud?

2  A.  We weren't doing a fraud audit.  You have to -- fraud is

3  part --

4       THE COURT:  Go ahead.

5       THE WITNESS:  Fraud is part of the consideration.

6  It's part of things you have to consider, but it's not -- I

7  don't know that when you start talking about just going

8  directly at fraud time and time again, it seems like maybe

9  there's a gap there.

10  MR. MULLEN:

11  Q.  So you do not agree that PwC had a responsibility to

12  design and perform tests that are directed at detecting fraud?

13  A.  PwC's responsibility to design and perform their audits

14  to obtain reasonable assurance to detect fraud.

15  Q.  I'm not asking you exactly that question.  I'm asking

16  you, did PwC have a responsibility to design and perform

17  tests that are directed at detecting fraud?

18  A.  I'm uncomfortable with the word "direct," in that it's a

19  part of it, certainly.  But I don't know that you're sitting

20  down -- again, it's not a fraud audit.

21       It's part of consideration.  There are steps you

22  undertake that could unveil it.  There are procedures you do

23  that could unveil it.  That would be about it.

24  Q.  When you were performing the 2003 audit as the -- and

25  you were the senior manager on that audit, correct?

1    A.  I was a manager.  I don't think I was the senior manager.

2    Q.  Was there anybody higher than you -- higher up the food

3    chain than you to Mr. Jackson?  Between you and Mr. Jackson,

4    was there anybody else?

5    A.  No.  No.

6    Q.  Okay.  And so when you were performing the 2003 audit,

7    did you design and perform tests that were directed at

8    detecting fraud?

9    A.  We certainly -- we, as a part of the process and the

10   controls testing and the thousand steps that we -- ranging

11   from our kick-off meetings, we talk about the potential for

12   fraud, including looking at the various controls of doing

13   controls testing.

14          I think there were steps taken and tests done that

15   included the potential -- I think was the word -- potential

16   to catch fraud.

17   Q.  So are you saying the answer to my question is yes?

18   A.  I believe so, yes.

19   Q.  What audit -- were there any audit procedures that PwC

20   wanted to perform in the 2003 audit, that it was prevented

21   from performing by management or anybody else?

22   A.  I don't recall any, if there were.

23   Q.  Were there any questions that PwC asked of Colonial

24   management or employees that they refused to answer?

25   A.  I don't recall any, no, sir.

1  Q.  Where there any documents that PwC requested in the 2003

2  audit that it didn't get?

3  A.  Again, I don't recall any.

4  Q.  Let's look at exhibit -- I think it's P-2212.  It should

5  be in your notebook there.

6          Yeah, it will come up on the screen, too, Mr. Cox.

7  A.  But it is in here?

8  Q.  It should be in there, too.  It could be under -- its

9  other number is A-82, so it could be under one or the other,

10  A-82 or P-2212.

11  A.  Okay.  I'm sorry.  I just have bad eyes.  So, I mean,

12  I -- got it.  Yes, sir.

13  Q.  Are these your notes, P-2212?

14  A.  Yes, sir.

15  Q.  And were those done by you during quarterly procedures

16  during the year 2002?

17  A.  Yes, sir.

18  Q.  Now, was the acronym down here at the bottom -- well,

19  let's concentrate on this part -- blow that up for us, Rami --

20  where it says FNMA at the front.  Is that for Fanny Mae?

21  A.  Yes, sir.

22  Q.  Had Fannie Mae terminated its relationship with TBW?

23  A.  Yes, sir.

24  Q.  Had Fanny Mae terminated TBW as a seller and servicer?

25  A.  It had terminated Fannie Mae as a seller to Fannie Mae.

1    Servicer, I don't believe is correct.

2    Q.  Let's pop up your deposition from the TBW case at Page

3    179, Lines 18 to 25, if you would put those up.  Here's a

4    copy of your TBW deposition.

5           And so you were asked the question:  So, Miss

6    Kissick told you that Lee Farkas had issues with Fannie Mae?

7    And you gave the answer that they had a falling out, yes.

8           Correct?

9           And then you were asked:  And that Fannie Mae had

10   terminated TBW as -- yes -- a seller servicer?  And you

11   said, Yes.

12          Correct?

13   A.  Yes.

14   Q.  Did you do anything beyond talking to Miss Kissick to

15   investigate the termination of TBW by Fannie Mae?

16   A.  We saw that GMAC came in right behind and had picked up

17   where Fannie Mae left off.

18   Q.  GMAC.  Isn't it true that GMAC bought the -- bought all

19   the servicing, took over all the servicing on Fannie Mae

20   assets from TBW?

21   A.  I don't recall.  If we're talking about the notes, they

22   certainly took the purchase side, the notes themselves.  But

23   that's what I remember.  I don't remember the servicing.

24   Q.  Do you know -- do you know what Mortgage Dynamics is?

25   A.  Not off the top of my head, no, sir.

1  Q.  Do you remember that -- and it was brought up yesterday

2  by PwC counsel -- that there were reports that were received

3  from a company called Mortgage Dynamics on reviews of the

4  operations and assets of Taylor Bean and Whitaker, Corp?

5  A.  MDI?

6  Q.  MDI.

7  A.  Yes, sir.  I'm sorry.  Yes, sir.

8  Q.  Okay.  And I'd like to show you one of those reports, A-41.

9  A.  Would you like this back or stick it right here?

10  Q.  Yeah.  Just keep it.  You can have it.

11  A.  I'm sorry.  A-49?

12  Q.  Exhibit A-41.

13  A.  A-41, okay.

14        THE COURT:  You know, you could probably save

15  yourself a lot of time if you just looked at the exhibit on

16  your screen.  And then if you feel you want --

17        THE WITNESS:  Okay.

18        THE COURT:  -- more pages than we're showing you,

19  feel free to go to the paper.  Okay?

20        THE WITNESS:  Yes, ma'am, yes, ma'am.

21  BY MR. MULLIN:

22  Q.  And this document, A-41, is headed up, Mortgage

23  Dynamics, Inc., Due diligence review of the assets and

24  operation of Taylor Bean and Whitaker for Colonial Bank and

25  GMAC Residential Funding, May 2002.  Correct?

1    A.  Yes, sir.

2    Q.  And Miss Kissick said that she gave you a copy of this

3    report; do you recall receiving it?

4    A.  I do not.

5    Q.  Do you know if this was, in fact, something you reviewed

6    during your audit?

7    A.  I don't specifically remember it.

8    Q.  You knew MDI was out there.  Did you ask Miss Kissick

9    for the MDI report relating to the question of Fannie Mae

10   and the Fannie Mae termination?

11   A.  I don't recall much at all about MDI, to be honest with

12   you.

13   Q.  Well, if you go to the Page 8 of the report, I just want

14   to -- the second -- or, excuse me, first paragraph there,

15   regarding TBW.

16          This is a company that is in a state of

17   transition.  Fannie Mae has recently discontinued its

18   relationship with TBW and is requiring that all of the

19   Fannie Mae assets be transferred from the company.

20          It is also providing on-site oversight until this

21   happens.  The company has entered into an agreement with

22   GMAC to sell its Fannie Mae servicing to them.

23          Do you see that?

24   A.  Yes, sir.

25   Q.  Okay.  Did you know about that during the audit of 2002

1  or 2003?

2  A. Well, through the notes, we knew that Fannie Mae had

3  terminated its relationship.

4  Q. But did you know the facts that are stated in the MDI

5  report, that Fannie Mae was providing on-site oversight

6  until the assets of Fannie Mae could all be transferred away

7  from TBW?

8  A. I don't recall it.

9  Q. Is there anything that you saw in your review of PwC's

10  work papers reflecting that you verified whether the Fannie

11  Mae termination of TBW was due to fraud or not?

12  A. Well, the fact that, again, you had GMAC coming in, and

13  we saw loans rolling off.

14      And then Freddie, who is a cousin, for lack of a

15  better term, to Fannie, you know, coming in and picking up

16  right where they left off, told us that at the end of the

17  day, there must not be fraud.

18  Q. And was there anything -- was there anything in your

19  work papers that indicated you had determined that Freddie

20  Mac knew why Fannie Mae had terminated TBW?

21  A. I -- I don't think so, but I don't recall with certainty.

22  Q. And you keep saying GMAC was coming in behind Freddie --

23  behind Fannie.

24      GMAC was not going to become -- was not going to

25  be the buyer of TBW's loans in place of Fannie, where they?

1   Is that what you're telling us?

2   A.   At the time, GMAC was just stepping in to provide a

3   bridge, for lack of a better term, an overline, to

4   eventually get it up to Freddie, was my recollection.

5   Q.   And Kissick told you that Fannie Mae would have taken

6   the servicing, if there was fraud, right?

7   A.   Yes.

8   Q.   And, in fact, they did take the servicing, right?

9   A.   No.   I think that -- Taylor Bean kept -- I thought they

10  did, kept servicing, and eventually controlled its own

11  destiny.

12          They didn't sweep everything and drop the hammer

13  right then and there on them and completely wipe off the --

14  you know, pull everything back inhouse to Fannie, is my

15  recollection.

16  Q.   Are you telling me the MDI report's wrong?   That didn't

17  happen; that they had on-site oversight until the assets

18  could be moved?

19  A.   But Fannie didn't take them, from what I recall.   They

20  were eventually moved, to your point, to Freddie.   I think

21  servicing was either -- again, to the best of my

22  recollection, servicing was kept to some degree at Taylor

23  Bean, or perhaps it got -- they ultimately controlled where

24  it went.

25  Q.   Well, you wouldn't expect -- you didn't understand Miss

1  Kissick to be telling you, oh, the servicing would have gone

2  over to Fannie Mae?

3        You're saying that they had to transfer the

4  servicing somewhere and they transferred it to GMAC, right?

5  To somebody they thought was honest, right?

6  A.  I -- I don't know.

7  Q.  And you also said in those notes, if you go back to

8  P-2212, that Mr. Farkas has taken a lesser role, at the very

9  last line; is that right?

10  A.  Yes, sir.

11  Q.  And did you -- did you take comfort in Mr. Farkas taking

12  a lesser role?

13  A.  I really didn't.  I don't know that it was comfort.

14  Just more of, at that point, a note, more than anything.

15  Q.  Okay.  Well, let's see what you said when you were under

16  oath in the TBW deposition at Page 181, Lines 1 to 10.

17        And you've got that deposition up there.  You can

18  see it?

19  A.  I didn't realize the screen was right in front of me.

20  Q.  Yeah, okay.  "And did it give you some comfort that Lee

21  Farkas would be taking on a lesser of a role?"

22        And you said, "It did; it also gave us comfort

23  that my understanding was that Freddie was coming in right

24  behind."

25        Right?

A. Yes. Also look and see if the CEO and CFO were talking about a data point, as much as anything. They were new people, which I think was in his notes, too.

Q. Did you -- if -- in light of the fact that you took comfort in Lee Farkas taking a lesser role, if you had been sending a confirmation to TBW for something, you would not have sent it to Lee Farkas, would you? You would have sent it to one of these new people, right?

A. I -- you know, a confirmation from inside. Yes, it would have gone to the CFO, most likely, at Taylor Bean.

Q. Let me get to what happened the following year. Let me show you A-301.

And this is some typewritten notes that you took from a conversation with Cathie Kissick on July 14th. Is that right, 2003?

A. Yes, sir.

Q. And in that conversation, Miss Kissick made the statement to you that she -- and it's in the -- I guess it would be the third paragraph down, Mr. Cox.

It says, "She remains determined to help Taylor Bean find a new lender, and Bank of America has tentatively agreed to provide financing, with the last obstacle to be cleared being the completion of TBW's financial statement audit.

"Cathie remains convinced that removing TBW from

1    her portfolio will increase operational prowess," correct?

2    A.  Yes, sir.

3    Q.  So as of this date, you knew that Fannie Mae had

4    terminated its relationship with TBW and that Miss Kissick

5    was wanting to terminate her relationship with TBW, correct?

6    A.  Yes.

7    Q.  And I think you said before, that it was -- the way you

8    interpreted it was that Miss Kissick wanted to get rid of

9    TBW because of the PITA factor, right?

10            THE COURT:  The what factor?

11            THE WITNESS:  PITA, P-I-T-A --

12            THE COURT:  Oh, got it.  It's another one of those

13   esoteric accounting terms.

14            THE WITNESS:  Yes, ma'am.  Exactly.  Wait until

15   you get to FUBAR.

16   BY MR. MULLIN:

17   Q.  And PITA factor had redlined, right?

18   A.  I'm sorry.  I shouldn't have said that.  I'm sorry.  I'm

19   sorry.

20            What, now?

21   Q.  And that you thought the PITA factor with Lee Farkas had

22   redlined, correct?

23   A.  Yes, I -- yes.  Yes, sir.

24   Q.  And did you -- did you also conclude that Kissick

25   believed that Farkas presented challenges for her personally?

1    A.  Yes, I think that's fair.  Lee had called Cathie direct,

2    from what I recall.

3    Q.  And that he was very intense?

4    A.  To what -- that general sentiment was what I remember,

5    yes, sir.

6    Q.  And was it your observation that everything with Miss

7    Kissick and Mr. Farkas was drama?

8    A.  I would disagree with the word "everything," but there

9    was a lot of drama, yes, sir.

10   Q.  And you also commented that your Attention Deficit

11   Disorder kicked in?

12   A.  Maybe so.  You'd have to tell me.

13   Q.  Okay.  Well, let's look at your testimony at FDIC depo,

14   Page 70, Line 15 to Page 71, Line 14.

15         If you look at -- "Can you tell me anything else

16   you remember about Cathie Kissick's discussion with you

17   regarding Lee Farkas being difficult?"

18         And, you said, "I'm thinking everything I

19   remember -- Cathie saying everything had drama.  If you talk

20   to Lee Farkas, there was drama attached to it, you know,

21   wow."

22         "I'm saying 'um' a lot as I sit here and think

23   about it.  Sorry, my ADD just kicked in.  I remember her

24   saying drama; that everything had drama attached to it with

25   Lee."

1    So that's, clearly, what you -- one of the things

2  you drew from that conversation?

3  A.  Yes, sir.

4  Q.  And did Miss Kissick also state at the audit committee

5  meeting in January of '03, that fraud was the primary risk

6  associated with the Mortgage Warehouse Lending Division?

7  A.  I don't remember that specific thing, but I'm guessing

8  it's somewhere and you're going to show it to me.

9  Q.  Well, do you agree that it is the primary risk

10  associated with the Mortgage Warehouse Lending Department?

11  A.  Yes, sir.

12  Q.  Okay.  Well, then we don't need to look at it.

13    On the 2003 audit, I was just trying to get a

14  timeline of events.  You said you left PwC in April,

15  correct, of 2004?

16  A.  '4, yes, sir.

17  Q.  So the audit would have been in the first couple months

18  of 2004, the 2003 audit?

19  A.  Yes, sir.

20  Q.  And I believe that the audit opinion is dated February

21  20th, 2004.  You wouldn't disagree with that, would you?

22  A.  No, sir.  I'm sure it's somewhere in the record.

23  Q.  Was the 2003 Colonial audit the last audit you

24  performed?

25  A.  Yes, sir.

1    Q.  And I don't mean just of Colonial, but of anybody's; is

2    that right?

3    A.  Oh, performed, yes.

4    Q.  All right.  And you have not practiced public accounting

5    since '03 -- '04 then?

6    A.  I've been a CPA, but public accountancy, in terms of

7    working for a firm, that would be correct, '04.

8    Q.  Okay.  I think you said you let your CPA license lapse?

9    A.  This past year.

10   Q.  Last year?

11   A.  Yes, sir.  I think that's right.

12   Q.  Okay.  Do you know who Flake Oakley is?

13   A.  Yes, sir.

14   Q.  Did Flake Oakley tell you that he wanted you to make

15   sure that you understand Warehouse Lending and that we're

16   good?

17   A.  Yes, sir.  I don't remember exact words, but in so many

18   words, yes, sir.

19   Q.  Okay.  And Flake Oakley was -- did he have a -- is he an

20   officer of the bank?

21   A.  Yes, sir.

22   Q.  Okay.  And he told you that in December 2002?

23           THE COURT:  What did he tell him?

24           MR. MULLIN:  He told him that:  Make sure you

25   understand the Warehouse Lending, and that we're -- we're --

1    we are good.

2    BY MR. MULLIN:

3    Q.  Correct?

4    A.  Oh, yes.  I'll answer it, yes.

5    Q.  Okay.  Let me show you Exhibit A-83.

6         This is a work paper from your 2002 audit, and

7    that's dated December -- it's for the period ended December

8    31, 2002.  Do you see that?

9    A.  Yes, sir.

10   Q.  Okay.  And in the work paper on the second page, it has

11   a statement under credit quality.  Do you see that?

12        It says -- and you're going to need to -- Rami,

13   it's cutting it off on the left side.  There we go.  Okay.

14   Thanks.

15        It says at the top:  Historically speaking, the

16   largest losses related to the mortgage warehouse lending

17   industry have come from frauds perpetrated by mortgage

18   originators, correct?

19   A.  The last word on the right is mortgage.  Yes, that's

20   what it says.

21   Q.  And do you agree with that?

22        THE COURT:  Is this an audit report he's done?

23        MR. MULLIN:  He worked on this work paper -- yeah,

24   this is his 2002 -- you worked on the audit, right?

