IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

The Colonial BancGroup, Inc.,    )
and Kevin O'Halloran, as Plan    )
Trustee for the Colonial         )  Civil Action
BancGroup, Inc.,                 )  No. 2:11-cv-00746 - BJR
                                 )
                    Plaintiff,   )  BENCH TRIAL
                                 )
vs.                              )  Washington, DC
                                 )  September 28, 2017
PricewaterhouseCoopers, LLP      )  Afternoon Session
and Crowe Horwath, LLP,          )  Time:  1:30 p.m.
                                 )
                    Defendants.  )
_____

TRANSCRIPT OF BENCH TRIAL
HELD BEFORE
THE HONORABLE JUDGE BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Plaintiff:      **Lawrence H. Heftman**
                        Schiff Hardin
                        233 S. Wacker Drive
                        Suite 6600
                        Chicago, IL  60606
                        **David C Mullin**
                        Mullin Hoard & Brown LLP
                        500 S. Taylor
                        Suite 800
                        Amarillo, TX 79101
                        (806)372-5050
                        Email: Dmullin@mhba.com
                        **Stephen P. Sorensen**
                        Thomas Alexander Forrester &
                           Sorensen LLP
                        14 27th Ave
                        Venice, CA 90291
                        (310)961-2536
                        Email: Ssorensen@tafsattorneys.com

 1                          **Ronald T Coleman, Jr.**
                            Parker, Hudson, Rainer & Dobbs LLP
 2                          285 Peachtree Center Avenue NE
                            1500 Marquis Two Tower
 3                          Atlanta, GA 30303
                            (404)420-1144
 4                          Email: Rtc@phrd.com
                            **Nicholas J DiCarlo**
 5                          DiCarlo Caserta McKeighan & Phelps
                            6900 E. Camelback Rd. Suite 250
 6                          Scottsdale, AZ 85251
                            (480)222-0914
 7                          Email: Ndicarlo@dcmplaw.com
                            **John G. Turner, III**
 8                          Mullin Hoard & Brown, LLP
                            P O Box 31656
 9                          Amarillo, TX 79120
                            Email: Jturner@mhba.com
10
      For the Defendants:   **Philip S. Beck**
11                          **Mark L. Levine**
                            Bartlit Beck Herman Palenchar & Scott
12                          54 West Hubbard Street, Suite 300
                            Chicago, IL 60654
13                          (312)494-4411
                            Email: Philip.beck@bartlitbeck.com
14                          Email: Mark.levine@bartlitbeck.com
                            **Jameson R. Jones**
15                          Bartlit Beck Herman Palenchar & Scott
                            1899 Wynkoop Street. 8th Floor
16                          Denver, CO 80202
                            Email: Jameson.jones@bartlitbeck.com
17                          **Meredith Moss**
                            King & Spalding LLP
18                          1700 Pennsylvania Ave NW
                            Washington, DC 20006
19                          (202)626-2916
                            Email: Mmoss@kslaw.com
20                          **Christopher D. Landgraff**
                            Bartlit Beck Herman Palenchar & Scott
21                          54 W Hubbard St., Ste 300
                            Chicago, IL 60654
22                          Email: Chris.landgraff@bbhps.com

23    _____

      Court Reporter:       Janice E. Dickman, RMR, CRR
24                          United States Courthouse, Room 6523
                            333 Constitution Avenue, NW
25                          Washington, DC 20001
                            202-354-3267

# Index

**Timothy Lucas**

Direct Examination (Cont.) by Mr. Jones............ 1904
Cross-Examination by Mr. Heftman................... 1913
Redirect Examination by Mr. Jones................. 1958

*   *   *

1    *  *  *  *  *  *  * AFTERNOON SESSION *  *  *  *  *  *  *

2            THE COURT:  Good afternoon, Counsel.

3            Please be seated.  Whenever you're ready.

4            MR. JONES:  Thank you, Your Honor.

5                        TIMOTHY LUCAS

6                    DIRECT EXAMINATION (Cont.)

7    BY MR. JONES:

8    Q.  Mr. Lucas, in the spring of 2008, was the OCC asking

9    questions other than FAS 140?

10   A.  Yes.  There were several different questions raised.

11   Q.  And one of the questions was with respect to FAS 140.

12   What does that question involve?

13   A.  Well, it's the question we've been discussing.  They

14   were asking for explanations of how the trans -- the COLB

15   transaction met the sales accounting requirements.

16   Q.  What were the potential answers from those questions?

17   A.  It could have been deemed to be a purchase, a sale from

18   TBW, or it could have been the term of the loan -- a loan to

19   TBW.

20           MR. JONES:  Can we turn on the screen?

21   BY MR. JONES:

22   Q.  Mr. Lucas, does the choice of a description for the

23   cash, does that go to the FAS 140 question at all?

24   A.  The $2?

25   Q.  Right.

1      A.  No.

2      Q.  And so what were the different ways that that $2 can be

3      described?

4      A.  The presentation of the asset that you have, if you

5      purchased it.

6              THE COURT:  You're going to have to talk into the

7      microphone, even though you're looking in that direction.

8              THE WITNESS:  Sorry.  The presentation on the

9      financial statements, once you've decided that it was a

10     purchase and it is your asset, we've discussed it in terms

11     of it could be considered an embedded derivative, it could

12     be considered an implicit call, which is -- overlaps

13     considerably with the embedded derivative idea.  Or, as I've

14     discussed, it could be considered a retained interest that

15     TBW held all along, which would preclude its being shown

16     anywhere on Colonial's balance sheet.

17     Q.  Does whether you choose one of these particular labels

18     matter for -- with respect to the criteria in FAS 140?

19     A.  No.  You don't get to those questions until after you've

20     already resolved the first question.

21     Q.  Are there rules that apply to which of these you might

22     select in GAAP?

23     A.  There are rules on how to account for the embedded

24     derivative or the implicit call, if that's the choice you

25     take.  I do not believe there's GAAP that restricts or

1    defines only one of those as the right approach.

2    Q.  What are the rules that go to whether you would choose

3    an embedded derivative or implicit call structure?

4    A.  It's not whether you would choose, it's how do you

5    account for it once you've chosen.

6    Q.  And what is that rule?

7    A.  That's FAS 133, hedge accounting.

8    Q.  We don't need to get into the details of that, right?

9    A.  That's correct.

10   Q.  Mr. Lucas, you were here when Professor Carmichael

11   testified about this PwC guidance, weren't you?

12   A.  Yes.

13   Q.  I put on the screen Exhibit P-2526, at page 101.

14           Do you remember Mr. Carmichael's testimony about

15   this guidance?

16   A.  I do.

17   Q.  How do you think this guidance would apply to the COLB

18   transactions?

19   A.  I don't know exactly what Scott Traub had in mind when

20   he was giving this guidance, but I'm confident that it was

21   not saying disregard the GAAP standards and make your own

22   choices.  There are situations where transactions come up

23   where there is no GAAP on point, and this guidance could be

24   potentially useful there.

25           Elsewhere in the speech that this is taken from,

1   he talked about roundtrip transactions without substance,

2   which is a whole different problem.  But -- the FAS 140

3   guidance really tells you what substance to look for, if --

4   and the substance you're looking for is who controls the

5   asset.

6          If you have a situation -- if you have a situation

7   where the substance of the transaction differs in some

8   respect from the documentation of it, perhaps some of this

9   would apply.

10  Q.  Are the FAS 140 requirements in 9.A, B, and C, are those

11  substantive?

12  A.  I believe they are.  They go to who owns the asset.

13  Q.  How is the legal isolation of bankruptcy requirement

14  substantive?

15  A.  Well, as we discussed earlier, if I sold you an asset,

16  then my bankruptcy shouldn't cause you to have to give that

17  asset back.

18  Q.  How is the 9.B and 9.C -- how are those paragraphs

19  substantive?

20  A.  Similarly, if I've sold you an asset and it's really a

21  sale, it should be represented as a sale, you should have

22  the right to sell it to somebody else without my having any

23  say-so.

24  Q.  Leaving aside the economic substance argument, what is

25  Professor Carmichael's opinion on 9.A, B, and C?

1    A.  I don't believe he ever addressed 9.B and C.  He did get

2    into discussing 9.A, in the context of the argument that the

3    assets were supposedly -- the transactions were supposedly

4    not at fair value and, therefore, would not be isolated.

5         But as I've discussed, I'm confident they were at

6    fair value when you understand the transaction.

7    Q.  Were the COLB transactions structured and set up to

8    frustrate the goal of telling the truth and providing

9    transparent financial information?

10   A.  I don't believe they were.

11   Q.  Were the COLB transactions always recorded at fair value

12   in Colonial Bank's financial statements?

13        THE COURT:  Wait.  Which transactions are you

14   addressing?

15        MR. JONES:  The COLB transactions.

16   BY MR. JONES:

17   Q.  How did the presentation of the COLB transactions change

18   before and after April 2008?

19   A.  Prior to 2008, the assets were reported -- basically,

20   they took the retained interest approach without having

21   thought of it in that way, but they just recorded the

22   $99,000 assets based on what they paid.

23        And as I said, that was the fair value of that at

24   that date.  Subsequently, they decided to take the implicit

25   call approach, so they recorded the larger asset, the fair

1    value of 99 percent of all of the proceeds, which in our

2    example would be 101, and they recorded the $3 liability --

3    $2 liability for the call.

4    Q.  Up on the screen, is this a demonstrative of the

5    difference in the presentation in the financial statements?

6    A.  Yes.

7    Q.  And what is the difference, again?

8    A.  Well, the difference is in the left-hand column.

9    They're assuming they bought just the $99,000 worth of

10   principal and the rest of it was retained all along.  So

11   retained interest by TBW afterward, they took the view that

12   they had bought exactly, literally, a 99 percent participation

13   in everything.  That's the 100,980.  And they had created

14   the implicit call liability for the almost $2,000.

