1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    THE COLONIAL BANCGROUP, INC.
     and KEVIN O'HALLORAN,

6
            Plaintiffs,

7
         v.                              CASE NO.: 2:11cv746-BJR

8
     PRICEWATERHOUSECOOPERS LLP

9    and CROWE HORWATH LLP,

10          Defendants.

11                    * * * * * * * * * *

12                       NONJURY TRIAL

13                    * * * * * * * * * *

14          BEFORE THE HONORABLE BARBARA JACOBS ROTHSTEIN, UNITED

15   STATES DISTRICT JUDGE, at Montgomery, Alabama, on Monday,

16   October 2, 2017, commencing at 9:06 a.m.

17                          APPEARANCES

18   FOR THE PLAINTIFFS:      Mr. David C. Mullen
                              Mr. John G. Turner III
19                            Attorneys at Law
                              MULLIN HOARD & BROWN LLP
20                            800 Amarillo National Plaza Two
                              500 South Taylor Street
21                            Amarillo, Texas  79101

22                            Mr. Rufus T. Dorsey IV
                              Mr. Ronald T. Coleman Jr.
23                            Attorneys at Law
                              PARKER HUDSON RAINER & DOBBS LLP
24                            1500 Marquis Two Tower
                              285 Peachtree Center Avenue NE
25                            Atlanta, Georgia  30303

```
 1                      APPEARANCES, continued:

 2   FOR THE DEFENDANTS:      Mr. Philip S. Beck
                              Mr. Mark L. Levine
 3                            Mr. Nicolas L. Martinez
                              Mr. Christopher D. Landgraff
 4                            Attorneys at Law
                              BARTLIT BECK HERMAN
 5                            PALENCHAR & SCOTT LLP
                              Courthouse Place
 6                            54 West Hubbard Street, Suite 300
                              Chicago, Illinois  60654
 7
                              Mr. Jameson R. Jones
 8                            Attorney at Law
                              BARTLIT BECK HERMAN
 9                            PALENCHAR & SCOTT LLP
                              1899 Wynkoop Street, 8th Floor
10                            Denver, Colorado  80202

11                            Ms. Meredith Moss
                              Attorney at Law
12                            KING & SPALDING LLP
                              1700 Pennsylvania Avenue NW
13                            Washington, D.C.  20006

14                            Mr. Jonathan C. Medow
                              Attorney at Law
15                            MAYER BROWN LLP
                              71 South Wacker Drive
16                            Chicago, Illinois  60606

17                            Mr. Tabor Robert Novak Jr.
                              Attorney at Law
18                            BALL BALL  MATTHEWS & NOVAK PA
                              445 Dexter Avenue, Suite 9045
19                            Montgomery, Alabama  36104

20   FOR FDIC as Receiver     Mr. Stephen P. Sorensen
     for Colonial Bank:       Attorney at Law
21                            THOMAS ALEXANDER
                              FORRESTER & SORENSEN LLP
22                            14 27th Avenue
                              Venice, California  90291
23
                   Proceedings reported stenographically;
24                   transcript produced by computer

25                        * * * * * * * * * * *
```

```
1                    EXAMINATION INDEX

2  PHILLIP RIVERS
        DIRECT BY MR. SORENSEN                    1981
3
   LEWIS EDWARD BEVILLE
4       DIRECT BY MR. COLEMAN                     2084
        CROSS BY MR. LEVINE                       2151
5
                   * * * * * * * * * *
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (The following proceedings were heard before the Honorable

2     Barbara Jacobs Rothstein, at Montgomery, Alabama, on

3     Monday, October 2, 2017 commencing at 9:06 a.m.:)

4    (Call to Order of the Court)

5         THE COURT:  Same faces, very different surroundings.

6   Good morning, Mr. Beck.

7         MR. BECK:  Good morning, Your Honor.  I have a couple

8   of housekeeping or logistical things before we begin.

9         First, our team has been assuming that the damages

10  trial, if it takes place, will take place in Washington, D.C.

11  But I learned over the weekend that the Crowe trial, which

12  begins on November 6th, is going to be here rather than in

13  Washington, D.C.  So I didn't know -- we need to make hotel

14  plans.  We'll go anywhere Your Honor wants us to go.  But I

15  think from your facial expression, you were anticipating we

16  would be in Washington, D.C., as well.  Whatever you do with

17  Crowe, that's where we'll go.  The --

18         THE COURT:  No.  The rest of this trial, next week, is

19  going to be in Washington, D.C., whatever happens.

20         MR. BECK:  And then when we come back, Your Honor, for

21  the damages phase, which I think Your Honor said we would begin

22  October 30th or so, my question is where will that be.  And I

23  was anticipating that, too, would be in Washington, D.C.

24         THE COURT:  So was I.  Is there a reason it's here?

25  Are there witnesses that are unavailable in D.C.?

1    MR. BECK:  No.  Well, the only reason I mentioned it

2  was because if you've got the Crowe trial starting on November

3  6th here, I didn't know whether you would want us to come here

4  because you would be coming early or the plaintiffs' lawyers who

5  are getting ready for the Crowe trial would want to be here.  We

6  don't really care where we go.  We just want to know where.

7    As far as witnesses, we've got a couple of witnesses

8  that will be testifying over the next couple days where we would

9  have some questions for them on damages.  I was hoping that to

10  avoid coming back -- much as I have grown to love Montgomery, to

11  avoid coming back if we could do that this week.  And we're not

12  going to be crunched for time here.  Both sides have dropped a

13  couple witnesses.  So with Mr. Beville, for example, we have

14  about -- I don't know -- 45 minutes of testimony that would

15  relate to damages.  I would rather do it here than come back at

16  the end of the month.  But that's what we needed guidance from

17  Your Honor on.

18    THE COURT:  My understanding -- yes?

19    MR. COLEMAN:  Oh, I'm sorry.  I was going to address

20  that when the Court would like to have that addressed.

21    THE COURT:  Was there a different approach?

22    MR. COLEMAN:  Yes, Your Honor.  Ron Coleman on behalf

23  of Colonial BancGroup.  We understood and believe the court

24  order and the discussion at the pretrial conference was clear

25  that the damages -- that this phase would be addressed just to

1  liability and that -- based on the Court's order, that all

2  damages issues and the plea trial conference discussion,

3  agreement with PwC's counsel, would be that all issues relating

4  to damages and causation for damages such as the condition of

5  the Bank, Bank would have failed anyway, would be reserved for

6  phase two where it could be presented in the context of the

7  other damages evidence that will come out.  And we've acted in

8  accordance with that with respect to ordering our witnesses and

9  that sort of thing, and we believe that's how it ought to --

10         THE COURT:  Okay.  And there is another comment back

11  there.

12         MR. BECK:  On a different matter, I think.

13         MR. SORENSEN:  It is on a different issue, Your Honor.

14         THE COURT:  Okay.

15         MR. BECK:  Your Honor, actually, when we were in

16  Seattle and Your Honor first raise the bifurcation issue,

17  Mr. Levine alerted the Court to this issue of whether that meant

18  we would have to come back here to do the testimony of a couple

19  of fact witnesses.  And I think Your Honor indicated, let's

20  leave that open for now.  If there's time, let's try to do it.

21  And there's going to be plenty of time.

22         THE COURT:  Okay.  Let me put this to rest.  And I'm

23  sorry, Mr. Coleman, if this is going to inconvenience you.

24         I have gone out of my way to not inconvenience counsel

25  and to keep the Court as flexible as it needed to be to

1 accommodate your needs. I am not coming back to Montgomery to

2 try any part of the damages case. The only reason I would do it

3 would be if there was a subpoena issue, as there is with these

4 witnesses, and they were unavailable. You guys are going to

5 have to work it out. If you're not prepared to do a cross on

6 witnesses that they are calling here but who will also be

7 available in D.C., you can do your cross later. I don't care

8 how you work it out. I am not coming back here on the 30th to

9 try a few days' worth of case to then go back and then come back

10 on the 6th. I think that is more inconvenience to the Court

11 than I care to engage in, especially having now found out what

12 it takes to get from D.C. to Montgomery.

13          MR. BECK:  Thank you, Your Honor.

14          MR. COLEMAN:  And, Your Honor, just so the record is

15 clear, we were not suggesting that the Court needed to come back

16 here in the damages trial. There had been discussion at

17 pretrial conference about alternatives. And the Court, I think

18 on the Court's own, identified that there were alternatives,

19 whether it was taking testimony by video or otherwise. And

20 that's all that we're suggesting, is that the damages evidence

21 be considered in the context of the other damages trial.

22          THE COURT:  Okay. So your objection is to their

23 putting -- you were going to put on a witness here that --

24          MR. BECK:  Both -- they're putting on Mr. Beville. And

25 when we cross him or -- and we've also subpoenaed him, so we

1  would, during cross or taking him as our own witness, ask him

2  questions about whether the Bank would have failed anyway.

3       THE COURT:  Is Beville available in D.C.?

4       MR. BECK:  No.

5       MR. COLEMAN:  He was not available in D.C. this week.

6  We have not checked about his availability in D.C. for the

7  week --

8       THE COURT:  Well, somehow Beville is going to have to

9  get on; right?  You're putting him on now.

10      MR. COLEMAN:  We're putting him on on the liability

11  issues today, Your Honor.

12      THE COURT:  If he can't come to -- counsel, this is --

13  we're wasting time.  If he can't come to D.C. during the week we

14  are trying damages in D.C., then they can present whatever

15  testimony he has to give now.  And -- I mean, otherwise, what

16  are we going to do?  Otherwise, we have to come back.  And I'm

17  not coming back.

18      MR. COLEMAN:  We understand, Your Honor.  We'll talk to

19  Mr. Beville.  But I just want the Court to know, we were not

20  suggesting the Court come back.  The Court had suggested that

21  there were other ways to take that testimony in the context of

22  the damages trial.  And that's all we were --

23      THE COURT:  I don't --

24      MR. COLEMAN:  -- trying to do.

25      THE COURT:  I don't care how you do it.  Mr. Beville's

 1  testimony, as long as we're here, should either be -- it seems

 2  logical for me to do it.  I know it's -- you can prepare for it.

 3  We've got -- I don't know -- call him on the last day we're here

 4  so you get some time to prepare.  Put him on here as long as

 5  we're all here and he's -- and they want to ask him some

 6  questions.  I assume he's on your witness list; right?

 7          MR. BECK:  Yes.  Yes, he is.  And then, Your Honor, and

 8  we have -- I may have a few for Ms. Moore as well, who they were

 9  on both -- witnesses they dropped, we are calling her.  But if I

10  have any with her, it will be more like five minutes.  So --

11          THE COURT:  Okay.  Let me regroup here.  You dropped a

12  bunch of witnesses.  Are you thinking it will be four days,

13  leave on Friday, or what?

14          MR. BECK:  I think that there is -- there is a chance

15  we will be done on Wednesday.  We will be done Thursday morning,

16  I predict, at the latest.

17          THE COURT:  Okay.  Well, we won't be done at all if we

18  don't start.

19          MR. BECK:  That -- and if I could have just another

20  moment, Your Honor, I'll give you an update on the mediation.

21  As I indicated, it is set for Saturday in New York City.  The

22  mediator requested the parties to provide confidential mediation

23  statements tomorrow, which we'll all be doing.  He also stated

24  that he thought it would be helpful if he could contact Your

25  Honor, and he asked the parties if we would all consent to that.

1  We have.  I don't know if he's heard from the plaintiffs yet.

2  So if he hears from them and they consent, you may be hearing

3  from the mediator, who thought it would be helpful to talk to

4  Your Honor before the session.

5      THE COURT:  Is it okay with the plaintiffs?

6      MR. MULLIN:  Sure.  Sure.

7      THE COURT:  Okay.  You're all sure?  Because I usually

8  do not talk to mediators.  But if he thinks it would be useful,

9  I'll be happy to talk to him if it's okay with everyone.

10     MR. TURNER:  Judge, John Turner.  At the risk of

11 getting smacked down, I do want to visit on the Crowe issue that

12 Mr. Beck brought up and where the trial will start.  I visited

13 with Mr. Medow this morning.  He's Crowe counsel.  And

14 Mr. Parzen is going to be here on Wednesday, and I think we

15 would anticipate visiting with you on Wednesday if you could

16 carve out a few minutes to talk about logistics on the Crowe

17 trial.

18     THE COURT:  Sure.

19     MR. TURNER:  All right.

20     THE COURT:  Let's do it, especially now that we know

21 that we're probably going to finish early.  We should be able to

22 save some time.  Wednesday afternoon.  I think what you ought to

23 do is talk to counsel and see where in their plans -- I mean, if

24 you have witnesses coming in that they need to get on and off,

25 we could always do it Thursday morning if they think we're going

1  to finish Wednesday afternoon.

2         MR. TURNER:  Sure.  We're very flexible on that.  But I

3  did want to let Your Honor know that's something we're

4  discussing with Crowe.  Okay.  Thank you.

5         MR. MULLIN:  Your Honor, I'm a little caught by

6  surprise here on the -- if they're dropping witnesses, I didn't

7  know which witnesses they're dropping.  So the estimate that we

8  could get done on Wednesday, when I know right now I think there

9  were -- I'm still thinking there are seven witnesses on the

10 list, so I'd like --

11        THE COURT:  Whose list?

12        MR. MULLIN:  On the total list between the two parties.

13 I'd like to know who it is you're dropping.

14        THE COURT:  Okay.  Do I have to do this?  I'd be happy

15 to --

16        MR. BECK:  No, no.  We're going to -- I think we gave

17 you our witnesses for -- through Ms. Moore.  We're going to drop

18 Mr. Hosein.  I say we're likely to drop Mr. Boozer, but we

19 haven't made a final determination on that.

20        MR. MULLIN:  Okay.

21        THE COURT:  So are we down to maybe five witnesses?

22        MR. MULLIN:  That makes a big difference.

23        THE COURT:  Well, all right.  Five.  You're agreeing

24 Wednesday, Mr. Mullin?

25        MR. MULLIN:  I would still say Thursday morning, just

1  knowing this group, but --

2         MR. BECK:  I don't disagree with that, Your Honor.

3         MR. DORSEY:  Your Honor, for the record, Rufus Dorsey

4  with Parker, Hudson on behalf of Colonial BancGroup.  Instead of

5  just piecing this all together, I believe -- and would like to

6  be corrected if I'm wrong -- that the witnesses for this week

7  are Mr. Rivers, then Mr. Beville who we will be offering.  Then

8  I have understood but want to make sure I'm still correct that

9  the defendant is calling Ms. Bathen, Ms. Moore, Mr. Bryant.  And

10 I guess my question is, does it end there?

11        THE COURT:  Well, I said I'd be happy to do this.  I

12 am.  Usually counsel can do this on their own, but -- okay.  Who

13 are the plaintiffs' witnesses?

14        MR. MULLIN:  We're calling Mr. Rivers.

15        MR. COLEMAN:  And Mr. Beville.

16        MR. MULLIN:  And Mr. Beville.

17        THE COURT:  That's two.  Mr. Beck?

18        MR. BECK:  We're calling Ms. Bathen, Ms. Moore, and

19 we've dropped Mr. Hosein.  We have Bryant and then Mr. Boozer,

20 who we probably won't call, but we'll make that determination.

21        THE COURT:  Okay.  Who are we starting with?

22        MR. DORSEY:  Mr. Rivers.

23        THE COURT:  Okay.  Ready to call our first witness?

24        MR. SORENSEN:  Yes.  Plaintiffs call Phillip Rivers.

25        THE COURT:  If you'll step forward, please, and be

1  sworn by the clerk.

2          MS. MOSS:  He's just outside, Your Honor.  We'll call

3  him in.

4          THE COURT:  Oh, he's not in here?  Okay.

5      (Brief pause)

6          THE CLERK:  Stand right there and raise your right

7  hand, please.

8      (The witness is sworn)

9          THE CLERK:  Have a seat right there, please.  Kind of

10 lean close to the mike.

11                         **PHILLIP RIVERS**

12      The witness, having first been duly sworn to speak the

13 truth, the whole truth and nothing but the truth, testified as

14 follows:

15                      DIRECT EXAMINATION

16 BY MR. SORENSEN:

17 Q.  Good morning, Mr. Rivers.

18 A.  Good morning.  How are you?

19 Q.  Fine.  Thank you.

20          MR. SORENSEN:  Your Honor, may I approach with the

21 exhibits for today?

22          THE COURT:  Sure.

23 Q.  Mr. Rivers, I've put in front of you some exhibits that we

24 may look at today.  We'll have them on the screen as well.  You

25 have a screen in front of you, we'll have a big screen here, so

1  whichever is easier for you.  But you'll have the hard copy in

2  case you need to refer to it.

3      I've also put to your side there two deposition transcripts,

4  one for the deposition that you gave in this case and one for

5  the deposition that you gave in the TBW case.  So we may be

6  referring to those.  So you have copies of those, but you're

7  free to look at it on the screen if it's easier.

8  A.  Okay.

9  Q.  Okay?  Mr. Rivers, you were an auditor for PwC until 2012;

10 right?

11 A.  Correct.

12 Q.  And I think you started -- 2001 is when you started with

13 PwC?

14 A.  Correct.

15 Q.  And you were in the Montgomery office; is that right?

16 A.  Yes.

17 Q.  And during that time, you worked on the Colonial BancGroup

18 engagement; is that right?

19 A.  Yes.

20 Q.  And while you were working on it, you worked with Wes Kelly

21 as a supervisor; is that right?

22 A.  Yes.

23 Q.  And Mr. Westbrook?  He was the engagement partner?

24 A.  Kim Jackson was at first and then Gary in the latter years.

25          THE COURT:  You know what?  You're going to have to

1  move -- you and that microphone are going to have to get closer

2  together.  Maybe if you move the microphone up a little.  There

3  you are.  Now try.

4          THE WITNESS:  Is that better?

5          THE COURT:  Much better.

6  A.  I was saying Kim Jackson in earlier years and Gary Westbrook

7  in latter years.

8  Q.  And so for the years 2002 and 2003, Kim Jackson was the

9  engagement partner in charge of the audit; right?

10  A.  Yes.

11  Q.  And then from 2004 until 2008, Mr. Westbrook was in charge;

12  right?

13  A.  Yes.

14  Q.  And then after that, Mr. Jackson took over at the end of the

15  2008 year audit and took over what would have been 2009?  Is

16  that true?

17  A.  I don't recall those years.

18  Q.  And when you -- during your time working at PwC, so focused

19  on 2003 to 2008, the amount of work you did on the Colonial

20  BancGroup engagement varied over those years; right?

21  A.  Yes.

22  Q.  And fair to say that in 2004 and 2005, you did a lot of the

23  more substantive work on testing assets in the audit; right?

24  A.  Just in general testing.  I worked on Colonial a lot in 2004

25  and 2005.

1  Q.  And you did -- but you did work -- other work for Colonial

2  BancGroup over, say, 2003; right?

3  A.  Yes.

4  Q.  And you did some work for Colonial Bank after 2005; right?

5  A.  Yes.

6  Q.  I would like to turn right to the financial statements.

7  This is Exhibit A-64.  And do you see this is the financial

8  statements for the year end 2004 for Colonial BancGroup?

9  A.  Yes.

10  Q.  And if we turn to page 53.  Do you see this is the -- this

11  is the audit opinion that PwC issued on the 2004 year-end

12  financial statements?

13  A.  Yes.

14  Q.  And if you look under the heading Consolidated Financial

15  Statements, do you see that first sentence where it says, In our

16  opinion, the consolidated financial statements listed in the

17  accompanying index present fairly in all material respects the

18  financial position of the Colonial BancGroup?

19  A.  Yes.

20  Q.  Okay.  And that's the audit opinion that PwC issued on the

21  2004 year-end financials; right?

22  A.  Yes.

23  Q.  And that's what you would call a clean audit opinion; right?

24  A.  Yes.

25  Q.  No qualifications; right?

1  A.   Right.   An unmodified opinion.

2  Q.   And if we turn to the next page, the next page we'll see

3  that there's a signature of PwC -- do you see that down at the

4  bottom?

5  A.   Yes.

6  Q.   It's actually what's called a conformed signature, the slash

7  S.   Do you see that?

8  A.   Yes.

9  Q.   Okay.   And you know sometimes auditors actually write the

10  name out by hand and sometimes they put in a slash S?

11  A.   Yes.

12  Q.   Okay.   But you understand this is PricewaterhouseCoopers

13  signing its name to that opinion; right?

14  A.   Yes.

15  Q.   Okay.   If we go to the next page.   And you'll see this is

16  the balance sheet as of year end 2004 for Colonial BancGroup;

17  right?

18  A.   Yes.

19  Q.   And you see it has both years, 2003 and '4; right?

20  A.   Yes.

21  Q.   And so when you -- when you express an opinion on audited

22  financials, you often have the prior year.   And your opinion

23  also applies to the prior year; right?

24  A.   Yes.

25  Q.   And if we look at the assets, do you see there is something

1  called Loans Held For Sale there?

2  A.  Yes.

3  Q.  And it's $678 million, more or less?

4  A.  Yes.

5  Q.  And you understand that's the -- what people call the COLB;

6  right?

7  A.  Yes.

8  Q.  And then if you go up to the third line, it says Federal

9  funds sold and securities purchased under agreements to resell.

10  Do you see that?

11  A.  I do.

12  Q.  Okay.  And it's 246,491,000.  That's the AOT; right?

13  A.  A portion of that, yes.

14  Q.  And then -- if you could leave that up again.  And do you

15  see next to the 246 for 2003, there's a dash there?

16  A.  Yes.

17  Q.  And that means there was -- there were no AOT assets in

18  2003; right?

19  A.  Yes.

20  Q.  And you recall the AOT transactions started in 2004; right?

21  A.  I don't remember exactly what year it started.

22  Q.  But do you see there are no AOT assets as of the year end

23  2003; right?

24  A.  I do.  Yes.

25  Q.  Let's take a look at the next year's financials.  It's A-66.

1  And is this the 10-K that Colonial BancGroup filed for the

2  fiscal year ended 2005?

3  A.   Yes.

4  Q.   And if we turn to page 58, this is the opinion that PwC

5  issued on the financial statements; right?

6  A.   Yes.

7  Q.   And this is also a clean opinion; correct?

8  A.   Yes.

9  Q.   And you understood that Colonial was --

10        MR. SORENSEN:   Strike that.

11  Q.   You understood that PwC was issuing two kinds of opinions on

12  the Colonial BancGroup financial statements; right?   Opinion on

13  the financial statements and on controls; right?

14  A.   Yes.

15  Q.   And that's what's referred to as an integrated audit?

16  A.   Correct.

17  Q.   And if we turn to -- page 60 is the balance sheet.   And if

18  we could call out the assets at the top.   And do you see

19  securities purchased under agreements to resell?   That's the

20  AOT; right?

21  A.   Yes.

22  Q.   And that's 589 million?

23  A.   Yes.

24  Q.   And loans held for sale, that's the COLB; right?

25  A.   Yes.

1  Q.  And that's about -- almost $1.1 billion?

2  A.  Yes.

3  Q.  Okay.  And let's just take a look at one more financial

4  statement, A-69, the 2008.  And do you see this is the 10-K

5  filed for the year end 2008?

6  A.  Yes.

7  Q.  Okay.  And if we could turn to page 82.  And that's PwC's

8  audit opinion for 2008?

9  A.  Yes.

10 Q.  And that's also a clean opinion?

11 A.  Yes.

12 Q.  And if we turn to the balance sheet, page 83.  Under assets,

13 securities purchased agreement -- under agreements to resell,

14 that's the AOT; right?

15 A.  Yes.

16 Q.  And the amount is about $1.556 billion; correct?

17 A.  Yes.

18 Q.  And the loans held for sale line item is -- that's COLB;

19 right?

20 A.  Yes.

21 Q.  And that's about 2 billion, 2.1 billion?

22 A.  Yes.

23 Q.  And you understand that on the financial statements here,

24 that Colonial BancGroup is representing that it has $1.5 billion

25 of AOT assets as of year end; right?  You understand that's what

1  this says?

2  A.  Yes.

3  Q.  And you understand that the audit or part of your audit job

4  is to confirm whether that assertion, CBG saying these are our

5  assets, whether those actually exist.  You understood that was

6  part of your job?

7  A.  Yes.

8  Q.  And the same for the COLB.  This is Colonial BancGroup

9  saying we have $2 billion worth of COLB assets; right?

10  A.  Yes.

11  Q.  And part of your job was to check to see whether they

12  actually existed; right?

13  A.  Yes.

14  Q.  Now, the COLB assets were supposed to be individual mortgage

15  loans; right?

16  A.  Yes.

17  Q.  Now, the AOT -- you understood that those were supposed to

18  be pools of loans; right?

19  A.  Correct.  Securities.

20  Q.  You understood they were supposed to be pools of loans;

21  right?

22  A.  Yes.

23  Q.  I think you said securities, but you understood they were

24  supposed to be pools of loans; right?

25  A.  Yes.

1  Q.  And did you understand that when you were doing this work

2  and when PwC was giving its opinion on these financial

3  statements, that there would be stakeholders who would be

4  relying on PwC's opinion?

5  A.  I'm not sure who relied on PwC's opinion or not.  We issued

6  our audit report and published it with SEC for public use if

7  someone wanted to.

8  Q.  Let's take a look at Exhibit P-2649.  Now, you understood

9  that PricewaterhouseCoopers had to report to the audit committee

10  of Colonial BancGroup; right?

11  A.  Yes.

12  Q.  And if we turn to page -- thank you.  1708.  So this is

13  Exhibit P-2649.  And do you see there, this is a presentation

14  made to the audit committee by PricewaterhouseCoopers, and it

15  says, Our audit is designed to deliver our services for Colonial

16  at three levels.  Independent opinions and reports that add

17  credibility to the financial information released by Colonial to

18  the marketplace.

19     Do you agree that PricewaterhouseCoopers, by putting its

20  name on the financial statements, those add credibility to those

21  financial statements?

22  A.  Yes.

23  Q.  And do you see there's also a reference to the audit

24  committee there which says, PwC will provide assistance to the

25  audit committee in discharging your corporate governance and

1 compliance responsibilities. You understood that the audit

2 committee was relying on PricewaterhouseCoopers; right?

3 A. Yes.

4 Q. And you mentioned that these were filed with the SEC. You

5 understood that these financial statements were going to be used

6 by the public; right?

7 A. They would be available to the public. Yes.

8 Q. But you understood that the public would use these financial

9 statements; right?

10 A. They could, yes.

11 Q. And, in fact, did you understand as an auditor that you had

12 a public responsibility?

13 A. As a public accountant, maybe not necessarily to the general

14 public, but to my clients that I worked for.

15 Q. Did you understand that the duty you had or the

16 responsibility that you had, it ran not just to the client but

17 also to the public?

18 A. As a certified public accountant, there's, you know,

19 qualifications and credentials and regulations that we would

20 adhere to, which would be that duty to the public of the

21 standards and the credentials that I would hold.

22 Q. And you know that there are standards. There are auditing

23 standards and there are also ethical standards that apply to

24 auditors; right?

25 A. Yes.

1   Q.  And why don't we look at ET-53, which is one of those

2   standards.  It's P-1105.  And are you familiar with ET-53?

3   A.  I don't know exactly what it is, but I know ET is ethical

4   standards.

5   Q.  And you understand this is an ethical standard that applies

6   to auditors?  You understand that; right?

7   A.  Or to public accountants, yes.

8   Q.  And certified public accountants like yourself?

9   A.  Correct.

10  Q.  And do you see where it says, in paragraph one, A

11  distinguishing mark of a profession is acceptance of its

12  responsibility to the public?

13      And then it goes on to say, The accounting profession -- the

14  accounting profession's public consists of clients, credit

15  grantors, governments, employers, investors, the business and

16  financial community, and others who rely on the objectivity and

17  integrity of certified public accountants to maintain the

18  orderly functioning of commerce.

19      You see?

20      And then it goes on to say, This reliance imposes a public

21  interest responsibility on certified public accountants.

22      Do you see that?

23  A.  Yes.

24  Q.  And you understood that your audit opinions, that those were

25  going to be used by all of the people -- all of the entities

1   listed here; right?  Clients, credit grantors, governments?  You

2   understood that; right?

3   A.   Yes.   That they could be.

4   Q.   Now, when you were at PwC until 2012, do you recall that

5   each year PricewaterhouseCoopers would put out an annual report?

6   A.   Yes.

7   Q.   And talk about the different audit work that it had done for

8   the year?  Are you familiar with those reports?

9   A.   Yes.

10  Q.   Why don't we take a look at one, Exhibit P-2881.  And if we

11  could go to page 46.  Actually, before you go to page 46, do you

12  see this is the global -- 2004 global annual review of PwC?

13  A.   I'm sorry.  In your question when you said annual report, I

14  thought you were referring to the 10-K for Colonial.  So could

15  you just tell me what annual report you're -- that's

16  something -- this one you're speaking of?

17  Q.   Sure.  Were you familiar with the annual reviews or reports

18  that PricewaterhouseCoopers would put out to the public talking

19  about its audit work?

20  A.   I don't recall those.

21  Q.   And if we would turn to page 46.  And if we could pull out

22  the very top.

23       And you see it says, For PwC to have credibility in

24  advocating transparency and openness, we must live by those same

25  values.  We strive to be transparent with all stakeholders,

1  including clients, investors, our staff, professional bodies,

2  and regulators.

3      And did you understand that the work that you were doing

4  could be relied on by regulators?

5  A.  Yes.

6  Q.  And Colonial Bank had many -- had different regulators,

7  didn't it?

8  A.  Yes.

9  Q.  The SEC, for one, because it was a public company?

10 A.  Correct.

11 Q.  And Colonial Bank itself also had banking regulators; right?

12 A.  Yes.

13 Q.  The OCC?

14 A.  Yes.

15 Q.  The FDIC?

16 A.  Yes.

17 Q.  And the Federal Reserve Board?

18 A.  Yes.

19 Q.  As an auditor, you understand that when you do your audit

20 work, you actually have to write the work -- write the work down

21 after you do it; right?

22 A.  There are forms of documentation, but part of that

23 documentation would be to put certain work in the audit file.

24 Q.  You have to have evidence of the work that you've done in

25 the audit; right?

1  A.  Yes.

2  Q.  And there's actually a standard that says how much evidence

3  you have to have in your audit files, isn't there?

4  A.  Yes.

5  Q.  And the standard says that an experienced auditor with some

6  industry experience should be able to pick up your audit papers

7  and figure out -- or understand the work that you did to reach

8  your conclusions; right?

9  A.  Correct.

10  Q.  In fact, do you consider yourself an experienced auditor

11  now?

12  A.  Yes.

13  Q.  And so you should be able to pick up work papers and

14  understand the work that was done, at least the work papers in

15  this case; right?

16  A.  Maybe not all of them, but that's what the standard talks

17  about, an experienced auditor.

18  Q.  If we could pull up Exhibit D-2437.  And this is auditing

19  standard three.  This is the standard that deals with audit

20  documentation; correct?

21  A.  Yes.

22  Q.  And you see it was effective as of 2004?

23  A.  Yes.

24  Q.  So this was a standard that applied when you were working on

25  the Colonial BancGroup audits; right?

1    A.   Yes.

2    Q.   And if we could pull out paragraph two.  And you see in

3    paragraph two it says, Audit documentation is the written record

4    of the basis for the auditors' conclusions that provides the

5    support for the auditors' representations.

6        Do you see that?

7    A.   Yes.

8    Q.   And so the audit work papers are essentially the official

9    record of the audits; right?

10   A.   Yes.

11   Q.   And if you look further down in the second sentence, the one

12   that begins Audit Documentation, it says, Audit documentation

13   also facilitates the planning and performance and supervision of

14   the engagement.  And then it goes on to say, and is the basis

15   for the review of the quality of the work.

16       So you agree it's -- the only way you can assess the quality

17   of the work is through the work papers; right?

18   A.   Yes.  You could -- I mean, you could also have discussions

19   with the auditors as well.

20   Q.   The work papers have to have -- have to have the evidence

21   that supports the auditors' opinions; right?

22   A.   Yes.

23   Q.   Now, when you were working on the Colonial BancGroup audits,

24   you understood that the standards that applied were the PCAOB

25   standards?

1  A.  Starting in 2004, yes.

2  Q.  Starting in 2004.  Because they were -- prior to that, for

3  2002 and '3, they were Generally Accepted Auditing Standards;

4  right?

5  A.  Right.

6  Q.  And then after the PCOB -- PCAOB was formed, they

7  incorporated Generally Accepted Auditing Standards into their

8  standards; right?

9  A.  Yes.

10  Q.  But you knew from 2004 forward, it was the PCAOB standards

11  that you had to follow.

12  A.  Yes.

13  Q.  And in doing your work, did you also -- did you also have

14  internal guidance from PricewaterhouseCoopers that you followed?

15  A.  Yes.

16  Q.  You had an audit manual that PwC provided and made available

17  to everyone on the audit team; right?

18  A.  Yes.

19  Q.  And the audit manual was something that you were supposed to

20  be using; correct?

21  A.  I looked at it as a guide.  It was an information to help us

22  perform procedures.  So it was informational and suggested

23  procedures that you may could perform in your audits.

24  Q.  Was the PwC audit manual the official reference manual for

25  all aspects of the audits?

1  A.  I'm not sure I understand your question.

2  Q.  Okay.  Why don't we just look at the manual.  If we could

3  put up P-3111.  This is a version from April 2008.  And if we

4  turn to the second page and pull out the first paragraph, do you

5  see there it says, PwC audit guide is the official reference

6  manual for all aspects of the PwC audit approach and its

7  supporting practices?

8  A.  Yes.

9  Q.  Do you agree that the manual was the official reference that

10  you and others were supposed to be using?

11  A.  I mean, it says here it's the official reference manual.

12  Q.  Now, when you were an audit team member on the Colonial

13  BancGroup audits, you understood that you had access to any

14  information or records of the audit client that you needed to do

15  your work.  You understood that; right?

16  A.  Yes.

17  Q.  And at any time when you were serving on the audit team, did

