1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE MIDDLE DISTRICT OF ALABAMA

3                              NORTHERN DIVISION

4

5    THE COLONIAL BANCGROUP, INC.
     and KEVIN O'HALLORAN,
6
             Plaintiffs,
7
         v.                              CASE NO.: 2:11cv746-BJR
8
     PRICEWATERHOUSECOOPERS LLP
9    and CROWE HORWATH LLP,

10           Defendants.

11                    *  *  *  *  *  *  *  *  *  *  *

12                             NONJURY TRIAL

13                    *  *  *  *  *  *  *  *  *  *  *

14           BEFORE THE HONORABLE BARBARA JACOBS ROTHSTEIN, UNITED

15   STATES DISTRICT JUDGE, at Montgomery, Alabama, on Tuesday,

16   October 3, 2017, commencing at 9:02 a.m.

17                              APPEARANCES

18   FOR THE PLAINTIFFS:      Mr. David C. Mullen
                              Mr. John G. Turner III
19                            Attorneys at Law
                              MULLIN HOARD & BROWN LLP
20                            800 Amarillo National Plaza Two
                              500 South Taylor Street
21                            Amarillo, Texas  79101

22                            Mr. Rufus T. Dorsey IV
                              Mr. Ronald T. Coleman Jr.
23                            Attorneys at Law
                              PARKER HUDSON RAINER & DOBBS LLP
24                            1500 Marquis Two Tower
                              285 Peachtree Center Avenue NE
25                            Atlanta, Georgia  30303

```
1                    APPEARANCES, continued:

2   FOR THE DEFENDANTS:       Mr. Philip S. Beck
                              Mr. Mark L. Levine
3                             Mr. Nicolas L. Martinez
                              Mr. Christopher D. Landgraff
4                             Attorneys at Law
                              BARTLIT BECK HERMAN
5                             PALENCHAR & SCOTT LLP
                              Courthouse Place
6                             54 West Hubbard Street, Suite 300
                              Chicago, Illinois  60654
7
                              Mr. Jameson R. Jones
8                             Attorney at Law
                              BARTLIT BECK HERMAN
9                             PALENCHAR & SCOTT LLP
                              1899 Wynkoop Street, 8th Floor
10                            Denver, Colorado  80202

11                            Ms. Meredith Moss
                              Attorney at Law
12                            KING & SPALDING LLP
                              1700 Pennsylvania Avenue NW
13                            Washington, D.C.  20006

14                            Mr. Jonathan C. Medow
                              Attorney at Law
15                            MAYER BROWN LLP
                              71 South Wacker Drive
16                            Chicago, Illinois  60606

17                            Mr. Tabor Robert Novak Jr.
                              Attorney at Law
18                            BALL BALL MATTHEWS & NOVAK PA
                              445 Dexter Avenue, Suite 9045
19                            Montgomery, Alabama  36104

20  FOR FDIC as Receiver      Mr. Stephen P. Sorensen
    for Colonial Bank:        Attorney at Law
21                            THOMAS ALEXANDER
                              FORRESTER & SORENSEN LLP
22                            14 27th Avenue
                              Venice, California  90291
23
                    Proceedings reported stenographically;
24                    transcript produced by computer

25                      * * * * * * * * * * *
```

EXAMINATION INDEX

LEWIS EDWARD BEVILLE
    FURTHER CROSS BY MR. LEVINE               2210
    REDIRECT BY MR. COLEMAN                 2230
    RECROSS BY MR. LEVINE                   2240

MARY BATHEN
    DIRECT BY MR. LEVINE                    2246
    CROSS BY MR. TURNER                    2344
    CROSS BY MR. DORSEY                    2389
    REDIRECT BY MR. LEVINE                 2394
    RECROSS BY MR. TURNER                 2402

SARAH MOORE
    DIRECT BY MR. BECK                     2404

\* \* \* \* \* \* \* \* \* \* \*

(The following proceedings were heard before the Honorable

Barbara Jacobs Rothstein, at Montgomery, Alabama, on

Tuesday, October 3, 2017, commencing at 9:02 a.m.:)

(Call to Order of the Court)

THE COURT:  Please be seated.

Good morning, all.  Ready to go?

MR. LEVINE:  Ready, Your Honor.  I believe -- I could

ask questions, but I need the witness up there too.

Mr. Beville, if you would go to the stand, that would be great.

Thank you very much.

THE COURT:  I don't know, Mr. Levine.  You could

probably do both.

MR. LEVINE:  I'll try.  I could put Mr. Beck on the

stand.

1        **LEWIS EDWARD BEVILLE**

2     The witness, having been previously sworn, resumed the

3 stand and testified further, as follows:

4              FURTHER CROSS-EXAMINATION

5 BY MR. LEVINE:

6 Q.  Good morning, Mr. Beville.

7 A.  Good morning.

8 Q.  To sum up where we left off yesterday when we broke, we were

9 talking about the E&Y investigation and that the audit committee

10 had hired them to conduct a complete and thorough forensic

11 examination of the transactions with TBW.  Do you remember that?

12 A.  I do.

13        MR. COLEMAN:  Objection, Your Honor.  He testified that

14 he wasn't involved at the time E&Y gave its report.

15        MR. LEVINE:  That's not what I said, Your Honor.  I

16 asked if they were hired.  I can repeat the question.

17        THE COURT:  Well, don't.

18        MR. LEVINE:  Okay.  Let's move on, then.

19 Q.  After you hired -- after the audit committee hired E&Y --

20 and that was around April of 2009; correct?

21 A.  That sounds about right.  I don't have a recollection of the

22 date.

23 Q.  Sure.  Are you aware that as part of their investigation,

24 E&Y spent 3,400 hours?

25 A.  No.


Q. Are you aware that E&Y invoiced Colonial approximately $1.4 million for its first phase?
A. No.
Q. Do you recall that you received the preliminary findings of the E&Y forensic examination?
A. I have no independent recollection of it, although I may have.
Q. All right. I'm going to show you D-913. And if you see here -- I'm going to make this bigger -- on the bottom is an e-mail from Larry Childs from the Waller firm to Tommy Tynes and says, Attached is a revised draft of our preliminary report to the audit committee. Do you see that?
A. I do.
Q. And do you see, then, on the top that Mr. Tynes forwarded the draft report to a number of people, including yourself?
A. I do.
Q. Okay. So then if we turn to the third page of the document, we see that it's titled Preliminary Report of Counsel to the Audit Committee Concerning the SIGTARP Subpoena Investigation; is that right?
A. Yes.
Q. And this date that was -- that it was sent, August 5th of 2009, was that two days after the FBI raid?
A. Sounds right.
Q. So if we turn, then, to the fourth page of the document, it

1    says that E&Y assisted counsel in compiling a list of 17

2    relevant custodians and numerous search terms.  And then E&Y and

3    Waller Lansden reviewed approximately 60,000 -- 67,000 e-mails

4    in the course of the investigation.  Do you see that?

5    A.  I do.

6         MR. COLEMAN:  Your Honor, I object to walking through

7    the report with the witness when he's already testified that he

8    has no recollection and wasn't on the audit committee at this

9    point in time.

10        MR. LEVINE:  Your Honor, he received the document.  We

11   just went through that.  And I'm asking him about the document

12   that he received.

13        THE COURT:  Well, I'm going to overrule.  They're only

14   going to call another witness to do the same thing, and they

15   want to bring in this document.  He received it.

16        MR. COLEMAN:  I'll also object to cumulative, because I

17   think we've already covered this.

18        THE COURT:  Well, it is getting cumulative, counsel.

19   Can you --

20        MR. LEVINE:  I'll move through it quickly, Your Honor.

21        THE COURT:  Please.

22   BY MR. LEVINE:

23   Q.  So were you aware that one of the custodians whose e-mails

24   was reviewed was Cathie Kissick?

25   A.  I have no recollection of that, no.

1  Q.  And then if we look a little further down on this page, it

2  says that one of the things that E&Y looked at was tracing cash

3  in and out of relevant accounts, tying out specific

4  mortgage-related -- mortgage-specific transactions to the

5  Colonial operating system.  Were you aware that E&Y was doing

6  that?

7  A.  I have no recollection of that.  No.

8  Q.  Was that consistent with what you had hired E&Y to do, which

9  was -- when it was to conduct a complete and thorough forensic

10  examination?

11      THE COURT:  He doesn't know anything about this,

12  counsel.  And seeing the document hasn't refreshed his

13  recollection, apparently.  So getting into detail on it --

14  Q.  Let me turn to the last page, the conclusions.  If you look

15  at the fifth page of the document, you see the conclusions are:

16  No credible evidence of any illegal acts as to business and

17  relationships -- business relationships and transactions with

18  TBW.  And then, moving down, no evidence of round-tripping or --

19  and that E&Y's "follow the money" analysis in reconciling

20  deposit account activity with loan activity did not identify

21  significant anomalies.

22      Do you see that?

23      MR. COLEMAN:  Your Honor, lack of foundation.  He's

24  simply walking through a document that he doesn't recall.

25      THE COURT:  Sustained.

1  Q.  When you heard this -- are you aware, sir, of E&Y ever

2  telling the audit committee that -- in this early August time

3  frame that they found fraud at Colonial?

4         MR. COLEMAN:  Objection.  Lack of foundation.  He

5  wasn't on the audit committee.

6         THE COURT:  Sir, you weren't on the audit committee at

7  this point, were you?

8         THE WITNESS:  That's correct, I was not.

9  Q.  Were you CEO of the business?

10 A.  Yes.

11 Q.  As CEO, did you become aware of E&Y ever -- in this early

12 August, first -- August -- let's say the first ten days in

13 August, finding fraud in the Colonial Bank area?

14        MR. COLEMAN:  Objection.  Asked and answered.

15        THE COURT:  You can't do that.  You can't --

16        MR. COLEMAN:  Asked and answered that he has no

17 knowledge and lack of foundation.

18        THE COURT:  As CEO, did you hear about this or not?

19        THE WITNESS:  I have no independent recollection of

20 hearing about this because at that time, August 9th, I was

21 involved in a lot of moving parts.  And I very likely never read

22 or digested that report.

23 BY MR. LEVINE:

24 Q.  Okay.  Let's move on to another area, then.

25        There's been some discussion in our case about entities

1  owing duties to the public.  Was Colonial BancGroup a public

2  company.

3  A.   Yes.

4  Q.   And did you believe or understand that as a public company,

5  when certifications were signed pursuant to the Sarbanes-Oxley

6  law, that Colonial BancGroup had an obligation to the public to

7  make sure those were accurate?

8  A.   Yes.

9  Q.   And do you understand that regulators of the -- there were

10  regulators of the bank; is that right?

11  A.   Yes.

12  Q.   And one of them was the OCC?

13  A.   Yes.

14  Q.   And then there was also the FDIC?

15  A.   Yes.

16  Q.   And the Federal Reserve?

17  A.   Yes.

18  Q.   Did you understand that the regulators from the federal

19  government had a responsibility to the public?

20  A.   Yes.

21  Q.   Now, did the regulators of the bank like the OCC and the

22  FDIC routinely or regularly attend audit committee meetings?

23  A.   I would not say regularly.  They intermittently attended

24  audit committee meetings.

25  Q.   From time to time, they came.

1  A.  They intermittently attended audit committee meetings.

2  Q.  So the OCC was the primarily regulator from 2003 to June

3  2008.  Does that sound about right?

4  A.  Yes.

5  Q.  Did you know or meet with Brent Spencer at all from the OCC?

6  A.  Yes.

7  Q.  Are you aware that he had an office inside Colonial Bank?

8  A.  I don't recall it.  I don't doubt it.

9  Q.  Are you aware that Mr. Spencer, most weeks, spent four to

10 five days a week at Colonial Bank?

11        THE COURT:  If he didn't know he had an office, then I

12 doubt that he's -- you're asking him things he doesn't know,

13 counsel.

14 Q.  Did the OCC issue reports on targeted examinations of the

15 mortgage warehouse lending division to the company?

16 A.  They issued a lot of reports.  And I would imagine, although

17 I don't have an independent recollection of seeing a mortgage

18 warehouse report, that they probably did that.

19 Q.  Did the FDIC become the primary regulator in June 2008?

20 A.  That sounds about right.

21 Q.  Were they the backup regulator before that?

22 A.  I believe that's correct.

23 Q.  Did the FDIC conduct examinations of the bank as well?

24 A.  Yes.

25 Q.  And did the regulators issue results of their examinations?

1  A.  Yes.

2  Q.  Were those examination results typically presented to the

3  audit committee?

4  A.  They were.

5  Q.  And did you review the findings of the regulatory

6  examination reports that were presented to the audit committee?

7  A.  Yes.

8  Q.  Did you take comfort in regulatory findings that suggested

9  that the mortgage warehouse operational controls were considered

10  strong?

11  A.  I did.

12  Q.  Did you consider the regulatory oversight of the mortgage

13  warehouse lending division of Colonial Bank to be robust?

14  A.  Yes.

15  Q.  Did the regulators ever find the fraud prior to the FBI

16  raid?

17  A.  Not that I'm aware of.

18  Q.  I want to turn to another topic.  In direct examination you

19  testified about the OCC asking questions about the FAS 140

20  accounting treatment in April 2008.  Do you recall that?

21  A.  I do.

22  Q.  Now, for -- when that -- those questions came up, Colonial

23  didn't just ask PwC to look at it.  Colonial had its own

24  accountants look at the FAS 140 issue; correct?

25  A.  I have no independent recollection, but I'm confident that

1  it did happen, yes.

2  Q.  Well, did Colonial accountants and management look at the

3  issue and conclude the sale treatment was consistent with FAS

4  140?

5  A.  They concluded, to the best of my recollection, that it was

6  not only consistent with 140, but it was consistent with what

7  PwC had agreed was appropriate over the past number of years.

8  Q.  I'm going to show you A-368.  This is a letter from Colonial

9  Bank dated July 25th, 2008, to the FDIC and the State of Alabama

10  banking department.  Do you see that?

11  A.  Yes.

12        THE COURT:  What was the number of that, again,

13  counsel?

14        MR. LEVINE:  A-368.

15  Q.  And at the back of the document, you can see that it's

16  signed by Sarah Moore; is that right?

17  A.  Yes.

18  Q.  She was CFO of the company at the time?

19  A.  She was.

20  Q.  And if we look at the next page, page 20, there are a number

21  of people that are cc'd.  And one of them -- it's actually not a

22  person, it's a group -- is the audit committee; is that right?

23  A.  Yes.

24  Q.  And in July of 2008, were you on the audit committee?

25  A.  I --

1  Q.  2008.

2  A.  Yes.  2008, I was.

3  Q.  And if we look at the text here -- and this is on page 15 of

4  the document.  It says that Colonial's accounting personnel

5  worked closely with the OCC staff, including members of the

6  office of the chief accountant of the OCC; MWL personnel;

7  Colonial's independent auditors, PricewaterhouseCoopers; and

8  outside counsel, Akerman Senterfitt and Capell & Howard, to

9  review the appropriateness of the existing accounting treatment

10  under FAS 140, 133, and 65.  Do you see that?

11  A.  I do.

12  Q.  Is this management saying that based on the work that it

13  referenced, the accounting treatment meets or satisfies FAS 140?

14          MR. COLEMAN:  Objection, Your Honor.  Lack of

15  foundation.  He had no evidence who prepared the document or had

16  knowledge of its contents.

17          THE COURT:  I think the question was is that what this

18  says.  And he can tell him.

19          MR. COLEMAN:  I heard it as asking for the witness's

20  opinion.  If the document -- the documents -- we don't dispute

21  the document says what the words on the page say, but he doesn't

22  have any -- he hasn't established this witness has any knowledge

23  of the preparation of the document.

24          THE COURT:  You can repeat the question.  Let's see

25  what you were really asking.

1  Q.  Did you understand that what's referring to here in this

2  document that you received is that Colonial management was

3  saying based on the work that is referenced on page 15 that the

4  COLB transactions meet FAS 140?

5      MR. COLEMAN:  Same objection.  He's asking his

6  understanding.

7      THE COURT:  Overruled.  He's just asking you if that's

8  what the letter says.

9  A.  It is saying the words on the page, that a group consulted

10  on that issue and that their purpose was to review the

11  appropriateness of the existing accounting treatment.  I can't

12  add insight to a letter that I did not write.

13  Q.  Did you classify this work as fairly extensive and thorough?

14  A.  Yes.

15  Q.  Was the audit committee satisfied with the results?

16  A.  I don't have an independent recollection of that.

17  Q.  Do you have any recollection of the FDIC or the Alabama

18  banging department telling Colonial that they disagreed and that

19  COLB didn't qualify for sales accounting treatment?

20  A.  The FDIC and who was the other party?

21  Q.  The Alabama banking department.

22  A.  I have no recollection of them saying that.

23  Q.  I want to ask you to move to a different area.  You

24  testified in direct examination that the audit committee

25  expected PwC to contact the audit committee with any concerns

1  that it had.  Do you remember that?

2  A.  Yes.

3  Q.  Did you expect that -- in conducting the audit, that PwC

4  would receive the full and complete information from the

5  Colonial folks at the mortgage warehouse lending division?

6  A.  I would expect that PwC would receive whatever documents

7  they requested or had notified the bank that were needed in that

8  regard.

9  Q.  Well, did you expect that the folks at the mortgage

10  warehouse lending division would cooperate fully with PwC?

11  A.  Absolutely.

12  Q.  And did you expect that the folks at the mortgage warehouse

13  lending division, if they had concerns, that they would raise

14  them with PwC?

15  A.  If it was a material concern that was relevant to the audit,

16  yes.

17  Q.  Are you aware that there were -- there was a set of what

18  were called auditor rules at the mortgage warehouse lending

19  division that said, don't volunteer anything to the auditors or

20  answer beyond the question asked?

21  A.  I never saw that.

22  Q.  Did the audit committee or the board of directors approve

23  that kind of auditor rules?

24  A.  I may have characterized it somewhat differently if the

25  audit committee had authored it, but I'm not surprised that such

1  a document existed in the context of mortgage warehouse.

2     No unit within the bank welcomed being audited.  It was time

3  consuming.  It could take two days, it could take two months,

4  and it interrupted the normal course of their operations on

5  getting their usual business done.  No unit within the bank was

6  more audited than mortgage warehouse lending, not just from PwC

7  or Crowe Chizek but, as you point out, from regulators, from

8  E&Y, probably from firms who had custodial interests, rating

9  agencies, secondary mortgage markets, other financial

10 institutions who had documents in the vault, and their

11 accountants.

12    So that tells me that they had to learn to be very efficient

13 at handling audits.  If they didn't, they would never get their

14 work done.  And the alternative to having audit rules is having

15 no audit rules, which would be chaotic and very problematic in

16 the normal course of what warehouse lending did.

17 Q.  Well, wouldn't another alternative -- by the way, none of

18 those various entities that you listed found the fraud before

19 the FBI raid; correct?

20 A.  The only one that was hired by Colonial Bank and the

21 shareholders to find fraud in terms of the ongoing audits and

22 operations, not isolated regulatory exams or special-purpose

23 audits, were the two layers of professionals that we hired,

24 Crowe Chizek and PwC.

25 Q.  Going back to the audit rules, sir, did you expect that if

1   people who weren't fraudsters at the bank had serious concerns

2   about things that they were learning, that they would tell their

3   auditors?

4   A.  If they had serious concerns related to fraud that were

5   material, that they would tell the auditors?  Yes.

6   Q.  Okay.  Let's go back to the engagement agreement that we

7   looked at yesterday, which was the 2008 agreement.  A-7.  And I

8   want to go to the third page.  Actually, let me start -- this

9   is -- there's a long section starting at the first page,

10  actually, where it's our responsibilities and limitations, "our"

11  being PwC; correct?

12  A.  That's correct.

13  Q.  And then all the second page deals with that; right?

14  A.  Yes.

15  Q.  And then the third page up until the end deals with that;

16  right?

17  A.  Yes.

18  Q.  So I'm going to look at that big paragraph there.  It's hard

19  to -- I'm going to make it bigger, but you can see there's a big

20  paragraph that starts, We will design?

21  A.  Yes.

22  Q.  Bear with me just one second.  There we go.  Hold on.

23  Sorry.

24      In that paragraph, PwC said, Audits are based on

25  selective -- a concept of selective testing of the data

1  underlying the financial statements, which involves judgment

2  regarding the areas to be tested and the nature, timing, extent,

3  and results of the tests to be performed.

4      Do you see that?

5  A.  I do.

6  Q.  And then it says that audits are, therefore, subject to the

7  limitation that material errors or fraud or other illegal acts

8  having a direct and material financial statement impact, if they

9  exist, may not be detected.

10      Do you see that?

11  A.  Yes.

12  Q.  Did you understand that PwC would be examining Colonial Bank

13  on a test basis?

14  A.  I understood that PwC would be examining Colonial Bank in

15  accordance with PCAOB standards.

16  Q.  Right.  But did you understand that that included PwC

17  examining the bank on a test basis?  In other words, not looking

18  at every record.

19  A.  If that was a part of their engagement and a part of PCAOB,

20  yes.

21  Q.  And then if we turn to the next -- a little bit further

22  down, I highlighted the next sentence.  It says, Because of the

23  characteristics of fraud, an audit designed and executed in

24  accordance with the standards established by the PCAOB may not

25  detect a material misstatement due to fraud.

1      Did you understand that an audit might not be able to detect

2  fraud?

3  A.  I understood that an audit, any audit, may not be able to

4  detect fraud.  But I was of the belief and understanding that

5  any audit that is properly planned around the exposures of the

6  institution itself and properly executed had a very high

7  likelihood of catching fraud.

8  Q.  But you knew that it's not perfect and it may not catch it;

9  right?

10  A.  I didn't say it was perfect.

11  Q.  All right.  So let's look at the next sentence, then, that I

12  highlighted here.  It says, Characteristics of fraud include

13  concealment through collusion among management employees with

14  third parties; with -- then number two, withheld, misrepresented

15  or falsified documentation; and, number three, the ability of

16  management to override or instruct others to override what

17  otherwise appears to be effective controls.

18      Do you see that?

19  A.  Yes.

20  Q.  I want to talk about each of those.  The first one is

21  concealment through collusion among management, employees, or

22  third parties.  Do you agree the fraud here was very well

23  concealed?

24  A.  All frauds are well concealed.  And I don't know that this

25  one was any more well concealed than any other fraud.

1  Q.  Okay.  Well, would you describe this fraud as having been

2  very well concealed?

3  A.  I don't have a context to answer that because I'm not

4  experienced with any other frauds other than this one.

5  Q.  Did the fraudsters at Colonial and TBW take steps to conceal

6  the fraud from the auditors?

7  A.  Yes.

8  Q.  Did the fraud here involve concealment and collusion among

9  Kissick, Kelly, and the third party, TBW?

10  A.  Yes.

11  Q.  And did Kissick and Kelly and TBW collude in the fraud to

12  avoid detection?

13  A.  Yes.

14  Q.  Okay.  Let's look at the second item here.  Withheld,

15  misrepresented, or falsified documentation.  Did the fraud

16  within the mortgage warehouse lending division involve withheld,

17  misrepresented, or falsified documentation?

18         THE COURT:  Counsel --

19         MR. COLEMAN:  I object to the lack of foundation.  He's

20  not established that this witness has an understanding of the

21  details.

22         THE COURT:  Do we really have to go through these?  I

23  mean, whether this witness has a foundation, you all know the

24  answer to that question; right?

25         MR. LEVINE:  Well, I think so, but I want to -- it's

1  going to take five minutes.  I think it's important to have it

2  in the record, given that's what PwC has in its engagement

3  letter.  And that's all I have after this, Your Honor.

4          THE COURT:  Okay.  Go ahead.

5          MR. COLEMAN:  I renew my objection --

6          THE COURT:  Overruled.

7          MR. COLEMAN:  -- for lack of foundation.

8          THE COURT:  Overruled.

9  Q.  Sir, did the fraud within the mortgage warehouse lending

10  division involve withheld, misrepresented, or falsified

11  documentation?

12  A.  Yes.

13  Q.  Did you become aware after the fraud was exposed about a

14  separate computer system that Kissick and Kelly had that tracked

15  confidential documents?

16  A.  Yes.

17  Q.  And did you become aware that steps were taken in an attempt

18  to subvert detection by Colonial management, PwC, Crowe, and the

19  regulators by Kissick and Kelly?

20  A.  Repeat the question, please.

21  Q.  Sure.  Did you become aware that Kissick and Kelly took

22  steps to subvert detection of the fraud by the auditors and the

23  internal bank folks and the regulators?

24  A.  Yes.

25  Q.  And finally, the third area is the ability of management to

1  override or instruct others to override what otherwise appears

2  to be effective controls.  Did the fraud within the mortgage

3  warehouse lending division involve management's override or

4  instructions to others to override what you thought were

5  effective internal controls?

6  A.  I don't know enough about the granular details of the

7  mechanics of the fraud as it relates to that question, so I'm

8  not a good one to ask it or answer it.

9  Q.  Was that your understanding?

10  A.  Again, I've answered that.

11      THE COURT:  Now, when you refer to management, you're

12  including Kissick and Kelly in that; right?

13      THE WITNESS:  Yes.

14  Q.  And did Kissick and Kelly override or instruct others to

15  override controls?

16  A.  Again, I don't know the mechanics as far as how they overlay

17  with that question, so I'm unable to answer it.

18  Q.  Did you understand -- we have the fraud with these three

19  different characteristics that were in the engagement letter.

20  Did you understand that fraud with these characteristics set

21  forth in the engagement letter may very well subvert a properly

22  executed and performed audit?

23  A.  I knew that -- from what the engagement letter said that,

24  yes, fraud could not be captured by the engagement letter.  But,

25  again, as I said earlier, if it's done by PCAOB standards and if

1   it is designed with knowledge of the exposures and operations of

2   the specific organization, not the generic template of a letter,

3   but the specific operations of an organization where they have

4   been in meetings -- not one meeting, but for ten years or more

5   of meetings -- to understand what the exposures are, where they

6   have seen the same reports that we have seen, including the Pam

7   Vitto reports that you introduced yesterday -- which you are

8   implying had the telltale signs or nature of fraud, whereas the

9   audit committee may have believed that instead of that being a

10  telltale sign of fraud or an early warning, that it was an

11  anomaly that layer one had properly identified and properly

12  resolved and added additional risk mitigants to it but, if there

13  were others in the room, those other two layers of professionals

14  who were hearing that same information that we heard for ten

15  years and were in those meetings for that very reason -- then I

16  would expect that it would give insight on how you might want to

17  design the audit of that unit and how you would want to execute

18  that audit.  So I understand the template, but there's more to

19  the story than what this letter says.

20  Q.  All right.  But did you understand that fraud with the

21  characteristics set forth in these three items here in the

22  engagement letter may very well subvert a properly executed and

23  performed audit?

24  A.  I understood the words on that page.  Yes.

25  Q.  And did you understand that by the very nature of fraud

1  itself, that it may go undetected despite everyone's best

2  efforts?

3  A.  I understood that is what that letter said.  Yes.

4  Q.  And did you understand that it was possible to comply with

5  your professionals duties, yet fail to detect the fraud in

6  mortgage warehouse lending?

7  A.  I understood that it's possible, but there are also ways

8  that you can increase the possibility that it will detect fraud.

9  Q.  But you can have someone following their professional duties

10  and still not find the fraud in mortgage warehouse lending;

11  correct?

12        MR. COLEMAN:  Your Honor, I object.  Lack of

13  foundation.  It sounds like it's expert testimony.

14        THE COURT:  Overruled.

15        MR. LEVINE:  Asking for his understanding.

16        THE COURT:  Overruled.  He's already answered it twice,

17  I think.

18        MR. LEVINE:  All right.  No further questions.

19        MR. COLEMAN:  Excuse me one second, Your Honor, while I

20  get situated.

21     (Brief pause)

22                        REDIRECT EXAMINATION

23  BY MR. COLEMAN:

24  Q.  Mr. Beville, good morning.

25  A.  Good morning.

1  Q.  You were asked a number of questions yesterday by Mr. Levine

2  about the efforts of BancGroup and the bank to prevent and

3  detect fraud.  From your position as chair of the audit

4  committee, did you believe that anything that Colonial BancGroup

5  or Colonial BancGroup did or did not do had any impact on PwC's

6  obligations under their engagement letter or PCAOB standards?

7  A.  No.

8  Q.  Do you believe that Colonial BancGroup or Colonial Bank did

9  anything that prevented PwC from conducting an audit as required

10  under their engagement letter or PCAOB standards?

11  A.  No.

12        THE COURT:  Counsel, would you be better -- you're not

13  leaving that lectern, I notice.

14        MR. COLEMAN:  Yeah.  I --

15        THE COURT:  Do you prefer using that one?

16        MR. COLEMAN:  Okay.  I didn't know if this was on

17  when this is on.

18        THE COURT:  Well, you press the little --

19        THE CLERK:  That one may not --

20        THE COURT:  Oh, not --

21        THE CLERK:  The antenna for that that you're trying to

22  use is located quite a ways from here.  That's why it's not

23  picking up.

24        MR. COLEMAN:  Oh, okay.  Well, it seems if I bend down

25  and talk into it, it does okay, but that doesn't make a good

1    presentation.  I'll just try to have it up here --

2              THE COURT:  You're doing fine.

3              MR. COLEMAN:  -- and be close.

4              THE COURT:  You're doing fine.

5              MR. COLEMAN:  All right.

6    Q.  Do you believe that there's anything wrong with Colonial

7    BancGroup or bank personnel relying on PwC auditors to ask for

8    materials that they want?

9    A.  No.

10   Q.  You were asked about -- some questions early on in the

11   cross-examination about distinguishing between Colonial

12   BancGroup and Colonial Bank.  Do you generally recall that?

13   A.  Yes.

14   Q.  We looked at a document yesterday in your direct

15   examination --

16             MR. COLEMAN:  And Tim, if you could put up D-234,

17   please.  Just go to the first page.

18   Q.  We looked at this, and this was -- now, you identified this

19   as meeting minutes of the board of directors of Colonial

20   BancGroup, January 16, 2006.  Do you recall that?

21   A.  2008.

22   Q.  Eight.  I'm sorry.  Thank you for that correction.  And was

23   one of the things that the board of directors typically did each

24   year was authorize officers of Colonial BancGroup?

25   A.  Yes.

    1            MR. COLEMAN:  If you would go to the -- I think it's

    2    the seventh page of the document.  It has page 6 at the bottom.

    3    Maybe it's page 6 of the document.  It says at the top,

    4    Resolution of the board of directors of the Colonial BancGroup

    5    regarding election of officers.  And if you would blow up that

    6    part of the page.  And scroll down, if you can.

    7    Q.  So does this reflect -- well, just tell the Court what this

    8    reflects.  What's the board of directors of Colonial BancGroup

    9    doing in this resolution?

   10    A.  It's electing the slate of executive officers, which is the

   11    management team that leads the institution in different areas.

   12    Q.  And does this reflect -- this reflects the officers of

   13    Colonial BancGroup as opposed to Colonial Bank; is that correct?

   14    A.  It does.

   15    Q.  And did -- in the time that you were on the board of

   16    directors of Colonial BancGroup, did you make efforts to respect

   17    corporate form and separateness of the bank and BancGroup?

   18    A.  Yes.

   19    Q.  And there was a mention of --

   20    A.  And may I --

   21    Q.  Oh, absolutely.

   22    A.  There were actually separate boards as well between the two.

   23    And we respected that in all respects, including that.

   24    Q.  And were there certain people who were officers of Colonial

   25    BancGroup who were not officers of Colonial Bank and vice versa?

1  A.  Yes.

2  Q.  Ms. Kissick -- were Ms. Kissick and Ms. Kelly officers of

3  Colonial BancGroup?

4  A.  No.

5  Q.  You were asked some questions about the management

6  representation letter.  And I think it was A-12.  Do you recall

7  that?

8          MR. COLEMAN:  If we could pull up A-12 and go to the

9  line right above the numbers toward the bottom of the page.

10 Q.  What was your understanding of what management was

11 confirming or the basis for management's confirmation in these

12 management representation letters?

13 A.  May I read it for a moment?

14 Q.  Absolutely.

15 A.  It's confirming and asserting from management to the auditor

16 that the financial statements have been prepared in accordance

17 with conformity to GAAP.

18 Q.  Okay.  Was this done to the best of management's knowledge

19 and belief?

20 A.  It would be, yes.

21 Q.  And did you have any reason to believe when you saw these in

22 the audit committee that there were any errors in the materials

23 provided to the auditors?

24 A.  No.

25 Q.  What was the -- in the context -- put this management

1   representation letter, for the Court, in the context of the work

2   PwC was supposed to perform in connection with its integrated

3   audits.  What role -- what did you expect --

4   A.  Well, management prepared the statements.  Management could

5   not issue audited statements.  In fact, they were required to

6   have audited statements.  So all management did was prepare

7   documents that were exactly as they have been characterized in

8   this letter.  And if it stopped there, the company would have

9   had to cease operations because not only would the shareholders

10  not accept the statement that stopped here, the regulators would

11  not.  Many other third parties -- investors, the SEC, and others

12  who rely upon our financial statements -- would have thrown a

13  red flag and stopped us in our tracks.  So that's the

14  difference.  This is what management did.  Management cannot

15  issue an audited financial statement.

16  Q.  Did you expect PwC to do anything less under either the

17  engagement letter or their PCAOB standards based on the

18  management representation letters?

19  A.  No.

20  Q.  You talked a little bit about Pam Vitto reports, and you

21  talked about that a little bit at the end.  Did you consider

22  Ms. Vitto's reports as substitutes for any audit work you

23  understood PwC was doing?

24  A.  Yes.

25  Q.  Did you consider that as a substitute for --

1   A.   Oh, I thought substance.  I didn't understand the word

2   "substitute."  No.  Pam Vitto was put in mortgage warehouse as a

3   supplemental additional step by management due to the exposures

4   that were inherent with the operations and the size of that

5   organization.  We wanted layer one to have its own robust

6   controls, but they were never -- she was never intended to be in

7   lieu of work by our other two auditing firms.

8   Q.   Could Colonial BancGroup or Colonial Bank have submitted

9   Ms. Vitto's reports to the regulators in lieu of audited

10  financials?

11  A.   No.

12  Q.   You talked about Ms. Vitto's reports, some going to the

13  audit committee.  If they went to the audit committee, what

14  would PwC have seen?

15  A.   PwC would have seen the same reports that we did.  And the

16  audit committee read those reports, would have the opportunity

17  to ask questions and reach their own conclusions about what the

18  message or the nature of that report was.  But so, too, would

19  any other auditors who were in the room.  If they saw it

20  differently than we did, again, that was why we wanted the

21  committee to be a think tank.

22  Q.   Did you understand that Ms. Vitto was someone who was

23  available to PwC to speak with or talk with in the course of

24  their audits?

25  A.   Yes.

1  Q.  Would you -- what was your expectation of whether PwC and

2  auditing warehouse -- the mortgage warehouse lending division

3  would have spoken with Ms. Vitto or not?

4  A.  I would expect that in addition to Cathie Kissick and the

5  others who ran the division operationally, that certainly the

6  person who was there as risk manager would be an important

7  source of information for not only regulators but also PwC and

8  Crowe Chizek.

9  Q.  Okay.  There was a mention yesterday of Crowe Chizek reports

10 that were made to the audit committee.  Did PwC receive those

11 reports?

12 A.  They were in the room when those same reports were presented

13 and the discuss ensued.

14 Q.  Did you -- what was your expectation as chair of the audit

15 committee as to what PwC would do if they had any questions or

16 issues regarding what they saw in the Crowe reports?

17 A.  That they would raise them.  Again, everyone has their point

18 of view and perspective on material that's presented, and we

19 didn't just fill the room with 20 people for no good reason.

20 Q.  Did the audit committee have as its objective to prevent

21 fraud like that which occurred in the mortgage warehouse lending

22 division?

23 A.  Yes.

24 Q.  And in your time as audit committee chair, did you believe

25 that -- what did you believe as to whether BancGroup and

1  Colonial Bank had appropriate people, policies, and procedures

2  in place to prevent or detect that type of fraud?

3  A.  Felt very confident about it, as I mentioned the other --

4  yesterday's testimony.

5  Q.  And that's what you referred to in your testimony as layer

6  one; is that correct?

7  A.  Yes.

8  Q.  Did you ever intend layer one to be the only way that the

9  audit committee discharged its duties and responsibilities

10  regarding the detection -- prevention and detection of fraud?

11  Sorry.  My mike cut out.  Let me restate that.

12  A.  No, I heard the question.

13  Q.  Okay.

14  A.  As was pointed out yesterday, we had the responsibility for

15  internal audit.  We acknowledged that and we took that very

16  seriously.  But what is also important to your question, equally

17  as important, is how did we discharge that responsibility.  It

18  didn't stop with just layer one, our own people, policies, and

19  procedures.  It continued with two other layers of professional

20  auditors hired by either the audit committee or the company to

21  be that other fail-safe in case layer one did not work.

22  Q.  And Mr. Levine was asking you there at the end of his

23  cross-examination about the engagement letter, which is A-7.

24  And we won't put the engagement letter up again, because we've

25  seen that engagement letter.  But you understood that there were

1  duties set forth in that engagement letter for PwC; correct?

2  A.  Yes.

3  Q.  Did you understand that PwC had duties under the PCAOB

4  standards?

