1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE MIDDLE DISTRICT OF ALABAMA

3                            NORTHERN DIVISION

4

5    THE COLONIAL BANCGROUP, INC.
     and KEVIN O'HALLORAN,
6
             Plaintiffs,
7
         v.                            CASE NO.: 2:11cv746-BJR
8
     PRICEWATERHOUSECOOPERS LLP
9    and CROWE HORWATH LLP,

10           Defendants.

11                      * * * * * * * * * * *

12                          NONJURY TRIAL

13                      * * * * * * * * * * *

14           BEFORE THE HONORABLE BARBARA JACOBS ROTHSTEIN, UNITED

15   STATES DISTRICT JUDGE, at Montgomery, Alabama, on Wednesday,

16   October 4, 2017, commencing at 8:57 a.m.

17                              APPEARANCES

18   FOR THE PLAINTIFFS:       Mr. David C. Mullin
                               Mr. John G. Turner III
19                             Attorneys at Law
                               MULLIN HOARD & BROWN LLP
20                             800 Amarillo National Plaza Two
                               500 South Taylor Street
21                             Amarillo, Texas  79101

22                             Mr. Rufus T. Dorsey IV
                               Mr. Ronald T. Coleman Jr.
23                             Attorneys at Law
                               PARKER HUDSON RAINER & DOBBS LLP
24                             1500 Marquis Two Tower
                               285 Peachtree Center Avenue NE
25                             Atlanta, Georgia  30303

```
 1                    APPEARANCES, continued:

 2  FOR THE PLAINTIFFS        Mr. Andrew Phillip Campbell
    (continued):              Attorney at Law
 3                            CAMPBELL, GUIN, WILLIAMS,
                              GUY & GIDIERE
 4                            505 North 20th Street, 16th Floor
                              Birmingham, Alabama  35203
 5
    FOR THE DEFENDANTS:       Mr. Philip S. Beck
 6                            Mr. Mark L. Levine
                              Mr. Nicolas L. Martinez
 7                            Mr. Christopher D. Landgraff
                              Attorneys at Law
 8                            BARTLIT BECK HERMAN
                              PALENCHAR & SCOTT LLP
 9                            Courthouse Place
                              54 West Hubbard Street, Suite 300
10                            Chicago, Illinois  60654

11                            Mr. Jameson R. Jones
                              Attorney at Law
12                            BARTLIT BECK HERMAN
                              PALENCHAR & SCOTT LLP
13                            1899 Wynkoop Street, 8th Floor
                              Denver, Colorado  80202
14
                              Ms. Meredith Moss
15                            Attorney at Law
                              KING & SPALDING LLP
16                            1700 Pennsylvania Avenue NW
                              Washington, D.C.  20006
17
                              Mr. Jonathan C. Medow
18                            Attorney at Law
                              MAYER BROWN LLP
19                            71 South Wacker Drive
                              Chicago, Illinois  60606
20
                              Mr. Tabor Robert Novak Jr.
21                            Attorney at Law
                              BALL BALL MATTHEWS & NOVAK PA
22                            445 Dexter Avenue, Suite 9045
                              Montgomery, Alabama  36104
23

24

25
```

```
1                    APPEARANCES, continued:

2   FOR FDIC as Receiver      Mr. Stephen P. Sorensen
    for Colonial Bank:        Attorney at Law
3                             THOMAS ALEXANDER
                              FORRESTER & SORENSEN LLP
4                             14 27th Avenue
                              Venice, California  90291
5
                Proceedings reported stenographically;
6                 transcript produced by computer

7                    * * * * * * * * * *

8                      EXAMINATION INDEX

9   SARAH MOORE
         FURTHER DIRECT BY MR. BECK                    2475
10

11                   * * * * * * * * * *

12     (The following proceedings were heard before the Honorable

13      Barbara Jacobs Rothstein, at Montgomery, Alabama, on

14      Wednesday, October 4, 2017, commencing at 8:57 a.m.:)

15     (Call to Order of the Court)

16         THE COURT:  Is Ms. Moore still with us?

17         MR. TURNER:  I'll get her.

18         THE COURT:  If we are -- is she available, or should we

19   discuss other things while we're waiting?

20         MR. BECK:  We can discuss -- I don't know where she is,

21   but we can discuss other things.

22         THE COURT:  Okay.

23         MR. BECK:  I can -- Your Honor, one thing is the dates

24   that we were sent.  Our very, very strong preference is to go on

25   the 27th.  And a couple of reasons.  One is if Your Honor is
```

1  aiming for a decision around November 10th, then November 13th

2  would basically just give us a weekend to digest that.  And it's

3  pretty complicated stuff.  I'm hopeful that it's going to be

4  streamlined and that CBG won't be invited to the damages trial.

