IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE COLONIAL BANCGROUP INC., and KEVIN O'HALLORAN | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) ) | |
| | ) ) | CASE NO. 2:11-cv-746-BJR |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP, | ) ) ) | |
| Defendants. | ) ) ) | |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:12-cv-957-BJR |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP | ) ) ) | |
| Defendants. | ) | |

**ORDER ON THE LIABILITY PHASE OF THE PWC BENCH TRIAL**

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................... 4

II. SUMMARY OF THE CASE ........................................................................................... 5

III. STANDARD OF REVIEW ............................................................................................. 7

IV. DISCUSSION ................................................................................................................. 7

   A.  *Factual Background* ................................................................................................. 7

     1.  The Parties ........................................................................................................ 7

     2.  The Role of PWC .............................................................................................. 8

     3.  Colonial's Mortgage Warehouse Lending Division ......................................... 9

     4.  The Fraud ........................................................................................................ 10

     5.  The Fraud Is Discovered ................................................................................. 11

   B.  *Plaintiffs' Claims against PWC* ............................................................................ 12

     1.  Plaintiffs' Professional Negligence Claims ................................................... 12

       (a) The Mortgage Warehouse Lending Division ............................................. 13

         (1)  The COLB Facility .............................................................................. 13

         (2)  The AOT Facility ................................................................................. 14

           i.   The First Step of an AOT Transaction ......................................... 15

           ii.  The Second Step of an AOT Transaction ..................................... 15

       (b) The Fraud ................................................................................................... 16

         (1)  Account Sweeping ............................................................................... 16

         (2)  The Fraud in the COLB Facility ......................................................... 17

         (3)  The Fraud in the AOT Facility ............................................................ 18

       (c) PWC Was CBG's Independent External Auditor ....................................... 19

         (1)  PWC's and CBG's Obligations under the Engagement Letters ........... 20

         (2)  PWC's and CBG's Obligations under the Auditing Standards ............. 22

       (d) The Audit Procedures PWC Performed in 2002-2005 and 2008 ................ 24

       (e) PWC Owed a Duty to CBG and Colonial ................................................. 25

       (f) PWC Breached the Professional Duties It Owed CBG and Colonial .......................... 26

         (1)  PWC Failed to Design Its Audits to Detect Fraud ................................. 27

         (2)  PWC Did Not Obtain Sufficient Competent Evidence of the COLB Transactions to Sign Its Audit Reports ............................................... 29

           i.   PWC Failed to Inspect the underlying Loan Documents .................................... 30

           ii.  PWC Failed to Obtain other Competent Evidence of the COLB Asset's Existence ........................................................................................... 32

(3)    PWC Did Not Obtain Sufficient Competent Evidence of the AOT Transactions to Sign Its Audit Reports.......................................................................................... 34

i.    PWC Never Gained an Understanding of the AOT Transactions ..................... 35

ii.    PWC Did Not Test for the Physical Existence of the AOT Asset ...................... 38

iii.    PWC Failed to Obtain other Competent Evidence of the AOT Asset's Existence .................................................................................................................. 38

(g) Bank of America's Breach of Its Custodial Duties to Colonial Was an Intervening Cause of the Shipped Not Paid Damages .................................................... 41

(1)    The Shipped Not Paid Fraud.................................................................... 42

(2)    BOA's Breaches Were an Intervening Cause of the Shipped Not Paid Damages.. 46

2.    Plaintiffs' Breach of Contract Claims against PWC ...................................... 53

(a) PWC Owed CBG and Colonial a Contractual Duty under the.................................... 53

Engagement Letters ...................................................................................... 53

(b)  PWC Breached Its Contractual Obligations............................................... 56

(c)  CBG Breached Its Contractual Obligations ............................................... 56

3.    The FDIC's Wantonness Claim against PWC.................................................. 58

*C.    PWC's Affirmative Defenses to CBG's Professional Negligence* Claim ....................... 62

1.    The *in Pari Delicto* Doctrine and the *Hinkle* Rule ......................................... 63

(a)  Ms. Kissick's and Ms. Kelly's Actions Are Imputed to Colonial.............................. 64

(1)    The Sweeping Phase of the Fraud.......................................................... 67

(2)    The COLB Plan B Phase of the Fraud .................................................... 68

(3)    The AOT Phase of the Fraud ................................................................ 70

(b)  Ms. Kissick's and Ms. Kelly's Actions are Imputable to CBG .................................. 74

2.    The Audit Interference Rule ........................................................................ 79

(a)  The Knowledge of Multiple MWLD Employees........................................... 81

(b)  Ms. Kissick and Ms. Kelly Actively Hid the Fraud .................................... 84

(c)  The Knowledge of CBG and Colonial's Treasurer and Assistant Treasurer .............. 85

V.    CONCLUSION.......................................................................................... 91

# I.     INTRODUCTION

Plaintiffs, the Federal Deposit Insurance Corporation as Receiver for Colonial Bank ("FDIC"), and The Colonial BancGroup, Inc., represented by Kevin O'Halloran, as Plan Trustee acting on behalf of  The Colonial BancGroup, Inc. (collectively "CBG"), bring this action against Defendant PricewaterhouseCoopers LLP ("PWC"), CBG's independent, external auditor, for failing to discover a fraud perpetrated against Colonial Bank ("Colonial") by Taylor, Bean & Whitaker Mortgage Corporation ("TBW") and certain of Colonial's employees. Plaintiffs also fault PWC for allowing CBG to account for certain transactions as sales of mortgages from TBW to Colonial, rather than as loans from Colonial to TBW that were secured by those mortgages.

This Court bifurcated the liability and damages portion of the case and a bench trial regarding PWC's alleged liability was held September 18 through October 13, 2017. David Mullin and John G. Turner, III of Mullin Hoard & Brown LLP, Stephen Sorensen of Thomas, Alexander, Forrester & Sorensen LLP, and Lawrence H. Heftman of Schiff Hardin LLP appeared for the FDIC; Rufus T. Dorsey, IV and Ronald T. Coleman, Jr. of Parker Hudson Rainer & Dobbs, LLP, and Nicholas J. DiCarlo of DiCarlo Caserta & McKeighan PLC appeared for CBG; and Philip S. Beck, Mark L. Levine, Christopher D. Landgraff, Jameson R. Jones of Bartlit Beck Herman Palenchar & Scott; and Meredith Moss of King & Spalding appeared for PWC.

The Court heard testimony in open court from:  Kevin O'Halloran, Douglas Carmichael, Gary Westbrook, Kim Jackson, Patrick Cox, Timothy Lucas, Phillip Rivers, Lewis Beville, Mary Lou Bathen, Sarah Moore, Jeffrey Naumann, and Sandra Johnigan. In addition, the parties submitted the depositions of Arthur Barksdale, III, Wayne Beahler, Desiree Brown, Laura Bryan

Laura Dawkins, Kevin Donnelly, Cherie Fite, Frank Gaetano, Teresa Hawkins, Brent Hicks, David Hoffman, Clinton Holdbrooks, Sandra Jansky, Teresa Kelly, James Wesley Kelly, Catherine Kissick, Marianne Lester, William Lewis, Neil Luria, Sheila Moody, Sarah Roland, Brent Spencer, Ralph Summerford, Louis Thompson, Pamela Vitto, Peter Wallace, and Kevin Young.

The Court has considered the testimony of each of the witnesses, the admitted trial exhibits, the parties' proposed findings of fact and conclusions of law, and the arguments of counsel. The following constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.[1]

## II.   SUMMARY OF THE CASE

On August 3, 2009 at approximately 9:30 am, special agents from the FBI and the Treasury Department simultaneously raided the offices of Colonial and Colonial's largest customer, TBW. And with that, the United States financial sector, which was already reeling from the subprime mortgage crisis, the collapse of Lehman Brothers, and a drop in the Dow Jones Industrial Average of more than 20%, was rocked by yet another financial crisis: Colonial, one of the 25 largest banks in the United States at the time of the FBI raid, had been the victim of a multi-year, multi-faceted, multi-billion dollar fraud.

Ten days after the raid, the State of Alabama Banking Authorities closed Colonial and appointed the FDIC its Receiver. CBG, Colonial's parent company, filed for Chapter 11 bankruptcy protection eleven days later. CBG's bankruptcy filing was followed by that of TBW, the largest privately held mortgage company in the United States at the time.

---

[1] To the extent certain findings of fact may be deemed conclusions of law, or certain conclusions of law deemed findings of fact, they shall each be considered findings or conclusions, respectively.

The fraud, which centered in Colonial's Mortgage Warehouse Lending Division ("MWLD"), was orchestrated by Lee Bentley Farkas, the Chairman of TBW, with the aid of Catherine Kissick, a senior vice president at Colonial and the head of the MWLD, and several other Colonial employees. The fraud began in 2002, grew and became more complex as the years progressed, until it was exposed in August 2009. By the time the fraud was shut down, the fraudsters had diverted over $2 billion dollars' worth of assets from Colonial, ensnared multiple financial institutions, including government-sponsored enterprises such as the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Government National Mortgage Association ("Ginnie Mae"), and cost thousands of innocent employees their livelihoods.

As will be discussed in more detail below, Defendant PWC acted as CBG's independent, external auditor during all of the years that Colonial was victimized by the fraud, yet PWC never discovered it. CBG and the FDIC each filed a lawsuit against PWC, alleging that PWC breached the professional and contractual duties it owed CBG and Colonial, thereby allowing the fraud to go undetected. CBG's and the FDIC's lawsuits also state claims against Crowe Horwath LLP ("Crowe"), who acted as CBG's internal auditor during the years that Colonial was victimized by the fraud and who also failed to detect the fraud.

The lawsuits were consolidated and the parties proceeded through discovery and pretrial motions. Through stipulation and motion practice, Plaintiffs' claims against PWC and Crowe were bifurcated for purposes of trial and were also bifurcated with respect to liability and damages. This order pertains to the liability portion of the PWC bench trial. The Crowe bench trial is scheduled to commence after the conclusion of the PWC bench trial.[2]

---

[2] The FDIC brings claims based on the 2002-2008 audit years, while CBG's claims are based on the 2007-2008 audit years. This Court previously ruled that Plaintiffs' claims arising out of the 2006-2007 audit years will be tried to a jury; therefore, the FDIC's claims in this bench trial are limited to the 2002-2005 and 2008 audit years and CBG's claims are limited to the 2008 audit year.

## III.   STANDARD OF REVIEW

In a bench trial, the judge serves as the sole fact-finder. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law. *See Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993) (holding that "it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony."); *Prickett v. United States*, 111 F. Supp. 2d 1191, 1192 (M.D. Ala. 2000) (citing *Childrey*, 997 F.2d at 834) *aff'd*, 268 F.3d 1066 (11th Cir. 2001).

## IV.   DISCUSSION

### A.  *Factual Background*

The following is a bird's eye view of the factual background of this case. It is provided simply to orient the reader before the Court delves into the proffered evidence and the parties' specific claims. The narrative set forth in this background section is uncontested. The Court will make detailed findings as to the contested facts as they relate to each specific claim *infra*.

#### 1.   The Parties

There are two plaintiffs in this case: the FDIC, which was named Colonial's Receiver on August 14, 2009, and CBG, Colonial's parent company. The FDIC is organized and existing under the laws of the United States of America, and upon being named Receiver for Colonial, the FDIC succeeded to all rights, titles, powers, and privileges of Colonial. 12 U.S.C. § 1821(d). CBG was a public bank holding company headquartered in Montgomery, Alabama. Ex. A69 at 3; Stipulated Fact at 2. CBG declared bankruptcy on August 25, 2009, and is represented in this case by its bankruptcy trustee, Kevin O'Halloran. Tr. 150:2-23; Ex. B234 at 64. As will be discussed in more detail below, for all practical purposes, CBG (a single-bank holding company)

and Colonial (the subsidiary that made up at least 97% of CBG's assets) were one and the same entity. Tr. 2092:15-18.

There are also two defendants in this case: PWC and Crowe. PWC is an accounting and auditing firm, organized as a Delaware limited liability partnership headquartered in New York. PWC audited CBG starting in the 1980s through 2008. Tr. 1087:8-1080:12, 1281:7-10. Crowe is an accounting and auditing firm, organized as a limited liability partnership headquartered in Chicago, Illinois. Crowe audited CBG from at least 2002 through 2008.[3]

### 2. The Role of PWC

As a publicly traded company, CBG was subject to disclosure laws and regulations monitored and enforced by the U.S. Securities and Exchange Commission ("SEC"), including the requirement that CBG annually file a Form 10-K with the SEC. Tr. 165:3-6; Securities Exchange Act of 1934, as amended; 17 C.F.R. Part 210, *et seq*. The Form 10-K required a comprehensive summary of CBG's financial performance and an integrated audit of CBG's financial statement and internal controls by an independent auditor. *Id*. The Sarbanes Oxley Act of 2002 ("SOX"), imposed additional year-end disclosures and certification requirements relating to CBG's system of internal controls. Tr. 2179:7-2180:12, 2421:10-2422:8; 15 U.S.C. § 7262(a). Section 404 of SOX required that CBG's independent auditor perform an audit of the operating effectiveness of CBG's internal controls. Tr. 464:19-465:6; Ex. D1765; 15 U.S.C. § 7262(a)(2).

In order to fulfill these requirements, CBG retained PWC as its independent external auditor. Tr. 1087:8-1080:12, 1281:7-10. Relevant here, CBG and PWC entered into engagement agreements for the audit years 2002-2005 and 2008 ("Engagement Letters"). Exs. A2-A4, A7.

---

[3]  As discussed above, Plaintiffs' claims against PWC and Crowe were bifurcated and this order only pertains to Plaintiffs' claims against PWC.

Pursuant to these Engagement Letters, PWC agreed to audit CBG on a consolidated basis, which meant that the financial statements PWC audited included the financial information of Colonial, along with that of CBG.

At the conclusion of each of its audits for 2002 through 2008, PWC issued a "clean" or unqualified audit report representing, among other things, that (1) PWC had performed an audit in accordance with the relevant auditing standards; (2) that CBG's year-end financial statements were fairly and accurately presented in all material respects the financial position of CBG; and (3) that CBG maintained in all material respects effective internal controls. Ex. A69 at 79; Tr. 159:11-12, 784:2-11, 2135:3-2136:5.

### 3.   Colonial's Mortgage Warehouse Lending Division

Colonial was a large bank with over $26 billion in assets and more than 340 branches throughout Alabama, Georgia, Florida, Nevada, and Texas in 2008. Tr. 1420:1-4. It was a full service bank for both consumers and businesses. The Mortgage Warehouse Lending Division ("MWLD") was a division of Colonial based in Orlando, Florida. *Id*. The MWLD represented approximately 20 percent of Colonial's operations. Tr. 2153:17-2154:12. Ms. Kissick, a senior vice president of Colonial, ran the MWLD. Kissick Dep. (Ex. D3074) at 22:7-24, 306:24-307:25.

The MWLD provided short-term funding to mortgage originator customers to enable those customers to originate and fund mortgage loans until such time as those loans could be sold to third-party investors, such as Freddie Mac or Ginnie Mae. Tr. 168:14-20; Ex. A69 at 50. The MWLD provided funding to over 60 mortgage-origination companies; TBW was the MWLD's largest customer. Exs. A279 at 10, D3074 at 56:16-18. The MWLD provided TBW with access to funding for the purpose of originating mortgages under three different types of funding facilities: (1) a traditional warehouse line of credit whereby Colonial accepted the underlying

mortgage loans that TBW originated as collateral, (2) the COLB Facility whereby Colonial acquired a 99% participation interest in the underlying mortgage loans that TBW originated as collateral, and (3) the AOT Facility whereby Colonial acquired a 99% participation interest in a pool of loans TBW originated as collateral. Ex. A69 at 50, D3074 at 50:10-20.

### 4. The Fraud

As stated above, between 2002 and August of 2009, Colonial was victimized by one of the largest and longest-lasting bank frauds in American banking history. The fraud was spearheaded by Mr. Farkas, the chairman of TBW, along with the assistance of Ms. Kissick, the head of the MWLD, and several Colonial employees. The fraud centered in Colonial's MWLD and the COLB and AOT Facilities transactions with TBW.

The fraud began around March 2002, when TBW began overdrafting its operating account with Colonial. T. Kelly Dep. (Ex. D3072) at 405:22-406:20; Kissick Dep. (Ex. D3074) at 106:7-22. To prevent the overdrafts from appearing on Colonial's overdraft reports, employees in the MWLD began "sweeping" money from TBW's investor funding account to TBW's operating account. Kissick Dep. (Ex. D3074) at 75:9-77:22, 81:3-83:2; T. Kelly Dep. (Ex. D3071) at 228:19-229:8, 230:11-231:2. The employees then swept the funds back into the investor funding account after the overdraft report was generated. Kissick Dep. (Ex. D3074) at 76:23-77:20; T. Kelly Dep. (Ex. D3071) at 231:25-232:13.

In late 2003, the fraudsters moved TBW's overdraft, which was approximately $120 million at this point, to the COLB Facility. T. Kelly Dep. (Ex. D3071) at 33:25-34:13, 35:3-12; Kissick Dep. (Ex. D3074) at 124:3-13, 1031:9-22, 146:15-147:4; Ex. D67; Ex. D418 at 8 (¶ 33); Tr. 303:23-304:1. Under this phase of the fraud, TBW acquired COLB funding by selling Colonial participation interests in mortgages that had already been sold to other investors.

T. Kelly Dep. (Ex. D3071) at 35:3-12. This had the effect of concealing TBW's overdraft by making it appear on Colonial's books and records as if Colonial owned a 99% participation interest in mortgages that had value, when, in reality, the mortgages were valueless. T. Kelly Dep. (Ex. D071) at 247:18-248:6; Kissick Dep. (Ex. D3074) at 125:12-17.

In the summer of 2005, the fraudsters moved the fraud from the COLB Facility to the AOT Facility. T. Kelly Dep. (Ex. D3071) at 44:23-45:2, 282:24-283:4; Kissick Dep. (Ex. D3074) at 172:3-15; Ex. D419 at 4 (¶ 8); Tr. 285:21-24, 318:6-13. At this point, the fraud had grown to nearly $600 million. Ex. A66 at 60; Tr. 472:9-473:3 (Carmichael). During this phase of the fraud, instead of Colonial paying TBW for participation interests in individual mortgages that had already been sold to other investors, Colonial paid TBW for pre-certified securities-in-process that were supposed to be backed by pools of mortgages, but that in fact had no underlying mortgages backing them. Kissick Dep. (Ex. D3074) at 183:3-16; Ex. D419 at 4-6 (¶¶ 9-11).

### 5.   The Fraud Is Discovered

As set forth above, on August 3, 2009, the FBI raided Colonial's and TBW's offices. Tr. 1203:4-8 (Jackson); Jansky Dep. (Ex. P3131) at 47:3-48:18. By this time, the fraud had grown to $2.3 billion dollars. Tr. 286:11-287:7 (O'Halloran). The FDIC was named receiver for Colonial on August 14, 2009, and CBG filed for bankruptcy on August 25, 2009. Tr. 150:2-23, 286:11-15 (O'Halloran); Ex. B234 at 64.

In 2011, Ms. Kissick pled guilty to conspiracy to commit bank, wire, and securities fraud. Kissick Dep. (Ex. D3075) at 624:2-20; Ex. A381 at 1; Ex. D419. She was sentenced to eight years in prison. Kissick Dep. (Ex. D3075) at 631:11-16; Ex. P1750. Teresa Kelly, an operations analyst who worked under Ms. Kissick and who assisted in perpetrating the fraud, also pled

guilty to conspiracy to commit bank, wire, and securities fraud and was sentenced to three months in prison and nine months of house arrest. T. Kelly Dep. (Ex. D3071) at 26:20-27:4; Ex. D422. Mr. Farkas was convicted at trial and sentenced to 30 years in prison. Kissick Dep. (Ex. D3074) at 36:19-25. At least three other TBW employees went to prison because of their involvement in the fraud. *Id.* at 37:2-18.

### B.  Plaintiffs' Claims against PWC

The FDIC and CBG each bring a professional negligence claim for accounting malpractice based on PWC's failure to detect the fraud and on PWC's role in how CBG accounted for the COLB and AOT transactions on its financial statements. The FDIC also brings a wantonness claim based on the accounting issue. In addition, the FDIC brings gross negligence and negligent misrepresentation claims against PWC pursuant to the Restatement (Second) of Torts, § 552 for PWC's failure to detect the fraud.

Each Plaintiff also brings a breach of contract claim against PWC. CBG alleges that PWC breached its contractual obligations under the Engagement Letters; the FDIC also alleges that PWC breached those obligations, and further alleges that because Colonial was an intended third-party beneficiary of the Engagement Letters, the FDIC is entitled to recover damages against PWC.

The following are the Court's findings of fact and conclusions of law with respect to each of these claims.

