UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
THE COLONIAL BANCGROUP, INC.,     )
and KEVIN O'HALLORAN, as plan     )  Case No. 2:11-cv-746-BJR
trustee,                          )
             Plaintiffs,          )
v.                                )
PRICEWATERHOUSECOOPERS LLP        )  March 23, 2018
and CROWE HORWATH LLP,            )  9:29 a.m.
             Defendants.          )  Washington, D.C.
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
FEDERAL DEPOSIT INSURANCE         )
CORPORATION AS RECEIVER FOR       )  Case No. 2:12-cv-957-BJR
COLONIAL BANK,                    )
             Plaintiff,           )
v.                                )
PRICEWATERHOUSECOOPERS LLP        )
and CROWE HORWATH LLP,            )
             Defendants.          )
                                  )
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF BENCH TRIAL**
**BEFORE THE HONORABLE BARBARA JACOBS ROTHSTEIN,**
**UNITED STATES DISTRICT COURT JUDGE**

**APPEARANCES:**

**FOR FEDERAL DEPOSIT INSURANCE CORPORATION:**

STEPHEN SORENSEN
Thomas, Alexander, Forrester & Sorensen LLP
14 27th Avenue
Venice, CA  90291
 310-961-2536

LAWRENCE H. HEFTMAN
Schiff Hardin LLP
233 S. Wacker Dr # 6600
Chicago, IL 60606
(312) 258-5500
Email:  Lheftman@schiffhardin.com

**(APPEARANCES CONTINUED)**

**APPEARANCES (continued):**

**FOR FEDERAL DEPOSIT INSURANCE CORPORATION:**
                     DAVID C. MULLIN
                     Mullin Hoard Brown, LLP
                     800 Amarillo National Plaza Two
                     PO Box 31656
                     Amarillo, TX  79120-1656
                     (806) 372-5050
                     Email:  Dmullin@mhba.com

                     GRACE L. KIPP
                     Spotswood Sansom & Sansbury
                     One Federal Place
                     1819 Fifth Avenue North, Suite 1050
                     Birmingham, AL  35203
                     Email:  Gkipp@spotswoodllc.com

**FOR PRICEWATERHOUSECOOPERS LLP:**
                     PHILIP S. BECK
                     MARK L. LEVINE
                     CHRISTOPHER D. LANDGRAFF
                     CHRISTOPHER R. HAGALE
                     NICOLAS MARTINEZ
                     JAMESON JONES
                     Bartlit Beck Herman Palenchar & Scott LLP
                     Courthouse Place, Suite 300
                     54 West Hubbard Street
                     Chicago, IL  60654
                     (312) 494-4440
                     Email: Philip.beck@bartlit-beck.com
                     Email: Mark.levine@bartlit-beck.com

                     MEREDITH MOSS
                     King & Spalding LLP
                     1700 Pennsylvania Avenue, NW
                     Washington, D.C.  20006-4707
                     (202) 626-2916
                     Email: Mmoss@kslaw.com

ALSO PRESENT:  Gregory Conway, David Schillinger
               Rami Burbar, Amy Gonzales Lori Barnicke


Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
                202-354-3242

        Proceedings reported by machine shorthand, transcript
        produced by computer-aided transcription.

```
 1                  P R O C E E D I N G S
 2          THE COURT:  Good morning.
 3          Lynn, you don't have to call the whole case again.
 4   I think I got the idea who is here.  It looks like everybody
 5   is here.
 6          THE DEPUTY:  Just put the case number on?
 7          THE COURT:  Sure.
 8          THE DEPUTY:  This is case MDAL 11-746.  This is a
 9   bench trial on damages, Day 3.
10          THE COURT:  Okay.  I believe we are resuming with
11   Mr. Malek.  Am I right?
12          MR. LEVINE:  That's correct, Your Honor.
13          THE COURT:  Mr. Malek, would you like to resume
14   the stand?  I remind you, you are still under oath, having
15   been sworn earlier.
16          MR. LEVINE:  Your Honor, in the interest of time,
17   I have gone through -- really streamlined what I am going to
18   do and just try to get out some basic facts and then the
19   parties can make their arguments in the papers based on the
20   facts.
21          THE COURT:  Fine.  I read the papers you
22   submitted.  Most of it was to the argument about why the
23   cross-examination should or shouldn't go forward.  So we may
24   need additional arguments.  Let's see.
25          MR. LEVINE:  Sure.  By that, I mean the papers,
```

1    the post trial -- the findings and conclusions where we can

2    get into the legal arguments, and significance.

3              (KENNETH MALEK, FDIC's witness, previously sworn)

4                   CROSS-EXAMINATION (continued)

5    Q.   Good morning again, Mr. Malek.

6    A.   Good morning, Mr. Levine.  How are you today?

7    Q.   Good.  We have to stop meeting like this.

8              So I want to address the one remaining open topic,

9    which is the REO sales.

10             What does "REO" stand for?

11   A.   REO stands for real estate owned.

12   Q.   Is that sometimes called loans in foreclosure?

13   A.   My understanding is that it is loans as to which

14   foreclosure has been completed.

15   Q.   Okay.  At bank close in August 2009, were some of the

16   AOT loans in foreclosure?

17   A.   Some were in foreclosure.

18   Q.   And is the loan that's not in foreclosure called -- is

19   that something you have called an active loan or a non-REO

20   loan?

21   A.   I don't recall calling it either of those in my report.

22   However, I will agree that if a loan is not in foreclosure,

23   or foreclosure is completed, it would be an active loan.

24   Q.   Were REO loans that existed at bank close sold at

25   auction?

1    A.   Yes.

2    Q.   Was the net recovery on those REO loans approximately

3    $78 million?

4    A.   I haven't investigated that thoroughly, but I am aware

5    that that's in an email I saw that PwC's counsel had sent.

6    Q.   Did you review the TBW bankruptcy pleadings, including a

7    motion to approve a settlement and order in connection with

8    your work in this case?

9    A.   I did.

10   Q.   I am going to put up D4001.  Is D4001 -- you see it

11   refers -- it says it's the:  Order approving the debtor's

12   sale of certain REO assets and granting related relief.

13            Do you see that?

14   A.   I do.

15   Q.   The date up top there that it's filed is December 17,

16   2009?

17   A.   I see that.

18   Q.   If we look at the third page of D4001, section E, it

19   says:  The Court entered an order approving an auction and

20   bid procedures on November 10, 2009, correct?

21   A.   I see that.

22   Q.   And then if we look at F, it refers to the auction

23   having been conducted on December 11, 2009, right?

24   A.   I also see that.

25   Q.   And it refers to a list of properties that were subject

1    to the auction which were attached as Exhibit A, right?

2    A.  Yes, sir.  That's what the document says.

3            MR. LEVINE:  Okay.  And Exhibit A, if we move

4    down -- sorry.

5    Q.  I could use this version, but you can see it's turned

6    sideways, which we can fix, but it's also kind of a blurry,

7    the PDF version.

8            I am going to turn to D4000, which is an Excel

9    version of Exhibit A and, therefore, easier to read.

10   A.  Thank you.

11   Q.  Exhibit 4000, which is a clean version of Exhibit A to

12   D4001, at the top there you see there is a reference to

13   "bulk sale auction," December 11, 2009?

14   A.  I see that.

15   Q.  And then there are a number of different mortgages that

16   are listed, again, in D4000 with a lot of information about

17   those mortgages, correct?

18   A.  Yes, sir.

19   Q.  If we look at the last page of D4000, which is page 18,

20   there is a total there for what we have just seen, correct?

21   A.  Yes, there is.

22   Q.  And we may have to -- there is a total list.  And

23   unfortunately -- I will blow it up in a second -- it doesn't

24   have columns above it, the header columns, telling you what

25   these numbers mean.  So we have to go back to the first page

1    to see that.

2         And you see, at the very top there --

3         THE COURT:  Let me ask you, is there a question

4    about what -- how much these particular REOs sold for?

5         Do we all agree it was 78 thousand -- 78 million?

6         MR. LEVINE:  If counsel will agree, otherwise it

7    will take me two minutes to establish it.

8         THE COURT:  It's already taken more.

9         MR. SORENSEN:  Your Honor, Mr. Malek tried to

10   do -- he just learned about this.  I don't think he's going

11   to be able to tell one way or the other today.  He just

12   didn't have time to do the analysis.

13        THE COURT:  All right.  Go through it.

14   Q.  All right.  D4000, you see the column second from the

15   right refers to "purchase price"?

16   A.  I see that.

17   Q.  That's in this document on the bulk sale auction, right?

18   A.  Yes.

19   Q.  And we see -- if we go to the last page -- and I'll make

20   it bigger -- the column second to the right, the purchase

21   price that's listed is $81.2 million, right?

22   A.  I see that.

23   Q.  And is it correct that the net amount from the sale,

24   after you deduct expenses, payments to the people that

25   helped out with the auction, et cetera, was $78 million?

1    A.  I am not aware of the expenses that apply to this gross

2    purchase price, so I can't say one way or the other.

3    Q.  Now, was this amount that was received from the sale of

4    the REO auctions included as the recovery in your damages

5    calculation?

6    A.  It was because this was an amount received by the TBW

7    bankruptcy estate.  And the --

8    Q.  Let me --

9    A.  I'm sorry.  I'm trying to answer your question.

10   Q.  Go ahead.  Let me -- I understand where you are going.

11   I have a more precise question.  If you want to finish, you

12   can finish.  I will ask my more precise question.

13            THE COURT:  Okay.  Go ahead and finish.

14            THE WITNESS:  Thank you, Your Honor.

15            The proceeds of this auction, I understand, became

16   proceeds of the TBW bankruptcy estate.  The FDIC is one of

17   the three principal unsecured creditors of the estate and,

18   as a result, it receives between a 37 and a 38 percent,

19   approximately, benefit and distribution with respect to

20   funds that come into the TBW bankruptcy estate.

21   Q.  So now my more precise question.  Did you include --

22            THE COURT:  Wait.  Wait, wait, wait.  So it would

23   be entitled to a third of the 78 million?

24            THE WITNESS:  It would have already received that,

25   Your Honor.  It would have already been included in the

1    accounting for the recoveries that are part of my

2    computation of $625 million of net damages.

3                THE COURT:  Do you want to explain that a little

4    more?  A third of it would have been or all of it would have

5    been?  And how --

6                THE WITNESS:  Well, because the FDIC is

7    a 38 percent unsecured creditor, and this is an auction that

8    happened in 2009, these proceeds were remitted to the TBW

9    bankruptcy estate and then taken into account in the

10   distributions to the general unsecured creditors.

11               So the 78 million, approximately, which I have

12   invalidated, 38 percent of that would already have been part

13   of the recoveries that the FDIC received.  And I accounted

14   for every dollar of those recoveries in computing my

15   $625 million worth of damages.

16               THE COURT:  Okay.

17   Q.  And let me ask my more precise question.

18               Did you take into account, in your secured claim

19   recoveries, the $78 million from the sales of the REOs?

20   A.  I did not.

21   Q.  And I am going to get very shortly to the unsecured

22   claims and explain that.

23               So did TBW and the FDIC reach a settlement in

24   connection with the claims in the TBW bankruptcy estate?

25   A.  They did.

1    Q.  And is that a settlement that you reviewed?

2    A.  It is.

3    Q.  As part of the settlement, did TBW get the proceeds of

4    the sales of the REO loans?

5    A.  No, it did not.

6    Q.  TBW --

7    A.  I'm sorry.  I need to listen to your question more

8    carefully.  Would you ask it again, please.

9    Q.  Sure.  Sure.

10              As part of the settlement between TBW and the

11   FDIC, did TBW get the proceeds of the sale of the REO loans?

12              THE COURT:  You don't mean -- say your question

13   again.  I think you misspoke.

14   Q.  Okay.  As part of the settlement, did TBW get the

15   proceeds of the sales of the REO loans?

16   A.  Yes.

17              THE COURT:  TBW?

18              THE WITNESS:  Yes.

19              MR. LEVINE:  Yes.

20   BY MR. LEVINE:

21   Q.  As part of that same settlement, did the FDIC get other

22   value, including the legitimate COLB loans?

23   A.  I think there were many items resolved in the settlement

24   agreement which runs some 20 pages.  I see no connection

25   among any of those items.  But two of the individual items

1   settled were the party who was deemed treated as owning the

2   REO proceeds and the party who was treated as owning the

3   COLB loans.

4   Q.  And at the time of the settlement agreement, had the REO

5   sales occurred so it was cash at that point?

6   A.  I can't remember the exact dates.

7   Q.  Okay.  Let's -- we just saw in D4001 that the Court

8   approved the sale on December 17, 2009.  Do you recall that?

9   A.  I do.

10  Q.  So let's look at B182.  Is B182 the motion to approve

11  the settlement agreement between TBW and the FDIC?

12  A.  It is.

13  Q.  Is that a document you have reviewed?

14  A.  Yes.

15  Q.  Is that dated August 11 of 2010?

16  A.  It is.

17  Q.  So that's about nine months after the document on the

18  bulk sale auction, correct?

19  A.  It's about nine months after the motion to approve the

20  settlement that we just looked at.

21  Q.  All right.  Let's look at the fifth page of B182.

22          You see on section 14 there is a summary of the

23  settlement agreement?  And I have highlighted a few of the

24  columns.  But what I really want to focus on is 14(b) -- I'm

25  sorry, 14(c) -- where it says that:  The settlement

1    agreement resolves in favor of the debtor.

2              Is the debtor TBW?

3    A.  Yes.

4    Q.  The issue of entitlements to the AOT and Overline REO,

5    as a result of which, the debtor's estate will have

6    available to it approximately $78 million in proceeds from

7    AOT --

8              THE COURT:  Where are you reading, Counsel?

9              MR. LEVINE:  14(c), Your Honor.

10             THE COURT:  Got it.

11   Q.  That there would be available to the debtor

12   approximately $78 million in proceeds from AOT and Overline

13   REO that has already been liquidated.  Do you see that?

14   A.  I see that.

15   Q.  And also in this paragraph 14, the summary of the

16   settlement agreement, it says in 14(a) that COLB loans go to

17   the FDIC, right?

18   A.  I see that.

19   Q.  And in 14(b) it says that:  With respect to AOT loans

20   and Overline -- and that's something different than the REO

21   loans, correct?

22   A.  I'm sorry.  Are you asking me a specific question about

23   14(b)?

24   Q.  Are the loans in 14(b) different than the loans in

25   14(c)?

1    A.  Yes, they are.

2    Q.  In 14(b) it explains that the debtor received those

3    loans but subject to a first priority security interest in

4    favor of the FDIC, correct?

5    A.  Yes.

6    Q.  So what I want to now talk about are the numbers,

7    because there is a reference to both AOT REO and Overline

8    REO.  So the $78 million included both; is that correct?

9    A.  That's my understanding.

10   Q.  And we looked before at what was sold, and that was

11   D4000.  And D4000 lists these individual loans that were

12   sold, correct?

13   A.  Yes.

14   Q.  Do you have a schedule that contains a list of the AOT

15   loans in your report?

16   A.  I do.

17   Q.  Is that schedule 4.6(c)?

18   A.  Yes, it is.  Those were the AOT junk fraudulent loans

19   that were associated with the fake AOT trades, as to which

20   the FDIC incurred a loss as of bank close.

21   Q.  So let's look at F4134.  Is F4134 your schedule 4.6(c)?

22   A.  Yes, it is.

23   Q.  And if you compare the list of all of the REO loans that

24   were sold to the list that you have in F4134 of what was

25   AOT, can you figure out which of the loans that were sold

1    were AOT?

2    A.  I believe it's possible to do that.  I haven't studied

3    it in sufficient detail -- having just received this a

4    couple of days ago -- to reach a definitive conclusion on

5    that.  So I am not -- I am not willing to say how much

6    exactly at this point.

7    Q.  Does -- in the document we saw, D4000 that gives the

8    sale proceeds, the $81 million before it was netted to 78,

9    that contains amounts for each of the loans; the sales price

10   for each of the loans, correct?

11   A.  That's my understanding, that it does.

12   Q.  And we had the folks at Complexicon do the analysis, and

13   it showed that 63 percent of the dollar value of what was on

14   D4000 was -- of REO loans were from AOT and 37 percent were

15   from overline.

16           Do you have any basis to dispute that number --

17   those numbers?

18   A.  I haven't made any final analysis other than --

19           THE COURT:  63 percent of which schedule?

20           MR. LEVINE:  63 -- so looking back at D4000 --

21           THE COURT:  This is the list of the loans that

22   went to foreclosure?

23           MR. LEVINE:  That were sold.  It's the list --

24   hold on, Your Honor.

25           THE COURT:  They were put up on auction, right,

1    and were sold?

2              MR. LEVINE:  Yes.  Yes, Your Honor.

3              THE COURT:  So that list you are now comparing to

4    his list?

5              MR. LEVINE:  His list of AOT loans.

6              So let me explain.  So the list that we saw from

7    D4001, the sales document, that what was sold was two types

8    of REO, or two categories.

9              THE COURT:  AOT and Overline.

10             MR. LEVINE:  Right.  And then the question is how

11   to figure out how much of what was in 4000 was AOT and how

12   much was Overline.

13             THE COURT:  Why does it matter?

14             MR. LEVINE:  Because the calculation in this

15   case -- the fraud losses that were at the total there that

16   Mr. Malek calculated were all in AOT.

17             THE COURT:  Okay.

18             MR. LEVINE:  So we're trying to --

19             THE COURT:  You're trying to eliminate the

20   overline?

21             MR. LEVINE:  You got it.

22   BY MR. LEVINE:

23   Q.  And through Exhibit 4000, because it lists each of the

24   loans -- if you compare it to your schedule, which is F4134,

25   you can figure out how much is AOT.  And the balance would

1   be overline, right?

2   　　　　　THE COURT:  Well, he doesn't know that yet because

3   he says he hasn't had time to do it.

4   Q.  I am not asking for exact numbers.  This is the

5   exercise -- that's the exercise you can go through to figure

6   it out; is that right?

7   A.  That's one of the things that I would do as part of

8   analyzing this, but I haven't had the chance to do that yet.

9   Q.  Okay.  Now, you also mentioned earlier -- and now I want

10  to, you know, make sure that we understand it -- the point

11  about the unsecured recoveries.

12  　　　　　This is the point that the FDIC made at the end of

13  the brief that was submitted to Heather a couple of nights

14  ago.  And it was a good point, that's why I'm raising it

15  here.

16  　　　　　So you are saying that the 36 percent of this

17  amount has already been received by the FDIC and, therefore,

18  the difference -- the balance has not.  So, I guess, doing

19  the math here, that means that 64 percent has not been

20  received by the FDIC, correct?

21  A.  I think I said 37 to 38 percent.

22  Q.  Oh, I'm sorry.

23  A.  But it's very difficult to do computations on the fly

24  here on something I have just seen because of the underlying

25  electronic records that would need to be reviewed as part of

1      this.

2      Q.  And I can get you a calculator if you want.  I am just

3      asking if 37 percent has been received, that means 63

4      percent hadn't been, right?

5      A.  I agree that 37 percent and 63 percent add up to 100

6      percent.  But, again, I haven't had time to study this,

7      other than a preliminary review with respect to, you know --

8      yes, some of these loans are on my Schedule 4.6C.

9      Q.  Again, if you are right that the 36 -- that 36 percent

10     has already been received by the FDIC, all you need to do is

11     say:  Okay.  We'll take that amount that you have, and we'll

12     subtract 36 percent out, or 37 percent, right?

13                 THE COURT:  Out of what?

14                 MR. LEVINE:  Out of the total.

15                 THE COURT:  Out of 78?

16                 MR. LEVINE:  Well, the 78 million.

17                 And then we're down to the amount -- the 78

18     million is already out, and then we take out the overline.

19     That's the next step.  And that takes us down, using the 63

20     percent value for REO -- we could do the math, and we'll put

21     this in our proposed findings -- but 63 percent of 78

22     million is about $49 million.

23     BY MR. LEVINE:

24     Q.  And, then, if you want to take into account the 36

25     percent that's been received in the -- as an unsecured

1   claim, you just subtract that out, right?

2             MR. SORENSEN:  It sounds like testimony now.

3             THE COURT:  It sure sounds like testimony to me.

4             MR. LEVINE:  I am just asking.

5             Your Honor had asked the question, so I was

6   explaining.

7   BY MR. LEVINE:

8   Q.  The question is just on the 36 percent.  All that is

9   just a mathematical exercise, right?

10            Taking away the 36 percent is just a simple

11  mathematical exercise, correct?

12  A.  Are we talking about the 36 percent relating to what I

13  said was approximately 37 or 38 percent share that the FDIC

14  had --

15  Q.  I'm sorry.

16            THE COURT:  Pick a number.

17            How about 38 percent?

18            MR. LEVINE:  Sure.

19            THE COURT:  Let's just talk 38 percent so we don't

20  go...

21  BY MR. LEVINE:

22  Q.  If you're subtracting out the 38 percent, that's a

23  pretty straightforward mathematical exercise, correct?

24            THE COURT:  Well, you have done it, right?  38

25  percent of -- are we talking about 78, or have you already

1    taken out the overline?

2              MR. LEVINE:  If you take out the overline, you're

3    at 49 million.  And then if you take 49 million, subtract

4    out 38 percent of that is pretty straightforward

5    mathematically.

6              THE COURT:  Well, what is it -- what's your point?

7              MR. LEVINE:  Well, I subtracted out 36 percent.

8    BY MR. LEVINE:

9    Q.  I can get the calculator, but math is easy to do, right?

10   A.  I agree that you can multiply those percentages.  But I

11   haven't had sufficient time to study this exhibit and

12   determine how I think it would apply to the damages, except

13   for the fact that, in the settlement agreement, I see no

14   connection between the treatment of the REO proceeds and the

15   treatment of the COLB loans.

16   Q.  All right.

17   A.  So there is no basis that I would have for doing any of

18   this.

19   Q.  And you are a damages expert; you are not a legal

20   expert, right?

21   A.  That is correct.  Yes.

22   Q.  We'll discuss that in the proposed findings and make the

23   legal arguments about the significance.

24              By the way, Mr. Beck nicely handed me a

25   calculator.

1            And if you take the 49 million in AOT REO, and

2    subtract out 38 percent, it leaves you with about $30.4

3    million.  I will represent to you that's the math.

4            Does that sound about right?

5    A.  You can use the calculator yourself, if you want.

6            I understand that you are multiplying the

7    percentages and skinnying down the amounts of these proceeds

8    that you are trying to assert has some connection to

9    recoveries.

10            But my understanding of the settlement agreements

11    is that there is no known visible connection, nor any

12    otherwise known to me about how each of the individual items

13    were settled.

14    Q.  Did you take -- the money that came to the FDIC for the

15    COLB that it received as part of the settlement agreement,

16    that value, did you take that into account at all in your

17    settlement calculation?

18    A.  It would have been wrong to do that because those COLB

19    loans were not part of the fraud loss as to which I was

20    computing damages.

21            MR. LEVINE:  Let me ask one more thing, and then I

22    will be done.

23            THE COURT:  Say that again.

24            They were not part of -- okay.  I got it.  Never

25    mind.

1    THE WITNESS:  There was no stealing on the COLB

2    line, Your Honor, other than the ship not paid that's not

3    recoverable damages in this case.

4    BY MR. LEVINE:

5    Q.  So one last question.

6         I know you don't agree that any of the blue loans

7    should be removed from the fraud losses, and I am not going

8    to get back into that.

9         But, mathematically, if you removed some or all of

10   the blue losses and you had REO loans that should be

11   included as recoveries, could you do the pro rata

12   calculation?

13        THE COURT:  Are you asking could it be done, or

14   are you asking him to do it now?

15   BY MR. LEVINE:

16   Q.  Could it be done?  Is that how you do it, you just do a

17   pro rata reduction?

18   A.  I don't know whether that would be the case or not.  I

19   would have to study it and think about this further.

20        MR. LEVINE:  Okay.  No further questions.

21        MR. SORENSEN:  Just three questions, Your Honor.

22                      REDIRECT

23   BY MR. SORENSEN:

24   Q.  Mr. Malek, you just said there was no stealing on the

25   COLB.

1          Did you mean as of bank close, that there was

2    nothing stolen on the COLB?

3    A.  That's my understanding, except for the ship-not-paid

4    component.

5    Q.  You were asked some questions about the settlement

6    agreement.

7          Do you have any knowledge of the FDIC TBW

8    settlement agreement, other than your review of that

9    agreement?

10   A.  None.

11   Q.  Do you have any knowledge of why any particular terms of

12   that agreement were in there?

13   A.  No.

14   Q.  Did the FDIC receive directly any of the proceeds of

15   those REO sales?

16   A.  No.

17          THE COURT:  Well, I thought you said that as an

18   unsecured creditor they would have received one -- how about

19   a third.  Okay?  It was somewhere -- 36, 38 percent of the

20   78 million.

21          THE WITNESS:  You are absolutely right, Your

22   Honor.  I was probably answering Mr. Sorensen's question too

23   literally because he asked:  Did the FDIC receive directly?

24          And the answer is, no, they didn't.  They received

25   it as -- in their status as an unsecured creditor.

1              So, first, the TBW trustee got all of the

2    proceeds, which we think are around 78 million, and then

3    they divided it up -- he divided it up among the different

4    unsecured creditors pro rata.

5              THE COURT:  So they didn't receive it directly.

6    They received it through the bankruptcy trustee, the TBW

7    bankruptcy trustee.

8              THE WITNESS:  Yes, Your Honor.

9    BY MR. SORENSEN:

10   Q.  One last question.

11             Mr. Malek, have you properly accounted for all

12   cash payments from the TBW bankruptcy to the FDIC in your

13   damages calculations?

14   A.  I have.

15             MR. SORENSEN:  No further questions.

16             MR. LEVINE:  Nothing, Your Honor.

17             THE COURT:  Mr. Malek, thank you very much.

18             You may step down; and I think this is for real.

19             THE WITNESS:  Thank you, Your Honor.  It's been a

20   pleasure being in your courtroom.

21             THE COURT:  I will accept that.  Most witnesses

22   don't think so.  I never take it personally if you don't

23   find it a pleasure.

24             (Laughter.)

25             THE COURT:  Okay.  So I assume -- you indicated,

1    Mr. Levine, that I'm going to hear about this via the

2    findings and conclusions.

3             Is that really the only way I'm going to read

4    about this?  I mean, were you going to submit a brief of

5    some kind on this?

6             MR. LEVINE:  Unless Your Honor wants it, I think

7    the parties can both address it at this point in the

8    proposed findings.  They can address it, too, in closing,

9    although --

10            THE COURT:  Oh, that might be better.

11            MR. LEVINE:  But I think the focus will be on the

12   bigger amount.

13            MR. BECK:  Yeah.  My focus is -- I am not going to

14   spend time on that in closing, Your Honor.

15            So if you would like a short memorandum that

16   describes this issue and the evidence apart from the

17   proposed findings, we'd be happy to supply that.

18            THE COURT:  I think a two-, three-page memorandum

19   to summarize what I just heard and where you're going with

20   it.

21            MR. BECK:  Sure.

22            THE COURT:  I get the picture that, at most, this

23   makes a $30 million difference, right?  I mean, that's all

24   we're talking about.

25            MR. LEVINE:  I think that's right, Your Honor.

1          THE COURT:  And I think today you spent a lot of

2     time on getting down to that figure and why that figure.  I

3     am not concerned about that.  I understand how you got

4     there, taking out the overline, reducing it by whatever.

5          But I think -- the briefs that you all gave to

6     Heather that I have reviewed really, predominantly, deal

7     with whether there should be cross-examination or not, and

8     we have done that.

9          So a couple of pages just saying exactly why you

10    think they should have accounted for the 30 million; I think

11    that would be helpful.

12          MR. LEVINE:  Sure.

13          Your Honor, the proposed findings and conclusions

14    of law by each party are due a week from today, next Friday.

15          Do you want the brief at the same time, or just

16    want us -- have us include it?

17          That's what I was mentioning.  We would include

18    what would be in the brief with the proposed findings so

19    it's in one place.

20          THE COURT:  Sure.

21          Well, the trouble is, if you do that, you're

22    talking, essentially, about simultaneously briefing, which I

23    find often to be useless.  I think there is no sense in the

24    FDIC filing a brief until they see exactly what theory you

25    are using about this $30 million.

1          MR. LEVINE:  Sure.

2          THE COURT:  So I would say -- you guys seem to be

3     capable of doing things overnight.  I am not going to ask

4     you to do that, nor am I going to ask you to do it over the

5     weekend.

6          But I would say -- well, I am going to ask you --

7     Tuesday, or something like that --

8          MR. LEVINE:  Sure.

9          THE COURT:  -- so that the FDIC can get me

10    something Thursday so I have --

11         MR. SORENSEN:  Sure.

12         THE COURT:  -- both of them in time to review with

13    the findings and conclusions.

14         MR. LEVINE:  Okay.  We will do that, Your Honor.

15         THE COURT:  Sound good?

16         MR. SORENSEN:  Sure.

17         THE COURT:  Okay.  It is now 10:00.  And so I

18    think if we started with closing, we should be able to make

19    some progress before noon.

20         Are you ready, Mr. Sorensen?

21         MR. SORENSEN:  I am ready.  I just need to find a

22    microphone.

23         THE COURT:  Do you want to reserve any time for

24    rebuttal?

25         MR. SORENSEN:  I would like -- yes, I would like

```
 1    to reserve 25 minutes.

 2              THE COURT:  Okay.  Is somebody on your side going

 3    to keep time or...

 4              MR. HEFTMAN:  Yes, we will.

 5              THE COURT:  Thank you.

 6              So somebody will say to Mr. Sorensen -- if you go

 7    on, you are cutting into your rebuttal?

 8              MR. HEFTMAN:  Yes, Your Honor.

 9              THE COURT:  I just don't want to be responsible

10    for doing that while I am taking notes.

11              MR. HEFTMAN:  Yes, Your Honor.

12              MR. SORENSEN:  Neither do I.

13              May I proceed, Your Honor?

14              THE COURT:  Please.

15              MR. SORENSEN:  May it please the Court.

16              Your Honor, in the liability phase, you have

17    already found that PwC was negligent during its 2003 audit.

18    And if PwC had not been negligent, the fraud would have been

19    uncovered by February 20th, 2004.

20              And there is no dispute that, by the time the bank

21    closed in August of 2009, there was a $1.473 billion loss on

22    the AOT.  And that ultimately resulted in $1.244 billion

23    being stolen after the completion of the audit.

24              And it was stolen because there was, obviously, a

25    giant fraud going on.  And the fraud started before the 2003
```

1    audit and had grown to $229 million by the time the audit

2    was complete.  So it was a great big fraud, and it

3    continued.

4         And now the numbers we have up on the screen here,

5    the reductions for the moneys stolen before the 2003 audit,

6    the reductions for net income, the allocable recoveries,

7    there is really no dispute about those.

8         The only issue is the 1.473 and the argument that

9    we have heard, that some of that was somehow real,

10   legitimate loans that declined due to the economy.

11        Now, it's undisputed that what we're talking about

12   here -- what they referred to as the blue -- the $415

13   million, those were loans that were all listed in the secret

14   database.  So they were all hidden by the fraudsters, put

15   into the secret database, and that's undisputed.

16        So if it's -- if all of that is undisputed, well,

17   why are we here?  Well, we were here to hear Professor Lehn.

18        And his theory was -- it's really one theory, but

19   there's two sides of the same coin.  He said, one, maybe the

20   economy caused it and, therefore, it wasn't a fraud loss.

21        THE COURT:  Wait.  I am hearing from Heather that

22   she's having trouble hearing you.  So I think we need to

23   make sure that that mic is working.  I think the court

24   reporter is also having trouble.

25        As you walk away, you are not using --

 1              THE REPORTER:  I can't hear you when you walk

 2      away.

 3              MR. SORENSEN:  Oh, you can't hear me now?

 4              THE COURT:  And neither can Heather.  So let's...

 5              MR. HEFTMAN:  This is going to pause our time

 6      while we're doing this.

 7              MR. BECK:  I agree, Your Honor, but it shouldn't

 8      count against his time.

 9              THE COURT:  You are just anticipating that your

10      mic might be out, too.

11              (Laughter.)

12              MR. BECK:  I did have some selfish motives.

13              THE COURT:  I was not assuming you were being

14      charitable.

15              (Whereupon, microphone issues were addressed.)

16              MR. SORENSEN:  My apologies, Your Honor.  It was

17      the mute button.

18              THE COURT:  Technology will be an embarrassment

19      for us all, I am afraid.

20              Mr. Beck is listening very carefully so that he

21      doesn't do the same thing.  He is going to find a new way to

22      create a problem.

23              MR. BECK:  I better rely on that fellow over there

24      to make sure that the --

25              THE COURT:  Make sure the mute button is off.

1          Okay.

2          MR. SORENSEN:  Turning back to Professor Lehn.

3          Why were we here?  Well, we were here to hear

4    about another theory as to reducing damages here.

5          As I noted in the opening, we have already gone

6    through 2.3 down, taken off 900 million for the ship not

7    paid.  And Mr. Malek, in his damages calculation, he took it

8    down another 58 percent.  So we're all the way down to 625.

9          And Professor Lehn came up with a theory for

10   taking it down even further.  And his theory is the

11   economy -- maybe the economy caused it.  He doesn't actually

12   give that opinion, he just says:  Maybe it was the economy.

13   There was a mortgage crisis, and maybe that caused the loss.

14          You know, the other side of that coin is that it

15   wasn't a fraud loss.  And that's his view.

16          But what you didn't hear from Professor Lehn, who

17   is an economist, you would think an economist would come in

18   and say:  I have done an economic analysis and the economy

19   caused these losses.  But you didn't hear anything from

20   Professor Lehn about that.  In fact, he said he did no

21   economic analysis at all.

22          It's not surprising, because if he had done it, he

23   would have discovered what Mr. Malek discovered, which is

24   there were very few losses in legitimate mortgage warehouse

25   lending at Colonial Bank.  If you just went to their

1    financial statements and you took out the fraud, took out

2    TBW, they were very profitable through the entire period,

3    even up through the mortgage crisis, all the way through

4    March of 2009.

5            So Professor Lehn chose not to do that.  Maybe he

6    knew what the results would be.  So instead he came in and

7    said:  Well, there was a big mortgage crisis, and you know,

8    it affected everyone.  He started talking about

9    mortgage-backed securities.

10           Well, those are not comparable to a warehouse

11   lending arrangement, which is a short-term, 30- to 45-day

12   facility where the warehouse lender is not supposed to be

13   exposed to the long-term mortgage.  That is what mortgage

14   investors, take-out investors -- when they buy a mortgage,

15   they are taking it to hold, and they are subject to the risk

16   that something could happen; the mortgage could go in

17   default two years down the line.

18           Professor Lehn, he didn't look at the market, but

19   Mr. Malek did.  It's clear from the financial statements

20   that there was profit; it was profitable the entire time.

21   Professor Lehn sat up there and said:  Well, Mr. Malek, he

22   made a rookie error; he didn't take into account the

23   economy.

24           Well, he was sitting here when Mr. Malek

25   testified.  Mr. Malek said:  I did.  I considered it because

1    I needed to.  I determined, based on mortgage warehouse

2    lending, which was profitable, that the economy did not have

3    an effect.

4            You may remember, Your Honor, he also testified

5    that -- I did ask him:  If you did -- if you assume -- let's

6    assume that they replaced TBW with a legitimate warehouse

7    customer.  What would the damages have been?

8            He said:  Well, they could be higher by as much as

9    $365 million.  But he said:  I didn't want to speculate

10   about what would have happened, so I wanted to be

11   conservative.  And I am just going to assume that the

12   mortgage warehouse lending, once the fraud was revealed,

13   would be downsized.  No more dealings with TBW, and it gets

14   downsized.

15           He took a very conservative approach.  If he took

16   a more aggressive approach, he would have increased the

17   damages to reflect the fact that mortgage warehouse lending,

18   at least the legitimate part of it, was very profitable.

19           So if Professor Lehn doesn't offer -- he doesn't

20   offer an economic opinion, really, all he does is -- he came

21   in and said:  I am not convinced -- I am not convinced that

22   there was fraud on the junk loans on the COLB.  That was

23   his thing; I have looked at the evidence, and I am not

24   convinced.  We all sat here as he was presented with

25   evidence, evidence like documents and testimony showing that

1    there was junk loans on the COLB, but that didn't persuade

2    him.

3             I should note he did agree that there were junk

4    loans on the AOT. But he said:  Yeah, the AOT, I agree, but

5    COLB?  No, I haven't seen any evidence of that.  Even when

6    we showed him documents that showed the fraudsters talking

7    about dumping before the AOT existed.  We saw emails.