25        THE WITNESS:  Yes, sir.

1    THE COURT:  All right.

2    BY MR. MULLIN:

3    Q.  Okay.  And I think you've said previously that you

4    learned this fact, that the largest losses related to the

5    mortgage warehouse lending industry have come from frauds

6    perpetrated by mortgage originators, from Tim Kviz, correct?

7    A.  Yes, and that was one of Tim's points.  And I think

8    here, though, one thing we didn't talk about was the

9    internal/external affect.  I think that's one thing that is

10   different in this one.

11   Q.  Well, and is it fair to say that you, in this work

12   paper, is saying the largest losses related to the mortgage

13   warehouse lending industry have come from frauds perpetrated

14   by mortgage originators that have identified the exact risk

15   of fraud that came to pass at Colonial Bank, correct?

16   A.  It's part of it.  It's a part of it.  The other part,

17   again, is when you have -- what is different, from my

18   recollection, is this was speaking more towards the

19   tried-and-true, where external groups by themselves made up

20   documents, did different things.  Obviously, here there was

21   internal collusion with Cathie.

22   Q.  Well, let me ask you this first:  Let's look at your

23   testimony at TBW depo Page 138, Lines 8 through 14.

24        I think you were asked the question, "So you

25   actually identified the exact risk that came to pass at

1    Colonial Bank in this work paper.  Isn't that right?"

2              And you said, "Yes, if you believe a fraud was

3    committed."  Correct?

4    A.  Yes.  And, again, I think it is part of it.

5    Q.  And there's nothing in your years of experience when you

6    were an auditor, it's nothing -- there's nothing unusual to

7    find that a bank officer is engaged in fraud?  It's not like

8    it's a unicorn, is it?

9    A.  It was a unicorn to me, yes, sir.

10   Q.  So never -- you didn't even take that into consideration

11   as a possible thing that could happen in your audit, that

12   there would be a bank officer involved in fraud?

13   A.  No.  We certainly took it into consideration, but you'd

14   asked if I had ever seen one, and I -- we hadn't seen one.

15   Q.  You hadn't seen it then, but you did take it into

16   consideration in planning and performing the audit, that

17   there was a risk that bank officers could be involved in

18   fraud?

19   A.  Yes, sir, I believe so.

20   Q.  And the collateral for the COLB transactions was mortgages,

21   correct?

22   A.  Yes, sir.

23   Q.  And if there's no collateral, the loan could be fictitious,

24   correct?

25   A.  Correct.

1    Q.  And Mr. Kviz, we talked about him briefly on the 2002

2    audit.  He didn't work on the '03 audit, did he?

3    A.  I think Tim was involved, but I don't have, obviously,

4    anything in front of me to look.  But I remember him being

5    involved on some level.

6    Q.  Was Mr. Kviz actually on site in Orlando for the '02 audit?

7    A.  I don't remember.

8    Q.  Was Mr. Kviz's subject matter orig -- expert on mortgage

9    operations and was -- was he?

10   A.  Was he the subject expert on mortgages?

11   Q.  Mortgage operations.

12   A.  Yes, sir.

13   Q.  And was he a very smart guy?

14   A.  Yes, sir, Tim was.

15   Q.  And was he "the man," when it came to mortgage warehouse

16   lending?

17   A.  He was one of them, yes, sir.

18   Q.  And in 2002, when the man on Mortgage Warehouse Lending,

19   Mr. Kviz, was on the audit, Mr. Kviz obtained the December

20   31, 2002, COLB pipeline report, didn't he?

21   A.  I believe so, yes.

22   Q.  And let's look at Exhibit A-83 and see what Mr. Kviz did

23   in 2002.  And this is the -- this is that same work paper we

24   were looking at.

25            Let's go to the first page to see what the title

1    of this work paper is.  This is Mortgage Warehouse Lending

2    Assets.

3            Do you see that?

4    A.  Yes.

5    Q.  Okay.  And he's talking, in the section that we're

6    looking at, it's actually steps performed.

7            Do you see that?  And if we go to the -- do you

8    see where it says "steps performed"?

9    A.  Yes.

10   Q.  Okay.  If we go to the second page, it continues over.

11   The second step performed is the very top of the page.

12           Rami, if you could pull that out to be a little

13   easier --

14           THE COURT:  Make it larger.

15           MR. MULLIN:  Yeah.  Much bigger would help us.

16   BY MR. MULLIN:

17   Q.  And it says that Mr. Kviz reviewed the detailed pipeline

18   report, each sublimit by loan as of December 17th.  The

19   focus of this was to scan for loans with illogical dates,

20   large gaps in time.  Correct?

21   A.  Yes.

22   Q.  And is it in fact true that Mr. Kviz then asked for

23   proof that the mortgages existed on the loans that had

24   illogical dates?

25   A.  We looked at and got explanations.  I don't remember

1    exactly how we satisfied ourselves, but some of them may

2    have been hard copies, some of them may have been looking at

3    loan policy.  Off the top of my head, I don't recall.

4    Q.  And let's just -- let's just -- but you were looking --

5    Mr. Kviz was asking for proof of the existence of these

6    transactions?

7    A.  Yes.  He was looking for backup, yes.

8    Q.  And the reason that Mr. Kviz did that was because

9    fundamentally -- PwC's objective was to try to make sure the

10   assets are not overstated, correct?

11   A.  I'm sorry could you say that -- say that again.

12   Q.  The reason that Mr. Kviz was trying to get evidence of

13   the existence of these assets that had illogical dates was

14   fundamentally it was PwC's objective to try to make sure the

15   assets are not overstated, correct?

16   A.  At its core every audit is.  I believe this is a test of

17   controls.  But, I need to read the whole work paper.

18          THE COURT:  Do you have a problem with the

19   statement he just made to you?

20          THE WITNESS:  I want -- in relation to this

21   report --

22          THE COURT:  Well, isn't it the goal of all of this

23   to make sure the assets are not overstated?

24          THE WITNESS:  That's what I said.  At the end of

25   the day with the audit, yes, ma'am.

THE COURT:  All right, okay.

BY MR. MULLIN:

Q.  And in 2003, you obtained a pipeline report listing out all the COLB loans?  If you put up Exhibit A-300.

Isn't that true, sir?

A.  Yes, sir.

Q.  And is this the report that you obtained?

A.  It's the cover page.

Q.  And is the handwriting on the front of this report your handwriting?

A.  Yes, sir, it is.

Q.  And you did not scan this report, A-300, for loans with illogical dates, correct?

A.  That's correct.

Q.  Did -- let's go -- do you have the hard copy?  I think it would be a little easier on this report, since it's so lengthy.  Just open A-300 in there, if you can.  I think it's not too far down and you can put your hands on it.

A.  There it is.  I got it.

Q.  I think it will be a lot easier to work with it.

A.  Sure.

Q.  I'll show it up here, too.  But if you go to -- this is a report that has 47 pages, right?  All together?

A.  I'll take your word for it.

Q.  It has page numbers at the bottom.  So it has 47 pages.

1    And if you go to page 27 of the report.

2              Rami, if you go to 27, please?

3              And you go down to the Boardman loan right there.

4    A.  Yes, sir.

5    Q.  And now we're -- we're now in the TBW portion of the

6    report, correct?

7    A.  Yes, sir.

8    Q.  Okay.  And the -- in that -- the Boardman loan has a

9    mortgage date --

10             Rami, you're going to have to make that bigger for

11   us to see, because I know I can't see.

12             Okay.  The Boardman loan has as a reported

13   mortgage date of August 21, 2002, but it's reported to have

14   been warehoused or funded by the bank on November -- or,

15   excuse me, December 11th, 2003, correct?

16   A.  Yes, sir.

17   Q.  Okay.  And there are 20 pages, or 19 -- 19 or 20 pages

18   in a row that have loans that have a large gap between the

19   mortgage date and the warehouse date in that report.  Isn't

20   that so, sir?

21   A.  I would have to flip all the pages, but I will take your

22   word for it.

23   Q.  And the -- in the 2003 audit, did PwC look at one mortgage

24   file on TBW COLB loan to confirm the assets were real?

25   A.  One mortgage file --

1        THE COURT:  Did they look at it?

2        THE WITNESS:  No.  We saw they were -- to look at

3   existence, and we look at if they were there.  Looked at

4   that lined age report and other things, but we did not pull

5   the file.

6   Q.  You didn't look at any mortgages during the 2003 audit?

7   A.  Mortgage loans, I don't believe so.  No, sir.

8   Q.  And the mortgages would be -- were supposed to be

9   available for you for physical inspection in the vault,

10  correct?

11  A.  That's not -- I -- I don't agree with that.  In the

12  vault there's -- you'd have to -- you're talking about --

13  you probably know exactly how many.  There's thousands and

14  thousands of loans.

15       What is better in many ways, because you see cash

16  coming and going, is the loans rolling.  We could -- we

17  could have requested underlying documents, but I don't know

18  that the idea of a vault to go pick from is exactly right.

19  Q.  Well, if we look at the top of the -- the top of the

20  list here, if we wanted to get the loan mortgage, I want to

21  see the loan file -- the mortgage on Mr. Rollet, that's

22  supposed to be in the possession of the bank at that point,

23  correct, under COLB?

24  A.  Parked, yes, sir.

25  Q.  And the mortgage for Mr. Boardman's loan is also

1    supposed to be in possession of the bank, right?

2    A.   Yes, sir.

3    Q.   And don't the auditing rules, if we look at slide 1219,

4    say that assets having physical existence are available to

5    the auditor for his or her inspection; is that correct?

6    A.   Yes.  But, again, you're talking about so many of them

7    that a pure substantive test, I don't think it shares what

8    it is that this -- for this particular asset that the

9    standard is talking about.

10   Q.   So, you could -- you could have sampled -- you could

11   have taken samples of the loans with the illogical dates,

12   correct?

13   A.   You could have, yes, sir.

14   Q.   And in fact, Mr. Kviz, he actually looked at

15   documentation on every one that had an illogical date in

16   2002, didn't he?  On every loan?

17   A.   I don't remember that.  I thought some of them were

18   policy.  We didn't have time to do policy exceptions and

19   reviews, but I could be wrong.

20   Q.   He looked at loans -- he looked at loans where he

21   thought the dates were illogical and he looked at loan files

22   for other reasons, too, right?

23   A.   He looked at loan files for other reasons, yes.  And

24   again, though, whether looking at where there were --

25   there's illogical dates, I don't know that every one of them

1    were put to rest by actually getting a document out of the

2    underlying loan file.  I just don't recall that.

3    Q.  Well, none of them got put to rest by actually getting a

4    document from the underlying loan file in 2003, correct?

5    A.  That is correct.

6    Q.  And do you know now that $175 million of the TBW loans

7    on that list were fake?

8    A.  I do now, yes, sir.

9    Q.  Do the auditing rules require auditors to exercise

10   professional skepticism, including a questioning mind and a

11   critical assessment of audit evidence?

12   A.  Yes, sir.

13   Q.  In your 2003 audit, did you -- did the PwC look at any

14   investor commitments on COLB?

15   A.  I'm not sure I understand the question.  Investor

16   commitments?

17   Q.  Well, you understood that when the COLB loans were

18   supposed to be sold, they were subject to an investor

19   commitment where someone was going to buy them, had

20   committed to buy them.  Do you recall that?

21   A.  Yes, sir.

22   Q.  And did -- and that investor commitment was a written

23   document.  Did you understand that?

24   A.  Yes, sir.

25   Q.  Did PwC do any procedures that involved looking at

1 reviewing investor commitments in connection with the 2003

2 audit?

3 A.  Not that I recall.

4 Q.  In 2003, did PwC obtain a confirmation with respect to

5 COLB from TBW?

6 A.  I don't recall.

7 Q.  And there's no documentation of it in your work papers

8 that you saw, did you?  Of a confirmation letter being sent

9 or e-mail being sent?

10 A.  I didn't scan the work papers to that degree, but I

11 don't recall one.

12 Q.  And in 2003, did PwC test any wire payment confirmations

13 on any of the COLB to see if there were wire confirmations

14 that had come in showing that money had been paid on the

15 COLB loans?

16 A.  We saw them rolling off the underlying reports.  We

17 didn't -- you know, that's one of those -- I understand the

18 question.  But it's -- if I go to bed and there's no snow on

19 the ground and I wake up and there's snow on the ground, I

20 can surmise that it snowed.  I think in this case when you

21 can see the loans rolling off, when you see activity, then

22 they've been paid off, which I think achieves the same as

23 pulling the wire comp. down.

24 Q.  You're talking about looking at a bank report, right,

25 that says the loan has rolled off, right?

1   A.   Yes, sir.

2   Q.   Okay.  And the -- and the report that you're looking at,

3   that's generated by the bank's management too, correct?  The

4   A-300?

5   A.   The COLB line?

6   Q.   Yeah.

7   A.   Yes, sir.

8   Q.   And so, you're talking there about management

9   assertions, correct?

10  A.   You're talking about management's assets, yes, sir.

11  Q.   Well, you're talking about the statements in those

12  reports are management assertions, are they not, sir?

13  They're from the management's databases?

14  A.   They're from the management's database, yes, sir.

15  Q.   And isn't it true that an auditor has to obtain evidence

16  corroborating management assertions and cannot just accept

17  management assertions as his sole evidence of the existence

18  of assets?

19  A.   But assets in this case, if following the line,

20  management would not want it paid off, because they're

21  bigger assets.  It would make their balance sheet better.

22  Q.   But the answer to my question is:  You cannot rely on

23  management assertions alone, you have to get corroborating

24  evidence; isn't that true, sir?

25  A.   Yes.

1    Q.  And the documents that you've referred to and looked at

2    were management assertions, but the wire payment

3    confirmations would be another form of evidence that would

4    go beyond management assertions, correct?

5    A.  Yes.

6    Q.  And PwC, in the 2003 audit, did not obtain wire payment

7    confirmations, correct?

8    A.  I don't believe so.

9    Q.  Let me ask you a few questions about the COLB, the

10   inception of COLB.

11            Let's look at Exhibit A-84.

12   A.  Yes, sir.

13   Q.  Okay.  And A-84, I believe, is one of the work papers

14   from PwC's December 31, 2002, audit referring to Mortgage

15   Warehouse Lending assets, correct?

16   A.  Yes, sir.

17   Q.  And one of the things that you wrote in here at the

18   bottom, it's in the second -- the paragraph right at the

19   bottom where it says, "Actions, results."  Is that Cathie --

20   and you're talking about COLB here, aren't you, in this

21   thing about -- this point?

22   A.  May I see the top?  I'm sorry.

23            MR. MULLINS:  Show the whole thing, if you can.

24            THE WITNESS:  It cuts off on my screen, for what

25   it's worth.

1    MR. MULLINS:  Shut it down, a little bit, Rami, so

2    he can see the big picture over there of this exhibit.

3            THE COURT:  Can you read that?

4            THE WITNESS:  Yes, ma'am.

5    BY MR. MULLIN:

6    Q.  It's the one in the fall of 2002, MWLD is utilizing

7    fraud --

8            THE COURT:  No.  No.  Stop.  Stop.  You're going

9    too fast for the court reporter.

10           MR. MULLIN:  Okay.

11           THE COURT:  And if you just made that thing

12   bigger, we could all read it.

13           MR. MULLIN:  Okay.  All right.

14   BY MR. MULLIN:

15   Q.  Let's start there.

16           THE COURT:  There you go.

17   BY MR. MULLIN:

18   Q.  All I'm asking you, sir, is if this work paper is about

19   COLB.  Can you read that and see that it, in fact, is about

20   COLB?

21   A.  Yes.

22   Q.  It is.  Okay.  Let's go down to the bottom of the page

23   now.  And the very last line on the page is what I want to

24   ask you about.

25           It says Cathie consulted with PwC at the product's

1    inception, in order to evaluate potential accounting issues

2    and concerns.

3            Do you see that?

4    A.  Yes, sir.

5    Q.  And is that a true statement?

6    A.  When was this?

7    Q.  This was written December 31, 2000 -- well, it's in

8    connection with your December 31, 2002 audit.  I'm not

9    exactly sure when you wrote it.

10   A.  I believe at this point they had already started using

11   COLB.

12   Q.  But was it true that she had consulted with PwC -- that

13   Kissick had consulted with PwC at the products -- at the

14   COLB products inception in order to evaluate potential

15   accounting issues and concerns?

16   A.  I think this -- from the way this is written, and a very

17   broad recollection, they had already done it and started

18   using COLB in this inception, being relatively early; not

19   necessarily zero moment of D-day.

20   Q.  Could we go to A-101.

21           And this is a work paper from your 2003 audit,

22   December 31, 2003.  And this is a work paper that was

23   completed by Mr. Kelly and reviewed by you and cleared by

24   Mr. Jackson, correct?

25   A.  Yes, sir.

1   Q.  And A-101 also is talking about -- one of the subjects

2   of it notes additional documentation requirements,

3   significant and unusual transactions.  Is that what it's

4   about?

5           THE COURT:  Where are you reading?

6           MR. MULLIN:  It's in the second -- the second --

7   see at the top, where it says CM?  The letters CM.

8           THE COURT:  Oh, I see it.

9           THE WITNESS:  Oh, yes, sir.

10  BY MR. MULLIN:

11  Q.  All right.  And if we look at the second page here of

12  this and go to the paragraph that begins with, "As a part of

13  quarterly procedures."  And it says, "Furthermore,

14  management has grown accustomed to making PwC aware of any

15  significant transactions in advance of their implementation

16  in order to be clear on the accounting treatment."