15   Q.  Mr. Carmichael testified -- do you remember Mr.

16   Carmichael's testimony that had PwC required the bank to

17   account for the COLB transactions as loans, the fraud would

18   have stopped right there?

19             THE COURT:  Say that again.  I'm sorry.

20             Do you have a number for that?  Does that have a

21   number or is it --

22             MR. JONES:  It's demonstrative.

23             THE COURT:  Okay.

24             MR. JONES:  That we can provide to the Court, but --

25             THE COURT:  No, that's okay.  Just keep going.

1    BY MR. JONES:

2    Q.  Mr. Lucas, do you remember Professor Carmichael's

3    testimony with Mr. Beck about whether the COLB transactions

4    could be restructured to shift the gains and losses between

5    TBW and Colonial?

6    A.  I remember the general discussion, yes.

7    Q.  And do you remember that Professor Carmichael testified

8    that there would be no reason or no way for these

9    transactions to be restructured where the borrower was

10   giving up the 99 percent of their profits?

11   A.  I remember somewhat.

12   Q.  I know you disagree with Professor Carmichael's views of

13   the economic substance, but is there a way that these

14   transactions could have been restructured?

15            MR. HEFTMAN:  Objection, Your Honor.  It's outside

16   the scope of his opinion.  He never said anything about it

17   in the report.

18            THE COURT:  I don't understand what you're doing,

19   why -- what are you asking?

20            MR. JONES:  I am asking, is -- if Professor

21   Carmichael were right and if PwC had come to the conclusion

22   that the risks and rewards of these assets needed to shift

23   for it to be a sale, is there an economically similar way

24   for these transactions to be structured?

25            THE COURT:  And you're saying this wasn't part of

1    his report?

2              MR. HEFTMAN:  Yes, Your Honor.

3              THE COURT:  Sustained.

4              MR. JONES:  Your Honor, we believe Mr. Lucas is

5    entitled to respond to trial testimony on particular

6    subjects where he does have -- where he has had opinions,

7    and he had opinions on these COLB transactions.

8              Would you allow an explanation of it?

9              THE COURT:  Did he have a copy of the opposing

10   expert report?

11             MR. JONES:  He didn't.

12             THE COURT:  You could comment on it there.  I'm

13   going to sustain the objection.

14             If it comes up in the course of cross-examination,

15   of course, then my ruling would be different, and it may.

16   BY MR. JONES:

17   Q.  Mr. Lucas, there was some discussion before lunch about

18   the end investor commitments and the nature of them.

19             Mr. Lucas, as an accountant, did you see, when you

20   were evaluating the transactions, documents in the -- that

21   described the nature of the end investor commitments?

22   A.  Yes.

23   Q.  What is this document, Exhibit A-352?

24   A.  This is a memo from Colonial Bank to -- I believe those

25   people are representatives of the Controller of the Currency,

1    technically responding to some of the controllers --

2    questions raised by the Controller of the Currency.

3    Q.  What does this memorandum say about the nature of the

4    end investor commitments?

5    A.  End investor commitments do not require delivery of

6    specific mortgage loans, but rather, allow for the seller to

7    net settle the commitment.  That would be a cash settlement

8    or substitute similar mortgage loans.

9            And it goes on to say Colonial has the right to

10   net cash settle the seller's call option at fair value,

11   rather than deliver the participation interest.

12   Q.  As an accountant, in understanding the company's

13   documents, what does that tell you about whether and how

14   Taylor Bean and Whitaker needs to fulfil an investor

15   commitment for a particular loan?

16   A.  Well, it says that they don't have a commitment for a

17   particular loan.  They have a commitment for loans with

18   certain characteristics.

19           They can substitute other loans for the one we're

20   looking at or they can make a cash payment and settle the

21   commitment that way.

22   Q.  How is that relevant to the FAS 140 issues in Paragraph 9?

23   A.  Paragraph 9.C is looking to see whether the seller,

24   that's Taylor Bean & Whitaker, has the right to reacquire;

25   to require the buyer to return the assets.  And this

1  suggests they don't have that right.

2  Q.  Just to wrap up, what were your conclusions about 9.A,

3  B, and C, and whether -- how FAS 140 applied to the COLB

4  transactions?

5  A.  I concluded that all three of the criteria in 9.A, B,

6  and C were met, and that the accounting for it as a purchase

7  and putting them on the balance sheet as mortgage loans,

8  rather than a loan to TBW, was appropriate.

9  Q.  Did anything about the identify -- the identification of

10  the implicit call option affect that conclusion?

11  A.  Other than it made it more complex to understand what

12  was going on and get there, no.

13        At the end of the day, none of the choices there

14  affect the 140 accounting.

15  Q.  Do you have any doubt about the proper accounting in

16  this case?

17  A.  I think it looks pretty clear.

18        MR. JONES:  No further questions.

19        THE COURT:  Please, whenever you're ready.

20        MR. HEFTMAN:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22  BY MR. HEFTMAN:

23  Q.  Good afternoon, Mr. Lucas.

24  A.  Good afternoon.

25  Q.  For six years, from 2002 to the spring of 2008, PwC said

1    there's no sellers call option at all in the COLB LPSA,

2    correct?

3    A.  That's my understanding.

4    Q.  PwC's work papers from 2002 to 2007 said there's no call

5    option in the COLB LPSA at all, right?  Right?

6    A.  As far as I know.

7    Q.  As far as you know, because you didn't read the work

8    papers?

9    A.  I certainly didn't look at all of them.

10   Q.  Okay.  PwC didn't tell Colonial that there is a call

11   option and you have to account for a liability to TBW on

12   that call option up until the spring of 2008, right?

13   A.  That's consistent with my understanding.

14   Q.  That was the chart that you showed, the last slide which

15   basically said --

16         THE COURT:  Don't worry.  Not a hurricane, just --

17         MR. HEFTMAN:  The air conditioning is welcome,

18   Your Honor.

19   BY MR. HEFTMAN:

20   Q.  So in the spring of 2008, PwC told Colonial you need to

21   change how you're accounting for COLB LPSA because we have

22   now recognized the existence of a call option that their

23   accounting records never said existed up until the OCC came

24   along, right?

25   A.  I understand that PwC and Colonial came to that

1    conclusion.  I -- I don't have -- I don't know that it was

2    strictly PwC telling them that.

3    Q.  But you didn't do a factual investigation of whose idea

4    it was, right?

5    A.  That's correct.

6    Q.  But before counsel was giving you a document and asking

7    you to infer that it was Colonial's idea instead of PwC's

8    idea, right?

9    A.  They showed me the 2008 memo that was the first

10   reference, the oldest reference anybody had showed me.

11   Q.  But you testified in your deposition you didn't know who

12   came up with the idea, right?  Do you recall that?

13   A.  Right, I don't know.

14   Q.  Okay.  So we should listen to what the actual fact

15   witnesses in the case have said about whose idea it was,

16   instead of you, right?

17   A.  I -- I assume you're going to listen to all witnesses.

18   Q.  Did you listen to Mr. Westbrook's testimony at trial?

19   A.  No.

20   Q.  Okay.  You didn't read his deposition either, right?

21   A.  I don't -- I don't remember whether that was one of the

22   ones I read or not.

23   Q.  It's not in the depositions you were sent, and you

24   testified at your deposition that you didn't recall

25   receiving it, right?

1   A.  Right.

2   Q.  Okay.  So you just took whatever information that PwC's

3   counsel sent you; they selected the depositions, and you

4   didn't ask for any more information beyond what they sent

5   you, right?

6   A.  Certainly, they sent me the initial selection of

7   information.  I don't recall whether I asked for anything else.

8   Q.  Let's look at Mr. Westbrook's trial testimony about

9   whose idea it was, the implicit call option.

10          If we can look at 988, 413.  Do you see Mr.

11  Westbrook testified in Florida that it was Mr. Gaetano, and

12  he thought it was either Mr. Gaetano or Mr. Naumann, right?

13          You weren't aware of that testimony, correct?

14  A.  I don't recall seeing this.

15  Q.  Okay.  And you're aware that Mr. Naumann said it was Mr.

16  Gaetano's idea for the implicit call option, right?

17  A.  I think I do remember seeing that someplace.

18  Q.  Okay.  And you read Miss Kissick's deposition and you're

19  aware that Miss Kissick's response that -- she was the head

20  of the Mortgage Warehouse Lending Division, right?

21  A.  Correct.

22  Q.  And Miss Kissick, when she heard that there was an

23  implicit call option, her response was WTF, right?

24          THE COURT:  Was what?

25          MR. HEFTMAN:  I won't say the words, Your Honor.

1    THE COURT:  Oh, okay.  Okay.  Got it.  Got it.  I

2    thought you were referring to some accounting term.

3    MR. HEFTMAN:  It may be, also.

4    BY MR. HEFTMAN:

5    Q.  That was Miss Kissick's reaction, right?

6    A.  I don't remember that specifically, but I --

7    Q.  Okay.  Well, how people who were actually administering

8    the transaction, like Miss Kissick or the audit partner from

9    PwC for five years, whether they thought there actually was

10   a call option is relevant to how to account for it, right?

11   A.  I'm not sure how to answer that.  I think that --

12   Q.  Well, let me ask you this:  Does an asset actually have

13   to exist for you to account to it, or can auditors or

14   accountants create something new, that everybody on the

15   ground says doesn't exist for six years?

16   A.  Well, the asset certainly is supposed to exist in order

17   to be recognized.

18   Q.  Right.  And so there had to be a recognition.  It had to

19   really exist, that there was a call option for you to

20   account for one, right?

21   A.  Yes.  But as we covered in direct, there was the $2

22   additional payment that was going to be received by TBW; it

23   was just not fully understood.