18  anyone ever deny you access to anything that you believed you

19  needed to do your work?

20  A.  No.

21  Q.  If someone had denied you access, that would have caused

22  some concern; right?

23  A.  Yes.

24  Q.  Now, you understand in trying to confirm the existence of

25  assets, those assets that we saw on the balance sheet, one thing

1  that is a concern for auditors is that the assets might be

2  misstated due to fraud; right?  Do you understand that's a risk

3  associated with audits?

4  A.   Yes.   That's -- a material misstatement for fraud is a risk.

5  Q.   And for Colonial BancGroup, you understood back in 2004 and

6  '5 when you were doing the work on the audit that Colonial Bank

7  had a mortgage warehouse lending division; right?

8  A.   Yes.

9  Q.   And you understood that it engaged in mortgage warehouse

10  lending to mortgage originators; right?

11  A.   Yes.

12  Q.   And you also understood that PwC identified in its work

13  papers that one of the biggest risks facing Colonial Bank was

14  mortgage originator fraud; right?

15  A.   I don't recall if that was a risk we identified or not.

16  Q.   Let's take a look at Exhibit P-1295.  And do you see this is

17  a work paper for the year end 2002 audit?

18  A.   Yes.

19  Q.   And you see the area says Mortgage Warehouse Lending?

20  A.   Yes.

21  Q.   And then if we turn to the second page underneath Credit

22  Quality, you see it says, Historically speaking, the largest

23  losses related to the mortgage warehouse lending industry have

24  come from frauds perpetrated by mortgage originators.

25       Do you see that?

1  A.  Yes.

2  Q.  And this was back in 2002; right?

3  A.  Yes.

4  Q.  And this was in the audit work papers; right?

5  A.  Yes.

6  Q.  And the audit work papers, those are -- those are available

7  to everyone on the audit team to use; right?

8  A.  Yes.

9  Q.  And, in fact, when you took -- when you started doing work

10  in 2003 or 2004, you had access to all the prior years' work

11  papers; right?

12  A.  Yes.

13  Q.  And, in fact, doesn't PwC have a policy of trying to plan

14  its audits based on what they had learned in prior audits?

15  A.  I mean, that would be a source of your planning, was to see

16  what you had done in prior years.  Yes.

17  Q.  And they actually had an acronym called CAKE.  Do you

18  remember CAKE?

19  A.  Unfortunately.  I've heard it so much.  Cumulative audit

20  knowledge and experience.

21  Q.  And what that is, it's the -- you're supposed to look back

22  at what you've learned about an audit client or its business and

23  apply that in planning your subsequent audits; right?

24  A.  You would use that -- the CAKE to use that knowledge going

25  forward.  Yes.

1   Q.  And if we could look at Exhibit A-309.  And just to get us

2   oriented here, this is a work paper from the 2004 year-end

3   audit; right?

4   A.  Yes.

5   Q.  And you can see that up at the top; right?  It has the date

6   on the left.

7   A.  Yes.

8   Q.  And then over on the right, it tells you who completed it

9   and who reviewed it.  And this is one that you completed; right?

10  A.  Yes.

11  Q.  And that Mr. Westbrook also reviewed?

12  A.  Yes.

13  Q.  And if you look at the title of this one, it says, Summarize

14  audit comfort at the assertion level for each significant

15  account.

16      And you understood that you had -- part of -- part of what

17  you needed to do as an auditor was to get comfort about what

18  management was saying about the assets; right?

19  A.  We would get comfort over the financial statement line

20  items.  Yes.

21  Q.  And do you see here in the area -- this one is for warehouse

22  lending process.

23  A.  Yes.

24  Q.  See that?  So that's the mortgage warehouse lending group at

25  Colonial Bank operating in Orlando; right?

1    A.   Yes.

2    Q.   And if we look down at the bottom, you see that it says

3    Guidance there?

4    A.   Yes.

5    Q.   And the way these -- the way the work papers are set up,

6    most of them, they have a section that has guidance; right?

7    A.   Yes.

8    Q.   And that usually is something that's dropped into the

9    worksheet from the PwC audit manual; right?

10   A.   That's correct.

11   Q.   And then further down in the work paper, you find something

12   called Tailored Procedures; right?

13   A.   That's correct.

14   Q.   And that's what the team actually did on the audit; right?

15   A.   Not necessarily.  In many occasions, the guidance would just

16   copy down into the tailored procedures, so I -- I remember

17   sometimes either editing the tailored procedures or sometimes

18   you may not.

19   Q.   So under tailored -- if you found something under tailored

20   procedures, are you saying that the audit team may or may not

21   have done what's listed?

22   A.   Either under the guidance or the tailored procedures.  Yes.

23   Q.   Okay.  I guess, then, if you wanted to see what the team

24   actually did, would you look under the Results heading?

25   A.   That's what we would have documented there in the results

1  section.

2  Q.  Okay.  And if we look -- if we could go back to the first --

3  the first page down at the bottom under Guidance here, it says,

4  Perform the audit procedures for this process to ensure that the

5  risk of material misstatement of relevant financial statements'

6  assertions are, and then it goes on to the next page, say

7  properly addressed for each significant financial statement

8  area.

9      So this was an audit -- this was an audit procedure aimed at

10  looking for material misstatements; right?

11  A.  Could you go back to the title of the work paper, please?

12  Q.  Sure.

13  A.  So if I read the title there, it's summarizing our audit

14  comfort of the approach around each of the accounts we would

15  test.

16  Q.  And this work paper -- this work paper addresses what's

17  called existence -- right? -- among other things?

18  A.  Yes, among other things.

19  Q.  And why don't we turn to page 7.  And if we could pull out

20  the middle section of that all the way down to -- and do you see

21  there it says Risks of material misstatement, key risks?

22  A.  Yes.

23  Q.  And then down below, number one says, Existence of loans.

24  A.  Yes.

25  Q.  So you understood that a key risk for Colonial BancGroup was

1   whether -- the loans it was reporting on its balance sheet,

2   whether those existed.  You understood that as a key risk;

3   right?

4   A.  Yes.

5   Q.  And if you look at number one, it goes on to say, PwC

6   addressed this via substantive testing of MWL, mortgage

7   warehouse lending, amounts to original loan documents and

8   confirmation of Taylor Bean.

9       Do you see that?

10  A.  Yes.

11  Q.  And so you understood at the time that one of the jobs that

12  you had and the team had was to figure out whether loans and

13  pools of loans actually existed; right?

14  A.  Those balances on their financial statements.  Yes.

15  Q.  And if we could look at Exhibit P-2958.  And you see this is

16  a work paper from the year-end 2002 audit?

17  A.  Yes.

18  Q.  And it's called an Audit Comfort Matrix.  Do you see that?

19  A.  Yes.

20  Q.  And then if we look down at the bottom of the first page

21  under B, it says, A 2002 matrix was prepared for the most -- for

22  the four most significant highest inherent risk areas.

23      And the four that were identified were lending, warehouse

24  lending, treasury, and financial reporting.  Right?

25  A.  Yes.

1  Q.  So as early --

2        THE COURT:  Let me interrupt you for a minute.  A

3  couple of questions back when he asked about substantive testing

4  of the warehouse loans, you answered of the balances of the

5  warehouse loans.  I think there's a difference between what he

6  was referring to and what you were referring to.  Am I right?

7        THE WITNESS:  Yes, ma'am.

8        THE COURT:  Okay.  So he's referring to whether there

9  was a substantive examination of the actual existence of the

10  loans, and you were referring to a check of the balances and

11  confirmation of the balances.  Am I right?

12        THE WITNESS:  Yes, ma'am.  Also, and our opinion is an

13  as of date and time.  So, you know, we said December 31, 2004,

14  audit, then our procedures would have addressed the balances on

15  the financial statements at that time.  But, you know, if there

16  had been a loan that had transactioned during the year and sold,

17  then we wouldn't have done any -- made -- you know, not done

18  specific work on that.

19        THE COURT:  Sure.  I understand.  But you weren't

20  addressing work on specific loans.  You were talking about

21  balances of --

22        THE WITNESS:  The balances.

23        THE COURT:  -- the balances that appeared on the

24  financial statement given to you by CBG; right?

25        THE WITNESS:  Yes.  Yes, ma'am.

1          THE COURT:  Okay.

2   BY MR. SORENSEN:

3   Q.  And just to follow up on that, confirming a balance, you

4   could take the number that was on the balance sheet and you

5   could go into the accounting records of Colonial BancGroup to

6   see whether the balances agreed.  That's something you could do;

7   right?

8   A.  You're talking about confirming?

9   Q.  Talking about checking -- if you wanted to see whether the

10  balance, say, that was reported for the COLB on the balance

11  sheet, you could go back into the internal accounting records of

12  CBG, its general ledger, and try to see if the numbers agreed;

13  right?

14  A.  Oh, yes.  Yes.

15  Q.  But that would not tell you anything about whether those

16  assets, the loans themselves, actually existed; right?

17  A.  That -- I mean, that's what management would have been

18  reporting in their numbers, that those balances represent their

19  assets that are on their books.

20  Q.  But you agree, matching up numbers doesn't tell if you

21  actually have loans down in your vault, does it?

22  A.  It wouldn't tell you if you had loans in your vault, no.

23  Q.  So going back to Exhibit P-2958, you see this matrix

24  identifies warehouse lending down at the bottom.  And then if we

25  could turn to page 6 and pull out the middle of the page, this

 1  was called a Warehouse Lending Matrix.  Do you see that?

 2  A.  Yes.

 3  Q.  And do you see it identifies business risks and then it says

 4  what the audit risk is?  And the first one, the first --

 5          THE COURT:  Who prepared this?

 6          THE WITNESS:  I don't know.

 7          THE COURT:  It wasn't a work paper of PwC, was it?  Or

 8  was it?  It wasn't?

 9          MR. SORENSEN:  Let's turn back to the first page.  It

10  is a work paper of PwC.

11          THE COURT:  Okay.

12  Q.  I think I asked you at the beginning, but let me just

13  confirm that.  So this is a work paper for the Colonial

14  BancGroup audit, year end 2002?

15  A.  Yes.

16  Q.  And this is one that I don't believe says who created it,

17  but you can correct me if I'm wrong about that.  Can you tell

18  from the cover sheet who prepared it?

19  A.  Just what's on the screen here, I can't tell.

20  Q.  Okay.  If we could turn back to page 6.

21          MS. MOSS:  Your Honor, if I may help.

22          I think if you turn to page 2 you can answer

23  Mr. Sorensen's question.

24  Q.  Let's turn to page 2.  There we go.  So do you see this one

25  was completed by Wes Kelly and reviewed by Patrick Cox?

1    A.   Yes.

2    Q.   And Wes Kelly, he kept working on the audits after 2002 and

3    up and through 2009; right?

4    A.   Yes.

5    Q.   And then Patrick Cox, he left about the time that you

6    started doing work, around 2004?

7    A.   I'm not exactly sure when Patrick left, but somewhere around

8    there.

9    Q.   Okay.  If we could go back to page 6.  And, again,

10   identifying business risks, you see the second item in the first

11   row says, fraudulent submissions by mortgage companies?

12   A.   Yes.

13   Q.   And that is audit risk that poses is an overstatement of

14   assets, potentially?

15   A.   Yes.

16   Q.   And you understood when you started working the audit that

17   that was a risk that Colonial BancGroup was facing, potentially?

18   A.   I don't remember if I knew that was a specific risk, but

19   overstatement of assets is a risk.

20   Q.   And then if we could turn to page 9.  And down at the bottom

21   of the page there's a table that says, Financial Reporting

22   Matrix.  Do you see that?

23   A.   Yes.

24   Q.   And if we go to the next page, it says -- under Business

25   Objectives, it says, Early identification of red flags and other

1  potential warning signs.

2      Do you see that?

3  A.  Yes.

4  Q.  So as part of your audit, were you trying to have an early

5  identification of red flags that might lead you to believe

6  there's potentially fraudulent activity?

7  A.  As part of planning, you would address risk, however you

8  would want to identify those.  But you would -- as part of the

9  planning, you would identify risks.  Therefore, you could create

10  procedures in order to address those risks.

11  Q.  And you know what a red flag is; right?

12  A.  Yes.

13  Q.  What is a red flag in the audit context?

14  A.  I don't -- you know, I don't specifically know that the

15  standards state red flags.  I don't recall that.  But I would

16  tell you a red flag is some type of item to bring attention to.

17  Q.  You have your deposition transcript in front of you from the

18  TBW case.  I'll put it on the screen here as well.  I would like

19  to go to page 110.

20      And do you see at line 15 I asked you the question:  Are you

21  familiar with the term "red flag" as it's used in the audit

22  context?  And your answer was:  Not in a -- not ness- -- I mean,

23  no.  No, not in a specific context.

24      Did you give that answer?

25  A.  Yes.

1  Q.  Now, can a red flag ever be a good thing?

2  A.  In general terms, I mean, it -- it would depend upon, you

3  know, whose ever outlook it was for a red flag.  But I think in

4  general, as I stated, it would be something to identify an item

5  of interest.

6  Q.  If you could take a look at your deposition transcript at

7  page 113, line four.  And I asked you:  A red flag could be --

8  could be a positive thing.  Is that your testimony?  And your

9  answer was:  Again, if we're talking about a red flag that's a

10  flag flying from a state capitol, it might be, you know.  That

11  may be the state's flag.  You know, I don't know what you mean

12  when you say red flag.  Again, that would be whatever the

13  situation was.

14       Did you give that answer?

15  A.  Yes.

16  Q.  Now, you agree, don't you, that as an auditor, you were

17  required to design procedures to detect fraud?

18  A.  Could you repeat that question, please?

19  Q.  Sure.  As an auditor, when you were working on the Colonial

20  BancGroup audits, you were required to design procedures to

21  detect fraud.

22  A.  The standards state that we have a responsibility to provide

23  reasonable assurance that the financial statements are not

24  materially misstated, whether due to fraud or error.  So it

25  would -- we would perform procedures to address fraud risks.

1  Q.  And under the standard, were you required to design

2  procedures to detect fraud?

3  A.  As I stated, the standards talk about materiality.  So we

4  provide an opinion about the financial statements not being

5  materially misstated, whether due to fraud or error.

6  Q.  My question was under the standards, were you required to

7  design procedures to detect material fraud?

8  A.  We were -- we were -- under the standards, we're required to

9  provide reasonable assurance that the financial statements are

10 not materially misstated.  So therefore, we would perform

11 procedures to address fraud risk.

12 Q.  If we could look at the trial testimony, Mr. Westbrook's

13 testimony, at page 822.

14      THE COURT:  I think his answer was yes, if that's what

15 you're concerned about, counsel.

16      MR. SORENSEN:  Okay.

17 Q.  And did you have a duty to do something with respect to

18 fraud for Colonial BancGroup?

19 A.  The procedures state that we perform procedures to address

20 fraud risk.  Yes.

21 Q.  And you had a responsibility to do something with respect to

22 looking for fraud at your audit client, Colonial BancGroup;

23 right?

24 A.  When you say "looking for fraud," in the -- as the job as an

25 auditor, when you say "looking for fraud," I take that as being

1  like a forensic type audit that I know there's fraud, so then I

2  go looking for it to perform a forensic audit.  So as part of a

3  financial statement audit, I would tell you we're not looking

4  for fraud.  If I'm looking for something, I expect to find it.

5  So as part of our financial statement audit, we're performing

6  procedures to address fraud risk.  So when you say "looking," I

7  think like forensic audit, not what the audit that we would

8  perform, the financial statement audit.

9  Q.  Now, as an auditor, you're supposed to -- you're supposed to

10  expect that fraud might be occurring at an audit client in

11  certain circumstances; right?

12  A.  You can -- you know, as part of professional skepticism, you

13  could -- you know that there's fraud risk.  That's the -- the

14  standard states that that's a presumed risk, is fraud risk.

15  Q.  And you understood that when you were doing your audits,

16  that if there was fraud going on, it was most likely going to be

17  concealed from you.  You understood that; right?

18  A.  I'm not sure how -- if it would have been concealed or not

19  from the auditors specifically.  I'm not sure, if they were

20  committing fraud, what they would have been doing.

21  Q.  But you wouldn't expect to come in and ask people to tell

22  you where -- you wouldn't expect them to tell you where the

23  frauds were, would you?

24  A.  Yes.  I've had that happen in my career where people told me

25  fraud was happening within the company.

1  Q.  You would agree that in most cases, fraud usually -- fraud

2  usually is concealed; right?

3  A.  I would agree with that, yes.

4  Q.  In fact, that's what the standard -- the standards, the

5  auditing standards, say that fraud is usually concealed; right?

6  A.  I don't know what the standard exactly says.

7  Q.  Why don't we look at AU-316.  You're familiar with AU-316;

8  right?

9  A.  Yes.

10 Q.  That's the auditing standard that deals with what an auditor

11 is supposed to do with respect to fraud; right?

12 A.  Yes.

13 Q.  This is Exhibit A-400.  And if we could go to what is page

14 281 of the standard, paragraph 11.  So do you see in the first

15 sentence there in the standard it says, Although fraud usually

16 is concealed.  Do you see that?

17 A.  Yes.

18 Q.  And then it goes on to say, And management's intent is

19 difficult to determine.

20     Do you agree with that?

21 A.  That's what it says.  Yes.

22         THE COURT:  No.  He didn't ask whether you agreed that

23 that's what it says.  He asked do you agree with it.

24         THE WITNESS:  Yes.

25 Q.  So as an auditor, you're supposed to be skeptical of

1  management; right?

2  A.  Yes.  The standards state that we have to be professionally

3  skeptical.

4  Q.  And going in, you're also supposed to expect that there may

5  be concealed fraud that could have a material impact on the

6  financial statements; right?

7  A.  Yes.

8  Q.  And then as a result, given that, you're supposed to design

9  procedures that are aimed at trying to detect any concealed

10 frauds; right?

11 A.  We perform procedures to address fraud risk, and some of

12 those procedures are designed for the purpose of detecting

13 material fraud.

14 Q.  Let's take a look at Exhibit A-3.  If we could pull out the

15 top of the page.  Do you see this is the PwC engagement letter

16 with Colonial BancGroup for 2004?

17 A.  Yes.

18 Q.  And if we could go to the second page and pull out the

19 paragraph -- sorry -- I guess the third page.  Third page,

20 please.  Pull out the paragraph that begins, We will design our

21 audits.

22     Do you see here in the engagement letter it says, We will

23 design our audits to obtain reasonable but not absolute

24 assurance of detecting errors or fraud.

25     Do you see that?

1   A.   Yes.  And it's followed up about material effect.

2   Q.   Okay.  And so PwC was required to design audits to obtain

3   reasonable assurance of detecting material frauds; right?

4   A.   Yes.

5   Q.   And when you were working as an auditor at PwC, did you use

6   some of the training materials that PwC made available to

7   auditors?

8   A.   Yes.

9   Q.   Did you actually go through training as an auditor when you

10  joined PwC?

11  A.   Yes, and throughout my career.

12  Q.   Let's take a look at Exhibit P-2381.  You see this is a

13  training booklet from 2005?

14  A.   Yes.

15  Q.   And if we turn to page 39, here's -- do you see it talks

16  about fraud here?

17  A.   Yes.

18  Q.   And then underneath the bullet points it says, Our

19  profession and our PwC brand are based on public trust.  The

20  public believes that we are rigorously challenging our clients,

21  digging deep and hard to find fraud.

22      Did you understand that part of your job was to dig deep and

23  hard to find fraud?

24  A.   I haven't seen this document before, but I understood my job

25  was to perform procedures to support our audit opinion, which

1  would provide reasonable assurance that the financial statements

2  were not materially misstated.

3  Q.  One of the things that you're supposed to do when you're

4  trying to perform your duties to detect fraud -- one of the

5  things you're supposed to do is have a meeting to talk about

6  potential fraud; right?

7  A.  Yes.  A brainstorming meeting.

8  Q.  And you understand -- you would agree that the brainstorming

9  meeting is an important meeting for the audit team; right?

10  A.  Yes.

11  Q.  And it's required by the standards; right?

12  A.  Yes.

13  Q.  And if you could just look at your TBW deposition in front

14  of you.  Go to page 99.

15      If we look at line four, I asked you:  Were you required to

16  do that?  Referencing a brainstorming session.  And do you see

17  your answer at four was:  I don't think the standards states

18  that you have to have a fraud risk brainstorming meeting.

19      Did you give that answer?

20  A.  Yes.

21  Q.  Okay.  And why don't we take a look at the standard.

22  That's -- A-400 is the exhibit.  And if we could look at

23  paragraph 14.  And this is -- this is AU-316; right?

24  A.  I'm not -- I'm not sure.

25  Q.  If we go back -- maybe we should go back to the top just so

1  we can show what the --

2  A.  I believe it says it at the bottom right there.

3  Q.  Okay.  If we could pull that out again, paragraph 14.  And

4  you see there's a reference in the first bullet to a

5  brainstorming session?

6  A.  Yes.

7  Q.  And if we could also show Exhibit P-1140.  And you

8  understand that from time to time the PCOB will issue its own

9  reports on audit firms and what's happening with auditors who do

10 PCOB audits; right?

11 A.  Yes.

12 Q.  And do you see this is one that released from January 2007?

13 A.  Yes.

14 Q.  And then if we could turn to page 4 and go down to the

15 paragraph -- you see where it says brainstorming sessions?

16 A.  Yes.

17 Q.  If we could pull out the first paragraph there and look at

18 the last sentence.  It says, The brainstorming session also

19 reinforces the concept that the detection of a material

20 misstatement in the financial statements caused by fraud is an

21 essential element of an audit.

22    And do you agree that detection of a material misstatement

23 in the financial statements caused by fraud is an essential

24 element of an audit?

25 A.  Yes.

1  Q.  I would like to turn to the testing -- the work that you did

2  on the COLB and the AOT in 2004.  So we're going to go back to

3  2004.  Now, you understand that COLB was a different transaction

4  structure than warehouse lending; right?

5  A.  The warehouse line?  Just when you say warehouse lending, I

6  think of the entire division.  So you're asking me like COLB

7  versus the warehouse lending line?

8  Q.  Yes.  Let me clarify.  So before there was COLB, Colonial

9  Bank had a credit line that it offered to TBW that it called a

10  warehouse line; right?

11  A.  Yes.

12  Q.  And that was Colonial Bank lending money to TBW; right?

13  A.  Yes.

14  Q.  And the collateral that TBW provided was mortgages; right?

15  A.  I don't recall what the collateral was for that lending --

16  for the line.

17  Q.  But the COLB was supposed to be the purchase by Colonial

18  Bank of individual loans; right?

19  A.  Yes.

20  Q.  And my question was the COLB was a different transaction

21  than the warehouse line; right?

22  A.  Yes.

23  Q.  Now, in -- as part of the 2004 audit, part of your job was

24  to confirm the existence of the COLB assets that Colonial

25  BancGroup was reporting on its balance sheet; right?

1  A.  Yes.

2  Q.  And isn't it true that you never went to the vault to look

3  at any TBW COLB mortgages during 2004?

4  A.  I did not go do that.

5  Q.  And isn't that true for 2005 as well?

6  A.  I did not do that.

7  Q.  You could have done it if you wanted to; right?

8  A.  We performed various procedures around COLB, you know.  We

9  confirmed balances.  We performed controls testing.  You know,

10 that was the work we performed.

11 Q.  And did you try to confirm the existence of COLB loans with

12 a confirmation?

13 A.  We sent confirmations to TBW in regards to the COLB balance.

14 Q.  Let's take a look at that confirmation.  That's A-283.  And

15 if we could pull out the very top part.  Is this a work paper

16 that you reviewed?

17 A.  Yes.

18 Q.  And is that -- those are your initials up there on the left,

19 P. R.?

20 A.  Yes.

21 Q.  And it says, Reverse repurchase agreement received?

22 A.  Yes.

23 Q.  And this is a work paper that you completed for the year --

24 2004 year-end audit?

25 A.  Yes.

1  Q.  And it says, Reverse repurchase agreement.  What does that

2  mean?

3  A.  Reverse -- the definition of that is an instrument where one

4  entity lends money, provides money to another entity, and that

5  entity pledges security, collateral, to then give that money

6  back.

7         THE COURT:  Say that again?  Rather than in a general

8  term, what does it mean here?

9         THE WITNESS:  It's just the title of the work paper

10  to -- I think this is for the confirmation.

11         Is this for the confirmation?

12         MR. SORENSEN:  If you want to take -- you can take a

13  look at the document.

14         THE COURT:  Well, can you put the whole document on the

15  screen?

16         MR. SORENSEN:  Oh, sure.  We can -- why don't we go to

17  the next page.  This is a short document.  We can go to -- if we

18  could blow that up a little bit.

19         THE WITNESS:  Yes.  So that was just the title of the

20  work paper where this confirmation was placed.

21         THE COURT:  Wait.  Let me understand that.  Can you go

22  back?

23         MR. SORENSEN:  Sure.  First page?

24         THE COURT:  First page.  So the -- so this is just the

25  title, and the rest of the page is a blank; right?  Is it?

1          THE WITNESS:  It was an external work paper, so it

2   would just have the title on it.  And then this confirmation

3   would have just like been slid into the pocket.

4          THE COURT:  Is this a CBG paper or yours?

5          THE WITNESS:  It's a PwC work paper.

6          THE COURT:  Okay.  Go ahead.

7   BY MR. SORENSEN:

8   Q.  And the reference to reverse purchase agreement, that's not

9   a reference to COLB transactions, is it?

10  A.  No.  It's just the title on that work paper.

11  Q.  Is it a reference to AOT transactions?

12  A.  No.

13  Q.  Is there -- you understand there was no reverse repurchase

14  agreement between TBW and Colonial; right?

15  A.  That's correct.

16  Q.  Do you know why that -- why it says reverse repurchase

17  agreement?

18  A.  When we built the database each year, you would go to the

19  U.S. master general file and pull in steps.  And so -- you know,

20  I don't recall what was available in there.  And so we pulled

21  this work paper out and used that to -- as a place holder for

22  the testing.

23  Q.  So --

24         THE COURT:  Okay.  I get it.  It had nothing to do with

25  anything specific to this audit.  It was just a work paper

1  that -- a form that you had, and then you put things behind it.

2  Is that right?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  Okay.

5  Q.  So what happened was somebody went into the database and

6  pulled out forms for reverse repurchase agreements; right?

7  A.  That's correct.

8  Q.  And those got put in the work papers?

9  A.  Yes.

10  Q.  And even though there are no reverse repurchase agreements

11  here, those got put in the work papers; right?

12  A.  Yes.

13          THE COURT:  I think it was a plot to just confuse us.

14  I'm kidding.  I didn't really think that.  It was confusing, but

15  we got it that it doesn't apply.  Okay.

16  Q.  And you understood, didn't you, that the steps for reverse

17  repurchase agreement were different than the steps for COLB or

18  AOT; right?

19          THE COURT:  Wait a minute.  I thought -- wait a minute.

20  I thought there were no reverse repurchase agreements.  What

21  whatever the steps were, it doesn't apply because this is just a

22  form they happened to use that had that title on it.

23          Am I right?

24          THE WITNESS:  Can I answer that?

25          THE COURT:  Yes.

1          THE WITNESS:  So, again, this step would have came out

2    of just a master guide, and it has steps associated with it.

3    These were not applicable.  Therefore, the steps were not

4    applicable.  However, as an engagement team, we would have known

5    that we were testing AOT and COLB.  And therefore, we would have

6    performed procedures that the engagement team determined to

7    perform, regardless if they were in this work -- in the guidance

8    or not.

9          THE COURT:  You can keep going, counsel.

10          MR. SORENSEN:  Okay.

11    Q.  Those are -- that's your handwriting up there; right?

12    Reverse repurchase agreement?

13    A.  No.

14    Q.  Okay.  Well, somebody wrote that; right?  That's not

15    something that came out of a form somewhere; right?

16    A.  Someone wrote that.  Yes.

17    Q.  Let's take a look at the confirmation that's attached here.

18    If we go -- go to the last page of this, you'll see there's an

19    e-mail.  At the top -- this is an e-mail from you to Lee Farkas

20    in January of 2005; right?

21    A.  Yes.

22    Q.  And you asked Mr. Farkas.  You say, Lee, I was hoping I

23    could get a reply from you on these balances.  You see that?

24    A.  Yes.

25    Q.  And you were on a -- so you were on a first-name basis with

1  Mr. Farkas?

2  A.  I wouldn't have called him Mr. Farkas, so I -- I never met

3  the man, so I just called him by his first name.

4  Q.  And if we look down at the bottom, you'll see you're asking

5  for information from him; right?

6  A.  Yes.

7  Q.  And you say, number one, in regards to the repurchase

8  agreement with CBG and Colonial, could you please confirm the

9  outstanding balance of -- right.  Now, I think we just

10  established there was no repurchase agreement; right?

11  A.  Yes.

12  Q.  Okay.  So this is your -- you're asking for a balance for

13  what?

14  A.  The sentence right below it says, If this helps, CBG has its

15  repurchase agreement identified as TBW AOT, assignment of trade.

16  So maybe I was, you know, trying to just help him identify what

17  we were looking for.

18  Q.  Okay.  So that's -- you're asking about AOT balance; right?

19  A.  Yes.

20  Q.  And then down in number two, you list three items there.

21  And the third one is the COLB assets; is that right?

22  A.  Yes.

23  Q.  Now, for COLB and --

24        THE COURT:  Let me interrupt a minute.  What was your

25  understanding of the difference between the warehouse line and

1  the COLB line?

2       THE WITNESS:  So the warehouse line was the original

3  lending agreement, and then the COLB facility was where Colonial

4  was purchasing an interest in those loans.  So Colonial was

5  purchasing the loans rather than lending the money in the

6  warehouse line.

7       THE COURT:  Was that your understanding of the

8  difference, then?  They were purchasing the loans rather than

9  lending money and taking the loans as collateral?

10      THE WITNESS:  Yes, ma'am.

11      THE COURT:  Okay.

12 Q.  And so you were asking Mr. Farkas to tell you what the

13 balance of the COLB and the AOT were as of these dates; right?

14 A.  Yes.

15 Q.  Okay.  And if we go to page 2, we see the response that

16 comes back from Mr. Farkas.  And those notations there, did you

17 make those?

18 A.  Yes.  That's my handwriting.

19 Q.  And it says, repurchase agreement balances.  Do you see

20 that?

21 A.  Yes.

22 Q.  Okay.  That's the AOT; right?

23 A.  Yes.

24 Q.  Okay.  There was no -- there was no repurchase agreement

25 between TBW and CBG; right?

1  A.  Correct.

2       THE COURT:  We did go through a lot just to find out

3  that there was no -- according to you, there was no repurchase

4  agreement.  So why are you and Farkas referring to a repurchase

5  agreement?

6       THE WITNESS:  I don't recall why we used those exact

7  wording.  But we knew what it was, because in my previous

8  e-mail, you know, I stated, if this helps, they refer to it as

9  AOT something.  And based on these tick marks, we agreed these

10 balances to the balances in the financial statements, which was

11 the -- for these two items, the top two, were the AOT balances.

12 I don't recall why we used those specific wordings, but we did

13 know it was AOT.

14 Q.  And you are familiar with what an actual repurchase

15 agreement is; right?

16 A.  Yes.

17 Q.  And that's typically a case where someone has Treasury

18 securities that they need -- that they agree to sell to someone

19 and buy them back in a short period of time because they need a

20 short-term loan; right?

21 A.  Something like that, yes.

22 Q.  Okay.  And that's very different from what we have here, the

23 AOT, which is pools of loans being purchased; right?

24 A.  They're different, but the only thing I would say is they're

25 both -- would be considered liquid, current assets.

1  Q.  Do you think pools of loans are liquid assets?  Is that --

2  A.  Securities purchased under agreement to resell were shown as

3  current assets in the financial statements.

4       THE COURT:  But these weren't securities.  These were

5  mortgage loans, weren't they?

6       THE WITNESS:  AOT were securities purchased under

7  agreement to resell.

8  Q.  Earlier I asked you -- you agree these were pools of loans;

9  right?  The AOT transaction is pools of loans; right?

10  A.  There is a pool of loans that has been put together, and

11  it's -- it's a -- it then becomes a security.

12       THE COURT:  But these haven't been securitized yet.

13  They don't get securitized until they go to either -- I may be

14  misunderstanding this, but I thought they didn't get securitized

15  until they went to either Fannie Mae or Freddie Mac or whoever

16  was doing it at the time.

17       THE WITNESS:  I don't know that answer.  But in the

18  financial statements, they're referred to as securities under

19  agreement to resell.  That's how they're referred to.

20  Q.  You understood that they were -- you understood that COLB

21  was individual mortgage loans that Colonial Bank was supposed to

22  be purchasing; right?

23  A.  Yes.

24  Q.  And you understood AOT was like COLB except it was pools of

25  loans; right?

1  A.  That was represented by an investment security.

2  Q.  But on the balance sheet, the balance sheet we looked at,

3  you understood that that balance sheet, the number for AOT,

4  those were pools of loans, not securities.  You understood that;

5  right?

6  A.  The financial statements refer to them as securities under

7  agreement to resell.  It doesn't say they're pools of loans.  It

8  says they're securities under agreement to resell.

9  Q.  That's what it says.  But you understood that the actual

10  asset was a pool of mortgages; right?

11  A.  I don't know if we're splitting hairs here or not.  I don't