5  A.  Yes.

6  Q.  And one of those duties had to do with auditing the

7  effectiveness of BancGroup and the bank's internal controls.  Is

8  that your understanding?

9  A.  It did.  That was the second part of an integrated audit.

10  Q.  And what was your expectation of what PwC would do with the

11  audit committee if it believed that -- as part of its audits,

12  that internal controls were not operating effectively?

13  A.  That they would notify us, number one; and number two, that

14  the opinion rendered, if it was in connection with the audit

15  process itself, would not be a clean opinion.

16  Q.  But did you, in fact, get clean opinions in 2004, '5, and

17  '8?

18  A.  We did.

19  Q.  And what did that tell you in your capacity as chair of the

20  audit committee about the effectiveness of BancGroup and the

21  bank's internal controls?

22  A.  Not only did the audit committee feel like our systems of

23  internal controls were robust and correct and not only was

24  management's assertion about that robustness correct, but that

25  PwC, in connection with their integrated audit, also agreed that

1  they were robust.

2  Q.  I want to ask you just a question about one of the FAS 140

3  topics that Mr. Levine asked you about.  Do you have any

4  understanding of what PwC's view was of the abilities or the

5  skill sets of the BancGroup personnel who were dealing with the

6  FAS 140 issue with PwC in April of 2008?

7          MR. LEVINE:  Objection.  Lacks foundation.

8          THE COURT:  Sustained.

9          MR. COLEMAN:  Excuse me one second, Your Honor.  Let me

10 check one of the documents here.

11     (Brief pause)

12          MR. COLEMAN:  Excuse me on second.  May I take one

13 second, Your Honor?

14     (Brief pause)

15          MR. COLEMAN:  That's all I have at this point, Your

16 Honor.

17          THE COURT:  Mr. Levine, anything?

18          MR. LEVINE:  While Dan is doing the setup here, this

19 ought to be real quick.

20                      RECROSS-EXAMINATION

21 BY MR. LEVINE:

22 Q.  Mr. Beville, after the time that we broke yesterday at

23 4:45 p.m. or so and this morning at 9 a.m., did you talk to

24 anyone about your testimony?

25 A.  No.

1  Q.  No lawyers or anything?

2  A.  I walked with Dorman Walker, my lawyer, back to the hotel,

3  but he was not discussing testimony.  And I didn't even see or

4  talk or have occasion to speak with any of the other lawyers on

5  either side.  In fact, on my cell phone you'll find a voice mail

6  from Sim Sippial.  While my wife and I were at dinner last

7  night, I got a call from him.  And I intentionally did not

8  answer it for that very reason, because I did not want there to

9  be any indication of impropriety.  And I did not return his

10 call.

11 Q.  But we're not going to check your cell phone records, so let

12 me move on here to something that you testified about just now

13 with Mr. Coleman.  You remember you went through how there are

14 officers of Colonial BancGroup and that's different than

15 Colonial and there are corporate formalities that are followed?

16 Do you remember that?

17 A.  I do.

18 Q.  Now, you looked at Mr. -- and Mr. Coleman put up D-234.  I'm

19 going to put that on the screen here.  I think you looked at --

20 and that was January 2008 minutes.  You looked at page 6.  I'll

21 make it bigger.  And that's where it goes through the different

22 people who would be officers of Colonial BancGroup; is that

23 right?

24 A.  Yes.

25 Q.  All right.  So let me put that on one side here.  And on the

1  other side I'm going to put up D-1165.  And that's minutes from

2  the meeting of Colonial Bank as opposed to Colonial BancGroup.

3  And if we look at the fourth page of D-1165, you see there are

4  officers listed there too.  And I'm going to make these both as

5  big as I can, given that I split the screen.

6         MR. COLEMAN:  Excuse me.  Counsel, is that something

7  that was included in the exhibits that were delivered, or is

8  this a different exhibit?

9         MR. LEVINE:  It's not, because it just came up during

10 their redirect, so --

11        MR. COLEMAN:  I'm just asking.  I'm just asking.

12        MR. LEVINE:  No.  Sorry.

13 Q.  So if we look at the first two people here on the left for

14 Colonial BancGroup, it's Mr. Lowder and Ms. Moore.  And they're

15 also in the same positions for Colonial Bank; correct?

16 A.  Yes.

17 Q.  And then if we turn to the next page of D-1165 -- and I'll

18 make it bigger again -- we see that the chief credit officer --

19 senior -- executive vice-president/chief credit officer of

20 Colonial Bank was Caryn Cope Hughes, and she had the same

21 position for Colonial BancGroup; right?

22 A.  Yes.

23 Q.  And same thing for Patti Hill; right?

24 A.  Correct.

25 Q.  And same thing for David Byrne; right?

1  A.  Right.

2  Q.  And then these are people that are listed as officers below

3  the line on the -- for Colonial BancGroup on the left, Mr. Burge

4  and Ms. Condon, Mr. Hicks and Mr. Hosein, Mr. Prame.  All but

5  Mr. Prame are listed as being officers for Colonial Bank; right?

6  A.  Yes.

7  Q.  And then for all these people who are assistant secretaries,

8  if we turn to the next page of D-234, so for all the -- for the

9  top-line people of Colonial BancGroup the first nine names of

10  the ten of Colonial BancGroup as officers were all officers of

11  Colonial Bank as well; right?

12  A.  Correct.

13  Q.  In the same positions.

14  A.  Correct.

15          MR. LEVINE:  That's all I have.

16          MR. COLEMAN:  Nothing, Your Honor.

17          THE COURT:  You'll be happy to hear you may step down.

18          THE WITNESS:  Thank you, Your Honor.

19          THE COURT:  And you are excused.  That means you may

20  leave or stay as you wish.  Just giving you heads-up, nobody

21  ever stays when I say that.

22          THE WITNESS:  I don't intend to break that mold.

23          MR. LEVINE:  And I think we talked about this

24  yesterday.  But Mr. Beville is excused, but he's agreed to be --

25  appear in Washington for either side if we ask for him.

```
 1            THE COURT:  Some people are gluttons for punishment.

 2            Okay.  Your next witness is?

 3            MR. MULLIN:  Your Honor, the plaintiff rests.

 4            THE COURT:  I'm sorry?

 5            MR. MULLIN:  We'll rest.  We rest.

 6            THE COURT:  You're resting.  Okay.  Then I take it

 7  Bathen, Moore, and Bryant, whose -- they're PwC witnesses;

 8  right?

 9            MR. BECK:  Correct, Your Honor.

10            MR. LEVINE:  Yes, Your Honor.

11            THE COURT:  Okay.  And are you ready to call your first

12  witness?

13            MR. LEVINE:  In about one minute, Your Honor.  Sorry.

14  I'm just changing --

15            MR. BECK:  In about one minute.  And Mr. Levine is

16  sorry.

17            MR. LEVINE:  But in the mean time --

18            THE COURT:  You can actually have two if necessary.

19       (Brief pause)

20            THE COURT:  If you'll step forward, please, right over

21  here, and raise your right hand to be sworn.

22       (The witness is sworn)

23            THE CLERK:  Be seated right there.  Sit kind of close

24  to the mike.

25            THE COURT:  While we're waiting for the attorneys,
```

1 would you state your full name and spell your last name.

2      THE WITNESS:  Sure.  It's Mary Bathen, B-A-T-H-E-N.

3      THE COURT:  Okay.  Ms. Bathen, you're going to have to

4 get really close to that mike.  It's very flexible.  You can

5 lean it to you.  But you have a nice, soft voice, and we need to

6 hear you well.

7      THE WITNESS:  Okay.  Is that better?

8      THE COURT:  Not really.  You're getting there.

9      MR. LEVINE:  Your Honor, if I may approach?

10      THE COURT:  Surely.

11      MR. LEVINE:  I'm going to move these out of the way

12 from the last witness so we'll have more room.

13      I'm also handing the witness, just to have nearby, the

14 transcripts of depositions.

15      THE COURT:  Okay.

16      MR. LEVINE:  I'm bringing everything.  I may have to

17 bring you water as well.

18      THE COURT:  I think that was your last trip.

19      MR. LEVINE:  That was.  Unless they ask me to do more.

20 I don't know.

21                          **MARY BATHEN**

22      The witness, having first been duly sworn to speak the

23 truth, the whole truth and nothing but the truth, testified as

24 follows:

25

1                    DIRECT EXAMINATION

2    BY MR. LEVINE:

3    Q.  Good morning, Ms. Bathen.  Are you here pursuant to

4    subpoena?

5    A.  Yes, I am.

6    Q.  Did you work at Colonial Bank?

7    A.  Yes, I did.

8    Q.  When did you work at Colonial Bank?

9    A.  From --

10   Q.  Approximately.

11   A.  Yeah.  From 2000 till the bank was closed.

12   Q.  In 2009?

13   A.  Yes.

14          THE COURT:  Excuse me.  Can you hear her?

15          COURT REPORTER:  Yes, ma'am.

16   Q.  What was your initial position at Colonial Bank?

17   A.  I was the treasurer.

18   Q.  And that was 2000 until about 2003; is that right?

19   A.  That's correct.

20   Q.  And what was your next position?

21   A.  I was assistant treasurer.

22   Q.  And when did you have that job?

23   A.  2003 until 2009.

24   Q.  In preparation for your testimony today, have you met with

25   lawyers for Colonial?

```
 1  A.  For the FDIC.

 2  Q.  Okay.  You've met with lawyers for the FDIC in preparation

 3  for your testimony?

 4  A.  Yes, I have.

 5  Q.  And were you with the lawyer for the FDIC yesterday?

 6  A.  No.  No, not yesterday.

 7  Q.  In the last couple of days, though?

 8  A.  Yes.

 9  Q.  Okay.  I'm having a little trouble hearing you, so --

10  A.  Okay.

11        THE COURT:  I think you're going to have to -- there

12  you go.  Move it really close.  It won't break.

13        THE WITNESS:  Okay.

14  Q.  All right.  Prior to working at Colonial Bank, where did you

15  work?

16  A.  I worked for SunTrust Banks.

17  Q.  And you worked for SunTrust for about 20 years?

18  A.  Yes, I did.

19  Q.  Was that in Florida?

20  A.  In Florida and in Atlanta.

21  Q.  And before you left SunTrust, had any of your colleagues at

22  SunTrust gone over to work for Colonial Bank?

23  A.  Yes, they had.

24  Q.  Who was that?

25  A.  Art Barksdale and Cathie Kissick.
```

1  Q.  So you worked with Cathie Kissick at SunTrust before you

2  worked with her at Colonial?

3  A.  We were working there at the same time, yes.

4  Q.  In fact, before you started working together -- before you

5  started working at SunTrust, did you know Cathie Kissick from

6  college?

7  A.  Yes, I did.

8  Q.  Were you sorority sisters with her?

9  A.  Yes, I was.

10  Q.  Did you attend her wedding?

11  A.  Yes, I did.

12  Q.  Are you aware that pursuant to a board resolution, you were

13  an officer of Colonial BancGroup who was authorized to conduct

14  transactions on behalf of Colonial BancGroup?

15  A.  Yes.

16        MR. TURNER:  Objection, Your Honor.  Just there was no

17  time frame to that at all.

18        THE COURT:  Do you have a time frame?

19        MR. LEVINE:  One second.

20  Q.  Are you aware that when you were treasurer, you were an

21  officer of Colonial BancGroup?

22  A.  Yes, sir.

23  Q.  And are you aware that in 2007, you were a director -- you

24  were an officer of Colonial BancGroup?

25  A.  I'm not sure about that.

1  Q.  That's when you were assistant treasurer; right?

2  A.  Correct.

3  Q.  I'm going to put up on the screen D-1067.  And that's a

4  meeting -- it's minutes of a board of directors' meeting of

5  Colonial BancGroup dated January 17, 2007.  I'm going to turn to

6  the fifth page of that.  There is -- that's kind of small.  Let

7  me see if I can make it bigger.  Sorry.

8      It's a resolution that says, This board of directors wishes

9  to designate and approve those officers of Colonial BancGroup

10  who shall be authorized by the BancGroup to conduct or cause

11  conduct of certain types of transactions on behalf of Colonial

12  BancGroup -- or on behalf of BancGroup.

13      Do you see that?

14  A.  Yes, I do.

15  Q.  And then a little bit down, there's your name as senior

16  vice-president, assistant treasurer, and a signature.  Is that

17  your signature?

18  A.  Yes, it is.

19  Q.  Did you -- in your years at Colonial, did you find very

20  little difference between Colonial Bank and Colonial BancGroup?

21  A.  I would say that's correct.

22  Q.  From 2005 on, so 2005 to 2009 when the bank shut down, what

23  percentage of your time was spent on the mortgage warehouse

24  lending division as opposed to other parts of the bank?

25  A.  It varied.  I would say maybe 40 to 50 percent of my time in

1  2005.

2  Q.  So from 2005 on until the time you left, about 40 to 50

3  percent of your time on mortgage warehouse lending; is that

4  right?

5  A.  Probably greater in the later part of that time period.

6  Q.  Okay.  And were there different groups within the mortgage

7  warehouse lending division that looked at quality assurance with

8  expect to assets and transactions of the business?

9  A.  Yes, there was.

10 Q.  And was one of those groups called internal audit?

11 A.  Yes.

12 Q.  And you weren't part of the internal audit group.  We talked

13 a little bit about that yesterday with a different witness, but

14 internal audit wasn't your group; right?

15 A.  No, it was not.

16 Q.  Okay.  So I'm going to talk about the other group that was

17 there called compliance or risk control.  Are you familiar with

18 that group?

19 A.  Yes, I am.

20 Q.  And is that a group that you had involvement with?

21 A.  Yes, it is.

22 Q.  And I've seen references to both names, compliance and risk

23 group.  Was it -- was this same group called compliance until

24 October 2008, and then the name changed to risk control?

25 A.  Yes.

1  Q.  The same group, just a different name; right?

2  A.  Correct.

3  Q.  And was there a change in reporting in October 2008?

4  A.  Yes, there was.

5  Q.  In that change in reporting, did this group, the risk

6  control group, start reporting to you?

7  A.  Yes, it did.

8  Q.  I'm going to put up on the screen D-28.  And it's an

9  e-mail -- I can make that bigger.  It's an e-mail from Terry

10  Bryant to a large number of people -- I'm not going to go

11  through all the names -- dated October 2nd, 2008.  Was

12  Mr. Bryant responsible for the risk control group?

13  A.  Yes, he was.

14  Q.  And he was responsible for the same group when it was called

15  compliance before that?

16  A.  Yes.

17  Q.  All right.  So let's move down, then, to the announcement in

18  the e-mail.  And it says that there's been an organizational

19  change, as risk control now reports to Mary Lou Bathen,

20  Colonial's assistant treasurer.  It notes you've been very

21  active with the division for some time and sit on both the

22  credit and asset purchase committees and that the reporting

23  change increases the independence of risk control and brings

24  strength in reporting and analysis.

25      Was the change designed to -- the change in reporting --

1   well, actually, let me ask a different question.  Who was the

2   risk control group reporting to before you took over the

3   reporting responsibilities in October 2008?

4   A.  Cathie Kissick.

5   Q.  And was the change in having the mortgage warehouse lending

6   group -- I'm sorry.  Was the change in having the risk control

7   group within mortgage warehouse lending to report to you

8   something that was done to create more separation of duties

9   between operations and risk control?

10  A.  That's what I was told.

11       MR. TURNER:  Your Honor, I'm going to go ahead and

12  start objecting the leading the witness.  I think this is a

13  direct examination.

14       MR. LEVINE:  Your Honor, two things.  Number one, I'm

15  allowed to lead under Rule 611(c)(2), third point, which says

16  you can lead anyone identified with an adverse witness.  There

17  as an Eleventh Circuit case on point, the *Haney* case.

18       THE COURT:  All you had to do was say --

19       MR. LEVINE:  Is that like you got --

20       THE COURT:  All you had to do was say she was an

21  adverse witness, and I bet I would have known all about the

22  rules supporting your leading.

23       MR. TURNER:  And I would just say, Your Honor, I mean,

24  this witness hasn't shown to be adverse.  She's answering his

25  questions.  I mean, there may be a presumption, but I don't

1  think -- she's up there.  She's answering his questions.  I

2  don't think he's entitled to lead.

3          THE COURT:  Overruled.

4          MR. TURNER:  Thank you.

5          MR. LEVINE:  Reminds me of that Tom Cruise movie when

6  she said, You had me at "Hello."  Sorry about repeating the

7  rules there.  *Jerry Maguire*.

8          THE COURT:  That's the first literary reference I think

9  we've had in three weeks.  And you might have reached a little

10  higher, but --

11          MR. LEVINE:  That's about as high as I go, Your Honor.

12  BY MR. LEVINE:

13  Q.  Ms. Bathen, going back to the risk control group and outside

14  of -- no more Hollywood -- we talked about the change there.

15  Actually, I can't remember if I got the answer to my question.

16  But was the change --

17          THE COURT:  You didn't.

18          MR. LEVINE:  I didn't.

19  Q.  So was the change designed to create more separation of

20  duties between the operational function and the risk control

21  group?

22  A.  That was my understanding.

23  Q.  Now, let's talk about the risk control group --

24          THE COURT:  I'm sorry.  I didn't hear your answer.

25          THE WITNESS:  That was my understanding.

1      THE COURT:  Thank you.

2  Q.  In this risk control group -- and I'm going to -- just so

3  it's clear, when I talk about the risk control group, I'm

4  referring to compliance, too, just because there was a name

5  change and I don't want to refer to it -- you know, both names

6  every single time.  Do you understand that?

7  A.  I understand.

8  Q.  How many people were in the risk control group?

9  A.  I think roughly a half a dozen.

10  Q.  Okay.  Terry Bryant was in charge; right?

11  A.  Yes, he was.

12  Q.  And others -- was Wayne Beahler his kind of assistant or

13  deputy?

14  A.  Wayne Beahler.  Yes.

15  Q.  And was Sarah Roland also in the group?

16  A.  Yes, she was.

17  Q.  And Cherie Fite?

18  A.  Yes.

19  Q.  Lauren Ewault?  Was she in the group?

20  A.  She may have been.  Sounds familiar.

21  Q.  Sherry Kennedy?

22  A.  Yes.

23  Q.  And Stephanie Welcher?

24  A.  Again, that one sounds familiar, but I'm not sure.

25  Q.  And was your role in the risk -- on risk control to have

1  oversight and review in order to try to catch fraud?

2  A.  The role of the group was to review the policies and

3  procedures -- make sure that the department and its customers

4  were following the rules and procedures of the contracts in the

5  warehouse group.

6  Q.  But was one of the things that you did in the risk control

7  group to try to have oversight and review to try to catch fraud?

8  A.  If fraud was occurring, hopefully the things that we were

9  looking at would show that.

10  Q.  You were deposed in this case as well as the case between

11  the FDIC and the Bank of America; correct?

12  A.  Yes, I was.

13  Q.  Actually, in Bank of America, there were two different days

14  of deposition.  Do you recall that?

15  A.  Yes, I do.

16  Q.  And I think I handed you the volume for the first day there,

17  but there was a second day as well.  And I'm going to put that

18  up on the screen, and particularly page 98.  And it's a

19  Min-U-Script, so I have to blow it up to make it bigger.

20  A.  I'm sorry.  This was the second time?

21  Q.  Yeah.  Dated August 19th, 2014.  Let me go back to the front

22  here.

23        THE COURT:  That's all right.

24        MR. LEVINE:  Okay.

25  Q.  So page 98, lines 2 to 10.  Question:  So it was not your

1  role to ensure that there were commitments in the secondary

2  market for the loans funded by the mortgage warehouse lending

3  division?  Answer:  I had more oversight and after the fact.  I

4  had nothing to do with -- you know, as funds were put forth that

5  there was collateral.  Mine was more oversight review, trying to

6  catch the fraud, which I was unable to do.

7      Was that your testimony under oath in the Bank of America

8  case?

9  A.  I don't remember it, but I don't have any reason to believe

10 that it was not.

11 Q.  Did the risk -- or did the risk control group perform

12 compliance reviews?

13 A.  Yes, I believe so.

14 Q.  Did those compliance reviews attempt to ensure that

15 information received by Colonial matches to the actual records?

16 A.  I don't remember a lot of details, but --

17 Q.  All right.  Let's look at D-249, which is a meeting -- it's

18 an agenda for a meeting of the asset purchase committee.  Were

19 you on the asset purchase committee?

20 A.  Yes, I was.

21 Q.  And if we look on the second page, you can see at the top

22 there that you were attending this meeting via teleconference;

23 is that right?

24 A.  That's correct.

25 Q.  And look at the ninth page, then, under risk control update.

1  There is -- the last bullet says there, Ensuring that

2  information received by Colonial matches to the actual records.

3      And that was listed as one of the things that was -- one of

4  the areas reviewed on each compliance review.  Do you see that?

5  A.  Yes, I do.

6  Q.  And when the risk control group did compliance reviews, did

7  the group look at every single document?

8  A.  No, they did not.

9  Q.  Did the group use selective testing?

10 A.  Yes.

11 Q.  Does selective testing mean not looking at every single

12 document?

13 A.  Yes.

14 Q.  Why did you -- did you use selective testing or sampling

15 because it was an audit process?

16 A.  I believe we used it because it would have been impossible

17 to look at every single record.

18 Q.  And does engaging in selective testing mean that you may

19 miss something that's fraudulent?

20 A.  Yes.

21 Q.  Despite your role as head of the risk control group, is the

22 fraud something that you only saw with hindsight?

23 A.  Yes, it is.

24 Q.  And hindsight means that when people commit fraud, you say,

25 if we had only done this or that, we would have caught it;

1 right?

2 A.  My understanding of hindsight is that you know things now

3 that you didn't know in the past.

4 Q.  And the way that hindsight is used is to improve fraud

5 protection in the future, it's always easy to say, we should

6 have done this or should have done that; right?

7 A.  Yes.

8 Q.  Do you understand -- you've actually -- after the fraud came

9 out in August of 2009, did you become aware of the different

10 parts of the fraud?

11 A.  Yes, I did.

12 Q.  And are you aware of something called sweeping?

13 A.  With respect to the fraud, yes.

14 Q.  All right.  You had no personal knowledge of the sweeping

15 back in 2003, did you?

16 A.  No, I did not.

17 Q.  And since then, have you learned the sweeping was moving

18 money from one TBW account to another to cover an overdraft and

19 the next morning sweeping it back?

20 A.  That's my understanding.

21 Q.  And back in 2003, you were treasurer; is that right?

22 A.  For most of it, I think.

23 Q.  And as treasurer, would you expect that anyone who wasn't a

24 fraudster at Colonial Bank who knew that millions of dollars per

25 night were swept this way to hide overdrafts should have told

1  someone?

2  A.  Sweeping itself is not -- there's sweep accounts all over

3  the place.  So moving funds from one account to another is not

4  necessarily an unusual event.  I think the unusual event in

5  this -- in the instance of the fraud had to do with one account

6  was the account of Taylor Bean's and in their control and the

7  other was in the control of Colonial Bank.

8  Q.  All right.  Well, let me make it more specific.  If an

9  employee in mortgage warehouse lending knew that each day --

10 let's say $70 million at night was being moved from one Taylor

11 Bean account to another Taylor Bean account to cover up an

12 overdraft and it didn't show up in the overdraft report and the

13 next morning that money was swept back to Taylor Bean's other

14 account, it happened day in, day out, would that employee be

15 derelict in his or her duties by not reporting up the chain?

16 A.  If they understood the problem, yes.

17 Q.  And you knew at the time Art Barksdale was a senior

18 vice-president at Colonial; right?

19 A.  Yes.

20 Q.  And you knew him from your days of working together at

21 SunTrust; right?

22 A.  Yes, I did.

23 Q.  Did you expect that an officer or a senior vice-president

24 who knew of the kind of sweeping I just described would have

25 reported it?

1   A.   If he knew.  I have no knowledge that he knew.

2   Q.   Right.  But if someone in that position of Mr. Barksdale

3   knew about the sweeping, that's something that should have been

4   reported; right?

5           MR. TURNER:  Objection.  Asked and answered.  She

6   answered his question.

7           THE COURT:  Overruled.

8   A.   I'm sorry.  Would you repeat?

9   Q.   If Mr. Barksdale did know about the sweeping as I described

10  it, that's something he should have reported; correct?

11  A.   Yes.

12  Q.   I want to turn to a different topic, which is COLB.  You're

13  familiar with COLB?

14  A.   Yes, I am.

15  Q.   Did you play a role in the development of the COLB program?

16  A.   Yes, I did.

17  Q.   Were you involved in reading documents and developing the

18  COLB program?

19  A.   Yes, I was.

20  Q.   Was that back when you were treasurer in 2002?

21  A.   Yes, I believe so.

22  Q.   And did you play a role in drafting and preparing the

23  purchase and sale agreements?

24  A.   I believe you're referring to the same agreement.

25  Q.   Sure.  That's one of the documents that you were looking at;

1  right?

2  A.  I believe COLB was our short name for a loan purchase and

3  sale agreement.

4  Q.  Okay.  And that's something that you were involved in

5  preparing; correct?

6  A.  Yes.

7  Q.  And TBW, were they the only mortgage originator that the

8  COLB program was working with, or were there others?

9  A.  No, there's many others.

10  Q.  And did you believe that COLB was a legitimate program?

11  A.  Absolutely.

12  Q.  Did you understand that it was Colonial's intention that

13  COLB transactions were purchases from mortgage originators?

14  A.  Yes, sir.

15  Q.  Was it important to Colonial that it owned the mortgages

16  instead of making a loan to mortgage originators such as TBW?

17  A.  Yes, it was.

18  Q.  Were the loan purchase and sale agreements prepared with the

19  objective of allowing Colonial to treat COLB transactions as

20  sales instead of loans?

21  A.  As purchases instead of loans.

22  Q.  Fair enough.  And from the beginning, did the agreements

23  with the mortgage originators say the intent of the agreement is

24  to have a true sale to Colonial?

25  A.  Yes, sir.

1   Q.  I'm going to put up briefly A-92.  And look at the fourth

2   page of that document.  There is an agreement there, a loan

3   participation sale agreement.  That's the COLB agreement you

4   were referring to earlier; is that right?

5            MR. LEVINE:  A-92.  Sorry.

6   A.  Yes, I believe it is.

7   Q.  And this one is between Colonial and a AmeriFirst Financial.

8   Is AmeriFirst Financial one of the mortgage originators?

9   A.  I assume so.  I don't remember their name.

10  Q.  And did Colonial use the same or similar language in the

11  agreements with the different mortgage originators?

12  A.  Yes, we did.

13  Q.  If we look at the next page in paragraph two, it says, This

14  loan participation is intended by the parties to be and

15  constitute a sale by the seller to the buyer and a purchase by

16  the buyer from the seller.  And then it goes on.  Do you see

17  that?

18  A.  Yes, I do.

19  Q.  And it says toward the end that no amount paid shall in any

20  way be construed as a loan.  The seller there was the mortgage

21  originator and the buyer was Colonial; correct?

22  A.  Correct.

23  Q.  I want you to look now -- I'm going to put up on the screen

24  D-209.  And D-209 -- I made it bigger so you could see there.

25  That's an e-mail from you to Sarah Moore dated April 15th, 2009.

1   And you say, Sarah, attached is my description of Colonial's

2   relationship with TBW as of March 31st, 2009.

3       Do you see that?

4   A.  Yes, I do.

5   Q.  And then we're going to turn to the next page, which has the

6   attachment.  And there's an attachment that describes a bunch of

7   things, but I'm particularly -- I'm focusing on the one that

8   talks about COLB.  And I made that bigger.  Do you see that?

9   A.  Yes.

10  Q.  And this description that you sent to Ms. Moore, that's

11  something that you drafted?

12  A.  Yes, it is.

13  Q.  And it says under COLB that the transactions under these

14  agreements qualify as a true legal sale and Colonial has legal

15  opinions to that effect.  Do you see that?

16  A.  Yes, I do.

17  Q.  Now, are you an accountant?

18  A.  No, I'm not.

19  Q.  Are you a CPA?

20  A.  No, I'm not.

21  Q.  Are you an expert in Generally Accepted Accounting

22  Principles, GAAP?

23  A.  No, I'm not.

24  Q.  Are you an expert in FAS 140?

25  A.  I'm familiar with it.  I'm not an expert.

1    Q.  Okay.  But you did get -- but you did rely on opinions that

2    you got from lawyers about whether the COLB transactions were

3    sales under the accounting principles; correct?

4    A.  Yes, we did.

5    Q.  In the drafting of the COLB agreement in 2002, were you

6    working with lawyers?

7    A.  Yes.

8    Q.  And what was the name of the lawyer that you were working

9    the most with on that?  It's not a memory test, so let me give

10   you a hint.  He was from the Akerman firm; is that right?

11   A.  Right.  I can't -- I've thought of his name in the last few

12   days.

13   Q.  Rob Mullin?

14   A.  Oh, Rob Mullin.  Yes, I remember that name.

15   Q.  And was Rob Mullin kind of the main guy working as

16   Colonial's lawyer for drafting the COLB agreement?

17   A.  Yes, he was.

18   Q.  And you worked with him on that?

19   A.  With others and him, yes.

20   Q.  And during your work with him, did you come to understand in

21   2002 when the agreements were drafted that they were consistent

22   with the -- what it said in the Intent section, sales -- or

23   purchases by Colonial?

24   A.  It was my understanding that they were purchases.

25   Q.  Did you get formal written legal opinions later on?

1  A.  Yes, we did.

2  Q.  Putting up A-207, specifically in that -- in the

3  twenty-eighth page of that document, there is a May 26th, 2006,

4  letter from -- is it Caple or Capell?

5  A.  I believe it's Capell.

6  Q.  Thank you.  Capell & Howard.  Is that something that you've

7  seen before?

8  A.  I believe so.

9  Q.  And in this letter they say -- I've blown up some pages

10  here.  They say that we've acted as special counsel to Colonial

11  Bank and that you've requested our opinion as to whether a court

12  would, in connection with the bankruptcy proceeding concerning

13  the seller, find that the transfer of the participation interest

14  by the seller to the buyer pursuant to the loan participation

15  sale agreement constitutes a sale of such assets.

16     Now, the seller that is being referred to is the mortgage

17  originator; is that right?

18  A.  Yes.

19  Q.  And the participation interest, is that the 99 percent of

20  the mortgage that would be purchased by Colonial?

21  A.  Yes, it was.

22  Q.  In the COLB transaction?

23  A.  Yes, sir.

24  Q.  And if we look then at -- further on in the document, on

25  page 15, the opinion is stated that it is our opinion that if it

1   were to go before a court and they analyzed things -- I didn't

2   highlight all that -- and then it says, the court would hold

3   that the transfer of the participation interest to the buyer by

4   the seller pursuant to the loan participation sale agreement

5   constitutes a sale of such assets as opposed to a loan.

6       Is that the opinion that legal counsel gave Colonial in

7   2006?

8   A.  Yes, it is.

9   Q.  And did you get an update on the opinion from legal counsel

10  in 2008?

11  A.  Perhaps.  I don't remember.

12  Q.  I'm putting up A-52.  A-52, there is an e-mail dated April

13  17th from Courtney Williams to Kamal Hosein.  And you're one of

14  the people who is cc'd.  Do you see that?

15  A.  Yes, I do.

16  Q.  And it says, attached is our response letter and assumption

17  of facts letter.  Do you see that?

18  A.  Yes.

19  Q.  And, again, the accounting details was not -- of whether

20  something complied with FAS 140, that's not something that you

21  had personal knowledge of, but you're looking to the lawyers to

22  tell you what the answer is; right?

23      MR. TURNER:  Object to the form.

24  Q.  Let me ask it a different way.  You're not the accounting

25  expert on FAS 140, but you were looking to the attorneys to give

1  you an opinion; correct?

2  A.  I'm not an expert.  I learned a lot in that process.

3  Q.  Right.  But you were looking to the attorneys because -- to

4  give you a result or give you an answer on how a bankruptcy

5  court would view it in their view; correct?

6  A.  Yes.

7  Q.  And if we look in this 2008 opinion to the fifth page, there

8  is a letter there that says, We were recently informed of

9  certain facts.  And then it says at the bottom, It is still our

10 opinion that -- and I'll turn to the next page -- the court

11 would have held that the transfer of the participation interest

12 to the buyer by the seller pursuant to the loan participation

13 sale agreement constituted a sale of such assets as opposed to a

14 loan or the granting of security interests to secure a loan.

15      Was that the opinion that the lawyers gave you in 2008?

16 A.  Yes, based on this document.

17 Q.  And did Colonial rely on the --

18 A.  Based on this document.

19 Q.  I'm sorry.  What?

20 A.  I was just -- sorry.

21 Q.  I didn't hear you.  I'm sorry.

22 A.  My answer was based on this document.

23 Q.  Yes.

24 A.  I didn't remember.

25 Q.  And did Colonial rely on the opinions that its lawyers gave

1  it about the true sale treatment?

2  A.  Yes, it did.

3  Q.  Okay.  I want to turn to a different area now, which is

4  something called risk weighting.  Are you familiar with the

5  concept of risk weighting?

6  A.  Yes, I am.

7  Q.  Is risk weighting a capital calculation based on

8  classification of assets?

9  A.  Yes.  Yes, it is.

10 Q.  And is the classification of assets based on the relative

11 risk of the assets?

12 A.  Yes.  That's the intention.

13 Q.  And the source of risk weighting is federal regulatory

14 requirements; is that right?

15 A.  Yes, it is.

16 Q.  And we've -- I've seen a little bit, looking this up, about

17 Basel, the Basel agreement or Basel understanding.  Are you

18 familiar with that?

19 A.  Yes, I am.

20 Q.  And was there was Basel I and Basel II that we probably all

21 read about a little bit during the financial crisis.  Is Basel

22 one of the sources of the regulatory requirements?

23 A.  I believe so.

24 Q.  And are you familiar with those regulatory requirements?

25 A.  I'm familiar with the risk weighting.

1  Q.  Okay.  So I'm going to put up a demonstrative.  It's just a

2  slide here that we got from looking at the OCC handbook in 2010

3  about these risk-weighted assets.  And I just want to ask you

4  about these things.  Can you see that okay?

5  A.  Yes, I can.

6              THE COURT:  The number of this?

7              MR. LEVINE:  It's just a slide, Your Honor.  It's

8  demonstrative.  It's not an underlying document.

9              THE COURT:  Okay.

10             MR. LEVINE:  But I'm going to go through it with the

11 witness one by one.

12             THE COURT:  I'll tell you what.  If you're going to go

13 through it and that might take a little time, this may be a good

14 place for our morning recess.

15             MR. LEVINE:  Sure.

16             THE COURT:  Okay.  We'll be in recess for 15 minutes.

17 Well, let me ask about how much -- will this witness take the

18 rest of the morning, do you think?

19             MR. LEVINE:  Yes, Your Honor.

20             THE COURT:  Okay.  Court will be in recess.

21    (Recess was taken from 10:30 a.m. until 10:50 a.m., after

22      which proceedings continued, as follows:)

23             THE COURT:  Please be seated.

24             Whenever you're ready, Mr. Levine.

25 BY MR. LEVINE:

1  Q.  Ms. Bathen, we were talking about risk weighting before the

2  break, and I put up a chart here that we got off an OCC -- from

3  an OCC manual that describes different categories and the effect

4  of that.  Are you familiar with these risk-weight categories?

5  A.  Yes, I am.

6  Q.  And let's just go through some of those.  The zero percent

7  risk weight, that means it's not risky at all; correct?

8  A.  Correct.

9  Q.  And an example of that would be cash or a Treasury bill?

10  A.  Yes.

11  Q.  And then the next level is 20 percent, 20 percent is a very

12  high credit quality asset.  In other words, pretty low risk;

13  right?

14  A.  Yes, sir.

15  Q.  And examples would be securities issued by

16  government-sponsored agencies such as Fannie Mae or Freddie Mac;

17  correct?

18  A.  Correct.

19  Q.  And then at 50 percent, that's still considered relatively

20  low risk.  And that is high credit -- high credit quality assets

21  like qualifying mortgages or state and local revenue bonds;

22  right?

23  A.  Correct.

24  Q.  And then 100 percent risk weight, that means something --

25  that's just the standard risk weight under the government

1  regulations; right?

2  A.  Right.

3  Q.  You may have to speak up a little bit.  Sorry.

4  A.  Yes.

5  Q.  Or maybe more the microphone slightly closer.

6      And an example of 100 risk weight is a commercial loan or a

7  consumer loan?

8  A.  Yes, it is.

9  Q.  And then 200 percent risk weight, that's considered riskier.

10  And that's an -- an example of that is below investment grade

11  bonds; is that right?

12      (The court reporter interrupts for clarification)

13  Q.  The 200 percent risk-weight category is a higher risk

14  category; is that right?

15  A.  Yes, it is.

16  Q.  And an example would be a below investment grade bond;

17  correct?

18  A.  Correct.

19  Q.  And these weights that we have here from zero to 200

20  percent, are those set by the government?

21  A.  By a -- the banking regulators.

22  Q.  Okay.  Of the government; right?

23  A.  Of the government.

24  Q.  And the -- and who is it that determines what kind of asset

25  goes into what percent risk category -- risk-weight category?