5          THE COURT:  Mr. Dorsey, don't take it personally.

6          MR. DORSEY:  I do, Your Honor.

7          THE COURT:  He's not --

8          MR. BECK:  But we're going to have to sort through

9  whatever Your Honor rules, and our experts are going to have to

10 take that into account.  And I just don't think that the weekend

11 is adequate --

12         THE COURT:  That's why I gave you -- that's why I gave

13 you the other alternative.

14         MR. BECK:  Right.  Right.  And I appreciate that.

15         THE COURT:  I thought you might want some --

16         MR. BECK:  And that would be -- that would give us a

17 couple of weeks, and I think that would be adequate time.  But I

18 don't think that a weekend would be adequate time.

19         MR. DORSEY:  Your Honor, Rufus Dorsey for Colonial

20 BancGroup.  I don't mean to be contrarian, but the plaintiffs

21 prefer to go forward on damages on November 13th.  We believe

22 that a decision up or down will be pretty self-evident for that

23 damage trial from the Court, and we can move forward just as we

24 were going to move forward fairly quickly before.  And we need,

25 Your Honor, a little bit more time to prepare for Crowe, which

1  would be on its heels, including -- the concept was to have some

2  additional pretrial decisions made, in making room for that.  So

3  we would prefer November -- December 4th for that.

4         And, you know, a personal note, both Mr. Mullin and I

5  have the same birthday right there at Thanksgiving, so our

6  families would like to see us.  But, you know, besides that, our

7  preference is November 13th and December 4th for the Crowe

8  trial, Your Honor.

9         MR. MULLIN:  That's also our --

10         MR. BECK:  Your Honor, on birthdays, my first and only

11  grandson is having his first birthday during the time where they

12  would like me to be on trial.

13         THE COURT:  Anybody else have a -- any other family

14  emergency or --

15         MR. MULLIN:  I'm trying to forget my birthday, Your

16  Honor.  But it's -- we agree with what Mr. Dorsey said, the

17  November 13th and December 4th dates.

18         THE COURT:  Okay.  Well, give us some time to think

19  about that.  But I see our witness is really ready to go, so

20  let's proceed.

21         Good morning.  I'll remind you, you are still under

22  oath, having been sworn earlier.

23         Whenever you're ready, Mr. Beck.

24

25

1         **SARAH MOORE**

2    The witness, having been previously sworn, resumed the

3 stand and testified further, as follows:

4       FURTHER DIRECT EXAMINATION

5 BY MR. BECK:

6 Q. Good morning, Ms. Moore.

7 A. Good morning.

8 Q. We touched on FAS 140 yesterday.  And I know in your

9 deposition last year you indicated that you really don't

10 remember very much at all about the FAS 140 issue.  Is that

11 still the case today?

12 A. Yes.

13 Q. And I'm going to ask you just a few questions about what you

14 do and don't remember.  And my hope is that if we can get that

15 straight, I can skip an hour or two of going through documents

16 and details --

17 A. Thank you.

18 Q. -- if you're not going to be able to help us on that.

19    So let me just -- to reprise some of the things we covered

20 yesterday just for a few seconds, you indicated that you were

21 generally aware that FAS 140 has to do with whether a

22 transaction is treated as a sale or a loan but that you're no

23 expert in that area; correct?

24 A. Yes.

25 Q. And, in fact, I think you reminded us that FAS 140 didn't

1  even exist back when you were auditing companies; right?

2  A.  Yes.

3  Q.  And when I asked you whether you had ever changed the FAS

4  140 accounting for COLB at any time when you were the CFO, I

5  think you said you didn't remember one way or another on that;

6  right?