### 1.  Plaintiffs' Professional Negligence Claims

As stated above, the FDIC and CBG both bring a claim against PWC for professional negligence. *See* FDIC Third Am. Compl., Dkt. No. 281 at 73; CBG Second Am. Compl., Dkt. No. 285 at 52. Broadly speaking, Plaintiffs allege that PWC was negligent because it failed to

perform sufficient audit procedures to uncover the fraud.[4] Under Alabama law, to recover for

professional negligence, a plaintiff must prove "(1) a duty to a foreseeable plaintiff; (2) a breach

of that duty; (3) proximate causation; and (4) damage or injury." *Crowne Invs., Inc. v. Bryant*,

638 So. 2d 873, 878 (Ala. 1994) (citing *Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992));

*Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So. 2d 665, 679 (Ala. 2001) (citing

*AALAR, Ltd., Inc. v. Francis*, 716 So. 2d 1141, 1144 (Ala. 1998)) ("The elements of a negligence

claim are a duty, a breach of that duty, causation, and damage."). The burden is on Plaintiffs to

establish each of these elements. *See Jamison, Money, Farmer & Co., P.C. v. Standeffer*, 678 So.

2d 1061, 1066-67 (Ala. 1996).

### (a)   The Mortgage Warehouse Lending Division

Colonial's MWLD provided short-term funding to TBW so that it could originate

mortgage loans. Kissick Dep. (Ex. D3074) at 56:16-18, Tr. 168:14-20 (O'Halloran); Ex. A69 at

50. The MWLD provided TBW access to funding through various funding facilities, two of

which are relevant to this lawsuit: the COLB Facility and the AOT Facility.

### (1)   The COLB Facility

In 2002, the MWLD created the COLB Facility. Under the terms of the COLB Facility,

Colonial would advance funds to a mortgage originator, the mortgage originator would use the

funds to fund mortgages loans, and in return, Colonial would receive a short-term 99%

participation interests in the mortgage loans. Ex. A372; Tr. 233:12-23, 238:19-239:11

(O'Halloran); Tr. 1098:9-1099:5 (Jackson). Advances to the mortgage originator were

conditioned on the mortgage originator having entered into a binding commitment with an end

---

[4]  As stated *supra*, Plaintiffs base their professional negligence claims on PWC's failure to discover the fraud and on
PWC's role in how CBG accounted for the COLB and AOT transactions on its consolidated financial statements.
This section focuses on the former basis for liability alleged by Plaintiffs. The accounting issue is discussed *infra* at
page 58.

investor to purchase the underlying mortgage loan. Ex. A372 at § 5(a)(i); Tr. 230:23-231:5, 232:21-233:1 (O'Halloran). When the mortgage loans were sold to the end investor, Colonial would be paid for its 99% participation interest in the mortgage loans (*i.e.*, Colonial was repaid for the sum it advanced to the mortgage originator). *Id*.

If the COLB transactions operated as intended, Colonial's 99% participation interest was to be evidenced by Colonial's receipt of a "participation certificate." Ex. A372; Tr. 228:17-20 (O'Halloran). The mortgage originator was also obligated to deliver to Colonial the original promissory note for each loan in which Colonial purchased a 99% participation interest. Ex. A372 at § 5; Tr. 230:14-22 (O'Halloran). These documents were supposed to be held as collateral for Colonial in its vault until such time that Colonial was paid for its 99% participation interest in the underlying mortgages.

### (2) The AOT Facility

In 2004, TBW also began to obtain funding from Colonial under a facility known as the AOT Facility. In contrast to the COLB Facility, which resulted in Colonial acquiring from TBW an interest in individual loans, under the AOT Facility, Colonial purportedly acquired from TBW a participation interest in pools of mortgage loans that were in the process of being packaged as mortgage backed securities ("MBS") issued by government sponsored entities ("GSE") such as Freddie Mac and Ginnie Mae, under agreement to be sold to third party investors. Tr.180:22-181:3, 186:1-5, 210:5-15 (O'Halloran).

TBW was the only MWLD customer that had access to funding from the AOT Facility. Tr. 163:3-12 (O'Halloran). Although TBW began receiving funding under the AOT Facility in 2004, there was no master agreement governing TBW's use of the AOT Facility until 2006 when Colonial ultimately entered into a master Mortgage Loan Participation Sale Agreement (the

"AOT Master Agreement") with TBW. Colonial also entered into a Custodial Agreement with TBW, whereby Colonial agreed to act as the as custodian of the underlying original AOT documents. Exs. A266, A370, D1536; Tr. 218:-16-219:6 (O'Halloran).

Under the terms of these Agreements, if operating as intended, an AOT transaction proceeded as follows:

### i.    The First Step of an AOT Transaction

The first step of an AOT transaction involved Colonial's purchase of a 99% participation interest in a pool of mortgage loans. Tr. 206:21-25 (O'Halloran); Tr. 801:3-13 (Westbrook). As part of the first step, TBW was supposed to originate individual mortgage loans, pool the loans, prepare a participation certificate that listed each of the loans in the pool (the "Participation Certificate"), and deliver the Participation Certificate to Colonial. Exs. A266, A370; Tr. 180:15-181:8, 184:25-185:7, 206:10-13, 210:20-211:2, 212:2-9 (O'Halloran); Tr. 778:16-20 (Westbrook). The Participation Certificate and the original mortgage documents for each loan in the pool then would be delivered to the trust department at Colonial, as custodian (the "Custody Department"), to be stored in its vault and held in safekeeping for the benefit of Colonial. Ex. D1536; Tr. 181:19-24, 182:6-9, 206:14-18, 211:5-12, 219:7-221:6 (O'Halloran); Tr. 778:16-23 (Westbrook). The Custody Department operated separately from the MWLD's lending operations. Tr. 183:16-19, 211:13-15 (O'Halloran); Tr. 832:10-12 (Westbrook). Importantly, no funds were supposed to be transferred to TBW under the AOT Facility until the Custody Department had confirmed receipt of the Participation Certificate, list of loans, and the mortgage documents. Exs. A370, D1536; Tr. 185:8-11, 188:1-3, 215:20-216:12 (O'Halloran).

### ii.    The Second Step of an AOT Transaction

In the second step of an AOT transaction, TBW was required to have a takeout commitment from an end investor wherein the end investor agreed to purchase the yet-to-be

issued government sponsored MBS (the "Takeout Commitment"). Tr. 185:12-18, 187:8-19, 207:1-6, 216:21-217:1 (O'Halloran); Tr. 779:1-7, 811:7-12 (Westbrook). The end investor was the party who was ultimately going to purchase the MBS and thereby pay Colonial back for the amount it funded to TBW under AOT. Tr. 185:19-25 (O'Halloran). TBW was required to assign its rights to the proceeds under the Takeout Commitment to Colonial (the "Takeout Assignment"). In other words, the Takeout Assignment was the document that "ensure[d] that [Colonial was] going to be repaid for all the billions of dollars that is going to TBW." Tr. 1300:19-1301:10 (Westbrook).

At the conclusion of the transaction and ultimate sale of the MBS to the end investor, the documents for the loan pools remained in Colonial's Custody Department, on behalf of the GSE that issued the MBS, but was reassigned within the Custody Department to the control area for whatever GSE issued the MBS. Tr. 231:22-232:12 (O'Halloran).

### (b) The Fraud

#### (1) Account Sweeping

As has already been briefly described, the TBW fraud began in 2002 when TBW began experiencing cash flow issues and difficulty staying within its credit limits. As a result, TBW began overdrawing on its operating account with Colonial and MWLD employees began sweeping funds between TBW's accounts at Colonial to mask the overdrafts. Plaintiffs do not fault PWC for failing to discover the account sweeping aspect of the TBW fraud. Tr. 660:3-6 (Carmichael). Therefore, this aspect of the fraud is not relevant to Plaintiffs' professional negligence claims and will not be discussed here. The account sweeping is, however, relevant to PWC's affirmative defenses against CBG and will be discussed in detail later in this order.

In late 2003, the fraudsters began operating the TBW fraud out of the COLB Facility.

T. Kelly Dep. (Ex. D3071) at 35:3-12. The fraudsters then shifted the fraud to the AOT Facility

in 2005 where the fraud continued until it was discovered in 2009. T. Kelly Dep. (Ex. D3071) at

44:23-45:2, 282:24-283:4; Tr. 285:21-24, 318:6-13 (O'Halloran). Plaintiffs fault PWC for failing

to discover these phases of the fraud, and therefore, it is necessary to understand how the fraud

was effectuated in the COLB and AOT Facilities.

(2)   The Fraud in the COLB Facility

By December 2003, TBW was overdrawn on its accounts at Colonial by approximately

$120 million. T. Kelly Dep. (Ex. D3071) at 33:25-34:13; Kissick Dep. (Ex. D3074) at 148:5-10.

The fraudsters referred to this as "the hole." The fraudsters decided to move the hole (*i.e.*,

TBW's overdraft) to the COLB Facility in an effort to better conceal it. T. Kelly Dep. (Ex.

D3071) at 239:11-14, 239:17-240:6; Kissick Dep. (Ex. D3075) at 1030:21-1031:8. Again, under

the COLB Facility, Colonial extended funding to TBW in exchange for a 99% participation

interest in the mortgage that TBW originated. The fraudsters shifted the hole to the COLB

Facility by having TBW "sell" Colonial 99% participation interests in mortgages *that had*

*already been sold to other investors*. T. Kelly Dep. (Ex. D3071) at 35:3-12. The parties refer to

these mortgages as "Plan B mortgages." Colonial's alleged purchase of the 99% participation

interest in the Plan B mortgages had the effect of concealing TBW's overdraft by making it

appear on Colonial's books and records as if Colonial owned an interest in legitimate COLB

mortgages when, in fact, the mortgages were worthless.

T. Kelly Dep. (Ex. D3071) at 247:18-248:6; Kissick Dep. (Ex. D3074) at 125:12-17

Because the Plan B mortgages were real mortgages (although of no value to Colonial,

having already been sold to other investors), TBW was able to send Colonial genuine

information about the mortgages, including the borrowers' real names, social security numbers,

17

and addresses. Kissick Dep. (Ex. D3074) at 159:6-16; Brown Dep. (Ex. P3125) at 105:17-25.

The data for the Plan B mortgages appeared on the MWLD's records alongside legitimate

mortgage data. T. Kelly Dep. (Ex. D3071) at 247:9-13, 247:16-248:6. However, Colonial did *not*

receive the underlying documentation for the Plan B mortgages (*e.g*., the actual mortgage

document and promissory note), presumably because those documents were with the entity that

actually owned the mortgages. T. Kelly Dep. (Ex. D3071) at 43:21-24; Kissick Dep. (Ex. D3074)

at 170:5-9.

It was expected that COLB mortgages would be paid off by the end investor typically

within thirty days of Colonial advancing funds for the mortgages. If this was not done within

thirty days, the mortgages would appear on "aging" reports generated by the MWLD's

compliance department. T. Kelly Dep. (Ex. D3071) at 255:13-23; Kissick Dep. (Ex. D3074) at

158:13-16, 158:19-159:5. To prevent the Plan B mortgages from appearing on the aging reports

(as they would because there were no real end investors to purchase the mortgages), the

fraudsters would supply new Plan B mortgage data on the MWLD's pipeline reports roughly

every 30 days (the pipeline reports were also generated by the MWLD's management—the

MLWD's compliance department used the pipeline reports to generate the aging reports). The

fraudsters referred to this practice as "refreshing" or "recycling" the transactions. Kissick Dep.

(Ex. D3074) at 128:18-25, 159:6-160:21, 162:4-16, 200:17-201:7; T. Kelly Dep. (Ex. D3071) at

257:14-21, 258:4-10, 262:23-263:2, 264:6-16.

(3)     The Fraud in the AOT Facility

By February 2005, TBW's overdraft had grown to more than $220 million and in the

summer of 2005, the fraudsters moved the Plan B mortgages from the COLB Facility to the AOT

Facility. Ex. D76 at 1; T. Kelly Dep. (Ex. D3071) at 44:23-45:2, 282:24-283:4; Kissick Dep.

(Ex. D3074) at 172:3-15; Tr. 285:21-24, 318:6-13 (O'Halloran). During the AOT phase of the fraud, instead of Colonial paying TBW for participation interests in individual mortgages that had already been sold to other investors, Colonial paid TBW for pools of loans that were supposedly in the process of being issued as a MBS by Freddie Mac. In fact, the vast majority of the pools of loans had no underlying mortgages backing them, that is, *the mortgages were non-existent*. Kissick Dep. (Ex. D3074) at 183:3-16; Ex. D419 at 4-6 (¶¶ 9-11). There were also pools of loans that contained so-called "junk loans"—real mortgages that were in default or had other problems.  T. Kelly Dep. (Ex. D3071) at 145:14-146:23, 328:19-329:8; Kissick Dep. (Ex. D3075) at 613:19-614:8.

With each Plan B AOT transaction, TBW transmitted data to Colonial regarding a fictitious pool that looked the same as data for a legitimate, pre-certified pool. Brown Dep. (Ex. P3125) at 88:14-89:6, 90:2-9. With each transaction, TBW also sent Colonial a fraudulent "assignment of trade" document that looked like a legitimate AOT agreement and generally contained the same information required for a real AOT transaction. T. Kelly Dep. (Ex. D3071) at 289:24-291:2; Kissick Dep. (Ex. D3074) at 191:12-192:3, 195:24-196:10; Brown Dep. (Ex. P3125) at 124:16-125:9, 135:9-14.

### (c)    PWC Was CBG's Independent External Auditor

As a publicly traded company, CBG was required to annually file with the SEC a comprehensive summary of CBG's financial condition, as well as an integrated audit of CBG's financial statement (including Colonial's financial statements) and internal controls by an independent auditor. CBG was also required to comply with the Sarbanes-Oxley Act of 2002 ("SOX"), which seeks to ensure that a public company's financial reporting is materially

accurate and that its internal controls over financial reporting are operating effectively. 15 U.S.C. 78m; 15 U.S.C. § 7262(a).

To that end, CBG engaged the services of PWC to serve as CBG's outside independent auditor to perform the required integrated audits of CBG's financial statements and internal controls. PWC and CBG each had obligations with respect to the integrated audits imposed on them by the engagement agreements between PWC and CBG and the auditing standards. Each is discussed below.

(1)    PWC's and CBG's Obligations under the Engagement Letters

Relevant to this order, CBG's Audit Committee and PWC entered into contracts that dictated PWC's and CBG's respective responsibilities for the audit years 2002-2005 and 2008 (hereinafter referred to as the "Engagement Letters"). Exs. A2-A4, A7. Under the terms of the Engagement Letters, PWC was responsible for performing two types of audits at CBG: (1) a financial statement audit, and (2) an audit of CBG's internal controls over its financial reporting. Exs. A3, A4, A7 (PWC did not begin to audit the effectiveness of CBG's internal controls until 2004). The Engagement Letters stated that the objective of the financial statement audit was for PWC to "express[] [] an opinion on the financial statements," while the objective of the internal control audit was for PWC to be able to "express[] [] an opinion on the effectiveness of [CBG's] internal control over financial reporting." *See, e.g*., A4 at 2.

The Engagement Letters further required PWC to perform its audit work in accordance with the established auditing standards. *Id*. For instance, with respect to the 2004 audit, PWC

promised to perform its audit in accordance with the Public Company Accounting Oversight

Board ("PCAOB") standards:

> [PWC] will be responsible for performing the audit in accordance with the standards established by the PCAOB. *Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.* The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. [PWC] will consider [CBG's] internal control over financial reporting in determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements.

Ex. A4 at 2 *see also*, Exs. A2 at 2-3, A3 at 3-4, A7 at 2-3 (emphasis added). The Engagement

Letters also required PWC to:

> *plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.* The audit will include obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as [PWC] consider[s] necessary in the circumstances.

Ex. A4 at 2 (emphasis added). PWC was required to inform CBG's audit committee of material

matters relating to the audit, including accounting policy and practices and any deficiencies or

weaknesses identified during the audit. *Id*. at 3.

However, the Engagement Letters also noted that because "of the inherent limitations of

internal control over financial reporting, including the possibility of management override of

controls, misstatements due to error or fraud may occur and not be detected." *Id*. Thus, PWC was

required to:

> design [the] audits to *obtain reasonable, but not absolute*, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect

> on the financial statement amounts, and of identifying material
> weaknesses in internal control over financial reporting.

*Id.* (emphasis added).

With respect to CBG, the Engagement Letters stated that CBG was "responsible for the financial statements … including establishing and maintaining adequate internal control over financial reporting" and "for the design and implementation of programs and controls to prevent and detect fraud." Ex. A7 at 3-4; Tr. 2159:15-2160:18; *see also* Tr. 2160:19-25 (Beville).

The Engagement Letters further provided that CBG was responsible for:

> *informing [PwC] (i) about all known or suspected fraud affecting the*
> *entity* involving (a) management, (b) employees who have significant
> roles in internal control over financial reporting, and (c) others where the
> fraud could have a material effect on the financial statements; and (ii) of
> its knowledge of any allegations of fraud or suspected fraud affecting the
> entity received in communications from employees, former employees,
> analysts, regulators, short sellers, or others.

Ex. A7 at 4 (emphasis added); Tr. 2162:24-2163:5 (Beville). CBG was also required to notify PWC of any

> deficiencies in the design or operation of internal control over financial
> reporting identified as part of management's assessment, including
> separately disclosing to [PWC] all such deficiencies that it believes to be
> significant deficiencies or material weaknesses in internal control over
> financial reporting.

Ex. A4 at 5.

(2) PWC's and CBG's Obligations under the Auditing Standards

The parties agree and the Court concludes that in 2003, PWC was required to perform its audit work in compliance with SEC regulations, as well as the applicable provisions of Generally Accepted Auditing Standards ("GAAS"). They further agree that in 2004 (and the remaining years relevant to Plaintiffs' claims), PWC's work was subject to the standards set by the

PCAOB, which included applicable GAAS provisions, as well as Generally Accepted Accounting Principles ("GAAP"), and certain rules and ethical principles adopted by the American Institute of Certified Accountants ("AICPA").

Generally speaking, under these standards, PWC was required to: (1) obtain sufficient, competent evidence in order to have "reasonable assurance" that CBG's financial statements were fairly stated and had no material misstatements due to error or fraud (AU §§ 110, 326.01 and .02), (2) maintain an "independence of mental attitude," remain independent, and exercise "professional skepticism" (AU §§ 150, 220, and 230.07), (3) obtain a sufficient understanding of CBG's internal controls in order to properly plan the audit (AU § 150), (4) plan and perform the audit to "obtain reasonable assurance about whether [CBG's] financial statements are free of material misstatement whether caused by error or fraud" (AU § 316), and (5) include in its workpapers sufficient audit documentation so that a reasonably competent auditor could pick up the workpapers and understand what was done (AU § 339).

The auditing standards also placed obligations on CBG. For instance, AU § 110.03 states that the "fair presentation of financial statements in conformity with [GAAP] is an implicit and integral part of management's responsibility." AU § 316.04 further states that "it is management's responsibility to design and implement programs and controls to prevent, deter, and detect fraud." Indeed, CBG's own internal audit policy provided that "The Boards of Directors [of CBG and Colonial] and senior management are responsible for supervising the Bank to ensure that the operations are effectively governed by comprehensive policies, internal controls, and compliance procedures." Ex. D49 at 3; Tr. 2160:19-29 (Beville) (testifying that ensuring that internal controls were properly functioning was management's responsibility).

(d)     The Audit Procedures PWC Performed in 2002-2005 and 2008

For each audit in 2002-2005 and 2008, PWC performed the following audit procedures. PWC began each audit with a "preliminary risk analysis," in which PWC determined which areas of CBG's business were susceptible to causing material misstatements on its consolidated financial statements. *See*, *e.g*., Ex. D1653. Each year beginning in 2002, PWC identified Colonial's MLWD as representing "one of the most pronounced risks." Ex. A83 at 2; Tr. 1167:11-20 (Jackson); Tr. 1721:10-1723:12 (Cox). Next, PWC made inquiries of CBG and Colonial senior management, including members of the Audit Committee, the Chief Financial Officer, and the Chief Accounting Officer as to whether these individuals were aware of any fraud at CBG and/or Colonial. *See*, *e.g*., D1597. Ms. Kissick was one of the individuals interviewed. Ex. D1617.

PWC then performed specific, substantive testing, including: (1) testing revenue recognition (*see*, *e.g*., Ex. A98), (2) conducting a quarterly review of the overall financial statements (*see*, *e.g*. Ex. A99 at 2); (3) assessing accounting estimates (*see*, *e.g*., Ex. A100); (4) reviewing significant and unusual transactions (*see*, *e.g*., Ex. A101); (5) reviewing "suspense and intercompany accounts" (*see*, *e.g*., Ex. A102 at 2); (6) performing credit reviews of the MWLD's largest customers (*see*, *e.g*., Ex. A90) and (7) testing aging reports in the COLB and AOT Facilities (*see*, *e.g*., Ex. A33).