8    Cathie Kissick, AOT didn't exist yet, and they're already

9    talking about how Colonial was the dumping ground for junk

10   loans.

11            We showed him emails; that didn't convince him.

12   We even showed him the testimony from the criminal trial

13   where Desiree Brown said -- where are the junk loans?  She

14   said:  It's all over the place.

15            She said the majority was probably AOT, but she

16   testified it was all over the place.  That didn't convince

17   Professor Lehn.

18            We even showed him what PwC said down in Florida,

19   which is that there was junk loans on the COLB.  That was

20   part of the fraud.  That didn't convince him.  We even

21   showed him the SEC complaint where the SEC said part of the

22   fraud was junk loans on the COLB.

23            It was clear, no matter how many pieces of

24   evidence we put in front of him, he was never going to say

25   there were junk loans on the COLB.

1          Why?  Because his view was he didn't have to look

2    at the evidence.  He said that the testimony of the

3    fraudsters was not even probative for him.  He came in here

4    to talk about a fraud and suggest that you could investigate

5    a fraud without actually looking at the testimony and the

6    documents of the fraudsters.  That's just not right.

7          He had to admit, actually under cross-examination,

8    that he is not a fraud expert.  At first, on direct, he

9    said:  Well, I have been involved in fraud investigations at

10   the SEC.  But when pressed, he said:  No, I did an economic

11   analysis.  And that's really what he does.  He is an

12   economic expert, he is not a fraud expert.

13         The idea that just -- the idea that any of

14   Colonial's business with TBW after 2003, after there was

15   already a $229 million fraud, the idea that any of that is

16   legitimate is really absurd.  This place -- the whole

17   relationship was infected with fraud, and it was all about

18   keeping the fraud going, and the fraud just grew and grew.

19   As it grew, it got harder and harder to cover it up.  There

20   was nothing legitimate going on there.  Colonial was just

21   getting deeper and deeper into the hole.

22         Had PwC done its job in 2003, it would have found

23   the fraud.  The fraud would have stopped.  But because it

24   didn't find the fraud, the fraud continued; and that was the

25   foreseeable result of PwC's negligence.  And that's why PwC

1    is liable for $625 million, because the proposed damages

2    have been established with reasonable certainty here.

3              What have we seen?  What has the evidence shown in

4    this case?  Well, Your Honor, I would like to walk through

5    four items here.

6              First of all, PwC's negligence allowed the fraud

7    to continue.  Second, the FDIC has proven its damages to a

8    reasonable certainty.  In fact, to a level of precision down

9    to the penny Mr. Malek has calculated those.  And these

10   damages are fraud losses.

11             Finally, the economy did not cause the losses.

12             I would like to start with the first one.  PwC's

13   negligence allowed the fraud to continue.

14             Your Honor, under Alabama law, the cornerstone of

15   proximate cause is foreseeability.  Excuse me.

16             In fact, Your Honor has already found that the

17   losses here were foreseeable.

18             I think we lost our -- thank you.

19             In the Order on Liability, Your Honor found it is

20   foreseeable that an auditor's negligence in failing to

21   discover fraud will allow the fraud to continue.  PwC, by

22   failing to find the fraud, it was foreseeable that this

23   would continue.

24             And we know that a proper audit would have

25   revealed the fraud because that's what Your Honor found --

1          Excuse me, Your Honor.

2          My apologies.  More technical difficulties.

3          Your Honor found if PwC had just followed up on

4   the 2003 pipeline report, the fraud would have been

5   uncovered.

6          There were multiple audit failures in 2003.  That

7   was one of the most obvious ones.  PwC also never designed

8   its audit to detect fraud, and that was a violation of the

9   standard.

10          PwC actually foresaw the exact fraud risk that

11   came to pass here.  Right in their work papers, as Your

12   Honor found in the Order on Liability, they had identified

13   fraud by a loan originator client, TBW, the largest, that

14   was the biggest risk to mortgage warehouse lending; and they

15   did nothing to address that risk in their audit.

16          What was the result?  Well, the result was

17   $1.224 billion of losses.  And Mr. Malek testified about

18   that.  After February 25th, 2004, the fraudsters were able

19   to steal another $1.244 billion.

20          Mr. Malek; you heard his testimony about the

21   but-for world.  In the but-for world -- what would have

22   happened if PwC had not been negligent?  What did he

23   testify?  It's obvious.  You probably don't need an expert

24   to figure out that if it had been stopped in 2004, the

25   relationship with TBW would have ended.

1        What did that mean?  That meant there wouldn't

2    have been any additional junk loans on the COLB.  There

3    wouldn't have been any Plan B on the AOT.  There wouldn't

4    have been any junk loans on the AOT, and there wouldn't have

5    been any more Plan B loans on the COLB.  None of that would

6    have happened, and the $1.244 billion of losses would have

7    been avoided.

8        And we know that the relationship with TBW would

9    have ended because that's what happened in August 2009.  As

10   soon as the fraud was revealed, everyone -- Ginnie Mae and

11   Freddie Mac cut off TBW, and TBW went into bankruptcy

12   because it couldn't pay all of the billions that it owed at

13   that point.  That would have happened back in February 2004.

14   TBW was already -- had already stolen $229 million.  So that

15   would have happened back in February 2004.

16       You may recall that Professor Lehn, when he was

17   testifying yesterday, had some story about, well, maybe TBW

18   could have continued in a different corporate form, but we

19   know that could never have happened.  TBW would have gone

20   away, and there would have been none of these loans.

21       Moving on to the reasonable certainty standard,

22   Your Honor.  We heard from Mr. Malek about the thousands of

23   hours that his forensic team spent with the Colonial

24   records, validating them, and calculating damages down to

25   the penny.  They figured out how much was stolen at each

1    point in time.

2              Under Alabama law, what is our burden?  Well, we

3    have to prove -- we have to estimate damages with reasonable

4    certainty and without speculation; and Mr. Malek clearly has

5    done that.  For each audit date, he went back and calculated

6    how much money was stolen.

7              And the only loans that he included in his

8    calculation were loans that were in that secret database

9    that were hidden and loans on which the FDIC suffered a

10   loss.  Everything else he excluded from his calculations.

11             And his team went in, and they quantified each day

12   how much was stolen, hundreds of thousands of transactions.

13   And they did it on a transaction-by-transaction basis.  It

14   was meticulous, time consuming; and they did it with

15   precision.

16             So after accounting for all of the reductions and

17   setoffs, Mr. Malek testified.  How much were the damages as

18   a result of the negligent 2003 audit?  $625 million.  He

19   calculated that with reasonable certainty.  Well beyond that

20   standard.

21             Now, the FDIC's damages here, they're fraud

22   losses.  They're obviously fraud losses.  There was a great

23   big fraud that continued for years, going all the way back

24   to 2002.  But for our purposes, when it starts on the COLB

25   in 2003, by the time we get to the end of the 2003 audit,

1    it's over $200 million.

2            And those are fraud losses.  How do we know

3    they're fraud losses?  Well, we know because PwC admitted

4    that these are fraud losses, and specifically admitted that

5    junk loans on the COLB were part of the fraud.

6            We saw their Answer, what they filed down in

7    Florida.  And we have seen this before, where PwC says one

8    thing in the TBW case and then tries to change the story

9    here.  Well, in Florida they said:  Part of the fraud was

10   falsifying the value of loans on the COLB through crap loan

11   transactions, junk loan transactions, making them look like

12   legitimate transactions, but of course they weren't.

13           And that's what PwC said down in Florida.  That

14   was after they had taken the depositions of all of the

15   fraudsters.  I know because I was present for all of those

16   depositions.

17           And about six months later they filed the answer,

18   which was the answer that was -- the operative answer at

19   trial, and this is what they said.  They noted specifically

20   that there were crap or junk loans on the COLB.  And they

21   even said Kissick, Kelly, they were aware of the crap loans

22   on the COLB.

23           The reason they said that -- it served their

24   interest there, but it was also true, and it is true; and it

25   was not actually controversial.  Because until

1   Professor Lehn came into the courtroom here, no one had ever

2   heard the theory that junk loans were not part of the fraud

3   on the COLB.

4        There have been so many criminal cases, civil

5   cases that have been going on for nine years.  No one had

6   ever come up with the theory that junk loans were not on the

7   COLB.  So this was the first time anyone has presented that.

8        But PwC, they knew after they took Kissick and

9   Kelly's deposition, and all of the other fraudsters, that

10  there was fraud, junk loans on the COLB before the AOT

11  started, and that continued.  That's what they said in

12  Florida, Your Honor, and they should be held to that, the

13  same way that you held them to what they said about

14  designing their audits to detect fraud.

15       Now, there is actually another reason why these

16  are fraud losses.  That is, the entire TBW relationship was

17  an illegitimate fraud starting, for our purposes, from

18  February 2004.  It just can't be said that there was

19  anything legitimate about an insider at Colonial Bank giving

20  fraudsters access to Colonial Bank money.  And that's what

21  was going on.

22       While some of the -- yeah, there was money going

23  back and forth; it was all part of a fraud.  And after

24  February 2004, it was all part of a cover-up.  Because TBW,

25  even in the good years, was losing money and needed to steal

1     from Colonial; and it just got worse over time.

2            That's -- this is an independent basis that Your

3     Honor can find that there was fraud losses here.  So not

4     only did PwC admit that there was a fraud loss -- and I

5     should note, Your Honor, during the closing in the liability

6     phase, PwC's main argument was Bank of America, ship not

7     paid.

8            Remember we heard, I think, Mr. Beck spent all of

9     his closing, except for the last ten minutes, talking about

10    Bank of America and ship not paid.  His argument was:  Look,

11    Your Honor, the FDIC, in their answer, they said that B of A

12    did a bad thing, and they should be held to that because

13    there is no evidence to the contrary.

14            Same thing here.  That's what PwC said in its

15    answer, and there is not only no evidence that that is not

16    true; all of the evidence shows that there were junk loans

17    on the COLB.

18            THE COURT:  Let me ask you.

19            I detect that Dr. Lehn was saying that it made a

20    difference whether the loans, in their inception, were good

21    or not.  Do you think it makes a difference?  If, say, some

22    of those loans, when they started out, were legitimate and

23    then became -- do you see a difference there?

24            MR. SORENSEN:  No, Your Honor.  Let me tell you

25    why.  I know you did ask him that question yesterday.  You

1    said:  Could a loan go from good to bad?  He actually -- I

2    reread his answer.  He didn't really answer your question,

3    but the answer is yes.

4            When a loan comes on -- the moment it becomes

5    impaired, it's supposed to be sent back.  That's what is

6    supposed to happen.

7            So even when you get up to the time it gets to the

8    AOT, at that time, the right of Colonial is to send it back

9    to TBW and get a full refund.  So no matter which point it

10   happens, whether it's at inception, in the middle of it,

11   right before it goes on the AOT, the right of Colonial at

12   that point is to send it back to TBW and get its money back.

13   That's -- at each point in time, Colonial is deprived of the

14   right to send it back; and it's a loss.

15           No matter where you look at it on that timeline,

16   it's a loss to Colonial because Cathie Kissick had

17   highjacked mortgage warehouse lending, and it wasn't acting

18   like a normal lender.

19           We saw emails regarding Credit Suisse and WaMu.

20   There was no fraud there.  When they got aged loans from

21   TBW, they sent them back and they got their money back; and

22   that's what should have happened.  So the inception date, it

23   doesn't matter because, at every point, Colonial had a right

24   to get its money back, and didn't.

25           Excuse me Your Honor.

1          As Mr. Malek testified, it was -- the entire

2     relationship was illegitimate because there was stealing

3     going on.  So the fact that there is also -- you have other

4     loans -- loans came in and went out, and Mr. Malek testified

5     he couldn't see what happened to them when they went out.

6          But we know from other testimony in the case that

7     there was fraud going on at Ocala Funding.  There may have

8     been fraud elsewhere.  So all we see is money coming in and

9     out; and it's really hard to tell what is legitimate and

10     what is not.

11          But Mr. Malek; he applied some indicators of

12     fraud.  He went in and applied what -- forensic people that

13     are looking at frauds, they go in and they look for badges

14     that are indicators of fraud, and that's what he did.

15          He went in and looked at the evidence and

16     determined that these were fraud losses based on the

17     indicators of fraud that -- we actually have them up on the

18     flow chart there.

19          But the entire relationship was filled with fraud.

20     The fraudsters were stealing money, but they were sending

21     money back over.  But, you know, over this time period, they

22     only ended up sending 365 million back.

23          So there was, obviously, no benefit to the

24     Colonial Bank during this time period.  It was just the

25     longer it went on the greater the hole grew and the more --

1    the more Colonial Bank lost.

2              It was -- it was fraud for Ms. Kissick to allow

3    the relationship to continue.  There is never -- it's never

4    legitimate to do business with a fraudster, and that's what

5    she did.  She was in so deep she didn't want the fraud to be

6    revealed.  So she allowed the fraudsters to continue to take

7    money from Colonial.

8              So, Your Honor, when PwC puts up that board with

9    orange, blue, red, saying that they're different, there is

10   no difference.  All of these loans, they all ended up in

11   that secret database because they were all junk loans at

12   some point, and they were all loans that should have been

13   sent back to TBW for which Colonial should have gotten its

14   money back; that's what should have happened.

15             Now, the defense that PwC is raising here about

16   losses, other accounting firms have tried to raise that.

17   Grant Thornton tried to raise it against the FDIC and said,

18   you know, we shouldn't be responsible for all losses.

19             And the Court held:  No, if you are negligent, you

20   fail to discover the fraud, you, the auditor, you are liable

21   for losses from the time that the fraud should have been

22   discovered until it was actually discovered.

23             And that's true here as well.

24             And then the third -- so, Your Honor, in terms of

25   finding that these are fraud losses -- and we're really

1    talking about the 415 because that's what is at issue

2    here -- we have got PwC's answer.  They said there was junk

3    loan fraud on the COLB.  The entire TBW relationship was

4    fraud.

5           And then we also have a third and independent

6    reason -- and this is one that I touched on already -- which

7    was, it was fraud for Ms. Kissick to hide junk loans in the

8    AOT instead of getting Colonial repaid.

9           So the idea that -- what we heard from

10   Professor Lehn was the idea that he agreed, yes, it's fraud

11   when it's in the AOT, but not before that.  As if it

12   magically goes from here to there and there is no point in

13   between.  That's just not true.

14          Before they went into AOT, the moment before, ten

15   days before, six months before, Colonial had the right to

16   send it back to TBW and get its money; and that's what

17   should have happened.

18          By not sending it back -- they suffered a loss at

19   that point as well because they didn't -- Kissick keeping

20   those loans hidden instead of sending them back to TBW, that

21   caused the FDIC a loss.

22          And it was fraudulent to put those in a secret

23   database.  It's, obviously, fraud not to report accurately

24   what the assets of the bank are.  These were never -- once

25   they were taken off the offline database, they were hidden.

1    As Mr. Malek said, it was like the tip of the iceberg, and

2    you couldn't see what was below.  That was fraud.

3            And why did all of this happen?  Well, we know

4    from the testimony of the fraudsters why this happened.

5            Mr. Bowman, he testified Colonial was the dumping

6    ground for TBW's aged receivables.  There are other

7    lenders -- this is like Credit Suisse, WaMu -- all of these

8    other lenders, they weren't in the same situation as Cathie.

9    They didn't have to take junk loans, and they sent them back

10   and got their money.

11           But Cathie, she had to keep TBW going because she

12   had to work out the situation.  The "situation" was fraud.

13           This was not a normal relationship.  Normally,

14   mortgage warehouse lending, somebody sends you aged loans,

15   you send them back, get your money back.  And if they don't

16   send your money back, you cut them off.  And that's what --

17           Can we go back to that?

18           That's what Mr. Bowman said in his testimony:  The

19   other lenders could just cut us off.  And some of them did.

20   And that's what should have happened.

21           So what was Ms. Kissick's fraud?  Well, I will

22   categorize it three ways:  Hiding, she had a secret set of

23   books, that's fraud.  And that was actually part of the

24   securities fraud that she was charged with;

25           She lied.  She lied in lots of different ways --

1    fake trades, fake pools of loans, lied about aging;

2              And she stole.  She stole from Colonial by not

3    sending loans back.  Because Colonial had the right to get

4    its money back.  And she highjacked mortgage warehouse

5    lending and made sure those loans didn't get sent back and

6    deprived Colonial of that money.

7              THE COURT:  By fake trade -- go back a minute.

8    Part of her lie was making up that they really had been

9    third-party investors buying these things, right?

10             Didn't she say that?  That's what you mean by the

11   fake trade information?

12             MR. SORENSEN:  The fake trade -- I think there

13   are -- yes, that's part of it.  So there are -- the fake

14   trade is, you know -- in the ProMerit database they just

15   kept track of the trade number.  And so she would put in

16   trades that came from somebody else, and she would just put

17   those in.  So she falsified -- or she had Teresa Kelly

18   falsify, put in fake trade numbers, fake pool numbers.

19             But they also had fake trade assignment, the

20   Mesirow documents?  Is that what you're --

21             THE COURT:  Yes.

22             MR. SORENSEN:  There were multiple forged, fake

23   documents in connection with the trades.

24             Excuse me.

25             So the fraud prevented Colonial from getting its

1    money back.  That didn't depend -- that doesn't depend at

2    all on the initial funding date because Colonial had the

3    right to get it back at any time.

4            We heard about curtailment on the warehouse, which

5    really just means, on the warehouse line, if there was a

6    problem with a loan, Colonial could just reach into TBW's

7    account and take money -- 20 percent, 40 percent until -- if

8    it stayed on the line too long, they would take all their

9    money back.

10           So on the warehouse line, Colonial could use

11   self-help.  They had the right to go into the account.

12           On the COLB, since it was supposed to be a sale,

13   they would have to send the mortgage back to TBW, and TBW

14   would have to send money back.

15           But in either case, Colonial was entitled to get

16   its money back for loans that didn't comply with the

17   requirements; and Ms. Kissick deprived Colonial of that

18   right on all of these loans.

19           Now, the fourth -- this is also an independent

20   reason, independent basis you can find that this is a fraud

21   loss, and that the FDIC is entitled to recover the entire

22   $625 million.

23           And that's because not only did PwC admit that the

24   junk loans on the COLB were part of the fraud, but the

25   evidence that we have seen is overwhelming that junk loans

1    were part of the fraud.  I would just like to walk through

2    some of it.

3         Mr. Malek testified at length about the badges of

4    junk loan fraud hidden in a secret set of books.  That

5    alone -- no one hides legitimate loans in a secret set of

6    books.  So that's an indicia of fraud.

7         The junk loans, well, they were not sent -- oh, in

8    Your Honor's order you noted these were hidden, and these

9    were impaired loans that were hidden in a secret offline

10   database.  So we heard testimony about it in the liability

11   phase.  And that's an indicia of fraud, the fact that they

12   were put in those fraudulent offline books.

13        And Mr. Lehn, he conceded that every one of the

14   loans, including what they call the blue loans, that those

15   were hidden in the offline database.

16        And these junk loans were not sent back because

17   Ms. Kissick didn't want the fraud to be exposed.  But not

18   sending them back, that's another indicator of fraud, as

19   Mr. Malek testified.

20        Because legitimate lenders -- we saw this e-mail

21   from Ms. Brown talking about WaMu loans.  Washington Mutual,

22   when they had aged loans that they got from TBW, they sent

23   them back.

24        Washington Mutual wasn't the only institution that

25   did that.  Credit Suisse, CSFB, when they had aged loans,

1     they sent them back to TBW.  And Mr. Malek testified about

2     this specific transaction.  And this happened before the

3     AOT.

4          CSFB sent the aged loans to TBW.  TBW, they had a

5     problem because they had to send the money to CSFB.  So they

6     had to get the money from somewhere.  Where did they get it?

7     They turned around, sent them to Colonial, took the money.

8     These are junk loans.

9          So it was happening before the AOT started.

10         Mr. Bowman; he testified.  We saw that testimony.

11         Mr. Malek testified about why they didn't send

12    them back.  It's because if they started rejecting -- that

13    is, Colonial, if they started rejecting loans from TBW and

14    sending them back, the fraud would be disclosed because TBW

15    couldn't afford to buy -- didn't have the money to buy them

16    back.

17         And the fraudsters, they admitted that COLB was

18    used as a dumping ground for reject loans.  We have seen

19    testimony -- we have seen emails.  Cathie Kissick back in

20    April, April 12, 2004 -- and, again, this is before the AOT

21    exists, so there is no AOT -- she's already complaining

22    about being the dumping ground for TBW's junk loans.

23         Ms. Kelly had written to her:  Why are we always

24    the dumping ground?  So it had already started.

25         Mr. Malek testified it started back in 2003.  By

1    2006, well, Lee Farkas said Colonial is full of total junk.

2           Ms. Brown; she testified -- she was asked about

3    that email.  Problem is, Colonial is full of total junk.

4    She was asked:  Where were these loans that are total junk?

5    She said:  They could be on any of the lines.

6           Probably the majority were on AOT, but she

7    testified they could be on any -- they were on all of the

8    lines.

9           Ms. Kelly; she also said:  Any time TBW had aged

10   loans issues, they would just dump them right back on us.

11   We were the dumping ground.

12          Mr. Bowman said the same.  We have seen this one

13   before; dumping ground.

14          So all of the fraudsters are talking about

15   Colonial Bank as the dumping ground for junk loans.  It goes

16   all the way back to 2003.

17          Mr. Malek gave an explanation of why this was

18   happening.  Sometimes TBW would run out of space on the AOT,

19   and so they would put it on the COLB.  So wherever there was

20   space is where they would do the fraud.

21          He said sometimes they would be totally tapped out

22   and have no more borrowing ability on its AOT lines, and

23   sometimes they would dump onto COLB or the warehouse line.

24          So TBW was opportunistic about where it dumped

25   loans on the lines.  So that's why you see sometimes there

1   is more AOT.  Sometimes there is COLB.  But it was all part

2   of the fraud.

3            These loans -- these loans could never be sold,

4   and they never, in fact, were sold.  They didn't have

5   investor commitments.  They sat there.  They got dumped in

6   the offline database.  And they could never be sold.

7            During the liability phase we heard a lot about

8   investor commitments, takeout commitments and how important

9   they are.  And they are critical for a mortgage warehouse

10  lender.  Because if someone hasn't agreed to buy the

11  mortgage from you, then you are exposed.

12           You are exposed to the risk of default, the risk

13  of the mortgage decline.  These investor commitments were

14  critical, and these loans didn't have them, couldn't be

15  sold.

16           Mr. Malek testified, that's a badge of fraud for

17  him.

18           And then finally -- he went through those four.

19  And he testified that all of the loans in that offline

20  database, all of those loans had the first four

21  characteristics when he looked at them.

22           Then he didn't stop there.  He actually went to

23  the TBW records and said:  Well, let's see what the TBW

24  records say about these loans.

25           What did he find?  Well, he found things like do

1    not sell and rejected.

2            And then he was asked how many of the -- what

3    percentage of the loans in the offline database had these

4    kinds of marks?  He said about 2,000 -- over 2,000 of them

5    had this additional indicator of fraud.

6            So all of the loans in the offline database

7    satisfied the first four categories, and over 2,000

8    additionally had do not sell on them.

9            We saw this; this is a summary of these markings

10   that were put in the TBW database.  You may recall PwC

11   counsel pulled up the native Excel spreadsheet and had

12   someone type in "Do Not Sell."  That only turned up 26.

13           But, actually, that's not how you search; you had

14   to search for "DNS" as well.  So there were way more than

15   26; there were over a thousand.  So I don't know if PwC's

16   counsel knew that you had to search for DNS.  But in any

17   case, there were thousands that said do not sell; do not

18   sell per Lee Farkas.  And that was in the TBW records.

19           Mr. Malek testified that was clear evidence to him

20   that there was a fraud going on.  Because TBW was saying do

21   not sell this loan, and turning around and selling it to

22   Colonial Bank and taking money.

23           Finally, Your Honor, I would just like to turn to

24   the economy and Mr. Lehn.

25           The damages we're seeking here are fraud losses;

1    they are not economic losses.  There was a massive fraud

2    going on, and PwC wants to blame the economy.

3            Now, Mr. Malek, he analyzed the effect of the

4    economy on legitimate mortgage warehouse lending customers.

5    He testified absent the fraud, for a legitimate warehouse

6    customer, Colonial Bank was able to manage through the

7    economic downturn.

8            How did they do that?  Well, they used their right

9    to return loans, get refunds.  So for their non-fraudulent

10   customers, yeah, sometimes there were aged loans, but they

11   worked it out with a customer.  And if they didn't, they

12   would cut off a customer.  So their mortgage warehouse

13   lending division was very profitable.

14           The reason that's important is because if you want

15   to isolate the effect of the economy, what's the best way to

16   do that?  Well, compare the legitimate to TBW and were there

17   any differences.

18           And as Mr. Malek testified, yes, there were big

19   differences.  The legitimate customers didn't -- on those,

20   they didn't suffer losses.

21           THE COURT:  Okay.  I am just checking on who is

22   keeping time, whether you --

23           MR. HEFTMAN:  We were just about 40 minutes in,

24   Your Honor.

25           THE COURT:  Okay.

1          MR. SORENSEN:  And Mr. Lehn, Professor Lehn, he

2    made no attempt to quantify what the effect of the economic

3    downturn was.  He was asked:  Did you do any -- do you do an

4    analysis of how the housing and economic crisis affected

5    Colonial's relationship with legitimate customers?

6          He said:  No, I didn't study that.

7          He was also asked:  Did you -- he said:  I didn't

8    study that.  That's correct.

9          And then he was asked -- he didn't think it was

10   relevant.  How would you isolate the effect of the economy

11   on mortgage warehouse lending without comparing it to the

12   legitimate customers?  And that's what Mr. Malek did.

13   That's the only way -- that's the only way you can compare

14   it.

15         When you look at the legitimate customers, it's

16   clear that they were profitable.  We did that with

17   Mr. Malek.  Let me put up -- is it slide 50?

18         Okay.  There.

19         Professor Lehn, he was asked:  You didn't think

20   the best evidence of what is a fraud loss versus an economic

21   loss would be to look at how legitimate mortgage warehouse

22   lending customers performed?

23         He said:  I don't think looking at the

24   profitability of the warehouse lending relations with other

25   customers is probative of that.

1        This is the economist who didn't bother to compare

2    legitimate and not-legitimate.  But Mr. Malek did.

3        If we could put up slide 52.  He went into the

4    financials and took out all of the income from mortgage

5    warehouse lending, backed out the income from TBW, and

6    showed that mortgage warehouse lending was profitable over

7    this period.  This is the only evidence in the case about

8    the effect of the economy on mortgage warehouse lending.

9    Mr. Malek wasn't even cross-examined on this issue.

10       So the only evidence in this case, Your Honor,

11   shows that there were no economic effects.  Mortgage

12   warehouse lending was profitable, and very profitable once

13   you took out the fraud.

14       PwC has no answer to that.  No evidence.  There is

15   no evidence that the economy caused any of the losses on

16   these loans because we know what the bank did with other

17   customers.  They sent the loans back and got their money

18   back.

19       Finally, I would just like to -- we heard from

20   Professor Lehn that he did 25 to 30 hours.  Then he said --

21   that's what he said during his deposition.  Then he came in

22   and said:  Well, maybe it was 60 because I did work for CBG.

23       But he did a lot of different things.  And the

24   work that he did on studying the fraud here, it was very

25   minimal compared to Mr. Malek.  The comparison between the

1    two couldn't be starker.

2             Mr. Malek spent hundreds of hours studying the

3    fraud, the testimony.  And Mr. Lehn, well, he reached his

4    conclusion very quickly.  And his conclusion was:  I am not

5    convinced that there was -- I am not convinced that there

6    was fraud, junk loan fraud, on the COLB.

7             But he didn't do the work to reach that

8    conclusion.  He didn't read the depositions of the TBW

9    fraudsters.  He didn't read the criminal trial testimony.

10   He didn't review documents.  He was very selective in what

11   he reviewed.

12            Had he read the criminal trial, he would have

13   learned about all of these things we talked about, all of

14   these badges of fraud, do not sell; the fraudsters talking

15   about it being part of the fraud.  So he wasn't convinced by

16   any of the evidence that we showed him.

17            As I said, Your Honor, there was nothing we could

18   do to convince him.  We could have brought the fraudsters in

19   here and had them confess, and he probably would not have

20   been convinced there was evidence of junk loans on the COLB.

21            He is not an expert on fraud.  In fact, he was

22   asked questions about -- he was asked the question:  Is it

23   fraud to lie on a loan application?  And he couldn't answer

24   that question.  So he is not an expert on fraud.  He did no

25   economic analysis.  And Your Honor should not put any weight

1    on his opinion here.  There is only one expert who is

2    reliable in this case, and you heard him:  Mr. Malek.  His

3    calculation of damages, he did it with precision and clearly

4    met the standard.

5           Mr. Malek also, I think, probably taught Your

6    Honor something about the fraud just because he spent so

7    much time and showed you things he probably hadn't seen

8    before, these records from TBW.  And so Mr. Malek; he has a

9    lot to offer here beyond the calculation of damages.  So,

10   Your Honor -- I am going to finish up here.  But he is the

11   only reliable expert.

12          But, Your Honor, in finding there are fraud losses

13   here, there are four independent reasons.  I just want to

14   run through this quickly here.

15          PwC said in their answer there were.  These were

16   illegitimate transactions from start to finish.  The

17   fraud -- the loans should have been sent back instead of

18   hidden.  And the evidence is overwhelming that there were

19   junk loans on the COLB.  PwC foresaw this happening --

20          THE COURT:  You are running into your rebuttal

21   time.

22          MR. SORENSEN:  Thank you, Your Honor.

23          MR. HEFTMAN:  Not yet, Your Honor, but --

24          THE COURT:  Well, he is.  I don't know what --

25          MR. SORENSEN:  Let me just finish up here.

1          THE COURT:  All right.

2          MR. SORENSEN:  Mr. Malek; he's calculated the

3    fraud losses and the damages with reasonable certainty, and

4    the FDIC is entitled to a judgment for $625 million.

5          Thank you.

6          THE COURT:  Okay.  What I propose that we do is

7    take a break, and then we will begin, Mr. Beck, with your

8    closing.  Okay.  So Court will be in recess for 15 minutes.

9          MR. BECK:  Is Your Honor anticipating that we'll

10   do the rebuttal and then we can all sort of get out of here

11   by 1:00 o'clock and go home, or are we -- I'd rather wrap

12   the whole thing up than take an hour for lunch and then come

13   back for --

14         THE COURT:  I am hoping we will finish before

15   lunch.

16         MR. BECK:  Thank you, Your Honor.

17         MR. SORENSEN:  Thank you, Your Honor.

18         THE COURT:  Even if it means we take another break

19   so that --

20         MR. BECK:  Sure.

21         THE COURT:  We'll take another break probably at

22   the end of yours, then you will do your rebuttal.  But the

23   way I time it, if we get out of here for a 15-minute recess,

24   we should be done by 1:00.

25         MR. BECK:  Right.  I think so.

1          THE COURT:  Okay.  Court will be in recess.

2          (Whereupon, a recess was taken, 10:55 a.m.)

3          THE COURT:  Mr. Sorensen, I think I shortchanged

4    you on five minutes.  I should have trusted Mr. Heftman.  So

5    you can add it on if you'd like.

6          MR. SORENSEN:  Thank you.

7          THE COURT:  Okay?

8          Mr. Beck, you look all set to go.  So whenever you

9    are ready.

10         MR. BECK:  I am, Your Honor.

11         THE COURT:  And if you want to -- I don't know.

12   When would you like a break?  Do you want to go -- just go

13   straight through?

14         MR. BECK:  I think I just want to go straight

15   through.

16         THE COURT:  That would be fine.

17         MR. BECK:  If my legs start wobbling, I will ask

18   for a break.

19         THE COURT:  If you start wobbling, I will gladly

20   give you a break.

21         Okay.  We'll go straight through, and we can take

22   a break prior to Mr. Sorensen.

23         MR. BECK:  And I'm going to press the start button

24   now on my clock.

25         THE COURT:  Okay.

1          MR. BECK:  Your Honor, during the trial and again

2     today, you heard a lot from the FDIC about what they call

3     the but-for world.  Put up some testimony from Mr. Malek.  I

4     don't propose to read it all, but he was asked about what

5     would have happened in an alternative universe if PwC had

6     discovered the fraud.

7          We also saw the same sort of thing during the

8     cross-examination of Mr. Lehn.  And, in fact, I think they

9     had a slide with this precise testimony.

10         When I heard them talk about but-for world over

11    and over again, I thought back to when I was a first-year

12    law student about 100 years ago, and a torts professor had

13    an example that he used to explain proximate cause to us.

14         And the example was that -- this was an old

15    English case -- a fellow who owned a ship sold it to

16    somebody else based on the misrepresentation that the

17    tonnage capacity of the ship was 40 tons, when, in fact, it

18    was only 30 tons.

19         And but for that misrepresentation, the buyer

20    never would have bought the ship.

21         So then he put 20 tons of goods on the ship, and

22    sailed off to the United States.  And the typhoon came by --

23    if that's what it is in the Northern Hemisphere -- and sunk

24    the ship.  And the buyer said, I never would have bought

25    that ship but for your misrepresentation about the tonnage.

1            And the Court or the House of Lords, or whomever,

2      said, That may be true, but the misrepresentation about the

3      tonnage is not what caused the ship to sink.

4            If you had 40 tons on the ship, and the ship sank

5      because it was overloaded, then the sinking would be the

6      proximate cause of the -- or would be proximately caused by

7      the misrepresentation.  But even though you wouldn't have

8      bought the ship absent the misrepresentation, the

9      misrepresentation itself had nothing to do with the sinking.

10           So good old Professor Wallace drove it into us

11     that there is a difference between but-for causation and

12     proximate causation.

13           Really, I think of it in terms of if he hadn't --

14     if there hadn't been the misrepresentation and he hadn't

15     bought the ship, then by lucky accident, he wouldn't have

16     owned it when the ship went down.

17           Well, that sort of thing, the lucky accident,

18     serendipity, is not proximate cause.

19           Your Honor, of course, is familiar with the law of

20     proximate cause.  This is the Eleventh Circuit decision in

21     the United Food and Commercial Workers.  And it talks in

22     terms of proximate cause instead of remote cause.  And

23     different courts use different language when talking about

24     this concept.

25           Your Honor, in the Order on Liability, also talked

1    about how the existence of a causal relationship, kind of

2    like but for, is not sufficient.  You have to prove

3    proximate cause.

4         And the Eleventh Circuit also had a case where

5    they talk about serendipity, kind of the lucky accident,

6    where they say the harm may have been serendipitously

7    avoided if the standard of care had not been breached, but

8    foreseeability is inconsistent with serendipity.

9         So those are the concepts that govern here.

10        In a lot of cases, the difference between but-for

11   causation and proximate causation isn't very important; they

12   tend to collapse into one another.  Not so, though, in

13   auditor cases.  It's often quite important in auditor cases.

14        This is a KPMG case where they say:  Gee whiz, if

15   you had done your audit right, we never would have had the

16   merger.  And if we didn't have the merger, then we wouldn't

17   have suffered these losses.

18        And they said:  No, that's not enough.  The cause

19   of the merger failure has to be something in the misstated

20   financial statements.  It can't be for some other cause.

21        So the same is true here.  Even assuming -- or

22   granting, rather, that Colonial would not have purchased the

23   blue mortgages but for PwC's failure to find the fraud, the

24   losses are not recoverable damages unless the fraud itself

25   rather than some other influences, such as the housing

1    market or whatever, are what caused the blue mortgages to

2    decline in value.

3              So there has to be a causal link between the fraud

4    and the loss of value in the blue mortgages.

5              Mr. Malek tried to get around that, as did

6    Mr. Sorensen this morning, by saying:  Well, the entire

7    relationship between Colonial and TBW is fraudulent, and

8    that therefore, every blue loan was tainted by that

9    relationship.

10             But that's just another way of talking about

11   but-for causation.  It's dressing it up in evening clothes.

12             Mr. Malek said that but for the relationship,

13   Colonial wouldn't have purchased any loans from TBW.  And,

14   of course, this is from an expert who said in his reports he

15   wouldn't be offering any causation opinions at all, any

16   liability opinions at all.  But he came in here and gave

17   this but-for testimony.

18             But it's not enough.  If a particular loan or

19   category of loans like the blue mortgages were legitimate

20   mortgages at the time that they were acquired --

21             THE COURT:  What makes you say they were

22   legitimate, given all of the testimony that dumping was

23   taking place on every line?

24             MR. BECK:  What makes me say that blue loans were

25   legitimate, Your Honor, is that -- I guess I don't have it

1    over here.