17          Correct?

18  A.  Yes.

19  Q.  Okay.  Was that a true statement?

20  A.  I believe so.

21  Q.  And was the COLB product offered to Mortgage Warehouse

22  Lending customers who had ordinary mortgage warehouse lines

23  already?

24  A.  I believe so.  I don't recall exactly, but I believe so.

25  Yes, sir.

1   Q.  Okay.  Let's look at your work paper that you prepared

2   relating to the COLB when it was first started at A-325.  I

3   want to see --

4           Actually, I want to see the first pages of this,

5   Rami.  There's an e-mail on the front of it.  Yeah, we're

6   going to start there.

7           Okay, and this is -- in the middle of this page on

8   A-325 is an e-mail from you to Tim Kviz with a copy to Wes

9   Kelly, correct?

10  A.  Yes, sir.

11  Q.  And it says November 7, 2002, correct?

12  A.  Yes.

13  Q.  And it says in the subject, New Warehouse Lending

14  Product, right?  Correct?

15  A.  Yes, sir.

16  Q.  And you start off talking to Mr. Kviz and say, "I cannot

17  remember if you and I discussed this previously, but

18  Colonial has developed a new warehouse lending product,"

19  correct?

20  A.  Yes, sir.

21  Q.  And you were talking about COLB, right?

22  A.  Yes, sir.  I believe so.

23  Q.  And then you actually prepared a memo that was attached

24  to this, that you sent to Mr. Kviz, correct?

25  A.  I believe so.

1   Q.  And is this the memo that was attached?  The October

2   13th, 2002 memo called Mortgage Warehouse Lending Loan

3   Purchases?

4   A.  Honestly, I assume so, but I don't recall specifically.

5   Q.  It's -- there -- it's what's attached to the e-mail,

6   according to the records we received.

7   A.  Yes, sir.

8   Q.  And in your memo, in the first paragraph, first

9   sentence, you say that, "Via discussions around procedures

10  for the third quarter, PwC learned Colonial's warehouse

11  lending unit has entered into a different form of lending

12  than has previously been associated with them."  Correct?

13  A.  Yes.

14  Q.  And in your memo you say, down further, when you're

15  describing COLB, in the next section, under specifics, you

16  say that the loan term for COLB is 120 days, correct?

17  A.  Right.  But I think there's other places it talks about

18  it being held for sale versus just a raw loan.

19  Q.  Do you also say that the rates for the 120-day loan are

20  prime plus one, correct?

21  A.  Yes.

22  Q.  And so, Colonial's return on COLB was to be prime plus

23  one, not any profit gained on the sale of the loans,

24  correct?

25  A.  No, that's -- I don't know about the gain, that's just a

1    statement of fact of what the rate will be while they hold it.

2    Q.  And -- well, while they have the money out, right?

3    Until they get paid back, correct?  That's what the rate is

4    until they get paid back?

5    A.  Until they sell it.  They ended up selling, if I'm not

6    mistaken.

7    Q.  But if the loans are sold, then they get their money

8    back, right?

9    A.  Yes.  If they sell, they get their money back.

10    Q.  Plus prime plus one, right?

11    A.  I believe so.

12    Q.  Okay.  And didn't you -- didn't you say that COLB is, in

13    your view, was going to act like a typical loan?

14    A.  From an underlying characteristics standpoint, it had

15    all of the same facts, just like is shown here, yes, sir.

16    Q.  And in fact, you testified in your deposition it was

17    going to act like a typical loan, right?

18    A.  If you tell me, yes, sir.

19    Q.  Well, let's just double check to make sure we're on the

20    same page.  Let's go to FDIC depo at Page 86, Line 2 to 15.

21    And you were asked the question, "So, in other

22    words, the return for Colonial for this product is going to

23    be calculated based upon an interest calculation of prime,

24    prime plus one, correct?"

25    And you said, "Sure seems that way.  Yes."

```
 1              Correct?
 2    A.  Yes.
 3    Q.  And then you were asked, "Not any profit that is
 4    obtained from the sale of the actual loans to a third-party
 5    investor?"
 6              And you answered, "I do not know that for a fact.
 7    But, reading this, it appears it was going to act as a
 8    typical loan."
 9              Correct?
10    A.  Yes.
11    Q.  And when you wrote your e-mail to Mr. Kviz with the
12    attached memo --
13              That goes back to that first page, back to that
14    e-mail, Rami, if you would, on the first page of A-325.
15              And when you wrote that, you asked a couple
16    questions of Mr. Kviz.  You said, "Have you ever seen this
17    before?  If not, does this pass the feel test with you?
18    What does your gut say?"
19              Correct?
20    A.  Yes.
21    Q.  And you were trying to determine if this was form over
22    substance, rather than substance over form, right?
23    A.  Under the 140 guidelines, yes, sir.
24    Q.  And would you agree that one of the principal objectives
25    of generally accepted accounting principles is to report
```

1    transactions for financial statement and purposes in

2    accordance with the substance of the transactions, as

3    opposed to the form?

4    A.  Yes.

5    Q.  And would you agree also that substance over form was a

6    salient issue in the auditing world in 2002, because of

7    Enron and WorldCom?

8    A.  Yes, sir.

9    Q.  And would you agree that the goal of generally accepted

10   accounting principles, the financial statements will be fair

11   and transparent to users?

12   A.  Yes, sir.  I don't remember the statutes in great detail

13   any more, but it sounds right.  Yes, sir.

14   Q.  And was -- I think substance over form was a headline

15   drama all over the place for auditors at the time you were

16   looking at these, the FAS 140 question on COLB, correct?

17   A.  Yes.

18   Q.  Now, the actual decision on whether COLB was a sale

19   under FAS 140 was going to be made by somebody senior to

20   you, correct?

21   A.  Yes, sir.

22   Q.  And do you -- but do you recall anybody suggesting to

23   you at the time, in 2002, or even in 2003 -- in 2002 or 2003

24   that there was an implied seller's call option in the COLB

25   transactions?

1    A.   I remember one of the issues had to deal with the call

2    option or an option of some sort.  I'm sorry, but I don't

3    remember the intimate details -- the verbiage, for lack of a

4    better term.

5    Q.   Okay.  Well, let's look at your deposition in the FDIC

6    case at Page 128, Lines 7 to 14.

7         You were asked the question, "Do you have any

8    recollection whatsoever of anybody suggesting that there was

9    an implied call option anywhere in the agreement?"

10        And you answered, "An implied call option?"

11        And you said -- and the questioner said, "Right."

12        And you said, "The obvious answer is no.  Implied

13   call option?  No."

14        Do you stand by that answer?

15   A.   It's been a long time.  I just remember there was some

16   discussion and it ended up getting kicked around.  I thought

17   it was call option, but --

18   Q.   And let's look at your 2002 work papers, A-84, again.

19   And on the -- and this is again about COLB, this -- we just

20   established -- let's look at the second page.  And --

21             THE COURT:  Which number is this?

22             MR. MULLIN:  This is A-84.

23   BY MR. MULLIN:

24   Q.   And in the last paragraph, 3-C.

25        We need to expand that a little bit.

1        It says the seller does not maintain effective

2   control through the right to repurpose the loans, call

3   option.  Correct?

4   A.  Yes, sir.  I'm sorry.  Yes, sir.

5   Q.  So your own work papers said there wasn't a seller's

6   call option, correct?

7   A.  Yes, sir.

8   Q.  And did -- in connection with the 2002 -- or, 2003

9   audit, did you identify any imbedded derivatives in the COLB

10  loan participation sale agreement?

11  A.  I don't believe so.  I don't recall.

12  Q.  And in connection with those audits, did you ever ask

13  the bank's lawyers to give an opinion that there was an

14  implied seller's call option?

15  A.  I don't recall.

16  Q.  You don't recall that happening?

17  A.  I -- I don't recall either way, but -- I just don't

18  recall either way.

19  Q.  You didn't see any documents when you were preparing for

20  your deposition that indicated that you did, did you?

21  A.  No, sir, I don't think so.

22  Q.  Excuse me.  Your deposition, preparing for your trial

23  testimony.

24       Okay.  And did you -- did you ask any of the

25  customers to give any kind of certification that there was

1    an implied seller's call option?

2    A.   Not that I recall.

3    Q.   Okay.  Let me ask you a little bit about the COLB

4    contract.  Did you read the COLB contract, what they call

5    the LIPSA, at the time?

6    A.   Gosh, it's been so long.  I -- I think I read it, but I

7    just don't remember any detail.

8    Q.   Do you recall that in your 2002 year-end procedures,

9    that PwC confirmed that there was a signed contract, COLB

10   contract existing for every customer that had a COLB balance?

11   A.   I don't recall it, but it sounds reasonable.

12   Q.   Okay.  Let me -- let me show you your deposition, just

13   to refresh you.  FDIC deposition Page 196, Line 21 to page

14   197, Line 18.

15          So, you were asked the question, "So I'm

16   understanding this correctly, if there was an outstanding

17   balance for mortgages, loans held for sale, what PwC did was

18   go and look to see if there was a signed contract?"  And you

19   said, "Yes."  Correct?

20   A.   Yes, sir.

21   Q.   All right.  And so, in order to be comfortable that

22   you -- that there were in fact actually signed contracts in

23   place, PwC went and -- and actually looked at the signed

24   contracts to make sure that they existed, correct?

25   A.   Yes, sir.

1    Q.  Okay.

2    A.  I remember looking at it.  Yes, sir.

3    Q.  And the purpose of that was what?

4    A.  Given it was the beginning, anything from sort of

5    permanent file documentation to understanding it, to

6    verifying that there was a -- there was an offset, there was

7    another personal review.

8    Q.  Right.  So you wanted to understand the transaction,

9    correct?

10   A.  Yes, sir.

11   Q.  And you wanted to obtain a -- you wanted to understand

12   what all the -- what the terms were so you could analyze

13   what audit procedures you needed to do, right?

14   A.  Yes, understand the transaction, understand the parts

15   and pieces, yes, sir.

16   Q.  And to do -- to be able to make a determination on the

17   FAS 140, PwC needed to read the contracts, right?

18   A.  Yes.  And for exception, yes.

19   Q.  And you -- and you wanted to make sure that the

20   contracts were actually signed, correct?

21   A.  I don't recall that being a specific motivator, but

22   certainly if we were going to pull them, make sure they were

23   complete.

24   Q.  And the -- the actual wording of the -- of your answer

25   in the deposition was that you asked for signed contracts,

1    right?

2    A.  Yes, sir.

3    Q.  I'll pass the witness.

4            MS. MOSS:  To Mr. DiCarlo or to me?

5            MR. DiCARLO:  I have no questions.

6            THE COURT:  It's up to you.

7                    CROSS-EXAMINATION

8    BY MS. MOSS:

9    Q.  Do you have still have some water?

10   A.  Yeah, I'm good.

11   Q.  Good afternoon, Mr. Cox.  I'd like the Court to hear a

12   little bit more about your background than has been covered

13   thus far.  When did you start working at PwC?

14   A.  1997.

15   Q.  And where had you come from?

16   A.  Auburn University.

17   Q.  How long did you work at PwC?

18   A.  From 1997 to April of 2004.

19   Q.  And did you work on the Colonial audits for that entire

20   time?

21   A.  In some shape, form or fashion, but not -- but there was

22   many other things worked on.

23   Q.  Tell me a little bit about your -- I guess seven years

24   that you spent at PwC.  What did you work on besides

25   Colonial?

1    A.  Worked on other financial services companies, spent time

2    in Europe working on the IPO for Forest Bank Insurance

3    Company back when they were considering merging and going

4    public.  Spent time in New York working on CIT and special

5    projects for AmEx and Goldman.  Really, you know, frankly,

6    after the first few years, Colonial was one of the few

7    clients that base -- what kept me in Montgomery, but

8    otherwise I was traveling to other financial services

9    companies.

10   Q.  And that work that you just described, had you done all

11   of that before the 2002 audit?

12   A.  Yes, ma'am.

13   Q.  And you left PwC in 2004.  What did you go to do?

14   A.  Went to go work as CFO for a relatively large privately

15   held real estate development company.  Real estate, which is

16   a kissing cousin to the banking in some ways, it always

17   appealed to me and it was a good opportunity.

18   Q.  Did you stay with that company?

19   A.  I did, up until 2011, and in the midst of the great

20   recession split off and formed -- took a -- one of my

21   partners and, sort of in a blessing, we split the company

22   and created a new company called Net Lease Alliance, and

23   sold my interest in that in 2014.  And I'm semiretired and

24   driving my wife crazy right now.

25   Q.  Well, we're glad that you're here with us today.  Thank

1    you.

2              Do you still live in Montgomery?

3    A.  No.  After Montgomery, moved to Nashville and then moved

4    from Nashville to Auburn, Alabama where I reside now.

5    Q.  And you're here today voluntarily, correct?

6    A.  Yes.  We -- apparently there was some drama, but last --

7    next week -- I serve on the Auburn College of Business board

8    and there's a meeting -- there's meetings next Thursday,

9    Friday.  So I asked if -- I asked if I could try to work

10   around that, plus my daughter has a sorority thing that in

11   her eyes is much more important than anything else I could

12   do, so --

13   Q.  In our eyes as well, Mr. Cox.

14             I'd like to get some color from you, for lack of a

15   better word, about how the audit engagement team actually

16   worked together in 2002 and 2003 on the Colonial audit.

17   Tell me a little bit about the practicalities, the

18   day-to-day.

19   A.  Well, we were all together on the sixth floor of our --

20   our building.  We had a pretty small office.  I don't know

21   if you literally want layouts, but Kim sat next to me, a

22   wall separated us, Kim Jackson, and Wes sat one door down,

23   and then you had senior staff, and staff that were in a big

24   room right next door to us.  It was not a very formal, in my

25   mind, management style; it was I don't care about titles as

1    much as I care about let's do it.  So it was very informal,

2    very free flowing.

3            Certainly we followed divisions of responsibility.

4    Certainly everybody had tasks, but in terms of, you know, if

5    there was a question or a problem, I didn't -- we didn't

6    wait to go up some chain of command.  Everybody knew to just

7    grab somebody and let's talk about it.

8    Q.  And did you always write down those discussions that you

9    had, if there were questions or problems?

10   A.  No.  No.

11   Q.  Did the documentation standards in 2002 or 2003 require

12   you to do that?

13   A.  I don't believe so, no.

14   Q.  Tell me about your interactions with the people at the

15   company; Mr. Oakley, Ms. Moody, Miss Bathen.

16   A.  You know, obviously, on a professional level -- well,

17   first of all, we ran into them a lot, just elevators and

18   halls.  It was very -- that, to some degree, especially with

19   Flake, who the counsel asked about, you know, Flake's office

20   literally was right above ours and there was a fire -- fire

21   stairway, he would come down and pop his head in and talk to

22   Kim, talk to I -- myself, excuse me, about things.  Again,

23   it was informal.  I thought at the time, you know,

24   appropriate.  And then, you know, formally we would do

25   procedures, we would talk, we would do our reviews.  So, you

1     know, I thought it was effective.

2     Q.  When you first started working on the Colonial audit,

3     did the Mortgage Warehouse Lending division exist at Colonial?

4     A.  No, ma'am.

5     Q.  When did it start?

6     A.  I believe 1999.

7     Q.  And how did you yourself -- how did you gain an

8     understanding of what Mortgage Warehouse Lending was when

9     Colonial started this new line of business?

10    A.  It was best I recall, we had a -- what we call kickoff

11    meetings back then.  And part of the kickoff is for the

12    audit, where its brainstorming session, you talk about

13    issues.  I think there's several memos, or there was, got

14    asked about.  I think -- I loosely recall that either Brent

15    Hicks or Tim Kviz led a session on what is warehouse

16    lending.

17           And frankly, as a young person that had bought a

18    house and was going to buy another one, it makes some sense

19    because I always wondered, you basically bought a house,

20    there's documents that make this (indicating) look like

21    Ned's first reader, and so how does that work?  And suddenly

22    it made sense.

23    Q.  And Mr. Kviz's role at the time at PwC, where did he --

24    was he in Montgomery with you or --

25    A.  No, ma'am.  He was in Minneapolis.  I think that's what

1 pops in my head, but I'm -- I'm hesitating now. But

2 Minneapolis is what pops in my head.

3 Q. Did he come and visit you all in Montgomery?

4 A. Yes.

5 Q. Did you go to the Mortgage Warehouse Lending Division in

6 Orlando?

7 A. Yes.

8 Q. How often?

9 A. My first recollection is the year -- is fall of 2000.

10 And, you know, at least -- at least once annually and

11 sometimes more than that from then until I left in, you

12 know, 2004.

13 Q. Did anybody else from PwC go with you?

14 A. Yes. You had Kviz, you had me, Brent I think went in

15 the beginning -- no, maybe not. Kim went a couple times. I

16 don't know if a concurring ever came. I don't remember.

17 That doesn't -- concurring partner. But -- but I could be

18 wrong on that.

19 Q. So you said just a minute ago that when Mr. Kviz came

20 down and kind of give you an overview. Having just bought

21 your first house, Mortgage Warehouse Lending made sense.

22 Tell me your understanding of what Mortgage Warehouse

23 Lending is.

24 A. Now, you know how a watch works -- now, I think in a

25 deposition, I think I used a fruit example, or maybe a

grocery store.  But, you got to kind of think of it as that
you have a product that is on one side, and if you think
about when you buy a house there's all these papers,
somebody to sell -- somebody is selling you a house and they
want to get paid.  They don't care anything else about
getting that check.  But in the end, resident -- almost all
of our residential mortgages are held by one of the
governmental entities.  So you got to stop and think,
getting from point A, which is paying the seller with a
check, to the very last point, which is it going in a bond
at one of these governmental entities.