24   Q.  Not fully understood.  So PwC, for six years, didn't

25   fully understand that Colonial wasn't really buying 99 percent

1    of the fair value of the loan, right?

2    A.   Apparently.

3    Q.   Right.  So, apparently, for all six of those years, PwC

4    didn't recognize what was really going on in the transaction

5    and didn't address it, right?

6    A.   The accounting they followed in those years was, as I've

7    said, appropriate.  They did not specifically identify or

8    call out the $2 gain.

9    Q.   You didn't say the accounting was appropriate.  What

10   you're saying is they accidentally did it the right way that

11   you came up with in this litigation, right?

12   A.   I wouldn't call it accidentally, but they accounted for

13   it in a way that was consistent with the approach that says

14   TBW just kept the $2.  They just hadn't focused on the fact

15   that TBW had an additional asset that they weren't thinking

16   about.

17   Q.   So PwC, in its work papers from 2002 to 2008, never said

18   TBW has a retained interest that allows them to keep all of

19   the gain, right?

20   A.   Again, I haven't looked at all those work papers, but I

21   assume that's true, based on what we've seen.

22   Q.   Okay.  Because this was -- your idea is PwC -- or,

23   excuse me.

24          TBW really has an added contract, right, where

25   they get to just keep all of the gain?  That's the simple

1    solution you've identified in this litigation after the

2    fact, right?

3    A.   That's correct.

4    Q.   Okay.  And there's nothing written down anywhere in

5    anything that PwC did to account for these transactions that

6    says TBW gets to keep the retained gain, right?  Or you

7    don't know because you --

8    A.   Nothing that I've seen that says that explicitly.  But

9    that, apparently, is how the transactions were operating

10   from the beginning.

11   Q.   And PwC should have known that because they were the

12   accountants and the auditors, and it was their job to

13   actually understand how the transaction was working, right?

14   A.   I'm not sure -- I think that a full understanding of

15   TBW's assets was necessary for what PW was doing but --

16           MR. JONES:  Objection, Your Honor.

17           Mr. Lucas has been identified as an accounting

18   expert on the GAAP principals, not what needed to be found

19   for an auditing opinion, reasonable assurance.

20           THE COURT:  Overruled.

21   BY MR. HEFTMAN:

22   Q.   You would agree that to properly account for the COLB

23   transaction, PwC needed to understand how it really worked,

24   right?

25   A.   I wouldn't say they needed to understand every single

1    aspect of it.

2              THE COURT:  Lynn, that's too loud.

3              We'll all just speak up, okay?

4              MR. HEFTMAN:  Okay.  Shall I proceed, Your Honor?

5              THE COURT:  Sure.

6              MR. HEFTMAN:  Okay.  I'll speak up.

7    BY MR. HEFTMAN:

8    Q.  So you don't think PwC needed to understand all parts of

9    the transaction that they were accounting for?

10             THE COURT:  Can I interrupt a minute?

11             Up until 2008, the way this was treated was it

12   wasn't mentioned at all.  And it was assumed that when the

13   third-party buyer came in, the extra two, three, whatever

14   dollars, would go to TBW?

15             THE WITNESS:  I'm not sure anybody really asked

16   the question.  I don't know that anybody really asked the

17   question; that's what was happening.

18             THE COURT:  That's what was happening?

19             THE WITNESS:  Yes, ma'am.

20   BY MR. HEFTMAN:

21   Q.  Okay.  So nobody at PwC asked that question in your

22   review of the documents, right?

23   A.  That's true.

24   Q.  Okay.  And so -- and there's nothing in the work papers

25   indicating that PwC addressed the fair value problem that

1    you identified when you looked at the contract, right?

2              THE COURT:  Can we turn that down?

3              THE COURTROOM DEPUTY:  I just called and I'm going

4    to put in a work ticket.

5    A.  Nothing in the work papers I've seen addressed that.

6    But there was no fair value problem.

7              And PwC, from what they knew of the transaction,

8    could see that $99 was going out and $99 came back in, plus

9    interest.

10   BY MR. HEFTMAN:

11   Q.  Well, the contract says that Colonial Bank is supposed

12   to be buying a 99 percent participation interest in the

13   loans, right?

14   A.  Right.

15   Q.  And it says that Colonial Bank is entitled to a pro-rata

16   share, based on their 99 percent interest, of all proceeds

17   from the disposition of that loan, right?

18   A.  I believe that's what it says.

19   Q.  Okay.  And when you looked at this contract and when the

20   people from New York -- the experts that PwC flew down after

21   the OCC came in -- they said and you said, wait a minute.

22   On the face of this contract, Colonial Bank never pays more

23   than the par -- the $100, the amount of the loan.  They

24   never pay more than $100.

25             But even if the price is way higher, 104, they're

1    entitled to 99 percent of that $104, so they're paying 100

2    and they're getting 103 in value, and that's not fair value.

3    That's the issue you identified; that's the issue that PwC's

4    pros when they came down identified, right?

5             THE COURT:  Wait a minute.  Wait a minute.

6             They're paying 100 because that's what they bought

7    it for.  Right now we're assuming it's a sale.

8             They bought it for 100.  And when the resale takes

9    place, they're getting 103, or 99 percent -- the pro-rata

10   share of 103, right?

11            MR. HEFTMAN:  Yes.

12            THE COURT:  But was that happening before 2008?

13            MR. HEFTMAN:  Why don't I put up an example, Your

14   Honor?  And we can walk through and we can look at the

15   contract.  But the bottom line is:  I'm talking about what

16   the contract says, and what PwC failed to address, sitting

17   in their papers, of what does this contract say Colonial's

18   entitled to?

19   BY MR. HEFTMAN:

20   Q.  So the way I described it is correct, right?  That the

21   contract says Colonial gets 99 percent of everything, minus

22   servicing costs, right?

23   A.  That's what the contract said.

24   Q.  Right?  That's what the contract said.

25            And that is the fair value question that Mr.

1    Gaetano is asking.  He said it's hard to see how this is at

2    fair value, when the bank is not paying 99 percent of $104

3    but they're getting, under the contract, 99 percent of $104,

4    right.  That's the issue?

5    A.  That's the issue.

6    Q.  Okay.  And there is nothing in PwC's work papers

7    indicating that for six years they were even aware of this

8    issue until the OCC raised it and they sent their experts

9    in, right?

10   A.  I'm not sure this is actually the issue the OCC raised,

11   but it came up in 2008.

12   Q.  Well, that's the problem PwC's experts identified and

13   that's why they created this implied call option, right?

14   A.  That's the new information about the transaction that

15   they understood in 2008 that led to them deciding that the

16   call option was the appropriate description.

17   Q.  Right.  And there's nothing new about it because it was

18   there from the face of the contract all along, right?

19   A.  The language was in the contract all along, yes.

20   Q.  Okay.  You're aware that the contract contains no

21   seller's call option, right?

22   A.  The contract contains no explicit mention of a seller's

23   call option.

24   Q.  If I handed you the contract and said can you point me

25   to the language that says there's a seller's call option,

1    could you do that?

2    A.  Nope.

3    Q.  Because it's not like there's some ambiguous language

4    and you can kind of read between the lines; it's just not

5    there, right?

6    A.  There's no language saying there's a seller's call

7    option or buying that or -- but there's other --

8    Q.  But it's not -- there's no language implying it.  It

9    doesn't say it at all, right?  Correct?

10   A.  Correct.

11   Q.  Okay.  Because they did take a seller's call option out

12   in 2002, and if they wanted to make another one, you would

13   expect two sophisticated parties to put it in, right?

14   A.  I don't think I have a basis for answering that.  I've

15   seen more than one contract that was incomplete.

16   Q.  Okay.  You're aware that Mr. Gaetano, on April 9th,

17   2008, in his notes of a call with Colonial's attorneys,

18   wrote, "There is no call option held by the seller"?

19        Do you recall reading that deposition exhibit?

20   A.  I don't remember the date or --  I mean, that's

21   consistent with what I remember seeing.

22   Q.  And during this time, you saw Mr. Westbrook's e-mail

23   when he told people to pray when asked what they could do

24   about sales accounting.

25        Do you remember that e-mail?

A.  I vaguely think I may have seen that one; I don't

remember exactly.

Q.  Okay.  And this issue of whether it was treated as a

loan or a sale was extremely significant for both Colonial

and PwC due to the consequences for legal lending limits,

right?

A.  I believe it was important, yes.

Q.  Okay.  Because it could have acquired a restatement of

their financials and they would have been massively in

excess of the legal lending limit, right?

A.  I haven't gone into that aspect of things and the

consequences, but that's consistent with what I understand.

Q.  Okay.  Well, let's look at P-2426, please.

        This is an April 12th, 2000 e-mail from Mr.

Gaetano, and you can see that -- Mr. Hicks, at the top,

we'll talk about this in a minute, says:

        "Have read in car, but need to digest it," and

he's forwarding it to other people at Colonial Bank, right?

Do you see that?

A.  I see it.

Q.  Okay.  Let's go down to the first paragraph, the intro,

and then the first paragraph.

        Thank you.

        So, it says, "This morning we had further

discussions --" and this was April 12th.  He's working on a

1    Saturday.  And it appears to come down to two items; do you

2    see that?  "So the transaction must be at fair value, and

3    currently it is difficult to discern how the purchase is at

4    fair value when the purchase price will never exceed par."

5         Now, that's exactly what we were just talking

6    about.  From the face of the contract, the purchase price

7    never gets above par or 100, but they're getting 99 percent

8    of everything, right?

9    A.   That's what the contract says.

10   Q.   Right.  And the transaction has to be at fair value.

11   You agree that under FAS 140, it's important that the

12   transaction be at fair value?