12  recall the -- you know, at what point it becomes securitized or

13  what.  But my understanding of AOT is that Colonial bought the

14  security that was under agreement to resell, that that was a

15  pool of loans, but it was the security that would have a quick

16  turnaround to be sold off to an end investor.

17  Q.  You understood that there was a lag between the time the

18  pools of loans came to Colonial Bank and a security was issued

19  by Freddie Mac or Ginnie Mae; right?

20  A.  I don't recall the specifics of a lag with the AOT.  I just

21  don't remember.

22         THE COURT:  So your understanding was that the purchase

23  that was being made by Colonial was the purchase of a security.

24         THE WITNESS:  Yes.

25         THE COURT:  Okay.

1   Q.  In we could put up the trial testimony from Mr. Westbrook,

2   page 1587, line 12.  And the question was:  Now, on the AOT

3   transaction, the AOT transaction, I think you testified that the

4   asset that Colonial was supposed to be buying was a pool of

5   loans; right?  Yes.

6       Now, Mr. Rivers, you disagree?  You don't believe the asset

7   that was supposed to be on the balance sheet was a pool of

8   loans?

9   A.  As I just stated, I think we may just be splitting hairs in

10  the fact that a pool of loans was then represented by a security

11  under agreement to resell.  So that security represents that

12  pool of loans is my understanding.

13          THE COURT:  Okay.  I think you've -- I think what we've

14  learned is that he has a different understanding and that the

15  correct understanding, I think -- I think the correct

16  understanding that everyone has agreed to so far is that it's a

17  pool of loans until such time as it gets securitized by

18  whichever agency was doing it at the time; right?  Okay.

19  Q.  Let's go back to A-283, the confirmation that we were

20  looking at.  If we go to page 2 and pull out the middle part.

21  And you see down at the TBW COLB line, it says 489 million?

22  A.  Yes.

23  Q.  And part of what you're trying to do in confirmation is

24  confirm existence of assets; right?

25  A.  Yes.

1   Q.  And this piece of paper where Mr. Farkas says we owe 489

2   million on the COLB, that doesn't tell you anything about

3   whether Colonial Bank has $489 million worth of mortgages in its

4   vault, does it?

5   A.  Well, in your question, you stated that TBW would owe the

6   money on COLB.  CBG purchased an interest in those loans.  So my

7   understanding is that that balance represents the -- what

8   Colonial had purchased.  So that was that line item, not what

9   TBW owed them.  But it -- it verifies the existence of that

10  balance.

11  Q.  You understood that TBW could not confirm for Colonial Bank

12  what Colonial Bank had in its own vault; right?  You understood

13  that.

14  A.  That -- to me, the purposes of the confirmation was not

15  asking TBW to confirm to us what Colonial had in their vault.

16  It was to confirm to us the balance of the COLB line.

17  Q.  My question was this piece of paper doesn't tell you

18  anything about what COLB loans may or may not be in Colonial

19  Bank's vault; right?

20  A.  It doesn't tell me certain things, and that's not one of

21  them.  It tells me what the balance is as of November 30th.

22  Q.  And the balance, all that refers to is -- the only thing

23  this tells you is that TBW is saying, we did $489 million worth

24  of COLB transactions with Colonial BancGroup.  That's what this

25  tells you; right?

1  A.  I disagree with that.  I mean, I don't know how -- they may

2  have done way -- I would -- I don't know how -- I don't know how

3  many transactions they did; but as of November 30th, it's

4  stating that's the balance at November 30th, not the -- not how

5  many transactions they conducted.

6  Q.  Okay.  Now, that's a fair point.  They may have done more

7  than 489 million.  But as of this date, TBW is saying what we've

8  shipped to Colonial, what Colonial should have, is $489 million

9  worth of COLB loans; right?

10  A.  Again, when you talk about shipped and those kind of things,

11  I -- that's not the purpose of the confirmation, is asking what

12  they shipped to Colonial.  The purpose of the confirmation is

13  asking TBW to confirm the balance of the COLB line as of

14  November 30th, not what was shipped and maybe not what had not

15  been shipped.

16        THE COURT:  Okay.  The balance as of November 30th

17  would be what?

18        THE WITNESS:  The amount of COLB loans that Colonial

19  owned at that point in time.  Whether the mortgage had been

20  shipped or not, I don't know.

21  Q.  So this -- you're saying that this confirms for Colonial

22  what it owns on the COLB?  Is that your testimony?

23  A.  Yes.  That's my understanding at that point in time.

24  Q.  You understand that TBW was supposed to be selling those

25  mortgages to Colonial; right?

1  A.   For the COLB line, yes.

2  Q.   And Colonial was supposed to have those mortgages; right?

3  A.   I don't know where the mortgages were supposed to be.

4  Q.   You don't know that they were supposed to be in the vault at

5  Colonial Bank?

6         THE COURT:   I thought your point was that he never

7  looked, so he wouldn't know whether they were there or not.

8         MR. SORENSEN:   He was supposed to know where they were

9  supposed to be.  He never looked.

10 Q.   But you knew that the loans were supposed to be -- if it was

11 working properly, the loans were supposed to be shipped to

12 Colonial Bank; right?

13 A.   I -- I have no idea where the loans would be.  I know other

14 institutions perform custodial responsibilities for others and

15 hold mortgages for others, so I'm not sure that every

16 institution that has a mortgage has physical -- you know,

17 physical ownership of that document.  I don't know that.

18 Q.   But we're just talking about Colonial Bank here.  And did

19 you ever read the Colonial Bank COLB agreement?

20 A.   Not that I recall.

21 Q.   So you don't know -- you don't know what the terms of the

22 COLB agreement were?

23 A.   No.

24         THE COURT:   Is this a good place to take our break now?

25         MR. SORENSEN:   Yes.

1       THE WITNESS:  Yes.

2       THE COURT:  Okay.  We'll be in recess for 15 minutes.

3  You may step down.

4      (Recess was taken from 10:40 a.m. until 11:01 a.m., after

5       which proceedings continued, as follows:)

6  BY MR. SORENSEN:

7  Q.  Mr. Rivers, before we took our break, we were looking at

8  this confirmation that you sent -- or that you got back from

9  Mr. Farkas.  We were looking at the COLB line, $489 million.  Do

10  you see that?

11  A.  Yes.

12  Q.  And it says -- in the confirmation it says, balances; right?

13  Does it say confirmed -- it says balances; right?

14  A.  For the first -- yes.  Repurchase agreement balances.  Yes.

15  Q.  And isn't the -- the 489 down there, is that a balance for

16  the COLB?

17  A.  As of November 30th, yes.

18  Q.  Now, it's true, isn't it, that -- it's not true that

19  Colonial owed --

20       MR. SORENSEN:  Strike that question.

21  Q.  It's not true that TBW owed Colonial $489 million as of that

22  date; right?

23  A.  My understanding of COLB is that that 489 million represents

24  Colonial's interest ownership in individual loans.

25  Q.  So as of this date, TBW doesn't owe Colonial Bank anything

1   for COLB loans if those loans, in fact, were sales; right?

2   A.   The confirmation is in regards to Colonial's assets, but my

3   understanding, again, is that this is a confirmation for

4   Colonial's assets that they own.

5   Q.   So just to be clear, the way COLB was supposed to work, it

6   was supposed to be a sale of loans to Colonial; right?

7   A.   Yes.

8   Q.   And Colonial was supposed to send money to TBW, and that

9   would be -- that would be the end of it; right?

10  A.   As far as that part of the transaction goes, yes.

11  Q.   So TBW is -- as you read this, TBW is saying, we got $489

12  million from Colonial Bank; right?  Isn't that partly what this

13  says?

14  A.   As of that date.

15  Q.   And what you're trying to do when you're doing existence

16  testing is determine whether Colonial Bank actually got

17  something in return for the $489 million; right?

18  A.   Well, again, what we're trying to do is -- in this is send a

19  confirmation to a third party that they would verify the balance

20  as of that date.  And that balance represents Colonial's

21  interest in those loans.

22  Q.   So you're asking -- you're asking TBW to tell you what COLB

23  assets Colonial Bank owns; right?

24  A.   Well, management has told us what the number is, and we're

25  asking TBW to confirm that.

1    Q.  You're asking TBW to tell you what COLB loans Colonial Bank

2    owns as of this date; right?

3    A.  Yes.

4    Q.  And if we just go back to A-64, the balance sheet we looked

5    at earlier for 2004.  If we could go to page 55 and pull out the

6    assets.  And, you know, we see loans held for sale, that's COLB,

7    $678 million; right?

8    A.  Yes.

9    Q.  And that's what Colonial Bank is reporting as -- it's

10   reporting that it has $678 million worth of COLB loans; right?

11   A.  Yes.

12   Q.  And you testified earlier that you don't know where the COLB

13   loans, the physical loans, where they were supposed to be;

14   right?

15   A.  Yes.

16   Q.  And so how -- you had no -- how did you know whether they

17   existed or not if you didn't know where they were?

18   A.  Well, again, as part of the confirmation, it is to ask a

19   third party to verify -- confirm the balance.  So to me, this

20   would be no difference than sending a confirmation for accounts

21   receivable.  So if I sold a widget to a company and asked them

22   to owe us -- tell us how much they owed my client, I have no

23   idea where that widget is that they may have purchased.  So the

24   purpose is getting a confirmation of the balance at a point in

25   time.

1  Q.  But you understand that account receivable confirmation is

2  very different because you're asking a customer to confirm what

3  it owes to your client; right?

4  A.  Well, it's a confirmation from a third -- I mean, you could

5  send confirmations of all sorts of balances.  And so, again,

6  we're asking a third party to verify a balance, not what a

7  mortgage may be.

8  Q.  But you understand that there is no balance on the COLB

9  because Colonial Bank doesn't owe any money for the COLB assets

10  because it was supposed to be purchasing them; right?

11  A.  However, TBW would know what they sold to Colonial Bank.

12  Q.  Does TBW know whether Colonial Bank has $678 million worth

13  of COLB mortgages as of December -- the end of December 2004?

14  A.  I'm not sure what they know; but I know at November 30th,

15  they confirmed what the balance was as of November 30th.

16  Q.  But they didn't confirm -- TBW couldn't tell Colonial Bank

17  and couldn't tell you whether Colonial Bank had $678 million

18  worth of COLB mortgages; right?

19  A.  I don't know if they could or not.  I didn't ask them.

20  Q.  Could TBW tell Colonial Bank what it had in its vault?

21  A.  I don't know.  I didn't ask -- I didn't ask them to do that.

22  Q.  Does TBW have access -- did TBW have access to the Colonial

23  Bank vault in the custody department?

24  A.  I do not know if they had access or not.

25  Q.  Do you think that TBW had access to Colonial Bank's

1  custodial department vault?

2  A.  I don't know.

3  Q.  You would agree, wouldn't you, that the best way to find out

4  what's in the vault in the trust department is to ask people in

5  the trust department?

6  A.  So are you -- is your question just what -- asking someone

7  what is in the vault is the best way to find out?  Just wanting

8  to know what's in the vault?  You could -- you could ask them

9  what is in the vault.  You could do other things, but you could

10 also ask.

11 Q.  And the physical -- you understand the COLB assets, those

12 are physical assets; right?

13 A.  Those mortgages, yes.

14 Q.  All right.  Physical mortgages that you can look at and you

15 can inspect; right?

16 A.  You could, yeah.

17 Q.  And you could, if you -- if you knew where they were, and I

18 think you testified earlier you didn't know where the COLB

19 mortgages were; right?

20 A.  I don't recall where they would have been.

21 Q.  But if you had known where they were, you could have gone

22 and physically inspected at least some of them; right?

23 A.  I know based on looking at work papers that we did look at

24 loans for COLB.  You know, I don't know where those loans came

25 from, where -- who provided them.  But I do know, based on

1 looking at work papers, that we did look at COLB mortgages.

2 Q.  But you didn't look at TBW COLB mortgages; right?

3 A.  Based on the work papers we reviewed, yes, we -- we did look

4 at COLB TBW mortgages.

5 Q.  But you didn't look at TBW COLB mortgages; right?

6 A.  I don't specifically recall.

7 Q.  We can look at the work paper.  You've seen the work

8 paper -- right? -- that has all the lists of loans for the

9 different TBW lines.  Right?

10 A.  Yes.

11 Q.  And there never -- no one on PwC's audit team ever looked at

12 a TBW COLB loan; right?

13 A.  I can't remember the answer.  As I stated, in looking at

14 work papers, I remember looking at -- the team looked at

15 specific mortgages.  I can't remember specifically if it was TBW

16 COLB or not.

17 Q.  If we could put up the trial testimony from Mr. Westbrook,

18 page 1562.  And at line nine, I asked Mr. Westbrook about

19 looking at COLB loans.  And then at line 15, I asked him:  Just

20 to be clear, your team never tested for existence any TBW COLB

21 loan in this year; correct?  And he said no.

22     And then the Court asked:  Not correct or -- and then he

23 said:  No, we did not test it.  Yes, that is correct.

24 Q.  The testing that was done on COLB was not for TBW COLB;

25 right?

1   A.   What I -- I don't know the context of what we're looking at

2   or -- what year are we referring to?  I don't know the context

3   of your question.  Sorry.

4   Q.   2000 -- 2004.  We're looking at 2004, the existence testing.

5            THE COURT:  Counsel, why don't we just leave it?  He

6   isn't sure.  We know the answer.  We got it from Mr. Westbrook.

7   Let's go.

8            MR. SORENSEN:  Okay, Your Honor.

9   Q.   And if we could just look at the standard, Exhibit D-2525.

10  This is AU-326.  If we could go to page 3.  You see at the top

11  there it says, Evidential matter.  And you understand this is

12  the standard that talks about the evidence that you need to

13  support your audit opinions; right?

14  A.   It talks about that, yes.

15  Q.   And in paragraph two it says, Most of the independent

16  auditors' work in forming his or her opinion on financial

17  statements consists of obtaining and evaluating evidential

18  matter.

19       Do you see that?

20  A.   Yes.

21  Q.   And that's -- that's what you're required to do as an

22  auditor -- right? -- obtain and evaluate evidence?

23  A.   Yes.  We look at evidence.  Yes.

24  Q.   And then if we look at paragraph four, this goes exactly to

25  the issue we were talking about; right?  It says, Assertions

1  about existence or occurrence address whether assets or

2  liabilities of the entity exist at a given date.  Right?

3  A.  Yes.

4  Q.  And that's what we were looking at.  Management was saying,

5  we own all of these COLB assets.  And part of your job was to

6  determine if they actually existed; right?

7  A.  Provide reasonable assurance.  Yes.

8  Q.  And if we look further down in the standard at paragraph 20,

9  which is on page 449 of the document -- if we could pull out

10 paragraph 20.  In the middle of the page, you see there is a

11 sentence that says, Assets having physical existence are

12 available to the auditor for his or her inspection.

13     Do you see that?

14 A.  Yes.

15 Q.  And physical assets are things like mortgage files; right?

16 A.  Could be, yes.

17 Q.  So the COLB assets were physical assets; right?

18 A.  Yes.

19 Q.  And the AOT assets, pools of loans, those are also physical

20 assets; right?

21 A.  Yes.

22 Q.  That an auditor can physically inspect; right?

23 A.  Yes.

24 Q.  And then further down in the standard it talks about, in

25 paragraph 21, competence of evidential matter.  And you

1  understand that some evidence is more persuasive than other

2  evidence; right?

3  A.   Agree.

4  Q.   And if we look at C under paragraph .21, it says, The

5  independent auditors' direct, personal knowledge obtained

6  through physical inspection, observation, computation, and

7  inspection is more persuasive than information obtained

8  indirectly.

9       Now, information obtained indirectly would be something like

10  a confirmation; right?

11  A.   Yes.

12  Q.   And something -- a physical inspection, like looking at a

13  mortgage loan file, that is more persuasive evidence than a

14  third-party confirmation; right?

15  A.   Whoever is underlining that, yeah, they're underlining that.

16  However, in point A, it also talks about evidential matter can

17  be obtained from independent sources outside an entity.  It

18  provides greater assurance of reliability for the purpose of an

19  independent audit than that secured solely within the entity.

20       So it also addresses that -- that way to obtain evidence.

21  Q.   And confirmations can -- they can have value -- they can

22  have value, and they can be persuasive in some circumstances;

23  right?

24  A.   The standards state that a third-party confirmation is one

25  of the best forms of evidence.  Yes.

1  Q.  And what this says is, just to bring it specifically to our

2  case, is that looking physically at mortgage files, that's more

3  persuasive evidence than getting a confirmation from someone;

4  right?

5  A.  From a practicality standpoint, I don't necessarily go

6  look -- do a physical examination of every account that I would

7  audit.  So if I could get a third-party confirmation, again,

8  from a third-party source, I would rely on that as persuasive

9  evidence that that asset exists without having to go physically

10  look at it.

11  Q.  Now, you don't have to -- for the COLB, the TBW COLB, you

12  could have looked at a sample of COLB loans; right?

13  A.  You -- we could have, or we could have sent a confirmation

14  or other procedures we could have performed.

15  Q.  In fact, you did that for other customers other than TBW;

16  right?

17  A.  Did what?

18  Q.  You actually physically looked at loan files.

19  A.  Yes.  I don't know if we looked at it for TBW or not, but I

20  do know we looked at loan files.  I'm not aware if TBW was

21  included in that or not, as I previously stated.

22  Q.  I would like to talk about the AOT transaction now.  Now,

23  you understand that the AOT transaction was a different kind of

24  transaction than warehouse lending or the warehouse line that

25  Colonial Bank had with TBW; right?

1   A.   Yes.

2   Q.   And you also agree that as an auditor, you can't audit a

3   transaction that you don't understand; right?

4   A.   You're supposed to obtain an understanding of the

5   significant, you know, process that that transaction may be

6   occurring in.

7   Q.   And if we could look at A-64 again, the balance sheet for

8   2004.  And if we could pull out the assets again.  And the

9   federal funds sold and securities purchased under agreements to

10  resell, the amount of AOT assets being reported is $246 million,

11  about; right?

12  A.   Yes.

13  Q.   And in the prior year, there were no AOT assets; right?

14  A.   Yes.

15  Q.   So AOT was a brand new transaction in 2004; right?

16  A.   Correct.

17  Q.   And $246 million, that's a material amount; right?

18  A.   Yes.

19  Q.   You would call that the AOT -- you would call that a

20  significant account; right?

21  A.   Yes.

22  Q.   And if we could take a look at Exhibit D-2482.  That's

23  AU-311.  And if we could go to the third page and pull out the

24  heading at the top.  This is an auditing standard that applies

25  to planning and supervising an audit; right?

1  A.  Yes.

2  Q.  And you're familiar with this standard?

3  A.  Yes.

4  Q.  And if we could turn to page 242 of the standard.  That's

5  paragraph .06.  And you see it says here that an auditor -- The

6  auditor should obtain a level of knowledge of the entity's

7  business that will enable him to plan and perform his audit in

8  accordance with Generally Accepted Auditing Standards.  That

9  level of knowledge should enable him to obtain the understanding

10  of the events, transactions, and practices that in his judgment

11  may have a significant effect on the financial statements.

12       You would agree, wouldn't you, that that $246 million of AOT

13  assets, those were transactions that could have a significant

14  effect on the financial statements; right?

15  A.  Yes.

16  Q.  And then it goes on to say here in the standard that you

17  should have, as an auditor, a level of knowledge that will

18  enable you to understand the transaction; right?

19  A.  Yes.

20  Q.  And let's take a look at the PwC audit manual, P-1486.  This

21  is an excerpt from the audit manual.  And you see at the top

22  there, there's a date that says February 2005?

23  A.  Yes.  Sorry.  Yes.

24  Q.  And this is an excerpt from the PwC audit manual that

25  applies to U.S. clients; right?

1  A.  Yes.

2  Q.  And if you look under the overview section, first paragraph,

3  it says, During the course of an audit, we come across various

4  types of contracts or agreements.  We need to examine these

5  documents, gain a thorough understanding of their contents, and

6  ensure that they are valid and that they are properly disclosed

7  in the financial statements.

8      Do you agree that that's -- you are required to do that?

9  A.  I look at this as -- normally I would refer to this as PwC

10  audit guide.  So, again, I look at this as guidance.  And the

11  engagement team is allowed to use professional judgment on what

12  we deem for that engagement that we need to do.  So we may deem

13  to read a contract or not, depending on that engagement team's

14  judgment.

15  Q.  So in your view, you didn't have to follow what was in the

16  PwC audit manual?

17  A.  That's not what I said.  In my view, it is a guide that

18  would do exactly that, help guide you in your performance.  You

19  could look at this guidance and help you determine what you may

20  perform as your procedures on your audit engagement.

21  Q.  And you understood that the PwC audit manual, it's

22  different -- it's not -- it's not the standards that apply to

23  your audits; right?

24  A.  I would agree it's not authoritative.

25  Q.  You understood that in drafting the manual, PwC was trying

1  to make sure that you complied with the standards; right?

2  A.  I didn't draft it, but that -- yes.  That would be the

3  firm's goal is to be compliant with standards.  Yes.

4  Q.  And if you look further down on the section further down the

5  page, 5722, it talks about controls testing.  You see that?

6  A.  Yes.

7  Q.  Okay.  And under there it says, We should first consider the

8  controls surrounding significant contracts by identifying

9  controls management has in place to -- and then it goes on to

10 say, identify all new significant contracts.  And then it goes

11 on to say, ensure all new significant contracts have been

12 appropriately authorized.

13      Now, the AOT, I think you said, was a significant

14 transaction; right?

15 A.  Yes.

16 Q.  And you know that in 2004, 2005, there was no contract for

17 the AOT; right?

18 A.  There were contracts in place as far as -- I've seen like an

19 assignment of trade in the work papers.  So there were contracts

20 in place with -- that Colonial had for AOT.

21 Q.  But you understood that there was no master or governing

22 document that governed the AOT transactions before 2006; right?

23 A.  I know that now.  Yes.

24 Q.  And, in fact, you never -- you never reviewed any AOT

25 contracts while you were doing your audit work; right?

1   A.  Again, as I stated, I have reviewed an AOT contract in the

2   work paper in regards to actual assignment of trade but have not

3   reviewed a -- I think you said a master agreement.

4   Q.  You understood that there was a -- you understood for the

5   COLB that there was a master agreement called a participation

6   agreement that was supposed to govern how COLB would operate?

7   A.  I don't recall knowing if there was an agreement for COLB or

8   not.

9   Q.  For transactions like these involving hundreds of millions

10  back in 2004 and billions in 2008, you would -- as an auditor

11  you would expect to see a contract, wouldn't you?

12  A.  That's -- that's a management practice.  So what management

13  does and how they enter into contracts with their vendors or

14  customers is management's decision.

15  Q.  So as an auditor, if a company is doing billions of dollars

16  of transactions without contracts, that wouldn't concern you?

17  A.  As long as I could obtain evidence in other ways to audit

18  those transactions, then I would, you know, perform other

19  procedures to gain that evidence.

20  Q.  Under -- if we go down further under Substantive Testing.

21  Now, there's a difference between controls and substantive

22  testing; right?

23  A.  Yes.

24  Q.  And substantive testing is -- can include trying to figure

25  out if things exist; right?

1  A.  Controls could cover that, too, but substantive would

2  address existence assertion.  Sure.

3  Q.  And part of -- part of what -- when it comes to the COLB and

4  the AOT, if you're trying to confirm existence, don't you need

5  to know what it is that Colonial Bank is supposed to be

6  receiving?

7  A.  For AOT and COLB?

8         THE COURT:  Which one are we talking about now?

9  Q.  Okay.  Well, we'll take them -- let's say COLB.  For COLB,

10  as an auditor, if you're trying to confirm that something

11  exists, don't you have to know what is the asset that's supposed

12  to be received?

13  A.  We knew that Colonial was getting a 99 percent interest in a

14  loan and sent a confirmation with that respect.

15  Q.  My question is you need -- as the auditor, you need to know

16  what the assets are supposed to be; right?

17  A.  And we knew what that was.

18  Q.  And for the AOT as well, you needed to know what it is

19  Colonial Bank was supposed to be receiving; right?

20  A.  Yes.

21  Q.  And in connection with those transactions, you needed to

22  know which documents Colonial Bank was supposed to be receiving;

23  right?

24  A.  I don't -- I don't -- can you ask me that question again?

25  I'm not sure I know what you're asking.

1  Q. If you're -- for the AOT, if you're trying to confirm that

2  Colonial Bank actually has the AOT assets it's supposed to have,

3  don't you need to know what documents it was supposed to be

4  receiving?

5  A. Again, you could test the existence of those items by, you

6  know, different audit procedures. You could perform different

7  procedures to gain existence comfort. I'm not sure, you know,

8  about the documents.

9  Q. Did you know what documents Colonial Bank was supposed to be

10 receiving in the AOT transactions?

11 A. I don't recall exactly what documents they were receiving.

12 Q. Do you recall any of the documents that Colonial Bank was

13 supposed to be receiving?

14 A. The one I mention earlier, I have seen and do remember

15 looking at an assignment of trade. That's the only document I

16 specifically remember with respect to AOT.

17 Q. Do you know which document Colonial Bank was supposed to be

18 receiving that was the evidence of its interest in the pools of

19 loans?

20 A. Again, other than the one assignment-of-trade contract,

21 that's the only document I recall.

22 Q. Did you know whether Colonial Bank was supposed to receive

23 any document at all that would be evidence of its interests in

24 pools of loans?

25 A. Other than the one I've seen, that's -- that's the only

1   document I know of.

2          THE COURT:  I bet if you ask him another question,

3   you're going to get -- along those lines, you're going to get

4   the exact same answer, counsel.

5          MR. SORENSEN:  I'll move on, Your Honor.

6   Q.  Under Substantive Testing, it says, We should ask the client

7   for a complete list of all new significant contracts entered in

8   during the period, and we should read them, ensuring the

9   following.  So you never -- you didn't ask Colonial Bank for the

10  AOT contract back in 2004, did you?

11  A.  As I just stated, I would consider the assignment of trade

12  that I looked at as a contract.  And I asked for that.

13  Q.  But you didn't ask for the master agreement; right?

14  A.  I did not.

15  Q.  And then it says here, Review of the contracts should be

16  performed by an appropriately experienced team member,

17  preferably one who was involved in the planning stage of the

18  audit and has a good understanding of the business.

19      Do you see that?

20  A.  Yes.

21  Q.  And then it goes on to say, Obtain for review whenever

22  practical the original or a certified copy of a contract.

23      Do you see that?

24  A.  Yes.

25  Q.  And you do agree -- right? -- that if you're trying to look

1  at a contract, it's important to have one that's an original?

2  Right?

3  A.  I would disagree with that.  In the world we live in, with

4  scans and the various electronic signatures, I -- I -- I don't

5  know that I ever look at an original document anymore.

6  Q.  You would at least look at one that's signed; right?

7  A.  If there's one available, I would take it, whether it was

8  signed or unsigned.

9  Q.  So did you make a decision as part of the 2004 audit not to

10  review the AOT agreement?

11  A.  I don't know that I specifically made a decision not to

12  review it.  I don't recall that I would have made that decision.

13  Q.  Now, the AOT transaction, did you understand that these were

14  pools of loans that were supposed to be delivered to the

15  agencies like Freddie Mac and Ginnie Mae?

16  A.  As we mentioned earlier, you know, I'm not sure the

17  terminology is "pools of loans" or "security under agreement."

18  I don't recall the process of that.  But I do know that there

19  were people like Freddie -- the GSA is involved as the end

20  investor in those.

21  Q.  But you did understand that there were -- the transaction

22  involved pools of mortgage loans; right?

23  A.  That's correct.

24  Q.  And you understand that when there are pools of mortgage

25  loans that are going to be securitized or sent to Freddie and

1   Ginnie, that there are documents that are associated with

2   pooling transactions; right?

3   A.  Yes.

4   Q.  And these have to be -- these pools have to be certified

5   that they meet the standards of Freddie Mac and Ginnie Mae;

6   right?

7   A.  I don't know what the -- I don't recall what all the

8   standards or certifications are on those.  I just don't recall.

9   Q.  But you understood that there were documents that reflected

10  pools being certified or there were supposed to be documents

11  reflecting pools being certified for delivery to the agencies

12  Freddie Mac and Ginnie Mae; right?

13  A.  I do understand that pools are certified.  Yes.

14  Q.  And it's true, isn't it, you never -- in your 2004 or 2005

15  audit work, you never saw any documents relating to pools of

16  loans being sold to Freddie and Ginnie; right?

17  A.  Not that I recall.

18  Q.  And you didn't ask for them from Colonial, did you?

19  A.  No.

20        THE COURT:  Counsel, do you think you would be finished

21  with this witness by noon, or is it going to go over till the

22  afternoon?

23        MR. SORENSEN:  I will finish by noon.

24  Q.  If we could look again at A-400.  This is AU-316 that we

25  looked at previously.  If we could look at paragraph 11.

 1          MR. SORENSEN:  If we could make that bigger, please.

 2   Q.  And do you see where it says -- we looked at this before --

 3   Although fraud usually is concealed and management's intent is

 4   difficult to determine, the presence of certain conditions may

 5   suggest to the auditor the possibility that fraud may exist.

 6          Do you see that?

 7   A.  Yes.

 8   Q.  And one of the conditions, actually, the first one, is, For

 9   example, an important contract may be missing.

10          Do you see that?

11   A.  Yes.

12   Q.  So right in the standards, it actually says that a missing

13   contract could be a signal that there might be fraud; right?

14   A.  Yes.  And when I read that, though, when I see "missing," it

15   means it's supposed to be there but it can't be found, which is

16   different than maybe one not existing.  So "missing" takes a

17   different context for me there.

18   Q.  So if Colonial Bank had told you, the contract is not

19   missing, it just doesn't exist for these hundreds of millions of

20   dollars of transactions, that would have been okay?

21   A.  It would -- as an auditor, it would make me have a different

22   consideration of if I asked for a document and they said it

23   didn't exist -- then I perform other procedures to gain

24   comfort -- versus if I ask for a document and they said they had

25   one but they couldn't find it.  Then that may cause me concern.

1  Q.  Now, you're familiar with the concept of a walk-through,

2  aren't you?

3  A.  Yes.

4  Q.  And a walk-through is something that an auditor is supposed

5  to do to understand a significant transaction; right?

6  A.  Well, we -- a walk-through is a way -- and you can do

7  multiple things, but a walk-through is a way to understand a

8  significant process.

9  Q.  And when you do a walk-through, it's not a theoretical

10  process; right?

11  A.  Yes.  We -- the walk-through would have discussions with

12  management.  And you would actually select an item to see it go

13  through that significant process.

14  Q.  So you have to pick an actual -- a specific, actual

15  transaction and trace it from start to finish; right?

16  A.  Depending on the process.  So some items might not be an

17  actual document.  You know, if you did a walk-through of the

18  annual reporting process, it may be kind of more of an inquiry

19  and seeing documents.  But in many instances, it's selecting a

20  specific item.

21  Q.  But for a transaction like the AOT, it would mean taking an

22  actual AOT transaction and following it from start to finish;

23  right?

24  A.  Well, my understanding is that the engagement team

25  identified mortgage warehouse lending as a significant process.

1    Therefore, we were to gain an understanding over mortgage

2    warehouse lending.  And you could pick a product if it went

3    through the same processes in that -- if it went through the

4    same controls in that significant process, then you could -- you

5    could pick a transaction within that group.

6    Q.  But you never did a walk-through of an AOT transaction;

7    right?

8    A.  I did not.  We did other walk-throughs as part of the

9    significant process, which is mortgage warehouse lending.

10   Q.  And I think you testified earlier AOT was a different

11   structure, transaction structure, than warehouse -- the

12   warehouse line; right?

13   A.  I did.

14   Q.  Let's take a look at Exhibit A-128.  And you see up on the

15   top left, this is a work paper from the 2004 year-end audit?

16   A.  Yes.

17   Q.  This is one that you completed; right?

18   A.  Yes.

19   Q.  And was reviewed by Wes Kelly; right?

20   A.  Yes.

21   Q.  And this one is called obtain an understanding of nature an

22   terms of agreements; right?

23   A.  Yes.

24   Q.  And you see the area there, it says, federal funds and

25   reverse repurchase agreements process; right?

1   A.   Yes.

2   Q.   And this is supposed to be the AOT; right?

3   A.   Yes.

4   Q.   And, again, this is an example where because someone pulled

5   reverse repurchase agreement forms from the system, they got

6   used as audit work papers; right?

7   A.   Yes.

8   Q.   And that's even though these are not reverse repurchase

9   agreements; right?

10  A.   Correct.

11  Q.   And when you pull something from your system for a kind of

12  transaction, it may include things that don't apply at all to

13  the transaction you're working on; right?