1  A.   I'm not sure what you mean.

2  Q.   Sure.  Let me ask it this way.  The idea that cash is in the

3  zero percent risk-weight category, that's something the

4  government says in the regulations, the banking regulators;

5  right?

6  A.   Right.  All of this is due to regulations.

7  Q.   Okay.  And the lower the risk-weight category, the less

8  risky the asset was considered; correct?

9  A.   Correct.

10  Q.   So zero percent at the top of the chart is the least risky.

11  And all the way to 200 percent, that's the most risky of what's

12  shown on the chart; right?

13  A.   Correct.

14  Q.   There's actually a category that's even riskier than the 200

15  percent called dollar-for-dollar that we don't have the chart;

16  right?

17  A.   That one I'm not familiar with.

18  Q.   Okay.  So let's stick with --

19        THE COURT:  You're going to have to move that.  I'm

20  sorry.  You're going to have to move that closer because --

21  there you go.

22  Q.   So what I want to talk about now is that -- we've talked

23  about the two -- the first column and the second column of what

24  goes in the risk-weight category.  So I want to talk about the

25  third column now, which is the effective capital charge.  Are

1  you familiar with that?

2  A.  Yes.

3  Q.  If something is in -- let's use the 100 percent risk-weight

4  categories as an example, because that's the standard risk

5  weight.  If something is in the standard risk-weight category,

6  does that mean if the bank makes a loan of $100 to a business,

7  that it has to keep $100 in reserve?  Or is it only some

8  percentage of that?

9  A.  Are you talking about reserves or are you talking about

10  capital?

11  Q.  Capital.  I'm sorry.

12        THE COURT:  And let me suggest a different way.  What

13  does that mean, that third category?

14        THE WITNESS:  The third category?

15        THE COURT:  Yes.

16        THE WITNESS:  It's those weights applied to the amount

17  of capital itself.  So for a 100 percent one, you would only

18  need to hold 8 percent to achieve an 8 percent risk-weighted

19  capital ratio.

20  Q.  All right.  So let's say it's $100 loan.  How much capital

21  would you have to hold for that?

22  A.  $8.

23  Q.  And if you had something at 50 percent -- in the 50 percent

24  category, then you only have to hold $4?

25  A.  Correct.

1  Q.  Now, when you were -- and these capital charges, the

2  effective capital charges, again, those are set by the

3  government, too, the regulators; right?

4  A.  The levels we have to hold?

5  Q.  Yes.

6  A.  Yes.  The minimum requirements, yes.

7  Q.  Okay.  In other words, that third column there, the

8  effective capital charge, that's something -- those percentages

9  of the minimum capital is set by the regulators; correct?

10  A.  The minimum capital ratios are set by the regulators, yes.

11  Q.  And when you were at Colonial, did you look at the risk

12  weights of different categories of assets?

13  A.  Yes.

14  Q.  And with respect to the COLB program, where did the COLB

15  program fall in the risk-weight categories that we have up on

16  the screen?

17  A.  It fell in the 50 percent risk weighting.

18  Q.  So COLB was treated as less risky than the standard risk

19  weight of 100 percent?

20  A.  Yes, it was.

21  Q.  And the AOT, where did that fall?

22  A.  If they were agency AOT, it would be on the 20 percent.

23  Q.  What does agency AOT mean?

24  A.  As described here, securities guaranteed by a government

25  entity like Freddie Mac or Fannie Mae.

1  Q.  So it would be like a Freddie -- and that's because it was

2  believed to be a Freddie Mac security that would be based on a

3  pool of loans; is that right?

4  A.  That's right.

5  Q.  And by the way, the security that's been talked about that

6  you were looking at, is that -- was that a security in process?

7  A.  What are you referring to?

8  Q.  Do you know what a security in process is?

9  A.  Yes.

10  Q.  What is it?

11  A.  It's -- it has -- it's a security that has not settled yet.

12  Q.  And did you understand that an AOT, there were -- the pool

13  of loans would turn into securities issued by Freddie Mac?

14  A.  Yes.

15  Q.  So looking, then, at our chart, the AOT was considered to be

16  a 20 percent risk weight, which is very high credit quality

17  asset; correct?

18  A.  If it was an agency, yes.

19  Q.  And, again, those are -- and a COLB was considered to be

20  less risky than a standard commercial loan; correct?

21  A.  Yes, because it was a mortgage that we held.

22  Q.  Okay.  Let's talk about COLB a little bit now.

23        THE COURT:  Wait.  Let me ask you something.

24        MR. LEVINE:  Sure.

25        THE COURT:  You just answered it was less risky than a

1   standard loan.  Because it was a mortgage, or because it was

2   treated as a security in process?

3           THE WITNESS:  I think I was referring to the 50 percent

4   risk weight of COLB.  Because we had the true legal sale

5   opinion, it was our opinion that we owned mortgage loans as

6   opposed to a commercial loan that we would have made to the

7   customer.  So because we looked at it as holding mortgage loans,

8   we -- it got the 50 percent risk weighting.

9           THE COURT:  Okay.  It was COLB, then.  The 20 percent

10  was AOT.

11          THE WITNESS:  Was AOT, if it was agency.  Not all of

12  them -- not all of them were agency.

13  Q.  You mean if the -- let me see if I can help out.  You mean

14  if the security based on the pool of mortgages was issued by

15  Freddie Mac as opposed to a bank, that would be agency?

16  A.  Correct.

17  Q.  And the agency issuance is considered to be lower risk

18  because of the -- what was thought to be the full faith and --

19  the agencies like Freddie Mac are backed by the full faith and

20  credit of the U.S. government; correct?

21  A.  Yes.

22  Q.  So I want to focus now --

23          THE COURT:  Wait.  The determination as to -- okay.  So

24  these were really securities in progress; right?

25          THE WITNESS:  Yes, ma'am.

1    THE COURT:  The determination as to whether the

2  security would be issued by a bank or whether it would be issued

3  by Freddie Mac, was that done by looking at the commitment, the

4  end commitment paper, or what?

5    THE WITNESS:  Yes, ma'am.

6  Q.  I want to turn now to the COLB side of things.  Did the risk

7  control group analyze underlying collateral and trends and

8  balances of customers with respect to COLB?

9  A.  Yes, I believe so.

10  Q.  And in particular, was the mortgage warehouse lending

11  division responsible for looking at collateral supporting COLB

12  loan -- COLB transactions?

13  A.  Would you state that again?  I'm sorry.

14  Q.  Was the mortgage warehouse lending division responsible for

15  looking at collateral supporting COLB mortgages?

16  A.  Yes.  Absolutely.

17  Q.  And did you receive reports on collateral supporting COLB

18  mortgages?

19  A.  Yes, I did.

20  Q.  And did those reports have information about collateral from

21  a computer system at Colonial?

22  A.  Yes.

23  Q.  Was that -- what was the name of that computer system?

24  A.  Promerit.

25  Q.  Did the Promerit reports reflect the state where the

1  collateral was located?

2  A.  Yes.

3  Q.  Did the reports reflect how long Colonial owned it?

4  A.  Yes.

5  Q.  Did the reports reflect what date it was issued?

6  A.  I believe so.

7  Q.  Did the reports reflect who the mortgage originator was?

8  A.  Yes.

9  Q.  Did the reports reflect who the final or end investor was

10 for the COLB -- or was going to be?

11 A.  Yes.

12 Q.  Did you receive these reports on COLB mortgages at least

13 monthly?

14 A.  Yes, I did.

15 Q.  And was that the case from 2004 or 2005 through 2009?

16 A.  Yes.

17 Q.  Did you also get daily line usage reports?

18 A.  I don't know that I did.

19 Q.  Do you know what a line usage report was?

20 A.  Yes.

21 Q.  What was it?

22 A.  It was the amount of funding that had been --

23 Q.  Did you receive something called a shipped-not --

24        THE COURT:  Wait.

25 A.  It was the amount of funding on the guidance line that a

1  customer had used.  So -- so if they were -- if they had a $50

2  million guidance line and they were using 20 million.

3        THE COURT:  The guidance line is some kind of a ceiling

4  that they had or --

5        THE WITNESS:  Yes, ma'am.

6  Q.  Okay.  So the daily line usage report was more general in

7  nature as opposed to the Promerit reports that looked at

8  specific mortgages; is that right?

9  A.  It would have been the total of -- for each customer, I

10  believe.

11  Q.  In the daily line usage report?

12  A.  In the daily line usage report.

13  Q.  But the Promerit report was specific to individual

14  mortgages?

15  A.  You could pull that information, yes.

16  Q.  Are you familiar with something called shipped-not-paid

17  reports?

18  A.  Yes, I am.

19  Q.  What's a shipped-not-paid report?

20  A.  It's a report of mortgage loans that had been shipped to a

21  final investor and we had not yet been paid for those.

22  Q.  And did that happen sometimes just because of the time lag

23  or delay?  You sent something and it took a few days to get

24  paid?

25  A.  Sometimes it could take, you know, a few weeks.  Depends on

1  if all the -- if they had -- if everything matched what they

2  were looking for.

3  Q.  And did Colonial use these shipped-not-paid reports to

4  monitor whether the end investor needed to pay Colonial or send

5  the loan back?

6  A.  Correct.

7  Q.  Did you also receive reports from the mortgage warehouse

8  lending division on aging?

9  A.  Yes, we did.

10  Q.  What did the aging reports tell you?

11  A.  How long we had -- depended.  How long we had either owned

12  the loans, in the case of COLB or an AOT, or how long we had

13  funded them on the line.

14  Q.  And was there a concern at times about having aging reports

15  that show holding of COLB mortgages for too long a period of

16  time?

17  A.  State that one more time, please.

18  Q.  Did you want to try to -- the COLB participation interest

19  that you purchased, did you want to sell those relatively

20  quickly?

21  A.  Yes, we did.

22  Q.  And these aging reports, did they list how long Colonial was

23  holding on to the participation interests before selling them?

24  A.  Yes, they did.

25  Q.  And did they break it out by time period, like 120 days to

1  180 days and 180 days to 240 days, that kind of thing?

2  A.  I don't remember the Promerit report necessarily.  I mean, I

3  know that I helped create reports that would summarize that kind

4  of information.

5  Q.  Okay.  And was there a concern at times about the aging

6  reports showing COLB loans being held for too long a period of

7  time or having -- showing significant aging beyond a certain

8  number of days?

9  A.  Yes.  That was a concern.

10  Q.  Did you ask questions if the COLB loans showed too much

11  aging or were shipped and not paid?

12  A.  Yes, we did.

13  Q.  And all these reports we've been talking about relate to the

14  collateral for COLB loans that you saw during your time at

15  Colonial; correct?

16  A.  I'm sorry.  Would you repeat that one more time?

17  Q.  These reports we've been talking about, the aging report,

18  the shipped-not-paid report, the Promerit report, all list

19  information about the mortgage loans that are the subject of

20  COLB transactions; correct?

21  A.  Yes.

22       THE COURT:  Let me just ask you something.  In -- did

23  all of these mortgages come in with a plan to move them to some

24  final investor?

25       THE WITNESS:  Yes, ma'am.

1          THE COURT:  And whose responsibility was it to find the

2   final investor?

3          THE WITNESS:  The customer, the mortgage warehouse

4   lending customer.

5          THE COURT:  That means the mortgage originator.

6          THE WITNESS:  Yes, ma'am.

7          THE COURT:  Now, did the mortgages come in -- well,

8   let's take them -- they may be different, COLB and AOT.  But did

9   the mortgage come in presumably with the investor already

10  designated, or did they come in with the understanding that one

11  would be found?

12         THE WITNESS:  I believe they came in with it already

13  designated, although it got more confusing if a customer was

14  actually securitizing them themselves.

15         THE COURT:  Securitizing them themselves.  So then the

16  final investor would be the same -- would be the mortgage

17  originator?

18         THE WITNESS:  Somewhat.  The final investor -- I think

19  they called it mandatory delivery.  So as opposed to showing up

20  that was being sold to Credit Suisse, it would show sold to

21  MAND, M-A-N-D, on the reports he was talking about.

22  Q.  When -- following up on that, when you had the end investor

23  being lined up ahead of time, Colonial wasn't part of the

24  agreement between the mortgage originator and the end investor,

25  was it?

1  A.   No.  They did not make -- arrange those sales.  The

2  originator did.

3  Q.   Okay.  So -- fair enough.

4     Let me ask a little bit about the collateral that was on

5  these reports that I was just asking about.  Were there people

6  in the risk control group called collateral analysts?

7  A.   I thought the collateral analysts were the operations side

8  of the warehouse group.

9  Q.   Okay.  Are you familiar with people called collateral

10 analysts?

11 A.   Yes, I am.

12 Q.   And did the collateral analysts verify the existence of

13 collateral?

14 A.   Yes, they did.

15 Q.   Do you know who any of those collateral analysts were?

16 A.   I don't remember any names.

17 Q.   Did anyone in the risk control group --

18 A.   Well, that's not true.

19 Q.   I'm sorry.

20 A.   I remember Teresa Kelly's.

21 Q.   Okay.  Anyone else?

22 A.   No, that I remember.

23 Q.   Did anyone in the risk control group do reviews of the work

24 done by collateral analysts?

25 A.   Yes.

1  Q.  Did anyone in the risk control group attempt to count the

2  collateral for mortgages in the COLB program?

3  A.  I don't recall exactly what they did in those reviews.

4  Q.  Where was the collateral kept?

5  A.  It was either -- depended on the situation, but COLB

6  collateral would have been held in the secured location at --

7  for the most part -- everything seemed to have an exception, but

8  for the most part, the collateral was held in a secured file

9  room in the mortgage warehouse division.

10  Q.  Was it in a vault in the basement?

11  A.  That was a different group.

12  Q.  Hold on.  So the COLB mortgages we've been talking about,

13  were those held in the vault in the basement or not?

14  A.  The vault in the basement was for securitized loans.

15  Q.  Okay.  So does that mean -- is that more AOT, then?

16      THE COURT:  Let me help you and see if we've got it

17  right.  This may save a little.  Some of the loans went to,

18  let's say, Freddie Mac, got securitized, and then Colonial

19  held -- Freddie Mac sent them back so they could be held in the

20  vault in the basement after they were securitized?

21      THE WITNESS:  Yes.  So the document custody group in

22  the basement was -- that's what one of their roles was, is that

23  they held on to the collateral that supported the mortgage.

24      THE COURT:  For Freddie Mac.

25      THE WITNESS:  For Freddie Mac.

1          THE COURT:  It was just a place for -- Freddie Mac used

2   it kind of as a storage place; right?

3          THE WITNESS:  Right.

4          THE COURT:  Okay.  I think you're asking about

5   something different, and I'm just trying to --

6          MR. LEVINE:  I am, Your Honor.  Thank you.

7          THE COURT:  Just trying to save a little time.

8          MR. LEVINE:  I appreciate that.

9   Q.  So what I'm asking about is when Colonial purchased the 99

10  percent participation interest in the COLB mortgages, where did

11  the COLB mortgages go?

12  A.  They went in a secured file room in the mortgage warehouse

13  division.

14  Q.  Okay.  Was that secured file room located in a vault in the

15  basement?

16  A.  No, it wasn't.

17  Q.  Where was it located?

18  A.  I don't remember.  It was either the fifth or sixth floor.

19  Q.  Fifth or sixth floor?

20  A.  Uh-huh.

21  Q.  And who is it that was responsible for the secured file room

22  that held the COLB mortgage collateral?

23  A.  I don't know specifically.

24  Q.  Was it Teresa Kelly, as the collateral analyst for it?

25  A.  Well, she would have been in there.  She would have been one

1  of the people who would have been in that file room, would have

2  had authority to be in that file room.

3  Q.  We've had testimony in the case about a couple people whose

4  names rhyme, Dawkins and Hawkins.  Are you familiar with them?

5  A.  Yes, I am.

6  Q.  Did they work in this fifth and sixth floor where the COLB

7  mortgages were, or were they down in the basement in the vault?

8  A.  They were in the basement with the document custody group.

9  Q.  Okay.  And that's a different -- and we talked about -- so

10  for COLB mortgage collateral, that was on the fifth or sixth

11  floor, not the basement; right?

12  A.  Correct.

13  Q.  Okay.  Did anyone from risk control go to the fifth or sixth

14  floor into the secured file room to confirm the actual mortgages

15  for the COLB program?

16  A.  I believe so.

17  Q.  Who did that?

18  A.  I don't remember the names.

19  Q.  Someone working for Mr. Bryant?

20  A.  Yes.

21  Q.  I want to talk now about AOT and the mortgages in AOT.  We

22  just talked about COLB.  Did the AOT facility come into

23  existence after COLB?

24  A.  Yes, it did.

25  Q.  Did you have a report from Promerit that listed the

1  individual pools on the AOT facility?

2  A.  Yes.

3  Q.  And the pools would be a pool of mortgages, but what you had

4  is something that listed the pool without listing all of the

5  underlying mortgages within it; correct?

6  A.  Correct.  From Promerit.

7  Q.  Yes.  Did Promerit track the individual mortgages that were

8  in the AOT pools?

9  A.  They did not.

10 Q.  Did you want to be able to provide the same level of detail

11 on AOT as you had on COLB to Colonial management?

12 A.  Yes.  There was a point at which I did want to do that.

13 Q.  And was the level -- that level of detail available to

14 Colonial in the Promerit reports?

15 A.  No, it was not.

16 Q.  I'm going to put up D-19.  And let me back up a little bit.

17 Sorry.  This is a series of e-mails.  And I'm not going to go

18 through every single one, so what I did is I made bigger the one

19 at the bottom.  As you know, e-mails, if you want to go

20 chronologically, you read from the bottom to the top.  So the

21 one on the bottom on D-19 is an e-mail from you to Cathie

22 Kissick and Rodney Lewis; is that right?

23 A.  Yes, it is.

24 Q.  I highlighted a part of it where you ask, Why do we not

25 track collateral level info for AOT?  Do we have plans to start

1  tracking collateral level or getting more info on the underlying

2  loans from TBW on a regular basis?

3      So you see that?

4  A.  Yes, I do.

5  Q.  And you write back -- and then -- I'm sorry.  Ms. Kissick

6  writes back on the top e-mail there.  Do you see that?  It says

7  it's from Cathie on the bottom?

8  A.  Yes.

9  Q.  She writes back:  We haven't tracked loan level because we

10  track on CUSIP number.  Some don't have CUSIP numbers, but most

11  do.  That's what it is now.

12      Do you see that?

13  A.  Yes, I do.

14  Q.  After this, did you discuss the tracking of data -- loan

15  level detail data for AOT with your boss, Kamal Hosein, who was

16  the treasurer?

17          THE COURT:  Excuse me.  Can you give me the number of

18  this?

19          MR. LEVINE:  Sure.  It's D-19, Your Honor.

20          THE COURT:  D-19.

21  A.  Yes, I did.

22  Q.  And just so we're clear, this is the time period after 2003

23  where you're assistant treasurer and reporting to Mr. Hosein,

24  who was treasurer; correct?

25  A.  Correct.

1  Q.  Let's turn to D-22.  Now we're -- and there's different

2  parts of this e-mail, and you're not on the top part.  I'm not

3  going to ask you about that.  I'm going to ask you about the

4  part that you were on, which is the e-mail on the bottom that

5  I've made a little bigger here.

6      This is October 1st, 2007, and it's an e-mail from Kamal

7  Hosein to you and Cathie Kissick saying, Also please take

8  whatever steps necessary to have the same specificity of data

9  regarding AOT collateral as we do for the other portfolios.

10      So you see that?

11  A.  Yes, I do.

12  Q.  And did you understand that meant tracking the underlying

13  collateral for AOT?

14  A.  That's what I understood it to mean.

15  Q.  And did you press Ms. Kissick on getting the data for

16  underlying collateral for AOT?

17  A.  Yes, I did.

18  Q.  Let's turn -- this e-mail, D-22, is October 1st.  Now let's

19  look at D-23, two days later.  There's an e-mail, October 3rd,

20  2007, and there's actually first an e-mail from you to

21  Ms. Kissick and then a response from Ms. Kissick.  Do you see

22  that?

23  A.  Yes.

24  Q.  All right.  So two days after Mr. Hosein said he wanted this

25  loan-level detail, you write, Kamal would like a file from TBW

1  on the loans in AOT at 9/30.  That's September 30; right?

2  A.  Right.

3  Q.  And then you say, We need to start tracking that information

4  on a regular basis and ask -- then say -- give some detail about

5  that.  And Ms. Kissick's response was, check your PIN.

6      Do you see that?

7  A.  Yes, I do.

8  Q.  What's the PIN referring to?

9  A.  Private message on a Blackberry device.

10 Q.  Was communication on a Blackberry private message outside

11 the servers of Colonial?

12 A.  Yes, it was.

13 Q.  So someone at Colonial who was monitoring e-mail couldn't

14 see what was said back and forth on a private message on a

15 Blackberry; correct?

16 A.  That's correct.

17 Q.  So let's look a little over a week later, October 11th,

18 2007.  I'm going to put up D-24.  And we have a couple different

19 e-mails here.  And, again, starting with the one at the bottom,

20 it's from you to Ms. Kissick dated October 11.  And you say,

21 Where do we stand on getting a file on what is in AOT for

22 internal purposes here?  With such a large shift AOT this

23 quarter, we have information on a much smaller piece of the pie,

24 and I don't want to make sweeping statements about how things

25 have changed if really all it is is that it is now in an asset

1  class we don't track the detail on.

2      So I want to ask a little bit about that.  The quarter that

3  you're talking about is -- "this quarter," that's the third

4  quarter of 2007; is that right?

5  A.  Yes.

6  Q.  And in the third quarter of 2007, was Colonial taking

7  mortgages that were in COLB and switching some of them over to

8  AOT?

9  A.  Colonial wasn't doing that.  I believe at the direction --

10 you know, if a security -- if a loan -- I'm sorry -- ended up

11 going into a pool, it could have moved from COLB to AOT.

12 Q.  All right.  Let's -- I'll ask it a little bit more

13 specifically, then.  So -- and thanks for the correction there.

14 So for -- in the third quarter of 2007, a number of the

15 mortgages that were in the COLB program were being moved into

16 the AOT pools; is that right?

17 A.  AOT became a much larger piece of the pie.

18 Q.  And COLB became --

19 A.  I don't know if they all came from COLB.

20 Q.  Right.  But at the same time, in the third quarter of 2007

21 that COLB -- or that AOT became a much larger piece of the pie,

22 COLB became a smaller piece of the pie; right?

23 A.  Yes.

24 Q.  And on COLB, someone could see the aging of the loans, of

25 the underlying mortgages.  That's something you couldn't see on

1  AOT; is that right?

2  A.  Not on Promerit.

3  Q.  Not on the system that the company had, Promerit; right?

4  A.  Right.

5  Q.  And at that time, in the third quarter of 2007, was there

6  some push-back from the regulator, the OCC, with respect to the

7  aging of COLB mortgages that were being shown on the COLB

8  reports?

9  A.  I believe that's the case.

10  Q.  And if COLB mortgages that were aged went into AOT, the

11  result would be that the aging -- the percent of -- the number

12  of aged COLB loans on the report that the regulators saw would

13  be lower; correct?

14  A.  If that's what happened, yes.

15  Q.  So going back to this e-mail here, when you're talking about

16  the -- where we stand on getting a file and what's in AOT, the

17  response from Ms. Kissick is, All AOT is, is the same thing

18  except for the two large securities that they're going to try

19  and market once the market chills.  So about 900 million is

20  agency.  The rest, well, let's not dig too much.

21      Now, when you talk about the agency -- when she references

22  the agency there, is that what you understood to be something

23  like a Freddie Mac security?

24  A.  Yes.

25  Q.  And on the rest, she said, Let's not dig too much.  Did you

1  find it unusual that the head of the mortgage warehouse lending

2  division said not to dig too much on AOT detail?

3  A.  I guess.

4  Q.  Did you share this e-mail with PwC?

5  A.  I did not.

6  Q.  Did you tell PwC that Ms. Kissick, the head of the mortgage

7  warehouse lending division, said "let's not dig too much" with

8  respect to AOT?

9  A.  No, I didn't.

10 Q.  Now, after this exchange in October -- and we saw some in

11 September as well -- with Ms. Kissick, did you keep asking

12 Ms. Kissick for loan-level detail in AOT?

13 A.  Yes, I did.

14 Q.  Let's go to D-160.  Again, it's a series of e-mails, and I'm

15 going to start on the bottom there when you write, February 13th

16 of 2008, to Ms. Kissick.  And one of the things you say is, TBW,

17 AOT data.  We are still trying to find a funding source, but I

18 am going to need information.

19     Do you see that?

20 A.  I do.

21 Q.  And then Ms. Kissick responds the same day on a number of

22 things.  I'm not going to go through all those things.  I'm

23 focused on the AOT detail here.  And she says, AOT, what exactly

24 do you need?  They have given us the same data for three years.

25     And then you respond, at the top:  On AOT, I was hoping for

1  a file with some of the same loan-level detail we get on COLB.

2      Is that right?

3  A.   That's correct.

4  Q.   That's the same information you were asking for back in

5  October of 2007, five months earlier; right?

6  A.   Yes.

7  Q.   And several months later you still hadn't gotten the AOT

8  loan-level detail yet; correct?

9  A.   That's what it appears.

10 Q.   Did you report to your boss, Mr. Hosein, that you were not

11 getting information from Ms. Kissick after repeatedly asking for

12 it?

13 A.   Yes.  He was aware.

14 Q.   Let's turn to D-25 now.  And this is, again, a series of

15 e-mails.  And I've pulled up a couple back and forth on March

16 11, 2008.  And Mr. Hosein writes to you, So they have the data

17 when it is on COLB, but it is not tracked on AOT.  And you say

18 yes.

19      Did you ultimately, at some point, get loan-level detail in

20 AOT.

21 A.   Yes, I did.

22 Q.   Did you find it very difficult to get information on

23 underlying loans in AOT from Ms. Kissick?

24 A.   Yes, it was.

25 Q.   Was it very difficult to deal with Ms. Kissick on

1  collateral?

2  A.  I'm not sure what you mean.

3  Q.  Well, was it very difficult to deal with Ms. Kissick on

4  getting information on underlying collateral?

5  A.  On the AOT, yes.

6  Q.  Did you believe at the time that the refusal to provide

7  loan-level detail on AOT was part of a fraudulent scheme?

8  A.  I did not.

9  Q.  But in hindsight, with 20/20 vision, do you now know what

10  was going on with the refusal to provide loan-level detail for

11  AOT?

12  A.  I don't know exactly, but it was part of the fraud.

13  Q.  Did you contact the collateral analysts or custody

14  department in connection with efforts to get more loan-level

15  detail with respect to AOT?

16  A.  No, I did not.

17  Q.  Did you go to any other sources to verify whether the

18  collateral in AOT was what it was supposed to be?

19  A.  No, I did not.

20  Q.  Did you inform PwC about any concerns that you had about not

21  getting loan-level detail for AOT?

22  A.  No.

23  Q.  And generally, did you inform PwC about difficulty you had

24  in obtaining loan-level detail for AOT?

25  A.  No, I did not.

1  Q.  All right.  I want to turn to a different topic now, which

2  is -- we talked about this a little bit before, the end-investor

3  commitments.  Did you ever see a master AOT agreement?

4  A.  Yes.

5  Q.  And pursuant to that, was every AOT transaction supposed to

6  have been sold to an investor?

7  A.  Yes.

8  Q.  And was an end-investor commitment supposed to be in place

9  for AOT?

10 A.  Yes, it was.

11 Q.  Did you discuss that with Mr. Hosein?

12 A.  Yes.

13 Q.  Did Mr. Hosein ask you to make sure you had a copy of

14 whatever documented the fact that there was a commitment to sell

15 the loans?

16 A.  Yes, he did.

17 Q.  And was it your responsibility to see for every AOT pool

18 listed on the pipeline there was an end-investor commitment in

19 place?

20 A.  That's what I was asked to do.  Yes.

21 Q.  By the way, we just saw in the e-mails there was a time when

22 there was securities, and it was talked about trying to sell

23 them but not sure if it was going through at that point.  Do you

24 remember that?

25 A.  Yes.

1 Q. At that point, was there an end-investor commitment in

2 place?

3 A. It was my understanding they had the end-investor

4 commitment. I think that the end investor had plans to market

5 it later. That's what she said.

6 Q. Did you ask Ms. Kissick and Ms. Kelly for all the

7 end-investor commitments that matched up with the pools on the

8 report, the AOT pools?

9 A. Yes, I did.

10 Q. And was the end-investor commitments for AOT something that

11 Ms. Kissick and her group should have provided to you?

12 A. Yes.

13 Q. Did you find it difficult to get support for end-investor

14 commitments from AOT trades from Ms. Kissick?

15 A. Sometimes.

16 Q. Did you tell PwC about difficulty in getting support for

17 end-investor commitments?

18 A. No, I did not.

19 Q. Are you familiar with the assignment-of-trade agreements,

20 the one-pagers?

21 A. When you say "assignment of trade," to me that's a whole

22 document.

23 Q. Okay. And I think we've been showing the front page. Are

24 you familiar with those documents?

25 A. With the assignment-of-trade documents?

1    Q.   Yes.

2    A.   Yes.

3    Q.   And did you ever call an end investor to verify that the

4    end-investor commitments were real?

5    A.   No, I did not.

6    Q.   Did you ever consider doing that as part of what Mr. Hosein

7    asked you to do?

8    A.   No, I did not.

9    Q.   Did you notice that all or almost all the

10   assignment-of-trade agreements involved Mesirow?

11   A.   No.

12   Q.   Did you ever call Mesirow Financial to verify whether they

13   were a real end investor or not?

14   A.   No, I did not.

15   Q.   And you were head of risk controls starting in October 2008

16   or at least reported to you; correct?

17   A.   Reported to me.  Yes.

18   Q.   Did you see assignment-of-trade agreements that were

19   unsigned by the buyer?

20   A.   Yes, I did.

21   Q.   And was there anything about the review of

22   assignment-of-trade agreements that suggested to you there was

23   any kind of fraud?

24   A.   Not at the time.

25   Q.   Only with hindsight; right?

1   A.   Right.

2   Q.   Yes?

3   A.   Yes.   I'm sorry.

4   Q.   Sorry.   Sometimes it's just hard to hear you.

5        I want to turn to a different topic now for a couple

6   minutes, which is TBW.   Was TBW an important customer of the

7   mortgage warehouse lending division?

8   A.   Yes.   They were the largest customer.

9   Q.   They were the most important customer of the warehouse

10  lending division; correct?

11  A.   Yes.

12  Q.   And did TBW's business grow quickly and significantly?

13  A.   Yes, it did.

14  Q.   And did that growth benefit Colonial?

15            THE COURT:   Did it what?

16  Q.   Did it benefit Colonial at the time?

17  A.   Certainly.

18  Q.   Is that because Colonial could do more business with TBW?

19  A.   Yes, sir.

20  Q.   And Colonial could earn more money from TBW in those

21  transactions?

22  A.   Yes.

23  Q.   And was TBW's survival one of the bank's interests?   Let me

24  ask it a different way.

25  A.   Okay.

1  Q.  Was it in the interest of Colonial Bank to have its largest

2  customer in mortgage warehouse lending survive?

3  A.  It was in our interests that all of our customers survive.

4  Q.  It was especially in your interests that your most important

5  customer survived; right?

6  A.  Certainly.  I had no concerns that they weren't going to.

7  Q.  Let me turn to another topic that may take us a while but

8  may take us through lunch or up to lunch.  Not through lunch.

9  Are you familiar with something called -- I'm not going to do

10  that to the witness or the Court.

11     Are you familiar with something called a funds administrator

12  audit?

13  A.  Yes, I am.

14  Q.  And is a fund administrator audit an audit of what the funds

15  administrator did?

16  A.  Yes.

17  Q.  Okay.  So let's start with that.  What's a -- what was a

18  funds administrator at Colonial?

19  A.  That was the person who was responsible for the movement of

20  funds.  It's been a while.  But I believe on both sides of the

21  transaction that they would -- when the collateral came in and

22  they were given direction that they had collateral, they would

23  send the funds to the customer.  They also -- when an end

24  investor purchased the loans, those funds would come back to us

25  to an account controlled by us, and they would disburse them

1   once they had the information about which loans that

2   represented.

3   Q.   Okay.  And I'm going to focus on one side of the

4   transaction.  When wires came in, when money came in, was the

5   funds administrator comparing the wire that came in from the end

6   investor to the purchase advice that said what loans -- what

7   mortgages were being paid off?

8   A.   Yes.

9   Q.   And the information on the mortgages that were paid off is

10  called a purchase advice?

11  A.   Yes.

12  Q.   Okay.  And is a purchase advice detail from the end investor

13  on the money -- on the loans or mortgages they're buying and

14  sending money for; correct?

15  A.   Yes, I believe it's a listing and an amount for each --

16          THE COURT:  Okay.  You're going a little fast.

17          MR. LEVINE:  Okay.  No problem.

18          THE COURT:  When the wire came in, it would specify

19  which loans were being paid off by that wire from the end

20  investor?

21          THE WITNESS:  I'm not sure who provided the advice,

22  whether it came from the end investor or from our customer.

23  Q.   By the customer, you mean the mortgage originator like TBW?

24          THE COURT:  But wait a minute.  Who was paying it off?

25  The end investor.

1          THE WITNESS:  The end investor.  So I think it did come
2   from them, but I can't swear to it.
3   Q.  And was it important to have this purchase advice, whoever
4   sent it, so you knew that the money that was coming in matched
5   up to particular loans that were -- or mortgages that were being
6   purchased?
7   A.  Yes.
8   Q.  And that way you would know what mortgages to pay down in
9   your system; correct?
10  A.  Correct.
11  Q.  So now that we talked about what a funds administrator does,
12  I want to turn to the funds administrator audit that occurred.
13  Is the funds administrator audit something that was performed by
14  a person in the risk control group that reported to you?
15  A.  Yes.
16  Q.  Who was that person?
17  A.  Sarah Roland.
18  Q.  When did Ms. Roland begin her --
19          THE COURT:  Sarah --
20          THE WITNESS:  Sarah Roland.
21          THE COURT:  V-O --
22          THE WITNESS:  No.  R-O-W-L-A-N-D.
23          THE COURT:  Roland.  Okay.
24          MR. LEVINE:  I think there may be -- I there's no W.
25          I think it's R-O-L-A-N-D, Your Honor.

1   Q.  Did Ms. Roland begin doing these fund administrator audits

2   in early 2008?

3   A.  I don't know when they started.

4   Q.  Did she perform them on a quarterly basis?

5   A.  I believe so.

6   Q.  Now, these fund administrator audits, those weren't audit

7   like audits of financial statements by professional auditors;

8   right?

9   A.  It was more like a review.

10  Q.  Okay.  So it was a review that was actually -- instead of

11  looking at everything at Colonial Bank, it was very specific to

12  comparing the purchase advices to the wires to see if they

13  matched up; right?

14  A.  Yes.

15  Q.  And during the funds administration audit, did Ms. Roland

16  identify an inability to match purchase advices with incoming

17  funds for TBW?

18  A.  Yes, she did.

19  Q.  I'm going to put on the screen D-31.  And we'll start with

20  this e-mail here from Ms. Roland to you dated November 12th of

21  2008.  And that's on the bottom of the page.  And it starts out

22  by saying, Hi, Mary Lou.  I've been doing the funds

23  administrator's audit, and for the most part everything is

24  normal.  But then she says, TBW -- and by the way, this wasn't

25  limited to TBW.  This was done on a number of different

1  customers; is that right?

2  A.  All the customers.  Yes.

3  Q.  Right.  Not just TBW.

4  A.  Correct.

5  Q.  All right.  But what Ms. Roland said to you is, TBW is

6  proving to be a challenge.  Surprise, surprise.

7      Do you see that?

8  A.  Yes, I do.

9  Q.  And that was -- she was being sarcastic?

10  A.  I believe so.

11  Q.  Because you found that you were frequently finding issues or

12  difficulties with TBW; correct?

13  A.  I'm not sure why she put that.

14  Q.  All right.  So she then adds in the next paragraph, My

15  problem is when looking through the backup information, there

16  aren't purchase advices for all the loans to tell why the

17  haircut is negative or positive, for that matter.

18      What's a haircut other than -- you know, other than when I

19  go to the barber for five minutes?

20          THE COURT:  I think in order for me to understand your

21  answer, we're going to have to back up.  You see the line after

22  the highlighted line?  The first day I reviewed them, they had a

23  negative pay-down of -- is that million?  Yes, I guess that's

24  million.  What does that -- it said, Many of the loans were

25  between 10 to 25,000 in the negative.  Granted, the rest of the

1  days I reviewed, the pay-downs were more -- but that's still

2  quite high.  What does that mean?

3       THE WITNESS:  We would have advanced, you know, a

4  certain amount in -- if the amount we were getting back from the

5  end investor was less than the amount we had advanced, that

6  would have been a negative haircut.  Sometimes they would come

7  back and they had paid more than what we had advanced, and that

8  would have been a positive.

9       THE COURT:  Obviously, you wanted positive, not

10  negative.

11       THE WITNESS:  Yeah.  If it was negative, then the

12  differential had to be covered by the customer.

13       THE COURT:  So you're getting a wire from an end

14  investor to pay off certain loans or they're going to take

15  certain loans -- buy certain loans; right?