7  A.  That's correct.

8  Q.  Similarly, for AOT, when I asked whether you had ever

9  changed the accounting for FAS 140, I think you said we made --

10  we may have made some kind of a change, but I don't remember

11  whether it was FAS 140 or something else.  Is that right?

12  A.  Correct.

13  Q.  The -- and then we also -- last thing from yesterday, when

14  we discussed the management representation letter that you gave

15  to PwC that had that paragraph about FAS 140, you said, I think,

16  that you don't remember what it is you did or the analysis, but

17  all you could say for sure is that you did whatever was required

18  in order to make that representation.  Is that fair?

19  A.  Well, I mean, I would have had people reporting to me that

20  understood that issue and would have analyzed it, and they would

21  have said it was okay to sign this representation letter.  So

22  yes.

23  Q.  Right.  But you can't remember the details of the analysis

24  or anything that went into that.

25  A.  No.

1  Q.  Okay.  So picking up on that, is it also the case that, as I

2  think you said in your deposition, you don't remember any of the

3  details of any conversations or communications you may have had

4  with PwC on the FAS 140 issue?

5  A.  I do not.

6  Q.  Would that be true as to your internal communications as

7  well, folks who worked for you?  You don't remember what

8  happened during those?

9  A.  I really don't.

10  Q.  That's fair.  And similarly, if you had any communications

11  back and forth with the regulators, you don't remember any of

12  that either?

13  A.  I do not.

14  Q.  Do you remember one way or another whether FAS 140 got any

15  special attention in any particular audit year?

16  A.  You know, I just don't remember --

17  Q.  That's fair.

18  A.  -- on the FAS 140 issue.

19  Q.  And yesterday we talked about how Colonial acquired 99

20  percent participation interest in the COLB loans -- the

21  mortgages, rather, or the AOT securities and process.  Do you

22  remember one way or another whether there was an accounting

23  issue having to do with that 1 percent, what happened to that

24  money?

25  A.  Well, Taylor Bean & Whitaker retained that 1 percent.

1 That's what I remember.

2 Q.  Okay.  But do you remember whether there was any sort of

3 accounting issue?

4 A.  I don't.

5 Q.  All right.  Nothing about, I take it, FAS 133 or hedge

6 accounting?

7 A.  Well, I remember there was an issue about hedge accounting;

8 but, again, it's so foggy at this point.  And we had a

9 restatement.  I think we had to go back quarter by quarter and

10 analyze the impact of the derivatives, but I thought that had to

11 do with the forward-sales commitments in place and the hedge

12 accounting.  It was a little bit more granular than what

13 we're -- what you're asking.  But it ended up not being a

14 material issue at the end of the day, but it did require some

15 restatement -- or maybe -- it required a big analysis, but I

16 don't know that it had a restatement.

17 Q.  It required somebody to go through and say, okay, there's

18 this change on that.  But it ends up that it wasn't material,

19 and so it didn't require a restatement of the financial

20 statements?

21 A.  I believe that's correct.

22 Q.  Okay.  And that was separate from the FAS 140 issue; right?

23 A.  I believe so.

24 Q.  Okay.  Thank you.  So I'm not going to ask you about FAS 140

25 beyond that, and so I think we'll be able to wrap up pretty

1  quickly here.

2      We talked yesterday about the importance to you of the

3  existence of end-investor commitments.  Was it also important to

4  you in terms of internal control on the AOT that it appeared

5  that money was coming in as it should be if AOT was operating

6  properly?

7  A.  Yes.

8  Q.  In your deposition, you talked about a DDA account, and I

9  couldn't figure out what that was from the transcript.  Do you

10  remember what that --

11  A.  That's a checking account.

12  Q.  I'm sorry.  What?

13  A.  That's a demand-deposit account or checking account, but I

14  don't remember what we talked about in the deposition.

15  Q.  Okay.  Well, I -- what I wrote down is that you said that

16  you saw in the DDA account there was money coming in and out,

17  and that's one reason why you thought that the AOTs were being,

18  you know, sold to end investors and that they were paying the

19  money just like they were supposed to.  Do you remember that?

20  A.  I don't remember it, but that does sound correct.  If

21  you're -- if the cash is coming in, I thought we were getting

22  paid off and then buying new ones.  And that's the way it should

23  have worked.