PWC also performed tests on Colonial's MWLD's internal controls. Specifically, PWC reviewed reports generated by Colonial's management through Colonial's online computer system, ProMerit. *See*, *e.g*., Ex. A16, A107-A108, A114, A120, A131, A135, A261, A300 D1832 - D1836. Significant here, PWC reviewed the COLB pipeline report for eight COLB customers, of which TBW was one, and compared it to Colonial's general ledger/balance sheet.

Ex. A120. PWC randomly selected a number of loans generated by the eight customers and looked at the original loan documents for those loans. *Id.*[5]

Lastly, PWC reviewed Crowe's work (CBG's internal auditor) to determine whether PWC could rely on the work as part of PWC's audit procedures. *See, e.g.*, Exs. A14, D1712-1716.

(e)   PWC Owed a Duty to CBG and Colonial

As stated *supra*, in order for Plaintiffs to recover on their professional negligence claims against PWC, they must prove that (1) PWC owed each of them a duty, (2) PWC breached that duty, and (3) PWC's breach was the proximate cause of Plaintiffs' damages. *See Crowne Invs., Inc. v. Bryant*, 638 So. 2d 873, 878 (Ala. 1994); *Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So. 2d 665, 679 (Ala. 2001).

The Honorable Keith Watkins previously noted in denying PWC's motion to dismiss in this case that Alabama law is "indisputably clear" that accountants owe their clients a duty to exercise reasonable professional care, "regardless of the existence of a valid contract between accountant and client."[6] *Colonial BancGroup, Inc. v. PricewaterhouseCoopers, LLP*, 2014 WL 4444148 at *3 (M.D. Ala. Sept. 9, 2014) (citing *Blumberg v. Touche Ross & Co.*, 514 So. 2d 922, 925 (Ala. 1987). Judge Watkins further noted that:

> In Alabama, one who contracts with another and expressly promises to use due care is undoubtedly liable in both tort and contract when his negligence results in injury to the other party. He is liable in contract for breaching an express promise to use care. He is liable in tort for violating the duty imposed by law on all people not to injure others by negligent

---

[5] Plaintiffs contend that PWC's workpaper (Ex. A120) shows that PWC did not test the existence of TBW loans. The Court disagrees with Plaintiffs' interpretation of Ex. A120 and instead finds that PWC tested the existence of the TBW loans as well. Indeed, note B on Ex. A120 states that PWC found "comfort due to the fact that the [TBW] balance at 11/30 was confirmed [by Farkas] *and individual loans tested for existence at [workpaper] 3345-12.*" *Id.* at 7, note B (emphasis added). However, the TBW loans that PWC randomly selected to test for existence did *not* include TBW COLB mortgages, let alone Plan B mortgages. Tr. 871:1-5 (Westbrook).

[6]  This case was originally assigned to the Honorable Keith Watkins before it was reassigned to this district court judge in May, 2016. Dkt. No. 399.

conduct. The injured party has the choice of remedies when a contract contains an express promise to use due care.

*Id*. at *3 (quoting *Blumberg*, 514 So. 2d at 927). Thus, it is clear that PWC owed a duty to CBG.

The FDIC claims that PWC also owed a duty to Colonial through several mechanisms. First, the FDIC points to United States Supreme Court precedent which states that by certifying CBG's public reports, PWC "assume[d] a public responsibility" and "complete fidelity to the public trust." *United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984). The FDIC argues that Colonial was a member of the public to whom PWC "owed ultimate allegiance" as a result of its certification of CBG's financial statements. Dkt. No. 785 at 40 (citing ET § 53). The FDIC also argues that PWC owed a duty to Colonial pursuant to Section 552 of the Restatement (Second) of Torts, which Alabama law has adopted. Finally, the FDIC argues that Colonial was the third-party beneficiary of the Engagement Letters between PWC and CBG.

PWC does not dispute in its proposed findings of fact and conclusions of law that it owed a duty to both CBG and Colonial to exercise reasonable care in performing its audits of CBG under Alabama law. Therefore, this Court concludes that PWC owed a duty to both CBG and Colonial.

### (f)      PWC Breached Professional Duties It Owed CBG and Colonial

The FDIC charges that PWC breached its professional obligations in the following four ways: (1) PWC failed to plan and perform its audit to detect fraud, (2) PWC failed to obtain sufficient audit evidence of the COLB transactions to sign its audit reports for 2002-2005, (3) PWC failed to obtain sufficient audit evidence of the AOT transactions to sign its audit reports for 2005 and 2008, and (4) PWC's certification of the COLB and AOT transactions as sales

rather than loans. CBG joins in the FDIC's claim as to the AOT transactions for the 2008 audit year and the FDIC's claim regarding accounting treatment for the 2008 AOT transactions.[7]

### (1)    PWC Failed to Design Its Audits to Detect Fraud

The standard of care for auditors is defined by GAAP and GAAS. GAAP are the basic principles that govern business accounting and are promulgated by the Financial Accounting Standards Board ("FASB"). GAAS are the standards that govern the performance of an audit. Until 2003, the Auditing Standards Board of the American Institute for Certified Public Accountants ("AICPA") issued GAAS for all audits. However, in 2002, Congress adopted the SOX, pursuant to which the PCAOB was created. Thereafter, the PCAOB established the auditing standards that govern the audits of public companies, such as CBG.[8] In 2003, the PCAOB adopted the then-existing auditing standards of the AICPA, which it has subsequently amended.

While there are numerous auditing standards that are implicated in this case (each of which is discussed in detail below), the overarching standard that governed the PWC audits is that: "[t]he auditor has a responsibility to *plan and perform the audit to obtain reasonable assurance* about whether the financial statements are free of material misstatements, whether caused by error or fraud." AU § 110.02 (emphasis added); AU § 316. PCAOB Auditing Standard No. 2 states that "[a]lthough not absolute assurance, reasonable assurance is nevertheless a *high level of assurance*." *Id*. at ¶ 17 (emphasis added). To that end, a PCAOB 2007 release clarified that "[t]he auditor should, therefore, assess risks and *apply procedures directed specifically to the detection of a material, fraudulent misstatement* of the financial statements." (emphasis

---

[7] As stated earlier in this order, this section focuses on PWC's alleged liability for failing to detect the fraud; the accounting treatment is discussed on page 58.
[8] *See* https://www.sec.gov/fast-answers/answerspcaobhtm.html last accessed 11/8/17.

added). The Engagement Letters between PWC and CBG acknowledged this responsibility by stating that PWC would "design [the] audits to obtain reasonable, but not absolute, assurance of detecting errors or fraud." *See*, *e.g*., A4 at 3. Indeed, Mr. Westbrook, one of the PWC audit partners, testified at trial that PWC had a duty to design audit procedures to detect fraud. Tr. 817:25-818:7 (Westbrook). He further testified that if PWC failed to design its audit procedures to detect fraud, it would be a violation of PCAOB standards. Tr. 822: 19-22 (Westbrook).

However, PWC voiced a very different tune just a few years ago with respect to another lawsuit that stemmed from this fraud. TBW's bankruptcy trustee also filed suit against PWC, alleging that PWC breached its duties when it failed to detect the fraud. That lawsuit proceeded to trial in August 2016 before it settled mid-trial. As part of that lawsuit, many of the same PWC engagement partners, audit managers, and audit staff who are involved in this case gave deposition testimony under oath in the TBW trustee's case. During that testimony, these individuals repeatedly admitted that PWC *did not design its audits to detect fraud*. For instance, Mr. Westbrook testified that PWC "audits are not designed to detect fraud." Tr. 358:6-7 (Westbrook) (quoting Westbrook TBW Dep. at 23:7-12). Likewise, Mr. Jackson, the PWC engagement partner, testified that "I would point out that our audit procedures were not designed to detect fraud." Tr. 1027:1-10 (TBW Dep. at 31:17-20). Similarly, Wes Kelly, PWC's audit manager for the 2003-2005 and 2008 CBG audits, testified that PWC "did not design audit procedures to detect fraud." W. Kelly TBW Dep. 45:608 (Ex. P3120). Finally, Mr. Rivers, a PWC audit associate assigned to the CBG audit, testified that PWC had no obligation to look for fraud. Rivers TBW Dep. at 66:17-23.

At trial, PWC attempted to explain away this testimony by arguing that these individuals simply meant that PWC was not a guarantor against the possibility of material fraud because the

auditing standards recognize that "even a properly planned and performed audit may not detect a material misstatement resulting from fraud." Ex. A400 at 7-8 (AU § 316.12); Tr. 821:25-822:24 (Westbrook stating that in order to provide a guarantee against fraud, auditors would "need a lot more tools like lie detector tests and subpoena power and guns and badges and all those kinds of things."). This Court does not find this explanation credible, nor is it consistent with the previous testimony from the TBW trustee's lawsuit. This Court heard Mr. Westbrook and Mr. Rivers testify for hours and is convinced that these gentlemen are more than capable of saying what they mean. If they had intended to say that PWC audits were not a guarantee against the possibility of material fraud, they would have testified accordingly. However, that was not their testimony. Instead, they clearly stated that PWC had *no* duty to detect fraud and did *not* design its audits to detect fraud. The Court concludes that PWC did not design its audits to detect fraud and PWC's failure to do so constitutes a violation of the auditing standards.

      (2)    **PWC Did Not Obtain Sufficient Competent Evidence of the COLB Transactions to Sign Its Audit Reports**

As discussed above, by December 2003, the fraudsters had shifted TWB's overdraft to the COLB Facility. They did this by causing Colonial to "purchase" 99% participation interests in mortgage loans that either did not exist or had already been sold by TBW to other investors. By year end, the COLB Facility showed an asset balance of $378 million, which represented approximately 2% of the assets on CBG's balance sheet. *See* Ex. A63 at 54; Tr. 410:22-411:9 (Carmichael); Tr. 293:5-294:1 (O'Halloran). Approximately $175 million of the COLB asset constituted Plan B mortgages, meaning they were fake. Ex. 63 at 54, Tr. 1656:3-8 (Cox); Tr. 1043P:22-25 (Jackson); TBW v. PWC Tr. 1128:24-1129:4 (Luria). By year end 2004, the COLB Facility represented $678 million on the CBG consolidated financial statements. Ex. A64 at 55. TBW COLB mortgage loans totaled $487 million of the $678 million, and $269 million of those

loans were Plan B mortgages and were, therefore, fake. Nevertheless, PWC certified that Colonial's financial statements were free of material misstatement and were presented fairly.

The FDIC charges that PWC breached its professional duties with respect to its 2003 audit of the COLB Facilities by: (1) failing to inspect the physical documents that were supposed to evidence the COLB transactions, and (2) failing to gain any alternative reliable evidence of the COLB asset. The Court will discuss each of these allegations in turn.

i.   PWC Failed to Inspect the underlying Loan Documents

Under the auditing standards, PWC was required to "plan and perform [its] audit to obtain reasonable assurance about whether [CBG's consolidated] financial statements [were] free of material misstatement, whether caused by error or fraud." AU § 110.2. In order to do this, the standards required PWC to gather "[s]ufficient competent evidential matter" that allowed PWC to form "an opinion regarding the financial statements." AU § 150.02. Indeed, as the auditing standards state, "[m]ost of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter." AU § 326.02. PWC was also required to exercise "professional skepticism," defined by the auditing standards as "an attitude that includes a questioning mind and a critical assessment of audit evidence," throughout the audit process. AU § 230.07. Further, the auditing standards emphasize that an auditor's "direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly." AU § 326.21(c). Moreover, representations from management cannot "substitute for application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333.02.

Plaintiffs argue that before PWC could issue an unqualified audit report for the 2003 and 2004 year-end audits, it was required to test the existence of the COLB Facility asset. In other words, Plaintiffs argue, PWC was required to confirm that the $378 and $678 million asset listed on CBG's consolidated financial statements for 2003 and 2004, respectively, actually existed. Plaintiffs contend that the best way PWC could have tested the existence of the COLB asset was to physically inspect the loan documents that were supposed to back every COLB transaction. Recall, for each mortgage that Colonial funded through the COLB Facility, Colonial was supposed to receive a 99% participation interest in the mortgage. The physical mortgage loan documents were supposed to be stored in Colonial's secured file room in the MWLD until such time that Colonial was paid its 99% participation interest. Tr. 2285:9-20, 2395:3-11 (Bathen). In other words, the loan documents were Colonial's collateral under the COLB Facility.

Despite being in the same building as the secured file room, PWC never inspected nor requested to inspect a single TBW COLB loan document. PWC did not request to inspect a single TBW COLB loan document in 2003 despite identifying in its workpapers that a potential risk of fraud in the MWLD was that the loan documents Colonial relied on as collateral did not exist. Ex. A309 at 7. Nor did PWC inspect a single TBW COLB loan in 2004 despite Mr. Watt identifying in its 2004 workpapers that the "specter of fraud" was creeping in as the mortgage market weakened and that warehouse lenders, (*e.g.*, the MWLD), were particularly susceptible to fraud because they relied on their customers (*e.g.*, TBW) to have the required documents for collateral. Ex. P2214. PWC did not inspect a single TBW COLB mortgage despite having tested for the existence of the physical mortgage loans of some of Colonial's other, smaller customers. Exs. A120, A136; Tr. 826:8-10, 2335:8-15 (Westbrook).

This Court concludes that given the conditions that were present with respect to the 2003 and 2004 year-end audits (*i.e.*, the mortgage market was weakening, the COLB Facility was growing rapidly, and TBW was the COLB Facility's largest customer), it was unreasonable for PWC to sign off on the COLB asset without first physically inspecting at least some of the underlying documents for the TBW COLB mortgages.

PWC argues that even if it had attempted to inspect the underlying loan documents, it would not have uncovered the fraud because the fraudsters would simply have created fake documents. This, of course, is something that we will never know. However, what we do know is that Ms. Kissick, one of the key fraudsters, testified that if PWC had asked to see even just ten loan files "[t]he jig would be up." Kissick Dep. (Ex. D3074) at 849:16-20.

ii.   PWC Failed to Obtain other Competent Evidence of the COLB Asset's Existence

PWC concedes that it did not inspect any TBW COLB loan documents. Nevertheless, PWC argues that it performed other audit procedures related to confirming the COLB asset and that such procedures were sufficient under the auditing standards. Specifically, PWC points out that it reviewed the MWLD's pipeline reports for 2003 and 2004, obtained confirmation of the COLB assets from Lee Farkas, and tested the COLB controls.

This Court concludes that these procedures did not produce sufficient competent auditing evidence to warrant PWC signing off on the COLB asset. With respect to the 2003 and 2004 pipeline reports—reports created by MWLD management—PWC purportedly compared the balances listed on these reports to Colonial's general ledgers to confirm that the numbers "agreed." However, comparing management's numbers to management's numbers is not persuasive audit evidence and certainly does not comport to the auditing standards' requirement that PWC exercise professional skepticism.

Moreover, PWC's inspection of the pipeline reports missed what should have been a red flag to an auditor. These pipeline reports contained pages upon pages of fake mortgages, most of which had illogical dates that did not comport with the way the transactions had been described to PWC. Tr. 1831:15-1831:1 (Cox), Ex. A300. These illogical dates should have been a red flag to PWC, or at a minimum, sparked follow up questions. Indeed, when Mr. Jackson, a PWC audit partner, reviewed a similar pipeline report in 2002, he also noticed some illogical dates and followed up on those mortgages by inspecting the physical loan documents. Because all of the COLB mortgages were legitimate in 2002, the loan documents were there to inspect. However, nearly fifty percent of the COLB mortgages were fake in 2003. If PWC had followed up on the illogical dates on the 2003 and 2004 pipeline reports, the fraud would have been uncovered.

In addition, beginning with the 2004 audit, PWC sent a confirmation to Lee Farkas, the Chairman of TBW, asking him to confirm how much money Colonial had sent to TBW through the COLB Facility. Ex. A283. However, while this confirmation confirmed how much money Colonial had sent to TBW, it in no way confirmed whether TBW had sent loan documents to Colonial in return for the money or whether those documents were in Colonial's vault. Indeed, PWC's own expert Sandra Johnigan admitted as much. Expert Report of Sandra Johnigan dated August 29, 2016 at §150 ("TBW could not confirm the existence of assets held by CBG."); Tr. 951:2-4 (Westbrook).

The Court finds PWC's reliance on Farkas' alleged confirmation of the COLB assets particularly perplexing given that PWC had identified fraud by a loan originator client (*i.e.*, TBW) as the MWLD's biggest risk. The Court views asking TBW to confirm that Colonial had the collateral that TBW was supposed to send it as quintessentially the same as asking the fox to report on the condition of the hen house. Moreover, relying on a confirmation from Farkas

33

contradicted PWC's own workpapers from 2002 in which it noted that Farkas was supposed to be taking a reduced role in TBW due to a dispute he had with Fannie Mae. Ex. P2212 (noting that PWC had "comfort" because Farkas would be taking a lesser role with TBW in the future).

Finally, PWC claimed that that it conducted a "controls based" audit and was correct in doing so. Tr. 1379:25-1380:14 (Westbrook). However, both PWC's audit expert and the FDIC-R's audit expert agreed that there was no such thing as a "controls based" audit under the standards. Tr. 482:4-18 (Carmichael); Tr. 2940: 5-22 (Johnigan). Both experts agreed that PWC was required under the standards to perform substantive testing. Tr. 2940:23-2941:6 (Johnigan); Tr. 482:16-18 (Carmichael).

PWC claims that it tested the controls over the COLB Facility by testing MWLD. Tr. 1297:11-18 (Westbrook). However, PWC's own workpapers demonstrate that the key control—checking to see that Colonial received mortgages—was not tested. Ex. A16 at 4-5 ("PWC did not test specific reports due to the fact that … if the items are not monitored … the analyst will either be told to do a better job or be fired."). Because PWC did not confirm that controls over the COLB Facility either existed or were working properly, PWC could not reduce its substantive testing for the existence of COLB.

(3)    PWC Did Not Obtain Sufficient Competent Evidence of the AOT Transactions to Sign Its Audit Reports

Beginning in 2004 and for each year thereafter, the AOT Facility represented a significant asset on CBG's consolidated financial statements. In 2004, the asset was $490 million, in 2005, it was $589 million, 2006—$605 million, 2007—$2.05 billion, and 2008—$1.556 billion. Exs. A66-A69. A material misstatement as to the AOT asset in any one of these years would have constituted a material misstatement on the corresponding CBG consolidated

financial statement. Tr. 389:3-390:2, 631:2-632:3 (Carmichael). As it turned out, nearly all of the

yearly AOT asset balances for 2004-2008 were fake. Tr. 427:9-473:3, 601:3-5 (Carmichael).

> i.   PWC Never Gained an Understanding of the
>       AOT Transactions

It is axiomatic that an auditor cannot audit what the auditor does not understand.

Therefore, the auditing standards require an auditor to obtain a sufficient level of knowledge of

its client's business sufficient such that the auditor can properly plan and perform an audit in

accordance with GAAS. AU § 311.06; Tr. 2042:22-2043:6, 2044:4-19 (Rivers). Auditing

Standard § 330.25 states in relevant part:

> The auditor's understanding of the client's arrangements and transactions
> with third parties is key to determining the information to be confirmed.
> The auditor should obtain an understanding of the substance of such
> arrangements and transactions to determine the appropriate information to
> include on the confirmation request. The auditor should consider
> requesting confirmation of unusual agreements or transactions . . . in
> addition to the amounts.

Ex. D2539. Indeed, PWC's own internal audit manual instructed its auditors to gain a thorough

understanding of the client's contracts, agreements, and transactions to ensure that the auditors

adequately understand the client's business. Tr. 2044:4-2046:3; Ex. P1486 at § 5721.

Despite this clear mandate from the auditing standards and PWC's own internal

guidance, PWC never performed the work necessary to obtain a sufficient understanding of the

AOT Facility. The AOT Master Agreement set forth the terms of the AOT transactions.

Tr. 467:9-22 (Carmichael). Yet, no PWC auditor ever asked for a signed copy of the AOT

Master Agreement, let alone reviewed it. Tr. 778:3-6, 797:11-798:11, 805:1-10, 1297:7-10,

1572:23-1573:3 (Westbrook).

Moreover, PCAOB Auditing Standard No. 5 requires an auditor to perform a

"walkthrough" of all major classes of transactions a client has so that the auditor can confirm the

auditor's understanding of the nature of the transactions. Ex. D2442. In a "walkthrough," an auditor follows a transaction from origination through the client's processes, including information systems. The purpose of this is make sure the auditor understands how a transaction is initiated, processed, and recorded, so that the auditor can identify points within the transaction process at which a misstatement, including a misstatement due to fraud, could occur. Tr. 1293:23-1294:10 (Westbrook); Exs. A281, D2442. Despite this clear directive from the auditing standards, PWC never performed a single walkthrough of an AOT transaction. Tr. 893:24-894:1, 992:1-3, 1294:11-1295:2, 1295:25-1296:9, 1591:21-25 (Westbrook); 2055:6-9 (Rivers); 465:12-25 (Carmichael).