2          What makes me say that is the uncontested

3    testimony -- including from Mr. Malek -- that billions and

4    billions and billions of dollars of legitimate blue

5    mortgages flowed through COLB, particularly after August of

6    2005, and that, in fact, Colonial made lots and lots and

7    lots of money on those.

8          And while $415 million is a lot of money, it's a

9    small sliver of the total amount of blue mortgages that went

10   through COLB.

11         So unlike the red mortgages, where 100 percent of

12   them were fake, unlike the orange mortgages, where 100

13   percent of them were impaired on the dates that they were

14   acquired, here -- I haven't done the arithmetic -- but,

15   like, 95, 99 percent of the blue mortgages, when measured by

16   dollars over the years, were legitimate loans that they made

17   a lot of money on, and a tiny sliver of those loans ended up

18   being impaired.

19         And what they want you to think is that because a

20   tiny sliver were impaired, they must have been impaired on

21   the day they were acquired.

22         When, in fact, we know, including from Mr. Malek,

23   that any time you have a large group of legitimate loans

24   that were worth what they were paid for on the date of

25   acquisition, some of them are going to become impaired in

1    the future for reasons having nothing to do with fraud.  It

2    could be the housing crisis; it could be anything else.

3           So if they're legitimate when acquired, and they

4    lost value for reasons having nothing to do with the fraud,

5    then that loss in value isn't proximately caused by the

6    fraud.

7           That's what I mean by that, Your Honor.

8           So Mr. Malek and Mr. Sorensen today ignored --

9    when they talk about the relationship, ignored the fact that

10   the relationship was one that involved the vast, vast

11   majority of legitimate mortgages.  And even this morning

12   during Mr. Malek's testimony, he confirmed that at the bank

13   closing, he said that in the COLB facility there were no

14   fraudulent mortgages.

15          There were $700 million worth of blue mortgages in

16   COLB at closing.  He said none of them were fraudulent.  So

17   somehow or another, I guess, every single fraudulent

18   mortgage must have been moved out before the closing date.

19   It doesn't make any sense.

20          Meanwhile, what they're claiming is that every

21   single one of the impaired mortgages were fraudulent.

22   They're saying that none of them declined in value for other

23   reasons, even though Mr. Malek said that it's a certainty

24   that some of them would.

25          So that's what the focus is -- we believe is.

1              When was the impairment?  Did they prove that all

2      of these loans that -- the 415 million that ended up being

3      transferred into AOT, did they prove that all of those

4      mortgages were defective at the time they were acquired and,

5      therefore, possibly fraudulent?  Or is it -- well, did they

6      prove that?

7              And the answer is, no, they did not.

8              THE COURT:  And your reason that it has to be

9      impaired at the time acquired?  That it couldn't happen that

10     they weren't returned when they should have been returned?

11             MR. BECK:  I will come to the return point, Your

12     Honor.

13             THE COURT:  I don't want to take you out of order.

14     Go ahead.

15             MR. BECK:  I will just wait because I don't want

16     to do it twice and end up consuming time.

17             So when you -- in any kind of a proximate cause

18     analysis where the loss has to be caused by the fraud

19     itself, of course you need to understand the scope of the

20     fraud.  And that was the subject of the liability trial, and

21     Your Honor resolved that in the Court's opinion.

22             It was the Plan B red mortgages, as well as the

23     orange mortgages that were -- everybody agrees -- defective

24     when they were acquired.

25             It was during the damages trial for the first time

1    that somebody from the FDIC tried to redefine the fraud to

2    include blue mortgages that were impaired and transferred

3    into AOT.

4              Junk was kind of the word of the week.  We did a

5    word search for junk in the entire transcript of the

6    liability trial.  This is the only time anybody from the

7    FDIC used the word "junk"; and that was when Mr. Mullin was

8    saying:  We might need a little extra time to move down to

9    Montgomery, because we have a lot of junk we have to

10   transport down there.

11             Nobody talked about junk mortgages once in the

12   entire liability trial.

13             And Malek said:  Well, the problem was -- you

14   know, the key thing to the fraud is that they got

15   transferred into AOT.

16             Not a single liability witness at the trial said

17   anything about that being part of the fraud, including

18   Mr. Sorensen when he gave his closing argument describing

19   the scope of the fraud.

20             Now, there was good tactical reasons for them to

21   stay away from trying to claim that these blue mortgages

22   were part of the fraud.

23             As I said before, with the red mortgages and the

24   orange mortgages, you're talking about categories where 100

25   percent of them were either fake or impaired at the time

1    they were acquired.  And the purpose of their acquisition

2    was to enable TBW to steal money from Colonial.

3          Whereas the blue mortgages, as I said before,

4    there were billions and billions and billions of dollars

5    worth of those that were concededly legitimate and

6    profitable to Colonial.  The purpose of those mortgages was

7    for Colonial to make money, not to enable TBW to steal

8    money.

9          So if they had tried to shoehorn that in during

10   the liability trial, that would have complicated matters for

11   them enormously, and lawyers always make a judgment about

12   what kind of case they're going to try to make it effective.

13         Second, and perhaps more important, another

14   tactical reason is that if the FDIC and CBG had tried to

15   define the fraud to include the transfer of aged blue

16   mortgages into AOT, they would have been hurting themselves

17   a lot on things like the audit interference defense, the in

18   pari delicto defense.

19         So far from saying that the blue mortgages were

20   encompassed -- that the transfer of the blue mortgages were

21   encompassed between the fraud, what they did is they

22   insisted that Mr. Hosein, who ordered the largest of those

23   transfers, was absolutely not a fraudster.

24         Their position at the liability trial was that the

25   fellow who ordered the big transfers was not a fraudster.

1    He may have done other things wrong, but he was not part of

2    the fraud.

3              That's what their position was.

4              Now, it was fine for them to make that tactical

5    decision -- lawyers do that all the time -- but having

6    deliberately chosen at the liability trial not to contend

7    that the fraud encompassed the transfer of these impaired

8    blue mortgages, they're not free now at damages to redefine

9    that.

10             But let's set aside the question of whether

11   they're switching theories after having secured a liability

12   ruling, and focus on how the proximate cause principles

13   apply to the damages that they're now seeking at this phase.

14             They use the word "stealing," and I think that's

15   apt.  If TBW stole something from Colonial, that means that

16   Colonial paid for something it didn't get and TBW got money

17   that it didn't deserve.  I mean, that's what the stealing

18   was.

19             So it's like if TBW paid $100 for -- I'm sorry --

20   if Colonial paid $100 for a nonexistent red loan, TBW stole

21   $100, Colonial lost $100, and because that loss was a direct

22   result of the fraud, there is proximate cause there.

23             Or suppose that Colonial paid $100 for an orange

24   mortgage that everybody knew at the time of acquisition had

25   been returned by another bank and was impaired and was only

1        worth $80.  TBW stole $20, Colonial lost $20, and that loss

2        was proximately caused by the fraud.  And again, I emphasize

3        100 percent of the red loans were like that, 100 percent of

4        the orange loans were like that.

5               But suppose that Colonial paid $100 for a blue

6        that really was worth $100 at the time of acquisition, just

7        like the overwhelming majority of the blue loans in real

8        life that they made money on.  In that transaction, TBW

9        didn't steal anything and Colonial didn't lose anything.

10              This case involves the tiny fraction of those blue

11       loans that, after the acquisition, for one reason or

12       another, they declined in value.  And the law on proximate

13       cause requires that they prove why it is those loans

14       declined in value.  It's not our job to prove it, it's their

15       job to prove why these loans declined in value, and to prove

16       that the decline was caused by the fraud and not other

17       factors.

18              And because they're taking an all-or-nothing

19       approach, $415 million, they have to prove that as to all of

20       the loans that were transferred and that they're now

21       claiming damages for.

22              So where the -- unless they have proven that a

23       particular loan -- or in this case, every one of the loans

24       that declined in value and was transferred into AOT --

25       unless they prove as to all of the loans that the decline in

1    value was due to the fraud and not some other factor, then

2    they failed on proximate cause.  There hasn't been any

3    stealing by TBW in that instance.  They didn't benefit from

4    the decline in value.

5            And the analysis doesn't change just because after

6    the loans decline in value they get transferred into AOT.

7    There is no additional loss of value by virtue of the

8    transfer of an impaired loan from COLB into AOT.  It's the

9    same impaired mortgage, and it's just simply on a different

10   account.

11           And that's true even if the transfer were for some

12   improper purpose, like hiding the aging of the loans from

13   the regulator.  Hosein may be a bad guy.  He may even, as

14   was suggested yesterday, have committed bank fraud.  And

15   Malek may claim that the transfer somehow furthered the

16   fraud.  But the motive for the transfer doesn't change the

17   following key facts -- assuming that -- unless they have

18   proven these to be false.

19           It doesn't -- whatever his reason was to hide it

20   from the regulators, or whatever, it doesn't change the fact

21   that a mortgage that was acquired at full value at the

22   acquisition date and suffered a subsequent decline in value

23   for other reasons, that that decline in value was not due to

24   any aspect of the fraud.

25           Dr. Lehn explained this yesterday.  Mr. Malek was

1    here and heard the testimony, came back today and offered no

2    rebuttal at all.

3         So I think that the case poses two big questions.

4    The first one -- since I am a lawyer, it has subparts.

5    Question No. 1 is:  Did the FDIC prove that the blue loans

6    were worth less than Colonial paid TBW at the time of

7    acquisition, or was the evidence consistent with the notion

8    that the blue loans were worth what Colonial paid TBW at the

9    time of acquisition and only later lost value for other

10   reasons?  That's question No. 1, and that's the proximate

11   cause question.

12        And big question No. 2 is:  Even if the FDIC has

13   come forth with evidence that some of the blue loans were

14   fishy -- or call it fraudulent if you would like -- at the

15   time of their acquisition, have they met their burden of

16   proving that all or almost all were fraudulent?  Because

17   they're asking for damages for all of them.

18        As I said before, on this second question, even

19   Malek agreed that if you have billions and billions and

20   billions of dollars of these blue mortgages going through

21   COLB, when you bought and resold and Colonial is making

22   money, there are going to be some that get impaired for

23   reasons having nothing to do with the fraud, and it's their

24   obligation to prove which ones were which.

25        So let me move now to the sort of five factor

1    chart that they have over here that Mr. Malek went through.

2    Again, Your Honor permitted him to testify about this.

3            We'll point out in our proposed findings and

4    conclusions the repeat statements in his expert reports

5    that -- where he said he is not going to be offering

6    liability opinions, not going to be offering causation

7    opinions.

8            So then Your Honor can decide -- it's one thing in

9    a bench trial to hear evidence.  We know with the REO thing,

10   with the audit interference, evidence you are going to hear

11   in the Crowe case, even though you have ruled that the

12   defense is not available, it makes a lot of sense to hear

13   the proffered evidence in a bench trial so it's in the

14   record.  That's different from then saying:  I am going to

15   rely on Mr. Malek's redefinition of the fraud when it comes

16   to deciding the case.

17           So I am not going to go through every piece of

18   evidence that was discussed as to each of his five indicia.

19   That would eat up the rest of my time.  We'll address those

20   in our proposed findings of fact.

21           What I propose to do instead is to point out a few

22   of the mistakes that he made along the way.  But I am going

23   to try to stay, as I have so far, on more of a conceptual

24   level and address these things in the context of these two

25   big questions that I posed there, because I think these --

1      the first -- 1(a) and 1(b), that's the core proximate cause

2      analysis; and then number two is different but equally

3      important; and that is, have they proved that all of them

4      were subject to the fraud, because that's the claim they

5      decided to make.

6              So let me go through his five factors as

7      expeditiously as I can.

8              Number one is the secret set of books where he

9      said that anything that ended up getting transferred got --

10     ended up sooner or later getting put on the secret set of

11     books.  But putting a mortgage on a secret set of books

12     after it has already been impaired and then transferred to

13     AOT -- putting it on the secret set of books, number one, of

14     course, doesn't cause any additional loss.  But more

15     important here is it tells us nothing about when the

16     impairment took place or why.

17             If you are trying to hide aged loans that aged for

18     entirely, you know, innocent reasons, you may put them on a

19     secret set of books to hide the aging.  But that doesn't

20     mean that the loss in value is caused by anything other than

21     the normal types of things that cause a certain percentage

22     of mortgages to become impaired.

23             So it doesn't -- putting it on the secret set of

24     books, that's a bad thing, but it doesn't at all show that

25     the impairment existed at the time the loan was acquired or

1   that it had anything to do with any fraud in connection with

2   the loan.

3          So is that a bad thing to do, secret set of books?

4   Yeah.  As I said -- Mr. Heftman may have been right that it

5   constitutes bank fraud.  And if you do the crime, you pay

6   the time.  Those folks are doing the time right now.  But

7   their bad conduct in connection with hiding aged loans

8   doesn't mean that the aging itself or the impairment had

9   anything to do with their fraud.

10          The next one, No. 2, says that should have been

11   sent back to TBW.  And this was the question that Your Honor

12   asked me a little earlier and I asked you if you could be

13   patient with me.  This is the putback issue.

14          Here is what Mr. Malek said.  I am not going to

15   read it aloud but I will just summarize his testimony.  He

16   said that Colonial put aged mortgages back to other

17   customers but not TBW.  And he said that the only reason

18   that Colonial did not put the aged mortgages back to TBW was

19   that the loans were part of the fraud, and Farkas basically

20   wouldn't allow Kissick to put them back.

21          He is wrong on that, as was shown definitively, I

22   think, during the trial.  First of all, these are margin

23   calls.  One way that you can minimize your exposure to lose

24   when something has declined in value is a margin call.

25   People do that with stock, that they bought on margin, all

 1    the time.

 2            So what Colonial was doing, and what Mr. Malek

 3    overlooked, is they would make margin calls on TBW when

 4    there were these aging loans.  So they were managing that

 5    financial exposure through this mechanism rather than

 6    through the putback.

 7            Now, Ms. Kissick also explained that Colonial did,

 8    in fact, decline to exercise its putback rights with other

 9    customers.  Here are some documents that reflect that there

10    were aged loans with Pinnacle and with Bayrock.  This is

11    just one example, aged loans with Pinnacle and Bayrock that

12    Colonial had declined to exercise its putback right.

13            But the most important piece of evidence on this

14    was from Ms. Kissick's deposition that Mr. Malek said he

15    read, but somehow or another he forgot the testimony from

16    Ms. Kissick that said:  Well, the reason that we weren't

17    exercising these putback rights was because the OCC, the

18    federal regulators of Colonial, had told them that they

19    should not exercise those putback rights if they wanted to

20    have sales treatment under FAS-140.

21            The good news, Your Honor, is you don't have to

22    decide the FAS-140 issue.  The point here is simply that the

23    regulators, in communication with the bank, said:  We know

24    you have this sales treatment under FAS-140, but if you

25    exercise putback rights, that would be an indicia that it's

1     a loan rather than a sale so you shouldn't exercise those

2     rights if you want sales treatment.

3           So they had -- then they wanted -- everybody knows

4     they wanted to have sales treatment.  So they had a business

5     reason for declining to exercise the putback rights.  That's

6     sworn testimony from Ms. Kissick, rather than Mr. Malek's

7     mind reading of her, saying that she was intimidated by

8     Farkas and didn't do it.  So instead they managed it through

9     those margin calls, as I said before.

10          Number three on the indicia list is the fraudsters

11    said that junk was part of the fraud.  Here I think

12    Mr. Malek was overreaching somewhat.  This was the

13    testimony.  Mr. Sorensen was asking that question.  The

14    thing I reproduced at the top is an April 2004 email that --

15    about a group of mortgages that TBW was selling to Colonial,

16    but these mortgages had already been rejected by WaMu, like

17    the orange mortgages.

18          Malek claimed that these were blue mortgages that

19    came through COLB, and he said that this showed that they

20    were using the blue mortgage process to effectuate the

21    fraud.

22          And Mr. Sorensen asked him a leading question:

23    April 2004 -- I'm sorry, it's not a leading question --

24    April 2004, did the AOT exist yet?

25          He said:  No, it didn't.  He said:  AOT didn't

 1     come into existence until 2005.  That's why he said these

 2     WaMu mortgages couldn't have been part of AOT.  It had to be

 3     part of COLB.

 4              Well, Mr. Malek was wrong about that.  Mr. Levine

 5     proved that on cross-examination with three separate pieces

 6     of evidence establishing that AOT was in existence in 2004.

 7     It was testimony from Teresa Kelly.  And Mr. Malek said:

 8     Well, I am not convinced by that.  She may have gotten it

 9     wrong.

10              Then there was an email that showed that this was

11     being -- that the AOT was being discussed there in the same

12     time frame in connection with WaMu.  He said:  Well, that

13     doesn't convince me either.  I have to look at my own

14     schedules.

15              Mr. Levine said:  Okay, let's look at your own

16     schedule.  That's the thing at the bottom that showed -- in

17     fact, his own work showed that AOT existed in 2004.  He

18     finally admitted his mistake.  AOT did exist in 2004.

19              And in fact, what the document showed -- and we'll

20     put these in detail in the proposed findings -- is that AOT

21     came into existence and was being finalized right around the

22     time of these WaMu mortgages.  And that's -- you can tell

23     that, really, from that middle email, that the plan was to

24     put these things on AOT.  So he was just wrong about that.

25              Similarly, Mr. Malek testified that, well, you

1   know, the fraudsters talked about dumping blue mortgages, he

2   claimed.  They talked about dumping blue mortgages onto

3   Colonial, and so that showed somehow that these impaired

4   mortgages were part of the fraud.  But then he was forced to

5   admit that the thing that he said he relied on didn't say

6   that these were blue mortgages at all.  It was silent about

7   that.

8          Where Mr. Levine asked him:  Sir, you are

9   referring to the blue loans at the point at which they're

10  dumped onto AOT, not at the point in which they're first

11  brought onto Colonial, Overline, or Warehouse, or COLB,

12  correct?

13         ANSWER:  You are correct.

14         So I'm sorry.  I misspoke there.  What the dumping

15  testimony related to was, you get a blue loan that's in, and

16  then it becomes impaired, and after it becomes impaired, it

17  gets transferred or dumped onto AOT.  But that testimony

18  about the dumping didn't tell you whether the impairment was

19  at the time of acquisition or later for other reasons.

20         All it said was that after the impairment --

21  whenever the impairment took place -- it got transferred or

22  dumped over to AOT.

23         Then No. 4 on his 5 indicia, he says, well, these

24  junk loans were not sold to an investor.  And that doesn't

25  make sense as an indicia of fraud, because an aged loan by

1  definition has not been sold to an investor.  If it had been

2  sold to an investor, it wouldn't be aged.  It would be out

3  the door and gone.

4      So the fact that a loan sat on the books and

5  wasn't sold to an investor, that would be probative of fraud

6  only if the evidence was that legitimate loans never get

7  impaired and never experienced aging for reasons having

8  other than to do with the fraud.

9      In other words, if there was no such thing as an

10 impairment for -- in the normal course of business, then the

11 fact that a loan wasn't sold to an investor might mean

12 something.

13     But if, as Mr. Malek agreed, you expect that a

14 certain percentage of good loans are going to become

15 impaired for non-fraud reasons, then the fact that a

16 particular loan is one of those and wasn't sold to an

17 investor doesn't -- is not evidence at all that that loan

18 was fraudulent when it was obtained rather than legitimate,

19 and later became impaired.

20     Okay.  The last one that they have is, TBW records

21 said do not sell.  This is another mistake by Mr. Malek on

22 direct that ended up getting cleared up during Mr. Lehn's

23 cross-examination by Mr. Heftman.

24     The record that he was referring to when they made

25 their chart was the TBW rules database.  You know, there

1    were two different databases.  One of them was the TBW rules

2    database, which is Exhibit F4100.  And there are entries

3    saying "Do Not Sell."  I will come back to how many there

4    are in a minute.

5            When cross-examining Dr. Lehn, Mr. Heftman said,

6    well -- and then the question is, there are no dates.  It

7    says "Do Not Sell," but there are no dates for those

8    entries.  So we don't know from the database itself, TBW

9    database, we don't know when they put those entries in.

10            And Mr. Heftman said:  Aha, but since TBW sold the

11   loan to Colonial, then after TBW sold the loan to Colonial

12   there would be no reason for TBW to be making database

13   entries on whether to sell or not.  So doesn't that tell

14   you, just as a matter of logic, that the entries must have

15   been made before the sale?

16            And Dr. Lehn said:  No, because what you are

17   overlooking is that for lots and lots and lots, and maybe

18   all of these mortgages, after the sale from TBW to Colonial,

19   TBW continued to be the servicer of these mortgages.  These

20   blue, legitimate mortgages, they were owned by Colonial, but

21   TBW, for a fee, was still doing the servicing, collecting

22   the mortgage payments, passing it on, doing things like

23   that.

24            So TBW was, in fact, tracking the mortgages.  And

25   whether they were underwater or good or the payments were

1    timely, they were tracking those mortgages from the day that

2    they sold them to Colonial to the day that Colonial sold

3    them to a third party.  So they made a big deal about that,

4    but they were 100 percent flat wrong there.

5              So that's -- as I said, we'll address in more

6    detail, emails and spreadsheets and things like that in the

7    proposed findings.

8              But that's kind of an overview of his five

9    indicia.  And whether you take them individually or

10   collectively, Mr. Malek's five indicia don't tell us whether

11   a loan was impaired at the time of the sale, and therefore,

12   potentially fraudulent, or whether it became impaired later,

13   and therefore, presumably, for normal business reasons.

14             But even if the evidence on his five factors was

15   stronger than it is, he only put in evidence on a handful of

16   loans.  It was, you know, six or seven loans.

17             And that gets us back to my second big question,

18   if I can get back there.  There we go.

19             Even if the FDIC has come forth with evidence that

20   some of the blue loans were fishy at the time of their

21   acquisition, or even if they can somehow come up with a

22   theory that their subsequent impairment had something to do

23   with the fraud, had they met their burden of proving that

24   all or almost all of the blue loans that became impaired

25   were fraudulent?

1        And the answer there is, clearly not.

2        We heard from Mr. Malek about how he spent a lot

3   more time than Dr. Lehn and how exhaustive his work was.

4   But all he came up with was -- out of something like 4,200

5   of these loans that made their way from blue to AOT, he came

6   up with these six or seven examples with proof that, as we

7   have been talking about, is pretty iffy.

8        His poof involves misunderstanding of when things

9   happened, of why things happened.  And that's on the best

10  examples that they could find.  If there were better

11  examples, I am sure we would have heard about it.  They

12  spent, I don't know, they said 6,000 hours, and they came up

13  with five or six examples, and they were mistaken about the

14  evidence as to several of those.

15       So if the Court nevertheless says:  Well, I'm kind

16  of persuaded by the evidence on these individual loans, how

17  are you supposed to extrapolate from that?

18       The fact that there might have been six or seven

19  impaired loans that somehow had something to do with the

20  fraud doesn't mean that there is 4,000 impaired loans that

21  had something to do with the fraud.  Mr. Malek offered no

22  way for the Court to estimate or extrapolate to the full

23  universe of blue loans.

24       The Alabama Supreme Court dealt with an analogous

25  but nowhere near as extreme case back in 1991; that's *Corson*

1    *versus Universal Door*, is the name of the case.  I am sure

2    all of us are familiar with it.

3                    THE COURT:  It's a household word.

4                    MR. BECK:  Yeah.

5                    *Marbury versus Madison*, *Corson versus Universal*

6    *Door*.

7                    In that case, as we know, a former employee --

8                    THE COURT:  Do you have a cite on that?

9                    MR. BECK:  Yes, I do.  I have to catch up to where

10   I was supposed to be.

11                   THE COURT:  That's all right.  You can send it to

12   us later.

13                   MR. BECK:  I want to get there anyway.

14                   596 So.2nd. 565 Alabama Supreme Court (1991).

15                   So in the *Corson* case -- I will come back to the

16   Court in a second, but I want to explain the facts.

17                   A former employee had been found to have violated

18   a noncompetition and nonsolicitation agreement in his

19   employment agreement with his old employer.  He was found to

20   have violated it by soliciting customers.  And the -- four

21   specific customers.

22                   After the liability determination, the trial court

23   said it was the employee's obligation -- the defendant who

24   had found responsible -- to show that he had not improperly

25   solicited these four customers after he was found to have

1    violated.  That he -- he was -- the Court said that it was

2    the employee's responsibility to show that these four

3    customers were not among those that he had improperly

4    solicited.

5             What the Alabama Supreme Court said was that this

6    amounts to shifting the burden to the defendant to prove

7    that the defendant's breach did not cause plaintiff's

8    damages.

9             In other words, even if there is a breach, the

10   plaintiff still has to prove the damages.  It's not up to

11   the defendant to prove that the damages did not flow from

12   the breach.  So the Alabama Supreme Court reversed.

13            There is another important holding in this case,

14   and that is that just because there was proof as to damages

15   for one customer, you can't then just extrapolate and say,

16   well, there must have been damages for all four customers.

17            The Alabama Supreme Court said, no, you have to

18   prove the damages customer by customer.  You can't just

19   prove damages for one customer, and then assume from that

20   that there are damages from the other.

21            But here, what the FDIC is saying is that the

22   evidence as to seven or eight transactions establishes that

23   4,000 other transactions were presumptively fraudulent.

24   That all of the blue loans that make up that $415 million

25   were fraudulent.

1        The effect of that would be to shift -- and

2   Mr. Sorensen tried to do it this morning.  Where was the

3   proof from PwC about why the loans declined in value?

4        It's not our burden of proof to show that they did

5   not decline in value because of the fraud.  It's their

6   burden of proof, loan by loan, to show why they did decline

7   in value, and to prove that they did -- each one declined in

8   value because of the fraud.

9        Now, that's kind of burdensome to expect somebody

10  to prove 4,000.  But, see, they made another tactical

11  decision at the damages trial, just like they did in the

12  liability trial.

13       Mr. Malek and his team, with their 6,000-plus

14  hours, they could have gone loan by loan for the 4,000

15  loans, and found evidence, one way or another, as to when

16  the impairment took place and why the impairment took place.

17       Or they could have taken -- like sometimes people

18  do when they have got, you know, a large number of

19  transactions like that in a damages case -- they could have

20  taken them and said:  We have analyzed them, and put them in

21  different subcategories based on particular factors.

22       And what we found was sampling each subcategory,

23  that 60 percent of this one had these characteristics that

24  were indicated fraud, 80 percent of that category, and then

25  done a sensible reliable calculation.

1    They could have put some evidence in -- as you

2    have to in a case like that -- but the extrapolation

3    techniques that they're using to take facts about individual

4    loans, or some representative sampling of individual loans

5    that those can be reliably extrapolated to the total

6    universe here.

7    Here, there was nothing like that.  There was no

8    sampling evidence.  There was no evidence that these loans

9    were representative.  There was no evidence that they

10   randomly picked seven loans rather than combed through 4,000

11   of them to find the seven best that they could.  So they did

12   none of that.

13   Perhaps that's because if they had done that kind

14   of damages analysis where you do have to explain how and why

15   you are extrapolating, inevitably you are going to end up

16   having to tell the truth to the Court, that lots and lots of

17   these loans were impaired only after the acquisition, for

18   reasons having nothing to do with the fraud.  And then that

19   would take lots and lots of these loans out of any

20   legitimate damages analysis.

21   So the FDIC made a tactical decision.  We are not

22   going to do that.  We are just going to put in evidence on

23   six or seven cherry-picked loans, and hope that the judge

24   thinks that that means that 4,000 other loans must have some

25   evidence kind of like that; and, therefore, were caused by

1    the fraud.

2            Their tactical choice resulted in a failure of

3    proof.  Regardless of how the Court views the evidence as to

4    the individual loans that Mr. Malek had handpicked and

5    talked about in his flip chart, regardless of whether you

6    find that convincing as to those loans, there is no evidence

7    that would establish proximate cause as to the remaining

8    4,000-plus loans.

9            So what is the Court to do if Your Honor does find

10   that evidence convincing?

11           One thing the Court can do is to award damages for

12   the handful of specific loans that they focused on.  We

13   started to take a look at this last night.  It ends up a

14   couple -- I think there were -- I keep saying six or seven

15   because I am not positive how many we've talked about right

16   now -- but a small handful -- two of the small handful were

17   from November 2003, before the damage period starts, you

18   know, as of the February 24, 2004, time frame.

19           Mr. Malek said if damages were incurred earlier

20   than that date, he didn't count them.  So two of the loans

21   he focused on were from the predamage period, which wouldn't

22   be counted in any event.

23           The others we looked, but we don't have hard

24   numbers yet, but it basically is a few million dollars is

25   what the example said he used, what they amount to.

1          We'll continue to look at the evidence that's in

2     the record, and provide Your Honor with more of a refined

3     calculation in our proposed findings.

4          So that's one thing, if you found that evidence

5     convincing.

6          As I said before, you have to ask yourself whether

7     there is any evidence from which the Court could reliably

8     extrapolate from those handful of loans to 4,000; I think

9     the answer is no.  But, you know, that's, obviously, your

10    decision, not mine.

11         The only thing remotely approaching that sort of

12    evidence would be what was referred to as the exception

13    report numbers.  You remember, Your Honor, there would be

14    categories of loan and how many percentages of them had an

15    exception report?

16         It was, basically, Mr. Malek's summary of the

17    database.  It's in his report, I think at page 19 or 20.

18    It's his summary of the two databases, the Colonial database

19    and the TBW database, that say things like, you know, "bad

20    documentation," or "Do Not Sell."  You know, that kind of

21    thing.

22         So when they collected all of this and looked to

23    see how many of the loans had exceptions, what they find is

24    that if you combine the Colonial database and the TBW

25    database together, only 50 percent of these blue mortgages

1      that got transferred into AOT had any kind of exceptions at

2      all.

3              And then there -- of course there is the problem

4      that Dr. Lehn explained yesterday where there are

5      exceptions, there is no indication often as to when these

6      exceptions were made.  Is that at the time that they were

7      acquired or was it months later?

8              He said:  Where there are dates, which is true as

9      to some of the Colonial exceptions, he said:  What you see,

10     over and over and over again, is that the exceptions were

11     entered into that database several months after the

12     acquisition.

13             That kind of an exception tends to disprove their

14     case because it indicates that the mortgage was worth what

15     it was paid for -- worth what Colonial paid for it when it

16     was acquired, but then a couple of months later, something

17     happened out there in the marketplace and it declined in

18     value and Colonial went into the database and entered an

19     exception.

20             But set all of that aside, and what you have,

21     again, if you're searching around for extrapolation, is the

22     most you have is an exception report where 50 percent have

23     some kind of an exception.  Some of the exceptions wouldn't

24     at all indicate fraud.  It's like, you know, it wasn't

25     notarized properly or something like that.  So that's one

1   thing that's out there.

2          Then "do not sell," which Mr. Sorensen spent a lot

3   of time on this morning.  He said:  Well, when you look at

4   the correct fields, and you include all of the fields that

5   relate to do not sell, it's not just a couple of mortgages,

6   it's a thousand mortgages.  And I say:  Okay, there is

7   4,000, plus.  So "do not sell," the big smoking gun, that's

8   on 25 percent of them.

9          And again, as to the ones from TBW, we don't have

10  any idea when they were entered, and they could have been

11  entered many months or years after a mortgage was sold by

12  TBW to Colonial because TBW continued to service those

13  mortgages.

14         But if you ignore that and treat this as really

15  important evidence, and persuasive, then you're left with 25

16  percent, which is another way of saying that 75 percent of

17  them don't have that indication.

18         So, you know, one way to extrapolate would be to

19  say -- and incidentally, we would think it's erroneous to do

20  so -- but one way to extrapolate would be to say:  Well,

21  25 percent of them have this "do not sell."  I find that

22  highly persuasive.  Therefore, 25 percent of the

23  $300 million that PwC is saying should be eliminated, I'm

24  going to eliminate only 75 percent of that instead of the

25  full 300 million.

1          Did I say that in a confusing way or did you

2     follow?

3               THE COURT:  No.

4               MR. BECK:  Were you following the arithmetic?

5               THE COURT:  Yes.

6               MR. BECK:  I was confusing myself so it's probably

7     a good time to come to a close soon.

8               So if I do the arithmetic --

9               THE COURT:  You are not wobbling.

10              MR. BECK:  Well, from the inside.  You should see

11     it from my side.

12              (Laughter.)

13              THE COURT:  You put up a good front then.

14              MR. BECK:  Thank you.

15              If you do the arithmetic and say:  Okay, there is

16     300 million, and happily, everyone agrees on the math and

17     everybody has set aside whatever disagreements they have on

18     that kind of thing, we got a net that we're claiming damages

19     should go down 300 million.

20              If they say:  Well, 25 percent of those mortgages

21     have the "do not sell," you say:  Okay, then it should only

22     go down 75 percent of the 300 million, or 225 million.  So

23     the deduction that -- way back on -- way back, two or three

24     days ago --

25              THE COURT:  You don't have to do that.  You are

1    going to offer figures in your --

2             MR. BECK:  Anyway, rather than a $300 million

3    reduction, it would end up a -- here, let me see if I can

4    close this and turn it off, pull the plug.

5             Rather than a $300 million deduction, it would end

6    up being a $225 million deduction.

7             As I said, I don't think the evidence supports any

8    sort of an extrapolation at all.  And it wasn't our job to

9    present extrapolation evidence and to establish reliable

10    method; that was their job.

11             They made a tactical decision not to do their job.

12    As a consequence, they have a failure of proof on all but a

13    few million dollars of the blue loans.  So we think that the

14    correct result here is that they collect nothing in terms of

15    damages on the blue loans that were transferred onto AOT.

16             They made two tactical decisions concerning those

17    loans.  First, in the liability case, they chose not to

18    include them in the fraud that they proved to the Court.

19    And secondly, in the damages case, once they tried to bring

20    them back in, or bring them into, I should say, the fraud,

21    they took an all-or-nothing approach to damages without

22    putting in any of the kind of evidence that courts require

23    to extrapolate to a universe of items from a small sample of

24    items.  So they live with the consequence.

25             And the consequences are not so bad.  We're not

1    talking about zeroing out the FDIC.  We're talking about

2    whether they proved $300 million of their overall claim for

3    $625 million.  We are not arguing about $325 million in

4    damages represented by the red loans and the orange loans,

5    depending on what you do with REO, whether that gets

6    adjusted.  Call it $300 million that they would be

7    collecting.  That's a lot of money.

8          I am told that $300 million would be a record

9    recovery in an audit malpractice type of a case; that there

10   has never been one higher than that.  And it's a lot of

11   money to PwC, too.  We're a private partnership, not some

12   gigantic bank.  Plus, they have their case against Crowe.

13         The standards you have heard many times for

14   internal auditors and external auditors are different.

15   Crowe had access to different information than we did.

16         And Crowe is different from our case in another

17   very important way.  Mr. Carmichael, their audit expert in

18   this case, he didn't say one word about how we screwed up

19   the audit by not catching the aged loans problem that went

20   from COLB to AOT.

21         Mr. Carmichael never said one thing about it.  And

22   when they filed their proposed findings, they never said

23   anything about any supposed audit failure.  So that was

24   not -- they didn't say that we should have caught something

25   about the aged accounts in COLB; not part of their audit

1    case against us at all.

2            In contrast, the FDIC, the same lawyers, have an

3    expert named Mr. Summerford who has, in his written opinion,

4    said that Crowe should have caught the aged loan problem and

5    that that would have led them to find the fraud.  So they

6    have got a liability expert in the Crowe case who is going

7    to say that those things -- the loss from the blue loans

8    that got transferred is directly traceable to Crowe's

9    negligence.

10           As I said in the opening, I am not taking sides in

11   their fight with Crowe.  Who knows.  Maybe they'll make a

12   tactical decision that they won't pursue it with Crowe

13   either, but they at least have an expert who is teed up on

14   that.

15           And if they want to collect damages for the blue

16   loans, it ought to be against the one defendant that they

17   said did something wrong in connection with the audit of the

18   blue loans.

19           So, Your Honor, I think for the first time in this

20   trial, I am done with time left over.

21           THE COURT:  I believe you are.  Not very much time

22   left over.  You were pretty close to your estimate about

23   what you needed.

24           I appreciate your closing, and I appreciate the

25   fact that you may have finished early.

1              MR. BECK:  Thank you, Your Honor.

2              THE COURT:  And without wobbling.

3              MR. BECK:  Thanks.

4              THE COURT:  You know, I wonder, do we really need

5      a break, or could you -- what do you think?

6              MR. SORENSEN:  Can we have a short break, Your

7      Honor?

8              THE COURT:  Okay.  Everybody may really need a

9      break.  We will just take a -- we'll try to keep it to ten

10     minutes and then go.  Okay?