So it's all that in between, and it's really about
logistics.  And how it works is that when you go sit at the
table and sign your life away and that check slides over to
that seller and you sign saying I do hereby agree to pay all
this money, well, you got all these documents you were
talking about and, quite frankly, some of them were asked
about today.  Well, that end investor doesn't want -- they
want all of those in a nice neat package before they provide
the money back to the originators.

So in our example of, say, a loaf of bread going
to a grocery store, loaf of bread is made, it goes to the
grocery store where it sits there until you or I go in and
buy it.  Then when that's bought, the money all goes to the
people that make the loaf of bread, for lack -- for lack of

1    a better term.

2          So --

3    Q.  And explain to me what you understood the COLB product

4    to be.

5    A.  COLB was, you know -- you know, necessity is the mother

6    of invention, and what was happening at the time was that

7    the interest rates had stayed so low that there continued --

8    the governmental entities kept getting pounded with just

9    application after application after -- you know, loan after

10   loan after loan.  And so what COLB -- as that happened, and

11   I think it's -- I don't think that's debatable, but I could

12   be wrong.

13         But as that happened, the governmental entities,

14   quite frankly, like we all do when we're backed up, what

15   should have taken a matter of days -- and I don't recall

16   exactly, but what used to or should have taken a matter of

17   days suddenly was taking weeks.  And so that mortgage

18   originator, going back to our example, that is sitting there

19   and transacting our loans, or the closing, they don't have

20   enough money, they can't -- they can't sit on a bunch of loans.

21         If you stop and think about it again, our loaf of

22   bread example, you know, they don't have enough cash to just

23   keep making bread indefinitely, right?  Somebody has to come

24   in and give them money so that they can pay for the labor

25   and the machines to bake the bread.  Same thing with this,

1    that if you're sitting there and these mortgage originators,

2    if they can't move their product, if they can't sell that to

3    these governmental entities, then they don't have enough

4    money to keep doing more and more deals.  And listen, what

5    we talked about, when you're going to close your loan,

6    nobody wants to hear I'm sorry, but Fannie or Freddie or

7    anybody else is backed up; nobody cares, they just want

8    their check and sign the papers and then go home.

9    Q.  So when this -- when COLB was developed, did you talk

10   about it with Mr. Kviz?

11   A.  Yes.  Yes.

12   Q.  What did Mr. Kviz tell you?

13        MR. MULLIN:  Objection, Your Honor.  That's

14   hearsay.  And Mr. Kviz was deposed in this case and they

15   didn't designate one line of his deposition to be read.

16        MS. MOSS:  Your Honor, I'm trying to get Mr. Cox's

17   understanding of what was happening.

18        THE COURT:  He can give his understanding without

19   quoting Mr. Kviz.  Just ask him what he understands.

20        MS. MOSS:  Can I ask a question before that?

21        THE COURT:  Sure.

22   BY MS. MOSS:

23   Q.  Was part of your understanding of what was happening in

24   the market that you just described informed by what Mr. Kviz

25   told you?

1    A.  Yes.

2    Q.  And --

3          THE COURT:  Just ask him how he understands the

4    market.  That's all we need to know.

5    BY MS. MOSS:

6    Q.  How do you understand the market?

7          MS. MOSS:  Thank you, Your Honor.

8    A.  Through discussions was Kim or others that operate in

9    that market on realtime, minute-to-minute basis.

10   BY MS. MOSS:

11   Q.  And this phenomenon that you were just describing, was

12   that happening only to Colonial or only to TBW?

13   A.  No.  It was an industry -- that's why I said I don't

14   think that's a matter of debate -- but I guess we are in

15   court.

16         THE COURT:  We debate everything.

17         THE WITNESS:  Yes, ma'am.  I'm figuring that out,

18   with all due respect.

19   BY MS. MOSS:

20   Q.  You visited Orlando, it sounds like several times with

21   several members of your team.

22         THE COURT:  Did you finish your description of

23   where -- okay --

24         THE WITNESS:  How we found -- through Tim and --

25   that's a good question.

1    THE COURT:  You don't have to say where it came

2    from.  What's your understanding of it?  What happened?  So

3    the government agencies got backed up?

4        THE WITNESS:  Yes, ma'am.

5        THE COURT:  The originators were short of cash

6    because all of these people were coming in to get low

7    interest.

8        THE WITNESS:  That's correct.

9        THE COURT:  Then what happened?

10       THE WITNESS:  COLBs developed.  Things like COLB

11   across the industry.  People trying to come up with ways to

12   alleviate that issue.

13       THE COURT:  And what does COLB do to alleviate that?

14       THE WITNESS:  It provides additional funds.  What

15   it can do is buy -- let's say that that mortgage originator

16   has a $100 million loan and because the governmental

17   entities can't -- aren't digesting, they are up bumping up

18   against that, what products like COLB and others did, across

19   the industry did was create an avenue to create line space

20   via having these be mortgages held for sale.  They created

21   line space to be able to then continue funding to these

22   originators.

23   BY MS. MOSS:

24   Q.  Now are you finished?  I didn't mean to cut you off

25   before.

1    A.  I hope -- I believe so.

2    Q.  Thank you.

3         You went to -- you went to Orlando with several

4    members of your team.  Tell me, when you were in Orlando at

5    the Mortgage Warehouse Lending Division, what were your

6    observations while you were there?

7    A.  It was very busy.

8         THE COURT:  Can you be more -- can you maybe

9    direct him more?  Because I don't think he knows what --

10        MS. MOSS:  Would you like me to lead him, Your

11   Honor?

12        THE COURT:  That's a possibility.  Well, let's see

13   what he answers.

14        THE WITNESS:  Very busy, very hectic.

15   Professional, but, you know, a little bit of variety in

16   banking, which was neat; it was dominated by women.  It

17   was -- it was -- it seemed like a -- a neat operation.

18   BY MS. MOSS:

19   Q.  How many people worked there?

20   A.  In Orlando?

21   Q.  Yeah.

22   A.  In the beginning, maybe -- well, one thing I remember is

23   there's a core group of permanent employees, and then there

24   was quite a bit of temporary employees.  And we asked about

25   that, and I just -- I remember one of those things that was

1  interesting to me, just from a business perspective, and

2  Cathie's point was that that industry is one with very large

3  highs and lows, and so she wanted to be able to react very

4  quickly.  And because of labor laws and, frankly, just, you

5  know, business dynamics, it's much easier to -- to separate

6  from temporary employees than full-times.

7  Q.  What were your impressions and observations of Miss

8  Kissick as the leader of the Mortgage Warehouse Lending

9  Division?

10  A.  Well, I'm almost embarrassed to say this, but I was

11  impressed by her, I thought she was smart.  I thought she

12  was tough, but fair.  I thought she understood her business

13  very well.  You know, I was impressed -- you know, I'm

14  almost embarrassed, but I was impressed by her.

15  Q.  Describe for me the internal control environment that

16  you observed at the Mortgage Warehouse Lending Division.

17  A.  It was -- you know, in our estimation was thorough.  It

18  was -- you had -- again, it's been a long time since I've

19  seen the work chart, but you have lines of businesses that

20  you had sort of collateral control, you had money, the wire

21  room and the money flow, you had investor relations.  So it

22  appeared to have good separation.  It had good -- one of the

23  things you think about with the controls is knowledge and

24  education levels.  They seem -- everybody seemed to know

25  what they were doing.  So, I mean, and with Tim coming in

1    and working through it, it seemed to be a good working -- a

2    good controls environment.

3    Q.   Why did PwC focus on the internal controls at Mortgage

4    Warehouse Lending Division?

5    A.   Because it's -- it's different.  It's different in its

6    dynamics than a bank, than a commercial bank like Colonial

7    in their normal operations.

8    Q.   How -- how is it different?

9    A.   You know, with Colonial, the largest commercial banks --

10   coming from, for instance, commercial real estate, you have

11   very few but very large balance loans, right?  Warehouse

12   lending, you had thousands upon thousands of, you know,

13   pages and pages of loans with an average balance, you know,

14   150,000 -- I don't know, $150,000 or something, and so you

15   had lots of volume, small dollars.  You also had a quick --

16   again going back to our example of what made it different

17   when it came to, like, a commercial real estate loan that

18   could stay outstanding, you know, certainly months and,

19   frankly, years and years.  With this, you're talking about

20   turnaround times that were measured in days or weeks.  So it

21   was -- it was a different animal, and because of those

22   things, you tended to focus on controls.

23   Q.   Why -- why does focusing on controls make sense?

24   A.   Well, because it's so very hard to -- from a purely

25   substantive standpoint, to -- I was asked about

1    confirmations.  From a purely substantive standpoint, to get

2    coverage you would be talking about -- to have a substantive

3    test work, you would have to send out thousands upon

4    thousands of confirmations to get coverage.  And by

5    coverage, I mean -- just making up a number -- there's a

6    million dollars and the standards say -- or, the

7    calculations say you need 75 percent coverage, then you need

8    7.5 million in confirms.

9         Well, if you're talking about a billion dollar

10   line of business, the confirmations on it would be at 150 --

11   again, I'm not sure what the exact average is, it would be

12   hundreds and thousands of confirms.  You know, I thought

13   about it before, I think explained it one time, it's kind of

14   like a vineyard and a winemaker.  If you go around plucking

15   grapes, you'll be there forever.  So what you need to

16   concentrate on are your inputs.  You need to concentrate on

17   the quality of the grapes and what you're doing with the

18   grapes versus the grapes themselves.  And then those

19   controls allow you to have a good feel for what your product

20   is going to be.

21             THE COURT:  Ms. Moss?

22             MS. MOSS:  Yes.

23             THE COURT:  About time to take a break?

24             MS. MOSS:  It is.

25             THE COURT:  Okay.  We'll have a 15-minute recess.

1    You may step down.

2            (Recess.)

3            THE COURT:  Wherever you're ready.

4            MS. MOSS:  I'm ready.

5    BY MS. MOSS:

6    Q.  Are you ready, Mr. Cox?

7    A.  Yes, ma'am.

8    Q.  Thank you.  Mr. Cox, how did you learn that Colonial had

9    developed the COLB product?

10   A.  I don't remember if it was Kathy reaching out or Mary Lou

11   Bathen.  I can't remember which ones hit first.

12   Q.  I've got Exhibit AA -- excuse me, Exhibit A-325, at page

13   3.  Mr. Mullins showed you this document as well.

14            Does this help you refresh your memory as to when

15   you learned?

16   A.  Yes, ma'am.

17   Q.  What is this memo -- let's take a step back.

18            What is this memo?

19   A.  It's, in essence, the beginning of the steps or the

20   beginning of the understanding of what COLB is and what they

21   are, how they're working through it.  The moving parts and

22   pieces.

23   Q.  The lines I've highlighted there says, "Via discussions

24   centered around procedures for the third-quarter."

25            When does the third-quarter end?

1    A.  September 30th.  September 30th.

2    Q.  What was the date?  You said this at the beginning.

3    What was the date you began your memo?

4    A.  October 13th.

5    Q.  What was your understanding as to whether Colonial had

6    already started doing COLB or was thinking about doing COLB

7    on October 13th?

8    A.  You know, as I said earlier, my recollection is that

9    they were already doing it.  We -- part of what you do at

10   the end of quarter is those discussions -- I can't remember

11   if it was you or counsel -- the other counsel asked about

12   it, but when you have discussions with the CFO, CAO, those

13   things, and I think via that is when this first came up,

14   those quarter procedures.

15   Q.  And Mr. Mullin highlighted words like different form of

16   lending, loan term, rates charged.  Do you remember that?

17   A.  Yes, ma'am.

18   Q.  Are there other words in this memo, Mr. Cox, that say

19   different things?

20   A.  Yes.  If you look at the selling them, there's

21   different -- there's several different -- they have

22   purchasing, selling, in several different places.  I think

23   there are words that are different than that.

24   Q.  Was this memo meant to conclude on whether the COLB

25   product was a sale under FAS 140?

1    A.  No.  Quite the opposite.  I think that, again, Mr.

2    Mullin mentioned the decision being made above me.  This

3    was -- this was an attempt to ring fence some of the -- as I

4    said, the parts and pieces to be able to push that dialogue,

5    to be able to have that discussion.

6    Q.  You got to help me out, Mr. Cox.  I don't know what ring

7    fence means.

8              THE COURT:  What what means?

9              MS. MOSS:  Ring fence.  If Your Honor knows, we

10   can skip it.

11             THE COURT:  Don't skip it.

12             THE WITNESS:  Sorry.  My southern vernacular is

13   catching me.  Quantifying ring fence, as in build a fence.

14   BY MS. MOSS:

15   Q.  Get your arms around it?

16   A.  Get your arms around it, yes.  Thank you.

17   Q.  Thank you.  After this -- you said you started drafting

18   the memo.  Did you add to it later on?

19   A.  I'm -- I believe so.  I mean, I don't think you ever

20   start with your final draft.

21   Q.  Fair point.  What happened next?

22   A.  I remember -- I mean, the broad strokes of it, and we

23   looked at -- sent it to Tim.  You know, obviously at some

24   point got Kim involved pretty quickly.  And I think that's

25   the broad strokes of it.

Q.  So, let's march through those broad strokes in a little
more detail.

MS. MOSS:  Can you read that?

THE COURT:  No.

THE WITNESS:  My screen is messed up.

THE COURT:  Our screens are -- there we go.

THE WITNESS:  Yeah.  That's better.

MS. MOSS:  Can you read that?

THE COURT:  No.  It's got to be made bigger.

MS. MOSS:  Let me try it again.

THE WITNESS:  Something is going on with -- I
don't know about Your Honor's, but this is jumping, fuzzy.

MS. MOSS:  May I approach, Your Honor, his screen?

THE COURT:  Try to fix it.

MS. MOSS:  Wow.  I am the last person who should
try this, but I'll try.

THE COURT:  Well, why don't we get --

MS. MOSS:  Maybe Negrete --

THE COURT:  Why don't we get the person who can
really fix it?

THE WITNESS:  My eyes -- it probably wouldn't
bother most people, but I just can't see it.

THE COURTROOM DEPUTY:  I don't know if you turn it
on and turn it off.  Because there's really nobody in the
clerks office.

1    THE COURT:  Well, you know, if you make those

2    bigger, he can probably read it on the screen just as well

3    as he can read it there.  So, let's forget about this.

4    We'll get it fixed by tomorrow.

5    MS. MOSS:  Okay.  Thank you.

6    BY MS. MOSS:

7    Q.  Can you read on the big screen, Mr. Cox, what this

8    document is?

9    THE COURT:  Do you need it bigger?

10    THE WITNESS:  Yeah, please.

11    MS. MOSS:  I think that's as big as I can go.

12    THE COURT:  Nope.  Now you've cut some of it off.

13    MS. MOSS:  Just a smidge.

14    THE WITNESS:  Okay.

15    BY MS. MOSS:

16    Q.  That's the best I can do.  Good enough?

17    A.  Yeah.  It's big enough, the wiggling doesn't -- I can

18    read it.

19    Q.  Okay.  What's this document?

20    A.  It's the loan participation sale agreement.  In essence,

21    the discussion with COLB.

22    Q.  This is an e-mail from who to --

23    A.  Mary Lou Bathen, who was the, I believe -- I believe

24    treasurer at the time, to a host of people.

25    Q.  Including yourself?

1    A.  Yes, ma'am.

2    Q.  And Mr. Jackson?

3    A.  Yes, ma'am.

4    Q.  And do you see that there is an attachment here?

5    A.  Yes, ma'am.

6    Q.  What was she forwarding to you?

7    A.  I think it was the contract.  The document itself.

8    Q.  And in the text of her e-mail, what was she conveying to

9    you?

10   A.  That the -- the -- the wishes of the Fed, that they were

11   looking for an opinion letter.

12   Q.  And further down, I think we established she was

13   forwarding an e-mail.  What's this?

14   A.  Oh, that's -- that's the attorney at Akerman.

15   Q.  Mr. Mellen.

16   A.  I'm sending, I think, that document that Mary Lou, in

17   turn, turned around and sent to us.  I think that's the

18   point of origination, if I'm reading that correctly.

19   Q.  Who was he sending it to?

20   A.  Trey Wheeler at the Fed and Mary Lou Bathen.

21   Q.  I think you mentioned there was an attachment.  Is that

22   what this is?

23   A.  I believe so.

24   Q.  What is this?

25   A.  Loan participation sale agreement, the contract.

1    Q.  And so -- it was November 1st that she was sending this

2    e-mail?

3    A.  Yes.  I believe so.

4    Q.  I didn't mean to trick you.

5    A.  Yes.

6    Q.  So on October 13th, you had drafted -- started drafting

7    a memo.  I think you said you were beginning to draft the

8    memo, then you get the contract on November 1st.  Then what

9    did you do?

10   A.  You know, it would stand to reason, I read the contract,

11   started getting Tim and Kim involved.

12   Q.  Why did you start getting Tim and Kim involved?

13   A.  Again, Tim -- it sounds flippant, but like I said in one

14   of the depositions quoted back to me, was the man, you know,

15   when it came to mortgage operations.  And so Tim was

16   somebody who would know sort of what was happening in the

17   industry and then Kim, obviously, was my boss.

18   Q.  In the e-mail that we just saw at Exhibit A-390, Ms.

19   Bathen was telling PwC that the Fed was interested in

20   getting a letter from PwC.  Is that something you could sign

21   in your role then, in 2002?