13   A.   I read that as saying the transaction has to be at fair

14   value because transactions between sophisticated parties are

15   at fair value, and they wouldn't enter into it otherwise.

16        It can also be read the way you're talking about,

17   but that's -- I mean, there is no requirement in FAS 140

18   that says the transaction has to be at fair value.  There is

19   the connection that's been drawn, based on isolation.

20        Some people have said, if it's not a fair value,

21   it won't achieve isolation, and then it would fail 9.A.  I

22   don't know which of those this is referring to, but --

23   Q.   Well, in your opinion, is it a relevant factor in

24   applying the legal isolation test in bankruptcy, whether the

25   transaction was at fair value?

1    A.   I understand that there's a legal concept of a sham

2    transaction.  And if a transaction is deemed to be a sham

3    because its not at fair value, that would cause it to fail

4    isolation.

5            I don't know what -- I mean, I don't know the

6    details of how far from fair value it needs to be to trip

7    that wire.

8    Q.   Okay.  So you're generally aware that under the legal

9    isolation test, as a matter of law, fair value is relevant

10   to determining legal isolation, but you're not an expert on

11   that issue?

12   A.   That's correct.

13   Q.   Okay.  You said transactions between sophisticated

14   parties are at fair value.  Loans are not at fair value,

15   right?

16   A.   I believe when a loan is made, arm's length, that it's

17   an exchange at fair value and that the fair value of the

18   loan will be typically the amount of cash that the borrower

19   got.

20   Q.   Well, I mean, obviously, here's -- there's an interest

21   rate and it's whatever the market bears, but we don't

22   evaluate loans and say is this a fair value?  We -- we cap

23   them so they're not too high, right?

24           Let me change my question.

25           What matters for fair value is whether it's a sale

1    or not.  If it's a loan, you don't have a FAS 140 fair value

2    concern, right?

3    A.  You wouldn't have a concern with isolation, but as an

4    accountant if I saw a loan that was clearly not at fair

5    value, if you signed a note for $100,000 and only got 50,

6    I'd say I don't understand this transaction, I haven't seen

7    all the parts, something is wrong.

8    Q.  Sure, but that's irrelevant to FAS 140.

9         What matters for FAS 140 is -- sorry.  Too fast.

10   What matters for FAS 140 is if you're going to call it a

11   sale under FAS 140, it matters under legal isolation if it's

12   at fair value as a matter of law, right?

13             THE COURT:  We've gone there already.

14             MR. HEFTMAN:  Okay.

15             THE COURT:  And he agreed once.  Don't try to get

16   him to agree a second time.

17             MR. HEFTMAN:  He did agree, Your Honor.  Sorry.

18   BY MR. HEFTMAN:

19   Q.  Next he says what may have occurred is that you

20   purchased a loan and wrote it in the money call option to

21   the seller.  Is it an accountant's job to theorize what

22   parties have actually been doing in the past, or is it to

23   record that they actually exist?

24   A.  I just read this as an attempt to understand what was

25   really happening in the transaction because they'd

1    identified that the pieces of the transaction that reflected

2    the literal contract didn't fit together.  They didn't

3    describe a transaction that would be at fair value and would

4    be fully distributed.  So they were trying to figure out how

5    to reconcile the 99 percent participation and the cap at 100

6    for the price paid and the pro rata distribution, and they

7    found out that all that wasn't happening.  In fact, the pro

8    rata distribution wasn't happening.

9    Q.  That was what they found out in 2008 after they started

10   looking at this issue after six years; right?

11   A.  Correct.

12   Q.  And their conclusion was we have to have a call option,

13   right?

14   A.  Their conclusion was that they wanted to use the

15   approach that recognizing the call option and taking the

16   99 percent participation language to mean 99 percent of

17   everything.

18   Q.  Well, let's look at what the e-mail says and what Mr.

19   Gaetano says.  If we look at paragraphs 2 and 3 -- or, let's

20   look at the two stars.  It says, Counsel needs to conclude

21   for you that there exists an option to the seller and that

22   option must be able to be net settled.  Do you see that?

23   A.  Yes.

24   Q.  So, PwC's conclusion was that there had to be a call

25   option for proper -- for there to be FAS 140 sales

1  accounting, right?

2  A.  I read that more saying that there had to be a call

3  option in order to reflect all of the assets and liabilities

4  they were -- they were seeing.  It wasn't so much for sale

5  accounting as for complete representation of the transaction

6  as they were now understanding it.

7  Q.  So you don't think that this e-mail -- let's look at the

8  last line in this e-mail.  You don't think this e-mail is

9  saying we need this for sales accounting?  This is where Mr.

10  Gaetano says, at the end, sale accounting is preserved.  The

11  presentation of the components of the transaction will most

12  likely need to be separately recognized on the B/S and I/S,

13  balance sheet and income statement.

14         So he's saying you need to get a lawyer to say

15  there's a call option here and if we can preserve sales

16  accounting, we need to change how we've been accounting for

17  this transaction for six years, right?

18  A.  I don't see the direct link to sales accounting.  But, I

19  mean, they were saying that they needed to change the

20  accounting to reflect the option that they decided was there

21  and then they were suggesting that -- that they could confer

22  with counsel to conclude that -- that it was there.

23  Q.  So your -- your testimony is that PwC came down in April

24  of 2008 and they didn't conclude that a call option was

25  necessary for sales accounting, but they still required

1    Colonial to completely revise how they accounted for this

2    transaction?

3    A.  I mean, I don't really know.  I'm getting beyond my GAAP

4    area of expertise.  But the way I read this, they were

5    deciding that they needed to recognize the call option and

6    that was -- this was a time period when derivatives were a

7    hot issue and not finding -- not recognizing, not presenting

8    on the balance sheet a derivative that actually existed was

9    problematic.

10   Q.  Your view is it doesn't matter whether PwC was right or

11   wrong, because you have a different way that sales

12   accounting could work.  So it doesn't matter whether all the

13   work they did and their conclusion that you needed an

14   implicit call option to be read into the agreement was

15   necessary at all, PwC wins either way, that's your view?

16        MR. JONES:  Objection, Your Honor.  He's just

17   testifying.  That's not a question.

18        THE COURT:  Sustained.

19   BY MR. HEFTMAN:

20   Q.  Was a call option necessary for sales accounting?

21   A.  I don't believe so, no.

22   Q.  Okay.  So your view is even if Colonial didn't do

23   anything in the spring of 2008, despite all the advice that

24   PwC gave, they could just keep doing the same exact thing

25   they did before, which was ignore the gain, you're not doing

1    anything about it, right?

2    A.   That's what my report says.  The approach they were

3    doing before, reflecting the item as retained interest that

4    they never bought and, in effect, reinterpreting the

5    definition of 99 percent participation, was also a way to

6    deal with this contract.

7    Q.   What did you say?  Reinterpreting the definition of

8    99 percent, is that what you just said?

9    A.   They had identified the fact that the contract terms and

10   the way the contract was working were not completely

11   consistent, so something was missing.  99 percent

12   participation could, in my mind, also mean 99 percent of the

13   principal, as opposed to 99 percent of everything.

14   Q.   Well, that's the opposite of what the contract says,

15   isn't it?

16   A.   It just says 99 percent participation.

17   Q.   It doesn't say of what that 99 participation is?  Let's

18   look at it.

19            I'll get the exhibit number, Your Honor.

20            THE COURT:  While you're looking, let me ask the

21   question:  Up until -- I thought we had this -- I had this

22   straight.  But up until April, the way in which this was all

23   done -- I'm not talking about the contract now, I'm talking

24   about the way the parties dealt with the excess.  By excess

25   I mean the $3 overage or $3,000 overage; whatever it was.

1      The way the parties dealt with the excess that

2   came in on the resale was to figure 99 percent of the whole

3   thing, the $100 plus the 103, and then distribute 99 percent

4   of the 103 to Colonial and the extra back to TBW.  Was that

5   what they were doing?

6      THE WITNESS:  No.  For the first -- well,

7   throughout, the cash flows were Colonial advanced 99 -- $99,

8   in the example we were using.  When the $102 came in at the

9   end, Colonial got back its 99.  The rest, the gain always

10  went to TBW.

11      THE COURT:  Okay.  That is the way it was done up

12  until 2008?

13      THE WITNESS:  Right.  And that was the way it was

14  done after that, but they changed the description of it in

15  the accounting.

16      THE COURT:  So Colonial never got any part of the

17  overage?

18      THE WITNESS:  That's correct.

19      THE COURT:  So before it was just done without any

20  description?

21      THE WITNESS:  That's correct.

22      THE COURT:  And then presumably -- who noticed it?

23  Was it OCC or Gaetano?

24      THE WITNESS:  I don't recall that OCC raised the,

25  quote, fair value issue.  They asked people to give us

1    support for the accounting decision that was made.  I don't

2    know exactly who first raised --

3              THE COURT:  The accounting decision that was made

4    being calling it a sale?

5              THE WITNESS:  Yes, ma'am.

6              THE COURT:  That was OCC's concern, should this

7    have been a sale or should it have been called a loan?

8              THE WITNESS:  Correct.

9              THE COURT:  Then when they took a look at it, they

10   said, well, we've been treating it kind of like a loan.

11   We've just been paying back the amount, and they didn't get

12   any part of the profit that was being paid by whoever, the

13   third-party.

14             THE WITNESS:  Correct.  But that was the deal that

15   they'd struck and that was the deal that was at fair value.

16             THE COURT:  But was that the deal they struck?  I

17   thought --

18             THE WITNESS:  That's not what the contract said,

19   but that was the way the parties understood it.

20             THE COURT:  Well, no, no, that isn't what the

21   contract said.

22             THE WITNESS:  That's correct.  The contract said

23   99 percent participation.