14  A.   For instance, in this case, that's correct.  Yes.

15  Q.   And that's what happened here.  You were using forms for

16  reverse repurchase agreement that didn't necessarily apply to

17  AOT; right?

18  A.   Yes.

19  Q.   And then if we look down at the bottom of the page under

20  Guidance there, it says, Obtain an understanding of the nature

21  and terms of specific agreements and related risks and

22  uncertainties surrounding those agreements.

23       Do you see that?

24  A.   Yes.

25  Q.   And in this work paper, you were trying to document your

1  understanding of the AOT transaction; right?

2  A.  Yes.

3  Q.  But not based on -- not based on any review of an agreement;

4  right?

5  A.  As I stated earlier, I do recall looking at an

6  assignment-of-trade agreement if that's what you're asking.

7  Q.  Okay.  Why don't we look -- actually, turn to the last page

8  of the exhibit.  I think this is what you're referring to;

9  right?  If you see, there is a trade assignment agreement.  Is

10  that what you're referring to?

11  A.  That's correct.

12  Q.  Okay.  And you understand that that -- that's not -- that's

13  not an agreement that would govern the AOT transaction; right?

14  A.  I'm not sure what agreements would govern the AOT contract.

15  I know this is a contract that deals with an AOT transaction.

16  Q.  You understand that the AOT transactions, if they were

17  working properly, would have had many different types of

18  documents that needed to be delivered; right?

19  A.  I'm not aware of that.

20  Q.  Let's turn back to the second page where it reports your

21  results.  These are the results of the work that you did in this

22  work paper; right?

23  A.  Yes.

24  Q.  And there you note, PwC notes that the repurchase agreement

25  in the lead in the section of the database is with Taylor Bean

1   through CBG's mortgage warehouse lending division in Orlando.

2      Do you see that?

3   A.   Yes.

4   Q.   It's -- but it's not a repurchase agreement; right?

5   A.   Agreed.

6   Q.   And then there are two documents attached.  Do you see that?

7   There's an icon for an Excel spreadsheet and a PDF icon there.

8   A.   Yes.

9   Q.   So did you -- you put these documents in the work paper?

10  A.   I don't recall if I put them in there or not.

11  Q.   And if we turn to the fourth page, did you put this chart

12  into the work paper?

13  A.   That's the same thing as the Excel work -- I just said that.

14  I don't recall.

15  Q.   Does this chart accurately explain how the AOT transactions

16  were supposed to work?

17  A.   Based on the title of the document, it's to obtain an

18  understanding.  So that's the purpose of the work paper, is to

19  obtain an understanding.

20  Q.   My question was looking at this chart, does this accurately

21  explain how the AOT transactions were supposed to work?

22  A.   I don't recall every part of how an AOT transaction was

23  supposed to work, so I don't know if this work paper follows

24  every aspect of that through.

25  Q.   Do you know whether this is an accurate depiction of the AOT

1  transactions?

2  A.  Again, I don't know every aspect of the AOT transactions, so

3  I'm not sure.  I would have to somehow compare the two documents

4  or whatever that may be.

5  Q.  If you look at the very top paragraph, you'll see there's a

6  reference in the last sentence to Fannie Mae.  Do you see that?

7  A.  I do.

8  Q.  And you knew in 2004 when you put this into the work paper

9  that Fannie Mae no longer did business with TBW; right?  You

10  knew that.

11  A.  I did not know that at that time.

12  Q.  But you've since -- you did learn at some point that Fannie

13  Mae terminated TBW as a seller/servicer; right?

14  A.  In preparing for this, I did.

15  Q.  And then if you look in the second paragraph below the two

16  boxes, it says, The security note represents the future payment

17  from the individual loans in that pool of loans.  And then in

18  the last sentence it says, Taylor Bean borrows money.

19      Do you see that?

20  A.  Yes.

21  Q.  And is that an accurate description of the AOT transaction?

22  A.  My understanding of that statement is Taylor Bean obviously

23  had to have money to create mortgages.  Therefore, they could

24  either borrow money, or they could sell assets and receive

25  funding in that way.  So the sentence states, Taylor Bean

1  borrows money by selling or, better put, borrowing up under.

2      So TBW needed money to generate loans, so they either went

3  out and borrowed the money or they sold those mortgages to

4  someone like Colonial.  And therefore the terminology "borrowing

5  up under" is -- and then we state "selling," that they were able

6  then to get the money from selling those loans and then to

7  generate new mortgages -- or more mortgages.

8  Q.  And you understood that the COLB and the AOT were facilities

9  that Colonial put in place because it was limited in how much

10  money it could actually lend to TBW; right?

11  A.  I know there are banking regulations on how much you can

12  lend to a customer.  I'm not sure exactly what those are for

13  TBW.

14  Q.  But you knew that it wasn't -- Colonial Bank couldn't lend,

15  for example, a billion dollars to TBW; right?

16  A.  I just said I don't know what the limit was.  It's just a

17  different product that was offered to customers.

18  Q.  So at the time you were doing audit work in 2004 and '5, you

19  didn't understand that the amount that Colonial Bank could lend

20  to TBW was capped at less than a billion dollars?

21  A.  I don't know what the limit was.  I just stated I don't know

22  what the limit was.

23  Q.  Now, the -- the AOT transactions you consider to be a

24  complex transaction?

25  A.  Yes.

1  Q.  And you would agree understanding the whole transaction,

2  that was above your pay grade?

3  A.  I think I mentioned that in my deposition, yes.

4  Q.  Did you also -- is it also true that you didn't understand

5  the entire transaction?

6  A.  I understood AOT and performed audit procedures in regards

7  to AOT, but I didn't understand the -- you know, 100 percent of

8  AOT.

9  Q.  And is it fair to say you expected that people more senior

10  to you, like Mr. Kelly and Mr. Westbrook, that they would have

11  an understanding of the entire transaction; right?

12  A.  I'm not sure about the specific engagement team members.

13  But as an engagement team as a whole, that we would have

14  understood the transaction to be able to issue our audit

15  opinion.

16  Q.  And did you -- when you were auditing in 2004 and 2005, did

17  you feel like you had perfect insight into the AOT transaction?

18  A.  "Perfect" is a strong word.  I had an understanding of AOT

19  and was able to perform audit procedures in regards to AOT.  But

20  I -- I'm not sure I'm perfect in many things I do, including all

21  aspects of myself.  So I wouldn't use the word "perfect."  I had

22  an understanding that I could perform my job duties.

23  Q.  One thing that you didn't understand at the time was you

24  didn't -- and you still don't understand what documents were

25  supposed to be delivered to Colonial Bank in the AOT

1  transactions; right?

2  A.  Yeah.  I'm not sure what documents were -- were out there.

3  Q.  Like, for example, did you -- you didn't know that Colonial

4  Bank was supposed to get a participation certificate that was

5  the evidence of what it was buying.  You didn't know that, did

6  you?

7  A.  Again, I stated I didn't know what all documents -- the only

8  document that I specifically know with regards to AOT is the one

9  we just looked at regarding that assignment of trade.

10 Q.  And you also didn't know that Colonial Bank was supposed to

11 be receiving a list of all the loans --

12        THE COURT:  Counsel, if you're going to go through

13 every document just to hear him say that he didn't know, it's

14 going to take --

15        MR. SORENSEN:  I'm move on, Your Honor.

16        THE COURT:  All right.

17 Q.  Now, for the AOT, we earlier looked at the COLB testing that

18 you did with expected to -- or tried to do with respect to

19 existence.  Do you remember that?

20 A.  No.  I mean, can we pull that up?

21 Q.  Well, the confirmation from Lee Farkas.

22 A.  Which included AOT on that confirmation.

23 Q.  Okay.  Let's talk about the AOT existence testing.  So if we

24 could look at A-283.  That was the one we were looking at

25 before, the Farkas confirmation.  And go to the second page.

1  And you said -- you said repurchase agreement here means AOT;

2  right?  Or that's what you --

3  A.  Yes.

4  Q.  And the amount is 221 million; right?

5  A.  At December 31, yes.

6  Q.  And, now, that -- again, if this were a true sale of pools

7  of loans, TBW shouldn't owe Colonial Bank money for those AOT

8  assets; right?

9  A.  Based on my understanding, is that the AOT represents

10  Colonial's interests in that security that's under agreement to

11  resell.  So that's what Colonial owed -- owned for those AOT

12  items.

13          THE COURT:  Was it your understanding that those loans

14  were supposed to be sold back to TBW?  You say under resell.

15          THE WITNESS:  To some other end investor but not --

16          THE COURT:  Oh, some other entity.  Okay.

17          So that figure doesn't represent what TBW owes

18  Colonial.  It just represents Colonial's interest in the loans

19  that it purchased from TBW; right?

20          THE WITNESS:  Yes, ma'am.  TBW was the only customer

21  that they had an AOT with, so this represents what they

22  purchased from TBW.

23          THE COURT:  So this is TBW confirming, yes, that's the

24  figure -- that's what we sold to Colonial.

25          THE WITNESS:  And that's what Colonial holds at

1  December 31.  Yes, ma'am.

2  BY MR. SORENSEN:

3  Q.  And so for the AOT pools of loans, did you know where those

4  were supposed to be physically located?

5  A.  Could you just -- I wasn't paying attention.

6  Q.  Sure.  Sure.  The -- earlier we were talking about the COLB

7  loans.  And you testified, I don't know -- you didn't know where

8  the COLB loans were supposed to be; right?

9  A.  Correct.

10  Q.  And I'm asking on the AOT pools of loans, did you know

11  where, physically, those pools of loans were supposed to be?

12  A.  No.

13  Q.  And so you never went and checked to see if they existed;

14  right?

15  A.  I haven't gone looking for some AOT loans that I recall.

16  Q.  And this -- Lee Farkas telling -- telling you that he's

17  done -- or TBW has done $221 million worth of AOT assets, that

18  doesn't tell you anything about the pools of loans that Colonial

19  Bank is supposed to have; right?

20  A.  It tells me that a third party agrees with what Colonial

21  BancGroup is saying that they own in AOT assets.

22  Q.  You agree that TBW can't confirm for Colonial Bank what

23  Colonial Bank physically has in its possession; right?

24  A.  As I stated earlier, the purpose of the procedure is not

25  asking for TBW to confirm who physically holds a mortgage.

1  We're asking them to confirm what balance that CBG owns as of

2  12/31 related to AOT.  It's not the physical documents.

3  Q.  And just to be clear, there is no -- as of this time, there

4  is no balance on the AOT; right?

5       THE COURT:  What do you mean?

6  Q.  A balance -- a balance represents something that somebody

7  owes; right?

8  A.  A balance could represent many things, what's in their cash

9  account to what debt they owed.  So my -- this work paper here

10 is representing the interests that Colonial BancGroup owns in

11 AOT assets as of those two dates.

12 Q.  And this is what TBW says Colonial has in the way of AOT

13 assets; right?

14 A.  Well, I stated earlier this is what management at Colonial

15 BancGroup said that they owned.  And we sent a confirmation to

16 Taylor Bean, who is a third party, and asked them to confirm

17 that the balance that management stated that was there agreed to

18 their records.  And so that was one of the audit procedures we

19 performed.

20 Q.  And just to be clear, the $221 million that came back from

21 Mr. Farkas at TBW, that doesn't tell you anything about whether

22 Colonial Bank has in its possession or in someone else's

23 possession $221 million worth of pools of loans; right?

24 A.  Again, we did not ask him that.  We asked him to confirm the

25 balance that Colonial BancGroup owned in AOT.  So that's the

1    answer that was received back.

2    Q.   Let's take a look at Exhibit A-152.  And you see up at the

3    top left this is a work paper for year end 2005.

4    A.   Yes.

5    Q.   And it's completed by Alicia Whetstone.  And she was an

6    intern that was working under your supervision; right?

7    A.   Under the entire engagement team's supervision.

8              THE COURT:  Before you leave, let me just confirm what

9    I think counsel was asking you.  The most that TBW could confirm

10   is what they sold to Colonial; right?  That's what that

11   figure -- what else can they say other than we sold to Colonial

12   $221 million worth of an interest in mortgage loans; right?

13             THE WITNESS:  Yes.

14             THE COURT:  But how could they say that as of November

15   30th or December 31st, I forget which, Colonial actually has

16   that amount in its -- on its -- as an asset?

17             THE WITNESS:  I'm not sure what they did to obtain that

18   information.  But they would have known the loans that were

19   sold, you know, or the securities that were sold to Colonial.  I

20   think understanding your question, well, maybe what did Colonial

21   do something with them subsequent to that?  I don't -- I don't

22   know how they were able to get that information, but we verified

23   it with a third party.

24             THE COURT:  Then you don't have to go into it any

25   further, counsel.

1          MR. SORENSEN:  Okay.  I won't, Your Honor.

2    Q.  So going back to the work paper here, Ms. Whetstone, she was

3    an intern; right?

4    A.  At some point.  I don't know if she was an intern at this

5    date or not.  I don't recall.

6    Q.  And she was -- she was junior to you; right?

7    A.  Yes.

8    Q.  Junior to you?

9    A.  Yes.

10   Q.  And this work paper is a work paper -- this is an AOT work

11   paper; right?

12   A.  Yes.

13   Q.  And it says -- it has that same area, 3375, federal funds

14   and reverse repurchase agreements; right?

15   A.  Yes.

16   Q.  And then the -- this work paper says, Identify and examine

17   collateral held.  Do you see that?

18   A.  Yes.

19   Q.  And down below it says, Audit objectives, accuracy,

20   existence, slash, occurrence.  Do you see that part there?

21   A.  Yes.

22   Q.  And then on the second page, there's guidance here for the

23   audit team.  And it says, Identify assets pledged as collateral

24   by reviewing contractual agreements.

25        Do you see that in A?

1  A.  Yes.

2  Q.  And then B says, Count collateral to verify existence.

3      Do you see that?

4  A.  Yes.

5  Q.  Counting collateral is physically counting things like

6  securities or mortgages; right?

7  A.  Yes.

8  Q.  And that's something -- that's something that your guidance

9  said you should do; right?

10  A.  Well, that's what it says.  However, I think we established

11  earlier that this is a reverse repurchase agreement step, and we

12  deemed that they weren't even applicable.  So the guidance

13  technically relates to reverse repurchase agreement.  So I would

14  look at the results section more than guidance for something

15  that doesn't apply.

16  Q.  So the guidance here is for a different kind of transaction;

17  right?

18  A.  That's what we agreed to earlier.  Yes.

19  Q.  But as we talked about earlier, you can also count

20  collateral even if the asset is a mortgage loan; right?

21  A.  You could.  You could send confirmations.  You could perform

22  control testing.  You could do many procedures.

23          THE COURT:  How are we doing, counsel?  Because it's --

24          MR. SORENSEN:  Okay, Your Honor.  And I wish I had not

25  committed to finishing by noon, because we went a little slower.

1   I have a little bit more which I would like to do after the

2   break.  Now is a good time for a break.

3          THE COURT:  Yes.  This is a good time for a break.  But

4   we'll try to keep our lunch hour to an hour instead of the

5   longer hour and a half so that you can finish with this witness

6   and have some cross, I assume.

7          Right?

8          Okay.  See you back here at one o'clock.

9      (Recess was taken from 11:58 a.m. until 1:02 p.m., after

10      which proceedings continued, as follows:)

11         THE COURT:  Please be seated.

12         Whenever you're ready, counsel.

13         MR. SORENSEN:  Thank you, Your Honor.

14  Q.  Welcome back, Mr. Rivers.

15  A.  Thank you.

16  Q.  I just have a few more questions for you.  I would like to

17  just turn back to the exhibit we were looking at before the

18  lunch break, A-152.  And I think you testified before the break

19  that this was a form that applied to repurchase agreements that

20  was included in the audit file here; is that right?

21  A.  Yes.

22  Q.  And was it your testimony that it did or did not apply to

23  the AOT?

24  A.  That -- this step was for repurchase agreements, which was

25  not applicable.

1   Q. And if we look at the second page where it says Results, do

2 you see under results that actually there's a whole paragraph

3 there?

4   A. Yes.

5   Q. Okay. So it doesn't say -- in some work papers, sometimes

6 it says N, slash, A, not applicable; right?

7   A. I'm not looking at another work paper that says N/A, but a

8 work paper could say that, yes.

9   Q. But this work paper reports some results for this procedure;

10 correct?

11   A. It documents results. Yes.

12   Q. And if you look at the results, it says, PwC notes that this

13 product is backed by real estate mortgage loans.

14     This product here is the AOT; right?

15   A. Yes.

16   Q. And then it goes on -- I want to go to the -- the very last

17 sentence that says, PwC feels that the collateral for these

18 securities purchased under agreement to resell is adequate.

19     Do you see that?

20   A. Yes.

21   Q. And do you see that the -- before that sentence, there are

22 three things that are cited there for that conclusion. It says,

23 Due to the low risk of real estate mortgages.

24     Do you see that?

25   A. Yes.

1  Q.  And then it says, The fact that Taylor Bean does not pool

2  these loans by geographic area.

3      Do you see that?

4  A.  Yes.

5  Q.  And then the third thing is CBG has never incurred a loss in

6  their mortgage warehouse lending department.

7      Do you see that?

8  A.  Yes.

9  Q.  And so the conclusion here is that PwC feels that the

10  collateral is sufficient because of those three things; right?

11  That's what this says?

12  A.  Yes.

13  Q.  And so because of that, PwC did not count the collateral;

14  right?

15  A.  PwC performed these procedures, and that's the procedures

16  they performed in regards to that.

17  Q.  But if we look up above under the guidance at the top of the

18  page, it says, Count collateral to verify existence.  Remember

19  we looked at that from the guidance?

20  A.  But, again, we deemed this work paper wasn't applicable.

21  Therefore, that guidance wouldn't necessarily be applicable.

22  Q.  If the guidance -- if the -- if this was a repurchase

23  agreement type of procedure, why did you -- why did you fill in

24  results for a procedure that you say wouldn't apply to the AOT?

25  A.  I mean, our documentation could be placed anywhere in the

1   file, so I just read this as a step that doesn't apply.

2   However, we did document consideration as part of our audit.  So

3   regardless of the title of the work paper, what was written is

4   the results of our work.  Regardless if it's in a repurchase

5   agreement step or in an AOT step, that's the results of our

6   procedures performed.

7   Q.  And this was -- this was written in by Ms. Whetstone, the

8   intern; right?

9   A.  I'm not sure who wrote it.  I mean, it says she completed it

10  and I reviewed it.  I take it that she completed it and I

11  reviewed.

12  Q.  And if you look at the edit history on the document on

13  page 3, you see you and Ms. Whetstone are the only two auditors

14  on the team that had any -- either reviewed or worked on this

15  document; right?

16  A.  So based on that edit history, I would say you're correct on

17  that.

18  Q.  And if somebody else had edited the document or reviewed it,

19  that would be reflected here; right?

20  A.  That's my understanding, yes.

21  Q.  Okay.  And so if we could go back to that second page, this

22  work paper reflects the fact that you decided not to go and look

23  at AOT collateral; right?

24  A.  So, again, this work paper does not state that we decided

25  not to go look at collateral.  It states what we did.  But also

1  as part of our planning -- as part of the planning of the audit,

2  the engagement team would meet and we would decide what we were

3  going to do in the significant areas of the audit.  And a

4  decision was made as part of the engagement team, a planning of

5  what we would do.

6  Q.  Doesn't this reflect PwC's view that given the low risk of

7  real estate mortgages, the fact that they're pooled -- not

8  pooled by geographic area, and that CBG has never lost any money

9  in the mortgage warehouse lending department that PwC didn't

10  need to do more on the collateral?  Isn't that what this says?

11  A.  It doesn't say that we don't have to do more.  It's

12  explaining our consideration of that and that we felt it was

13  adequate.  And so my understanding of the work paper is that

14  based -- again, we're talking about a security under agreement

15  to resell, so there's someone that's agreeing to purchase this

16  security -- that the fact that the loans aren't specific to a

17  geographic area, they're not -- that there haven't been losses,

18  that the risk of those mortgages defaulting while Colonial Bank

19  owned them was a lower risk due to those mortgages.

20  Q.  And if we look at the edit history again, you will see it

21  tells you exactly when this was completed and reviewed.  So it

22  says completed March 3rd, 2006, and reviewed March 3rd, 2006.

23      Do you see that?

24  A.  Yes.

25  Q.  And you understand that was the day after the audit opinion

1  was signed.  You understand that?

2  A.  I don't know the audit opinion date, but is that -- is the

3  audit opinion date March 2nd, 2006?

4  Q.  Go ahead and put it up.  I think it's -- A-65 is the 2005.

5  If we could go to the audit opinion.  And it should be page 65,

6  I think.  And you see the date, March 2nd, 2006?

7  A.  Yes.

8  Q.  Okay.  So the work paper was completed and reviewed the day

9  after the date of the audit opinion; right?

10  A.  That's when it was marked completed and reviewed.  Yes.

11      THE COURT:  Before you move on to something else, I

12  notice in the exhibit we just had that you talked about it being

13  a resale and you, yourself, referred to it as having -- knowing

14  that it was going to -- these were all going to be repurchased

15  or purchased.  I know we spent a lot of time this morning saying

16  that using the form repurchase agreement was incorrect and

17  irrelevant.  Are you sure of that?  Are you sure that the reason

18  you didn't use the form -- that you did use the form repurchase

19  agreement was because you thought these were going to be

20  repurchased or purchased again or resale of some kind?

21      THE WITNESS:  I don't recall, you know, that many years

22  ago, our exact thoughts.  But repurchase agreements usually

23  involve two parties.  The AOT involved three parties.  So I

24  don't -- I do not recall what our exact thoughts were.  But

25  there is a repurchasing function to these securities, and that

1   may be why we did that.  I just do not recall.

2           THE COURT:  Okay.

3   BY MR. SORENSEN:

4   Q.  And the AOTs, the AOT transactions, as you understood them,

5   were supposed to be structured as sales of an asset to Colonial

6   Bank; right?

7   A.  Yes.

8   Q.  And the idea was that TBW would get the asset off of its

9   balance sheet; right?

10  A.  I'm not sure of how TBW handled their transaction, but we

11  recorded an asset -- Colonial Bank recorded an asset in their

12  financial statements.

13  Q.  But in order for Colonial Bank to record an asset on its

14  balance sheet, it has to come off of TBW's balance sheet; right?

15  A.  Again, I'm not sure how TBW handled their balance sheet.  I

16  didn't perform that audit.  But for Colonial Bank, they had

17  their assets on their books.

18  Q.  But you know, sir, don't you, as an experienced auditor that

19  you can't have the same asset on two separate balance sheets;

20  right?

21  A.  That's a complex question.  There's a concept called

22  variable-interest entities that the standards state that there

23  could be a possibility that something could be recorded if

24  people think they're the primary beneficiary in a VIE.  So

25  completely separate?  But something like that could occur, and I

1  didn't do an audit of TBW.

2       THE COURT:  But in the common situation, isn't that

3  what would have happened, gone off one set of books and onto the

4  other as an asset?

5       THE WITNESS:  In a common situation, yes, ma'am.

6  Q.  In fact, in our situation here, we're talking about AOT

7  assets that needed to be out of the control of TBW in order for

8  Colonial Bank to report them as assets; isn't that right?

9  A.  Again, I know Colonial recorded the AOT -- their interest in

10  the AOT investments on their balance sheet as an asset.  You

11  know, I didn't perform FAS 140 assessments or things like that,

12  but I just know what was recorded on Colonial's books.

13  Q.  But you do know that FAS 140 is the guidance that was --

14  that applies when you have transfers of financial assets like

15  the AOT assets; right?

16  A.  Yes.

17  Q.  And, in fact, we're going to look at a work paper where your

18  audit team or the audit team of PwC actually looked at the AOT

19  from the perspective of FAS 140; right?

20  A.  We can -- I guess we can look at that, yes.

21  Q.  And the issue is has TBW transferred control to Colonial.

22  You understand that's one of the issues under FAS 140; right?

23  A.  I understand control is an issue under 140.  Yes.

24  Q.  And so if TBW maintained control over the asset, Colonial

25  couldn't report it as an asset on its balance sheet; right?

1   A.  Again, I have not gone through a FAS 140 analysis, so I

2   cannot answer about control of those assets.

3   Q.  And you're not -- you're not a FAS 140 expert; right?

4   A.  No.

5   Q.  And back when you were doing the audits, you weren't

6   qualified to do a FAS 140 analysis, were you?

7   A.  I don't particularly know what the qualifications would be.

8   I don't know.  There's -- what you refer -- I have read portions

9   of FAS 140, but I'm not a FAS 140 expert.

10          THE COURT:  So let's move on, then, to something else,

11  unless you really have to ask him about it.

12  Q.  Let's just take a look at a work paper that you did -- you

13  reviewed, A-357.  And you see up in the left-hand corner, this

14  is an audit work paper for the year end 2005?

15  A.  Yes.

16  Q.  And over at the right, this is another one completed by

17  Ms. Whetstone, the intern, and reviewed by you?

18  A.  Yes.

19  Q.  And if you look down at the audit history, do you see -- has

20  anyone else completed or reviewed this work paper?

21  A.  No.  No one else.

22  Q.  And the title of this one is identify SFAS 140 financial

23  asset transfers; right?

24  A.  Yes.

25  Q.  And that's what people in the courtroom are calling FAS 140;

1  right?

2  A.  Correct.

3  Q.  And, again, under the area here, it says, Federal funds and

4  reverse repurchase agreements.  Do you see that?

5  A.  Yes.

6  Q.  So is this another form that was pulled from the repurchase

7  agreements section of the database?

8  A.  Yes.

9  Q.  And if we turn to the second page, you see there are results

10  reported here for this one.  And do you see there's one -- it's

11  a one-sentence -- it says per CAKE, PwC notes that this AOT

12  product with Taylor Bean is an actual sale of these different

13  pools of loans pooled by Taylor Bean with an underlying security

14  sold to CBG.

15      Now, if we look -- look at the date when this was completed

16  and reviewed, again, it has the same date, March 3rd, 2006.  Do

17  you see that?

18  A.  Yes.

19  Q.  And so this was the day after the audit opinion was signed?

20  A.  Right.

21  Q.  And, now, Ms. Whetstone, she was -- she was an intern

22  working under your supervision; right?

23  A.  The engagement team's supervision, yes.

24  Q.  But she was also working under -- you were supposed to be

25  reviewing her work, weren't you?

1   A.  Other people may have reviewed her work, but she was junior

2   to me, as you mentioned earlier.

3   Q.  And she wasn't -- she wasn't qualified to do a FAS 140

4   analysis, was she?

5   A.  Like I said, I don't know what the qualifications are to do

6   a FAS 140.  So, I mean, I can't answer that.  She was an intern.

7   Q.  If we could take a look at your -- if you have your TBW

8   deposition in front of you there, you could look at page 335.

9   And I'm looking at line 17.  In your deposition, I asked you the

10  question, talking about Ms. Whetstone:  Since she is below

11  you -- so if you're not high enough, you don't have enough

12  seniority or experience to handle FAS 140, she certainly

13  doesn't; right?  And then your answer was:  Again, that's -- I

14  mean, that's your conclusion.

15      And then I asked you the question:  Do you disagree with

16  that conclusion?  And your answer was:  She -- she's less

17  experienced than me, so I would not expect her to do a FAS 140

18  analysis.

19      Did you give that testimony?

20  A.  Yes.

21  Q.  Let's go back to the work paper, A-357, and the second page.

22  And you see it says per CAKE.  And earlier we talked about CAKE

23  being what's call cumulative audit knowledge and experience?

24  A.  Yes.

25  Q.  And you understood that CAKE -- you could use CAKE for

1  planning purposes, but CAKE could not be your source of audit

2  evidence; right?

3  A.  I don't -- I mean, we use CAKE throughout the engagement,

4  planning, field work, and as part of the conclusion.

5  Q.  And Ms. Whetstone writes in here that this AOT product is an

6  actual sale of these different pools of loans.  Do you see that?

7  A.  Yes.

8  Q.  And you understand that under FAS 140, that's a complicated

9  determination, isn't it?

10  A.  I would say FAS 140 is a complicated standard.

11  Q.  You have to figure out whether the assets are legally

12  isolated from the seller; right?

13  A.  I don't know all the details of 140, so I -- I don't know

14  what it says about isolated or whatever.

15  Q.  And so do you see here there's no -- there's no attachment

16  of any document either?

17  A.  I see that, yes.

18  Q.  And so from this -- from this -- looking at this work

19  paper -- you're an experienced auditor -- can you tell me what

20  analysis there was to support the opinion that the AOT was a

21  true sale to Colonial?

22  A.  Based on the results, it states that per CAKE, the product

23  is an actual sale.  I don't know how Alicia or myself received

24  the CAKE.  Was that discussions with others on the engagement

25  team?  I'm not sure.

1  Q.  Well, you would agree with me, sir, wouldn't you, that

2  someone picking up this work paper would have no basis for

3  understanding how PwC could conclude that the AOT transactions

4  were true sales?  Right?

5  A.  Other than cumulative audit knowledge and experience.

6  That's all I would know.

7  Q.  And whether they were true sales -- whether they were sales

8  or loans, that had significance for the balance sheet of

9  Colonial Bank, didn't it?

10  A.  Yes.

11  Q.  And if we just look at A-69, let's just put the balance

12  sheet up there.  I think it's 83.

13      All right.  By the end of 2008, the AOT assets were $1.556

14  billion; right?

15  A.  Yes.

16  Q.  And if those were -- if that was $1.556 billion of lending

17  to TBW rather than a sale of -- I'm sorry.  If that turned out

18  to be a loan to TBW instead of a sale to Colonial Bank, that

19  would be a problem, wouldn't it?

20  A.  It would be a different line item, you know, a loan instead

21  of a securities purchased under -- it would be -- it would be

22  labeled something different in that case.

23  Q.  And that would -- if it were -- if it turns out it was a

24  loan to TBW, that would affect the lending limits; right?

25  A.  As I stated earlier, I do know there are lending limits.  I

1  do not recall what lending limits were for Colonial nor

2  individual customers.

3          MR. SORENSEN:  No further questions.

4          THE COURT:  Cross-exam?  Oh, any questions from CBG?

5          MR. DICARLO:  Your Honor, we will reserve for recross

6  based upon direct.

7          THE COURT:  Little confusing, but okay.  None right

8  now; right?

9          MR. DICARLO:  None right now.

10          THE COURT:  Thanks.

11          MS. MOSS:  Your Honor, I have no questions for this

12  witness.

13          THE COURT:  Now is your moment.

14          MR. DICARLO:  No, Your Honor.

15          THE COURT:  None?

16          MR. DICARLO:  No questions.

17          THE COURT:  You'll be glad to hear you may step down.

18  And you are excused.

19          There's no problem with excusing this witness, is

20  there?

21          MS. MOSS:  No, Your Honor.

22          THE COURT:  Okay.

23          MR. COLEMAN:  Your Honor, the plaintiff calls the next

24  witness, Mr. Lewis Beville, who is outside.

25      (Brief pause)

1      MR. COLEMAN:  Your Honor, while we're waiting for

2  Mr. Beville to come into the courtroom, I wanted to inform the

3  Court that we have spoken about the issue we talked about at the

4  beginning of the day.  And Mr. Beville has agreed to be made

5  available in Washington for the damages trial.  So we've agreed

6  that his testimony here today will not address damages or Bank

7  would have failed anyway or those issues that we were discussing

8  this morning.

9      THE COURT:  That's a great arrangement.

10      MR. LEVINE:  And, Your Honor, just to be more specific

11  so we don't have a situation like with Mr. Malek, I understand

12  that Mr. Beville has agreed to be available in Washington the

13  week of October 30th either for CBG if they call him or, if they

14  don't call him, then for PwC.

15      MR. COLEMAN:  That is correct.

16      THE COURT:  Okay.  How about making him available?

17      MR. COLEMAN:  He was spotted in the hallway as we were

18  coming back in from lunch, so I do know he's here.

19      THE COURT:  He made his escape before you could reach

20  him.  Is he a long witness or short witness?

21      MR. COLEMAN:  I anticipate him --

22      THE COURT:  The rest of the day?

23      MR. COLEMAN:  No.  I'm anticipating hour and a half,

24  maybe two hours.

25      MR. LEVINE:  But then we'll have cross, so the cross

1   will last the rest of the day.  I don't know if Your Honor --

2   you know, it depends on when we break, but we'll see when we get

3   there.

4           THE COURT:  I was thinking we would go to five.

5           MR. LEVINE:  Okay.  Thank you, Your Honor.

6           MR. COLEMAN:  I see him through the window.

7           Plaintiff calls Mr. Lewis Beville.

8           THE COURT:  Step forward and be sworn by the clerk,

9   please.

10                      **LEWIS EDWARD BEVILLE**

11      The witness, having first been duly sworn to speak the

12  truth, the whole truth and nothing but the truth, testified as

13  follows:

14                        DIRECT EXAMINATION

15  BY MR. COLEMAN:

16  Q.  Good afternoon, Mr. Beville.

17  A.  Good afternoon.

18  Q.  Would you introduce yourself to the Court.

19  A.  My name is Lewis Edward Beville.

20  Q.  And where do you reside, Mr. Beville?

21  A.  In Mobile, Alabama.

22  Q.  And were you formerly a member of the board of directors and

23  the audit committee of Colonial BancGroup?

24  A.  Yes, sir.

25  Q.  What is your current employment?