16       THE WITNESS:  Right.

17       THE COURT:  And sometimes the amount -- well, let's say

18  for TBW, the amount of the wire coming from -- where?  Who was

19  sending that wire?  An end investor.

20       THE WITNESS:  An end investor.

21       THE COURT:  Was sending that wire.  And it would come

22  in at less than the loans that were supposed to be being bought?

23  How does that -- I'm trying to figure out how that works.

24       THE WITNESS:  The value of them, what they paid for

25  them, was less than what the amount we had advanced.

```
 1              THE COURT:  You had advanced to TBW.

 2              THE WITNESS:  To TBW.

 3              THE COURT:  Okay.  I see.

 4              THE WITNESS:  That would be the negative.

 5              THE COURT:  That's the negative haircut.

 6              THE WITNESS:  Right.

 7              THE COURT:  I won't ask.

 8  BY MR. LEVINE:

 9  Q.  And you didn't want a negative haircut; right?

10  A.  No, we did not.

11  Q.  Did you actually want it to match up?

12  A.  Yes.

13  Q.  So Ms. Roland talks about, then, that there aren't purchase

14  advices for all the loans.  Did you want to have purchase

15  advices for all the loans?

16  A.  Yes.

17  Q.  And let's go to the next page, and I'll ask a little more

18  about that.  She says -- the top of the second page of D-31

19  Ms. Roland says, If the loans are being funded through Ocala

20  Funding or the CSFB lines.  I've got to stop there.  What's

21  Ocala Funding?

22  A.  Ocala Funding is a bankruptcy-remote special-purpose vehicle

23  wholly owned by Taylor Bean & Whitaker.

24  Q.  Okay.  So Ocala Funding is part of TBW?

25  A.  Yes.
```

1          THE COURT:  What did you say about bankruptcy?

2          THE WITNESS:  Bankruptcy-remote is I believe how it was

3    described.

4          THE COURT:  Bankruptcy-remote?  Do you know what that

5    is?

6          THE WITNESS:  I believe it's the way in which the --

7    they structured it for independence from Taylor Bean, but

8    that's --

9          THE COURT:  But it's part of TBW; right?

10         THE WITNESS:  It was owned by TBW.  Well, actually, I

11   say that.  I don't remember those documents well enough to say

12   that for sure.

13   BY MR. LEVINE:

14   Q.  And I'm certainly not asking you, you know, like you're a

15   transactional lawyer setting up bankruptcy-remote entities.  But

16   you treated Ocala Funding as being part of TBW in these

17   dealings; is that right -- or looked at Ocala Funding saying,

18   that's TBW?

19   A.  It was -- yeah.  It was another funding source for Taylor

20   Bean.  So, you know, they could have moved a loan from our

21   facility to that facility.

22   Q.  Well, let me see if I can help out a little bit.  Was Ocala

23   set up -- it got some money from big banks like Deutsche Bank

24   and BNP Paribas, and so it was set up as a separate entity but

25   with -- either owned by or with ties to TBW; is that right?

1   A.   That's right.

2   Q.   So moving on, then, if the loans are being funded through

3   Ocala Funding or this CSFB line, there is only a list of loans

4   from TBW and the wire with the total amount to be repaid, no

5   purchase advices.  This is not standard protocol for any other

6   customer.  Now, I know TBW is not any other customer, but so far

7   I'm hitting wall -- I think the wall -- trying to find out how

8   they come out with these lists of loans and these repayment

9   amounts which are creating the negative balances.

10       You see that?

11  A.   Yes, I do.

12  Q.   When there's the reference to TBW isn't any other customer,

13  you knew TBW was the biggest customer; right?

14  A.   That's right.

15  Q.   And did there always seem to be some kind of story with TBW?

16  A.   I'm not sure what you mean.

17  Q.   Well, did you -- let me show you your deposition, page 231

18  of the deposition in this case.  I'm sorry.  It's the

19  deposition --

20          MR. TURNER:  I'm sorry, Your Honor.  What's the

21  question he's impeaching her on?

22          MR. LEVINE:  I'm actually going to see if I can refresh

23  mere memory.  She's said she's not sure about the story of some

24  kind, and I'm going to show her her deposition.

25  Q.   There is a reference here to the "surprise, surprise" remark

1  we saw before.  And the question was:  What was your

2  understanding of what she meant by that?  And you answered that

3  everything -- things about Taylor Bean tended to be different

4  and -- I don't know, just different.

5      Question:  How so?  I mean, there always seemed to be a

6  story of some kind.  I -- I don't know.

7      In that deposition testimony, what did you mean by story of

8  some kind with respect to TBW?

9  A.  Well, in the example of what you've just been showing, the

10  funds administrator audit, there was a story -- there was a

11  description of why it was that it was different that came from

12  Cathie and from Lee.  And I believed it supported what they were

13  saying.

14  Q.  Is what's shown here about the lack of -- you know, there's

15  a reference on the lack of purchase advices saying, This is not

16  standard protocol for any other customer.

17      Is this an example of TBW not following standard protocol?

18  A.  Yes, it is.

19  Q.  Did you find that Ms. Kissick made exceptions for TBW with

20  some sort of explanation of how they were different?

21  A.  Yes, she did.

22  Q.  Did you tell PwC that TBW was always treated differently?

23  A.  No, I did not.

24  Q.  Then Ms. Roland adds at the last paragraph of this e-mail,

25  D-31 -- she says, it could be that everything is on the up and

1  up.  But the lack of communication, of course, is making me

2  question their entire process.

3      Do you see that?

4  A.  I do.

5  Q.  Did you share this e-mail exchange with PwC?

6  A.  No, I don't think so.

7  Q.  Did you tell PwC about Ms. Roland's concerns, questioning

8  the entire process at this point?

9  A.  No, but her reports were available, and she did write up a

10 report on this.

11 Q.  Well, this wasn't a report, though, was it?

12 A.  No, it wasn't.  This is just an e-mail.

13 Q.  All right.  So this e-mail here, D-31, where Ms. Roland says

14 that she's questioning the entire -- their entire process,

15 referring to TBW, that's not something that you shared with PwC;

16 correct?

17 A.  Correct.

18 Q.  Let's turn to D-37.  Now we have a memo dated December 22nd,

19 2008, from Sarah Roland to a number of people, including you.

20 Do you see that?

21 A.  I do.

22 Q.  And Ms. Roland notes a number of things.  And she says that

23 she's found several questions regarding the process TBW uses to

24 repay loans.  And that's under the header called

25 Findings/Concerns.  Do you see that?

1  A.  I do.

2  Q.  And she says, The findings and concerns are listed as

3  follows.  The first thing she references is large negative

4  haircuts.  We talked about negative haircuts before, but here

5  there's a reference to a November 4th -- a negative haircut of

6  over $5 million; is that right?

7  A.  That's right.

8  Q.  And that's a pretty large haircut?

9  A.  Yes, it is.

10 Q.  The second thing that Ms. Roland lists as a finding and

11 concern is number two, loans transferred to CSFB, AOT line.  Who

12 is CSFB?  I know it's Credit Suisse First Boston, but what was

13 their role?

14 A.  I believe they also provided funding to Taylor Bean.

15 Q.  And then it says -- there's a reference to some

16 spreadsheets.  And then she says, We are not able to make sense

17 of this repayment partially due to a lack of a purchase advice.

18     Do you see that?

19 A.  I do.

20 Q.  And then number three that's listed is Bank of New York

21 settlement wires.  Bank of New York here was -- what was their

22 role?

23 A.  They were the originating -- they were the bank to which the

24 wire came.

25 Q.  Okay.  They weren't the end investor; right?

1  A.  They weren't the end investor.

2  Q.  Were they like a settlement or clearing agent?

3  A.  Yes.

4  Q.  And that's the entity that disburses the funds that were to

5  have -- that were supposed to have come from the end investor;

6  correct?

7  A.  Yes.

8  Q.  So the Bank of New York was an intermediary; right?

9  A.  They were just the bank that was used to wire the funds.

10  Q.  Okay.  So Ms. Roland writes about the Bank of New York

11  settlement wires.  And in particular, she says that -- she

12  refers to a wire sent for over $60 million on October 30th of

13  2008.  Correct?

14  A.  Yes.

15  Q.  And she says, In looking at the specific loans repaid with

16  that wire, not all those contracts were repaid that day or were

17  repaid in full.  Most of those contracts were already repaid on

18  earlier dates.  Mortgage warehouse lending is unable to

19  reconcile the spreadsheet from TBW to the sheet from Bank of New

20  York.  And then she adds, on B, that on the same day, only 43

21  million -- over $43 million in loans were repaid, and the rest

22  of the money, close to $17 million, was transferred to the

23  master account.

24      Is that TBW's master account?

25  A.  That's what I would take it to mean.

1  Q.  Was it a problem that Colonial was -- or that the wrong

2  loans were getting paid down?

3  A.  Yes.

4  Q.  And is that a problem because Colonial could think it owned

5  a loan when, in fact, someone else had purchased it?

6  A.  Yes.

7  Q.  And did the mismatch identified by Ms. Roland exacerbate

8  that concern?

9  A.  Yes, it should have.

10  Q.  And then on the second page -- or the next page of this

11  document, second page, under Results, there's a reference to a

12  meeting.  Was there a meeting that was held with TBW folks on

13  this?

14  A.  Yes, there was.

15  Q.  And it says, At the end of the meeting it was determined

16  that TBW will reconcile one full day of pay-downs, October 30th,

17  to show the paper trail of each transaction.  Then she goes on

18  to say, They are not entirely sure on the timetable but will

19  make it a top priority and get back to mortgage warehouse

20  lending as soon as possible.

21      Do you see that?

22  A.  I do.

23  Q.  Did that reconciliation for October 30 ever happen?

24  A.  I don't recall.

25  Q.  Well, you know --

```
 1  A.  I don't recall.

 2  Q.  You know it didn't happen, don't you?

 3  A.  It's possible that it didn't happen.  I don't know.

 4  Q.  You don't think it happened; right?

 5  A.  Right -- I guess not.

 6  Q.  Well, did you share this e-mail or this memo with PwC?

 7  A.  It was available to them.  I didn't specifically share it.

 8  Q.  When you say it's available to them, among tens of thousands

 9  of possible documents?

10  A.  It was a review of the warehouse group.

11  Q.  Did you tell PwC about the concerns that Ms. Roland had

12  raised concerning this mismatch on October 30?

13  A.  I did not?

14  Q.  Let's turn to D-33.  And this is another memo dated January

15  29th, 2009, so about a month later.  And it refers -- and this

16  one is from Ms. Roland, again, and, again, to a number of

17  people, including you; correct?

18  A.  Yes.

19  Q.  And I made a paragraph of this bigger where, referring to

20  the over $60 million wire from Bank of New York, Ms. Roland

21  notes that there was a spreadsheet that was included that had a

22  list of pools to be repaid.  In researching the list, it was

23  apparent the pools on that list were largely not repaid with

24  that wire and other loans were repaid, slash, transferred in

25  their place as well as a large transfer of $16 million to TBW's
```

1  master account.

2      What's TBW's master account?

3  A.  It's the deposit account that they had control over.

4  Q.  And --

5          THE COURT:  Was that account in Colonial Bank?

6          THE WITNESS:  Yes, ma'am.

7          THE COURT:  But it was TBW's own account.

8          THE WITNESS:  TBW's own account.  Yes.

9  Q.  So TBW -- for the money that -- the $60 million that was

10 being paid to Colonial for Colonial's sale of the mortgages;

11 right?

12         THE COURT:  What?

13 Q.  What was the $60 million for?

14 A.  Yes.  I would assume it was for the payment for the loans.

15         THE COURT:  Wait.  Wait.  Wait.  It was from an end

16 investor, some end investor, or was it from TBW?

17         THE WITNESS:  It was from an end investor.

18         THE COURT:  An end investor gave a wire for $60 million

19 through Bank of New York.

20         THE WITNESS:  Yes.

21         THE COURT:  And along with that wire was a spreadsheet

22 with a list of pools to be repaid.  Now, who made up that

23 spreadsheet?  The end investor?

24         THE WITNESS:  That, I'm not sure.

25         THE COURT:  Okay.  So in researching, the pools on the

1   list were not repaid with that wire?

2           THE WITNESS:  That's what it says, yeah.

3           THE COURT:  So what happened -- okay.  So subtract the

4   16 million.  We know where that went.  So what happened to the

5   remaining money?  What did it pay off?

6           THE WITNESS:  It states that it paid off other loans.

7           THE COURT:  Other loans.

8           THE WITNESS:  Other loans.

9           THE COURT:  I see.  But many of the loans -- did they

10  mean many of the loans that had -- that were being paid off had

11  already been transferred to other lines of credit?  What does

12  that mean?

13          THE WITNESS:  I don't know.

14  BY MR. LEVINE:

15  Q.  And looking, then, at the next page of D-33, Ms. Roland says

16  that it's possible they realized these loans were already repaid

17  or transferred, and this wire was accidentally used to repay

18  more loans to settle the balances.  Are you aware of any

19  follow-up to determine if that was the case after this memo in

20  late January 2009?

21  A.  I don't know for sure.

22  Q.  Did Colonial just accept the explanations provided by TBW?

23  A.  Yes, we did.

24  Q.  And then --

25          THE COURT:  Can I ask one question here?  When they

1  were used to repay loans or settle the balances, that money went

2  to Colonial; right?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  Okay.

5  Q.  But it went there to pay off the wrong loans; right?

6  A.  That's what it states.

7  Q.  Other than the $16 million that went to TBW's account, the

8  master account.

9  A.  Correct.

10  Q.  And I highlighted the next paragraph of the second page of

11  D-33.  Ms. Roland says, The CSFB line -- and, again, they're a

12  funding source; right?

13  A.  I believe so.

14  Q.  -- has since been repaid by TBW and Colonial Bank.

15  Therefore, all the money that needed to go to CSFB has been

16  settled.  Hence, it would not be in TBW's best interest to go

17  back and investigate what happened with the October 30 Bank of

18  New York wire.

19      Do you see that?

20  A.  Yes.

21  Q.  Did you push back to Ms. Roland and suggest it would be in

22  Colonial's best interest to see what was going on here?

23  A.  I didn't.

24  Q.  Did Colonial ever determine what caused this mismatch

25  between the $60 million wire and the loans to be purchased?

1  A.  No.

2  Q.  Did you discuss the problem that Ms. Roland identified to

3  you with Ms. Kissick?

4  A.  Yes, I did.

5  Q.  And did Ms. Kissick give you some explanation?

6  A.  Yes, she did.

7  Q.  And you accepted it; right?

8  A.  I did.

9  Q.  If there were a serious problem identified at mortgage

10  warehouse lending, you could have raised it with various

11  committees at Colonial; right?

12  A.  Yes.

13  Q.  And you could have raised it even with the board of

14  directors; right?

15  A.  Yes.

16  Q.  And you could also have raised it with PwC; right?

17  A.  Yes.

18  Q.  Instead of raising the issue, what you did is you accepted

19  explanations from Ms. Kissick that you probably should not have;

20  correct?

21  A.  Benefit of hindsight, you're right.  Yes.

22  Q.  And did you ever tell PwC about these concerns concerning

23  the funds administration audit that was done by Ms. Roland?

24  A.  No, I didn't.

25  Q.  I'm going to put on the screen a slide.  It's the testimony

1  of --

2      MR. TURNER:  Your Honor, at the risk of getting another

3  goose-gander from Mr. Levine, I really do think this is

4  inappropriate to ask her to comment on another witness's

5  testimony.  When we did it in our case in chief, I think it was

6  when Mr. Westbrook testified as a corporate representative.  So

7  I object to this.

8      MR. LEVINE:  Your Honor, it's been done with many

9  witnesses, and I'm not asking to comment on testimony.

10     THE COURT:  What are you doing?

11     MR. LEVINE:  I'm just going to put up what Ms. Roland

12  says -- I'm sorry -- what Ms. Kelly said as a backdrop to the

13  last couple of questions here before lunch.

14     THE COURT:  Is this part of the Kelly deposition --

15     MR. LEVINE:  It is.

16     THE COURT:  -- that I'm supposed to be reading at some

17  point?

18     MR. LEVINE:  Yes, Your Honor.

19     THE COURT:  Okay.  Overruled.

20  BY MR. LEVINE:

21  Q.  So Ms. Kelly was asked:  Because Roland was knocking on the

22  door of the fraud; right?  Answer:  Yeah.  She didn't know what

23  she was finding; but obviously, she was finding discrepancies

24  that she didn't realize were discrepancies.  She was kind of

25  just asking to be educated so she could review it.

1    In your opinion as someone who was head of risk control at

2  mortgage warehouse lending, if more robust follow-up had been

3  done on the issues that Ms. Roland raised, it's possible that

4  the fraud could have been discovered; right?

5  A.  It's possible.

6  Q.  And you never told PwC about the issue or asked them to

7  follow up, did you?

8  A.  No.

9       MR. LEVINE:  Your Honor, it's noon and it's also a good

10  time for lunch.  I'm about to move to a different topic.

11       THE COURT:  Both of which are true, but I have a

12  question for you.  About how much longer do you have with this

13  witness?

14       MR. LEVINE:  My guess is 30 minutes.

15       THE COURT:  Okay.  And any --

16       MR. TURNER:  Well, I'll know better after the lunch

17  hour, Your Honor, but I would say about an hour.

18       THE COURT:  Okay.

19       MR. TURNER:  That's my best guess.

20       THE COURT:  So we will finish with this witness and get

21  on to the next witness?  The reason I'm -- one of the reasons

22  I'm asking, counsel, is trying to get a more realistic estimate

23  of when we're going to finish, because you gave me Wednesday,

24  you gave me Thursday morning.  You-all may be comfortable with

25  that vagueness, but I'm just trying to get a picture.  What do

 1 │ you think?  Are we looking at Wednesday?

 2 │         MR. LEVINE:  We are, Your Honor.

 3 │         THE COURT:  It seems that way.

 4 │         MR. LEVINE:  Yes.

 5 │         THE COURT:  We seem to be moving along rather nicely.

 6 │ Okay.

 7 │         MR. BECK:  And part of that, Your Honor, if I may, is

 8 │ that with Ms. Moore, our next witness, we have an agreement with

 9 │ CBG -- you had encouraged us to do that -- that either one of us

10 │ can call her during the damages trial if CBG is involved in the

11 │ damages trial, and we would do so by video link.  So we wouldn't

12 │ have to come back here, but she's not going to voluntarily go to

13 │ D.C., so we would arrange for a video link.  That way we won't

14 │ have to do the damages testimony today and take extra time.

15 │         THE COURT:  So she'll be shorter, is what you're

16 │ saying.

17 │         MR. BECK:  Yes.  She'll still be substantial, but

18 │ she'll be quite a bit less substantial than if we both covered

19 │ damages issues.

20 │         THE COURT:  And Bryant?  Is Bryant long or short?

21 │         MR. LEVINE:  Short.

22 │         THE COURT:  Short.

23 │         MR. LEVINE:  And we're going to reassess tonight

24 │ whether we're going to call him.  So that would make it really

25 │ short.

1       THE COURT:  It does have that effect.

2       MR. DORSEY:  Your Honor, Rufus Dorsey for Colonial

3 BancGroup.  There seems to be a missing piece.  While they're

4 talking about it being shorter, they also added a witness this

5 morning.  So I don't know what is going on with that.  I

6 thought --

7       THE COURT:  Who did you add?

8       MR. DORSEY:  Mr. Boozer.

9       MR. LEVINE:  No.  I think what we said -- Mr. Beck

10 said -- today is Tuesday? -- yesterday that it's unlikely that

11 we're going to call Mr. Boozer, but he's still there as a

12 possibility.  I still think it's highly unlikely.  We just need

13 to confer at lunch before we say that we don't need Mr. Boozer.

14       THE COURT:  Okay.  I am going to, then, count on the

15 fact that we will finish Wednesday.  Okay?  That makes a

16 difference.

17       MR. LEVINE:  Yes.

18       THE COURT:  We've got plane reservations and things

19 like that to make.

20       MR. LEVINE:  Understood.

21       THE COURT:  Okay.  I'm going to count on the fact that

22 we'll finish Wednesday.  If you think you're running into

23 trouble, let me know.  We can always arrange to go rather late

24 on Wednesday, but that's kind of grueling.  I noticed yesterday

25 when we went late, everybody was really quite tired at the end

1  of the day.  So let's take our lunch hour, and I'll see you back

2  here at one o'clock.

3          MR. LEVINE:  Thank you, Your Honor.

4          THE COURT:  You may step down.

5      (Recess was taken from 12:04 p.m. until 1:04 p.m., after

6       which proceedings continued, as follows:)

7          THE COURT:  Please be seated.

8          Whenever you're ready, counsel.

9  BY MR. LEVINE:

10  Q.  Good afternoon, Ms. Bathen.  I want to turn to another topic

11  now, a new topic.  Are you familiar with a custodial arrangement

12  involving LaSalle Bank that began in 2008?

13  A.  Yes, I am.

14  Q.  And LaSalle Bank later got bought by Bank of America;

15  correct?

16  A.  That's my understanding.

17  Q.  You may need to move the mike up again.  Sorry.

18      And I'm putting on the screen D-1558.  Starting on the

19  second page, do you recognize that is as a custodial agreement

20  among Colonial, TBW, and LaSalle?

21  A.  Yes, I do.

22  Q.  And I'm going to refer to LaSalle as Bank of America since

23  they later bought them so we don't keep on going back and forth.

24  Okay?

25  A.  Okay.

1    Q.  Under this arrangement, were loans shipped on Colonial's

2    behalf to Bank of America?

3    A.  Yes.

4    Q.  And is the way that it worked -- and that's the way it

5    worked after the custodial agreement was entered into; correct?

6    A.  Correct.

7    Q.  Did you understand that Bank of America was acting on

8    Colonial's behalf in accepting the loan?

9    A.  Yes.

10   Q.  And did you understand that Bank of America was supposed to

11   hold on to the mortgages or loans until they were paid by an end

12   investor and then send the payment to Colonial?

13   A.  I don't know if they always would have immediately gone to

14   the end investor.  I think they could have gone to Ocala

15   Funding.

16   Q.  Let me rephrase it, then.  Was Bank of America's role to

17   hold on to the mortgages until money came in for them and, when

18   that money came in, to send the money to Colonial?

19   A.  Yes.

20   Q.  And was the purpose of having a custodian like Bank of

21   America to ensure that Colonial's ownership interests in the

22   loans is protected?

23   A.  Yes, it was.

24   Q.  Did you expect -- when this arrangement went into place in

25   2008, did you expect Bank of America, as custodian for Colonial,

1  to act on Colonial's instructions?

2  A.  Yes.

3  Q.  Were you aware of any history at the time of Bank of America

4  diverting loan proceeds from clients when acting as custodian?

5  A.  No.

6  Q.  Did you expect the custodian, Bank of America, to improperly

7  divert loan proceeds from Colonial to other parties?

8  A.  No, I did not.

9  Q.  Prior to August 2009, did you discuss with anyone at

10 Colonial the possibility of Bank of America improperly diverting

11 loan proceeds from Colonial?

12 A.  No, I don't believe so.

13 Q.  Was that something that you hadn't even thought of as a

14 likely possibility?

15       MR. TURNER:  Objection, Your Honor.  Are you talking

16 about Ms. Bathen individually or Colonial?

17       MR. LEVINE:  I'm talking -- I can only ask the witness

18 what she thought of.

19 Q.  So did you even think about the likelihood of Bank of

20 America diverting proceeds contrary to Colonial's instructions?

21 A.  No.

22 Q.  Now, we talked earlier about what a shipped-not-paid loan

23 is.  Was it unusual -- was it normal to have a small quantity of

24 shipped-not-paid loans due to the time lag between shipping the

25 loan and receiving payment?

1  A.  Yes.

2  Q.  But in early August 2009, were there a large number of

3  shipped-not-paid loans showing up in collateral being held by

4  Bank of America as custodian?

5        THE COURT:  I'm sorry.  Could you repeat that.

6        MR. LEVINE:  Sure.

7  Q.  In early August of 2009, did it come to your attention that

8  there were a large number of loans marked as shipped not paid

9  that were being held by Bank of America or were supposed to be?

10  A.  I don't recall.

11  Q.  I'm going to put on the screen D-914.  And it's some e-mails

12  here.  A little bigger.  It starts out in the bottom --

13  Ms. Kissick sends an e-mail, you're copied on it, to Donna --

14  and I'm not even going to try the last name.  Let's just say

15  Donna.  To Donna.  That Donna was someone -- was Donna someone

16  from Taylor Bean or TBW?

17  A.  That's what it looks like from the e-mail address.

18  Q.  And Ms. Kissick says, Donna, in light of everything, could

19  you please make sure that LaSalle -- that's Bank of America

20  now -- sends the notes back to us that Ocala Funding has not

21  funded.

22       Do you see that?

23  A.  Yes, I do.

24  Q.  And Donna says, Sure thing.  And then there's a response

25  from Cherie Fite that you're copied on.  Was Cherie Fite one of

1  the people in the mortgage warehouse lending division?

2  A.  Yes, she was.

3  Q.  Was she in the risk control group or not?

4  A.  Yes, she was.

5  Q.  Okay.  And she said, Donna, attached is the list of all

6  outstanding loans for Ocala Funding with LaSalle.

7      And I'm not going to go through all of these, but it's

8  actually 120 pages of loans.  And if you do the math, it ends up

9  being around 5,000 loans.  That was a lot of loans to show up on

10  a shipped-not-paid list; right?

11  A.  Yes.

12  Q.  And so did Colonial attempt to send somebody, to your

13  knowledge, to TBW or to Bank of America to get the loans back in

14  early August 2009?

15  A.  I believe so.

16  Q.  Did they succeed?

17  A.  I don't -- I don't know.

18  Q.  I couldn't hear that.  I'm sorry.

19  A.  I don't know.  I don't remember.

20  Q.  Are you aware now that Bank of America did not send the

21  notes back to Colonial for almost all those loans?

22  A.  I know that was part of the whole loss that was suffered.

23  Q.  Are you aware that Bank of America, as custodian, diverted

24  loan proceeds that were supposed to go to Colonial to other TBW

25  customers or creditors?

1  A.  I believe I've heard that, yes.

2  Q.  Let me turn to another topic.  Are you aware of instances of

3  Colonial finding records of duplicate loans from TBW?

4  A.  Yes.

5  Q.  I'm going to put up on the screen D-206.  And this is a

6  series of e-mails, and you're not on these.  I just want to

7  see -- go through a little bit of it and just ask you if you

8  ever heard about this.  So on the fifth page, there is an e-mail

9  from Cherie Fite we just mentioned.  She was in the risk control

10  group that ultimately -- within mortgage warehouse lending that

11  ultimately reported to you; right?

12  A.  Right.

13  Q.  And she says -- sends an e-mail to Desiree Brown.  Was she

14  someone at TBW?

15  A.  Yes.  She was the treasurer of Taylor Bean.

16  Q.  And she said, these are two loans that were recently added

17  for TBW.  Both these borrowers have had loans that show in our

18  system several times for these properties.  Do you see that?

19  A.  Yes.

20  Q.  When you have a loan that's showing up several times for the

21  same property, does that suggest there might be an issue?

22  A.  It's possible.

23  Q.  And why is that an issue?

24  A.  Well, there should only be one first-lien mortgage on a home

25  at a time.

1  Q.  Right.  And if you see one mortgage, then another mortgage,

2  then another mortgage showing up on the exact same address, it

3  suggests there might be a problem there; right?

4  A.  Or it could be refinancing repeatedly.

5  Q.  Could be if it happens over and over again, but that's

6  something that's worth looking into; right?

7  A.  That's why I think she was looking into it.

8  Q.  And Ms. Fite wrote on the second page here, for TBW only, it

9  is her suggestion that the risk control analyst should perform a

10  review of duplicated addresses every two weeks using the system

11  data from the prior two weeks of activity.

12      Do you know if that happened?

13          THE COURT:  Wait.  What's the number on this?

14          MR. LEVINE:  D-206.

15          THE COURT:  And the other was?  Or was it all on the

16  same --

17          MR. LEVINE:  It's all part of the same.  It's just many

18  pages of an e-mail string.

19  A.  I don't know.

20  Q.  Okay.  And then on the first page here, Mr. Bryant writes to

21  Ms. Fite and Mr. Beahler, I want to think about this for a bit.

22  I guess I still have concerns on all duplicate loans.

23      Do you see that?

24  A.  I do.

25  Q.  Did Mr. Bryant make you aware of his concerns on duplicate

1  TBW loans discovered by Ms. Fite?

2  A.  I don't recall that.

3  Q.  All right.  Let's turn to another issue with loans.  There's

4  been some testimony in this case about Pam Vitto.  You knew Pam

5  Vitto; right?

6  A.  Yes.

7  Q.  What was her job when you were there?

8  A.  She was within the internal audit department, and she was

9  permanently assigned to the mortgage warehouse group.

10 Q.  I want to make sure I've got it straight, because it's been

11 a little unclear so far.  Ms. Vitto was assigned to mortgage

12 warehouse lending; right?

13 A.  Yes.

14 Q.  But was she in your risk -- the risk control that used to be

15 compliance group that you -- that was reporting to you?

16 A.  No, she was not.

17 Q.  And what group was she in?

18 A.  She was a part of internal audit.

19 Q.  So she was in this other group that was looking at things

20 within the company.

21 A.  Yes.

22 Q.  And who did she report to, if you know?

23 A.  Tommy Tynes.

24 Q.  And before that, was it Young Boozer?

25 A.  Yes, it was.

1  Q.  Did Ms. Vitto have a prescribed audit plan that she followed

2  at mortgage warehouse lending?

3  A.  Yes, she did.

4  Q.  Did Ms. Vitto prepare reports summarizing her findings on a

5  monthly basis?

6  A.  Yes, she did.

7  Q.  Were you in some ways a go-between between Ms. Vitto and the

8  mortgage warehouse lending division?

9  A.  Yes, I was, at -- once I was responsible for the risk

10  control group.

11  Q.  Sure.  Starting in October 2008.

12  A.  Right.

13  Q.  Was Ms. Vitto very thorough?

14  A.  Yes.

15  Q.  Do you -- did you have any criticisms of Ms. Vitto's work?

16  A.  No, I don't.

17  Q.  Did you ever find anything that Ms. Vitto did or provided to

18  be unsatisfactory?

19  A.  No.

20  Q.  Did Ms. Vitto have wide-ranging responsibilities to assess

21  the operations of the mortgage warehouse lending operation?

22  A.  Yes, she did.

23  Q.  In doing her work, did you understand that Ms. Vitto looked

24  at documents and records and files?

25  A.  I believe so.

1  Q.  From time to time, would Ms. Vitto bring to your attention

2  problems she found with TBW loans?

3  A.  Yes.

4  Q.  I'm going to put on the screen D-182.  This is a

5  September 15, 2008, e-mail from Ms. Vitto to you and Cathie

6  Kissick with a copy to Tommy Tynes; right?

7  A.  Right.

8  Q.  And she writes that she wants to send at least information

9  that at this time looks like it will be derogatory in the

10 report.  It has to do with construction loans that were

11 transferred from TBW's Wachovia line to Colonial's COLB

12 construction in August 2007.

13    So let's just talk about -- back up and talk about that for

14 a minute.  What was the TBW Wachovia line?

15 A.  They previously had provided funding for Taylor Bean.

16 Wachovia.

17 Q.  Wachovia did?

18 A.  Yeah.

19 Q.  And that was one of the large banks that got taken over, I

20 think, after the -- during the financial crisis; is that right?

21 A.  Yes.

22 Q.  And it refers then to Colonial's COLB construction.  What's

23 Colonial's COLB construction?

24 A.  It's similar to the COLB agreement except the time period in

25 which we would hold it would have been a longer period of time.

1   We would hold it during the construction period.  And then when

2   it was moved on to -- construction was complete and it moved to

3   a permanent status, that's when the loan would be sold.

4   Q.  So is that -- are these construction loans?

5   A.  They are.

6   Q.  For homes or businesses or what?

7   A.  Residential construction loans that are permanent that --

8   their structure was that they were construction-to-permanent

9   loans.  So it was kind of a one-close situation.  It would move

10  into the permanent mortgage.

11  Q.  Once the house got built and construction ended, then it

12  would become a permanent loan?

13  A.  Yes.

14  Q.  And that's when Colonial -- and that's when it would be

15  sold?

16  A.  Yes.

17  Q.  Is that when it would be sold to Colonial or when it would

18  be sold to the end investor?

19  A.  Sold to the end investor.

20  Q.  In the meantime, Colonial held on to it during construction?

21  A.  Yes.

22  Q.  So moving on, then, Ms. Vitto writes that during her

23  research, she decided to search the county's website on a

24  limited number of the properties and found that one property,

25  information below, is actually property owned by TBW since they

1   took a deed in lieu of foreclosure on August 30, 2007.

2       So that means there was a TBW construction loan on -- for

3   that property; is that right?

4   A.  Yes.

5   Q.  And it had been sold to -- the 99 percent interest had been

6   sold to Colonial under COLB?

7   A.  Yes.

8   Q.  And it was listed on the Promerit system?

9   A.  Yes, it would have been.

10  Q.  But then TBW foreclosed on it and owned the property is what

11  she found; right?

12  A.  That's what she said.  Yeah.

13  Q.  If a construction loan has already been foreclosed on by

14  TBW, does that -- what happens to the value of the -- what does

15  that mean for the loan that's listed on the Promerit schedule

16  for Colonial?

17  A.  It's worthless.

18  Q.  What's that?

19  A.  If they foreclosed on it, there is no more mortgage.  It's

20  worthless.

21  Q.  Worthless.  So that's -- you know, if that was happening,

22  that could be a concern; right?

23  A.  Absolutely.

24  Q.  And did you share that with PwC?

25  A.  No.

1  Q.  Let's look, then, a day later, September 16th, 2008.  D-184.

2  And here Ms. Vitto writes to Ms. Kissick and Mr. Bryant with a

3  copy to you and Mr. Tynes the following day.  After I found the

4  initial problem that I brought to your attention yesterday, I

5  decided to at least review the remaining properties that had

6  construction inspection certificates that appeared bogus or at

7  least suspect.

8       Do you see that?

9  A.  I do.

10  Q.  And then after that, she says, in the next paragraph, Based

11  on these findings, it appears that further research, independent

12  of Taylor Bean, needs to be done.  If the information is

13  correct, it would appear that possible fraud by someone was

14  committed when the Bank purchased an interest in these

15  mortgages.  Then she adds:  As I stated, I did not review all

16  the properties, just those that the certificate appeared

17  suspicious.  And then there's some information on loans listed

18  below that; right?

19  A.  Yes.

20  Q.  Was this e-mail alarming to you?

21  A.  Yes, it was.

22  Q.  In response, did you talk to Ms. Kissick?

23  A.  I did.

24  Q.  Did you just rely on what Ms. Kissick told you about it?

25  A.  We went to Taylor Bean and --

1    THE COURT:  I'm sorry.  I can't hear you.

2    THE WITNESS:  I'm sorry.

3  A.  We went to Taylor Bean, and the construction loans were paid

4  off.

5  Q.  The construction loans were paid off?

6  A.  I mean, these construction COLBs were -- they paid us our

7  money back.

8  Q.  So let me get -- so Taylor Bean told you, here, take some

9  money.  We'll pay off the loans.  And did you ever do further

10  investigation to see how that -- how it got to be the situation

11  in the first place?

12  A.  They said there was a problem internally that they had dealt

13  with.

14  Q.  So you just accepted the explanation there was an internal

15  problem without doing further research to see what was causing

16  what Ms. Vitto called a possible fraud with suspicious

17  certificates; correct?

18  A.  Correct.

19  Q.  Did you ever tell PwC about Ms. Vitto's concerns about what

20  she called a possible fraud?

21  A.  No, but it was in her final report.

22  Q.  Did you tell PwC about Ms. Vitto's e-mail that was alarming

23  to you?

24  A.  No.

25  Q.  Let's turn to P-2046.

```
1              THE COURT:  Wait.  Let me just ask.

2              MR. LEVINE:  I'm sorry.

3              THE COURT:  Vitto indicated she only checked some of

4    the certificates.  Did anyone check the rest of the

5    certificates?

6              THE WITNESS:  I believe I checked some more of them.

7              THE COURT:  And did they turn out to be authentic or

8    what?

9              THE WITNESS:  I think we found similar problems, not

10   with all of them, but there were --

11             THE COURT:  And did you get reimbursed for those?

12             THE WITNESS:  Yes.

13   BY MR. LEVINE:

14   Q.  Did you follow up, then, to see what had caused the problems

15   with the other loans?

16   A.  It was all part of the same problem with an employee at

17   Taylor Bean.

18   Q.  Let's look at P-2046.  This is -- let me -- this is e-mails

19   back and forth.  We start with one from Ms. Kissick to you and

20   Ms. Vitto, and then from you back to Ms. Kissick.  I'm going to,

21   again, go in order.  And here, actually there's an e-mail from

22   Ms. Vitto too.  So Ms. Vitto wrote on October 15th, about a

23   month later, When reviewing aged collateral, I came across

24   information that the property on TBW's COLB facility for

25   Mahak -- I'm not even going to try -- for a long word that
```

1 begins with M was foreclosed on by TBW in June 2008.