24  Q.  And if you could confirm this, you indicated in your

25  deposition that that fact gave you comfort that it -- the

1  internal control made it look like the AOTs were functioning as
2  they should; right?
3  A.  Yes.  I can confirm that.  Yes.
4  Q.  And was it Mr. Hosein who communicated that to you?  Do you
5  remember?
6  A.  It would have been the treasury department.  I don't
7  remember specifically, but it would have been Kamal Hosein or --
8  yeah.  Out of that group that he managed.
9  Q.  The -- I'll turn now to what I think will be my last
10  subject, and that is some conversations that you had with
11  Mr. Thomas, of Crowe, in 2008.  I realize you might not remember
12  the year.  But do you remember, as you said in your deposition,
13  that you had some conversations with Mr. Thomas -- and I think
14  maybe yesterday you mentioned Mr. Tynes, but -- about whether
15  the controls were operating properly?
16  A.  Well, the conversation was documentation of what key
17  controls existed and were these all the key controls over this
18  area.  "Operating properly" would require testing by Crowe and
19  PwC.
20  Q.  Okay.  The -- and you wanted to have controls tested for all
21  the significant accounts; is that right?
22  A.  Well, that's -- all the balance sheets should have been
23  tested.  Yes.  All material accounts.
24  Q.  Including AOT; is that right?
25  A.  Yes.

1  Q.  You indicated in your deposition that you discussed with him

2  that you wanted to make sure that these controls were tested and

3  working appropriately, including for AOT.  Did he represent to

4  you that the controls were adequate after he tested them in the

5  mortgage warehouse lending division?

6  A.  Well, the conversation with Tommy Tynes and Mike Thomas was

7  relating to documentation, that we had the key controls

8  documented.  We received reports from Crowe Horwath at the time

9  that indicated that mortgage warehouse lending -- there were

10 very few findings in the internal audit reports.  They were

11 considered clean internal audit reports year after year after

12 year.

13 Q.  Well, let me ask this.  Did Mr. Thomas ever disclose that

14 Crowe had not tested any of the controls relating to the AOT?

15 A.  No.

16 Q.  If he had disclosed that to you, would that have been

17 important to you?

18 A.  Yes.

19 Q.  And if he had disclosed that to you, would you have made

20 sure to inform PwC about that?

21 A.  Well, what we would have done is asked that he test those

22 controls over AOT.

23 Q.  And if, for some reason, you knew that they hadn't been

24 tested when PwC was doing its audit, would you have told PwC

25 about that?

1   A.  I would have asked them probably to test it, make sure they

2   look at it.

3   Q.  The --

4   A.  That should have been -- but I can't direct -- let me -- let

5   me retract that answer.  You know, I'm the one being audited.

6   Q.  Right.

7   A.  I don't direct PwC's testing.  PwC had carte blanche to look

8   at everything in our company.  It's their job to express an

9   opinion on the financials.  It's not my job to tell them what to

10  test and what not to test.

11  Q.  No, but it is your job --

12  A.  We would have told Crowe, who are our internal auditors,

13  that they need to address the testing of internal controls.

14  Q.  But it was your job to make representations to PwC that, in

15  management's view, you had adequate controls in place that had

16  been tested internally; right?

17  A.  Like I said, I would have told Crowe to test the internal

18  controls.

19  Q.  No, I'm asking a different question.

20  A.  I hear your question.  I can't answer that.  That's --

21  Q.  You can't answer that question?  Was it your --

22  A.  So you're saying that I should tell PwC --

23  Q.  No.  No.  I don't think you heard my question, ma'am.

24  A.  I misunderstood.  Okay.

25  Q.  My question is, was it your responsibility to represent each

1  year to PwC that management had in place adequate internal

2  controls that had been tested internally?

3  A.   That -- we represented that there was nothing that would

4  indicate our internal control environment was not operating

5  properly.

6  Q.   Right.  And so, then, my question is not whether you would

7  direct PwC to do something.  My question is if, at the time

8  you're making that representation to PwC, you had been told that

9  AOT -- the controls had not been tested, you would have

10 communicated that fact to PwC, wouldn't you?

11 A.   It would have been hard to represent the internal controls

12 were operating properly had they not been tested.

13 Q.   That's -- and that was my only point.  So I apologize if I

14 got us confused there.