As a result, PWC never understood how an AOT transaction was supposed to work. This is reflected in PWC's workpapers. PWC's audit procedures with respect to the AOT Facility started in 2004, the year the asset first appeared on CBG's balance sheet. During that year, PWC auditor Phillip Rivers was tasked with obtaining an understanding of the AOT transactions. However, at trial, Mr. Rivers testified that the AOT transactions were "complex" and "above his paygrade." Tr. 2060:23-2061:8. Mr. Rivers' lack of understanding is reflected in a workpaper he completed in 2004. Ex. A128. It is titled "Obtain an Understanding of Nature and Terms of Agreements" and in it, Mr. Rivers purports to document how an AOT transaction works. Tr. 1301:16-1302:12 (Westbrook); Ex. A128. The workpaper includes a chart purportedly describing an AOT transaction, but the description is wholly inadequate. For instance, while the workpaper references (and attaches) a trade assignment, it makes no reference to the participation certificates (*i.e.*, the documents that gave Colonial an ownership interest in an identified pool of loans) or the takeout commitments (*i.e.*, the documents that provided Colonial with the assurance that an end investor has committed to purchasing the yet-to-be issued security

and that Colonial will, in fact, be repaid for amounts advanced to TBW). Tr. 1303:1-1304:20
(Westbrook); Ex. A128. Moreover, the trade assignment is unsigned, uncertified, and
incomplete. Ex. A128. The trade assignment is only one of the many documents required in an
AOT transaction, yet Mr. Rivers testified that it was the only agreement he was aware of in
relation to the AOT transactions. Tr. 2049:17-2050:1 (Rivers). In fact, Mr. Rivers' understanding
of the AOT transactions was so inadequate that he used templates from PWC's master
workpapers for two-party "reverse repurchase agreements" as part of his audit procedures for
auditing the three-party AOT transactions, despite acknowledging at trial that the AOT
transactions were not reverse repurchase agreements and, therefore, the template did not apply.
Tr. 2022:5-12, 2074:11-2075:1 (Rivers).

PWC's audit procedures on the AOT transactions did not improve in 2005. In 2005, PWC
prepared another workpaper entitled "Obtain an Understanding of the Nature and Use of Reverse
Repurchase Agreements." Ex. A151. In other words, PWC was still erroneously referring to the
AOT transactions as "reverse repurchase agreements." That is remarkable in and of itself.
However, what is truly astonishing, is that PWC assigned a college intern, Alicia Whetstone, to
evaluate this complex, $589 million asset. Tr. 1305:2-1306:9. Ms. Whetstone was supervised by
Mr. Rivers, the auditor who admitted that understanding the AOT transactions was "above his
paygrade". Ms. Whetstone, the intern, simply took the description of the AOT transaction that
was included in the 2004 workpaper prepared by Mr. Rivers (together with the very same
unsigned and incomplete trade assignment) and cut and pasted it into the 2005 audit workpapers.
1306:17-1307:2 (Westbrook); Ex. A151. Indeed, the same incomplete and inaccurate description
of the AOT transaction that was contained in the chart that was attached to PWC's 2004

workpaper was simply cut and pasted from that workpaper into the equivalent workpaper for

2005, 2006, 2007, and 2008 audits. Exs. A23 (2006), A188 (2007), A224 (2008).

|  | ii. | PWC Did Not Test for the Physical Existence of the AOT Asset |

In discharging its PCAOB duty to obtain evidence of existence of the AOT assets, PWC

partner Westbrook admitted that PWC "needed to have evidence of the transaction, the complete

transaction" – meaning, as described *supra* at pages 15-16, both step one (CBG's acquisition of a

99% interest in a pool of loans) and step two (the end investor's purchase of a GSE security

which was supposed to result in repayment to Colonial of the amounts funded to TBW by

Colonial). Tr. 802:18:24 (Westbrook). Nevertheless, the PWC audit team never requested nor

examined any participation certifications, list of loans, underlying mortgage documents, or

takeout commitments that should have been part of a proper AOT transaction. Tr. 813:12-16,

1299:19-1300:5, 1313:16-20, 1314:7-12, 1606:15-21 (Westbrook).

PWC failed to physically examine the collateral despite PWC workpapers that identified

"examin[ing] [the] collateral held" as the proper audit test for the AOT Facility. Exs. A152,

A313. Instead, PWC chose to rely on Ms. Whetstone's (the college intern) assessment that it was

not necessary to inspect the AOT collateral because "PWC *feels* that the collateral for these

'securities purchased under agreement to resell' is adequate." Ex. A152 (emphasis added).

|  | iii. | PWC Failed to Obtain other Competent Evidence of the AOT Asset's Existence |

PWC acknowledged that the principle way it tested for the existence of the AOT asset

was to send a third-party confirmation to Mr. Farkas, the mastermind behind the fraud.

Tr. 1469:1-17, Ex. A249. However, as previously discussed *supra*, the only thing that PWC

could confirm by sending a confirmation to Mr. Farkas was the balance of the funds that were

advanced to TBW under the AOT Facility. The confirmations said nothing about the existence of

the actual mortgage loans. Tr. 433:1-12 (Carmichael), 951:2-4, 1602:21-1603:1 (Westbrook)

(agreeing that TBW could not confirm what was in Colonial's vault).

      The Court finds PWC's reliance on Mr. Farkas' confirmation particularly remarkable

given that PWC identified fraud by the MWLD's mortgage originator customers (*e.g.*, TBW) as

one of the potential risks facing Colonial. Tr. 951:25-952:8 (Westbrook), Tr. 443:14-444:3

(Carmichael). Confirming the existence of the AOT assets through Farkas alone is the opposite

of professional skepticism and is not a critical assessment of the audit evidence.

      During the 2008 audit, for the very first time, PWC attempted to gain assurance regarding

the valuation and existence of the AOT asset by performing testing on the receipt of funds from

end investors. The results of this testing are contained in a workpaper titled "Test assignment of

trade." Ex. A33. The timing and nature of the procedures performed are described in the

workpaper as follows:

> Engagement team performed AOT Testing as of 9/30/2008 to gain
> assurance regarding the valuation and existence of AOT trades. . . . This
> testing was performed while on site at MWL Site Visit in December 2008.
> Additionally, this testing was updated as of 12/31/2008 to gain additional
> assurance regarding the valuation as of period end. The testing included
> taking a sample from the pipeline report as of the date of testing and
> performing the following to each sample selected:
>
> Test A – Agreed item and loan inception date to Trade Assignment
> Agreement.
>
> Test B – Recalculated the purchase price based on supporting
> documentation.
>
> Test C – Recalculated subsequent payment from wire confirmation from
> third party investor and other supporting documentation.

*Id*. As documented in the workpaper, PWC performed its initial testing of AOT trades while on-

site at the MWLD in December 2008. PWC selected trades to test as of September 30, 2008

because the expectation was that the September trades should have settled and Colonial been

repaid by the time PWC performed its testing in December. Tr. 1319:8-12 (Westbrook). In other

words, PWC expected to see a wire confirmation for each trade given the time lapse. Tr. 512:24-

513:8 (Carmichael).

PWC selected 10 trades off one of the MWLD's pipeline reports and purportedly

matched the trade and loan inception dates to the corresponding Trade Assignment Agreement

and an incoming wire confirmation. Ex. A33. All of these trades were in fact fictitious.

Tr. 1344:1-4 (Westbrook). Despite PWC's expectation that all 10 trades should have settled by

the time PWC performed its testing in December, three of the 10 trades failed PWC's

expectation because there was no incoming wire information evidencing that the three trades had

settled or that Colonial had been paid by the end investor. Ex. A33 at PWC-CBG-

TBW00097112-97117, *see note* N/A; Tr. 1319:8-1320:19 (Westbrook). Although Mr.

Westbrook admitted that the failure of 30 percent of PWC's test sample "raised questions,"

neither he nor anyone else at PWC went to Colonial's vault to confirm the existence of any of the

documents that were supposed to evidence the AOT transactions. Tr. 1322:17-1323:16

(Westbrook).

PWC updated its December 2008 test in February 2009. Ex. A33. However, instead of

retesting the original three loans that had failed the December 2008 test, PWC selected three new

loans to test. If PWC had retested the original three loans, it would have discovered that those

loans had different loan inception dates, different settlement dates, and slightly different

purchase amounts in February 2009 than they did in December 2008. Compare Ex. A33 trades

denoted by "N/A" at PWC-CBG-TBW00097112-97117, *with* trades with same trade numbers

listed on pipeline report at PWC-CBG-TBW00097130-07137; Tr. 524:17-525:4 (Carmichael).

Even Mr. Westbrook had to admit at trial that the reappearance of the same three loans on a later

pipeline report with different inception and settlement dates was an indicator of fraud.

Tr. 1351:21-1352:7 (Westbrook).

　　In light of the foregoing, this Court concludes that PWC did not have sufficient

competent evidence of the AOT asset to sign its audit report for the 2005 and 2008 year-end

audits.[9]

     (g)    Bank of America's Breach of Its Custodial Duties to Colonial Was
an Intervening Cause of the Shipped Not Paid Damages

　　"Proximate cause is an act or omission that in a natural and continuous sequence,

unbroken by any new independent causes, produces the injury and without which the injury

would not have occurred." *Lemley v. Wilson*, 178 So. 3d 834, 842 (Ala. 2015) (quoting *Martin v.

Arnold*, 643 So. 2d 564, 567 (Ala. 1994)). To establish proximate causation, Plaintiffs must

demonstrate that PWC's acts or omissions "probably caused" their injuries. *See Looney v.

Moore*, No. 13-cv-733, 2015 WL 4773747, at *4 (N.D. Ala. Aug. 13, 2015) ("To establish

proximate cause under Alabama law, a plaintiff must establish that the defendant's acts or

---

[9] The FDIC also brings claims against PWC for "negligent misrepresentation" and "gross negligence." *See* FDIC Third Am. Compl., ECF No. 281, at 80 (count 3), 82 (count 5). As Judge Watkins has previously observed, the FDIC's claims for professional negligence and negligent misrepresentation are "closely related" and not obviously "distinguishable." *FDIC v. PricewaterhouseCoopers, LLP*, No. 12-cv-957, 2013 WL 4851613, at *6, n.3 (Sept. 10, 2013). This Court agrees and, having already determined that PWC breached its professional obligations to CBG and Colonial, it is not necessary for the Court to address the FDIC's negligent misrepresentation claim. Furthermore, "gross negligence" is not a standalone tort under Alabama law. *See Rutledge v. State*, 60 So. 2d 360, 362-63 (Ala. Ct. App. 1952) ("Our Supreme Court in several cases has expressed the idea that the word 'gross,' when used in connection with negligence, implies nothing more than negligence. . . . Negligence is either totally present, or totally absent, according to one's conduct under the circumstances, but it cannot be partly present or partly absent."); *Miller v. Bailey*, 60 So. 3d 857, 867 (Ala. 2010) ("'Gross negligence' is negligence, not wantonness." (quotation marks omitted)). Therefore, the Court will not address this claim.

omissions 'probably caused, rather than only possibly caused, the plaintiff's injury.'" (quoting *Breland ex rel. Breland v. Rich*, 69 So. 3d 803, 814-15 (Ala. 2011)).

The issues of causation and damages are reserved for the damages phase of the PWC bench trial; nevertheless, one aspect of the FDIC's alleged damages can be resolved with this order: the "Shipped Not Paid" damages. As discussed earlier in this order, in mid-2008, Ms. Kissick stopped cooperating in the TBW fraud in the sense that she refused to authorize more Colonial funding for fraudulent AOT mortgages. Kissick Dep. (Ex. D3074) at 42:16-17, 60:7-19, 182:2-9; Kissick Dep. (Ex. D3075) at 567:24-568:6, 569:5-12, 573:20-574:6, 930:3-14. Thereafter, Mr. Farkas devised a new fraud, the "Shipped Not Paid" fraud, that did not depend on the cooperation of Ms. Kissick and the other Colonial insiders. *Id*.

### (1)   The Shipped Not Paid Fraud

The "Shipped Not Paid" aspect of the fraud began in late December 2008, at the earliest, and functioned as follows. Colonial would advance funds to TBW through the COLB Facility in exchange for a 99% participation interest in individual mortgage loans. Unlike the Plan B COLB mortgages, the funding was used to originate legitimate mortgage loans. The mortgage loans were then sent to Bank of America ("BOA") pursuant to a Custodial Agreement and a Bailee Letter executed by BOA, TBW, and Colonial on or about July 2008. Under the Custodial Agreement and Bailee Letter, BOA agreed to hold the mortgage loans "in trust as Colonial's bailee" pending resale of the loans to a TBW affiliate, Ocala Funding ("Ocala"). According to the terms of the Custodial Agreement and Bailee Letter, BOA was not to transfer the loans to Ocala until BOA received payment from Ocala; when BOA did receive payment from Ocala,

BOA was required to send the money to Colonial (thereby repaying Colonial the original amount it loaned to TBW).

The parties agree that BOA initially complied with its obligations under the Custodial Agreement and Bailee Letter. *See e.g*., Expert Damages Report of Kenneth K. Malek dated July 20, 2016 ("Malek Report") Dkt. No. 535, Ex. 4 at 16, 38 (stating that the Shipped Not Paid "phase of the fraud began in April of 2009" and the "Shipped Not Paid damages began accruing in May 2009"); Brown Dep. (Ex. P3126) at 361:24-364:6. In addition, the parties agree that PWC signed its last audit opinion for CBG on March 2, 2009. Ex. A69 at 82. In other words, the parties agree that BOA was complying with its custodial duties when PWC last performed audit work for CBG.

However, the parties also agree that beginning in April 2009, when Ocala purchased the mortgage loans, instead of sending the funds to Colonial as was required under the Custodial Agreement and Bailee Letter, BOA sent the money to TBW or other third parties. BOA did this pursuant to TBW's instructions. Thus, Colonial was not paid when the loans were sold to Ocala. The parties refer to these mortgage loans as the "Shipped Not Paid" loans. "The absence of payment to Colonial [for the Shipped Not Paid loans] is the basis for the Shipped Not Paid damages." Dkt. No. 535, Ex. 4 at 41. By the time Colonial closed in August 2009, there were approximately 4,800 Shipped Not Paid loans, with unpaid balances totaling approximately $900 million, for which Colonial has never been paid. *Id*. at 41-42; Malek Report at 29-30; Tr. 2326:2-2328:1 (Bathen); Ex. D914.

In 2010, the FDIC sued BOA to recover for Colonial's losses associated with the Shipped Not Paid loans; this Court presided over that litigation. *See Bank of Am. v. FDIC*, 908 F. Supp. 2d 60, 69-75 (D.D.C. 2012). In that litigation, the FDIC claimed that BOA had violated its

custodial duties to Colonial by improperly transferring the 4800 Shipped Not Paid loans for which Colonial was never paid. *Id*. Specifically, the FDIC asserted that BOA "abdicated its duties" to Colonial and "strip[ped] Colonial of its ownership rights in the [Shipped Not Paid] mortgages." Ex. D2759 at 37 (¶ 5), 44-45 (¶¶ 45-46). The FDIC also specifically denied that any Colonial employee was involved in the Shipped Not Paid fraud. Ex. D2762 at 4 (arguing that any suggestion that "Colonial or its employees played any role" in the Shipped Not Paid fraud was "disingenuous").

In the instant trial, the FDIC offered no evidence to contradict its previous claims that BOA breached its custodial duties to Colonial. Therefore, the Court accepts as an evidentiary admission that BOA breached its custodial duties to Colonial. *See*, *e.g*., *Williams v. Union Carbide Corp*., 790 F.2d 552, 555-56 (6th Cir. 1986) (*citing Contractor Utility Sales v. Certain-Teed Products Corp*., 638 F.2d 1061, 1084 (7th Cir. 1981)) ("Pleadings in a prior case may be used as evidentiary admissions."), *cert. denied*, 479 U.S. 992 (1986); *Enquip, Inc. v. Smith-McDonald Corp*., 655 F.2d 115, 118 (7th Cir. 1981) (citations omitted) ("It is well established in this circuit and elsewhere that [a pleading] from one proceeding is indeed admissible and cognizable as an admission in another . . . Furthermore, the trial court properly ruled that while such evidence was admissible it was not a judicial admission and thus not binding or conclusive."); *Ross v. Philip Morris & Co*., 328 F.2d 3, 15 (8th Cir. 1964) ("[A]n admission in a pleading in one action may be received in evidence against the pleader on the trial of another action to which he is a party.").

However, despite claiming in the prior BOA litigation that Colonial's employees did not play a role in the Shipped Not Paid fraud, the FDIC now argues that Ms. Kissick was at least aware of the fraud. Tr. 3319:11-16. The FDIC cites to the deposition testimony of Cherie Fite, a

former MWLD employee, and an email chain from July 2009, as evidence that Ms. Kissick was involved in the Shipped Not Paid fraud. Ex. A333; Tr. 3319:17-3321:15. In the email chain, Ms. Fite brings to Ms. Kissick's attention certain COLB mortgages that had been shipped to Ocala Funding but for which Colonial had not yet been paid. Ex. A333 at 2. Ms. Kissick instructed Ms. Fite to hold off on requesting that the mortgages be returned to Colonial because TBW would "fund[]" the mortgages later that week. *Id*. The FDIC claims that Ms. Kissick's instruction to Ms. Fite to hold off on requesting the mortgages demonstrates that Ms. Kissick was aware of the Shipped Not Paid fraud.

The Court finds otherwise. Ms. Kissick testified that she did not want the mortgages returned to Colonial because she preferred that Colonial receive the cash payment for the mortgages and she felt that demanding that the mortgages be returned would only delay payment. Kissick Dep. (Ex. D3075) at 822:21-823:22, 825:20-25. Ms. Kissick explained that Colonial was in dire financial condition by July 2009, so her priority was that Colonial receive cash for the mortgages as soon as possible. However, once it became clear to Ms. Kissick after the August 2009 FBI raid on Colonial and TBW that she had been duped and that TBW had no intention of paying Colonial for the mortgages, she requested that the mortgages be returned. Ex. D914 (August 4, 2009 email from Kissick to TBW requesting that BOA "send[] the notes back to us that Ocala Funding has not funded" because "[t]hat's our collateral").

The FDIC also cites to Teresa Kelly's deposition testimony to support its claim that Ms. Kissick "was aware" of the Shipped Not Paid fraud. Tr. 3322:3-7; T. Kelly Dep. (Ex. D3071) at 191:7-9, 12-13.  However, the Court finds more persuasive Ms. Kissick's testimony, *see*, *e.g*., Kissick Dep. (Ex. D3074) at 42:16-17, and that of the prosecutor's statements at Ms. Kissick's sentencing hearing:

> [Ms. Kissick] was lied to. The evidence is uncontroverted that she and Ms.
> Kelly were lied to by Mr. Farkas, Ms. Brown, and others about . . . Ocala
> Funding. They were unaware of the Ocala Funding side of the scheme,
> which is a much larger side of the scheme ultimately dollar-wise.

Ex. P1753 at 12:19-23. It is also contrary to the FDIC's own admissions in the BOA litigation:

> While it is true that certain of Colonial's employees were engaged in
> unrelated criminal acts, it is equally true—and known to BOA—that
> Colonial was not involved with the double pledging of mortgages that was
> aided by BOA and that caused Ocala Funding's and Colonial's losses. In
> fact, Catherine Kissick and Teresa Kelly, the two Colonial employees who
> were prosecuted for completely unrelated acts, both testified that they
> were unaware of the multiple pledging of mortgages until *after* it had
> happened.

Ex. D2761 at 3-4 (emphasis in original). Consequently, the Court declines to credit Ms. Kelly's

speculation that Ms. Kissick was somehow aware of the Shipped Not Paid fraud.

### (2)   BOA's Breaches Were an Intervening Cause of the Shipped Not Paid Damages

The parties agree that Alabama law governs the question of causation as to the "Shipped

Not Paid" damages. Under Alabama law, "[f]or an act to constitute actionable negligence, there

must be not only some causal connection between the negligent act complained of and the injury

suffered, but also the connection must be by a natural and unbroken sequence, without

intervening, efficient causes, so that, but for the negligence of the defendant, the injury would

not have occurred." *City of Mobile v. Havard*, 268 So. 2d 805, 810 (Ala. 1972). In other words,

the existence of a causal connection between the defendant's action and the injury is not

sufficient to establish liability; the defendant's action must also have been the proximate cause of

the injury in order for liability to attach to defendant. *Id*. Proximate cause exists if the "injury [is

the] natural and probable consequence of the negligent act [] which an ordinarily prudent person

ought reasonably to foresee would result in injury." *Vines v. Plantation Motor Lodge*, 336 So. 2d

1338, 1339 (Ala. 1976).

46

If, between the alleged negligent act and the injury, there occurs an independent, intervening, unforeseeable event, the causal connection between the alleged negligence and the injury is broken. *Id.* (*citing Mobile City Lines, Inc. v. Proctor*, 130 So. 2d 388 (Ala. 1961); *Mahone v. Birmingham Electric Co.*, 73 So. 2d 378 (Ala. 1943)). As the Alabama Supreme Court has stated: "[A] person, who by some act or omission sets in motion a series of events, is not responsible for consequences of intervention of another agency, unless at the time of his original act or omission, the act of the intervening agency could reasonably be foreseen. If so, the causal chain is not broken. If the injury results from an independent intervening, efficient cause, not reasonably foreseeable, the original negligent act or omission is not the proximate cause of injury." *Id.* (*citing Liberty Nat'l Life Ins. Co. v. Weldon*, 100 So. 2d 696 (1958); *Watt v. Combs*, 12 So. 2d 189 (Ala. 1943); *Hammett v. Birmingham Railway, Light & Power Co.*, 81 So. 22 (Ala. 1919)).