11             MR. SORENSEN:  Thank you.

12             THE COURT:  Court will be in recess.

13             (Whereupon, a recess was taken.)

14             THE COURT:  You may all be seated.

15             THE DEPUTY:  Court is back in session.

16             MR. MULLIN:  Your Honor, I will step out and get

17     Mr. Sorensen; he is in the hallway.

18             THE COURT:  Well, we can't do much without him,

19     that's for sure.

20             Whenever you are ready.

21             MR. SORENSEN:  Thank you, Your Honor.

22             Counsel for PwC took you through a number of

23     issues, all of them taken in isolation, which ignored the

24     context of what what's going on here.

25             This is a giant fraud that's happening here, and

1      he was going through each one as if you could ignore the

2      elephant in the room, which is, there is a big fraud going

3      on here.

4              The one thing I noticed when he was talking is, he

5      didn't mention, as he did in opening, that there was no junk

6      loans on the COLB.  That was the big issue on opening, and

7      he didn't say that.  That's because their answer, which he

8      also didn't talk about, the answer they filed in Florida --

9              If we could put that up, 2879, again --

10             They said down in Florida that junk loans were

11     part of the fraud on the COLB.

12             Your Honor, they're bound by that, unless they can

13     come in and show you evidence to the contrary, and they

14     haven't.  We haven't seen any evidence up there.

15             We showed you email after email, as well as

16     testimony showing -- testimony from Desiree Brown saying it

17     was on all of the lines.  They have not put on any evidence

18     to rebut that.  And so they are bound by what they said,

19     what they told the Court down in Florida, that the junk

20     loans were part of the fraud on the COLB.

21             And because they were part of the fraud on the

22     COLB, it's a fraud loss.  And when you are dealing with a

23     fraud loss, there is no obligation to prove loss of value.

24     That's not what we have to prove here.  We have to prove

25     that we suffered a fraud loss, and that the loss was

1    proximately caused by the negligence.

2           Your Honor has already made a finding that it's

3    foreseeable that if an auditor fails to find fraud, the

4    consequence is it's foreseeable that the fraud will

5    continue, and that's what happened here.  All of these

6    losses on the junk loans, on the COLB which later got

7    secretly hidden on the AOT -- I know PwC likes to say they

8    were transferred, but they had no business being on the AOT.

9    They were never proper loans that could ever have been in an

10   AOT pool.  They were just hidden.  Even though the

11   fraudsters called it the AOT offline database, it had

12   nothing to do with AOT.

13          They were just sticking it in this hidden database

14   to keep it hidden from management; but it could never have

15   been part of the AOT.  All of the AOT, as we heard, was

16   fake.

17          So what they said in Florida, which is -- and I

18   just want to go over the language again -- it could not be

19   any clearer.  It says:  Part of the fraud here was pools of

20   crap loans on the COLB.

21          And that's what we're talking about here.  We're

22   talking about loans that started on the COLB and then later

23   got transferred to the AOT.  So there is fraud on the COLB,

24   and it's not our burden to go back and prove the value of

25   the loans at that time, particularly not in a circumstance

1    where you have a massive fraud going on here.

2            What you heard from Mr. Malek was he went in and

3    did a massive undertaking to be able to produce his report

4    showing the amount of money stolen.  He has established far

5    beyond a reasonable certainty an estimate of those damages,

6    and tied them directly to fraud.

7            Again, there is not a single loan that's in

8    damages that didn't end up in that secret database and

9    result in a loss to the FDIC.

10           There was also -- PwC counsel was talking about

11   there being no discussion of junk loans, but it's actually

12   in Your Honor's order.

13           If we can pull that up.

14           The Order on Liability, on page 19, the last

15   sentence of the top paragraph, it says:  There were also

16   pools of loans that contained so-called junk loans, real

17   mortgages that were in default or had other problems.

18           So it's not true that junk loans were not part of

19   the liability phase.  They were, and they were in those AOT

20   pools.

21           It was fraud when they went into those pools, and

22   it was fraud before they went into those pools.  Because

23   that's what PwC said and that's the truth; and there is no

24   evidence to the contrary that we have seen.

25           Now, I would like to just talk a little bit about

4012

1      those loans.

2             Mr. Beck was saying, well, we only showed six

3      loans, and these were the Lee Farkas loans.  Those were

4      really just to illustrate the point that when PwC opened,

5      they said:  Oh, the blue, it's pure.  These are legitimate

6      loans.

7             And we just wanted to point out that, no, these

8      have so many problems.  We went through the TBW records.  Do

9      Not Sell, you know, repurchased.  And just the most

10     egregious example was Lee Farkas's own fraudulent loans were

11     sitting in that database.  So those ended up in the blue,

12     but they were by no means the only ones.

13            Those were the exceptions that Mr. Malek could

14     identify, in addition to all of the other indicia that he

15     said.  He said:  All 4200 loans have the first four indicia

16     of fraud here and then, beyond that, I have been able to

17     find half of them that have things to say, like, "do not

18     sell" and other exceptions.

19            So that was just on top of all of the evidence

20     that he saw.

21            With respect to -- one thing that I didn't hear in

22     PwC's closing was anything about the economy, because they

23     don't have an answer.  Because Mr. Malek -- the only

24     evidence in the case -- in his testimony from Mr. Malek --

25     is that the economy had no effect on the legitimate mortgage

1    warehouse lending business.

2         He testified that he took it into account in doing

3    his calculation.  And he went in and figured out, did they

4    lose money on legitimate mortgage warehouse lending?  And

5    they didn't.  So he has isolated that economic effect, and

6    there is no economic effect that needs to be taken into

7    account here.  There is no evidence to the contrary.

8         Mr. Malek is the only witness that testified on

9    that.

10        THE COURT:  All right.  The key part of Mr. Beck's

11   argument -- perhaps you should address that -- was the level

12   to which -- the level to which your burden rises in terms of

13   showing that there were 4200 bad loans here.

14        I am not concerned about whether the bad part rose

15   at inception.  That doesn't trouble me.  They could easily

16   have gotten bad by not being returned when something went

17   wrong with them.

18        But do you agree that there needs to be more proof

19   to extrapolate -- what you are relying on, basically, is a

20   pattern, a pattern set by the overall proof in the liability

21   case, and what Mr. Malek has talked about.

22        I think what Mr. Beck is saying is:  No, your

23   burden is higher than that, that you have to show something

24   that would justify all 4200 being included.

25        So I would like you to respond to that.

1          MR. SORENSEN:  Sure, Your Honor.

2          There are general things, but there are also very

3     specific things.

4          The indicia of fraud.  So the fact that it got

5     hidden in the secret database, that's an indicator of fraud.

6     What we have to do is show that it's a fraud.

7          THE COURT:  Have every one of these 4200, were

8     they all included in the secret database?

9          MR. SORENSEN:  Yes.

10         THE COURT:  And they were all moved to AOL?

11         MR. SORENSEN:  They were all moved to AOT, yes.

12         THE COURT:  I mean AOT.

13         MR. SORENSEN:  Yes.

14         THE COURT:  It would be nice if they were on AOL.

15     We could just look at them.

16         AOT.  They were all moved to AOT, and they were

17     all in the secret database that she set up.  Okay.

18         MR. SORENSEN:  Yes.

19         And our burden is to show that these are fraud

20     losses, and that's what we did with Mr. Malek.  He went in

21     and did an investigation; came up with all of these indicia.

22     It's hidden in a secret database.  Put in these fake trades.

23     And then it has all of these other problems as well.

24         The fraudsters are talking about how they're

25     dumping these loans on Colonial Bank, and these are all

1    loans that we know should have been sent back at some point,

2    and they should have gotten their money back.

3            So Mr. Malek has established beyond -- you know,

4    with reasonable certainty, which of these loans were the

5    fraudulent ones, and he's also identified which ones he's

6    not including.  I think his testimony was:  I can't say what

7    happened to the loan after it left, but I am not including

8    those.

9            So that also reflects how meticulous he was about

10   this process.  He has identified a universe that was

11   identified by the fraudsters as being junk loans that they

12   put into a secret database and then put into fake trades.

13           THE COURT:  Now, tell me more about the fake

14   trades.

15           In what way were they fake -- were the trades

16   fake?

17           MR. SORENSEN:  The trades had -- the AOT trades

18   were supposed to have a trade number and a pool number that

19   was tracked.  These were -- what they did was they used

20   trade numbers for trades that belonged to somebody else.

21   They weren't real trades for Colonial, and they would list

22   those in the ProMerit system.

23           So we saw -- with Mr. Malek there was a list of

24   124 trades that were supposed to be sitting on the AOT at

25   the end; those were all fake.  So if you went to look for

1   the documents behind those, the participation certificates,

2   the pools of loans, they wouldn't have found anything.

3             Instead, what you would have found is, if you went

4   to this offline database, the fraudsters were associating

5   some of the loans -- the loans in the offline database with

6   trades, but they were not -- the trades themselves were

7   fake.  There were never any AOT trades --

8             THE COURT:  By "trade" do you mean the purchase of

9   the loan, or do you mean an investor purchase?

10            MR. SORENSEN:  I guess when I'm using "trade," I'm

11   thinking about the whole AOT transaction.

12            Remember we had our board up there?  I'm thinking

13   it's really the whole transaction; which is the pool of

14   loans comes in and the money goes out and then there is an

15   end investor on the other side, like a Mesirow, who enters

16   into a trade assignment.  I was thinking of the whole

17   package as being the trade.

18            THE COURT:  Okay.  And these had trade numbers?

19            MR. SORENSEN:  They did, but they were not real

20   for Colonial.  They were, in some cases, recycling numbers

21   that had been used on other trades.

22            So none of those were real, and none of the loans

23   in the offline database were ever part of a real AOT pool of

24   loans.

25            THE COURT:  Well, there was no real AOT pool of

1    loans.

2            MR. SORENSEN:  There wasn't.  There wasn't.

3    That's why I was making the point that even though the

4    fraudsters called it the AOT offline database, it really had

5    no connection to a legitimate pool of loans.  That's what

6    they labeled it.

7            THE COURT:  Okay.  I think I got it.

8            MR. SORENSEN:  There was some discussion about a

9    repurchase agreement and whether the regulators said that

10   there couldn't be a repurchase on the COLB.

11           I would like to go back to the PwC answer in

12   Florida, P2879.  I think it's paragraph 22.

13           This is also in their Answer down in Florida.

14   They said something about the repurchase, right?  And they

15   actually said that Colonial did have the right to put the

16   loans back to TBW.

17           Is it 22?  Is that right?

18           MR. HEFTMAN:  Yes.

19           MR. SORENSEN:  Yeah.  There it is.

20           This is the Answer, and this is what PwC tells the

21   Court in Florida:

22           PwC admits that Colonial Bank purchased from TBW

23   and others participation interests in individual mortgage

24   loans, that the terms of those transactions required that

25   commitment takeout investors be in place, and that Colonial

1    Bank's customer -- that's TBW -- was required upon request

2    by Colonial Bank to repurchase the loan if, among other

3    things, a takeout investor did not purchase it.

4            That's what PwC said in its Answer, and that's

5    true.  And they should be held to what they said there.

6            And this discussion about the OCC saying:  No, you

7    can't have a repurchase agreement, there is no -- the

8    evidence -- Kissick was talking about that.  But that's not

9    true.

10           What PwC said in its Answer, that's true.

11   Colonial Bank had the right to put it back and should have

12   been putting it back when there wasn't a takeout commitment.

13           If we can go back to Exhibit 1907.  It's one we've

14   put up before.

15           I'm sorry.  Not 1907.  The one with the date on

16   it, the AOT date, please.

17           Is that it?

18           Okay.  If we can blow up the top part of it.

19           Mr. Beck was making a point about suggesting that

20   somehow Mr. Malek got something wrong about the date of the

21   AOT.  I just want to go back to this email.  Because when I

22   was asking questions, I was asking him whether the AOT

23   existed at the time Cathie Kissick was writing:  We cannot

24   continue to be the dumping ground.

25           And there was no AOT at this time.  The AOT didn't

1   exist.  That was the point that we're making with Mr. Malek.

2   It didn't come into being until April 28th.  So Mr. Malek is

3   entirely consistent.  The point is, they were already the

4   dumping ground before the AOT existed.

5           And what existed at this time?  The COLB and the

6   warehouse line.  So there was dumping on the COLB and the

7   warehouse line before.

8           Yeah, that's the...

9           We also heard from PwC counsel that Professor Lehn

10  had some opinion on this exceptions database.

11          Your Honor may recall when he started testifying,

12  Mr. Heftman objected because, in his deposition, he said he

13  wasn't qualified.  He didn't even know how to look at that

14  exceptions database.

15          And then, suddenly, when he appeared yesterday, he

16  said things like, you know, do not sell.  Maybe that means

17  the servicer.

18          Well, that actually makes no sense because the

19  servicer doesn't sell loans.  TBW, they may have been the

20  servicer, but the do not sell wouldn't apply to the

21  servicer.  So that makes no sense.

22          The do not sell, if you look at the exceptions,

23  either said Per Lee Farkas or others.  The reason it

24  couldn't be sold was because it had been sent back -- in the

25  case of Lee Farkas, it was fraudulent -- or some other

1    reasons.

2            And so all of these loans that said "do not sell"

3    got dumped on Colonial, and that's just another indicator of

4    fraud for those loans that had this specific designation.

5            If we could put up A185, please.  If we can just

6    highlight the bottom part.  This is one of the aging

7    reports.  If you look here, you can see -- Ms. Kissick --

8    this is a work paper.  99 percent of the loans on the aging

9    report were TBW.  TBW was only 70 percent of mortgage

10   warehouse lending.

11           The aging -- TBW had a much greater aging problem

12   than anyone else.  TBW was originating way more aged loans

13   than any other lender.  So if the idea is that these were

14   legitimate and affected by the same forces that were

15   affecting others in the market, it's just not reflected in

16   the data here.  This is 99 percent TBW.  So aging was a huge

17   problem for TBW; and they solved their aging problem by

18   dumping it on Colonial Bank.

19           MR. HEFTMAN:  You have ten minutes.

20           MR. SORENSEN:  Thank you.

21           Your Honor, just stepping back, the theory that

22   these loans, the $415 million, that that could have been in

23   any way legitimate, it just doesn't make any sense if you

24   think about it.

25           The idea that a bank that's trying to protect its

1    interests would ever allow $415 million of junk loans to

2    just sit on its books would never happen.  It never happened

3    with any of the legitimate lenders that TBW dealt with.

4    They sent the loans back.

5            Why would a bank sit there with aged loans,

6    variable loans, and take a loss when it had the ability to

7    put it back to the mortgage originator?  That's what

8    Colonial had at every step in the process.

9            Your Honor had asked about the initial funding

10   date, does that matter.  I said:  No, it doesn't matter for

11   our losses because we have the right all along the way.  But

12   in any case, I wanted to be clear, the evidence -- the

13   evidence is clear that there was -- there were problems at

14   initial funding.  And PwC has said:  Yeah, there were

15   problems in initial funding on the COLB.

16           But I don't think Your Honor has to find that to

17   find that we're entitled to recover all of our losses

18   because they had the right to put it back to Colonial all

19   along the way, up until the time it got into this offline

20   database.

21           THE COURT:  Okay.  Mr. Beck also made an argument

22   about an analogy to a merger call.

23           MR. SORENSEN:  A margin call?

24           THE COURT:  A margin call, yeah.

25           MR. SORENSEN:  Yes.

1          THE COURT:  Do you want to address that?

2          MR. SORENSEN:  Sure.  I think Mr. Malek addressed

3    it in his testimony, that there were -- do you remember,

4    there is a difference between the COLB line had -- you had

5    the right to put the loan back, and TBW had to send the

6    money back.  A margin call, what they call a haircut, is

7    where Colonial Bank would just take the money from TBW.

8          Mr. Malek testified that happened on a token basis

9    with respect to some of the loans.

10          THE COURT:  But it didn't happen very frequently.

11          MR. SORENSEN:  His testimony was it didn't happen

12    very frequently.  You do see some entries in that database

13    for some older loans, where they did eventually -- they did

14    take money back from -- TBW -- excuse me -- Colonial would

15    do haircuts from time to time, but as time wore on, less and

16    less.  I think Mr. Malek said it was really token.

17          Mr. Heftman reminded me.  And those loans -- so

18    when they would do a margin call and take some of the money

19    back, later on TBW would take an advance on some of those

20    loans.

21          So if you look at that database, some of the loans

22    were at 100 percent, and then they got aged, and Colonial

23    would take back, say, 50 percent.  Later on, TBW would take

24    back the other 50 percent.  So some of them went down and

25    then got taken back up.  But it was -- TBW could never

1     meaningfully pay back what it owed to Colonial.

2            Your Honor, I think the last point I would like to

3     hit is that Mr. Beck said something about, you know, this is

4     going to be an audit record case; PwC is a partnership,

5     whatever.

6            The reason this is going to be a record case is

7     because this is a record audit failure.  This is a

8     $2 billion audit failure of monumental proportions.  PwC is

9     responsible for that.

10           PwC is not some small partnership.  Its revenues

11    are bigger than Google's.  It's a giant organization, and it

12    should take responsibility for the damage it caused.  So to

13    the extent that he's arguing sympathy, I don't think that's

14    proper.

15           THE COURT:  Okay.  I hear you.  But I have a

16    question.

17           If the Court were to award what the Government is

18    asking, would that fully compensate FDIC?

19           MR. SORENSEN:  No, Your Honor.  The FDIC -- I

20    mean, its ultimate loss on Colonial was, I think -- I don't

21    know, somewhere close to 3 billion, and then the loss they

22    tried to recover here was 2.2.  And obviously ship not paid

23    is out; that's not recovered.  So it's not anywhere close.

24           THE COURT:  Okay.  Because if it were, there is

25    another case coming up.  And I don't think -- well, it would

 1    be interesting to see if -- the FDIC is not supposed to make

 2    money on this.

 3              MR. SORENSEN:  No, Your Honor.  I think there's

 4    joint and several liability, so I think it will be dealt

 5    with in due course.

 6              THE COURT:  Okay.

 7              MR. SORENSEN:  Thank you, Your Honor.

 8              THE COURT:  Were you finished, Mr. Sorensen?

 9              MR. SORENSEN:  Yes.

10              THE COURT:  I thought so.

11              Well, Counsel, thank you very much.  As usual, you

12    left the burden with me, as it should be.  I want to thank

13    you for putting on, as usual, a very good case.

14              You are going to be getting me a couple of briefs

15    next week, and then you will also be getting me findings and

16    conclusions.

17              I learned my lesson last time about giving you a

18    date by which I'd get back to you because I found out that

19    that was an impossible date to meet.  I am not going to say

20    anything at this time.  I will just get -- try to get it as

21    soon as possible because starting in April I will be

22    otherwise occupied, as you all well know.  So I will work on

23    it as fast as I can.

24              Thank you, again.  Court will be adjourned.

25              MR. BECK:  Thank you, Your Honor.

1          MR. SORENSEN:  Thank you, Your Honor.

2          MR. LEVINE:  Thank you, Your Honor.

3          (Whereupon, the proceeding concludes, 12:56 p.m.)

4                        **<u>CERTIFICATE</u>**

5

6          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

7  certify that the foregoing constitutes a true and accurate

8  transcript of my stenographic notes, and is a full, true,

9  and complete transcript of the proceedings to the best of my

10  ability.

11

12      Dated this 24th day of March, 2018.

13

14      <u>/s/ Elizabeth Saint-Loth, RPR, FCRR</u>
        Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

## $

**$1.224** [1] - 3947:17
**$1.244** [3] - 3938:22, 3947:19, 3948:6
**$1.473** [1] - 3938:21
**$100** [7] - 3981:19, 3981:20, 3981:21, 3981:23, 3982:5, 3982:6
**$20** [2] - 3982:1
**$200** [1] - 3950:1
**$225** [1] - 4005:6
**$229** [3] - 3939:1, 3945:15, 3948:14
**$30** [2] - 3935:23, 3936:25
**$300** [6] - 4003:23, 4005:2, 4005:5, 4006:2, 4006:6, 4006:8
**$325** [1] - 4006:3
**$365** [1] - 3943:9
**$415** [6] - 3939:12, 3976:8, 3982:19, 3997:24, 4020:22, 4021:1
**$49** [1] - 3928:22
**$625** [7] - 3920:2, 3920:15, 3946:1, 3949:18, 3959:22, 3970:4, 4006:3
**$700** [1] - 3977:15
**$78** [6] - 3916:3, 3918:25, 3920:19, 3923:6, 3923:12, 3924:8
**$80** [1] - 3982:1
**$81** [1] - 3925:8

## /

**/s** [1] - 4025:13

## 1

**1** [2] - 3984:5, 3984:10
**1(a** [1] - 3986:1
**1(b** [1] - 3986:1
**1.473** [1] - 3939:8
**10** [1] - 3916:20
**100** [9] - 3928:5, 3972:12, 3976:11, 3976:12, 3979:24, 3982:3, 3994:4, 4022:22
**1050** [1] - 3913:8
**10:00** [1] - 3937:17

**10:55** [1] - 3971:2
**11** [3] - 3916:23, 3917:13, 3922:15
**11-746** [1] - 3914:8
**12** [1] - 3961:20
**124** [1] - 4015:24
**12:56** [1] - 4025:3
**14** [3] - 3912:19, 3922:22, 3923:15
**14(a** [1] - 3923:16
**14(b** [5] - 3922:24, 3923:19, 3923:23, 3923:24, 3924:2
**14(c** [3] - 3922:25, 3923:9, 3923:25
**15** [1] - 3970:8
**15-minute** [1] - 3970:23
**17** [2] - 3916:15, 3922:8
**1700** [1] - 3913:18
**18** [1] - 3917:19
**1819** [1] - 3913:8
**19** [2] - 4001:17, 4011:14
**1907** [2] - 4018:13, 4018:15
**1991** [1] - 3995:25
**1991)** [1] - 3996:14
**1:00** [2] - 3970:11, 3970:24

## 2

**2** [3] - 3984:12, 3987:10, 4023:8
**2,000** [3] - 3964:4, 3964:7
**2.2** [1] - 4023:22
**2.3** [1] - 3941:6
**20** [4] - 3921:24, 3959:7, 3972:21, 4001:17
**20006-4707** [1] - 3913:19
**2002** [1] - 3949:24
**2003** [13] - 3938:17, 3938:25, 3939:5, 3945:14, 3945:22, 3947:4, 3947:6, 3949:18, 3949:25, 3961:25, 3962:16, 4000:17
**2004** [15] - 3938:19, 3947:18, 3947:24, 3948:13, 3948:15, 3951:18, 3951:24, 3961:20, 3989:14, 3989:23, 3989:24,

**3990:6, 3990:17, 3990:18, 4000:18
**2005** [2] - 3976:6, 3990:1
**2006** [1] - 3962:1
**2009** [12] - 3915:15, 3916:16, 3916:20, 3916:23, 3917:13, 3920:8, 3922:8, 3938:21, 3942:4, 3948:9
**2010** [1] - 3922:15
**2018** [2] - 3912:6, 4025:12
**202** [1] - 3913:19
**202-354-3242** [1] - 3913:23
**20th** [1] - 3938:19
**22** [2] - 4017:12, 4017:17
**225** [1] - 4004:22
**23** [1] - 3912:6
**233** [1] - 3912:22
**24** [1] - 4000:18
**24th** [1] - 4025:12
**25** [7] - 3938:1, 3967:20, 4003:8, 4003:15, 4003:21, 4003:22, 4004:20
**258-5500** [1] - 3912:23
**25th** [1] - 3947:18
**26** [2] - 3964:12, 3964:15
**27th** [1] - 3912:19
**2879** [1] - 4009:9
**28th** [1] - 4019:2
**2:11-cv-746-BJR** [1] - 3912:4
**2:12-cv-957-BJR** [1] - 3912:8

## 3

**3** [2] - 3914:9, 4023:21
**30** [4] - 3936:10, 3942:11, 3967:20, 3972:18
**30.4** [1] - 3931:2
**300** [5] - 3913:14, 4003:25, 4004:16, 4004:19, 4004:22
**310-961-2536** [1] - 3912:20
**312** [2] - 3912:23, 3913:15
**31656** [1] - 3913:4
**35203** [1] - 3913:8
**36** [10] - 3927:16, 3928:9, 3928:12,

**3928:24, 3929:8, 3929:10, 3929:12, 3930:7, 3933:19
**365** [1] - 3954:22
**37** [7] - 3919:18, 3925:14, 3927:21, 3928:3, 3928:5, 3928:12, 3929:13
**372-5050** [1] - 3913:5
**38** [12] - 3919:18, 3920:7, 3920:12, 3927:21, 3929:13, 3929:17, 3929:19, 3929:22, 3929:24, 3930:4, 3931:2, 3933:19

## 4

**4** [1] - 3991:23
**4,000** [8] - 3995:20, 3997:23, 3998:10, 3998:14, 3999:10, 3999:24, 4001:8, 4003:7
**4,000-plus** [1] - 4000:8
**4,200** [1] - 3995:4
**4.6(c** [2] - 3924:17, 3924:21
**4.6C** [1] - 3928:8
**40** [4] - 3959:7, 3965:23, 3972:17, 3973:4
**4000** [3] - 3917:11, 3926:11, 3926:23
**415** [2] - 3956:1, 3978:2
**4200** [4] - 4012:15, 4013:13, 4013:24, 4014:7
**45-day** [1] - 3942:11
**49** [1] - 3930:3, 3931:1
**494-4440** [1] - 3913:15

## 5

**5** [1] - 3991:23
**50** [5] - 3966:17, 4001:25, 4002:22, 4022:23, 4022:24
**52** [1] - 3967:3
**54** [1] - 3913:14
**565** [1] - 3996:14
**58** [1] - 3941:8
**596** [1] - 3996:14

## 6

**6,000** [1] - 3995:12
**6,000-plus** [1] - 3998:13
**60** [2] - 3967:22, 3998:23
**60606** [1] - 3912:23
**60654** [1] - 3913:15
**625** [1] - 3941:8
**626-2916** [1] - 3913:19
**63** [7] - 3925:13, 3925:19, 3925:20, 3928:3, 3928:5, 3928:19, 3928:21
**64** [1] - 3927:19
**6600** [1] - 3912:22

## 7

**70** [1] - 4020:9
**75** [3] - 4003:16, 4003:24, 4004:22
**78** [12] - 3918:5, 3919:23, 3920:11, 3925:8, 3928:15, 3928:16, 3928:17, 3928:21, 3929:25, 3933:20, 3934:2
**79120-1656** [1] - 3913:4

## 8

**80** [1] - 3998:24
**800** [1] - 3913:3
**806** [1] - 3913:5
**81.2** [1] - 3918:21

## 9

**900** [1] - 3941:6
**90291** [1] - 3912:20
**95** [1] - 3976:15
**99** [3] - 3976:15, 4020:8, 4020:16
**9:29** [1] - 3912:6

## A

**a.m** [2] - 3912:6, 3971:2
**A185** [1] - 4020:5
**ability** [3] - 3962:22, 4021:6, 4025:10
**able** [6] - 3918:11,

3937:18, 3947:18,
3965:6, 4011:3,
4012:16
**absent** [2] - 3965:5,
3973:8
**absolutely** [2] -
3933:21, 3980:23
**absurd** [1] - 3945:16
**accept** [1] - 3934:21
**access** [2] - 3951:20,
4006:15
**accident** [3] -
3973:15, 3973:17,
3974:5
**account** [10] - 3920:9,
3920:18, 3928:24,
3931:16, 3942:22,
3959:7, 3959:11,
3983:10, 4013:2,
4013:7
**accounted** [3] -
3920:13, 3934:11,
3936:10
**accounting** [3] -
3920:1, 3949:16,
3955:16
**accounts** [1] -
4006:25
**accurate** [1] - 4025:7
**accurately** [1] -
3956:23
**acquired** [12] -
3975:20, 3976:14,
3976:21, 3977:3,
3978:4, 3978:9,
3978:24, 3980:1,
3983:21, 3986:25,
4002:7, 4002:16
**acquisition** [13] -
3976:25, 3980:1,
3981:24, 3982:6,
3982:11, 3983:22,
3984:7, 3984:9,
3984:15, 3991:19,
3994:21, 3999:17,
4002:12
**acting** [1] - 3953:17
**active** [2] - 3915:19,
3915:23
**add** [2] - 3928:5,
3971:5
**addition** [1] - 4012:14
**additional** [5] -
3914:24, 3948:2,
3964:5, 3983:7,
3986:14
**additionally** [1] -
3964:8
**address** [9] - 3915:8,
3935:7, 3935:8,

3947:15, 3985:19,
3985:24, 3994:5,
4013:11, 4022:1
**addressed** [2] -
3940:15, 4022:2
**adjourned** [1] -
4024:24
**adjusted** [1] - 4006:6
**admit** [4] - 3945:7,
3952:4, 3959:23,
3991:5
**admits** [1] - 4017:22
**admitted** [4] - 3950:3,
3950:4, 3961:17,
3990:18
**advance** [1] - 4022:19
**affected** [3] - 3942:8,
3966:4, 4020:14
**affecting** [1] - 4020:15
**afford** [1] - 3961:15
**afraid** [1] - 3940:19
**aged** [24] - 3953:20,
3957:6, 3957:14,
3960:22, 3960:25,
3961:4, 3962:9,
3965:10, 3980:15,
3986:17, 3987:7,
3987:16, 3987:18,
3988:10, 3988:11,
3991:25, 3992:2,
4006:19, 4006:25,
4007:4, 4020:12,
4021:5, 4022:22
**aggressive** [1] -
3943:16
**aging** [12] - 3958:1,
3983:12, 3986:19,
3987:8, 3988:4,
3992:7, 4020:6,
4020:8, 4020:11,
4020:16, 4020:17
**ago** [4] - 3925:4,
3927:14, 3972:12,
4004:24
**agree** [10] - 3915:22,
3918:5, 3918:6,
3928:5, 3930:10,
3932:6, 3940:7,
3944:3, 3944:4,
4013:18
**agreed** [4] - 3956:10,
3963:10, 3984:19,
3992:13
**agreement** [16] -
3921:24, 3922:4,
3922:11, 3922:23,
3923:1, 3923:16,
3930:13, 3931:15,
3933:6, 3933:8,
3933:9, 3933:12,

3996:18, 3996:19,
4017:9, 4018:7
**agreements** [1] -
3931:10
**agrees** [2] - 3978:23,
4004:16
**Aha** [1] - 3993:10
**ahead** [3] - 3919:10,
3919:13, 3978:14
**aided** [1] - 3913:25
**AL** [1] - 3913:8
**Alabama** [7] -
3946:14, 3949:2,
3995:24, 3996:14,
3997:5, 3997:12,
3997:17
**ALABAMA** [1] -
3912:1
**Alexander** [1] -
3912:19
**all-or-nothing** [2] -
3982:18, 4005:21
**allocable** [1] - 3939:6
**allow** [4] - 3946:21,
3955:2, 3987:20,
4021:1
**allowed** [3] - 3946:6,
3946:13, 3955:6
**almost** [2] - 3984:16,
3994:24
**alone** [1] - 3960:5
**aloud** [1] - 3987:15
**ALSO** [1] - 3913:21
**alternative** [1] -
3972:5
**Amarillo** [2] - 3913:3,
3913:4
**America** [2] - 3952:6,
3952:10
**amount** [10] - 3918:23,
3919:3, 3919:6,
3927:17, 3928:11,
3928:17, 3935:12,
3976:9, 4000:25,
4011:4
**amounts** [3] - 3925:9,
3931:7, 3997:6
**Amy** [1] - 3913:21
**analogous** [1] -
3995:24
**analogy** [1] - 4021:22
**analysis** [13] -
3918:12, 3925:12,
3925:18, 3941:18,
3941:21, 3945:11,
3966:4, 3968:25,
3978:18, 3983:5,
3986:2, 3999:14,
3999:20
**analyzed** [2] - 3965:3,

3998:20
**analyzing** [1] - 3927:8
**Answer** [5] - 3950:6,
4017:13, 4017:20,
4018:4, 4018:10
**answer** [21] - 3919:9,
3933:24, 3950:17,
3950:18, 3952:11,
3952:15, 3953:2,
3953:3, 3956:2,
3967:14, 3968:23,
3969:15, 3978:7,
3995:1, 4001:9,
4009:7, 4009:8,
4012:23, 4017:11
**ANSWER** [1] -
3991:13
**answering** [1] -
3933:22
**anticipating** [2] -
3940:9, 3970:9
**anyway** [2] - 3996:13,
4005:2
**AOL** [2] - 4014:10,
4014:14
**AOT** [90] - 3915:16,
3923:4, 3923:7,
3923:12, 3923:19,
3924:7, 3924:14,
3924:18, 3924:19,
3924:25, 3925:1,
3925:14, 3926:5,
3926:9, 3926:11,
3926:16, 3926:25,
3931:1, 3938:22,
3944:4, 3944:7,
3944:8, 3944:15,
3948:3, 3948:4,
3951:10, 3953:8,
3953:11, 3956:8,
3956:11, 3956:14,
3961:3, 3961:9,
3961:20, 3961:21,
3962:6, 3962:18,
3962:22, 3963:1,
3978:3, 3979:3,
3979:15, 3980:16,
3982:24, 3983:6,
3983:8, 3986:13,
3989:24, 3989:25,
3990:2, 3990:6,
3990:11, 3990:17,
3990:18, 3990:20,
3990:24, 3991:10,
3991:17, 3991:22,
3995:5, 4002:1,
4005:15, 4006:20,
4010:7, 4010:8,
4010:10, 4010:11,
4010:12, 4010:15,

4010:23, 4011:19,
4014:11, 4014:12,
4014:16, 4015:17,
4015:24, 4016:7,
4016:11, 4016:23,
4016:25, 4017:4,
4018:16, 4018:21,
4018:22, 4018:25,
4019:4
**apart** [1] - 3935:16
**apologies** [2] -
3940:16, 3947:2
**APPEARANCES** [3] -
3912:16, 3912:25,
3913:1
**appeared** [1] -
4019:15
**application** [1] -
3968:23
**applied** [2] - 3954:11,
3954:12
**apply** [4] - 3919:1,
3930:12, 3981:13,
4019:20
**appreciate** [2] -
4007:24
**approach** [4] -
3943:15, 3943:16,
3982:19, 4005:21
**approaching** [1] -
4001:11
**approve** [3] - 3916:7,
3922:10, 3922:19
**approved** [1] - 3922:8
**approving** [2] -
3916:11, 3916:19
**April** [7] - 3961:20,
3989:14, 3989:23,
3989:24, 4019:2,
4024:21
**apt** [1] - 3981:15
**arguing** [2] - 4006:3,
4023:13
**argument** [7] -
3914:22, 3939:8,
3952:6, 3952:10,
3979:18, 4013:11,
4021:21
**arguments** [4] -
3914:19, 3914:24,
3915:2, 3930:23
**arithmetic** [4] -
3976:14, 4004:4,
4004:8, 4004:15
**arrangement** [1] -
3942:11
**AS** [1] - 3912:8
**aside** [3] - 3981:10,
4002:20, 4004:17
**aspect** [1] - 3983:24

**assert** [1] - 3931:8
**assets** [2] - 3916:12, 3956:24
**assignment** [2] - 3958:19, 4016:16
**associated** [1] - 3924:19
**associating** [1] - 4016:4
**assume** [5] - 3934:25, 3943:5, 3943:6, 3943:11, 3997:19
**assuming** [3] - 3940:13, 3974:21, 3983:17
**attached** [1] - 3917:1
**attempt** [1] - 3966:2
**auction** [11] - 3915:25, 3916:19, 3916:22, 3917:1, 3917:13, 3918:17, 3918:25, 3919:15, 3920:7, 3922:18, 3925:25
**auctions** [1] - 3919:4
**audit** [24] - 3938:17, 3938:23, 3939:1, 3939:5, 3946:24, 3947:6, 3947:8, 3947:15, 3949:5, 3949:18, 3949:25, 3974:15, 3980:17, 3985:10, 4006:9, 4006:17, 4006:19, 4006:23, 4006:25, 4007:17, 4023:4, 4023:7, 4023:8
**auditor** [4] - 3955:20, 3974:13, 4010:3
**auditor's** [1] - 3946:20
**auditors** [2] - 4006:14
**audits** [1] - 3951:14
**August** [5] - 3915:15, 3922:15, 3938:21, 3948:9, 3976:5
**available** [3] - 3923:6, 3923:11, 3985:12
**Avenue** [3] - 3912:19, 3913:8, 3913:18
**avoided** [2] - 3948:7, 3974:7
**award** [2] - 4000:11, 4023:17
**aware** [3] - 3916:4, 3919:1, 3950:21