22   A.  No, ma'am.

23   Q.  Is that something that Mr. Jackson would need to sign?

24   A.  Yes, ma'am.

25   Q.  Mr. Mullin showed you this, it's Exhibit A-325, the

1    first page of your e-mail to Mr. Kviz.  And we've seen this

2    phenomenon in a number of documents, Mr. Kviz -- or sorry,

3    Mr. Cox.

4              What does it mean when you put quotes around a word?

5    A.  It's a point of emphasis.  That's how I -- everybody

6    used to laugh at me, but that was -- that's how I sort of

7    delineated point of emphasis.

8    Q.  When you say point of emphasis, is that like I might

9    underline something?

10   A.  Yes, ma'am.  Well, I guess.  Yes.

11             MR. MULLIN:  Objection, leading.

12             THE COURT:  Don't bother.  That couldn't possibly

13   be --

14             MS. MOSS:  Thank you.

15   BY MS. MOSS:

16   Q.  You asked Mr. Kviz a number of questions.  Did you hear

17   back from him?

18   A.  I believe so, yes.

19   Q.  What did you hear?

20   A.  That this was normal in the industry --

21             MR. MULLIN:  Objection.  Objection, Your Honor.

22   It's hearsay.

23             THE COURT:  Sustained.

24             MR. MULLIN:  She keeps trying to get in Mr. Kviz

25   somehow.  And they had his deposition, they could have done

1    his deposition and given it to the Court.

2              MS. MOSS:  May I respond?

3              THE COURT:  Sure.

4              MS. MOSS:  Mr. Kviz provided Mr. Cox with

5    information -- first of all, Mr. Kviz works for PwC -- at

6    the time he worked for PwC.  He was providing information to

7    Mr. Cox that informed both Mr. Cox and Mr. Jackson.  Mr.

8    Jackson was here on Monday and he testified about those

9    conversations without objection.

10             THE COURT:  I understand.  You're asking this

11   witness what Kviz responded to his question.

12             MS. MOSS:  Correct.  Just trying to close the

13   loop.  Right?  He asked a bunch of questions, he said he

14   heard back from Kviz.  I'd like to understand what he heard.

15             MR. MULLIN:  It's a backdoor way to getting

16   another witness to come in.

17             THE COURT:  Sustained.

18             MS. MOSS:  Your Honor, may I to do an offer of

19   proof?  I can either do it now or --

20             THE COURT:  You don't have to do an offer of

21   proof.  There are other ways you can get it in.  He reached

22   certain conclusions on his own, and I assume those

23   conclusions incorporate what Kviz told him.

24   BY MS. MOSS:

25   Q.  What did you understand after you sent this e-mail to

1   Mr. Kviz?

2   A.  Through various conversations, that this was normal in

3   the industry, that the Genisis of this was happening.

4   Q.  When you say "this," what do you mean?

5   A.  I'm sorry.  The digestion issues.  The mortgage

6   company's -- their originators, the pressure to clear line

7   space, to have capital.

8   Q.  And you sent this e-mail when?

9   A.  November 7th.

10  Q.  My apologies.  Trying to make it bigger.

11         Can you read that?

12  A.  Yes, ma'am.

13  Q.  All right.  So that was November 7th.  What happened on

14  November 8th?

15  A.  What happened on November 8th?

16         It went away.

17  Q.  I'm sorry.  I can't get it to highlight.  It takes a

18  village.

19         What happened on November 8th?

20  A.  We had to resend it -- or, I resent it to Kim.

21  Q.  Resent what?

22  A.  The e-mail from the day before, just saying that -- kind

23  of a recap along with, I think, the first draft of that

24  memo, if I can read it right.

25  Q.  And you informed Mr. Jackson of what?

1    A.  Oh, that I sent it along to Tim and asked that they

2    e-mail -- the attached e-mail had been sent along to Tim.

3    Q.  So you provided Mr. Jackson -- as of November 8th, you

4    provided him with what?

5    A.  I believe -- two things.  In reading this, I think is

6    the draft of my memo and then the e-mail that I had sent

7    Tim, with some of the questions we had -- that were out there.

8    Q.  And on November 8th, why were you sort of delivering

9    this package of stuff to Mr. Jackson?

10   A.  To get his involvement.  To -- because of -- because of

11   what was being requested; comfort letter, opinion -- I don't

12   know if opinion letter is right, but comfort letter or

13   whatever it may be.  Like I think you asked, it was going to

14   take somebody -- Kim had to be involved with that to be able

15   to sign anything of that nature.

16   Q.  And after November 8th, did -- did you understand that

17   he did do work on that topic?

18   A.  Yes, ma'am.

19   Q.  Do you know whether he did in fact issue some sort of

20   letter on the topic that the Federal Reserve asked for?

21   A.  I believe he did issue -- yes, he did issue a letter.

22   Q.  And the analysis between November 1st, when you got the

23   contract, and mid-November, when he issued that letter, were

24   you -- were you deeply involved after this day?

25   A.  No.

1  Q.  Who was?

2  A.  Kim, obviously.  I think Tim was, but I think also our

3  national office.

4  Q.  And Mr. Mullin asked you some questions about a call

5  option.  Do you remember hearing anything in the fall of

6  2002 about a call option in the first original contract that

7  was sent to you by Ms. Bathen in Exhibit A-390?

8  A.  I'm sorry.  I'm so foggy on it.

9  Q.  I'm sorry.  I'm not sure, do you remember hearing

10  something?

11  A.  Yeah.  That there was discussion around it, but I really

12  don't remember.  Again, because when Tim and Kim and

13  national office got involved, I backed away to focus on the

14  regular audit.  But I don't remember much more than just a

15  pass -- you know, the name, if that.

16  Q.  Do you know what a call option is?

17          THE COURT:  Well, why did we go with him -- I

18  mean, why pursue it with him if he doesn't remember anything

19  about it?

20          MS. MOSS:  I'm just -- just two questions, Your

21  Honor, if you will indulge me.

22  BY MS. MOSS:

23  Q.  Do you know what a call option is?

24  A.  Yes, ma'am.

25  Q.  Are there different kinds of call options?

1    A.  Sure.

2           THE COURT:  Well, then you may want a third

3    question.  Do you want a third question?

4           MS. MOSS:  I want to ask whatever Your Honor wants

5    me to ask, but I can't divine it.

6           THE COURT:  I think we've gone through a lot of --

7    he doesn't know much, so let's move on.

8           MS. MOSS:  Okay.

9    BY MS. MOSS:

10   Q.  When Colonial developed the COLB product, did you have

11   an understanding as to whether it was trying to achieve a

12   certain kind of accounting?

13   A.  It was -- it was trying to qualify for sale accounting.

14   Q.  Did you understand why it was trying to qualify for sale

15   accounting?

16   A.  That -- for mortgage held for sale to be qualified on

17   the balance sheet at a different location.

18   Q.  And is there anything wrong with a company structuring

19   an agreement or product to conform to a certain accounting

20   standard?

21   A.  No, ma'am.

22   Q.  Is there anything wrong with a company structuring an

23   agreement or product to comply with legal lending limits?

24   A.  No, ma'am.

25   Q.  And if it were improper to structure a transaction with

1   those objectives in mind, would you expect the Federal

2   Reserve, Colonial's regulator, to have thrown a flag on

3   that, for lack of a better word?

4         MR. MULLIN:  Objection.  Speculation.  There's no

5   foundation at all.

6         THE COURT:  Sustained.

7         MS. MOSS:  I asked for his expectation, Your

8   Honor.  He worked in and around banking for seven years

9   before he did this work.  He understood what the Federal

10   Reserve was and that they regulated it.

11         THE COURT:  So what was your question?

12         MS. MOSS:  If it were improper to structure a

13   transaction with these objectives in mind, would you expect

14   the Federal Reserve, the regulator, to have thrown a flag on

15   it?

16         MR. MULLIN:  Objection.  It's pure speculation.

17   They had an opinion letter, the expert opinion letter, and

18   you want him to say that, okay, even though they got an

19   opinion lettering from PwC, he would have expected that they

20   would have objected to it.  I mean --

21         THE COURT:  I'm going to sustain the objection.

22         MS. MOSS:  Would you like me to do a proffer now

23   or later?

24         I'm trying to follow Your Honor's guidance from

25   this morning, and I will do whatever you want.

1      THE COURT:  Why would you do a proffer on

2  something like this?

3      MS. MOSS:  His understanding.

4      THE COURT:  He doesn't have an understanding.

5  There's so many different reasons why an agency would write

6  back or not write back.  Isn't what you're getting at, his

7  opinion about whether there would be an answer, is that what

8  you're saying?

9      MS. MOSS:  No.  And if Your Honor understands that

10  to be the intent of my question, maybe I can rephrase.

11  Maybe I'll build a little foundation and see if we can get

12  there.  Is that acceptable?

13      THE COURT:  Sure.

14  BY MS. MOSS:

15  Q.  Mr. Cox, by the fall of 2002, you had been an auditor

16  for five years?

17  A.  Yes.

18  Q.  And you had worked in, I think you said, New York and

19  Europe.  You've worked on a number of audits for financial

20  institutions and banks?

21  A.  Yes, ma'am.

22  Q.  You understood what the Federal Reserve was?

23  A.  Yes, ma'am.

24  Q.  They regulated others of your clients, and including

25  Colonial for the five years you'd served up until 2002?

1    A.  Yes.

2    Q.  And based on that experience, did you have opportunity

3    to observe if a federal banking regulator disagreed with the

4    way a company was accounting for a transaction, that they

5    would say that out loud?

6              MR. MULLIN:  Objection, Your Honor.  Unless he's

7    talking about this particular event, it is completely

8    irrelevant.  And if he's talking about this particular

9    event, the -- there is no way but by speculation that he

10   can -- he can say in this particular instance, after they've

11   written an opinion letter, that they weren't entitled to --

12   that the Fed would have responded and rejected PwC's -- one

13   of the biggest accounting firms in the world opinion

14   letters, that they would have rejected that opinion letter

15   and gone behind it.  That's just -- he's just making that

16   up, if he's going to say that.

17             MS. MOSS:  He's not making anything up.

18             THE COURT:  Don't argue.  Just tell me your

19   answer.

20             MS. MOSS:  I have a couple of responses to what

21   happened.  First of all, I was building the foundation that

22   I think Your Honor let me do.  I asked a general question.

23   And, of course, the next one will be the specific as to the

24   situation.  The reason this evidence is important and

25   relevant and admissible in this case, Your Honor is that it

1    goes to PwC's state of mind.

2        The plaintiffs have -- the plaintiffs -- the core

3    of the plaintiff's case is that PwC did not believe that

4    FAS 140 accounting was properly applied to COLB.  And the

5    fact that the federal regulator --

6        THE COURT:  Why don't you ask him about -- if this

7    goes to their state of mind, or its state of mind --

8        MS. MOSS:  It absolutely does Your Honor.

9        THE COURT:  Then why don't you phrase it that way?

10   How would he know there's -- in his mind.

11       MR. MULLIN:  In his mind -- his state of mind is

12   not an issue.  The issue on FAS 140 is the state of mind

13   of -- the only place that state of mind even comes into play

14   in this case is in 2008 when the OCC makes an inquiry when

15   he's long gone, he's five years gone -- or, four years gone.

16       MS. MOSS:  That's absolutely untrue.

17       THE COURT:  Okay.  Counsel, stop.

18       MS. MOSS:  I'm sorry, Your Honor.

19       THE COURT:  Stop.  I think you're making a

20   mountain out of a molehill.  I think this is 2002 and -- you

21   can rephrase it as to what he would have expected and I will

22   allow it.

23       MS. MOSS:  Thank you, Your Honor.  I think that

24   actually was my original question.

25   BY MS. MOSS:

1  Q. Mr. Cox, in 2002 would you have expected the Federal

2  Reserve to tell PwC or Colonial if the Federal Reserve

3  disagreed with the way the Colonial was accounting for the

4  COLB product?

5  A. Yes.

6  Q. So after November -- I think you said, in answer to one

7  of my last questions to you, you handed this off to Mr.

8  Jackson, in part to focus on what you called the regular

9  audit. Is this the regular audit? Can you read it?

10  A. Yes.

11  Q. I'll try to make it bigger.

12  A. Yes.

13  Q. I'll go in pieces. What is this?

14  A. It's the Warehouse Lending section in the Lotus Notes

15  database. It's internal work paper.

16  Q. Do you see that reference to external to system?

17  A. Yes.

18  Q. Do you know what that means?

19  A. It means it can include papers that are in a hard copy

20  working file.

21  Q. Pull out the next section.

22       This is Exhibit A-84, if I didn't say earlier,

23  Your Honor. My apologies.

24       Can you read that?

25  A. Yes, ma'am.

1    Q.  Did you draft this work paper?

2    A.  I believe so.

3    Q.  Did you put the word "buy" in quotes?

4    A.  Yes, that's why -- without seeing the signature, I

5    assume it's my "buy" in quotes.

6    Q.  Kind of your signature, for lack of a better word?

7    A.  Yes.

8    Q.  If I'm putting quotes around the word "buy," what did

9    you mean?

10   A.  Again, put emphasis on it.

11   Q.  This paragraph, which I won't -- I won't force any of us

12   to read out loud into the record because it covers things

13   that have been covered before, but at a high level, if you

14   can just scan that, Mr. Cox.  What was your understanding of

15   why those acronyms there -- which I think stand for Fannie

16   Mae, Freddy Mac and then some nongovernmental entities

17   Washington Mutual, Citi, etcetera -- that they were not able

18   to digest loans as quickly, in the past.  When was that

19   happening?

20   A.  The volume of financings and, frankly, just packages

21   that were hitting their different bond desk.

22   Q.  Now, there are -- there is a procedures section and

23   action results section.  Do you see that?

24   A.  Yes, ma'am.

25   Q.  I would like to go through each one of them.  And let's

1    go do the procedures and the results at the same time, in

2    the interest of efficiency, hopefully.

3            Tell me what the first procedure is.

4    A.  Talking to management, if they knew and approved this

5    product, this asset.

6    Q.  What was the purpose of the procedure in step one of

7    Exhibit A-84?

8    A.  To make sure that this wasn't being done -- that this

9    was being done within the purview of senior management.

10   Q.  What evidence did PwC obtain on that procedure?

11   A.  We went and sat down with Sheila and Flake and others

12   and talked, talked through it with them.

13   Q.  Where were Ms. Moody and Mr. Flake Oakley physically

14   located?  Were they in Florida?

15   A.  No, ma'am, they were in Montgomery.

16   Q.  You stated both verified that they were acutely aware of

17   the activities.  Is there any meaning to the word "acutely"?

18   A.  Just that they had talked about it live.

19   Q.  Based on what you observed, did Ms. Moody and Mr. Oakley

20   understand both the COLB product and the accounting that

21   Colonial was applying to it?

22   A.  I believe so, yes.  It's been a long time, but I believe

23   so.

24   Q.  All right.  Go to procedure number 2, which references

25   discussions with Miss Kissick regarding the nature and

1    planned extent of the use of these products.  Do you see

2    that?

3    A.  Yes, ma'am.

4    Q.  And then down in the actions results section, it says

5    PwC held discussions with Cathie on December 19th while in

6    Orlando, while performing on-sight procedures.  Did you go

7    to Orlando?

8    A.  Yes, ma'am.

9    Q.  The work paper reflects that Miss Kissick stated the

10   product was only a temporary solution and as soon as rates

11   start ascending or investors speed up digestion, the product

12   will be done away with.  Do you see that?

13   A.  Yes, ma'am.

14   Q.  Mr. Cox, did rates start ascending?

15   A.  No.

16   Q.  For how long?

17   A.  I don't think they've ever -- talk of discussion on

18   every business channel right now, rates have not gone

19   anywhere hardly.

20   Q.  Did investors speed up digestion?

21   A.  No, not particularly.  Not that I can recall.

22   Q.  Was the COLB product, as far as you know, ever done away

23   with?

24   A.  Not to my knowledge, I don't recall.

25   Q.  And skipping ahead just a moment, in the 2003 audit, a

1    year from now when you came back and the COLB product was

2    still there, did that raise sort of an antenna for you?

3    A.  No, ma'am.

4    Q.  Is it indicative of any kind of fraud risk that a

5    product intended to be temporary lasted for longer than it

6    was meant to?

7    A.  No.

8            MS. MOSS:  Am I talking too fast?

9            THE COURT REPORTER:  (Shakes head.)

10           MS. MOSS:  Okay.  I told you.

11   BY MS. MOSS:

12   Q.  Mr. Cox, why did PwC perform procedure number 2?

13   A.  To get an understanding of its -- you know, again, it's

14   Genesis and use and what -- how she viewed the product in

15   her tool box.

16   Q.  Mr. Mullin also pointed out that the work paper you

17   drafted said it should also be noted that Cathie consulted

18   with PwC at the product's inception in order to evaluate

19   potential accounting issues and concerns.  What did you mean

20   by that?

21   A.  You know, I think in the generality of just -- I don't

22   remember her calling, like I said, sort of D-day, H-hour and

23   say, hey, we're doing this.  Again, it's been a long time.

24   But I think it was more this is the inception, this is the

25   start of it, this is the spin around for -- you know, a few

1    months.

2    Q.  I'll move on to the next page.  Also, Tim Kviz noted

3    other PwC clients are developing similar products.  Did Mr.