24             THE COURT:  Of the whole thing.

25             THE WITNESS:  I'm sure we're about to see the

1    words.

2              THE COURT:  Well, I remember it from the first

3    examination.  Why don't you show it.

4              MR. HEFTMAN:  That's exactly what I'm about to do.

5    Thank you, Your Honor.

6    BY MR. HEFTMAN:

7    Q.  So this is now one of the loan participation sale

8    agreements that you looked at, correct, Exhibit A-372, Mr.

9    Lucas?

10   A.  Yes, looks to be.

11   Q.  Okay.  Can you turn to page 4 and look at paragraph 2,

12   ownership interest, please?

13              You see here -- so buyers percentage of the

14   participating mortgage loans, right?  That's always 99

15   percent -- usually 99 percent, that's your understanding?

16   A.  Where are you reading?

17   Q.  The second line.

18              THE COURT:  Can you use one of those underliners?

19   There we go.

20   BY MR. HEFTMAN:

21   Q.  Do you see that?

22   A.  Yes.

23   Q.  So, what -- the buyers percentage, they're getting 99

24   percent of the participated mortgage loans, right?

25   A.  That's what it says.

1    Q.  That's what the contract says, right?  And then if you

2    go down a few lines it says "the buyer," so that's Colonial,

3    right?

4    A.  Right.

5    Q.  Okay.  The buyer shall immediately -- shall become

6    vested to the extent of such percentage, 99 percent, with

7    beneficial ownership of the participating mortgage loans.

8    And then it goes on to list that they have rights of

9    everything; all the notes, the security and all the assets,

10   right?

11          So, the contract doesn't leave it uncertain what

12   Colonial is getting 99 percent of.  The contract specifies

13   that they are getting 99 percent of the loans and all of the

14   ownership rights that go with that, right?

15   A.  That's what this says.

16   Q.  Right.  And so when you -- your -- when you call your

17   simple approach, right, is just to say let's delete, of the

18   participated mortgage loans, and let's say buyer's

19   percentage equals $99, right?

20   A.  I mean, there are lots of ways you could redraft it.

21   It's -- I mean, what became clear to me was that the

22   contract as drafted did not reflect the way the contract --

23   the way the transaction was operating in real life.

24   Q.  So the approach that you brought to the table here

25   requires you to rewrite the contract, right?

1    A.  I -- that's a legal question.

2    Q.  Well, as an accountant you've looked at legal

3    agreements, just the plain language and how you understand

4    it.  You got to change the agreement to do what you want to

5    do, right?

6    A.  There's a difference between how the agreement reads and

7    how the transaction was working.

8    Q.  Because how the transaction actually worked was Colonial

9    advanced money, charged interest, and got it all back

10   without ever participating in the gain and without ever

11   having the risk of loss, right?

12   A.  Leaving aside credit situations, but --

13   Q.  Right.

14   A.  -- yes, basically that's how it worked.

15   Q.  Leaving aside the risk that you have when you make a

16   loan, they didn't take on any of the burdens or benefits of

17   ownership, right?

18   A.  They did not have the risks and rewards that would

19   normally attach, that's correct.

20   Q.  Right.  Let's look at paragraph 15 of the agreement.

21   Now this is the pro rata distribution application of

22   payments, right?

23            This is on page 17, Rami.  Paragraph 15, please.

24            THE COURT:  What was the other paragraph we were

25   looking at?

1          MR. HEFTMAN:  It was paragraph 2, Your Honor --

2          THE COURT:  Paragraph 2.

3          MR. HEFTMAN:  -- on page 4.

4          THE COURT:  And this is page --

5          MR. HEFTMAN:  Page 17, paragraph 15, application

6     of payments.

7     BY MR. HEFTMAN:

8     Q.  So you can read this to yourself.  I won't read it all

9     into the record.  But you would agree that what this says is

10    that all the proceeds -- keeps popping up.  I'll represent

11    to you that this says all of the proceeds of the disposition

12    of the sale of the loans shall be applied pro rata in

13    accordance with the participation interests owned by each

14    party.  Do you see that?

15    A.  I see that.

16    Q.  So, for your simple interpretation to work, you would

17    have to add pro rata in accordance with the participation

18    interest owned by each party, except for the gain, right?

19          THE COURT:  Well, or the loss.

20          MR. HEFTMAN:  The loss is a different problem,

21    Your Honor.  We'll talk about that.  Well, let's talk about

22    it now.

23    BY MR. HEFTMAN:

24    Q.  You talked -- you said on direct examination that you

25    saw evidence -- and I think you were talking about how you

1  read Mr. Westbrook's e-mail with Miss Thompson -- indicating

2  that there were losses sometimes on these loans and if there

3  was a loss, TBW would pay Colonial back the dollar of the

4  loss, right?

5  A.  What I said was I've not seen any evidence that there

6  ever was a loss, but I had seen some evidence that the

7  people believed that in the event such a thing happened,

8  that it would belong to TBW.

9  Q.  Well, let's --

10            THE COURT:  Well, after or before?  It has to be

11  after the implicit call option was in effect.

12            THE WITNESS:  We're really just talking about cash

13  flows and how this transaction worked, not the accounting

14  for it.  This -- this would need to be changed to reflect

15  what the parties were actually doing, not to fix the

16  accounting.

17  BY MR. HEFTMAN:

18  Q.  Well, your -- your retained interest idea, the way

19  you've described it is TBW gets all the gain, right?

20  A.  That's what I understand was happening.

21  Q.  But if there's a loss, your -- you adding TBW gets all

22  the gain, your -- your simple solution doesn't address what

23  happens or explain why TBW would pay Colonial back that

24  dollar?

25  A.  My solution is an accounting -- as you call it, the

1    accounting approach that I described doesn't have anything

2    to do with who pays -- I mean, it reflects what was

3    happening in the payments, but it doesn't govern it.

4    Q.  Well, the contract is supposed to govern it, right?

5    A.  It's supposed to, but it doesn't in this case.

6    Q.  Right.  But you're changing the contract to suit your

7    interpretation and then you're -- well, let me ask you this:

8    The only reason that TBW would pay a dollar back to

9    Colonial, if there was a loss on the sale, is if they owed

10   them the amount advanced as a debt, right?

11   A.  My understanding is -- first of all, I don't know that

12   there was ever a loss on any of these.  They started out

13   with a commitment of a profit.  So this may be a

14   hypothetical, but I did see some documents exchanged among

15   participants that said we think any losses, if there were

16   any, would go to TBW.  What would happen, in the case we're

17   talking about with the $1 loss, is the money would -- the

18   1 -- 101 -- or, would it be 99, I don't know, the amount of

19   money -- the money would come in from Freddie Mac and

20   Colonial, or whoever the trustee was that was doing the

21   distribution, would presumably give $99 to Colonial because

22   that's what they always put in, and anything else, if there

23   was anything else, would go to TBW.

24            Now, another question beyond that is suppose it

25   went all the way down to 98?  And I just don't know how that

1    would work.

2    Q.  Right.  You don't know how that would work.  And you

3    said the same thing in your deposition.  And you didn't

4    investigate that in forming your opinion, right?

5    A.  Didn't investigate what would happen?

6    Q.  Right.  How it works when there's a loss.  Let's look at

7    the e-mail that we all keep talking about, that tells us

8    what Pw -- what -- what PwC believes happens if there's a

9    loss.

10           I believe it is P-24 or 29, but let me check.

11    Excuse me.  2288.  P-2288.

12           So this is Miss Thompson responding to Mr. Kelly.

13    Let's -- let's go down a little and see what the initial

14    e-mail is on the second page, please.  Okay.

15           So this is Mr. Westbrook, right?  This is March

16    28th, 2008 and he's saying he needs help because he's

17    confused at what happens to the gain or the loss shown on

18    COLB, right?  Do you see that?

19    A.  Yes.

20    Q.  Now, he's been the audit partner for five years now and

21    COLB has been part of his responsibility, right?

22    A.  That's consistent with my understanding.

23    Q.  Okay.  But he's confused as to how COLB works and he's

24    saying, "My understanding is that the seller would bear any

25    loss and reap any gain and CBG is paid back the amount it's

1    invested."  Is that true?  Or is there somewhere in the

2    general ledger where Colonial actually gets the gain?  Right?

3              MR. JONES:  Your Honor, objection to the

4    argumentative testimony.

5              THE COURT:  Overruled.

6    BY MR. HEFTMAN:

7    Q.  Now, let's see what Miss Thompson tells Mr. Westbrook --

8    or, Mr. Kelly, excuse me.  She says he's correct, CBG is

9    paid back the amount it has invested in the loans.  Do you

10   see that?

11   A.  I see that.

12   Q.  And they don't forgive a loss.  They get it back from

13   them over time, right?

14   A.  That's what it says.

15   Q.  And you have no reason to doubt that that's accurate,

16   right?

17   A.  Nope.

18   Q.  Okay.  And so, they pay it back because -- and they pay

19   back exactly the amount that's advanced because that's what

20   TBW has committed to pay back, right?

21   A.  That's what this e-mail says.

22   Q.  Right.  Just like a loan.  Because they are -- they are

23   paying back the amount that is advanced and paying interest,

24   right?

25              MR. JONES:  Your Honor, counsel just interrupted

the witness, who is trying to explain his answer.  Let him

answer the questions.

THE COURT:  Were you going to say something more?

THE WITNESS:  I don't think so.

THE COURT:  I didn't think so either, but go

ahead.

BY MR. HEFTMAN:

Q.  So, your retained interest idea, the idea that will

change the contract to say Colonial -- TBW just keeps the

gain, we'll just exclude the gain from Colonial's interest,

doesn't address the reality on the ground when there's a

loss, and it doesn't explain why TBW is paying Colonial back

something it owes, right?