```
 1  A.   Thames Batre Insurance.

 2  Q.   And what's the nature of the business of Thames Batre?

 3  A.   We're a privately held insurance brokerage firm providing

 4  primarily property and liability insurance and risk management

 5  services.

 6  Q.   And what's your position with the company?

 7  A.   Vice-president.

 8  Q.   And has your entire career been spent in the property

 9  casualty insurance business?

10  A.   Yes, sir.

11  Q.   What's your academic background?

12  A.   Graduate of the University of Alabama in 1974.

13  Q.   And what was your degree --

14          THE COURT:  Hold on.

15          Can I ask you to move a little closer to that

16  microphone?

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  You can move it around.  It's very

19  flexible.  And talk directly into it.

20          THE WITNESS:  Okay.

21  Q.   What was your degree in at the University of Alabama, sir?

22  A.   Commerce and business administration.

23  Q.   And do you hold any professional certifications in your

24  primary area of business?

25  A.   Yes, sir.  CPCU, which stands for Chartered Property and
```

1  Casualty Underwriter.  I received that designation from the

2  American Institute of Property and Liability Underwriters in

3  1981.

4  Q.  Okay.  Do you have any specialized audit training, sir?

5  A.  No, sir.

6  Q.  Do you have any specialized training in accounting?

7  A.  No, sir.

8  Q.  Are -- so you're not a CPA.

9  A.  Correct.

10 Q.  I want to ask you about your first involvement with Colonial

11 Bank.  When did you first become involved with Colonial Bank?

12 A.  In the early to mid-1980s.

13 Q.  And under what circumstances?

14 A.  Colonial had opened up a bank in Mobile, Alabama.  A friend

15 of mine worked with Colonial, so our company started doing

16 business with them.  And sometime thereafter, I was asked to

17 join the board of the relatively new bank in Mobile.

18 Q.  And when you say the -- join the board of the new bank in

19 Mobile, can you explain the difference between the Mobile bank

20 and the larger bank.

21 A.  Yes, sir.  At that time, the different metropolitan areas

22 primarily had their own charter, and there were separate banks.

23 That's no longer -- or was no longer the case as time went on.

24 But I was associated only with the Mobile bank at that time.  It

25 later became, for the record, a part of what was called the Gulf

1    Coast Region, which was both Mobile and Baldwin Counties.

2    Q.   Did there come a time when you joined the board of directors

3    of Colonial BancGroup, the holding company?

4    A.   Yes, sir.

5    Q.   And approximately what point in time?

6    A.   That would have been approximately 1997.

7    Q.   And when you became a member of the board of directors, did

8    you join any committees on the board?

9    A.   Yes, sir, I did.  The audit committee.

10   Q.   Okay.  From roughly that same time frame?

11   A.   Almost immediately.  Yes.

12   Q.   And did you remain on the board of directors through August

13   of 2009 when the Bank was -- Colonial Bank was ultimately taken

14   over by the FDIC and Colonial BancGroup filed bankruptcy?

15   A.   Yes.

16   Q.   And with respect to the audit committee, how long did you

17   serve on the audit committee?

18   A.   From my initial appointment to the audit committee back in

19   the 1997 era up until perhaps June of 2009.

20   Q.   Okay.  And what happened in June 2009 that caused you to

21   cease to be a member of the audit committee?

22   A.   I was named interim president and CEO of BancGroup and could

23   no longer serve on the audit committee.

24   Q.   And did you also -- were you also named interim president

25   and CEO of Colonial Bank at that time?

1  A.  Yes.

2  Q.  Describe for the Court generally the nature of your duties

3  as a member of the board of directors when you served on the

4  board of Colonial BancGroup.

5  A.  It was general oversight of the organization by a body of

6  people who were elected by the shareholders.

7  Q.  Did the board establish policies and procedures for

8  management to follow in the operation of the business of the

9  company?

10  A.  They did.

11         MR. COLEMAN:  Okay.  If you would put up Exhibit D-234,

12  please.

13  Q.  And Mr. Beville, just so you know, there are hard copies of

14  the exhibits to your left -- but we're also going to put up

15  exhibits on the screen, which you should have access to -- but

16  if you ever need to make reference to the documents.

17      Do you recognize Exhibit D-234 to be a copy of minutes of

18  the board of directors of Colonial BancGroup for January 16,

19  2008?

20  A.  I do.

21         MR. COLEMAN:  And, Tim, if you would go to page 24,

22  please, at the bottom of that page.  There we go.  If you'd blow

23  up the bottom of the page.

24  Q.  Is this an example of a resolution of the board of directors

25  approving certain policies and procedures for the operation of

1  the company's business?

2  A.  Yes.

3          MR. COLEMAN:  And if you just go to the next page and

4  highlight the list at the top, the first half of the page.

5  Q.  Are these -- I'm not going to read through everyone of them,

6  but are these just examples of some of the policies that the

7  board of directors regularly put in place or affirmed during

8  your time on the board of Colonial BancGroup?

9  A.  Yes, sir.

10 Q.  How did the board go about monitoring management's operation

11 of the business and whether those policies were being complied

12 with?

13 A.  Primarily through regular board meetings.

14 Q.  Okay.  And how frequently did the board meet?

15 A.  Quarterly.

16 Q.  And what types of things occurred at those board meetings?

17 A.  A variety of matters.  It would be questions and answers by

18 the board members or employees or others who may be attending

19 the meetings for certain purposes.

20 Q.  Did the board receive materials or reports in connection

21 with the meeting?

22 A.  We did, primarily from management.  Yes.

23 Q.  Did the board form committees specific -- to address

24 specific areas relating to the company's business?

25 A.  Yes.

1  Q.  And was -- you mentioned you were on the audit committee.

2  Was that one of those committees?

3  A.  Yes, it was.

4  Q.  Okay.  Did the audit committee have a charter?

5  A.  Yes.

6          MR. COLEMAN:  Would you put up A-350, please.

7  Q.  Do you recognize Exhibit A-350 as a copy of an audit

8  committee charter that was established by the board for the

9  audit committee?

10  A.  I do.

11  Q.  Okay.  And that charter --

12          MR. COLEMAN:  If you would also put up Exhibit D-304.

13  And if you would flip to the second page of that, please, and

14  just blow up the top half of the page.

15  Q.  Do you recognize this as a copy of the audit committee

16  charter effective January of 2008?

17  A.  I do.

18  Q.  And if you would look at that, that describes the purpose of

19  the committee.  In your words, what -- what's the purpose of the

20  audit committee in the corporate governance context of Colonial

21  BancGroup?

22  A.  Exercise oversight of the financial reporting process and

23  over internal audits primarily.

24  Q.  Did the audit committee also oversee the relationship with

25  the external auditor, PricewaterhouseCoopers?

1  A.  Yes.  We hired the external auditor.  And that, of course,

2  would be part of the financial reporting process.

3          MR. COLEMAN:  Okay.  Let me ask you to go to, Tim, to

4  the sixth page of the exhibit at the bottom of the page.

5  Q.  Did the audit committee itself plan or conduct audits?

6  A.  No, sir.

7  Q.  Okay.

8          MR. COLEMAN:  I may have given you the wrong page.  Go

9  to the next page and blow up that bottom paragraph.

10  Q.  Okay.  So it says that the -- It is not the duty of the

11  audit committee to plan or conduct audits or to determine that

12  the company's financial statements are complete and accurate in

13  accordance with Generally Accepted Accounting Principles.  Was

14  that your understanding during the time you served on the audit

15  committee?

16  A.  Yes, it is.

17  Q.  Okay.  Who were some of the other members of the audit

18  committee in the 2007 to 2009 time frame at Colonial?

19  A.  Billy Powell, Sim Sippial, Herky Harris, Clint Holdbrooks.

20  Ed Welch was on there a period of time.  I'm not sure if it was

21  in that era or not, but those would be the core of the audit

22  committee.

23  Q.  And in that era, until you had to resign from the audit

24  committee because you became part of management, you were the

25  chair of the audit committee?

1  A.  Yes, sir.

2  Q.  Let me go back and ask you to -- about one other document,

3  D-49, please.  Did the audit committee establish -- was there

4  also an audit policy established for the audit committee?

5  A.  Yes, sir.

6  Q.  And do you recognize this --

7          MR. COLEMAN:  And you can flip to the second and third

8  page for the witness's benefit.

9  Q.  Do you recognize this as a copy of the audit policy that was

10  approved as of the end of 2007?

11  A.  I do.

12  Q.  Okay.  Did the audit committee act for both Colonial

13  BancGroup and Colonial Bank?

14  A.  Yes.

15  Q.  And what portion of the assets, roughly, of BancGroup did

16  Colonial Bank represent?

17  A.  Nearly all of them.  I would -- you know, if I had to guess,

18  I would say 97 percent.

19  Q.  Okay.  And when there were audits of the consolidated

20  financial statements of Colonial BancGroup, did that cover

21  Colonial Bank as well?

22  A.  Yes.

23  Q.  To your knowledge, both Colonial BancGroup and Colonial Bank

24  were regulated by different federal bank regulatory agencies

25  over time; correct?

U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, AL  36104   334.262.1221

1  A.  Yes.

2  Q.  And did Colonial BancGroup use its audited financial

3  statements for the purpose of delivery to its regulators?

4  A.  Yes.

5  Q.  And were those same audited financial statements used by

6  Colonial Bank to deliver to its regulators?

7  A.  Yes.

8  Q.  Describe -- you talked a little bit about the way the board

9  of directors discharged its duties.  Describe for the Court the

10  way that the audit committee went about discharging its duties.

11  A.  Similar in the terms -- or the context of the meetings that

12  we held.  We would have, originally when I came on the audit

13  committee, four meetings that mirrored the quarterly meetings of

14  the Bank.  But then over time, it became a bit too onerous for

15  us to cover the material that we needed and wanted to cover in

16  four meetings, so we expanded that to eight meetings per year.

17  And we would have agendas, obviously, at each one of those

18  meetings with a variety of topics on them.  Some would include

19  employees attending the meetings.  Some would be outside

20  parties.

21          MR. COLEMAN:  Let me ask you to pull up Exhibit D-1021,

22  please.  And just blow up the first part of that.

23  Q.  Do you recognize D-1021 as an example of an agenda for the

24  audit committee meetings?  And this one is dated January 15,

25  2008.

1    A.   I do.

2    Q.   Okay.  And would you -- did the audit committee receive

3    written materials in connection with its meetings?

4    A.   Yes, we did.  We would receive some in advance.  And then at

5    each meeting we would have a thick, three-ring binder with tabs

6    in it for each of the different subject matters on the agenda.

7    Q.   And did the audit committee have minutes prepared to

8    document what was discussed at those meetings?

9    A.   We did.

10   Q.   And can you just -- we certainly aren't going to go through

11   each one of these, but can you just generally give the Court a

12   flavor of the types of things that were regularly discussed at

13   audit committee meetings.

14   A.   A number of -- three, the OCC report, obviously, we would

15   have our regulators in to visit with us.  It was an opportunity

16   to visit one on one with them absent the written paper and

17   reports.  CFO is number four, Sarah Moore, was always in

18   attendance to give the financial report to us.  You'll see

19   executive sessions scattered regularly throughout the agenda.

20   Q.   And let me interrupt you just there.  What do you mean by

21   executive session in the context of your audit committee?  What

22   did that mean?

23   A.   They would be sessions where only the members of the audit

24   committee were in the room with the person -- with Sarah in that

25   example, and/or Brent Hicks.  So it was a private meeting

1  instead of the probably 20-something people who may be in the
2  meetings otherwise.
3  Q.  Okay.  You can -- there's a reference to
4  PricewaterhouseCoopers.  What was the role --
5  A.  Number six, PwC would be our independent external auditors
6  who would be in attendance at the meetings.  Gary Westbrook and
7  Wes Kelly would be there.  Executive session with them as well.
8      Internal audit, Crowe Chizek would be in attendance.  Mike
9  Thomas and Amanda Stanford were our primary contacts.  They
10 would be in attendance at the meeting to present the internal
11 audit report for those audits that had been conducted during the
12 most recently expired quarter.
13     Legal, David Byrne, who was our in-house counsel, would
14 attend.
15     Compliance and BSA, Stan Julian, who was our compliance
16 officer, would report on that, which was important for loss and
17 regulations.
18     Then corporate risk management and privacy.  Ultimately,
19 that was split off in a separate risk committee, but for a
20 period of time we were also baking it in and adding risk
21 management to our agendas.
22 Q.  Just flip to the next page.  That's the only one we'll look
23 at just to show the rest of this sample agenda.
24 A.  Right.  More risk management on that page.  Ethics
25 certifications, which we needed to do every year.  Multifactor

1  authentication update -- IT was regularly in our meetings

2  because of the obvious exposures that were present from your IT

3  systems.  But that's a general flavor of what the meetings would

4  consist of.

5  Q.  Okay.  And in your two binders to your left, the second

6  binder, it says one of two and two of two.

7         MR. COLEMAN:  Your Honor, I'm not going to ask him to

8  go through it, but I do -- since we have, I think, agreed that

9  we enter documents into the record through the testimony of a

10  witness, I just want him to identify a list of exhibits as being

11  the set of audit committee agendas and meeting minutes for the

12  2008-2009 time frame.

13        THE COURT:  I'll bet you that if you wait till a break

14  and show it to everybody concerned, you're not going to garner

15  up one objection.

16        MR. COLEMAN:  I'll do it.  I'll do it.

17        THE COURT:  And then they can be admitted.

18        MR. COLEMAN:  Okay.

19  Q.  Mr. Beville, would you explain to the Court the different

20  elements of the risk management structure that the audit

21  committee for Colonial Bank and BancGroup put in place in this

22  2008-2009 time frame.  Well, let me broaden it out.  In the --

23  let's say from 2003 to 2009 time frame.

24  A.  The general framework of the audit structure?

25  Q.  Well, the elements or layers of the risk management

1  structure.

2  A.  Okay.  There were several components to that or elements to

3  it.  The first was really our own people, policies, and

4  procedures, which I always referred to as the first layer.  And

5  then we also had, in addition to that, two additional layers

6  that were professional auditors.  One would be Crowe Chizek,

7  who we outsourced our internal audit function to.

8  Q.  And let me just stop you right there for a minute.  What

9  were some of the primary functions that Crowe performed in that

10  second layer that you're referring to?

11  A.  Risk assessments; design and testing of controls, internal

12  controls, primarily; and evaluation of controls.

13  Q.  And did Crowe perform any duties in the context of

14  Sarbanes-Oxley obligations that BancGroup was --

15  A.  They did when -- of course, Sarbanes-Oxley was a big deal to

16  the Bank and particularly to the audit committee when it came

17  about.  And we had to be very careful and thoughtful and

18  affirmative about how we went about complying with that new act.

19  And so the way that we chose to do it in the context of the Bank

20  was to hire Crowe Chizek to assist us in the establishment of

21  suitable controls that were in compliance.

22  Q.  Okay.  And why did you hire -- just staying with Crowe for a

23  minute, why did you hire Crowe rather than staff internally with

24  your own people?

25  A.  We could do it either way.  I mean, we could staff it with

1    our own people or we could choose to outsource it.  And we did

2    deliberate over time, which was the better way to do it, but we

3    had always reached the conclusion that because Crowe had skill

4    sets and resources within their organization that Colonial

5    didn't, it would be very difficult for us to replicate that by

6    hiring people on our own.  And probably an equally compelling

7    reason would have been the fact that Crowe had been -- as an

8    organization, was taken behind the curtain of many other

9    financial institutions in a context of their general work, so

10   they had experience that we felt like could be leveraged to the

11   advantage of our bank.

12   Q.   Okay.  So we talked about your own people, policies, and

13   procedures, and we talked about Crowe.  What's the third layer?

14   A.   Would be our external auditor or independent auditor,

15   whichever you want to call it, PricewaterhouseCoopers.

16   Q.   And what was the role of PwC from the audit committee's

17   perspective in this risk management structure?

18   A.   They were our third-party outside independent auditor who

19   would be charged with responsibility for both an audit, an

20   integrated audit, which would be the financial statements, and

21   an evaluation and opinion on the effectiveness of our internal

22   controls.

23   Q.   And how did this three layers of risk management make the

24   audit committee feel about the protection of Colonial BancGroup

25   and Colonial Bank?

1  A. Well, we obviously -- the audit committee -- and I think the

2  entire bank, but I can speak for the audit committee -- took

3  risk management very seriously. And I felt and I think we all

4  felt that having those three layers in place, coupled or married

5  with the fact that we had eight meetings a year where they would

6  all be in the same room together, sort of sewed the whole thing

7  up, I felt like, in an effective day way. We never rested on

8  our laurels or quit trying to improve. And I think, by and

9  large, we all slept very good at night.

10  Q. And you mentioned when we were looking at the draft agenda

11  that PwC and Crowe were always in attendance at the audit

12  committee meetings; is that correct?

13  A. Yes.

14  Q. And were they there for only part of the time, or were they

15  there the entire time for those meetings?

16  A. The entire time.

17  Q. And you mentioned -- well, we'll come to that in a minute.

18      So what was the role -- from the audit committee's

19  perspective, what was the role of an independent, external audit

20  in the way that BancGroup, the holding company, and the Bank

21  conducted its business?

22  A. Well, the role of the independent auditor would be to just

23  have another set of eyes that was not part of management that

24  would come in and review the work of management.

25  Q. And was that required for BancGroup's public company

1  reporting obligations?

2  A.  It was.  We had to have -- we had no choice.  We had to

3  appoint an independent auditor or select one.  We would have

4  done it either way.  But, yes, it was a requirement as a

5  publicly held company.

6  Q.  And was it required for the Bank and BancGroup for their

7  bank regulatory obligations?

8  A.  Yes, it was.

9  Q.  Do you recall receiving materials from PwC describing their

10  relationship and proposed interactions with audit committees of

11  the clients?

12  A.  Are you talking about specific meetings or in general?

13  Q.  No, I'm talking about written materials.  Do you recall

14  receiving from time to time written materials from PwC?

15  A.  Yes.

16       MR. COLEMAN:  Would you please put up Exhibit P-3053.

17  And if you go to the next page, the letter to the members of

18  audit committees of our clients.

19  Q.  In May 2003, BancGroup -- the BancGroup audit committee was

20  a client of PwC's; correct?

21  A.  Yes.  Correct.

22  Q.  Is this document an example of the types of communications

23  that you would receive from time to time from PwC?

24  A.  It looks very typical of those type documents, yes.

25  Q.  Okay.  I want to ask you about a few of the things that PwC

1    says in this document and get your reaction to them.  On page 2

2    in the middle of the page --

3              MR. COLEMAN:  If you would blow up that middle part

4    right there.

5    Q.  The third line down, it talks about the recognition of the

6    importance of a strong and effective relationship between a

7    company's audit committee and its independent auditors.  Did you

8    agree that that was an important feature of the relationship

9    between the audit committee and PwC?

10   A.  Yes.

11             MR. COLEMAN:  And if you would go over to page 4 of the

12   document and, at the bottom, blow up that bottom paragraph.

13   Q.  If you look about halfway down, fourth line, it says, The

14   relationship between the audit committee and our firm is a

15   particularly vital one.

16        Did the audit committee view PwC's relationship as vital?

17   A.  Yes.

18   Q.  And if you go farther down, it describes that our support of

19   the audit committee is intended to enable it --

20             MR. COLEMAN:  Blow that back up again.

21   Q.  And if you go to the fourth line from the bottom, Our

22   support of the audit committee is intended to enable it to

23   effectively represent the interests of the shareholders.

24        Did you view PwC's relationship and the performance of their

25   work as being essential to helping the audit committee

1 effectively represent the interests of shareholders?

2 A.  Yes.

3 Q.  It also talks about at the bottom, last line of that,

4 preserving our, being PwC's, independence from management.  Did

5 you think that was -- that was important as well?

6 A.  Yes, it was.

7 Q.  And why?  Tell the Court why, in your view, from the

8 perspective of the audit committee, that PwC's independence from

9 management was important.

10 A.  Well, as I said earlier, they're an independent auditor or

11 external auditor.  And I think the reason that they're called

12 independent auditors is probably this very section right here.

13 It's important to have someone other than management involved in

14 the preparation and auditing of the financial statements.

15 Q.  And what are some examples of the significance of PwC's

16 independent auditors being different from the company's risk

17 management employees?

18 A.  They could operate independent of the company's org chart.

19 They could enter wherever they needed or wanted to without

20 having the dynamics of employee-to-employee interaction.

21 Q.  Okay.  What about any type of specialized expertise?  Did

22 that come into your calculation between PwC and company

23 employees?

24 A.  Yes.  They were certainly, as auditors, trained professional

25 auditors, whereas our employees were -- had other duties within

```
1   the Bank in addition to having a hat on as a part of our

2   internal controls.

3   Q.  Did your company employees -- were they obligated to perform

4   audits according to certain outside standards?

5   A.  They were not.

6   Q.  What about PwC?

7   A.  They were.  As a publicly traded company, again, we had to,

8   obviously, have an independent audit firm engaged.  And unlike a

9   nonpublic company, a public company's audit has to be prepared

10  in accordance with the standards of PCAOB, the Public Company

11  Accounting Oversight Board.

12  Q.  Okay.  Let me ask you -- I want to go back to Exhibit 3053

13  and go to the seventh page of the exhibit, please.  And there's

14  a heading on the seventh page --

15      (Off-the-record discussion)

16          MR. COLEMAN:  No.  P -- the same exhibit we had up

17  there, P-3053.  Page 7.

18  Q.  So under the heading Acting With Objectivity --

19          MR. COLEMAN:  If you could blow up that paragraph.

20  Q.  It says, starting at the end of the third line, The

21  company's audit committee can expect us to contact it directly

22  and timely if we have a concern about an important financial

23  reporting or disclosure matter that has not been addressed

24  satisfactorily by company management.

25      Why was that important to you?
```

1    A.  So that the audit committee could be assured that if there

2    were obstacles that were encountered, that we would know about

3    it and be able to facilitate a solution to that.

4    Q.  And do you recall at any point in time in, say, the 2003 to

5    2009 time frame that PwC ever came to you with respect to any

6    activities of the mortgage warehouse lending division and told

7    you they didn't think there was something sufficiently addressed

8    by company management?

9    A.  They did not.

10   Q.  Then flip to the next page of this exhibit, the last thing

11   we'll look at here.  Under the heading of Respecting the

12   Importance of Auditor Independence --

13          MR. COLEMAN:  And just highlight that first sentence.

14   Q.  Is says, Auditor independence in fact and in appearance is

15   essential to investors' and other stakeholders' confidence in

16   audited financial information.

17       Did you agree with that?

18   A.  Yes.

19   Q.  And did you agree with that with respect to both Colonial

20   BancGroup and Colonial Bank?

21   A.  Yes.

22   Q.  Based on the materials that you received from PwC and the

23   interactions you had with PwC, did you understand that PwC would

24   be auditing all aspects of Colonial BancGroup and Colonial

25   Bank's business?

1  A.  Yes.

2  Q.  Did you understand they would be auditing all significant

3  accounts of the business?

4  A.  Yes.

5  Q.  Did you expect them to speak up to you if they saw something

6  that they thought wasn't right?

7  A.  Yes.

8  Q.  Did you expect PwC to rely on or take management's word for

9  things rather than investigate them themselves?

10  A.  Well, we expected them to rely upon management for

11  information but not to use it as a sole criteria, no.

12  Q.  Okay.  Did the audit committee enter into engagement letters

13  with PwC for each of the audits?

14  A.  Yes.

15  Q.  Okay.

16      MR. COLEMAN:  And I will represent for the record that

17  we have Exhibits A-1, 2, 3, 4, and 7, which are the engagement

18  letters for 2002, '3, '4, '5, and '8, which we will also address

19  during a break, so we won't go through each one of them.  But

20  can we look at Exhibit P-1525, please.

21  Q.  And this was a document that says on the front, Report to

22  the audit committee of the board of directors, October 14, 2008.

23  And then if you look at the second page of the document --

24      MR. COLEMAN:  And just blow up that first -- that part,

25  the first half of the page right there.

1  Q.  Do you recognize this as a document that PwC provided to the

2  audit committee on or around October 14th of 2008 in connection

3  with its proposal and engagement letter for the 2008 audit?

4  A.  Yes.

5  Q.  Okay.  And is this, again, typical of the type of documents

6  that you would receive on a regular basis from PwC in connection

7  with the work they were going to be doing?

8  A.  Yes.

9  Q.  And this refers in the second line to our planned integrated

10  audit of the 2008 consolidated financial statements of the

11  Colonial BancGroup.  And I think you told me earlier that that

12  would include the holding company as well as Colonial Bank?

13  A.  Yes.

14  Q.  And the next sentence states that while our integrated audit

15  approach is consistent with prior years, there will be increased

16  emphasis on areas with higher risks due to the current credit

17  environment.

18      Did you understand that in this 2008 audit, anyway, that PwC

19  was going to be focusing on higher risks due to credit

20  conditions?

21          MR. LEVINE:  Objection, Your Honor.  Leading.  I've

22  stopped it for a while, but now we're just getting to the point

23  where it's getting a little more substantive.

24          THE COURT:  It has been leading, but I just figured

25  that, you know, it was understood, but --

1    MR. COLEMAN:  I will -- I think we've been going

2 through documents that are simply documents that are documents

3 PwC provided, but I'll be mindful of that going forward, Your

4 Honor.

5    THE COURT:  Okay.

6 Q.  Let me ask you to -- or ask Tim to go to the fourth page of

7 this document that has at the top Audit Objectives.

8    MR. COLEMAN:  And just blow up the top three or four

9 bullet points.

10 Q.  So did this document accurately reflect what you understood

11 to be the audit objectives that PwC was proposing for the 2008

12 audit?

13 A.  Yes.

14 Q.  And it refers to an audit in accordance with standards of

15 PCAOB in the first bullet point.  That's the standard you

16 mentioned in your testimony a few minutes ago?

17 A.  Correct.

18 Q.  And the second bullet point, read for the Court what the

19 second bullet point says.

20 A.  Obtain reasonable assurance about whether the consolidated

21 financial statements are free of material misstatement, whether

22 caused by error or fraud, and render an opinion thereon.

23 Q.  And was that -- was that accurate to your understanding

24 based on your position as chair of the audit committee about the

25 scope of PwC's audit?