2     Is that right?

3 A.  That's what it says.

4 Q.  What's that?

5 A.  Yes.

6 Q.  Is that part of the construction facility for COLB or

7 different ones?

8 A.  I don't know.  I would assume it's COLB.

9 Q.  Regular COLB, not construction COLB?

10 A.  I'm assuming, because she didn't identify it as construction

11 COLB.

12 Q.  Okay.  And then in response to that, you write on the top

13 thing that I blew up, the top part of blow-up, to Cathie

14 Kissick.  And you wrote, On the attached loan they foreclosed

15 on, it was in COLB.  And since it was originated prior to

16 June 30, 2008, we asked for next payment due.  We were told its

17 next payment due date was September 1st, 2008, which, of course,

18 is impossible if it was foreclosed on in June.

19     So what you had is you had information that there was a

20 foreclosure in June, but the information you were getting from

21 TBW, it showed that there was money that was going to get paid

22 in September; right?

23 A.  Right.

24 Q.  And you asked -- you said, I want risk control to pull a 20

25 percent sample of all the loans originated prior to June 30,

1   2008, WH or COLB.  WH is warehouse?

2   A.   Warehouse line.

3   Q.   And ask TBW to give us a printout off their servicing system

4   of each of these loans to show us their pay history.

5       Did that happen?

6   A.   I don't recall.

7   Q.   Did you -- so let's actually go to the same day, P-2047.

8   There's some highlighting on here.  It's not mine.  That's just

9   the way the document is as an exhibit.  It may have been -- I

10  assume that's how it was highlighted in the file.  And at 2047,

11  there is an e-mail from you to Mr. Bryant and Mr. Beahler.  And

12  they're both in the risk control group at mortgage warehouse

13  lending; right?

14  A.   Yes.

15  Q.   And it's on this -- the attachment is this long name that

16  begins with an M that we saw in the last document; right?  You

17  see under attachments?  I'll put the cursor there.

18  A.   Oh, yes.

19  Q.   And in the part that I highlighted, the second paragraph, it

20  refers to, Also Pam pulled county records on six aged loans and

21  found that -- found on that was on TBW's COLB that had been

22  foreclosed on in June, see attached.  They told us in September

23  that the next payment due date on this loan was September 1,

24  2008.

25      That's what we just looked at in the e-mail that we saw that

1  was 2046; right?

2  A.  Right.

3  Q.  And what you wrote after that was, That sincerely concerns

4  me.  Right?

5  A.  Yes.

6  Q.  And that did sincerely concern you, what you were seeing,

7  didn't it?

8  A.  Yes, it did.

9  Q.  Did you share this e-mail exchange with PwC?

10  A.  No.

11  Q.  And your concern, by the way, was that it was inappropriate

12  collateral; right?

13  A.  Right.

14  Q.  And did you have a heightened sense -- or a heightened

15  awareness after this?

16  A.  I did.

17  Q.  Did you tell PwC about your sincere concerns or heightened

18  awareness?

19  A.  No, I didn't.

20  Q.  Did you tell PwC that you found something that might be

21  inappropriate collateral?

22  A.  No.

23  Q.  Let's turn to D-32.  We have -- again, it's a series of

24  e-mails back and forth.  I'm pulling one out of D-32.  It's an

25  e-mail from Pam Vitto to Cathie Kissick with a copy to you.  And

1  now we're a few months later, January 9th of 2009.  And

2  Ms. Vitto says, I seem to have found an anomaly in TBW's

3  portfolio that I'm sure has an easy explanation.  And she

4  explains, The short synopsis is that all three loans found have

5  the same following criteria -- and I've highlighted three of the

6  five criteria -- the borrower's name, address, note amount, and

7  rate are always the same; each funding has a different loan ID;

8  and since my criteria for searching was December 31 of '08, all

9  the loans were last repaid on December 31, '08, and refinanced

10 on 12/31/08.

11     What does it mean when all the loans have last repaid and

12 refinanced on the same date?

13 A.  I'm -- I'm not sure.

14 Q.  Well, you did see these -- this reference to three different

15 loans that have the same borrower name, address, note amount, et

16 cetera; right?

17 A.  Right.

18 Q.  Did this alarm you?

19 A.  Yes.

20 Q.  And what Ms. Vitto is describing here on January 9th of 2009

21 could be a sign of fraud, couldn't it?

22 A.  Could be.

23 Q.  Did you talk to Ms. Kissick about the issues raised by

24 Ms. Vitto?

25 A.  Yes.

1  Q.  Based on that, did you view the problems identified in

2  Ms. Vitto's e-mails as just isolated occurrences, according to

3  Ms. Kissick?

4  A.  Possibly.

5  Q.  Did you tell PwC about something that Ms. Vitto found that

6  could be a sign of fraud?

7  A.  No, I did not.

8  Q.  Did you discuss the issues that were raised by Ms. Vitto

9  with Mr. Hosein, the treasurer?

10  A.  I would think I -- yes.  I don't know remember a specific

11  instance of it, but it's the kind of thing I would have

12  shared with --

13  Q.  Did you discuss the issues raised by Ms. Vitto with anyone

14  else in Montgomery other than Mr. Hosein?

15  A.  I don't believe so.

16  Q.  And just so it's clear, you were working in Montgomery,

17  Alabama, at the time; right?

18  A.  Yes.

19  Q.  And Ms. Kissick and the mortgage warehouse lending division

20  were all in Florida?

21  A.  Orlando.

22  Q.  Orlando, Florida.  Right.  And so the issues raised by

23  Ms. Vitto you talked about with Mr. Hosein but not others in

24  Montgomery; right?

25  A.  Correct.

1    Q.   Often when Ms. Vitto or someone in risk control found a

2    problem, the way it would get -- with TBW, the way it would get

3    resolved is simply by the loans at issue being paid off; right?

4    A.   Yes.

5    Q.   Without looking at the -- what the underlying issue is;

6    right?

7    A.   We would accept the story -- the description of what

8    happened from Taylor Bean and from Cathie.

9    Q.   Ms. Bathen, were issues raised by Ms. Vitto not always

10   looked at as carefully as they should have been by the people

11   who read her reports?

12   A.   I'm sure that's possible.

13   Q.   Well, it's more than just possible.  That's your view, isn't

14   it?

15   A.   Yes.

16   Q.   I couldn't hear.  I'm sorry.

17   A.   Yes.

18   Q.   And that includes you too; right?

19   A.   Yes.

20   Q.   Did you ever inform PwC about the issues that Ms. Vitto

21   found to see if they could do more follow-up?

22   A.   No.

23   Q.   So knowing about the duplicate loans that Ms. Vitto found,

24   the pay-down issues that Ms. Roland found, and not getting loan

25   level details quickly from -- on AOT from Ms. Kissick all

1 happening at once, did you put it all together and think there

2 was a fraud?

3 A.  It wasn't all happening at once, and there was a lot of

4 other things going on.  But, no, I did not put it together, and

5 I did not think there was a fraud.

6 Q.  When the FDIC came in for its targeted examinations, did you

7 share issues that had arisen with respect to the TBW

8 transactions?

9 A.  No.

10 Q.  And the same is true with PwC.  When they came in, did you

11 share with PwC the concerns and suspicions that had been

12 raised -- that had arisen with respect to TBW?

13 A.  No.

14 Q.  In response to questions from people outside the company,

15 did you just tend to answer the questions that you were asked?

16 A.  That's -- I answered questions.  Yes.

17 　　　　　MR. LEVINE:  Nothing further.

18 　　　　　THE COURT:  Whenever you're ready, counsel.

19 　　　　　MR. TURNER:  Thank you, Judge.

20 　　　　　　　　　　　　CROSS-EXAMINATION

21 BY MR. TURNER:

22 Q.  Ms. Bathen, how are you?  You doing all right?

23 A.  I'm hang anything there.

24 Q.  All right.  The end is in sight.  Now, I may bounce around a

25 little bit, because I'm going to try to ask you some questions

1  with respect to some of the issues that have been brought up by

2  counsel for PwC.  But I would like to start out by -- I think I

3  would like to clear something up.  You talked about COLB loans

4  being in the vault on six or seven.  Do you recall that

5  testimony?

6  A.  I do.

7  Q.  Okay.  But isn't it true that when the loans were ultimately

8  sold to an end investor -- Fannie Mae, Ginnie Mac, one of

9  those -- where did the loans go?

10  A.  They went to the end investor.

11  Q.  Did they go down to the vault?

12  A.  Only if the -- only if the custody group was going to be the

13  final custodian for the security itself.

14  Q.  For example, Fannie Mae.  If it was Fannie Mae and they were

15  the end custodian and the custodian, it would go down to the

16  vault; right?

17  A.  Yeah.  I believe it -- much more likely, it was Freddie Mac.

18  Q.  Freddie Mac.  Thank you.

19      In prior testimony, I believe you referred to the custody

20  department -- used the phrase "Chinese wall."  Do you recall

21  that?

22  A.  I do.

23  Q.  Could you explain to the Court what you mean by that.

24  A.  That there was a separation of duties and responsibilities.

25  They were essentially a trust function, and so they had -- even

1  though there was a reporting relationship with Ms. Hawkins and

2  Dawkins to Cathie, they had the responsibility within all the

3  documents -- all the custody agreements that they entered into

4  to follow those rules and regulations.

5  Q.  So let's talk about some of the issues that have been raised

6  in previous -- in your testimony this morning.  One of the

7  issues was the issue of loans moving from COLB to at AOT.  Do

8  you recall that?

9  A.  I do.

10 Q.  And do you recall that you received or Colonial received in

11 September of 2007 a letter from the OCC?  Do you recall that?

12 A.  I do.

13 Q.  Okay.

14      MR. TURNER:  Rami, could we put up 2644, please.

15 Q.  And, ma'am --

16      MR. TURNER:  If we could blow that up just a little

17 bit, Rami.

18 Q.  Is this the letter you were remembering, ma'am?

19 A.  Yes.

20 Q.  And on the second page of this letter, theres an issue

21 raised with respect to aging.  Do you recall that?

22 A.  Yes, I do.

23 Q.  All right.  What do you recall about that issue?

24 A.  That there were certain customers -- and Bayrock Mortgage

25 being one of the ones most concerned about -- that had loans

1  that had been on the COLB line for an extended period of time.

2  Q.  And the issue with respect to COLB loans being moved to AOT

3  that you talked about with counsel today, did it have anything

4  to do with the mortgages that were -- or the loan originators

5  that are referenced in this letter?

6  A.  I don't -- I don't think so.  I'm not sure who all was

7  referenced, but my recollection was it was mostly Bayrock.

8  Q.  Is there any problem with moving loans from COLB to AOT?

9  A.  No.

10  Q.  Did it happen often?

11  A.  Yes.

12  Q.  And was there anything unusual about that?

13  A.  No.  It would have been in Taylor Bean's interests.  It was

14  a lower rate that they had to pay on an AOT loan, so it was in

15  their interest, if they had sold it into a security, to move it

16  over to the AOT line.

17  Q.  Ma'am, do you have an understanding that PwC has accused you

18  of hiding aged loans on AOT?

19  A.  No.

20  Q.  Well, let me show you something, then.

21       MR. TURNER:  Rami, could we put up that demonstrative,

22  please.

23  Q.  This is a pleading that has been filed in this case by PwC

24  responding to a summary judgment that my client filed.

25       MR. TURNER:  Could we pull out the --

1  Q.  And in this, it says, Some bank managers, including Kamal

2  Hosein and Mary Lou Bathen, knew that COLB -- knew that aged

3  COLB loans were being hidden on AOT where they knew loan-level

4  detail was not tracked.

5      Ms. Bathen, did you know that aged loans were being hidden

6  on AOT?

7  A.  No.  I knew loans had been moved from COLB to AOT.

8  Q.  Did this --

9          THE COURT:  Those loans were moved after the OCC

10 letter?

11         THE WITNESS:  Those are transactions that could happen

12 all the time.  I'm -- I just wasn't familiar with wholesale

13 transfer.

14 Q.  Well, let's take a look.  You understand that -- after the

15 OCC raised the issue, did you provide some aging information to

16 the OCC?

17 A.  Yes, I did.

18 Q.  And was that information provided to -- was that information

19 provided after those loans had been moved off of the COLB line

20 to AOT?

21 A.  I don't know.

22 Q.  Okay.  Well, let's take a look at what you sent to the OCC,

23 if we could.  That's going to be P-2037.  Do you recognize this

24 e-mail, ma'am?

25 A.  I do.

1  Q.  Okay.  And it's an e-mail from you to Sarah Moore.  You're

2  saying, Attached is the COLB aging report as of 9/17/07 that has

3  been provided to the OCC.

4      Do you see that?

5  A.  I do.

6  Q.  Okay.  And attached to that is the information that you were

7  providing to the OCC; correct?  Do you see that?

8  A.  Yes.

9  Q.  All right.  Well, let's look at it.  It says, COLB aging

10 reports for collateral aging summary.  Do you see that?

11 A.  Yes.

12 Q.  And you go down, and there's a line for TBW.  Do you see

13 that?

14 A.  Yes, I do.

15 Q.  All right.  Do you see that in that line, what you're

16 reporting to the OCC is that there's a grand total of 8,990

17 loans totaling about $1.1 billion; right?

18 A.  Right.

19 Q.  And if you could explain to the Court how this -- how these

20 columns work.  The zero to 90 days, what are we looking at here?

21 A.  There's just -- those are subsets of that total amount.  How

22 many loans in each of those time buckets.  So how many had been

23 on the line for zero to 90 days, how many had been on the line

24 91 to 120, and so on.

25 Q.  Okay.  So -- and we did a little math here.

1          MR. TURNER:  So could we see the next one?

2    Q.  By our calculations -- and we can get a calculator if we

3    need to -- there are 4,363 loans 90 days.  You're telling the

4    OCC there were $348 million in aged loans on COLB; correct?

5    A.  Yes.  I'm going to take your math.

6    Q.  All right.  And then next --

7          MR. TURNER:  If we could have the next one, Rami,

8    please.

9    Q.  And, in fact, 3,639 of those loans are aged 120 days, aren't

10   they?

11   A.  Yes.

12   Q.  And that's $217 million.

13   A.  Yes, it is.

14   Q.  So would you agree with me that if your goal was to hide

15   aged loans from the OCC, that you didn't do a very good job of

16   it?

17         MR. LEVINE:  Objection.  Leading.

18   Q.  Did you show the OCC that there were an enormous amount of

19   aged loans on COLB?

20   A.  Yes.

21   Q.  Did you hide that from the OCC?

22   A.  No.

23   Q.  Did you or Mr. Hosein -- did you move loans from COLB to AOT

24   to hide things from the OCC?

25   A.  No.

1      MR. LEVINE:  Objection.  Lacks foundation on

2   Mr. Hosein.

3      THE COURT:  Okay.  And sustained as leading.

4   Q.  Now, on the loans that were moved from COLB to AOT, did you

5   believe they had an investor commitment?

6   A.  Yes, I did.

7   Q.  Why did you -- what led you to believe that?

8   A.  I was provided with them.

9   Q.  Okay.

10      MR. TURNER:  Well, if we could, could we look at

11   P-1689.  And this is -- what page is this, Rami?  Page 1?  Okay.

12   Q.  This is a stack of investor commitments.

13      MR. TURNER:  Could we go to 434.

14   Q.  And is this -- ma'am, is this what you refer to as an

15   investor commitment?

16   A.  Yes.

17   Q.  And this is -- is this what you looked at as you testified

18   earlier today when Mr. Hosein asked you to start looking at

19   investor commitments?  Is this the document -- the types of

20   documents you were looking at?

21   A.  Yes, it is.

22   Q.  All right.

23      MR. TURNER:  And if we could go to the next one, Rami,

24   please.

25   Q.  This is -- again, is this one of the trade assignment

1  agreements that you were provided as it relates to the loans

2  that were being moved from COLB to AOT in September of 2007?

3  A.  It's ones that were on AOT at that time.

4  Q.  All right.  And there's a couple more.  I don't think we

5  need to keep going through them.  So you're -- as you understood

6  it, the loans that were moved from COLB to AOT had investor

7  commitments.

8  A.  Yes.

9  Q.  There was also some testimony today about efforts to get AOT

10  loan-level detail.  Do you recall that, ma'am?

11  A.  Yes, I do.

12  Q.  No doubt that one point in time, there was no individual

13  loan tracking on AOT; right?

14  A.  Right.

15        MR. LEVINE:  Objection.  Leading.

16        THE COURT:  Sustained.

17  Q.  Did you have any discussions with Ms. Kissick regarding the

18  loan-level detail on AOT and the lack of it?

19  A.  Yes, a number of conversations.

20  Q.  Could you tell us about those, please.

21  A.  I asked her for it, you know, talked to her about why it

22  wasn't on Promerit.  So just several different conversations and

23  several different e-mails.

24  Q.  All right.  Did Ms. Kissick provide an explanation as to why

25  loans were not tracked on the loan level?

1  A.  She said that they were pools of loans that were essentially

2  securities and we needed to treat them as such, much as we treat

3  securities in our investment portfolio.  We don't look at the

4  individual loans underlying them.  We look at the security as a

5  whole.

6  Q.  Did you accept that explanation?

7  A.  I did.

8  Q.  Let's talk about Ms. Kissick.  You and she were friends.

9  That was established during your testimony this morning.

10  A.  Yes.

11  Q.  But aside from the friendship, did you have a view of

12  Ms. Kissick as it relates to her ability to do her job?

13  A.  She knew more about the mortgage warehouse lending than

14  anyone else that I knew of or had heard of.  She had been doing

15  it for 15 or more years.  She was very well respected.  I felt

16  like she was very capable.

17          THE COURT:  Very what?

18          THE WITNESS:  Very capable.

19  Q.  Did you have any reason to doubt her abilities in any way?

20  A.  No.

21  Q.  Did you at any point in time have any reason to doubt that

22  she was ever telling you the truth?

23  A.  I did not think she was lying to me.

24  Q.  Okay.  At any point in time until the end; right?

25  A.  Right.

1    MR. LEVINE:  Objection.  Leading.

2    THE COURT:  Sustained.

3  Q.  Did you suspect Ms. Kissick of lying at any point in time?

4  A.  I did not suspect her of lying.

5  Q.  Did you suspect her of lying when the Bank failed?

6    THE COURT:  At what point?

7    MR. TURNER:  When the Bank failed.

8  Q.  August 3rd when the -- the raid.  Did you come to believe

9  that Ms. Kissick had been less than truthful with you?

10  A.  Yes.

11  Q.  But prior to that time, you had no reason to believe --

12  A.  I did not.

13  Q.  Okay.  So let's go back to the efforts to track loan-level

14  detail.  Well, let me back up.  There's been a lot of talk about

15  you relied on Ms. Kissick.  Did you rely on Ms. Kissick?

16  A.  Yes, I did.

17  Q.  Did you accept her word?

18  A.  Yes, I did.

19  Q.  Did you think there was anything wrong with that?

20  A.  No, I didn't.

21  Q.  And as a manager, a person in a management position, did you

22  often rely on what you were told by employees?

23  A.  Certainly.

24  Q.  Was Ms. Kissick -- did Ms. Kissick report to you?

25  A.  She did not.

1  Q.  In terms of where you guys fell on the food chain, where --

2  how did y'all stack up?

3  A.  During these later time periods, she reported to Kamal

4  Hosein, who was also my boss.  So we're peers.

5  Q.  She was a peer.  Okay.  And going back to the loan-level

6  detail, let's look at D-735.  And Ms. Bathen, I'm going to --

7  I'm going to represent and remind you that the information that

8  you provided to the OCC was done in mid-September of '07.  We

9  can go back and look at the exhibit if we need to.  All right?

10  A.  Uh-huh.

11  Q.  Could you identify this for us, please.

12  A.  It's an e-mail from Kamal to myself, Brent Sloman, who was

13  our investment portfolio manager, and Walter Hargrove, who was

14  our funding manager.

15  Q.  And what is the subject of this e-mail?

16  A.  The subject is AOT.  The topic was trying to find a way in

17  which to finance or use AOT as a means of funding.

18  Q.  And could you explain to us what that means.

19  A.  We were trying to determine if there was -- we could find

20  someone who would be interested in accepting our AOT contracts

21  as collateral to provide funding to the Bank.

22  Q.  And is that -- is that a typical treasury function?

23  A.  Yes.

24  Q.  Could you explain to the Court in general terms what the

25  treasury function at a bank does or at Colonial what it did.

1    A.  Well, responsible for the overall management of the balance

2    sheet to make sure there's sufficient capital and liquidity to

3    do a lot of planning and forecasting to measure interest rate

4    risk, any of the wholesale funding and our wholesale investment

5    portfolio.  All of those are functions under the treasurer.

6    Q.  And so Mr. Hosein, who is the treasurer; is that right?

7    A.  That's right.

8    Q.  He's asking to come up with a plan to see whether you can

9    use AOT as collateral.

10   A.  Yes.

11   Q.  Okay.  And as part of that effort, did you and Mr. Hosein

12   try to get loan-level detail on the AOT?

13   A.  Yes.

14           MR. LEVINE:  Objection.  Leading.

15           THE COURT:  Overruled.

16   A.  Yes, we did.

17   Q.  And why is that?

18   A.  Because anyone who would -- someone who would take that

19   collateral would want more detailed information on the

20   underlying loans.

21   Q.  Did you want -- or during this time frame, were you looking

22   for loan-level detail to determine whether the loans existed?

23   A.  No.

24   Q.  What were you getting it for?

25   A.  So that I could better describe the assets.

1  Q.  So, Ms. Bathen, if it's true that aged loans had been put on

2  to AOT, does it make any sense that you would be looking for

3  loan-level detail to provide to investors?

4  A.  I don't believe so.

5          MR. LEVINE:  Objection.

6          THE COURT:  Sustained.

7  Q.  So at the time that you're being accused of dumping aged

8  loans on to AOT, you were trying to get loan-level detail.

9          MR. LEVINE:  Objection.

10          THE COURT:  Counsel, it's --

11          MR. LEVINE:  Leading.

12          THE COURT:  The reason it keeps coming out leading is

13  because --

14          MR. TURNER:  It is.

15          THE COURT:  -- it's your argument that leads to

16  leading; right?

17          MR. TURNER:  I understand, Judge.  Okay.

18  Q.  Let's look at -- if I could, P-1871.  And I think we ran

19  through some of these.  Ultimately, there was a lot of

20  back-and-forth about getting loan-level detail; correct?

21  A.  Yes.

22  Q.  All right.  And did you eventually determine -- you,

23  Ms. Bathen, as assistant treasurer, did you determine that you

24  would not be financing the AOT or trying to finance the AOT?

25  A.  Yes.

1  Q.  When did that occur?

2  A.  I don't recall.

3  Q.  Can you explain to the Court why you determined that you

4  would not be financing the AOT.

5         THE COURT:  By "financing," you mean looking for

6  someone to take it as collateral and then give money to the

7  Bank?

8         MR. TURNER:  Yes, Judge.

9  Q.  And just to make sure, is that an improper use -- I mean, is

10  "financing" not the right word?

11  A.  That was a perfect description.

12         THE COURT:  Okay.  Thank you.

13         MR. TURNER:  Thank you, Judge.

14  Q.  All right.  So --

15         THE COURT:  The trouble with "financing" is it has

16  several different meanings, and that's a little confusing.

17         MR. TURNER:  Absolutely.  Okay.  Thank you.

18  Q.  So you determined ultimately that you were not going to try

19  to raise funds using the AOT as collateral; is that right?

20         MR. LEVINE:  Objection.  Leading.

21         THE COURT:  Let it stand.

22         MR. TURNER:  Thank you.

23  Q.  Did you -- I mean, and you did; correct?

24  A.  We decided that we couldn't find a place for it.  Yes.

25  Q.  And do you remember why you decided you couldn't find a

1  place for it?

2  A.  To some extent, because a significant portion of it was now

3  private label as opposed to agency securities.

4          THE COURT:  I'm sorry.  What?

5          THE WITNESS:  Nonagency pools of loans.  They would

6  have gone to a private investor.

7          THE COURT:  Like a bank.  Like a bank?

8          THE WITNESS:  Yeah, like a bank or an investment bank.

9          THE COURT:  Rather than an agency.

10         THE WITNESS:  Right.

11         THE COURT:  Why would that make a difference in your

12  decision whether to use them?

13         THE WITNESS:  Well, it was a crazy time in the mortgage

14  market.  And agency collateral was what people wanted, not --

15         THE COURT:  I see.

16         THE WITNESS:  -- not nonagency, for the quality.

17         THE COURT:  Okay.

18  Q.  Do you recall generally the time frame when it was

19  determined that you would no longer be seeking to use the AOT as

20  collateral?

21  A.  No, I don't recall.

22  Q.  And, ma'am, you ultimately did receive loan-level detail on

23  the AOT --

24  A.  Yes.

25  Q.  Did you ultimately receive loan-level detail --

1  A.  Yes, I did.

2         MR. TURNER:  Could we pull up D-780, please.  D-780.

3  Q.  Could you identify this for us, Ms. Bathen.

4  A.  It's a chain of e-mails.  Is there one in particular you

5  want -- this one?  Is from Teresa Kelly to myself wherein she

6  copied Cathie and my assistant, Jason Scruggs.  And she says,

7  Attached is a document that says AOT data.

8         MR. TURNER:  Okay.  Let's look at the attachment if we

9  could, please.

10  Q.  Is this the loan-level data that you were provided?

11  A.  Yes.

12         MR. TURNER:  Okay.  You can take that down, Rami.

13  Q.  And is it your recollection that you were provided with it

14  more than on this occasion?

15  A.  I do believe I was given it more than once.

16  Q.  During the time that you were trying to get the loan-level

17  data, there's no doubt you were experiencing difficulty.  Were

18  you experiencing difficulty getting that information?

19  A.  Yes.

20  Q.  And at any point in time did you determine that there was a

21  fraud going on?

22  A.  I did not.

23  Q.  What did you attribute the difficulty you were having?  How

24  did -- why did you think that was happening?

25  A.  You know, I don't know.  Mostly because it wasn't on

1  Promerit, which would have been easily -- then that information

2  would have been easily available.

3  Q.  Was the lack of loan-level detail on AOT a big secret?

4  A.  No.

5  Q.  If someone had come and asked you, is there loan-level

6  detail on AOT, how would you have responded?

7  A.  We did not track it that way on Promerit.

8  Q.  And if PwC had come and asked you about loan-level detail on

9  AOT, how would you have responded?

10 A.  That we tracked it at the pool level on Promerit.

11         THE COURT:  I can't hear you.

12         THE WITNESS:  I'm sorry.  That we tracked it at the

13 pool level on Promerit.

14 Q.  Did PwC ever come and ask you about that?

15 A.  I don't recall.

16 Q.  Do you recall -- did you have interactions with PwC?

17 A.  Yes.

18 Q.  How frequent were they?

19 A.  You know, during audits -- you know, I don't know how

20 frequent.

21 Q.  Was it a fairly regular event?

22 A.  Certainly more regular when an audit was going on.

23 Q.  Let's talk about your background.  You were the assistant

24 treasurer from 2003 to 2009?

25 A.  Right.

1  Q.  Do you believe that at all times when you were the assistant

2  treasurer that you fulfilled your responsibilities and

3  obligations to the Bank?

4  A.  I believe so.

5  Q.  Did what happened to the Bank -- how would you describe that

6  from a personal standpoint?  How did it impact you?

7  A.  It was devastating to live through.  It was an exceedingly

8  stressful couple of years.  And, you know, I lost money in the

9  failure of the Bank.  A lot of my friends and coworkers lost

10  money in the failure of the Bank.

11  Q.  After the Bank failed, what did you do for employment?

12  A.  I was kept on with BB&T through January of the following

13  year, and then I joined Renasant Bank.

14  Q.  How long were you kept on at BB&T?

15  A.  Until mid-January 2010.

16  Q.  So that would have been five, six months, somewhere?

17  A.  Five, six months.

18  Q.  And then you went to work for Renasant?

19  A.  Yes.

20  Q.  What did you do at Renasant at the time you went over there?

21  A.  I'm director of planning, responsible for financial planning

22  and analysis.

23        THE COURT:  I can't hear a word you're saying.

24        THE WITNESS:  Okay.

25  A.  I'm the director of planning, and I'm responsible for

1   financial planning and analysis.

2   Q.  Were you in -- did you have happen to be in Orlando at the

3   time of the FBI raid?

4   A.  Yes.  I arrived on a plane the day of the raid.  So when we

5   got off the plane, we heard that that was going on.

6   Q.  And can you describe for the Court what you personally did

7   on the day of the raid.  What was your -- what were your

8   responsibilities?

9   A.  I was just present, tried to -- I don't know.  I kind of

10  just wandered the halls and answered questions.  I know there

11  were -- I was interviewed by the FBI for -- because we had

12  concerns about -- some of the things that they were going to

13  take was the collateral that we relied on, so I know I was

14  interviewed by the FBI to describe what my concern was.

15  Q.  Did you play any role in trying to figure out what had

16  occurred in terms of the fraud?

17  A.  Yes.

18  Q.  Who did you work with in that regard?

19  A.  I reported to -- after the time -- it wasn't exactly at the

20  time of the raid, but within a day or two after, Tamara

21  Stoudemire, associate counsel, told me that I was reporting

22  directly to her in my investigation.

23  Q.  I'm not going to ask you any other questions, then, in that

24  regard.

25      Let's talk about your duties as it relates to the mortgage

1   warehouse lending division.  In 2008, I think the testimony is

2   that you became -- risk management or compliance reported to

3   you; is that right?

4   A.  That's right.

5   Q.  Prior to that time, what was your role with mortgage

6   warehouse lending division?

7   A.  I was on both of the mortgage warehouse lending credit

8   committee and the asset purchase committee.  And I worked with

9   them also because -- I don't remember the year, but we had an

10  off-balance-sheet commercial-paper conduit that we did with

11  Citigroup, and I was responsible for doing the reporting on

12  that.  And the assets of the warehouse group, the COLB assets,

13  were what we sold into that all-purpose vehicle.

14  Q.  That Citigroup securitization, did that have anything to do

15  with AOT?

16  A.  No.  Only the COLB assets were in that.

17  Q.  And approximately -- prior to 2008, approximately how much

18  of your time was spent dealing with the mortgage warehouse

19  lending division?

20  A.  I think I said probably 40 to 50 percent.

21  Q.  Okay.  And after 2008?

22  A.  Probably more like 70 percent.  It depended on what else was

23  going on.

24  Q.  Did the responsibilities that you had at mortgage warehouse

25  lending at any point in time, did it involve oversight over the

1  operations?

2  A.  No, it did not.

3  Q.  And can you explain to the Court what you understand

4  operations to mean.

5  A.  The mortgage warehouse operations was all the function

6  that -- the collateral moving in and out, the funding, and the

7  pay-downs being received.  All those functions that were the

8  operational aspects of the mortgage warehouse lending division.

9  Q.  Who was responsible for the operations of the mortgage

10 warehouse lending division?

11 A.  Ray Schultz was the operations manager.  Cathie was

12 ultimately responsible.

13 Q.  As the assistant treasurer, at any point in time from, let's

14 just say, 2003 to 2009, was it ever part of your job description

15 to audit the mortgage warehouse lending division?

16 A.  I would say it was really more of a review function, what

17 the risk control group did.  I was not part of audit.

18 Q.  Let's talk about the risk control group real briefly.  Do

19 you know whether the risk control group performed its duties and

20 obligations pursuant to any professional -- specific

21 professional standards?

22 A.  No, I don't believe they did.

23 Q.  Did you or the risk compliance group design audit procedures

24 to test for fraud?

25 A.  No.

1  Q.  Did you or the risk control group design audit procedures to

2  test the internal controls at mortgage warehouse lending

3  division?

4  A.  Yes, I believe we did.

5  Q.  You did?

6  A.  Yeah.

7  Q.  Tell me about that.

8  A.  Well, that was what we were there for, was to make sure that

9  the policies and procedures of the department were being

10  followed both by our customers and by our employees.

11  Q.  Did you, Mary Lou Bathen, you personally, have

12  responsibility for examining any collateral that was underlying

13  the mortgage warehouse lending assets?

14  A.  Not the physical collateral, no.

15  Q.  Who had those responsibilities?

16  A.  That would have eventually rolled up to Cathie Kissick.

17  Q.  Did you expect that PwC would have obligations as it relates

18  to examining collateral?

19         MR. LEVINE:  Objection.  Lacks foundation.

20         THE COURT:  Sustained.

21  Q.  Did you understand in general terms what PwC was doing for

22  the Bank?

23  A.  They were auditing our books and records.

24  Q.  Okay.  And while you don't understand the ins and outs of

25  that, did you have a general understanding of what that meant?

1  A.  A generally understanding.

2  Q.  Okay.  And did you expect that PwC would have been examining

3  the collateral?

4        MR. LEVINE:  Objection.

5        THE COURT:  Sustained.

6  A.  I don't know.

7  Q.  And you're not an accountant; is that right?

8  A.  No, I'm not.

9  Q.  You're not a CPA?

10  A.  No.

11        THE COURT:  Asked and answered, counsel.  We've been

12  through this.

13        MR. TURNER:  Okay.  I do want to address one thing,

14  Judge, if I could.

15  Q.  You're not an expert on FAS 140 or sales accounting;

16  correct?

17  A.  No.

18        THE COURT:  That's been asked also.  You're not, right?

19        THE WITNESS:  No, I'm not.

20  Q.  And as part of the true -- you talked about the true sales

21  opinions; right?

22  A.  Yes.

23  Q.  Did you also understand that PwC had a role in determining

24  whether assets should be treated as sales or loans?

25  A.  They would have had to sign off on our financial statements,

1    and that's how we showed them on our financial statements.

2    Q.  Now, you took over the compliance department in October of

3    '08; right?

4    A.  Yes.

5    Q.  And can you explain to the Court just very briefly the facts

6    and circumstances surrounding that.  How did that come about?

7    A.  Sarah Moore asked me to take on that responsibility.  And I

8    don't recall exactly what she said.  I do remember it came more

9    directly from her than even Kamal.

10   Q.  Do you know why they were asking you to take over those

11   responsibilities?

12   A.  I believe she stated she wanted more independence --

13          MR. LEVINE:  Objection.  Hearsay.

14          THE COURT:  Overruled.

15   A.  I believe she wanted more independence of that group from --

16   from the overall division.

17   Q.  Who had the compliance department been reporting to prior to

18   you?

19   A.  Cathie Kissick.

20   Q.  I think at the time that compliance came over, the name

21   changed to risk control?

22   A.  Right.

23   Q.  Is that right?  Was there any change in the function of

24   that, of that group?

25   A.  Not necessarily.  We just felt like that was a better

1  description of what we were trying to do.

2  Q.  Do you remember Ms. -- was Ms. Kissick unhappy about the

3  change?

4  A.  Yes, she was.

5       MR. TURNER:  Could we put up D-809, please.

6  Q.  Do you remember this e-mail exchange?

7  A.  Yes, I do.

8  Q.  Okay.  Let's go down to the bottom.  And it's an e-mail from

9  you -- from Cathie to you.

10      MR. TURNER:  Actually, let's go down even lower than

11 that.  I'm sorry, Rami.  Second page.

12 Q.  And this is an e-mail from you to Cathie.  You're copying

13 Kamal.  You said that you just spoke to Sarah and Tommy.  Is

14 that Tommy Tynes?

15 A.  Tommy Tynes.

16 Q.  And need to speak to you about reporting structure and my

17 role.  Correct?  Is that what you said?  And I want you to be

18 able to spin this however you want, and we can just say this

19 increases the independence of compliance.  Did I read that

20 correctly?

21 A.  Uh-huh.

22 Q.  Were you concerned that Ms. Kissick was going to be upset

23 with this change?

24 A.  Yes, I was.

25 Q.  Why is that?

1   A.  She liked having the whole group together.  She did not want

2   there to be any kind of adversarial relationship between that

3   group and the rest of the operations group, so she wanted it to

4   be a part of the department.

5   Q.  Let's go up to her response to you.  And she says, This is

6   very disheartening to me.  And then she says, I started this

7   division, created the compliance rules, and now I'm being

8   connected to the curb.

9       Is that consistent with your recollection that she did

10  create the compliance rules?

11  A.  Oh, sure.  Yes.

12  Q.  She did?

13  A.  Yes.

14  Q.  And she's talking about being kicked to the curb.  Is that

15  pretty consistent with the tone of many of Ms. Kissick's

16  e-mails?

17          MR. LEVINE:  Objection.  Leading.

18          THE COURT:  Sustained.

19  A.  She's colorful in her --

20          THE COURT:  Wait.  Wait.  Counsel --

21  Q.  I need to ask another question.

22  A.  Sorry.

23  Q.  Did you find Ms. Kissick to often be dramatic?

24  A.  Yes, I did.

25  Q.  And is this an example of her being dramatic?

1  A.  Yes.

2  Q.  There's been some talk about the compliance department and

3  the field examiner reports.  Do you recall that?

4     Let me ask it this way.  In the compliance department, did

5  it conduct field examiner reviews of customers?

6  A.  Yes.  I believe if -- I wasn't sure what we called it, but

7  where Terry Bryant went out and -- to the customers and did

8  certain procedures.

9  Q.  And do you know what kinds of procedures were typically done

10  in connection with those reviews?