15     Did Mr. Thomas, of Crowe, disclose to you that Crowe had

16 never tested the internal control concerning end-investor

17 commitments?

18 A.   No.

19 Q.   And similarly, if that was the case and you had been told

20 that, you would not have been able to represent to PwC what you

21 represented; right?

22 A.   Correct.

23         MR. BECK:  That's all that I have, Your Honor.  Thank

24 you.

25         MR. MULLIN:  Your Honor, could we have -- I know it's

1  very early in the day. Could we have just about ten minutes to

2  talk among ourselves? I think it would help us cut down,

3  because we just -- we didn't know he was going to be that short.

4          THE COURT: Yes. I think that it took everybody a bit

5  by surprise. Sure. Let's take -- but it would help if I had

6  some idea how much longer you are all going to be. Do you have

7  any idea now?

8          MR. MULLIN: Yes, I do. Right now I can tell you that

9  I think we'll be out of here by lunch for sure.

10         MR. CAMPBELL: For CBG, Your Honor, I think I would

11  have no more than an hour.

12         THE COURT: An hour?

13         MR. CAMPBELL: Yes.

14         THE COURT: Okay. Well, then I just wanted to be sure

15  we weren't going to do something like Mr. Beck just did and

16  you-all are going to be done in 15 minutes. Okay. If that's

17  what -- all right. We're still where I thought we would be.

18  We'll be done by lunch; right?

19         MR. MULLIN: Yes, Your Honor.

20         THE COURT: Okay. Then let's take a ten --

21         MR. BECK: The same caveat I expressed yesterday, Your

22  Honor. If they're going to do examinations that are outside of

23  the scope of what I did, I don't know what my redirect would be.

24  I have no idea what they're planning.

25         THE COURT: Well, right now, they don't either. So

1  they will after -- they will after a ten-minute recess, which is

2  just what we're about to take.

3          You may step down during that time.

4          Court will be in recess.

5      (Recess was taken from 9:16 a.m. until 9:29 a.m., after

6       which proceedings continued, as follows:)

7          THE CLERK:  Court is in session.

8          THE COURT:  Please be seated.

9          Ready to go?

10         MR. MULLIN:  The FDIC has no questions for this

11  witness.

12         MR. CAMPBELL:  Your Honor, CBG has no questions for

13  this witness either.

14         MR. BECK:  That shortens my redirect substantially.

15         THE WITNESS:  You made my day.

16         THE COURT:  Well, what can I say?  You may step down.

17         THE WITNESS:  Thank you.

18         THE COURT:  And you are excused.

19         And I assume, counsel, we have no further witnesses?

20         MR. BECK:  Not --

21         THE COURT:  Here.

22         MR. BECK:  Ms. Moore may end up having to rejoin us in

23  the damages trial, but that's for another day.

24         THE COURT:  And that's going to be by video, I

25  understand?

1    MR. BECK:  That would be by video link, and we have a

2 separate subpoena.

3    But I didn't want you to think that we were never going

4 to speak again.

5    THE WITNESS:  You know, I have no such expectations.

6    MR. BECK:  We have no more witnesses here in Alabama.

7 We'll resume in Washington on Tuesday.

8    THE COURT:  Right.  On Tuesday.

9    Now, counsel, I do have a couple of other questions --

10 well, actually, really only one.  Exhibits.  What have you been

11 doing by way of exhibits?  What is your expectation?  Is your

12 expectation that all of the exhibits that we've referred to here

13 have been admitted?

14    MR. BECK:  That is our expectation, as I think we

15 indicated on the first day, that exhibits that have been

16 referred to and not objected to during the trial would be deemed

17 to be admitted.

18    THE COURT:  Okay.  It's important because I think Lynn

19 knows that back in D.C., but I'm not sure Ann was aware of the

20 procedures we were using.  I would appreciate it if after I

21 leave you talk to Ann and make sure that those exhibits here

22 that you've used and you're deeming admitted, she has marked

23 admitted.  And then we will send them back to D.C. to go with

24 all the other exhibits; right?

25    Is that what you're anticipating happening?

 1      (Off-the-record discussion)

 2          THE COURT:  Gracious.  I didn't even have to show up

 3   this morning.  Everything has been take care of.  Ann indicates

 4   that she and Amy Gonzales are going to get together, and they're

 5   going to take care of everything.