PWC and FDIC dispute whether BOA's breach of the custodial duties it owed to Colonial was an unforeseeable intervening cause that insulates PWC from liability for the Shipped Not Paid damages. PWC argues it had no reason to foresee that BOA, a reputable third party, would violate its custodial obligations. FDIC disagrees and argues that BOA's breach was a foreseeable twist in an ongoing fraudulent scheme that continued to evolve through different permutations intended to steal assets from Colonial's mortgage lending division. The Court denied PWC's motion for summary judgment because it determined that foreseeability is a question of fact, and a reasonable trier of fact could adopt either PWC's or FDIC's framing of the issue.  Having reviewed the relevant evidence and legal authority, the Court now finds that BOA's breach was not foreseeable and therefore was an intervening cause that defeats FDIC's claim as to the Shipped Not Paid damages.

Alabama courts have generally found a third party's wrongful conduct to be foreseeable only when the defendant was on notice that the third party would behave improperly. For example, in *City of Birmingham v. Benson*, 631 So. 2d 902, 907 (Ala. 1993), the Alabama Supreme Court affirmed a verdict brought against a security guard who negligently failed to prevent a bar fight that resulted in the death of plaintiff's son. The Court rejected the defendant's argument that the fight was an unforeseeable intervening cause for which defendant could not be held liable because, the Court said, there was evidence that the defendant knew the individuals intended to fight. *Id*. Similarly, in *Thetford v. City of Clanton*, 605 So. 2d 835 (Ala. 1992), the Court reversed summary judgment for the defendant hotel manager who cut the chain on a guest's door and admitted the guest's husband, who later inflicted a fatal beating upon the guest. The Court held that because the guest had notified the hotel clerk that she had been beaten by her husband and was hiding from her husband, a factfinder could find that the fatal beating was foreseeable and therefore was not an intervening cause exculpating the hotel manager from liability. *Id*. at 841. The Court also found evidence of foreseeability in *Springer v. Jefferson County*, 595 So. 2d 1381 (Ala. 1992), where the plaintiff sued the County after being struck by a motorist on an allegedly poorly designed and maintained road. The County argued that the motorist's negligent driving was an intervening cause of the accident, but the Court held there was substantial evidence that the accident was foreseeable because the County was aware of at least two previous accidents that had occurred at the same location. *Id*. at 1384-85.

BOA's breach does not match any of these models of foreseeable harm. Unlike the defendants in *Benson* and *Thetford*, who were on clear notice that the respective assailants had violent intentions, PWC had no reason to believe that a reputable bank would abdicate its duties and execute demonstrably false documents stripping Colonial of its ownership rights in the

mortgages. And unlike the defendant in *Springer*, which had been warned of previous accidents just like the one giving rise to the lawsuit at issue, PWC had not been notified of previous episodes where a third-party custodian had transferred mortgages to purchasers without remitting payment to Colonial.

Rather, these facts more closely resemble cases where Alabama courts have held that a third party's improper act was not foreseeable. For example, in *Morguson v. 3M Co.*, 857 So. 2d 796 (Ala. 2003), the plaintiff sued 3M for defectively designing a perfusion pump used to pump blood during open heart surgery. The pump was improperly assembled, which led to the death of the patient. *Id*. at 800. The Alabama Supreme Court affirmed summary judgment for the defendant, however, because it determined the surgical team's negligence in bypassing a safety checklist constituted an intervening cause. *Id*. at 800-01. The Alabama Supreme Court said that even if a defective design rendered improper assembly of the pump foreseeable, it was not foreseeable that a surgical team would decide to bypass a safety checklist, and therefore the decision to bypass the safety checklist was an intervening cause. 857 So. 2d at 800-01. Likewise, while it may have been foreseeable that PWC's negligent audit risked exposing Colonial to fraud, it was not foreseeable that BOA would bypass its regular due diligence and transfer mortgages without payment.

The Court also finds *Ex parte Wild Wild West Social Club, Inc.*, 806 So. 2d 1235 (Ala. 2001), analogous. In that case a bouncer forcefully ejected the plaintiff from a bar, mistakenly believing the plaintiff was involved in a fight. *Id*. at 1237-38. Once outside, the plaintiff was then assaulted by a parking lot security guard. The plaintiff sued the bar, arguing that his wrongful ejection foreseeably led the security guard to perceive him as a troublemaker, which ultimately resulted in the assault. *Id*. at 1239. The Alabama Supreme Court disagreed, explaining that the

assault was not foreseeable by the bar because there was no evidence that the security guard had

a propensity for violence, or that similar altercations had previously occurred, or that the bar had

ever received a complaint about the security guards. *Id.* at 1241. In the same way, there is no

evidence that PWC was aware of BOA's propensity for violating custodial agreements, that

PWC was aware of similar bailee violations, or that PWC had received previous complaints

about BOA. *See* Tr. 2324:24-2325:21. Indeed, BOA was complying with its duties at the time

that PWC last performed audit work for CBG.

The Alabama Supreme Court also found an intervening cause in *Vines v. Plantation

Motor Lodge*, 336 So. 2d 1338 (Ala. 1976). There, the defendant left his keys in the ignition of

his unlocked truck in a dark alley, which was subsequently stolen by a nineteen-year-old under

the influence of drugs and crashed into plaintiff. *Id.* at 1338. The plaintiff sought to hold

defendant liable for the crash, arguing that the accident was a foreseeable consequence of

defendant's negligence in leaving his keys in the ignition. *Id.* The Court recognized that a local

ordinance prohibited individuals from leaving keys in the ignition of unattended vehicles; "[t]he

location from which the truck was stolen is an area containing many stores and bars; auto theft is

a high incident crime of which an alarming number occur when keys are left in the vehicle; a

substantial proportion of stolen vehicles are involved in accidents, frequently after high-speed

chases through cities, and often result in damage to property and person of innocent victims." *Id.*

at 1339. Nonetheless, the Court held "the consequences of the theft were too remote to be

reasonably foreseeable by the defendant when he left the truck unattended with the keys in the

ignition," and therefore the theft was an intervening cause insulating defendant from liability. *Id.*

at 1340.

The FDIC argues that even a foreseeable subsequent cause of an injury is not an intervening cause unless it is sufficient to be considered the sole cause of the injury. FDIC cites *Gen. Motors v. Edwards*, 482 So. 2d 1176 (Ala. 1985), *overruled on other grounds by Schwartz v. Volvo N. Am. Corp.*, 554 So. 2d 927 (Ala. 1989), where the Alabama Supreme Court explained:

> [I]f the intervening cause is not sufficient to be considered the sole "cause in fact" of the injury, if it is not in and of itself sufficient to stand as the "efficient cause" of the injury, the causal chain is not broken; but, if the intervening cause was alone sufficient to produce the injury complained of, it is deemed the proximate cause of the injury and the tortfeasor or tortfeasors between whose acts and the injury the cause intervened are relieved of liability.

482 So. 2d at 1195 (citing *Watt v. Combs*, 12 So. 2d 189 (Ala. 1943); *Goodwyn v. Gibson*, 117 So. 140 (Ala. 1937)).

In *Edwards*, the Court held that one of the parties could have requested a more specific jury instruction on the principles of intervening cause, but waived the issue by failing to do so. *Id*. at 1195-96. It did not discuss whether a third party's conduct was "alone sufficient to produce the injury complained of," or further describe the elements of that test. FDIC also cites *Miller v. Cleckler*, 51 So. 3d 379, 384 (Ala. Civ. App. 2010), where the court restated the rule from *Edwards*: "in order for conduct to be an intervening cause insulating the defendant from liability, the conduct must (1) occur after the defendant's actions giving rise to the negligence claim, (2) be unforeseeable to the defendant at the time the defendant acts, and (3) be sufficient to be the sole proximate cause of the plaintiff's injury." *Miller* concerned a multiple-car accident where the Court determined that finding an intervening cause at summary judgment was not appropriate because the third-party's conduct occurred concurrently with the defendant's conduct and because there was an issue of fact whether the third-party's conduct was foreseeable to the

defendant. *Id*. at 384-85. The Court did not further discuss the requirement that the intervening cause must be sufficient to be the sole proximate cause of the plaintiff's injury.

The Court is not aware of – and parties have not identified – any Alabama case rejecting a defendant's defense of intervening cause on the grounds that the alleged intervening cause was not the "sole proximate cause" of plaintiff's injury. Given the outcomes of the cases cited *supra*, it is not required that a third-party's conduct must be the sole cause-in-fact of plaintiff's injury; *Morguson*, *Wild Wild West*, and *Vines* are all examples where the Alabama Court found an intervening cause despite the fact that defendant's actions were a but-for cause of plaintiff's injury. Rather, the Court asks whether the "intervening cause [is] sufficient in and of itself to break the natural sequence of the first negligence and stand as the efficient cause of the injury and damage." *Goodwyn v. Gibson*, 177 So. 140, 142 (Ala. 1937).

Therefore, the Court concludes that BOA's negligence was a non-foreseeable intervening cause. The Court finds that the elements of an intervening cause are present. First, BOA's misconduct occurred after PWC conducted the audits at issue. Second, BOA's misconduct was not foreseeable to PWC. It is foreseeable that an auditor's negligence in failing to discover fraud will allow that fraud to continue, *see Grant Thornton, LLP v. FDIC*, 535 F. Supp. 2d 676, 711 (S.D.W. Va. 2007), *rev'd on other grounds, Ellis v. Grant Thornton, LLP*, 530 F.3d 280 (4th Cir. 2008). It was not foreseeable that a reputable non-fraudster third party would become complicit in that fraud and violate its independent obligations to Colonial. And third, BOA's decision to ship mortgages belonging to Colonial without collecting and remitting payment for those mortgages to Colonial was sufficient in and of itself to proximately cause the Shipped Not Paid losses. Thus, BOA's actions constitute an intervening cause, and PWC is not liable for these damages. The Court recognizes that the chief fraudster, Farkas, and his company, Ocala, were

maneuvering and directing these transactions, but the simple fact is that without the intervening breaches by BOA, this part of the fraud could not have taken place.

### 2.    Plaintiffs' Breach of Contract Claims against PWC

CBG and the FDIC each bring a breach of contract claim against PWC. CBG alleges that PWC breached its contractual obligations under the Engagement Letters; the FDIC also alleges that PWC breached those obligations, and further alleges that because Colonial was an intended third-party beneficiary of the Engagement Letters, the FDIC is entitled to recover damages against PWC.

### (a)    PWC Owed CBG and Colonial a Contractual Duty under the Engagement Letters

As stated *supra*, CBG and PWC entered into a series of Engagement Letters that governed the parties' agreement with respect to PWC's audit work for the years 2002-2005 and 2008. Exs. A2-A4, A7. PWC agreed to audit CBG on a consolidated basis, meaning that the financial statements PWC audited included the financial information of Colonial. PWC knew that its audits of CBG included auditing Colonial and its operations. Tr. 1377: 1-5 (Westbrook). PWC also recognized that its audits of CBG's consolidated financial statements were required by CBG's and Colonial's banking regulators and that CBG, CBG's banking regulators, Colonial, and Colonial's banking regulators relied on PWC's work for that purpose. Tr. 816:3-24 (Westbrook). Both CBG and Colonial delivered PWC's audit reports to their regulators. Tr. 2093:2-7 (Beville).

At the conclusion of each of its audits for 2002 through 2008, PWC issued a "clean" or unqualified audit report to the Audit Committee representing, among other things, that (1) PWC had performed an audit in accordance with PCAOB standards; (2) that CBG's year-end financial statements fairly presented "in all material respects" the financial position of CBG; and (3) that

CBG maintained in all material respects effective internal controls. Ex. A69 at 79; Tr. 159:11-12 (O'Halloran); Tr. 784:2-11 (Westbrook); Tr. 2135:3-2136:5 (Beville).

The Engagement Letters placed obligations on both PWC and CBG. With respect to PWC, the terms of the Engagement Letters required PWC to perform its audits in compliance with applicable auditing standards and to plan and perform the audit to obtain reasonable assurance as to whether the financial statements were free of material misstatements due to error or fraud. Ex. A2 at 2-3; Ex. A3 at 3-4; Ex. A4 at 3-4; Ex. A7 at 2-3. PWC was also required to inform CBG's audit committee of material matters relating to the audit, including accounting policy and practices and any deficiencies or weaknesses identified during the audit. *Id.*

With respect to CBG, the terms of the Engagement Letters stated that CBG was responsible for:

> informing [PwC] (i) about all known or suspected fraud affecting the entity involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others.

Ex. A-7 at 4; *see* Tr. 2162:24-2163:5 (Beville) (agreeing that with respect to these points, all of the Engagement Letters were "essentially the same"); *see also* Tr. 2161:1-2162:23 (Beville) (acknowledged that if officers of CBG "were aware of possible or suspected fraud," they "should have told PWC").

There is no dispute that PWC owed CBG a contractual duty under the Engagement Letters. Neither CBG nor PWC contend that the Engagement Letters are ambiguous, nor, after hearing the evidence in this case, does the Court find the existence of ambiguity. Thus, the Engagement Letters must be enforced as written.

However, the FDIC and PWC dispute whether PWC owed Colonial a duty under the Engagement Letters. As previously stated, the FDIC asserts that Colonial was a third-party beneficiary of the Engagement Letters. A party seeking to recover under a contract as a third-party beneficiary must establish that it was a direct beneficiary of that contract's terms. *H.R.H. Metals, Inc. v. Miller*, 833 So. 2d 18, 24 (Ala. 2002) (quoting *McGowan v. Chrysler Corp.*, 631 So. 2d 842, 848 (Ala. 1993)). In determining whether a party was a direct beneficiary, Alabama courts look at the intentions of the contracting parties, which are typically "'to be derived from the contract itself, where the language is plain and unambiguous.'" *Id.* (quoting *Loerch v. Nat'l Bank of Commerce of Birmingham*, 624 So. 2d 552, 553 (Ala. 1993)); *Colonial Bank of Ala. v. Ridley & Schweigert*, 551 So. 2d 390, 395 (Ala. 1989) (a third party bringing a claim for breach of contract "must establish that the contracting parties intended, at the time the contract was created, to bestow a direct, as opposed to an incidental, benefit upon" the third party). However, "[i]t is not essential to the creation of a right in an intended beneficiary that he be identified when a contract containing the promise is made." *Turquoise Props. Gulf, Inc. v. IberiaBank*, No. 09-00272-KD-N, 2009 WL 3451125, at *4 (S.D. Ala. Oct. 21, 2009) (alteration in original) (quoting *Rumford v. Valley Pest Control, Inc.*, 629 So. 2d 623, 630-31 (Ala. 1993); *see also Locke v. Ozark City Bd. of Educ.*, 910 So. 2d 1247, 1250-54 (Ala. 2005). Furthermore, "when determining whether the parties to the contract intended to bestow a benefit on a third party, a court may look beyond the contract to the circumstances surrounding its formation." *Rumford*, 629 So. 2d at 630-31 (quoting *Beverly v. Macy*, 702 F.2d 931, 940 (11th Cir. 1983)).

This Court previously rejected PWC's argument that the Engagement Letters expressly disavowed any intention to create third-party beneficiaries. Dkt. No. 21-2 at 4; Case No. 12-957, Dkt. No. 52 at 15-16. However, this Court did not determine whether Colonial was a third-party

beneficiary of the Engagement Letters. *See* Dkt. No. 662 at 30. The Court now finds that Colonial was an intended, direct beneficiary of the Engagement Letters between PWC and CBG because PWC and CBG intended to confer the benefits of those contracts on Colonial. From 2002-2008, PWC audited CBG's financial statements on a consolidated basis, meaning the financial statements included Colonial's financial information. Exs. A2 - A7; Tr. 2092:19-22 (Beville). PWC knew that its audits of CBG's consolidated financial statements were required by Colonial's banking regulators and that Colonial and Colonial's banking regulators relied on PWC's work for that purpose. Tr. 816:3-24 (Westbrook), Tr. 2093:2-7, 2136:6-22 (Beville). Accordingly, Colonial was a third-party beneficiary of PWC's audit engagements with CBG and, as such, PWC owed contractual duties to Colonial.

### (b)     PWC Breached Its Contractual Obligations

The Engagement Letters required PWC to perform its audits in accordance with the applicable auditing standards. Exs. A2 - A7. As this Court has already determined in Section IV.B.1. *supra*, PWC failed to satisfy this requirement.

### (c)     CBG Breached Its Contractual Obligation

In order to maintain their breach of contract claims against PWC, Plaintiffs must establish that CBG performed its own obligations under the Engagement Letters. *See State Farm Fire & Cas. Co. v. Williams*, 926 So. 2d 1008, 1013 (citing *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293 (Ala. 1999)) (explaining that plaintiff's own performance is an element of a breach-of-contract claim); *Tidmore v. Citizens Bank & Tr.*, No. 2150834, 2017 WL 1968270, at *11 (Ala. Ct. App. May 12, 2017) (citing *Poole v. Prince*, 61 So. 3d 258, 273 (Ala. 2010) (affirming summary judgment for defendant because plaintiff did not "establish his own performance under

the mortgage contract, and, therefore, he failed to present evidence of an essential element of his breach-of-contract counterclaim").

Under the Engagement Letters, CBG's and Colonial's management was responsible for "notifying [PWC] of all deficiencies in the design or operation of internal control over financial reporting identified as part of management's assessment." Ex. A-7 at 4. As discussed in this order in detail *infra* at Sections IV.C.1 and 2, CBG failed to meet this requirement in a number of ways.  Accordingly, this Court concludes that CBG failed to fulfill its contractual obligations under the Engagement Letters, and as such, cannot maintain a breach of contract claim against PWC. *See State Farm*, 926 So. 2d at 1013.

CBG's failure to perform its obligations under the Engagement Letters also precludes the FDIC from enforcing those agreements against PWC. A party claiming to be a third-party beneficiary of a contract cannot enforce the contract against the promisor (here, PWC) if the promisee (here, CBG) has failed to perform its obligations under the contract. *See* Restatement Second of Contracts § 309(2) (Am. Law Inst. 1981) ("If a contract ceases to be binding in whole or in part because of . . . present or prospective failure of performance, the right of any beneficiary is to that extent discharged or modified"); *id*. at cmt. b ("[A] failure of the promisee to perform a return promise ordinarily discharges the promisor's duty to a beneficiary to the same extent that it discharges his duty to the promisee."); *Guscott v. City of Boston*, No. 91-1887m 1992 WL 55889, at *2-3 (1st Cir. 1992) (finding that purported third-party beneficiary's "right to enforce the [promisor]'s performance under the . . . contract can be no better than [the promisee]'s right to do so"). Thus, the FDIC's breach of contract claim against PWC is barred.

### 3.    The FDIC's Wantonness Claim against PWC

The FDIC, but not CBG, brings a claim against PWC for wantonness, for which it seeks punitive damages. The claim is limited to PWC's work on an accounting issue that took place in the spring of 2008 in response to questions raised by CBG's regulators. *See* FDIC Third Am. Compl., ECF No. 281 at 84 (count 7). Beginning in 2002 through Colonial's closure, the funds that Colonial transferred to TBW through the COLB and AOT Facilities were treated for accounting purposes as sales rather than loans under Financial Accounting Standard 140 ("FAS 140"). This was based on an accounting opinion that PWC issued in 2002 (at CBG's request) that described the COLB transactions as "sales" rather than "loans" under FAS 140 (this accounting opinion was later extended to the AOT transactions). Tr. 1235:18-1236:5 (Jackson). The description of the transactions is significant because accounting for the transactions as "sales" rather than "loans" allowed Colonial to increase the volume of transactions between Colonial and TBW while avoiding the federal lending limits. *Id*.; Tr. 287:8-288:8. Plaintiffs allege that had the transactions been treated by PWC as loans to TBW instead of as sales to Colonial, Colonial would have been in violation of the loan-to-one-borrower rules as early as 2004, when the limit on Colonial's lending to TBW was $225 million. Tr. 288:9-23 (O'Halloran). Instead, because the transactions were accounted for as sales under FAS 140, the volume of transaction between Colonial and TBW ultimately grew to billions of dollars. Tr. 886:11-887:6 (Westbrook); Ex. A69 at 83.