**B**

**B182** [3] - 3922:10, 3922:21

**backed** [2] - 3942:9, 3967:5
**bad** [11] - 3952:12, 3953:1, 3983:13, 3986:24, 3987:3, 3987:7, 4001:19, 4005:25, 4013:13, 4013:14, 4013:16
**badge** [1] - 3963:16
**badges** [3] - 3954:13, 3960:3, 3968:14
**balance** [2] - 3926:25, 3927:18
**BANCGROUP** [1] - 3912:3
**Bank** [16] - 3941:25, 3951:19, 3951:20, 3952:6, 3952:10, 3954:24, 3955:1, 3962:15, 3964:22, 3965:6, 4014:25, 4017:22, 4018:2, 4018:11, 4020:18, 4022:7
**bank** [15] - 3915:15, 3915:24, 3924:20, 3933:1, 3938:20, 3956:24, 3967:16, 3977:12, 3981:25, 3983:14, 3987:5, 3988:23, 4006:12, 4020:25, 4021:5
**BANK** [1] - 3912:9
**Bank's** [1] - 4018:1
**bankruptcy** [10] - 3916:6, 3919:7, 3919:16, 3919:20, 3920:9, 3920:24, 3934:6, 3934:7, 3934:12, 3948:11
**BARBARA** [1] - 3912:14
**Barnicke** [1] - 3913:21
**Bartlit** [1] - 3913:13
**based** [5] - 3914:19, 3943:1, 3954:16, 3972:16, 3998:21
**basic** [1] - 3914:18
**basis** [6] - 3925:16, 3930:17, 3949:13, 3952:2, 3959:20, 4022:8
**Bayrock** [2] - 3988:10, 3988:11
**became** [5] - 3919:15, 3952:23, 3992:19, 3994:12, 3994:24
**BECK** [29] - 3913:10, 3935:13, 3935:21, 3940:7, 3940:12,

3940:23, 3970:9, 3970:16, 3970:20, 3970:25, 3971:10, 3971:14, 3971:17, 3971:23, 3972:1, 3975:24, 3978:11, 3978:15, 3996:4, 3996:9, 3996:13, 4004:4, 4004:6, 4004:10, 4004:14, 4005:2, 4008:1, 4008:3, 4024:25
**Beck** [11] - 3913:13, 3930:24, 3940:20, 3952:8, 3970:7, 3971:8, 4012:2, 4013:22, 4018:19, 4021:21, 4023:3
**Beck's** [1] - 4013:10
**beck.com** [2] - 3913:16, 3913:16
**become** [3] - 3976:25, 3986:22, 3992:14
**becomes** [2] - 3953:4, 3991:16
**BEFORE** [1] - 3912:14
**begin** [1] - 3970:7
**behind** [1] - 4016:1
**belonged** [1] - 4015:20
**below** [1] - 3957:2
**bench** [3] - 3914:9, 3985:9, 3985:13
**BENCH** [1] - 3912:14
**benefit** [3] - 3919:19, 3954:23, 3983:3
**best** [5] - 3965:15, 3966:20, 3995:9, 3999:11, 4025:9
**better** [3] - 3935:10, 3940:23, 3995:10
**between** [12] - 3919:18, 3921:10, 3922:11, 3930:14, 3956:13, 3967:25, 3973:11, 3974:10, 3975:3, 3975:7, 3980:21, 4022:4
**beyond** [5] - 3949:19, 3969:9, 4011:5, 4012:16, 4015:3
**bid** [1] - 3916:20
**big** [13] - 3939:2, 3942:7, 3949:23, 3965:18, 3980:25, 3984:3, 3984:12, 3985:25, 3994:3, 3994:17, 4003:7, 4009:2, 4009:6
**bigger** [3] - 3918:20,

3935:12, 4023:11
**biggest** [1] - 3947:14
**billion** [7] - 3938:21, 3938:22, 3947:17, 3947:19, 3948:6, 4023:8, 4023:21
**billions** [10] - 3948:12, 3976:3, 3976:4, 3980:4, 3984:19, 3984:20
**Birmingham** [1] - 3913:8
**bit** [1] - 4011:25
**blame** [1] - 3965:2
**blow** [2] - 3917:23, 4018:18
**blue** [50] - 3932:6, 3932:10, 3939:12, 3955:9, 3960:14, 3974:23, 3975:1, 3975:4, 3975:8, 3975:19, 3975:24, 3976:4, 3976:9, 3976:15, 3977:15, 3979:2, 3979:21, 3980:3, 3980:15, 3980:19, 3980:20, 3981:8, 3982:5, 3982:7, 3982:10, 3984:5, 3984:8, 3984:13, 3984:20, 3989:18, 3989:20, 3991:1, 3991:2, 3991:6, 3991:9, 3991:15, 3993:20, 3994:20, 3994:24, 3995:5, 3995:23, 3997:24, 4001:25, 4005:13, 4005:15, 4007:7, 4007:15, 4007:18, 4012:5, 4012:11
**blurry** [1] - 3917:6
**board** [2] - 3955:8, 4016:12
**books** [13] - 3957:23, 3960:4, 3960:6, 3960:12, 3986:8, 3986:11, 3986:13, 3986:19, 3986:24, 3987:3, 3992:4, 4021:2
**borrowing** [1] - 3962:22
**bother** [1] - 3967:1
**bottom** [2] - 3990:16, 4020:6
**bought** [6] - 3972:20, 3972:24, 3973:8, 3973:15, 3984:21,

3987:25
**bound** [2] - 4009:12, 4009:18
**bowman** [4] - 3957:5, 3957:18, 3961:10, 3962:12
**Box** [1] - 3913:4
**breach** [3] - 3997:7, 3997:9, 3997:12
**breached** [1] - 3974:7
**break** [10] - 3970:7, 3970:18, 3970:21, 3971:12, 3971:18, 3971:20, 3971:22, 4008:5, 4008:6, 4008:9
**brief** [5] - 3927:13, 3935:4, 3936:15, 3936:18, 3936:24
**briefing** [1] - 3936:22
**briefs** [2] - 3936:5, 4024:14
**bring** [4] - 4005:19, 4005:20
**brought** [3] - 3968:18, 3991:11
**Brown** [5] - 3913:3, 3944:13, 3960:21, 3962:2, 4009:16
**bulk** [3] - 3917:13, 3918:17, 3922:18
**Burbar** [1] - 3913:21
**burden** [11] - 3949:2, 3984:15, 3994:23, 3997:6, 3998:4, 3998:6, 4010:24, 4013:12, 4013:23, 4014:19, 4024:12
**burdensome** [1] - 3998:9
**business** [7] - 3945:14, 3955:4, 3989:4, 3992:10, 3994:13, 4010:8, 4013:1
**but-for** [8] - 3947:21, 3972:3, 3972:10, 3973:11, 3974:10, 3975:11, 3975:17
**button** [3] - 3940:17, 3940:25, 3971:23
**buy** [4] - 3942:14, 3961:15, 3963:10
**buyer** [2] - 3972:19, 3972:24
**buying** [1] - 3958:9
**BY** [10] - 3921:20, 3926:22, 3928:23, 3929:7, 3929:21, 3930:8, 3932:4,

3932:15, 3932:23, 3934:9

## C

CA [1] - 3912:20
calculated [5] - 3926:16, 3946:9, 3949:5, 3949:19, 3970:2
calculating [1] - 3948:24
calculation [11] - 3919:5, 3926:14, 3931:17, 3932:12, 3941:7, 3949:8, 3969:3, 3969:9, 3998:25, 4001:3, 4013:3
calculations [2] - 3934:13, 3949:10
calculator [4] - 3928:2, 3930:9, 3930:25, 3931:5
cannot [1] - 4018:23
capable [1] - 3937:3
capacity [1] - 3972:17
care [1] - 3974:7
carefully [2] - 3921:8, 3940:20
Carmichael [2] - 4006:17, 4006:21
Case [2] - 3912:4, 3912:8
case [48] - 3914:3, 3914:6, 3914:8, 3916:8, 3926:15, 3932:3, 3932:18, 3946:4, 3950:8, 3954:6, 3959:15, 3964:17, 3967:7, 3967:10, 3969:2, 3972:15, 3974:4, 3974:14, 3980:12, 3982:10, 3982:23, 3984:3, 3985:11, 3985:16, 3995:25, 3996:1, 3996:7, 3996:15, 3997:13, 3998:19, 3999:2, 4002:14, 4005:17, 4005:19, 4006:9, 4006:12, 4006:16, 4006:18, 4007:1, 4007:6, 4012:24, 4013:21, 4019:25, 4021:12, 4023:4, 4023:6, 4023:25, 4024:13
cases [6] - 3951:4,

3951:5, 3974:10, 3974:13, 4016:20
cash [2] - 3922:5, 3934:12
catch [1] - 3996:9
catching [1] - 4006:19
categories [4] - 3926:8, 3964:7, 3979:24, 4001:14
categorize [1] - 3957:22
category [2] - 3975:19, 3998:24
Cathie [6] - 3944:8, 3953:16, 3957:8, 3957:11, 3961:19, 4018:23
caught [2] - 4006:24, 4007:4
causal [2] - 3974:1, 3975:3
causation [7] - 3973:11, 3973:12, 3974:11, 3975:11, 3975:15, 3985:6
caused [17] - 3939:20, 3941:11, 3941:13, 3941:19, 3956:21, 3967:15, 3973:3, 3973:6, 3975:1, 3977:5, 3978:18, 3982:2, 3982:16, 3986:20, 3999:25, 4010:1, 4023:12
CBG [3] - 3967:22, 3980:14
certain [3] - 3916:12, 3986:21, 3992:14
certainty [9] - 3946:2, 3946:8, 3948:21, 3949:4, 3949:19, 3970:3, 3977:23, 4011:5, 4015:4
CERTIFICATE [1] - 4025:4
certificates [1] - 4016:1
certify [1] - 4025:7
cetera [1] - 3918:25
chance [1] - 3927:8
change [4] - 3950:8, 3983:5, 3983:16, 3983:20
characteristics [2] - 3963:21, 3998:23
charged [1] - 3957:24
charitable [1] - 3940:14
chart [4] - 3954:18, 3985:1, 3992:25,

4000:5
checking [1] - 3965:21
cherry [1] - 3999:23
cherry-picked [1] - 3999:23
Chicago [2] - 3912:23, 3913:15
choice [1] - 4000:2
chose [2] - 3942:5, 4005:17
chosen [1] - 3981:6
CHRISTOPHER [2] - 3913:11, 3913:12
Circuit [2] - 3973:20, 3974:4
circumstance [1] - 4010:25
cite [1] - 3996:8
civil [1] - 3951:4
claim [6] - 3920:18, 3929:1, 3979:21, 3983:15, 3986:4, 4006:2
claimed [2] - 3989:18, 3991:2
claiming [3] - 3977:20, 3982:21, 4004:18
claims [2] - 3920:22, 3920:24
clean [1] - 3917:11
clear [6] - 3942:19, 3944:23, 3964:19, 3966:16, 4021:12, 4021:13
cleared [1] - 3992:22
clearer [1] - 4010:19
clearly [3] - 3949:4, 3969:3, 3995:1
client [1] - 3947:13
clock [1] - 3971:24
close [9] - 3915:15, 3915:24, 3924:20, 3933:1, 4004:7, 4005:4, 4007:22, 4023:21, 4023:23
closed [1] - 3938:21
closing [12] - 3935:8, 3935:14, 3937:18, 3952:5, 3952:9, 3970:8, 3977:13, 3977:16, 3977:18, 3979:18, 4007:24, 4012:22
clothes [1] - 3975:11
coin [2] - 3939:19, 3941:14
COLB [60] - 3921:22, 3922:3, 3923:16,

3930:15, 3931:15, 3931:18, 3932:1, 3932:25, 3933:2, 3943:22, 3944:1, 3944:5, 3944:19, 3944:22, 3944:25, 3948:2, 3948:5, 3949:24, 3950:5, 3950:10, 3950:20, 3950:22, 3951:3, 3951:7, 3951:10, 3952:17, 3956:3, 3959:12, 3959:24, 3961:17, 3962:19, 3962:23, 3963:1, 3968:6, 3968:20, 3969:19, 3976:5, 3976:10, 3977:13, 3977:16, 3983:8, 3984:21, 3989:19, 3990:3, 3991:11, 4006:20, 4006:25, 4009:6, 4009:11, 4009:20, 4009:22, 4010:6, 4010:20, 4010:22, 4010:23, 4017:10, 4019:5, 4019:6, 4021:15, 4022:4
collapse [1] - 3974:12
collect [2] - 4005:14, 4007:15
collected [1] - 4001:22
collecting [2] - 3993:21, 4006:7
collectively [1] - 3994:10
COLONIAL [2] - 3912:3, 3912:9
Colonial [91] - 3941:25, 3944:9, 3945:20, 3948:23, 3951:19, 3951:20, 3952:1, 3953:8, 3953:11, 3953:13, 3953:16, 3953:23, 3954:24, 3955:1, 3955:7, 3955:13, 3956:8, 3956:15, 3957:5, 3958:2, 3958:3, 3958:6, 3958:25, 3959:2, 3959:6, 3959:10, 3959:15, 3959:17, 3961:7, 3961:13, 3962:1, 3962:3, 3962:15, 3964:22, 3965:6, 3974:22, 3975:7, 3975:13,

3976:6, 3980:2, 3980:6, 3980:7, 3981:15, 3981:16, 3981:20, 3981:21, 3981:23, 3982:1, 3982:5, 3982:9, 3984:6, 3984:8, 3984:21, 3987:16, 3987:18, 3988:2, 3988:7, 3988:12, 3988:18, 3989:15, 3991:3, 3991:11, 3993:11, 3993:18, 3993:20, 3994:2, 4001:18, 4001:24, 4002:9, 4002:15, 4002:18, 4003:12, 4014:25, 4015:21, 4016:20, 4017:15, 4017:22, 4017:25, 4018:2, 4018:11, 4020:3, 4020:18, 4021:8, 4021:18, 4022:7, 4022:14, 4022:22, 4023:1, 4023:20
Colonial's [2] - 3945:14, 3966:5
column [2] - 3918:14, 3918:20
columns [3] - 3917:24, 3922:24
combed [1] - 3999:10
combine [1] - 4001:24
coming [3] - 3954:8, 4023:25
Commercial [1] - 3973:21
commitment [2] - 4017:25, 4018:12
commitments [4] - 3963:5, 3963:8, 3963:13
committed [1] - 3983:14
communication [1] - 3988:23
comparable [1] - 3942:10
compare [5] - 3924:23, 3926:24, 3965:16, 3966:13, 3967:1
compared [1] - 3967:25
comparing [2] - 3926:3, 3966:11
comparison [1] - 3967:25
compensate [1] -

4023:18
complaining [1] - 3961:21
complaint [1] - 3944:21
complete [2] - 3939:2, 4025:9
completed [2] - 3915:14, 3915:23
completion [1] - 3938:23
Complexicon [1] - 3925:12
complicated [1] - 3980:10
comply [1] - 3959:16
component [1] - 3933:4
computation [1] - 3920:2
computations [1] - 3927:23
computer [1] - 3913:25
computer-aided [1] - 3913:25
computing [2] - 3920:14, 3931:20
conceded [1] - 3960:13
concededly [1] - 3980:5
concept [1] - 3973:24
concepts [1] - 3974:9
conceptual [1] - 3985:23
concerned [2] - 3936:3, 4013:14
concerning [1] - 4005:16
concludes [1] - 4025:3
conclusion [4] - 3925:4, 3968:4, 3968:8
conclusions [6] - 3915:1, 3935:2, 3936:13, 3937:13, 3985:4, 4024:16
conduct [1] - 3987:7
conducted [1] - 3916:23
confess [1] - 3968:19
confirmed [1] - 3977:12
confusing [2] - 4004:1, 4004:6
connection [12] - 3916:7, 3920:24, 3921:24, 3930:14,

3931:8, 3931:11, 3958:23, 3987:1, 3987:7, 3990:12, 4007:17, 4017:5
consequence [3] - 4005:12, 4005:24, 4010:4
consequences [1] - 4005:25
conservative [2] - 3943:11, 3943:15
considered [1] - 3942:25
consistent [2] - 3984:7, 4019:3
constitutes [2] - 3987:5, 4025:7
consuming [2] - 3949:14, 3978:16
contained [1] - 4011:16
contains [2] - 3924:14, 3925:9
contend [1] - 3981:6
context [2] - 3985:24, 4008:24
continue [9] - 3946:7, 3946:13, 3946:21, 3946:23, 3955:3, 3955:6, 4001:1, 4010:5, 4018:24
CONTINUED [1] - 3912:25
continued [9] - 3913:1, 3915:4, 3939:3, 3945:24, 3948:18, 3949:23, 3951:11, 3993:19, 4003:12
contrary [4] - 3952:13, 4009:13, 4011:24, 4013:7
contrast [1] - 4007:2
controversial [1] - 3950:25
convince [5] - 3944:11, 3944:16, 3944:20, 3968:18, 3990:13
convinced [8] - 3943:21, 3943:24, 3968:5, 3968:15, 3968:20, 3990:8
convincing [3] - 4000:6, 4000:10, 4001:5
Conway [1] - 3913:21
core [1] - 3986:1
cornerstone [1] - 3946:14

corporate [1] - 3948:18
CORPORATION [3] - 3912:8, 3912:17, 3913:2
correct [20] - 3914:12, 3916:20, 3917:17, 3917:20, 3918:23, 3922:18, 3923:21, 3924:4, 3924:8, 3924:12, 3925:10, 3927:20, 3929:11, 3929:23, 3930:21, 3966:8, 3991:12, 3991:13, 4003:4, 4005:14
Corson [3] - 3995:25, 3996:5, 3996:15
Counsel [2] - 3923:8, 4024:11
counsel [7] - 3916:5, 3918:6, 3964:11, 3964:16, 4008:22, 4011:10, 4019:9
count [2] - 3940:8, 4000:20
counted [1] - 4000:22
couple [7] - 3925:4, 3927:13, 3936:9, 4000:14, 4002:16, 4003:5, 4024:14
course [8] - 3950:12, 3973:19, 3975:14, 3978:19, 3986:14, 3992:10, 4002:3, 4024:5
court [5] - 3939:23, 3971:1, 3996:22, 4008:15, 4024:24
Court [27] - 3913:23, 3916:19, 3922:7, 3938:15, 3955:19, 3970:8, 3973:1, 3995:15, 3995:22, 3995:24, 3996:14, 3996:16, 3997:1, 3997:5, 3997:12, 3997:17, 3999:16, 4000:3, 4000:9, 4000:11, 4001:7, 4005:18, 4008:12, 4009:19, 4017:21, 4023:17, 4025:14
COURT [118] - 3912:1, 3912:15, 3914:2, 3914:7, 3914:10, 3914:13, 3914:21, 3918:3, 3918:8, 3918:13, 3919:13, 3919:22, 3920:3,

3920:16, 3921:12, 3921:17, 3923:8, 3923:10, 3925:19, 3925:21, 3925:25, 3926:3, 3926:9, 3926:13, 3926:17, 3926:19, 3927:2, 3928:13, 3928:15, 3929:3, 3929:16, 3929:19, 3929:24, 3930:6, 3931:23, 3932:13, 3933:17, 3934:5, 3934:17, 3934:21, 3934:25, 3935:10, 3935:18, 3935:22, 3936:1, 3936:20, 3937:2, 3937:9, 3937:12, 3937:15, 3937:17, 3937:23, 3938:2, 3938:5, 3938:9, 3938:14, 3939:21, 3940:4, 3940:9, 3940:13, 3940:18, 3940:25, 3952:18, 3958:7, 3958:21, 3965:21, 3965:25, 3969:20, 3969:24, 3970:1, 3970:6, 3970:14, 3970:18, 3970:21, 3971:1, 3971:3, 3971:7, 3971:11, 3971:16, 3971:19, 3971:25, 3975:21, 3978:8, 3978:13, 3996:3, 3996:8, 3996:11, 4004:3, 4004:5, 4004:9, 4004:13, 4004:25, 4007:21, 4008:2, 4008:4, 4008:8, 4008:12, 4008:14, 4008:18, 4013:10, 4014:7, 4014:10, 4014:12, 4014:14, 4015:13, 4016:8, 4016:18, 4016:25, 4017:7, 4021:21, 4021:24, 4022:1, 4022:10, 4023:15, 4023:24, 4024:6, 4024:8, 4024:10
Court's [1] - 3978:21
courthouse [1] - 3913:14
courtroom [2] - 3934:20, 3951:1
courts [2] - 3973:23, 4005:22

cover [2] - 3945:19, 3951:24
cover-up [1] - 3951:24
crap [4] - 3950:10, 3950:20, 3950:21, 4010:20
create [1] - 3940:22
Credit [3] - 3953:19, 3957:7, 3960:25
creditor [3] - 3920:7, 3933:18, 3933:25
creditors [3] - 3919:17, 3920:10, 3934:4
crime [1] - 3987:5
criminal [4] - 3944:12, 3951:4, 3968:9, 3968:12
crisis [5] - 3941:13, 3942:3, 3942:7, 3966:4, 3977:2
critical [2] - 3963:9, 3963:14
cross [8] - 3914:23, 3936:7, 3945:7, 3967:9, 3972:8, 3990:5, 3992:23, 3993:5
CROSS [1] - 3915:4
cross-examination [6] - 3914:23, 3936:7, 3945:7, 3972:8, 3990:5, 3992:23
CROSS-EXAMINATION [1] - 3915:4
cross-examined [1] - 3967:9
cross-examining [1] - 3993:5
CROWE [2] - 3912:6, 3912:11
Crowe [8] - 3985:11, 4006:12, 4006:15, 4006:16, 4007:4, 4007:6, 4007:11, 4007:12
Crowe's [1] - 4007:8
CSFB [3] - 3960:25, 3961:4, 3961:5
curtailment [1] - 3959:4
customer [9] - 3943:7, 3965:6, 3965:11, 3965:12, 3997:15, 3997:18, 3997:19, 4018:1
customers [16] - 3965:4, 3965:10,

4031

3965:19, 3966:5, 3966:12, 3966:15, 3966:22, 3966:25, 3967:17, 3987:17, 3988:9, 3996:20, 3996:21, 3996:25, 3997:3, 3997:16
**cut** [4] - 3948:11, 3957:16, 3957:19, 3965:12
**cutting** [1] - 3938:7

# D

**D.C** [2] - 3912:7, 3913:19
**D4000** [9] - 3917:8, 3917:16, 3917:19, 3918:14, 3924:11, 3925:7, 3925:14, 3925:20
**D4001** [6] - 3916:10, 3916:18, 3917:12, 3922:7, 3926:7
**damage** [2] - 4000:17, 4023:12
**damages** [52] - 3914:9, 3919:4, 3920:2, 3920:15, 3930:12, 3930:19, 3931:20, 3932:3, 3934:13, 3941:4, 3941:7, 3943:7, 3943:17, 3946:1, 3946:7, 3946:10, 3948:24, 3949:3, 3949:17, 3949:21, 3964:25, 3969:3, 3969:9, 3970:3, 3974:24, 3978:25, 3981:8, 3981:13, 3982:21, 3984:17, 3997:8, 3997:10, 3997:11, 3997:14, 3997:16, 3997:18, 3997:19, 3997:20, 3998:11, 3998:19, 3999:14, 3999:20, 4000:11, 4000:19, 4004:18, 4005:15, 4005:19, 4005:21, 4006:4, 4007:15, 4011:5, 4011:8
**data** [1] - 4020:16
**database** [44] - 3939:14, 3939:15, 3949:8, 3955:11, 3956:23, 3956:25, 3958:14, 3960:10, 3960:15, 3963:6,

3963:20, 3964:3, 3964:6, 3964:10, 3992:25, 3993:2, 3993:8, 3993:9, 3993:12, 4001:17, 4001:18, 4001:19, 4001:24, 4001:25, 4002:11, 4002:18, 4010:11, 4010:13, 4011:8, 4012:11, 4014:5, 4014:8, 4014:17, 4014:22, 4015:12, 4016:4, 4016:5, 4016:23, 4017:4, 4019:10, 4019:14, 4021:20, 4022:12, 4022:21
**databases** [1] - 3993:1, 4001:18
**date** [14] - 3916:15, 3949:5, 3953:22, 3959:2, 3976:24, 3977:18, 3983:22, 4000:20, 4018:15, 4018:16, 4018:20, 4021:10, 4024:18, 4024:19
**Dated** [1] - 4025:12
**dated** [1] - 3922:15
**dates** [5] - 3922:6, 3976:13, 3993:6, 3993:7, 4002:8
**David** [1] - 3913:21
**DAVID** [1] - 3913:2
**days** [3] - 3925:4, 3956:15, 4004:24
**deal** [2] - 3936:6, 3994:3
**dealing** [1] - 4009:22
**dealings** [1] - 3943:13
**dealt** [3] - 3995:24, 4021:3, 4024:4
**debtor** [4] - 3923:1, 3923:2, 3923:11, 3924:2
**debtor's** [2] - 3916:11, 3923:5
**December** [4] - 3916:15, 3916:23, 3917:13, 3922:8
**decide** [2] - 3985:8, 3988:22
**decided** [1] - 3986:5
**deciding** [1] - 3985:16
**decision** [7] - 3973:20, 3981:5, 3998:11, 3999:21, 4001:10, 4005:11, 4007:12
**decisions** [1] -

4005:16
**decline** [11] - 3963:13, 3975:2, 3982:16, 3982:25, 3983:4, 3983:6, 3983:22, 3983:23, 3988:4, 3998:5, 3998:6
**declined** [1] - 3939:10, 3977:22, 3982:12, 3982:14, 3982:15, 3982:24, 3987:24, 3988:12, 3998:3, 3998:7, 4002:17
**declining** [1] - 3989:5
**deduct** [1] - 3918:24
**deduction** [3] - 4004:23, 4005:5, 4005:6
**deemed** [1] - 3922:1
**deep** [1] - 3955:5
**deeper** [2] - 3945:21
**default** [3] - 3942:17, 3963:12, 4011:17
**defective** [2] - 3978:4, 3978:23
**defendant** [4] - 3996:23, 3997:6, 3997:11, 4007:16
**defendant's** [1] - 3997:7
**Defendants** [2] - 3912:7, 3912:11
**defense** [4] - 3955:15, 3980:17, 3980:18, 3985:12
**define** [1] - 3980:15
**definition** [1] - 3992:1
**definitive** [1] - 3925:4
**definitively** [1] - 3987:21
**deliberately** [1] - 3981:6
**delicto** [1] - 3980:18
**DEPOSIT** [3] - 3912:8, 3912:17, 3913:2
**deposition** [4] - 3951:9, 3967:21, 3988:14, 4019:12
**depositions** [3] - 3950:14, 3950:16, 3968:8
**deprived** [3] - 3953:13, 3958:6, 3959:17
**DEPUTY** [3] - 3914:6, 3914:8, 4008:15
**describes** [1] - 3935:16
**describing** [1] -

3979:18
**deserve** [1] - 3981:17
**designation** [1] - 4020:4
**designed** [1] - 3947:7
**designing** [1] - 3951:14
**Desiree** [2] - 3944:13, 4009:16
**detail** [3] - 3925:3, 3990:20, 3994:6
**detect** [3] - 3947:8, 3951:14, 3952:19
**determination** [1] - 3996:22
**determine** [1] - 3930:12
**determined** [2] - 3943:1, 3954:16
**difference** [9] - 3927:18, 3935:23, 3952:20, 3952:21, 3952:23, 3955:10, 3973:11, 3974:10, 4022:4
**differences** [2] - 3965:17, 3965:19
**different** [18] - 3917:15, 3923:20, 3923:24, 3934:3, 3948:18, 3955:9, 3957:25, 3967:23, 3973:23, 3983:9, 3985:14, 3986:2, 3993:1, 3998:21, 4006:14, 4006:15, 4006:16
**difficult** [1] - 3927:23
**difficulties** [1] - 3947:2
**direct** [3] - 3945:8, 3981:21, 3992:22
**directly** [5] - 3933:14, 3933:23, 3934:5, 4007:8, 4011:6
**disagreements** [1] - 4004:17
**disclosed** [1] - 3961:14
**discover** [2] - 3946:21, 3955:20
**discovered** [5] - 3941:23, 3955:22, 3972:6
**discuss** [1] - 3930:22
**discussed** [2] - 3985:18, 3990:11
**discussion** [3] - 4011:11, 4017:8, 4018:6

**disprove** [1] - 4002:13
**dispute** [3] - 3925:16, 3938:20, 3939:7
**distribution** [1] - 3919:19
**distributions** [1] - 3920:10
**DISTRICT** [3] - 3912:1, 3912:1, 3912:15
**divided** [2] - 3934:3
**division** [1] - 3965:13
**DIVISION** [1] - 3912:2
**dmullin@mhba.com** [1] - 3913:5
**DNS** [2] - 3964:14, 3964:16
**document** [7] - 3917:2, 3918:17, 3922:13, 3922:17, 3925:7, 3926:7, 3990:19
**documentation** [1] - 4001:20
**documents** [8] - 3943:25, 3944:6, 3945:6, 3958:20, 3958:23, 3968:10, 3988:9, 4016:1
**dollar** [2] - 3920:14, 3925:13
**dollars** [6] - 3976:4, 3976:16, 3980:4, 3984:20, 4000:24, 4005:13
**done** [16] - 3929:24, 3931:22, 3932:13, 3932:16, 3936:8, 3941:18, 3941:22, 3945:22, 3949:5, 3970:24, 3974:15, 3976:14, 3981:1, 3998:25, 3999:13, 4007:20
**door** [1] - 3992:3
**Door** [2] - 3996:1, 3996:6
**down** [25] - 3917:4, 3928:17, 3928:19, 3931:7, 3934:18, 3936:2, 3941:6, 3941:8, 3941:10, 3942:17, 3944:18, 3946:8, 3948:24, 3950:6, 3950:13, 3973:16, 3979:8, 3979:10, 4004:19, 4004:22, 4009:10, 4009:19, 4017:13, 4022:24

**downsized** [2] - 3943:13, 3943:14
**downturn** [2] - 3965:7, 3966:3
**Dr** [7] - 3912:22, 3952:19, 3983:25, 3993:5, 3993:16, 3995:3, 4002:4
**dressing** [1] - 3975:11
**drove** [1] - 3973:10
**due** [5] - 3936:14, 3939:10, 3983:1, 3983:23, 4024:7
**dump** [2] - 3962:10, 3962:23
**dumped** [6] - 3962:24, 3963:5, 3991:10, 3991:17, 3991:22, 4020:3
**dumping** [19] - 3944:7, 3944:9, 3957:5, 3961:18, 3961:22, 3961:24, 3962:11, 3962:13, 3962:15, 3975:22, 3991:1, 3991:2, 3991:14, 3991:18, 4014:25, 4018:24, 4019:4, 4019:6, 4020:18
**during** [12] - 3938:17, 3952:5, 3954:24, 3963:7, 3967:21, 3972:1, 3972:7, 3977:12, 3978:25, 3980:9, 3987:22, 3992:22

**E**

**e-mail** [1] - 3960:20
**early** [1] - 4007:25
**easier** [1] - 3917:9
**easily** [1] - 4013:15
**easy** [1] - 3930:9
**eat** [1] - 3985:19
**economic** [14] - 3941:18, 3941:21, 3943:20, 3945:10, 3945:12, 3965:1, 3965:7, 3966:2, 3966:4, 3966:20, 3967:11, 3968:25, 4013:5, 4013:6
**economist** [3] - 3941:17, 3967:1
**economy** [18] - 3939:10, 3939:20, 3941:11, 3941:12,

3941:18, 3942:23, 3943:2, 3946:11, 3964:24, 3965:2, 3965:4, 3965:15, 3966:10, 3967:8, 3967:15, 4012:22, 4012:25
**effect** [10] - 3943:3, 3965:3, 3965:15, 3966:2, 3966:10, 3967:8, 3998:1, 4012:25, 4013:5, 4013:6
**effective** [1] - 3980:12
**effects** [1] - 3967:11
**effectuate** [1] - 3989:20
**egregious** [1] - 4012:10
**eight** [1] - 3997:22
**either** [6] - 3915:21, 3959:15, 3979:25, 3990:13, 4007:13, 4019:23
**electronic** [1] - 3927:25
**elephant** [1] - 4009:2
**Eleventh** [2] - 3973:20, 3974:4
**eliminate** [2] - 3926:19, 4003:24
**eliminated** [1] - 4003:23
**ELIZABETH** [1] - 4025:6
**Elizabeth** [2] - 3913:23, 4025:13
**elsewhere** [1] - 3954:8
**Email** [6] - 3912:24, 3913:5, 3913:9, 3913:16, 3913:16, 3913:20
**email** [8] - 3916:5, 3962:3, 3989:14, 3990:10, 3990:23, 4009:15, 4018:21
**emails** [5] - 3944:7, 3944:11, 3953:19, 3961:19, 3994:6
**embarrassment** [1] - 3940:18
**emphasize** [1] - 3982:2
**employee** [2] - 3996:7, 3996:17
**employee's** [2] - 3996:23, 3997:2
**employer** [1] - 3996:19

**employment** [1] - 3996:19
**enable** [2] - 3980:2, 3980:7
**encompassed** [3] - 3980:20, 3980:21, 3981:7
**end** [10] - 3927:12, 3949:25, 3970:22, 3978:16, 3999:15, 4005:3, 4005:5, 4011:8, 4015:25, 4016:15
**ended** [10] - 3947:25, 3948:9, 3954:22, 3955:10, 3976:17, 3978:2, 3986:9, 3986:10, 3992:22, 4012:11
**ends** [1] - 4000:13
**English** [1] - 3972:15
**enormously** [1] - 3980:11
**entered** [5] - 3916:19, 4002:11, 4002:18, 4003:10, 4003:11
**enters** [1] - 4016:15
**entire** [10] - 3942:2, 3942:20, 3951:16, 3954:1, 3954:19, 3956:3, 3959:21, 3975:6, 3979:5, 3979:12
**entirely** [2] - 3986:18, 4019:3
**entitled** [5] - 3919:23, 3959:15, 3959:21, 3970:4, 4021:17
**entitlements** [1] - 3923:4
**entries** [6] - 3993:2, 3993:8, 3993:9, 3993:13, 3993:14, 4022:12
**equally** [1] - 3986:2
**erroneous** [1] - 4003:19
**error** [1] - 3942:22
**essentially** [1] - 3936:22
**establish** [3] - 3918:7, 4000:7, 4005:9
**established** [3] - 3946:2, 4011:4, 4015:3
**establishes** [1] - 3997:22
**establishing** [1] - 3990:6
**estate** [8] - 3915:11,

3919:7, 3919:16, 3919:17, 3919:20, 3920:9, 3920:24, 3923:5
**estimate** [4] - 3949:3, 3995:22, 4007:22, 4011:5
**et** [1] - 3918:25
**evening** [1] - 3975:11
**event** [1] - 4000:22
**eventually** [1] - 4022:13
**evidence** [66] - 3935:16, 3943:23, 3943:25, 3944:5, 3944:24, 3945:2, 3946:3, 3952:13, 3952:15, 3952:16, 3954:15, 3959:25, 3964:19, 3966:20, 3967:7, 3967:10, 3967:14, 3967:15, 3968:16, 3968:20, 3969:18, 3984:7, 3984:13, 3985:9, 3985:10, 3985:13, 3985:18, 3988:13, 3990:6, 3992:6, 3992:17, 3994:14, 3994:15, 3994:19, 3995:14, 3995:16, 3997:22, 3998:15, 3999:1, 3999:8, 3999:9, 3999:22, 3999:25, 4000:3, 4000:6, 4000:10, 4001:1, 4001:4, 4001:7, 4001:12, 4003:15, 4005:7, 4005:9, 4005:22, 4009:13, 4009:14, 4009:17, 4011:24, 4012:19, 4012:24, 4013:7, 4018:8, 4021:12, 4021:13
**exact** [3] - 3922:6, 3927:4, 3947:10
**exactly** [3] - 3925:6, 3936:9, 3936:24
**examination** [6] - 3914:23, 3936:7, 3945:7, 3972:8, 3990:5, 3992:23
**EXAMINATION** [1] - 3915:4
**examined** [1] - 3967:9
**examining** [1] - 3993:5
**example** [5] - 3972:13, 3972:14, 3988:11,