4    Kviz go to Orlando as well in December of 2002?

5    A.  I don't recall.

6    Q.  Procedure number 3 is PwC reviewed contracts which were

7    developed by MWL's external legal counsel in order to ensure

8    proper accounting.

9         Mr. Cox, why did PwC perform this audit procedure?

10   A.  It was keyed to making sure at the end of the day that

11   was the guts of the transaction, that was the document that

12   gave it -- gave it substance.

13   Q.  Was it meaningful to you that the contracts were

14   developed by Mortgage Warehouse Lending's external legal

15   counsel?

16   A.  You know, I think any time you're looking at a contract

17   you want an attorney who's knowledgeable, invested in that

18   arena, for lack of a better term.  So, I don't remember

19   specifically thinking this, but it's logical that it

20   provided comfort that somebody who knew what they were doing

21   did it.

22   Q.  Had drafted the contract?

23   A.  Yes, ma'am.

24   Q.  The results section, number 3.  Can you read that?

25   A.  Yes.

1    Q.  Tell me what this audit evidence that you obtained here

2    in the results section of number 3 means.

3    A.  Basically, after reviewing the contracts, Tim Kviz's --

4    not Tim Kviz, excuse me, Kim and Tim's efforts, plural, in

5    part, whatever, that they viewed it did qualify.

6    Q.  Did you understand when you were drafting this work

7    paper at year end 2002 that that analysis had been performed?

8    A.  Yes, ma'am.

9    Q.  We've seen some here today.  Were there other documents,

10   beyond just these -- this short paragraph that reflected the

11   work that was done in 2002 on this topic?

12   A.  Again, I think -- if I understand right what you're

13   referencing, yes, there were the e-mails and the memo.  And

14   kind of looking at it, evaluating it, everything from an

15   initial ring fence and sort of what it was trying to gather,

16   what this thing -- what it is, all the way up to now, this,

17   which is it's been disposed of.

18   Q.  Why didn't you put those other documents in the work

19   papers?

20   A.  You know, it -- it really wasn't a reason to.  It would

21   have been approved -- it, the letter had been issued, so I

22   don't know what we would have put in, per se.  But again,

23   it's been so long that --

24   Q.  Do you remember what the audit documentation standards

25   were from 15 years ago?

1    A.  I know they changed shortly after, I remember that.  I

2    think it's my experience -- not in great detail, I don't,

3    I'm sorry.

4    Q.  That's fine.  You wrote in this work paper, "The seller

5    does not maintain effective control through the right to

6    repurchase loans," parens, "call option."  What did you

7    mean?

8    A.  That they couldn't sort of arbitrarily reach in and pull

9    it back.

10   Q.  Did you intend in this sentence to state that there

11   could never be any kind of seller's call option in COLB

12   contract in order for it to qualify for sales accounting?

13   A.  I was just speaking to the -- looking at this, what had

14   been identified.

15   Q.  What had already been identified in the fall of '02?

16   A.  Yes, ma'am.

17   Q.  Last one, procedure number 4.  What was PwC's purpose in

18   performing procedure number 4, which relates to reconciliations

19   and signed contracts?

20   A.  To make sure that there was a backup for the -- for

21   these.

22   Q.  And in the results section, what does that mean?

23   A.  That gets -- I think your first question about what does

24   external mean, that means there is a -- a work paper,

25   physical work paper in a binder somewhere.

1  Q.  Pulling up exit A-93, Your Honor.

2          Is that what this is?  Is this --

3  A.  I believe so, yes, 3205.

4  Q.  And is that your handwriting?

5  A.  Yes, ma'am.

6  Q.  That note, "See discussion at electronic work paper in

7  the database," is that meant to reference the electronic

8  work paper that we were looking at, Exhibit A-83?

9  A.  Yes, you can have duplicate -- you can have the same

10  work paper in an electronic format and a hard copy form.

11  Q.  Let's start by pulling out this.  What is this?  Oops.

12  I'll do it again.

13          What's this?

14  A.  It's a tick mark saying that something was agreed to, a

15  signed contract.

16  Q.  What is a tick mark?  Is that like a -- give me a non-

17  auditor word for tick mark?

18  A.  A map.

19  Q.  And what's this?

20  A.  That would be the other -- that's -- let me back up.

21          The tick mark would be the legend, if you will,

22  and the map would be what you just pulled up, that had all

23  the different ones that showed you where it's going.

24  Q.  So these tick marks next to a number of company -- well,

25  let me take that back.  What are these dozen company names?

1  A.   That's all the -- I believe it is all of the companies

2  that had COLB -- that had a COLB relationship with the bank.

3  Q.   As of 12-31-02?

4  A.   I believe so.

5  Q.   That is what this is from?

6  A.   Yes, yes.

7  Q.   So in the first quarter or so of COLB's existence,

8  Mortgage Warehouse Lending was offering the COLB product to

9  roughly how many customers?

10  A.   14, if my counting is right.

11  Q.   And the tick mark indicates that you -- and this is your

12  handwriting, correct?

13  A.   That's my bad handwriting, yes.

14  Q.   I can read it, so can you.  It says, "PwC agreed to sign

15  and dated contract."  What does that mean you did?

16  A.   For these four people, we went and pulled that contract,

17  the original contract, and looked to make sure it matched up

18  with what had been ultimately approved by Kim and Kviz

19  nationally.

20  Q.   And the four COLB customers are Taylor Ben and Whitaker,

21  Pinnacle Financial, Franklin American Mortgage and

22  AmeriFirst Financial?

23  A.   I believe that's right.

24  Q.   Why did you pick those four?

25  A.   Looking at it, it looks like you've got the top three

1    largest and then a random.  I can't -- I can't say for

2    certain, but that's what it looks like it is.  I think the

3    three largest and then thrown in a random to check a smaller

4    balance, just to make sure it's there, too.

5    Q.  Why is that kind of an approach to picking what -- which

6    of a dozen you're going to test, why does that make sense?

7    What's the purpose of that audit methodology?

8    A.  Well, there's -- it's -- you want to get good coverage.

9    I think we talked about earlier, coverage, in that what we

10   see in front of us.  But then it's the three largest, which

11   gives you a big number, and then that covers how much of the

12   275.  But then you also want to make sure that the smaller

13   ones aren't being ignored, that there is in fact something

14   that backs those up to.

15   Q.  Mr. Cox, what was the ultimate conclusion by Colonial's

16   in-house accountants and management on the issue of whether

17   the COLB product qualified for sales accounting treatment

18   under FAS 140?

19   A.  That it did.

20   Q.  What was the ultimate conclusion by PwC's engagement

21   team on that same issue?

22   A.  That it did.

23   Q.  And after the consultation in 2002 that Mr. Jackson led,

24   did anyone at Colonial ever tell you that they were

25   concerned that the COLB transactions did not qualify for

1    sales treatment under 140?

2    A.  I don't believe so.

3    Q.  Now, in 2003 did PwC perform the same kind of national

4    consultation that you just described for 2002 on the FAS 140

5    applicability to COLB?

6    A.  No.

7    Q.  Did you start over again from scratch?

8    A.  No.

9    Q.  Why not?

10   A.  If nothing had changed, you wouldn't go in and redo it all.

11   Q.  And if there had been changes made to the contract or

12   the program in the intervening year, what would you have done?

13   A.  Then it would have looked, I think, very similar to what

14   you saw in 2002.  It would have been a quick then-now sort

15   of analysis, what changed?  More than likely I would have

16   done a first shot at this is what it looks like and kicked

17   it up to Kim and Tim and national.  And I think -- frankly,

18   sitting here talking about it, I think it would look very

19   similar.

20          THE COURT:  I'm sorry.  I didn't hear you.  You

21   think it would what?

22          THE WITNESS:  In terms of -- Meredith, Miss

23   Meredith asked what would 2003 have looked like if there had

24   been change.

25          THE COURT:  If there had been change?

1    THE WITNESS:  Yes, ma'am, if there had been a

2 change to the contract.  And I was saying it would have

3 looked very similar to what you saw in 2002, where more than

4 likely we would have been notified, we would have talked to

5 people, figured out what the change was; I would have looked

6 and said -- you know, what was it versus what is it now.

7 And then, like I said, in 2002, like you saw, that memo to

8 Kim and Tim, and this is what -- guys, this is what I think,

9 and national would have got involved, too.

10    THE COURT:  But there wasn't the change, was

11 there?

12    MS. MOSS:  Right, there was not.

13    THE WITNESS:  No.

14    MS. MOSS:  In '03.

15    THE COURT:  Okay.

16 BY MS. MOSS:

17 Q.  Now, I want to switch topics Mr. Cox.  In 2002 or 2003

18 did PwC issue an opinion on the -- an actual opinion on the

19 effectiveness of Colonial's internal controls on financial

20 reporting?

21 A.  I don't recall.

22 Q.  Do you remember when Sarbanes Oxley was passed?

23 A.  It was right about -- it was right about that time.

24 Q.  In 2002?

25 A.  Okay.

1    Q.  And did it take the PCAOB a couple of years to roll out

2    auditing standards that would affect what Sarbanes said?

3    A.  Yes.  PCAOB, yes.

4    Q.  So do you --

5            MS. MOSS:  Trying not to lead him, Your Honor.

6            THE COURT:  You may not be able to not lead him.

7    He says he doesn't remember.

8    BY MS. MOSS:

9    Q.  Yeah, let me ask this way:  Do you remember the first

10   year in which PwC was required by the regulations to issue

11   an opinion not only on whether the financial statements were

12   materially misstated -- or, materially stated in all

13   respects in accordance with GAAP, but also the effectiveness

14   of management's internal controls over financial reporting?

15   A.  I remember the last year we were having to do the roll-

16   up assertions, where management had to sign -- where

17   management had to sign -- you know, like the controller had

18   to verify and say that she was aware of nothing and that she

19   was comfortable with internal controls.  And the CFO had to

20   take responsibility for the controller.

21         You know, I'm sorry, I don't remember specifically

22   if that -- if those two are linked, but I think they are.

23   Q.  And your last year at PwC, that was in 2004.  Does that

24   help you?

25   A.  Yes, ma'am.

1    Q.  Okay.  But does that mean that even before that started

2    happening in 2004, that PwC didn't consider internal

3    controls as part of its audits?

4    A.  Oh, no.  No, we did consider internal controls.

5    Q.  How did PwC design audit procedures?  Broad question,

6    but starting off.

7    A.  You had to look at -- I mean, broad question, broad

8    answer.  You started with the balance sheet and looked at

9    materiality in various accounts, you looked at where -- not

10   just on the dollar figure, but also from a question of

11   accounting treatment, things like that.  And then you

12   started there and then went deeper into substantive

13   procedures versus test and controls.

14   Q.  I pulled exhibit D-1653 up on to the screen.  It's a

15   memo drafted by you, September of 2002, entitled Preliminary

16   Risk Analysis.  Do you see that?

17   A.  Yes, ma'am.

18   Q.  Is this part of audit planning?

19   A.  Yes.

20   Q.  What's the objective of this piece of audit planning?

21   A.  It's to talk about the risk -- the places that are most

22   likely to effect or to cause an ineffective audit.

23   Q.  Why did you as an auditor, if not a team, identify those

24   places in the planning phase?

25   A.  To pay more attention to them.

1    Q.   What do you do when you pay more attention to them?

2    A.   You --

3    Q.   What's the back end of the process?

4    A.   You're going to do more tests, whether they are controls

5    or they are substantive procedures, those tests can include

6    everything from spending more time with management, spending

7    more time with people.  You know, sort of a soft side of it.

8    Spending more time having more discussions to field test a

9    specific task.  You could spend more time doing --

10   increasing your scope over those accounts.  It's a very

11   broad range of things you can do.

12   Q.   Was one of the risks that you as a team initially

13   identified to help Mortgage Warehouse Lending?

14   A.   Yes, ma'am.

15   Q.   What does that mean, to help identify it as a risk?  I

16   don't understand what that means.

17   A.   That we knew going in we were going to spend -- I think

18   it's helpful at this point to understand how Colonial was

19   structured.

20   Q.   Okay.

21   A.   Colonial was structured by regions.  For instance, you

22   had Alabama, you had south Florida, central Florida, you had

23   Nevada, you had Georgia, you had geographic regions.  And

24   you really -- we didn't go ask -- and Mortgage Warehouse

25   Lending was considered to be sort of a region, it was its

1    own self-contained unit, for lack of a better term.

2           Other than doing credit reviews, loan reviews in

3    the regions, which was a test of controls of the internal

4    auditing function, we really didn't spend that much time in

5    the regions.  In other words, I didn't go to Atlanta per se,

6    didn't send anybody to Las Vegas -- trust me, they asked.

7           You know, and so with Mortgage Warehouse Lending,

8    it was different in that while it was its own separate

9    entity, we treated it different in terms of the procedures

10   that we did.  Does that make more sense?

11   Q.  It does.

12          I'm now on page 4 of Exhibit D-1653, Your Honor.

13          Mr. Cox, you wrote in your memo, "Because of the

14   amounts of money involved and the speed at which

15   transactions take place, controls play a vital role in

16   operational and risk management."  What did you mean?

17   A.  This gets back in this issue of controls versus

18   substantive testing.  Substantive literally meaning

19   substantiate.  You are substantiating a balance.  And again,

20   I think we looked earlier, just a second ago, with the four

21   tick marks and talking about coverage.  In a place like

22   Warehouse Lending where you have multiple, multiple volumes

23   of lower balance transactions, it's harder, much harder to

24   get coverage as it relates to individual -- you know,

25   substantive procedures over an entire balance.

1      Again, sort of the grape analogy.

2    Q.  I think of it as the wine analogy, but okay.

3    A.  The wine analogy, yes.

4      So that's from a control standpoint, it's

5    really -- it's -- the better approach -- or, a perceived

6    better approach, to focus on controls than it would be to go

7    in and do substantive testing over the balances themselves.

8    Q.  Going briefly to the next page, there's a reference to

9    the planned visit to Warehouse Lending.

10      In your memo, Mr. Cox, you wrote in part, in what

11    I've highlighted, "Although cash is funded on a

12    transaction-by-transaction basis, at its core Warehouse

13    Lending still revolves around the credit worthiness of the

14    underlying borrowers."

15      Do you see that?

16    A.  Yes, ma'am.

17    Q.  What does that mean?

18    A.  That while there are almost underlying additional

19    transactions represented as borrowings, it still comes down

20    to the financial capability of that mortgage originator.

21      We were talking about -- I don't remember if it

22    was earlier with you, how they didn't have the capital,

23    these originators.  If things did not get digested, they

24    didn't have the capital to operate.

25      Well, even outside of those times of stress, you

1   still could have times when an originator, if they weren't

2   financially viable, if weren't creditworthy, if they weren't

3   performing as expected, they could still blow up and cause

4   problems?

5           THE COURT:  So let me understand it.  That phrase,

6   "underlying borrowers," does not mean the borrowers of --

7   who are buying houses?

8           THE WITNESS:  That's correct.  It means --

9           THE COURT:  It means the borrowers -- it means the

10  originators, the mortgage originators.

11          THE WITNESS:  Yes, ma'am.  Yes, ma'am.

12          THE COURT:  And they are borrowing from Colonial?

13          THE WITNESS:  Yes, ma'am.

14          THE COURT:  Okay.

15  BY MS. MOSS:

16  Q.  Did PwC design a procedure in the 2002 audit to address

17  that risk?

18          THE COURT:  Can you be --

19          MS. MOSS:  I'm at Exhibit D-1653.  I started on

20  Page 4; this is on Page 5.

21          THE COURT:  Thank you.

22  A.  I'm sorry.  Can you say that again?

23  BY MS. MOSS:

24  Q.  Did PwC design a procedure in the 2002 audit to address

25  this risk of Warehouse Lending still revolving around credit

1    worthiness of the underlying borrowers?

2    A.  We did loan reviews.

3    Q.  What does that mean?

4    A.  We would go down to -- the Judge's point, we would go

5    down to Orlando and pull the file of, say, a Taylor Bean or

6    an Ivanhoe or, I think, AmeriFirst -- not AmeriFirst,

7    whatever it was up there.

8    Q.  AmeriFirst.

9    A.  AmeriFirst.  One of the borrowers.  And we would look at

10   their payment history, their financial condition, their

11   owners, their experience, things like that.

12        We would perform an actual loan review.

13   Q.  What kind of audit evidence did -- well, never mind.

14   We'll look at one in a minute, and then we can talk in

15   specifics, as opposed to imaginaries.

16   A.  Sure.

17   Q.  The last paragraph -- it's not going to work.

18        Can you read that?

19   A.  Yes.

20   Q.  I've highlighted the last half of this last paragraph on

21   Page 5 of Exhibit D-1653.

22        I'm not going to read it into the record, but it

23   refers to systems, computer systems, correct?

24   A.  Yes, ma'am.

25   Q.  Tell me why this piece of the Mortgage Warehouse Lending

1    Divisions operations made it into your risk analysis memo?

2    A.  If you think about, again, these underlying borrowers

3    that are the originators, one of the originators could have

4    upwards of a half dozen to -- I really don't remember, but

5    multiple -- I want to say up to a dozen different sublimits.

6            And by sublimits, I mean not all loans are created

7    equal.  When you or I go in and sit down at that table and

8    sign, it's not really so much about credit worthiness,

9    subprime, or any of that.  It's about the documents.  Did --

10   it's about the age of them.

11           There's different characteristics these packages

12   have that can push -- that can push these things in

13   different sublimits within Colonial's line.  And those

14   sub-limits have different things, like the interest rate

15   they charge.