A.  I don't understand the question.

THE COURT:  Well, let me try to get it in terms I

will understand.  Okay?  A call option works two ways,

doesn't it?  If there were a call option being read into the

contract, if there was a gain it was going to go to TBW, and

if there was a loss TBW would pay --

THE WITNESS:  Actually, no.  A call option is a

one-sided instrument.  A call option, the holder can gain,

but the losses --

THE COURT:  That's right.  That's right, because

it's a strike, right?

THE WITNESS:  Exactly.  So if I get my call

1    option, or my stock appreciation right and the stock price

2    is 100 and it goes down to 60, I don't have any -- I don't

3    have anything.  My instrument has no value, but I don't have

4    to pay the -- the difference.

5              THE COURT:  You don't have to pay the difference.

6    You just don't exercise your option?

7              THE WITNESS:  That's why it's called an option.

8              THE COURT:  You just let it go.

9              THE WITNESS:  Right.  It's a one-sided instrument.

10             THE COURT:  Okay.  Now I think I know where --

11   okay.  That helps a lot in terms of understanding counsel's

12   question.

13             So, then I'm going to ask the same question.  The

14   price that establishes that TBW will pay Colonial for a loss

15   has nothing to do with the call option, it has to do with

16   this e-mail, right?

17             THE WITNESS:  I think so.

18             MR. HEFTMAN:  Right.  Because the parties, TBW,

19   the way it behaved was that Colonial advanced it money and

20   it paid back what it loaned them, right?

21             THE COURT:  There never was a loss.  So all of

22   this is hypothetical, right?

23             MR. HEFTMAN:  No, not at all, Your Honor.

24   BY MR. HEFTMAN:

25   Q.  You're not a mortgage warehouse lending expert, right?

1    A.   That's correct.

2    Q.   You didn't read any investor commitments at all, right?

3    A.   I don't remember seeing anything.

4    Q.   Right.  Well, you did testify about their meaning and

5    their legal impact earlier, but you didn't review any in

6    preparing for your opinion, right?

7    A.   I don't recall seeing anything.

8    Q.   And you're aware that there are rate sheets attached to

9    those investor commitments, are you?

10   A.   I don't -- I'm -- I don't think I've seen anything

11   called a rate sheet.

12   Q.   Do you know whether the timing of when you deliver one

13   of those commitments influences the price, and then if it's

14   at 15 days or 30 days or 45 days before you deliver that

15   loan to an end investor, it changes the initial investor

16   commitment price?

17   A.   I don't know that.

18   Q.   Right.  So, you haven't investigated this situation, but

19   PwC is saying here, and communicating, Mr. Kelly, Mr.

20   Westbrook, that Colonial doesn't forgive the customer.

21   They're the auditors.  They should know.  What they're

22   saying is they get the money back.  They get exactly what

23   they lent out, right?

24        MR. JONES:  Your Honor, this is just argumentative.

25   Objection.

```
1              THE COURT:  Overruled.

2              THE WITNESS:  My understanding of the transaction

3     is that Colonial was getting paid back exactly what they

4     advanced plus the interest.  And I don't know of any cases

5     where there was a loss.

6              THE COURT:  Doesn't matter.  Let's move on.

7              MR. HEFTMAN:  I'll move on.

8     BY MR. HEFTMAN:

9     Q.  In your FAS 140 experience, you've never seen a

10    transaction with an implicit call option, correct?

11    A.  I don't remember another one, no.

12    Q.  Before I move on to another subject, the scope of your

13    opinion, your opinion is limited to whether COLB is a loan

14    or a sale for FAS 140, right?

15    A.  That's correct.

16    Q.  You have no opinion on whether -- how AOT should be

17    treated under FAS 140, correct?

18    A.  That's correct.  I was not asked to look at AOT.

19    Q.  You were not asked to look at it.

20              You had some initial conversations with counsel

21    about it, but they didn't ultimately ask you for an opinion,

22    right?

23    A.  That's correct.

24    Q.  And if you had offered an opinion on AOT, you would have

25    read the contract to properly account for it, right?
```

1    THE COURT:  Why are you going there?  You know,

2    he's just said he didn't do anything on AOT.  So anything

3    you ask him he's going to be making up now.

4    MR. HEFTMAN:  I'll move on, Your Honor.

5    BY MR. HEFTMAN:

6    Q.  We didn't hear, in terms of what you've been doing since

7    you left FASB.  You're a consultant and you work as an

8    expert witness, right?

9    A.  That's correct.

10   Q.  And you've testified on behalf of accounting firms and

11   in security class actions on behalf of officers and

12   directors, right?

13   A.  Yes.

14   Q.  And you've been retained by PwC in another lawsuit,

15   along with Miss Johnigan, where PwC was sued for audit

16   malpractice in the MF Global case, right?

17   THE COURT:  I'm sorry, what?  You said -- I think

18   you're talking too fast.

19   MR. HEFTMAN:  I apologize, Your Honor.  Force of

20   habit.

21   BY MR. HEFTMAN:

22   Q.  You've been retained by PwC in other litigation.  The MF

23   Global lawsuit where PwC was accused of audit malpractice,

24   including FAS 140 issues, correct?

25   A.  I was.

1    Q.  I'd like to talk with you about economic substance.  You

2    made it very clear in your direct testimony that economic

3    substance is irrelevant to FAS 140, right?

4    A.  I don't think that's what I said.  I said you do not

5    just independently assess the substance of whether something

6    is a loan rather than applying the criteria that are set

7    forth in 140.  I think 140 is about substance.

8    Q.  Are the risks and rewards of ownership relevant to

9    determining whether it is a sale or a loan?

10   A.  As I discussed on direct, the risks and rewards

11   approach, which would mean you look to see who's got the

12   risks and rewards in order to decide whose asset it is, is

13   one that the board rejected.

14   Q.  Right.  Sorry.  I didn't mean to interrupt you.

15   A.  The board decided that control over the asset was the

16   criteria, as set forth in paragraph 9, that we should follow

17   in making that decision.

18   Q.  So, who gets the gain or who bears the risk of loss is

19   irrelevant to applying FAS 140, right?

20   A.  Yes.  You do not need an analysis of who gets the gains

21   and losses.  There are lots of ways you can shift those

22   around with various derivatives, and at the end of the day

23   you're looking for control of the asset.

24   Q.  Okay.  I want to focus on 9.A, legal isolation in

25   bankruptcy.  Okay?  That's a required element, and if you

1    fail 9.A, it's a secured borrowing or a loan, not a sale,

2    right?

3    A.  That's correct.

4    Q.  You got to meet all three of those, right?

5    A.  That's correct.

6    Q.  Okay.  The legal isolation test is effectively a legal

7    judgment about whether it would be deemed a true sale of law

8    in bankruptcy, right?

9    A.  That's correct.

10   Q.  So to make that judgment you have to understand what are

11   the relevant factors a court would look at to determine

12   whether it's a true sale, right?

13   A.  I'm not sure.  I mean, we've established that it's

14   basically a legal question, and so I assume that the people

15   who are ultimately making that assessment would need to

16   understand how a court approaches it.

17   Q.  Well, you've offered an opinion on 9.A that it satisfies

18   legal isolation of bankruptcy, right?

19   A.  I based that on the information that was available,

20   which included letters from lawyers who had made that

21   judgment, which I think is how the accountants normally made

22   that judgment.

23   Q.  So you didn't make an independent judgment about whether

24   legal isolation was satisfied, you relied on the fact that

25   there was a legal opinion, eventually.  Is that a fair

1    characterization?

2    A.  Well, that's -- I mean, I relied on all the information

3    I had about who was involved in making that call.  I mean, I

4    understand there were attorneys involved in the drafting,

5    and I considered that also.

6    Q.  Well, the fact an attorney drafts an agreement doesn't

7    make it a sale or secured borrowing under FAS 140, right?

8    A.  That's true.

9    Q.  So did you analyze the factors that are relevant to

10   whether, in bankruptcy, it would be treated as a true sale

11   yourself?

12   A.  I did not.

13   Q.  Okay.  So, you don't have any affirmative opinion about

14   legal isolation, other than you're aware that there is a

15   legal opinion on the subject, right?

16   A.  I concluded that all of the evidence I saw indicated or

17   suggested, moved me -- convinced me that it was reasonable

18   to conclude that it was isolation, and that includes the

19   subsequent development.

20   Q.  Well, identify for us the factors that are relevant in

21   bankruptcy for determining whether it's a true sale.

22   A.  As I said, I didn't try to make that assessment.  That

23   would be a legal judgment.

24   Q.  So you're not qualified to make that assessment?

25   A.  I'm not a lawyer.

1    Q.  So when you just said, I looked at all the facts and

2    circumstances, you didn't look at the case law, you didn't

3    make any judgments about what are the relevant legal

4    factors.  What did you do, other than be aware that there's

5    a lawyer's letter?

6    A.  That was -- that was part of what I did, was look at the

7    lawyer's letter.  I looked at the evidence that was

8    available to me.

9         THE COURT:  What made you -- what made you

10   conclude it was isolated sufficiently to withstand a

11   bankruptcy trustee?

12        THE WITNESS:  It was apparent that it had been

13   drafted by people who were intending it to achieve

14   isolation.  That was one factor.  It was apparent that --

15   from everything I knew, those were attorneys who practiced

16   in this area, drafted that on behalf of the bank.  And I saw

17   the letters in '06 and '08 and -- I'm not supposed to --

18   BY MR. HEFTMAN:

19   Q.  Did you read the letter from the lawyers?

20   A.  Yes.

21        MR. JONES:  Your Honor, I think they've opened the

22   door to the question of what happened in this bankruptcy.

23   That shows -- he's being asked about legal isolation and a

24   prediction.

25        THE COURT:  Right now, as far as I'm concerned,

1    we're talking about the lawyer's opinion in this case.