```
1   A.  Yes.
2           MR. COLEMAN:  I'm going to ask you, Tim, to flip to the
3   next page, please, and highlight just the top part of the page
4   with the funnel.
5   Q.  And did you understand that PwC was proposing to do a
6   top-down risk-based audit approach for the 2008 audit?
7   A.  Yes.
8           MR. COLEMAN:  And let me ask you to go to the next
9   page, please.  And just highlight that top paragraph.
10  Q.  And read for the Court what -- just the first sentence
11  there.
12  A.  Our top-down risk-based approach drives the identification
13  of significant accounts and locations for testing.
14  Q.  And did you -- there's been a lot of testimony in this case
15  so far about the assignment-of-trade facility, or AOT, at
16  Colonial Bank's mortgage warehouse lending division.  You're
17  generally familiar with that; correct?
18  A.  Yes.
19  Q.  Did you consider AOT to be a significant account that PwC
20  would be auditing?
21  A.  Yes.
22  Q.  Did you understand mortgage warehouse lending division to be
23  a significant location within the company?
24  A.  Yes.
25  Q.  All right.
```

1          MR. COLEMAN:  I want to ask you now to pull up, please,

2    Exhibit A-7.  And if you would just blow up the top part.

3    Q.  Mr. Beville, do you recognize this document as the

4    engagement letter that PwC and the audit committee entered into

5    for the year -- for the audit for the year 2008?

6    A.  Yes.

7          MR. COLEMAN:  And if you would go to the last page of

8    the document, please, and blow up the line at the top and the

9    signature at the top.

10   Q.  That's your signature; correct, sir?

11   A.  Yes.

12   Q.  And you signed this on behalf of Colonial BancGroup, Inc.,

13   by and through its audit committee; correct?

14   A.  Yes.

15         MR. COLEMAN:  Okay.  Let's go back to the first page of

16   the engagement.

17   Q.  And I just want to ask you some questions both about PwC's

18   promises in this letter and about some things that management

19   was going to be responsible for in this letter.  So let's start

20   with the second paragraph under that first heading in the middle

21   of the page.  You understood that PwC was proposing to perform

22   an integrated audit of the consolidated financial statements at

23   December 31, 2008; correct?

24   A.  Yes.

25   Q.  And you talked before about an integrated audit.  Tell me

1   again in the context of this engagement letter what your

2   understanding of an integrated audit means.

3   A.  It includes both the financial statements and the internal

4   controls.

5   Q.  Okay.  Let me ask you to look at the last sentence of that

6   paragraph that's blown up and read that to the Court where it

7   says, If, for any reasons.

8   A.  If, for any reasons caused by or relating to the affairs or

9   management of the BancGroup, we are unable to complete our

10  integrated audit, we may decline to issue a report as a result

11  of this engagement.

12  Q.  And I take it that did not happen in 2008; correct?

13  A.  Correct.

14  Q.  And to your knowledge, did that happen in any of the years,

15  2003 to 2008?

16  A.  No.

17  Q.  If you would look at the bottom --

18         MR. COLEMAN:  Let's go to the bottom of that page and

19  highlight the last paragraph.  This refers to our, PwC's,

20  responsibilities and limitations.  If you would highlight the

21  sentence that begins in the fourth line in the middle, The audit

22  will include.

23  A.  The audit will include examining on a test basis evidence

24  supporting the amounts and disclosures in the financial

25  statements, assessing the accounting principles used and

1 significant estimates made by management, and evaluating the

2 overall financial statement presentation.

3 Q.  Mr. Beville, on behalf of the audit committee, did you

4 understand that PwC, in the course of this audit, would be

5 examining evidence to support material balances on BancGroup's

6 financial statements?

7 A.  Yes.

8         MR. COLEMAN:  Let me ask you to go to the second page,

9 please.  And if you would just highlight the first part of the

10 first full paragraph.

11 Q.  It refers to an audit of financial -- internal controls over

12 financial reporting and an opinion on the effectiveness of

13 BancGroup's internal controls.  What was the significance to the

14 audit committee of PwC expressing an opinion on the

15 effectiveness of the company's internal controls?

16 A.  It gave another level of affirmation that the controls that

17 we had in place were operating or effective, as we had expected

18 or wanted them to be.

19         MR. COLEMAN:  Okay.  Let me ask you to go down farther

20 down that page, Tim, to the second to the last paragraph, right

21 there.  Blow that up.

22 Q.  PwC states that all significant deficiencies and material

23 weaknesses relating to internal control over financial reporting

24 identified while performing our work will be communicated in

25 writing to management and the audit committee.

1    Did -- in connection with this audit, did PwC communicate

2  any deficiencies with respect to mortgage warehouse lending to

3  the audit committee?

4  A.  No.

5  Q.  There's also a reference to communicating -- excuse me.

6        MR. COLEMAN:  Go to the next page, actually, and in the

7  middle of the next page, the paragraph that begins just below

8  the middle, We are also responsible.

9  Q.  This talks about informing the audit committee of certain

10 things.  And if you just read the first part of that paragraph,

11 there is a reference to, We are responsible for determining that

12 the audit committee is informed about certain matters relating

13 to the conduct of our audits including any disagreements with

14 management about matters that could be significant to

15 BancGroup's financial statements.

16    Do you recall PwC ever communicating to the audit committee

17 any disagreements with management that related to any aspect of

18 the mortgage warehouse lending division?

19 A.  No.

20 Q.  They also state in this paragraph, small double I, that they

21 would communicate any serious difficulties encountered in

22 performing the audit.

23    Do you recall whether PwC ever communicated to the audit

24 committee any serious difficulties in -- they encountered in

25 performing the audit as it related to any aspect of the mortgage

1    warehouse lending division?

2    A.  No.

3    Q.  Now, at the bottom of that page, if you go back out, it

4    says, Management Responsibilities.  Did you understand that

5    there were some things that management -- they wanted management

6    to do in connection with this engagement?

7    A.  Yes.

8    Q.  Okay.  Now, you've seen this audit letter -- excuse me --

9    this engagement letter, and we'll look at some specific things.

10   But as chair of the audit committee, do you believe that the

11   audit committee and management discharged their obligations

12   under this letter?

13   A.  Yes.

14   Q.  And do you believe that to be the case with respect to the

15   other audits that were conducted by PwC from 2003 forward?

16   A.  Yes.

17   Q.  It says in this paragraph that management is responsible for

18   the financial statements.  And do you agree with that?

19   A.  I do.

20   Q.  Okay.  Do you -- are you aware of any time that management

21   put together financial statements that either the audit

22   committee or senior management knew were not accurate?

23   A.  I'm not aware of any such occasion.

24   Q.  It talks about internal -- maintaining adequate --

25   establishing and maintaining adequate control -- internal

1  controls over financial reporting.  From your perspective as

2  chair of the audit committee, do you believe the audit committee

3  discharged that obligation?

4  A.  Yes.

5  Q.  What role did the independent folks you had working with

6  you, Crowe and PwC, have in helping establish and test those

7  internal controls?

8  A.  Would you repeat the question?  I was reading.

9  Q.  Oh, sure.  I'm sorry about that.

10     What role did the independent audit professionals that the

11  audit committee retained, Crowe and PwC, have in establishing

12  and maintaining and testing those internal controls?

13  A.  They were separate from one another.  There was no common

14  answer to that because Crowe had a responsibility or was hired

15  to assist management and the audit committee with risk

16  assessment and the design of controls and the testing of those

17  controls.

18  Q.  And did PwC audit those controls?

19  A.  PwC had a responsibility to opine on management's assertion

20  about the effectiveness of those internal controls.  And that

21  assertion had to be apart from our own and I think, in fact,

22  also subject to PCAOB criteria.

23  Q.  And did you understand that if PwC thought that management

24  was not fulfilling their responsibility in any of these regards,

25  that they would communicate that to the audit committee?

1  A.  Yes.

2  Q.  And did PwC ever communicate to the audit committee that

3  they did not believe that management was fulfilling these

4  responsibilities with respect to anything having to do with the

5  mortgage warehouse lending division?

6  A.  They did not.

7  Q.  There's a reference in this paragraph to establishing

8  policies and procedures that pertain to the maintenance of

9  accounting records and the safeguarding of assets.  Do you

10  believe that the audit committee fulfilled that responsibility

11  by having policies and procedures?

12  A.  Yes.

13  Q.  Did you expect that if PwC thought that management or the

14  audit committee was not filling that responsibility, that PwC

15  would let the audit committee know about that?

16  A.  Yes.

17  Q.  And did they ever do so?

18  A.  No.

19  Q.  Let me ask you to look over to the top of the next page,

20  please.

21       MR. COLEMAN:  And just highlight the top half of the

22  first paragraph.

23  Q.  The first line talks about design and implementation of

24  programs and controls to prevent and detect fraud.  Did the

25  audit committee put in place programs and controls to aim to

1  prevent and detect fraud?

2  A.  Yes.

3  Q.  Did PwC ever communicate to the audit committee that it

4  believed those programs or controls or procedures were not

5  effective?

6  A.  No.

7  Q.  What specific -- let's talk specifically about mortgage

8  warehouse lending.  Were you aware of any of the particular

9  processes or procedures or personnel who were in place at

10  mortgage warehouse lending for the purpose of discharging some

11  of these goals?

12  A.  Yes.

13  Q.  Can you tell the Court about that.

14  A.  Cathie Kissick was in charge of mortgage warehouse lending

15  in our Orlando region.

16  Q.  Okay.  What about within the mortgage warehouse lending

17  division?  Were there risk control or compliance groups or

18  employees with that -- within their scope of responsibilities?

19  A.  There were.  There was -- it was probably the only unit

20  where we imbedded a dedicated person for control purposes.  Pam

21  Vitto was her name, as I recall.

22  Q.  And did you understand that Ms. Vitto was supposed to be

23  performing work under PCAOB audit standards?

24  A.  No, she was not.

25  Q.  Did you understand that Ms. Vitto was supposed to be

1  fulfilling or taking the place of PwC's role?

2  A.  No, she was not.

3  Q.  Do you believe that if PwC thought management was not

4  fulfilling its responsibilities in this regard regarding

5  programs and controls, that they would let the audit committee

6  know about it?

7  A.  Yes.

8  Q.  And did they ever let the audit committee know that they

9  thought mortgage warehouse lending policies and procedures were

10  not adequate?

11  A.  They did not.

12  Q.  This goes on to say in the next line that management should

13  inform us about all known or suspected fraud affecting the

14  entity and then some --

15       MR. COLEMAN:  No, the first line -- informing us -- at

16  the end of the first line.

17  Q.  Informing us about all known or suspected fraud affecting

18  the entity.  And then it identifies management, employees, and

19  others where the fraud could have a material effect on the

20  financial statements.

21     Sir, were you or, to your knowledge, the audit committee

22  ever aware of any known or suspected fraud that could have a

23  material impact on the financial statements of the company?

24  A.  No.

25  Q.  There's also a reference to informing PwC of knowledge of

1  any allegations of fraud or suspected fraud received in

2  communications from employees.  Did you have any knowledge of

3  known or -- excuse me.  Did you have any knowledge of

4  allegations of fraud or suspected fraud from employees?

5  A.  No.  The only exception I'll offer to that is that in the

6  banking business, you deal with fraud every day, so it was an

7  inherent part of what the audit committee did.  But there were

8  never occasions that I recall where there was any mention of

9  anything that was material or out of the garden variety of fraud

10  that we had to contend with.

11  Q.  Sorry.  Were you aware at any point in time of any

12  allegation of fraud of the type that's involved in -- that this

13  lawsuit is about, fraud in the AOT and COLB product lines in the

14  mortgage warehouse lending division?

15  A.  No.

16  Q.  Did the audit committee direct that PwC have access -- well,

17  let me ask it another way.  Did the audit committee put any

18  limits on what PwC could do in connection with its audits?

19  A.  None.

20  Q.  Did it limit what type of documents PwC could ask for?

21  A.  No.

22  Q.  Did it limit the types of people or the particular people

23  PwC could talk to about -- to get information for their audits?

24  A.  No.

25  Q.  Did PwC ever make the audit committee aware of any issues or

1  problems or barriers they had in terms of getting access to

2  documents or people to do their audit?

3  A.  No.

4  Q.  Did PwC ever indicate in the 2003 to 2008 time frame that it

5  believed the audit committee or management of Colonial Bank was

6  not fulfilling its obligations under the engagement letters?

7  A.  No.

8  Q.  Did BancGroup pay PwC for its audits each year?

9  A.  Yes.

10  Q.  I want to talk just a little bit about just the general

11  nature of the interaction between the audit committee and PwC in

12  kind of the normal course of the audit committee's business.  I

13  think you mentioned that the audit committee always included PwC

14  in those meetings.

15  A.  Correct.

16  Q.  Did PwC receive -- or what types of materials did PwC

17  receive in connection with those audit committee meetings?

18  A.  They would have received the same material that the members

19  of the committee received, the three-ring binder that I referred

20  to earlier, if that's the nature of your question.

21  Q.  And did they participate in the entire meeting?

22  A.  They did.

23  Q.  Were they allowed to ask questions?

24  A.  Yes.  They were encouraged to ask questions.

25  Q.  And did they do so from time to time?

1  A.  Yes.

2  Q.  Why did -- why was it important to the audit committee and

3  to the company to include PwC as an integral part of these audit

4  committee meetings?

5  A.  Well, as I said earlier, the committee meetings were the

6  glue that held the different layers together.  So having

7  everyone at the same table in the same room, hearing the same

8  thing, was very important, we thought, to the effective

9  operation of the audit committee and its work.

10 Q.  What, if any, impact -- or what, if any, impact did it have

11 on PwC's understanding of the overall company's business?

12 A.  It would improve it and deepen it.  They could get it from

13 annual reports, but you certainly can't read an annual report

14 and get a sense of what you can get by participating in eight

15 audit committee meetings per year.

16 Q.  And you had mentioned earlier that there were executive

17 sessions held with just the PwC representatives.  Was that your

18 testimony?

19 A.  Yes.

20 Q.  And why was it important for the audit committee to have

21 executive sessions just with PwC representatives?

22 A.  Well, for one reason, as I mentioned earlier, there were a

23 lot of people in the room at the meetings.  And so we didn't

24 haven't to have any inhibitions about them being open about

25 concerns.  But primarily, the people -- some of the people in

1  the room were, obviously, members of management.  And we wanted

2  them to have an opportunity to have a conversation with the

3  committee absent management's attendance.

4  Q.  And why was that important to the audit committee?

5  A.  If there was a concern that had been problematic in the

6  dealings with management that may be difficult to express

7  through management or in the context of an audit committee

8  meeting, they would have an opportunity to express that to us in

9  private.

10  Q.  Okay.  Did the audit committee -- this lawsuit has to do

11  with fraud that was engaged in the mortgage warehouse lending

12  division.  Did the audit committee engage in specific oversight

13  over time of the mortgage warehouse lending division at Colonial

14  Bank?

15  A.  Yes.

16          MR. COLEMAN:  If you would put up Exhibit P-3043,

17  please.

18  Q.  Mr. Beville, do you recognize this exhibit as a presentation

19  that Cathie Kissick made to the audit committee on April 17,

20  2007, regarding the Colonial Bank mortgage warehouse lending

21  division?

22  A.  Yes.

23  Q.  Why did the audit committee around this point in time ask

24  Ms. Kissick to make this presentation?

25  A.  Well, the date of it is April 17th, 2007.  And obviously,

1  that was a time that we're all aware was full of stress in the

2  financial segment. Mortgage warehouse is central to a lot of

3  the stress as it relates to mortgages and home ownership and

4  other financing, and we felt like it would be important to have

5  her come and give us some insight into that division, all things

6  considered.

7  Q. And, again, was this a meeting in which PwC representatives

8  were present?

9  A. Yes.

10 Q. Did they receive the materials that Ms. Kissick provided to

11 the audit committee?

12 A. They did. And it was also -- I think we had these handouts,

13 if I recall, and it was a PowerPoint as well.

14 Q. Okay. I want to just ask you a couple of questions about

15 different aspects of this document. If you would go first to

16 page 5, please. So this is titled Business Overview, Asset

17 Types. Do you recall that Ms. Kissick gave an overview of the

18 different types of assets at the mortgage warehouse lending

19 division?

20 A. I do.

21 Q. And the bottom bullet point, securities in process purchased

22 under agreement to resell, that refers to what's been known as

23 the AOT facility?

24 A. Yes.

25 Q. And did Ms. Kissick explain the nature and dynamics of each

1  of the different assets listed here?

2  A.  Yes.

3  Q.  Flip over to two pages to page 7, please.  This is --

4  Ms. Kissick lists the management team of the mortgage warehouse

5  lending division.  What did you and the audit committee take

6  away from this presentation regarding management of the mortgage

7  warehouse division?

8  A.  Tenured and experienced at what they did.

9  Q.  And how was Ms. Kissick regarded at this point in time

10  within the company based on her work in the mortgage warehouse

11  lending division?

12  A.  She was highly regarded.  Mortgage warehouse had been a

13  profitable, effective line of business for the company, and she

14  was held in high regard.

15        MR. COLEMAN:  Let me ask you to go to page 10, please.

16  Q.  This reports on the MWL top customers.  So does this reflect

17  that Ms. Kissick gave a report of the state of the accounts and

18  the best customers of the division?

19  A.  Yes.

20  Q.  And who is the only AOT customer in this list that

21  Ms. Kissick provides?

22  A.  Taylor, Bean & Whitaker.

23  Q.  And do you understand the numbers here to be in millions of

24  dollars?

25  A.  Yes.

1  Q.  And do you consider AOT at $641 million as of this date to

2  have been a significant account within the Bank?

3  A.  I do.

4  Q.  Did Ms. Kissick also address certain risk management

5  processes and procedures in place at the mortgage warehouse

6  lending division?

7  A.  Yes.  There were, I believe, mitigants that were a part of

8  this presentation.

9  Q.  Let's go to page 17, please.  So Ms. Kissick, in the

10 presentation, identifies risk of warehouse client fraud or

11 mortgagee fraud as a risk to the business; correct?

12 A.  Yes, she did.

13 Q.  And then there's a list of risk mitigants.  How -- what did

14 the audit committee take from this presentation about fraud

15 protection ongoing at mortgage warehouse lending division?

16 A.  It was well thought out and had its own internal controls

17 commensurate with the nature of warehouse operations.

18 Q.  Let me ask you to go -- or ask to go to page 28 and then 29.

19 Did Ms. Kissick describe the document Custody Group in this

20 presentation?

21 A.  Yes.

22 Q.  Okay.  And go to the next page, page 29.  And if you look at

23 the middle paragraph in the bottom of that page, did Ms. Kissick

24 talk about the files that were available in the custody

25 department?

1  A.  Yes, she did.

2  Q.  Do you recall whether any of the PwC representatives at the

3  meeting spoke up or raised any particular issues at this

4  meeting?

5  A.  I have no recollection one way or the other.

6  Q.  They -- did they have the opportunity to do so?

7  A.  They did.

8  Q.  And did you -- how did the audit committee feel about the

9  fact that PwC was in this meeting hearing all about the details

10  of the mortgage warehouse lending division?

11  A.  Consistent with what I described earlier about everyone

12  having the same depth of understanding about the company

13  operations.

14  Q.  Did the audit committee expect, based on this and other

15  dealings with PwC, that they would have understood the nature of

16  the business of the mortgage warehouse lending division?

17  A.  Yes.

18  Q.  Did the audit committee expect PwC to be auditing the

19  significant accounts of the mortgage warehouse lending division?

20  A.  Yes.

21  Q.  Did PwC ever tell the audit committee that they were not

22  confirming the existence of AOT collateral?

23  A.  No.

24  Q.  What would have been your reaction as chair of the audit

25  committee if PwC had informed you, after seeing this

1 presentation in 2007, that they didn't understand the details of

2 how the AOT transactions worked?

3 A.  Stunned.

4 Q.  What if they had told you that they weren't specifically

5 auditing to check the collateral for AOT and COLB?

6 A.  Stunned.

7 Q.  And what would you have done?  What would your reaction have

8 been?

9 A.  It would have been immediate consultation with the audit

10 committee to discuss that and understand the problem and resolve

11 it.

12 Q.  I want to ask you a few questions regarding to the concept

13 or -- and issues around sale accounting.  We're not going to

14 spend a whole lot of time on this.  But you understood that sale

15 accounting and a standard known as FAS 140 applied to certain

16 lines of the mortgage warehouse lending assets?

17 A.  Yes, it did, to COLB.

18 Q.  Okay.  And did you understand that COLB and AOT were being

19 treated for accounting purposes as purchases -- sales and

20 purchases of either loans or pools of loans?

21         MR. LEVINE:  Objection.  Leading.

22         THE COURT:  Sustained.

23 Q.  What was your understanding of why sales accounting

24 treatment, FAS 140, was being applied to those assets in

25 mortgage warehouse lending?

1    A.  We looked earlier at the characterization of the assets

2    within mortgage warehouse, and I think there were four working

3    capital lines, mortgage warehouse lines, COLB, and AOT.  The

4    first two were considered to be loans.  The bottom two were not.

5    And so if the bottom two were not -- or particularly COLB, in

6    the context of your question -- was not a loan, it would not be

7    considered within the legal lending limits of the Bank.

8    Q.  Did you or, to your knowledge, the other members of the

9    audit committee have the expertise to make a determination about

10   whether a particular type of transaction qualified under FAS

11   140?

12   A.  No.

13   Q.  Were you or other audit committee members experts in

14   Generally Accepted Accounting Principles?

15   A.  No.

16   Q.  Did the audit committee rely in any way on PwC in connection

17   with the determination of whether something should be treated

18   under FAS 140 or not?

19   A.  Yes.

20   Q.  And how did the audit committee -- in what way did the audit

21   committee rely on PwC?

22   A.  Management would prepare the statements, as we said earlier.

23   And if there were ever a new area of accounting, whether it's

24   FAS 140 or any other area, management would be in consultation

25   with our accountants about the proper treatment of those

1  transactions, whether it was how to -- what depreciation

2  schedule to use or how to treat sale accounting.  And so having

3  an independent auditor available to work with management in that

4  regard and either confirm or deny the applicability of a certain

5  accounting treatment was obviously necessary.

6  Q.  And were you aware that in prior -- in -- from about 2003

7  forward, that PwC had given an opinion that COLB was eligible

8  for sales accounting treatment?

9        MR. LEVINE:  Objection.  Leading.

10        THE COURT:  Counsel, really.  This is your witness, you

11  know.  I think they've been more than understanding.

12        MR. COLEMAN:  I'll rephrase it, Your Honor.

13  Q.  Did you have an understanding one way or the other about

14  PwC's -- whether PwC had given an opinion regarding COLB as

15  eligible for sales accounting?

16  A.  We had been doing it for years, and they had always given us

17  a clean opinion.  So, yes, there had to be a confirmation that

18  the treatment that we were applying for the years you described

19  was, in fact, correct and qualified under FAS 140.

20  Q.  Do you recall PwC ever coming to the audit committee and

21  explaining whether there was anything controversial or any

22  questions about the eligibility for FAS 140 treatment?

23  A.  I did in April of 2008.  It came --

24  Q.  Let me -- we will talk about that.  Let me just ask you, do

25  you have a recollection one way or the other whether there was

1  any discussion by PwC about the significance of sale accounting

2  treatment prior to what you're about to go into in April of

3  2008?

4  A.  No.

5  Q.  All right.  So tell me what you recall about what happened

6  in April of 2008.

7  A.  An issue surfaced.  I believe it came about from the

8  regulators, OCC at the time, who were calling in to question the

9  accounting treatment that COLB was receiving specifically under

10  FAS 140 and whether or not it was correct.

11  Q.  And did the audit committee ask PwC to become involved in

12  the response to that?

13  A.  We did.  Yes.

14  Q.  What was your reaction to the fact that this issue was being

15  raised by the OCC in April of 2008?

16  A.  Surprised.

17  Q.  And why were you surprised?

18  A.  Because it had been treated that way from day one, and

19  everybody had stacked hands that that was the correct accounting

20  treatment for it.  I didn't understand why the issue was just

21  now being raised.

22  Q.  And what was the nature of your involvement with PwC in

23  the -- in this April 2008 time frame once the OCC raised the

24  question?

25  A.  The issue came about right at the time we had the April

1  meeting.  So it originated, I believe, in the audit committee

2  meeting.  And it consumed, as you could imagine, a lot of

3  discussion then; and then it carried on into the board meeting,

4  which was the next day.  And the issue was still unresolved at

5  the completion of the board meeting.  So I decided to stay in

6  Montgomery, realizing that there were going to be our PwC

7  representatives there as well as bringing in other PwC

8  representatives to work through this issue in a timely way.

9  Q.  Did you understand that PwC brought in national office

10 representatives here?

11 A.  Yes.  Brought in outside help.

12 Q.  Who do you recall that you dealt with during this time

13 frame?

14 A.  Certainly dealt with Gary Westbrook, the lead partner on our

15 account at the time, or our relationship at that time.  There

16 were others who I met that were in the office in connection with

17 that and then had a phone conversation with Sam DiPiazza at one

18 point in time.

19 Q.  And for the benefit of the Court, who was Mr. DiPiazza?

20 A.  He was the president and chairman of PwC.

21 Q.  Okay.  And did you understand the situation was resolved one

22 way or the other?

23 A.  Yes, it was.  In time, it was resolved.  And our accounting

24 treatment -- and I can't recall all the specific details or

25 layers of the analysis that it went through, but it was deep and

1   wide.  And the conclusion was that the accounting treatment, as

2   performed in the past, was correct going forward.

3   Q.  Did you have any understanding one way or the other of the

4   basis for why it had been done in the past versus why it was --

5   versus the explanation that was being given in April of 2008?

6       Let me -- that was a bad question.  Let me rephrase that

7   question.

8       What understanding did you have of any reliance that the

9   BancGroup and Bank placed on PwC's analysis in this April 2008

10  time frame.

11  A.  We relied upon it the same as we had always relied upon it

12  in the past, that their opinion in the past was correct.  And

13  then when we reaffirmed that it was correct going forward, we

14  similarly accepted that as verification that their treatment did

15  not need to change.

16  Q.  Did the audit committee direct PwC to reach any particular

17  conclusion one way or the other on that?

18  A.  No, we did not.  We wanted it timely and we wanted it right;

19  but we did not, obviously, have any persuasion or say-so in what

20  that conclusion needed to be.  It was in their court.

21  Q.  And if -- in this April 2008 time frame, if PwC had come to

22  the audit committee and said that we now realize FAS 140

23  treatment is not appropriate, what would your reaction, as chair

24  of the audit committee, have been?

25  A.  Again, it would have been very problematic and surprising,

1  given the impact on the legal lending limits if we had to recast

2  or recharacterize the nature of those assets.

3  Q.  And if the consequences -- if that had happened and the

4  consequences included a restatement, what would your reaction as

5  a member of the audit committee have been at that point?

6  A.  If it was necessary and if there was an accounting policy or

7  procedure that was incorrect, we would have to restate.  We had

8  done that once before.  And we didn't like it, but we knew that

9  that was part of being on the audit committee and part of being

10  a public company.  Sometimes that happens.

11  Q.  What -- you mentioned that it happened once before.  Can you

12  just briefly elaborate on that.

13  A.  Yes, sir.  It was 2005-2006 era, I believe -- era, E-R-A --

14  at a point in time when we were using hedge accounting.  And it

15  was a question, as I recall, related to the applicability of

16  hedge accounting in that situation.  And it was determined that

17  the treatment that we had been using was wrong, so we had to go

18  back and restate our financial statements because of that.  And

19  also, it caused our assessment of internal controls to likewise

20  be rendered to be ineffective.

21        THE COURT:  Counsel, is this a good place to take a

22  break?

23        MR. COLEMAN:  It's a perfect place to take a break.

24        THE COURT:  About how much more do you think you have

25  with this witness on direct?

```
 1          MR. COLEMAN:  Twenty minutes, maybe.

 2          THE COURT:  Okay.

 3          MR. COLEMAN:  No more than 30 minutes.  Say 15 to 30

 4  minutes.

 5          THE COURT:  Okay.  Let's take a 20-minute recess.

 6  Okay?  You may step down.

 7     (Recess was taken from 2:42 p.m. until 3:01 p.m., after

 8       which proceedings continued, as follows:)

 9          THE COURT:  Please be seated.  Whenever you're ready,

10  counsel.

11          MR. COLEMAN:  Thank you, Your Honor.

12          Would you turn back up D-49, please.

13  Q.  Mr. Beville, we talked early in your examination about

14  Exhibit D-49, which I think you identified as the audit policy

15  of Colonial Bank.

16          MR. COLEMAN:  Could you go to page 5 of the exhibit,

17  please?  And then blow up the paragraph just above the middle of

18  the page right there.

19  Q.  Would you read for the Court that first two lines of that

20  paragraph, please.