11  A.  I don't recall all the different things that he did.  It

12  was -- you know, a page-long list of different functions that he

13  would request and get, you know, things like just making sure

14  they were properly insured and licensed and then other things

15  along the lines of whether they were performing according to our

16  agreements.

17          THE COURT:  Performing according to what?

18          THE WITNESS:  Our various agreements, like with COLB.

19  Q.  And was -- to your knowledge, were these field examiner

20  reports done pursuant to any professional standards?

21  A.  Not to my knowledge.

22          THE COURT:  She doesn't know about them, so let's go

23  on.

24  Q.  There's been some talk about the collateral and the

25  collateral analysts.  Can you explain what the role of a

PATRICIA G. STARKIE, OFFICIAL COURT REPORTER

1  collateral analyst was at the mortgage warehouse lending

2  division?

3  A.  Their role was to accept the documents in that represented

4  the collateral and say that they had them so they could tell the

5  funds administrators to send the funds to the customer.

6  Q.  Who was the collateral analyst for TBW?

7  A.  Teresa Kelly.

8  Q.  Anybody else perform that role?

9  A.  I believe she had a staff.

10       MR. TURNER:  Could we put up D-166, please, Rami.  And

11  could we blow that up.

12  Q.  This is an e-mail from Ms. Kelly.  You're asking about AOT

13  balances.  And down there at the bottom -- or at the middle, We

14  have possession.  Do you see that?  Was that your understanding,

15  that you had possession of the collateral for both private label

16  and agency securities?

17  A.  Yes.

18       MR. LEVINE:  Objection.  Leaked.

19  Q.  Is that consistent with your recollection?

20  A.  Yes, it is.

21  Q.  Thank you.  Let's talk about the funds administrator review.

22  Was the funds administrator review -- it was not an audit

23  procedure.

24  A.  No, it was not.

25       MR. TURNER:  Could we pull up D-30, please.  And this

1 is when you became aware -- I think you may have talked about

2 this, but I'm just trying to set the stage. I think you talked

3 to counsel about this. This is when you first became aware of

4 the issue; is that right?

5          THE COURT:  What issue?

6          MR. TURNER:  The funds administrator review.

7 Q.  Ma'am?

8 A.  Yeah.  I was just trying to read it.

9 Q.  Sure.  No problem.

10 A.  Yes, I believe so.

11 Q.  Okay.  So you received this e-mail at 8:58 a.m.?

12 A.  Yes.

13          MR. TURNER:  If we could go to P-2063, please.

14 Q.  And this is also an e-mail exchange that I think you've gone

15 over with counsel, but I want to talk about some things that

16 weren't discussed.  I want to talk about your e-mail to

17 Ms. Roland, which is in the middle.  You get -- first of all, I

18 guess you get an e-mail from Ms. Roland at 12:35 p.m.

19          MR. TURNER:  Could we look at that, Rami, please?

20 Q.  And this is the e-mail that you spent some time on with

21 counsel.  She's alerting you to the issue.

22 A.  Right.

23 Q.  Now let's look at your response.  And six hours later, you

24 are responding to her; is that right?

25 A.  Yes.

1  Q.  Okay.  And this indicates that you spoke to Ms. Kissick.

2  I'm not just going to sit here and read this explanation into

3  the record.  What I would really like you to do is, if you

4  could, read it and then explain to the Court what Ms. Kissick

5  was telling you.

6  A.  I'm trying to think about how to say this simply.

7  Q.  Sure.

8  A.  First of all, I was talk -- what Cathie had said was that

9  CSFB and Ocala Funding are both other funding vehicles.  They're

10 not investors in this instance.  And what I was describing is

11 that CSFB, they would only advance 90 percent of the amount of

12 the loan or the value of the loan, and we were advancing 99

13 percent.  So there's going to be a negative haircut that -- when

14 they advance it, they're only going to advance 90 percent.  So

15 the other 9 percent has to come from Taylor Bean.  Same with

16 Ocala Funding.  I thought that that was at 97 percent.  So that

17 was the main thing, is that because -- that was the main thing I

18 took away was that the transfer, when it had to do with those

19 two, that there would be a reason for the negative haircuts.

20      THE COURT:  What does this mean?  I think the

21 settlement on the hedges is often the large positive offset.

22 What's that mean?

23      THE WITNESS:  Mortgage originators make commitments to

24 the mortgage -- I'm going to say the wrong word -- when you go

25 as a borrower, you go in and it takes an amount of time to get

1  the mortgage done.  And you might lock in a rate prior to the

2  closing of that mortgage.  And there's a certain amount of loans

3  that will fund and a certain amount that won't, but they're now

4  committed to giving you that rate.  If the market moved and

5  they -- you know, if rates went up and they had committed to

6  lower-rate loans, then the value of those loans would have gone

7  down.  So they had a process whereby they hedged that pipeline

8  of loans.  And so that's what I think I was talking about, that

9  the settlement on the hedges would be the offset to any loss on

10 the loans themselves.

11 Q.  Let me ask you this.  Did the explanation that Ms. Kissick

12 provided, did it make sense to you?

13 A.  It did.

14 Q.  And in addition to providing the explanation, did you take

15 some other steps as evidenced by this e-mail?

16 A.  Yeah.  I believe that I told Sarah I wanted to see her

17 procedures.  I wanted her to go over them with me and we would

18 talk about it more.

19 Q.  Did you take this issue seriously?

20 A.  Yes, I did.

21 Q.  Let's look at --

22         THE COURT:  Let me just ask you.  Why would it make

23 sense -- if Colonial was taking 99 percent and others are taking

24 90 percent, that's the case -- that's been the case presumably

25 all along.  Colonial was always doing 99 percent; right?

 1          THE WITNESS:  Yes.

 2          THE COURT:  So at least the description she gave for

 3 the negatives was far more than just a 9 percent difference;

 4 right?  I mean, the negatives she was concerned about was

 5 something totally different; right?  It didn't match up.

 6          THE WITNESS:  Yeah.

 7          THE COURT:  So why were you convinced that that e-mail

 8 or whatever she told you solved the whole problem?

 9          THE WITNESS:  I'm not sure.  At the time, I thought I

10 had an explanation.

11          THE COURT:  Okay.

12          MR. TURNER:  So let's look at P-2081, please, Rami.

13          THE COURT:  I'm sorry.  P what?

14          MR. TURNER:  P-2081.

15          And if we could go to the second page, Rami, at the

16 bottom.

17 Q.  This is an e-mail from you to Ms. Roland and Terry Bryant.

18 And you're asking -- what are you asking Ms. Roland to do?

19 A.  To set up a call with the funds administrators who were

20 responsible for Taylor Bean and also their boss and their boss's

21 boss, Christine and Joyce, so that we can talk about Taylor

22 Bean.

23          MR. TURNER:  And if we could look at D-190.  And go to

24 the -- sorry -- go to the second page, please.

25 Q.  And you're listed as a copy on this.  And just cutting to

1  the chase, this is Ms. Roland setting up the call you requested.

2  A.  Yes.

3  Q.  You're still -- you are following up on this issue.

4  A.  Yes, I was.

5  Q.  Let's look at D-37.  And I think this is Ms. Roland's funds

6  administrator memo.

7        MR. TURNER:  If we could go to the second page.

8  Q.  I'm going to try not to cover anything covered by counsel.

9        MR. TURNER:  If we could blow up that section, Findings

10  of the call.

11  Q.  First of all, you --

12        MR. TURNER:  If we go up to the -- a little above that,

13  please, Rami, to the conference call with TBW.

14  Q.  I don't believe you were listed as being on that call.  Can

15  you -- do you recall whether you were on a call with TBW about

16  this issue?

17  A.  I recall being on a call with them.  I don't know if it was

18  this one.

19  Q.  I understand.  I understand.  Well, let's talk about the

20  findings of the call.  Maybe it will refresh your recollection.

21  And, again, I don't want to read this all into the record.  I

22  would just ask if you would read that, see if it refreshes your

23  recollection as to, one, whether you were on the call, and, if

24  it did, two, what you recall.

25  A.  I mean, these explanations seem -- I don't remember if I was

1    on the call.

2            THE COURT:  Let me ask you, counsel.  What does this go

3    to?  What is this relevant to?

4            MR. TURNER:  What this is relevant to is that she

5    didn't just let the issue drop, that she continued to press

6    forward and try to get answers, and that at the end of the

7    day --

8            THE COURT:  Who did, Roland or --

9            MR. TURNER:  Ms. Bathen.

10            THE COURT:  Couldn't you just ask her that?

11            MR. TURNER:  Yes, I could.

12            THE COURT:  And maybe --

13            MR. TURNER:  Would you like me to?

14            THE COURT:  Yeah.  Well, if it means we don't have to

15    go through -- but if it means we don't have to go through every

16    e-mail --

17            MR. TURNER:  All right.  That's fair enough.

18            THE COURT:  -- that everybody sent on this subject,

19    that would be helpful.

20            MR. TURNER:  Fair enough.

21    Q.  Ms. Bathen, at the end of the day as it relates to this

22    issue, did you believe that a fraud had been committed by TBW?

23    A.  No, I did not.

24    Q.  Did you continue to follow up on this issue?

25    A.  I did.

1  Q.  And did you believe that there was anything that you needed

2  to report to anyone?

3  A.  I didn't.

4  Q.  Including PwC.

5  A.  Right.

6        MR. TURNER:  Is that better?

7  Q.  All right.  Let's talk about the construction loans issue.

8  Let me ask you this.  We've had some discussion about Pam Vitto.

9  Did you know that Ms. Vitto was not looking at AOT?

10  A.  No, I didn't.

11        MR. TURNER:  Okay.  I'm going to take your advice, Your

12  Honor.  I'm going to cut to the chase on this.  How about that?

13        THE COURT:  That would be wonderful.

14  Q.  On the construction loans, I do want to put up a couple of

15  things to -- you know, so that we're all on the same page as to

16  what was -- what this issue was about.

17        Could we put up D-182.  Okay.

18  Q.  And so this is the issue that you talked to counsel about,

19  about the construction loan issue; right?  Are we all on the

20  same page?

21  A.  Yes.

22  Q.  All right.  So you remember what it was.  So let me go to

23  D-824.  And could you identify this for us, please, Ms. Bathen.

24  Do you need it blown up, ma'am, or --

25  A.  No, I can read it.  I'm just trying to get to it.

1    I believe I have attached to them my response to Pam's -- to

2  Pam's report.

3  Q.  And is this how the process typically worked as it relates

4  to Ms. Vitto's report?

5  A.  Yes.

6  Q.  Explain how it worked.  Just --

7  A.  Well, I would -- they -- we all would review her report.

8  Then it would depend whether -- I might assign certain people to

9  draft part of the response or I might draft it myself.  But I

10  would want everyone to review it once I drafted it to make sure

11  we were all on the same page.

12       MR. TURNER:  All right.  And if we go to the attachment

13  of D-824, this is a draft of the report.  If we could go to page

14  two.  And Rami, if you could blow up the aged construction loans

15  over 360 days.

16  Q.  And if you look at the second paragraph, starting The

17  collateral purchased.

18       MR. TURNER:  If you could just highlight that whole

19  paragraph, Rami, and I'll go over.

20  Q.  Do you see the sentence that says, When performing a sample

21  review of county records?

22  A.  Yes.

23  Q.  Okay.  Could you read the rest of that to yourself?  And

24  then I just have a couple of questions.

25       (Brief pause)

1  A.  Okay.  I've read it.

2  Q.  Is what's being described in Ms. Vitto's draft, is it the

3  same issue that we looked at on the -- in the e-mail we

4  previously looked at?

5  A.  Yes, it is.

6  Q.  All right.  And if you go to the next page, which is

7  management's comment -- management comments, in the red-lined

8  section, is that your -- that's your response; is that right?

9  A.  Yes.

10  Q.  And in that you say, The most significant finding in this

11  report was in regard to construction HFS; right?

12  A.  Right.

13  Q.  And in here you say, number one, TBW quickly moved to pay

14  down the loans; right?

15  A.  Right.

16  Q.  Next sentence.  And this is all stuff that you went over

17  with counsel.  They paid down the loans; right?

18  A.  Right.

19  Q.  Okay.  And also, were people fired over this at TBW?

20  A.  I believe I heard that they were.

21  Q.  And in the last paragraph is says, MWL risk control will

22  complete a complete scrub review of the files.

23      Do you see that?

24  A.  I do.

25  Q.  Do you know whether that was done?

1  A.  I believe so.

2  Q.  So let's see if this --

3        MR. TURNER:  Let's look at D-438.  And this is a big

4  packet, just so the Court knows.  What page is that on, Rami?

5  Okay.  The next one, the actual report.  There it is.  All

6  right.

7        This is the September 26, 2008, report.  And if I could

8  get you to go to the second page, aged construction loans.

9  Q.  Do you see that, ma'am?

10 A.  I do.

11 Q.  Okay.  And is this the construction loan issue -- it looks

12 almost identical to what was in the other document; right?

13 A.  Right.

14 Q.  But it made it into the final report.

15 A.  It did.

16        MR. TURNER:  And if you go to the next page, please,

17 Rami.

18 Q.  You have management's response.

19 A.  Right.

20 Q.  And is that the same response we saw in the other one?

21 A.  I think it generally is.

22 Q.  Okay.  So anybody who got this report that's D-438, do you

23 agree with me that they would know about this construction loan

24 issue?

25 A.  Yes.

1  Q.  And "anybody" would include PwC?

2  A.  Yes, it would.

3  Q.  Let's talk a little bit about your interaction with PwC.  I

4  know you can't quantify the numbers of times you may have talked

5  to them, but did you, from time to time, provide PwC with

6  information?

7  A.  Yes.

8  Q.  Did you always provide them with the information that it

9  requested?

10  A.  Yes.

11  Q.  Did you ever provide them with less than they requested?

12  A.  I don't believe so.

13  Q.  Did you always answer PwC's questions truthfully?

14  A.  Yes, I did.

15  Q.  Did you do anything to prevent PwC from doing its job?

16  A.  I don't believe so.

17  Q.  Are you aware of anyone else that would have prevented PwC

18  from doing its job at the time?

19  A.  At the time?  No.

20  Q.  Yes, ma'am.

21        THE COURT:  Strange question.

22  Q.  Do you know of anybody else?

23        THE COURT:  You mean --

24  Q.  At any time.

25  A.  I mean, hindsight.

1  Q.  Okay.  Let's look at D-9.  And you were asked a question

2  about -- let's go to the second page of this.  And have you ever

3  seen this e-mail before?  You're not on it.

4           MR. LEVINE:  Objection, Your Honor.  Beyond the scope.

5  I never asked about this document.

6           THE COURT:  Sustained.

7           MR. TURNER:  He asked about the subject of the

8  document, Your Honor.

9           THE COURT:  Have you seen this before?

10          THE WITNESS:  Yes.

11          THE COURT:  Overruled.

12          MR. LEVINE:  Your Honor, I just want to make -- she's

13  not on the e-mail.  It's a different time.  "Have you seen it

14  before" might be different if she saw it with a lawyer as

15  opposed to at the time.

16          THE COURT:  I'm sorry?  What?

17          MR. LEVINE:  I'm not sure if the witness has seen it --

18  saw it at the time as opposed to with counsel in the last couple

19  of days.

20          THE COURT:  Did you see this before your testimony

21  here?

22          THE WITNESS:  I saw it when the attorney showed it to

23  me.

24          MR. TURNER:  I'm going to move on, Your Honor.

25          THE COURT:  Okay.  Move on.

1          MR. TURNER:  Okay.

2  Q.  Did PwC ever once ask you whether there were any areas in

3  mortgage warehouse lending that they should pay special

4  attention to?

5  A.  I don't recall that.

6  Q.  Did PwC once ever ask you if you were aware of any

7  suspicious issues?

8  A.  No.

9  Q.  Do you recall them -- PwC raising any issues relating to the

10 following?  Investor commitments on AOT.

11 A.  No.

12 Q.  Why AOT was not tracked on a loan level on Promerit?

13 A.  I don't remember that specifically.

14 Q.  What about participation certificates as it relates to AOT?

15 Do you recall them asking anything?

16 A.  I don't recall.

17 Q.  How about location or existence of loan files?

18 A.  I don't think they would have asked me.

19 Q.  Did you take comfort from PwC's auditing procedures?

20 A.  Yes.

21 Q.  How did that manifest itself?

22 A.  My comfort level?

23 Q.  Yes, ma'am.

24 A.  You know, if you have a major accounting firm auditing your

25 financial statements, you have confidence that everyone is doing

1  what they're supposed to be doing and that they're right.

2  Q.  Was the independence of PwC important to you?

3  A.  Yes, it was.

4      MR. TURNER:  Could we go to D-32, please.

5  Q.  Do you remember looking at this document with counsel today?

6  A.  This one?

7  Q.  Yeah.  You've looked at a lot of stuff.

8  A.  I don't necessarily remember this one, but maybe.  Oh, yes.

9  Q.  Okay.  You do.  And this had to do with loan resetting; is

10 that right?

11 A.  Well, finding loans back and forth.

12 Q.  Right.  Would it surprise you to know that PwC was given

13 documents in '08 showing AOT loan resetting?

14     MR. LEVINE:  Objection.  Leading.

15     THE COURT:  Sustained.

16 Q.  Do you know whether PwC was given documents in 2008 that

17 showed AOT loan resetting?

18 A.  I don't know.

19 Q.  Now, there were some questions asked about PwC -- by PwC's

20 counsel on whether TBW was a problem and had special rules.  Do

21 you remember all of that?

22 A.  Yes.

23 Q.  Okay.  I would like to show you a couple of things.

24     MR. TURNER:  Could we go to A-301.

25 Q.  And this is a work paper of PwC.  And on page 2, this

1  paragraph here, it's noted that Ms. Kissick remains determined

2  to help Taylor Bean find a new lender, and Bank of America has

3  tentatively agreed to provide financing with the last obstacle

4  being cleared being the completion of TBW's financial statement

5  audit.  And that Cathie remains convinced that removing TBW from

6  her portfolio will increase operational prowess.

7      Do you see that?

8          MR. LEVINE:  Objection.  Lacks foundation.

9          THE COURT:  Sustained.

10 Q.  Was it any secret that TBW could be difficult?

11 A.  No.

12 Q.  But did that lead you to believe that TBW was committing

13 fraud?

14 A.  No, it didn't.

15         MR. LEVINE:  Objection.  Leading.

16         THE COURT:  Sustained.  Counsel, you know, asking a

17 leading question and then rewording it doesn't really cure the

18 problem.

19         MR. TURNER:  I'm not going to do it.

20         THE COURT:  Thank you.

21         MR. TURNER:  No problem.

22         THE COURT:  How are you doing, counsel?

23         MR. TURNER:  I'm doing pretty well.  I'm almost -- I'm

24 in the home stretch.  If you would give me just a second, I

25 think --

1          THE COURT:  I will, by all means.

2          MR. TURNER:  Thank you, Judge.

3  Q.  I want to talk about the BOA custodial agreement issue.  Do

4  you remember talking to counsel about that?

5  A.  I do.

6  Q.  All right.  Do you have any personal knowledge that Bank of

7  America improperly diverted proceeds due to Colonial?

8  A.  Not personal knowledge.

9  Q.  And do you understand that one of the risks facing Colonial

10  was that mortgage originators like TBW would divert moneys due

11  to Colonial?  Did you understand that?

12          THE COURT:  I'm sorry.  Move to do what?

13  Q.  Did you understand that one of the risks facing Colonial was

14  that mortgage originators like TBW could divert moneys due to

15  Colonial?

16          MR. LEVINE:  Objection.  Leading.

17          THE COURT:  Sustained.

18  Q.  Do you have any understanding of the rights and remedies

19  available as between BOA and Colonial as it relates to the

20  custodial agreement?

21  A.  I don't remember enough about the document.

22  Q.  Just a couple more questions on investor commitments as it

23  relates to COLB.  Did you actually look at investor commitments

24  as it relates to COLB?

25  A.  Not to COLB.

1   Q.  Who was responsible for that?

2   A.  The collateral analyst, Teresa Kelly.

3           MR. TURNER:  I'm going to pass the witness over to my

4   friend Rufus Dorsey.

5           THE COURT:  Okay.  Mr. Dorsey.  Let me ask you this.

6   About how long do you have with the witness?

7           MR. DORSEY:  Your Honor, I think maybe about five to

8   ten minutes.

9           THE COURT:  Okay.  Let's try.

10                          CROSS-EXAMINATION

11  BY MR. DORSEY:

12  Q.  Good afternoon.

13  A.  Good afternoon.

14  Q.  Ms. Bathen, my name is Rufus Dorsey.  And I'm one of the

15  counsel for Colonial BancGroup.  First I want to ask you a

16  question about your employment.  When you were assistant

17  treasurer, who sent you a paycheck, Colonial Bank or Colonial

18  BancGroup?

19  A.  I believe it came from Colonial Bank.

20  Q.  Okay.  And when Colonial Bank was sold out of receivership

21  to BB&T, where -- whose job -- where did your job go?

22  A.  Well, I mean --

23  Q.  Did it go with BB&T?

24  A.  Yes.  Yes.  I stayed with BB&T.

25  Q.  Did you ever work for the Colonial BancGroup bankruptcy

1  estate?

2  A.  No, I did not.

3  Q.  Now, you were asked a number of questions about -- questions

4  about reports.  I just have a few questions.  You mentioned the

5  aging report.  Do you recall that?

6  A.  I do.

7  Q.  Did the aging report have anything to do with AOT

8  transactions?

9  A.  I believe the one we looked at was COLB.

10  Q.  You talked about shipped not paid.  Do you recall that?

11  A.  I do.

12  Q.  Did the shipped-not-paid report have anything to do with AOT

13  transactions?

14  A.  Again, I think that was mostly -- I think it was COLB.

15  Q.  Now, you also talked about the Promerit report.  Do you

16  recall some discussions on that?

17  A.  I do.

18  Q.  And you remember when AOT transactions were first put in as

19  a facility at mortgage warehouse lending, don't you?

20  A.  Yes.

21  Q.  Okay.  And you actually were in conversations, weren't you,

22  about how the AOT -- how -- excuse me -- how Promerit would

23  track AOT transactions.  Do you recall that?

24          MR. LEVINE:  Objection.  Leading.

25          THE COURT:  Overruled.

1  A.  At the time of setting it up, I don't remember if I was a

2  party to those conversations at that point in time or not.

3  Q.  Okay.  Do you recall if you had any views with regard to

4  whether Promerit should track AOT transactions with regard to

5  pool numbers only or loan-level data?

6  A.  My personal opinion would have been -- my personal opinion

7  is that it would have been better if we tracked it at the loan

8  level and also identified the pool.

9  Q.  Did you express that view to anybody?

10  A.  Yes, I did.

11  Q.  And who did you express it to?

12  A.  Cathie Kissick.

13  Q.  And what did she say in response?

14  A.  That we should look at them at the pool level because we

15  should be looking at them as securities.

16  Q.  And was it your view that it was her department?

17  A.  Yes.

18  Q.  And she was the expert?

19  A.  Yes.

20  Q.  Who won that particular discussion?

21  A.  Cathie.

22  Q.  Now, were those Promerit reports available to PwC?

23  A.  Yes.

24  Q.  And they didn't have loan-level detail on them, did they?

25  A.  They did not.

```
1              MR. LEVINE:  Objection.  Leading.

2              THE COURT:  Overruled.

3  Q.  And did anybody from PwC ever tell you they had a problem

4  with the Promerit report not having loan-level detail on it?

5  A.  I don't recall that.

6  Q.  Was it ever your job as assistant treasurer to verify

7  collateral for facilities at mortgage warehouse lending

8  division?

9  A.  The actual physical collateral?

10 Q.  Yes.

11 A.  No.

12 Q.  Whose job was it?

13 A.  The collateral analyst.

14 Q.  And for TBW, who was that?

15 A.  Teresa Kelly.

16 Q.  And who did Teresa Kelly work for?

17 A.  She reported to the -- I think it was Cathie -- Bryant, but,

18 really, for all intents and purposes, she reported directly to

19 Cathie Kissick.

20 Q.  Do you have any reason not to believe Ms. Kelly?

21 A.  No.

22 Q.  Did you have any reason to believe she was a fraudster?

23 A.  No, I did not.

24 Q.  Did you trust her like you trusted Ms. Kissick?

25 A.  I trusted her.  I don't know if I trusted her as much as
```

1  Cathie.  I didn't know her as well as Cathie.

2  Q.  Because you knew Ms. Kissick quite well.

3  A.  Yes, I did.

4  Q.  You placed trust in her based on the years of your

5  experience.

6  A.  Yes.

7  Q.  Did you ever refuse to give PwC something they asked you to

8  get for them?

9  A.  No.

10 Q.  Did PwC ever ask you to get loan-level detail for AOT

11 transactions, the type that you were seeking from Ms. Kissick?

12 A.  I don't believe so.

13 Q.  Did PwC ever tell you that they wanted to access the vault

14 to look at the agency pools of loans?

15 A.  They didn't tell me that.  I don't know that they would

16 have.  I don't know that would have come to me.

17       MR. DORSEY:  No further questions, Your Honor.

18       THE COURT:  Mr. Levine, I'm going to ask you the same

19 question.  How long are you going to be?

20       MR. LEVINE:  Probably ten to 15 minutes.

21       THE COURT:  All right.  Let's keep going.  I would like

22 to get this witness off the stand before we take our break if

23 that's possible.  Okay?  And my court reporter tells me she can

24 keep going for ten, 15 minutes.

25       MR. LEVINE:  Thank you, Your Honor.

1                    REDIRECT EXAMINATION

2  BY MR. LEVINE:

3  Q.  While Danny is setting up here, let me -- you were asked by

4  Mr. Turner some questions about COLB loans and where the

5  collateral is.  I want to make sure I understood your answer.  I

6  think you said that it would go to custody after the COLB was

7  sold to Freddie Mac and you were holding it for Freddie Mac; is

8  that right?

9  A.  I believe -- if I didn't state it properly, I think what I

10 was trying to say was that the collateral, while in COLB, was

11 likely in the vault on the fifth or sixth floor.

12          THE COURT:  What?

13          THE WITNESS:  That it was in the vault on the fifth or

14 sixth floor while it was in COLB.

15 A.  That if it went into -- if it was going to be sold into an

16 agency security, I believe they started to get that information

17 even before the security settled.  So that's when it would -- if

18 it was going into an agency security, it would go down to the

19 vault.

20 Q.  By agency security, you mean AOT?

21 A.  Not only.

22 Q.  Okay.  So by --

23          THE COURT:  She means -- I think what you mean -- there

24 are two vaults; right?  There's one on the sixth floor and one

25 in the basement.

1          THE WITNESS:  Right.

2          THE COURT:  Which are you asking about?

3   Q.  Yes.  So when you have the COLB that you bought from TBW and

4   it wasn't gone to an agency yet, it would be in the secured

5   facility on the fifth or sixth floor; right?

6   A.  Right.

7   Q.  And then after it was prepared to go to Freddie Mac, for

8   instance, because they were purchasing it or getting it to an

9   end investor, then it would go down to the vault in the

10  basement; is that right?

11  A.  If it was going to an agency, yes.

12  Q.  Okay.  Let me talk about a different area, which is the

13  funds administrator audit.  There were some questions about, you

14  know, some of the discussions you had with Ms. Kissick and the

15  explanations that you got in November of 2008.  Do you recall

16  that?

17  A.  I do.

18  Q.  And even after you got the explanation from Ms. Kissick in

19  November 2008, Ms. Roland kept on following up, issuing the

20  December memo and the January memo talking about problems that

21  she found in the funds administrator audit; correct?

22  A.  I don't recall exactly.

23  Q.  We can take a quick look.  D-33 is a memo we looked at

24  before.  That's the January 29 memo discussing some of the

25  problems.  Do you recall that?

1  A.  Okay.  I do.

2  Q.  And then we have D-37.  That's the one from December where

3  Ms. Roland referred to the large negative haircuts and the $60

4  million, et cetera; right?

5  A.  Right.

6  Q.  And that all happened a month to two months after you got

7  this explanation from Cathie Kissick; right?

8  A.  Yes.

9  Q.  And are you aware that even into April of 2009, people in

10 the risk control group that was reporting to you wrote that

11 nothing had changed with respect to the funds administration

12 audit issues that had arisen?

13 A.  You're asking me if -- what?

14 Q.  Are you aware that by April -- that April, late April 2009,

15 that people who were doing funds administrative --

16 administration audits of TBW wrote memos about the fact that

17 despite the concerns that had been raised, nothing had changed?

18 A.  I don't recall.

19 Q.  And you don't remember any reconciliation ever being done of

20 the $60 million BONY wire, Bank of New York wire, on October

21 30th, do you?

22 A.  I don't believe so.

23 Q.  What's that?

24 A.  I don't.

25 Q.  Let's turn to a different topic.  On the memos from Pam

1  Vitto, you were shown a particular memo, which is D-438.  That's

2  a number of reports from 2008.  And you were shown on page 50

3  there a section of the Vitto memo where she talks about aged

4  construction loans; right?

5  A.  Right.

6  Q.  And you were asked about how -- whether PwC would have had

7  access to this memo; right?

8  A.  Right.

9  Q.  Unlike the Vitto e-mail that talked about things looking

10 bogus and suspicious and having possible fraud, there's none of

11 that language in this memo, is there?

12 A.  That language isn't there.  The issue is still there.

13 Q.  Right.  And the issue, then, is discussed -- and the

14 management response on the next page -- where the reference is

15 that TBW quickly moved -- sorry -- same problem as before.

16     The issue is it says that TBW quickly moved to pay down the

17 loans and improve supervision.

18     Now, TBW may have paid off that loans, but it doesn't answer

19 the question about why you were seeing the duplicate loans to

20 begin with, does it?

21 A.  I didn't think the construction loan issue was a duplicate

22 loan issue.

23 Q.  All right.  That was the issue of -- well, I think part of

24 it may have been.  But you thought it related to the loan that

25 was foreclosed on but still showing up?

1  A.  Right.

2  Q.  And just by paying it off didn't answer the question of why

3  it was on the list to begin with, did it?

4  A.  No, it didn't.

5  Q.  Okay.  And even after this memo -- this memo that we're

6  looking at that you were shown by opposing counsel is dated

7  September 26th of 2008.  And even after that, you recall that we

8  saw memos from Ms. Vitto to you -- or e-mails -- raising issues

9  in mid-October of 2008; correct?

10  A.  I believe so.

11  Q.  Let me -- I think I just have one more area to talk about,

12  and that is you testified in cross -- well, in examination from

13  the FDIC's counsel about the aged loans on -- for aged COLB

14  loans and issues with the OCC.  Do you recall that?

15  A.  Yes.

16  Q.  And you recall that in 2007 the OCC was criticizing Colonial

17  for having aged loans on its COLB line; correct?

18  A.  Correct.

19  Q.  And you were shown P-2644, which is the supervisory letter.

20  But the think about it is it is a draft; right?  You see here --

21  I'll make that bigger down at the bottom.  Says Confidential

22  Draft?

23  A.  I see that.

24  Q.  And if you look at the page here on the second page, there

25  is a reference under Matters Requiring Attention to risk

1  management practices and reporting should be strengthened for

2  loans in the COLB account and referring, then, to the ability to

3  identify aging of total loans housed in the COLB account.

4      Do you see that?

5  A.  I do.

6  Q.  And back on the first page, there is a reference to the

7  predominant risk being in loans with two correspondence and the

8  first one listed as Flick Mortgage, which is now Taylor Bean;

9  right?

10  A.  Taylor Bean had purchased Flick.

11  Q.  Okay.  But the OCC, in the draft letter is -- in September

12  2007 is talking about concerns with aged COLB loans and

13  specifically mentions TBW; correct?

14  A.  I took it to mean that the loans had originated with Flick

15  Mortgage.

16  Q.  Okay.  But Flick Mortgage was taken over by TBW; right?

17  A.  Right.

18  Q.  At the time of this letter, this draft letter on September

19  6th, 2007, it actually refers to Flick Mortgage as now Taylor

20  Bean; right?

21  A.  Right.

22  Q.  So -- and if you -- you're aware -- you were on the asset

23  purchase committee at the company; is that right?

24  A.  Yes.

25  Q.  And if you're aware -- we can go through the documents, but

1  hopefully we won't need to -- that between August and September

2  of 2007, there was a reduction of COLB by about $600 million and

3  an increase in AOT by about the same amount, $600 million;

4  right?

5  A.  I believe that's the case.

6  Q.  And there were some concerns that loans were on AOT longer

7  than they should have been, weren't they?

8  A.  Yes.

9  Q.  And when you did that, after loans were shifted from COLB to

10 AOT, you got the final supervisory letter from the OCC --

11 right? -- instead of just this draft?

12 A.  I'm sure we got a final.

13 Q.  So let's look at -- and by the way, I'm going to show you a

14 document that we looked at before but in a different context.

15 This is D-19.  We looked at it before for the context of not

16 getting the loan-level details in AOT, but there's something

17 else that's mentioned here.  And I'm looking in particular at

18 the bottom of the first page of D-19.  There's an e-mail from

19 Ms. Kissick to you referring to searching for funding.  Is that

20 funding for AOT?

21 A.  Yes, it is.

22 Q.  And it's slightly under two-thirds private label at the

23 moment.  That's the private label as opposed to the agency that

24 we talked about earlier?

25 A.  Yes.

1  Q.  And then she says, Primarily due to the security they

2  created to clean up all their vintage loans with the OCC.

3      Now, "vintage loans" is another way of referring to the --

4  to aged loans, isn't it?

5  A.  Yes.

6  Q.  And the OCC then comes back, after seeing the new

7  information, and they have the final letter.  Let's look at the

8  final letter.  This is D-44.  The final letter -- remember, the

9  draft was dated September 7th of 2007, and now we've got the

10 final letter dated September 26th of 2007.  You see that?

11 A.  Yes.

12 Q.  And it still refers in the first page to the predominant

13 risk being associated with Flick Mortgage, now Taylor Bean and a

14 different company.  Do you see that?

15 A.  I do.

16 Q.  But if you look at the second page before -- and that's --

17 the second page on the bottom has the signature there from Brent

18 Spencer; right?

19 A.  Yes.

20 Q.  Did you see Brent Spencer, by the way, around Colonial from

21 time to time?

22 A.  Yes.

23 Q.  Did he have an office there?

24 A.  Yes, he did.

25 Q.  Was he there frequently?

1  A.  Yes, he was.

2  Q.  Okay.  So --

3  A.  In Montgomery.

4  Q.  Right.  And before, we had that section about concerns in

5  the draft letter.  We don't have that section anymore in the

6  final, do we?

7  A.  I don't see it.

8         MR. LEVINE:  Nothing further.

9                      RECROSS-EXAMINATION

10 BY MR. TURNER:

11 Q.  Between those two letters that we just saw, did you -- do

12 you remember that you sent the aged loan report to the OCC?

13 A.  I don't recall.

14 Q.  Okay.  Well, let's look at it, then.

15         MR. TURNER: Rami, could we pull up --

16         Bear with me, Your Honor.  I've got to pull them up.

17         Rami, if we could pull up 2644, P-2644 and then P-2643

18 after that.

19 Q.  And you'll notice the date on this is September the 6th,

20 2007.

21 A.  Yes.

22 Q.  Is that right?

23 A.  Yes.

24         MR. TURNER:  And then let's go ahead, Rami, and pull up

25 P-2643.

```
1   Q.  And that's dated September 26th, 2007; is that right?

2   A.  Right.

3           MR. TURNER:  Okay.  And, Rami, if we could then pull up

4   P-2037.

5   Q.  And the date on this is when, ma'am?

6   A.  September 18th.

7   Q.  Just a couple of questions about the funds administrator

8   review.  You understood that there was an issue with respect to

9   pay-downs; is that correct?  Is that how you understood the

10  issue?

11  A.  Yes.

12  Q.  Did you know that at the same time that the funds

13  administrator review was going on that PwC was actually having

14  trouble matching up AOT wires?

15  A.  No.

16          MR. LEVINE:  Objection.  Leading and lacks foundation.

17          THE COURT:  Is there any --

18          MR. TURNER:  That's all I have, Your Honor.  I'm sorry.

19  I'll withdraw.

20          THE COURT:  Any other questions?

21          MR. DORSEY:  No, Your Honor.

22          THE COURT:  Thank you, Mr. Dorsey.

23          You'll be happy to hear you may step down.  And you are

24  excused.

25          THE WITNESS:  Okay.
```

 1          THE COURT:  That means you may stay or leave, as you

 2  wish.

 3          Counsel, it's time for our break.  Let's make it 20

 4  minutes since you've all been at it for a while.  See you back

 5  here in 20 minutes.

 6      (Recess was taken from 3:06 p.m. until 3:22 p.m., after

 7       which proceedings continued, as follows:)

 8          THE CLERK:  Court is in session.

 9          THE COURT:  Please be seated.

10          MR. BECK:  Good afternoon, Your Honor.

11          THE COURT:  Good afternoon.

12          MR. BECK:  May I proceed?

13          THE COURT:  Please.

14          MR. BECK:  PwC calls Sarah Moore.

15          THE COURT:  If you'll step forward to be sworn by the

16  clerk.