 6          MR. BECK:  I'm confident that Lori for us --

 7          THE COURT:  Amy for --

 8          MR. BECK:  -- and Amy -- it will all be done perfectly.

 9          THE COURT:  What more can I ask?  Well, counsel, you're

10   not going to have a total weekend, because you're going to be in

11   New York -- right? -- for -- right?

12          MR. BECK:  Yes.

13          MR. MULLIN:  Yes.

14          THE COURT:  Okay.  But I will see you on Tuesday.  And

15   we will get the dates set and get back to you probably this

16   afternoon.

17          Is there anything else?  I see other people waiting.

18          MR. MEDOW:  Judge, we would like to be heard on the

19   Crowe dates.

20          THE COURT:  Sure.

21          MR. MULLIN:  Judge, before Jon starts, could we -- I

22   just wanted to mention on the exhibits.  There are some

23   exhibits, Your Honor -- I think it's not a big number, but there

24   are some exhibits in this case that have not been specifically

25   referred to by a witness, but we would still want to offer into

1    evidence.  What are we supposed to do on that, just tell you one

2    day we want to offer these eight exhibits?

3            THE COURT:  Are you both -- are you all agreeing on

4    them?  Are there any objections?

5            MR. MULLIN:  Well, I don't know.  I would have to look

6    whether they're ones that we objected to.  Some of them would be

7    A exhibits.  Some of them might -- there might be some

8    objection.

9            MR. BECK:  Your Honor, all I would ask is -- I

10   recognize that they rested yesterday, but if they have those --

11   if they have exhibits like that, if they could let us know over

12   the weekend so that in our responsive case we would know what it

13   is they put in in their case.  That's all I ask.  And then we'll

14   have some exhibits as well that we will want to introduce that

15   may not be the subject of testimony, and we'll do that in

16   Washington during our case.

17           MR. MULLIN:  Okay.  That's fine.  That's what I -- I

18   thought both sides would have some.

19           THE COURT:  I didn't understand that resting meant, you

20   know, that --

21           MR. BECK:  And that's why I say I'm not standing on

22   ceremony.  I just wanted --

23           THE COURT:  We've got all next week to take care of

24   this.  By the time we're ready for closing arguments, just have

25   all the exhibits taken care of so that you can refer to them,

1  because I assume that's what you're going to do.  If you're not

2  using them with a witness, you intend to use them in your

3  closing arguments.

4          MR. BECK:  Yes, Your Honor.  And all I was asking for

5  is -- because we're going to put our case in in response to

6  their proof, I just want to know over the weekend what documents

7  there are.

8          MR. MULLIN:  Sure.

9          MR. BECK:  Then on closing, are we -- Friday closing?

10         THE COURT:  Friday.  Think about how much time you want

11  and then cut it in half.

12         MR. BECK:  We would like two days.  Friday should be

13  sufficient.

14         MR. MULLIN:  Judge --

15         THE COURT:  Seriously, we've got three parties doing

16  closing.  We've got one day.  I assume you don't want to cut

17  into what is already a short week; right?  You don't want to cut

18  into the proof.

19         MR. BECK:  Right.  So we're --

20         THE COURT:  So Friday can be all day, as far as I'm

21  concerned.  I don't care.  You can do some proof on Friday and a

22  little bit of closing.  I would assume you would want all day

23  Friday for closing.  And I would be happy with that because

24  there's so many facts to marshal and exhibits to marshal.  But

25  even with all day, you still have three parties, so they can't

1 be all that long. So figure it out. You've been -- counsel,

2 considering how complex this case is, you've been remarkable in

3 cooperation. And it's made it a lot pleasanter.

4      MR. BECK: We'll get --

5      THE COURT: And with that, now that I've complimented

6 you on it, you can't possibly doing something awful around

7 closings; right?

8      MR. BECK: I think we'll be able to figure it out.

9      MR. MULLIN: Yes, Your Honor. And we might have --

10 just to let the Court know, we might have a very short rebuttal

11 witness, possibly. We're still thinking about that and seeing

12 what they do this week. And I don't know whether --

13      Do you have three witnesses next week? Is that the

14 plan?