Both Plaintiffs allege that PWC breached its professional obligations when it agreed to certify the COLB and AOT transactions as sales under FAS 140. PWC disputes this allegation. The Court heard hours of testimony from expert and lay witnesses, as well as examined numerous exhibits on this issue. To describe the FAS 140 issue as confusing is an understatement. However, in the end, this Court does not need to determine whether the

transactions should have been accounted for as sales or loans under FAS 140. The Court has already determined that PWC breached its professional obligations to the FDIC and CBG without considering the FAS 140 issue, and, as discussed below, this Court determines that the FDIC has not carried its burden to establish its wantonness claim on this issue.[10, 11]

On April 2, 2008, the Office of the Comptroller of the Currency ("OCC") raised certain accounting questions in connection with its examination of the MWLD. Among other things, the OCC asked Colonial and PWC to explain how the COLB transactions qualified as sales under FAS 140. Ex. A365 at 1; Ex. A354 at 1; Tr. 568:14-22 (Carmichael). The OCC was particularly focused on whether the presence of end investor commitments constrained Colonial's ability to control the COLB mortgages and thus frustrated sale accounting under paragraph 9(b) or 9(c) of FAS 140. PWC had signed its audit opinion for the 2007 year-end audit on February 25, 2008, which concluded the 2007 audit. Ex. A68 at 64. Therefore, PWC helped CBG to respond to the OCC's inquiry as part of its review work for the first quarter of 2008, which was part of the 2008 audit. Tr. 1512:10-24, 1514:7-1515:4 (Westbrook); Ex. A203.

PWC's policy is that its partners should consult with specialists in its national office when responding to questions from a regulator like the OCC. Tr. 2504:15-24 (Naumann). Accordingly, on April 3, 2008, Mr. Westbrook forwarded the OCC's questions to several partners in PWC's national office, including Jeffrey Naumann. Ex. D2382; Tr. 975:15-978:3

---

[10]  However, were the Court to find it necessary to resolve the issue, the Court would be inclined to find that the COLB and AOT transactions were loans.

[11]  The FDIC and PWC dispute whether the FDIC's wantonness claim should be addressed as a part of this bench trial, which covers the 2008 audit year or whether it should be addressed in the jury trial that covers the 2007 audit year. The FDIC argues that because the OCC's inquiry related to the 2007 audit, the wantonness claim arises from the 2007 audit. PWC counters that each of the actions that its auditors took related to the OCC's inquiry (i.e., the actions which are the bases of the FDIC's wantonness claim) occurred in 2008 and, as such, the wantonness claim is properly before the Court in this bench trial. The Court agrees with PWC. The basis for the FDIC's wantonness claim is not that PWC allowed the COLB and AOT transactions to be accounted for as sales under FAS 140; rather, it is the actions that PWC took in response to the OCC's inquiry. Those actions occurred in 2008, thus the wantonness claim is properly before the Court now.

(Westbrook). Mr. Naumann specialized in accounting for financial transactions and had worked on 100 or more consultations involving FAS 140 issues. Tr. 2503:22-2504:3 (Naumann). Over the next few weeks, Mr. Naumann worked with others in the National Office, including Frank Gaetano; members of the engagement team; and members of CBG management, including Chief Accounting Officer Brent Hicks and Treasurer Kamal Hosein, to respond to the OCC's questions. Ex. A354.

In the course of reviewing the cash flows associated with the COLB transactions, Mr. Naumann determined that in order to properly account for those transactions, it was important to recognize that the COLB agreements contained a form of embedded derivative that he termed an implicit seller's call option. Tr. 2544:22-2548:18, 2573:17-2574:23 (Naumann); Tr. 978:7-979:4, 980:10-14 (Jackson). Because the implicit seller's call option was not explicitly set forth in the contract, PWC obtained confirmation from several of the MWLD's largest customers, including TBW, that this was consistent with their understanding of how the COLB transactions had always operated in the real world. Hicks Dep. (Ex. P3143) at 223:21-224:4, 227:23-228:6, 228:8-9; Ex. A398 at 1; Ex. A-361.

After receiving PWC's analysis and reviewing PWC's workpapers, the OCC did not express any further concerns about the use of sales accounting for the COLB transactions. *See* Tr. 2584:20-23 (Naumann); Spencer Dep. (Ex. P3133) at 119:23-120:19; 400:5-10; Thompson Dep. (Ex. P3141) at 81:3-11, 83:7-17, 87:10-13, 123:23-124:15; Hicks Dep. (Ex. P3143) at 235:8-236:7; Ex. D263. Mr. Naumann testified that based on his experience, he would have expected the OCC to have followed up if it was not satisfied with the answers it received. Tr. 2585:5-7.

In June 2008, the FDIC became Colonial's primary federal regulator. Lester Dep. (Ex. D3076) at 11:18-25. Representatives from the FDIC and the Alabama State Banking Department conducted a review "to follow up on issues raised by the OCC and to develop their own view of the area." Hicks Dep. (Ex. P3143) at 60:16-22, 62:16-23, 63:13-64:7; Ex. D240 at 1-3. Neither the FDIC nor the Alabama State Banking Department expressed any concerns about Colonial's use of sales accounting. Tr. 2220:17-22 (Beville); Lester Dep. (Ex. D3076) at 84:6-8, 93:3-9, 97:9-11, 102:14-19; Hicks Dep. (Ex. P3143) at 65:7-10, 65:12-16, 69:17-19, 69:21-24, 70:2-5, 70:7-10, 239:11-13. In fact, at a meeting of the Colonial/CBG audit committee held on August 13, 2008, the FDIC was "complimentary of the memos and documentation" that PWC and CBG had prepared on the FAS 140 accounting issue. Ex. D26 at 2; Lester Dep. (Ex. D3076) at 108:13-21.

Wantonness requires proof of the same elements as negligence—duty, breach, proximate cause, and damage—plus proof of the additional element of conscious wrongdoing. *See* Ala. Code 1975 § 6-11-20(b)(3) (defining wantonness as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others"). As the Alabama Supreme Court recently observed, "wantonness imports premeditation, or knowledge and consciousness that the injury is likely to result from the act done or from the omission to act. . . ." *Mazda Motor Corp. v. Hurst*, No. 1140545, 2017 WL 2888857, at *16 (Ala. July 7, 2017) (quoting *Ex parte Dixon Mills Volunteer Fire Dep't, Inc*., 181 So. 3d 325, 333 (Ala. 2015)). "Before one can be convicted of wantonness, the facts must show that he was conscious of his conduct and conscious from his knowledge of existing conditions that injury would likely or probably result from his conduct, that with reckless indifference to consequences, he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury."

*Miller v. Bailey*, 60 So. 3d 857, 867 (Ala. 2010) (quoting *Smith v. Roland*, 10 So. 2d 367, 369 (Ala. 1942)).

The FDIC has the burden of proving wantonness by clear and convincing evidence. *See* Ala. Code 1975 § 6-11-20(a). Proof by clear and convincing evidence is more demanding than proof by a preponderance of the evidence. It requires "a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." *Id.* § 6-11-20(b)(4) (emphases added).

The FDIC has not met its heavy burden of proof. While the Court would be inclined to find that the COLB transactions should have been accounted for as loans rather than sales under FAS 140, it is clear to the Court that the FDIC did not establish by clear and convincing evidence that PWC acted with "a reckless or conscious disregard of the rights" of CBG. Ala. Code § 6-11-20(b)(3). Rather, CBG wanted to be able to account for the transactions as sales under FAS 140 and requested PWC's help in doing so, and PWC contrived a method to help its client. Whether PWC made the correct determination was subject to strenuous debate by the well-qualified experts in this case, but, regardless, the FDIC did not satisfy its burden of proof on the wantonness claim.

### C.    *PWC's Affirmative Defenses to CBG's Professional Negligence* Claim

PWC raises three affirmative defenses to CBG's professional negligence claim: (1) the doctrine of *in pari delicto*, (2) the *Hinkle* rule, and (3) the Audit Interference Rule. The *in pari*

*delicto* doctrine and the *Hinkle* rule are closely related; therefore, the Court will address them together.

### 1.     The *in Pari Delicto* Doctrine and the *Hinkle* Rule

PWC argues that the doctrine of *in pari delicto* and the *Hinkle* rule both bar CBG from recovering damages against it. The doctrine of *in pari delicto* is an equitable principal that stands for the proposition that "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *In re Verilink Corp.*, 405 B.R. 356, 362 (Bankr. N.D. Ala. 2009) (quoting *Black's Law Dictionary* (8th ed. 1999)); *Ex parte W.D.J.*, 785 So. 2d 390, 392 (Ala. 2000) (citing *Wall v. Cotton*, 115 So. 690 (Ala. App. 1928); *Clark v. Colbert*, 67 Ala. 92 (Ala. 1880)) (the doctrine of *in pari delicto* "bars recovery by a plaintiff who is equally as guilty as the defendant in the breach of the law"). The doctrine derives from the Latin phrase "*in pari delicto potior est conditio de-fendentis*: 'In case of equal or mutual fault … the position of the [defending] party … is the better one.'" *In re Verilink Corp.*, 405 B.R. at 362 (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985)). The twin rationales for the doctrine are: "courts should not lend their good offices to mediating disputes among wrongdoers," and "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Bateman*, 472 U.S. 299 at 306 (footnote omitted).

The *Hinkle* rule, which originates from the Alabama Supreme Court case *Hinkle v. Ry. Express Agency*, stands for the proposition that "[a] person cannot maintain a cause of action if, in order to establish it, he must rely in whole or in part on an illegal or immoral act or transaction to which he is a party." 6 So. 2d 417, 421 (Ala. 1942). The *Hinkle* rule "derives principally not from consideration for the defendant, but from a desire to see that those who transgress the moral

or criminal code shall not receive aid from the judicial branch of government." *Oden v. Pepsi Cola Bottling Co.*, 621 So. 2d 953, 955 (Ala. 1993) (citations omitted).

CBG does not dispute that Ms. Kissick's and Ms. Kelly's intentional fraudulent and criminal conduct, if imputed to CBG, trigger application of both *in pari delicto* and the *Hinkle* rule. In other words, CBG does not dispute that if Ms. Kissick's and Ms. Kelly's fraudulent conduct is imputed to CBG, then CBG would be equally complicit in the fraud and barred from recovering damages from PWC. *See Ex parte W.D.J.*, 785 So. 2d at 393; *Hinkle*, 6 So. 2d at 421. Therefore, the only question is whether Ms. Kissick's and Ms. Kelly's conduct can be imputed to Colonial and, by extension, to CBG.

(a)      Ms. Kissick's and Ms. Kelly's Actions Are Imputed to Colonial

Under Alabama law, an employer is liable for the intentional acts of its employee if the "acts were committed within the scope of the employee's employment or were done to further the interests of the employer." *E. Ala. Behavioral Med., PC v. Chancey*, 883 So. 2d 162, 167 (Ala. 2003) (*citing Joyner v. AAA Cooper Transp.*, 477 So. 2d 364, 365 (Ala. 1985)). An employer "is liable for the intentional torts of its agent—even if the agent's acts were unknown to the principal, were outside the scope of the agent's authority, and were contrary to the principal's express directions—if the agent's acts were in furtherance of the principal's business and not wholly for the gratification of the agent's personal objectives." *SouthTrust Bank v. Jones, Morrison, Womack & Dearing, PC*, 939 So. 2d 885, 905-906 (Ala. Civ. App. 2005); *Solmica of the Gulf Coast, Inc. v. Braggs*, 232 So. 2d 638, 642 (Ala. 1970).

PWC argues that the evidence shows that Ms. Kissick and Ms. Kelly began sweeping funds to mask TBW's overdrafts in an effort to benefit Colonial by appeasing its most important customer, TBW, and later kept the fraud going in the COLB and AOT Facilities in a desperate,

albeit misguided, attempt to recoup Colonial's funds from TBW. PWC claims that because Ms. Kissick and Ms. Kelly acted within the scope of their employment and acted to further the interests of Colonial, their fraudulent actions are imputed to Colonial.

CBG counters that Ms. Kissick's and Ms. Kelly's actions cannot be imputed to Colonial because they knowingly defrauded Colonial. CBG cites to *Florence v. Carr* for the proposition that an agent's acts are not imputed to the principal "when the agent [] engaged in committing an independent fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act." 148 So. 148, 149 (Ala. 1933) (quoting *Commonwealth Life Ins. Co. v. Wilkinson*, 129 So. 300, 301 (ala. App. 1930)). The *Florence* Court was articulating an early formulation of what now is commonly referred to as the "adverse interest" exception to the general rule that the acts and/or knowledge of an agent is imputed to the principal. Under the adverse interest exception, imputation of an agent's wrongdoing and/or knowledge to the principal will not occur if the agent was engaged in fraud or self-dealing that is entirely adverse to the principle. *Verilink Corp.*, 405 B.R. at 362 n.2; *Florence v. Carr*, 148 So. 148, 149 (Ala. 1933) ("The general rule that notice to an agent … is notice to the principal … has no application … when the agent is acting for himself adversely to his principal, nor … [when the agent] has committed [fraud] on his own account in transacting the business of his principal.").

However, neither *Florence* nor any other Alabama case of which this Court is aware stands for the blanket proposition that an agent's actions cannot be imputed to the principal simply because the agent participated in a fraud against the principal. Rather, in order to avoid imputation via the adverse interest exception, the agent must also have "wholly abandoned" the principal's interest. *See Verilink*, 405 B.R. at 363 n.2. ("[The] 'adverse interest' exception is narrow and only applies when the individual wrongdoer/agent has wholly abandoned" the

principal's purpose); *Doe v. Swift*, 570 So. 2d 1209, 1213 (Ala. 1990) (declining to impute employee's action to employer because employee's misconduct was not for the benefit of the employer, but rather, was done for the employee's "own gratification"); *Cadet v. Fla. Dep't of Corr.*, 742 F.3d 473, 482-83 (11th Cir. 2014) (quoting *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000)) ("The adverse interest exception [] is narrow and applies only when the agent has 'totally abandoned' the principal's interests.") *vacated on other grounds*, 853 F.3d 1216 (11th Cir. 2017); *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998) (explaining that, under Florida law, the adverse interest exception applies only when the agent's actions are "entirely adverse" to the principal's interest, meaning that "his actions must neither be intended to benefit the [principal] nor actually cause short-or long-term benefit to the [principal]"); *Chancey*, 883 So. 2d at 167 (declining to impose vicarious liability on employer because employee's actions were "not undertaken to further [the employer's] business," but, instead, undertaken "to satisfy . . . personal needs"); *SouthTrust Bank*, 939 So. 2d at 905-906 (summarizing Alabama law and concluding that a principal is liable for the actions of its agent if the acts were "in furtherance of the principal's business and not wholly for the gratification of the agent's personal objectives").

Furthermore, an agent will not be considered to have "wholly abandoned" the principal for purposes of the adverse interest exception if the agent is acting to further the principal's business, even if the agent's actions are sorely misguided. *See, e.g., Verilink*, 405 B.R. at 356 n.2 (as long as the agent acts in furtherance of the principal's business, the adverse interest exception will not apply "even if the agent's purpose is misguided or [] fraudulent to the point of ultimately causing the company's failure"); *Solmica of Gulf Coast, Inc. v. Braggs*, 232 So. 2d 638, (Ala. 1970) ("[T]he master may be held liable though he did not authorize the agent to resort to such

means in rendering the services for the which he was employed and also though the agent may have sought to accomplish the master's business by improper or unlawful means or in a way unknown to his master or even contrary to his express direction."); *SouthTrust Bank*, 939 So. 2d at 905-906 (a principal is liable for an agent's intentional torts even if the agent acted "contrary to the principal's express directions").

Therefore, this Court must determine if Ms. Kissick and Ms. Kelly wholly abandoned Colonial's interests when they participated in the fraud. The Court finds the following with respect to Ms. Kissick's and Ms. Kelly's incentives for participating in the fraud.

### (1)    The Sweeping Phase of the Fraud

As stated *supra*, the fraud started with MWLD employees sweeping funds between accounts in order to mask the fact that TBW was overdrawn on its accounts. The first employee to do this was Joyce Shultz, vice president and operations director for the MWLD. Ms. Schultz executed the sweeping for three weeks before telling Ms. Kissick about TBW's overdraft problem. Kissick Dep. (Ex. D3074) at 33:23-34:23; *see also* Tr. 659:16-660:25. When Ms. Shultz first reported the sweeping to Ms. Kissick, the overdraft was approximately $10 million. T. Kelly Dep. (Ex. D3071) at 29:21-30:3.

Ms. Kissick testified that she immediately told her boss, Art Barksdale, about TBW's overdraft and the sweeping. Kissick Dep. (Ex. D3074) at 34:2-14, 77:23-78:19, 83:3-84:18. Mr. Barksdale, a senior vice president and CBG employee, instructed Ms. Kissick to "get this fixed" as he was "too old to find a new job" and had a son starting law school and a daughter starting college. Kissick Dep. (Ex. D3074) at 78:9-14, 84:5-8. Ms. Kissick described Mr. Barksdale's reaction as consistent with Colonial's culture, which was not receptive to "bad news" and

discouraged reporting the same. *Id*. at 78:17-19, 79:8-16, 83:3-85:4; Kissick Dep. (Ex. D3075) at 564:19-565:24, 566:6-9.

The sweeping was meant as a temporary solution; Ms. Kissick fully expected TBW to repay its overdraft. Kissick Dep. (Ex. D3074) at 79:17-80:6, 129:17-19. During the sweeping phase of the fraud, Mr. Farkas repeatedly told Ms. Kissick that TBW was not really overdrawn and that apparent overdrafts reflected a problem on Colonial's end. Kissick Dep. (Ex. D3074) at 85:5-19 ("Lee Farkas tried to always blame it on [Colonial] because he thought Colonial Bank was a little piddly bank and that was—our controls or our software or our systems were the reason for it. It was never his fault. It was always our fault."); *id*. at 88:15-89:3 ("[I]t would always be our fault somehow. . . . [T]hey would say, 'We don't have any problems with any other bank' . . . ."); *id*. at 94:24-95:14, 123:15-20 (same).

Ms. Kissick and Ms. Kelly appear to have entertained the possibility that Mr. Farkas was right, at least at first. Desperate not to alienate and perhaps lose their largest customer, they "tried everything to figure out what [the problem] was" that was causing the overdrafts. Kissick Dep. (Ex. D3074) at 85:5-19. Ms. Kissick even arranged for Colonial to hire a consulting firm, Robbins Gioia, to look into the overdraft problem and try to determine why it was happening. *Id*. at 92:14-93:11, 94:14-19.

### (2)     The COLB Plan B Phase of the Fraud

Moving the overdraft to the COLB Facility in December 2003 was an attempt by Ms. Kissick and Ms. Kelly to contain the overdraft. They hoped that if Mr. Farkas was right and Colonial's own systems were causing the problem, then "whatever was causing the overdraft might disappear once it moved into COLB."  Kissick Dep. (Ex. D3074) at 143:22-144:6; *see id*. at 123:15-124:2, 124:14-125:19, 145:2-10; Ex. A343. They intended for COLB Plan B to be "a

one-time thing" that would stop the overdraft from continuing to grow. Kissick Dep. (Ex. D3074) at 147:21-148:4, 149:4-5. Moving the overdraft to COLB also allowed Colonial to make "tens of millions of dollars" by charging interest and fees on the fraudulent COLB transactions. Kissick Dep. (Ex. D3074) at 166:2-18, 167:17-168:19; *see also id.* at 124:6-10 (TBW "got mad at" Ms. Kissick when she moved the overdraft to COLB "because then they had to start paying interest on their overdraft"); *id.* at 174:8-20 (Colonial also charged TBW interest on the fraudulent AOT transactions).

After Plan B was implemented, however, TBW continued to cajole Ms. Kissick into providing additional funds by representing that it needed those funds on a short-term basis to deal with various crises that were threatening to put TBW out of business, while assuring her that "the money's going to come back." Kissick Dep. (Ex. D3074) at 149:7-13, 150:15-154:7. When Ms. Kissick would threaten to stop the funds, Mr. Farkas would respond by threatening to hurt Colonial. *Id.* at 103:16-104:24 ("[H]e would get very aggressive, I guess you could say, and basically talk about how, you know, 'If you think'—'if you think you're going to hurt me, well, Colonial Bank's going to be a real shit storm,' and, you know, all your—basically all my biggest fears were my whole staff imploding and my customers losing their bank."). TBW was the MWLD's largest and most important customer. Kissick Dep. (Ex. D3074) at 56:16-18; Tr. 2299:5-2300:6 (Bathen). Ms. Kissick thus believed that cooperating with Mr. Farkas was necessary to protect Colonial:

> Q.  What did you think would happen if you didn't permit the overdraft to continue?
>
> A.   I thought [TBW] would blow up, and then my bank—my department would blow up and that would hurt the bank, and I thought not fixing it was not a solution, that fixing it was the solution.

> And I was so wound up in that—I mean, like I said, I didn't know—I think if I had known the whole story, I would have just said, "Whoa."
>
> I don't know.  It was unfixable, I mean, basically, but I didn't know that. And so I kept thinking. I did little things to try to pay it—you know, pay us back a hundred thousand a day.
>
> I thought he was doing much better because he had Wall Street firms courting him, and, you know, I was just a little stupid Alabama bank in their eyes.  And they had investment bankers and they had all these people, so I thought his—he was doing fine and we were just making headway. And I had this little hope that it was going to be fixed, you know.