4000:25, 4012:10
**examples** [4] - 3995:6, 3995:10, 3995:11, 3995:13
**Excel** [2] - 3917:8, 3964:11
**except** [3] - 3930:12, 3933:3, 3952:9
**exception** [6] - 4001:12, 4001:15, 4002:13, 4002:19, 4002:22, 4002:23
**exceptions** [12] - 4001:23, 4002:1, 4002:5, 4002:6, 4002:9, 4002:10, 4002:23, 4012:13, 4012:18, 4019:10, 4019:14, 4019:22
**excluded** [1] - 3949:10
**excuse** [5] - 3946:15, 3947:1, 3953:25, 3958:24, 4022:14
**exercise** [11] - 3927:5, 3929:9, 3929:11, 3929:23, 3988:8, 3988:12, 3988:19, 3988:25, 3989:1, 3989:5
**exercising** [1] - 3988:17
**exhaustive** [1] - 3995:3
**Exhibit** [8] - 3917:1, 3917:3, 3917:9, 3917:11, 3926:23, 3993:2, 4018:13
**exhibit** [1] - 3930:11
**exist** [4] - 3944:8, 3989:24, 3990:18, 4019:1
**existed** [7] - 3915:24, 3944:7, 3986:25, 3990:17, 4018:23, 4019:4, 4019:5
**existence** [4] - 3974:1, 3990:1, 3990:6, 3990:21
**exists** [1] - 3961:21
**expect** [2] - 3992:13, 3998:9
**expeditiously** [1] - 3986:7
**expenses** [2] - 3918:24, 3919:1
**experienced** [1] - 3992:7
**expert** [16] - 3930:19, 3930:20, 3945:8,

3945:12, 3947:23, 3968:21, 3968:24, 3969:1, 3969:11, 3975:14, 3985:4, 4006:17, 4007:3, 4007:6, 4007:13

**explain** [6] - 3920:3, 3920:22, 3926:6, 3972:13, 3996:16, 3999:14

**explained** [3] - 3983:25, 3988:7, 4002:4

**explaining** [1] - 3929:6

**explains** [1] - 3924:2

**explanation** [1] - 3962:17

**exposed** [4] - 3942:13, 3960:17, 3963:11, 3963:12

**exposure** [2] - 3987:23, 3988:5

**extent** [1] - 4023:13

**external** [1] - 4006:14

**extra** [1] - 3979:8

**extrapolate** [8] - 3995:17, 3995:22, 3997:15, 4001:8, 4003:18, 4003:20, 4005:23, 4013:19

**extrapolated** [1] - 3999:5

**extrapolating** [1] - 3999:15

**extrapolation** [4] - 3999:2, 4002:21, 4005:8, 4005:9

**extreme** [1] - 3995:25

---

**F**

---

**F4100** [1] - 3993:2

**F4134** [4] - 3924:21, 3924:24, 3926:24

**facility** [2] - 3942:12, 3977:13

**fact** [26] - 3930:13, 3941:20, 3943:17, 3946:8, 3946:16, 3954:3, 3960:11, 3963:4, 3968:21, 3972:8, 3972:17, 3976:6, 3976:22, 3977:9, 3983:20, 3985:20, 3988:8, 3990:17, 3990:19, 3992:4, 3992:11, 3992:15, 3993:24,

3995:18, 4007:25, 4014:4

**factor** [2] - 3983:1, 3984:25

**factors** [4] - 3982:17, 3986:6, 3994:14, 3998:21

**facts** [5] - 3914:18, 3914:20, 3983:17, 3996:16, 3999:3

**fail** [1] - 3955:20

**failed** [1] - 3983:2

**failing** [2] - 3946:20, 3946:22

**fails** [1] - 4010:3

**failure** [7] - 3974:19, 3974:23, 4000:2, 4005:12, 4006:23, 4023:7, 4023:8

**failures** [1] - 3947:6

**fake** [21] - 3924:19, 3958:1, 3958:7, 3958:11, 3958:12, 3958:13, 3958:18, 3958:19, 3958:22, 3976:12, 3979:25, 4010:16, 4014:22, 4015:12, 4015:13, 4015:15, 4015:16, 4015:25, 4016:7

**false** [1] - 3983:18

**falsified** [1] - 3958:17

**falsify** [1] - 3958:18

**falsifying** [1] - 3950:10

**familiar** [2] - 3973:19, 3996:2

**far** [3] - 3980:19, 3985:23, 4011:4

**Farkas** [7] - 3962:1, 3964:18, 3987:19, 3989:8, 4012:3, 4019:23, 4019:25

**Farkas's** [1] - 4012:10

**FAS-140** [3] - 3988:20, 3988:22, 3988:24

**fast** [1] - 4024:23

**favor** [2] - 3923:1, 3924:4

**FCRR** [3] - 3913:23, 4025:6, 4025:13

**FDIC** [44] - 3919:16, 3920:6, 3920:13, 3920:23, 3921:11, 3921:21, 3922:11, 3923:17, 3924:4, 3924:20, 3927:12, 3927:17, 3927:20, 3928:10, 3929:13, 3931:14, 3933:7,

3933:14, 3933:23, 3934:12, 3936:24, 3937:9, 3946:7, 3949:9, 3952:11, 3955:17, 3956:21, 3959:21, 3970:4, 3972:2, 3979:1, 3979:7, 3980:14, 3984:5, 3984:12, 3994:19, 3997:21, 3999:21, 4006:1, 4007:2, 4011:9, 4023:18, 4023:19, 4024:1

**FDIC's** [2] - 3915:3, 3949:21

**February** [7] - 3938:19, 3947:18, 3948:13, 3948:15, 3951:18, 3951:24, 4000:18

**FEDERAL** [3] - 3912:8, 3912:17, 3913:2

**Federal** [1] - 3913:7

**federal** [1] - 3988:18

**fee** [1] - 3993:21

**fellow** [3] - 3940:23, 3972:15, 3980:25

**few** [5] - 3922:23, 3941:24, 3985:21, 4000:24, 4005:13

**fields** [2] - 4003:4

**fifth** [1] - 3922:21

**Fifth** [1] - 3913:8

**fight** [1] - 4007:11

**figure** [7] - 3924:25, 3926:11, 3926:25, 3927:5, 3936:2, 3947:24

**figured** [2] - 3948:25, 4013:3

**figures** [1] - 4005:1

**filed** [5] - 3916:15, 3950:6, 3950:17, 4006:22, 4009:8

**filing** [1] - 3936:24

**filled** [1] - 3954:19

**final** [1] - 3925:18

**finalized** [1] - 3990:21

**finally** [5] - 3946:11, 3963:18, 3964:23, 3967:19, 3990:18

**financial** [4] - 3942:1, 3942:19, 3974:20, 3988:5

**financials** [1] - 3967:4

**findings** [16] - 3915:1, 3928:21, 3930:22, 3935:2, 3935:8,

3935:17, 3936:13, 3936:18, 3937:13, 3985:3, 3985:20, 3990:20, 3994:7, 4001:3, 4006:22, 4024:15

**fine** [3] - 3914:21, 3971:16, 3984:4

**finish** [7] - 3919:11, 3919:12, 3919:13, 3969:10, 3969:16, 3969:25, 3970:14

**finished** [2] - 4007:25, 4024:8

**firms** [1] - 3955:16

**first** [18] - 3917:25, 3924:3, 3934:1, 3945:8, 3946:6, 3946:12, 3951:7, 3963:20, 3964:7, 3972:11, 3978:25, 3984:4, 3986:1, 3987:22, 3991:10, 4005:17, 4007:19, 4012:15

**first-year** [1] - 3972:11

**fishy** [2] - 3984:14, 3994:20

**five** [8] - 3971:4, 3984:25, 3985:18, 3986:6, 3994:8, 3994:10, 3994:14, 3995:13

**fix** [1] - 3917:6

**flat** [1] - 3994:4

**flip** [1] - 4000:5

**Florida** [12] - 3944:18, 3950:7, 3950:9, 3950:13, 3951:12, 4009:8, 4009:10, 4009:19, 4010:17, 4017:12, 4017:13, 4017:21

**flow** [2] - 3954:18, 3997:11

**flowed** [1] - 3976:5

**fly** [1] - 3927:23

**focus** [3] - 3922:24, 3935:11, 3935:13, 3977:25, 3981:12

**focused** [2] - 4000:12, 4000:21

**folks** [2] - 3925:12, 3987:6

**follow** [1] - 4004:2

**followed** [1] - 3947:3

**following** [2] - 3983:17, 4004:4

**Food** [1] - 3973:21

**FOR** [5] - 3912:1,

3912:8, 3912:17, 3913:2, 3913:10

**forced** [1] - 3991:4

**forces** [1] - 4020:14

**foreclosure** [8] - 3915:12, 3915:14, 3915:16, 3915:17, 3915:18, 3915:22, 3915:23, 3925:22

**foregoing** [1] - 4025:7

**forensic** [2] - 3948:23, 3954:12

**foresaw** [2] - 3947:10, 3969:19

**foreseeability** [2] - 3946:15, 3974:8

**foreseeable** [6] - 3945:25, 3946:17, 3946:20, 3946:22, 4010:3, 4010:4

**forged** [1] - 3958:22

**forgot** [1] - 3988:15

**form** [1] - 3948:18

**former** [2] - 3996:7, 3996:17

**Forrester** [1] - 3912:19

**forth** [3] - 3951:23, 3984:13, 3994:19

**forward** [1] - 3914:23

**four** [10] - 3946:5, 3963:18, 3963:20, 3964:7, 3969:13, 3996:20, 3996:25, 3997:2, 3997:16, 4012:15

**fourth** [1] - 3959:19

**fraction** [1] - 3982:10

**frame** [2] - 3990:12, 4000:18

**fraud** [184] - 3926:15, 3931:19, 3932:7, 3938:18, 3938:25, 3939:2, 3939:20, 3941:15, 3942:1, 3943:12, 3943:22, 3944:20, 3944:22, 3945:4, 3945:5, 3945:8, 3945:9, 3945:12, 3945:15, 3945:17, 3945:18, 3945:23, 3945:24, 3946:6, 3946:10, 3946:13, 3946:21, 3946:22, 3946:25, 3947:4, 3947:8, 3947:10, 3947:13, 3948:10, 3949:21, 3949:22, 3949:23, 3950:2, 3950:3,

3950:4, 3950:5, 3950:9, 3951:2, 3951:10, 3951:14, 3951:16, 3951:17, 3951:23, 3952:3, 3952:4, 3953:20, 3954:7, 3954:8, 3954:12, 3954:14, 3954:16, 3954:17, 3954:19, 3955:2, 3955:5, 3955:20, 3955:21, 3955:25, 3956:3, 3956:4, 3956:7, 3956:10, 3956:23, 3957:2, 3957:12, 3957:21, 3957:23, 3957:24, 3958:25, 3959:20, 3959:24, 3960:1, 3960:4, 3960:6, 3960:11, 3960:17, 3960:18, 3961:14, 3962:20, 3963:2, 3963:16, 3964:5, 3964:20, 3964:25, 3965:1, 3965:5, 3966:20, 3967:13, 3967:24, 3968:3, 3968:6, 3968:14, 3968:15, 3968:21, 3968:23, 3968:24, 3969:6, 3969:12, 3969:17, 3970:3, 3972:6, 3974:23, 3974:24, 3975:3, 3977:1, 3977:4, 3977:6, 3978:18, 3978:20, 3979:1, 3979:14, 3979:17, 3979:19, 3979:22, 3980:15, 3980:21, 3981:2, 3981:7, 3981:22, 3982:2, 3982:16, 3983:1, 3983:14, 3983:16, 3983:24, 3984:23, 3985:15, 3986:4, 3987:1, 3987:5, 3987:9, 3987:19, 3989:11, 3989:21, 3991:4, 3991:25, 3992:5, 3992:8, 3992:15, 3994:23, 3995:20, 3995:21, 3998:5, 3998:8, 3998:24, 3999:18, 4000:1, 4002:24, 4005:18, 4005:20, 4007:5, 4008:25, 4009:2, 4009:11, 4009:20, 4009:21,

4009:22, 4009:23, 4009:25, 4010:3, 4010:4, 4010:19, 4010:23, 4011:1, 4011:6, 4011:21, 4011:22, 4012:16, 4014:4, 4014:5, 4014:6, 4014:19, 4020:4
**frauds** [1] - 3954:13
**fraudster** [3] - 3955:4, 3980:23, 3980:25
**fraudsters** [23] - 3939:14, 3944:6, 3945:3, 3945:6, 3947:18, 3950:15, 3951:9, 3951:20, 3954:20, 3955:6, 3957:4, 3961:17, 3962:14, 3968:9, 3968:14, 3968:18, 3989:10, 3991:1, 4010:11, 4014:24, 4015:11, 4016:4, 4017:4
**fraudulent** [20] - 3924:18, 3956:22, 3960:12, 3965:9, 3975:7, 3977:14, 3977:16, 3977:17, 3977:21, 3978:5, 3984:14, 3984:16, 3992:18, 3994:12, 3994:25, 3997:23, 3997:25, 4012:10, 4015:5, 4019:25
**Freddie** [1] - 3948:11
**free** [1] - 3981:8
**frequently** [2] - 4022:10, 4022:12
**Friday** [1] - 3936:14
**front** [2] - 3944:24, 4004:13
**full** [7] - 3953:9, 3962:1, 3962:3, 3983:21, 3995:22, 4003:25, 4025:8
**fully** [1] - 4023:18
**funding** [4] - 3959:2, 4021:9, 4021:14, 4021:15
**Funding** [1] - 3954:7
**funds** [1] - 3919:20
**furthered** [1] - 3983:15
**future** [1] - 3977:1

## G

**Gee** [1] - 3974:14
**general** [2] - 3920:10, 4014:2
**giant** [3] - 3938:25, 4008:25, 4023:11
**gigantic** [1] - 4006:12
**Ginnie** [1] - 3948:10
**given** [1] - 3975:22
**Gkipp@ spotswoodllc.com** [1] - 3913:9
**gladly** [1] - 3971:19
**go..** [1] - 3929:20
**Gonzales** [1] - 3913:21
**goods** [1] - 3972:21
**Google's** [1] - 4023:11
**govern** [1] - 3974:9
**Government** [1] - 4023:17
**GRACE** [1] - 3913:6
**grant** [1] - 3955:17
**granting** [2] - 3916:12, 3974:22
**great** [2] - 3939:2, 3949:22
**greater** [2] - 3954:25, 4020:11
**Gregory** [1] - 3913:21
**grew** [4] - 3945:18, 3945:19, 3954:25
**gross** [1] - 3919:1
**ground** [10] - 3944:9, 3957:6, 3961:18, 3961:22, 3961:24, 3962:11, 3962:13, 3962:15, 4018:24, 4019:4
**group** [2] - 3976:23, 3989:15
**grown** [1] - 3939:1
**guess** [4] - 3927:18, 3975:25, 3977:17, 4016:10
**gun** [1] - 4003:7
**guy** [1] - 3983:13
**guys** [1] - 3937:2

## H

**HAGALE** [1] - 3913:12
**haircut** [1] - 4022:6
**haircuts** [1] - 4022:15
**half** [1] - 4012:17
**hallway** [1] - 4008:17
**handed** [1] - 3930:24

**handful** [5] - 3994:15, 4000:12, 4000:16, 4001:8
**handpicked** [1] - 4000:4
**happily** [1] - 4004:16
**happy** [1] - 3935:17
**hard** [2] - 3954:9, 4000:23
**harder** [2] - 3945:19
**Hardin** [1] - 3912:22
**harm** [1] - 3974:6
**header** [1] - 3917:24
**hear** [12] - 3935:1, 3939:17, 3940:1, 3940:3, 3941:3, 3941:16, 3941:19, 3985:9, 3985:10, 3985:12, 4012:21, 4023:15
**heard** [21] - 3935:19, 3939:9, 3947:20, 3948:22, 3951:2, 3952:8, 3956:9, 3959:4, 3960:10, 3963:7, 3967:19, 3969:2, 3972:2, 3972:10, 3984:1, 3995:2, 3995:11, 4006:13, 4010:15, 4011:2, 4019:9
**hearing** [2] - 3939:21, 3939:22
**Heather** [4] - 3927:13, 3936:6, 3939:21, 3940:4
**HEFTMAN** [9] - 3912:21, 3938:4, 3938:8, 3938:11, 3940:5, 3965:23, 3969:23, 4017:18, 4020:19
**Heftman** [7] - 3971:4, 3987:4, 3992:23, 3993:5, 3993:10, 4019:12, 4022:17
**held** [5] - 3951:12, 3951:13, 3952:12, 3955:19, 4018:5
**help** [1] - 3959:11
**helped** [1] - 3918:25
**helpful** [1] - 3936:11
**Hemisphere** [1] - 3972:23
**hereby** [1] - 4025:6
**Herman** [1] - 3913:13
**hidden** [15] - 3939:14, 3949:9, 3956:20, 3956:25, 3960:4, 3960:8, 3960:9,

3960:15, 3969:18, 4010:7, 4010:10, 4010:13, 4010:14, 4014:5, 4014:22
**hide** [4] - 3956:7, 3983:19, 3986:17, 3986:19
**hides** [1] - 3960:5
**hiding** [3] - 3957:22, 3983:12, 3987:7
**higher** [3] - 3943:8, 4006:10, 4013:23
**highjacked** [2] - 3953:17, 3958:4
**highlight** [1] - 4020:6
**highlighted** [1] - 3922:23
**highly** [1] - 4003:22
**hit** [1] - 4023:3
**Hoard** [1] - 3913:3
**hold** [2] - 3925:24, 3942:15
**holding** [1] - 3997:13
**hole** [2] - 3945:21, 3954:25
**home** [1] - 3970:11
**Honor** [91] - 3914:12, 3914:16, 3918:9, 3919:14, 3919:25, 3923:9, 3925:24, 3926:2, 3929:5, 3932:2, 3932:21, 3933:22, 3934:8, 3934:16, 3934:19, 3935:6, 3935:14, 3935:25, 3936:13, 3937:14, 3938:8, 3938:11, 3938:13, 3938:16, 3940:7, 3940:16, 3943:4, 3946:4, 3946:14, 3946:16, 3946:19, 3946:25, 3947:1, 3947:3, 3947:12, 3948:22, 3951:12, 3952:3, 3952:5, 3952:11, 3952:24, 3953:25, 3955:8, 3955:24, 3964:23, 3965:24, 3967:10, 3968:17, 3968:25, 3969:6, 3969:10, 3969:12, 3969:22, 3969:23, 3970:9, 3970:16, 3970:17, 3971:10, 3972:1, 3973:19, 3973:25, 3975:25, 3977:7, 3978:12, 3978:21, 3985:2, 3985:8,

3987:11, 3988:21, 4000:9, 4001:2, 4001:13, 4007:19, 4008:1, 4008:7, 4008:16, 4008:21, 4009:12, 4010:2, 4014:1, 4019:11, 4020:21, 4021:9, 4021:16, 4023:2, 4023:19, 4024:3, 4024:7, 4024:25, 4025:1, 4025:2

**Honor's** [2] - 3960:8, 4011:12

**HONORABLE** [1] - 3912:14

**hope** [1] - 3999:23

**hoping** [1] - 3970:14

**HORWATH** [2] - 3912:6, 3912:11

**Hosein** [2] - 3980:22, 3983:13

**hour** [1] - 3970:12

**hours** [5] - 3948:23, 3967:20, 3968:2, 3995:12, 3998:14

**House** [1] - 3973:1

**household** [1] - 3996:3

**housing** [3] - 3966:4, 3974:25, 3977:2

**Hubbard** [1] - 3913:14

**huge** [1] - 4020:16

**hundreds** [2] - 3949:12, 3968:2

**hurting** [1] - 3980:16

## I

**iceberg** [1] - 3957:1

**idea** [9] - 3914:4, 3945:13, 3945:15, 3956:9, 3956:10, 4003:10, 4020:13, 4020:25

**identified** [4] - 3947:12, 4015:5, 4015:10, 4015:11

**identify** [1] - 4012:14

**iffy** [1] - 3995:7

**ignore** [2] - 4003:14, 4009:1

**ignored** [3] - 3977:8, 3977:9, 4008:23

**IL** [2] - 3912:23, 3913:15

**illegitimate** [3] - 3951:17, 3954:2, 3969:16

**illustrate** [1] - 4012:4

**impaired** [30] - 3953:5, 3960:9, 3976:13, 3976:18, 3976:20, 3976:25, 3977:21, 3978:9, 3979:2, 3979:25, 3981:7, 3981:25, 3983:8, 3983:9, 3984:22, 3986:12, 3986:22, 3991:3, 3991:16, 3992:7, 3992:15, 3992:19, 3994:11, 3994:12, 3994:24, 3995:19, 3995:20, 3999:17

**impairment** [11] - 3978:1, 3986:16, 3986:25, 3987:8, 3991:18, 3991:20, 3991:21, 3992:10, 3994:22, 3998:16

**important** [11] - 3963:8, 3965:14, 3974:11, 3974:13, 3980:13, 3986:3, 3986:15, 3988:13, 3997:13, 4003:15, 4006:17

**impossible** [1] - 4024:19

**improper** [1] - 3983:12

**improperly** [2] - 3996:24, 3997:3

**INC** [1] - 3912:3

**inception** [4] - 3952:20, 3953:10, 3953:22, 4013:15

**incidentally** [1] - 4003:19

**include** [7] - 3919:21, 3936:16, 3936:17, 3979:2, 3980:15, 4003:4, 4005:18

**included** [7] - 3919:4, 3919:25, 3924:8, 3932:11, 3949:7, 4013:24, 4014:8

**including** [8] - 3916:6, 3921:22, 3960:14, 3976:3, 3976:22, 3979:17, 4015:6, 4015:7

**income** [3] - 3939:6, 3967:4, 3967:5

**inconsistent** [1] - 3974:8

**increased** [1] - 3943:16

**incurred** [2] - 3924:20, 4000:19

**independent** [5] - 3952:2, 3956:5, 3959:19, 3959:20, 3969:13

**indicate** [1] - 4002:24

**indicated** [2] - 3934:25, 3998:24

**indicates** [1] - 4002:14

**indication** [2] - 4002:5, 4003:17

**indicator** [4] - 3960:18, 3964:5, 4014:5, 4020:3

**indicators** [3] - 3954:11, 3954:14, 3954:17

**indicia** [13] - 3960:6, 3960:11, 3985:18, 3988:25, 3989:10, 3991:23, 3991:25, 3994:9, 3994:10, 4012:14, 4012:15, 4014:4, 4014:21

**individual** [8] - 3921:25, 3924:11, 3931:12, 3995:16, 3999:3, 3999:4, 4000:4, 4017:23

**individually** [1] - 3994:9

**inevitably** [1] - 3999:15

**infected** [1] - 3945:17

**influences** [1] - 3974:25

**information** [3] - 3917:16, 3958:11, 4006:15

**initial** [4] - 3959:2, 4021:9, 4021:14, 4021:15

**innocent** [1] - 3986:18

**inside** [1] - 4004:10

**insider** [1] - 3951:19

**insisted** [1] - 3980:22

**instance** [1] - 3983:3

**instead** [9] - 3942:6, 3956:8, 3956:20, 3969:17, 3973:22, 3985:21, 3989:8, 4003:24, 4016:3

**institution** [1] - 3960:24

**INSURANCE** [3] - 3912:8, 3912:17, 3913:2

**interest** [3] - 3914:16,

3924:3, 3950:24

**interesting** [1] - 4024:1

**interests** [2] - 4017:23, 4021:1

**interference** [2] - 3980:17, 3985:10

**internal** [1] - 4006:14

**intimidated** [1] - 3989:7

**invalidated** [1] - 3920:12

**investigate** [1] - 3945:4

**investigated** [1] - 3916:4

**investigation** [1] - 4014:21

**investigations** [1] - 3945:9

**investor** [12] - 3963:5, 3963:8, 3963:13, 3991:24, 3992:1, 3992:2, 3992:5, 3992:11, 3992:17, 4016:9, 4016:15, 4018:3

**investors** [4] - 3942:14, 3958:9, 4017:25

**involved** [2] - 3945:9, 3977:10

**involves** [2] - 3982:10, 3995:8

**isolate** [2] - 3965:15, 3966:10

**isolated** [1] - 4013:5

**isolation** [1] - 4008:23

**issue** [8] - 3923:4, 3935:16, 3939:8, 3956:1, 3967:9, 3987:13, 3988:22, 4009:6

**issues** [3] - 3940:15, 3962:10, 4008:23

**items** [7] - 3921:23, 3921:25, 3931:12, 3946:5, 4005:23, 4005:24

**itself** [5] - 3973:9, 3974:24, 3978:19, 3987:8, 3993:8

## J

**JACOBS** [1] - 3912:14

**JAMESON** [1] - 3913:13

**job** [6] - 3945:22,

3924:3, 3950:24

**interesting** [1] - 4024:1

3982:14, 3982:15, 4005:8, 4005:10, 4005:11

**joint** [1] - 4024:4

**JONES** [1] - 3913:13

**judge** [1] - 3999:23

**JUDGE** [1] - 3912:15

**judgment** [2] - 3970:4, 3980:11

**junk** [52] - 3924:18, 3943:22, 3944:1, 3944:3, 3944:9, 3944:13, 3944:19, 3944:22, 3944:25, 3948:2, 3948:4, 3950:5, 3950:11, 3950:20, 3951:2, 3951:6, 3951:10, 3952:16, 3955:11, 3956:2, 3956:7, 3957:9, 3959:24, 3959:25, 3960:4, 3960:7, 3960:16, 3961:8, 3961:22, 3962:1, 3962:3, 3962:4, 3962:15, 3968:6, 3968:20, 3969:19, 3979:4, 3979:5, 3979:7, 3979:9, 3979:11, 3989:11, 3991:24, 4009:5, 4009:10, 4009:19, 4010:6, 4011:11, 4011:16, 4011:18, 4015:11, 4021:1

**justify** [1] - 4013:24

## K

**keep** [5] - 3938:3, 3957:11, 4000:14, 4008:9, 4010:14

**keeping** [3] - 3945:18, 3956:19, 3965:22

**Kelly** [5] - 3950:21, 3958:17, 3961:23, 3962:9, 3990:7

**Kelly's** [1] - 3951:9

**KENNETH** [1] - 3915:3

**kept** [1] - 3958:15

**KEVIN** [1] - 3912:4

**key** [3] - 3979:14, 3983:17, 4013:10

**kind** [18] - 3917:6, 3935:5, 3974:1, 3974:5, 3978:17, 3979:4, 3980:12, 3994:8, 3995:15, 3998:9, 3999:13,

3999:25, 4001:20, 4002:1, 4002:13, 4002:23, 4004:18, 4005:22
**kinds** [1] - 3964:4
**King** [1] - 3913:18
**KIPP** [1] - 3913:6
**Kissick** [17] - 3944:8, 3950:21, 3951:8, 3953:16, 3955:2, 3956:7, 3956:19, 3959:17, 3960:17, 3961:19, 3987:20, 3988:7, 3988:16, 3989:6, 4018:8, 4018:23, 4020:7
**Kissick's** [2] - 3957:21, 3988:14
**knowledge** [2] - 3933:7, 3933:11
**known** [2] - 3931:11, 3931:12
**knows** [2] - 3989:3, 4007:11
**KPMG** [1] - 3974:14

## L

**labeled** [1] - 4017:6
**LANDGRAFF** [1] - 3913:11
**language** [2] - 3973:23, 4010:18
**large** [2] - 3976:23, 3998:18
**largest** [2] - 3947:13, 3980:22
**last** [10] - 3917:19, 3918:19, 3932:5, 3934:10, 3952:9, 3992:20, 4000:13, 4011:14, 4023:2, 4024:17
**laughter** [3] - 3934:24, 3940:11, 4004:12
**law** [6] - 3936:14, 3946:14, 3949:2, 3972:12, 3973:19, 3982:12
**LAWRENCE** [1] - 3912:21
**lawyer** [1] - 3984:4
**lawyers** [3] - 3980:11, 3981:5, 4007:2
**leading** [2] - 3989:22, 3989:23
**learned** [3] - 3918:10, 3968:13, 4024:17
**least** [2] - 3943:18,

4007:13
**leaves** [1] - 3931:2
**led** [1] - 4007:5
**Lee** [6] - 3962:1, 3964:18, 4012:3, 4012:10, 4019:23, 4019:25
**left** [5] - 4003:15, 4007:20, 4007:22, 4015:7, 4024:12
**legal** [3] - 3915:2, 3930:19, 3930:23
**legitimate** [44] - 3921:22, 3939:10, 3941:24, 3943:6, 3943:18, 3945:16, 3945:20, 3950:12, 3951:19, 3952:22, 3954:9, 3955:4, 3960:5, 3960:20, 3965:4, 3965:5, 3965:16, 3965:19, 3966:5, 3966:12, 3966:15, 3966:21, 3967:2, 3975:19, 3975:22, 3975:25, 3976:4, 3976:16, 3976:23, 3977:3, 3977:11, 3980:5, 3992:6, 3992:18, 3993:20, 3999:20, 4012:5, 4012:25, 4013:4, 4017:5, 4020:14, 4020:23, 4021:3
**legs** [1] - 3971:17
**Lehn** [28] - 3939:17, 3941:2, 3941:9, 3941:16, 3941:20, 3942:5, 3942:18, 3942:21, 3943:19, 3944:17, 3948:16, 3951:1, 3952:19, 3956:10, 3960:13, 3964:24, 3966:1, 3966:19, 3967:20, 3968:3, 3972:8, 3983:25, 3993:5, 3993:16, 3995:3, 4002:4, 4019:9
**Lehn's** [1] - 3992:22
**lender** [4] - 3942:12, 3953:18, 3963:10, 4020:13
**lenders** [5] - 3957:7, 3957:8, 3957:19, 3960:20, 4021:3
**lending** [21] - 3941:25, 3942:11, 3943:2, 3943:12, 3943:17,

3947:14, 3953:17, 3957:14, 3958:5, 3965:4, 3965:13, 3966:11, 3966:22, 3966:24, 3967:5, 3967:6, 3967:8, 3967:12, 4013:1, 4013:4, 4020:10
**length** [1] - 3960:3
**less** [3] - 3984:6, 4022:15, 4022:16
**lesson** [1] - 4024:17
**let's..** [1] - 3940:4
**level** [4] - 3946:8, 3985:24, 4013:11, 4013:12
**Levine** [5] - 3915:6, 3935:1, 3990:4, 3990:15, 3991:8
**LEVINE** [41] - 3913:11, 3914:12, 3914:16, 3914:25, 3917:3, 3918:6, 3921:19, 3921:20, 3923:9, 3925:20, 3925:23, 3926:2, 3926:5, 3926:10, 3926:14, 3926:18, 3926:21, 3926:22, 3928:14, 3928:16, 3928:23, 3929:4, 3929:7, 3929:18, 3929:21, 3930:2, 3930:7, 3930:8, 3931:21, 3932:4, 3932:15, 3932:20, 3934:16, 3935:6, 3935:11, 3935:25, 3936:12, 3937:1, 3937:8, 3937:14, 4025:2
**lheftman@ schiffhardin.com** [1] - 3912:24
**liability** [21] - 3938:16, 3952:5, 3960:10, 3963:7, 3975:16, 3978:20, 3979:6, 3979:12, 3979:16, 3980:10, 3980:24, 3981:6, 3981:11, 3985:6, 3996:22, 3998:12, 4005:17, 4007:6, 4011:19, 4013:20, 4024:4
**Liability** [4] - 3946:19, 3947:12, 3973:25, 4011:14
**liable** [2] - 3946:1, 3955:20
**lie** [2] - 3958:8,

3968:23
**lied** [3] - 3957:25, 3958:1
**life** [1] - 3982:8
**line** [10] - 3932:2, 3942:17, 3959:5, 3959:8, 3959:10, 3962:23, 3975:23, 4019:6, 4019:7, 4022:4
**lines** [5] - 3962:5, 3962:8, 3962:22, 3962:25, 4009:17
**link** [1] - 3975:3
**liquidated** [1] - 3923:13
**list** [14] - 3916:25, 3917:22, 3924:14, 3924:23, 3924:24, 3925:21, 3925:23, 3926:3, 3926:4, 3926:5, 3926:6, 3989:10, 4015:21, 4015:23
**listed** [3] - 3917:16, 3918:21, 3939:13
**listen** [1] - 3921:7
**listening** [1] - 3940:20
**lists** [2] - 3924:11, 3926:23
**literally** [1] - 3933:23
**live** [1] - 4005:24
**LLP** [10] - 3912:6, 3912:6, 3912:10, 3912:11, 3912:19, 3912:22, 3913:3, 3913:10, 3913:13, 3913:18
**loan** [44] - 3915:18, 3915:19, 3915:20, 3915:22, 3915:23, 3947:13, 3950:10, 3950:11, 3953:1, 3953:4, 3956:3, 3959:6, 3960:4, 3964:21, 3968:6, 3968:23, 3975:8, 3975:18, 3981:20, 3982:23, 3983:8, 3986:25, 3987:2, 3989:1, 3991:15, 3991:25, 3992:4, 3992:11, 3992:16, 3992:17, 3993:11, 3994:11, 3998:6, 3998:14, 4001:14, 4007:4, 4011:7, 4015:7, 4016:9, 4018:2, 4022:5
**loans** [224] - 3915:12,

3915:13, 3915:16, 3915:24, 3916:2, 3921:4, 3921:11, 3921:15, 3921:22, 3922:3, 3923:16, 3923:19, 3923:21, 3923:24, 3924:3, 3924:11, 3924:15, 3924:18, 3924:23, 3924:25, 3925:9, 3925:10, 3925:14, 3925:21, 3926:5, 3926:24, 3928:8, 3930:15, 3931:19, 3932:6, 3932:10, 3939:10, 3939:13, 3943:22, 3944:1, 3944:4, 3944:10, 3944:13, 3944:19, 3944:22, 3944:25, 3948:2, 3948:4, 3948:5, 3948:20, 3949:7, 3949:8, 3949:9, 3950:5, 3950:10, 3950:20, 3950:21, 3951:2, 3951:6, 3951:10, 3952:16, 3952:20, 3952:22, 3953:20, 3954:4, 3955:10, 3955:11, 3955:12, 3956:7, 3956:20, 3957:9, 3957:14, 3958:1, 3958:3, 3958:5, 3959:16, 3959:18, 3959:24, 3959:25, 3960:5, 3960:7, 3960:9, 3960:14, 3960:16, 3960:21, 3960:22, 3960:25, 3961:4, 3961:8, 3961:13, 3961:18, 3961:22, 3962:4, 3962:10, 3962:15, 3962:25, 3963:3, 3963:14, 3963:19, 3963:20, 3963:24, 3964:3, 3964:6, 3965:9, 3965:10, 3967:16, 3967:17, 3968:20, 3969:17, 3969:19, 3975:13, 3975:19, 3975:24, 3976:16, 3976:17, 3976:23, 3978:2, 3982:3, 3982:4, 3982:7, 3982:11, 3982:13, 3982:15, 3982:20, 3982:23, 3982:25, 3983:6, 3983:12,

3984:5, 3984:8, 3984:13, 3986:17, 3987:7, 3987:19, 3988:4, 3988:10, 3988:11, 3991:9, 3991:24, 3992:6, 3992:14, 3994:16, 3994:20, 3994:24, 3995:5, 3995:16, 3995:19, 3995:20, 3995:23, 3997:24, 3998:3, 3998:15, 3999:4, 3999:8, 3999:10, 3999:17, 3999:19, 3999:23, 3999:24, 4000:4, 4000:6, 4000:8, 4000:12, 4000:20, 4001:8, 4001:23, 4005:13, 4005:15, 4005:17, 4006:4, 4006:19, 4007:7, 4007:16, 4007:18, 4009:6, 4009:10, 4009:20, 4010:6, 4010:9, 4010:20, 4010:22, 4010:25, 4011:11, 4011:16, 4011:18, 4012:1, 4012:3, 4012:6, 4012:10, 4012:15, 4013:13, 4014:25, 4015:1, 4015:4, 4015:11, 4016:2, 4016:5, 4016:14, 4016:22, 4016:24, 4017:1, 4017:5, 4017:16, 4017:24, 4019:19, 4020:2, 4020:4, 4020:8, 4020:12, 4020:22, 4021:1, 4021:4, 4021:5, 4021:6, 4022:9, 4022:13, 4022:17, 4022:20, 4022:21

**logic** [1] - 3993:14
**long-term** [1] - 3942:13
**look** [26] - 3916:18, 3916:22, 3917:19, 3922:10, 3922:21, 3924:21, 3942:18, 3945:1, 3950:11, 3952:10, 3953:15, 3954:13, 3966:15, 3966:21, 3971:8, 3990:13, 3990:15, 4000:13, 4001:1, 4003:3, 4014:15, 4015:25, 4019:13,