16           They also had, you know, the amount of loan

17   Colonial would make against it.  So if you had a -- and I

18   don't remember the numbers off the top of my head.  But, by

19   example, if Colonial had -- you got a package with a bow on

20   it, the originator, let's say -- it's clean, it's neat.

21           The originator, Colonial, might loan 95 cents on

22   the dollar.  So if it was a 100,000 loan, Colonial would

23   loan -- or, any lender could loan $95,000.

24           However, let's say that maybe there's -- the title

25   report's missing -- and I'm really making something up

1    now -- but some document, or age maybe.  It's gotten older,

2    for whatever reason.  Well, then all of a sudden, the

3    interest rate goes from whatever.  Because of this risk, it

4    goes up in interest rate.  And then they could also require

5    that instead of loaning 95 cents on the dollar on this loan,

6    it's now 90 cents on the dollar.

7         So in the settle-ups at the end of day, that

8    $5,000 difference has to come back into Colonial.

9    Q.  And how does that relate to the computer systems at

10   Mortgage Warehouse Lending?

11   A.  Well, I mean, think about what we just described or what

12   I just described and how those thousands of loans coming

13   through here, its sublimits, and they're bouncing around

14   between different categories.

15        And if the systems aren't right, then it's a --

16   it'd be very bad.

17   Q.  And I am going to read a piece of this because I think

18   it's cut off your screen.  My apologies, Mr. Cox.

19        It says, "However, due to the number of

20   sub-lines," which I think is what you just described, "and

21   their ever changing nature, there are constant, numerous

22   reconciling items between the commercial system and

23   warehouse lending system that must be addressed," and it

24   talks about PwC planning to review the reconciliations.

25        In the fall of 2002 -- or, December of 2002, did

1    you understand that it was Colonial's -- the Mortgage

2    Warehouse Lending Division -- let me start again.

3            As part of the 2002 audit, did you come to

4    understand the Mortgage Warehouse Lending Division was

5    hoping or intending or planning to upgrade its computer

6    systems?

7    A.  Yes.  If I remember correctly, they had an old, old

8    version WMS -- WMS, and they were moving to a windows-based

9    version.

10           And because of all of these different reasons and

11   the functionality of it, and so, that was a huge deal in the

12   2003 audit.

13   Q.  Why was it a huge deal?

14   A.  I mean, anybody that's ever been through a systems

15   implementation understands what a -- you know, highly

16   technical term -- a cluster it can be, you know -- and so,

17   you know, sorry.

18   Q.  It's going to be an interesting transcript today, Mr. Cox.

19   A.  Sorry.  I apologize.

20   Q.  Oh, you got to be yourself.  That's fine.  Go ahead.

21           A systems conversion can present a challenge --

22           THE COURT:  It wouldn't be funny if we all didn't

23   know what --

24           MS. MOSS:  I know.

25           THE WITNESS:  So, yeah, so if you think about at

1   our level, the things we do, imagine taking a multi-billion

2   dollar line of business, bouncing -- the sublimits and loans

3   bouncing around through it, and you're implementing that

4   thing, it was -- you know, it was part of our main concern.

5   Q.  But it didn't happen in 2002, right?

6   A.  No, ma'am.  I don't think so.  What year are we at?

7   Q.  This is the 2002 audit.

8   A.  No.

9   Q.  All right.  Mr. Cox, I'm going to move this along.  This

10  is Exhibit A-83.

11          This is a 2002 work paper entitled Document

12  Background, the Relevant History.  Asks to perform on

13  Mortgage Warehouse Lending Department -- and, you know, I

14  should have showed you this in the beginning.

15          This is a document you created?

16  A.  Okay.

17  Q.  And that last document, you also created that?  Do you

18  remember that?  Did I show you that?

19  A.  I think we established it, but I don't remember seeing it.

20  Q.  Just briefly, Mr. Cox, this work paper documents your

21  understanding of the Mortgage Warehouse Lending Division

22  consistent with your testimony today?

23  A.  Yes.

24  Q.  There's a description here of the steps performed.

25  A.  There you go.

1    Q.  Can you read it on your screen?  Is it any better?

2    A.  Sure.  I'm sorry.

3              THE COURT:  Is your screen still jiggling or --

4              THE WITNESS:  Yes, ma'am, but it's okay.  They've

5    gotten it blown up big enough, I can see it.  I'm supposed

6    to read it, right?

7    BY MS. MOSS:

8    Q.  Yeah.  And I'll just focus your attention, Mr. Cox; I'll

9    focus your attention on the last sentence.

10   A.  Yes, ma'am.

11   Q.  In general, the procedures focused on two areas; general

12   controls and credit quality.  Why?

13   A.  Those were the areas where, ultimately, that's what

14   Warehouse Lending was about, going back to all these things

15   we've been talking about, about the high volume, low dollar,

16   the inputs matter.

17             To be able to -- or, I mean, pardon the

18   expression, but the inputs matter to be able to control the

19   outputs that are on the financial statements.

20   Q.  And I've gone to Page 2 now of Exhibit A-83, Your Honor,

21   on the credit quality results section.

22             This is the sentence that Mr. Mullin asked you

23   about, the first sentence about large losses.

24   A.  Yes.

25   Q.  "Historically speaking, the large losses related to the

1  Mortgage Warehouse Lending industry have come from frauds

2  perpetrated by mortgage originators."

3         And Mr. Mullin asked you whether you thought that

4  meant that PwC had identified the very risk that has come to

5  pass.  And in your answer you said, Well, partially, but not

6  fully.  But I'm not sure you were able to explain what you

7  meant, so explain what you meant.

8  A.  The basis of the risk, yes, is here, and I did mean

9  part.  It is identified here, but what's not identified

10 here, and I think factually what is different is the level

11 of collusion.

12        And, you know, that may have changed since I got

13 out of public accounting, but at the time in this discussion

14 when this originated -- I just don't remember these

15 discussions, whether they were led by Tim or anybody else,

16 really highlighting, you know, collusion.

17 Q.  What do you mean by "collusion"?

18 A.  Where you have an external group, ala Taylor Bean, and

19 exactly what happened.  You have an external group, Taylor

20 Bean, working with an internal employee, a member of

21 management, and working together to defraud their employer

22 and everybody else.

23 Q.  Why is that kind of collusion, external and internal, as

24 you said, why is that different than what you were focused

25 on here?

1    That's not what I meant to say.  Why is that

2    different than what you were describing here?

3    A.  Well, I guess two things.  Again, it, specifically here,

4    in what we talked about collusion, just -- I just don't

5    remember it being a part of the hot button.  You know, the

6    hot topics that Tim and -- and also in the industry as a

7    whole, was talked about.  Why does it matter, is that my

8    understanding?

9    Q.  What's the effect of that kind of collusion that you're

10   describing; what is the effect of that --

11            THE COURT:  Which collusion is the --

12            MS. MOSS:  The external and internal collusion,

13   the two part, right?

14   A.  Right.  Got it.

15   BY MS. MOSS:

16   Q.  What is the effect of that kind of collusion on a

17   financial statement audit?

18   A.  It makes it much, much more harder to discover, to find,

19   to uncover.

20   Q.  Why?

21   A.  Think about the leverage and the ability -- I mean, part

22   of where most frauds, external frauds get discovered, is

23   when that person doesn't really -- I say "most," but my

24   belief, most external frauds come about because -- or get

25   discovered because the person makes a mistake because they

1    don't understand or they can't continue to interface

2    correctly with whomever they are defrauding.

3           They can't -- whatever it is they're doing to

4    them, eventually they make a mistake.  And the person, the

5    entity, the person or whatever, catches them.

6           Here, when you have somebody on the inside

7    helping, it's, you know, it's a heck of a lot harder to

8    catch.

9    Q.  The work paper goes on to describe that industry

10   specialists have determined that the most telling indicator

11   of potential problems was the deterioration of the various

12   companies' underlying financial statements.

13          Is that the underlying borrowers that you were

14   discussing with Her Honor before?

15   A.  Yes.  Yes, ma'am.

16   Q.  Okay.  So what is the audit procedure that, in this box,

17   PwC designed to test -- are you okay?

18   A.  Yeah, yeah.

19          THE COURT:  Do you need to stand up?

20          THE WITNESS:  Yes, ma'am.

21          THE COURT:  Go ahead.

22          THE WITNESS:  You may have heard that pop.

23          THE COURT:  You not only can stand up.  You can

24   stay standing as long as you like.

25          MS. MOSS:  Do you want a break?

1          THE WITNESS:  No.  I'm good.

2          THE COURT:  Why don't you stand?  It seems like

3      it's more comfortable for you.

4          THE COURTROOM DEPUTY:  What about the lapel mic?

5      You can do that.

6          MS. MOSS:  May I?  It's your moment.

7          THE WITNESS:  Can't see it.  Does that work?

8          MS. MOSS:  That's fine for me.  I ask our court

9      reporter, does that work?

10          THE COURT REPORTER:  It's not on.

11          THE COURT:  You have to make sure it's turn on,

12      and it's close to you.

13          THE COURTROOM DEPUTY:  Make sure that it's on.

14          THE COURT:  It's not on.

15          MS. MOSS:  Could you help me?

16          THE COURTROOM DEPUTY:  Of course.

17          MS. MOSS:  Thank you.

18          (Off-the-record discussion.)

19          THE WITNESS:  Okay.  Sorry.

20          MS. MOSS:  Did you want to clip it?  Did you want

21      me to clip it?

22          THE WITNESS:  I'm afraid you won't be able to

23      hear.  Did that work?

24          THE COURT:  Go ahead.

25          MS. MOSS:  Mr. Cox, what is the audit procedure

1  that's being described here in Exhibit A-83 on Page 2 in the

2  credit quality section?

3  　　　　　What is the objective of this audit procedure?

4  A.  The objective is to ultimately to look what it says, to

5  look at the underlying financial statements and prove that

6  they're creditworthy.

7  Q.  What did PwC do to in order to meet that objective?

8  A.  The loan reviews we talked about, we went and pulled --

9  as part of those loan reviews, they should have had -- I

10  don't remember them specifically, but I believe they had

11  financial statements included with them that we could review

12  and look at.

13  Q.  It says, "The four largest relationships were selected

14  for review, as well as the haphazard selection of four from

15  the remaining pools of customers."

16  　　　　　Do you see that?

17  A.  Yes, ma'am.

18  Q.  Is that kind of an approach consistent with the approach

19  you took in looking at the signed contracts --

20  A.  Yes.

21  Q.  -- that we looked at a minute ago?

22  A.  It's very similar in trying to get -- to the most

23  impactful relationships, and then a sampling.  Or that may

24  be too formal of a word.

25  Q.  And that word "haphazard," does that mean careless?

1    A.  Random.

2    Q.  Random, okay.  What's the benefit of a random test?

3    A.  Your predisposed biases don't show up; you just pick

4    them.

5    Q.  And when you select at random, does that mean that you

6    always select one of every particular kind of a balance

7    being tested, or in this case a pool of customers being

8    tested?

9    A.  Well, this would be the actual borrowers.  So we would

10   take out the four out of how ever many relationships and

11   borrowers there were, and I don't remember.

12          You take out the four and literally draw for the

13   rest of them.

14   Q.  I'm going to move for a moment to Exhibit A-85, and

15   start at the back.  This is a work paper from the 2002

16   audit.

17          Did you prepare this work paper?

18   A.  Yes, ma'am.

19   Q.  And Mr. Jackson reviewed it?

20   A.  Well, he last modified it, yes.

21   Q.  Start with the top.

22          What is this work paper, Exhibit A-85?

23   A.  It's looking at one of the individual sublimits for --

24   well, in this case Taylor Bean, from a loan review standpoint.

25   Q.  Is this the credit review that we saw referenced on the

```
1    work paper we were looking at in Exhibit A-83?
2    A.  Yes, ma'am.
3    Q.  Okay.
4    A.  I believe so.
5    Q.  Mr. Perez, I'm going to walk you through a handful of
6    sessions -- did I just call you Mr. Perez?
7    A.  It's all right.  I've been called worse.
8    Q.  Mr. Cox, I'm going to walk you through it.  Is this
9    audit evidence that you obtained?
10              THE COURT:  Incidentally, I don't know if anybody
11   wants to register the fact that he's not going to get out
12   today?
13              MS. MOSS:  I was having the same thought, Your
14   Honor.
15              THE COURT:  I'm sure there's somebody here that
16   can make arrangements for him that need to be made.
17              MS. MOSS:  We can.
18              THE COURT:  It's perfectly clear that I'm sure Mr.
19   Mullin is going to have one or two questions.
20              MR. MULLIN:  One or two.
21              THE COURT:  And we only have 20 minutes left, and
22   you're not -- you have a ways to go.
23              MS. MOSS:  I do have a ways to go.
24              THE COURT:  He's going to be here --
25              MS. MOSS:  He is going to be here tomorrow, and I
```

1   would guess that I have another hour.

2              THE COURT:  Hour?

3              MS. MOSS:  I think I have another hour.  And with

4   that in mind, Your Honor, given that Mr. Cox is -- looks

5   like he's in some physical pain, I would like to either take

6   a break or break early, since we know he's coming back

7   tomorrow.

8              THE COURT:  I'm not going to take a break, because

9   taking a break would bring us to the end of the trial day.

10             MS. MOSS:  Yeah, I understand that.

11             THE COURT:  You look pretty uncomfortable, Mr. Cox.

12             THE WITNESS:  I will do whatever you want to do.

13   I'm fine.

14             THE COURT:  Yeah, but this is not supposed to be a

15   torture procedure.

16             MS. MOSS:  Torture.  Right.

17             THE COURT:  Except for those of us who are here

18   day after day.  It's our briar patch.  We do this

19   voluntarily.

20             MS. MOSS:  Might I suggest that we -- since he's

21   going to hold over until tomorrow, can we adjourn?  Give him

22   a break.  I'm happy to start, if you'd like, Your Honor, at

23   8:30 tomorrow, make up a little bit of the time.  I don't

24   know if it works for our team here.

25             THE COURT:  Well, it works for our team here, but

1     it makes life very, very difficult for Heather.

2                MS. MOSS:  Oh, God, yes.

3                THE COURT:  I mean, she may as well not go to

4     sleep, but just stay in chambers.

5                MS. MOSS:  I'm sorry, Heather.

6                May we go to 5:00 tomorrow?

7                THE COURT:  No.  Tomorrow was supposed to be one

8     of the non-court days, remember?

9                MS. MOSS:  We have Mr. Lucas here for tomorrow.

10    So I think we were -- what our objective was, what we had

11    talked about --

12                THE COURT:  Was to finish Lucas.

13                MS. MOSS:  Yes.  And I recognize that I am the

14    problem in taking more time with Mr. Cox, but this is useful

15    evidence.

16                We would like to finish with Mr. Cox.  I think I

17    have 45 minutes left.  I'm sure Mr. Mullin has some time.

18    Mr. Lucas is a discrete witness.  He's here.  I would like

19    to put him on.  And then we brought out Mr. Naumann from

20    Los Angeles.  I would like to get him off the stand by,

21    like, 10:00, 10:15 tomorrow.  Lucas we hopefully can get done.

22                THE COURT:  You missed the eye-rolling behind you.

23                MS. MOSS:  It wouldn't be the first time.

24                THE COURT:  You may be through by 10 or 10:15, but

25    anyway it will be close.  If we can start at 9, have 45

```
 1    minutes, we'll certainly be through with him by 11, right?
 2              MR. MULLIN:  I would hope so, Your Honor.  Just
 3    waiting to see when I get on -- get up to bat here.  I don't
 4    know when I'm going to get up to bat.
 5              THE COURTROOM DEPUTY:  Heather just said -- she
 6    said she is fine with 8:30.
 7              MS. MOSS:  Really?
 8              THE COURTROOM DEPUTY:  "Will you please just let
 9    them know that I am fine."
10              THE COURT:  I think you did not read the whole
11    thing, but never mind.  She is saying she's fine with 8:30?
12              THE COURTROOM DEPUTY:  8:30, correct.
13              THE COURT:  I would like to get through at least
14    this witness and Lucas tomorrow.
15              MS. MOSS:  Yes.  And potentially, Your Honor, we
16    talked about this before, Mr. Naumann, who was brought out
17    from Los Angeles, trying to alleviate the crunch in
18    Montgomery; that's why Mr. Cox is here.
19              And in the last week, if Mr. Naumann -- he is
20    here, he's ready.  If we could put him on on Thursday
21    afternoon, start him, finish him Friday morning.  You and I
22    talked a little bit about maybe a spillover into Friday
23    morning.  I recognize we all need to move to -- closer to
24    where Mr. Cox lives, but --
25              THE COURT:  I will just point out that counsel has
```

1    been remarkably inaccurate in their predictions of how long

2    a witness is going to take.

3              MS. MOSS:  I concur.

4              THE COURT:  And the idea that you will get through

5    this witness, Lucas, and get on to Naumann and finish

6    Naumann by Friday morning, pardon me for being somewhat

7    doubting that that's really going to take place.

8              I do not want to spend the entire day Friday on

9    the bench.  I'm going to be gone for a week.  I've got

10   things I must take care of.  So I think you're going to have

11   to think long and hard.  I have no idea how long Lucas is

12   going to take.  You described him as a discrete witness,

13   which may be, but I don't know that -- whether it's Mr.

14   Mullin or whoever is going to do Mr. Lucas, sees him as a

15   discrete witness.

16             I think you should look long and hard.  I would

17   hate to have Mr. Naumann hang around and then not get on.