2           The letters of the lawyers in this case, you read

3    through -- you read the letters in this case, right?

4           THE WITNESS:  The -- the lawyer's letters that

5    were opining that the COLB transaction --

6           THE COURT:  Right.

7           THE WITNESS:  Yes.

8    BY MR. HEFTMAN:

9    Q.  You did read those?

10   A.  I did read them at the time, yes.

11   Q.  Okay.  Well, let's look at them.  A-207.  And let's turn

12   to page 153829.

13          So, this is the letter from May of 2006, and you

14   can see in about the fifth line down it talks about MFC

15   Mortgage.  So this is not a letter about TBW, but it's a

16   letter about another COLB agreement that Colonial has, right?

17   A.  Apparently, yes.

18   Q.  Right.  And you have no knowledge that PwC received this

19   legal opinion prior to the spring of 2008, correct?

20   A.  I don't know when they received it.

21   Q.  Fine.  Let's look -- so if you go down to the third

22   paragraph, you have requested -- this sets out that they're

23   being asked to give a true sale opinion of whether this COLB

24   transaction would be treated as a true sale, right?  Fair

25   enough?

1   A.  Yes.

2   Q.  Okay.  And you're aware, as you see right below that

3   assumptions and facts, the lawyers make a lot of assumptions

4   that they premise their opinion on, right?

5           Do you see that?  And if you go on to the next

6   page, there is a section in the middle, in rendering this

7   opinion letter, where they say they've considered and

8   relied.  They didn't do an independent investigation, other

9   than a review of the transaction documents, and then they

10  set out in these numbered paragraphs all these assumptions

11  they make.

12          Do you recall reading that?

13  A.  I -- I'm sure I read it at the time.  I don't recall

14  reading it.

15  Q.  Okay.  Well, I'm not certain that these were attached to

16  any of the depositions you were given, but if you recall

17  reading this, that's fine.

18          Paragraph 1 says -- they're assuming fair market

19  value, right?

20  A.  Yes.

21  Q.  So the lawyers are saying fair market value is important,

22  even if it's not written in the words of 9.A through C, right?

23  A.  Okay.  Fair, yes.

24  Q.  Fair.  So, then, paragraph 2 says, "This is the entire

25  agreement."  We're assuming this is the entire agreement,

1    right?

2          And you recall in the LPSA that it also said this

3    is the entire agreement, we won't be amending this

4    agreement, creating new terms without a written agreement,

5    right?

6    A.  I remember that.

7    Q.  And then number 3, The seller and buyer have valid

8    business reasons for the sale, rather than the seller

9    obtaining a secured loan with the participated mortgage

10    loans as collateral.  So they have a reason other than they

11    really want to have a loan, right?

12          You have an understanding of what the lawyers --

13    excuse me, let me change the question.

14          The lawyers are saying you have to have a valid

15    business reason that's not just you want to get a secured

16    borrowing from this party to have a true sale, right?

17    A.  It says you have to have a valid business reason for the

18    sale and assignment.

19    Q.  Well, let's look at page 153834, to see what are the

20    relevant factors, as a matter of law, that they identify.

21          THE COURT:  Do we need that?

22          MR. HEFTMAN:  I think it's really important, Your

23    Honor.

24    BY MR. HEFTMAN:

25    Q.  Looking at the bottom, number 3.  Go all the way to the

1    bottom paragraph, please.

2              One of the factors that is -- in analyzing whether

3    a transaction is a sale or finance arrangement is the

4    economic substance of the transaction.  Right?

5    A.  That's what it says.

6    Q.  Let's turn to where they explain what economic substance

7    means, 153838.  Courts have held that an analysis of the

8    economic substance -- says it's an essential element.  The

9    major factor cited by courts is -- I'm skipping -- is the

10   extent to which the risks and benefits associated with

11   ownership of the property have been transferred to the buyer.

12             Do you see that?

13   A.  Yes.

14   Q.  So, the lawyers -- and you're relying on them to satisfy

15   9.A, legal isolation -- have said we're assuming it's a fair

16   value and there has got to be a transfer to the owner of the

17   risks and the benefits associated with really owning that

18   asset, right?

19   A.  That's what it says.

20   Q.  And you relied on this opinion, right?

21   A.  I don't remember this particular part of it.  I may not

22   have focused on those words.  But I -- it was part of the

23   opinion that was part of what convinced me we had isolation.

24   Q.  Right.  This was part of the opinion that convinced you

25   you had isolation?

1  A.  Apparently.

2  Q.  Okay.  Well, you testified that it is irrelevant whether

3  the risks and benefits of ownership are transferred, and

4  that they're not transferred under the COLB transaction

5  because Colonial gets every cent back plus interest, right?

6  A.  That's true, but I think this is talking about the

7  specific property you bought.  And it seems to me that gets

8  to the details of what did they buy?  Did they just by $99

9  worth of principal or did they buy the whole loan?  But --

10  Q.  It doesn't say anything like that, does it?

11          MR. JONES:  Your Honor, he just interrupted again.

12  He said "but" and was about to finish the sentence.  He

13  keeps interrupting the witness.

14  BY MR. HEFTMAN:

15  Q.  I apologize.  Please continue.

16          THE COURT:  Were you finished?

17          THE WITNESS:  I -- yeah, I think so.

18  BY MR. HEFTMAN:

19  Q.  Let's look at the next page to see what the lawyers say,

20  because the lawyers apply it to this specific transaction.

21  Let's look at the bottom, because they're assuming it's a

22  fair value.  And it says at the bottom --

23          Bottom paragraph, please, Rami.

24          Now, you understand the lawyers are -- are not

25  actually relying on what it says in the language of the

1  contract, right?

2  A.  Yes.

3  Q.  Okay.  So, they say the seller, in the -- in the fourth

4  line, "Further, the seller will pass equitable title to the

5  participating mortgage loans to the extent of the buyer's

6  interest, and the buyer will receive all of the benefits and

7  burdens of ownership thereof."  Right?

8       Do you see that?

9  A.  I see that.

10  Q.  So the lawyers are saying, let's give a true sale

11  opinion on 9.A, legal isolation.  We're reading the contract

12  and understanding that Colonial really is going to take on

13  the 99 percent risk and benefit of ownership, right?

14  A.  That seems to be what it says.

15  Q.  But that's not what happened, right?

16  A.  That's not the way I understand the transaction was

17  operating.

18  Q.  And PwC, they got this letter too, right?

19       THE COURT:  I don't know that he knows that.

20       MR. HEFTMAN:  Okay.  Fair enough.  So when you

21  talked about how FASB eliminated consideration of the risks

22  and rewards and the benefits and burdens of ownership, they

23  didn't eliminate it; it's in 9.A, right?

24  A.  I'm not sure I know the answer to that.

25       THE COURT:  The question is not answerable.  If

1    you're saying what we just went through is 9.A, that's not

2    accurate.

3         MR. HEFTMAN:  It's in the standard for legal

4    isolation as a true sale, right?

5         THE COURT:  Well, it's in this letter.  Okay.

6    Let's leave it at that.

7         MR. HEFTMAN:  Fair enough, Your Honor.

8         THE COURT:  When you reach a good point for

9    stopping, we'll need a break.

10        MR. HEFTMAN:  A break would be great right now,

11   Your Honor.  It would be more efficient.

12        THE COURT:  And about how much longer do you have?

13        MR. HEFTMAN:  I have a few things, but I can -- I

14   can tell you much better when I get back.  I won't be too

15   much longer.

16        THE COURT:  Too much meaning?

17        MR. HEFTMAN:  Under 30 minutes.

18        THE COURT:  There you go.  We'll be in recess for 15.

19        (Recess.)

20        MR. HEFTMAN:  Your Honor, I checked my notes, no

21   further questions at this time.

22        THE COURT:  Good.

23                    REDIRECT EXAMINATION

24   BY MR. JONES:

25   Q.  Mr. Lucas, are you a lawyer?

1    A.  No.

2    Q.  You were asked a lot of questions about these legal

3    opinions, weren't you?

4    A.  Yes.

5    Q.  I put up on the screen Exhibit A-52.

6         Did the lawyers provide a subsequent legal opinion

7    after the implicit call option was identified?

8    A.  I believe they did.

9    Q.  And what did that opinion say?

10   A.  Basically, they were advised that the review of the COLB

11   program had brought to light some additional facts about the

12   contractual terms, and the -- this opinion was updating the

13   2006 opinion to say it still applied.

14             THE COURT:  To say what?

15             THE WITNESS:  To say it is still our opinion that.

16             THE COURT:  What's the number of this exhibit?

17             MR. JONES:  A-52.

18             THE COURT:  Thank you.

19   BY MR. JONES:

20   Q.  Did the attorneys tell or list in this opinion letter

21   that it was inappropriate to have implicit terms interpreted

22   in a contract?

23   A.  I don't recall that it said that.

24   Q.  Do accountants, when determining how to account for

25   transactions of sales or loans, rely on attorneys to make

1    those judgments and to provide information?

2    A.   Well, particularly with regard to isolation, which is in

3    part a legal question, yes.

4    Q.   Would you have expected the attorneys to say that the

5    implicit call option was inappropriate if it was a problem?

6    A.   That would seem reasonable, but I'm not sure I have an

7    expectation.

8    Q.   Did the contract -- and I put up on the screen A-372.4.

9            Did the loan participation sale agreement specify

10   that it was intended to be a sale of an asset, or a loan?

11   A.   Yes.

12   Q.   Would you have to reinterpret the contract to structure

13   it as a loan?

14   A.   Reinterpret?

15   Q.   Counsel asked you a lot of questions about whether the

16   par -- whether the implicit call option was present in this

17   contract.

18           Are there features of the contract that would have

19   to be reinterpreted to say it's a loan under FAS 140?