21  A.  The committee will also, under applicable regulation,

22  perform the duties required by law to be performed by an audit

23  committee or a fiduciary audit committee for Colonial Bank, NA

24  if Colonial Bank, NA does not have its own audit committee.  In

25  either case, to the extent permitted and in the manner required
```

1   by applicable laws and regulations.

2   Q.  And when you said earlier that the audit committee was

3   acting on behalf of both the holding company, BancGroup, and

4   Colonial Bank, was this the authority under which that occurred?

5   A.  Yes, sir.

6   Q.  Okay.

7       MR. COLEMAN:  Let me go to -- let's go to Exhibit A-69.

8   Q.  Do you recognize --

9       MR. COLEMAN:  Just blow up that first part.

10  Q.  Do you recognize this as the 10-K filed by Colonial

11  BancGroup for the year ending December 31, 2008?

12  A.  Yes, sir.

13  Q.  And if you look at page 82 --

14      MR. COLEMAN:  Would you blow up the top first half of

15  the first paragraph or so.

16  Q.  What are we looking at here on page 82?

17  A.  It's the independent auditor's opinion.

18  Q.  And if you -- what is -- and PwC, obviously, is the

19  independent auditor for this; correct?

20  A.  Yes.  That's correct.

21  Q.  And what is PwC giving their opinion about?

22      THE COURT:  Haven't we been through this, counsel?

23  Q.  What was your understanding as chair of the audit committee?

24  When you got this opinion --

25      First of all, let me ask you.  Was this a clean audit

1  opinion?

2  A.  Yes.

3  Q.  What were you understanding PwC to be telling the audit

4  committee by giving you a clean audit opinion for the year 2008?

5  A.  There were no material differences from management's

6  prepared financial statements, and that the internal controls

7  were operating in accordance with what management's assertions

8  had been regarding those controls.

9       MR. COLEMAN:  And can you go to the next page, please,

10  and blow up just the top half of the page.

11  Q.  Do you recognize this page, page 83, as the consolidated

12  balance sheet of Colonial BancGroup?

13  A.  I do.

14  Q.  Okay.  And do you recognize the fourth line down, Securities

15  purchased under agreements to resell, do you understand what

16  those assets are supposed to represent?

17  A.  Yes.  That would be the AOT assets.

18  Q.  Okay.  And when PwC gave you a clean audit opinion, what did

19  that tell you and the audit committee regarding the assets of

20  Colonial BancGroup and Colonial Bank?

21  A.  That they were as we had presented in the

22  management-prepared statements.

23  Q.  Did you receive clean audit opinions for all prior years

24  from PwC, particularly 2003, 4, and 5?

25  A.  Yes.

1 Q.  Okay.  And with respect to the clean audit opinions in those

2 prior years, what did that tell you about the assets on the

3 balance sheet for those years?

4 A.  That they were as management had presented them and as

5 audited by the accountants.

6 Q.  Did the audit committee of Colonial BancGroup and Colonial

7 Bank rely on those clean audit statements?  Audit opinions.

8 Excuse me.

9 A.  We did and others did as well.

10 Q.  How did the audit committee and the board of directors of

11 BancGroup and the Bank rely on those clean audit opinions for

12 conducting business?

13 A.  Affirmation that financials and the controls were

14 appropriate, that it was business as usual, and we could go

15 about conducting our affairs in the manner that we had planned.

16 Q.  Did Colonial BancGroup incorporate those into regulatory

17 filings, those --

18 A.  Yes.

19 Q.  -- financial statements?

20 A.  Yes.

21 Q.  Did Colonial Bank incorporate those into regulatory filings?

22 A.  Yes.

23 Q.  The opinion that was issued --

24       MR. COLEMAN:  Let's go back to the previous page, the

25 certification, and blow up the PwC signature at the bottom.

1  Include the date.

2  Q.  The date -- the date of the certification is what?

3  A.  March 2nd, 2009.

4  Q.  So as of March 2nd, 2009, PwC is certifying the accuracy of

5  the presentation of financial statements.  What did that mean in

6  the context -- to BancGroup and to Colonial Bank in the context

7  of what was going on in the markets as of March of 2009?

8  A.  I'm not sure I understand your question.

9  Q.  Okay.

10  A.  I apologize.

11  Q.  Fair enough.

12        THE COURT:  That's what happens when you stop leading.

13  I think you're going to have to be more specific about what

14  was -- what CBG planned to do at that time; right?  Isn't that

15  where you're going?

16  Q.  My question is March of 2009, what was your recollection --

17  what's your recollection of kind of the financial circumstances

18  that the holding company and all banks were facing around that

19  point of time?

20  A.  They were very stressed.

21  Q.  And the fact that you got a clean audit opinion from PwC for

22  the holding company in the consolidated statements, including

23  the Bank, how did that make the audit committee feel?

24  A.  It gave assurance that, again, management's statements were

25  correct as presented and it was business as usual and that there

1  were no surprises that would alter the course of our operations.

2  Q.  All right.

3         MR. COLEMAN:  Let's go back to page 83 with the assets

4  and the securities purchased under agreement to resell.

5  Q.  Having received PwC's clean audit opinion, what was your

6  understanding of the AOT line item that's reflected at little

7  over $1.5 billion?

8  A.  That it was validated and genuine and correct.

9  Q.  And did you later find out that was, in fact, not correct?

10  A.  We did.  And we found out that there was a fraud.  At the

11  time when we found it out, we were not initially -- we had no

12  clear understanding which line it was on, COLB or AOT or both.

13  But, yes, we understood that that line was impacted in some

14  manner by the fraud.

15  Q.  And have you come to understand that the assets on the

16  certified balance sheet were also impacted for the years 2003,

17  4, and 5?

18  A.  Yes.

19  Q.  Do you believe that the advances to TBW that resulted in

20  this impact on the balance sheet and the fictitious balance

21  benefited the Bank or harmed the Bank?

22  A.  Harmed the Bank.

23  Q.  Okay.  Did the Bank -- did the holding company continue --

24  CBG continue to operate after this in 2009 to support its

25  subsidiary, Colonial Bank?

1  A.  After --

2  Q.  After the clean audit opinion.

3  A.  Yes, we did.

4  Q.  Well, let me ask you just a little bit about the events of

5  the rest of 2009.  Did PwC at the point in time it issued this

6  audit opinion give any indication to the audit committee that it

7  felt like -- well, strike that.  Let me ask it a different way.

8      This was a clean, unreserved opinion in March of 2009;

9  correct?

10  A.  Yes.

11  Q.  Did there come a point in time in 2009 when there was a

12  leadership change in management at Colonial BancGroup and

13  Colonial Bank?

14  A.  Yes, there was.

15  Q.  Can you tell the Court about that.

16  A.  Sure.  In May, June of '09, our current chairman and CEO of

17  BancGroup and the Bank, Robert Lowder, elected to retire.  And

18  at that point in time, the management change that you're asking

19  about would have been Sim Sippial coming in as chairman of

20  BancGroup, and then I came in as interim president and CEO of

21  the Bank and BancGroup.

22  Q.  And I'm sorry.  You may have said it and but I didn't hear

23  it.  Approximately at what point in the year of 2009 did that

24  occur?

25  A.  That was in May.  I think I moved to Montgomery in June, so

1  it must have happened right at the tail end of May.

2  Q.  And did you -- how long did you stay in that position?

3  A.  I stayed in Montgomery for about six months.  I stayed there

4  until the Bank closed but remained there in a transitional

5  capacity for a period of time beyond that.

6  Q.  Okay.  I want to ask you about how you learned about the

7  discovery of the fraud in the mortgage warehouse lending

8  division.  Could you just tell the Court how that came to your

9  knowledge.

10 A.  Sure.  It was a normal morning in August and Sarah Moore,

11 our CFO's office was right next to mine.  And she came in and

12 described to me -- and told me that there had been a raid in the

13 Orlando office.  That was the first hint we had of anything awry

14 or amiss at all.

15 Q.  What was your reaction when she told you that?

16 A.  Stunned.  Bewildered.  We had been talking with interested

17 parties and with the regulators, including the FDIC, to navigate

18 through tumultuous times, and we were surprised that an event

19 like that occurred with no prior knowledge on our part.  We were

20 surprised that it had occurred, period.

21 Q.  And what did you do after you got that first knowledge?

22 A.  Well, we obviously did several things.  We notified the

23 board of directors of that via a telephone call.  And then we

24 immediately tried to start doing things to understand the nature

25 of the problem.

1    David Byrne and I went -- who was the in-house counsel at

2 the time -- to Orlando the very next day, I believe that it was,

3 and put several people on administrative leave.  Sandra Jansky,

4 our chief credit officer at the time, may have gone down there

5 with David and me.  I believe she did.  And she stayed after

6 David and I returned to try to make some sense and start

7 quantifying the nature of the fraud and what all had transpired

8 and taken effect.

9 Q.  Did you speak with Ms. Kissick during that initial time

10 frame after you became aware of the problem?

11 A.  I did.  When David and I went to Orlando, we spoke to

12 Mrs. Kissick to put her primarily on administrative leave.

13 Q.  And what did Ms. Kissick tell you, anything about what had

14 been going on?

15         MR. LEVINE:  Objection.  Hearsay.

16         MR. COLEMAN:  I think it's admissible to explain what

17 he was doing and how he went forward.

18         THE COURT:  Yes.  You can answer.

19 A.  Okay.  Yes.  We -- when I spoke with her -- and this was by

20 telephone because she was on vacation at the time this

21 occurred -- she was very rattled and made very little sense, but

22 it was immediately apparent that what we had understood to have

23 taken place had, in fact, taken place.  And she alluded to a

24 hole that was in mortgage warehouse lending, unquantified;

25 talking about other parties who may have some loss in that

1   instead of us, but that there was a hole there.  And we asked

2   her the size, and she could not describe it to us and wouldn't.

3   Described being approached in the parking lot by the FBI, who

4   got her in the back seat of her car to get admissions.  She was

5   beginning to tell us things that the point of which confirmed to

6   us immediately that the fraud was real.

7   Q.  What was the impact or the immediate impact of the raid and

8   the detection of the fraud on mortgage warehouse lending

9   operations at Colonial Bank?

10  A.  Obviously, it brought it to a screeching halt.  Chaotic.

11  Q.  Did the business with TBW continue at that point, or was it

12  shut down?

13  A.  It was effectively shut down and frozen and could not

14  continue.  In fact, it wasn't long after that that they had no

15  choice.  They were -- the secondary market agencies withdrew

16  their authority.  They lost all credibility.

17      And so in answer to your question, there was no business

18  conducted with TBW.  It was a matter of trying to figure out --

19  and this would have been a topic that Sarah and I had

20  immediately -- how to do and go about the unwinding of mortgage

21  warehouse to figure out what the math was and about getting an

22  accounting firm down there to quantify it.

23  Q.  So after you learned of the fraud and you went down the next

24  day to mortgage warehouse lending and you had the discussions

25  that you've just described, what happened next in terms of how

1  you dealt with this revelation?

2  A.  It continued to evolve as time went on.  We did get

3  ultimately notification through our attorney that, to our

4  surprise, Colonial was a target of a DOJ investigation.

5  Initially we thought, on the day that we became aware of the

6  fraud, that it was more TBW centered than Colonial centered.

7  That was an initial conversation with the lawyer.  And then as

8  time went on, it became apparent that both organizations were

9  involved in it and that not only was TBW a target, but so, too,

10  was Colonial.

11  Q.  And did Colonial have to put out a public announcement to

12  that effect?

13  A.  We did.  We had an ultimatum.  And I believe this phone call

14  came on a Thursday of that week through our attorney at, I

15  believe, Arnold & Porter.

16  Q.  I don't want you to tell the Court about discussions with

17  your attorney, but --

18  A.  Okay.

19  Q.  -- did the result -- did Colonial put out a public

20  announcement?

21  A.  We did.  We put out an 8-K.

22        MR. COLEMAN:  And would you please bring up 1463,

23  please.

24        THE COURT:  Put out a what?

25        THE WITNESS:  8-K.  A public announcement required by

1  the SEC.

2  Q.  So Tim has put up Exhibit D-1463.  And if you would look at

3  that and flip to the next page, please.  Do you recognize this

4  as an 8-K filing that Colonial BancGroup made on August 7, 2009?

5  A.  Yes.

6       MR. COLEMAN:  And if you would flip to the next page,

7  please, and just blow up that top -- yeah.

8  Q.  So does this reflect what you were just describing, the

9  disclosure of the notice from the Department of Justice that

10  Colonial had been named a target of criminal investigation?

11  A.  Yes.

12  Q.  And what did that criminal investigation relate to?

13  A.  The fraud in mortgage warehouse lending.

14  Q.  Did you understand there to be any implication on the

15  accounting that had been done for Colonial BancGroup as a result

16  of this fraud?

17  A.  Yes.

18  Q.  And what was that?

19  A.  That the financial statements were not correct as they had

20  been presented by management or as they had been published in

21  prior filings.

22  Q.  And if you would look at the last sentence of that first

23  paragraph, does that accurately describe what you and the board

24  and the audit committee were doing at the time regarding trying

25  to investigate the accounting irregularities?

1  A.  You said the last sentence of the first paragraph?

2  Q.  Yes, sir.

3  A.  Okay.

4        THE COURT:  Talking about "The company intends to

5  cooperate"?  That --

6        MR. COLEMAN:  No.  I'm referring to the company's board

7  of directors and audit committee are making every effort.

8  A.  And I did read that, and, yes, that does describe what we

9  were doing at the time.

10  Q.  Okay.  Does this also include a notice that you received

11  from the Alabama State Banking Department shortly after the

12  detection of the fraud?

13        THE COURT:  Last paragraph.

14  A.  Yes.

15  Q.  Okay.  Was the Alabama State Banking Department the primary

16  regulator of Colonial Bank as of this time?

17  A.  Yes.

18  Q.  And what did you understand that the Alabama State Banking

19  Department had conveyed as a result of the raid and the

20  detection of the fraud?

21  A.  I didn't understand your question.  I'm sorry.  What did the

22  state --

23  Q.  What did they tell you or what did you have to disclose that

24  the Alabama State Banking Department had told you?

25        THE COURT:  Is it the last paragraph?

1        MR. COLEMAN:  It is, Your Honor.

2   A.  There was a meeting that we had with the Alabama State

3   Banking Board that was announced in here.  It was scheduled.

4   Q.  What impact did the detection of the fraud have during this

5   beginning of August on the liquidity situation of Colonial Bank?

6        MR. LEVINE:  Your Honor, objection.  I thought we were

7   saving the financial condition of the Bank at this time and

8   whether it would have failed anyway for a different phase.  And

9   if he's going to -- if Mr. Coleman's going to go into this now,

10  it's only fair for me to respond.

11       MR. COLEMAN:  Your Honor, I don't view this as being

12  the Bank would have failed anyway.  This is what actually

13  happened.  I mean, I'm happy to do whatever the Court would

14  like.  I do not intend to go into any sort of damages or Bank

15  would have failed anyway.

16       MR. LEVINE:  Your Honor, if he's going to ask about the

17  liquidity situation after the fraud was discovered, I get to

18  ask -- I should be able to ask about the liquidity situation

19  before the fraud was discovered.

20       THE COURT:  So let's not even ask about the liquidity

21  situation.

22       MR. COLEMAN:  We'll reserve that, Your Honor.

23  Q.  What ultimately happened, Mr. Beville, with Colonial Bank

24  after the fraud was detected in that first week of August?

25  A.  It failed.

1  Q.  And at what -- do you recall how soon after?

2  A.  It was within probably three weeks of the event that it

3  failed.

4  Q.  And what was the impact of the receivership of Colonial Bank

5  on Colonial BancGroup?

6  A.  Devastating.  As we said earlier, the Bank was the primary

7  asset of BancGroup.  So when that was taken over by the FDIC, we

8  had a holding company with no real substance to it.

9  Q.  Okay.  And what ultimately occurred with respect to Colonial

10 BancGroup?

11 A.  It went into bankruptcy.

12 Q.  In this turmoil, the time period between the detection --

13 the raid and the detection of the fraud and the filing of the

14 bankruptcy, did Colonial BancGroup retain advisers or other

15 professionals to help assist it?

16 A.  We did.  We hired bankruptcy counsel, seeing what was

17 imminent or likely.  We also hired, as I alluded to earlier,

18 investigators to go down and try to determine the nature of the

19 fraud.  We also hired a person to be in charge of coordinating

20 the bankruptcy trustee activities.

21 Q.  Okay.  Did you hire a chief recovery officer?

22 A.  We did.

23 Q.  And who was that?

24 A.  Kevin O'Halloran.

25 Q.  And why did you want to retain an outside person outside the

1   company like Mr. O'Halloran for that function at this time?

2   A.  Well, again, it was a skill set that we didn't have.  We

3   needed somebody that understood how the shareholders needed to

4   be protected in that sort of an environment and someone to

5   conduct investigations or other affairs that came up in a

6   nongoing concern environment.  We were out of our element.  We

7   were used to a going concern environment.

8   Q.  I want to take you back now to the end of 2008 and beginning

9   of 2009.  And as reflected on the certified financial statements

10  we looked at for the year end 2008, I think the AOT line item

11  was a little over a billion and a half dollars.  Do you remember

12  that from what we looked at before?

13  A.  Yes.

14  Q.  If you had learned at that point in time that the entire AOT

15  balance was fictitious, what would have been the board of

16  directors' response at that time?

17  A.  It would have changed the entire nature of what we were

18  doing.  Our immediate response would have been to understand the

19  scope and nature of the fraud, but then we would have had to

20  have redirected our efforts once we understood what that was as

21  to whether the company would have a future or not.

22          MR. COLEMAN:  I'll ask you to go back to Exhibit A-69

23  and go to page 83.  Back to the balance sheet.  And if you would

24  blow up the first few lines under Assets.

25  Q.  We looked at this before.  The securities purchased under

1  agreements to resell line is a little over a billion and a half

2  dollars.  Do you see that?

3  A.  I do.

4  MR. COLEMAN:  And if you would go down to the very

5  bottom of this balance sheet and pull out the last several

6  lines.

7  Q.  If that 1.5 billion dollar AOT line item had been determined

8  to be fictitious and not exist, what impact do you believe that

9  would have had on the financial status, financial condition of

10 CBG and Colonial Bank?

11 A.  The mathematical answer to your question is that the Bank

12 would have been insolvent.

13 Q.  And why is that?

14 A.  Because all of the equity and surplus and capital of the

15 Bank would have been erased by the fraud.

16 Q.  And based on what you saw happen in August of 2009, do you

17 have an understanding of what you believe likely would have

18 happened at the beginning of -- end of 2008, beginning of 2009,

19 if the fraud had been detected at that point?

20 A.  With that math, it's obvious the Bank would not have had a

21 future.

22 Q.  And if you had determined that the fraud had rendered

23 Colonial Bank insolvent, what action would Colonial BancGroup

24 have taken or not taken with respect to its subsidiary at that

25 point?

1          MR. LEVINE:  Objection, Your Honor.  Now we're getting

2   again into the area of what would have happened in terms of

3   damages.  They can't have it where they can ask questions on

4   direct, but I can't get into it on cross.

5          THE COURT:  Let's leave it.  You'll get an occasion to

6   go into it.

7   Q.  Mr. Beville, did you ever suspect that there were fraud or

8   accounting irregularities at the mortgage warehouse lending

9   division before you learned of the raid in August of 2009?

10  A.  No.

11  Q.  Did you ever suspect there were any material inaccuracies in

12  the financial statements for either 2003, 4, 5, or 8, until you

13  learned of the raid and the fraud?

14  A.  No.

15  Q.  Did PwC ever make the audit committee aware of any suspected

16  fraud or accounting irregularities in those time frames at the

17  mortgage warehouse lending division?

18  A.  No.

19         MR. COLEMAN:  That's all I have for now, Your Honor.

20         THE COURT:  Okay.

21         MR. SORENSEN:  Nothing from the FDIC, Your Honor.

22         MR. LEVINE:  I do have a few questions.

23         THE COURT:  While we're waiting to be set up, I have a

24  question.  Are the Crowe people here, enough Crowe people here

25  to have a -- could we meet this afternoon?  I mean, are there

1  enough of you here to discuss trial proceedings and timing and

2  all?  Am I catching you by surprise?  Because if I am, it can

3  wait until tomorrow.  I just had some questions.

4          MR. MEDOW:  Either today or tomorrow, Judge.

5  Mr. Parzen will be here Wednesday.  I know he would like to

6  address the Court.  But if the Court wants to hear it sooner,

7  I'm --

8          THE COURT:  I'll just have some questions that I'd like

9  for you to be thinking about.

10          MR. MEDOW:  That's fine.

11                    CROSS-EXAMINATION

12 BY MR. LEVINE:

13 Q.  Good afternoon, Mr. Beville.  I'm Mark Levine, and I'm going

14 to ask you some questions this afternoon.

15 A.  Yes, sir.  Good afternoon.

16 Q.  I want to start out by asking you a little bit about

17 Colonial BancGroup and Colonial and the difference between them.

18 So to begin with, Colonial BancGroup, that's the parent company;

19 is that right?

20 A.  Correct.

21 Q.  And Colonial Bank is a wholly-owned subsidiary?

22 A.  Yes, sir.

23 Q.  And I think you said in direct examination, I wrote down

24 that Colonial Bank was nearly all of the Colonial BancGroup

25 assets at the end of -- or during the time you were there; is

1   that right?

2   A.   My point being it was the single largest holding and asset.

3   Yes.   It contained the majority of the value of BancGroup.

4   Q.   And I think you said over 97 percent.   And I don't want to

5   quibble about numbers, but if you look at the 2008 10-K that was

6   shown, it actually is over 99 percent; right?

7   A.   Okay.

8   Q.   Does that make --

9   A.   That sounds very plausible.   Yes.

10  Q.   And you served on -- and we've been calling -- everyone

11  likes acronyms.   So instead of Colonial BancGroup, we've been

12  calling it CBG, the parent company.   So you served on the CBG

13  audit committee for somewhere around 12, 15 years; is that

14  right?

15  A.   Yes.

16  Q.   And I think you said in direct examination that the CBG

17  audit committee also functioned as the audit committee for

18  Colonial Bank, the subsidiary; right?

19  A.   Right.

20  Q.   And in June 2009, you became the interim CEO and president

21  of CGB, the -- CBG, sorry -- the parent; right?

22  A.   Yes.

23  Q.   And you also became CEO and president of Colonial Bank; is

24  that right?

25  A.   Yes.

1  Q.  Now, is it true that you never really distinguished between

2  CBG and Colonial Bank from a practical standpoint?

3  A.  From a practical standpoint and operations, we would --

4  whether it was at the audit committee level or the other

5  committees that operated within the Bank, since the Bank was the

6  primary holding of BancGroup, we did not distinguish except for

7  regulatory matters.  There were different regulators that were

8  involved.  So there were some exception to that, but by and

9  large in the normal course of the day they were the same.

10  Q.  Right.  So you always looked at the Colonial Bank and CBG as

11  one and the same from a practical, operational, and risk

12  management standpoint; correct?

13  A.  Largely, yes.

14  Q.  Well, I just want to -- largely, actually entirely; right?

15          THE COURT:  I get it.  You don't have to impeach him or

16  try to impeach him.  He answered.

17  Q.  Let me ask you this:  Colonial Bank itself had a number of

18  different parts or groups within the Bank; is that right?

19  A.  Yes.

20  Q.  There was the mortgage warehouse lending division that was

21  about 20 percent of the Bank?

22  A.  That sounds about right.

23  Q.  But 80 percent of Colonial Bank was made up of different

24  regional banks; is that correct?

25  A.  No.  There were no regional banks in terms of separate

1  charters.  There were divisions within it in other metropolitan

2  areas or states.

3  Q.  Okay.  But 80 percent of Colonial Bank was ordinary -- what

4  you think of as ordinary banking where you go in and they make

5  commercial loans and that kind of thing; right?

6  A.  Yes.

7  Q.  And it operated in -- Colonial Bank was operating in Florida

8  and Alabama, Nevada, and a couple other states; right?

9  A.  Texas and Georgia.

10  Q.  Right.  And that made up the 80 percent of the Bank;

11  correct?

12  A.  Yes.

13  Q.  I want to ask some questions about the audit committee that

14  you were on and the experience of the members of the audit

15  committee.  I think you said that the audit committee met -- was

16  meeting at least once a quarter, and then it increased over

17  time; is that right?

18  A.  Yes.

19  Q.  And you mentioned some of the names of people who were also

20  on the audit committee.  And we'll get to a couple of them in a

21  minute.  Were all the members of the audit committee independent

22  directors?

23  A.  Yes.  They had to be.

24  Q.  And was the role of the audit committee to oversee the

25  company's financial reporting and auditing process?

1  A.  Yes.  That was one of the roles.  It was more fully

2  described in the charter, but that was certainly two of the

3  primary functions of the committee.

4  Q.  What was your view of the level of competence and

5  sophistication of the members of the audit committee?

6  A.  I felt like we had an excellent committee that was very

7  engaged and committed and aware of the operations.

8  Q.  Did the audit committee members have experience in financial

9  literacy?

10  A.  Herky Harris particularly did.

11  Q.  And are you familiar with what financial literacy is?

12  A.  It's an understanding of finance and accounting and

13  accounting principles.

14  Q.  Is that a requirement -- is it a requirement of the New York

15  Stock Exchange that if you're a public company, the audit

16  committee members have to have at least one person who has

17  that -- meets that financial literacy requirement?

18  A.  Yes.

19  Q.  And you met that; right?  The audit committee had that?

20  A.  Yes.

21  Q.  In fact, all the committee members have to be financially

22  literate, and at least one member is what's called an audit

23  committee financial expert as defined by the SEC regulations;

24  right?

25  A.  Right.

1  Q.  And you talked a little bit about your experience as a

2  vice-president of an insurance agency; right?

3  A.  Yes.

4  Q.  And you mentioned Herky Harris.  What was his experience?

5  A.  He was, I believe, chairman or president of Invesco, a

6  trading company in Atlanta.

7  Q.  Right.  That's a large investment management company out of

8  Atlanta?

9  A.  Yes, it is.

10  Q.  And both you and Mr. Harris qualified as financial experts

11  as defined by the SEC; correct?

12  A.  Initially I did.  I was the current chair of the audit

13  committee at the time that proclamation came out that some one

14  person had to be a financial expert.  And while I did not

15  qualify through education in terms of having an accounting

16  degree, you could qualify through experience.  And the sense was

17  that I qualified through the experience that I had had.  And

18  then shortly thereafter, to shore that up and make it an even

19  deeper compliance with that newly established criteria, we

20  brought Herky Harris on board, who probably exceeded the

21  qualifications that I had had initially.

22  Q.  He was pretty sophisticated financially?  Mr. Harris?

23  A.  He was -- he was very experienced in the ways of the

24  financial world.  And, yes, I would say, from both his training

25  and his experience, he was sophisticated.

1  Q.  And as a member of the board of directors and in your role

2  as chair of the audit committee, did you learn about how the

3  businesses at Colonial Bank worked?

4  A.  Yes.

5  Q.  And that includes the mortgage warehouse lending division?

6  A.  It would in the sense that, yes, we had Cathie Kissick make

7  presentations.  And that was not the only time that we had had

8  owners of divisions come in and help us understand the nature of

9  their operations.

10  Q.  Now, I want to turn to another area that you testified about

11  in direct examination, which is management responsibility.  And

12  you were shown some paragraphs from the engagement letter.  And

13  I'm going to get there in a minute, but I want to start by

14  looking at the audit policy.  We've put up on the credenza right

15  near you a lot of documents in a binder.  And you can look at

16  them if you want, but I'm going to put them on the screen.

17  A.  Okay.  Fair enough.

18  Q.  Hopefully, that will be enough.

19      I'm going to start with D-49, which is the audit policy.

20  That's one of the documents you looked at with Mr. Coleman;

21  correct?

22  A.  Yes.

23  Q.  And I'm going to turn to --

24      First of all, this audit policy is one of the policies that

25  was approved by the board of directors of CBG; correct?

1    A.  Yes.

2    Q.  I'm going to turn to the third page here.  And there's a

3    reference, and I blew it up to make it easier to read, that the

4    board and senior management are responsible for supervising the

5    Bank to ensure that the operations are effectively governed by

6    comprehensive policies, internal controls, and compliance

7    procedures.  Is that something that the board and senior

8    management were responsible for?

9    A.  Yes.

10   Q.  And then it says that the board and senior management also

11   have the responsibility to insure that the operations reflect

12   sound planning.  That's also something that the board and senior

13   management were responsible for; correct?

14   A.  Yes.

15   Q.  And I went to another point here I highlighted that the

16   board looks to management to establish and maintain a sound

17   system of controls and related operating procedures to promote

18   sound operations.  Do you see that?

19   A.  Yes.

20   Q.  And management's responsible for identifying operating risks

21   and establishing controls to effectively manage them; is that

22   correct?

23   A.  Yes.

24   Q.  And that's how you viewed management's responsibility;

25   correct?

1  A.  Yes.

2  Q.  And then turning to the fifth page of D-49, there's a

3  reference to the committee.  That's referring to the audit

4  committee and the audit policy?

5  A.  Yes.

6  Q.  And it said -- says that the committee, meaning the audit

7  committee, Shall oversee Colonial's financial reporting process,

8  including monitoring of management's responsibility, for the

9  preparation, presentation, and integrity of Colonial's financial

10  statements and for the appropriateness of the accounting

11  principles and reporting policies that are used by Colonial.

12  That accurately reflects the duties of the committee and of

13  management; correct?

14  A.  Yes.

15  Q.  Now I want to turn briefly, then, to the engagement

16  agreement, A-7, which I'm going to put up on the screen.

17      And by the way, you signed this agreement for CBG's audit

18  committee; correct?

19  A.  Yes.

20  Q.  And I want to turn in particular to -- well, first, let's

21  look at the fees here on page 7.  How much was PwC charging in

22  the fees for the 2008 audit?

23  A.  $1,140,000.

24  Q.  And it says that's the initial fee estimate.  Did it end up

25  coming in somewhere around there?

1  A.  I don't recall, but it was open ended in the event there was

2  special work that had to be done that merited additional fees.

3  Q.  All right.  But you don't remember anything where it was,

4  you know, ten times the amount.  It was somewhere in that range.

5  A.  It was not.  If it was, I would have recalled that.  But,

6  no.  We'll say that number is correct.

7  Q.  Okay.  Thanks.

8     And if we turn back a little bit to the third page of A-7,

9  it says there under management's responsibilities -- and you

10  talked about this with your counsel -- that the BancGroup's

11  management is responsible for the financial statements and

12  information referred to above, including establishing and

13  maintaining adequate internal control over financial reporting.

14     Do you see that?

15  A.  I do.

16  Q.  And that's consistent with what we just saw in the audit

17  policy; right?

18  A.  Yes.

19  Q.  Now, you agree that -- because you testified about what PwC

20  was supposed to do with respect to internal controls.  But when

21  you hired PwC to -- you hired them to assist you in that

22  responsibility of -- on the internal controls, but ultimately

23  the system of internal controls was management's responsibility;

24  correct?

25  A.  Yes, and we discharged that responsibility in several ways.

1  Q.  Now looking a little further on this document, still on 7.3

2  but near the bottom, you see there is -- and I highlighted the

3  last few words there because it goes onto the next page.

4  Management also is responsible for.  You see that?

5  A.  I do.

6  Q.  I'll turn, then, to the next page.

7  A.  Okay.

8  Q.  And we'll see what it says.

9      It's the design and implementation of programs and controls

10 to prevent fraud.

11     And then it lists a number of things that management had to

12 inform PwC about.

13          MR. LEVINE:  Danny?

14          This is the moment, when it says there's an error, that

15 Danny comes up and hopefully fixes it.

16     (Brief pause in the proceedings)

17 Q.  So we -- I put a little red box around something, but

18 it's -- when it says for informing "us," the "us" there is PwC;

19 right?

20 A.  Right.

21 Q.  So management had to inform PwC of all known and suspected

22 fraud affecting the entity involving management, employees who

23 have significant roles in internal control over financial

24 reporting, et cetera.  Do you see that?

25 A.  I do.

1    Q.  If there were officers of CBG who were aware of possible or

2    suspected fraud, is that something that management was required

3    to tell PwC under this agreement?

4    A.  Yes.

5    Q.  And is that -- and if officers of CBG were aware of

6    suspected fraud, do you expect that they should have told PwC?

7    A.  Certainly.

8    Q.  Now, you went through how there are -- you know, the first

9    few pages of this agreement start out with the section, our

10   responsibilities and limitations.  Do you see that?

11   A.  I do.

12   Q.  And that's referring to PwC -- because they authored or sent

13   the letter, that's referring to PwC's responsibilities; right?

14   A.  Yes.

15   Q.  And then the next section we just looked at a part of was on

16   management's responsibilities; right?

17   A.  Yes.

18   Q.  And you expected PwC to live up to its obligations under the

19   engagement agreement; right?

20   A.  Right.

21   Q.  And it's fair for PwC to expect CBG and Colonial management

22   to live up to their obligations under the agreement, too; right?

23   A.  It is.

24   Q.  And this -- the discussion we just went through about the

25   contract, without taking the time to go through each one, it's

1  the same for the other engagement agreements that you signed

2  with PwC as well; correct?

3  A.  I can't say that they're exactly the same, but, yes, I think

4  for the purposes of your question and your comment, yes, they

5  would be essentially the same.

6  Q.  Okay.  Thank you.

7     Do you know what a management representation letter is?

8  A.  Yes.

9  Q.  What's a management representation letter?

10 A.  It's management's statement about knowledge that they have

11 that may be interesting or pertinent to the auditors in

12 connection with the work that they're going to prepare.

13 Q.  And is a management --

14 A.  It had to be in writing.

15 Q.  Thank you.

16    Is a management representation letter given so that there is

17 assurance that's given to the independent auditor about

18 management's role in the process?

19 A.  Yes.

20 Q.  And did the audit committee have the responsibility to

21 review management's representation letter and inquire about any

22 difficulty in obtaining the representations?

23 A.  We had to review the management letter.  Yes.  And we had

24 the opportunity to make any inquiries that we felt like were

25 appropriate or necessary.

1 Q.  And did you do so?  Did you review the management letter?

2 A.  Yes.

3 Q.  So I'm going to put up on the screen A-12, which is the

4 management representation letter for -- well, it's dated March

5 2nd, 2009.  But when you look at it -- I'll make it a little bit

6 bigger here -- it says that it's for the statements as of

7 December 31st of 2008.  Do you see that?

8 A.  Yes.

9 Q.  So is A-12 the management representation letter with respect

10 to the 2008 audit year?

11 A.  Yes.

12 Q.  And did you understand that PwC would be relying on the

13 representations that were made in the management representation

14 letter?

15 A.  Yes.

16 Q.  I want to go through a few of them.  We're not going to --

17 there's a long list of them, but we have only -- we have some

18 limits on our time, so we're going to pick a few.  And I'm going

19 to start with A-12.  I'm sorry.  We're going to start with

20 number one.

21     It says -- first of all, this is the preamble, I think, to

22 all of the numbered items.  It says, we confirmed to the best of

23 our knowledge and belief as of March 2nd, 2009, the date of your

24 report, the following representations made to you during your

25 audit.  Do you see that?

1  A.  Yes.

2  Q.  And does that apply to -- that confirmation apply to all of

3  the representations from one to the end?

4  A.  Yes.

5  Q.  So number one is that the consolidated financial statements

6  referred to above are fairly presented and in conformity with

7  accounting principles generally accepted.

8     And that's also known as GAAP; is that right?

9  A.  Yes.

10  Q.  Now, the folks at Colonial, did they have their own

11  accounting department, accounting group?

12  A.  Yes.

13  Q.  Were there CPAs working at Colonial?

14  A.  Yes.

15  Q.  So when there were accounting issues that came up, they

16  didn't just turn everything over to PwC, they did their own work

17  on the accounting for the company; correct?

18  A.  It began with our own staff.  Yes.

19  Q.  And about how many different accountants were there at

20  Colonial?

21  A.  I couldn't tell you.

22  Q.  But you knew that there -- you knew that there was a CFO at

23  the company, Ms. Moore.  You mentioned her.  Was she an

24  accountant?

25  A.  Yes.

1  Q.  And let's go to the next one here or go to the next page,

2  page 2 of A-12.  Number six is, We have performed an evaluation

3  and have made an assessment of the effectiveness of the

4  company's internal control over financial reporting.

5      That's a representation made by the company to PwC; right?

6  A.  Yes.

7  Q.  And number seven is We have concluded the company has

8  maintained effective internal control over financial reporting,

9  including controls over the preparation of financial statements.

10  And it goes on.

11      That's another representation made by the company; right?

12  A.  Yes.

13  Q.  And I'm just going to pick a couple more.  Number nine.  The

14  company represented to PwC that it acknowledged the

15  responsibility for design and implementation of programs and

16  controls to provide reasonable assurance that fraud is prevented

17  and detected.  That's a representation made to the company;

18  right?

19  A.  Yes.

20  Q.  And number 11, similar to the -- on the next page, similar

21  to the statement that we saw in the engagement agreement is a

22  representation that we have no knowledge, other than the list

23  provided to you, of any allegations of fraud or suspected fraud

24  affecting the company received in communications from a number

25  of different people.  Do you see that?

1  A.  Yes.

2  Q.  And that's another representation that was made to PwC.

3  A.  Correct.

4  Q.  And finally, number 12 is that there have been no violations

5  or possible violations of laws or regulations whose disclosure

6  would be the basis for recording a loss contingency.  Is that

7  another representation that management made to PwC?

8  A.  Yes.

9  Q.  And were similar management representation letters sent in

10  connection with the earlier audits before the 2008 audit that

11  PwC worked on?

12  A.  Yes.

13  Q.  And I will -- we'll --

14        MR. LEVINE:  We have a list of those exhibits.  Again,

15  we'll talk to the other side and deal with that afterwards so we

16  don't have to take the time here.

17  Q.  You mentioned -- I want to turn to another topic, which is

18  the -- relates to, actually, something we just talked about

19  here.  Let me go back.

20      Number nine of the representation letter.  It talks about

21  the company's design and implementation of programs and controls

22  to provide reasonable assurance that fraud is prevented and

23  detected.  And I want to talk about what the company did in and

24  of itself to look for fraud.  And that's the next area that I'm

25  going to spend some time on.

1    I want to note, in your direct examination you recall you
2  said that PwC provided another set of eyes, I think, is the term
3  you used.  Do you remember that?
4  A.  Sounds right.
5  Q.  Okay.  And another set of eyes is in addition to what the
6  company itself was doing in looking for fraud; correct?
7  A.  Yes.
8  Q.  And there were -- one of the internal controls at Colonial
9  Bank were full-time employees who were involved in risk
10 management; correct?
11 A.  Yes.  Layer one was our own people and policies and
12 procedures.
13 Q.  Right.  And that's a good way of putting it.  So you talked
14 about three different layers, and I want to focus on what you
15 called layer one, which is -- I think you called that your own
16 people and policies and procedures.
17 A.  Yes.
18 Q.  So let's go through that.
19    To begin with, there was a group within the mortgage
20 warehouse lending division called at one point the compliance
21 group, and then in 2008 the name changed to the risk control
22 group; correct?
23 A.  I don't recall that.  I know that Stan Julian was in charge
24 of our compliance function at the Bank, and -- but I don't have
25 any specific recollection of the name changing.

1  Q.  Okay.  Let's look at one of the exhibits you looked at on

2  direct examination on the issue generally.  And it's P-3053.

3  I'm sorry.  P-3043.  Sorry about that.  It's important we get

4  the numbers right for recordkeeping purposes.

5      And this is the April 17, 2007, presentation that

6  Ms. Kissick made at the audit committee; correct?

7  A.  Yes.

8  Q.  And let's turn to page 7.  You see that there's a number of

9  people listed under Management Team.  And I highlighted

10  Mr. Bryant, the vice-president and compliance manager.  Were you

11  aware that Mr. Bryant was in charge of what was called the

12  compliance group within mortgage warehouse lending division?

13  A.  I have no independent recollection of it, but I may have

14  been aware of that at the time, and I'm certainly confident that

15  I was through her report.

16  Q.  Okay.  And sticking with this presentation for a minute or

17  so, you went over page 17 of P-3043, which is where Ms. Kissick

18  listed some risk mitigants; is that right?

19  A.  Yes.

20  Q.  And I want to ask about one of those risk mitigants, which

21  was review of collateral package for consistency.  What's that

22  referring to?

23  A.  It would be confirmation that the assets were verified and