17                            **SARAH MOORE**

18          The witness, having been duly sworn to speak the truth,

19  the whole truth and nothing but the truth, testified as follows:

20                       DIRECT EXAMINATION

21  BY MR. BECK:

22  Q.  Good afternoon, Ms. Moore.

23  A.  Good afternoon.

24  Q.  Were you the chief financial officer of Colonial BancGroup

25  from 2003 through 2009?

1 A. Yes.

2 Q. Were you also the chief financial officer of Colonial Bank

3 during that period?

4 A. Yes.

5 Q. During that period, was it true that if CBG had bills to

6 pay, Colonial Bank would pay most of those and then -- on CBG's

7 behalf and then just settle up later?

8 A. Not exactly.

9 Q. How did it work exactly?

10 A. It was a management fee, I believe, that BancGroup charged

11 Colonial Bank, and it's a quarterly management fee. And then --

12 BancGroup charged Colonial Bank the quarterly management fee.

13 Then Colonial Bank would pay that management fee or also a

14 dividend. I don't exactly remember all the details, but that's

15 what I remember.

16 Q. I'm putting up pages from the deposition that you gave in

17 the CBG versus FDIC case, pages 244 to 245, where you were

18 asked: And first, generally, on intercompany transfers, based

19 on your position as CFO, how were those handled between Colonial

20 BancGroup and Colonial Bank?

21 Answer: Well, most -- accounts payable was actually a

22 Colonial Bank function. And so just to -- ease administration

23 of paying invoices, most payments were made by Colonial Bank.

24 And then BancGroup expenses were then determined, you know, out

25 of the payments made, what was a BancGroup expense, what was a

1  brokerage expense.  And then those entries would be made to

2  reclassify those expenses from -- to reduce Bank's expense and

3  to record it on the appropriate other entity.  And that was

4  recorded through a due to/due from account.

5        MR. MULLIN:  Your Honor, I object.  It's improper

6  impeachment because I don't even know that the question is the

7  same question that was asked.

8        MR. BECK:  Sure it was, Your Honor.

9        THE COURT:  Overruled.

10       MR. BECK:  I'm sorry.

11 A.  I did not perceive that to be the same question.  There were

12 management fees.  There were dividends from Colonial Bank to

13 BancGroup.  This is more the nuts and bolts of how it was

14 recorded, so I stand by my earlier testimony.  Yes, most

15 expenses were Colonial Bank, but there was also, as I recall, a

16 management fee.  There were also dividend payments from the Bank

17 to BancGroup because BancGroup was its only shareholder.  And

18 that's how cash got to BancGroup to pay expenses.  This is more

19 about the nuts and bolts of how the expenses were accounted for

20 and divided.

21 Q.  Prior to 2003, were you the chief operating officer of

22 Colonial BancGroup?

23 A.  From 2000 -- spring of 2000 to fall of 2003, yes.

24 Q.  And were you also the chief operating officer of Colonial

25 Bank?

A.   Yes.

Q.   Before that, from '99 to 2000, did you have a position at Colonial BancGroup?

A.   I don't recall.  I was the treasurer, and I don't remember if it was BancGroup and Bank or just Bank.  I don't recall.

Q.   You can't remember whether you were the treasurer of both entities or one versus the other?

A.   You know, I don't.

Q.   And before you were the treasurer of one or both of those entities, were you the vice-president of strategic planning --

A.   I was a senior --

Q.   -- from around '96 through '99?

A.   I was senior vice-president strategic planning.  I believe that was a Bank-only office, if I recall.

Q.   You think it might have been just the Bank, but you don't remember between the Bank and the BancGroup?

A.   That's correct.

Q.   While you were the chief financial officer, did the mortgage warehouse lending division report to the treasury department?

A.   For a portion of my time as CFO, yes.

Q.   And the only audit year that's at issue here in the CBG case, at least, is 2008.  During 2008, did the mortgage warehouse lending division report to treasury?

A.   I believe so.

Q.   And is that because in 2008 the CEO of the entire operation,

1    Bobby Lowder, asked your group to take oversight of the

2    operations side of the mortgage warehouse lending group because

3    he said that he felt the CBG needed a bit stronger management

4    and oversight over the mortgage warehouse lending division?

5    A.   I recall something to that effect, yes.

6    Q.   And then did you and Mr. Lowder agree that mortgage

7    warehouse lending division, headed up by Ms. Kissick, would

8    report to treasury, headed up by Mr. Hosein?

9    A.   Yes.

10   Q.   And Mr. Hosein reported directly to you; is that correct?

11   A.   Yes.

12   Q.   In terms of your educational background, what kind of degree

13   did you get?

14   A.   I had a Bachelor of Science in business administration with

15   a degree in accounting from Auburn University.

16   Q.   And were you a CPA --

17   A.   Yes.

18   Q.   -- at some point in your professional career?

19   A.   I was -- I'm inactive.  I'm still a CPA in inactive status.

20   But, yes, I was in public accounting.

21   Q.   And did you work when you were in public accounting for a

22   firm called Coopers & Lybrand?

23   A.   Yes.

24   Q.   That was one of the predecessors to PricewaterhouseCoopers?

25   A.   Yes.

1  Q.  What years did you work for Coopers & Lybrand?

2  A.  Let's see.  June of 1987 to September of 1996.

3  Q.  Were you an auditor?

4  A.  Yes.

5  Q.  When you were with Coopers & Lybrand, did you do audit work

6  for Colonial BancGroup?

7  A.  Very little, but, yes.

8  Q.  Are you here today pursuant to a subpoena?

9  A.  Yes.

10 Q.  Have you testified on several occasions concerning the

11 events leading up to the failure of the Bank?

12 A.  I've only testified in court one other occasion.

13 Q.  That was in Mr. Farkas's criminal trial?

14 A.  Yes.

15 Q.  In terms of depositions, have you given several?  I think I

16 counted seven or eight, but several depositions?

17 A.  Yes.

18 Q.  When you were deposed in this case in May of 2016, did CBG

19 or the trustee for CBG pay the legal fees for your personal

20 lawyer?

21 A.  Someone did, yes.

22 Q.  And it was either CBG or FDIC?

23 A.  Yes, and I don't recall which.

24 Q.  Before the deposition, you had met with both lawyers for

25 both CBG and the FDIC; is that right?

1  A.  That is correct.

2  Q.  Did you meet with or talk with lawyers for either the CBG or

3  the FDIC in advance of your trial testimony?

4  A.  No, except in the hallway.  I did speak.  Sorry.

5  Q.  Of course, you spoke to me in the hallway.

6  A.  Yes.  But, no, I did not -- yeah.

7  Q.  And I take it that was just pleasantries.

8  A.  Yes.

9  Q.  Okay.  Good.

10     So do you agree that when you were the CFO of both Colonial

11  BancGroup and Colonial Bank, that it was the management who

12  owned the financial statements?

13  A.  Yes.

14  Q.  And does that mean that management, not outside auditors,

15  have the final responsibility for the accuracy and fairness of

16  the financial statements?

17  A.  Yes.

18  Q.  As CFO, did you personally have ultimate responsibility for

19  the financial statements of Colonial BancGroup?

20  A.  Yes.

21  Q.  Did you have a team of people assisting you in preparing and

22  reviewing the reports on the financial statements?

23  A.  Yes.

24  Q.  Is it also true that the management of Colonial owned the

25  internal controls, including those that were supposed to prevent

1  and detect fraud?

2  A.  Yes.

3  Q.  And, again, it was management, not outside auditors, who had

4  the ultimate responsibility for designing and testing internal

5  controls.  Would you agree with that?

6  A.  No.  The design of internal controls were management's

7  responsibility.  Colonial BancGroup hired Crowe Horwath to test

8  internal controls on behalf of management per the internal audit

9  function.  They hired PwC to test those internal controls that

10  were -- review the testing by Crowe.  So that question was a

11  compound question, so part of it is yes and part of it is no.

12  Q.  Okay.  The designing internal controls, you agree, is

13  management's responsibility; right?

14  A.  Yes.

15  Q.  And is it also management's responsibility, although you may

16  have exercised it by hiring Crowe, to in the first instance test

17  those internal controls?

18  A.  Yes.

19  Q.  Between all of the -- and so we talked about how you had a

20  team of people who helped on the financial statements.  And

21  then, as you indicated, you had Crowe as your internal auditors

22  helping to test internal controls.  Between all the people at

23  CBG and Colonial Bank who worked on the financial statements and

24  all the people, including Crowe, who worked on internal

25  controls, would you agree that you had people who spent

1  thousands and thousands of hours to get the financial statements

2  correct and to have effective internal controls?

3  A.  Yes.

4  Q.  When you were an auditor, did you have experiences where you

5  were not able to find problems that existed in a company's

6  financial statement, despite the fact that you did your audit

7  job properly?

8  A.  I don't know specific instances, but I would -- as I sit

9  here today, I'm sure.

10  Q.  And do you remember testifying in the Farkas criminal trial

11  that you did?

12  A.  Oh, did I?  Okay.  No, I don't remember.

13  Q.  I can show you if you want.

14  A.  That's fine.  I believe you.

15  Q.  Do you agree, based on your experience both as an auditor

16  and as a chief financial officer of a publicly held company,

17  that even a properly planned and performed audit may not detect

18  a fraud?

19  A.  Yes.

20  Q.  Did you understand that every year from 2003 through 2009?

21  A.  Yes.

22  Q.  And is that true, even though a company might have good

23  internal controls in place?  If you'd like me to back up if

24  you've lost track of my question.

25  A.  I mean, good -- well, I'm thinking about the definition of

1  "good internal controls."  I mean, a properly designed internal

2  control environment is only as good if it's functioning

3  properly.  I thought our internal controls were functioning

4  properly based on the reports of examination that I received

5  from Crowe and the audit reports, but they weren't.

6     So it's the definition of "good internal controls" I'm

7  having a tough time -- effective internal controls typically --

8  you know, there's no foolproof way to catch fraud all the

9  time -- I mean, every instance of fraud, that is true, even if

10 everything materially operates properly.  But, you know, if you

11 have sound internal controls, you're supposed to prevent the big

12 one.

13 Q.  Right.

14 A.  And our internal controls at Colonial did not prevent the

15 big one.  We thought they were operating properly.  If the

16 internal controls had been operating properly and were tested,

17 we would have caught the issue a lot sooner.

18 Q.  Well, we're going to discuss that in some detail.  But I

19 want to ask you a question -- a couple of questions that really

20 kind of repeat questions you were asked by the prosecutors in

21 Mr. Farkas's criminal trial.  And that is to focus on the issue

22 of how it is that a bank with auditors and employees working

23 thousands of hours, with internal controls that look like

24 they're designed well, could nevertheless fail to detect "the

25 big one" as you put it.

1       In this case we've heard from others about something called

2   customer confirmations.  Can you explain to the Court what a

3   customer confirmation is?

4   A.   Sure.  A confirmation is when, you know -- I think what

5   you're alluding to, as I testified in that trial, that it's very

6   difficult to detect fraud when the bank employee and the bank

7   customer are working together because the customer is a check on

8   the employee, and the employee is a check on the customer.  A

9   customer confirmation is when you send statements out to the

10  customer to confirm their balances with the financial

11  institution.  So that's typically what a customer confirmation

12  is.  And they're supposed to send it back if it's incorrect or

13  correct.

14  Q.   And you consider a customer confirmation to be a key

15  internal control; correct?

16  A.   Well, a customer's statement that the financial institution

17  sends to the customer is one of the controls in place.  A

18  confirmation is something an auditor would send out to a

19  customer to test.

20      So It's -- that's not really key internal control.  That's a

21  testing of the -- a customer confirmation would be a testing of

22  the internal control.  A statement would be part of the internal

23  control environment where the customer is supposed to check the

24  statement.

25  Q.   Okay.  So a customer's statement, you would consider that to

1  be a key internal control; right?

2  A.  That's one of the controls.  Yes.

3  Q.  An important one; right?

4  A.  I would think so, yes.

5  Q.  And you mentioned that then the customer, you know,

6  responds, and then someone can look and compare what the

7  customer says the balance of the account should be and what the

8  bank shows the balance of the account should be; right?

9  A.  Right.

10  Q.  And I think you indicated that a bank customer typically

11  acts as a check on dishonest bank employees; right?

12  A.  Yes.

13  Q.  And is that because if the dishonest bank employee is

14  siphoning off money somehow out of the customer's account, then

15  when the customer responds and says, here's what should be in my

16  account, it's going to be different from what the bank records

17  show after the siphoning of the money; right?

18  A.  Yes.

19  Q.  And then I think you said it's equally true that the bank

20  employees, if they're honest, can act as a check on the

21  customer; right?

22  A.  Yes.

23  Q.  And there, for example, if you had a customer trying to take

24  more money out of the account than he had, the bank employee,

25  the honest bank employee, is going to see that and put a stop to

1  it; right?

2  A.  They should.

3  Q.  But if there's collusion, as you indicated before, if

4  they're working together, if there's collusion between the two,

5  the bank employee on the one hand and the customer on the other,

6  does that make it very difficult to find problems?

7  A.  Yes.

8  Q.  And also if the insider at the bank is lying to the auditor,

9  does that make it even more difficult for the auditor to find

10 the truth?

11 A.  Yes.

12 Q.  We've heard in the case from others about the concept of

13 professional skepticism.  But do you agree that one does not

14 audit with the assumption that people are lying to them?

15 A.  Correct.  Yes.

16 Q.  You do agree with that?

17 A.  Yes.

18 Q.  So if you've got an insider, a dishonest insider, who's

19 lying, and then that compounds the already difficult situation

20 where you've got that insider colluding with a customer; right?

21 A.  Yes.

22 Q.  Now, if the colluding bank employee and the bank customer

23 are not only lying, but also creating a phony trail of

24 documents, does that make the detection of fraud harder still?

25 A.  Yes.

1   Q.  In such a situation, is there a problem that even if the

2   auditor comes and asks all the exact right questions, in

3   response the colluding parties can either alter or dummy up

4   documents to respond to the question?

5   A.  Could you -- I mean, I'm not an expert in fraud, but -- I

6   mean, we're talking theoretically.

7       Can you repeat your question for me so I understand it?

8   Q.  Sure.

9       In such a situation where you've got collusion between an

10  outsider and the bank employee, even if an auditor comes and

11  asks exactly the right questions, in response can the colluding

12  parties alter or dummy up documents to try to satisfy that

13  question?

14      MR. MULLIN:  Your Honor, Ms. Moore has not been

15  designated as an expert witness in this case on the -- on fraud

16  and being -- on the procedures to detect fraud and this kind of

17  thing.  I don't think this is an appropriate line of

18  questioning, given her being a fact witness in the case rather

19  than an expert.

20      MR. BECK:  Well, she -- shall I respond, Your Honor?

21      THE COURT:  I think so, yeah.

22      MR. BECK:  She was the chief financial officer who

23  certified the financial -- who gave certifications every year

24  under Sarbanes-Oxley about the effectiveness of internal

25  controls and the accuracy of the financial statements.  And she

1    did that with knowledge, and she also made management

2    representation letters to --

3           THE COURT:  How much further are you going with this

4    line of questioning?

5           MR. BECK:  About two minutes on this line, and then I'm

6    moving on.

7           THE COURT:  I'll overrule the objection.

8    A.  So I guess part of my heartburn with the question is, I

9    mean, I can't testify that all the right questions were asked.

10   I can testify theoretically, even if you ask all the right

11   questions, that fraud can still occur and they can lie to you.

12   So, yes.  But I can't say that -- part of your question is that

13   they asked all the right questions.

14   Q.  No, no.  I was just --

15   A.  Okay.

16   Q.  I wasn't trying to ask about what happened here.  We'll get

17   into that.

18   A.  But theoretically, you're correct.  Yes.

19   Q.  Yes.  Okay.

20       In 2008, about how big was Colonial Bank in terms of dollars

21   of its assets?

22   A.  I mean, I haven't looked at the financials in eight years or

23   since I last testified.  I'll just say 26 billion, roughly,

24   approximately.

25   Q.  And was Colonial Bank both a retail bank and a commercial

1   bank?

2   A.  Yes.

3   Q.  How many branches did Colonial Bank have?

4   A.  I haven't looked at any of this information in a while.  I

5   don't -- I'm going to approximate 400 branches, 350 to 400.  I

6   don't really remember.

7   Q.  And to help you out, was that in five states?  Alabama,

8   Georgia, Florida, Texas, and Nevada?

9   A.  Yes.

10  Q.  And do you remember that in 2008 Colonial, in terms of its

11  rank among U.S. domestic banks, would have been around number

12  22?

13  A.  That seems too high.  I didn't think we were that big.  But

14  that -- if you cite that, I don't recall specifically.  That

15  sounds reasonable.

16  Q.  Okay.

17  A.  You know, it's been a long time ago.

18  Q.  That's what you said in the Farkas trial.

19  A.  But that was in 2011.  I've looked at a lot of numbers since

20  2011.

21  Q.  I know.  I'll just -- I can show you the transcript.

22  A.  That's fine.

23  Q.  You said that a few years back.

24      So about $26 billion in assets.  And do you remember about

25  how much of that was in the mortgage warehouse lending division?

1   A.  If you'll show me documents -- if you're going to ask me

2   specific numbers questions, I need to refresh my memory.

3           THE COURT:  I have a suggestion.  You have the figures

4   right in front of you; right?  She's testified to these before.

5   Why don't you just ask, is this what you said?

6           MR. BECK:  Sure.

7           THE COURT:  And I have a feeling counsel will not

8   object to just moving it along, because that's what she said.

9           MR. BECK:  Sure.  I can do it that way, make it easier

10  on all of us.

11  Q.  So I'll represent to you that a few years back when you --

12  it was fresher, and I'm sure you looked at the documents before

13  the criminal trial, you indicated that the mortgage warehouse

14  lending division assets were about 4 billion out of the bank's

15  total 26 billion.  Does that sound right to you?

16  A.  Yes.  I stand by my earlier testimony, I mean, but I -- you

17  know, I haven't refreshed my memory for this trial.

18  Q.  Sure.  And the 4 billion in assets, that would be what shows

19  up on a balance sheet at year end or any point in time during

20  the year; correct?

21  A.  I mean, it would fluctuate, obviously, daily, but, yes.

22  Q.  But then during of the course of the year -- that's how

23  many -- let's call them mortgages -- that are owned or sitting

24  there as assets.  But during the year, there were lots and lots

25  of mortgages that were bought and sold that aren't sitting on

1 the balance sheet at any moment in time; right?

2 A.  Yes.

3 Q.  And in any given year, I can represent to you that you

4 testified in the Farkas criminal trial there would be about $70

5 billion worth of assets that would roll through the mortgage

6 warehouse lending division in the course of the year.  Does that

7 sound about right to you?

8 A.  Yes, if that's what I testified to.  I don't have a

9 recollection.

10 Q.  We've heard from some others in the case about how

11 Sarbanes-Oxley affected the job that auditors are supposed to

12 do.  Did Sarbanes-Oxley also have an impact on management's

13 responsibilities?

14 A.  Yes.

15 Q.  And could you describe for the Court, please, how

16 Sarbanes-Oxley changed your life as a chief financial officer of

17 a publicly held company.

18 A.  Well, if I recall, I mean, we went through several steps in

19 the implementation of Sarbanes-Oxley, including looking at

20 different areas of the bank to ensure we had internal controls

21 in place.  We had certifications by a hundred people or more --

22 I think we drew the line maybe at senior vice-president and

23 above -- that they would certify to me on a quarterly basis that

24 the internal control environment was operating properly.  We had

25 risk -- we formed a risk management committee; internal risk

1　management committee.  We had representation from every key area

2　of the company.  We would meet with our internal auditors and we

3　would assess the risk.  We had a big risk matrix by all the

4　different risk areas.  We wanted to make sure that we were

5　testing and how we assessed the risk.  And it was a very

6　robust -- what I thought at that time was a robust process.  And

7　also vendor risk management and other things that we put into

8　place.

9　Q.  And backing up just a little bit from what you did to comply

10　with Sarbanes-Oxley to the responsibilities that were imposed on

11　you by Sarbanes-Oxley.  Is it true that when Sarbanes-Oxley came

12　into being, that increased the responsibilities for senior

13　management of the company in terms of certifying the financial

14　statements and also the effectiveness of internal controls?

15　A.  Well, I mean, I guess from my standpoint, you always wanted

16　to ensure, even before Sarbanes-Oxley, that your financial

17　statements were correct.  So you had an internal control

18　environment in place prior to Sarbanes-Oxley.  But I think it

19　just more formalized the process.

20　Q.  Well, do you remember testifying that when these changes

21　came in, they scared you to death?

22　A.  I don't remember testifying to that, but I'll stand by it if

23　I said that.

24　Q.  That was in your deposition in this case.  So let me just

25　show you --

```
 1  A.  Okay.

 2  Q.  Do you -- whether you agree -- remember testifying about it,

 3  let me set that aside.  Scared you to death once these new

 4  requirements came in, and you had to make -- sign your name and

 5  make certifications; right?

 6  A.  If that's what I said.  You know, I -- you know, this is

 7  water under the bridge for me.  I'm tired.  I can't sit here

 8  today and say it scared me to death.  I don't remember being

 9  scared to death.  But if I said that, I'll stand by the

10  deposition.

11  Q.  Well --

12  A.  I'll be glad to read my deposition into the record; whatever

13  you would like.

14          THE COURT:  He's just done that.  That's okay.

15  Q.  I don't want to do that.

16      But I'm trying to get -- I'm just trying to get a feel about

17  whether this was a big change or not.  And --

18          THE COURT:  Why don't you just ask her that?

19          Was it a big change?  Was it a big change for you?

20          THE WITNESS:  You know, I think it did raise the

21  stakes.  And so that's --

22          I see that I did say it scared me to death.  But I

23  wanted to ensure that things were operating properly, that we

24  had the testing, we had key controls documented, those key

25  controls were tested, that people would certify up through me.
```

1  Personal responsibility on me for that.

2  Q.  And was the reason that -- one of the reasons that this was

3  a big deal was that after Sarbanes-Oxley, it was a requirement

4  that the chief financial officer of a public company certify the

5  quarterly and annual financial statements?

6  A.  Yes.

7  Q.  I'm going to show you here from Plaintiff's Exhibit 1009.

8  This is the Form 10-K for December 31, 2008.  Those are the

9  annual financial statements; right?

10  A.  Yes.  And, yes, I signed them.  So just skip that question.

11  Q.  And here --

12  A.  Yes.  That's my signature on the document.

13  Q.  Okay.  You're jumping ahead of me a little bit here.

14  Please --

15     I'm sorry.  It's going to take a little while, ma'am.

16  A.  Okay.

17  Q.  Will you bear with me?

18  A.  Yes, sir.  I apologize.

19  Q.  This is your signature on the bottom; correct?

20  A.  That's my electronic signature.  Yes.

21  Q.  And I don't want to walk through the entire certification,

22  but I just highlighted some language so that the Court can get a

23  feel for the nature of the certification.

24     You say you've reviewed the annual report.  And then

25  paragraph number two, you say, Based on my knowledge, this

1  annual report does not contain any untrue statements of a

2  material fact, et cetera.

3      And you understood that you actually had an obligation to go

4  out and acquire knowledge so that you could make the

5  certification; right?

6  A.  Yes.

7  Q.  And then a similar thing in paragraph three.  And then in

8  paragraph four:  The registrant's other certifying officer and

9  I --

10     So that would be one of the other -- would that be like the

11  CEO?

12  A.  Yes.

13  Q.  -- and you were responsible for establishing and maintaining

14  disclosure controls and procedures and internal controls over

15  financial reporting.  And you certified that you have designed

16  such disclosure controls and procedures -- and then I

17  underlined -- or caused such disclosure controls and procedures

18  to be designed under our supervision, et cetera.

19     And that was what I think you were referring to earlier when

20  you said you hired Crowe; right?

21  A.  Well, we designed the internal controls.  And then Crowe

22  tested those internal controls, and then PwC was supposed to

23  test Crowe's work.

24  Q.  You testified before that you had assistance from others at

25  CBG in preparing the financial statements.  Was Colonial's

1  accounting group responsible for making sure that the financial

2  statements were prepared in conformance with GAAP?

3  A.  Yes.

4  Q.  And how many people worked in the bank's accounting

5  department back in the 2008 time frame?

6  A.  I do not recall.

7  Q.  Does 140 to 150 sound reasonable?

8  A.  That's reasonable.

9  Q.  I'm showing you here on the screen Defendant's Exhibit 113,

10  which is a collection of organizational charts.  And this one is

11  from, I think, 2005.  And I've highlighted these.  They're kind

12  of hard to read, but I think you'll recognize the names.  You

13  can help me out.

14  A.  Mine is not really that legible.

15  Q.  The top one is --

16  A.  Me.

17  Q.  -- looks like Sarah Moore.

18  A.  Yes.

19  Q.  That's you; right?

20  A.  Right.

21  Q.  And then over on the top left, I think it's Sheila Moody,

22  chief accounting officer.

23  A.  Right.

24  Q.  Was she the chief accounting officer in 2005?

25  A.  Yes, I believe so.

1  Q.  And was she competent and professional in her work?

2  A.  Yes.

3  Q.  And then the next one highlighted there on the far left

4  column is Hans Petit, the accounting policy director.  Was he

5  competent and professional?

6  A.  Yes.

7  Q.  And did both of those individuals participate in putting

8  together the financial statements?

9  A.  Yes.

10 Q.  And then on the next column to the right, there's Young

11 Boozer as the general auditor.  Was he a competent and

12 professional person?

13 A.  Yes.

14       THE COURT:  Are you going to go through every one of

15 these this way, counsel?

16       MR. BECK:  I'm only going to go through the two others

17 that I have highlighted.

18 Q.  Mr. Hosein, the treasurer.  Was he competent and

19 professional?

20 A.  Yes.

21 Q.  And Mr. Hicks, the senior vice-president of finance.

22       Did all of those individuals help you in preparing the

23 financial statements that you certified?

24 A.  Yes.

25 Q.  We've been talking about internal controls.  Are these

 1  things that are procedures that you have in place to hopefully

 2  ensure the integrity of the financial statements?

 3  A.   Yes.

 4  Q.   And these internal controls, are they meant to make sure

 5  that the employees are doing what they're supposed to do and

 6  that there are checks and balances involved in the process?

 7  A.   Yes.

 8  Q.   And I take it that the insiders at the bank were aware of

 9  how the internal controls operated, because they were the ones

10  who were actually implementing the internal controls; correct?

11  A.   Yes.

12  Q.   And does that mean, as you indicated in the Farkas criminal

13  trial, that these insiders, if they're the ones participating in

14  the fraud, are better able to get around the internal controls

15  than an outsider would be able to do on his own?

16  A.   Yes.

17  Q.   When you hired Crowe to be the internal auditor and test the

18  internal controls, did you also consult with them in the design?

19  Or did you design them yourself, and then Crowe was just the

20  first one to be testing them?

21  A.   I did not hire Crowe.  The audit committee hired Crowe.

22  Q.   Okay.

23  A.   And I did not consult with them on the design, except on

24  mortgage warehouse lending we did -- I had an internal control

25  matrix that I thought with the key controls, and we did consult

1  with Mike Thomas on that matrix at Crowe, who was the partner at

2  Crowe.

3  Q.  Mike Thomas was his name?

4  A.  Yes.

5  Q.  So the audit committee, they retained Crowe.  And then you

6  worked with Crowe, at least in mortgage warehouse lending

7  division, both to design -- -- to design the controls -- no.

8  What's this matrix thing you were talking about?

9  A.  No.  You're --

10  Q.  I thought you said they participated.

11  A.  I said that Colonial had a key matrix -- internal control

12  matrix around mortgage warehouse lending that Tommy Tynes and I

13  sat down and talked about.  And I don't remember what year.  We

14  gave that to Mike Thomas to say, are we missing anything?  Are

15  these all the key controls?  Do you think this is adequate?

16      So I don't think I'm consulting with him on designing

17  internal controls, as you indicated in your question.  I think,

18  you know, we designed the internal controls and provided him a

19  matrix and said, do you think this is -- do we have everything

20  covered?  That's the way I recall it.

21  Q.  Okay.  Good.  Thank you.

22      So you, Mr. Tynes, whomever else you worked with internally,

23  designed the internal controls for the mortgage warehouse

24  lending division, and then Crowe was supposed to test those;

25  right?

1  A.  I say we documented the internal controls that were -- that

2  a bunch of people helped design, and we documented the key

3  controls.  I don't feel comfortable saying that I'm the only one

4  that designed the controls, because I didn't.  But we documented

5  on a matrix, and then we did provide that to Mike Thomas.

6  Q.  Getting back to Crowe, did you understand that Crowe was

7  working on behalf of Colonial BancGroup and Colonial Bank when

8  doing the testing?

9  A.  Yes.

10  Q.  And that that is a job that Sarbanes-Oxley imposes on

11  management but allows management to employ agents to do that job

12  on their behalf?

13  A.  Yes.

14  Q.  And did you consider Crowe to be the bank's and the

15  BancGroup's agent when they were testing the internal controls?

16          MR. CAMPBELL:  Your Honor, I object.  That calls for a

17  legal conclusion of the witness.

18          MR. BECK:  I'm not asking for a legal conclusion, Your

19  Honor.

20          THE COURT:  She can answer.

21  A.  They were our internal auditors.  I viewed them as -- we

22  called them the internal auditors.  We didn't call them the

23  agent.  We just said they were the internal audit firm.

24  Q.  The internal auditors, just as if you had an internal audit

25  department, but instead you retained them to do that internal

1  job; right?

2  A.  Yes.

3  Q.  You talked about how you and Tommy Tynes had I don't know

4  whether it was one conversation or more than one with Mike

5  Thomas at Crowe.

6      First, who is Tommy Tynes?

7  A.  He was at that time the head of compliance at Colonial Bank.

8  Q.  And you may have indicated this, but you asked them, I

9  think, when you showed them the matrix -- asked whether you had

10  missed anything, whether they had any suggestions; is that

11  right?

12  A.  Yes.

13  Q.  Do you remember whether you made any modifications as a

14  result of that conversation?

15  A.  I do not recall.  I don't recall what Mike said.  I don't

16  recall -- you know, I remember having the conversation, he was

17  on a conference call with us in my office, but I don't remember

18  any more than that.

19  Q.  Whether you made any modifications or not, did you

20  ultimately determine that you had the controls in place that you

21  felt you needed and that they should be tested then?

22  A.  We thought we had the internal controls in place to minimize

23  the risk in that unit.  Yes.

24  Q.  In connection with the AOT purchases that took place, are

25  you familiar with the term end-investor commitment?

1  A.  Yes.

2  Q.  Is that sometimes also referred to as a forward-sales

3  commitment?

4  A.  Yes.

5  Q.  And would you please describe for the Court what the

6  end-investor commitment or forward-sales commitment meant.

7  A.  One of the key controls that we were supposed to have in

8  place that was supposed to be tested is that Colonial was not

9  supposed to buy any participation interest in a mortgage loan

10 held for sale or an AOT, which is a security in process of being

11 securitized, pools of mortgages that were in the process of

12 being securitized, until there was a commitment from an end

13 investor to buy those assets.  So the risk would be less on the

14 TB -- Taylor Bean side and more on the counterparty risk for the

15 end investor.  So those forward-sales commitments were -- TBW

16 was supposed to secure an investor to buy those assets, and

17 Colonial was not supposed to fund those assets until that

18 commitment was in place.  So it was designed to be a temporary

19 liquidity facility.

20 Q.  And I think you indicated that having the end-investor

21 commitment in place I think you said was a key internal control;

22 is that right?

23 A.  Yes.

24 Q.  Was Mary Lou Bathen --

25     Did you happen to run into her in the hallway?

```
1   A.  I did.

2   Q.  Was she the assistant treasurer in the 2007-2008 time frame?

3   A.  Yes.

4   Q.  Did you appoint her to monitor the operations of the

5   mortgage warehouse lending division?

6   A.  Yes.

7   Q.  Was Ms. Bathen supposed to be verifying the end-investor

8   commitments for both COLB and AOT?

9   A.  Yes, prior to buying the assets.

10  Q.  I'm sorry.  I couldn't hear --

11  A.  Prior to buying the assets, yes.

12  Q.  But what you discovered is that, in your judgment, she had

13  failed to do this job properly; correct?

14  A.  I believe that's correct.

15  Q.  And do you agree that if Ms. Bathen had done -- had

16  performed this internal control that you had assigned to her,

17  the fraud never could have taken place?

18          MR. MULLIN:  Object.  Speculation.

19          THE COURT:  Overruled.

20  A.  What I agree to is if that key control had been tested by

21  anybody, it would have been found that it wasn't operating

22  properly, and we would have known and been able to stop it.

23  Q.  My question was --

24  A.  But Mary Lou's job, she should have verified there was a

25  forward-sales commitment in place prior to Colonial buying any
```

1    of those assets.  So I think it would have been caught a lot

2    sooner or stopped.  Like you said, they could have lied and

3    created documents, but --

4    Q.  Setting aside for the moment that they very well could have

5    lied and created documents -- we can go through the deposition

6    if you want.  But you -- I asked you a very specific question

7    about Ms. Bathen; not about --

8    A.  And I answered it, I thought.

9    Q.  Well, let's try it again.

10        Do you agree that if Ms. Bathen had done the job that you

11   assigned her to, that the fraud could not have taken place?

12            MR. MULLIN:  She answered that, Your Honor.

13   A.  No.

14            THE COURT:  She answered it.

15            MR. BECK:  I think she started talking about if

16   somebody else had done checks on the -- and I just want to find

17   out about Ms. Bathen.

18   A.  Okay.  The answer is no because, like we said, even if she

19   was checking the forward-sales commitments and had done her job,

20   you know, I'm not going to say fraud cannot occur.  I think it

21   would have been much less if she had been checking those sales

22   commitments.

23   Q.  So your deposition at page 138, question --

24   A.  I see.

25   Q.  So what leads you to conclude that she did not do what she

1  was supposed to be doing?

2      Answer:  Because if there were forward-sales commitments in

3  place, we wouldn't have had the fraud.

4  A.  And as I sit here today as a regulator of financial

5  institutions, I've seen fraud in my three years of being a

6  regulator that the people ask for documents, were given

7  documents, but they were falsified documents that looked real.

8  So as I sit here today, I can't answer that same way as I did a

9  year ago.

10  Q.  That's fair.  So that's perfectly appropriate.  A year ago,

11  based on even all your years of experience both as an auditor

12  and as a CFO, your view was that if Ms. Bathen had done the job

13  you assigned to her, there could not have been fraud.

14  A.  And I -- a year ago, yes.  Yes.

15  Q.  But since then --

16  A.  I've learned.

17  Q.  -- as a regulator, you've found out that even if somebody

18  does the job like that correctly, when you've got insiders and

19  outsiders colluding, they can phony up documents and they can

20  still hide the fraud; right?

21  A.  I believe that to be true as I sit here today.

22  Q.  Okay.  Thank you for that clarification.

23      But getting back to Ms. Bathen, do you -- do you know, to

24  your knowledge, whether anybody informed PwC that Ms. Bathen had

25  not done the job you assigned to her, this key control?

1    A.   That was never brought to my attention.

2    Q.   So, obviously -- I mean, if you knew that the person that

3    you had assigned had not performed the key internal control,

4    would you have informed PwC so that it could take that into

5    account when planning and performing its audit procedures?

6    A.   Well, I probably would have disciplined the person or

7    replaced the person or put someone else in charge of that task

8    or fired that person if I had known that key control was not

9    operating properly.   I had no knowledge of it.   So I can't say

10   what I would have done, sitting here.   My first thing would be

11   to correct the issue within Colonial.

12   Q.   And do you think you also -- if this had come to light, say,

13   right before the audit work was done, don't you think you would

14   have also wanted to inform the auditor that you had this issue

15   where the person in charge of the key internal control wasn't

16   doing her job?

17   A.   I'm sure they would have known at that point, because we had

18   to fill out questionnaires.   But I can't sit here -- it didn't

19   happen, so it's speculation.

20   Q.   Objection sustained.

21   A.   Sorry.

22   Q.   You kind of have gotten used to this whole routine.

23   A.   I don't know.

24        THE COURT:   You're both making my job very easy.

25   Q.   Was another important internal control that the mortgage

 1  warehouse lending division was supposed to be the custodian of

 2  the mortgages?

 3  A.  Yes.

 4  Q.  Was there a risk in the mortgage business that a mortgage

 5  originator would pledge a mortgage to one bank or sell a

 6  mortgage to one bank and then turn around and pledge or sell the

 7  same mortgage to another bank?

 8  A.  Yes.

 9  Q.  And that's -- is that called double pledging?

10  A.  Yes.

11  Q.  And do you now know that -- whether TBW was doing that with

12  COLB loans?

13  A.  I mean, I know what I've read.  You know, I think that's

14  part of the fraud.  I don't have firsthand knowledge of that.

15  But I can tell you that Colonial was supposed to be the

16  custodian, and then there was another financial institution that

17  also had some of the assets.  But they were supposed to be in

18  custody to prevent -- assigned to Colonial to prevent the double

19  pledging.

20  Q.  And how would Colonial, being the custodian, guard against

21  TBW, say, selling the loan to a different bank and then

22  pretending to sell that loan to Colonial?

23  A.  I really can't -- I don't know the -- I don't know.  I'm

24  sure I knew at one time, but I can't sit here today and testify.