15      MR. BECK: I think that's right. Yes, three witnesses.

16      MR. MULLIN: Right. Okay.

17      THE COURT: It seems to work. I mean, look at the fact

18 that we're finished. Okay.

19      Yes. You wanted to talk about the time.

20      MR. DORSEY: This actually relates a little bit to

21 Crowe. But in judging the dates, there are two things in

22 particular for the Crowe trial that I think all the parties,

23 both parties, would be interested in. And that is, number one,

24 we -- Your Honor said, I don't even want to think about the

25 Crowe trial, earlier, when we were doing pretrials. And we

1  understood that and observed that.  But that leaves a question

2  of whether we need further pretrial hearings before that trial.

3  And secondly, I'm not sure what the Court's desire will be at

4  that point as to bifurcation or not bifurcation of the Crowe

5  trial.  And I suspect that is part of what they stepped to the

6  lectern to talk about.

7          MR. MEDOW:  It is, Your Honor.  Really, I had two

8  questions.  One was were you contemplating the same damage

9  liability bifurcation in our trial as you've had in the PwC

10  trial.  And second, based on the prior discussion we've had with

11  the Court, we're assuming that our weeks in Montgomery would be

12  four-day weeks.  Is that still the Court's intention?

13          THE COURT:  Yes and no.  It has occurred to me,

14  belatedly, given the Court's somewhat sparse travel information

15  from our travel agent -- it occurs to me that there may be a

16  more efficient way to get here and back than coming the way I

17  came.  Something has to be better than the way I came.

18          MR. MEDOW:  If you find a good way, let us know.

19          THE COURT:  Well --

20          MR. PARZEN:  Not through Seattle, I hope.

21          THE COURT:  It may be -- let me see how it goes today.

22  And what I'm trying to do is go through Birmingham, which would

23  give me a direct flight instead of this, you know, crazy

24  changing of planes, which is totally unpredictable.

25          If that works, if that works, then rather than four

1  days, it may be that we end early enough on Friday for me to

2  catch the plane that I'm catching today, which is six something,

3  with plenty of time if we ended at noon.  And it may be Monday

4  morning would work.  So instead of four days, it may be two half

5  days, beginning and end, which would give us all a weekend but

6  still get us four full days, especially if we go till five and

7  take an hour lunch.  We should be able to do that.  I'll let you

8  know before we start.

9         But you are right.  We need to do some pretrial work.

10 And right now, it is very hard for me to figure a time, but I

11 will get to you with -- I recognize that we really need a

12 pretrial conference, at least one.

13        MR. MEDOW:  We agree, Your Honor.

14        With respect to the dates, if, in fact -- as between

15 the two dates that were potential in the e-mail we got, our

16 preference would be the early one, November 27th.  Obviously, if

17 the PwC damage phase, if there is one, is going forward that

18 week, we understand we would get moved to the following week.

19 But if the Court will hear the damage part earlier, we would

20 prefer going on the earlier date.  And it's really -- to return

21 to some of the topics we talked about yesterday because of

22 timing, we've heard the Court's admonitions, and we are going to

23 do everything possible to pare down and avoid repetitions.  I

24 don't --

25        THE COURT:  Let's talk about that.  Can you think of --

1    I mean, would a statement of agreed facts work?

2         MR. MEDOW:  Well, on that, Judge, we have thought -- at

3    least we've thought about it.  We haven't really talked much

4    with counsel yet.  I think, based on past experience, a

5    statement of agreed facts would be difficult.  And we'd probably

6    end up with something that really wouldn't advance the trial.

7    It would be basic stuff, the type of thing you would ask in an

8    introductory question to move on, and it just wouldn't save a

9    lot of time.

10        One possibility would be on the overlap witnesses --

11   and there haven't been a lot, but there have been some --

12   O'Halloran, Beville, Bathen, Moore so far -- on those, we would

13   be certainly willing to talk with plaintiffs about stipulating

14   that if the witnesses were asked the same questions, they'd give

15   the same answers.  So at least we can get their testimony as

16   relevant to the -- on the relevant portions.  There's been a lot

17   that isn't relevant to us.  But we at least could get that

18   testimony into the record in our case and not have to repeat it.

19   So that would be one way.  There may be others.  We'll explore

20   it with them.