Kissick Dep. (Ex. D3074) at 109:16-110:16; *see id.* at 224:9-225:2 ("None of us at Colonial were trying to hurt the bank, and all we wanted to do was get some time to get it fixed because—and that's what we were working towards."); *id.* at 104:11-24, 359:4-360:4.

Indeed, from the time the fraud began in 2002, Ms. Kissick believed that TBW would eventually pay down the overdraft. Kissick Dep. (Ex. D3074) at 220:11-22. She took a variety of steps that she thought would help ensure that Colonial would eventually be made whole. For example, she tried to secure whatever collateral she could from TBW in an attempt to cover the overdraft. Kissick Dep. (Ex. D3074) at 85:20-87:15 ("I took as collateral pretty much everything that wasn't nailed down at Taylor Bean."); *id.* at 188:11-189:10, 189:13-18. Ms. Kissick and Ms. Kelly also implemented what they referred to as the "Easy Payment Plan" to force TBW to pay back $50,000 to $100,000 per day to Colonial. *Id.* at 222:21-223:10.

### (3)    The AOT Phase of the Fraud

Even as the fraud grew, Ms. Kissick and Ms. Kelly continued to believe that things were moving in the right direction for Colonial. During the Plan B AOT phase, TBW's demands for additional funding became less frequent—"sometimes it didn't happen for months . . . [a]nd sometimes we'd tell them no"—and they believed the situation had "stabilized or normalized" and they could focus on "just trying to get rid of the problem that we had." Kissick Dep. (Ex.

D3074) at 192:4-194:7; *see id*. at 220:11-221:5 ("[W]e would take two steps forward and one step back. And we thought we were narrowing it down. Our whole thing was to keep him alive so we could get out of it and get our money back and just make everything right . . . ."); *id*. at 221:22-222:7 ("[W]e thought we were making such great progress. We were getting all these loans and selling those off because we'd have—we'd have some positive moves. You know, we'd have things paid down. And—but it really was nothing."). In fact, things were moving in the right direction, albeit not fast enough. The TBW "hole" was at its largest around the end of 2007. Between then and Colonial's collapse in August 2009, the size of the hole decreased as a result of Ms. Kissick's and Ms. Kelly's efforts to collect money and assets from TBW. T. Kelly Dep. (Ex. D3072) at 406:21-407:7, 407:9, 407:11-408:6, 408:15-19.

Ms. Kissick further testified that she believed that TBW was using the proceeds of the fraud to fund short-term operating expenses such as "[p]ayroll, utility bills, rent." Kissick Dep. (Ex. D3074) at 101:6-102:2; *see id*. at 154:19-155:3. She thought that TBW was "asset rich, cash poor" and just needed "time to get financing." *Id*. at 79:9-80:6. Mr. Farkas repeatedly assured her that TBW was working to get the financing necessary to fix the overdraft. *Id*. at 108:25-109:15. At one point, he even showed her a letter of credit from Credit Suisse First Boston in order to convince her that "cash was on the way." *Id*. at 97:16-98:3, 99:9-16.

The Court finds the foregoing testimony credible; neither Ms. Kissick nor Ms. Kelly participated in the fraud with the intent to harm Colonial. Rather, Ms. Kissick and Ms. Kelly initially participated in the sweeping in an attempt to help Colonial's largest customer, and later developed the COLB Plan B and AOT Plan B in the hope that TBW would be able to recover and repay Colonial.

The Court acknowledges that both Kissick and Kelly executed "Statements of Facts" in connection with their guilty pleas in federal court and in these statements, each acknowledged that she "engaged in a scheme to defraud various entities and individuals," including Colonial and CBG. Kissick Dep. (Ex. D3075) at 606:6-607:22; 608:24-609:12; Ex. D419, T. Kelly Dep. (D3071) at 259:3-260:11; Ex. D422. Ms. Kissick and Ms. Kelly also admitted that they "knowingly and intentionally placed Colonial [] and [CBG] at a significant risk of incurring losses as a result of the scheme" and acknowledged that they "in fact" caused Colonial to acquire assets that "had no value and were held on Colonial['s] [] and [CBG's] books as if they had value." Kissick Dep. (Ex. D3074) at 609:21-610:11; Exs. D419, D422. Nevertheless, the Court concludes that these statements do not tell the full story, but rather, must be read in the context of the evidence in this case.

The Court further finds that neither Ms. Kissick nor Ms. Kelly "personally receive[d] funds paid out by Colonial [] to TBW as a result of the" TBW fraud. Kissick Dep. (Ex. D3074) at 44:6-13, 358:5-360:4; Kissick Dep. (Ex. D3075) at 1023:16-1024:5 ("There was absolutely no benefit to me whatsoever."); Ex. D419 at 2 (¶ 2) (the Justice Department agreed that Ms. Kissick "did not personally receive funds paid out by Colonial Bank to TBW as a result of the scheme"); Ex. D422 at 1-2 (¶ 2) (same for Ms. Kelly).

The Court finds that Ms. Kissick's and Ms. Kelly's belief that their behavior was furthering Colonial's interests, while misguided, was both genuine and (without the benefit of hindsight) plausible. It is not difficult to understand why they concluded that keeping TBW afloat was vital to Colonial. TBW was the MWLD's largest and most important customer. Colonial made hundreds of millions of dollars from interest it charged TBW while the fraud was ongoing—money Colonial would not have earned absent the fraud. Ms. Kissick also believed

that TBW intended to pay back the money it had taken from Colonial and that TBW's officers were cooperating with her efforts to obtain enough collateral from TBW to ensure that Colonial was fully protected.

CBG argues that Ms. Kissick and Ms. Kelly benefitted from the TBW fraud because they earned salaries and bonuses from Colonial while the fraud was ongoing. However, the fact that Ms. Kissick and Ms. Kelly "also may have seen benefits to themselves" in the form of their salaries and benefits "does not make their interests adverse" to the Bank. *Baena v. KPMG LLP*, 453 F.3d 1, 7-8 (1st Cir. 2006); *see also Gray v. Evercore Restructuring LLC*, 544 F.3d 320, 326 (1st Cir. 2008) (citing *Baena*, 453 F.3d at 8) ("The bare fact that management received bonuses upon confirmation is not sufficient to establish the [adverse interest] exception."); Restatement (Second) of Agency § 282 Reporter's Notes (1958) ("The mere fact that the agent was interested in having the transaction go through, as where he receives a commission if successful, is not of itself sufficient to prevent the principal from being bound by the agent's knowledge.").

Ms. Kissick and Ms. Kelly were acting to further Colonial's interests as they perceived them. If the fact that they were also motivated to keep their jobs and continue drawing their salaries was sufficient enough to make their interests adverse to those of Colonial and defeat imputation, then the adverse-interest exception would swallow the rule, and corporations would be immune from liability for the misdeeds of their officers and managerial employees in almost every instance. As the New York Court of Appeals has explained, "a corporate insider's personal interests—as an officer, employee, or shareholder of the company—are often deliberately aligned with the corporation's interests by way of, for example, stock options or bonuses, the value of which depends upon the corporation's financial performance." *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 952 (N.Y. 2010). To allow those ubiquitous personal incentives to defeat

imputation "would enable the corporation to disclaim, at its convenience, virtually every act its officers undertake." *Id.*; *see also Grede v. McGladrey & Pullen LLP*, 421 B.R. 879, 886 (N.D. Ill. 2009) ("The adverse interest exception swallows the rule if all that is required to invoke it is a secondary, or indirect benefit of keeping the enterprise alive to preserve their jobs or increase the paper value of their ownership shares."); *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("[A]n allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient [to support an inference of motive to commit securities fraud] because such a desire can be imputed to all corporate officers.").

In any event, Ms. Kissick's compensation was not a significant motivating factor for her participation in the fraud:

> A.  But I didn't not disclose it because—just to get a bonus.  I would have gladly not had a bonus to not have to deal with that
>
> . . . .
>
> I'm just—some years I got zero bonus.  But nothing—no bonus would— nothing would ever have compensated me for the hell I went through.  And I know it was my own fault because I didn't stand up to them, but I did not do this for any gain personally at all.

Kissick Dep. (Ex. D3075) at 837:13-838:20. Based on the foregoing, this Court concludes that Ms. Kissick's and Ms. Kelly's actions are imputable to Colonial.

Next, this Court must determine whether their actions are imputed to CBG.

### (b)    Ms. Kissick's and Ms. Kelly's Actions are Imputable to CBG

PWC raises two bases for imputing Ms. Kissick's and Ms. Kelly's actions to CBG. First, it argues that under Alabama law, a parent company that owns all of the stock of a subsidiary corporation is liable for the acts of the subsidiary (and thus for imputable acts of the subsidiary's employees) if "the parent corporation so controls the operation of the subsidiary corporation as to make it a mere adjunct, instrumentality, or alter ego of the parent corporation." *Hill v. Fairfield*

*Nursing & Rehab. Ctr., LLC*, 134 So. 3d 396, 408 (Ala. 2013) (quoting *Duff v. S. Ry.*, 496 So. 2d 760, 762 (Ala. 1986)). Second, PWC argues that Ms. Kissick's and Ms. Kelly's actions are imputable to CBG because CBG and Colonial are indistinguishable. In other words, PWC argues, because Ms. Kissick and Ms. Kelly are agents of Colonial, they are also agents of CBG.

CBG counters that the corporate form "is not lightly disregarded" under Alabama law "since limited liability is one of the principal purposes for which the law has created the corporation." Dkt. No. 784 at 104 (quoting *M&M Wholesale Florist, Inc. v. Emmons*, 600 So. 2d 998, 999 (Ala. 1992)). In addition, CBG claims, a parent company that owns all the stock of its subsidiary is not liable for the acts of the subsidiary unless the parent corporation "so controls the operation of the subsidiary [] as to make it a mere adjunct, instrumentality, or alter ego of the parent corporation." *Id.* at 107 (citing *Baker v. Hospital Corp. of America*, 432 So. 2d 1281, 1284 (Ala. 1983)). CBG argues that PWC has failed to demonstrate that CBG exercised the requisite control over Colonial. Lastly, CBG claims that PWC failed to demonstrate that CBG had the right to control Ms. Kissick's and Ms. Kelly's actions in such a manner that they were agent of CBG. CBG charges that "[t]here is simply no evidence that [CBG] retained any right to exercise control over Colonial [] employees." *Id.* at 116. This Court finds otherwise. As the Alabama Supreme Court recently stated:

> The doctrine that a corporation is a legal entity existing separate and apart from the persons composing it is a legal theory introduced for purposes of convenience and to subserve the ends of justice. The concept cannot, therefore, be extended to a point beyond its reason and policy, and when invoked in support of an end subversive of this policy, will be disregarded by the courts. Thus, in an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock and assets will be treated as identical.

*Hill v. Fairfield Nursing & Rehab. Ctr., LLC*, 134 So. 3d 396, 407 (Ala. 2013) (quoting *Cohen v. William*s, 318 So. 2d 279, 280-81 (Ala. 1975)). Therefore, although Alabama law readily

recognizes the corporate form, *Loper v. Gill*, 213 So. 2d 674, 675 (Ala. 1968), the Alabama

Supreme Court has also instructed that courts should "always look[] to substance over form."

*Cohen*, 318 So. 2d at 281 (stating that the "decision [to disregard corporate form] is one made as

an evidentiary matter on a case to case basis" and noting that the corporate form may be

disregarded "to prevent injustice or inequitable consequences"); *Messick v. Moring*, 514 So. 2d

892, 893 (Ala. 1987) (citing *Cohen*, 318 So. 2d 279 (Ala. 1975) (the question of piercing the

corporate veil is "a question of fact … to be determined on a case by case basis"). Likewise, in

*Duff v. Southern Ry.*, 496 So. 2d 760, 762 (Ala. 1986), the Alabama Supreme Court stated:

> This Court has said that a parent corporation which owns all the stock of
> a subsidiary corporation is not liable for acts of its subsidiary corporation,
> unless the parent corporation so controls the operation of the subsidiary
> corporation as to make it a mere adjunct, instrumentality, or alter ego of
> the parent corporation.

*Id*. at 762-763 (listing factors to consider determining whether the required indicia of control

exists).

This Court finds the following with respect to whether CBG had the requisite indicia of

control over Colonial such that CBG is liable for Colonial's actions. As has already been stated,

CBG was Colonial's parent company; CBG was a single-bank holding company and Colonial

was CBG's principle operating subsidiary. Stipulated Facts at 2. Colonial comprised at least 97%

of CBG's assets and perhaps as much as 99%. Tr. 2092:15-18. CBG owned all of Colonial's

stock. Tr. 2151:16-22 (Beville). CBG provided financial support to Colonial as it was required to

do under federal law. Tr. 2405:5-2406:4 (Moore); 12 U.S.C. § 1831o-1. When CBG had

expenses to pay, "most payments were made by Colonial Bank," with adjustments made later to

"record [the expense] on the appropriate other entity." Tr. 2405:5-2406:20 (Moore).

CBG and Colonial shared nearly all the same officers. Tr. 2241:13-2243:14 (Beville); Ex. D234 at 6-7; Ex. D1165 at 4-5. For instance, Lewis Beville, who testified at trial in this case, served as President and Chief Executive Officer of both CBG and Colonial from June 2009 until Colonial collapsed in August 2009. Tr. 2152:20-25. (Before June 2009, Robert Lowder was President and CEO of both entities.) Tr. 2139:16-17. Except for certain regulatory matters where the two companies had different primary regulators, Mr. Beville "never really distinguished between CBG and Colonial Bank" and regarded them as "one and the same from a practical, operational, and risk management standpoint." Tr. 2153:1-13.

Sarah Moore, who testified at trial in this case, served as the Chief Operating Officer for both CBG and Colonial from 2000 to 2003 and as Chief Financial Officer of both CBG and Colonial from 2003 to 2009. Tr. 2404:24-2405:4, 2406:21-2407:1. She held other positions with one or both entities before 2000, but she could not recall whether those positions were with CBG, Colonial, or both. Tr. 2407:2-17. Mary Lou Bathen, who testified at trial in this case, served as Treasurer of both CBG and Colonial from 2000 to 2003 and as Assistant Treasurer of both CBG and Colonial from 2003 through 2009. Tr. 2246:16-23, 2248:20-2249:18. She found "very little difference between Colonial Bank and Colonial BancGroup." Tr. 2249:19-21. The Audit Committee for CBG also functioned as the Audit Committee for Colonial. Tr. 2152:16-19 (Beville); Hicks Dep. (Ex. P3143) at 34:24-35:4; Ex. D304 at 2.

Considering the *Duff* factors in light of the evidence presented in this case, the Court concludes that CBG had the requisite control over Colonial to be subject to liability for Colonial's actions. Colonial represented at least 97% of CBG's assets and CBG's and Colonial's executive officers nearly entirely overlapped. These officers drew no meaningful distinction between CBG and Colonial (to the point that they often did not know or had trouble

remembering which entity they technically worked for). And, like the officers, management at Colonial and CBG did not distinguish which entity employed them. For instance, Ms. Kissick's direct supervisor in 2002, Art Barksdale, testified that it was "never very clear" whether he worked for Colonial or CBG, although he "later realized" that he was officially employed by CBG. Barksdale Dep. (Ex. P3122) at 20:15-18. Mr. Barksdale also testified that there was no real significance to whether someone was a CBG employee or a Colonial employee *Id*. at 21:7-14. Based on the foregoing, this Court concludes that CBG exercised sufficient control over Colonial to deem the bank an alter ego of CBG.

Nevertheless, CBG argues that even if this Court concludes that CBG controlled Colonial, "proof of control alone is not enough to justify the exercise of the Court's extraordinary equitable power to deem Colonial [] the alter ego of [CBG]; there must be evidence that the control was misused. Dkt. No. 784 at 111 (citing *South Alabama Pigs, LLC v. Farmer Feeders, Inc.*, 305 F. Supp. 2d 1252 (M.D. Ala. 2004); *In re Birmingham Asbestos Litigation*, 619 So. 2d 1360, 1362 (Ala. 1993)). The Court need not determine whether misuse is a necessary requirement for holding CBG responsible because the Court finds that CBG did, in fact, misuse its position of control over Colonial. For all the reasons given *supra* as well as those set forth *infra*, the Court finds that CBG had sufficient information to have suspected that fraud, or at least improper activities, were occurring in the MWLD at Colonial. It failed to alert its auditor to those activities. By all accounts, had it done so, the fraud would have been stopped or, at a minimum, mitigated.

The Court also concludes that Ms. Kissick's and Ms. Kelly's actions are imputable to CBG because Ms. Kissick and Ms. Kelly were CBG's agents. "The test for agency is whether the alleged principal has retained a right of control over the actions of the alleged agent." *Wild Wild*

*West*, 806 So. 2d at 1241. An agency relationship need not be express, but can be implied from the "facts and circumstances of the particular case, including the words and conduct of the parties." *Fisher v. Comer Plantation, Inc.*, 772 So. 2d 455, 465 (Ala. 2000) (quoting 3 Am.Jur.2d Agency § 18 (1986)). Here, Ms. Kissick initially was supervised by Art Barksdale, the senior lending officer for Florida, and an officer of CBG. Later she took direction from Mr. Hosein, who was Treasurer of both CBG and Colonial. Because CBG officers directed Ms. Kissick in the performance of her job, Ms. Kissick was an agent of CBG. *See Evans v. City of Talladega*, 136 F. Supp. 3d 1354, 1363 (N.D. Ala. 2015) (quoting *Dickinson v. City of Huntsville*, 822 So. 2d 411, 416 (Ala. 2001) ("Under Alabama law, '[t]he test for agency is whether the alleged principal has retained a right of control over the actions of the alleged agent.'"); *cf. Wild Wild West*, 806 So. 2d at 1242 (security guard was not agent of bar where "no one from [bar] ever told him how to perform his job" or "exercised . . . any control over the means by which [he] performed [his] duties"). The evidence also establishes that Ms. Kelly was a sub-agent of Ms. Kissick, and thus also an agent of CBG. *See Booker v. United Am. Ins. Co.*, 700 So. 2d 1333, 1335 (Ala. 1997) ("When one employs an agent who has either express or implied authority to employ a subagent, the subagent will also be the agent of the principal . . . ." (quoting 3 C.J.S. Agency § 265 (1973)).

Therefore, based on the foregoing, the Court concludes that Ms. Kissick's and Ms. Kelly's fraudulent actions are imputed to CBG. As such, CBG's professional negligence claim against PWC is barred by the doctrine of *in pari delicto* and the *Hinkle* rule.

### 2.    The Audit Interference Rule

Alabama follows the traditional rule that a plaintiff's contributory negligence serves as a complete bar to recovery in tort. *See Williams v. Delta Int'l Mach. Corp.*, 619 So. 2d 1330, 1333

(Ala. 1993). Under that rule, "a plaintiff cannot recover in a negligence suit where plaintiff's own negligence is shown to have proximately contributed to his damage, notwithstanding a showing of negligence on the part of the defendant." *Phillips v. Seward*, 51 So. 3d 1019, 1025 (Ala. 2010) (quoting *Brown v. Piggly-Wiggly Stores*, 454 So. 2d 1370, 1372 (Ala. 1984)); *see Zatarain v. Swift Transp., Inc.*, 776 F. Supp. 2d 1282, 1290 (M.D. Ala. 2011) (quoting *Hannah v. Gregg, Bland & Berry, Inc.*, 840 So. 2d 839, 860 (Ala. 2002)).

This Court held at summary judgment that the Alabama Supreme Court would limit the contributory negligence defense in the context of a professional negligence claim against an auditor by adopting the so-called "audit interference rule." Dkt. No. 747 at 11. The audit interference rule was first articulated in *National Surety Corp. v. Lybrand*, 9 N.Y.S.2d 554, 563. (N.Y. App. Div. 1939). In *Lybrand*, a finance firm fell victim to an embezzlement scheme orchestrated by one of its cashiers. *Id.* at 227. The surety on a fidelity bond paid the finance firm and instituted an action against the finance firm's accountants for their failure to discover and report the embezzlement. *Id.* The accountants argued that they "[were] not liable, no matter how negligent they may have been, because [the finance firm] [was] guilty of contributory negligence." *Id.* at 235. The *Lybrand* Court disagreed, stating:

> We are [] not prepared to admit that accountants are immune from the consequences of their negligence because those who employ them have conducted their own business negligently. The situation in this respect is not unlike that of a workman injured by a dangerous condition which he has been employed to rectify. Accountants, as we know, are commonly employed for the very purpose of detecting defalcations which the employer's negligence has made possible. Accordingly, we see no reason to hold that the accountant is not liable to his employer in such cases.

*Id.* at 235-236 (citation omitted). Therefore, the *Lybrand* Court concluded that "[n]egligence of the employer is a defense only when it has contributed to the accountant's failure to perform his contract and to report the truth." *Id.* at 236. This standard for utilizing the defense of contributory

negligence in accounting litigation has become known as the audit interference rule. *Bd. of Trustees of Cmty. Coll. Dist. No. 508 v. Coopers & Lybrand*, 803 N.E.2d 460, 464-65 (Ill. 2003); *see also Jewelcor Jewelers & Distributors, Inc. v. Corr*, 542 A.2d 72, 79 (Pa. Super. Ct. 1988).