4019:22, 4020:7, 4022:21
**looked** [7] - 3922:20, 3924:10, 3943:23, 3954:15, 3963:21, 4000:23, 4001:22
**looking** [4] - 3925:20, 3945:5, 3954:13, 3966:23
**looks** [1] - 3914:4
**Lords** [1] - 3973:1
**Lori** [1] - 3913:21
**lose** [3] - 3982:9, 3987:23, 4013:4
**losing** [1] - 3951:25
**loss** [33] - 3924:20, 3931:19, 3938:21, 3939:20, 3941:13, 3941:15, 3949:10, 3952:4, 3953:14, 3953:16, 3956:18, 3956:21, 3959:21, 3966:20, 3966:21, 3975:4, 3977:5, 3978:18, 3981:21, 3982:1, 3983:7, 3986:14, 3986:20, 4007:7, 4009:22, 4009:23, 4009:25, 4011:9, 4021:6, 4023:20, 4023:21
**losses** [34] - 3926:15, 3932:7, 3932:10, 3941:19, 3941:24, 3946:10, 3946:11, 3946:17, 3947:17, 3948:6, 3949:22, 3950:2, 3950:3, 3950:4, 3951:16, 3952:3, 3954:16, 3955:16, 3955:18, 3955:21, 3955:25, 3964:25, 3965:1, 3965:20, 3967:15, 3969:12, 3970:3, 3974:17, 3974:24, 4010:6, 4014:20, 4021:11, 4021:17
**lost** [6] - 3946:18, 3955:1, 3977:4, 3981:21, 3982:1, 3984:9
**Loth** [2] - 3913:23, 4025:13
**LOTH** [1] - 4025:6
**lucky** [3] - 3973:15, 3973:17, 3974:5
**lunch** [2] - 3970:12, 3970:15
**Lynn** [1] - 3914:3

## M

**Mac** [1] - 3948:11
**machine** [1] - 3913:24
**Madison** [1] - 3996:5
**Mae** [1] - 3948:10
**magically** [1] - 3956:12
**mail** [1] - 3960:20
**main** [1] - 3914:2
**majority** [4] - 3944:15, 3962:6, 3977:11, 3982:7
**Malek** [84] - 3914:11, 3914:13, 3915:5, 3918:9, 3926:16, 3932:24, 3934:11, 3934:17, 3941:7, 3941:23, 3942:19, 3942:21, 3942:24, 3942:25, 3946:9, 3947:17, 3947:20, 3948:22, 3949:4, 3949:17, 3954:1, 3954:4, 3954:11, 3957:1, 3960:3, 3960:19, 3961:1, 3961:11, 3961:25, 3962:17, 3963:16, 3964:19, 3965:3, 3965:18, 3966:12, 3966:17, 3967:2, 3967:9, 3967:25, 3968:2, 3969:2, 3969:5, 3969:8, 3970:2, 3972:3, 3975:5, 3975:12, 3976:3, 3976:22, 3977:8, 3977:23, 3979:13, 3983:15, 3983:25, 3984:19, 3985:1, 3987:14, 3988:2, 3988:14, 3989:12, 3989:18, 3990:4, 3990:7, 3990:25, 3992:13, 3992:21, 3995:2, 3995:21, 3998:13, 4000:4, 4011:2, 4012:13, 4012:23, 4013:8, 4013:21, 4014:20, 4015:3, 4015:23, 4018:20, 4019:1, 4019:2, 4022:2, 4022:8, 4022:16
**malek** [2] - 4000:19, 4012:24
**MALEK** [1] - 3915:3

**Malek's** [5] - 3977:12, 3985:15, 3989:6, 3994:10, 4001:16
**malpractice** [1] - 4006:9
**manage** [1] - 3965:6
**managed** [1] - 3989:8
**management** [1] - 4010:14
**managing** [1] - 3988:4
**marbury** [1] - 3996:5
**March** [3] - 3912:6, 3942:4, 4025:12
**margin** [9] - 3987:22, 3987:24, 3987:25, 3988:3, 3989:9, 4021:23, 4021:24, 4022:6, 4022:18
**MARK** [1] - 3913:11
**mark.levine@bartlit** [1] - 3913:16
**mark.levine@bartlit-beck.com** [1] - 3913:16
**market** [3] - 3942:18, 3975:1, 4020:15
**marketplace** [1] - 4002:17
**markings** [1] - 3964:9
**marks** [1] - 3964:4
**MARTINEZ** [1] - 3913:12
**massive** [3] - 3965:1, 4011:1, 4011:3
**math** [5] - 3927:19, 3928:20, 3930:9, 3931:3, 4004:16
**mathematical** [3] - 3929:9, 3929:11, 3929:23
**mathematically** [2] - 3930:5, 3932:9
**matter** [8] - 3926:13, 3944:23, 3953:9, 3953:15, 3953:23, 3993:14, 4021:10
**matters** [1] - 3980:10
**MDAL** [1] - 3914:8
**mean** [18] - 3914:25, 3917:25, 3921:12, 3933:1, 3935:4, 3935:23, 3948:1, 3958:10, 3977:7, 3981:17, 3986:20, 3987:8, 3992:11, 3995:20, 4014:12, 4016:8, 4016:9, 4023:20
**meaningfully** [1] - 4023:1

**means** [8] - 3927:19, 3928:3, 3959:5, 3970:18, 3981:15, 3999:24, 4012:12, 4019:16
**meant** [1] - 3948:1
**meanwhile** [1] - 3977:20
**measured** [1] - 3976:15
**mechanism** [1] - 3988:5
**meet** [1] - 4024:19
**meeting** [1] - 3915:7
**memorandum** [2] - 3935:15, 3935:18
**mention** [1] - 4009:5
**mentioned** [1] - 3927:9
**mentioning** [1] - 3936:17
**MEREDITH** [1] - 3913:17
**merger** [4] - 3974:16, 3974:19, 4021:22
**Mesirow** [2] - 3958:20, 4016:15
**met** [3] - 3969:4, 3984:15, 3994:23
**method** [1] - 4005:10
**meticulous** [2] - 3949:14, 4015:9
**mic** [2] - 3939:23, 3940:10
**microphone** [2] - 3937:22, 3940:15
**middle** [2] - 3953:10, 3990:23
**MIDDLE** [1] - 3912:1
**might** [5] - 3935:10, 3940:10, 3979:8, 3992:11, 3995:18
**million** [61] - 3916:3, 3918:5, 3918:21, 3918:25, 3919:23, 3920:2, 3920:11, 3920:15, 3920:19, 3923:6, 3923:12, 3924:8, 3925:8, 3928:16, 3928:18, 3928:22, 3930:3, 3931:1, 3931:3, 3933:20, 3934:2, 3935:23, 3936:10, 3936:25, 3939:1, 3939:13, 3941:6, 3943:9, 3945:15, 3946:1, 3948:14, 3949:18, 3950:1, 3954:22, 3959:22,

4038

3970:4, 3976:8, 3977:15, 3978:2, 3982:19, 3997:24, 4000:24, 4003:23, 4003:25, 4004:16, 4004:19, 4004:22, 4005:2, 4005:5, 4005:6, 4005:13, 4006:2, 4006:3, 4006:6, 4006:8, 4020:22, 4021:1

**mind** [2] - 3931:25, 3989:7

**mine** [1] - 4001:10

**minimal** [1] - 3967:25

**minimize** [1] - 3987:23

**minute** [2] - 3958:7, 3993:4

**minutes** [8] - 3918:7, 3938:1, 3952:9, 3965:23, 3970:8, 3971:4, 4008:10, 4020:19

**misrepresentation** [8] - 3972:16, 3972:19, 3972:25, 3973:2, 3973:7, 3973:8, 3973:9, 3973:14

**misspoke** [2] - 3921:13, 3991:14

**misstated** [1] - 3974:19

**mistake** [2] - 3990:18, 3992:21

**mistaken** [1] - 3995:13

**mistakes** [1] - 3985:22

**misunderstanding** [1] - 3995:8

**mmoss@kslaw.com** [1] - 3913:20

**moment** [2] - 3953:4, 3956:14

**money** [50] - 3931:14, 3949:6, 3951:20, 3951:22, 3951:25, 3953:12, 3953:21, 3953:24, 3954:8, 3954:20, 3954:21, 3955:7, 3955:14, 3956:16, 3957:10, 3957:15, 3957:16, 3958:4, 3958:6, 3959:1, 3959:7, 3959:9, 3959:14, 3959:16, 3961:5, 3961:6, 3961:7, 3961:15, 3964:22, 3967:17, 3976:7, 3976:8, 3976:17,

3980:2, 3980:7, 3980:8, 3981:16, 3982:8, 3984:22, 4006:7, 4006:11, 4011:4, 4013:4, 4015:2, 4016:14, 4022:6, 4022:7, 4022:14, 4022:18, 4024:2

**moneys** [1] - 3939:5

**Montgomery** [1] - 3979:9

**months** [8] - 3922:17, 3922:19, 3950:17, 3956:15, 4002:7, 4002:11, 4002:16, 4003:11

**monumental** [1] - 4023:8

**morning** [7] - 3914:2, 3915:5, 3915:6, 3975:6, 3977:11, 3998:2, 4003:3

**mortgage** [42] - 3941:13, 3941:24, 3942:3, 3942:7, 3942:9, 3942:13, 3942:14, 3942:16, 3943:1, 3943:12, 3943:17, 3947:14, 3953:17, 3957:14, 3958:4, 3959:13, 3963:9, 3963:11, 3963:13, 3965:4, 3965:12, 3966:11, 3966:21, 3967:4, 3967:6, 3967:8, 3967:11, 3977:18, 3981:24, 3983:9, 3983:21, 3986:11, 3989:20, 3993:22, 4002:14, 4003:11, 4012:25, 4013:4, 4017:23, 4020:9, 4021:7

**mortgage-backed** [1] - 3942:9

**mortgages** [55] - 3917:15, 3917:17, 3974:23, 3975:1, 3975:4, 3975:19, 3975:20, 3976:5, 3976:9, 3976:11, 3976:12, 3976:15, 3977:11, 3977:14, 3977:15, 3977:21, 3978:4, 3978:22, 3978:23, 3979:2, 3979:11, 3979:21, 3979:23, 3979:24,

3980:3, 3980:6, 3980:16, 3980:19, 3980:20, 3981:8, 3984:20, 3986:22, 3987:16, 3987:18, 3989:15, 3989:16, 3989:17, 3989:18, 3990:2, 3990:22, 3991:1, 3991:2, 3991:4, 3991:6, 3993:18, 3993:19, 3993:20, 3993:24, 3994:1, 4001:25, 4003:5, 4003:6, 4003:13, 4004:20, 4011:17

**MOSS** [1] - 3913:17

**most** [7] - 3914:22, 3934:21, 3935:22, 3947:7, 3988:13, 4002:22, 4012:9

**motion** [3] - 3916:7, 3922:10, 3922:19

**motive** [1] - 3983:16

**motives** [1] - 3940:12

**move** [3] - 3917:3, 3979:8, 3984:25

**moved** [4] - 3977:18, 4014:10, 4014:11, 4014:16

**moving** [1] - 3948:21

**MR** [125] - 3914:12, 3914:16, 3914:25, 3917:3, 3918:6, 3918:9, 3921:19, 3921:20, 3923:9, 3925:20, 3925:23, 3926:2, 3926:5, 3926:10, 3926:14, 3926:18, 3926:21, 3926:22, 3928:14, 3928:16, 3928:23, 3929:2, 3929:4, 3929:7, 3929:18, 3929:21, 3930:2, 3930:7, 3930:8, 3931:21, 3932:4, 3932:15, 3932:20, 3932:21, 3932:23, 3934:9, 3934:15, 3934:16, 3935:6, 3935:11, 3935:13, 3935:21, 3935:25, 3936:12, 3937:1, 3937:8, 3937:11, 3937:14, 3937:16, 3937:21, 3937:25, 3938:4, 3938:8, 3938:11, 3938:12, 3938:15, 3940:3,

3940:5, 3940:7, 3940:12, 3940:16, 3940:23, 3941:2, 3952:24, 3958:12, 3958:22, 3965:23, 3966:1, 3969:22, 3969:23, 3969:25, 3970:2, 3970:9, 3970:16, 3970:17, 3970:20, 3970:25, 3971:6, 3971:10, 3971:14, 3971:17, 3971:23, 3972:1, 3975:24, 3978:11, 3978:15, 3996:4, 3996:9, 3996:13, 4004:4, 4004:6, 4004:10, 4004:14, 4005:2, 4008:1, 4008:3, 4008:6, 4008:11, 4008:16, 4008:21, 4014:1, 4014:9, 4014:11, 4014:13, 4014:18, 4015:17, 4016:10, 4016:19, 4017:2, 4017:8, 4017:18, 4017:19, 4020:19, 4020:20, 4021:23, 4021:25, 4022:2, 4022:11, 4023:19, 4024:3, 4024:7, 4024:9, 4024:25, 4025:1, 4025:2

**MULLIN** - 3913:2, 4008:16

**Mullin** [2] - 3913:3, 3979:7

**multiple** [2] - 3947:6, 3958:22

**multiply** [1] - 3930:10

**multiplying** [1] - 3931:6

**must** [5] - 3976:20, 3977:18, 3993:14, 3997:16, 3999:24

**mute** [2] - 3940:17, 3940:25

**Mutual** [2] - 3960:21, 3960:24

---

## N

**name** [1] - 3996:1

**named** [1] - 4007:3

**National** [1] - 3913:3

**native** [1] - 3964:11

**near** [1] - 3995:25

**need** [11] - 3914:24, 3921:7, 3927:25,

3928:10, 3937:21, 3939:22, 3947:23, 3978:19, 3979:8, 4008:4, 4008:8

**needed** [3] - 3943:1, 3951:25, 4007:23

**needs** [2] - 4013:6, 4013:18

**negligence** [6] - 3945:25, 3946:6, 3946:13, 3946:20, 4007:9, 4010:1

**negligent** [5] - 3938:17, 3938:18, 3947:22, 3949:18, 3955:19

**net** [5] - 3916:2, 3918:23, 3920:2, 3939:6, 4004:18

**netted** [1] - 3925:8

**never** [25] - 3931:24, 3934:22, 3944:24, 3947:7, 3948:19, 3955:3, 3956:24, 3963:3, 3963:4, 3963:6, 3972:20, 3972:24, 3974:15, 3992:6, 3992:7, 4006:10, 4006:21, 4006:22, 4010:9, 4010:14, 4016:7, 4021:2, 4022:25

**nevertheless** [1] - 3995:15

**new** [1] - 3940:21

**news** [1] - 3988:21

**next** [4] - 3928:19, 3936:14, 3987:10, 4024:15

**nice** [1] - 4014:14

**nicely** [1] - 3930:24

**NICOLAS** [1] - 3913:12

**night** [1] - 4000:13

**nights** [1] - 3927:13

**nine** [3] - 3922:17, 3922:19, 3951:5

**nobody** [1] - 3979:11

**non** [3] - 3915:19, 3965:9, 3992:15

**non-fraud** [1] - 3992:15

**non-fraudulent** [1] - 3965:9

**non-REO** [1] - 3915:19

**noncompetition** [1] - 3996:18

**none** [8] - 3933:10, 3948:5, 3948:20,

3977:16, 3977:22,
3999:12, 4016:22
**nonexistent** [1] -
3981:20
**nonsolicitation** [1] -
3996:18
**noon** [1] - 3937:19
**normal** [5] - 3953:18,
3957:13, 3986:21,
3992:10, 3994:13
**normally** [1] - 3957:13
**North** [1] - 3913:8
**Northern** [1] - 3972:23
**NORTHERN** [1] -
3912:2
**not-legitimate** [1] -
3967:2
**notarized** [1] -
4002:25
**note** [2] - 3944:3,
3952:5
**noted** [3] - 3941:5,
3950:19, 3960:8
**notes** [2] - 3938:10,
4025:8
**nothing** [16] - 3933:2,
3934:16, 3945:20,
3947:15, 3968:17,
3973:9, 3977:1,
3977:4, 3982:18,
3984:23, 3986:15,
3999:7, 3999:18,
4005:14, 4005:21,
4010:12
**noticed** [1] - 4009:4
**notion** [1] - 3984:7
**November** [2] -
3916:20, 4000:17
**nowhere** [1] - 3995:25
**number** [13] - 3914:6,
3917:15, 3925:16,
3929:16, 3958:15,
3986:2, 3986:8,
3986:13, 3989:10,
3998:18, 4008:22,
4015:18
**numbers** [12] -
3917:25, 3924:6,
3925:17, 3927:4,
3939:4, 3958:18,
4000:24, 4001:13,
4015:20, 4016:18,
4016:20
**NW** [1] - 3913:18

## O

**o'clock** [1] - 3970:11
**O'HALLORAN** [1] -

3912:4
**oath** [1] - 3914:14
**objected** [1] - 4019:12
**obligation** [3] -
3984:24, 3996:23,
4009:23
**obtained** [1] - 3992:18
**obvious** [2] - 3947:7,
3947:23
**obviously** [6] -
3938:24, 3949:22,
3954:23, 3956:23,
4001:9, 4023:22
**Ocala** [1] - 3954:7
**OCC** [2] - 3988:17,
4018:6
**occupied** [1] -
4024:22
**occurred** [1] - 3922:5
**OF** [2] - 3912:1,
3912:14
**offer** [4] - 3943:19,
3943:20, 3969:9,
4005:1
**offered** [2] - 3984:1,
3995:21
**offering** [3] - 3975:15,
3985:5, 3985:6
**official** [1] - 4025:14
**offline** [14] - 3956:25,
3960:9, 3960:12,
3960:15, 3963:6,
3963:19, 3964:3,
3964:6, 4010:11,
4016:4, 4016:5,
4016:23, 4017:4,
4021:19
**often** [3] - 3936:23,
3974:13, 4002:5
**old** [3] - 3972:14,
3973:10, 3996:19
**older** [1] - 4022:13
**once** [5] - 3943:12,
3956:24, 3967:12,
3979:11, 4005:19
**One** [1] - 3913:7
**one** [58] - 3915:8,
3918:11, 3919:3,
3919:16, 3927:7,
3931:21, 3932:5,
3933:18, 3934:10,
3936:19, 3939:18,
3939:19, 3946:12,
3947:7, 3950:7,
3951:1, 3951:5,
3956:6, 3960:5,
3960:13, 3962:12,
3969:1, 3974:12,
3977:10, 3977:21,
3982:11, 3982:23,

3984:4, 3985:8,
3986:8, 3986:13,
3987:10, 3987:23,
3988:11, 3992:16,
3992:20, 3993:1,
3997:15, 3997:19,
3998:7, 3998:15,
3998:23, 4000:11,
4001:4, 4002:25,
4003:18, 4003:20,
4006:10, 4006:18,
4006:21, 4007:16,
4009:1, 4009:4,
4012:21, 4014:7,
4018:13, 4018:15,
4020:6
**ones** [6] - 3947:7,
3984:24, 4003:9,
4012:12, 4015:5
**open** [1] - 3915:8
**opened** [1] - 4012:4
**opening** [4] - 3941:5,
4007:10, 4009:5,
4009:6
**operative** [1] -
3950:18
**opinion** [6] - 3941:12,
3943:20, 3969:1,
3978:21, 4007:3,
4019:10
**opinions** [4] -
3975:15, 3975:16,
3985:6, 3985:7
**opportunistic** [1] -
3962:24
**or..** [1] - 3938:3
**orange** [8] - 3955:9,
3976:12, 3978:23,
3979:24, 3981:23,
3982:4, 3989:17,
4006:4
**order** [6] - 3916:7,
3916:11, 3916:19,
3960:8, 3978:13,
4011:12
**Order** [4] - 3946:19,
3947:12, 3973:25,
4011:14
**ordered** [2] - 3980:22,
3980:25
**organization** [1] -
4023:11
**originating** [1] -
4020:12
**originator** [2] -
3947:13, 4021:7
**otherwise** [3] -
3918:6, 3931:12,
4024:22
**ought** [1] - 4007:16

**overall** [2] - 4006:2,
4013:20
**Overline** [7] - 3923:4,
3923:12, 3923:20,
3924:7, 3926:9,
3926:12, 3991:11
**overline** [7] - 3925:15,
3926:20, 3927:1,
3928:18, 3930:1,
3930:2, 3936:4
**overloaded** [1] -
3973:5
**overlooked** [1] -
3988:3
**overlooking** [1] -
3993:17
**overnight** [1] - 3937:3
**overreaching** [1] -
3989:12
**overview** [1] - 3994:8
**overwhelming** [3] -
3959:25, 3969:18,
3982:7
**owed** [2] - 3948:12,
4023:1
**own** [4] - 3990:13,
3990:15, 3990:17,
4012:10
**owned** [4] - 3915:11,
3972:15, 3973:16,
3993:20
**owning** [2] - 3922:1,
3922:2

## P

**p.m** [1] - 4025:3
**P2879** [1] - 4017:12
**package** [1] - 4016:17
**page** [9] - 3916:18,
3917:19, 3917:25,
3918:19, 3922:21,
3935:18, 4001:17,
4011:14
**pages** [2] - 3921:24,
3936:9
**paid** [16] - 3932:2,
3933:3, 3941:7,
3952:7, 3952:10,
3976:24, 3981:16,
3981:19, 3981:20,
3981:23, 3982:5,
3984:6, 3984:8,
4002:15, 4023:22
**Palenchar** [1] -
3913:13
**paper** [1] - 4020:8
**papers** [4] - 3914:19,
3914:21, 3914:25,

3947:11
**paragraph** [3] -
3923:15, 4011:15,
4017:12
**pari** [1] - 3980:18
**Part** [1] - 4010:19
**part** [45] - 3920:1,
3920:12, 3921:3,
3921:10, 3921:14,
3921:21, 3927:7,
3927:25, 3931:15,
3931:19, 3931:24,
3943:18, 3944:20,
3944:21, 3950:5,
3950:9, 3951:2,
3951:23, 3951:24,
3957:23, 3958:8,
3958:13, 3959:24,
3960:1, 3963:1,
3968:15, 3979:17,
3979:22, 3981:1,
3987:19, 3989:11,
3990:2, 3990:3,
3991:4, 4006:25,
4009:11, 4009:20,
4009:21, 4010:15,
4011:18, 4013:10,
4013:14, 4016:23,
4018:18, 4020:6
**participation** [2] -
4016:1, 4017:23
**particular** [6] - 3918:4,
3933:11, 3975:18,
3982:23, 3992:16,
3998:21
**particularly** [2] -
3976:5, 4010:25
**parties** [2] - 3914:19,
3935:7
**partnership** [3] -
4006:11, 4023:4,
4023:10
**party** [5] - 3922:1,
3922:2, 3936:14,
3958:9, 3994:3
**pass** [1] - 3947:11
**passing** [1] - 3993:22
**patient** [1] - 3987:13
**pattern** [2] - 4013:20
**pause** [1] - 3940:5
**pay** [3] - 3948:12,
3987:5, 4023:1
**payments** [4] -
3918:24, 3934:12,
3993:22, 3993:25
**PDF** [1] - 3917:7
**Pennsylvania** [1] -
3913:18
**penny** [2] - 3946:9,
3948:25

**people** [4] - 3918:24, 3954:12, 3987:25, 3998:17
**Per** [1] - 4019:23
**per** [1] - 3964:18
**percent** [60] - 3919:18, 3920:7, 3920:12, 3925:13, 3925:14, 3925:19, 3927:16, 3927:19, 3927:21, 3928:3, 3928:4, 3928:5, 3928:6, 3928:9, 3928:12, 3928:20, 3928:21, 3928:25, 3929:8, 3929:10, 3929:12, 3929:13, 3929:17, 3929:19, 3929:22, 3929:25, 3930:4, 3930:7, 3931:2, 3933:19, 3941:8, 3959:7, 3976:11, 3976:13, 3976:15, 3979:25, 3982:3, 3994:4, 3998:23, 3998:24, 4001:25, 4002:22, 4003:8, 4003:16, 4003:21, 4003:22, 4003:24, 4004:20, 4004:22, 4020:8, 4020:9, 4020:16, 4022:22, 4022:23, 4022:24
**percentage** [3] - 3964:3, 3986:21, 3992:14
**percentages** [3] - 3930:10, 3931:7, 4001:14
**performed** [1] - 3966:22
**perhaps** [3] - 3980:13, 3999:13, 4013:11
**period** [6] - 3942:2, 3954:21, 3954:24, 3967:7, 4000:17, 4000:21
**permitted** [1] - 3985:2
**personally** [1] - 3934:22
**persuade** [1] - 3944:1
**persuaded** [1] - 3995:16
**persuasive** [2] - 4003:15, 4003:22
**phase** [6] - 3938:16, 3952:6, 3960:11, 3963:7, 3981:13, 4011:19

**PHILIP** [1] - 3913:10
**philip.beck@bartlit** [1] - 3913:16
**philip.beck@bartlit-beck.com** [1] - 3913:16
**pick** [1] - 3929:16
**picked** [2] - 3999:10, 3999:23
**picture** [1] - 3935:22
**piece** [2] - 3985:17, 3988:13
**pieces** [2] - 3944:23, 3990:5
**Pinnacle** [2] - 3988:10, 3988:11
**pipeline** [1] - 3947:4
**place** [10] - 3936:19, 3944:14, 3944:16, 3945:16, 3975:23, 3986:16, 3991:21, 3998:16, 4017:25
**Place** [2] - 3913:7, 3913:14
**plaintiff** [1] - 3997:10
**Plaintiff** [1] - 3912:9
**plaintiff's** [1] - 3997:7
**Plaintiffs** [1] - 3912:5
**Plan** [3] - 3948:3, 3948:5, 3978:22
**plan** [2] - 3912:4, 3990:23
**Plaza** [1] - 3913:3
**pleadings** [1] - 3916:6
**pleasure** [2] - 3934:20, 3934:23
**plug** [1] - 4005:4
**plus** [2] - 4003:7, 4006:12
**PO** [1] - 3913:4
**point** [30] - 3922:5, 3925:6, 3927:10, 3927:12, 3927:14, 3930:6, 3935:7, 3948:13, 3949:1, 3953:9, 3953:12, 3953:13, 3953:23, 3955:12, 3956:12, 3956:19, 3978:11, 3985:3, 3985:21, 3988:22, 3991:9, 3991:10, 4012:4, 4012:7, 4015:1, 4017:3, 4018:19, 4019:1, 4019:3, 4023:2
**poof** [1] - 3995:8
**pool** [7] - 3958:18, 4010:10, 4015:18, 4016:13, 4016:23,

4016:25, 4017:5
**pools** [7] - 3958:1, 4010:19, 4011:16, 4011:20, 4011:21, 4011:22, 4016:2
**posed** [1] - 3985:25
**poses** [1] - 3984:3
**position** [2] - 3980:24, 3981:3
**positive** [1] - 4000:15
**possible** [2] - 3925:2, 4024:21
**possibly** [1] - 3978:5
**post** [1] - 3915:1
**potentially** [1] - 3994:12
**precise** [5] - 3919:11, 3919:12, 3919:21, 3920:17, 3972:9
**precision** [3] - 3946:8, 3949:15, 3969:3
**predamage** [1] - 4000:21
**predominantly** [1] - 3936:6
**preliminary** [1] - 3928:7
**PRESENT** [1] - 3913:21
**present** [2] - 3950:15, 4005:9
**presented** [2] - 3943:24, 3951:7
**press** [1] - 3971:23
**pressed** [1] - 3945:10
**presumably** [1] - 3994:13
**presumptively** [1] - 3997:23
**pretty** [4] - 3929:23, 3930:4, 3995:7, 4007:22
**prevented** [1] - 3958:25
**previously** [1] - 3915:3
**price** [4] - 3918:15, 3918:21, 3919:2, 3925:9
**PRICEWATERHOUS ECOOPERS** [3] - 3912:6, 3912:10, 3913:10
**principal** [1] - 3919:17
**principles** [1] - 3981:12
**priority** [1] - 3924:3
**private** [1] - 4006:11
**pro** [3] - 3932:11, 3932:17, 3934:4

**probative** [3] - 3945:3, 3966:25, 3992:5
**problem** [11] - 3940:22, 3959:6, 3961:5, 3962:3, 3979:13, 4002:3, 4006:19, 4007:4, 4020:11, 4020:17
**problems** [5] - 4011:17, 4012:8, 4014:23, 4021:13, 4021:15
**procedures** [1] - 3916:20
**proceed** [1] - 3938:13
**proceeding** [1] - 4025:3
**Proceedings** [1] - 3913:24
**proceedings** [1] - 4025:9
**proceeds** [14] - 3919:15, 3919:16, 3920:8, 3921:3, 3921:11, 3921:15, 3922:2, 3923:6, 3923:12, 3925:8, 3930:14, 3931:7, 3933:14, 3934:2
**process** [3] - 3989:20, 4015:10, 4021:8
**produce** [1] - 4011:3
**produced** [1] - 3913:25
**professor** [2] - 3966:19, 3972:12
**Professor** [17] - 3939:17, 3941:2, 3941:9, 3941:16, 3941:20, 3942:5, 3942:18, 3942:21, 3943:19, 3944:17, 3948:16, 3951:1, 3956:10, 3966:1, 3967:20, 3973:10, 4019:9
**proffered** [1] - 3985:13
**profit** [1] - 3942:20
**profitability** [1] - 3966:24
**profitable** [10] - 3942:2, 3942:20, 3943:2, 3943:18, 3965:13, 3966:16, 3967:6, 3967:12, 3980:6
**progress** [1] - 3937:19
**ProMerit** [2] - 3958:14, 4015:22

**proof** [9] - 3995:6, 3997:14, 3998:3, 3998:4, 3998:6, 4000:3, 4005:12, 4013:18, 4013:20
**proper** [3] - 3946:24, 4010:9, 4023:14
**properly** [2] - 3934:11, 4002:25
**properties** [1] - 3916:25
**proportions** [1] - 4023:8
**propose** [3] - 3970:6, 3972:4, 3985:21
**proposed** [13] - 3928:21, 3930:22, 3935:8, 3935:17, 3936:13, 3936:18, 3946:1, 3985:3, 3985:20, 3990:20, 3994:7, 4001:3, 4006:22
**protect** [1] - 4020:25
**prove** [24] - 3949:3, 3974:2, 3978:1, 3978:3, 3978:6, 3982:13, 3982:14, 3982:15, 3982:19, 3982:25, 3984:5, 3984:24, 3997:6, 3997:10, 3997:11, 3997:18, 3997:19, 3998:7, 3998:10, 4009:23, 4009:24, 4010:24
**proved** [4] - 3986:3, 3990:5, 4005:18, 4006:2
**proven** [3] - 3946:7, 3982:22, 3983:18
**provide** [1] - 4001:2
**proving** [2] - 3984:16, 3994:23
**proximate** [17] - 3946:15, 3972:13, 3973:6, 3973:12, 3973:18, 3973:20, 3973:22, 3974:3, 3974:11, 3978:17, 3981:12, 3981:22, 3982:12, 3983:2, 3984:10, 3986:1, 4000:7
**proximately** [4] - 3973:6, 3977:5, 3982:2, 4010:1
**pull** [2] - 4005:4, 4011:13
**pulled** [1] - 3964:11

**purchase** [6] - 3918:15, 3918:20, 3919:2, 4016:8, 4016:9, 4018:3
**purchased** [3] - 3974:22, 3975:13, 4017:22
**pure** [1] - 4012:5
**purpose** [3] - 3980:1, 3980:6, 3983:12
**purposes** [2] - 3949:24, 3951:17
**pursue** [1] - 4007:12
**put** [43] - 3914:6, 3916:10, 3925:25, 3928:20, 3939:14, 3944:24, 3956:22, 3958:15, 3958:16, 3958:18, 3960:12, 3962:19, 3964:10, 3966:17, 3967:3, 3968:25, 3972:3, 3972:21, 3986:10, 3986:18, 3987:16, 3987:18, 3987:20, 3990:20, 3990:24, 3993:9, 3994:15, 3998:20, 3999:1, 3999:22, 4004:13, 4009:9, 4009:17, 4014:22, 4015:12, 4017:15, 4018:11, 4018:14, 4020:5, 4021:7, 4021:18, 4022:5
**putback** [8] - 3987:13, 3988:6, 3988:8, 3988:12, 3988:17, 3988:19, 3988:25, 3989:5
**puts** [1] - 3955:8
**putting** [6] - 3986:11, 3986:13, 3986:23, 4005:22, 4018:12, 4024:13
**PwC** [43] - 3938:17, 3938:18, 3944:18, 3945:22, 3945:25, 3946:21, 3947:3, 3947:7, 3947:10, 3947:22, 3950:3, 3950:7, 3950:13, 3951:8, 3952:4, 3952:14, 3955:8, 3955:15, 3959:23, 3964:10, 3965:2, 3967:14, 3969:15, 3969:19, 3972:5, 3998:3, 4003:23, 4006:11, 4008:22,

4010:7, 4011:10, 4011:23, 4012:4, 4017:11, 4017:20, 4017:22, 4018:4, 4018:10, 4019:9, 4021:14, 4023:4, 4023:8, 4023:10
**PwC's** [9] - 3916:5, 3945:25, 3946:6, 3946:12, 3952:6, 3956:2, 3964:15, 3974:23, 4012:22

## Q

**qualified** [1] - 4019:13
**quantified** [1] - 3949:11
**quantify** [1] - 3966:2
**questions** [8] - 3932:20, 3932:21, 3933:5, 3934:15, 3968:22, 3984:3, 3985:25, 4018:22
**quickly** [2] - 3968:4, 3969:14
**quite** [1] - 3974:13

## R

**raise** [2] - 3955:16, 3955:17
**raising** [2] - 3927:14, 3955:15
**Rami** [1] - 3913:21
**randomly** [1] - 3999:10
**rata** [3] - 3932:11, 3932:17, 3934:4
**rather** [10] - 3970:11, 3974:22, 3974:25, 3988:5, 3989:1, 3989:6, 3992:18, 3999:10, 4005:2, 4005:5
**reach** [4] - 3920:23, 3925:4, 3959:6, 3968:7
**reached** [1] - 3968:3
**read** [9] - 3914:21, 3917:9, 3935:3, 3968:8, 3968:9, 3968:12, 3972:4, 3987:15, 3988:15
**reading** [2] - 3923:8, 3989:7
**ready** [4] - 3937:20, 3937:21, 3971:9, 4008:20

**real** [10] - 3915:11, 3934:18, 3939:9, 3982:7, 4011:16, 4015:21, 4016:19, 4016:22, 4016:23, 4016:25
**really** [24] - 3914:17, 3922:24, 3935:3, 3936:6, 3939:7, 3939:18, 3943:20, 3945:11, 3945:16, 3953:2, 3954:9, 3955:25, 3958:8, 3959:5, 3973:13, 3982:6, 3990:23, 4003:14, 4008:4, 4008:8, 4012:4, 4016:13, 4017:4, 4022:16
**reason** [15] - 3950:23, 3951:15, 3956:6, 3959:20, 3965:14, 3978:8, 3980:14, 3982:11, 3983:19, 3987:17, 3988:16, 3989:5, 3993:12, 4019:23, 4023:6
**reasonable** [8] - 3946:2, 3946:8, 3948:21, 3949:3, 3949:19, 3970:3, 4011:5, 4015:4
**reasons** [15] - 3969:13, 3977:1, 3977:4, 3977:23, 3979:20, 3983:23, 3984:10, 3984:23, 3986:18, 3991:19, 3992:7, 3992:15, 3994:13, 3999:18, 4020:1
**rebut** [1] - 4009:18
**rebuttal** [6] - 3937:24, 3938:7, 3969:20, 3970:10, 3970:22, 3984:2
**receivables** [1] - 3957:6
**receive** [3] - 3933:14, 3933:23, 3934:5
**received** [15] - 3919:3, 3919:6, 3919:24, 3920:13, 3924:2, 3925:3, 3927:17, 3927:20, 3928:3, 3928:10, 3928:25, 3931:15, 3933:18, 3933:24, 3934:6
**RECEIVER** [1] - 3912:8