18   You know, I mean, we're going to recess today.  So you've

19   still got -- you originally said an hour and I think you

20   should stick to an hour, although if you got done in less,

21   it would be great.

22             MS. MOSS:  45 minutes, Your Honor.

23             THE COURT:  45 minutes.

24             You have no idea, do you, Mr. Mullin?

25             MR. MULLIN:  Not yet, but I'll be -- I'll be

1  quick.  I mean, I only took 55 minutes for my direct.  So I

2  don't think --

3          THE COURT:  Maybe we will finish him earlier in

4  the morning, especially if we start at 8:30.

5          MS. MOSS:  Yeah.  And Mr. Naumann is here.  If we

6  can start him and finish him Friday morning, check him off

7  the list.

8          THE COURT:  Depends on how long Lucas is up.

9          MS. MOSS:  I understand.  I'm relentlessly

10  optimistic, Your Honor, and I'm going to stick with it.

11          MR. MULLIN:  I think the Court should be

12  professionally skeptical about Mr. Lucas.  Say he gets on at

13  10:30, that he is through by --

14          THE COURT:  Four.

15          MR. MULLIN:  Three, four.  And then if you start

16  Mr. Naumann -- I just don't want to get in a situation with

17  Mr. Naumann where they've directed and I don't get to do a

18  cross because we have to quit at noon, or whenever we're

19  going to quit on Friday.

20          MS. MOSS:  Might I make a suggestion?

21          Let's adjourn so we can all go make our

22  examinations for tomorrow more efficient; get as far as we

23  can get.  Aim for getting through as much as we can by

24  Friday at noon, before we all leave to do the things we need

25  to do before we move for a week.  Assess where we are

1  tomorrow, and let Mr. Cox have a little bit of a break.

2          THE COURT:  Mr. Cox is getting a break.  He's

3  going home.

4          MS. MOSS:  May he be excused from the stand?

5          THE COURT:  You can start leaving, Mr. Cox.

6          THE WITNESS:  Thank you.

7          THE COURT:  This is not something we need him to

8  be here for.

9          MS. MOSS:  I'm sorry.  I should have asked before.

10  Thank you.

11          THE COURT:  Let's put it this way, let's think of

12  it this way:  If it looks as if we're not going to finish

13  Naumann -- if we don't start Naumann before the first thing

14  Friday, let's not do Naumann.

15          You know, originally you weren't going to do

16  Naumann, you were going to have those two days off.  We now

17  got one of them completely taken care of, and if I didn't

18  hang in there for noon, I'm sure you would all cheerfully

19  fill up all of Friday.

20          But we're not going to do that.  We're going to

21  end at noon on Friday.  You can keep going.  You can stay

22  here and keep going; I'm leaving the bench at noon.

23          MS. MOSS:  Understood.

24          THE COURT:  Let me just give you something that

25  might help you.

1     MS. MOSS:  Sure.

2     THE COURT:  In -- I'm looking at your offer of

3 proof.

4     MS. MOSS:  On Mr. Jackson?

5     THE COURT:  Yes.  Okay.  The first issue that you

6 raise has not only been already introduced once, but has

7 already come in twice.

8     I don't claim to have total recall of Mr.

9 Jackson's testimony; if he didn't testify to it, somebody

10 else has.  The fact that -- the fact that things got worse

11 because of a whole bunch of low interest rates running

12 around in the mortgage department that couldn't be handled

13 in a timely fashion because there were these huge volumes

14 coming in.  If I've heard that once, I've probably heard it

15 at least three times.

16     And why you would bother making -- an offer of

17 proof should be saved for something really important.  It

18 should not be made on every evidentiary ruling that I make

19 that you don't like.  Because otherwise I'll tell you what

20 will happen, I'll stop taking you seriously.  I probably

21 won't even find time to read them and I'll just

22 categorically say, Don't do it, and that would leave you

23 without a tool that I think is a valuable tool.

24     But these offers of proof, to me, are -- we went

25 through the same thing about the idea that he can testify in

1    any way as to what the meaning of a lack of Federal Reserve

2    comment means, he can testify what it means to him.

3         The fact that -- I understand the point you're

4    making, that PwC may have thought that because if Federal

5    Reserve didn't respond, it meant everybody was happy with

6    what they had done.  They gave their letter and there was no

7    response.  But you've made that point.  I believe you even

8    made that point with Mr. Jackson, you just didn't make it

9    quite the way you wanted to make it, which is to push it a

10   little further and get me to hear somebody say they didn't

11   respond because they thought it was great.

12        Now, that's not going to happen, it's not going to

13   happen with any of the witnesses.  But what's relevant to

14   you, I will and have let in, that PwC had a certain

15   conclusion about it.  And if they thought that this meant

16   that they were okay, that's what you want and you got it.

17   I'm trying to look at the third one now.

18        MS. MOSS:  So that was the first one, Your Honor.

19   The second one was about the information that Mr. Jackson

20   obtained from David Byrne, who was Colonial's general

21   counsel, about the purpose of the FBI's visit to Mr. Kelly's

22   office.

23        THE COURT:  What page are you on?

24        MS. MOSS:  I'm on page 3.

25        THE COURT:  I don't even see --

1    MS. MOSS:  It's number 2.

2    THE COURT:  It's not even --

3    MS. MOSS:  The import of that evidence, Your

4    Honor, is what Mr. Jackson learned from Mr. Byrne, who is

5    Colonial's general counsel, was that the FBI agent who

6    visited Wes Kelly's house was working with SIGTARP.  SIGTARP

7    had an ongoing investigation into Colonial.

8    So the questions that Mr. Mullin asked Mr. Jackson

9    about weren't you alarmed? and, oh, my God, an FBI agent

10   showed up at your colleague's house.  Mr. Jackson's state of

11   mind, once he learned from Mr. Byrne that this related not

12   to an investigation of PwC and it had nothing to do --

13   nothing to do, as Mr. Mullin implied in his questioning of

14   Mr. Jackson, with what Mr. Kelly said to the --

15   THE COURT:  The evidence is coming in from

16   somebody.  It's not a party admission to say that he talked

17   to an attorney who told him something different.

18   MS. MOSS:  It goes to Mr. Jackson's state of mind,

19   Your Honor.  It's a different point.

20   THE COURT:  I'm sticking with my ruling and I'll

21   go on with the next one.  You have made the point, and I

22   know you've made the point, that the fact that Ernst and

23   Young didn't spot it, that came in.  I didn't have to go

24   back and -- and I'm not going to do it, rest assured.  But

25   the fact that in our transcript somewhere it came in,

because I remember distinctly the fact that Ernst and Young
spent four months on this and they didn't spot the fraud.
They made that point.  I'm sure it will be argued in
closing, it should be argued in closing, but it's not
necessarily the subject of an offer of proof because it's in
already.  If it isn't in with him, I'm sure you're going to
get it in with at least two or three other witnesses.

MS. MOSS:  Understood.  This is very helpful to
me.  And I would like to return to the point that I asked
Your Honor, because I think we will have -- I've got a few
witnesses to go.

As far as the procedure for going forward, when I
do think I need to issue -- or, make an offer of proof under
103 for preserving the record for, you know, for the 11th
Circuit, once we all get there, what would you like us to do?

THE COURT:  I would like you not to make -- well,
I would like you not to be thinking in terms of an offer of
proof.  If I'm making a ruling that for some reason you
really think is wrong and you can explain to me why that
issue is important to you, I will reconsider my ruling.  If
I stick with my ruling then, and you feel strong, you've
made your offer of poof, because you've given me the reason
for changing my mind.  Do you see what I mean?

You've made that -- you've made that issue that
you needed clear.  It's on the record.  And we know that

1   I've excluded that and you can say that -- why don't you

2   just say the magic words, and you can consider that I've

3   made my offer of poof on that and I'll go on to something

4   else.

5         MS. MOSS:  And so long as we're able to not -- to

6   explain -- just to make sure I'm following, Your Honor,

7   because the way I think of it, there's two pieces.  I need

8   to explain to you why I think it should be let in and then

9   you rule, of course.  But I also need to, for the record,

10  tell you what it is, and that's partially --

11        THE COURT:  That's part of what you're doing, I

12  would assume.

13        MS. MOSS:  Sure.

14        THE COURT:  You're saying to me, Your Honor, if

15  you would let this witness testify, he would say X, and this

16  goes to -- just to use an example you had:

17        If we had let Mr. Jackson testify, he would have

18  said, you know, things about SIGTARP or whatever, and that

19  goes to his state of mind, that's what he would have said.

20        MS. MOSS:  Okay.

21        THE COURT:  You don't have a jury here.  It's not

22  as if by saying this -- if you did this in a jury trial, you

23  would be tarred and feathered, but this isn't a jury trial.

24  You can say to me:  Were this witness allowed to testify,

25  what you're excluding is the following.  And let me see,

1    once I hear it, and you've also at the same time made your

2    record.

3              MS. MOSS:  Okay.

4              THE COURT:  If I still excluded it, your record is

5    made.  If I change my mind, of course he then knows what to

6    testify to, but that's something we will all live with.

7    Okay?

8              MS. MOSS:  That's great.  And we'll do it sort of

9    right in the moment when I make the judgment call.

10             THE COURT:  Let's do it.  I don't -- I don't want

11   papers coming in two days later telling me that I should

12   have done X with the witness, that's not a practical way to

13   proceed in a bench trial.

14             MS. MOSS:  Thank you.  I think that makes sense.

15             THE COURT:  The only offer of proof that is

16   different is the offer of proof on Mr. Malek, because Mr.

17   Malek's testimony is in a different category.  And I've

18   gotten your offer of proof.

19             Have I gotten a response to that?  Do you want to

20   file a response to that, Mr. Mullin?  Do you want to just

21   argue it?  I haven't had a chance to read it.

22             MR. MULLIN:  I haven't had a chance to read it

23   either, Your Honor.  I was about to start Mr. Cox's

24   questioning when I was handed it.  I handed it off to

25   co-counsel, Your Honor.

1       THE COURT:  Okay.  Let's look at it tonight.  We

2   can talk about it tomorrow.  We've got some time on our

3   plate.

4       Let me raise something else, Counsel, that is sort

5   of in the back of my mind.  And don't all faint, okay?

6   Because this is something that will affect all of you,

7   across-the-board.

8       We are going to Montgomery and in Montgomery is a

9   sitting judge who has some familiarity with this case

10  already.  Right?

11      MS. MOSS:  Judge Watkins?

12      THE COURT:  Yes.

13      MS. MOSS:  Sure.

14      THE COURT:  Not that he will remember it, given

15  that he's probably heard a number of cases since then.  I

16  have not spoken to Judge Watkins, I do not know what next

17  week is like for him.  He may be in trial for all I know, he

18  may be gone, he may be on vacation or sitting somewhere else.

19      But, I am -- I am somewhat concerned that in a

20  case of this dimension and this import to all the parties

21  concerned, there hasn't been more of an effort to settle the

22  case and to mediate the case.  Bearing in mind that in every

23  other one of these cases that has been around has settled.

24  I mean, the odds in favor of settling a case like this are

25  great.

1    I don't mind, you know.  Quite frankly, it's

2  getting more and more interesting, even though some of the

3  witnesses do go on a bit.  But they get more colorful as

4  they go along.  This guy has been fun.  You never quite know

5  what he's going to say next, but --

6    MS. MOSS:  I totally agree.

7    THE COURT:  I would like -- here's the dilemma,

8  and I -- that's why I said don't faint.  You've already told

9  me you're very pressed for time.  We're only there for five

10  days.  None of us want to stay over the weekend or lap over

11  into the next week; that would not be a good thing.

12    I would like you to talk to each other and see --

13  is there any time at all left for you -- I just think -- it

14  occurs to me that Chief Judge Watkins would be an ideal

15  person to talk to, because, you know, it would -- I don't

16  think it would take that long to bring him up to the case.

17  I mean, he did have the case not too long ago, and he made

18  some rulings.  He may remember it.  You certainly could

19  bring it back to him.  But I don't know what this does to

20  your witnesses.

21    Now, we can keep a very long trial day there.

22  It's easier for me, because I have no other obligations.  Of

23  course, you guys have to prepare your witnesses for the next

24  day, so it may not be as easy for you.  And of course we

25  don't know what the court reporting would be like and how

1    long they can go.

2           But we could have a long trial day and make up

3    some of the time, if you did take time.  I don't want to

4    send you on a totally fruitless errand here, but, you know,

5    the case has proceeded now, we're into our second week.

6    Frankly, I can't -- each day I think it's going a different

7    way, so I don't -- it isn't like I could say now, you know,

8    how it's going to go, go settle it.  It's not that way at

9    all.  The case is developing as it should, in a very slow

10   and careful manner.

11          What do you think, Mr. Beck?  You took over the

12   mic, so I'll ask you.

13          MR. BECK:  I did only because we're now onto

14   something that's more in my area of responsibility.

15          THE COURT:  Right.  That's what I figured.

16          MR. BECK:  And we would be delighted to work with

17   the other side and figure out how we could make that work,

18   if Judge Watkins is free.  We also got a call the other day,

19   checking in from Layn Phillips, who was the mediator before.

20   And so, I think that would be a very productive use of our

21   time.

22          I -- I would like to try to work it out so that

23   we're not -- we have a bunch of witnesses and we're only

24   going to pass through Alabama once, I hope, so we need to

25   get them in.  But I think we can work together and find a

1    way to do it.

2            If I'm not taking a witness, I know how to read a

3    transcript at night and I can be somewhere else.  And I

4    assume that decision-makers on their side, and certainly

5    we've got a litigation general counsel who, if we have a

6    meeting like that, can attend and don't have to be in the

7    courtroom and we can be brought up to speed in the evening.

8    So --

9            THE COURT:  Well, why don't you -- I'm sorry.

10           Why don't you do this:  Why don't -- of course

11   there is another possibility that you're mentioning, that

12   Layn Phillips had called you, and that is that although I

13   am -- I am waiting with bated breath to hear from Mr.

14   Naumann, one of the things we do is skip Mr. Naumann and put

15   him back where he was supposed to be and meet with Layn

16   Phillips Friday.

17           MR. BECK:  Well, my other -- the other reason that

18   I ventured up here was because while my poor colleague Ms.

19   Moss was up answering all the questions about Mr. Naumann,

20   the rest of us were e-mailing and saying, you know what, Mr.

21   Cox has gone a little longer than we anticipated, there's --

22   we checked with Mr. Jones, Jameson Jones, who will be doing

23   Mr. Lucas.  And I don't think we can represent to you -- and

24   I think you're right, I don't think we can represent to Your

25   Honor that we could ever get to Mr. Naumann for cross-

1    examination.

2         I appreciate that counsel doesn't want a week

3    break between the direct and the cross, and so I was going

4    to report that with Your Honor's permission, we'll take Mr.

5    Naumann off the table, if we -- if, miracle by miracles, we

6    finish early --

7         THE COURT:  It's not going to happen.  It would be

8    very nice if we finish earlier.

9         MR. BECK:  So I wanted to alert the Court to that.

10   And then I don't have any idea -- Mr. Phillips, Layn

11   Phillips is difficult to schedule.  Last time he had one day

12   open for us, and that was a Sunday over Labor Day weekend.

13   So, I don't know what his availability is.  He'll move

14   heaven and earth, I'm sure, and maybe -- I don't know if we

15   can cajole him into meeting us in Birmingham and meeting on

16   Saturday or Sunday there.  But we'll -- for us, any time,

17   any place, we will have the decision-makers there and we'll

18   have one of us who doesn't need to be in court there.

19        THE COURT:  Two questions then:  One is timing,

20   and that's something you all have to talk about.  The other

21   is who?  You know, if you're comfortable with Layn Phillips,

22   I mean, you've already met with him and he's willing to meet

23   with you again, maybe that's the place to start.  Maybe I

24   should forget about -- because I don't even know if Watkins

25   is going to be available or if he wants to take this on.

1          Maybe you should -- the better thing to do would

2     be to stick with Lane Phillips and see what you can do with

3     him.  If you think that he would be willing to --

4          MR. BECK:  I think he would be very willing, if the

5     schedule permits.  And the advantage with him is that he's

6     read their confidential mediation statement, our confidential

7     mediation statement, he's met with them, and he knows their

8     expectations.  He's met with us and knows ours, so --

9          THE COURT:  Okay.  Let me -- let me chime in,

10    because the more I think about, I think it's a pretty --

11    it's really an easy thing.  And my advice would be to stick

12    with him, because the most Chief Judge Watkins could do

13    would be to give you what? a morning, an afternoon?  It will

14    take him that long to get familiar with the case again.

15    This case can't settle in a morning or afternoon with a new

16    person; it's unrealistic.

17         I would take that off the table and I would get

18    back to Layn Phillips and talk to him and see what he's

19    willing to do and the time.  If you wanted to -- somebody

20    could work on that while we continue in Montgomery.  I

21    really don't want us to not finish in Montgomery, Monday

22    through Friday.  I think that's a must.

23         You know, we don't need a court reporter for this.

24    Can I let her go?

25         MR. BECK:  Oh, sure.  Sure.

1    (No further record.)
          *  *  *
2    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of

6    my stenograph notes and is a full, true and complete

7    transcript of the proceedings to the best of my ability.

8                    Dated this 28th day of September, 2017.

9

10

11                    /s/_____

12                    Janice E. Dickman, CRR, RMR
                     Official Court Reporter
13                    Room 6523
                     333 Constitution Avenue NW
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25