20   A.   Well, if it failed one of the criteria, then it would be

21   treated as a loan under 140.  So some change would have to

22   be made to cause it to fail one of the criteria, but that

23   could happen a lot of ways.

24   Q.   Just to be clear, your understanding -- what was your

25   understanding of how the contract was operating all along?

1   A.   How the business -- how the cash flows were operating?

2   Q.   Yes.

3   A.   We have the loan to the home buyer, and then TBW, or

4   whoever, sells the 99 percent participation to Colonial.

5   And then anytime there's been a third-party, Freddie Mac has

6   signed a commitment to buy loans at 102.

7           And then my understanding is in the large majority

8   of cases, the loan did settle as expected with Freddie Mac.

9   So when Freddie Mac paid the 102, in all cases Colonial got

10  the $99 it had advanced and interest and fees, and the

11  rest -- the $2 and the $1 at 1 percent were passed through

12  to TBW.

13  Q.   If a contract is written ambiguously, but an accountant

14  sees that it's operating in practice somewhat differently,

15  how is the accountant supposed to deal with that?

16  A.   Carefully.  I think you can't disregard the way the

17  transaction is actually operating.  You need to try and

18  reconcile, and if the -- if it's clear that the parties have

19  an understanding that's not accurately reflected in the

20  paperwork, then it's appropriate to account for it based on

21  the understanding.

22  Q.   Are there different types of call options?

23  A.   Yes.

24  Q.   And the 17-A call option that was omitted from the

25  original contract, was that for a different thing?

A.   The 17-A explicit call option was what I would call -- I
mean, it just calls it a seller's call option, but I
interpret it to give the seller the right to call back or to
retain or get the return of the underlying mortgages.

     And if that was the way it was interpreted, it
would potentially create a problem -- would create a problem
under 9.C, because 9.C says the seller does not retain
control through the ability to unilaterally require return
of the assets.

     The -- so in that sense, the 17-A call was
analogous to the stock options we were talking about before,
where I would have to advance the strike price and I'd get
the actual shares.

     The implicit call option that was visualized, as I
understand it, was more like the stock appreciation right,
because as it was described, it was not expected to give
them the right to call back the mortgages.  Rather, it was
just a cash settlement equal in value to the value that
other call option would have had.

Q.   How do you know that an implicit call option didn't
give -- didn't give Taylor Bean & Whitaker a unilateral
right to get back the particular mortgages?

A.   Well, some of the descriptions of it said it was
required to be cash settled, and there was also the 18-A
language, that gave Colonial the overriding right to take

1    TBW out of the transaction and sell it in cash that way.

2              THE COURT:  What was that last name you said?

3    What was the language that talked about cash settlement?

4              THE WITNESS:  When they described the implicit

5    call, they suggested that it could be cash settlement.

6              There's also that 18-A clause that says Colonial

7    has the right to buy the 1 percent, the seller's retained

8    interest, and then they would own the whole loan and could

9    take it wherever they wanted.

10             In my mind that kind of trumps any ability of TBW

11   to get it back, because if they do try to get it back and

12   Colonial doesn't want to give it back, they have a way in

13   the contract, but retain control.

14   BY MR. JONES:

15   Q.  Mr. Lucas, was there a requirement in the COLB contracts

16   for an end investor commitment?

17   A.  Yes.  It required that to be part of the appeal.

18   Q.  There was a lot of discussion on cross about what could

19   cover and what could explain Colonial Bank's not

20   participating in the losses.  Is -- could a breach of -- are

21   you a lawyer -- you're not a lawyer, but a breach of this

22   provision, could that explain the ability to avoid the

23   losses if an end investor commitment fell through?

24             MR. HEFTMAN:  Leading, Your Honor.

25             THE COURT:  Overruled.

1    THE WITNESS:  Does that question have something to

2    do with what's here?

3         THE COURT:  Do you understand the question?

4         THE WITNESS:  I don't understand the question.

5    BY MR. JONES:

6    Q.  Mr. Lucas, I put up on the screen A-372.5, and this is

7    section 4 of the COLB LIPSA.

8         What does this provision say?

9    A.  It says it shall be covered by a bona fide current,

10   unfilled, unexpired commitment by an end investor.

11   Q.  So separate and apart from the transactions being

12   considered a loan, do you have any basis for understanding

13   whether this -- a breach of this provision could result in

14   Colonial Bank being covered for any losses?

15        THE COURT:  Can I make a suggestion?  Since

16   there's never been any losses, why don't we just skip it?

17        MR. JONES:  Okay.  Your Honor, Mr. Lucas was asked

18   multiple times on direct examination about legal isolation

19   and bankruptcy, and there was one point in time -- on cross-

20   examination, when -- and there was one point in time when he

21   was asked, How do you know this was legally isolated?  And

22   he was about to mention what happened in bankruptcy and that

23   being relevant.

24        I think by focusing on whether these assets are in

25   economic substance alone, and that meaning that it shouldn't

1    be kept by the FDIC when they took over Colonial Bank, it's

2    relevant that they went into the bankruptcy, claimed that

3    these were owned by the bank, and Taylor Bean & Whitaker

4    agreed and the Court agreed.

5              THE COURT:  It was a settlement, Counsel.

6              Do you want to reply?

7              MR. HEFTMAN:  Briefly, Your Honor.  This witness

8    doesn't know anything about it.  It wasn't part of his

9    opinion and he didn't look at those documents in forming his

10   opinion, besides the fact that it's irrelevant because it's

11   a settlement.

12             What we did and what we asked him about was 9.A.

13   9.A is his opinion.

14             MR. JONES:  9.A is legal isolation in bankruptcy.

15   They opened the door to what happened in the actual

16   bankruptcy.  The position --

17             THE COURT:  I didn't hear them open the door,

18   Counsel.

19             MR. JONES:  Okay.

20             THE COURT:  Okay.  Are we finished with this

21   witness, or do you have some more questions?

22             MR. JONES:  I was going to finish up just real

23   quickly, Your Honor.

24             THE COURT:  Go ahead.  Take your time.

25   BY MR. JONES:

1    Q.  Mr. Lucas, to the question of how you described the

2    cash, where on this board does that fall?

3    A.  How we described the cash?

4    Q.  Does the choice of how you describe the gain in this

5    transaction affect the FAS 140 requirements?

6    A.  No, the -- the way you describe what happens to the $2

7    is the three boxes at the bottom, the retained interest

8    approach, the implicit call, the imbedded derivative.  Those

9    are the -- that's the variable that we've been talking about.

10   Q.  All right.  Was TBW always entitled to the gain on sale?

11   A.  That's my understanding.

12   Q.  Did PwC ever say that there was no right of TBW to get

13   that gain?

14           THE COURT:  Say that again.

15   BY MR. JONES:

16   Q.  You were asked questions about whether PwC had ever

17   mentioned an implicit call option and had ever said that an

18   implicit call option existed.

19           Is there anything in your review of documents

20   where PwC said TBW had no right to that gain on sale?

21   A.  No.

22   Q.  Is the description of that sliver of cash -- does it go

23   to either one of the strike criteria in FAS 140?

24   A.  No.

25           MR. JONES:  No further questions, Your Honor.

```
 1              THE COURT:  Anything?

 2              MR. HEFTMAN:  Nothing, Your Honor.

 3              THE COURT:  You'll be very glad to hear you can

 4      step down.  Watch your step going down.  You may be excused.

 5              Is that right, Counsel?  We're excusing him.

 6              You may stay or leave, as you wish.  I can tell

 7      you everybody leaves.

 8              THE WITNESS:  That's good.

 9              THE COURT:  Some people are gluttons for

10      punishment.

11              Is that it for today?

12              MR. MULLIN:  Yes, Your Honor.

13              THE COURT:  I thought so.  Okay.  Counsel, I guess

14      the next time I see you will be in Montgomery, Alabama,

15      right?

16              Oh, Heather e-mailed me about your proposal for

17      the depositions.  It's just fine with me, as long as it's

18      clear that the relevant exhibits to the deposition I'm

19      reading are right there with that deposition, so I can turn

20      to them very quickly and easily.

21              Is that going to happen?

22              MR. HAGALE:  It will be, Your Honor.

23              MR. MULLIN:  Yes, Your Honor.

24              THE COURT:  Okay.  Counsel, court is adjourned.

25              MR. BECK:  Your Honor, what time do we commence on
```

1  Monday morning?

2          THE COURT:  God, I have no idea.  Why don't we

3  just -- you're going to need time to set up, aren't you?

4          MR. BECK:  I think originally we thought we were

5  going to have an issue with their letting us in early.

6          Do you have an update on that, Ms. Moss?

7          MS. MOSS:  Yes, thankfully -- thank you.

8          The Court has been very helpful and we're going to

9  be able to set up on Friday, so we could start on Monday at

10  9 a.m.

11          I know Your Honor mentioned -- as you know, we

12  have a lot of witnesses for next week.  Why don't we plan to

13  start Monday at 9, unless you have a different preference.

14          THE COURT:  No, Monday at 9 would be fine.  I just

15  didn't know whether you needed more time to set up, in which

16  case we would start at 9:30.  But if you think you'll be all

17  set up at 9, let's start at 9.

18          MS. MOSS:  That's great.

19          THE COURT:  So have safe travels.  I'll see you on

20  Monday.  Court will be adjourned.

21                          *   *   *

22

23

24

25

1
CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4           I, JANICE DICKMAN, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of

6    my stenograph notes and is a full, true and complete

7    transcript of the proceedings to the best of my ability.

8                         Dated this 28th day of September, 2017.

9

10

11                    /s/_____

12                    Janice E. Dickman, CRR, RMR
                      Official Court Reporter
13                    Room 6523
                      333 Constitution Avenue NW
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25