24  as we thought they were in mortgage warehouse lending.  Double

25  pledging was a known fraud, and so it was to confirm the

1  verification of the collateral packages for validity.

2  Q.  And were these risk control people who were looking at --

3  risk control analysts looking at the collateral packages?

4  A.  They were an employee of Colonial Bank's that was looking at

5  that.  I think Pam Vitto specifically was the one who was

6  charged with that responsibility.

7  Q.  Okay.  And we're going to talk about Ms. Vitto in a second.

8      So we talked a little bit about something within mortgage

9  warehouse lending division.  Was there also an internal audit

10  group at Colonial?

11  A.  Yes.

12  Q.  And let me put up -- again, we're going back to D-49, the

13  audit policy.  I'm going to turn to page 4 of that document.

14  And under Audit Committee Responsibilities, the second bullet

15  there is Overseeing Colonial's internal audit function.  You see

16  that?

17  A.  Yes.

18  Q.  Was one of the responsibilities of the audit committee to

19  oversee the internal audit function of the company?

20  A.  Yes.

21  Q.  And did the audit committee review reports from the internal

22  audit department?

23  A.  Yes.

24  Q.  Was there a general auditor at Colonial who was in charge of

25  internal audit?

1  A.  There was a general auditor by title at one time, and then
2  there was an audit liaison as it was called subsequent to that.
3  Q.  All right.  And let's talk about them one by one.  Because I
4  think the title changed when the people changed, too; right?
5  A.  It did.
6  Q.  All right.  So the general auditor, what was his name?
7  A.  Young Boozer.
8  Q.  And Mr. Boozer was the general auditor until approximately
9  when?
10  A.  The latter part of '07 is the best of my recollection on
11  that, but I can't say.
12  Q.  Is he a state official now in Alabama?
13  A.  He is.  He's the treasurer.
14  Q.  And then Mr. Boozer left the company in 2007.  Did the name
15  change from general auditor to -- into audit liaison?
16  A.  Yes, it did.
17  Q.  And who became the audit liaison in 2007?
18  A.  Tommy Tynes.
19  Q.  And was Mr. Tynes someone who had some accounting
20  experience?
21  A.  I don't recall exactly what his qualifications were or
22  background.
23  Q.  Do you remember -- or were you aware that he had experience
24  at PwC and as the CFO of the banking group with AmSouth?
25  A.  I may have been at the time, but I can't tell you that I

1  have an independent recollection of that awareness.

2  Q.  And then you mentioned before Pam Vitto.

3  A.  Yes.

4  Q.  And by the way, I'm just reading the documents.  Is it Vitto

5  or Vito?

6  A.  You may be right.  I've always said Vitto.  Either way

7  works.

8  Q.  Okay.  And there's a little confusion.  Was she -- she was a

9  risk manager imbedded within the mortgage warehouse lending

10  division; correct?

11  A.  She was an employee of Colonial that was assigned to

12  mortgage warehouse lending to supplement and reinforce our

13  internal controls in the mortgage warehouse division.

14  Q.  But specifically she was looking at issues of risk; is that

15  right?

16  A.  She was -- risk, yes, and the control of that risk would be

17  her primary responsibility.  Yes.

18            THE COURT:  Let me understand it.  By "risk," we're

19  talking about fraud; right?  The risk of fraud, or what other

20  risks?

21  Q.  What other risks are there besides the risk of fraud?  Is

22  that the primary one?

23  A.  Well, there are many risks.  Operational risks, there are

24  fraud risks, there's credit risks.  Her primary responsibility

25  would be the credit risk and the operational risk also as it

1  relates to compliance with laws and regulations and that kind of

2  thing.  But by and large, it would have been more rooted in the

3  credit risk element of that.

4         THE COURT:  Credit risk.  What does that mean?

5         THE WITNESS:  The risk that credits that are owed to

6  the Bank by borrowers will not be repaid as agreed.

7  Q.  She was also responsible for looking for the risk of fraud;

8  correct?

9  A.  Yes, she was.

10  Q.  And that was her year-round job when she was hired in 2005

11  or so; correct?

12  A.  Her year-round job was, yes, as a risk manager in mortgage

13  warehouse lending.

14  Q.  All right.  So she wasn't looking at the other 80 percent of

15  the company that was doing ordinary banking operations in

16  Florida and Georgia, et cetera.  She was just focused on

17  mortgage warehouse lending; is that right?

18  A.  Correct.  Correct.

19  Q.  And did Ms. Vitto prepare periodic reports about what she

20  had found in her work at the mortgage warehouse lending

21  division?

22  A.  Yes.

23  Q.  And did she submit those reports or explain those reports to

24  the audit committee?

25  A.  I don't know if she explained them to the audit committee.

1  They were submitted to the audit liaison or to the general

2  auditor, and then on occasion, yes, I do know that we saw some

3  of her reports.

4  Q.  So during some of the audit committee meetings, you said, I

5  think, in direct examination there was a package that would be

6  submitted before the meeting; is that right?

7  A.  Yes.

8  Q.  And usually you would get -- was it a day or two before?

9  A.  No.  We would get the three-ring binder the day of the

10 meeting.

11 Q.  Okay.

12 A.  Some material may come in advance, but it was too voluminous

13 to send.  And a lot of times it was not even completely prepared

14 until the morning of the meeting.

15 Q.  And then you had different agenda items.  And when the

16 relevant agenda item came up, someone would have you turn to

17 certain documents in the three-ring binder; is that right?

18 A.  Yes.

19 Q.  So I'm going to put up on the screen D-977.  This is the

20 minutes from a meeting on March 15th, 2005, of the audit

21 committee.  And you were present then; correct?

22 A.  Yes.

23 Q.  And if we turn to the fifth page of the document, I

24 highlighted a part where it says that Mr. Boozer presented the

25 mortgage warehouse lending report and stated that Colonial now

1  has a person from the risk management side working in the

2  mortgage warehouse lending division -- lending area in Orlando.

3  Reports from Pam Vitto were included.

4      Do you see that?

5  A.  Yes.

6  Q.  And does that refer to the fact that reports from Ms. Vitto

7  were included in the package for this meeting of the audit

8  committee?

9  A.  It does.

10 Q.  And if we turn to D-978, you see the cover page here is --

11 oops.  Sorry.  The cover page here is a reference to the audit

12 committee meeting on March 16, 2005.  Is that the cover page of

13 the package that was in the three-ring binder?  Is that what it

14 would look like?

15 A.  That would be representative of it, yes.

16 Q.  Thank you.  So then let's turn to the fifth page of this

17 document.  And you see the fifth page of the package submitted

18 for the March 2005 audit committee report is a memo dated

19 February 4th, 2005, from Pam Vitto to Stan Julian; is that

20 right?

21 A.  Uh-huh.  Yes.

22 Q.  And the subject is the annual risk management audit;

23 correct?

24 A.  Yes.

25 Q.  And that's within mortgage warehouse lending division?

1   A.  Yes.

2   Q.  And let's turn to number seven here.  There's a section on

3   collateral.  It says "advances."  And I highlighted a part of it

4   saying A review of policies and procedures and the handling of

5   collateral was conducted to ensure the Bank is adequately

6   secured and individuals assigned to authorize advances are

7   knowledgeable in the process.  You see that?

8   A.  Yes.

9   Q.  And then Ms. Vitto refers to collateral analysts managed by

10  Michelle Carroll and Cathy Browning.  What did these collateral

11  analysts do?

12  A.  Analyze collateral, I would assume.

13  Q.  Make sure it was really there, it existed?

14  A.  Yes.

15  Q.  And the numbers matched up?

16  A.  They would analyze collateral; look at it for its

17  authenticity.

18  Q.  And then in the two paragraphs down I highlighted a line

19  where Ms. Vitto said that a review of collateral documentation

20  did not find any exceptions.  Is that referring to Ms. Vitto's

21  review in 2005 of collateral in the mortgage warehouse lending

22  division?

23  A.  Yes.

24  Q.  And I'm going to turn now to D-227.  Here's another audit

25  committee meeting.  This one's a year and a half later, dated

1  December 20, 2006.  Again, you were present at the meeting,

2  according to the minutes; right?

3  A.  Yes.

4  Q.  And there is -- one second.  If we turn to the next

5  document, you see it's again another package.  This is the

6  package -- Exhibit D-228 is the package for the December 20,

7  2006 audit committee meeting?

8  A.  Yes.

9  Q.  And if we look at the agenda here -- you went through a

10 sample agenda with Mr. Coleman on direct examination.  Here we

11 have another agenda from this meeting that happened on my

12 birthday in 2006; right?  Didn't know that one, did you?

13 A.  No.

14 Q.  And then if you look here, there's a reference at ten

15 o'clock -- 10:05 to 10:25 that there would be a mortgage

16 warehouse lending report by Pam Vitto; right?

17 A.  Yes.

18 Q.  And then if we look at the fifth page of D-228, there is a

19 PowerPoint presentation called Risk Management Mortgage

20 Warehouse Lending.  And that's the PowerPoint presentation, or

21 slides, I should say, included in the package that were prepared

22 by Ms. Vitto; correct?

23 A.  I would assume they were prepared by her.  I don't have an

24 independent recollection of it.

25 Q.  Okay.  You know she was doing the risk management stuff --

1  A.  Yes, sir.

2  Q.  -- in the mortgage warehouse lending.

3      If we move to the tenth page of this document within the set

4  of slides, there's a reference to collateral, ensure

5  documentation has been obtained to adequately secure the line.

6  Do you see that?

7  A.  Yes.

8  Q.  Did Ms. Vitto ever tell the audit committee that she looked

9  at the collateral and found some problems with it in the

10 mortgage warehouse lending?

11 A.  She very well may have.  I don't have an independent

12 recollection of it.

13 Q.  Do you remember any time where Ms. Vitto told the audit

14 committee, I looked at the collateral -- I looked for the

15 collateral, and it just -- it was missing.  It wasn't there at

16 all.

17 A.  I don't have an independent recollection of that, no.

18 Q.  Okay.  Now, we've been talking about that first layer of

19 protection, you know, what you did actually at Colonial.  I now

20 want to talk a little bit about kind of the merger between the

21 first layer and the second layer.

22 A.  Uh-huh.

23 Q.  Because the second layer you had was Crowe; right?

24 A.  Yes.

25 Q.  And Crowe -- Crowe was engaged to assist in internal

1  auditing; correct?

2  A.  Yes.

3  Q.  But the internal audit function is something that management

4  of Colonial itself had to do; correct?

5  A.  Management had the responsibility for internal audit and we

6  just discharged that in several ways.

7  Q.  Fair enough.  And you mentioned, I think, in direct

8  examination the Sarbanes-Oxley Act; right?

9  A.  Yes.

10  Q.  Passed by Congress, signed by the president; right?

11  A.  Yes.

12  Q.  And I think in direct examination you said it was a pretty

13  big deal to the Bank when it passed; is that right?

14  A.  Absolutely.

15  Q.  And the section went into -- and in particular, there was a

16  section of Sarbanes-Oxley called Section 404.  Is that familiar

17  to you?

18  A.  Very.

19  Q.  What did Section 404 require?

20  A.  It required appropriate internal -- appropriate system of

21  internal controls within the organization.

22  Q.  And in particular, did -- do you understand that it dealt

23  with the responsibility that the public companies themselves

24  have for the effectiveness of the internal controls?

25  A.  Yes.

1  Q.  And as part of the -- this requirements under -- and I'm

2  sorry.  I should have asked.  When did that go into effect?

3  A.  Sarbanes-Oxley?

4  Q.  The Section 404 of Sarbanes-Oxley.  Was it around 2003 or

5  so?

6  A.  It was 2002 or shortly thereafter.

7  Q.  Okay.  And as part of Sarbanes-Oxley, Section 404, did the

8  CEO -- the chief executive officer and the chief financial

9  officer of the company have to independently certify when

10  financial statements were filed that the company designed

11  internal controls over financial reporting to provide reasonable

12  assurance regarding the preparation of the financial statements?

13  A.  Yes.

14  Q.  And I'm going to put up on the screen P-1016, which is a

15  10-Q for Colonial BancGroup in 2004.  And I'm just doing it as

16  an example because these attestations that the CEO and CFO have

17  to make about the internal controls, that has to be done with

18  every 10-Q that's filed and every 10-K that's filed; right?

19  A.  Yes.

20  Q.  And just so it's clear, the 10-K is filed once a year?

21  A.  Correct.

22  Q.  And how often are the 10-Qs filed?

23  A.  Quarterly.

24  Q.  Okay.  So let's look at toward the end of this document.

25  I'm going to the thirty-seventh page here.  And as an example --

1  let me -- I just put up here -- I made it as big as I can --

2  this is one signed by Sarah Moore.  Do you see that?

3  A.  Yes.

4  Q.  Is that same conforming signature that was being talked

5  about before with the little S when you file something?  You

6  have that for Ms. Moore as well; right?

7  A.  Yes.

8  Q.  And Ms. Moore disclosed -- in number four, she refers to the

9  registrant's other certifying officer.  The other certifying

10  officer is that Mr. Lowder, who was the CEO at the time?

11  A.  Yes.

12  Q.  And she said that Mr. Lowder and Ms. Moore are responsible

13  for establishing and maintaining disclosure controls and

14  procedures, as defined in certain acts, and internal control

15  over financial reporting.  Correct?

16  A.  Yes.

17  Q.  And then she makes a number of different statements under

18  number four, but I'm just going to focus for now on 4-B, which

19  is the certification from Ms. Moore that the company designed

20  internal control over financial reporting or caused it to be

21  designed under your supervision to provide reasonable assurance

22  regarding the reliability of financial reporting and the

23  preparation of financial statements for external purposes in

24  accordance with GAAP; right?

25  A.  Yes.

Q.  Now, this part here about the -- under -- designed under our supervision that I'm putting a little box around -- do you see that?

A.  Yes.

Q.  That means that -- did you understand that to mean that you could hire someone like Crowe to help you out with doing the work on internal controls, but it still management's responsibility to supervise Crowe and then to make the certification pursuant to Sarbanes-Oxley?

MR. COLEMAN:  Your Honor, I'm going to object to the extent it's calling for a legal conclusion or legal opinion.

Q.  Just discuss for your understanding.

THE COURT:  He can testify as to his understanding.

A.  My understanding was that management had responsibility for internal controls, and we discharged that in several different ways.

Q.  And when -- and to the extent you outsourced some of the internal control work or internal audit work, I should say, to Crowe, management had to supervise Crowe with respect to that work; correct?

A.  Ultimately --

MR. COLEMAN:  Same objection, Your Honor.  His understanding.

THE COURT:  I understand.

Q.  Just your understanding.

PATRICIA G. STARKIE, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, AL  36104   334.262.1221

1          THE COURT:  As to your understanding.

2    A.  Ultimately, management still had the responsibility.

3    Q.  Okay.  So what you did with respect to Crowe is that you

4    outsourced certain testing of internal controls and periodic

5    reports to the committee to Crowe; is that right?

6    A.  Not entirely.  It was much more than that.

7    Q.  Well, CBG had its own risk management or compliance or

8    auditing personnel; is that right?

9    A.  Yes.

10         THE COURT:  Didn't we just go through that?

11         MR. LEVINE:  Yes.  We just went through that.

12   Q.  So I'm just talking about the Crowe stuff now.  And let's

13   talk about what supervision was done over Crowe.  That's what I

14   want to focus on next.

15      Did Crowe present a draft of the scope or plan for the

16   internal audit to the audit committee, which then discussed it?

17         MR. COLEMAN:  Your Honor, I'm going to object on

18   relevance grounds to going into more detail on the internal

19   audit process.  I mean, we've covered it at a high level.  I

20   think it's irrelevant at this level.

21         THE COURT:  Where are we going with this?

22         MR. LEVINE:  Two things, Your Honor.  One is it's

23   relevant as an internal control that PwC relied on.  And the

24   auditors, Mr. Westbrook and others, have testified about that.

25   Second, the actions of Crowe and whether they failed or didn't

1  fail are relevant if they are an agent of the company.  And we

2  believe -- and this has been in some of the summary judgment

3  briefing -- that if Crowe was acting as the agent of the company

4  because they were supervised by them and doing everything at the

5  direction of the company, any failings of Crowe can be

6  attributable to Colonial.

7          MR. COLEMAN:  Sounds like that's a legal argument that

8  may be taken up at some point, but not necessarily appropriate

9  to be addressed with this witness.

10          MR. LEVINE:  Your Honor, the facts --

11          THE COURT:  I can answer that.  It's a legal argument;

12  but in order for the Court to reach a decision, I would have to

13  know exactly the degree of involvement that Crowe had with CBG.

14  So to the extent that it's a mixed question of law and fact, I

15  think we need some facts.  But is there any way to keep this

16  shorter than we kept all the compliance stuff?  Because --

17          MR. LEVINE:  I'll keep it as short as I can.

18          THE COURT:  Thank you.

19  Q.  So let's turn to -- let me repeat the question.  Did Crowe

20  present a draft of the scope of the internal audit to the audit

21  committee?

22  A.  Yes.

23  Q.  And was that something that would be discussed by the audit

24  committee?

25  A.  Yes.

1  Q.  I'm going to put up A-238, which, if we turn to the second

2  page here, is the risk assessment and internal audit plan for

3  April 1, 2008, through March 31, 2009, that's prepared by Crowe;

4  is that right?

5  A.  Yes.

6  Q.  I'm going to turn to the third page of the document.  And

7  there, there is an approval of this plan that's hereby granted

8  by the audit committee as signed by its chairman.  And there's a

9  signature there that's your signature; right?

10  A.  Yes.

11  Q.  And you were signing on behalf of the audit committee?

12  A.  Yes.

13  Q.  Did you understand that Crowe was proposing to perform its

14  work consistent with the plan set forth in this document?

15  A.  Yes.

16  Q.  Now, did Colonial -- I think before you said that there was

17  an audit liaison that was Tommy Tynes; is that right?

18  A.  Yes.

19  Q.  And let's look at page 124 of A-238.  There there's this

20  checklist that's done pursuant to a federal agency, interagency

21  guidance.  Is that something that you saw when you gave the

22  approval of the plan?

23  A.  Repeat the question, please.  Is that something we saw --

24  Q.  Is that part of the plan that you gave the approval to?

25  A.  Yes.

1  Q.  And there's actually -- you go through each of these

2  bullets --

3          MR. LEVINE:  And trust me, Your Honor.  I'm not going

4  to go through all of them.  I'm going to pick a few.

5  Q.  And then there could be a check under "satisfied" or "not

6  satisfied"; correct?

7  A.  Yes.

8  Q.  And then --

9          MR. COLEMAN:  Can counsel tell me what page you're on?

10          MR. LEVINE:  It's on -- it's the 124th page, but it's

11  page 112 in the document.

12          MR. COLEMAN:  Thank you.  I got it.

13          MR. LEVINE:  There's other numbers there.

14  Q.  So if we turn ahead to the end of the list, you see that

15  there is some signatures there.  Let me fix that.  Hold on.  It

16  says, I concur with the above assessment.  And is that your

17  signature on the right there?

18  A.  It is.

19  Q.  And the assessment that you're referring to is the check

20  marks next to different bullet points; correct?

21  A.  Yes.

22  Q.  So let's, then, look at some of the check marks on this

23  page, the 128th page, which if you're going by the numbers on

24  the bottom, is page 116 of the document.  I've highlighted

25  three.  One of them is that the board and senior management

1　maintain ownership of the outsourced internal audit function and

2　provide active oversight of the outsourced activities.

3　　Do you see that?

4　A.　Yes.

5　Q.　So you agree that the board and the senior management were

6　providing active oversight of the activities that Crowe was

7　doing?

8　A.　Yes.

9　Q.　The next bullet that I highlighted is that the board and

10　senior management have designated an internal audit coordinator

11　to oversee the activities of the outsourcing vendor.

12　　Here the outsourcing vendor was Crowe; right?

13　A.　Yes.

14　Q.　And the internal audit coordinator that was overseeing their

15　activities was Tommy Tynes in 2008; correct?

16　A.　Right.

17　Q.　And it was Young Boozer in the years before that; right?

18　A.　Correct.

19　Q.　And then the last bullet that I highlighted is that the

20　internal audit coordinator is responsible for approving the

21　audit scope, plan, and procedures to be performed.

22　　Do you see that?

23　A.　Yes.

24　Q.　So the internal audit coordinator there is Tommy Tynes at

25　the company, and he is the one who's approving Crowe's audit

1    scope, Crowe's plan, and Crowe's procedures to be performed;

2    correct?

3    A.    Yes.   He was not the only one who was involved in that

4    process, but certainly, yes.

5    Q.    But he was the one responsible.

6    A.    Yes.

7    Q.    Right?

8         And the final determination of the scope of Crowe's work was

9    up to the internal audit liaison, Tommy Tynes, subject to audit

10   committee approval; correct?

11   A.    Say that one more time.

12   Q.    The final determination of the scope of the work that Crowe

13   was going to do was up to the internal audit liaison, Tommy

14   Tynes, subject to audit committee approval; correct?

15   A.    Yes.

16   Q.    And this checklist that we just went through was similar for

17   the earlier years in which the company hired Crowe; correct?

18   A.    I would expect that to be so.

19   Q.    Except Mr. Boozer was doing the job instead of Mr. Tynes; is

20   that correct?

21   A.    Yes.

22   Q.    And did Crowe prepare reports based on its outsourced

23   internal audit activities?

24   A.    Yes.

25   Q.    Did the audit committee get those reports?

1   A.   Yes.

2   Q.   Did that include work that Crowe performed on the mortgage

3   warehouse lending division?

4   A.   Yes.

5   Q.   I'm going to put up one of those reports, D-428.  You can

6   see it's called Internal Audit Report, Mortgage Warehouse

7   Lending, 2007-2008.

8   A.   Yes.

9   Q.   And if you look at the very bottom there, you can see it's a

10  Crowe document.

11  A.   Yes.

12  Q.   I'm going to turn to the seventh page of the document,

13  though I think it has -- it's page 4 in the numbered pages.  And

14  there there's a part that I made bigger to see it.  And it says,

15  Selected a sample of 20 outgoing wires and traced to a properly

16  completed wire authorization form from the customer and a

17  corporate resolution with wires.

18       And actually, I have the wrong one.  I'm sorry.

19       This is the one I meant to do.  I've made bigger a different

20  bullet now.  That's what I want to ask you about.  Crowe said

21  they selected a sample of 20 collateral packages and reviewed

22  for proper documentation to release in advance a completed loan

23  advance request, correct investor information, and proper

24  coding.

25       Do you recall asking any questions to Crowe about the

1  collateral packages that it reviewed?

2  A.  I do not.

3  Q.  Do you know if Mr. Tynes did?

4  A.  I do not.

5  Q.  All right.  I'm going to turn to -- well, I'm going to ask

6  kind of one summary area, and then I'm going to turn to

7  something else.

8      You testified before that -- in direct -- that management --

9  you believed that management satisfied its representations or

10  responsibilities under the engagement letter.  Do you remember

11  that?

12  A.  I do.

13  Q.  Now, as we discussed, management's responsible ultimately

14  for internal controls; correct?

15  A.  Yes.

16  Q.  And management set up a system of controls that involved

17  internal folks, including internal audit and compliance group,

18  and outsourced internal audit activities at Crowe.  And then at

19  the end, PwC came in as the independent auditor; correct?

20  A.  Yes.

21  Q.  And those are the three layers you talked about?

22  A.  Right.

23  Q.  And at the time, did you think the internal controls were

24  effective and working as designed?

25  A.  Yes.

1  Q.  But the fraud occurred; right?

2  A.  Correct.

3  Q.  In your opinion, because of what happened, management failed

4  in its responsibility to identify and control the risk of fraud

5  in the mortgage warehouse lending division as one of the three

6  legs or layers that was being relied on; correct?

7  A.  When all three layers failed simultaneously, management did

8  not meet its responsibility under that.

9  Q.  And management also failed to meet its responsibility as one

10  of the three layers to ensure that the company complied with

11  laws and regulations; correct?

12         MR. COLEMAN:  Objection.  It's vague.  I'm not sure

13  what laws and regulations he's talking about.

14         THE COURT:  The ones we've been talking about for the

15  past couple of hours.  OCC, federal reserves, SEC.

16  Q.  There was a fraud that was committed, not known to you at

17  the time, but now you know about the fraud; right?

18  A.  Right.

19  Q.  And you know that Ms. Kissick and Ms. Kelly ended up going

20  to jail for that; right?

21  A.  Yes.

22  Q.  So that was a violation of law; right?

23  A.  I see where you're headed.  Yes.

24         THE COURT:  There you go.

25  A.  Thank you.

1  Q.  That's all right.  And --

2  A.  It was too obvious.

3  Q.  So you agree that as one layer and the ultimate layer,

4  management failed in its responsibility to ensure that the

5  company complied with laws and regulations; correct?

6         MR. COLEMAN:  I would object to his characterization of

7  the ultimate layer.

8         THE COURT:  Why don't you ask -- since that question

9  has been asked several times, why don't you try something

10  different?

11        MR. LEVINE:  Okay.

12  Q.  Let me just -- I think you answered what I needed before, so

13  let me turn to a different area.  In 2009 did the audit

14  committee hire Ernst & Young to investigate the possibility of

15  money being funneled from Colonial to TBW, and they didn't find

16  any evidence of fraud?  Is that true?

17  A.  In 2009 we hired Ernst & Young to investigate the

18  possibility of what was called "round tripping" in connection

19  with the equity participation that TBW was going to have with

20  Colonial.  And --

21        THE COURT:  Can you tell me what round -- what you mean

22  by round tripping?

23        THE WITNESS:  It would imply that if an equity investor

24  was going to invest money in Colonial as an equity partner or

25  shareholder, it would be illegal if we loaned them money over

1  here to invest in Colonial Bank.  They would -- they would have

2  to have their own separate money that we did not lend to them.

3  And there was a suspicion by SIGTARP when the TARP was approved

4  and that equity participation was announced that they wanted to

5  confirm that we had not, in fact, been guilty of round tripping

6  in connection with that.

7      THE COURT:  In other words, that Colonial hadn't loaned

8  money to TBW to then invest in Colonial.

9      THE WITNESS:  Exactly.

10 Q.  That would include -- you know, that would include doing

11 something off the books, too, you know, surreptitiously getting

12 money from Colonial to TBW that somehow comes back as part of

13 the investment; right?

14 A.  I don't know about that, no.  I don't know that it would be

15 off the books.  It could have been a loan that's on the books

16 that they used the proceeds to invest in Colonial.

17 Q.  But it would include either, wouldn't it?  They were just

18 looking to see if TBW was getting money funneled to it from

19 Colonial that was then -- TBW is then using to make the official

20 investment in Colonial.

21 A.  They were looking for round tripping.  We didn't put any

22 limitations upon them.  We said that SIGTARP is going to conduct

23 their own investigation of this, but we know that it may take

24 them six months to complete it.  We don't have six months.  We

25 don't want to wait that long.  So we want you to go down there

1  and conduct your own investigation, and we're going to make the

2  results of that report available to the government.

3         THE COURT:  What kind of investment was TBW

4  contemplating?

5         THE WITNESS:  They were contemplating an investment of

6  $300 million in Colonial, which was a condition that Colonial

7  had to meet, to get 300 in private equity, in order to be able

8  to receive 500 million in TARP funds.

9         THE COURT:  Okay.  So that 300 million, would that have

10  been in the form of buying shares?

11         THE WITNESS:  Yes.  They would have gotten --

12         THE COURT:  They would have been a shareholder?

13         THE WITNESS:  That's right.  They would have

14  effectively controlled the Bank after their investment.  Because

15  the value of the shares were so low at that point in time, given

16  the market conditions, that 300 million would represent more

17  than 51 percent ownership in the company.

18         MR. LEVINE:  And, Your Honor, I'm going to go through

19  this chronologically in order now.  I was just kind of setting

20  it up, what the issue was.  And it may make more sense --

21         THE COURT:  Well, it makes perfect sense now.  You

22  don't have to go through it step by step.

23         MR. LEVINE:  Well, I'm just going to do a little bit of

24  that.

25  Q.  So let's just go back.  Fall 2008, we remember, is -- you

1  know, the financial crisis going on, and Colonial -- it was

2  having some effect on Colonial; correct?

3  A.  Yes.

4  Q.  And Colonial applied for TARP money; right?

5  A.  Yes.

6  Q.  And the treasury said conditionally you'll get a little over

7  500 million in TARP money, but you've got to come up with $300

8  million in capital.

9  A.  Yes.

10  Q.  And you announced a deal then between Colonial and TBW and a

11  couple other investors where TBW and the other investors would

12  invest money in Colonial; correct?

13  A.  I don't recall the other investors.  I think TBW may have

14  had some subparts to it.  I remember --

15          THE COURT:  It was really TBW that was coming --

16          THE WITNESS:  Yes.  For practical purposes, TBW.

17  Q.  Fair enough.  Fair enough.  So TBW and Colonial announced

18  this deal in the spring of '09 to raise capital by having TBW

19  invest $300 million in Colonial; correct?

20  A.  Yes.

21  Q.  And then SIGTARP issued a subpoena.  Who's SIGTARP?

22  A.  That was the special investigative unit of the federal

23  government for transactions related to TARP.  I can't recite

24  what SIGTARP stands for, but that was, in effect, what they did.

25  Q.  Special Inspector General?

1    A.  Okay.

2    Q.  Then SIGTARP, what they did, they subpoenaed Colonial,

3    asking for information on the relationship between Colonial and

4    TBW; correct?

5    A.  Yes.

6    Q.  And in the board minutes, it was noted that the way in which

7    TBW conducted itself in the transaction raised the suspicions of

8    SIGTARP; correct?

9    A.  I don't recall that.

10   Q.  Let's look at D-1084 briefly.  This is June 15th, 2009,

11   minutes of a meeting of -- a special meeting of the board of

12   directors.  And see that you're listed as being present; right?

13   A.  Yes.

14   Q.  And then we'll turn to the third page.  And Mr. Harris is

15   talking, and he said that TBW is not well thought of as a result

16   of the manner in which they've conducted themselves, e.g.,

17   substituting investors, raising the suspicion of SIGTARP, et

18   cetera.  Do you see that?

19   A.  I do.

20   Q.  And what Colonial did is they hired a law firm to help them

21   address the SIGTARP subpoena and the issues that were being

22   raised; correct?

23   A.  Colonial hired a law firm to help us with the SIGTARP

24   investigation?  We hired Ernst & Young.

25          THE COURT:  You sure it was a law firm and not --

1   A.   -- to help with the investigation.

2   Q.   Do you remember Waller Lansden?

3   A.   Yes.

4   Q.   Did you hire them to help legally in responding to the

5   subpoena that was filed?

6   A.   I was not chairman of the audit committee at the date of

7   this.  Waller Lansden had been engaged by the audit committee

8   prior to me changing positions, but I don't have an independent

9   recollection about the timing of any engagement that you're

10  referring to.

11  Q.   Okay.  But you remember that the -- that -- and that was

12  really just a way to get to Ernst & Young.  So you remember

13  Ernst & Young was hired; right?

14  A.   By Waller Lansden, as I recall.

15  Q.   Okay.

16  A.   On behalf of the audit committee.

17  Q.   And I'm going to put up P-1634.  This is April 14, 2009.

18  You were on the audit committee then; right?

19  A.   Yes.

20  Q.   You were listed as an attendee of that meeting?

21  A.   Yes.

22  Q.   If we go down to page 12 of the document, there's a motion

23  that was made -- well, actually, let me back up.  Sorry.

24       There was a legal executive session that took place with

25  Mr. Byrne and Ms. Mitchell.  And Mr. Byrne, was he the general

1  counsel of the company?

2  A.  Yes.

3  Q.  And Ms. Mitchell, does that ring a bell as one of the

4  lawyers at Waller Lansden?

5  A.  Yes.  That would be Marlee Mitchell.

6  Q.  Okay.  And there was extensive privilege discussion on the

7  legal proceedings; the proposed transaction with TBW.  Then a

8  motion was made directing the chairman of the committee --

9      That was you, right?

10 A.  Yes.

11 Q.  -- to authorize special counsel to the audit -- go to the

12 next page -- committee to engage a forensic accounting firm to

13 perform a complete and thorough investigation to determine if

14 there are any transactions that have not been reported to the

15 board of directors between Colonial and its affiliates on one

16 hand, and TBW, other potential purchasers, and their affiliates

17 on the other.

18      You see that?

19 A.  I do.

20 Q.  And the firm that you hired to do the complete and thorough

21 investigation, was that Ernst & Young?

22 A.  Yes.  And that would have been in the context of making sure

23 that the government knew if a report was rendered from us to

24 them, that there were no limitations, artificial or otherwise,

25 that had been placed on Ernst & Young.  They were to go down

1  there and do what it took to render the opinion.

2  Q.  Okay.  And you signed the engagement letter with Ernst &

3  Young; correct?

4  A.  I don't recall doing that.

5  Q.  You remember --

6  A.  I don't doubt that I did, but I don't recall.

7  Q.  Sure.  You remember hiring them?

8  A.  Yes.

9  Q.  And I'm going to put up some deposition testimony that was

10  given in this case -- I have a slide here -- from Mr. Hoffman.

11       MR. COLEMAN:  Your Honor, I'm going to object to asking

12  the witness to comment on deposition testimony.

13       MR. LEVINE:  Your Honor, I'm not asking for comment.

14  But if you recall in D.C., every time we made the objection, it

15  was overruled.  And what's SAUCE for the GOOSE is SAUCE for the

16  gander.

17       THE COURT:  Wait a minute.  I don't understand why you

18  need this.

19       MR. LEVINE:  I'm putting it up and I'm going to ask

20  some questions about Mr. Hoffman.  And it's similar to when we

21  made the objection in D.C. about putting up deposition testimony

22  of other people, it was overruled.  And I'm just going to ask

23  about -- we're going to see what Mr. Hoffman said, and I have a

24  few questions about Mr. Hoffman.

25       MR. COLEMAN:  I'm not sure what he's talking about in

1  D.C.  He's certainly free to ask questions about Mr. Hoffman,

2  but I don't think it's appropriate to put his deposition

3  testimony in.

4       THE COURT:  I'll overrule it.  You may go ahead.

5  Q.  Mr. Hoffman refers to Ernst & Young undertaking to design to

6  spot places where Colonial Bank could have been funneling money

7  to the customers.  Do you know who David Hoffman was?

8  A.  I have no independent recollection of it, but obviously, he

9  was a partner with E&Y.

10  Q.  He came to a board meeting in August 2009.  Do you remember

11  meeting with him then?

12  A.  No.

13  Q.  Are you aware that Mr. Hoffman is a certified fraud

14  examiner?

15  A.  No.  I don't recall even meeting with him, so I would not

16  recall that.  And I may have known that at the time.

17  Q.  Okay.  But would you expect that as the leader -- that the

18  leader of the E&Y forensic team that you hired would have a good

19  idea of what they were looking for?

20  A.  Yes.

21  Q.  Let's turn, then, to -- I want to ask a little bit about

22  what E&Y was doing.  They weren't doing a financial statement

23  audit; right?

24       THE COURT:  I think we've already gone over this.  We

25  know that E&Y were doing a forensic examination.

1          MR. LEVINE:  Okay.  I'll make it quicker, then.

2   Q.  I just want really quickly note, they're only looking at

3   some very specific, dealings with TBW and the mortgage warehouse

4   lending division, not looking at the entire company, including

5   the 80 percent of banks in various states; correct?

6   A.  Correct.

7   Q.  Let's look at the work that E&Y did.  Did you receive some

8   reports from E&Y?

9   A.  Say that again.  My mind was on your last question.

10  Q.  No problem.  Did you receive some reports from E&Y about

11  what they had found?

12  A.  I don't think I ever did, because I was not on the audit

13  committee at that time.  And if I did see them, I don't recall

14  seeing them.

15          MR. LEVINE:  Bear with me one second.

16          THE COURT:  Counsel, about how much more do you have

17  with this witness?

18          MR. LEVINE:  After this, I have several -- a few other

19  areas.  Probably 30 to 45 minutes.

20          THE COURT:  Well, let me make a suggestion.  I do want

21  to discuss a few matters with the Crowe people on scheduling.

22  So maybe -- it sounds like this might be a good time to take a

23  break, since you're looking for documents, which might take a

24  while.

25          MR. LEVINE:  Sure.  That's fine, Your Honor.

1          THE COURT:  Okay.  And we'll resume with this witness

2    tomorrow morning.

3          You may step down, you'll be glad to hear.  Take a

4    break.

5          Who do I need to talk with for Crowe?  And Mr. Mullin

6    is standing up bravely.  Mr. Dorsey.  You guys should be fresh

7    because you've been relatively quiet.

8          Let me give you an idea of some questions I have that

9    you might want to go back and think about so that when we

10   talk -- some of them you maybe can answer easily.  I doubt it,

11   but we'll try.

12         First of all, I'm a little confused on how long this

13   case was supposed to be.  I understood it was going to be three

14   weeks, and I've heard some muttering about a month.  And that

15   wasn't what I understood.

16         Second of all, where is it taking place?  How many days

17   are we coming back here, and how many days are we supposed to be

18   in D.C.?  I think I -- when you're starting to talk about

19   dividing up time -- because I am also going to ask you to do

20   some time divisions.  Given what I've learned about going back

21   and -- if we're going to be here more than a week, if it's going

22   to be two weeks, I think what you should count on is a four-day

23   week.  Otherwise, all of us will end up spending the weekend in

24   Montgomery, which I'm not sure -- at least the Court can't do.

25   I've got to get back for at least the weekend.  And that would

1  mean leaving on Friday.

2          The other issue that I think you need to think about is

3  how to avoid repetition in this case.  At great length and in

4  sometimes excruciating detail the Court has been educated about

5  what AOT is and what COLB is and what the audit committee was

6  doing and what was going on.  So believe me, don't worry,

7  counsel.  I know that Crowe has the right to put on its own case

8  and to present its own version of some of the things I've

9  already heard that may have a different slant in another case.

10 And I'm certainly open to that.

11         But I really urge you to look into -- I've been sitting

12 up here thinking of possibilities.  I don't know whether you can

13 come up with an agreed statement of facts that on certain dates,

14 certain things happened; certain reports were made; certain

15 financial statements were filed with the SEC; the 10-Ks.  I

16 mean, there's an awful lot that I think can be agreed on without

17 Crowe giving away any of its positions.  Do you see what I'm

18 saying?  It's been established very, very clearly, there was

19 nothing in the AOT account.  I don't need to hear that again.

20 Had anyone looked, there was nothing there, but there was

21 nothing there.  I don't want to go through all the facts that I

22 think you could stipulate to.  But I just urge you to think

23 through the burden.  And if there's a way of doing it -- that's

24 why I want to give you a heads up.  Because I think this takes a

25 certain inventive approach on the part of counsel.  How to do

1   this without impeding the burden of proof or whatever in the

2   other case and the defenses or whatever we're talking about.

3           So these are a couple of things that came to my mind

4   that I would like to talk to you about.  If some of them are

5   clear, that would be great.  But I wanted to give you some

6   thoughts.  And you may have thoughts on your own of issues you

7   would like me to cope with before November.  But as long as

8   we're all here, we should be talking about this before we go

9   back on Thursday or Friday, whatever day.

10          Counsel, did this spark any great responses or --

11          MR. MULLIN:  Well, we -- Your Honor, David Mullin on

12  behalf of the FDIC.

13          I think that we had thought the trial was scheduled for

14  three weeks, but it is -- I've wondered about Thanksgiving week

15  being the third week and how that was going to work.  Because we

16  have the 6th and the 20th, and then we're in Thanksgiving week,

17  I think.  The 24th is Thanksgiving, I think, this year.  Isn't

18  that right?

19          THE COURT:  You don't want to be here on -- I mean,

20  being in my court on Thanksgiving?  I don't know whether to be

21  hurt by that or not.

22          MR. MULLIN:  Only if I could bring my whole family and

23  all my relatives.

24          THE COURT:  Okay.  And I do have another question,

25  which I would appreciate a response to, and that is the

1   mediation that's taking place this weekend.  Is Crowe

2   participating?

3           MR. MEDOW:  Nobody's invited us, Judge.

4           THE COURT:  Okay.  Well, if you're not involved in this

5   one, I'd like you to start thinking in terms of your own.  You

6   know, I would like mediation to take place before we go through

7   two weeks of trial.  I think that's -- or three weeks of trial.

8   I think that's certainly a more efficient way to proceed.  So

9   give that -- give it some thought.

10          Do you think -- I don't know whether this particular

11  mediator will be so sick of you guys that he doesn't want to see

12  anybody connected with this case again, or he may think that

13  he's right on top of it and knows the issues and would be a very

14  logical place to turn for mediation.  So why don't you add that

15  to the list of things that we will talk about.  Okay?

16          And that brings us to an earlier conclusion of the day,

17  which I don't think anybody's going to mind.  So see you back

18  here at nine o'clock.

19      (Evening recess at 4:52 p.m.)

20                      * * * * * * * * * *

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript

3   from the record of proceedings in the above-entitled matter.

4            This 2nd day of October, 2017.

5

6                              /s/ Patricia G. Starkie
                               Registered Diplomate Reporter
7                              Certified Realtime Reporter
                               Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PATRICIA G. STARKIE, OFFICIAL COURT REPORTER
U.S. District Court, Middle District of Alabama
One Church Street, Montgomery, AL  36104   334.262.1221