25  I don't remember all that.  But I just remember if we had

1  custody of the mortgage and it was assigned to Colonial, then

2  you're kind of like you have the first mortgage on it, you know.

3  You have it.

4  Q.  And who at Colonial Bank was responsible for this internal

5  control, making sure that it had custody of the mortgages?

6  A.  There was a lady in Orlando, and I do not recall her name.

7  The custody business was in the Orlando office.

8  Q.  You testified before that you concluded that Ms. Bathen had

9  not done her job properly.  Did the lady in Orlando, who was

10  supposed to be the custodian of the mortgages, did she do her

11  job properly?

12  A.  Apparently not.

13  Q.  In the spring of 2008, did you and the treasury department

14  and finance accounting do a deep dive into the details of the

15  list of mortgage loans that were supposed to back up AOT and

16  COLB?

17  A.  That -- I remember -- I mean, the treasury, they would have

18  performed the deep dive, and they brought to my attention there

19  was some aged collateral on some of the lists.  And we said,

20  you've got to clean this up.  You've got to sell these assets.

21  That's not what our agreements -- they're in violation of our

22  agreements.  I remember the aged collateral issue.

23  Q.  But did anything in this deep dive that your folks did, did

24  anything in that cause you to believe that the internal controls

25  relating to AOT were not operating properly?

1   A.  You know, I really don't remember a whole lot.  If you can

2   refresh my memory, or if I've testified to that before, I'll

3   certainly look at that.  But I -- I just remember aged

4   collateral, and I don't remember if it was on AOT or held for

5   sale.  But I remember in the unit there was aged collateral.

6   Q.  We've heard from other witnesses on that, so I'm not going

7   to take your time.

8   A.  Okay.  Thank you.

9   Q.  I do want to ask you to look at Defendant's Exhibit 40.

10  These are minutes of a Colonial BancGroup audit committee

11  meeting, September 19th, 2007.  You see there I highlighted your

12  name.  You were present there?

13  A.  Yes.

14  Q.  And then Mr. Beville, whom we've heard from.  The

15  highlighted portion there says he introduced Brent Spencer and

16  Robert --

17      I don't know how to pronounce his name.  Can you help me?

18  A.  Sejnoha.

19  Q.  -- Sejnoha with the OCC.

20      Mr. Spencer presented the safety and soundness compliance

21  and information technology and asset management report of

22  examination on Colonial Bank dated August 8, 2006.  He stated

23  that the bank is well managed and remains in fundamentally sound

24  condition.

25      So can you describe for us, please, why is it that

1 regulators from the OCC are appearing before the audit committee

2 presenting their conclusions?

3 A.  I mean, that's routine that regulators present their

4 conclusions of their reports of examination to the board of

5 directors of the audit committee.

6 Q.  So that was a regular occurrence where the regulators

7 themselves would come and meet with the audit committee?

8 A.  Yes.

9 Q.  And would the audit committee members ask them questions?

10 A.  You know, I don't recall.  I'm sure they did, but I can't --

11 you know, I don't remember.

12 Q.  Then on page 2 it says, Mr. Spencer spoke about mortgage

13 warehouse lending.  He indicated that there are no indications

14 of a collapse in the mortgage warehouse department.  It

15 continues to be a sound and profitable operation.  Mr. Spencer

16 stated that they have made a thorough examination, and the

17 mortgage warehouse lending operation is a very well run

18 organization with strong operational and collateral controls.

19     And did you have dealings on a regular basis with

20 Mr. Spencer?

21 A.  I wouldn't say on a regular basis, but, I mean, he was an

22 imbedded examiner because of the size institution we had, so he

23 was at Colonial continuously.

24 Q.  And do you remember in that fall 2007 time frame that this

25 statement, you know, reflected the views that he would express

1  on behalf of the OCC?

2  A.  I have no independent recollection of that, but I can read

3  that here.  It's been 10 years ago.

4  Q.  And over on page 3, I'm not going to go through all of this

5  paragraph, but it -- you're free to read it over if you would

6  like, since it is talking about Ms. Moore giving an overview.

7      But what I really want to ask you about is down here.  You

8  say, Mr. Wynn, former president of Colonial Mortgage Company,

9  has been here for the last 45 days ensuring that we have

10  identified all of our risks.

11      Who is Mr. Wynn?

12  A.  Mr. Ronnie Wynn.  As it says here, he was the former

13  president of Colonial Mortgage Company, a long-time employee

14  of -- which became a subsidiary of the bank, and then he

15  retired.  So he did a consulting arrangement.  I think it was

16  Mr. Lowder suggested that we ask Mr. Wynn to come in and look at

17  mortgage warehouse lending and -- and just to do another check.

18  Q.  And after Mr. Wynn's work, did he raise any questions about

19  suspecting any fraud, untoward conduct was going on?

20  A.  No.

21  Q.  I'm putting up now Exhibit A-12, which is a March 2nd, 2009,

22  management representation letter that was for the 2008 audit.

23  And we could jump ahead to the end.  Were you one of the people

24  who signed the management representation letter?

25  A.  Yes.

1  Q.  And would you do this every year in connection with the

2  year-end audits?

3  A.  Yes.

4  Q.  And did you understand that PricewaterhouseCoopers would be

5  relying on these management representation letters when they

6  issued their audit opinions?

7  A.  Yes.

8  Q.  When you signed this, had you satisfied yourself that you

9  had made sufficient inquiries to believe that you had a sound

10  basis for the representations that were contained in the letter?

11  A.  Yes.

12  Q.  We've gone through this letter with some other witnesses, so

13  you'll be happy to know I'm not going to go through all 55 or so

14  paragraphs with you.  I just want to focus on two that I don't

15  think we've touched on with others.

16     Over on page 3, paragraph 16, you represented that the

17  company has satisfactory title to all owned assets.  There are

18  no liens or encumbrances on such assets, nor has any asset been

19  pledged as collateral except as disclosed in the consolidated

20  financial statements.

21     And you believed that to be true when you signed the letter;

22  right?

23  A.  Yes.

24  Q.  And then over on page 8, paragraph 55, you say there, we

25  evaluated, recorded, and disclosed in the consolidated financial

1 statements all transfers of financial assets to determine that

2 control over the transferred assets has been surrendered and

3 that all conditions in accordance with paragraph nine of FAS 140

4 have been met.

5     Did you understand generally that FAS 140 had to do with

6 whether a transaction would be classified as a sale or a loan?

7 A.  Yes.

8 Q.  And did you consult with the accounting folks inside of

9 Colonial Bank, Colonial BancGroup, and satisfy yourself that

10 this representation was true?

11 A.  On all representations we went over it with the accounting

12 people.  Yes.

13 Q.  And I know that you testified that you were an auditor for a

14 while.  Is FAS 140 an area that you hold yourself out as an

15 expert in?

16 A.  It didn't exist when I was an auditor, so -- you know, I

17 think we may have been like on 101 or something when I was an

18 auditor.  So, no, I'm not an expert.

19 Q.  Okay.  But you had people within the company who were

20 experts; right?

21 A.  Yes.

22 Q.  I want to show a slide that I think it was the FDIC counsel

23 showed during opening statement.  It's got PwC as the gatekeeper

24 with Colonial Bank on one side of the fence, and then the

25 regulators -- FDIC, OCC, SEC -- all locked out on the other side

1  of the fence. Do you see that?

2  A.  I do.

3  Q.  That's not how it worked in real life, is it?

4  A.  I don't know -- I mean, it's not my slide. I didn't -- I

5  don't know what they mean by "gatekeeper." But, I mean, there

6  are auditors that also audit, and they issued unqualified

7  opinions to the investing public so that the public relied on

8  those financials. You know, I don't know what the term

9  "gatekeeper" means.

10  Q.  Sure. I'm focused on not the investing public, because

11  they're not part of this case, but the regulators.

12        THE COURT:  You know, it might be faster if you just

13  ask questions. This slide is not going to advance things very

14  quickly.

15  Q.  You mentioned the OCC had an imbedded person. What does

16  that mean, they had an imbedded --

17  A.  Well, for financial institutions of certain size, the OCC

18  just had an examiner in charge that had an office. And that's

19  the way they conduct their business as national regulators.

20  They actually had Brent. Brent had an office in our building.

21  Q.  Brent Spencer was his name?

22  A.  Yes.

23  Q.  And how often was he at his office in your building, do you

24  know?

25  A.  I mean, it was his full-time office and assigned to him. I

1  did not monitor his comings and goings, so I cannot testify to

2  that.

3  Q.  Was it your understanding that his full-time job was to

4  oversee Colonial Bank?

5  A.  Well, he was the examiner in charge.  I don't -- I mean,

6  that was his -- that was, I guess -- I don't know how many other

7  institutions he had.  I can't speak to that.

8  Q.  And you got to know him pretty well?

9  A.  No.

10  Q.  Well, did you get to know him well enough to form an

11  extremely unfavorable opinion of him?

12  A.  Yes.

13  Q.  And I'm not going to ask you to repeat precisely what you

14  said.

15  A.  Thank you.

16  Q.  You're welcome.

17      Did you feel like he was a wallflower, or was he pretty

18  aggressive in terms of his dealings with the bank?

19  A.  I have tried to put Brent Spencer out of my memory bank.

20  Q.  And I apologize, but we're all living through some events

21  that we wish never happened, so you're going to have to

22  participate as well.

23  A.  You know, he was -- you know, he was just a very abrasive

24  guy.  You know, I -- I wouldn't describe him as a wallflower.  I

25  wouldn't describe him as aggressive.

1   Q.  You would not describe him as aggressive?

2   A.  Those aren't my words.  I mean, I guess -- you know, I guess

3   aggressive would be closer to a wallflower.  Yes.  He's not a

4   wallflower.  He was pretty -- I guess aggressive is all right.

5   That's fine.

6   Q.  Okay.  Good.

7   A.  Is that what I said?  Then why don't you just show me the

8   testimony?

9   Q.  Because I'm not allowed just to show it to you.

10          THE COURT:  But actually, in this case, you can do it.

11  It would move things along so much more quickly.  She's

12  trying -- she can't remember, and you have her testimony in

13  front of you, so maybe we can just go like that.

14  Q.  Did the OCC have unfettered access to whatever documents

15  they wanted, as you testified at page 334 in your deposition?

16  A.  Yes.

17  Q.  And the FDIC, who on the graphic was on the other side of

18  the fence, did they come periodically through when they were the

19  regulators during the course of the year?

20  A.  Yes.

21  Q.  Did they also have unfettered access to all of the records?

22  A.  Yes.

23  Q.  To your knowledge, was there ever a time when anybody at the

24  bank that you knew of withheld any information or records from

25  the FDIC or the OCC?

1  A.  I'm not aware.

2  Q.  Was the Alabama State Banking Department also one of the

3  regulators in the later years?

4  A.  Yes.

5  Q.  Did they also come through periodically throughout the year?

6  A.  Yes.

7  Q.  And did they also have unfettered access to whatever books

8  and records they wanted to look at?

9  A.  Yes.

10  Q.  And the Federal Reserve, did they regulate Colonial

11  BancGroup?

12  A.  They did.

13  Q.  And did they have access to whatever documentation they

14  wanted?

15  A.  Yes.

16  Q.  Now, with PwC, would you agree, as you said at page 331 of

17  your deposition, that they would come in relatively

18  infrequently?

19  A.  Well, they came in every quarter.

20  Q.  Right.  They would come in --

21  A.  Quarterly.

22  Q.  -- to do their quarterly audit work and year-end audit work,

23  but not as frequent as the regulators were there; right?

24  A.  I don't know.  I don't recall as -- where I sit today.

25  Q.  And recognizing it was a long time ago, am I correct, as you

1    testified at page 330 of your deposition, that you have no

2    knowledge of the audit work and tests that PwC performed or

3    didn't perform in the course of its audits?

4    A.   Yes.

5    Q.   And you have never done any sort of investigation, looking

6    back to try to figure out what PwC did or didn't do; right?

7    A.   That's correct.

8    Q.   And you have not ever had any occasion to review PwC's work

9    papers; right?

10   A.   That's correct.

11   Q.   And you are not in a position to say whether or not PwC did

12   or did not do anything wrong in connection with its audits;

13   right?

14   A.   I have not reviewed their work papers, so I cannot say that

15   they did or did not test anything.

16   Q.   So back to Colonial's dealings with TBW.  Are you familiar

17   with the fact that Colonial basically had three different

18   facilities or product lines that it dealt with with TBW?

19   A.   Yes.

20   Q.   One of those would be a warehouse line; right?

21   A.   Yes.

22   Q.   And -- or warehouse credit.  And was that a situation where

23   just a traditional loan where Colonial would loan money to TBW

24   and take collateral in return?

25   A.   That was -- I believe it was a line of credit, and that was

1 the smallest of the three asset categories. And it would have

2 been collateralized, but it was more of just a short-term

3 facility line of credit that would go up and down. But it was

4 not large, if I recall correctly.

5 Q. And as a line of credit, that was a loan; correct?

6 A. Yes.

7 Q. Okay. And then COLB was the second facility; correct?

8 A. Yes.

9 Q. And under COLB, Colonial Bank purchased participation

10 interests in mortgages; correct?

11 A. Correct.

12 Q. And then there was AOT; right?

13 A. Yes.

14 Q. And let me just set the stage and then ask you. I want to

15 focus on what it was that Colonial was purchasing in the AOT

16 facility. We've had some people suggest that they were

17 purchasing participation interests in pools of mortgages, and

18 other people have said they were purchasing participation

19 interests in securities in process that were backed up by pools

20 of mortgages. Do you understand the difference there?

21 A. It's just a life cycle, you know. It's just a point in

22 time, because those pools become securities in process. So, you

23 know, I think it -- and I've always described it, I believe, as,

24 you know, these were mortgages, they had been assigned a pool

25 number, and they were in the process of being securitized.

1  Q.  And I could go through six or eight transcripts with you,

2  but I don't think you want me to do that.  The terminology that

3  you would use when describing this is more on the security in

4  process side; correct?

5  A.  Right.  They were pools that were in the process of being

6  securitized.

7  Q.  So we saw a demonstrative here with Ms. Bathen that I want

8  to try to spend a few minutes with you on.  You're familiar with

9  risk weighting and the capital charge that goes along with risk

10 weighting of different types of assets; correct?

11 A.  Yes.

12 Q.  And so over here in terms of the three facilities that we've

13 been talking about, am I correct, Ms. Moore, that the

14 warehouse -- what's it called? -- the warehouse credit, the line

15 of credit, that would be kind of in the 100 percent category?

16 A.  If I recall correctly, yes.

17 Q.  And that means that it's just a standard commercial loan,

18 standard risk; right?

19 A.  Yes.

20 Q.  And then over here on the effective capital charge, does

21 that mean that what the regulators say is that if you've got a

22 $100 loan out there under the warehouse credit line, the bank's

23 got to set aside $8 in capital reflecting that risk level.

24 A.  Yes.

25 Q.  And then COLB, that was a 50 percent risk-weighted asset;

1  correct?

2  A.  I believe that's correct.

3  Q.  And there, that's because COLB -- by and large, these were

4  supposed to be mortgages that met the high standards of the

5  government-sponsored agencies such as Fannie Mae and Freddie

6  Mac.  And those were considered more secure, safer assets than a

7  regular commercial loan; right?

8  A.  Yes.

9  Q.  And when I say "considered more secure and safer,"

10  considered more secure and safer by the regulators who set these

11  standards; right?

12  A.  Yes.

13  Q.  And therefore, for the COLB loans, the bank would only have

14  to set aside 4 percent or $4 for a $100 mortgage; right?

15  A.  Yes.

16  Q.  And that was better for the bank, because then you had that

17  other $4 that you could use some other way to make money; right?

18  A.  Yes.

19  Q.  And then AOT was actually in the 20 percent risk-weighted

20  category; is that right?

21  A.  That's correct.

22  Q.  And so you only had to set aside I guess $1.60 for $100.

23  And can you explain for us, please, why it is that AOT would be

24  considered safer, less risky, by the regulators than COLB?

25  A.  Because it was in the process of being securitized and

1  backed by government guarantees, and it was going to be packaged

2  into mortgage-backed securities.

3  　　　　THE COURT:  So the presumption there is that there is a

4  valid end investor relationship or commitment --

5  　　　　THE WITNESS:  Yes, ma'am.

6  　　　　THE COURT:  -- set up with a government agency; right?

7  　　　　THE WITNESS:  Well, with an end investor with a

8  government guarantee in place.  And also the COLB, or the held

9  for sales, what I called them, that also was supposed to have

10 that end-investor commitment, and Colonial was not supposed to

11 fund any or buy those participation interests until they had a

12 commitment to be sold.

13 　　　　THE COURT:  Right.  But the difference was, I assume,

14 at least one of the differences, was that the COLB was a private

15 commitment, and the AOT was a government agency commitment.

16 　　　　THE WITNESS:  It had the government guarantee on the

17 mortgage backed -- the future mortgage-backed security.  An

18 agency security.

19 BY MR. BECK:

20 Q.  I don't think that there's any confusion.  I want to make

21 sure.  The end-investor commitment that would come along with

22 AOT, it wasn't that it was going to be sold to Freddie Mac; it

23 was --

24 A.  Right.

25 Q.  -- going to be sold to some investment bank.

1   A.  Well, it could have been; but basically, it was the

2   government guarantee that was in place on the pool of mortgages

3   that qualified for government guarantees, and then the end

4   investor would buy those.  They were more marketable because

5   they had a government guarantee.  So a Wells Fargo, for example,

6   could have been a buyer of those mortgage-backed securities.

7   Q.  Thank you.  That was helpful.

8       When you became -- back to FAS 140 right now, recognizing

9   that you don't hold yourself out as an expert in it.  But when

10  you became the chief financial officer in 2003, did you change

11  any accounting with respect to FAS 140 and the COLB program?

12  A.  You know, I don't recall.

13  Q.  I can represent that you testified before you did not.

14  A.  Okay.

15  Q.  And also that you did not ever change the sales accounting

16  conclusion under FAS 140 for the AOT facility; correct?

17  A.  As I sit here today, there was something that we changed,

18  but I don't remember if it was 140 or --

19  Q.  Okay.

20  A.  -- what.  But if I testified when it was fresher, whatever

21  you represent.

22  Q.  You did.

23  A.  Okay.

24      MR. BECK:  And I take it, Your Honor, you don't want me

25  to be putting the screen up, but people are accepting my

1    representation right now about what she testified to.

2          THE COURT:  I think you're being checked by probably at

3    least, you know, a dozen other attorneys.  If they see some

4    discrepancy, they'll let you know and they'll let me know for

5    sure.

6          Are you going on to another area right now?

7          MR. BECK:  I just entered another area, so this -- if

8    we're -- this might be a good place to stop for the day.

9          THE COURT:  I think it would.  I would like to see

10   counsel after I excuse the witness for just a few minutes.

11         So you may step down.  You're excused for the day.  See

12   you back here at nine o'clock tomorrow morning.

13         MR. BECK:  And I'm not sure that Ms. Moore knows, but

14   the rule is that you should not be discussing the substance of

15   your testimony with anybody while you're on the stand.

16         THE WITNESS:  Okay.

17         MR. BECK:  Thank you, Ms. Moore.

18         (Witness excused)

19         THE COURT:  Counsel, you can be seated while we just

20   discuss some of those other issues that I raised yesterday.

21         Just give me an idea about the Crowe case:  Where it's

22   going to be, which week is going to be where.

23         Mr. Mullin, you look like you're ready to move.

24         MR. MULLIN:  Ready to do something; right?  Been

25   sitting all day.

1          Your Honor, I don't think we've reached agreement on

2    these issues.  I think the plaintiffs' preference, especially in

3    light of the damage trial that we have the week before, would be

4    to have the trial begin in D.C.  And then after we've completed

5    our D.C. witnesses, we move to here to do the Alabama witnesses.

6    We also think the trial will last approximately three weeks.

7          We have done some talking to Crowe counsel about

8    scheduling a mediation, but we haven't yet done that.

9    Obviously, we have a mediation this weekend, but it just

10   wasn't -- it just -- the timing wasn't -- it wasn't enough time

11   for Crowe to be able to realistically get involved in that

12   mediation, I don't think.

13         So I think we've got -- I mean, I think that's

14   basically where it sits.  I don't know if there's anything else.

15         THE COURT:  Yes.  The other thing was any plans as to a

16   methodology for avoiding repetition of some of the things I've

17   heard in this case.

18         MR. MULLIN:  Yes.  And we talked about that yesterday,

19   Your Honor.  Of course, you know, the one -- well, there's

20   probably several common witnesses at this point.  But at the

21   time we talked yesterday, it was just Mr. O'Halloran, who would

22   be coming.  But now potentially Ms. Moore and Ms. Bathen might

23   be common.  So we did discuss that a little bit.  We didn't, you

24   know, decide how to do that.  And so I'm not sure -- I guess we

25   would have to discuss a plan for how to do that.

1           MR. MEDOW:  Judge, from our perspective, we think the

2   trial's probably closer to four weeks than three.

3           THE COURT:  No.  It's going to be three, counsel.

4   That's what the Court was told a while ago, and --

5           MR. MEDOW:  Actually, Your Honor, in one of your orders

6   there's a footnote where you said the parties are expecting four

7   weeks in each trial.  That was in --

8           THE COURT:  I think since then I have been given an

9   update of three weeks.

10          MR. MEDOW:  Not from us, Judge.  It's document 735,

11  your order denying the request for interlocutory appeal, page 3,

12  note one.  We will certainly try to keep it as short as

13  possible, Judge; but at this point, I think, in light of what

14  I've seen --

15          THE COURT:  Well, I cannot imagine, I cannot imagine

16  that the Crowe case could go much longer than this case.  And

17  given the fact that in this case I have heard quite a bit of

18  testimony describing the fraud and describing the various

19  accounts, it can only be shorter.

20          Because I will tell you right now that if you-all start

21  repeating yourself, I'm just going to cut you off.  And that

22  will make it a very inefficient way for you to put your proof on

23  because then you're going to have to, while you're standing

24  here, regroup your questions.  So I really urge you both to sit

25  down and find a way to keep it from being repetitious.  And if

1   you do so, I cannot imagine that if the first case is a month

2   long, that the second case is going to be a month long.

3           So I'm not saying now what -- I just want to hear a

4   genuine effort to keep this from being repetitious.  That's all

5   I'm asking.

6           MR. MEDOW:  Certainly agree with that.

7           In terms of where, the predominant witnesses are

8   Alabama.  That's the reality.  Our people that are subject to

9   subpoena are here.  The company witnesses are here.  That's

10  where the bulk of the witnesses are.

11          THE COURT:  Have you exchanged witness lists yet?

12          MR. MEDOW:  Well, in the pretrial statement, yes.  And

13  I went through last night, went back to it -- I thought I

14  remembered, but I went back.  And if you look on the will-call

15  list, they have two witnesses in D.C., Mr. O'Halloran and

16  Mr. Summerford.

17          MR. MULLIN:  Mr. Malek.

18          MR. MEDOW:  Well, that begs the question of whether or

19  not there's going to be bifurcation.

20          THE COURT:  Well, the question is -- let me ask FDIC.

21  Where are your witnesses?

22          MR. MULLIN:  Well, Your Honor, we have those three that

23  he just named, and then -- and I don't have the witness list

24  sitting in front of me, but the rest of our witnesses would be

25  out here in Alabama.

1          Now, one issue, Your Honor, is that -- and you may
2    remember, we had a big argument about this earlier in the case.
3    Mr. Thomas, who would be, to me, the primary witness in the
4    case, fact witness in the entire case -- and you've heard a lot
5    about him even in this proceeding -- lives in -- he does not
6    live in Alabama.  And he -- we had asked previously that he be
7    brought to the trial in -- you know, in Washington or wherever,
8    you know, during our case.  And they said no, they didn't want
9    to do that.  But, you know, in terms of trying this case in an
10   orderly fashion, it would move things along quite a bit if he
11   were to appear in our case rather than be where we go basically
12   a week and a half, and nobody's heard from the engagement
13   partner, and then they put him on in their case, which is what
14   they're planning to do.  And I don't know whether they're
15   planning to bring him here or bring him to Washington, but
16   they're going to have to bring -- they're going to bring him
17   somewhere.  And we think if we brought him to D.C., then that
18   would give us more -- you know, that would place more of the
19   trial in D.C.
20          MR. MEDOW:  Your Honor, as Mr. Mullin said, the issue
21   was fully vetted.  It was briefed about whether or not we had to
22   bring him through their case.  Your Honor issued your order in
23   April of this year where you said expressly -- it's document
24   660, page 3 -- the party who designates the witness is not
25   required to make the witness available for testimony and

1 questioning by the other parties to the trial as part of those

2 parties' cases. We are going to bring Mr. Thomas. What we told

3 them in our filing was we'll bring him for your case if we can

4 do our direct first, the way it would be if we presented him in

5 our case. So we'll bring him, but we're going to put on the

6 direct first. They've said no.

7 THE COURT: I'll have to go back and look at that order

8 and see what -- you know, I think I need to look at it again.

9 But the question is, wherever he is, he has to be moved

10 somewhere, because nobody's going to Atlanta. So why not bring

11 him to D.C.?

12 MR. MEDOW: We will bring him, Your Honor, if we can

13 put on the direct first so that we're not prejudiced that

14 we're -- if we did it in the ordinary course -- they can't

15 subpoena him either in D.C. or Atlanta. In the ordinary course,

16 we would bring him in our case, we'd put on a direct, they would

17 cross. We'll do that as part of their case if it's the same

18 order.

19 THE COURT: I didn't understand what you just said.

20 Let me try. Okay? It was a little confusing.

21 If you could bring him on in -- early enough in the

22 case, I guess it would be, in their case, but you bring him on

23 to do your direct first, that would suit what you're doing?

24 MR. MEDOW: We would prefer to put him on in our case.

25 But if the Court is going to order us to bring him to

1   Washington, that would be --

2          THE COURT:  Well, I can't order you to bring him to

3   Washington.  I can suggest strongly that you bring him to

4   Washington, because it's so much more convenient for the Court

5   and for the rest of us not to -- I mean, I'm not having any

6   problem with Montgomery, I'm enjoying my week here, but another

7   two weeks here makes it very difficult for the Court to attend

8   to anything back in my own chambers.  And therefore, spending

9   more time of the case in Washington is tremendously convenient.

10  I, frankly, thought from what I had heard that it was convenient

11  for counsel, too, and that many of you prefer to be in

12  Washington.  I could be wrong.

13         But if it were possible to bring him to -- he has to be

14  brought somewhere.  And if he could come to Washington, and you

15  could put him on on direct but early in the case so that we

16  didn't have -- if he's a key witness, we don't have to wait

17  until halfway through the case before we hear from him.  I'll

18  take a look at the order that I entered.

19         Okay.  So if Thomas were to be in Washington, what's

20  your estimate of how much of the case would be here and how much

21  would be in Washington?

22         MR. MEDOW:  Two weeks here.

23         THE COURT:  Two weeks here.  If a month, two weeks in

24  Washington?

25         MR. MEDOW:  The only concern I have, Judge, is whether

1   we would finish here in two weeks.  Because, again, that's where

2   the principal witnesses are.

3         THE COURT:  We're going to finish -- you know, I put

4   them on a chess clock, and I'm going to do the same thing in

5   your case.  This is not a case that's going to drag on and on.

6   I'm going to set a time, the number of hours that you have, and

7   you're going to finish.  And I'll tell you right now, we're not

8   spending more than two weeks here.  I mean, you know, for us to

9   stay over a weekend to put on another Monday or Tuesday is

10  totally impractical and is not going to happen.  If we have to

11  run late, we'll run late.  But the fact of the matter is two

12  weeks is all that we're going to do here maximum.

13        Okay.  Now, we have another question that I want to

14  raise that will just confuse the issues even more.  And that is,

15  if I recall correctly, I had asked for findings and conclusions

16  from all of you -- I'm back to this case now -- at the end -- on

17  the last day of this case.  That would be the last day of the

18  liability phase.

19        As I've indicated to you all, I am leaving the Saturday

20  after I would get those findings and conclusions.  The way that

21  we have set things up now, I would not have time to go through

22  those findings and conclusions and get you any rulings on the

23  liability phase before we start the damages phase.  It occurs to

24  me that maybe we should discuss that and see if that's a

25  realistic way to proceed; that maybe what -- maybe it really

1  would be helpful to you to get rulings from me on liability, but

2  that would mean postponement.  It would mean postponing damages.

3  And of course, it would also mean postponing Crowe, because

4  Crowe is -- the whole thing is -- everybody is backed up.

5       The damages would -- right now we have starting on the

6  30th, which would give me no time to get you findings and

7  conclusions.  And I would need some time in there to work on

8  that.  I don't know how much time, because rather than spring on

9  you new effective dates, I thought I would get some input from

10 you about your response to the fact that we may have to build in

11 some additional time, which would mean postponing two things.

12 Postponing the damages trial -- and I know you have witnesses

13 lined up for that -- and I would be postponing the Crowe trial

14 because it's backed -- one backs up on the other.

15      You may not want to respond to me immediately.  You may

16 want time to think about this.  But I'm just telling you that

17 when I looked at what I'm doing, it's unrealistic if what you

18 want from me -- and I think you do want from me and I think I'd

19 like to give you -- at least if not the detailed final findings

20 and conclusions, at least thoughts about what's going on.

21      Mr. Beck, you looked like you're ready to say

22 something.

23      MR. BECK:  Yes.  Your Honor, I think that's an

24 excellent idea.  I think that in my mind, the only practical way

25 we could have kept the schedule was to go forward without

 1   findings and conclusions, but just sort of an assumption that

 2   there may be liability, and therefore we're going to have a

 3   damages trial.  I think -- and we, obviously, would do that if

 4   that's what Your Honor decides.

 5           I think that all parties would be better served and the

 6   interest of justice would be better served if Your Honor had

 7   ample time to review the findings, go back and look at the

 8   evidence, and reach a more deliberate decision.  There are

 9   complicated issues that have to do with different parties and

10   different audit years.  We were ready to do it the other way,

11   and it was going to be kind of a let's sort it out at the end

12   thing, but I do think that that's a wiser course.

13           THE COURT:  You agree, Mr. Mullin?  I think this is

14   something you all should be able to agree on, no?

15           MR. MULLIN:  Well, I doubt we'll be able to agree on

16   it.

17           Here's what I would say, Your Honor.  The way it is

18   right now is fine with us.  And even if we went into that damage

19   phase with the uncertainty as to where we stood on liability,

20   you know, we wanted to get it done and get it completed with the

21   Crowe trial.  If the Court felt that it wanted to spend some

22   time in there trying to come up with the findings on the

23   liability and move the Crowe trial back, to me, it would not be

24   a big deal if it was moved back, you know, a few weeks or a

25   month.  But if we're talking, you know --

1          THE COURT:  No, no.

2          MR. MULLIN:  -- next summertime or something --

3          THE COURT:  No.  No.  No, we're talking about maximum

4   just moving it back maybe -- I don't know, I haven't thought

5   about it, but I'm thinking in terms of a month or so.

6          No.  We're going to keep -- we're going to keep the

7   pace that we're keeping.  These things are -- how can I put it?

8   These are not the things one keeps fresh in one's mind forever.

9   You don't spend -- you know, I'm not spending my time on my

10  vacation thinking about the difference between COLB and AOT.

11  These things leave one very quickly.

12         I think there's an advantage to having these cases

13  promptly done and back to back so that, realistically, counsel

14  are on top of their game because they've been thinking about

15  this and preparing for it, the Court still remembers a lot of

16  the details and -- not that I can remember all of them, but

17  enough so that we have some efficiencies here.  So, no.  It will

18  not be.  I just need -- I just think it's practical.

19         Aha.  Heather points out to me that I have the PwC jury

20  trial for four weeks starting January 8th, so we have a natural

21  time right there to move Crowe to, assuming it may even be four

22  weeks.  Okay?  We have four weeks.  Because deep down inside,

23  the thought, again, of presenting this case to a jury, that one

24  I would be perfectly willing to put over as long as we could.

25  Because the thought just staggers me that we're going to explain

 1  this to a jury.  You've had enough trouble explaining it to the

 2  Court.

 3         So, you see, there's time.  We don't have to put this

 4  over very long.  And given the fact that we've got holidays in

 5  between, flying back and forth to Montgomery is probably

 6  something we all would prefer to avoid over Thanksgiving and

 7  Christmas and all.  So it may be that January 8th is a good

 8  time.

 9         I don't know.  What do you think, counsel?  You're the

10  only one who hasn't said anything.

11         MR. MEDOW:  Just a couple of comments, Judge.  I think,

12  in part, the length of delay, as you alluded to, also gets back

13  to the issue we were talking about before about avoiding

14  repetition.  The longer the delay, the less you're going to be

15  thinking about it and, inevitably, the more repetition will be

16  necessary.  So from our standpoint, the sooner the better, but

17  we understand the Court's constraints.

18         The other thing that we don't want to get lost, to make

19  it even more complicated, is we still have pending motions

20  for -- dispositive pending motions against both parties for

21  summary judgment.  And I guess one advantage here, it would give

22  the Court more time to rule on those as well.

23         THE COURT:  Well, the more I hear about this case, the

24  more -- I'll certainly look at them.  Many of the summary

25  judgments that were brought ended up being things that had to be

1  dealt with at trial.  I don't claim to say those are yours or

2  not, but --

3        Okay.  I'm just alerting you that the Court may want to

4  move some of the dates.  Okay?  I didn't want to spring that on

5  you as a *fait accompli* before we all headed for the airport

6  Thursday.

7        We're still looking at Thursday; right?

8        MR. BECK:  We'll be done tomorrow, I'm quite confident.

9        THE COURT:  Does that go for FDIC?  Any rebuttal case

10 tomorrow?

11       MR. MULLIN:  Well, we did not anticipate putting on any

12 rebuttal witnesses here in Alabama.

13       THE COURT:  That's fine.

14       MR. BECK:  Yes.  And we have witnesses in Washington.

15 I'm saying --

16       THE COURT:  No.  We've got another week.

17       MR. MULLIN:  Yes.  We talked about -- they did talk

18 about -- well, I don't know if we're going to get there, because

19 if it comes up, the issue of whether I've exceeded counsel's

20 direct.  I don't think -- it's been pretty broad, so I don't

21 know that I could possibly exceed it.  But if that were to come

22 up, I was thinking of saying, look, we can't put this witness on

23 in rebuttal with respect to Ms. Moore, for instance, so let me

24 do it now.  But I --

25       MR. BECK:  They dropped her, Your Honor.  They had her

1   listed as a witness and chose not to call her.  Then they're

2   confined by my direct examination.  They don't get to decide,

3   after having dropped her as their witness, that now they want to

4   take her as their witness during our case.

5          MR. MULLIN:  But we shouldn't be disadvantaged from

6   being able to rebut, use her as a rebuttal witness just because

7   of the flying back and forth.

8          THE COURT:  You're not.  You're not.  If your use --

9   are you talking about needing her on Thursday?  Right now all

10  I'm caring about is when this case is -- it's five o'clock.  I'm

11  not going to get into who could -- you know, whether you can

12  call her or not.  The question is if you did call her or

13  extended your cross or whatever we're going to call it, will you

14  finish tomorrow?

15         MR. MULLIN:  Yes.

16         MR. BECK:  And I have no idea.  If he does a direct

17  that is way outside the scope of mine, I don't have any idea

18  what he would be doing and how long the cross would be on that.

19  So if -- when I said tomorrow for sure, I was working under an

20  assumption that if it proves wrong, then it will be Thursday.

21         THE COURT:  Okay.  I'm pretty sure, after hearing both

22  of you, it sounds like -- Bryant's not going to be long; right?

23         MR. BECK:  And we may drop him.  And as we've

24  dropped -- as we told the plaintiffs, we've already dropped

25  Mr. Boozer, much to my dismay, because I just wanted to announce

1  his name.  Mr. Bryant, whose name isn't nearly as entertaining,

2  he's a candidate to be dropped.  We're going to go back and

3  confer on that and let them know by, you know, seven o'clock.

4  So I'm guessing that we're going to drop him as well.  I don't

5  want to play hide the ball.

6      THE COURT:  In which case, we will definitely finish

7  tomorrow, no matter what you do with Ms. Moore.  It's just

8  helpful to me to know what to do about reservations and hotel.

9  And we all have to give notice to the hotel and everything.

10      MR. BECK:  Speaking of which, Your Honor, if you are

11  going to postpone the damages trial, I don't want this to be the

12  driver, but we have to make pretty substantial deposits to

13  secure all the rooms that we need.  So if you could let us know

14  as soon as you've decided, that way we won't have to forfeit a

15  big huge deposit for hotel rooms.

16      THE COURT:  I will try to let you know tomorrow maybe.

17      MR. BECK:  That would be great.

18      THE COURT:  And we'll take it -- we'll take it from

19  there.  And I assure you, we won't put Crowe over.  I mean, the

20  longest we would put it over would be January, and maybe not

21  even that long if we can do it.

22      See you back here at nine o'clock tomorrow, counsel.

23  Thank you.

24     (Evening recess at 5:05 p.m.)

25               * * * * * * * * * *

1                    COURT REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4            This 3rd day of October, 2017.

5

6                                    /s/ Patricia G. Starkie
                                     Registered Diplomate Reporter
7                                    Certified Realtime Reporter
                                     Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25