21        THE COURT:  That would be interesting, just to cite to

22   the transcript, transcript lines.

23        MR. MEDOW:  Yeah.  Yeah.  Exactly.  Page, line, to

24   page, line, whatever.  We think that would help.  But even if we

25   start on December 4th, the second day, it's kind of fait

```
 1   accompli it's a three-week trial, because you have the week of
 2   the 4th, the 11th, the 18th, and then you're into the Christmas
 3   week.
 4            THE COURT:  But there's always January.
 5            MR. MEDOW:  There is.  And we'll do that as well.  I
 6   just wanted to bring out that if we don't -- if we're limited to
 7   three weeks, particularly with the short weeks in Montgomery,
 8   you know, we're down to 13, 14 days.  And just in Montgomery
 9   alone -- I went again through the -- just the "will call" list,
10   assuming bifurcation, and there will be three Crowe witnesses,
11   none of whom you've heard; seven company witnesses, most of whom
12   you haven't heard; and then we would be on to experts.  Now,
13   that could be deferred to Washington, but if we're in a
14   three-week trial, we've got to put them in -- assuming we're
15   starting in Washington, then we would have to do them in those
16   last two weeks in Montgomery.
17            So bottom line, Your Honor, again, we understand the
18   Court's admonition.  We're going to look to pare and avoid
19   repetition, but I'm really having a hard time seeing the math
20   work that --
21            THE COURT:  Well, if -- let me say this.  If you look
22   at it, both -- all sides, and if three weeks is really an
23   impossibility, we had discussed four weeks too.  And I don't
24   want to be rigid on that, but I would ask that you set it up so
25   that the fourth week is in D.C.
```

1            MR. MEDOW:  We're fine with that.

2            MR. PARZEN:  That's -- Your Honor, Mr. Parzen.  That's

3    easy because we have --

4            THE COURT:  I mean, first of all --

5            MR. PARZEN:  It's experts.  D.C.  It's easy.

6            THE COURT:  Okay.  First of all, judging from the fact

7    that it is now a quarter to ten and we're finished for the day

8    that was supposed to be a whole day and judging from the fact

9    that I have now changed my plane reservations three times,

10   things tend to go faster than you anticipate.

11           MR. MEDOW:  We understand that.

12           THE COURT:  You know, we're here for three days; we

13   thought it was five days.  Believe me, I'm not complaining.  I

14   think it's wonderful.  We're all going to get home even before

15   New York for you guys.  I'm just pointing out that bear in mind

16   that things do move along.  So if you have the experts set for

17   what might be a fourth week and they're a day or two over the

18   fourth week, that would be fine.  I don't see a problem.

19           Let me get you what I think -- what I'm thinking now

20   would be a viable schedule for the Court and the dates.  My

21   thinking is that -- well, let me think about it before I even

22   start talking about it.  But somewhere in there we're going to

23   have time for some pretrial going on.

24           I think the idea of using the transcripts -- I'm

25   curious whether -- is the FDIC going to use the same expert?

1              MR. MULLIN:  No.

2              THE COURT:  Oh, no.  Okay.

3              MR. MULLIN:  We do not -- Dr. Carmichael is not in the

4    Crowe case.  We have a different expert.  He lives in

5    Birmingham, though, incidentally.

6              THE COURT:  He lives in Birmingham.  So he'll go on

7    while we're here.

8              MR. MULLIN:  Well, it would make some sense.  We've

9    been -- if the Court -- we were trying to get more of the trial

10   into Washington, so he was willing to go to Washington too.  So

11   wherever that works best.  But we'll -- we do have him.  He

12   happens to be pretty close here.

13             THE COURT:  Okay.  See you all on Tuesday.  Nine

14   o'clock.

15             MR. MULLIN:  Thank you.

16             MR. BECK:  Thank you.

17        (Montgomery proceedings concluded at 9:47 a.m.)

18                     * * * * * * * * * *

19

20

21

22

23

24

25

1                     COURT REPORTER'S CERTIFICATE

2         I certify that the foregoing is a correct transcript

3 from the record of proceedings in the above-entitled matter.

4         This 4th day of October, 2017.

5

6                          /s/ Patricia G. Starkie
                                 Registered Diplomate Reporter

7                               Certified Realtime Reporter
                               Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25