PWC and CBG dispute to what degree the client's negligence must have contributed to the auditor's failure to detect the misstatements in the client's financial statements in order to bar recovery by the client against the auditor. PWC argues that recovery is barred if CBG's negligence contributed at all to PWC's failure to detect the misstatements in CBG's financial statements. Dkt. No. 783 at 150 (citing *Lybrand*, 9 N.Y.S.2d at 563). CBG, on the other hand, argues that in order to be sufficient to shield PWC from liability, PWC must establish that CBG substantially impeded its ability to complete its audit work. Dkt. No. 784 at 97 (*citing Collins v. Esserman & Pelter*, 681 N.Y.S.2d 399, 402 (N.Y. App. Div. 1998)). It is not necessary for this Court to determine which standard is correct because, for the reasons stated below, the Court finds CBG's negligence was sufficient under either standard.

The Court makes the following findings with respect to the audit interference rule.

### (a)   The Knowledge of Multiple MWLD Employees

Numerous MWLD employees knew about the sweeping in 2002 and 2003. In addition to Ms. Kissick, Mr. Barksdale, and Ms. Shultz, Teresa Kelly, Michelle Carroll, an operations manager in the MWLD, Amy Nunneley, a senior lending officer in the MWLD, and Rachel Jones, an employee with the MWLD, also knew about the overdraft and/or sweeping. As Ms. Kelly testified, "the sweeping wasn't a big secret." T. Kelly Dep. (Ex. D3071) at 232:18-233:6; *see* Kissick Dep. (Ex. D3074) at 35:4-21 ("The first year, virtually my entire department was involved in some form, . . . virtually my entire department knew that we had an overdraft."); *id.* at 38:8-13 ("Well, the first year, my entire department, including my boss, took steps [to hide the

overdraft].”); *id.* at 81:25-82:11 (“Everybody knew that [TBW] had an overdraft in my department. . . . Everybody knew, and our whole goal was to get it fixed.”); Ex. D2; Ex. P3019. In addition, knowledge of the sweeping was not limited to the MWLD. Ms. Kissick testified that two individuals from CBG’s internal audit department learned about the sweeping in December 2002. Kissick Dep. (Ex. D3074) at 112:9-113:3. And Ms. Kelly testified that certain employees in the Colonial’s paydown group also were aware of the sweeping. T. Kelly Dep. (Ex. D3071) at 236:23-237:9.

CBG proffered testimony through its Trustee, Mr. O’Halloran, that no one other than Ms. Kissick and Ms. Kelly were aware of the sweeping at CBG and/or Colonial. Tr. 307:19-308:13. CBG’s counsel also suggested that the Court should disregard Ms. Kissick’s and Ms. Kelly’s testimony as unreliable because they are convicted felons. The Court finds this position overstated. At the time of their testimony, Ms. Kissick and Ms. Kelly had nothing to gain by implicating others in the fraud. There is no evidence in the record that they were offered reduced sentences in exchange for cooperating in the prosecution of other individuals at Colonial. Indeed, both Ms. Kissick and Ms. Kelly were either serving or had served their prison sentences at the time of their deposition testimony.

Moreover, there is written evidence that corroborates Ms. Kissick’s and Ms. Kelly’s testimony. Although Mr. Barksdale has denied knowing about the sweeping, an email that Ms. Kissick sent to Amy Nunneley, a senior lending officer in the MWLD, on November 12, 2002, reads in part:

> I’m a wreck. I literally didn’t sleep last night…worried about TBW. Art [Barksdale] must have called me 10 times (no joke) over the weekend. I think it just dawned on him…(the seriousness of it). I had it out with him this a.m. I told him that he needs to remain calm, and he needs to let me take care of it. I told him if he panics and pulls the servicing, we’re screwed.

Ex. P3019. This contemporaneous email strongly suggest that Ms. Kissick was telling the truth when she testified that Mr. Barksdale knew about the fraudulent sweeping. *See also* Bryan Dep. (Ex. D3068) at 165:15-18, 166:2-167:6 (after Colonial failed, Ms. Kissick confirmed to Ms. Bryan that Mr. Barksdale had known about the sweeping).

Additional contemporaneous emails support Ms. Kissick's testimony that others in her division knew about the fraudulent sweeping. For instance, on December 18, 2002, Ms. Kissick emailed Ms. Kelly, Ms. Shultz, and Ms. Carroll examples of false explanations they could give if asked by PWC why "we sweep." Ex. D2. Ms. Kissick forwarded that email to Mr. Farkas, writing:

> I just sent this e-mail to Michelle and Joyce . . . . What do you think of some of these "reasons" to give the auditors…when asked why we sweep from investor funding into the master.

Ex. P2145.

The testimony of Sarah Roland, a compliance specialist in the MWLD, about concerns she had with Ms. Kissick's improper handling of the TBW relationship further supports Ms. Kissick's and Ms. Kelly's testimony that knowledge of the sweeping was widespread within Colonial. *See* Roland Dep. (Ex. D3077) at 159:14-19, 160:2-11, 162:23-163:16, 168:6-12, 169:6-20, 170:16-20; Roland Dep. (Ex. D3078) at 645:5-21. In her testimony, Ms. Roland confirmed that her concerns about Ms. Kissick's unethical behavior with regard to TBW "began back in August 2002," which is while the sweeping was occurring. Roland Dep. (Ex. D3077) at 159:14-19, 160:2-11, 162:6-16, 162:23-163:16. Ms. Roland admitted that she "let lying take place" and that she went along with "spin doctoring" of documents, including overdraft reports. *Id.* at 159:14-19, 164:21-165:4, 169:6-20. Ms. Roland also admitted to signing overdraft reports and other documents that she believed at the time were false. Roland Dep. (Ex. D3078) at 645:6-10.

Ms. Roland further divulged that "many people in [her] office" were "struggl[ing]" with the knowledge that "questionable actions" were taking place in the MWLD. Roland Dep. (Ex. D3077) at 164:8-165:4. She explained that those who were struggling with that knowledge included Terry Bryant, the head of the MWLD's risk control group, Wayne Beahler, a member of the risk control group, Cherie Fite, another member of the risk control group, and Joyce Shultz. *Id*. at 164:8-165:4, 173:10-18.

Despite so many CBG and Colonial employees knowing about the overdraft and sweeping, not one of the employees told PWC. Tr. 315:16-21 (O'Halloran); T. Kelly Dep. (Ex. D3071) at 237:20-25; Kissick Dep. (Ex. D3074) at 110:17-23, 118:16-18.

### (b)     Ms. Kissick and Ms. Kelly Actively Hid the Fraud

Not only did the MWLD employees keep the sweeping a secret from PWC, but this Court finds that Ms. Kissick and Ms. Kelly actively worked to hide the fraud from PWC when it shifted to the COLB Facility. For instance, one of the controls that Colonial had in place to protect against fraud by mortgage originators was tracking duplicate addresses or social security numbers in its ProMerit system. Kissick Dep. (Ex. D3074) at 60:2-25, 257:3-258:17. To override this control, Ms. Kelly worked with Mike Wawrzyniak, a TBW employee, to make sure that the mortgage data for the COLB Plan B mortgages had never gone through the ProMerit system before and therefore would not be caught by the system's duplication check. T. Kelly Dep. (Ex. D3071) at 268:24-269:16; Ex. D83 at 2-3.

Another control Colonial had in place was to keep track of COLB mortgages that were not paid off by an end investor within a certain amount of time. Such mortgages were considered "aged" and appeared on periodic "aging" reports generated by the MWLD's compliance group. T. Kelly Dep. (Ex. D3071) at 255:13-23; Kissick Dep. (Ex. D3074) at 158:13-16, 158:19-159:5. The age of a mortgage was calculated from the date the funds were advanced by Colonial.

T. Kelly Dep. (Ex. D3071) at 255:16-20. To prevent the Plan B mortgages from appearing on the aging reports (because there were no real end investors to purchase the mortgages), Ms. Kelly worked with Mr. Wawrzyniak to get new Plan B mortgage data roughly every 30 days. They referred to this practice as "refreshing" or "recycling" the transactions. Kissick Dep. (Ex. D3074) at 128:18-25, 159:6-160:21, 162:4-16, 200:17-201:7; T. Kelly Dep. (Ex. D3071) at 257:14-21, 258:4-10, 262:23-263:2, 264:6-16. Likewise, Ms. Kelly worked with TBW's Treasurer, Desiree Brown, to "recycle" the fraudulent AOT pools information so they would not appear on the AOT aging reports. T. Kelly Dep. (Ex. D3071) at 259:2-296:6, 296:16-299:16; Kissick Dep. (Ex. D3074) at 200:17-201:7, 205:14-19, 211:15-21.

Finally, as discussed *infra*, Ms. Kissick and Ms. Kelly also used the AOT Facility to hide real TBW-originated mortgages that were somehow impaired and could not be sold to end investors. Kissick Dep. (Ex. D3075) at 613:19-614:8; T. Kelly Dep. (Ex. D3071) at 145:14-146:23, 328:19-329:8. Ms. Kelly tracked these mortgages in a secret offline database that she did not share with regulators or auditors. T. Kelly Dep. (Ex. D3071) at 328:19-329:8;

(c)     The Knowledge of CBG and Colonial's Treasurer and Assistant Treasurer

Not only does this Court find that MWLD employees failed to tell PWC about the sweeping phase of the fraud and that Ms. Kissick and Ms. Kelly actively worked to hide the COLB and AOT phases of the fraud from PWC, but this Court also finds that CBG's Assistant Treasurer, Mary Lou Bathen,[12] failed to notify PWC of TBW-related anomalies that were or should have been red flags for potential fraud. For instance, in 2008 and 2009, Ms. Roland discovered anomalies in the processes by which TBW's transactions were being paid down. Tr. 2303:15-18 (Bathen); Exs. D31, D33, D37. Unbeknownst to Ms. Roland, she had stumbled onto

---

[12]  Ms. Bathen was also the Assistant Treasurer of Colonial at the time.

one of the forms of round-tripping TBW and Colonial were using to recycle the fraudulent transactions. According to Ms. Kelly, Ms. Roland was "knocking on the door" of the fraud. T. Kelly Dep. (Ex. D3072) at 422:9-15. Ms. Roland informed Ms. Bathen of these TBW-related anomalies. Exs. D31 at 1-2, D33, D37; *see* Tr. 2303:19-2310:17, 2314:14-2318:24 (Bathen). Ms. Bathen acknowledged that Ms. Roland's discoveries were concerning, but failed to notify PWC of Ms. Roland's findings. Tr. 2309:17-23, 2310:5-17, 2313:4-9, 2314:6-13, 2318:16-24, 2318:18-21, 2320:6-8 (Bathen); Beahler Dep. (Ex. D3067) at 213:10-16, 225:25-226:10; Roland Dep. (Ex. D3077) at 317:17-21.

In addition, in September 2008, Pam Vitto—one of Colonial's internal auditors whose full-time job was to monitor the MWLD—found evidence of what she called a "possible fraud" involving TBW. Exs. D184 at 1 and D182, Tr. 2332:1-2334:25 (Bathen). Specifically, she discovered that a TBW loan that had been transferred to Colonial in 2007 had been foreclosed on by TBW, making it worthless to Colonial. Ex. D182; Tr. 2332:1-2334:25 (Bathen). When Ms. Vitto investigated further, she discovered that although certain loans had inspection certificates indicating that construction on the properties was complete, the county records showed the sites were vacant and no construction permits had even been requested. Ex. D184 at 1. Ms. Vitto notified Ms. Bathen that she might have discovered a "possible fraud" against Colonial. *Id.* Again, although Ms. Bathen found Ms. Vitto's discovery "alarming," she did not notify PWC of her concern. Tr. 2335:1-2337:12 (Bathen).

In January 2009, Ms. Vitto found yet more problems related to TBW—three different mortgages showing the same borrower name, address, note amount, rate, and last repaid and refinanced dates. Once again, Ms. Vitto informed Ms. Bathen of these anomalies, and once again, Ms. Bathen regarded this discovery as "alarm[ing]" and a possible "sign of fraud."

Tr. 2340:23-2341:22; Ex. D-32. Nevertheless, Ms. Bathen did not reveal this information to PWC. Tr. 2334:21-25, 2336:22-24, 2340:9-22, 2342:5-7, 2343:20-22 (Bathen).

This Court also finds that CBG Treasurer Kamal Hosein[13] was aware of TBW-related anomalies but failed to notify PWC. For instance, Mr. Hosein was aware that Ms. Bathen had repeatedly requested certain AOT loan level detail from Ms. Kissick but was stymied every time. Tr. 2287:10-2289:17, 2289:18-2293:9 (Bathen); Exs. D19, D22-D24 (October 11, 2007 email from Kissick to Bathen in which she again stalls on supplying the requested information "…well, let's not dig too much"). In March 2008, after Ms. Bathen had tried and failed to obtain the requested information for six months, Mr. Hosein wrote Ms. Kissick an email telling her, "We need the data." Ex. D25. Ms. Kissick responded, "Kamal - can we just give it a rest today?" *Id.*; Tr. 2294:14-18 (Bathen). It is unclear from the record whether Mr. Hosein or Ms. Bathen ever received the data they requested, but it is clear that neither Mr. Hosein nor Ms. Bathen told PWC that Ms. Kissick repeatedly failed to provide them with requested loan level detail. Tr. 2293:4-9, 2295:20-25.

In addition, this Court finds that Mr. Hosein used the AOT Facility to "hide" aged mortgages so that Colonial's regulators would not become concerned about the number of aged mortgages on Colonial's books. For instance, on September 6, 2007, the OCC sent Colonial a draft supervisory letter in which it criticized Colonial for having too many aged mortgages on its COLB Facility. Ex. P2644 at 1; Tr. 2292:5-9, 2398:16-18 (Bathen); Kissick Dep. (Ex. D3075) at 537:10-15. In response to the OCC's concerns, employees of CBG and Colonial Bank used the AOT facility, which did not track mortgage-level data, to hide aged COLB mortgages from the regulators. Kissick Dep. (Ex. D3074) at 216:2-8, 308:21-311:24; Kissick Dep. (Ex. D3075) at

---

[13]  Mr. Hosein was also Colonial's Treasurer at the time.

526:16-25, 527:9-531:7, 533:6-21; Tr. 2291:6-2292:14 (Bathen) (agreeing that moving aged

mortgages from COLB to AOT would prevent regulators from seeing them). Mr. Hosein was

aware of this practice. Kissick Dep. (Ex. D3075) at 527:9-530:8, 1015:6-16, 1016:4-11; Ex. D16

at 2. Indeed, Mr. Hosein himself "directed" Ms. Kissick to move hundreds of millions of dollars

in unsalable COLB mortgages onto the AOT facility. Kissick Dep. (Ex. D3074) at 309:10-25;

Kissick Dep. (Ex. D3075) at 524:9-25, 526:16-25, 1023:7-11; Exs. D14, D19.

There is no evidence in the record that Mr. Hosein told PWC that Colonial was hiding

aged mortgages on the AOT Facility.

In addition, the Court finds that the MWLD employees were instructed not to volunteer

any information to PWC's auditors. This is evident from an email written by Joyce Shultz,

director of operations for the MWLD that was sent to 85 employees in October 2005 with the

subject line, "Auditors are amongst us!"  The email reads:

> We have auditors here again (all week) and so we must be on our very
> best behavior.  All auditor rules apply—<u>Only answer questions asked (if
> asked), do not offer extra information of any kind, especially personal
> opinions.  If unsure of answers, see supervisor.</u>

Ex. D9 (emphases in original); *see also* Ex. D135 (email sent by Ms. Shultz on July 6, 2007)

("Remember, we only give [the auditors] what they ask for. We don't offer any extra

information."). Other Colonial employees testified that employees were discouraged from

cooperating openly and honestly with PWC. *See, e.g.*, Fite Dep. (Ex. P3123) at 341:16-342:6;

Kissick Dep. (Ex. D3075) at 1027:11-1028:11.

Based on the foregoing, the Court concludes that there is no question that multiple

MWLD employees actively hid the fraud from PWC. The fraud started with the account

sweeping, the very purpose of which was to mask TBW's financial difficulties. Not one of these

employees informed PWC of the account sweeping. Mr. O'Halloran and Plaintiffs' liability

expert, Mr. Carmichael, both agreed that if the account sweeping had been exposed, the fraud would have "died in the cradle." Tr. 323:9-15 (O'Halloran); Tr. 660:11-15 (Carmichael) (agreeing that informing PwC "would have killed the fraud in the cradle"). CBG argues that the account sweeping, which occurred in 2002-03, did not interfere with the 2008 audit that occurred five years later. This Court finds otherwise. Had PWC known that the head of the MWLD, along with several other employees, had colluded with Colonial's largest customer to hide overdrafts, the disclosure would have affected PWC's audit procedures in every audit going forward. Moreover, the individuals who knew about the sweeping in 2002-03 had a continuing duty to provide that information to PWC in each successive audit—including the 2008 audit, when Ms. Shultz was interviewed by PWC about possible fraud in the MWLD, but hid her knowledge of the fraud committed in the MWLD in prior years.

This Court further concludes that Ms. Kissick and Ms. Kelly interfered with PWC's audits in countless ways. As described *supra*, they circumvented Colonial's internal controls by "refreshing" or "recycling data." They also arranged for aged mortgages to be "paid off" prior to PWC conducting its audit work on the MWLD and they created misleading wire transfers to make it appear that the mortgages had been paid for by third parties. And, of course, throughout the entire fraud, Ms. Kissick provided false, misleading, and/or incomplete response to PWC's audit questions. Because Ms. Kissick's and Ms. Kelly's fraudulent conduct is properly imputed to CBG for the reasons discussed earlier, that conduct constitutes audit interference.

Even if Ms. Kissick's and/or Ms. Kelly's conduct was not imputed to CBG, this Court concludes that other CBG officers and employees negligently interfered with PWC ability to "report the truth." As discussed *supra*, pursuant to the Engagement Letters between CBG and PWC, CBG was required to report to PWC any known, suspected, or alleged fraud, as well as

any deficiencies in CBG's internal controls for detecting and preventing fraud. Both Mr. Hosein and Ms. Bathen knew in 2007-2009 that serious anomalies existed with respect to TBW-related transactions. The Court concludes that Mr. Hosein and Ms. Bathen should have told PWC about these anomalies and that their failure to do so interfered with PWC's ability to perform its audits.

CBG counters that there is no evidence in the record that anyone at CBG or Colonial interfered with PWC's ability to perform a proper audit of the existence of the AOT assets. For instance, CBG points out, CBG's Audit Committee did not place any limits on PWC's audits (such as limit the types of documents PWC could have inspected), nor did anyone at CBG or Colonial prohibit PWC from doing a walkthrough of the AOT Facility, inspecting the loan documents in Colonial's vault, asking for the missing takeout commitments, contacting Mesirow, or following up on the three AOT transactions that failed PWC's audit. CBG argues that there is no evidence that anyone in Colonial's vault department was involved in the TBW fraud, and further points to Ms. Kissick's testimony in which she stated that if anyone from PWC had asked to see the loan-level detail of the COLB and AOT transactions, "the jig would [have been] up." Kissick Dep. (Ex. D3075) at 849:16-20. In short, CBG contends that there is no evidence that anyone at CBG impeded PWC's ability to design and perform its audits.

CBG misconstrues the audit interference standard. The test is not whether PWC could have done additional audit work to discover the TBW fraud. Indeed, the Court has already found that it could have and should have done additional procedures. Rather, the test is whether CBG's negligence "contributed to the accountant's failure to perform [its] contract and to report the truth." *Lybrand*, 9 N.Y.S. 2d at 563. Based on the testimony already cited in this order, this Court concludes that CBG's negligent and wrongful conduct contributed to PWC's failure to report the

truth. *Id*. Therefore, the audit interference rule bars CBG from recovering on its professional negligence claim.

## V.   CONCLUSION

Based on the foregoing, the Court HEREBY RULES as follows:

(1)    The FDIC's professional negligence claim against PWC is GRANTED;

(2)    PWC breached the professional duties it owed CBG as CBG's independent, external auditor. However, CBG's professional negligence claim is barred by: (a) the *in pari delicto* doctrine, (b) the *Hinkle* rule, and (3) the audit interference rule. Therefore, CBG's professional negligence claim against PWC is DENIED;

(3)    CBG's breach of contract claim against PWC is DENIED;

(4)    The FDIC's breach of contract claim against PWC is DENIED;

(5)    The FDIC's wantonness claim against PWC is DENIED; and

(6)    BOA's breach of the duties it owed Colonial was an intervening cause of Colonial's shipped not paid losses. Therefore, the FDIC is barred from recovering those losses.

Dated this 28th day of December, 2017.

Barbara Jacobs Rothstein
U.S. District Court Judge