**receives** [1] - 3919:18
**recess** [6] - 3970:8, 3970:23, 3971:1, 3971:2, 4008:12, 4008:13
**record** [7] - 3985:14, 3992:24, 4001:2, 4006:8, 4023:4, 4023:6, 4023:7
**records** [8] - 3927:25, 3948:24, 3963:23, 3963:24, 3964:18, 3969:8, 3992:20, 4012:8
**recover** [3] - 3959:21, 4021:17, 4023:22
**recoverable** [2] - 3932:3, 3974:24
**recovered** [1] - 4023:23
**recoveries** [8] - 3920:1, 3920:13, 3920:14, 3920:19, 3927:11, 3931:9, 3932:11, 3939:6
**recovery** [3] - 3916:2, 3919:4, 4006:9
**recycling** [1] - 4016:20
**red** [7] - 3955:9, 3976:11, 3978:22, 3979:23, 3981:20, 3982:3, 4006:4
**redefine** [2] - 3979:1, 3981:8
**redefinition** [1] - 3985:15
**REDIRECT** [1] - 3932:22
**reducing** [2] - 3936:4, 3941:4
**reduction** [2] - 3932:17, 4005:3
**reductions** [3] - 3939:5, 3939:6, 3949:16
**reference** [2] - 3917:12, 3924:7
**referred** [2] - 3939:12, 4001:12
**referring** [2] - 3991:9, 3992:24
**refers** [4] - 3916:11, 3916:22, 3916:25, 3918:15
**refined** [1] - 4001:2
**reflect** [2] - 3943:17, 3988:9
**reflected** [1] - 4020:15
**reflects** [1] - 4015:9

**refund** [1] - 3953:9
**refunds** [1] - 3965:9
**regarding** [1] - 3953:19
**regardless** [2] - 4000:3, 4000:5
**regulator** [1] - 3983:13
**regulators** [4] - 3983:20, 3988:18, 3988:23, 4017:9
**reject** [1] - 3961:18
**rejected** [2] - 3964:1, 3989:16
**rejecting** [2] - 3961:12, 3961:13
**relate** [1] - 4003:5
**related** [2] - 3916:12, 3991:15
**relating** [1] - 3929:12
**relations** [1] - 3966:24
**relationship** [16] - 3945:17, 3947:25, 3948:8, 3951:16, 3954:2, 3954:19, 3955:3, 3956:3, 3957:13, 3966:5, 3974:1, 3975:7, 3975:9, 3975:12, 3977:9, 3977:10
**relevant** [1] - 3966:10
**reliable** [4] - 3969:2, 3969:11, 3998:25, 4005:9
**reliably** [2] - 3999:5, 4001:7
**relied** [1] - 3991:5
**relief** [1] - 3916:12
**rely** [2] - 3940:23, 3985:15
**relying** [1] - 4013:19
**remaining** [2] - 3915:8, 4000:7
**remember** [7] - 3922:6, 3943:4, 3952:8, 4001:13, 4016:12, 4022:3
**remind** [1] - 3914:14
**reminded** [1] - 4022:17
**remitted** [1] - 3920:8
**remote** [1] - 3973:22
**remotely** [1] - 4001:11
**removed** [2] - 3932:7, 3932:9
**REO** [28] - 3915:9, 3915:10, 3915:11, 3915:19, 3915:24, 3916:2, 3916:12, 3919:4, 3921:4,

3921:11, 3921:15, 3922:2, 3922:4, 3923:4, 3923:13, 3923:20, 3924:7, 3924:8, 3924:23, 3925:14, 3926:8, 3928:20, 3930:14, 3931:1, 3932:10, 3933:15, 3985:9, 4006:5

**REOs** [2] - 3918:4, 3920:19

**repaid** [1] - 3956:8

**repeat** [1] - 3985:4

**replaced** [1] - 3943:6

**report** [10] - 3915:21, 3924:15, 3947:4, 3956:23, 4001:13, 4001:15, 4001:17, 4002:22, 4011:3, 4020:9

**reported** [1] - 3913:24

**reporter** [1] - 3939:24

**Reporter** [2] - 3913:23, 4025:14

**REPORTER** [1] - 3940:1

**reports** [3] - 3975:14, 3985:4, 4020:7

**represent** [1] - 3931:3

**representative** [2] - 3999:4, 3999:9

**represented** [1] - 4006:4

**reproduced** [1] - 3989:14

**repurchase** [5] - 4017:9, 4017:10, 4017:14, 4018:2, 4018:7

**repurchased** [1] - 4012:9

**request** [1] - 4018:1

**require** [1] - 4005:22

**required** [2] - 4017:24, 4018:1

**requirements** [1] - 3959:17

**requires** [1] - 3982:13

**reread** [1] - 3953:2

**reserve** [2] - 3937:23, 3938:1

**resold** [1] - 3984:21

**resolved** [2] - 3921:23, 3978:21

**resolves** [1] - 3923:1

**respect** [5] - 3919:19, 3923:19, 3928:7, 4012:21, 4022:9

**respond** [1] - 4013:25

**responsibility** [2] - 3997:2, 4023:12

**responsible** [4] - 3938:9, 3955:18, 3996:24, 4023:9

**rest** [1] - 3985:19

**result** [9] - 3919:18, 3923:5, 3945:25, 3947:16, 3949:18, 3981:22, 4005:14, 4011:9

**resulted** [2] - 3938:22, 4000:2

**results** [1] - 3942:6

**resume** [1] - 3914:13

**resuming** [1] - 3914:10

**return** [2] - 3965:9, 3978:11

**returned** [4] - 3978:10, 3981:25, 4013:16

**revealed** [4] - 3943:12, 3946:25, 3948:10, 3955:6

**revenues** [1] - 4023:10

**reversed** [1] - 3997:12

**review** [5] - 3916:6, 3928:7, 3933:8, 3937:12, 3968:10

**reviewed** [5] - 3921:1, 3922:13, 3927:25, 3936:6, 3968:11

**rights** [6] - 3988:8, 3988:17, 3988:19, 3988:25, 3989:2, 3989:5

**rises** [1] - 4013:12

**risk** [6] - 3942:15, 3947:10, 3947:14, 3947:15, 3963:12

**rookie** [1] - 3942:22

**room** [1] - 4009:2

**rose** [1] - 4013:14

**ROTHSTEIN** [1] - 3912:14

**RPR** [3] - 3913:23, 4025:6, 4025:13

**ruled** [1] - 3985:11

**rules** [2] - 3992:25, 3993:1

**ruling** [1] - 3981:12

**run** [2] - 3962:18, 3969:14

**running** [1] - 3969:20

**runs** [1] - 3921:24

# S

**sailed** [1] - 3972:22

**SAINT** [1] - 4025:6

**Saint** [2] - 3913:23, 4025:13

**SAINT-LOTH** [1] - 4025:6

**Saint-Loth** [2] - 3913:23, 4025:13

**sale** [14] - 3916:12, 3917:13, 3918:17, 3918:23, 3919:3, 3921:11, 3922:8, 3922:18, 3925:8, 3959:12, 3989:1, 3993:15, 3993:18, 3994:11

**sales** [12] - 3915:9, 3920:19, 3921:4, 3921:15, 3922:5, 3925:9, 3926:7, 3933:15, 3988:20, 3988:24, 3989:2, 3989:4

**sample** [1] - 4005:23

**sampling** [3] - 3998:22, 3999:4, 3999:8

**sank** [1] - 3973:4

**Sansbury** [1] - 3913:7

**Sansom** [1] - 3913:7

**sat** [4] - 3942:21, 3943:24, 3963:5, 3992:4

**satisfied** [1] - 3964:7

**saw** [13] - 3916:5, 3922:7, 3925:7, 3926:6, 3944:7, 3950:6, 3953:19, 3960:20, 3961:10, 3964:9, 3972:7, 4012:20, 4015:23

**Schedule** [1] - 3928:8

**schedule** [6] - 3924:14, 3924:17, 3924:21, 3925:19, 3926:24, 3990:16

**schedules** [1] - 3990:14

**Schiff** [1] - 3912:22

**Schillinger** [1] - 3913:21

**scope** [2] - 3978:19, 3979:19

**Scott** [1] - 3913:13

**screen** [1] - 3939:4

**screwed** [1] - 4006:18

**search** [4] - 3964:13,

3964:14, 3964:16, 3979:5

**searching** [1] - 4002:21

**seated** [1] - 4008:14

**SEC** [3] - 3944:21, 3945:10

**second** [8] - 3917:23, 3918:14, 3918:20, 3946:7, 3980:13, 3984:18, 3994:17, 3996:16

**secondly** [1] - 4005:19

**secret** [22] - 3939:13, 3939:15, 3949:8, 3955:11, 3956:22, 3957:22, 3960:4, 3960:5, 3960:9, 3986:8, 3986:10, 3986:13, 3986:19, 3986:23, 3987:3, 4011:8, 4014:5, 4014:8, 4014:17, 4014:22, 4015:12

**secretly** [1] - 4010:7

**section** [2] - 3916:18, 3922:22

**secured** [2] - 3920:18, 3981:11

**securities** [2] - 3942:9, 3957:24

**security** [1] - 3924:3

**see** [36] - 3914:24, 3916:10, 3916:13, 3916:17, 3916:21, 3916:24, 3917:5, 3917:12, 3917:14, 3918:1, 3918:2, 3918:14, 3918:16, 3918:19, 3918:22, 3921:24, 3922:22, 3923:13, 3923:14, 3923:18, 3930:13, 3936:24, 3952:23, 3954:5, 3954:8, 3957:2, 3962:25, 3963:23, 3998:10, 4001:23, 4002:9, 4004:10, 4005:3, 4020:7, 4022:12, 4024:1

**seeking** [2] - 3964:25, 3981:13

**seem** [1] - 3937:2

**selective** [1] - 3968:10

**self** [1] - 3959:11

**self-help** [1] - 3959:11

**selfish** [1] - 3940:12

**Sell** [5] - 3964:12, 3993:3, 3993:7, 4001:20, 4012:9

**sell** [19] - 3964:1, 3964:8, 3964:17, 3964:18, 3964:21, 3968:14, 3992:21, 3993:13, 4003:2, 4003:5, 4003:7, 4003:21, 4004:21, 4012:18, 4019:16, 4019:19, 4019:20, 4019:22, 4020:2

**selling** [2] - 3964:21, 3989:15

**send** [12] - 3953:8, 3953:12, 3953:14, 3956:16, 3957:15, 3957:16, 3959:13, 3959:14, 3961:5, 3961:11, 3996:11, 4022:5

**sending** [7] - 3954:20, 3954:22, 3956:18, 3956:20, 3958:3, 3960:18, 3961:14

**sends** [1] - 3957:14

**sense** [7] - 3936:23, 3977:19, 3985:12, 3991:25, 4019:18, 4019:21, 4020:23

**sensible** [1] - 3998:25

**sent** [18] - 3916:5, 3953:5, 3953:21, 3955:13, 3957:9, 3958:5, 3960:7, 3960:16, 3960:22, 3961:1, 3961:4, 3961:7, 3967:17, 3969:17, 3987:11, 4015:1, 4019:24, 4021:4

**sentence** [1] - 4011:15

**separate** [1] - 3990:5

**serendipitously** [1] - 3974:6

**serendipity** [3] - 3973:18, 3974:5, 3974:8

**served** [1] - 3950:23

**service** [1] - 4003:12

**servicer** [5] - 3993:19, 4019:17, 4019:19, 4019:20, 4019:21

**servicing** [1] - 3993:21

**session** [1] - 4008:15

**set** [16] - 3957:22, 3960:4, 3960:5,

3971:8, 3981:10, 3986:8, 3986:10, 3986:11, 3986:13, 3986:19, 3986:23, 3987:3, 4002:20, 4004:17, 4013:20, 4014:17

**setoffs** [1] - 3949:17

**settled** [2] - 3922:1, 3931:13

**settlement** [20] - 3916:7, 3920:23, 3921:1, 3921:3, 3921:10, 3921:14, 3921:21, 3921:23, 3922:4, 3922:11, 3922:20, 3922:23, 3922:25, 3923:16, 3930:13, 3931:10, 3931:15, 3931:17, 3933:5, 3933:8

**seven** [8] - 3994:16, 3995:6, 3995:18, 3997:22, 3999:10, 3999:11, 3999:23, 4000:14

**several** [3] - 3995:14, 4002:11, 4024:4

**share** [1] - 3929:13

**shift** [1] - 3998:1

**shifting** [1] - 3997:6

**ship** [18] - 3932:2, 3933:3, 3941:6, 3952:6, 3952:10, 3972:15, 3972:17, 3972:20, 3972:21, 3972:24, 3972:25, 3973:3, 3973:4, 3973:8, 3973:15, 3973:16, 4023:22

**ship-not-paid** [1] - 3933:3

**shoehorn** [1] - 3980:9

**short** [3] - 3935:15, 3942:11, 4008:6

**short-term** [1] - 3942:11

**shortchanged** [1] - 3971:3

**shorthand** [1] - 3913:24

**shortly** [1] - 3920:21

**show** [9] - 3986:24, 3996:24, 3997:2, 3998:4, 3998:6, 4009:13, 4013:23, 4014:6, 4014:19

**showed** [18] - 3925:13, 3944:6, 3944:11, 3944:12,

3944:18, 3944:21, 3967:6, 3968:16, 3969:7, 3989:19, 3990:10, 3990:16, 3990:17, 3990:19, 3991:3, 4009:15, 4012:2

**showing** [4] - 3943:25, 4009:16, 4011:4, 4013:13

**shown** [2] - 3946:3, 3987:21

**shows** [2] - 3952:16, 3967:11

**side** [4] - 3938:2, 3941:14, 4004:11, 4016:15

**sides** [2] - 3939:19, 4007:10

**sideways** [1] - 3917:6

**significance** [2] - 3915:2, 3930:23

**silent** [1] - 3991:16

**similarly** [1] - 3990:25

**simple** [1] - 3929:10

**simply** [2] - 3983:9, 3988:22

**simultaneously** [1] - 3936:22

**single** [4] - 3977:17, 3977:21, 3979:16, 4011:7

**sink** [1] - 3973:3

**sinking** [2] - 3973:5, 3973:9

**sit** [2] - 4021:2, 4021:5

**sitting** [3] - 3942:24, 4012:11, 4015:24

**situation** [3] - 3957:8, 3957:12

**six** [9] - 3950:17, 3956:15, 3994:16, 3995:6, 3995:13, 3995:18, 3999:23, 4000:14, 4012:2

**skinnying** [1] - 3931:7

**slide** [3] - 3966:17, 3967:3, 3972:9

**sliver** [3] - 3976:9, 3976:17, 3976:20

**small** [5] - 3976:9, 4000:16, 4005:23, 4023:10

**smoking** [1] - 4003:7

**so-called** [1] - 4011:16

**So.2nd** [1] - 3996:14

**sold** [26] - 3915:24, 3918:4, 3924:10, 3924:12, 3924:24,

3924:25, 3925:23, 3926:1, 3926:7, 3963:3, 3963:4, 3963:6, 3963:15, 3972:15, 3991:24, 3992:1, 3992:2, 3992:5, 3992:11, 3992:16, 3993:10, 3993:11, 3994:2, 4003:11, 4019:24

**solicited** [2] - 3996:25, 3997:4

**soliciting** [1] - 3996:20

**solved** [1] - 4020:17

**someone** [2] - 3963:10, 3964:12

**sometimes** [6] - 3915:12, 3962:18, 3962:21, 3962:23, 3962:25, 3963:1, 3965:10, 3998:17

**somewhat** [1] - 3989:12

**somewhere** [3] - 3933:19, 3961:6, 4023:21

**soon** [3] - 3948:10, 4004:7, 4024:21

**sooner** [1] - 3986:10

**SORENSEN** [49] - 3912:18, 3918:9, 3929:2, 3932:21, 3932:23, 3934:9, 3934:15, 3937:11, 3937:16, 3937:21, 3937:25, 3938:12, 3938:15, 3940:3, 3940:16, 3941:2, 3952:24, 3958:12, 3958:22, 3966:1, 3969:22, 3969:25, 3970:2, 3970:17, 3971:6, 4008:6, 4008:11, 4008:21, 4014:1, 4014:9, 4014:11, 4014:13, 4014:18, 4015:17, 4016:10, 4016:19, 4017:2, 4017:8, 4017:19, 4020:20, 4021:23, 4021:25, 4022:2, 4022:11, 4023:19, 4024:3, 4024:7, 4024:9, 4025:1

**Sorensen** [14] - 3912:19, 3937:20, 3938:6, 3971:3, 3971:22, 3975:6,

3977:8, 3979:18, 3989:13, 3989:22, 3998:2, 4003:2, 4008:17, 4024:8

**Sorensen's** [1] - 3933:22

**sorry** [11] - 3917:4, 3919:9, 3921:7, 3922:25, 3923:22, 3927:22, 3929:15, 3981:19, 3989:23, 3991:14, 4018:15

**sort** [6] - 3970:10, 3972:7, 3973:17, 3984:25, 4001:11, 4005:8

**sound** [2] - 3931:4, 3937:15

**sounds** [2] - 3929:2, 3929:3

**space** [2] - 3962:18, 3962:20

**Spalding** [1] - 3913:18

**specific** [6] - 3923:22, 3961:2, 3996:21, 4000:12, 4014:3, 4020:4

**specifically** [2] - 3950:4, 3950:19

**speculate** [1] - 3943:9

**speculation** [1] - 3949:4

**spend** [1] - 3935:14

**spent** [8] - 3936:1, 3948:23, 3952:8, 3968:2, 3969:6, 3995:2, 3995:12, 4003:2

**Spotswood** [1] - 3913:7

**spreadsheet** [1] - 3964:11

**spreadsheets** [1] - 3994:6

**stand** [2] - 3914:14, 3915:10

**standard** [5] - 3947:9, 3948:21, 3949:20, 3969:4, 3974:7

**standards** [1] - 4006:13

**stands** [1] - 3915:11

**starker** [1] - 3968:1

**start** [5] - 3946:12, 3969:16, 3971:17, 3971:19, 3971:23

**started** [13] - 3937:18, 3938:25, 3942:8, 3951:11, 3952:22, 3961:9, 3961:12,

3961:13, 3961:24, 3961:25, 4000:13, 4010:22, 4019:11

**starting** [2] - 3951:17, 4024:21

**starts** [2] - 3949:24, 4000:17

**statements** [4] - 3942:1, 3942:19, 3974:20, 3985:4

**STATES** [2] - 3912:1, 3912:15

**States** [1] - 3972:22

**status** [1] - 3933:25

**stay** [2] - 3979:21, 3985:23

**stayed** [1] - 3959:8

**steal** [5] - 3947:19, 3951:25, 3980:2, 3980:7, 3982:9

**stealing** [7] - 3932:1, 3932:24, 3954:2, 3954:20, 3981:14, 3981:17, 3983:3

**stenographic** [1] - 4025:8

**step** [4] - 3928:19, 3934:18, 4008:16, 4021:8

**STEPHEN** [1] - 3912:18

**stepping** [1] - 4020:21

**sticking** [1] - 4010:13

**still** [3] - 3914:14, 3993:21, 3997:10

**stock** [1] - 3987:25

**stole** [5] - 3958:2, 3981:15, 3981:20, 3982:1

**stolen** [9] - 3933:2, 3938:23, 3938:24, 3939:5, 3948:14, 3948:25, 3949:6, 3949:12, 4011:4

**stop** [2] - 3915:7, 3963:22

**stopped** [2] - 3945:23, 3947:24

**story** [2] - 3948:17, 3950:8

**straight** [3] - 3971:13, 3971:14, 3971:21

**straightforward** [2] - 3929:23, 3930:4

**streamlined** [1] - 3914:17

**Street** [1] - 3913:14

**stronger** [1] - 3994:15

**student** [1] - 3972:12

**studied** [1] - 3925:2

**study** [5] - 3928:6, 3930:11, 3932:19, 3966:6, 3966:8
**studying** [2] - 3967:24, 3968:2
**subcategories** [1] - 3998:21
**subcategory** [1] - 3998:22
**subject** [5] - 3916:25, 3924:3, 3942:15, 3978:20, 3986:4
**submit** [1] - 3935:4
**submitted** [2] - 3914:22, 3927:13
**subparts** [1] - 3984:4
**subsequent** [2] - 3983:22, 3994:22
**subtract** [4] - 3928:12, 3929:1, 3930:3, 3931:2
**subtracted** [1] - 3930:7
**subtracting** [1] - 3929:22
**suddenly** [1] - 4019:15
**suffer** [1] - 3965:20
**suffered** [5] - 3949:9, 3956:18, 3974:17, 3983:22, 4009:25
**sufficient** [3] - 3925:3, 3930:11, 3974:2
**suggest** [1] - 3945:4
**suggested** [1] - 3983:14
**suggesting** [1] - 4018:19
**Suisse** [3] - 3953:19, 3957:7, 3960:25
**Suite** [2] - 3913:8, 3913:14
**summarize** [2] - 3935:19, 3987:15
**summary** [5] - 3922:22, 3923:15, 3964:9, 4001:16, 4001:18
**Summerford** [1] - 4007:3
**sunk** [1] - 3972:23
**supply** [1] - 3935:17
**supports** [1] - 4005:7
**suppose** [2] - 3981:23, 3982:5
**supposed** [10] - 3942:12, 3953:5, 3953:6, 3959:12, 3995:17, 3996:10, 4006:23, 4015:18,

4015:24, 4024:1
**Supreme** [5] - 3995:24, 3996:14, 3997:5, 3997:12, 3997:17
**surprising** [1] - 3941:22
**switching** [1] - 3981:11
**sworn** [3] - 3914:15, 3915:3, 3989:6
**sympathy** [1] - 4023:13
**system** [1] - 4015:22

---

**T**

---

**tactical** [9] - 3979:20, 3980:14, 3981:4, 3998:10, 3999:21, 4000:2, 4005:11, 4005:16, 4007:12
**tainted** [1] - 3975:8
**take-out** [1] - 3942:14
**takeout** [4] - 3963:8, 4017:25, 4018:3, 4018:12
**talks** [1] - 3973:21
**tapped** [1] - 3962:21
**taught** [1] - 3969:5
**TBW** [114] - 3916:6, 3919:6, 3919:16, 3919:20, 3920:8, 3920:23, 3920:24, 3921:3, 3921:6, 3921:10, 3921:11, 3921:14, 3921:17, 3922:11, 3923:2, 3933:7, 3934:1, 3934:6, 3934:12, 3942:2, 3943:6, 3943:13, 3945:14, 3947:13, 3947:25, 3948:8, 3948:11, 3948:14, 3948:17, 3948:19, 3950:8, 3951:16, 3951:24, 3953:9, 3953:12, 3953:21, 3955:13, 3956:3, 3956:16, 3956:20, 3957:11, 3959:13, 3960:22, 3961:1, 3961:4, 3961:13, 3961:14, 3962:9, 3962:18, 3962:24, 3963:23, 3964:10, 3964:18, 3964:20, 3965:16, 3967:5, 3968:8, 3969:8, 3975:7,

3975:13, 3980:2, 3980:7, 3981:15, 3981:16, 3981:19, 3981:20, 3982:1, 3982:8, 3983:3, 3984:6, 3984:8, 3987:11, 3987:17, 3987:18, 3988:3, 3989:15, 3992:20, 3992:25, 3993:1, 3993:8, 3993:10, 3993:11, 3993:12, 3993:18, 3993:19, 3993:21, 3993:24, 4001:19, 4001:24, 4003:9, 4003:12, 4012:8, 4017:16, 4017:22, 4018:1, 4019:19, 4020:9, 4020:11, 4020:12, 4020:16, 4020:17, 4021:3, 4022:5, 4022:7, 4022:14, 4022:19, 4022:23, 4022:25
**TBW's** [3] - 3957:6, 3959:6, 3961:22
**team** [3] - 3948:23, 3949:11, 3998:13
**technical** [1] - 3947:2
**techniques** [1] - 3999:3
**technology** [1] - 3940:18
**teed** [1] - 4007:13
**ten** [4] - 3952:9, 3956:14, 4008:9, 4020:19
**tend** [1] - 3974:12
**tends** [1] - 4002:13
**Teresa** [2] - 3958:17, 3990:7
**term** [2] - 3942:11, 3942:13
**terms** [7] - 3933:11, 3955:24, 3973:13, 3973:22, 4005:14, 4013:12, 4017:24
**testified** [25] - 3942:25, 3943:4, 3944:16, 3947:17, 3949:17, 3954:1, 3954:4, 3957:5, 3960:3, 3960:19, 3961:1, 3961:10, 3961:11, 3961:25, 3962:2, 3962:7, 3963:16, 3963:19, 3964:19, 3965:5, 3965:18, 3990:25,

4013:2, 4013:8, 4022:8
**testify** [2] - 3947:23, 3985:2
**testifying** [2] - 3948:17, 4019:11
**testimony** [35] - 3929:2, 3929:3, 3943:25, 3944:12, 3945:2, 3945:5, 3947:20, 3954:6, 3957:4, 3957:18, 3960:10, 3961:10, 3961:19, 3968:3, 3968:9, 3972:3, 3972:9, 3975:17, 3975:22, 3976:3, 3977:12, 3984:1, 3987:15, 3988:15, 3989:6, 3989:13, 3990:7, 3991:15, 3991:17, 4009:16, 4012:24, 4015:6, 4022:3, 4022:11
**THE** [131] - 3912:1, 3912:3, 3912:14, 3914:2, 3914:6, 3914:7, 3914:8, 3914:10, 3914:13, 3914:21, 3918:3, 3918:8, 3918:13, 3919:13, 3919:14, 3919:22, 3919:24, 3920:3, 3920:6, 3920:16, 3921:12, 3921:17, 3921:18, 3923:8, 3923:10, 3925:19, 3925:21, 3925:25, 3926:3, 3926:9, 3926:13, 3926:17, 3926:19, 3927:2, 3928:13, 3928:15, 3929:3, 3929:16, 3929:19, 3929:24, 3930:6, 3931:23, 3932:1, 3932:13, 3933:17, 3933:21, 3934:5, 3934:8, 3934:17, 3934:19, 3934:21, 3934:25, 3935:10, 3935:18, 3935:22, 3936:1, 3936:20, 3937:2, 3937:9, 3937:12, 3937:15, 3937:17, 3937:23, 3938:2, 3938:5, 3938:9, 3938:14, 3939:21, 3940:1, 3940:4, 3940:9, 3940:13, 3940:18,

3940:25, 3952:18, 3958:7, 3958:21, 3965:21, 3965:25, 3969:20, 3969:24, 3970:1, 3970:6, 3970:14, 3970:18, 3970:21, 3971:1, 3971:3, 3971:7, 3971:11, 3971:16, 3971:19, 3971:25, 3975:21, 3978:8, 3978:13, 3996:3, 3996:8, 3996:11, 4004:3, 4004:5, 4004:9, 4004:13, 4004:25, 4007:21, 4008:2, 4008:4, 4008:8, 4008:12, 4008:14, 4008:15, 4008:18, 4013:10, 4014:7, 4014:10, 4014:12, 4014:14, 4015:13, 4016:8, 4016:18, 4016:25, 4017:7, 4021:21, 4021:24, 4022:1, 4022:10, 4023:15, 4023:24, 4024:6, 4024:8, 4024:10
**the..** [1] - 4019:8
**themselves** [2] - 3980:16, 4016:6
**theories** [1] - 3981:11
**theory** [10] - 3936:24, 3939:18, 3941:4, 3941:9, 3941:10, 3951:2, 3951:6, 3994:22, 4020:21
**therefore** [9] - 3917:9, 3927:17, 3939:20, 3975:8, 3978:5, 3994:11, 3994:13, 3999:25, 4003:22
**thinking** [3] - 4016:11, 4016:12, 4016:16
**thinks** [1] - 3999:24
**third** [8] - 3916:18, 3919:23, 3920:4, 3933:19, 3955:24, 3956:5, 3958:9, 3994:3
**third-party** [1] - 3958:9
**thomas** [1] - 3912:19
**Thornton** [1] - 3955:17
**thoroughly** [1] - 3916:4
**thousand** [3] - 3918:5, 3964:15, 4003:6

**thousands** [3] - 3948:22, 3949:12, 3964:17

**three** [7] - 3919:17, 3932:21, 3935:18, 3957:22, 3989:10, 3990:5, 4004:23

**three-page** [1] - 3935:18

**Thursday** [1] - 3937:10

**tied** [1] - 4011:6

**timeline** [1] - 3953:15

**timely** [1] - 3994:1

**tiny** [3] - 3976:17, 3976:20, 3982:10

**tip** [1] - 3957:1

**today** [7] - 3915:6, 3918:11, 3936:1, 3936:14, 3972:2, 3977:8, 3984:1

**together** [1] - 4001:25

**token** [2] - 4022:8, 4022:16

**tonnage** [3] - 3972:17, 3972:25, 3973:3

**tons** [4] - 3972:17, 3972:18, 3972:21, 3973:4

**took** [16] - 3941:7, 3942:1, 3943:15, 3951:8, 3961:7, 3967:4, 3967:13, 3986:16, 3991:21, 3998:16, 4005:21, 4008:22, 4013:2

**top** [7] - 3916:15, 3917:12, 3918:2, 3989:14, 4011:15, 4012:19, 4018:18

**topic** [1] - 3915:8

**torts** [1] - 3972:12

**total** [9] - 3917:20, 3917:22, 3926:15, 3928:14, 3962:1, 3962:3, 3962:4, 3976:9, 3999:5

**totally** [1] - 3962:21

**touched** [1] - 3956:6

**traceable** [1] - 4007:8

**track** [1] - 3958:15

**tracked** [1] - 4015:19

**tracking** [2] - 3993:24, 3994:1

**trade** [14] - 3958:7, 3958:11, 3958:12, 3958:14, 3958:15, 3958:18, 3958:19, 4015:18, 4015:20, 4016:8, 4016:10,

**trades** [17] - 3924:19, 3958:1, 3958:16, 3958:23, 4014:22, 4015:12, 4015:14, 4015:15, 4015:17, 4015:20, 4015:21, 4015:24, 4016:6, 4016:7, 4016:21

**transaction** [6] - 3949:13, 3961:2, 3982:8, 4016:11, 4016:13

**transaction-by-transaction** [1] - 3949:13

**transactions** [9] - 3949:12, 3950:11, 3950:12, 3969:16, 3997:22, 3997:23, 3998:19, 4017:24

**TRANSCRIPT** [1] - 3912:14

**transcript** [4] - 3913:24, 3979:5, 4025:8, 4025:9

**transcription** [1] - 3913:25

**transfer** [7] - 3980:15, 3980:20, 3981:7, 3983:8, 3983:11, 3983:15, 3983:16

**transferred** [15] - 3978:3, 3979:2, 3979:15, 3982:20, 3982:24, 3983:6, 3986:9, 3986:12, 3991:17, 3991:21, 4002:1, 4005:15, 4007:8, 4010:8, 4010:23

**transfers** [2] - 3980:23, 3980:25

**transport** [1] - 3979:10

**treat** [1] - 4003:14

**treated** [2] - 3922:1, 3922:2

**treatment** [6] - 3930:14, 3930:15, 3988:20, 3988:24, 3989:2, 3989:4

**TRIAL** [1] - 3912:14

**trial** [22] - 3914:9, 3915:1, 3944:12, 3950:19, 3968:9, 3968:12, 3972:1, 3978:20, 3978:25, 3979:6, 3979:12,

**4016:16, 4016:17, 4016:18

**typhoon** [1] - 3972:22

## U

**ultimate** [1] - 4023:20

**ultimately** [1] - 3938:22

**uncontested** [1] - 3976:2

**uncovered** [2] - 3938:19, 3947:5

**under** [6] - 3914:14, 3945:7, 3946:14, 3949:2, 3988:20, 3988:24

**underlying** [1] - 3927:24

**undertaking** [1] - 4011:3

**underwater** [1] - 3993:25

**undisputed** [3] - 3939:11, 3939:15, 3939:16

**unfortunately** [1] - 3917:23

**UNITED** [2] - 3912:1, 3912:15

**United** [2] - 3972:22, 3973:21

**Universal** [2] - 3996:1, 3996:5

**universe** [5] - 3972:5, 3995:23, 3999:6, 4005:23, 4015:10

**unless** [6] - 3935:6, 3974:24, 3982:22, 3982:25, 3983:17, 4009:12

**unlike** [2] - 3976:11, 3976:12

**unsecured** [9] - 3919:17, 3920:7, 3920:10, 3920:21, 3927:11, 3928:25, 3933:18, 3933:25, 3934:4

**up** [66] - 3916:10, 3916:15, 3917:23, 3925:25, 3928:5, 3934:3, 3939:4, 3941:9, 3942:3, 3942:21, 3945:19, 3947:3, 3951:6, 3951:24, 3953:7, 3954:17, 3954:22, 3955:8, 3955:10, 3958:8, 3964:11, 3964:12, 3966:17,**

**3967:3, 3969:10, 3969:25, 3970:12, 3972:3, 3975:11, 3976:17, 3978:2, 3978:16, 3985:19, 3986:9, 3986:10, 3992:22, 3994:21, 3995:4, 3995:6, 3995:12, 3996:9, 3997:10, 3997:24, 3999:15, 4000:13, 4004:13, 4005:3, 4005:6, 4006:18, 4007:13, 4009:9, 4009:14, 4011:8, 4011:13, 4012:11, 4014:17, 4014:21, 4016:12, 4018:14, 4018:18, 4020:5, 4021:19, 4022:25, 4023:25

**useless** [1] - 3936:23

**usual** [2] - 4024:11, 4024:13

## V

**validating** [1] - 3948:24

**value** [31] - 3921:22, 3925:13, 3928:20, 3931:16, 3950:10, 3975:2, 3975:4, 3977:4, 3977:5, 3977:22, 3982:12, 3982:14, 3982:15, 3982:24, 3983:1, 3983:4, 3983:6, 3983:7, 3983:21, 3983:22, 3983:23, 3984:9, 3986:20, 3987:24, 3998:3, 3998:5, 3998:7, 3998:8, 4002:18, 4009:23, 4010:24

**variable** [1] - 4021:6

**vast** [2] - 3977:10

**Venice** [1] - 3912:20

**version** [4] - 3917:5, 3917:7, 3917:9, 3917:11

**versus** [4] - 3966:20, 3996:1, 3996:5

**via** [1] - 3935:1, 3945:1

**view** [2] - 3941:15, 3945:1

**views** [1] - 4000:3

**violated** [3] - 3996:17, 3996:20, 3997:1

**violation** [1] - 3947:8

**virtue** [1] - 3983:7
**visible** [1] - 3931:11

# W

**Wacker** [1] - 3912:22
**wait** [6] - 3919:22,
3939:21, 3978:15
**walk** [4] - 3939:25,
3940:1, 3946:4,
3960:1
**Wallace** [1] - 3973:10
**WaMu** [7] - 3953:19,
3957:7, 3960:21,
3989:16, 3990:2,
3990:12, 3990:22
**wants** [2] - 3935:6,
3965:2
**Warehouse** [1] -
3991:11
**warehouse** [31] -
3941:24, 3942:10,
3942:12, 3943:1,
3943:6, 3943:12,
3943:17, 3947:14,
3953:17, 3957:14,
3958:4, 3959:4,
3959:5, 3959:10,
3962:23, 3963:9,
3965:4, 3965:5,
3965:12, 3966:11,
3966:21, 3966:24,
3967:5, 3967:6,
3967:8, 3967:12,
4013:1, 4013:4,
4019:6, 4019:7,
4020:10
**Washington** [4] -
3912:7, 3913:19,
3960:21, 3960:24
**ways** [2] - 3957:22,
3957:25
**week** [3] - 3936:14,
3979:4, 4024:15
**weekend** [1] - 3937:5
**weight** [1] - 3968:25
**West** [1] - 3913:14
**whereas** [1] - 3980:3
**whiz** [1] - 3974:14
**whole** [6] - 3914:3,
3945:16, 3970:12,
4016:11, 4016:13,
4016:16
**willing** [1] - 3925:5
**witness** [3] - 3915:3,
3979:16, 4013:8
**WITNESS** [8] -
3919:14, 3919:24,
3920:6, 3921:18,

3932:1, 3933:21,
3934:8, 3934:19
**witnesses** [1] -
3934:21
**wobbling** [4] -
3971:17, 3971:19,
4004:9, 4008:2
**wonder** [1] - 4008:4
**word** [6] - 3979:4,
3979:5, 3979:7,
3981:14, 3996:3,
4006:18
**words** [2] - 3992:9,
3997:9
**wore** [1] - 4022:15
**Workers** [1] - 3973:21
**world** [4] - 3947:21,
3972:3, 3972:10
**worse** [1] - 3952:1
**worth** [10] - 3920:15,
3976:24, 3977:15,
3980:5, 3982:1,
3982:6, 3984:6,
3984:8, 4002:14,
4002:15
**wrap** [1] - 3970:11
**writing** [1] - 4018:23
**written** [2] - 3961:23,
4007:3

# Y

**year** [1] - 3972:11
**years** [7] - 3942:17,
3949:23, 3951:5,
3951:25, 3972:12,
3976:16, 4003:11
**yesterday** [6] -
3948:17, 3952:25,
3983:14, 3983:25,
4002:4, 4019:15
**yourself** [2] - 3931:5,
4001:6

# Z

**zeroing** [1] - 4006:1