UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

```
* * * * * * * * * * * * * * * *
  THE COLONIAL BANCGROUP, INC.,     )
  and KEVIN O'HALLORAN, as plan     )  Case No. 2:11-cv-746-BJR
  trustee,                          )
                  Plaintiffs,       )
  v.                                )
  PRICEWATERHOUSECOOPERS LLP        )  March 22, 2018
  and CROWE HORWATH LLP,            )  1:30 p.m.
                  Defendants.       )  Washington, D.C.
* * * * * * * * * * * * * * * *
  FEDERAL DEPOSIT INSURANCE         )
  CORPORATION AS RECEIVER FOR       )  Case No. 2:12-cv-957-BJR
  COLONIAL BANK,                    )
                  Plaintiff,        )
  v.                                )
  PRICEWATERHOUSECOOPERS LLP        )
  and CROWE HORWATH LLP,            )
                  Defendants.       )  Afternoon Session
                                    )
* * * * * * * * * * * * * * * *
```

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE BARBARA JACOBS ROTHSTEIN,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR FEDERAL DEPOSIT INSURANCE CORPORATION:

        STEPHEN SORENSEN
        Thomas, Alexander, Forrester & Sorensen LLP
        14 27th Avenue
        Venice, CA  90291
        (310) 961-2536

        DAVID C. MULLIN
        Mullin Hoard Brown, LLP
        800 Amarillo National Plaza Two
        PO Box 31656
        Amarillo, TX  79120-1656
        (806) 372-5050
        Email:  Dmullin@mhba.com

APPEARANCES (continued):

FOR FEDERAL DEPOSIT INSURANCE CORPORATION:

                LAWRENCE H. HEFTMAN
                Schiff Hardin LLP
                233 S. Wacker Dr # 6600
                Chicago, IL 60606
                (312) 258-5500
                Email:  Lheftman@schiffhardin.com


FOR PRICEWATERHOUSECOOPERS LLP:

                PHILIP S. BECK
                MARK L. LEVINE
                CHRISTOPHER D. LANDGRAFF
                CHRISTOPHER R. HAGALE
                NICOLAS MARTINEZ
                Bartlit Beck Herman Palenchar & Scott LLP
                Courthouse Place, Suite 300
                54 West Hubbard Street
                Chicago, IL  60654
                (312) 494-4440
                Email: Philip.beck@bartlit-beck.com
                mark.levine@bartlit-beck.com

                MEREDITH MOSS
                PAUL ALESSIO MEZZINA
                King & Spalding LLP
                1700 Pennsylvania Avenue, NW
                Washington, D.C.  20006-4707
                (202) 626-2916
                Email: Mmoss@kslaw.com
                pmezzina@kslaw.com

ALSO PRESENT:  Gregory Conway, David Schillinger,
                Rami Burbar, Amy Gonzales, Lori Barnicke


Court Reporter: BRYAN A. WAYNE, RPR, CRR
                U.S. Courthouse, Room 4704-A
                333 Constitution Avenue, NW
                Washington, DC 20001
                (202) 354-3186


Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

# C O N T E N T S

## TESTIMONY

WITNESS:                                                        PAGE:


KENNETH MALEK:  Redirect Examination (Cont.)................3753
               Recross-Examination.........................3759

KENNETH LEHN:   Direct Examination.........................3762
               Cross-Examination..........................3805
               Redirect Examination.......................3872

```
 1                     P R O C E E D I N G S

 2            THE COURT:  Whenever you're ready.

 3            MR. SORENSEN:  Thank you, Your Honor.

 4        Welcome back, Mr. Malek.

 5            THE WITNESS:  Thank you.

 6          KENNETH MALEK, WITNESS FOR THE PLAINTIFFS

 7            REDIRECT EXAMINATION (CONTINUED)

 8   BY MR. SORENSEN:

 9   Q.   Let me show you a demonstrative that you were shown

10   yesterday by PwC counsel.  It's a demonstrative that has

11   testimony from Cathie Kissick talking about document exceptions.

12   Do you remember this testimony?

13   A.   I do.

14   Q.   Okay.  And actually, I'd like to put up the question that

15   you were asked.  The trial transcript page 3568.  And you were

16   asked some questions about this.  And you were -- if we look at

17   line 6, this is the question, reading from Ms. Kissick's

18   deposition, and the quote is, "It didn't have a power of

19   attorney with a signature matching it, or there was a typo," and

20   then she's asked later, "Was that part of a fraud?"  And she

21   said, "No."

22        Do you remember that testimony?

23   A.   I do.

24   Q.   Okay.  And do you remember the loans that were being

25   discussed in that testimony?
```

1    A.   Yes, I do.

2    Q.   Okay.  Why don't we take a look at that testimony.  It's

3    Kissick -- the transcript is at page 228.  And then if we look

4    down at the bottom, line 23, you'll see it says, "And then the

5    PwC work paper goes on to say, 'per discussion on January 26,

6    2008.'"

7         Do you see that?

8    A.   I do.

9    Q.   Okay.  And have you -- did you review that work paper?

10   A.   I did.

11   Q.   Okay.  Why don't we take a look at that work paper.

12   That is Exhibit A-185, I believe.

13         MR. SORENSEN:  And if we could go to page 129.

14   If you could pull out -- make that as big as you can, please.

15   BY MR. SORENSEN:

16   Q.   And this is a discussion of the aged loans.  Correct?

17   A.   Yes.  I see it.

18   Q.   Okay.  And it said, "Kissick reported the loans that appear

19   in the analysis are those loans made by TBW that have not been

20   sold due to some type of document exception."

21         Is that true?

22   A.   No.

23   Q.   Why were they not sold?

24   A.   Because these had serious impairments, not just document

25   exceptions.  If it were just a document exception, it would have

1   gotten cleared, sold in the ordinary course, not included by

2   me as part of the fraud loss.

3   Q.   And then Kissick -- it goes on to say, "Kissick reported

4   that TBW consistently has a group of loans that are aged, but

5   the dollar value of the group remains constant, just with

6   different individuals loans in the group."

7        Does that make any sense?

8   A.   The only way it makes sense is that they were cycling the

9   loans off of the aging report and into the secret database and

10  disguising them as constantly refreshing, fake AOT junk trades

11  when, in fact, it was the same pool of stale loans that weren't

12  getting sold.

13  Q.   And in your testimony you were talking about the tip of the

14  iceberg, that they would only show a tip, and the other stuff

15  got hidden down there.  Is that what that refers to?

16  A.   That's exactly what was going on here.

17  Q.   Okay.  And then she goes on to say, "Kissick stated that

18  the loans identified by the analysis are quality, A paper loans,

19  700-plus FICO score loans that are performing that have not been

20  sold into the second market due to a lack of documentation

21  perfection."

22        Is that true?

23  A.   No, it's not.

24  Q.   And is that reflected in the documents somewhere?

25  A.   Yes, it is.

1          MR. SORENSEN:  Let's pull up page -- I think it's

2     page 145 of the document.  If you could highlight that.

3     BY MR. SORENSEN:

4     Q.   Are these the loans that she's talking about?

5     A.   Yes, they are.

6     Q.   And is there a column that has FICO score?

7     A.   There is.

8          MR. SORENSEN:  Okay.  If we could pull that out.

9     BY MR. SORENSEN:

10    Q.   And do you see -- are there loans on there that have --

11         MR. LEVINE:  Your Honor, objection.  The scope was the

12    document exception issue.  Now we're on a different topic that

13    appear in the same document that he's using that I didn't use,

14    on FICO scores.  That's beyond the scope.  It's not the subject

15    matter I asked about.

16         THE COURT:  Overruled.

17    BY MR. SORENSEN:

18    Q.   And so you see these are -- are there -- this is just the

19    first page.  Are there many instances where the FICO score is

20    less than 700?

21    A.   There are.

22    Q.   Okay.  If we could just go to the last page of this.

23    I'm not going to go through every one.  There are 1100 loans on

24    here, and if you go to the last page, you will see highlighted

25    there are more that are less than 700, some substantially less

1    than 700.

2         Now, I'll just tell you, we went through and counted and

3    there are over 500 that are less than 700 FICO scores.  Is that

4    consistent with your analysis?

5    A.   Yes.

6              THE COURT:  Did you want to explain FICO scores?

7              MR. SORENSEN:  Sure.  And I think we have -- actually,

8    we do have -- do you have the FICO score, that demonstrative?

9    Why don't we put that up here and we can -- that might be

10   helpful here.

11   BY MR. SORENSEN:

12   Q.   Are you familiar with the FICO scoring?

13   A.   Yes, I am.

14   Q.   Okay.  And so --

15   A.   It's a Fair Isaac rating.

16   Q.   Okay.  And 700 means excellent credit.  Is that right?

17   A.   Yes.

18   Q.   Okay.  And below 700, what does that reflect?

19   A.   Well, as you go down the scale, you go from, you know,

20   non-A paper to subprime paper.

21   Q.   And is the difference between 700 and, say, 650, is that

22   significant to a lender?

23   A.   That is a huge difference.

24   Q.   And so the loans that were on that list we were looking at,

25   were they quality A, 700-plus FICO loans?

1    A.    No, they were not.

2              MR. SORENSEN:  Could we put up the demonstrative

3    that's on the board there, but put it on the screen?  Thank you.

4    BY MR. SORENSEN:

5    Q.    Mr. Malek, I'd like to ask you about this category that --

6    PwC counsel called it blue, and it says, "Real junk mortgages."

7          Do you see that category?

8    A.    I do.

9    Q.    Okay.  Is every mortgage that got put into the secret

10   database that you counted as a fraud loss, is every one of those

11   included in that blue category?

12   A.    No.

13   Q.    Okay.  Which ones did you include?

14   A.    I included both the ones in the yellow category and in the

15   blue category.

16   Q.    And if PwC had done a proper audit and the fraud was

17   discovered in 2004, would there ever have been a secret set of

18   books?

19   A.    No.

20   Q.    And if PwC had done a proper audit in 2003 and the fraud

21   had been uncovered, would there ever have been any junk loans

22   moved into fake AOT pools?

23   A.    No.

24   Q.    And just to be clear, did every loan that you included in

25   your damage analysis, was that a loan on which the FDIC suffered

1    a loss?

2    A.   Yes.

3             MR. SORENSEN:  No further questions.  Thank you.

4                      RECROSS-EXAMINATION

5    BY MR. LEVINE:

6    Q.   Mr. Malek, I'm only going to ask about two things here.

7    Number one, you testified about loans to Farkas and loans to

8    Welsh.  Are those personal loans?

9    A.   I believe they were.  They were identified in the total

10   loss claim, I believe.

11   Q.   How many of those were there altogether?

12   A.   I can't remember the specific number.  My general

13   recollection, from having read the document, is that there were

14   insider loans in that category in the 5 to $20 million range,

15   something in that...

16   Q.   But in terms of number of loans, you talked about for

17   Farkas, a loan for -- what was it a fireman, and a loan for

18   something else?

19   A.   Yes.  It was some kind of a nightclub-type establishment.

20   Q.   And actually, if you look through F4100, the exception

21   report, it shows two loans to Farkas and two loans to Welsh,

22   doesn't it?

23   A.   I can't remember specifically.  I just remember there was a

24   group of loans that was identified in the total loss claim, and

25   my recollection is it was in something in the 5 to $20 million

1   range.

2   Q.   All right.  One last topic.  You were shown and testified

3   about transcripts from the criminal trial.  That's the criminal

4   trial -- is that of Lee Farkas?

5   A.   Yes, sir.

6   Q.   And you read a number of volumes of the transcripts.

7   Correct?

8   A.   I did.

9   Q.   But, here, you didn't read a single page of transcripts

10  from the liability trial in this case in the fall, did you?

11  A.   No, I did not.  I read this Court's opinion.

12  Q.   And you didn't see what the liability and causation

13  witnesses testified to in the liability trial in this case by

14  reading the transcripts, did you?

15  A.   No, I did not.

16            MR. LEVINE:  Nothing further.

17            THE COURT:  Anything?

18            MR. SORENSEN:  Nothing, Your Honor.

19            THE COURT:  Well, I'm sure you're glad to step down,

20  but you're not finished yet; you will be back.  Just watch your

21  step getting down.

22            THE WITNESS:  Thank you, Your Honor.

23        (The witness steps down.)

24            THE COURT:  Does that complete the FDIC's case, other

25  than the fact that Mr. Malek is coming back?

1          MR. SORENSEN:  Other than rebuttal, yes, Your Honor.

2          THE COURT:  Okay.

3       So who is putting on Mr. Lehn?

4          MR. HAGALE:  I will, Your Honor.

5          THE COURT:  Fine.

6          MR. HAGALE:  PwC is going to call Dr. Kenneth Lehn,

7    and we need just a few minutes to set up here.

8          THE COURT:  Okay.  We're not going to take a break.

9    We'll just --

10         MR. HAGALE:  Right.

11         THE COURT:  We'll watch your setting up.

12         MR. HAGALE:  And would Your Honor like a copy of the

13   exhibits?

14         THE COURT:  I think I'm more comfortable working with

15   them on my screen.

16      Mr. Lehn, while they're setting up for you, why don't you

17   step forward and be sworn by the clerk, if you would, please.

18         MR. BECK:  Your Honor, while they're setting up, ever

19   the optimist, it occurred to me that we might actually get

20   Dr. Lehn on and off in time to conclude with Mr. Malek today.

21   So I just want to put that out as a possibility in the hopes

22   that Mr. Malek isn't going anywhere.  But it doesn't look like

23   he is.  And I think he'd probably appreciate that too.  So I

24   wanted that as a possibility.

25         THE COURT:  That would really be ideal, and then we --

1    tomorrow we could just concentrate on closing, unless FDIC has

2    some rebuttal.  But I think they'll do their rebuttal with

3    Mr. Malek.  So that would be great.  We'll see.

4              MR. HAGALE:  May I proceed, Your Honor?

5              THE COURT:  Please.

6          KENNETH LEHN, WITNESS FOR THE PLAINTIFFS, SWORN

7                        DIRECT EXAMINATION

8    BY MR. HAGALE:

9    Q.   Good afternoon, Dr. Lehn.

10   A.   Hello, Mr. Hagale.

11   Q.   Could you state your name, please.

12   A.   My name is Ken Lehn.

13   Q.   Dr. Lehn, what do you do for a living?

14   A.   I'm a professor of finance at the University of Pittsburgh.

15   Q.   Have you been --

16             THE COURT:  Dr. Lehn, I think you need to get closer

17   to the microphone, or bring the microphone up towards you.

18             THE WITNESS:  Sure.  Does that help?

19             THE COURT:  That's much better.

20             THE WITNESS:  Unfortunately, I can't get it to stay

21   here, but I can hold it.

22        (Discussion off the record.)

23   BY MR. HAGALE:

24   Q.   Dr. Lehn, have you been asked to give opinions in this case?

25   A.   I have.

1    Q.   On what?

2    A.   I've been asked to respond to Mr. Malek's damages analysis.

3    Q.   Dr. Lehn, I've put a demonstrative exhibit, PwC

4    Demonstrative 1, on the screen here.  Mr. Beck showed this

5    demonstrative in opening statements.  Are you here to give

6    testimony about one of the adjustments here today?

7    A.   I am.

8    Q.   Which one?

9    A.   The one that is titled Real Mortgages, and it's about a

10   $300 million adjustment.

11   Q.   And could you just very briefly describe your opinion at

12   a high level before we get into any detail?

13   A.   Sure.  My opinion is that Mr. Malek has substantially

14   overstated damages, and he's done so by including losses on the

15   blue mortgages, the ones that, in my opinion, are not fraud

16   losses.

17   Q.   I'm going to go through your background a little bit before

18   getting into any details on the merits here.  What degrees do

19   you have, Dr. Lehn?

20   A.   I have three degrees since high school, a bachelor's,

21   master's and Ph.D., all in economics.

22   Q.   Dr. Lehn, I've put up on the screen here Exhibit D2894.

23   Could you describe what this is?

24   A.   Yes.  This is the first page of my curriculum vitae,

25   although it's Exhibit A, so it's the entire curriculum vitae,

1    as of August 2016, which was the most recent curriculum vitae

2    at the time I submitted my report.

3    Q.    Your CV is a number of pages, so rather than go through it

4    page by page, did you help put together a one-page demonstrative

5    to summarize your background?

6    A.    I did.

7    Q.    I've put up on the screen PwC Demonstrative 100.

8          What is this, Dr. Lehn?

9    A.    This is a summary of my experience and publications.

10   Q.    Does this accurately summarize your background?

11   A.    I think it's a fair summary.

12   Q.    The first line there says that you're the Samuel A.

13   McCullough Professor of Finance at the University of Pittsburgh.

14   Is that correct?

15   A.    That's correct.

16   Q.    And what does that mean?

17   A.    That's an endowed chair at the University of Pittsburgh in

18   the school of business.

19   Q.    What are your responsibilities as a professor at the

20   University of Pittsburgh?

21   A.    They fall into three categories.  One is, obviously,

22   teaching.  Second is conducting research and publishing papers.

23   And then third is serving on committees and providing service to

24   the business school and the university.

25   Q.    You mentioned teaching.  What type of classes do you teach?

A.   Well, I've been teaching for about 30 years, so there have

been a variety of classes.  In recent years I largely teach

courses on business valuation, and in the past I've taught

various corporate finance classes on mergers and acquisitions,

corporate governance.  And periodically I teach in the law

school at the university as well.

Q.   Have you been a professor at any other universities?

A.   Yes.  I've been on the faculty at Washington University in

St. Louis, and then I've also visited at UCLA.  And when I lived

in Washington, I taught in the evening program at the Georgetown

Law Center.

Q.   The next two lines say chief economist at the U.S.

Securities and Exchange Commission and deputy chief economist at

the U.S. securities Securities and Exchange Commission.  Tell us

about your time at the SEC.

A.   I spent about a total of about four-and-a-half years at the

SEC.  And in both positions I helped run the economics office at

the SEC.

Q.   What were your responsibilities when you were running the

economics department at the SEC?

A.   Everything comes in threes.  There were largely three main

responsibilities.  One was working closely with the division of

enforcement and providing them with assistance on cases that

they were investigating or cases that they brought, second was

providing the commission with an economic analysis of policy

1    proposals that pertained to the SEC, and then third was

2    publishing papers on topics related to securities markets and

3    topics of interest to the SEC.

4    Q.   Dr. Lehn, you mentioned enforcement actions.  Approximately

5    how many enforcement actions were you involved with during your

6    time at the SEC?

7    A.   Well, I think cases I either worked on personally or

8    oversaw, there probably were 60 to 70 during my tenure at the

9    SEC.

10   Q.   What did those enforcement actions involve?

11   A.   Some type of alleged or actual securities fraud.  Most of

12   them would have been cases involving alleged insider trading or

13   alleged accounting fraud.

14   Q.   Any enforcement actions that we might be familiar with?

15   A.   Well, I was there during a period where there were a lot of

16   interesting insider trading cases.  So for example, Ivan Boesky

17   was a prominent name in the 1980s, and, you know, I certainly

18   worked on some of those cases.  Also, that was a period of time

19   in which Drexel Burnham and Michael Milken were charged and

20   convicted, at least in the case of Milken, of various reporting

21   and securities violations.

22   Q.   And what was your role in those enforcement actions?

23   A.   Well, twofold.  With respect to insider trading cases,

24   we were often asked to provide empirical evidence as to whether

25   the information that the insiders were trading on was material.

1    With respect to the Milken/Drexel Burnham stuff, I forget all

2    the details, but I recall basically estimating damages

3    associated with Mr. Milken's behavior that was used in his

4    sentencing after his conviction.

5    Q.   And moving on down to your publications, Dr. Lehn, have

6    you published any scholarly papers?

7    A.   I have, yes.

8    Q.   How many?

9    A.   Approximately 50.

10   Q.   And have you served on any editorial boards for any

11   scholarly journals?

12   A.   I have.  I have been on the editorial boards of about a

13   half dozen journals.

14   Q.   Were you the founding editor of any scholarly journals?

15   A.   I was.  I founded the Journal of Corporate Finance about

16   25 years ago.

17   Q.   Dr. Lehn, have you ever served as an expert in litigation

18   on finance business valuation or damages?

19   A.   I have, yes.

20   Q.   Approximately how many times?

21   A.   Well, this is a rough number.  I've been serving as an

22   expert for approximately 25 years, so I think in that time close

23   to 100 times I've been retained.

24   Q.   And have you ever been retained in litigation by the U.S.

25   government?

1    A.    I have, yes.

2    Q.    Which agencies?

3    A.    The two that come to mind -- it's possible there were

4    others -- are the Securities and Exchange Commission and the

5    Department of Justice.

6    Q.    What kind of cases were those where you were engaged by

7    the SEC or the DOJ?

8    A.    They, again, would be largely insider trading cases or

9    cases involving alleged accounting fraud.

10   Q.    In any of your expert engagements have you been involved

11   in a case involving mortgage finance?

12   A.    Yes.  I think there have been probably five stemming from

13   the housing crisis of about ten years ago, and in I think three

14   of those cases I was a damages expert and my task was basically

15   to disentangle fraud losses from nonfraud losses that were

16   incurred by investors.

17   Q.    Have you ever been retained by counsel for PwC?

18   A.    I have, yes.

19   Q.    Approximately how many times?

20   A.    I think, over the years, probably about five times.

21   Q.    And in this case, in forming your opinions, what materials

22   did you review?

23   A.    There have been a variety of materials.  Certainly,

24   Mr. Malek's report and his rebuttal report and the data that he

25   produced in the litigation.  I'm not a lawyer, but I always like

1    to read some of the legal proceedings.  So I've read the

2    complaint and various other pleadings.  I've read the trial

3    transcripts from the liability phase.  I've reviewed a lot of

4    data, and I've reviewed many deposition transcripts.

5    Q.   Have you reviewed the Court's findings of fact and

6    conclusions of law from the liability phase of this trial?

7    A.   Is that the order of liability?

8    Q.   Yes, it is.

9    A.   Yes, I have.  Yes.

10   Q.   Dr. Lehn, how are you being compensated for your time on

11   this case?

12   A.   At both my hourly rate -- my hourly rate is $1,050 an hour.

13   And then, in addition, I work with Compass Lexecon, which

14   provides support, and they provide me with compensation for

15   managing the staff as well.

16   Q.   And Dr. Lehn, have you been in the courtroom during opening

17   statements and the examinations of Mr. Malek?

18   A.   I have, yes.

19   Q.   At a high level, Dr. Lehn, what's the opinion that you're

20   offering here today?

21   A.   Again, my opinion is that Mr. Malek has substantially

22   overstated damages in this matter.

23   Q.   And how has he done that?

24   A.   He's done that by including losses on those blue mortgages

25   which, in my opinion, he has not established are fraud losses,

1    and therefore, they should be excluded from the damages

2    calculation.

3    Q.   And you've heard the term "junk" a lot over the last few

4    days.  Could you describe what junk is?

5    A.   Yeah.  Junk, as it's used in this case, is a pejorative

6    term, but generally it refers to mortgages that are defective in

7    some way such that they violate the purchasing guidelines of

8    Freddie Mac and government-sponsored entities, and therefore,

9    are not eligible for sale to those entities.

10   Q.   To your left there we have a board, which is PwC damages

11   Demonstrative 101.  Do you see that?

12   A.   I do.

13   Q.   So we're going to spend some time with that board today.

14   Hopefully the microphone on your tie works and so you can stand

15   up and explain, but let's walk through a few of the numbers on

16   that board.

17   A.   Sure.

18   Q.   The top left is claimed fraud losses at bank close, and

19   that's Mr. Malek's damages calculation.  Do you see that?

20   A.   I do.

21       And if I could ask, Your Honor, would you mind if I went to

22   the board?

23           THE COURT:  I would not mind, but now is the time we

24   find out if that other microphone works.  Because I already

25   think it doesn't.  But watch your step going down, and let's see

1    what we can do about a mic.

2            THE WITNESS:  Let's see if it's still on.  The light

3    is on.

4        (The witness steps down.)

5    BY MR. HAGALE:

6    Q.   Before we walk through that, Dr. Lehn, could you just

7    briefly describe what Mr. Malek's methodology was in calculating

8    fraud losses?

9    A.   Sure.  Yeah.  Mr. Malek uses a methodology that he refers

10   to as cash-in/cash-out.  And what he does is for every loan that

11   is at issue here, which is the red loans, the orange loans, and

12   the blue loans, for each one of those loans he computes the

13   amount of cash that Colonial Bank received from effectively

14   holding the loan.  And that would mostly be the mortgage

15   payments that were being made to Colonial Bank.  And then from

16   that he subtracts the cash that was used to advance the funding

17   to TBW.

18        So very simple example, if we had one mortgage that was

19   funded by Colonial Bank and it advanced $100 to TBW, and -- that

20   would be the cash-out, $100.  The cash-in would be the amount of

21   cash that came in on that mortgage from whenever it was funded

22   through the bank close date.  So, if Colonial received $20 of

23   payments on the mortgage during that period, the cash-in would

24   be $20, cash-out is $100, and Mr. Malek would compute the loss

25   on that loan as the $80 difference.

1  Q.   There's three subcategories under the claimed fraud losses

2  on PwC Demonstrative 101.  We've been through this quite a bit

3  in this trial, so just briefly, do those three subcategories

4  line up to the red mortgages, the orange mortgages, and the blue

5  mortgages?

6  A.   Correct.  These are the same numbers that were on the

7  tree diagram.  So Mr. Malek calculates the alleged fraud losses

8  at bank close as approximately $1.473 billion, and there are

9  three buckets of the alleged fraud losses.  The Plan B AOT,

10  $495 million, those are the red mortgages, and so those are the

11  losses associated with the fake trades of what in effect were

12  not real mortgages.

13       Then second are the so-called junk loans funded on AOT of

14  $562 million.  Those are the orange mortgages.  And these are

15  the losses associated with loans that were funded by Colonial

16  Bank, and in exchange for the funding, what they received was a

17  mortgage that was impaired at the time of funding, so impaired

18  meaning it was not eligible to be sold to a GSE.

19       And then third are the so-called junk loans that originated

20  on lines outside of AOT, principally COLB and Warehouse, and

21  then at some subsequent date they were transferred to AOT.

22       A major distinction between the blue loans -- these are the

23  blue loans -- and the orange loans is that Mr. Malek certainly

24  has provided no evidence, nor am I aware of any evidence that

25  I've reviewed, that indicates that these loans were impaired at

1    the time that they were initially funded.  And that totals to

2    $415 million, which he includes as a fraud loss which I believe

3    he has not established.

4    Q.   Thank you, Dr. Lehn.  And if I can ask you to move the

5    microphone just a little bit higher, maybe that will help a bit.

6         (The witness complies.)

7         So, Dr. Lehn, if a mortgage is funded on COLB and then

8    later ages and then is later moved on to AOT, when is the

9    cash-out on that mortgage?

10   A.   The cash is out when the loan is initially funded.

11   Q.   And is there any loss when that mortgage is moved from

12   COLB or Warehouse to AOT?

13   A.   No.

14   Q.   Dr. Lehn, looking back up at the board, PwC

15   Demonstrative 101, do you agree with Mr. Malek's calculation

16   of fraud losses?

17   A.   No, I disagree.  And, again, in my opinion, he should

18   exclude the $415 million of losses associated with the blue

19   mortgages.

20   Q.   Why is that?

21   A.   Well, I think -- to see it clearly, I think one has to go

22   back to how the stealing -- we heard a lot about stealing

23   here -- how the stealing occurred.

24        And the stealing occurred -- this is the stealing by TBW

25   from Colonial Bank -- in the following way.  Colonial would

1    advance funds to TBW, and in the case of Plan B AOT, in effect,

2    it didn't receive anything back, no collateral.  So that was

3    cash out with really nothing coming in.

4         With the orange mortgages, the junk loans that were funded

5    originally on AOT, the cash went out to fund mortgage, and then

6    what was received back was an impaired mortgage which had a

7    value less than the amount of funding because it was impaired.

8    And so that -- and those are both stealing.  I think that is the

9    way in which the stealing occurred.

10        With respect to the blue mortgages, the loans were funded,

11   and I haven't seen any evidence, and Mr. Malek has not provided

12   any evidence, that what Colonial received back was an impaired

13   mortgage that had a value less than the amount that was being

14   funded.  Therefore, there's no evidence that I've seen, no

15   evidence that he's presented, that the blue mortgages reflect

16   stealing by TBW from Colonial Bank.

17   Q.   So, Dr. Lehn, Mr. Malek has stated that he only included in

18   his damages calculation mortgages where Colonial Bank suffered a

19   loss.  Is that enough?

20   A.   No.  And to me, that's a rookie mistake when you're

21   conducting damages analysis, that a loss does not equate to

22   damages.  One has to disentangle losses that are fraud losses

23   that occurred because of the fraud versus losses that are

24   nonfraud losses that occurred in the ordinary course of

25   business, and Mr. Malek has not done that.

1    Q.   And you stated that you had reviewed the transcript from

2    the liability trial and the Court's opinion with respect to the

3    liability trial.  How did your review of those documents relate

4    to your opinion?

5    A.   Well, in a couple of ways --

6         MR. HEFTMAN:  Your Honor, I object.  He formed his

7    opinion well before the liability trial.  And so to ask how the

8    liability trial informed his opinion -- he reached his basis in

9    October of 2016, and he should testify on the basis on which he

10   reached his opinion.

11        MR. HAGALE:  Your Honor, as a damages expert, he is

12   assuming certain things are proven.  Things happened in the

13   court during the liability trial, and he's entitled to comment

14   on what's happened since his report.

15        MR. HEFTMAN:  What's going on is they're trying to

16   have an expert make a legal argument made in opening that's not

17   in his opinion.  It's not in his written opinion.

18        THE COURT:  What do you mean make a legal argument?

19        MR. HEFTMAN:  Well, I think we'll see, if they talk

20   about it, Your Honor, but in short, what I'm saying is he read

21   certain documents, he formed an opinion.  That should be the

22   basis on which he testifies.

23        MR. HAGALE:  Your Honor, all I'm asking him is how the

24   liability trial transcript and the opinion relate to his opinion

25   that he's already formed.

1          MR. HEFTMAN:  How would that be a relevant issue,

2     Your Honor?

3          THE COURT:  Well, it might elucidate his initial

4     opinion.  Well, what did he originally base his opinion on?  Why

5     don't we start there.

6          MR. HAGALE:  Dr. Lehn -- he can answer the question if

7     he'd like, but Dr. Lehn based his opinion on his review of

8     documents and pleadings and transcripts and a whole host of

9     things.

10          THE COURT:  Right.

11          MR. HEFTMAN:  Well, then he should testify about that,

12     not the Court's opinion.

13          THE COURT:  All right.  Why don't we go on that to

14     start out with.

15     BY MR. HAGALE:

16     Q.    Dr. Lehn, you heard Mr. Malek say that the fact that the

17     blue loans were eventually put on to a secret set of books is

18     one of his indicia of fraud.  Do you recall that?

19     A.    I do.

20     Q.    What did you think about that when you heard it?

21     A.    I disagree with Mr. Malek that the act of hiding the loan,

22     although it may be inappropriate, probably was inappropriate --

23     I'm not a lawyer so I wasn't asked to opine on that -- but the

24     actual act of hiding a loan does not mean that the losses

25     associated with that loan were part of the stealing.

1    Again, the litmus test for the stealing, quote-unquote, is

2    whether the loan was impaired when it was initially funded.  And

3    if it was [sic] and then it subsequently aged and then was,

4    quote, hidden on AOT, the actual act of hiding it,

5    quote-unquote, on AOT, however inappropriate that may be, does

6    not mean that that loss is a fraud loss.

7    Q.   And you heard Mr. Malek talk about the fact that Colonial

8    Bank was not asking TBW to repurchase aged loans off of Colonial

9    Bank's lines.  Do you recall that?

10   A.   I do.

11   Q.   And what was your reaction to that testimony?

12            THE COURT:  Wait.  Say that again.

13   BY MR. HAGALE:

14   Q.   One of Mr. Malek's indicia of fraud was the fact that

15   Colonial Bank was not requiring TBW to repurchase mortgages off

16   of Colonial Bank's lines.  Do you recall that?

17   A.   I do.

18            MR. HEFTMAN:  I do object because this is outside the

19   scope of his report.  The sum total of his opinion is three

20   paragraphs which mentions nothing about these issues.

21            THE COURT:  You're going to have to get to a

22   microphone if --

23            MR. HEFTMAN:  I apologize, Your Honor.

24       Objection, for the record.  The sum total of Professor

25   Lehn's report is three paragraphs.  It does not mention anything

1    about whether he formed an opinion or analyzed whether there was

2    an obligation to repurchase loans.

3            MR. HAGALE:  Your Honor, there was no mention of the

4    repurchase -- of the failure to repurchase loans as an indicia

5    of fraud in Mr. Malek's damages report.  Mr. Levine objected

6    that that testimony was outside the scope of his report.

7    Dr. Lehn is entitled to respond to that.  He would have

8    responded in his rebuttal report had that been in Mr. Malek's

9    expert report.

10           MR. HEFTMAN:  It is in -- I know it's in Mr. Malek's

11   rebuttal report, Your Honor.  It's not something he has

12   testified about, but we can cross him about it.

13           THE COURT:  Okay.  I'll overrule the objection.

14   BY MR. LEVINE:

15   Q.   Do you recall the question, Dr. Lehn?

16   A.   If you could repeat it.

17   Q.   Dr. Lehn, you heard Mr. Malek's testimony about one of his

18   alleged indicia of fraud is that Colonial Bank was not requiring

19   TBW to repurchase mortgages off of Colonial Bank's lines.  Do

20   you recall that?

21   A.   I do.

22   Q.   What was your reaction to that?

23   A.   Well, I disagree, again, with the inference that Mr. Malek

24   draws from that, and I think one has to place this in context.

25   You know, the first point is that, as he acknowledges, TBW was

1    the largest customer by far of Colonial Bank.  So it was an

2    important customer for Colonial Bank.

3         Second is, for most of the period under study, we were

4    going through the unprecedented housing crisis, housing and

5    financial crisis, and we all remember those days with declining

6    housing prices and skyrocketing delinquency and default rates

7    and failures of mortgage originators like New Century,

8    Countrywide --

9         MR. HEFTMAN:  Your Honor, just for the record, again,

10   not in his opening report at all.  There's nothing about any of

11   this.

12        THE COURT:  I think he's getting a little far afield,

13   don't you?

14        MR. HAGALE:  Well, Your Honor, he heard what Mr. Malek

15   said for the first time in his direct -- in Mr. Malek's direct

16   examination.  He's entitled to respond to that.

17        MR. HEFTMAN:  I just want to make clear, Your Honor,

18   that this witness included no economic data, no discussion of

19   mortgage originators failing.  His opinion is three

20   paragraphs --

21        THE COURT:  Can I see his opinion?

22        MR. HAGALE:  Your Honor, he was examined at length at

23   his deposition about all of these issues, and he discussed at

24   length the mortgage crisis in his deposition from Mr. Heftman's

25   questioning.  This is -- nothing of this is new.

1          MR. HEFTMAN:  I can display, Your Honor, the scope of

2     his opinion on these issues, if it would help the Court in

3     assessing these objections.

4          THE COURT:  That would be helpful.

5          MR. HEFTMAN:  Rami, can you put up Dr. Lehn's report?

6          MR. BECK:  Your Honor, while they're doing that, if I

7     can just interject, because it's a broader issue here, the --

8     over our objection, Mr. Malek, who was designated as a pure

9     damage calculator, was allowed to redefine the fraud and give a

10    lot of liability and causation testimony.  And Dr. Lehn was

11    always designated as someone who would respond to what Mr. Malek

12    said not only in his report but also at trial.

13       And Your Honor allowed that scope --

14         THE COURT:  Mr. Beck, first of all, that statement

15    doesn't correspond to the obligations of discovery.  You don't

16    have an expert come in and just free-wheeling respond to what's

17    said on the stand.  You have a report.

18       Now, I don't know what Mr. Malek's report -- I'm hearing

19    that he covered some of these things in his report.  If he did,

20    then you are on notice that your witness should have responded

21    to them.

22         MR. BECK:  Mr. Malek, as we showed during his

23    cross-examination, his report said, I will not be opining and

24    have no opinions on liability or causation.  I rely on others

25    for that, and I will only be calculating damages.

1          And then he shows up and says that I didn't read the

2     testimony of the people -- the trial testimony of the people I

3     said I was going to rely on, and he gave alternative liability

4     testimony, and Your Honor let him do it.  We understand it.

5               THE COURT:  What alternative liability testimony do

6     you think he gave, Mr. Beck?

7               MR. BECK:  Well, over here, for example, Your Honor,

8     junk loans equals fraud.  He testified as to each one of these,

9     and he said it's an indicia of fraud or a badge of fraud.

10    That's not somebody who's the human calculator.  That's somebody

11    who's talking about liability.

12              THE COURT:  I've heard enough of this.

13         Go ahead.  What's your objection?

14              MR. HEFTMAN:  I won't address that right now, but I'd

15    be happy to at a later time, Your Honor.  So this is Professor

16    Lehn's expert report.  If we turn to page 13, he obviously

17    addressed a number of issues in his report that are no longer

18    relevant.

19         The sum total of his opinion supporting his removal of

20    every they say is blue is paragraphs 19, 20, and 21.  It is one

21    page in total, and he should be held to the three paragraphs

22    that he has identified as the basis for his opinion in his

23    report and disclosed.

24         That's the basis of the objection, Your Honor.

25              MR. HAGALE:  And, Your Honor, Dr. Lehn's opinion was

1    that these were nonfraud losses and that Mr. Malek

2    inappropriately included them in his damages analysis.  He was

3    questioned at length at his deposition about what fraud losses

4    were and why he had those opinions.

5         The specific opinion that he's giving right now is in

6    relation to something that Mr. Malek said for the first time at

7    this trial and was not in his damages report.  So whether or

8    not --

9              THE COURT:  What are you asking him about now?

10             MR. HAGALE:  I'm asking him about the repurchase

11   obligations.

12             MR. HEFTMAN:  Well, actually, you just asked him to

13   talk about the financial crisis and the effect it had on

14   mortgage originators, and if this economist was going to provide

15   testimony about the economic effects of the mortgage crisis on

16   other mortgage originators other than Colonial Bank, then that

17   should have been disclosed.  That should have been documents

18   considered.  But his documents considered contained none of

19   that.  Nothing has been disclosed.

20             THE COURT:  So what is your question?

21             MR. HAGALE:  My question was, Dr. Lehn heard

22   Mr. Malek's testimony about the repurchase obligations of

23   Colonial Bank, and what was his reaction to that?

24             THE COURT:  All right.  I'm going to let him answer

25   that question.  We'll see where it goes.

1    MR. HEFTMAN:  Thank you, Your Honor.

2    THE WITNESS:  And so I'll short-circuit it a bit,

3    but again, I think Mr. Malek needs to take into consideration

4    the context in which those decisions might or might not have

5    been made.  TBW was by far the largest customer of Colonial

6    Bank.

7    We were going through this unprecedented housing crisis,

8    and so this was a time where, if one of your major customers

9    might be going through financial difficulties, as a business

10   decision, it may be imprudent for you to try to force a

11   repurchase that could cripple your largest customer.  It would

12   be tantamount to shooting yourself in the foot.  You might

13   choose to manage it in a more refined way, if you will.

14   And if you look at Mr. Malek's exception reports, you see

15   frequent margin calls on the COLB line.  So if the value of the

16   collateral was falling that Colonial Bank was holding, they

17   would basically require TBW to send more money to Colonial Bank.

18   That's short of forcing a repurchase, but it's one way of

19   managing during this very difficult time.

20   THE COURT:  And did TBW send more money?

21   THE WITNESS:  Yes.  My understanding is they did, yes.

22   THE COURT:  You really think so?

23   THE WITNESS:  Well, my recollection is that there was

24   some cash-in.  When we talked about cash-in before, I indicated

25   that most of the cash-in were payments on mortgages, but some of

1    the cash-in also was the reception of cash in response to margin

2    calls.

3    BY MR. HAGALE:

4    Q.   Thank you, Dr. Lehn.  You also heard Mr. Malek state that

5    the fraudsters had testified that they dumped junk loans on to

6    COLB.  Do you recall that?

7    A.   I do.

8    Q.   And what was your reaction to that?

9    A.   Again, Mr. Malek, in his rebuttal report, takes excerpts

10   from -- you know, probably a half dozen excerpts from different

11   depositions where he claims those deposition transcripts

12   illustrate that TBW was dumping junk on COLB when, in fact, I

13   read every word of the excerpts that he provided, and in none of

14   them is there any evidence that anyone said that TBW was dumping

15   junk loans on the COLB line.

16        There is testimony that they were dumping them on the AOT

17   line, but not on the COLB line, and those are the blue mortgages.

18   Q.   And you heard Mr. Malek also testify to the fact that a

19   mortgage wasn't able to be sold and became aged is another

20   indicia of fraud.  Do you recall that?

21   A.   I do.

22   Q.   And what was your reaction to that?

23   A.   I strongly disagree with that as well, that aging of loans,

24   especially during this period, was not uncommon.  And I must

25   say, Your Honor, that when I -- I've worked on a number of these

mortgage finance cases related to the housing crisis.  This is the first time I've ever seen an expert file a report -- and Mr. Malek's opening report was a big, thick report.  There was not a single reference, not one reference, to the housing crisis when he's looking at losses that were incurred on mortgages and mortgage-related securities.

I found that astounding that one would ignore the housing crisis, and the aging of loans during this period of time by no means was indicative of fraud.

Q.   Dr. Lehn, you heard Mr. Malek testify that there was data in an exception report that he ran that he said showed that these loans were fraudulent.  Do you recall that?

A.   I do.

THE COURT:  I'm sorry.  Say that again.

BY MR. HAGALE:

Q.   Dr. Lehn, you recall that Mr. Malek testified about an exception report that he ran that he stated was one of his indicia of fraud.  Do you recall that?

A.   I do.

MR. HAGALE:  Put Exhibit F4100 on the screen.

BY MR. HAGALE:

Q.   What is this, Dr. Lehn?

A.   This is the underlying data that Mr. Malek analyzed.

Q.   And what was Mr. Malek's conclusion that he drew from this exception report?

1    A.    The conclusion that he drew is that it supports his view

2    that the loans that were moved from other lines to AOT were,

3    quote, junk on arrival, meaning that they were defective at the

4    time they were initially funded.

5    Q.    And before we go any further, what is an exception?

6    A.    An exception is some marking of a loan that indicates that

7    it's troubled, and certainly troubled in such a way that would

8    make it not eligible for sale.

9    Q.    And do you agree with the conclusion that Mr. Malek drew

10   from Exhibit F4100?

11   A.    Here again, not at all.

12   Q.    Why is that?

13   A.    Well, for several reasons.  One is Mr. Malek is using the

14   presence of an exception loan or the marking of a loan as an

15   exception as indicative that it was so-called junk on arrival.

16   His own data shows that of the roughly 4200 blue mortgages, only

17   half of them were marked exceptions.  So by his own criteria,

18   half of them, roughly 2100, weren't marked exceptions and,

19   therefore, under his criterion, would not be indicative of junk

20   on arrival.

21        Second, of those that were marked exceptions, about half of

22   them were marked exceptions on ProMerit, which means none of

23   that was hidden.  That was not part of the secret books, if you

24   will.  So that was known.  It was hidden, and it was used by

25   management.

1    Furthermore, I asked the Compass Lexecon to calculate the

2    date on which a mortgage that was funded by Colonial outside of

3    AOT, the date on which the funds were advanced and then compare

4    that to the date on which the loan was marked as an exception.

5         MR. HEFTMAN:  Your Honor, I object.  This is, again,

6    an analysis that he could have revealed in his deposition when

7    he was questioned about this document.  He said none of this.

8    This is a brand-new opinion, never disclosed, that he had an

9    opportunity to testify about.

10        MR. HAGALE:  Your Honor --

11        MR. HEFTMAN:  We questioned him about this very

12   document.

13        MR. HAGALE:  Your Honor, this was an exception report

14   that was created by Mr. Malek in his rebuttal report after

15   Dr. Lehn's report, and he's entitled to testify about the mere

16   underlying data in Mr. Malek's exception report.

17        MR. HEFTMAN:  And then he testified about it and said

18   none of this in his deposition when asked about his analysis of

19   that report.  So --

20        MR. HAGALE:  If he wants to cross-examine Dr. Lehn on

21   this, he's free to cross-examine him on --

22        THE COURT:  Wait a minute.  His deposition was taken

23   after the rebuttal report?

24        MR. HAGALE:  That's correct, Your Honor.

25        THE COURT:  Okay.  So this information was in the

1    rebuttal report, and he was asked about it.  And said nothing

2    about it?

3            MR. HAGALE:  I don't believe he was asked a question

4    about whether he reviewed the data in the way that he's

5    disclosing right now.

6            THE COURT:  Was he?

7            MR. HEFTMAN:  I asked him questions about his review

8    and analysis of the data and what he took from it.

9            THE COURT:  Did you ask him about the exception

10   report?

11           MR. HEFTMAN:  Yes.  The exception report, certainly.

12           THE COURT:  Sustained.

13   BY MR. HAGALE:

14   Q.   Dr. Lehn, have you calculated the amount of the blue

15   mortgages?

16   A.   I have, yes.

17   Q.   And what's the amount that you calculated them to be?

18   A.   Well, just to be specific, I've calculated the losses

19   associated with the blue mortgages as approximately

20   $415 million.

21           THE COURT:  So then you agree, essentially, with the

22   figure that's on there.  Right?

23           THE WITNESS:  I believe Mr. Malek and I agree on the

24   math behind the calculation.  Correct.

25

1    BY MR. HAGALE:

2    Q.    I've put up on the screen Exhibit D005 and this is

3    Exhibit C-1 to your report in this case.  What is this?

4    A.    This is an exhibit that was in my report, and it shows the

5    underlying calculation that led to the $415 million of losses on

6    the blue mortgages.

7    Q.    Could you walk us through briefly what it is you did here?

8    A.    Sure, if I may get up again.

9               THE COURT:  Sure.

10              THE WITNESS:  So this data, Your Honor, contains the

11   roughly 7800 loans that comprise the orange and the blue

12   mortgages.  So it's the sum of the two.  And if you look on the

13   far left-hand column, it says "count," and if you went to the

14   very last page, it would be 7800-and-something.  Then the second

15   column is the loan number for that particular mortgage.

16         And then the third column is key, because you sometimes see

17   check marks, and you sometimes do not.  You see a check mark

18   when that particular loan that was considered by Mr. Malek to be

19   junk AOT at bank close, whether that loan was initially funded

20   outside of AOT and then transferred into AOT or whether it was

21   funded initially on AOT.

22         Where you see a check mark, that indicates that that loan

23   was funded originally on either COLB or Warehouse, and not on

24   AOT.  Then you see a series of check marks, and then some are

25   blank.  The ones that are blank were the ones that were funded

1    originally on AOT.

2          Then, basically, using the same methodology as Mr. Malek --

3    and at this point we -- none of us knew what the start date

4    would be, so Mr. Malek and I both used a variety of potential

5    start dates.  But the one column that is most relevant now is

6    the very last one where you see 8/14/2009.  That's the bank

7    close.  And what you see in that last column are the losses

8    using the cash-in/cash-out approach for every loan that was

9    funded on AOT.

10         And wherever you see a check mark, you see blanks, not

11   because there weren't losses, but I wanted to total the losses

12   that Mr. Malek had calculated, which was the combined orange and

13   blue of $978 million -- you might recall that number that he's

14   advanced -- I wanted to subtract from that the losses only on

15   the orange mortgages.  So C-1 effectively tells us what the

16   total losses on the orange mortgages were at bank close.

17   BY MR. HAGALE:

18   Q.    Dr. Lehn, I've gone to the last page of Exhibit C-1.

19   Could you tell us what this represents here?

20   A.    Yeah.  If you look in the far right-hand column there where

21   it says -- so this basically is summing the balances or, if you

22   will, the losses on the orange mortgages at various points in

23   time.

24         And the very last number to the far right is the total

25   losses associated with the orange mortgages as of bank close.

1    And you can see that number is $562 million, which is this

2    number that you see, Your Honor, next to the junk loans funded

3    on AOT of $562 million.  And again, those are the total losses

4    associated with the orange mortgages, and I'm not challenging

5    that calculation by Mr. Malek or the inclusion in his damages

6    estimate.

7    Q.   How do you get to the number for the blue mortgages from

8    your calculation from Exhibit C-1?

9    A.   Well, again, Mr. Malek and I agree that the total losses on

10   the junk, quote, in AOT at bank close was approximately the

11   $978 million number that Mr. Malek presented.

12        If you simply subtract 562 million from the 978 million,

13   you get this $415 million, and that would be the losses

14   associated with the so-called junk loans that were funded

15   outside of AOT, aged on other lines, and then were transferred

16   in to AOT.

17   Q.   Going down one more row on PwC Demonstrative 101, you see

18   preexisting fraud losses on 2/25/04.  What is that?

19   A.   Yes.  Those are the losses that had already been incurred

20   prior to the start date which Mr. Malek used as February 25, 2004.

21   Q.   What was Mr. Malek's calculation?

22   A.   The $229 million.

23   Q.   Do you agree with that?

24   A.   I disagree with that, and the reason I disagree with that

25   is that this $229 million that Mr. Malek calculated as

1    preexisting fraud losses included approximately $15 million,

2    which you see in blue, which were the losses associated with

3    loans that were originally funded outside of AOT and then

4    subsequently moved into AOT.

5         And I just -- it seems like a point worth making that, as

6    of 2/25/04, AOT wasn't even in existence.  So, obviously, they

7    were transferred into AOT at some subsequent time.

8    Q.   What effect does this $15 million adjustment that you made

9    have on damages?

10   A.   It increases damages, because what I'm doing is reducing

11   the preexisting fraud loss by $15 million, and that then has the

12   effect of increasing damages all else equal, from the period of

13   2/25/04 through bank close.

14   Q.   The line underneath that is claimed fraud losses after

15   2/25/04.  Could you describe what that is?

16   A.   Sure.  So what Mr. Malek does is he looks at the alleged

17   fraud losses as of bank close, and then he subtracts that amount

18   of alleged fraud losses that existed prior to the 2003 audit, or

19   2/25/04, on grounds that PwC is certainly not liable for any

20   losses that it incurred prior to that date.  So he's subtracting

21   that from the end number, and that leaves him with approximately

22   $1.244 billion of alleged fraud losses after February 25, 2004,

23   through the closing of the bank on August 14, 2009.

24        THE COURT:  And you don't agree with that number

25   because you'd add 15 million somewhere in there.  Right?

1          THE WITNESS:  Well, I don't agree with that number,

2     Your Honor, for two reasons.  One is that Mr. Malek, in my

3     opinion --

4          THE COURT:  The 415, of course.

5          THE WITNESS:  Right.  It's the 415, and that's at bank

6     close.  And the 415 are the losses with the blue mortgages as of

7     bank close.  But $15 million roughly of those losses had

8     occurred prior to February 25, 2004.

9          So it's this $400 million adjustment that I make, because

10     these are the losses associated with the blue mortgages after

11     February 25, '04 through bank close.  And again, in my opinion,

12     there's no evidence that the stealing manifests itself in these

13     blue mortgages.  There's absolutely no evidence that Mr. Malek

14     has presented to support that position.

15     BY MR. HAGALE:

16     Q.   Dr. Lehn, the next line down is income from TBW.

17     Do you see that?

18     A.   I do.

19     Q.   Just very briefly, what does that relate to?

20     A.   Yeah.  Mr. Malek basically looked at the income that

21     Colonial Bank earned from its relationship with TBW and

22     calculated the aggregate income from 2/25/04 through bank close,

23     and he deducts that from the alleged fraud losses of

24     $1.244 billion as he's calculated his damage number.

25          THE COURT:  And you agree with that figure?

1           THE WITNESS:  I don't challenge that.  Correct.

2    BY MR. HAGALE:

3    Q.   And then, finally, the last line before the total line at

4    the bottom on PwC Demonstrative 101, is the FDIC recoveries.  Do

5    you see that?

6    A.   I do.

7    Q.   And what is that?

8    A.   So these are the so-called allocable recoveries.  So

9    Mr. Malek looked at, I think either five or six recoveries or

10   restitution payments, summed them up, and then he attempted to

11   allocate those recovery and restitution payments to different

12   components of fraud.  And in particular, he was interested in

13   excluding any recoveries that he would allocate to losses that

14   PwC was not liable for, so things like ship not paid and the

15   preexisting fraud losses.

16   Q.   Do you have an adjustment to Mr. Malek's calculation?

17   A.   I do, and because I do not believe the $415 million of

18   losses on the blue mortgages were fraud losses -- I don't

19   believe he's established that -- it would be inappropriate to

20   apportion any of the recoveries to those losses as Mr. Malek

21   did.

22           And so what I've done is, using his same methodology, the

23   pro rata methodology that he used, I then estimated that about

24   $99 million of those recoveries had been apportioned by

25   Mr. Malek to losses that are not fraud losses and, therefore,

1    that should be a reduction in the recovery number that he

2    calculated.

3    Q.   And what effect does this $99 million adjustment have on

4    damages?

5    A.   All else equal, it increases damages because it reduces the

6    setoff, if you will.

7    Q.   And Dr. Lehn, did you help prepare some demonstratives to

8    explain how you came to that $99 million adjustment?

9    A.   I did.

10   Q.   Okay.  I've put PwC Demonstrative Exhibit 102 on the screen

11   here.  Can you tell me what's going on here, Dr. Lehn?

12   A.   Sure.  And there are some pretty tedious calculations,

13   Your Honor, that lies behind the numbers for both Mr. Malek and

14   me, so I thought a diagram would provide the intuition, and then

15   certainly can describe the tedious calculations.

16           THE COURT:  Oh.  Maybe not.

17       (Laughter)

18           THE WITNESS:  We see three bars here.  So the far

19   left-hand bar is Mr. Malek's alleged fraud losses after

20   February 25, 2004.  And you see that number 1244 corresponds to

21   that number 1244.  So this is just a bar chart, and you see

22   there are three different sections to that bar -- and I am color

23   blind, Your Honor, but I am told that that is red.  So that's

24   the Plan B AOT, which is about the $495 million; and then, of

25   course, the orange, which are the loans that were funded

1    originally on AOT, and that's the 562 million.  Then the blue

2    loans, of course, are the ones at issue here, and they are the

3    ones that were funded outside of AOT and then subsequently

4    transferred to AOT.

5         So he takes that 1244.  From that, he has total reductions

6    of $619 million, which is just the sum of the income from TBW

7    and the FDIC recoveries.  And you'll see in the bar chart here,

8    the middle bar, I've highlighted in blue the $99 million that I

9    think should be taken out because it includes recoveries

10   allocated by Mr. Malek to what I don't believe are fraud losses.

11        And then the third bar is his damages number, which is the

12   $625 million number.  And geometrically, it's simply the second

13   bar subtracted from the first bar, and that results in his

14   $625 million number.  And it consists of, you see both the blue

15   and -- I believe that's orange down below.

16             MR. HAGALE:  It's striped orange and red.

17             THE WITNESS:  Okay.  Orange and red, which are the

18   junk loans funded on AOT plus the Plan B AOT, and then the blue

19   part is the stuff that I think should be taken out.

20   BY MR. HAGALE:

21   Q.   So let's take it in small pieces.  I'm going to PwC

22   Demonstrative 103, and could you tell me what this demonstrative

23   represents?

24   A.   Yes.  So, again, visually, what I'm doing is taking out

25   that $400 million of losses on loans that originated outside of

1    AOT, aged on other lines other than AOT, and then were moved to

2    AOT.  Because they don't reflect the stealing.  Again, the key

3    litmus test is, were the loans impaired at the time they were

4    funded?

5            THE COURT:  Well, let me ask you about that.  I

6    realize this is all very interesting, and I can follow it and

7    it's not -- your criteria, as I understand it, is that you

8    assess the, quote, stealing category at the moment the loan is

9    acquired by Colonial.

10        Do you believe that things can happen to that loan

11   afterward and that the treatment of that loan can ever transform

12   it from a, quote, good loan to a bad loan?

13           THE WITNESS:  Good and bad in the sense of --

14           THE COURT:  Well, we know what we mean.  We mean a

15   loan that originates under your definition would be a good loan;

16   it's not a stealing loan.

17           THE WITNESS:  Correct.

18           THE COURT:  All right?  It was acquired and put in --

19   not put in AOT at the time.  It's put in AOT later.

20           THE WITNESS:  Correct.

21           THE COURT:  Is it your opinion that between the time

22   of the acquisition of the loan and either when it's put into AOT

23   or after it's put into AOT, nothing can happen to that loan that

24   would convert it into a loan on which something shady had

25   happened?

1          THE WITNESS:  Again, my only hesitancy is when we talk

2     about good or bad, that --

3          THE COURT:  Forget about good or bad.  That anything

4     would happen to that loan that would make you think that it had

5     become part of the stealing situation.

6          THE WITNESS:  You know, I'm always reluctant to give

7     an unequivocal no, but I'm pretty darn close to saying

8     unequivocally no for the following reason, Your Honor:  That the

9     stealing, as I understand it, took the form of Colonial funding

10    the -- advancing funding to TBW and then getting back something

11    that was either worthless or worth less than the amount that it

12    funded.  That's not the case with the blue mortgages.  There's

13    no evidence that what they received back in exchange for the

14    funding was of lesser value, that it was impaired at the time of

15    the funding.

16         Now, it can naturally age for reasons related to the

17    housing crisis and even outside the housing crisis.  There are,

18    you know, good business reasons why loans can age, and these did

19    age.  And we know, from looking at the balances, that they

20    ballooned during the housing crisis.

21         Now, insofar that management did something inappropriate by

22    hiding those mortgages in AOT, the hiding doesn't sound like a

23    good thing, but in terms of losses associated with misconduct of

24    PwC, there's nothing in the transfer itself that converts that

25    loan from a nonfraudulent loan to a fraudulent loan, because the

1    stealing, quote-unquote, occurs at the inception of the funding.

2        And the fact that it went into AOT and maybe it continued

3    to decline in value, well, I don't see any reason why, if it

4    hadn't been moved to AOT, that very loan, given the

5    characteristics of the borrower or whatever the problem is, it

6    probably would have sustained the same decline in value if it

7    aged on a COLB line or a Warehouse line.

8        So, again, I think one has to separate the act of moving

9    something into AOT versus the stealing, and there's nothing --

10   I mean, the moving to AOT, it's just, where are you putting this

11   thing?  And it may be that, you know, management didn't behave

12   properly.  But my understanding of this case is that PwC engaged

13   in a misconduct by not detecting the TBW fraud; and that's the

14   stealing, and that's why I think this litmus test that I've set

15   up is so important.

16           THE COURT:  I understand your -- I hear you.  Okay.

17   BY MR. HAGALE:

18   Q.   So let's continue with your demonstrative here.  Moving on

19   to PwC Demonstrative 104, what's going on in this demonstrative?

20   A.   Okay.  And I think the only difference is we reduced

21   Mr. Malek's alleged fraud losses from the $1.244 billion to the

22   $844 billion [sic] by subtracting out that $400 million of

23   losses associated with the blue mortgages.

24   Q.   And then moving on to PwC Demonstrative 105, tell me what

25   you've done here.

1    A.    So, again, I've removed the $99 million of recoveries that

2    Mr. Malek had allocated to the losses on the blue mortgages on

3    grounds that, in my opinion, he hasn't established that they are

4    fraud losses and, therefore, none of the FDIC recoveries should

5    be allocated to them.

6    Q.    And then going to Demonstrative 106, could you tell me

7    what's happening now?

8    A.    Yes.  And that then reduces the reductions from roughly his

9    $619 million to now about $519 million.

10   Q.    And now Demonstrative 107.

11   A.    Yeah.  This is where now I take out this $300 million down

12   here, which is the $400 million, which is taking out the losses

13   on the blue mortgages, but then reducing the recoveries by

14   99 million, and that causes the adjustment to damages to be

15   $300 million.  A $300 million reduction.

16   Q.    Thank you.  And then going to Demonstrative 108, what's the

17   result here?

18   A.    And that would give an adjusted damages number, using

19   Mr. Malek's framework -- so I'm not offering this as an

20   affirmative damages number, but I'm saying, working within his

21   framework and making what I think is a proper adjustment, that

22   the damages under his methodology would fall to about

23   $324 million.

24   Q.    Thank you.  We're going to move on to go into the details

25   of your $99 million adjustment, but before we do that, I wanted

1    to circle back to one thing that we talked about earlier.  We

2    were talking about Exhibit F4100.  Do you recall that?  This is

3    the exception report.

4    A.    I do.

5    Q.    And you had some testimony and there was an objection, and

6    I just want to make sure that the record is clear.  You had an

7    answer related to a 50 percent number.  I don't believe there

8    was an objection to that number, but I want the record to be

9    clear.  What's your opinion with respect to Mr. Malek's

10   exception report?

11   A.    Well, again, Mr. Malek is trying to use the presence of an

12   exception, a marking of a loan as an exception, as indicative

13   that that loan was junk on arrival so it was impaired at the

14   time it was funded, and I don't think he has established that

15   with his data on exception loans.

16   Q.    And why is that?

17   A.    Well, again, there are about 4200 of those blue mortgages,

18   and he only finds that 50 percent of them are marked as

19   exception.  So if he believes that a mark as exception is

20   indicative of so-called junk on arrival, by his very own

21   criteria, 50 percent of those loans, or 2100 loans, were not

22   junk on arrival.  At least there's no indication they were junk

23   on arrival.

24        Of the remaining 50 percent, there was a long time delay

25   from the time that the loans were initially --

1          MR. HEFTMAN:  Your Honor, that's the opinion that

2     you already excluded.

3          THE COURT:  Wait.  Wait.  I'm sorry.  I lost you

4     somewhere in there.  What was your question?

5          MR. HAGALE:  The question is what his opinion is with

6     respect to the exception report.  I understand there was an

7     objection to Dr. Lehn talking about the analysis that Compass

8     Lexecon did, and I understand that that was sustained, and I'm

9     simply asking him about his opinion with respect to the

10    50 percent exception rate.

11         MR. HEFTMAN:  And I have no problem with him talking

12    about his evaluation of the report, as he did in his deposition,

13    but not bringing in this new opinion that has already been

14    excluded which he just was starting to veer in to again.

15         THE COURT:  Well, I've lost your distinction.  Right

16    now, he is saying that even if you use Mr. Malek's computations

17    about exceptions, it still only comes to half of the 4800, or

18    whatever number we're talking about.

19         MR. HEFTMAN:  Sure.  And he's testified to that twice

20    and --

21         THE COURT:  So what's the next question?

22         MR. HAGALE:  That's the end of that detour, Your Honor.

23         THE COURT:  Okay.  I got that.

24    BY MR. HAGALE:

25    Q.   Getting back to the calculation of your $99 million

adjustment, Dr. Lehn, did you help to put together some more

granular demonstratives to explain the $99 million adjustment?

A.    Yes.  These are the tedious calculations.

Q.    I put up on the screen PwC Demonstrative 109.  Just at a

high level, could you describe what's going on in this

demonstrative, Dr. Lehn?

A.    Yes.  This recreates Mr. Malek's calculation of the

allocable recoveries.  And if you look, Your Honor, at the far

left-hand side, there are five rows.  Those were the five

sources of either recovery or restitution.

        THE COURT:  Let me save you some time.  Are you doing

a percentage, basically, saying that the 99 is to the total --

you're doing a percentage of getting that 99 million.  Right?

        THE WITNESS:  Correct.  And the way I do that is use

the same pro rata methodology that Mr. Malek uses, but now I'm

applying it to two things.

    One is I'm applying it to the losses on the blue mortgages

on grounds that I don't believe they are fraud losses, and then

there's a fairly minor adjustment to his calculation of the

recoveries allocable to preexisting fraud losses because I have

a small adjustment to that as well.  But otherwise, I'm using

the same methodology.

        THE COURT:  I understand.  Okay.  You can take him

through it, but I think I know where his --

        MR. HEFTMAN:  Your Honor, if it would help matters, I

1    mean, our disagreement with Professor Lehn is that these are

2    all fraud losses.  We don't care about the math.

3              THE COURT:  That's what I thought.  I thought the

4    99 million isn't the issue.

5              MR. HAGALE:  Your Honor, if the FDIC stipulates to

6    the 99 million adjustment, assuming Dr. Lehn is correct on the

7    reduction of the fraud losses, then we can save a whole lot of

8    time.

9              THE COURT:  I think you can.  Because I know where

10   he's going, they know where he's going, and that's not the issue.

11             MR. HAGALE:  Thank you, Your Honor.

12             THE COURT:  If he were correct, that $99 million

13   figure is correct.

14             MR. HAGALE:  Thank you, Your Honor.

15             MR. HEFTMAN:  Right.  If every one of those blue loans

16   was perfectly legitimate.

17             THE COURT:  Right.  That helped.

18             MR. HAGALE:  Yes, it did.  Saved quite a bit of time.

19   BY MR. HAGALE:

20   Q.   Dr. Lehn, going back to the board there, so your adjustment

21   is $99 million, roughly, to the FDIC recoveries.  Correct?

22   A.   That is correct.

23   Q.   So just to recap, could you say what your opinion is

24   as to what the adjustments should be to Mr. Malek's damages?

25   A.   Sure.  The two adjustments would be to remove the

$400 million of losses on the blue mortgages after February 25, 2004, through bank close on grounds that Mr. Malek hasn't established, nor am I aware of any evidence, that any of these reflected the stealing that's at the center of the fraud.  But then -- and that's a $400 million reduction.

But then there's a $99 million increase to damages to reflect the reduction in recoveries because I'm taking out the recoveries that Mr. Malek had allocated to those losses, which I don't believe are fraud losses.

Q.   And then what is your bottom line adjustment to Mr. Malek's damages number?

A.   The bottom line adjustment is $300,922,884.

Q.   And just circling back to Mr. Beck's slide from the opening statements, does that appear there as the first adjustment?

A.   It does, yes.

Q.   And if you make the adjustment that -- your adjustment of around $300 million, what's the result?

A.   Yeah.  You simply subtract that $300 million from Mr. Malek's $625 million, and you get $324,386,201.  That is the adjusted-damages number using Mr. Malek's methodology but making this adjustment, which I believe is proper.

MR. HAGALE:  Thank you.  Nothing further.

CROSS-EXAMINATION

BY MR. HEFTMAN:

Q.   Good afternoon, Professor Lehn.

1    A.    Good afternoon.

2    Q.    So looking at your board, you think that Mr. Malek has

3    calculated damages with reasonable certainly of $324,386,201.

4    Correct?

5    A.    I would not say that.  Again, the adjustment I've made is

6    working within the parameters of what he has done.  I'm

7    responding and making what I think are precise and proper

8    adjustments to what he's done.

9          I think there are other issues that potentially could be

10   challenged, and I've chosen not to simply because any

11   adjustments would be less precise than the ones that I've

12   advanced here.

13   Q.    Okay.  Well, the only adjustment that you have identified

14   is the $300 million one, and this is your demonstrative, and

15   according to you, the result of that adjustment is that the

16   damages that you have not contested as not being established

17   with reasonable certainty are $324,386,201.  Correct?

18   A.    Again, I'm working within the framework of what Mr. Malek

19   did, and I've made what I think is the appropriate adjustment.

20            THE COURT:  I realize you don't want to answer yes to

21   that question, but he has asked it in such a way as to say those

22   are the only adjustments you're making now.  Right?

23            THE WITNESS:  They are the only adjustments I'm making.

24   I just wouldn't want to take ownership of that $324 million

25   that -- I was asked, Your Honor, to respond to what Mr. Malek

did.  I wasn't asked, if you will, to provide an affirmative-
damages analysis, and if I would, I might well have chosen a
different methodology that would arrive at a different number.
But as a rebuttal expert, I am working within the framework of
what he has done and making what I think is a key critical
adjustment.  And his number would be $324 million if he excluded
the nonfraud losses.

        THE COURT:  That's as good as you're going to get,
Counsel, so stick with it.  All right?

BY MR. HEFTMAN:

Q.  Just to be clear, no restrictions were placed on the scope
of your testimony.  Right?  You were free to -- if you had a
criticism of Mr. Malek's opinion and how he got to $625 million,
you were free to offer it.  Right?

A.  Correct.

Q.  Okay.  All right.  So you have -- I want to talk with you
about what a fraud loss is.  Because essentially your entire
testimony is you think a category of these loans are not fraud
losses.  Right?

A.  Correct.

Q.  Because I didn't hear any discussion of the but-for world
in your testimony on direct at all.  Right?

A.  I believe that's correct.

Q.  Okay.  And so the only opinion you're offering to the Court
is a factual judgment of whether those $415 million are part of

1   the fraud and caused loss or not.  Right?

2   A.   Again, I think as a damages expert, one has to tie the

3   economic loss incurred by plaintiff to the finding of misconduct

4   by the defendant, and I don't believe Mr. Malek has done that.

5       Now, whether that's simply a factual issue or whether it's

6   the way damages analysis is to be properly done -- it may be a

7   semantic issue, but I think it's more than a factual issue, that

8   there's a methodology for conducting damages analysis, and one

9   should not include nonfraud losses in a damages estimate.

10   Q.   Okay.  Well, let's talk about what fraud is, then.  It's

11   bank fraud to get money from a bank under false pretenses.

12   Right?

13   A.   Are you talking generally?

14   Q.   Yes.

15   A.   I believe so.  I'm not an attorney; I'm an economist, but

16   I would believe that to be the case.

17   Q.   You believe it to be the case that it's bank fraud to lie

18   to a bank in order to get a loan.  Right?

19   A.   Again, I'm not a banking lawyer, sir.  I can only give you

20   a general impression I have as an economist.  But -- I believe

21   that's true, but I'm not a lawyer.

22   Q.   I want you to use the same judgment you made in saying what

23   is and is not a fraud loss to answer these questions.  So it's

24   fraud for a bank employee to falsify bank records.  Right?

25   A.   Again, I'm not an attorney, sir.

1    Q.   So you don't know whether it's fraud for a bank employee to

2    falsify the records of a financial institution?

3    A.   Well, I think there's a difference between asking legal

4    questions of an economist of a general nature as opposed to a

5    specific case where there's either an allegation of fraud or a

6    finding of fraud, because there, then, the parameters are laid

7    out either in a complaint or in a court order and one can then

8    read it, and then one can conduct the damages analysis

9    accordingly.

10        But if you're going to ask me a string of general questions

11   about what is legal and illegal generally, I'm not a lawyer so I

12   don't think I'm really in a position to provide you with, you

13   know, an answer from -- from an expert.

14   Q.   So you're not equipped, based on -- I mean, I heard about

15   your SEC investigation experience.  You're not equipped to say

16   whether it's fraud for a bank employee to falsify records?

17   A.   I presume that it is.  I think it is.  But I'm just saying

18   I'm not an attorney, and it's not -- as to what constitutes

19   legal and illegal behavior as a general matter, that's not my

20   expertise.  But I can apply damages analysis in the context of a

21   specific case with specific facts and circumstances.

22   Q.   So it would be fraud to hide assets in a second set of

23   books and create fake records at the financial institution, to

24   create a false impression of what assets exist.  Right?

25   A.   Again --

1          THE COURT:  Forget about legal or illegal.  You have

2    done a lot of work testifying in cases about banks, and you seem

3    to know an awful lot about banks.  Do you think that that is

4    bank fraud, to keep a separate set of books that -- I forget

5    your question.

6    BY MR. HEFTMAN:

7    Q.   Is it fraud for a bank employee to hide assets in a secret

8    second set of books?

9    A.   I honestly don't know what the general answer would be.  I

10   think it may depend upon the facts and circumstances.  I presume

11   that it is, but whether it is or it isn't, from a damages point

12   of view with respect to this case, in my opinion, it's not

13   relevant for the reasons that I gave Your Honor before, that

14   what I understand is that PwC has been found to be negligent for

15   not detecting the fraud.

16        And the TBW fraud, as I understand it from my reading of

17   the case and the facts, is that -- the fraud was that they were

18   stealing.  They were stealing from Colonial Bank, and the

19   stealing took the form of receiving advances from Colonial Bank

20   in exchange for either fictitious mortgages or mortgages that

21   were defective at the point of the initial funding.  That's my

22   understanding of the fraud.

23        If one is now calculating the losses associated with that

24   fraud, one has to calculate the losses on the loans that were

25   fraudulent, namely those in Plan B AOT and the orange ones.

 1          With respect to the blue ones, if there was no stealing

 2     under my definition, which is that there's no evidence that the

 3     loans were defective at the time that they were initially

 4     funded, as bad as it might be that somebody might have committed

 5     a different type of fraud by hiding the -- the loans in an

 6     offline database, that's separate from what's at issue here,

 7     which is the stealing which occurred on the front end of these

 8     transactions.

 9          And that's why one can't associate a subsequent decline

10     in the valley of these mortgages once they moved onto AOT as a

11     fraud loss, because it wasn't the stealing.

12     Q.   Well, let's talk about the specific facts of this case

13     rather than a general question.  Plan B was stealing using fake

14     data.

15     A.   That's my understanding.

16     Q.   And that happened on COLB where they provided fake loan

17     data and stole money.  Right?

18     A.   And you're talking about prior to the move to AOT?

19     Q.   Right.

20     A.   Correct.

21     Q.   And then there was Plan B --

22               THE COURT:  Say that again.  What did you just say?

23               MR. HEFTMAN:  I said, it was -- Plan B was bank fraud

24     on COLB by stealing money using fake data.

25               THE COURT:  Okay.

BY MR. HEFTMAN:

Q.   They handed over loans that had already been sold to somebody else and they got money, and that was stealing.  Right?

A.   Yes.

Q.   Okay.  And it was stealing to provide fake trade numbers and steal money with nothing behind it, which was Plan B on AOT.  Right?

A.   That's my understanding.

Q.   Okay.  And it was fraud and it was stealing on the AOT to dump junk, impaired loans on the AOT.  Right?

A.   That's my understanding.  Correct.

Q.   Because they were stealing money through deception by dumping an impaired loan and getting cash for it as if it were worth full value.  Right?

A.   Correct.

Q.   Okay.  So all $563 million that you all have now labeled orange, you agree they are properly included in damages and have been established with reasonable certainty.  Right?

A.   I wouldn't go that far.  I mean, I do think that they're -- I'm being conservative by not challenging it, but I'm not challenging.

Q.   You think you're being conservative?  You looked -- you looked at a lot of evidence to form your opinion.  Right?

A.   Correct.

Q.   Okay.  And you spent a lot of time in your view?

1    A.    I did.

2    Q.    Okay.  And so -- and you think you did a deep dive into the

3    factual record of this fraud before you formed your opinion in

4    this case.  Right?

5    A.    Correct.

6    Q.    Okay.  And so -- and based on that informed deep dive, your

7    conclusion is that fraudulent mortgages that were impaired were

8    deceptively put onto Colonial's books and full value was stolen

9    for them.  Right?

10   A.    For which particular group of mortgages?

11   Q.    The junk AOT fraud.  The $563 million.

12   A.    Yes, with one qualification, and that is, as I pointed out

13   in my report, Mr. Malek should have considered removing nonfraud

14   losses, including the $415 million.  But -- and again, I haven't

15   been asked to provide an affirmative opinion on damages, and if

16   I had been, I would have thought long and hard about an

17   alternative but-for world.

18        One but-for world might have been, you know, but for the

19   alleged fraud, instead of advancing money to TBW, they would

20   have advanced them in legitimate, quote-unquote, transactions to

21   other mortgage originators, and some of that 562 million might

22   have been lost in the normal course of business, given that we

23   were going through the housing crisis.

24        For purposes of this trial, I recognize that as a rebuttal,

25   not an affirmative damages expert, the adjustments I should make

1    should be ones that the Court could have confidence in if they

2    accept my line of reasoning, and any adjustment I made to the

3    562 million would be less precise than the adjustments I made,

4    and I chose, therefore, not to challenge that number.

5           THE COURT:  When somebody tells you they're not

6    challenging it, maybe that's a time to go on to -- not question

7    it.

8           MR. HEFTMAN:  Very well, Your Honor.

9    BY MR. HEFTMAN:

10   Q.   I'd like to understand the reasoning of why you agreed that

11   was fraud, because I think it's important.

12          MR. HEFTMAN:  Can we display, Rami, the opening

13   statement from PwC?

14   BY MR. HEFTMAN:

15   Q.   I want to make sure you agree with how PwC's counsel

16   described it.  3394:12 to 3394:21.

17          So the reason -- and you agree that what happened a lot of

18   times was other banks rejected TBW's loans, right, because they

19   didn't conform to the requirements?

20   A.   It's my general understanding.  Correct.

21   Q.   Right?  And then when the other banks would reject those

22   loans, they'd get dumped on Colonial Bank.  Right?

23   A.   I would agree with that, and in particular the AOT line.

24   Q.   Okay.  And TBW had to pay back that other bank, right,

25   because they had rejected the loan and required TBW to

1    repurchase it?  Right?

2    A.    I presume that's the case, yes.

3    Q.    Because that other bank made a business decision that

4    they didn't want to keep TBW's bad loan.  Right?

5    A.    I assume that to be the case, but I can't get into the

6    minds of other banks.

7    Q.    Well, because mortgage originators are supposed -- excuse

8    me -- mortgage warehouse lenders are supposed to be short-term

9    bridge lenders between when a mortgage is signed at a closing

10   table and when it's sold to an end investor.  Right?

11   A.    When you say they're supposed to be, I think that's the

12   general expectation during normal times.

13   Q.    Well, during any time, mortgage warehouse lenders are not

14   making a long-term investment in a mortgage.  Right?

15   A.    That's not the general expectation, but there can be

16   circumstances where, after the fact, even though it wasn't

17   intended, after the fact for legitimate transactions that the

18   loans age and they end up holding them for a long period of

19   time.

20   Q.    Well, these lenders that are working with TBW are sending

21   the loans back and getting their cash back.  Right?  They're

22   getting repaid.

23   A.    I presume that to be the case.

24   Q.    And you agree with PwC's counsel is that what the

25   fraudsters did is they took these reject mortgages that the

1    other banks didn't want, they dumped them on Colonial, even

2    though they were impaired, and they took full value.  Right?

3    A.    Right in the sense of the facts or right that I agree with

4    PwC counsel?

5    Q.    That you agree with PwC's counsel that that was fraud and

6    that was happening at Colonial Bank.

7    A.    Yes, I do.

8    Q.    Okay.  And the reason it was fraud is because another

9    lender had rejected those loans and they were being dumped on

10   Colonial using deception.  Right?

11   A.    I'm not sure the fact that another warehouse lender was

12   rejecting the loans is necessary for that, but...

13   Q.    You're aware from the factual record that these loans were

14   in default, were charged off or paid off.  Right?

15   A.    Correct.

16   Q.    You're aware that these loans didn't have investor

17   commitments and they had to have investor commitments to go on

18   the AOT.  Right?

19   A.    That's my understanding, yes.

20   Q.    And it was fraud to conceal these loans in the AOT in fake

21   trades, wasn't it?

22   A.    And you're talking again about the orange mortgages?

23   Q.    I am talking -- I am.  It's fraud to conceal them in fake

24   AOTs.  Right?

25   A.    That's -- I agree.

1   Q.   Okay.  And it was fraud to create fake Mesirow trade

2   assignment agreements for trades that didn't exist.  Right?

3   A.   I would agree.

4   Q.   Okay.  Now --

5        THE COURT:  Let me ask you, is this a good place -- I

6   notice you're taking a breath, so --

7        MR. HEFTMAN:  I don't do that very often, Your Honor.

8   Yes, that would be fine to take a break now.

9        THE COURT:  Okay.  And you may step down once the

10   court is in recess.  Okay.  15 minutes.

11        (Recess from 3:04 p.m. to 3:24 p.m.)

12   BY MR. HEFTMAN:

13   Q.   Professor Lehn, let's return to talking about the blue

14   loans.  And I understand, from your deep-dive investigation,

15   that you found no evidence whatsoever that there was a junk loan

16   fraud on the COLB where impaired loans at the time of sale were

17   sold to Colonial Bank for full value.  Right?

18   A.   Two things.  One is I'm not aware of any evidence that

19   Mr. Malek has presented that there were.  And in my review of

20   the evidence in this matter, I'm not aware that any, let alone

21   most or all, of those losses were fraud losses.

22   Q.   Well, just to be a little more precise on that answer, your

23   investigation concluded that there is no evidence that impaired,

24   defective junk loans were -- at the time of sale, were put on

25   the COLB for full value.  Right?

1    A.   Again, I'm not aware that any, let alone most, of those

2    loans -- again, there were about 4200-some-odd loans -- I'm not

3    aware of any, let alone most or all, that were impaired at the

4    time they were initially funded.

5    Q.   Okay.  So let's say, if there is evidence that foreclosed

6    loans -- a loan was already in foreclosure at TBW, and then it

7    was sold to Colonial for full value and put on the COLB or the

8    Warehouse line, you would agree that that would be part of the

9    fraud and properly included in damages.  Right?

10   A.   Insofar that it was impaired.  Correct.

11   Q.   Well, if a loan is in foreclosure, it's impaired.  Right?

12   A.   Correct.

13   Q.   Okay.  And so if a loan was already paid in full and no

14   more money was owed on it, that would certainly be impaired and

15   part of the fraud if that was dumped on the COLB line or the

16   Warehouse line or the Overline.  Right?

17   A.   Can you repeat that?

18   Q.   Sure.  If a loan had already been paid by a borrower and

19   then that loan was sent to Colonial Bank for full value, that

20   would be stealing and it would be fraud.  Right?

21   A.   On grounds that it was a fictitious loan.

22   Q.   Well, it existed at one point.  I'm saying if there is

23   evidence in this case that paid-in-full loans were dumped on the

24   COLB and dumped on the Overline and dumped on the Warehouse, you

25   would include them in damages.  Right?

1    A.    If they were impaired at the time of initial funding, I'm

2    saying that one should identify them, and then if one were going

3    to make an adjustment to the $415 million, one could.

4         But I'm not aware that Mr. Malek has made any determination

5    or any adjustment, and I'm not aware of any evidence that I've

6    seen of that.

7    Q.    And I'm trying to get at, if there is evidence that

8    impaired loans were put on the COLB and put on the warehouse,

9    those blue loans, then you would change your damages adjustment,

10   and you would increase the damages if there's evidence of those

11   things occurring.  Right?

12   A.    If, in fact, presented with evidence that that occurred,

13   I would adjust the $415 million number.  Correct.

14   Q.    Have you personally analyzed the $415 million of loans

15   and affirmatively concluded that they were legitimate and not

16   impaired when funded?

17   A.    No, again, I'm responding to what Mr. Malek did, and he

18   hasn't done that either.

19   Q.    Okay.  So I'm just trying to figure out what you bring to

20   the judge's consideration and so you're not sitting here

21   offering an affirmative opinion that you've analyzed those 4200

22   loans and affirmatively concluded they're legitimate when made.

23   You're just saying you're not convinced by Mr. Malek's evidence.

24   Right?

25   A.    I'm saying two things:  Mr. Malek has not provided reliable

1    evidence that any, let alone most, of these loans were impaired

2    at the time that they were initially funded; and in my review of

3    additional evidence in this matter, I'm not aware of any such

4    evidence.

5    Q.    Okay.  And just to be clear, that 415 million, just because

6    you're a rebuttal expert doesn't mean you don't have to provide

7    a correct adjustment or opinion to the Court.  Right?

8    A.    You know, again, when you say correct, when estimating

9    damages, they are estimates, so I just want to draw a little bit

10   of a distinction between correct and estimates.

11         These are solid numbers, and I think they're precise

12   numbers, but at the end of the day, when we're working in the

13   damages realm, we always like to be a little cautious and say

14   that they're estimates.

15   Q.    Well, you have very specifically said $415 million of loans

16   are not fraud and removed them, and you stand behind that

17   number, right, because there's no evidence of fraud on the COLB,

18   right, in junk loans?

19   A.    Again, I have seen no evidence that would qualify that

20   $415 million as a fraud loss.

21   Q.    Okay.  You would agree, just so we're all on the same page,

22   that if significantly aged loans that were impaired in value, if

23   foreclosed loans and real estate owned, also impaired, were

24   pain-in-full loans, were sold by TBW to Colonial Bank pursuant

25   to the COLB arrangement, that would be fraud and properly

1   included in damages.

2   A.   Meaning that loans that originated on the COLB line were

3   impaired at the time that they were initially funded?

4   Q.   Yes.

5   A.   Correct.  Given my litmus test, that is correct.

6   Q.   Okay.  You mentioned, in kind of talking about your

7   background and qualifications, that you worked at the SEC.

8   Right?

9   A.   Correct.

10   Q.   And you worked with -- on investigations at the SEC.

11   Right?

12   A.   I worked on matters that the SEC was investigating.

13   I wasn't an investigator --

14   Q.   Okay.

15   A.   -- but I provided economic support to the enforcement

16   division.

17   Q.   Okay.  And so -- right.  Your focus was kind of materiality

18   and the stock market.  It wasn't doing the literal fraud

19   investigation.  Right?

20   A.   Correct.

21   Q.   Okay.  But you had exposure to the process that the SEC

22   went through when it did a fraud investigation.  Right?

23   A.   At a very high level.

24   Q.   Okay.  So you understood that the SEC conducted a factual

25   investigation before it would bring securities charges.  Right?

1    A.    Correct.

2    Q.    And in your experience, it was a thorough investigation.

3    Correct?

4    A.    It's been a while.  I'm sure some were more thorough than

5    others.

6    Q.    Was that your view at the time, that they were not being

7    thorough?

8    A.    No.

9    Q.    So you believed that when the SEC brought securities fraud

10   charges, which are very serious, against somebody, that they had

11   done an investigation that was thorough and had a factual basis

12   for what they put in their complaint.  Right?

13   A.    I really wasn't involved in that part, Mr. Heftman.  I was

14   typically asked to see whether or not certain information was

15   material by applying certain techniques in finance that we use.

16   So, again, that's what I did.  Sometimes there were some damages

17   estimates for purposes of sentencing.  So I really didn't get

18   into the sort of things that you're asking about.

19   Q.    Okay.  Well, when you were on direct and being qualified by

20   your counsel, you were talking about all the experience you had

21   in investigations, so I wanted to explore that.  But you're

22   aware that the SEC filed a complaint against Ms. Kissick for

23   securities fraud?

24   A.    I think I'm aware of that.  Correct.

25   Q.    You didn't read the SEC's complaint against Ms. Kissick as

1    one of the materials you looked at in forming your opinion?

2    A.    Correct.

3              MR. HEFTMAN:    Could we display P2869?

4    BY MR. HEFTMAN:

5    Q.    Look at page 8, paragraph 34.

6              MR. HAGALE:    Your Honor, I object to this document.    A

7    hearsay allegation from the SEC, allegations that -- there's no

8    evidence they were proven; they were just allegations that were

9    made.

10              THE COURT:    He's just going to ask him questions.

11              THE WITNESS:    I'm sorry.    Which one, sir?

12    BY MR. HEFTMAN:

13    Q.    Well, we have it on the screen and on the screen in front

14    of you, if you like.

15    A.    Okay.    Great.

16    Q.    But you're obviously welcome to look at anything in the

17    binders.

18    A.    Sure.

19    Q.    So following along here, paragraph 34, you can see -- you

20    see the paragraph "When this occurred"?    And then it goes down,

21    "These loans."    So let's start at "These loans" in the middle of

22    the page, please.

23        "These loans, along with" -- and it lists -- "significantly

24    aged loans (which were also likely impaired in value),

25    foreclosed loans and real estate owned by virtue of foreclosure

1    sales (also significantly impaired), paid-in-full loans (also

2    significantly -- which had no value) were referred to internally

3    by Farkas, Brown and Kissick as the 'crap,' and were sold by TBW

4    to Colonial Bank pursuant to the COLB arrangement."

5        Do you see that?

6    A.   I do.

7    Q.   Okay.  So according to the SEC's investigation and their

8    allegations of securities fraud against Ms. Kissick, there was

9    a junk loan fraud on the COLB.  Right?

10   A.   Based on an allegation, but that's not something that an

11   expert, certainly not this expert, would rely upon in forming an

12   opinion, because it's simply an allegation.

13   Q.   So you think that you have a more extensive and nuanced

14   view of how the fraud worked than the SEC did before it brought

15   this securities fraud charge.  Right?

16   A.   I have no opinion on that as a general matter.  What I am

17   responding to is what Mr. Malek did.  And I've said it several

18   times, that Mr. Malek has not provided reliable evidence that

19   the loans that originated outside of AOT and were moved to AOT

20   were fraudulent at the time that they were initially funded.

21   And this is simply an allegation.  It's not something that I,

22   as an expert, would rely upon.

23   Q.   But based on your analysis, you think that the SEC was

24   wrong in concluding that there was a junk loan fraud on the

25   COLB, because you found no evidence of that.  Right?

1    A.   Again, I -- I keep repeating myself -- Mr. Malek has

2    provided no evidence, and I am not aware of any evidence.  I'm

3    not precluding the fact that there might be evidence.  I just

4    haven't seen it.

5    Q.   And I would like an answer to this specific question, which

6    was, you think the SEC was wrong when it alleged that there was

7    a fraud on the COLB loan -- line using junk loans, right,

8    because your -- what you have opined, removing all of those blue

9    loans, and what the SEC said are directly contradictory.  Right?

10             THE COURT:  I think he's answered your question.

11             MR. HEFTMAN:  Okay.

12             THE COURT:  So why don't you go on?

13             MR. HEFTMAN:  Pardon me, Your Honor?

14             THE COURT:  Why don't we go on?  I think he's answered

15   your question to the best of his ability.

16             MR. HEFTMAN:  Okay, Your Honor.

17   BY MR. HEFTMAN:

18   Q.   Let's talk about the work you did to support your

19   conclusion.  You would agree that to offer an opinion here in

20   this case on what the fraud was and what's a fraud loss, you

21   need a detailed understanding of the fraud.  Right?

22   A.   You need an understanding of the fraud.  Correct.

23   Q.   Well, this is a very involved fraud that lasted seven

24   years.  Right?

25   A.   Correct.

1   Q.   And the facts are complicated.  Right?

2   A.   Correct.

3   Q.   And it takes some time to understand what happened here.

4   Right?

5   A.   It does.

6   Q.   Okay.  So Mr. Malek testified that he spent over 700

7   hours analyzing data, looking at testimony, preparing his

8   report.  You personally spent approximately 25 to 30 hours

9   reviewing Mr. Malek's report and preparing your report in

10  response.  Correct?

11  A.   On this particular one -- I think to place it in context,

12  that I was concurrently writing reports where I was responding

13  to Mr. Malek, but also to the expert retained by CBG.  And there

14  were certain economies of scale, if you will, a certain amount

15  of document review and understanding the fact that pertain to

16  both cases.

17       I think I had about a month after receiving the initial

18  reports of the experts, and in that month I spent, I think,

19  about 25 to 30 hours on both.  So it was a total of approximately

20  60 to 65 hours on the two cases, but there was a great deal of

21  overlap.

22  Q.   Right.  And you addressed, obviously, a number of issues in

23  those reports completely unrelated to this junk loan fraud.

24  Right?

25  A.   I did.

1    Q.   Ms. Ryan's report, the CBG damages experts.  You talked

2    about capital contributions, and you spent time learning about

3    that.  Right?

4    A.   I did.

5    Q.   You spent some of your time dealing with ship not paid

6    issues.  Right?

7    A.   Correct.

8    Q.   You spent some of your time dealing with prejudgment

9    interest issues.  Right?

10   A.   Correct.

11   Q.   You spent some of your time dealing with post-August 2009

12   and whether the economy influenced anything.  Right?

13   A.   Correct.

14   Q.   So only a fraction of the 60 total hours dealing with two

15   experts' reports dealt with this junk loan fraud issue.  Right?

16   A.   In terms of my hours, that's correct, but I have a staff at

17   Compass Lexecon that put in a great deal of time.

18   Q.   And I asked you in your deposition about that, and you

19   couldn't identify how much time they put in.  Right?

20   A.   I don't know the specific numbers.

21   Q.   You still don't know.

22   A.   I still don't know.

23   Q.   Even though you received 20 percent of whatever they billed.

24   Right?

25   A.   No.  That's not correct.

1    Q.   Okay.  You didn't go through all of Mr. Malek's supporting

2    schedules and his data in forming your opinion.  Right?

3    A.   I asked Compass Lexecon -- again, the way this worked is

4    we received Mr. Malek's data, and he conducted a very intensive

5    forensic analysis and put a lot of complicated databases

6    together.  We didn't have to do that.  We got that from Mr. Malek.

7        And one of the first things I asked Compass Lexecon to do

8    was to validate that we had no problems with the math and the

9    computations.  We obviously have differences of opinion on what

10   to infer from the data.  And they put in what I presume was a

11   great deal of time, because the databases -- it's not like all

12   the data was in one file.  There are many, many files, and it's

13   a very complicated set of data.

14   Q.   Actually, what you said in your deposition was you don't

15   know how thorough Compass Lexecon was in reviewing Mr. Malek's

16   materials either.  Right?

17   A.   You'd have to refresh my memory on the exact language.

18        MR. HEFTMAN:  Professor Lehn's deposition, 231,

19   lines 2 to 6.

20   BY MR. HEFTMAN:

21   Q.   And we can look at the preceding page, 230, 20 to 25 where

22   you say you didn't go through all of Mr. Malek's supporting

23   schedules of materials.  And then I asked you, you don't know if

24   Compass Lexecon did either.  And you said you couldn't vouch for

25   how thorough they were in going through the materials.  Right?

A.   Yeah, I don't know whether this was taken out of context.
I mean, I can't vouch in the sense I wasn't there, but I've
worked with Compass Lexecon and I've worked with the people, and
I have complete confidence in what they do.

Q.   Well, when you say you weren't there, you --

     THE COURT:  Counsel -- there's no question.  Everybody
agrees that the math was done correctly, so let's go on to
something else.

BY MR. HEFTMAN:

Q.   Well, you spent maybe five to six hours of your time
looking at this data.  Right?

A.   Reviewing it, that's correct.

Q.   And you talked about, on direct exam, how you read a lot of
deposition testimony.  Right?

A.   Correct.

Q.   You didn't read the depositions of any TBW fraudsters.
Correct?

A.   I think at the time of my report, that's correct.

Q.   So you didn't think the depositions of the people at TBW
who committed the fraud would help inform you to know whether
they were sending junk, impaired loans to the COLB or the
mortgage warehouse line?

A.   At the time, I didn't view it as necessary, correct.

Q.   And because -- and you reached this $415 million number at
that time not reading any of their depositions.  Right?

A.   That is correct.  And it's not my normal practice, in

conducting damages analysis, to read a lot of fact witness

depositions at the point of forming -- of basically forming

opinions in a report.

Q.   So you don't think you need to fully inform yourself about

what the fraud is before you decide what [sic] and is not a

fraud loss?

A.   Well, it depends on the nature of the testimony.  It

depends on the facts and circumstances of a case.  But

oftentimes, what I look at when I'm conducting damages analysis

is what is the allegation of misconduct, what is the finding of

misconduct where you have a finding of misconduct, and then do

the damages analysis accordingly.

     You know, oftentimes it's hard for an expert to understand

the veracity of what one is saying.  I'm not questioning

people's integrity under oath in depositions, but it's not

something typically damages experts heavily rely upon.

Q.   Well, you're telling the Court that you've done a deep-dive

analysis, and you've concluded there's no evidence that those

are fraudulent, but you didn't read the depositions of most of

the people who committed the fraud.  Right?

A.   Well, in fairness, I don't think I volunteered the phrase

deep dive.  You might have asked a question and I perhaps

answered yes, but -- meaning in the sense that I did a deep dive

in the sense that I did the work that I thought was necessary in

1    order to form a reliable damages opinion.

2    Q.   Okay.  And that didn't include reviewing Desiree Brown's

3    testimony, who was the mechanic on the ground at TBW sending

4    these loans to Colonial Bank.  Right?

5    A.   Correct.

6    Q.   Okay.  And you didn't read any of the testimony of the Lee

7    Farkas criminal trial.  Right?

8    A.   Correct.

9    Q.   And in that trial, nearly everybody who committed this

10   fraud testified in their plea agreements with the government.

11   Right?  So that would have been a very good source of

12   information if you wanted to get a good understanding of how

13   this fraud worked.  Right?

14   A.   I don't think it, frankly, would have further informed my

15   opinion.

16   Q.   You don't know because you didn't read it.  Right?

17   A.   But again, you know, I've done probably 50 damages analyses

18   over the years in the context of litigation, and as I have said

19   before, it's typically not the case that I rely heavily on

20   deposition testimony.

21   Q.   Well, here, what you are doing is giving the Court your

22   assessment of the factual record as to whether these loans were

23   fraudulent.  And you don't think the testimony would inform you?

24   A.   Well, again, I've given my understanding of the fraud and

25   the fraud that PwC was supposed to have detected in the '03

audit, and I've described it -- and I won't repeat it again --
but it, in essence, involves stealing and stealing that took a
particular form.  I've articulated my understanding of that, and
then I've done my damages analysis accordingly.

Q.   And you think, based on your collective 60 hours dealing
with all the issues that you had to deal with, you have a more
informed and accurate understanding of the fraud than Mr. Malek
does who spent 11 to 12 times the amount you did looking at the
data and looking at the testimony and the documents.  Right?

A.   I won't speak to our relative understandings of the fraud,
but I will say that, in my opinion, he has included nonfraud
losses in his computation of damages, and that's inappropriate.

Q.   And just to put in context, because you were asked by the
Court about your knowledge of banking and things, aside from
some expert testimony you have provided, you have no
professional experience in the mortgage warehouse lending
industry.  Right?

A.   That is correct.

Q.   Your academic work primarily focuses on corporate finance,
valuation, and you do analysis of economic data in those
articles.  Right?

A.   Correct.

Q.   So your focus of your academic work is not in the mortgage
industry.  Right?

A.   Well, as I said, I think I've been retained on five or six

1    mortgage finance cases, largely emanating from the housing

2    crisis.  And in at least three I can think of off the top of my

3    head I was retained to offer damages analyses where investors

4    were making allegations that the losses they suffered during the

5    housing crisis were fraud losses.  And my damages analysis in

6    essence parsed the nonfraud component from the fraud component,

7    and that's very similar to what I'm doing here.

8    Q.   And my question was, aside from learning on the job

9    during -- serving as an expert witness, your professional work,

10   your work at the SEC was -- is not focused on mortgages.  Right?

11   I'll move on.

12   A.   It's certainly not been the thrust of my professional work,

13   but I have done a -- as I said, a substantial amount of work

14   in -- certainly in the context of litigation.

15   Q.   Let's look at P2879, please.  You said you like to look at

16   pleadings to help inform you and give you background when

17   forming an opinion.  And -- it's on the screen, sir.

18        And this is PwC's answer to the complaint in the Florida

19   case.  It's actually their answer to a third amended complaint.

20   And you're aware that there was a Florida lawsuit where PwC was

21   sued by Taylor, Bean and Whitaker, the trustee down there.

22   Right?

23   A.   That's my general understanding.

24   Q.   Okay.  And PwC's counsel didn't give you their answer in

25   which they described how the fraud worked.  Right?

```
1    A.    I didn't --

2    Q.    In forming your opinion --

3    A.    -- ask for it either.

4    Q.    And you didn't ask for it.  PwC's counsel --

5          MR. HAGALE:  Your Honor, I'm going to object on

6    foundation.  Mr. Malek didn't focus on this in his report, and

7    so Dr. Lehn didn't have reason to respond to it.  So I am going

8    to object on that basis.

9          THE COURT:  This is cross-exam.  Overruled.

10   BY MR. HEFTMAN:

11   Q.    You did look at the Bank of America pleading that PwC's

12   counsel gave you, and it formed a basis for your ship not paid

13   opinion.  Right?

14   A.    At the time, it did; correct.

15   Q.    Okay.  But they didn't give you this one.  And if we look

16   at page 20, section D, and we focus on the two paragraphs

17   under D, this says -- it's entitled, "Falsifying the value of

18   loans on the COLB facility."

19         Do you see that?

20   A.    I do.

21   Q.    And in the middle of the paragraph it states, "TBW sold

22   Colonial Bank interests in mortgage loans that were foreclosed,

23   real estate owned, and otherwise impaired."  It goes on to

24   define these as "crap" loans, and it says that they manufactured

25   and falsified details.  And it specifies in the second
```

paragraph, in the first sentence, that the fraudsters were aware

of the "crap loans" and "pools of crap loans" on the COLB and

AOT facilities.  Do you see that?

A.    I do.

Q.    So consistent with the SEC's conclusion, PwC, in describing

the fraud, alleged that there was a fraud with junk loans or

crap loans going on on the COLB, the blue.  Right?

A.    Again, this is the first time I've seen this, and, you

know, I haven't -- I don't have the benefit of the full

document, but I can read the words there and that appears to be

what the words are saying.

Q.    So PwC's description of the fraud in Florida is in direct

contradiction to your opinion that all of those blue loans are

perfectly legitimate.  Right?

A.    Again, Mr. Heftman, I think you're mischaracterizing my

opinion.  My opinion is that I'm responding to Mr. Malek.  He

has not provided any reliable evidence that the blue loans and

the losses on the blue loans were part of the fraud losses.  I

am not aware of any evidence that they were.  That's my opinion.

Q.    So based on what you've looked at, both the SEC and PwC

have made an allegation of junk loan fraud on the COLB that you

find no factual support for.  Right?

A.    I'm not aware of any evidence that I've reviewed in this

matter, including Mr. Malek's evidence, that would support the

view that the blue mortgages were part of the fraud.

1    Q.   Well, let's look at some of the evidence in this case.

2    Let's look at P1907, please.

3              MR. HEFTMAN:  Please focus on -- go to the last page.

4    I'm sorry.  Go up and pull up the top two e-mails.

5    BY MR. HEFTMAN:

6    Q.   Can I ask you if you have reviewed this e-mail in forming

7    your opinion?

8    A.   I don't recall seeing it when I formed my opinion, but I

9    have seen it subsequent to that.

10   Q.   Okay.

11             MR. HEFTMAN:  And actually -- I apologize, Your Honor.

12   BY MR. HEFTMAN:

13   Q.   If you could focus on the bottom there, you understand --

14   and since you were looking at this e-mail in preparation, just

15   the very bottom e-mail for Desiree Brown -- WAMU wanted loans

16   that had aged over 90 days shipped back to TBW.  Do you see that?

17   A.   I do.

18   Q.   And what Ms. Brown, one of the fraudsters, is seeking is

19   that Colonial Bank pay full value for this loan rejected so they

20   can pay back WAMU.  Right?

21   A.   That appears to be the case, but --

22   Q.   Okay.  Well, let's look up at the top.  There's a

23   discussion of dumping ground.  And you're familiar -- you've

24   heard that phrase a number of times.  Right?

25   A.   Yes.

1    Q.    Now, April 12, 2004.  AOT did not come into existence until

2    April 28, 2004.  That was the first trade.  Right?

3    A.    That's my recollection.

4    Q.    You saw that in Mr. Malek's work and schedules.  Right?

5    A.    Correct.

6    Q.    So prior to the existence of AOT, Ms. Kelly is complaining,

7    "Why are we always the dumping ground?" -- referring to loans

8    rejected from other banks.  Right?

9    A.    It appears to be.

10   Q.    And she's saying, "Why are we always the dumping ground?"

11   Right?  This isn't an isolated instance.  TBW is dumping aged

12   loans rejected by other banks on Colonial before AOT is created.

13   Right?

14   A.    I can't vouch for the veracity of that statement.  I can

15   only tell you the words I'm reading here in Ms. Kissick's

16   e-mail.

17   Q.    Well, you're here to give an expert opinion about whether

18   there is enough evidence to identify loans dumped on the COLB

19   and the Warehouse line as fraud.  Do you have the ability to

20   interpret this document?

21   A.    To interpret it in what way, sir?

22   Q.    You agree with me that Ms. Kissick and Ms. Kelly are

23   describing a dumping ground practice where TBW always sends

24   loans rejected from other banks and sends it to Colonial and

25   puts it on lines other than AOT, because AOT doesn't exist yet.

1    Right?

2    A.   Well, again, I mean, this is one statement by Ms. Kissick.

3    I think in her deposition testimony she had other statements

4    that would suggest otherwise.  Also, the phrase "dumping ground"

5    is pejorative.  It doesn't have a precise meaning, sir.

6         So I can't say that this would be something I would rely

7    upon to say that the blue mortgages were part of the stealing by

8    TBW from Colonial Bank.

9    Q.   So this specific example of Washington Mutual rejecting

10   loans and then them being dumped on Colonial Bank you don't

11   think is an example of junk loan fraud on the COLB.  It doesn't

12   persuade you.

13   A.   In my opinion, again, it's one person's e-mail reference to

14   dumping ground, could be subject to different interpretations.

15   It doesn't, in my opinion, rise to the level that would indicate

16   that the blue mortgages were defective at initial funding.

17   Q.   So you view it as part of your role here as an expert to

18   parse this evidence and assess whether it convinces you that

19   it's fraud or not.  Right?

20   A.   Again, there are certain standards I have for evidence when

21   I'm conducting damages analysis.  And an isolated e-mail with

22   references to a pejorative term -- and I don't know the state of

23   mind of Ms. Kissick at the time -- it certainly wouldn't be

24   something that I would base my opinion entirely on and suddenly

25   say that the blue mortgages were part of the stealing.

1    Q.   Now, you said earlier, when I asked you about the SEC, that

2    you're not a fraud investigator and that's not your specialty.

3    Right?

4    A.   That is correct.

5    Q.   Okay.  And in reviewing this type of evidence, you're not

6    applying -- you're not doing an economic analysis.  Right?

7    A.   It depends on how you describe economic analysis.  It's

8    certainly not empirical, but --

9    Q.   Well, I mean, there's no data analysis going on here.

10   You're reading the testimony of people engaged in a criminal

11   conspiracy, and you're giving your factual view of what they

12   mean or don't mean based on the amount of work that you did.

13   Right?

14   A.   I'm not following your question.

15   Q.   You're not applying an economist's expertise when you read

16   the evidence where the fraudsters say we're going to dump these

17   loans.  Right?  There's no -- you are not applying any economic

18   expertise in reading this e-mail.  Is that fair to say?

19   A.   Certainly not in reading the words, but in terms of the

20   criteria that one would look for in terms of something that

21   would be sufficient -- you would be sufficiently confident in to

22   guide your decision on an issue, for example, such as whether

23   the blue mortgages were part of the fraud, this would not rise

24   to that level, and there's contradictory testimony by Ms. Kelly

25   and Ms. Kissick about whether or not they were aware of bad

1    loans being dumped on COLB.

2    Q.   And you didn't read the rest of the deposition testimony to

3    see what that would have told you.  Right?

4    A.   I did read both of their testimonies.  I forget whether I

5    had read it at the time of my report, but I have subsequently

6    read it, and it's making my point that you often see the same

7    individual in some cases with lines that are contradictory, even

8    if I'm generous and say that what you're reading into this is

9    what I should be reading into it.  But the same person can say

10   things that are contradictory, and that not typically the type

11   of information that an expert would rely upon.

12   Q.   Well, let's look at P2094.  Let's look at the bottom

13   e-mail.  You saw this discussed in Mr. Malek's testimony.

14   Right?  Do you recall this?

15   A.   Generally, yes.

16   Q.   Okay.  Again, this is before AOT exists.  AOT trades start

17   six days later.  Right?

18   A.   Right.

19   Q.   Okay.  And they say, "As opposed to doing more Plan B, ask

20   Teresa if" -- I think it's supposed to say -- "they want to move

21   the Credit Suisse aged and cover the overdraft with the

22   advances."

23        Right?  So, again, Credit Suisse doesn't want these loans.

24   They're aged.  They're going to take money from Colonial Bank

25   and give them aged loans and put them in the blue on Warehouse

1    and COLB, not AOT because it doesn't exist.  Right?

2    A.   You're asking me to buy into a lot, but it appears to be,

3    from the words I see on the paper, with the caveat that these

4    words are -- I don't know the full context.

5    Q.   Well -- so it appears to you that what was happening was a

6    loan rejected by another bank who didn't want aged loans was

7    being dumped into the blue.  Right?

8    A.   It says ask Teresa if they want to move.  I don't see an

9    indication that --

10             THE COURT:  Well, let's assume.

11             THE WITNESS:  -- it wasn't --

12             THE COURT:  Let's assume.

13   BY MR. HEFTMAN:

14   Q.   Mr. Malek testified that that happened.  Did you --

15             THE COURT:  Let's assume that happened.

16   BY MR. HEFTMAN:

17   Q.   -- investigate that?

18   A.   I don't recall that I did.

19   Q.   Let's look at P2100, July 2006.  You recall Mr. Farkas and

20   Ms. Brown talking about how -- if you look at the bottom of the

21   page -- "the problem is Colonial is full of total junk"?

22        This is July of 2006.

23   A.   Correct.

24   Q.   So these two fraudsters knew that they had dumped a bunch

25   of junk loans on Colonial Bank and that they were sitting there,

1    not selling.  Right?

2    A.   It, again, appears from the words, but it doesn't say that

3    they were dumped on the COLB line.

4    Q.   You need something more explicit to convince you that they

5    weren't just dumped on the AOT.  Right?

6    A.   Correct.

7    Q.   Okay.  Let's look at page 1611 from the criminal trial

8    testimony, 1951 of the PDF.  And we see at the middle of the

9    page -- they're talking about this very e-mail, line 14 through

10   21:  "That should be the plan.  Move some loans from Colonial to

11   Ocala Funding.  The problem is Colonial is full of total junk."

12        Question at line 18:  "And where were these loans that are

13   total junk sitting at Colonial Bank?"

14        "They were -- they could be on any of the lines.  Probably

15   the majority of them were on AOT."

16        Do you see that?

17   A.   I do see the words, yes.

18   Q.   Okay.  So Desiree Brown, one of the fraudsters, testified

19   that the junk loans could be on any of the lines.  Maybe the

20   majority -- probably the majority of them on AOT.  Right?

21   A.   That appears to be what is being said, but again, we have

22   to be careful.  "Total junk" could be referring to aged loans.

23   I don't see any reference here that defective loans were dumped

24   on the COLB line at the time that TBW received funding.

25   Q.   But this is testimony that you obviously didn't seek out or

1   read in forming your opinion when you just on lopped off

2   $415 million.  Right?

3   A.   But this doesn't establish that there were loans being

4   dumped on the COLB line.  That's my only point.

5   Q.   So when Ms. Brown, the fraudster, said Colonial is full of

6   total junk and that junk could be on any of the lines, "probably

7   the majority of them were on AOT," that does not provide you, as

8   you've put it, any evidence that there was a junk loan COLB

9   fraud on -- junk loan COLB fraud.  Right?

10  A.   Well, again, it could have been that there's a legitimate

11  loan being funded by Colonial Bank, it's placed on the COLB

12  line, and then it ages and it's referred to as junk because it's

13  aged.  It doesn't mean that at the time it was funded it was

14  defective.

15  Q.   That's how you read this testimony.

16  A.   I'm saying that that is a reasonable way to interpret it,

17  but this does not categorically say that TBW was dumping

18  defective loans on the COLB line at the time they were receiving

19  funding.

20           THE COURT:  How much more of these are you going to

21  do?

22           MR. HEFTMAN:  I'm moving on to a different topic, not

23  on documents, Your Honor.

24           THE COURT:  Sounds good.

25

1   BY MR. HEFTMAN:

2   Q.   You mentioned on direct that you had been retained I think

3   five -- in your deposition you said about a half dozen times by

4   PwC previously.  Right?

5   A.   Correct.  I think I said five.  It's possible it could be a

6   half dozen.

7   Q.   So -- and the vast majority of times you testify you were

8   on the defense side of damages issues, right?

9   A.   Generally, or in cases of PwC.

10  Q.   In cases of PwC, you were on the defense side.  Right?

11  A.   I think that's correct.

12  Q.   So when PwC was sued for $2 billion for audit failures in

13  the MF Global case up in New York, they hired you to respond on

14  causation and damages, right?

15  A.   Yeah.  I think technically I was retained by counsel for

16  PwC.

17  Q.   Right.  And you offered an opinion that PwC wasn't

18  responsible for those damages.  Right?

19  A.   I'd have to go back and refresh my memory on the precise

20  opinion.  That case settled, so I never testified in court.

21  Q.   When PwC was sued in Oklahoma for failing to detect

22  financial misconduct and for damages of $1.1 billion, you gave

23  an opinion on behalf of PwC that they weren't responsible for

24  the damages claimed.  Right?

25  A.   Again, I don't think I word my reports that way, sir.  I

1    think that I either indicate that one has or has not established

2    a reliable basis for damages or, in this case, make an

3    adjustment to someone's damages.  So I don't recall the specific

4    opinion.

5    Q.    That was the Bettina Whyte case.  Right?  Do you recall

6    that?

7    A.    Correct.

8    Q.    Okay.  And then you were retained in securities litigation

9    by PwC in Washington State in the Metropolitan Securities

10   Litigation case.  Right?

11   A.    Correct.  And my recollection is that was a materiality

12   opinion that I offered.

13   Q.    Right.  So you gave an opinion that PwC's accounting errors

14   weren't material to the stock price?

15   A.    To investors, correct.

16   Q.    Okay.  So in addition to the documents we've talked

17   about -- and we talked about how you didn't read Mr. Bowman's

18   testimony.  I'd like to display 187:18 to 24.

19         This is from his deposition.  So Mr. Bowman -- and who was

20   Mr. Bowman?

21   A.    He was at TBW.  I forget his title.

22   Q.    He was the president.  So Mr. Bowman testified that, "Other

23   lenders would tell, like, WAMU, as we saw -- and other lenders

24   would say, you've got to get these aged receivables off our

25   line."

1          Do you see that?

2     A.    I do.

3     Q.    So those other lenders didn't want aged loans sitting

4     around on their books, and they'd send them back to Colonial and

5     get all their money back.  Right?

6     A.    That appears -- again, he doesn't talk about getting all

7     their money back, but he seems to be indicating that the first

8     part of your question is correct, in his opinion.

9     Q.    Okay.  And then what would they do when they got those aged

10    loans?  They would use Colonial -- turn to Colonial, the dumping

11    ground for aged receivables.  Right?

12    A.    Right in the sense that that was the question.

13    Q.    And the answer.

14    A.    And the answer was, "Correct."

15    Q.    So just to understand how you've parsed this out, you read

16    that e-mail and say he only meant AOT.  Right?  And that's why

17    orange is okay, blue bad.  Right?

18    A.    Again, there's no indication from this that they were being

19    dumped on the COLB line.

20    Q.    Well, there's no indication in this e-mail they're being

21    dumped on the AOT, is there?

22    A.    From this individual excerpt, that's correct.

23    Q.    Well, from -- I mean, you read this e-mail and you are

24    looking for somebody to say express ly -- I mean, we've already

25    looked at testimony saying it could be on any of the lines.  But

1    you read this e-mail and say they must be talking about AOT, not

2    COLB, not Warehouse, not Overline.  Right?

3    A.    Again, consistent with my review of what Mr. Malek has

4    presented and other evidence that I've seen, this does not

5    establish that there were loans being dumped on the COLB line.

6    Q.    Okay.  Does not convince you.  Let's look at F4100.  Now,

7    you gave some testimony about this on your direct, right?  You

8    agree that there's over a thousand entries in TBW's records

9    saying, do not sell.  Right?

10   A.    I -- you know, it's been hard to parse through this

11   database.  We got it -- this is the Rules database, I believe,

12   that Mr. Malek turned over.  And until he testified on Tuesday,

13   it was very, very unclear from what had been produced in

14   litigation as to what all this means.  You know, usually in

15   expert reports, when you get the data, you can tie it very

16   directly to an opinion.  This one is a bit puzzling for a

17   variety of reasons.  One is that that TBW database does not have

18   dates on it, so you don't really know the dates on which certain

19   things were being marked the way they are, at least based on my

20   review of what's been produced.

21        Second is this was a TBW database.  I don't know how much

22   in the way of testing Mr. Malek did of the reliability or

23   veracity of their internal servicing records.

24        So frankly, I mean, this was something we learned in his

25   testimony on Tuesday because it wasn't clear from what had been

1    produced.

2    Q.   Really?  Okay.  Let's look at page 19 of Mr. Malek's

3    rebuttal report.  Okay?  And we'll go back to this document.

4    So just to set the stage here, in your opinion, you wrote that

5    that $415 million would come out.  Right?  That's in your report.

6    Right?

7    A.   Correct.

8    Q.   And then Mr. Malek responded to that in a rebuttal report,

9    and he said at the bottom of the page here in this paragraph,

10   Exhibit 4 --

11        MR. HEFTMAN:  The bottom paragraph, Rami.

12   BY MR. HEFTMAN:

13   Q.   Exhibit 4 to this rebuttal report, exception report for

14   junk loans originally fund outside of junk AOT, illustrate --

15   identifies illustrative problems with these junk loans of the

16   type that would have prevented prompt sale to takeout end

17   investors.  Right?

18   A.   That's what he says.

19   Q.   So you said it was unclear the context of what he was

20   saying.

21        MR. HEFTMAN:  Let's go to the top of the next page.

22        THE WITNESS:  Well, just to clarify, that I said was

23   unclear the data that was produced, especially as it pertains to

24   the Rules database.

25   BY MR. HEFTMAN:

Q.   Okay.  Well, let's look at -- Mr. Malek helpfully

summarized all of these detailed fields that is in this jumbled

thousands-of-page spreadsheet, and he said that there are 1,047

loans in TBW's records that say "do not sell" that were put on

Colonial Bank's COLB, Warehouse, and Overline, the blue.  Right?

A.   Well, that's one of the things we're sorting through, is

there, I think, is one field that is marked that appears to be

something that Mr. Malek and his team marked, and I'm not saying

what they did was wrong; I'm just saying we're still trying to

understand how these were categorized.

     But the main thing is that we haven't been able to tie any

of these exceptions to dates, and namely, obviously, dates in

comparison to the date in which the loan was funded, where the

advanced funding was made from Colonial Bank to TBW.  And

without the dates, I'm not even sure what you do with the data

from the Rules database.

     Because from, again, my perspective, a key parameter here

is the distance between the date of the funding and the date

that these loans are marked exceptions, because Mr. Malek would

have us believe that exceptions are indicative of the fact that

they were junk on arrival.

     But if there's a long lag between the advance date and the

marking as an exception, that certainly is inconsistent with his

view, and that's what we've found on the ProMerit database, that

there often are long lags.  We can't do the same type of analysis,

1    at least based on our understanding of the database, on the

2    Rules data.  So, without the dates, I frankly find all of this

3    to be irrelevant to the litmus test.  It doesn't inform an

4    opinion as to whether these were junk on arrival.

5    Q.   You seem to have done a great deal of analysis of this data

6    since your deposition.  Is that the case?

7    A.   Since the Rules database?

8    Q.   Yeah.

9    A.   We have, in preparing for trial, of course.

10   Q.   Okay.  Well, when I asked you at your deposition whether

11   you had looked at the data underlying this schedule, you said

12   you hadn't.  Page 100, lines 5 to 10:  "Did you personally look

13   at any of the data underlying -- the underlying data that

14   Mr. Malek provided in Exhibit 4?"

15        "No.  I read his report and then relied on Compass Lexicon

16   to verify it."

17        That was true when you said it back then.  Right?

18   A.   Correct.

19   Q.   And when I asked you, "Were you -- did you have the

20   expertise to interpret the fields in this schedule," you told

21   me, "No."  Right?

22   A.   Well, again, if you could pull up the full context, I'd be

23   happy to --

24   Q.   Yes.  101:2 to 12.  I'm sorry.  There's two expertise ones.

25   Let's do this one first.  104:20 to 105:9.

1         So you say -- I asked you, "You agree you don't have the

2     expertise to evaluate the data in the exception report and give

3     an opinion to the jury about whether those loans were junk upon

4     arrival at Colonial.  Correct?"

5         "I don't have the -- it's not in my area of expertise to

6     evaluate all the line items in the exception reports and reach a

7     conclusion as to whether or not they were junk on arrival,

8     quote-unquote, but I haven't seen Mr. Malek provide any evidence

9     in his rebuttal that they were junk on arrival, and I am

10    qualified to make that observation."

11        So just to clarify, you're not qualified to read all of

12    this because you don't have the expertise to know what it means,

13    but you're qualified to know it doesn't mean what Mr. Malek

14    says?

15              THE COURT:  That's not what he said, Counsel.  Why

16    don't you ask another question?

17    BY MR. HEFTMAN:

18    Q.   It was truthful in your deposition that you didn't have the

19    expertise to evaluate these line items.  Right?

20    A.   That's quite different from what I'm saying here, sir.

21    What I said and what I meant, and I stand by my answer here, is

22    that I don't have the expertise to delve in and tell you exactly

23    what each of those exceptions means in detail, especially those

24    that were on the Rules database that was maintained by TBW.

25        But insofar as that Mr. Malek wants to use that data to

 1    show that the loans that originated outside of AOT were junk on

 2    arrival, I certainly have the expertise, as I indicate, to make

 3    a judgment and an observation about them.

 4        One of the observations is that there frequently is a long

 5    time lag from the time that the funds are advanced to TBW and

 6    the date at which the loan is marked exception, and that's

 7    inconsistent with the view that they were, quote, junk on arrival.

 8    Q.   The Rules database is TBW's data.  Right?

 9    A.   And that doesn't have the dates, so one can't do the

10    analysis for that database.

11    Q.   Well, when the loan went from TBW to Colonial Bank, it left

12    TBW's books and it went to Colonial's books.  Right?

13    A.   Correct.

14    Q.   Right?  And so after it went to Colonial, TBW had nothing

15    more to do with the loan because it was now at Colonial Bank.

16    Right?

17    A.   I don't know whether that's true or not.

18    Q.   You don't?  So if TBW put in its records "do not sell" and

19    the very purpose of putting it on COLB or mortgage warehouse

20    lending was to sell it, you don't think that indicates an

21    origination problem with that loan.  Right?

22    A.   I don't think it provides evidence that there was an

23    origination problem with the loan.

24    Q.   And if the TBW database, which is referring to the loans

25    presumably that TBW has when they have them, says charged-off

1    loans, you don't think it's a problem that those loans are then

2    put on Colonial's -- in the blue, in the mortgage warehouse

3    lending unit.  Right?  It does not convince you that there's an

4    origination problem.  Right?

5    A.   It doesn't tie together.  You can't tie it to the events

6    dates.

7    Q.   And if it says repurchased, that it's already been

8    repurchased from another customer, that doesn't convince you

9    that there's an origination problem.  Right?

10   A.   Well, but this again is part of the confusion of that Rules

11   database that Mr. Malek relies upon, that there are several

12   hundred loans where there's a mark of repurchase.  And then if

13   you look at -- there's a line for the mortgage warehouse lender,

14   and I think in something like 300-some-odd cases of the roughly

15   400-some-odd cases where repurchase is marked, the warehouse

16   lender is identified as Colonial.

17        So we don't understand, and Mr. Malek hasn't explained,

18   what all that means.  Did Colonial repurchase?  Was it

19   repurchased from Colonial?

20   Q.   You know it was readvanced on Colonial's line because it's

21   sitting on Colonial's line at the end.  Right?

22   A.   I'm only saying that the way the data is constructed and

23   the absence of a clear explanation by Mr. Malek, there's a lot

24   of confusion about that database.  And, again, the overriding

25   issue is that there are no dates on it, so I don't know what you

1    do with it to establish that the loans were so-called junk on

2    arrival.

3    Q.   Let's about back to F4100 and look at page 6.

4         We've highlighted two loans that actually PwC's counsel

5    brought up, too.  You're aware, as you heard from the testimony,

6    that, for example, these two "do not sell per Lee Farkas/John

7    Welsh" loans were fraudulent loans that there was testimony

8    about in the criminal trial against Lee Farkas?

9    A.   Again, I haven't followed the criminal trial, but if you

10   want me to accept the assumption for purposes of the question, I

11   will.

12   Q.   Well, let's look at what the FBI agents said about "do not

13   sell."  If we look at page 1249, volume 5, 1589 of the PDF.  So

14   this is the testimony of the special agent who's investigating

15   Mr. Farkas.  Do you see that?  And he's talking about the Lee

16   loans --

17             MR. HAGALE:  I'm going to object.  He's asking about

18   one statement out of context.  Dr. Lehn stated that he hadn't

19   read this, and he would have to read the entire transcript in

20   order to have context.

21             MR. HEFTMAN:  Your Honor, it's quite clear, and it's

22   proper impeachment, that -- what the FBI agent says on the next

23   page is Mr. Farkas put "do not sell" on loans that were entirely

24   fraudulent and criminal that he made up and took out as straw

25   purchasers, and those are blue loans.  Those are loans that go

1    in this blue.

2        And this witness has said that he has done a clear,

3    extensive investigation and found no evidence.  This is evidence

4    that there's fraud in those loans.

5            THE COURT:  Counsel, let me ask you, how much more of

6    this are you going to do?

7            MR. HEFTMAN:  Your Honor, there are a number of

8    entirely fictional and fraudulent loans in this blue section.

9    And so -- I have the evidence to support that --

10           THE COURT:  Are you going to do this with this witness

11   and then do it again with Mr. Malek?

12           MR. HEFTMAN:  No.

13           THE COURT:  I see what you have, and my question is,

14   don't we know the answer this witness is going to give to all of

15   these questions?  Your point is being made that he didn't look

16   at these things, and he's already told you he didn't.  So if you

17   show him all the criminal things and all that, he didn't look at

18   them.

19       His other answer -- and the fact that I know them so well

20   should give you pause.  His other answer is going to be that he

21   doesn't take these as proof of COLB being where they are.  They

22   could be anywhere.  Some of them are in COLB, and it's clear

23   from the documentation.

24       Well, we can go through them one at a time if you want.

25   And I understand that you feel the need to do this.

```
 1              MR. HAGALE:  Your Honor, we would object to that.

 2    They're simply trying to reprove the fraud case through our

 3    damages expert.  It's a damages expert, and they're trying to

 4    redo what wasn't proven in the --

 5              THE COURT:  No.  No, that's not what they're trying to

 6    do.  They're trying to impeach his testimony that, as far as he

 7    knows, there's nothing around to show that any of these

 8    defective loans or impaired loans were on COLB, that most of

 9    them were somewhere else, and that we shouldn't count the

10    blue --

11              MR. HEFTMAN:  Your Honor, I'll be three more minutes

12    on this and move on.

13              THE COURT:  Okay.  There we go.  Overruled.

14              MR. HEFTMAN:  All right.

15    BY MR. HEFTMAN:

16    Q.   So just looking at this, the FBI agent testifies that the

17    Lee loans are often referred to as "do not sell" loans as well.

18    And these are denoted to mean in the TBW system as not to sell.

19    Right?  Not to sell to a third party.  Okay?

20    A.   Okay.

21    Q.   And you agree with Mr. Malek that over a thousand of the

22    loans that say "do not sell" in TBW's records were sold to

23    Colonial Bank in the blue on the Warehouse line and the COLB

24    line.  Right?

25    A.   I believe that's the case, yes.
```

1    Q.   Right.   And -- well, I mean, you have the charts and the

2    spreadsheets and you traced all this through and you know that

3    to be the case.   Right?

4    A.   Correct.

5    Q.   Okay.   And so what this FBI agent is saying is that these

6    loans -- the notes that are associated with the loans, too, are,

7    in fact, not the borrowers.   Right?   They're criminal and

8    fraudulent.   You can see that testimony?

9    A.   All of the yellow?

10   Q.   Yeah.

11        MR. HEFTMAN:   If you scroll down a little, Rami.

12   BY MR. HEFTMAN:

13   Q.   Do you see that?

14   A.   I do.

15   Q.   Okay.   And then just very quickly, the last one here, if we

16   look to page 8, F4100.

17        MR. HEFTMAN:   Let's go back to F4100, page 8.

18   BY MR. HEFTMAN:

19   Q.   And we can see there are, in the bottom right-hand corner,

20   "Do not sell per Heather."

21        Do you know who Heather is?

22   A.   I don't recall.

23   Q.   Okay.   So that's not Desiree Brown who went to jail.   It's

24   not Alan Darmas.   It's not Farkas.   So here's another person

25   putting in "do not sell."   And Vorwerk, Boyd, and Higdon, do you

 1    know anything about those loans?

 2    A.   I do not.

 3    Q.   Well, let's look at the F4300, the proof of loss.  Did you

 4    consider the FDIC's proof of loss in forming your opinion?

 5            MR. HAGALE:  Your Honor, I object to this document as

 6    hearsay as well.  It's a self-serving document from the FDIC.

 7    There's no hearsay exception.

 8            THE COURT:  Overruled.

 9    BY MR. HEFTMAN:

10    Q.   Did you review this in forming your opinion?

11    A.   I don't believe so.

12    Q.   Just quickly turning to page 7 -- do you remember the names

13    from the other document we just looked at, Boyd, Higdon,

14    Vorwerk?  If you look at the second paragraph here --

15            MR. HEFTMAN:  Rami, please, just all of 4.  Sorry.

16    Under 4.

17    BY MR. HEFTMAN:

18    Q.   So in a nutshell, what the second paragraph says is these

19    all had bogus Social Security numbers and were fictional loans.

20    Right?

21    A.   I'd have to read it, sir.  I'm happy to take the time if...

22    Q.   I'll represent to you that that's what it says, in a

23    nutshell.  Okay?  But please feel free to read it.

24    A.   Okay.

25    Q.   So this is more evidence that completely fictional loans

1    were put in the blue on the COLB and the Warehouse line.  Right?

2            THE COURT:  Well --

3            MR. HEFTMAN:  Well, we know that these loans,

4    Your Honor, are in that section of what he says is not damage.

5            MR. HAGALE:  Your Honor, he has given no context to

6    this document at all.

7            THE COURT:  They may be in that section, but how do

8    you get from this to prove that they really have no Social

9    Security numbers and can't be confirmed as real loans?

10           MR. HEFTMAN:  Well, this is proof of loss for the bond

11   case, Your Honor.  I mean, this is impeachment, obviously.  The

12   proof of loss in the bond case.  The FDIC made a bond claim

13   saying that there was dishonest acts by its employees.  And it

14   was paid on that bond claim.  So this is the basis of that bond

15   claim.

16           MR. HAGALE:  Your Honor, he can't impeach Dr. Lehn

17   with the FDIC's statements.  Furthermore --

18           THE COURT:  I'll sustain the objection.

19   BY MR. HEFTMAN:

20   Q.   Every one of those blue loans is hidden in a fraudulent AOT

21   trade in an offline set of books at bank close.  Right?

22   A.   At bank close.  Correct.

23   Q.   Right.  And hiding them in a fake trade and manipulating

24   the bank's data to make it look like they were paid off on the

25   warehouse and COLB and sticking them in that second set of books

1    was fraud.  Right?

2    A.   Again, I'm not a lawyer, but if it was, that's not the way

3    I understand this case as a damages expert.  As I understand it,

4    PwC's misconduct was not detecting the TBW fraud, which entailed

5    stealing --

6    Q.   So now you're interpreting --

7              MR. HEFTMAN:  I don't mean to interpret, Your Honor,

8    but he's interpreting your legal opinion and making --

9              MR. HAGALE:  Objection --

10             THE COURT:  Whoa.  Whoa.  Stop.  First of all, he gets

11   to finish first.

12             MR. HEFTMAN:  Excuse me.

13             THE COURT:  Then you get to go, and then you get to

14   go.  Okay?

15             MR. HEFTMAN:  Please continue, sir.

16             THE WITNESS:  So my understanding is that PwC was

17   negligent, the Court has found, in not detecting the fraud in

18   the '03 audit.  And the fraud, as I understand it, is as I've

19   articulated it, and based on my understanding, the stealing

20   occurred at the time that Colonial advanced funds to TBW.

21             THE COURT:  Okay.  Let me save you some time, because

22   I'm not sure that anybody is grasping what he has now said a

23   thousand times.  His view of the fraud that counts -- that

24   counts because it's where PwC was negligent, is that the fraud

25   was either at the inception and that anything that happened

1    after that doesn't count.  Okay?  That's what he's saying.  He's

2    said it about 20 times.

3              MR. HEFTMAN:  Yes, Your Honor.

4              THE COURT:  And you keep asking him the same thing.

5    And the answer is -- he's always going to say the same thing.  I

6    assume at closing argument, whoever is going to do closing

7    argument, you're going to argue, as I can anticipate, that the

8    fraud didn't stop only at inception, that it went all the way

9    through.  But you're never going to get him to say it.

10             MR. HEFTMAN:  Understood, Your Honor.  I am going to

11   only talk about that exact issue with him.  Okay?  Just a little

12   further.

13   BY MR. HEFTMAN:

14   Q.   So your view is the blue deteriorated and developed a

15   credit problem later.  Your Honor asked you a very specific

16   question about that.  You think that this deteriorated and

17   that's why it didn't sell for economic reasons, non-fraud

18   reasons.  Right?

19   A.   Again, Mr. Malek hasn't provided the evidence --

20   Q.   Right.

21   A.   -- and I'm not aware of any other evidence to draw any

22   other conclusion.

23   Q.   Okay.  And so on direct exam you were asked about the

24   repurchase obligation.  Okay?  And -- because Colonial Bank,

25   like these other lenders were sending loans back to TBW, had an

1  opportunity to get its money back on those blue loans if it had

2  sent them back.  Right?

3  A.    Perhaps.

4  Q.    Well, contractually, Colonial Bank had a right to send it

5  back if there wasn't a committed end investor that purchased it.

6  Right?

7  A.    I'm not an expert on the contracts here, sir.  My

8  understanding is that there was possibly some opportunity to do

9  so, but I also understand that there may have been some

10  regulatory restrictions related to accounting issues that would

11  not make that possible.

12  Q.    All right.  Well, that's an important issue.  Let's just

13  look at PwC's answer, 2879, paragraph 31 --

14        THE COURT:  We've seen it.

15  BY MR. HEFTMAN:

16  Q.    Okay.  So you understand that PwC admitted in other

17  litigation that it has a right to send it back if the takeout

18  investor didn't purchase it.  Right?

19  A.    I am not aware of what PwC --

20  Q.    Okay.  So you said the context is critical.  And what you

21  said was that maybe Colonial Bank made a business decision not

22  to send the loans back.  Right?

23  A.    Correct.

24  Q.    Because TBW was a really important customer, and they

25  didn't want to destroy their really important customer.  Right?

1    A.    Correct.

2    Q.    Now, the context is that Ms. Kissick was the one handling

3    the TBW relationship.  Right?

4    A.    When you say handling, I'm not sure what all that entails,

5    but I know she was a principal player.

6    Q.    Right.  Okay.  And you know that Ms. Kissick was engaged in

7    a seven-year criminal conspiracy with TBW and allowed them to

8    steal over a billion dollars from the bank.  Right?

9    A.    I don't know all those details, but my understanding is

10   that she was convicted, yes.

11   Q.    So part of the context here is that Ms. Kissick didn't want

12   the fraud to be exposed.  Right?

13   A.    When you say "the fraud," which fraud, sir?

14   Q.    The fraud where Colonial Bank had hundreds of millions of

15   dollars stolen from it by TBW.  She didn't want that exposed.

16   Right?

17   A.    I presume that to be the case.

18   Q.    And she hid loans in fake AOT trades to reduce scrutiny of

19   those aged loans, didn't she?

20   A.    Again, I don't know what the line of command was at

21   Colonial Bank.  What I do know is what we're talking about are

22   aged loans on the COLB line.  And they -- the data on them was

23   in ProMerit, so nothing was hidden from management.

24         And I don't know whether Ms. Kissick unilaterally made the

25   decision to move them to AOT or whether there were others that

1    chose to move them to AOT.  But while they were on the COLB

2    line, they had aged.  And whether one wants to call them junk,

3    I don't think there's any disagreement that there were a lot of

4    aged loans on the COLB line.  The key is whether they were

5    defective at the point of initial funding, and again, I don't

6    see evidence that they were.

7    Q.    I want to talk about is -- your view is that Ms. Kissick

8    chose, not as part of the fraud, not part to avoid detection, to

9    avoid going to jail, but Ms. Kissick chose not to get Colonial's

10   money back, and instead stick these loans in fake trades as a

11   business decision.  That's your view.

12   A.    Again, I don't know the line of command and whose call this

13   was entirely.  I'm just saying forbearance is not an unusual

14   thing in the business world, especially with major customers

15   that might be going through financial difficulties.

16         So, setting aside the fraud and who knew what about TBW's

17   fraud, it could have just been that Colonial Bank said, we're

18   going to do margin calls, we're going to manage this in a

19   different way, but they might -- TBW might not have even had the

20   wherewithal to repurchase that volume of aged loans.

21         THE COURT:  Okay.  Counsel, I know exactly where

22   you're going to go now.  You're now going to go and show all the

23   comments by Kissick or in the criminal case that show otherwise.

24         You asked a question.  He's given you the answer we could

25   have foreseen he would give you.  He's not going to give you the

1    answer you want.

2         As far as he's concerned, whether it was a business

3    decision or not, he's treating it, if it was fraudulent, it's a

4    totally separate fraud.  He's not going to admit to you that

5    this is the same as fraud at the inception.

6         I really do not need to hear any more on this.  It is now

7    4:30.  We're going till 5:00 because the Court is trying to

8    indulge counsel to get this witness off the stand so he doesn't

9    have to stay overnight.  I am not staying past 5:00.  Okay?  We

10   have got you finishing up your exam, and I assume we're going to

11   have some re-cross.  If you go past 5:00, the witness is staying

12   on.  If you ask the same question again, I'm going to cut you

13   off.  Okay?

14             MR. HEFTMAN:  Yes, Your Honor.

15             THE COURT:  I got the picture.  I know what his

16   position is.  I even know what your position is.

17             MR. HEFTMAN:  That's what I really care about,

18   Your Honor.

19             THE COURT:  I got that.

20             MR. HEFTMAN:  Okay.

21             THE COURT:  I got them both.  I do not want to hear

22   again what he's going to tell you every time you ask him that

23   question.  He's committed.  He's -- he's their witness.  He's

24   not going to tell you what you want to hear.  Okay?

25             MR. HEFTMAN:  Yes, Your Honor.

1    BY MR. HEFTMAN:

2    Q.   Professor Lehn, you talked about the effects of the

3    economy, right, the mortgage crisis?

4    A.   In what context, sir?

5    Q.   I think the context of the case.  You were saying that

6    Mr. Malek -- you found it, I think astounding is the word that

7    you used -- you found it astounding that Mr. Malek didn't refer

8    to the housing crisis.  Right?

9    A.   Correct.

10    Q.   And so you think that legitimate mortgage warehouse lending

11    loans -- right? -- that Colonial's relationship with legitimate

12    mortgage warehouse lenders should have heavily suffered from the

13    mortgage crisis, just like its relationship with TBW.  Right?

14    A.   I'm not sure I follow your question.  If you could repeat

15    it.

16    Q.   Sure.  You did no analysis of how the housing and economic

17    crisis affected Colonial's relationship with legitimate

18    customers.  Right?

19    A.   I didn't study that.  That's correct.

20    Q.   And you had ample evidence in the financial statements that

21    you were given if you wanted to see how were the legitimate

22    customers faring.  Right?

23    A.   If I thought that was relevant for my opinion, correct, but

24    I didn't think that was relevant.

25    Q.   Well, you just gave an opinion that it was astounding that

1    r. Malek didn't address this, and Mr. Malek testified that he

2    studied the financial performance of the legitimate customers

3    and that Colonial Bank was profitable on those customers.  You

4    heard that testimony.

5    A.    I heard that, correct.

6    Q.    You did no analysis of that issue, and you have no opinion

7    about it.  Right?

8    A.    I haven't studied it, so I don't have an opinion on that

9    specific issue.

10   Q.    And so, coming here and saying that it's Mr. Malek that

11   didn't disentangle economic losses, you didn't think the best

12   evidence of what's a fraud loss versus an economic loss would be

13   to look at how legitimate mortgage warehouse lending customers

14   performed during that period?

15   A.    You know, it's been my consistent view from the time of my

16   initial report through deposition through today that one should

17   not comingle nonfraud losses with fraud losses.  That's been my

18   consistent view.  And I've mentioned it before, even with

19   respect to the orange mortgages, that taking into consideration

20   the fact that there were losses on mortgage-related securities

21   is something that should have at least been considered.

22         And I don't think looking at the profitability of the

23   warehouse lending relations with other customers is probative of

24   that.  His was an unprecedented housing crisis, and it should

25   have been recognized in his report.

1   Q.   Well, it was unprecedented for all those other customers,

2   Pinnacle and everybody else we saw on that list.  Right?

3   A.   I'm not sure what you mean when you're talking about

4   specific customers, but --

5                MR. HEFTMAN:  P2946, please.

6   BY MR. HEFTMAN:

7   Q.   So at December 31, 2007 -- you've seen this document when

8   we were talking about it with Mr. Malek.  Right?

9   A.   I vaguely recall it.

10  Q.   Okay.  So 99.6 percent of the aged COLB as of 12/31/07 was

11  TBW.  Right?  I'll represent to you that if you search through

12  all the pages of this, you'll find four Bayrock loans, and every

13  other one on this list, of $166 million, is TBW.  Right?  Do you

14  accept --

15  A.   You asked --

16  Q.   -- that representation?

17  A.   I haven't really studied the data here.

18               THE COURT:  Okay.  But assuming he's telling you the

19  truth -- he rarely makes mistakes on this stuff.

20               THE WITNESS:  Okay.

21       (Laughter)

22               MR. HEFTMAN:  Thank you, Your Honor.

23  BY MR. HEFTMAN:

24  Q.   So if the housing crisis was causing nonfraudulent

25  customers -- you know, we heard a lot about fires and divorces

1    and all kinds of things that befell customers -- you would

2    expect those things to befall not just TBW's customers, but all

3    of Colonial's mortgage warehouse lending customers.   Right?

4    A.    You'd have to look at each one and look at the

5    circumstances of each one, and it would have differential

6    effects.

7    Q.    Well, I mean, you do a lot of statistics work, I'm sure, as

8    an economist.   It would be an extraordinary coincidence -- so

9    you take no value or information from the fact that all the aged

10   COLB in 2007 is on the line where there's a massive criminal

11   conspiracy that involves dumping impaired loans, but every other

12   lender was able to get these aged loans off their books before

13   the end of 2007?

14   A.    Again, I haven't studied this data, but I don't think it's

15   probative of what I think is necessary for Mr. Malek to

16   establish.

17   Q.    Okay.  So you don't think the actual nonperformance -- or

18   actually, performance of the other mortgage warehouse lending

19   customers is probative of whether the losses here are fraud or

20   economic?

21   A.    It might contribute to an opinion, but it's not probative,

22   and I haven't -- again, I haven't studied this and I haven't --

23   Q.    Okay.  We'll move on.

24        As I said at the beginning, you didn't talk about a but-for

25   world.   The purpose of a but-for world is to compare what the

1    world looks like with the wrongful act -- in this case, PwC

2    failing to detect the fraud -- with what the world looks like

3    without the wrongful act, PwC finds the fraud.  Right?

4    A.   Right in the sense that I haven't done a but-for world?  Is

5    that your question?

6    Q.   No.  I'm saying that is the appropriate but-for world in

7    this case, and that's what you testified to in your deposition.

8    Right?

9    A.   Well, again, what I would say is that the but-for world in

10   this case is a world in which PwC had detected the fraud in the

11   2003 audit and, therefore, losses associated with the stealing

12   would have been avoided.

13   Q.   Right.

14   A.   But unless one can establish that the blue mortgages

15   reflect the stealing, then they should not be included in the

16   fraud losses.

17   Q.   So Plan B AOT, if the fraud was detected in the 2003 audit,

18   495 million isn't stolen.  Right?

19   A.   Again, I'm not objecting to the number.

20   Q.   Right.  And 562 isn't stolen.  Right?

21   A.   I'm not objecting to it.

22   Q.   Okay.  And then that 415 million, that's not going to be

23   lost either, is it?

24   A.   In what sense, sir?

25   Q.   Let's talk about this.  In a but-for world, the TBW-Colonial

1    relationship is over because the fraud has been discovered.

2    Right?

3    A.   Presumably, but -- I'm assuming that's the case.

4           THE COURT:  Well, Farkas is in jail, so, you know, it

5    would be hard for TBW to keep going, right?

6           THE WITNESS:  I don't know enough about the legal

7    structure and whether or not the entity could survive beyond

8    Mr. Farkas, but I'm just saying that I accept what you're

9    saying, but...

10   BY MR. HEFTMAN:

11   Q.   Well, you would agree that the fraud would stop.  Right?

12   A.   The TBW fraud, correct.

13   Q.   Right.  And you're not sure whether TBW becomes a

14   legitimate customer of Colonial or -- and what Mr. Malek said

15   is, I'm not going to speculate that some new legitimate customer

16   comes in.  Right?

17   A.   That's correct.

18   Q.   I'm going to say Colonial Bank would have downsized,

19   because it just lost its largest customer.  Right?

20   A.   Correct.

21   Q.   Okay.  So in that but-for world, none of the blue, none of

22   the orange, none of the whatever -- red was the other color,

23   none of those losses occur because the fraud stops and the TBW

24   relationship ends.  Right?

25   A.   Under Mr. Malek's but-for world, correct.

1    Q.   Right.  And you agreed in your deposition that the

2    appropriate but-for world in this case is looking at a world

3    where PwC doesn't detect the fraud, reality, and it does,

4    because that's what isolates the consequences of the wrongful

5    act.  Right?

6    A.   I would have to go back and look at the exact wording, but

7    I generally agree with that.

8              MR. HEFTMAN:  No further questions, Your Honor.

9                      REDIRECT EXAMINATION

10   BY MR. HAGALE:

11   Q.   Dr. Lehn, do you remember questions about Exhibit P2869?

12   This is the SEC complaint against Cathie Kissick.

13   A.   Yes, I do.

14   Q.   Do you see up here this complaint was filed on March 2,

15   2011?

16   A.   Yes.

17   Q.   Is that before any of the depositions taken in this case?

18   A.   I believe so, yes.

19   Q.   And is it before any of the discovery in this case?

20   A.   I don't know when discovery started, but I believe so.

21   Q.   Dr. Lehn, you heard some questions about the depositions

22   that you read in formulating your opinions in your report.  Do

23   you recall that?

24   A.   I do.

25   Q.   Did Mr. Malek cite to some depositions in his rebuttal

 1   report in response to your report?

 2   A.   He did.

 3   Q.   And did he include a list of deposition testimony from

 4   Mr. Ray Bowman and Ms. Teresa Kelly?

 5   A.   He did.

 6   Q.   And did you review those when Mr. Malek put those in his

 7   rebuttal report?

 8   A.   Yes.

 9   Q.   And what was the conclusion that you drew upon reading the

10   testimony that Mr. Malek cited in response to your opinion?

11   A.   That it didn't support the inference that he was drawing

12   from it.

13   Q.   And why is that?

14   A.   Because he used those excerpts to establish that -- you

15   know, that TBW was dumping bad loans on the COLB line at the

16   point in which they were being funded, and there was no

17   indication from those deposition transcripts that that was the

18   case.

19   Q.   Dr. Lehn, you also heard some questions about

20   Exhibit P2879.  This is PwC's answer in a case down in Florida.

21   Do you recall that?

22   A.   I do.

23   Q.   I'm pulling up on the screen the portion that the FDIC

24   highlighted.  Does this portion say anything about whether any

25   of this crap loans were crap at inception on COLB?

1    A.   No.

2    Q.   Is that important?

3    A.   It is.  Because that's the way in which the stealing took

4    place.

5    Q.   Mr. Heftman also asked you about this exhibit, which is

6    P1907.  Do you recall that?

7    A.   I do.

8    Q.   This is the one where Ms. Carrier -- that's Ms. Kissick's

9    maiden name -- said, "Why are we always the dumping ground?"

10   A.   Yes.

11   Q.   And did you see anything in this that was specifically

12   related to COLB?

13   A.   No.

14   Q.   Now, there were some questions about what Ms. Kissick was

15   saying or what Ms. Kelly was saying, and I think you stated that

16   you didn't know their state of mind.  Do you recall that?

17   A.   Yes.

18   Q.   Let's go see what Ms. Kissick said in her deposition.  This

19   is lines 16 -- pages 16, lines 15 to 22.  Could you just read

20   that, please.

21   A.   To myself?

22   Q.   Out loud.

23   A.   "Does that place it back for you again."

24        Answer:  "Well, once again, I didn't know exactly what was

25   on the loans.  So Terry was looking at them, and I -- in case

1   you haven't figured out, I'm sarcastic, and I would always call

2   all the old -- all loans dog loans or old loans or crap loans."

3   Q.   And is it fair to say that Ms. Kissick would probably be

4   the best person to talk about what her state of mind was when

5   talking about junk loans or crap loans or anything like that?

6   A.   I would think so.

7   Q.   Going back to the question about the depositions that you

8   reviewed in formulating your opinion, did you read the

9   transcript from the liability portion of this case in

10  preparation for trial?

11  A.   I did.

12  Q.   And how did that inform your opinion?

13          MR. HEFTMAN:  Your Honor, we've objected to that

14  already, and the Court has excluded his new analysis of the

15  liability opinion.  He reached an opinion.

16          THE COURT:  Sustained.

17  BY MR. HAGALE:

18  Q.   You heard some questions from Mr. Heftman about -- you

19  heard a lot of questions about e-mails that allegedly said that

20  there was dumping from TBW onto COLB.  Do you recall that?

21  A.   I do.

22  Q.   And do you recall Mr. Malek's testimony where he said that

23  he tied those specific e-mails to specific transactions with

24  respect to COLB?

25  A.   Yes.

1   Q.   Have you seen any evidence of that other than Mr. Malek's

2   say-so?

3   A.   No.

4   Q.   In talking about the exception report -- that's

5   Exhibit F4100 -- Mr. Heftman asked you whether TBW had any

6   relationship with the loan after it was sold to Colonial Bank.

7   Do you recall that?

8   A.   I do.

9   Q.   Do you know whether TBW remained the servicer for many of

10  the loans that it sold to Colonial Bank?

11  A.   Well, that was my hesitancy in answering, is I thought they

12  were, and I think they kept servicing records on the loans.

13  Q.   And would those servicing records have existed after the

14  sale of the loan to Colonial Bank?

15  A.   Again, there aren't dates, as far as I can recall, on that

16  database, but I would presume that would be the case.

17  Q.   Is there any reliable basis to say whether or not the data

18  in the TBW Rules database is not from the servicing records that

19  would postdate the sale of the loan to Colonial Bank?

20  A.   I'm sorry.  Can you repeat the question?

21  Q.   Is there any reliable basis to conclude that the Rules data

22  in the exception report does not -- only relates to dates prior

23  to the sale of the loans to Colonial --

24  A.   Oh, not at all.

25  Q.   And why is that?

1    A.   Because there are no dates to tie it to.

2    Q.   Dr. Lehn, you heard questions about "do not sell per Lee

3    Farkas."  Do you recall those?

4    A.   I do.

5    Q.   And do you know approximately how many of those loans

6    existed amongst the over 4,000 on Mr. Malek's exception report?

7    A.   Well, again, based on that database, I think there are

8    three or four.

9    Q.   And how did that relate to your opinion?

10   A.   In the sense that I think the total amount is around

11   $2 million, and insofar that those are loans that were junk on

12   arrival, quote-unquote, then one could certainly adjust the

13   $415 million number.  I'm not saying they are.  I'm just saying

14   that, under the hypothetical, that number could be adjusted.

15   But I don't know either way about that.

16   Q.   But was it a very small percentage of the loans on the

17   exception report?

18   A.   Yes, it was.  It was less than 1 percent.

19   Q.   Dr. Lehn, Mr. Heftman asked you a lot of questions -- this

20   was in relation to the put-back rights -- and he said, wouldn't

21   some proper context be to know that Ms. Kissick didn't want the

22   fraud to be uncovered?  Do you recall that?

23   A.   I do.

24   Q.   The aged loans on COLB, Warehouse and Overline, were those

25   on aging reports?

1    A.    They were.

2    Q.    And were those aging reports distributed to people within

3    mortgage warehouse lending division?

4    A.    It's my understanding.

5    Q.    Was it distributed to people who were not involved in the

6    fraud?

7    A.    That's my understanding as well.

8    Q.    Is that some important context?

9    A.    I think so, because it indicates that nothing was hidden at

10   least up until that point in time.

11   Q.    And is that important context to any management decision

12   with respect to repurchased loans?

13   A.    Sure.  Absolutely.

14   Q.    And why is that?

15   A.    Well, because this was information they had, and an issue

16   that they attempted to manage and manage in what they thought

17   was the most appropriate way, which is not to put it back on

18   TBW, but, as I indicated, there was other things they did, such

19   as frequent margin calls.

20   Q.    Dr. Lehn, you heard -- Mr. Heftman went through some

21   documents with you about the aged loans on COLB being 99 or so

22   percent TBW.  Do you recall that?

23   A.    I do.

24   Q.    Have you seen aged loans with respect to other customers

25   other than TBW?

1   A.   Yes, I have.

2   Q.   And just order of magnitude, do you recall the amount?

3   A.   I can remember seeing, for Bayrock and Pinnacle, just pages

4   and pages with lists of aged loans.

5   Q.   And was TBW -- how did TBW compare -- let me recoveries

6   that question.

7         Was TBW the largest customer of the mortgage warehouse

8   lending division?

9   A.   Yes, it was, by far.

10   Q.   And what conclusions would you draw from that with respect

11   to how many aged loans would be TBW versus other customers?

12   A.   You would expect it to account for a disproportionate

13   amount of the aged loans.

14         MR. HAGALE:  Give me just one second.

15       Nothing more, Your Honor.

16         MR. HEFTMAN:  No questions, Your Honor.

17         THE COURT:  Well, you're going to make your plane.

18         THE WITNESS:  Thank you, Your Honor.  I appreciate

19   that very much.

20         THE COURT:  So you may step down.

21         THE WITNESS:  Thank you.

22       (The witness steps down.)

23         MR. LEVINE:  Thank you, Your Honor, for adjusting the

24   schedule for him get out of here.

25         THE COURT:  And we're out of here by 5:00, which will

```
 1     make our court reporter and our deputy very happy, and also

 2     makes the Court very happy.

 3         Okay.  But your optimism, Mr. Beck, that we would be

 4     finished with all of the testimony by the end of today --

 5             MR. BECK:  Dashed.  Ever the optimist, though.

 6             THE COURT:  It's good to see that, after all these

 7     years, you still --

 8             MR. BECK:  You know, I used to be kind of a conspiracy

 9     theorist, but I've turned more optimistic in the last few years.

10             THE COURT:  Your timing is bad.

11         (Laughter)

12             THE COURT:  Okay.  So tomorrow, as I understand it,

13     Mr. Malek will go on the stand, and he'll go on for rebuttal.  I

14     assume he's going to want to say some things in response to --

15             MR. SORENSEN:  Your Honor, I would just note, you

16     know, we obviously still maintain that he should be excluded,

17     but yes, understanding that he will --

18             THE COURT:  No -- wait.  Wait.  I'm talking about

19     response to Dr. Lehn.  Is he --

20             MR. SORENSEN:  Oh, Dr. Lehn.  I'm sorry.  I'm sorry.

21     No rebuttal.

22             THE COURT:  You're not going to do that?

23             MR. SORENSEN:  No rebuttal.

24             THE COURT:  Oh, boy.

25             MR. BECK:  And also, Your Honor, they were kind enough
```

1    to let us know that they won't be calling the other two

2    witnesses that were may-call for rebuttal.  So there's no

3    rebuttal case.

4               THE COURT:  Talk about optimism.  I had just assumed

5    that we were finished -- that we only had two witnesses.

6               MR. BECK:  We're becoming close pals.

7               THE COURT:  You've been together long enough.

8         (Laughter)

9               THE COURT:  Okay.  So all we're talking about is the

10   44 million, or 40 million, or whatever that figure is?

11              MR. BECK:  Yes.

12              THE COURT:  Okay.  And that's not going to take -- you

13   said 20 minutes your side and --

14              MR. LEVINE:  25 minutes, at the most, for the cross.

15              THE COURT:  And you still need your hour and a

16   quarter?  You had asked for an hour and 15 minutes, I think,

17   closing.

18              MR. BECK:  Oh, for closing.  Yes, an hour and 15

19   minutes, Your Honor.  And I'm not as optimistic I can get it all

20   done in an hour and 15, but --

21              THE COURT:  It's a cutoff, because you know I didn't

22   think it needed an hour and 15 minutes.  I thought it only

23   needed an hour.  I was just being kind in saying you get an hour

24   and 15 minutes, but that's the cutoff.

25              MR. BECK:  Well, thank you for your kindness.

1          THE COURT:  That's it.

2          MR. BECK:  I expect I'll probably use all of it.

3          THE COURT:  Okay.  So we will finish tomorrow.  Right?

4          MR. LEVINE:  Yes, Your Honor.

5          THE COURT:  Gosh.  Dr. Lehn really cleared out of here.

6      (Laughter)

7          MR. LEVINE:  I think he had to get to Reagan.

8          THE COURT:  Yeah, it's a bad time of day, except the

9  traffic was amazingly light today.  A lot of people didn't come

10  to work.

11      I have a question for you.  Are counsel still discussing

12  settlement at all?

13          MR. BECK:  We have not had any discussions since the

14  mediation, which didn't result in any sort of agreement.  I

15  think we've all been --

16          THE COURT:  Busy.

17          MR. BECK:  -- this last week, too busy.

18          THE COURT:  Well, I'm going to make a suggestion, if

19  you all have heard the testimony that I've heard, that now might

20  be a very good time.  You don't need a mediator.  I have rarely

21  seen a collection of such talented and experienced attorneys all

22  in one place.  And between you, I think you could conduct some

23  very meaningful settlement negotiations without an interceding

24  mediator.  And I think now is the time to do it, because you're

25  getting very dangerous ly close to the point where there's not

1   going to be any time to do it because I'm going to make a

2   decision.

3          MR. BECK:  We've actually -- we haven't had any

4   substantive talks, but there has been -- it sounds like the --

5   you know, the Paris Peace Talks shape of the table.  But we did

6   have some discussion after the last mediation that maybe we

7   could get, you know, people with decision-making authority from

8   PwC together with people with real decision-making authority

9   from the FDIC and work something out, and we'd be very

10  interested in pursuing that.

11         THE COURT:  Well, when were you going to pursue that?

12         MR. BECK:  Well, we were -- we thought that -- and I'm

13  sorry; it wasn't Mr. Sorensen or any of the lawyers present

14  here, so I -- we thought that we'd be getting a call, and we

15  haven't gotten one yet, but then again, we've been busy on this

16  trial, so --

17         THE COURT:  Well, I suggest that if you don't hear

18  from them, you make the call and see if you can get something

19  going.

20         MR. BECK:  We will.

21         THE COURT:  You're going to finish early tomorrow --

22  well, not that early, but pretty early, and so, you know, you'll

23  have the afternoon, you'll have the weekend.

24         MR. BECK:  Our decision-maker is now blanching, but

25  we'll make the call, and if they're agreeable to having a

1    decision-maker with authority meet with us, we will have one and

2    we'll meet with them.  And if that means our general counsel

3    doesn't go on vacation with her family, so be it, and that sort

4    of thing.

5              THE COURT:  Well --

6              MR. BECK:  I mean, we'll do it.

7              THE COURT:  -- given the amount of work you all have

8    imposed on the Court, I have absolutely no sympathy for any of

9    you in terms of the time you want to spend.

10             MR. BECK:  And I'm serious, Your Honor.  We are

11   prepared -- you know, I'm supposed to -- my family doesn't care

12   if I go on vacation with them.

13        (Laughter)

14             MR. BECK:  But --

15             THE COURT:  Oh, Mr. Beck.  Now we're really all going

16   to feel sorry for you.

17             MR. BECK:  When my kids were real little and I told

18   them I was going to be away for a long trial and I went through

19   my whole *Father Knows Best* thing, I said, "Do you have any

20   questions at all?"  And one of them looked at me and said,

21   "You're not taking the car, are you?"  So that's kind of the

22   dynamic in the Beck household.

23        (Laughter)

24             MR. BECK:  But we will have the appropriate people if

25   they're prepared to have decision-makers ready to talk.

1          MR. SORENSEN:  Yes.  And I hear, Your Honor, and I

2     will discuss it with our clients.

3          THE COURT:  Yeah.  I'm just urging that you get going

4     on this, because this is not -- I mean, what's left for me to

5     decide is not that complicated.  After hearing the testimony

6     today, it's come down to a very simple issue.  All the numbers

7     are agreed on.  It's just --

8          MR. BECK:  Those blue loans.

9          THE COURT:  Yeah.  And, you know, once we're finished

10    here, I'm going to -- Heather and I are going to start putting

11    our heads together and it will be too late.  So get going, guys.

12       And I'll see you tomorrow.  Court will be in recess.

13       (Proceedings adjourned at 4:53 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.


*Bryan A. Wayne*
BRYAN A. WAYNE

## $

**$1,050** [1] - 3769:12
**$1.244** [3] - 3792:22, 3793:24, 3799:21
**$1.473** [1] - 3772:8
**$100** [3] - 3771:19, 3771:20, 3771:24
**$15** [4] - 3792:1, 3792:8, 3792:17, 3793:7
**$166** [1] - 3868:13
**$20** [4] - 3759:14, 3759:25, 3771:22, 3771:24
**$229** [2] - 3791:22, 3791:25
**$300** [7] - 3763:10, 3800:11, 3800:15, 3805:17, 3805:18, 3806:14
**$300,922,884** [1] - 3805:12
**$324** [3] - 3800:23, 3806:24, 3807:6
**$324,386,201** [3] - 3805:19, 3806:3, 3806:17
**$400** [6] - 3793:9, 3796:25, 3799:22, 3800:12, 3805:1, 3805:5
**$415** [17] - 3773:2, 3773:18, 3788:20, 3789:5, 3791:13, 3794:17, 3807:25, 3813:14, 3819:3, 3819:13, 3819:14, 3820:15, 3820:20, 3829:24, 3843:2, 3848:5, 3877:13
**$495** [2] - 3772:10, 3795:24
**$519** [1] - 3800:9
**$562** [3] - 3772:14, 3791:1, 3791:3
**$563** [2] - 3812:16, 3813:11
**$619** [2] - 3796:6, 3800:9
**$625** [4] - 3796:12, 3796:14, 3805:19, 3807:13
**$80** [1] - 3771:25
**$844** [1] - 3799:22
**$978** [2] - 3790:13, 3791:11
**$99** [11] - 3794:24, 3795:3, 3795:8,

3796:8, 3800:1, 3800:25, 3802:25, 3803:2, 3804:12, 3804:21, 3805:6

## '

**'03** [2] - 3831:25, 3860:18
**'04** [1] - 3793:11
**'crap** [1] - 3824:3
**'per** [1] - 3754:5

## 1

**1** [2] - 3763:4, 3877:18
**1,047** [1] - 3849:3
**1.1** [1] - 3844:22
**10** [1] - 3850:12
**100** [3] - 3764:7, 3767:23, 3850:12
**101** [5] - 3770:11, 3772:2, 3773:15, 3791:17, 3794:4
**101:2** [1] - 3850:24
**102** [1] - 3795:10
**103** [1] - 3796:22
**104** [1] - 3799:19
**104:20** [1] - 3850:25
**105** [1] - 3799:24
**105:9** [1] - 3850:25
**106** [1] - 3800:6
**107** [1] - 3800:10
**108** [1] - 3800:16
**109** [1] - 3803:4
**11** [1] - 3832:8
**1100** [1] - 3756:23
**12** [3] - 3832:8, 3837:1, 3850:24
**12/31/07** [1] - 3868:10
**1244** [3] - 3795:20, 3795:21, 3796:5
**1249** [1] - 3854:13
**129** [1] - 3754:13
**13** [1] - 3781:16
**14** [3] - 3750:20, 3792:23, 3842:9
**145** [1] - 3756:2
**15** [8] - 3792:25, 3817:10, 3874:19, 3881:16, 3881:18, 3881:20, 3881:22, 3881:24
**1589** [1] - 3854:13
**16** [2] - 3874:19
**1611** [1] - 3842:7
**1700** [1] - 3751:16
**18** [1] - 3842:12

**187:18** [1] - 3845:18
**19** [2] - 3781:20, 3848:2
**1951** [1] - 3842:8
**1980s** [1] - 3766:17
**1:30** [1] - 3750:6

## 2

**2** [4] - 3828:19, 3844:12, 3872:14, 3877:11
**2/25/04** [6] - 3791:18, 3792:6, 3792:13, 3792:15, 3792:19, 3793:22
**20** [6] - 3781:20, 3827:23, 3828:21, 3834:16, 3861:2, 3881:13
**20001** [1] - 3751:23
**20006-4707** [1] - 3751:17
**2003** [4] - 3758:20, 3792:18, 3870:11, 3870:17
**2004** [8] - 3758:17, 3791:20, 3792:22, 3793:8, 3795:20, 3805:2, 3837:1, 3837:2
**2006** [2] - 3841:19, 3841:22
**2007** [3] - 3868:7, 3869:10, 3869:13
**2008** [1] - 3754:6
**2009** [2] - 3792:23, 3827:11
**2011** [1] - 3872:15
**2016** [2] - 3764:1, 3775:9
**2018** [1] - 3750:6
**202** [2] - 3751:17, 3751:23
**21** [2] - 3781:20, 3842:10
**2100** [2] - 3786:18, 3801:21
**22** [2] - 3750:6, 3874:19
**228** [1] - 3754:3
**23** [1] - 3754:4
**230** [1] - 3828:21
**231** [1] - 3828:18
**233** [1] - 3751:4
**24** [1] - 3845:18
**25** [12] - 3767:16, 3767:22, 3791:20, 3792:22, 3793:8,

3793:11, 3795:20, 3805:1, 3826:8, 3826:19, 3828:21, 3881:14
**258-5500** [1] - 3751:5
**26** [1] - 3754:5
**27th** [1] - 3750:20
**28** [1] - 3837:2
**2879** [1] - 3862:13
**2:11-cv-746-BJR** [1] - 3750:4
**2:12-cv-957-BJR** [1] - 3750:8

## 3

**30** [1] - 3765:1, 3826:8, 3826:19
**300** [1] - 3751:11
**300-some-odd** [1] - 3853:14
**31** [2] - 3862:13, 3868:7
**310** [1] - 3750:21
**312** [2] - 3751:5, 3751:13
**31656** [1] - 3750:23
**333** [1] - 3751:22
**3394:12** [1] - 3814:16
**3394:21** [1] - 3814:16
**34** [2] - 3823:5, 3823:19
**354-3186** [1] - 3751:23
**3568** [1] - 3753:15
**372-5050** [1] - 3750:24
**3753** [1] - 3752:5
**3759** [1] - 3752:5
**3762** [1] - 3752:6
**3805** [1] - 3752:7
**3872** [1] - 3752:7
**3:04** [1] - 3817:11
**3:24** [1] - 3817:11

## 4

**4** [5] - 3848:10, 3848:13, 3850:14, 3858:15, 3858:16
**4,000** [1] - 3877:6
**40** [1] - 3881:10
**400-some-odd** [1] - 3853:15
**415** [5] - 3793:4, 3793:5, 3793:6, 3820:5, 3870:22
**4200** [3] - 3786:16, 3801:17, 3819:21
**4200-some-odd** [1] -

3818:2
**44** [1] - 3881:10
**4704-A** [1] - 3751:22
**4800** [1] - 3802:17
**494-4440** [1] - 3751:13
**495** [1] - 3870:18
**4:30** [1] - 3865:7
**4:53** [1] - 3885:13

## 5

**5** [4] - 3759:14, 3759:25, 3850:12, 3854:13
**50** [7] - 3767:9, 3801:7, 3801:18, 3801:21, 3801:24, 3802:10, 3831:17
**500** [1] - 3757:3
**54** [1] - 3751:12
**562** [5] - 3791:12, 3796:1, 3813:21, 3814:3, 3870:20
**5:00** [4] - 3865:7, 3865:9, 3865:11, 3879:25

## 6

**6** [3] - 3753:17, 3828:19, 3854:3
**60** [4] - 3766:8, 3826:20, 3827:14, 3832:5
**60606** [1] - 3751:5
**60654** [1] - 3751:12
**626-2916** [1] - 3751:17
**65** [1] - 3826:20
**650** [1] - 3757:21
**6600** [1] - 3751:4

## 7

**7** [1] - 3858:12
**70** [1] - 3766:8
**700** [8] - 3756:20, 3756:25, 3757:1, 3757:3, 3757:16, 3757:18, 3757:21, 3826:6
**700-plus** [2] - 3755:19, 3757:25
**7800** [1] - 3789:11
**7800-and-something** [1] - 3789:14
**79120-1656** [1] - 3750:24

**8**

**8** [3] - 3823:5, 3857:16, 3857:17
**8/14/2009** [1] - 3790:6
**800** [1] - 3750:23
**806** [1] - 3750:24

**9**

**90** [1] - 3836:16
**90291** [1] - 3750:20
**961-2536** [1] - 3750:21
**978** [1] - 3791:12
**99** [6] - 3800:14, 3803:12, 3803:13, 3804:4, 3804:6, 3878:21
**99.6** [1] - 3868:10

**A**

**A-185** [1] - 3754:12
**ability** [2] - 3825:15, 3837:19
**able** [3] - 3784:19, 3849:11, 3869:12
**above-entitled** [1] - 3886:5
**absence** [1] - 3853:23
**absolutely** [3] - 3793:13, 3878:13, 3884:8
**academic** [2] - 3832:19, 3832:23
**accept** [4] - 3814:2, 3854:10, 3868:14, 3871:8
**according** [2] - 3806:15, 3824:7
**accordingly** [3] - 3809:9, 3830:13, 3832:4
**account** [1] - 3879:12
**accounting** [4] - 3766:13, 3768:9, 3845:13, 3862:10
**accurate** [1] - 3832:7
**accurately** [1] - 3764:10
**acknowledges** [1] - 3778:25
**acquired** [2] - 3797:9, 3797:18
**acquisition** [1] - 3797:22
**acquisitions** [1] - 3765:4

**act** [7] - 3776:21, 3776:24, 3777:4, 3799:8, 3870:1, 3870:3, 3872:5
**actions** [5] - 3766:4, 3766:5, 3766:10, 3766:14, 3766:22
**acts** [1] - 3859:13
**actual** [4] - 3766:11, 3776:24, 3777:4, 3869:17
**add** [1] - 3792:25
**addition** [2] - 3769:13, 3845:16
**additional** [1] - 3820:3
**address** [2] - 3781:14, 3867:1
**addressed** [2] - 3781:17, 3826:22
**adjourned** [1] - 3885:13
**adjust** [2] - 3819:13, 3877:12
**adjusted** [3] - 3800:18, 3805:20, 3877:14
**adjusted-damages** [1] - 3805:20
**adjusting** [1] - 3879:23
**adjustment** [32] - 3763:10, 3792:8, 3793:9, 3794:16, 3795:3, 3795:8, 3800:14, 3800:21, 3800:25, 3803:1, 3803:2, 3803:19, 3803:21, 3804:6, 3804:20, 3805:10, 3805:12, 3805:14, 3805:16, 3805:21, 3806:5, 3806:13, 3806:15, 3806:19, 3807:6, 3814:2, 3819:3, 3819:5, 3819:9, 3820:7, 3845:3
**adjustments** [9] - 3763:6, 3804:24, 3804:25, 3806:8, 3806:11, 3806:22, 3806:23, 3813:25, 3814:3
**admit** [1] - 3865:4
**admitted** [1] - 3862:16
**advance** [3] - 3771:16, 3774:1, 3849:22
**advanced** [8] - 3771:19, 3787:3, 3790:14, 3806:12,

3813:20, 3849:14, 3852:5, 3860:20
**advances** [2] - 3810:19, 3840:22
**advancing** [2] - 3798:10, 3813:19
**affected** [1] - 3866:17
**affirmatively** [2] - 3819:15, 3819:22
**afield** [1] - 3779:12
**afternoon** [4] - 3762:9, 3805:25, 3806:1, 3883:23
**Afternoon** [1] - 3750:11
**age** [4] - 3798:16, 3798:18, 3798:19, 3815:18
**aged** [36] - 3754:16, 3755:4, 3777:3, 3777:8, 3784:19, 3791:15, 3797:1, 3799:7, 3820:22, 3823:24, 3836:16, 3837:11, 3840:21, 3840:24, 3840:25, 3841:6, 3842:22, 3843:13, 3845:24, 3846:3, 3846:9, 3846:11, 3863:19, 3863:22, 3864:2, 3864:4, 3864:20, 3868:10, 3869:9, 3869:12, 3877:24, 3878:21, 3878:24, 3879:4, 3879:11, 3879:13
**agencies** [1] - 3768:2
**agent** [4] - 3854:14, 3854:22, 3856:16, 3857:5
**agents** [1] - 3854:12
**ages** [2] - 3773:8, 3843:12
**aggregate** [1] - 3793:22
**aging** [5] - 3755:9, 3784:23, 3785:8, 3877:25, 3878:2
**ago** [2] - 3767:16, 3768:13
**agree** [27] - 3773:15, 3786:9, 3788:21, 3788:23, 3791:9, 3791:23, 3792:24, 3793:1, 3793:25, 3812:17, 3814:15, 3814:17, 3814:23, 3815:24, 3816:3, 3816:5, 3816:25,

3817:3, 3818:8, 3820:21, 3825:19, 3837:22, 3847:8, 3851:1, 3856:21, 3871:11, 3872:7
**agreeable** [1] - 3883:25
**agreed** [3] - 3814:10, 3872:1, 3885:7
**agreement** [1] - 3882:14
**agreements** [2] - 3817:2, 3831:10
**agrees** [1] - 3829:7
**ahead** [1] - 3781:13
**aided** [1] - 3751:25
**ALABAMA** [1] - 3750:1
**Alan** [1] - 3857:24
**ALESSIO** [1] - 3751:15
**Alexander** [1] - 3750:19
**allegation** [7] - 3809:5, 3823:7, 3824:10, 3824:12, 3824:21, 3830:11, 3835:21
**allegations** [4] - 3823:7, 3823:8, 3824:8, 3833:4
**alleged** [16] - 3766:11, 3766:12, 3766:13, 3768:9, 3772:7, 3772:9, 3778:18, 3792:16, 3792:18, 3792:22, 3793:23, 3795:19, 3799:21, 3813:19, 3825:6, 3835:6
**allegedly** [1] - 3875:19
**allocable** [3] - 3794:8, 3803:8, 3830:20
**allocate** [2] - 3794:11, 3794:13
**allocated** [4] - 3796:10, 3800:2, 3800:5, 3805:8
**allowed** [3] - 3780:9, 3780:13, 3863:7
**alone** [4] - 3817:20, 3818:1, 3818:3, 3820:7
**ALSO** [1] - 3751:19
**alternative** [3] - 3781:3, 3781:5, 3813:17
**altogether** [1] - 3759:11
**Amarillo** [2] - 3750:23,

3750:24
**amazingly** [1] - 3882:9
**amended** [1] - 3833:19
**America** [1] - 3834:11
**amount** [16] - 3771:13, 3771:20, 3774:7, 3774:13, 3788:14, 3788:17, 3792:17, 3798:11, 3826:14, 3832:8, 3833:13, 3839:12, 3877:10, 3879:2, 3879:13, 3884:7
**ample** [1] - 3866:20
**Amy** [1] - 3751:20
**analyses** [2] - 3831:17, 3833:3
**analysis** [36] - 3754:19, 3755:18, 3757:4, 3758:25, 3763:2, 3765:25, 3774:21, 3782:2, 3787:6, 3787:18, 3788:8, 3802:7, 3807:2, 3808:6, 3808:8, 3809:8, 3809:20, 3824:23, 3828:5, 3830:2, 3830:10, 3830:13, 3830:19, 3832:4, 3832:20, 3833:5, 3838:21, 3839:6, 3839:7, 3839:9, 3849:25, 3850:5, 3852:10, 3866:16, 3867:6, 3875:14
**analyzed** [4] - 3778:1, 3785:23, 3819:14, 3819:21
**analyzing** [1] - 3826:7
**answer** [24] - 3776:6, 3782:24, 3801:7, 3806:20, 3808:23, 3809:13, 3810:9, 3817:22, 3825:5, 3833:18, 3833:19, 3833:24, 3846:13, 3846:14, 3851:21, 3855:14, 3855:19, 3855:20, 3861:5, 3862:13, 3864:24, 3865:1, 3873:20, 3874:24
**answered** [3] - 3825:10, 3825:14, 3830:24
**answering** [1] - 3876:11
**anticipate** [1] - 3861:7

**AOT** [83] - 3755:10, 3758:22, 3772:9, 3772:13, 3772:20, 3772:21, 3773:8, 3773:12, 3774:1, 3774:5, 3777:4, 3777:5, 3784:16, 3786:2, 3787:3, 3789:19, 3789:20, 3789:21, 3789:24, 3790:1, 3790:9, 3791:3, 3791:10, 3791:15, 3791:16, 3792:3, 3792:4, 3792:6, 3792:7, 3795:24, 3796:1, 3796:3, 3796:4, 3796:18, 3797:1, 3797:2, 3797:19, 3797:22, 3797:23, 3798:22, 3799:2, 3799:4, 3799:9, 3799:10, 3810:25, 3811:10, 3811:18, 3812:6, 3812:9, 3812:10, 3813:11, 3814:23, 3816:18, 3816:20, 3824:19, 3835:3, 3837:1, 3837:6, 3837:12, 3837:25, 3840:16, 3841:1, 3842:5, 3842:15, 3842:20, 3843:7, 3846:16, 3846:21, 3847:1, 3848:14, 3852:1, 3859:20, 3863:18, 3863:25, 3864:1, 3870:17

**AOTs** [1] - 3816:24

**apologize** [2] - 3777:23, 3836:11

**appear** [3] - 3754:18, 3756:13, 3805:14

**APPEARANCES** [2] - 3750:17, 3751:1

**apply** [1] - 3809:20

**applying** [6] - 3803:16, 3803:17, 3822:15, 3839:6, 3839:15, 3839:17

**apportion** [1] - 3794:20

**apportioned** [1] - 3794:24

**appreciate** [2] - 3761:23, 3879:18

**approach** [1] - 3790:8

**appropriate** [5] - 3806:19, 3870:6,

3872:2, 3878:17, 3884:24

**April** [2] - 3837:1, 3837:2

**area** [1] - 3851:5

**argue** [1] - 3861:7

**argument** [4] - 3775:16, 3775:18, 3861:6, 3861:7

**arrangement** [2] - 3820:25, 3824:4

**arrival** [16] - 3786:3, 3786:15, 3786:20, 3801:13, 3801:20, 3801:22, 3801:23, 3849:21, 3850:4, 3851:4, 3851:7, 3851:9, 3852:2, 3852:7, 3854:2, 3877:12

**arrive** [1] - 3807:3

**articles** [1] - 3832:21

**articulated** [2] - 3832:3, 3860:19

**AS** [1] - 3750:8

**aside** [3] - 3832:14, 3833:8, 3864:16

**assess** [2] - 3797:8, 3838:18

**assessing** [1] - 3780:3

**assessment** [1] - 3831:22

**assets** [3] - 3809:22, 3809:24, 3810:7

**assignment** [1] - 3817:2

**assistance** [1] - 3765:23

**associate** [1] - 3811:9

**associated** [16] - 3767:3, 3772:11, 3772:15, 3773:18, 3776:25, 3788:19, 3790:25, 3791:4, 3791:14, 3792:2, 3793:10, 3798:23, 3799:23, 3810:23, 3857:6, 3870:11

**assume** [7] - 3815:5, 3841:10, 3841:12, 3841:15, 3861:6, 3865:10, 3880:14

**assumed** [1] - 3881:4

**assuming** [4] - 3775:12, 3804:6, 3868:18, 3871:3

**assumption** [1] - 3854:10

**astounding** [4] - 3785:7, 3866:6,

3866:7, 3866:25

**attempted** [2] - 3794:10, 3878:16

**attorney** [4] - 3753:19, 3808:15, 3808:25, 3809:18

**attorneys** [1] - 3882:21

**audit** [8] - 3758:16, 3758:20, 3792:18, 3832:1, 3844:12, 3860:18, 3870:11, 3870:17

**August** [3] - 3764:1, 3792:23, 3827:11

**authority** [3] - 3883:7, 3883:8, 3884:1

**Avenue** [3] - 3750:20, 3751:16, 3751:22

**avoid** [2] - 3864:8, 3864:9

**avoided** [1] - 3870:12

**aware** [22] - 3772:24, 3805:3, 3816:13, 3816:16, 3817:18, 3817:20, 3818:1, 3818:3, 3819:4, 3819:5, 3820:3, 3822:22, 3822:24, 3825:2, 3833:20, 3835:1, 3835:19, 3835:23, 3839:25, 3854:5, 3861:21, 3862:19

**awful** [1] - 3810:3

---

## B

**bachelor's** [1] - 3763:20

**background** [5] - 3763:17, 3764:5, 3764:10, 3821:7, 3833:16

**bad** [11] - 3797:12, 3797:13, 3798:2, 3798:3, 3811:4, 3815:4, 3839:25, 3846:17, 3873:15, 3880:10, 3882:8

**badge** [1] - 3781:9

**balances** [2] - 3790:21, 3798:19

**ballooned** [1] - 3798:20

**BANCGROUP** [1] - 3750:3

**bank** [33] - 3770:18, 3771:22, 3772:8,

3866:7, 3866:25

3789:19, 3790:6, 3790:16, 3790:25, 3791:10, 3792:13, 3792:17, 3792:23, 3793:5, 3793:7, 3793:11, 3793:22, 3805:2, 3808:11, 3808:17, 3808:18, 3808:24, 3809:1, 3809:16, 3810:4, 3810:7, 3811:23, 3814:24, 3815:3, 3841:6, 3859:21, 3859:22, 3863:8

**BANK** [1] - 3750:9

**Bank** [52] - 3771:13, 3771:15, 3771:19, 3772:16, 3773:25, 3774:16, 3774:18, 3777:8, 3777:15, 3778:18, 3779:1, 3779:2, 3782:16, 3782:23, 3783:6, 3783:16, 3783:17, 3793:21, 3810:18, 3810:19, 3814:22, 3816:6, 3817:17, 3818:19, 3820:24, 3824:4, 3831:4, 3834:11, 3834:22, 3836:19, 3838:8, 3838:10, 3840:24, 3841:25, 3842:13, 3843:11, 3849:14, 3852:11, 3852:15, 3856:23, 3861:24, 3862:4, 3862:21, 3863:14, 3863:21, 3864:17, 3867:3, 3871:18, 3876:6, 3876:10, 3876:14, 3876:19

**bank's** [1] - 3859:24

**Bank's** [4] - 3777:9, 3777:16, 3778:19, 3849:5

**banking** [2] - 3808:19, 3832:14

**banks** [9] - 3810:2, 3810:3, 3814:18, 3814:21, 3815:6, 3816:1, 3837:8, 3837:12, 3837:24

**bar** [8] - 3795:19, 3795:21, 3795:22, 3796:7, 3796:8, 3796:11, 3796:13

**BARBARA** [1] - 3750:15

**Barnicke** [1] - 3751:20

**bars** [1] - 3795:18

**Bartlit** [1] - 3751:11

**base** [2] - 3776:4, 3838:24

**based** [12] - 3776:7, 3809:14, 3813:6, 3824:10, 3824:23, 3832:5, 3835:20, 3839:12, 3847:19, 3850:1, 3860:19, 3877:7

**basis** [12] - 3775:8, 3775:9, 3775:22, 3781:22, 3781:24, 3822:11, 3834:8, 3834:12, 3845:2, 3859:14, 3876:17, 3876:21

**Bayrock** [2] - 3868:12, 3879:3

**Bean** [1] - 3833:21

**became** [1] - 3784:19

**BECK** [25] - 3751:8, 3761:18, 3780:6, 3780:22, 3781:7, 3880:5, 3880:8, 3880:25, 3881:6, 3881:11, 3881:18, 3881:25, 3882:2, 3882:13, 3882:17, 3883:3, 3883:12, 3883:20, 3883:24, 3884:6, 3884:10, 3884:14, 3884:17, 3884:24, 3885:8

**Beck** [7] - 3751:11, 3763:4, 3780:14, 3781:6, 3880:3, 3884:15, 3884:22

**Beck's** [1] - 3805:13

**beck.com** [2] - 3751:13, 3751:14

**become** [1] - 3798:5

**becomes** [1] - 3871:13

**becoming** [1] - 3881:6

**befall** [1] - 3869:2

**befell** [1] - 3869:1

**BEFORE** [1] - 3750:15

**beginning** [1] - 3869:24

**behalf** [1] - 3844:23

**behave** [1] - 3799:11

**behavior** [2] - 3767:3, 3809:19

**behind** [4] - 3788:24, 3795:13, 3812:6, 3820:16

**believes** [1] - 3801:19

**below** [2] - 3757:18, 3796:15

**BENCH** [1] - 3750:14
**benefit** [1] - 3835:9
**best** [3] - 3825:15, 3867:11, 3875:4
**Best** [1] - 3884:19
**better** [1] - 3762:19
**Bettina** [1] - 3845:5
**between** [9] - 3757:21, 3772:22, 3797:21, 3809:3, 3815:9, 3820:10, 3849:18, 3849:22, 3882:22
**beyond** [2] - 3756:14, 3871:7
**big** [2] - 3754:14, 3785:3
**billed** [1] - 3827:23
**billion** [8] - 3772:8, 3792:22, 3793:24, 3799:21, 3799:22, 3844:12, 3844:22, 3863:8
**binders** [1] - 3823:17
**bit** [8] - 3763:17, 3772:2, 3773:5, 3783:2, 3804:18, 3820:9, 3847:16
**blanching** [1] - 3883:24
**blank** [2] - 3789:25
**blanks** [1] - 3790:10
**blind** [1] - 3795:23
**blue** [69] - 3758:6, 3758:11, 3758:15, 3763:15, 3769:24, 3771:12, 3772:4, 3772:22, 3772:23, 3773:18, 3774:10, 3774:15, 3776:17, 3781:20, 3784:17, 3786:16, 3788:14, 3788:19, 3789:6, 3789:11, 3790:13, 3791:7, 3792:2, 3793:6, 3793:10, 3793:13, 3794:18, 3796:1, 3796:8, 3796:14, 3796:18, 3798:12, 3799:23, 3800:2, 3800:13, 3801:17, 3803:17, 3804:15, 3805:1, 3811:1, 3817:13, 3819:9, 3825:8, 3835:7, 3835:13, 3835:17, 3835:18, 3835:25, 3838:7, 3838:16, 3838:25, 3839:23, 3840:25, 3841:7, 3846:17,

3849:5, 3853:2, 3854:25, 3855:1, 3855:8, 3856:10, 3856:23, 3859:1, 3859:20, 3861:14, 3862:1, 3870:14, 3871:21, 3885:8
**board** [8] - 3758:3, 3770:10, 3770:13, 3770:16, 3770:22, 3774:3, 3804:20, 3806:2
**boards** [2] - 3767:10, 3767:12
**Boesky** [1] - 3766:16
**bogus** [1] - 3858:19
**bond** [5] - 3859:10, 3859:12, 3859:14
**books** [13] - 3758:18, 3776:17, 3786:23, 3809:23, 3810:4, 3810:8, 3813:8, 3846:4, 3852:12, 3859:21, 3859:25, 3869:12
**borrower** [2] - 3799:5, 3818:18
**borrowers** [1] - 3857:7
**bottom** [11] - 3754:4, 3794:4, 3805:10, 3805:12, 3836:13, 3836:15, 3840:12, 3841:20, 3848:9, 3848:11, 3857:19
**Bowman** [4] - 3845:19, 3845:20, 3845:22, 3873:4
**Bowman's** [1] - 3845:17
**Box** [1] - 3750:23
**boy** [1] - 3880:24
**Boyd** [2] - 3857:25, 3858:13
**brand** [1] - 3787:8
**brand-new** [1] - 3787:8
**break** [2] - 3761:8, 3817:8
**breath** [1] - 3817:6
**bridge** [1] - 3815:9
**briefly** [5] - 3763:11, 3771:7, 3772:3, 3789:7, 3793:19
**bring** [3] - 3762:17, 3819:19, 3821:25
**bringing** [1] - 3802:13
**broader** [1] - 3780:7
**brought** [4] - 3765:24, 3822:9, 3824:14,

3854:5
**brown** [2] - 3836:18, 3841:20
**Brown** [6] - 3750:22, 3824:3, 3836:15, 3842:18, 3843:5, 3857:23
**Brown's** [1] - 3831:2
**BRYAN** [3] - 3751:21, 3886:3, 3886:8
**buckets** [1] - 3772:9
**bunch** [1] - 3841:24
**Burbar** [1] - 3751:20
**Burnham** [2] - 3766:19, 3767:1
**business** [13] - 3764:18, 3764:24, 3765:3, 3767:18, 3774:25, 3783:9, 3798:18, 3813:22, 3815:3, 3862:21, 3864:11, 3864:14, 3865:2
**busy** [3] - 3882:16, 3882:17, 3883:15
**but-for** [12] - 3807:21, 3813:17, 3813:18, 3869:24, 3869:25, 3870:4, 3870:6, 3870:9, 3870:25, 3871:21, 3871:25, 3872:2
**but..** [2] - 3816:12, 3871:9
**buy** [1] - 3841:2
**BY** [61] - 3753:8, 3754:15, 3756:3, 3756:9, 3756:17, 3757:11, 3758:4, 3759:5, 3762:8, 3762:23, 3771:5, 3776:15, 3777:13, 3778:14, 3784:3, 3785:15, 3785:21, 3788:13, 3789:1, 3790:17, 3793:15, 3794:2, 3796:20, 3799:17, 3802:24, 3804:19, 3805:24, 3807:10, 3810:6, 3812:1, 3814:9, 3814:14, 3817:12, 3823:4, 3823:12, 3825:17, 3828:20, 3829:9, 3834:10, 3836:5, 3836:12, 3841:13, 3841:16, 3844:1, 3848:12, 3848:25, 3851:17, 3856:15, 3857:12,

3857:18, 3858:9, 3858:17, 3859:19, 3861:13, 3862:15, 3866:1, 3868:6, 3868:23, 3871:10, 3872:10, 3875:17

## C

**C-1** [4] - 3789:3, 3790:15, 3790:18, 3791:8
**CA** [1] - 3750:20
**calculate** [2] - 3787:1, 3810:24
**calculated** [9] - 3788:14, 3788:17, 3788:18, 3790:12, 3791:25, 3793:22, 3793:24, 3795:2, 3806:3
**calculates** [1] - 3772:7
**calculating** [3] - 3771:7, 3780:25, 3810:23
**calculation** [13] - 3770:2, 3770:19, 3773:15, 3774:18, 3788:24, 3789:5, 3791:5, 3791:8, 3791:21, 3794:16, 3802:25, 3803:7, 3803:19
**calculations** [3] - 3795:12, 3795:15, 3803:3
**calculator** [2] - 3780:9, 3781:10
**capital** [1] - 3827:2
**car** [1] - 3884:21
**care** [3] - 3804:2, 3865:17, 3884:11
**careful** [1] - 3842:22
**carrier** [1] - 3874:8
**case** [59] - 3760:10, 3760:13, 3760:24, 3762:24, 3766:20, 3768:11, 3768:21, 3769:11, 3770:5, 3774:1, 3789:3, 3798:12, 3799:12, 3808:16, 3808:17, 3809:5, 3809:21, 3810:12, 3810:17, 3811:12, 3813:4, 3815:2, 3815:5, 3815:23, 3818:23, 3825:20, 3830:9, 3831:19, 3833:19, 3836:1, 3836:21,

3844:13, 3844:20, 3845:2, 3845:5, 3845:10, 3850:6, 3856:2, 3856:25, 3857:3, 3859:11, 3859:12, 3860:3, 3863:17, 3864:23, 3866:5, 3870:1, 3870:7, 3870:10, 3871:3, 3872:2, 3872:17, 3872:19, 3873:18, 3873:20, 3874:25, 3875:9, 3876:16, 3881:3
**Case** [2] - 3750:4, 3750:8
**cases** [21] - 3765:23, 3765:24, 3766:7, 3766:12, 3766:16, 3766:18, 3766:23, 3768:6, 3768:8, 3768:9, 3768:14, 3785:1, 3810:2, 3826:16, 3826:20, 3833:1, 3840:7, 3844:9, 3844:10, 3853:14, 3853:15
**cash** [20] - 3771:10, 3771:13, 3771:16, 3771:20, 3771:21, 3771:23, 3771:24, 3773:9, 3773:10, 3774:3, 3774:5, 3783:24, 3783:25, 3784:1, 3790:8, 3812:13, 3815:21
**cash-in** [6] - 3771:20, 3771:23, 3783:24, 3783:25, 3784:1
**cash-in/cash-out** [2] - 3771:10, 3790:8
**cash-out** [3] - 3771:20, 3771:24, 3773:9
**categorically** [1] - 3843:17
**categories** [1] - 3764:21
**categorized** [1] - 3849:10
**category** [8] - 3758:5, 3758:7, 3758:11, 3758:14, 3758:15, 3759:14, 3797:8, 3807:18
**Cathie** [2] - 3753:11, 3872:12
**causation** [4] - 3760:12, 3780:10, 3780:24, 3844:14

**caused** [1] - 3808:1
**causes** [1] - 3800:14
**causing** [1] - 3868:24
**cautious** [1] - 3820:13
**caveat** [1] - 3841:3
**CBG** [2] - 3826:13, 3827:1
**center** [1] - 3805:4
**Center** [1] - 3765:11
**Century** [1] - 3779:7
**certain** [8] - 3775:12, 3775:21, 3822:14, 3822:15, 3826:14, 3838:20, 3847:18
**certainly** [18] - 3766:17, 3768:23, 3772:23, 3786:7, 3788:11, 3792:19, 3795:15, 3806:3, 3818:14, 3824:11, 3833:12, 3833:14, 3838:23, 3839:8, 3839:19, 3849:23, 3852:2, 3877:12
**certainty** [2] - 3806:17, 3812:18
**CERTIFICATE** [1] - 3886:2
**certify** [1] - 3886:3
**chair** [1] - 3764:17
**challenge** [2] - 3794:1, 3814:4
**challenged** [1] - 3806:10
**challenging** [4] - 3791:4, 3812:20, 3812:21, 3814:6
**change** [1] - 3819:9
**characteristics** [1] - 3799:5
**charge** [1] - 3824:15
**charged** [3] - 3766:19, 3816:14, 3852:25
**charged-off** [1] - 3852:25
**charges** [2] - 3821:25, 3822:10
**chart** [2] - 3795:21, 3796:7
**charts** [1] - 3857:1
**check** [5] - 3789:17, 3789:22, 3789:24, 3790:10
**Chicago** [2] - 3751:5, 3751:12
**chief** [2] - 3765:12, 3765:13
**choose** [1] - 3783:13
**chose** [4] - 3814:4, 3864:1, 3864:8,

3864:9
**chosen** [2] - 3806:10, 3807:2
**CHRISTOPHER** [2] - 3751:9, 3751:10
**circle** [1] - 3801:1
**circling** [1] - 3805:13
**circuit** [1] - 3783:2
**circumstances** [5] - 3809:21, 3810:10, 3815:16, 3830:9, 3869:5
**cite** [1] - 3872:25
**cited** [1] - 3873:10
**claim** [5] - 3759:10, 3759:24, 3859:12, 3859:14, 3859:15
**claimed** [4] - 3770:18, 3772:1, 3792:14, 3844:24
**claims** [1] - 3784:11
**clarify** [2] - 3848:22, 3851:11
**classes** [3] - 3764:25, 3765:2, 3765:4
**clear** [11] - 3758:24, 3779:17, 3801:6, 3801:9, 3807:11, 3820:5, 3847:25, 3853:23, 3854:21, 3855:2, 3855:22
**cleared** [2] - 3755:1, 3882:5
**clearly** [1] - 3773:21
**clerk** [1] - 3761:17
**clients** [1] - 3885:2
**close** [21] - 3767:22, 3770:18, 3771:22, 3772:8, 3789:19, 3790:7, 3790:16, 3790:25, 3791:10, 3792:13, 3792:17, 3793:6, 3793:7, 3793:11, 3793:22, 3798:7, 3805:2, 3859:21, 3859:22, 3881:6, 3882:25
**closely** [1] - 3765:22
**closer** [1] - 3762:16
**closing** [7] - 3762:1, 3792:23, 3815:9, 3861:6, 3881:17, 3881:18
**coincidence** [1] - 3869:8
**COLB** [64] - 3772:20, 3773:7, 3773:12, 3783:15, 3784:6, 3784:12, 3784:15, 3784:17, 3789:23,

3799:7, 3811:16, 3811:24, 3817:16, 3817:25, 3818:7, 3818:15, 3818:24, 3819:8, 3820:17, 3820:25, 3821:2, 3824:4, 3824:9, 3824:25, 3825:7, 3829:21, 3834:18, 3835:2, 3835:7, 3835:21, 3837:18, 3838:11, 3840:1, 3841:1, 3842:3, 3842:24, 3843:4, 3843:8, 3843:9, 3843:11, 3843:18, 3846:19, 3847:2, 3847:5, 3849:5, 3852:19, 3855:21, 3855:22, 3856:8, 3856:23, 3859:1, 3859:25, 3863:22, 3864:1, 3864:4, 3868:10, 3869:10, 3873:15, 3873:25, 3874:12, 3875:20, 3875:24, 3877:24, 3878:21
**collateral** [2] - 3774:2, 3783:16
**collection** [1] - 3882:21
**collective** [1] - 3832:5
**Colonial** [82] - 3771:13, 3771:15, 3771:19, 3771:22, 3772:15, 3773:25, 3774:12, 3774:16, 3774:18, 3777:7, 3777:8, 3777:15, 3777:16, 3778:18, 3778:19, 3779:1, 3779:2, 3782:16, 3782:23, 3783:5, 3783:16, 3783:17, 3787:2, 3793:21, 3797:9, 3798:9, 3810:18, 3810:19, 3814:22, 3816:1, 3816:6, 3816:10, 3817:17, 3818:7, 3818:19, 3820:24, 3824:4, 3831:4, 3834:22, 3836:19, 3837:12, 3837:24, 3838:8, 3838:10, 3840:24, 3841:21, 3841:25, 3842:10, 3842:11, 3842:13, 3843:5, 3843:11, 3846:4, 3846:10,

3849:5, 3849:14, 3851:4, 3852:11, 3852:14, 3852:15, 3853:16, 3853:18, 3853:19, 3856:23, 3860:20, 3861:24, 3862:4, 3862:21, 3863:14, 3863:21, 3864:17, 3867:3, 3870:25, 3871:14, 3871:18, 3876:6, 3876:10, 3876:14, 3876:19, 3876:23
**COLONIAL** [2] - 3750:3, 3750:9
**Colonial's** [9] - 3813:8, 3852:12, 3853:2, 3853:20, 3853:21, 3864:9, 3866:11, 3866:17, 3869:3
**color** [2] - 3795:22, 3871:22
**column** [7] - 3756:6, 3789:13, 3789:15, 3789:16, 3790:5, 3790:7, 3790:20
**combined** [1] - 3790:12
**comfortable** [1] - 3761:14
**coming** [3] - 3760:25, 3774:3, 3867:10
**comingle** [1] - 3867:17
**command** [2] - 3863:20, 3864:12
**comment** [1] - 3775:13
**comments** [1] - 3864:23
**commission** [1] - 3765:25
**Commission** [3] - 3765:13, 3765:14, 3768:4
**commitments** [2] - 3816:17
**committed** [6] - 3811:4, 3829:20, 3830:21, 3831:9, 3862:5, 3865:23
**committees** [1] - 3764:23
**compare** [3] - 3787:3, 3869:25, 3879:5
**comparison** [1] - 3849:13
**Compass** [10] - 3769:13, 3787:1,

3802:7, 3827:17, 3828:3, 3828:7, 3828:15, 3828:24, 3829:3, 3850:15
**compensated** [1] - 3769:10
**compensation** [1] - 3769:14
**complaining** [1] - 3837:6
**complaint** [9] - 3769:2, 3809:7, 3822:12, 3822:22, 3822:25, 3833:18, 3833:19, 3872:12, 3872:14
**complete** [2] - 3760:24, 3829:4
**completely** [2] - 3826:23, 3858:25
**complicated** [4] - 3826:1, 3828:5, 3828:13, 3885:5
**complies** [1] - 3773:6
**component** [2] - 3833:6
**components** [1] - 3794:12
**comprise** [1] - 3789:11
**computation** [1] - 3832:12
**computations** [2] - 3802:16, 3828:9
**compute** [1] - 3771:24
**computer** [1] - 3751:25
**computer-aided** [1] - 3751:25
**computes** [1] - 3771:12
**conceal** [2] - 3816:20, 3816:23
**concentrate** [1] - 3762:1
**concerned** [1] - 3865:2
**conclude** [2] - 3761:20, 3876:21
**concluded** [4] - 3817:23, 3819:15, 3819:22, 3830:19
**concluding** [1] - 3824:24
**conclusion** [9] - 3785:24, 3786:1, 3786:9, 3813:7, 3825:19, 3835:5, 3851:7, 3861:22, 3873:9

conclusions [2] - 3769:6, 3879:10
concurrently [1] - 3826:12
conduct [2] - 3809:8, 3882:22
conducted [2] - 3821:24, 3828:4
conducting [6] - 3764:22, 3774:21, 3808:8, 3830:2, 3830:10, 3838:21
confidence [2] - 3814:1, 3829:4
confident [1] - 3839:21
confirmed [1] - 3859:9
conform [1] - 3814:19
confusion [2] - 3853:10, 3853:24
consequences [1] - 3872:4
conservative [2] - 3812:20, 3812:22
consider [1] - 3858:4
consideration [3] - 3783:3, 3819:20, 3867:19
considered [5] - 3782:18, 3789:18, 3813:13, 3867:21
consistent [5] - 3757:4, 3835:5, 3847:3, 3867:15, 3867:18
consistently [1] - 3755:4
consists [1] - 3796:14
conspiracy [4] - 3839:11, 3863:7, 3869:11, 3880:8
constant [1] - 3755:5
constantly [1] - 3755:10
constitutes [1] - 3809:18
Constitution [1] - 3751:22
constructed [1] - 3853:22
Cont.).............. [1] - 3752:5
contained [1] - 3782:18
contains [1] - 3789:10
contested [1] - 3806:16
context [22] - 3778:24, 3783:4, 3809:20, 3826:11, 3829:1,

3831:18, 3832:13, 3833:14, 3841:4, 3848:19, 3850:22, 3854:18, 3854:20, 3859:5, 3862:20, 3863:2, 3863:11, 3866:4, 3866:5, 3877:21, 3878:8, 3878:11
continue [2] - 3799:18, 3860:15
continued [2] - 3751:1, 3799:2
CONTINUED [1] - 3753:7
contracts [1] - 3862:7
contractually [1] - 3862:4
contradiction [1] - 3835:13
contradictory [4] - 3825:9, 3839:24, 3840:7, 3840:10
contribute [1] - 3869:21
contributions [1] - 3827:2
convert [1] - 3797:24
converts [1] - 3798:24
convicted [2] - 3766:20, 3863:10
conviction [1] - 3767:4
convince [4] - 3842:4, 3847:6, 3853:3, 3853:8
convinced [1] - 3819:23
convinces [1] - 3838:18
Conway [1] - 3751:19
copy [1] - 3761:12
corner [1] - 3857:19
corporate [3] - 3765:4, 3765:5, 3832:19
Corporate [1] - 3767:15
CORPORATION [3] - 3750:8, 3750:18, 3751:2
correct [86] - 3754:16, 3760:7, 3764:14, 3764:15, 3772:6, 3787:24, 3788:24, 3794:1, 3797:17, 3797:20, 3803:14, 3804:6, 3804:12, 3804:13, 3804:21, 3804:22, 3806:4, 3806:17, 3807:15,

3807:20, 3807:23, 3811:20, 3812:11, 3812:15, 3812:24, 3813:5, 3814:20, 3816:15, 3818:10, 3818:12, 3819:13, 3820:7, 3820:8, 3820:10, 3821:5, 3821:9, 3821:20, 3822:1, 3822:3, 3822:24, 3825:22, 3825:25, 3826:2, 3826:10, 3827:10, 3827:13, 3827:16, 3827:25, 3829:12, 3829:15, 3829:17, 3829:18, 3829:23, 3830:1, 3831:5, 3831:8, 3832:18, 3832:22, 3834:14, 3837:5, 3839:4, 3842:6, 3844:5, 3844:11, 3845:7, 3845:11, 3845:15, 3846:8, 3846:22, 3848:7, 3850:18, 3851:4, 3852:13, 3857:4, 3859:22, 3862:23, 3863:1, 3866:19, 3866:23, 3867:5, 3871:12, 3871:17, 3871:20, 3871:25, 3886:4
Correct [5] - 3823:2, 3827:7, 3841:23, 3846:14, 3866:9
correctly [1] - 3829:7
correspond [1] - 3780:15
corresponds [1] - 3795:20
Counsel [2] - 3807:9, 3851:15
counsel [19] - 3753:10, 3758:6, 3768:17, 3814:15, 3815:24, 3816:4, 3816:5, 3822:20, 3829:6, 3833:24, 3834:4, 3834:12, 3844:15, 3854:4, 3855:5, 3864:21, 3865:8, 3882:11, 3884:2
count [3] - 3789:13, 3856:9, 3861:1
counted [2] - 3757:2, 3758:10
Countrywide [1] - 3779:8

counts [2] - 3860:23, 3860:24
couple [1] - 3775:5
course [7] - 3755:1, 3774:24, 3793:4, 3795:25, 3796:2, 3813:22, 3850:9
courses [1] - 3765:3
Court [14] - 3751:21, 3780:2, 3807:24, 3814:1, 3820:7, 3830:18, 3831:21, 3832:14, 3860:17, 3865:7, 3875:14, 3880:2, 3884:8, 3886:3
court [6] - 3775:13, 3809:7, 3817:10, 3844:20, 3880:1, 3885:12
COURT [134] - 3750:1, 3750:15, 3753:2, 3756:16, 3757:6, 3760:17, 3760:19, 3760:24, 3761:2, 3761:5, 3761:8, 3761:11, 3761:14, 3761:25, 3762:5, 3762:16, 3762:19, 3770:23, 3775:18, 3776:3, 3776:10, 3776:13, 3777:12, 3777:21, 3778:13, 3779:12, 3779:21, 3780:4, 3780:14, 3781:5, 3781:12, 3782:9, 3782:20, 3782:24, 3783:20, 3783:22, 3785:14, 3787:22, 3787:25, 3788:6, 3788:9, 3788:12, 3788:21, 3789:9, 3792:24, 3793:4, 3793:25, 3795:16, 3797:5, 3797:14, 3797:18, 3797:21, 3798:3, 3799:16, 3802:3, 3802:15, 3802:21, 3802:23, 3803:11, 3803:23, 3804:3, 3804:9, 3804:12, 3804:17, 3806:20, 3807:8, 3810:1, 3811:22, 3811:25, 3814:5, 3817:5, 3817:9, 3823:10, 3825:10, 3825:12, 3825:14, 3829:6, 3834:9, 3841:10,

3841:12, 3841:15, 3843:20, 3843:24, 3851:15, 3855:5, 3855:10, 3855:13, 3856:5, 3856:13, 3858:8, 3859:2, 3859:7, 3859:18, 3860:10, 3860:13, 3860:21, 3861:4, 3862:14, 3864:21, 3865:15, 3865:19, 3865:21, 3868:18, 3871:4, 3875:16, 3879:17, 3879:20, 3879:25, 3880:6, 3880:10, 3880:12, 3880:18, 3880:22, 3880:24, 3881:4, 3881:7, 3881:9, 3881:12, 3881:15, 3881:21, 3882:1, 3882:3, 3882:5, 3882:8, 3882:16, 3882:18, 3883:11, 3883:17, 3883:21, 3884:5, 3884:7, 3884:15, 3885:3, 3885:9
Court's [4] - 3760:11, 3769:5, 3775:2, 3776:12
Courthouse [1] - 3751:22
courthouse [1] - 3751:11
courtroom [1] - 3769:16
cover [1] - 3840:21
covered [1] - 3780:19
crap [8] - 3834:24, 3835:2, 3835:7, 3873:25, 3875:2, 3875:5
create [3] - 3809:23, 3809:24, 3817:1
created [2] - 3787:14, 3837:12
Credit [2] - 3840:21, 3840:23
credit [2] - 3757:16, 3861:15
criminal [13] - 3760:3, 3831:7, 3839:10, 3842:7, 3854:8, 3854:9, 3854:24, 3855:17, 3857:7, 3863:7, 3864:23, 3869:10
cripple [1] - 3783:11
crisis [22] - 3768:13,

3779:4, 3779:5, 3779:24, 3782:13, 3782:15, 3783:7, 3785:1, 3785:4, 3785:8, 3798:17, 3798:20, 3813:23, 3833:2, 3833:5, 3866:3, 3866:8, 3866:13, 3866:17, 3867:24, 3868:24
**criteria** [4] - 3786:17, 3797:7, 3801:21, 3839:20
**criterion** [1] - 3786:19
**critical** [2] - 3807:5, 3862:20
**criticism** [1] - 3807:13
**Cross** [1] - 3752:7
**CROSS** [1] - 3805:23
**cross** [7] - 3778:12, 3780:23, 3787:20, 3787:21, 3834:9, 3865:11, 3881:14
**cross-exam** [1] - 3834:9
**CROSS-EXAMINATION** [1] - 3805:23
**cross-examination** [1] - 3780:23
**Cross-Examination..** ....................... [1] - 3752:7
**cross-examine** [2] - 3787:20, 3787:21
**CROWE** [2] - 3750:6, 3750:11
**CRR** [1] - 3751:21
**curriculum** [3] - 3763:24, 3763:25, 3764:1
**customer** [11] - 3779:1, 3779:2, 3783:5, 3783:11, 3853:8, 3862:24, 3862:25, 3871:14, 3871:15, 3871:19, 3879:7
**customers** [17] - 3783:8, 3864:14, 3866:18, 3866:22, 3867:2, 3867:3, 3867:13, 3867:23, 3868:1, 3868:4, 3868:25, 3869:1, 3869:2, 3869:3, 3869:19, 3878:24, 3879:11
**cut** [1] - 3865:12
**cutoff** [2] - 3881:21,

3881:24
**CV** [1] - 3764:3
**cycling** [1] - 3755:8

## D

**D.C** [2] - 3750:7, 3751:17
**D005** [1] - 3789:2
**D2894** [1] - 3763:22
**damage** [4] - 3758:25, 3780:9, 3793:24, 3859:4
**damages** [75] - 3763:2, 3763:14, 3767:2, 3767:18, 3768:14, 3769:22, 3770:1, 3770:10, 3770:19, 3774:18, 3774:21, 3774:22, 3775:11, 3778:5, 3780:25, 3782:2, 3782:7, 3791:5, 3792:9, 3792:10, 3792:12, 3795:4, 3795:5, 3796:11, 3800:14, 3800:18, 3800:20, 3800:22, 3804:24, 3805:6, 3805:11, 3805:20, 3806:3, 3806:16, 3807:2, 3808:2, 3808:6, 3808:8, 3808:9, 3809:8, 3809:20, 3810:11, 3812:17, 3813:15, 3813:25, 3818:9, 3818:25, 3819:9, 3819:10, 3820:9, 3820:13, 3821:1, 3822:16, 3827:1, 3830:2, 3830:10, 3830:13, 3830:17, 3831:1, 3831:17, 3832:4, 3832:12, 3833:3, 3833:5, 3838:21, 3844:8, 3844:14, 3844:18, 3844:22, 3844:24, 3845:2, 3845:3, 3856:3, 3860:3
**dangerous** [1] - 3882:25
**Darmas** [1] - 3857:24
**darn** [1] - 3798:7
**dashed** [1] - 3880:5
**data** [42] - 3768:24, 3769:4, 3779:18, 3785:10, 3785:23, 3786:16, 3787:16,

3788:4, 3788:8, 3789:10, 3801:15, 3811:14, 3811:17, 3811:24, 3826:7, 3828:2, 3828:4, 3828:10, 3828:12, 3828:13, 3829:11, 3832:9, 3832:20, 3839:9, 3847:15, 3848:23, 3849:15, 3850:2, 3850:5, 3850:11, 3850:13, 3851:2, 3851:25, 3852:8, 3853:22, 3859:24, 3863:22, 3868:17, 3869:14, 3876:17, 3876:21
**database** [21] - 3755:9, 3758:10, 3811:6, 3847:11, 3847:17, 3847:21, 3848:24, 3849:16, 3849:24, 3850:1, 3850:7, 3851:24, 3852:8, 3852:10, 3852:24, 3853:11, 3853:24, 3876:16, 3876:18, 3877:7
**databases** [2] - 3828:5, 3828:11
**date** [13] - 3771:22, 3772:21, 3787:2, 3787:3, 3787:4, 3790:3, 3791:20, 3792:20, 3849:13, 3849:18, 3849:22, 3852:6
**dates** [13] - 3790:5, 3847:18, 3849:12, 3849:15, 3850:2, 3852:9, 3853:6, 3853:25, 3876:15, 3876:22, 3877:1
**David** [1] - 3751:19
**DAVID** [1] - 3750:22
**days** [4] - 3770:4, 3779:5, 3836:16, 3840:17
**DC** [1] - 3751:23
**deal** [5] - 3826:20, 3827:17, 3828:11, 3832:6, 3850:5
**dealing** [5] - 3827:5, 3827:8, 3827:11, 3827:14, 3832:5
**dealt** [1] - 3827:15
**December** [1] - 3868:7
**deception** [2] - 3812:12, 3816:10
**deceptively** [1] -

3813:8
**decide** [2] - 3830:6, 3885:5
**decision** [14] - 3783:10, 3815:3, 3839:22, 3862:21, 3863:25, 3864:11, 3865:3, 3878:11, 3883:2, 3883:7, 3883:8, 3883:24, 3884:1, 3884:25
**decision-maker** [2] - 3883:24, 3884:1
**decision-makers** [1] - 3884:25
**decision-making** [2] - 3883:7, 3883:8
**decisions** [1] - 3783:4
**decline** [3] - 3799:3, 3799:6, 3811:9
**declining** [1] - 3779:5
**deducts** [1] - 3793:23
**deep** [6] - 3813:2, 3813:6, 3817:14, 3830:18, 3830:23, 3830:24
**deep-dive** [2] - 3817:14, 3830:18
**default** [2] - 3779:6, 3816:14
**defective** [11] - 3770:6, 3786:3, 3810:21, 3811:3, 3817:24, 3838:16, 3842:23, 3843:14, 3843:18, 3856:8, 3864:5
**defendant** [1] - 3808:4
**Defendants** [2] - 3750:7, 3750:11
**defense** [2] - 3844:8, 3844:10
**define** [1] - 3834:24
**definition** [2] - 3797:15, 3811:2
**degrees** [2] - 3763:18, 3763:20
**delay** [1] - 3801:24
**delinquency** [1] - 3779:6
**delve** [1] - 3851:22
**Demonstrative** [15] - 3763:4, 3764:7, 3770:11, 3772:2, 3773:15, 3791:17, 3794:4, 3795:10, 3796:22, 3799:19, 3799:24, 3800:6, 3800:10, 3800:16, 3803:4

**demonstrative** [12] - 3753:9, 3753:10, 3757:8, 3758:2, 3763:3, 3763:5, 3764:4, 3796:22, 3799:18, 3799:19, 3803:6, 3806:14
**demonstratives** [2] - 3795:7, 3803:2
**denoted** [1] - 3856:18
**department** [1] - 3765:20
**Department** [1] - 3768:5
**DEPOSIT** [3] - 3750:8, 3750:18, 3751:2
**deposition** [28] - 3753:18, 3769:4, 3779:23, 3779:24, 3782:3, 3784:11, 3787:6, 3787:18, 3787:22, 3802:12, 3827:18, 3828:14, 3828:18, 3829:14, 3831:20, 3838:3, 3840:2, 3844:3, 3845:19, 3850:6, 3850:10, 3851:18, 3867:16, 3870:7, 3872:1, 3873:3, 3873:17, 3874:18
**depositions** [11] - 3784:11, 3829:16, 3829:19, 3829:25, 3830:3, 3830:16, 3830:20, 3872:17, 3872:21, 3872:25, 3875:7
**deputy** [2] - 3765:13, 3880:1
**describe** [8] - 3763:11, 3763:23, 3770:4, 3771:7, 3792:15, 3795:15, 3803:5, 3839:7
**described** [3] - 3814:16, 3832:1, 3833:25
**describing** [2] - 3835:5, 3837:23
**description** [1] - 3835:12
**designated** [2] - 3780:8, 3780:11
**Desiree** [4] - 3831:2, 3836:15, 3842:18, 3857:23
**destroy** [1] - 3862:25
**detail** [2] - 3763:12, 3851:23

**detailed** [2] - 3825:21, 3849:2
**details** [5] - 3763:18, 3767:2, 3800:24, 3834:25, 3863:9
**detect** [3] - 3844:21, 3870:2, 3872:3
**detected** [3] - 3831:25, 3870:10, 3870:17
**detecting** [4] - 3799:13, 3810:15, 3860:4, 3860:17
**detection** [1] - 3864:8
**deteriorated** [2] - 3861:14, 3861:16
**determination** [1] - 3819:4
**detour** [1] - 3802:22
**developed** [1] - 3861:14
**diagram** [2] - 3772:7, 3795:14
**difference** [5] - 3757:21, 3757:23, 3771:25, 3799:20, 3809:3
**differences** [1] - 3828:9
**different** [12] - 3755:6, 3756:12, 3784:10, 3794:11, 3795:22, 3807:3, 3811:5, 3838:14, 3843:22, 3851:20, 3864:19
**differential** [1] - 3869:5
**difficult** [1] - 3783:19
**difficulties** [2] - 3783:9, 3864:15
**Direct** [1] - 3752:6
**DIRECT** [1] - 3762:7
**direct** [9] - 3779:15, 3807:22, 3822:19, 3829:13, 3835:12, 3844:2, 3847:7, 3861:23
**directly** [2] - 3825:9, 3847:16
**disagree** [6] - 3773:17, 3776:21, 3778:23, 3784:23, 3791:24
**disagreement** [2] - 3804:1, 3846:3
**disclosed** [4] - 3781:23, 3782:17, 3782:19, 3787:8
**disclosing** [1] - 3788:5

**discovered** [2] - 3758:17, 3871:1
**discovery** [3] - 3780:15, 3872:19, 3872:20
**discuss** [1] - 3885:2
**discussed** [3] - 3753:25, 3779:23, 3840:13
**discussing** [1] - 3882:11
**discussion** [6] - 3754:5, 3754:16, 3779:18, 3807:21, 3836:23, 3883:6
**Discussion** [1] - 3762:22
**discussions** [1] - 3882:13
**disentangle** [3] - 3768:15, 3774:22, 3867:11
**disguising** [1] - 3755:10
**dishonest** [1] - 3859:13
**display** [4] - 3780:1, 3814:12, 3823:3, 3845:18
**disproportionate** [1] - 3879:12
**distance** [1] - 3849:18
**distinction** [3] - 3772:22, 3802:15, 3820:10
**distributed** [2] - 3878:2, 3878:5
**DISTRICT** [3] - 3750:1, 3750:1, 3750:15
**dive** [6] - 3813:2, 3813:6, 3817:14, 3830:18, 3830:23, 3830:24
**division** [4] - 3765:22, 3821:16, 3878:3, 3879:8
**DIVISION** [1] - 3750:2
**divorces** [1] - 3868:25
**dmullin@mhba.com** [1] - 3750:25
**document** [20] - 3753:11, 3754:20, 3754:24, 3754:25, 3756:2, 3756:12, 3756:13, 3759:13, 3787:7, 3787:12, 3823:6, 3826:15, 3835:10, 3837:20, 3848:3, 3858:5, 3858:6, 3858:13,

3859:6, 3868:7
**documentation** [2] - 3755:20, 3855:23
**documents** [10] - 3755:24, 3775:3, 3775:21, 3776:8, 3782:17, 3782:18, 3832:9, 3843:23, 3845:16, 3878:21
**dog** [1] - 3875:2
**DOJ** [1] - 3768:7
**dollar** [1] - 3755:5
**dollars** [2] - 3863:8, 3863:15
**done** [25] - 3758:16, 3758:20, 3763:14, 3769:23, 3769:24, 3774:25, 3794:22, 3799:25, 3806:6, 3806:8, 3807:5, 3808:4, 3808:6, 3810:2, 3819:18, 3822:11, 3829:7, 3830:18, 3831:17, 3832:4, 3833:13, 3850:5, 3855:2, 3870:4, 3881:20
**down** [21] - 3754:4, 3755:15, 3757:19, 3760:19, 3760:21, 3760:23, 3767:5, 3770:25, 3771:4, 3791:17, 3793:16, 3796:15, 3800:11, 3817:9, 3823:20, 3833:21, 3857:11, 3873:20, 3879:20, 3879:22, 3885:6
**downsized** [1] - 3871:18
**dozen** [4] - 3767:13, 3784:10, 3844:3, 3844:6
**Dr** [60] - 3751:4, 3761:6, 3761:20, 3762:9, 3762:13, 3762:16, 3762:24, 3763:3, 3763:19, 3763:22, 3764:8, 3766:4, 3767:5, 3767:17, 3769:10, 3769:16, 3769:19, 3771:6, 3773:4, 3773:7, 3773:14, 3774:17, 3776:6, 3776:7, 3776:16, 3778:7, 3778:15, 3778:17, 3780:5, 3780:10, 3781:25, 3782:21, 3784:4,

3785:10, 3785:16, 3785:22, 3787:15, 3787:20, 3788:14, 3790:18, 3793:16, 3795:7, 3795:11, 3802:7, 3803:1, 3803:6, 3804:6, 3804:20, 3834:7, 3854:18, 3859:16, 3872:11, 3872:21, 3873:19, 3877:2, 3877:19, 3878:20, 3880:19, 3880:20, 3882:5
**draw** [3] - 3820:9, 3861:21, 3879:10
**drawing** [1] - 3873:11
**draws** [1] - 3778:24
**drew** [4] - 3785:24, 3786:1, 3786:9, 3873:9
**Drexel** [1] - 3766:19
**due** [2] - 3754:20, 3755:20
**dump** [2] - 3812:10, 3839:16
**dumped** [20] - 3784:5, 3814:22, 3816:1, 3816:9, 3818:15, 3818:23, 3818:24, 3837:18, 3838:10, 3840:1, 3841:7, 3841:24, 3842:3, 3842:5, 3842:23, 3843:4, 3846:19, 3846:21, 3847:5
**dumping** [17] - 3784:12, 3784:14, 3784:16, 3812:13, 3836:23, 3837:7, 3837:10, 3837:11, 3837:23, 3838:4, 3838:14, 3843:17, 3846:10, 3869:11, 3873:15, 3874:9, 3875:20
**during** [16] - 3766:5, 3766:8, 3766:15, 3769:16, 3771:23, 3775:13, 3780:22, 3783:19, 3784:24, 3785:8, 3798:20, 3815:12, 3815:13, 3833:4, 3833:9, 3867:14
**dynamic** [1] - 3884:22

**E**

**e-mail** [13] - 3836:6,

3836:14, 3836:15, 3837:16, 3838:13, 3838:21, 3839:18, 3840:13, 3842:9, 3846:16, 3846:20, 3846:23, 3847:1
**e-mails** [3] - 3836:4, 3875:19, 3875:23
**early** [1] - 3793:21
**earned** [1] - 3793:21
**economic** [14] - 3765:25, 3779:18, 3782:15, 3808:3, 3821:15, 3832:20, 3839:6, 3839:7, 3839:17, 3861:17, 3866:16, 3867:11, 3867:12, 3869:20
**economics** [3] - 3763:21, 3765:17, 3765:20
**economies** [1] - 3826:14
**economist** [7] - 3765:12, 3765:13, 3782:14, 3808:15, 3808:20, 3809:4, 3869:8
**economist's** [1] - 3839:15
**economy** [2] - 3827:12, 3866:3
**editor** [1] - 3767:14
**editorial** [2] - 3767:10, 3767:12
**effect** [6] - 3772:11, 3774:1, 3782:13, 3792:8, 3792:12, 3795:3
**effectively** [2] - 3771:13, 3790:15
**effects** [3] - 3782:15, 3866:2, 3869:6
**either** [17] - 3766:7, 3789:23, 3794:9, 3797:22, 3798:11, 3803:10, 3809:5, 3809:7, 3810:20, 3819:18, 3828:16, 3828:24, 3834:3, 3845:1, 3860:25, 3870:23, 3877:15
**eligible** [3] - 3770:9, 3772:18, 3786:8
**elucidate** [1] - 3776:3
**Email** [4] - 3750:25, 3751:6, 3751:13, 3751:18
**emanating** [1] -

3833:1
**empirical** [2] -
3766:24, 3839:8
**employee** [4] -
3808:24, 3809:1,
3809:16, 3810:7
**employees** [1] -
3859:13
**end** [11] - 3792:21,
3802:22, 3811:7,
3815:10, 3815:18,
3820:12, 3848:16,
3853:21, 3862:5,
3869:13, 3880:4
**endowed** [1] -
3764:17
**ends** [1] - 3871:24
**enforcement** [7] -
3765:23, 3766:4,
3766:5, 3766:10,
3766:14, 3766:22,
3821:15
**engaged** [4] - 3768:6,
3799:12, 3839:10,
3863:6
**engagements** [1] -
3768:10
**entailed** [1] - 3860:4
**entails** [1] - 3863:4
**entire** [3] - 3763:25,
3807:17, 3854:19
**entirely** [4] - 3838:24,
3854:23, 3855:8,
3864:13
**entities** [2] - 3770:8,
3770:9
**entitled** [6] - 3775:13,
3778:7, 3779:16,
3787:15, 3834:17,
3886:5
**entity** [1] - 3871:7
**entries** [1] - 3847:8
**equal** [2] - 3792:12,
3795:5
**equals** [1] - 3781:8
**equate** [1] - 3774:21
**equipped** [2] -
3809:14, 3809:15
**errors** [1] - 3845:13
**especially** [4] -
3784:24, 3848:23,
3851:23, 3864:14
**essence** [2] - 3832:2,
3833:6
**essentially** [2] -
3788:21, 3807:17
**establish** [6] - 3843:3,
3847:5, 3854:1,
3869:16, 3870:14,
3873:14

**established** [9] -
3769:25, 3773:3,
3794:19, 3800:3,
3801:14, 3805:3,
3806:16, 3812:18,
3845:1
**establishment** [1] -
3759:19
**estate** [3] - 3820:23,
3823:25, 3834:23
**estimate** [2] - 3791:6,
3808:9
**estimated** [1] -
3794:23
**estimates** [4] - 3820:9,
3820:10, 3820:14,
3822:17
**estimating** [2] -
3767:2, 3820:8
**evaluate** [3] - 3851:2,
3851:6, 3851:19
**evaluation** [1] -
3802:12
**evening** [1] - 3765:10
**events** [1] - 3853:5
**eventually** [1] -
3776:17
**evidence** [61] -
3766:24, 3772:24,
3774:11, 3774:12,
3774:14, 3774:15,
3784:14, 3793:12,
3793:13, 3798:13,
3805:3, 3811:2,
3812:23, 3817:15,
3817:18, 3817:20,
3817:23, 3818:5,
3818:23, 3819:5,
3819:7, 3819:10,
3819:12, 3819:23,
3820:1, 3820:3,
3820:4, 3820:17,
3820:19, 3823:8,
3824:18, 3824:25,
3825:2, 3825:3,
3830:19, 3835:17,
3835:19, 3835:23,
3835:24, 3836:1,
3837:18, 3838:18,
3838:20, 3839:5,
3839:16, 3843:8,
3847:4, 3851:8,
3852:22, 3855:3,
3855:9, 3858:25,
3861:19, 3861:21,
3864:6, 3866:20,
3867:12, 3876:1
**exact** [3] - 3828:17,
3861:11, 3872:6
**exactly** [4] - 3755:16,

3851:22, 3864:21,
3874:24
**exam** [4] - 3829:13,
3834:9, 3861:23,
3865:10
**EXAMINATION** [5] -
3753:7, 3759:4,
3762:7, 3805:23,
3872:9
**examination** [2] -
3779:16, 3780:23
**Examination** [1] -
3752:5
**Examination.............
.......... [1] - 3752:7
**Examination.............
........... [1] - 3752:5
**Examination.............
............ [1] - 3752:6
**Examination.............
............ [1] - 3752:7
**examinations** [1] -
3769:17
**examine** [2] - 3787:20,
3787:21
**examined** [1] -
3779:22
**example** [7] - 3766:16,
3771:18, 3781:7,
3838:9, 3838:11,
3839:22, 3854:6
**excellent** [1] - 3757:16
**except** [1] - 3882:8
**exception** [36] -
3754:20, 3754:25,
3756:12, 3759:20,
3783:14, 3785:11,
3785:17, 3785:25,
3786:5, 3786:6,
3786:14, 3786:15,
3787:4, 3787:13,
3787:16, 3788:9,
3788:11, 3801:3,
3801:10, 3801:12,
3801:15, 3801:19,
3802:6, 3802:10,
3848:13, 3849:23,
3851:2, 3851:6,
3852:6, 3858:7,
3876:4, 3876:22,
3877:6, 3877:17
**exceptions** [11] -
3753:11, 3754:25,
3786:17, 3786:18,
3786:21, 3786:22,
3802:17, 3849:12,
3849:19, 3849:20,
3851:23
**excerpt** [1] - 3846:22
**excerpts** [4] - 3784:9,

3784:10, 3784:13,
3873:14
**exchange** [3] -
3772:16, 3798:13,
3810:20
**Exchange** [3] -
3765:13, 3765:14,
3768:4
**exclude** [1] - 3773:18
**excluded** [6] - 3770:1,
3802:2, 3802:14,
3807:6, 3875:14,
3880:16
**excluding** [1] -
3794:13
**excuse** [2] - 3815:7,
3860:12
**Exhibit** [17] - 3754:12,
3763:22, 3763:25,
3785:20, 3786:10,
3789:2, 3789:3,
3790:18, 3791:8,
3795:10, 3801:2,
3848:10, 3848:13,
3850:14, 3872:11,
3873:20, 3876:5
**exhibit** [3] - 3763:3,
3789:4, 3874:5
**exhibits** [1] - 3761:13
**exist** [4] - 3809:24,
3817:2, 3837:25,
3841:1
**existed** [4] - 3792:18,
3818:22, 3876:13,
3877:6
**existence** [3] - 3792:6,
3837:1, 3837:6
**exists** [1] - 3840:16
**expect** [3] - 3869:2,
3879:12, 3882:2
**expectation** [2] -
3815:12, 3815:15
**experience** [5] -
3764:9, 3809:15,
3822:2, 3822:20,
3832:16
**experienced** [1] -
3882:21
**expert** [30] - 3767:17,
3767:22, 3768:10,
3768:14, 3775:11,
3775:16, 3778:9,
3780:16, 3781:16,
3785:2, 3807:4,
3808:2, 3809:13,
3813:25, 3820:6,
3824:11, 3824:22,
3826:13, 3830:14,
3832:15, 3833:9,
3837:17, 3838:17,

3840:11, 3847:15,
3856:3, 3860:3,
3862:7
**expertise** [11] -
3809:20, 3839:15,
3839:18, 3850:20,
3850:24, 3851:2,
3851:5, 3851:12,
3851:19, 3851:22,
3852:2
**experts** [3] - 3826:18,
3827:1, 3830:17
**experts'** [1] - 3827:15
**explain** [4] - 3757:6,
3770:15, 3795:8,
3803:2
**explained** [2] -
3853:17
**explanation** [1] -
3853:23
**explicit** [1] - 3842:4
**explore** [1] - 3822:21
**exposed** [2] -
3863:12, 3863:15
**exposure** [1] -
3821:21
**express** [1] - 3846:24
**extensive** [2] -
3824:13, 3855:3
**extraordinary** [1] -
3869:8

**F**

**F4100** [9] - 3759:20,
3785:20, 3786:10,
3801:2, 3840:6,
3854:3, 3857:16,
3857:17, 3876:5
**F4300** [1] - 3858:3
**facilities** [1] - 3835:3
**facility** [1] - 3834:18
**fact** [21] - 3755:11,
3760:25, 3769:5,
3776:16, 3777:7,
3777:14, 3784:12,
3784:18, 3799:2,
3815:16, 3815:17,
3816:11, 3819:12,
3825:3, 3826:15,
3830:2, 3849:20,
3855:19, 3857:7,
3867:20, 3869:9
**facts** [7] - 3809:21,
3810:10, 3810:17,
3811:12, 3816:3,
3826:1, 3830:9
**factual** [10] - 3807:25,
3808:5, 3808:7,

3813:3, 3816:13, 3821:24, 3822:11, 3831:22, 3835:22, 3839:11
**faculty** [1] - 3765:8
**failing** [3] - 3779:19, 3844:21, 3870:2
**failure** [1] - 3778:4
**failures** [2] - 3779:7, 3844:12
**Fair** [1] - 3757:15
**fair** [3] - 3764:11, 3839:18, 3875:3
**fairly** [1] - 3803:19
**fairness** [1] - 3830:22
**fake** [14] - 3755:10, 3758:22, 3772:11, 3809:23, 3811:13, 3811:16, 3811:24, 3812:5, 3816:20, 3816:23, 3817:1, 3859:23, 3863:18, 3864:10
**fall** [3] - 3760:10, 3764:21, 3800:22
**falling** [1] - 3783:16
**false** [2] - 3808:11, 3809:24
**falsified** [1] - 3834:25
**falsify** [3] - 3808:24, 3809:2, 3809:16
**Falsifying** [1] - 3834:17
**familiar** [3] - 3757:12, 3766:14, 3836:23
**family** [2] - 3884:3, 3884:11
**far** [13] - 3779:1, 3779:12, 3783:5, 3789:13, 3790:20, 3790:24, 3795:18, 3803:8, 3812:19, 3856:6, 3865:2, 3876:15, 3879:9
**faring** [1] - 3866:22
**Farkas** [14] - 3759:7, 3759:17, 3759:21, 3760:4, 3824:3, 3831:7, 3841:19, 3854:8, 3854:15, 3854:23, 3857:24, 3871:4, 3871:8, 3877:3
**Farkas/John** [1] - 3854:6
**Father** [1] - 3884:19
**FBI** [4] - 3854:12, 3854:22, 3856:16, 3857:5
**FDIC** [11] - 3758:25,

3762:1, 3794:4, 3796:7, 3800:4, 3804:5, 3804:21, 3858:6, 3859:12, 3873:23, 3883:9
**FDIC's** [3] - 3760:24, 3858:4, 3859:17
**February** [6] - 3791:20, 3792:22, 3793:8, 3793:11, 3795:20, 3805:1
**FEDERAL** [3] - 3750:8, 3750:18, 3751:2
**few** [4] - 3761:7, 3770:3, 3770:15, 3880:9
**FICO** [9] - 3755:19, 3756:6, 3756:14, 3756:19, 3757:3, 3757:6, 3757:8, 3757:12, 3757:25
**fictional** [3] - 3855:8, 3858:19, 3858:25
**fictitious** [2] - 3810:20, 3818:21
**field** [1] - 3849:7
**fields** [2] - 3849:2, 3850:20
**figure** [5] - 3788:22, 3793:25, 3804:13, 3819:19, 3881:10
**figured** [1] - 3875:1
**file** [2] - 3785:2, 3828:12
**filed** [2] - 3822:22, 3872:14
**files** [1] - 3828:12
**finally** [1] - 3794:3
**Finance** [2] - 3764:13, 3767:15
**finance** [8] - 3762:14, 3765:4, 3767:18, 3768:11, 3785:1, 3822:15, 3832:19, 3833:1
**financial** [9] - 3779:5, 3782:13, 3783:9, 3809:2, 3809:23, 3844:22, 3864:15, 3866:20, 3867:2
**findings** [1] - 3769:5
**fine** [2] - 3761:5, 3817:8
**finish** [3] - 3860:11, 3882:3, 3883:21
**finished** [4] - 3760:20, 3880:4, 3881:5, 3885:9
**finishing** [1] - 3865:10

**fireman** [1] - 3759:17
**fires** [1] - 3868:25
**first** [18] - 3756:19, 3763:24, 3764:12, 3778:25, 3779:15, 3780:14, 3782:6, 3785:2, 3796:13, 3805:14, 3828:7, 3835:1, 3835:8, 3837:2, 3846:7, 3850:25, 3860:10, 3860:11
**five** [9] - 3768:12, 3768:20, 3794:9, 3803:9, 3829:10, 3832:25, 3844:3, 3844:5
**Florida** [4] - 3833:18, 3833:20, 3835:12, 3873:20
**focus** [6] - 3821:17, 3832:23, 3834:6, 3834:16, 3836:3, 3836:13
**focused** [1] - 3833:10
**focuses** [1] - 3832:19
**follow** [2] - 3797:6, 3866:14
**followed** [1] - 3854:9
**following** [4] - 3773:25, 3798:8, 3823:19, 3839:14
**foot** [1] - 3783:12
**FOR** [7] - 3750:1, 3750:8, 3750:18, 3751:2, 3751:7, 3753:6, 3762:6
**forbearance** [1] - 3864:13
**force** [1] - 3783:10
**forcing** [1] - 3783:18
**foreclosed** [4] - 3818:5, 3820:23, 3823:25, 3834:22
**foreclosure** [3] - 3818:6, 3818:11, 3823:25
**foregoing** [1] - 3886:4
**forensic** [1] - 3828:5
**foreseen** [1] - 3864:25
**forget** [6] - 3767:1, 3798:3, 3810:1, 3810:4, 3840:4, 3845:21
**form** [5] - 3798:9, 3810:19, 3812:23, 3831:1, 3832:3
**formed** [7] - 3775:6, 3775:21, 3775:25, 3778:1, 3813:3,

3834:12, 3836:8
**forming** [12] - 3768:21, 3823:1, 3824:11, 3828:2, 3830:3, 3833:17, 3834:2, 3836:6, 3843:1, 3858:4, 3858:10
**formulating** [2] - 3872:22, 3875:8
**Forrester** [1] - 3750:19
**forward** [2] - 3761:17
**foundation** [1] - 3834:6
**founded** [1] - 3767:15
**founding** [3] - 3767:14
**four** [3] - 3765:16, 3868:12, 3877:8
**four-and-a-half** [1] - 3765:16
**fraction** [1] - 3827:14
**framework** [4] - 3800:19, 3800:21, 3806:18, 3807:4
**frankly** [3] - 3831:14, 3847:24, 3850:2
**fraud** [175] - 3753:20, 3755:2, 3758:10, 3758:16, 3758:20, 3763:15, 3766:11, 3766:13, 3768:9, 3768:15, 3769:25, 3770:18, 3771:8, 3772:1, 3772:7, 3772:9, 3773:2, 3773:16, 3774:22, 3774:23, 3776:18, 3777:6, 3777:14, 3778:5, 3778:18, 3780:9, 3781:8, 3781:9, 3782:3, 3784:20, 3785:9, 3785:18, 3791:18, 3792:1, 3792:11, 3792:14, 3792:17, 3792:18, 3792:22, 3793:23, 3794:12, 3794:15, 3794:18, 3794:25, 3795:19, 3796:10, 3799:13, 3799:21, 3800:4, 3803:18, 3803:20, 3804:2, 3804:7, 3805:4, 3805:9, 3807:17, 3807:18, 3808:1, 3808:10, 3808:11, 3808:17, 3808:23, 3808:24, 3809:1, 3809:5,

3809:6, 3809:16, 3809:22, 3810:4, 3810:7, 3810:15, 3810:16, 3810:17, 3810:22, 3810:24, 3811:5, 3811:11, 3811:23, 3812:9, 3813:3, 3813:11, 3813:19, 3814:11, 3816:5, 3816:8, 3816:20, 3816:23, 3817:1, 3817:16, 3817:21, 3818:9, 3818:15, 3818:20, 3820:16, 3820:17, 3820:20, 3820:25, 3821:18, 3821:22, 3822:9, 3822:23, 3824:8, 3824:9, 3824:14, 3824:15, 3824:24, 3825:7, 3825:20, 3825:21, 3825:22, 3825:23, 3826:23, 3827:15, 3829:20, 3830:6, 3830:7, 3830:21, 3831:10, 3831:13, 3831:24, 3831:25, 3832:7, 3832:10, 3833:5, 3833:6, 3833:25, 3835:6, 3835:12, 3835:18, 3835:21, 3835:25, 3837:19, 3838:11, 3838:19, 3839:2, 3839:23, 3843:9, 3855:4, 3856:2, 3860:1, 3860:4, 3860:17, 3860:18, 3860:23, 3860:24, 3861:8, 3861:17, 3863:12, 3863:13, 3863:14, 3864:8, 3864:16, 3864:17, 3865:4, 3865:5, 3867:12, 3867:17, 3869:19, 3870:2, 3870:3, 3870:10, 3870:16, 3870:17, 3871:1, 3871:11, 3871:12, 3871:23, 3872:3, 3877:22, 3878:6
**fraudster** [1] - 3843:5
**fraudsters** [8] - 3784:5, 3815:25, 3829:16, 3835:1, 3836:18, 3839:16, 3841:24, 3842:18
**fraudulent** [13] - 3785:12, 3798:25,

3810:25, 3813:7, 3824:20, 3830:20, 3831:23, 3854:7, 3854:24, 3855:8, 3857:8, 3859:20, 3865:3

**Freddie** [1] - 3770:8

**free** [5] - 3780:16, 3787:21, 3807:12, 3807:14, 3858:23

**free-wheeling** [1] - 3780:16

**frequent** [2] - 3783:15, 3878:19

**frequently** [1] - 3852:4

**front** [2] - 3811:7, 3823:13

**full** [18] - 3812:14, 3813:8, 3816:2, 3817:17, 3817:25, 3818:7, 3818:13, 3818:19, 3818:23, 3820:24, 3824:1, 3835:9, 3836:19, 3841:4, 3841:21, 3842:11, 3843:5, 3850:22

**fully** [1] - 3830:5

**fund** [2] - 3774:5, 3848:14

**funded** [37] - 3771:19, 3771:21, 3772:13, 3772:15, 3773:1, 3773:7, 3773:10, 3774:4, 3774:10, 3774:14, 3777:2, 3786:4, 3787:2, 3789:19, 3789:21, 3789:23, 3789:25, 3790:9, 3791:2, 3791:14, 3792:3, 3795:25, 3796:3, 3796:18, 3797:4, 3798:12, 3801:14, 3811:4, 3818:4, 3819:16, 3820:2, 3821:3, 3824:20, 3843:11, 3843:13, 3849:13, 3873:16

**Funding** [1] - 3842:11

**funding** [17] - 3771:16, 3772:16, 3772:17, 3774:7, 3798:9, 3798:10, 3798:14, 3798:15, 3799:1, 3810:21, 3819:1, 3838:16, 3842:24, 3843:19, 3849:14, 3849:18, 3864:5

**funds** [4] - 3774:1, 3787:3, 3852:5, 3860:20

**furthermore** [2] - 3787:1, 3859:17

## G

**general** [13] - 3759:12, 3808:20, 3809:4, 3809:10, 3809:19, 3810:9, 3811:13, 3814:20, 3815:12, 3815:15, 3824:16, 3833:23, 3884:2

**generally** [6] - 3770:6, 3808:13, 3809:11, 3840:15, 3844:9, 3872:7

**generous** [1] - 3840:8

**geometrically** [1] - 3796:12

**Georgetown** [1] - 3765:10

**given** [8] - 3799:4, 3813:22, 3821:5, 3831:24, 3859:5, 3864:24, 3866:21, 3884:7

**glad** [1] - 3760:19

**Global** [1] - 3844:13

**Gonzales** [1] - 3751:20

**gosh** [1] - 3882:5

**governance** [1] - 3765:5

**government** [3] - 3767:25, 3770:8, 3831:10

**government-sponsored** [1] - 3770:8

**granular** [1] - 3803:2

**grasping** [1] - 3860:22

**great** [6] - 3762:3, 3823:15, 3826:20, 3827:17, 3828:11, 3850:5

**Gregory** [1] - 3751:19

**ground** [9] - 3831:3, 3836:23, 3837:7, 3837:10, 3837:23, 3838:4, 3838:14, 3846:11, 3874:9

**grounds** [5] - 3792:19, 3800:3, 3803:18, 3805:2, 3818:21

**group** [5] - 3755:4, 3755:5, 3755:6,

3759:24, 3813:10

**GSE** [1] - 3772:18

**guide** [1] - 3839:22

**guidelines** [1] - 3770:7

**guys** [1] - 3885:11

## H

**HAGALE** [57] - 3751:10, 3761:4, 3761:6, 3761:10, 3761:12, 3762:4, 3762:8, 3762:23, 3771:5, 3775:11, 3775:23, 3776:6, 3776:15, 3777:13, 3778:3, 3779:14, 3779:22, 3781:25, 3782:10, 3782:21, 3784:3, 3785:15, 3785:20, 3785:21, 3787:10, 3787:13, 3787:20, 3787:24, 3788:3, 3788:13, 3789:1, 3790:17, 3793:15, 3794:2, 3796:16, 3796:20, 3799:17, 3802:5, 3802:22, 3802:24, 3804:5, 3804:11, 3804:14, 3804:18, 3804:19, 3805:22, 3823:6, 3834:5, 3854:17, 3856:1, 3858:5, 3859:5, 3859:16, 3860:9, 3872:10, 3875:17, 3879:14

**Hagale** [1] - 3762:10

**half** [9] - 3765:16, 3767:13, 3784:10, 3786:17, 3786:18, 3786:21, 3802:17, 3844:3, 3844:6

**hand** [5] - 3789:13, 3790:20, 3795:19, 3803:9, 3857:19

**handed** [1] - 3812:2

**handling** [2] - 3863:2, 3863:4

**happy** [5] - 3781:15, 3850:23, 3858:21, 3880:1, 3880:2

**hard** [4] - 3813:16, 3830:14, 3847:10, 3871:5

**Hardin** [1] - 3751:4

**head** [1] - 3833:3

**heads** [1] - 3885:11

**hear** [7] - 3799:16, 3807:21, 3865:6, 3865:21, 3865:24, 3883:17, 3885:1

**heard** [26] - 3770:3, 3773:22, 3776:16, 3776:20, 3777:7, 3778:17, 3779:14, 3781:12, 3782:21, 3784:4, 3784:18, 3785:10, 3809:14, 3836:24, 3854:5, 3867:4, 3867:5, 3868:25, 3872:21, 3873:19, 3875:18, 3875:19, 3877:2, 3878:20, 3882:19

**hearing** [2] - 3780:18, 3885:5

**hearsay** [3] - 3823:7, 3858:6, 3858:7

**Heather** [3] - 3857:20, 3857:21, 3885:10

**heavily** [3] - 3830:17, 3831:19, 3866:12

**HEFTMAN** [97] - 3751:3, 3775:6, 3775:15, 3775:19, 3776:1, 3776:11, 3777:18, 3777:23, 3778:10, 3779:9, 3779:17, 3780:1, 3780:5, 3781:14, 3782:12, 3783:1, 3787:5, 3787:11, 3787:17, 3788:7, 3788:11, 3802:1, 3802:11, 3802:19, 3803:25, 3804:15, 3805:24, 3807:10, 3810:6, 3811:23, 3812:1, 3814:8, 3814:9, 3814:12, 3814:14, 3817:7, 3817:12, 3823:3, 3823:4, 3823:12, 3825:11, 3825:13, 3825:16, 3825:17, 3828:18, 3828:20, 3829:9, 3834:10, 3836:3, 3836:5, 3836:11, 3836:12, 3841:13, 3841:16, 3843:22, 3844:1, 3848:11, 3848:12, 3848:21, 3848:25, 3851:17, 3854:21, 3855:7, 3855:12, 3856:11, 3856:14, 3856:15, 3857:11,

3857:12, 3857:17, 3857:18, 3858:9, 3858:15, 3858:17, 3859:3, 3859:10, 3859:19, 3860:7, 3860:12, 3860:15, 3861:3, 3861:10, 3861:13, 3862:15, 3865:14, 3865:17, 3865:20, 3865:25, 3866:1, 3868:5, 3868:6, 3868:22, 3868:23, 3871:10, 3872:8, 3875:13, 3879:16

**Heftman** [7] - 3822:13, 3835:15, 3874:5, 3875:18, 3876:5, 3877:19, 3878:20

**Heftman's** [1] - 3779:24

**held** [1] - 3781:21

**hello** [1] - 3762:10

**help** [9] - 3762:18, 3764:4, 3773:5, 3780:2, 3795:7, 3803:1, 3803:25, 3829:20, 3833:16

**helped** [2] - 3765:17, 3804:17

**helpful** [2] - 3757:10, 3780:4

**helpfully** [1] - 3849:1

**Herman** [1] - 3751:11

**hesitancy** [2] - 3798:1, 3876:11

**hid** [1] - 3863:18

**hidden** [7] - 3755:15, 3777:4, 3786:23, 3786:24, 3859:20, 3863:23, 3878:9

**hide** [2] - 3809:22, 3810:7

**hiding** [7] - 3776:21, 3776:24, 3777:4, 3798:22, 3811:5, 3859:23

**Higdon** [2] - 3857:25, 3858:13

**high** [5] - 3763:12, 3763:20, 3769:19, 3803:5, 3821:23

**higher** [1] - 3773:5

**highlight** [1] - 3756:2

**highlighted** [4] - 3756:24, 3796:8, 3854:4, 3873:24

**hired** [1] - 3844:13

**Hoard** [1] - 3750:22

**hold** [1] - 3762:21

**holding** [3] - 3771:14, 3783:16, 3815:18
**honestly** [1] - 3810:9
**Honor** [88] - 3753:3, 3756:11, 3760:18, 3760:22, 3761:1, 3761:4, 3761:12, 3761:18, 3762:4, 3770:21, 3775:6, 3775:11, 3775:20, 3775:23, 3776:2, 3777:23, 3778:3, 3778:11, 3779:9, 3779:14, 3779:17, 3779:22, 3780:1, 3780:6, 3780:13, 3781:4, 3781:7, 3781:15, 3781:24, 3781:25, 3783:1, 3784:25, 3787:5, 3787:10, 3787:13, 3787:24, 3789:10, 3791:2, 3793:2, 3795:13, 3795:23, 3798:8, 3802:1, 3802:22, 3803:8, 3803:25, 3804:5, 3804:11, 3804:14, 3806:25, 3810:13, 3814:8, 3817:7, 3823:6, 3825:13, 3825:16, 3834:5, 3836:11, 3843:23, 3854:21, 3855:7, 3856:1, 3856:11, 3858:5, 3859:4, 3859:5, 3859:11, 3859:16, 3860:7, 3861:3, 3861:10, 3861:15, 3865:14, 3865:18, 3865:25, 3868:22, 3872:8, 3875:13, 3879:15, 3879:16, 3879:18, 3879:23, 3880:15, 3880:25, 3881:19, 3882:4, 3884:10, 3885:1
**HONORABLE** [1] - 3750:15
**hopefully** [1] - 3770:14
**hopes** [1] - 3761:21
**HORWATH** [2] - 3750:6, 3750:11
**host** [1] - 3776:8
**hour** [8] - 3769:12, 3881:15, 3881:16, 3881:18, 3881:20, 3881:22, 3881:23

**hourly** [2] - 3769:12
**hours** [8] - 3826:7, 3826:8, 3826:19, 3826:20, 3827:14, 3827:16, 3829:10, 3832:5
**household** [1] - 3884:22
**housing** [18] - 3768:13, 3779:4, 3779:6, 3783:7, 3785:1, 3785:4, 3785:7, 3798:17, 3798:20, 3813:23, 3833:1, 3833:5, 3866:8, 3866:16, 3867:24, 3868:24
**Hubbard** [1] - 3751:12
**huge** [1] - 3757:23
**human** [1] - 3781:10
**hundred** [1] - 3853:12
**hundreds** [1] - 3863:14
**hypothetical** [1] - 3877:14

---

**I**

**iceberg** [1] - 3755:14
**ideal** [1] - 3761:25
**identified** [6] - 3755:18, 3759:9, 3759:24, 3781:22, 3806:13, 3853:16
**identifies** [1] - 3848:15
**identify** [3] - 3819:2, 3827:19, 3837:18
**if..** [1] - 3858:21
**ignore** [1] - 3785:7
**IL** [2] - 3751:5, 3751:12
**illegal** [3] - 3809:11, 3809:19, 3810:1
**illustrate** [2] - 3784:12, 3848:14
**illustrative** [1] - 3848:15
**impaired** [33] - 3772:17, 3772:25, 3774:6, 3774:7, 3774:12, 3777:2, 3797:3, 3798:14, 3801:13, 3812:10, 3812:13, 3813:7, 3816:2, 3817:16, 3817:23, 3818:3, 3818:10, 3818:11, 3818:14, 3819:1,

3819:8, 3819:16, 3820:1, 3820:22, 3820:23, 3821:3, 3823:24, 3824:1, 3829:21, 3834:23, 3856:8, 3869:11
**impairments** [1] - 3754:24
**impeach** [2] - 3856:6, 3859:16
**impeachment** [2] - 3854:22, 3859:11
**important** [9] - 3779:2, 3799:15, 3814:11, 3862:12, 3862:24, 3862:25, 3874:2, 3878:8, 3878:11
**imposed** [1] - 3884:8
**impression** [2] - 3808:20, 3809:24
**imprudent** [1] - 3783:10
**in/cash** [2] - 3771:10, 3790:8
**inappropriate** [6] - 3776:22, 3777:5, 3794:19, 3798:21, 3832:12
**inappropriately** [1] - 3782:2
**INC** [1] - 3750:3
**inception** [5] - 3799:1, 3860:25, 3861:8, 3865:5, 3873:25
**include** [5] - 3758:13, 3808:9, 3818:25, 3831:2, 3873:3
**included** [13] - 3755:1, 3758:11, 3758:14, 3758:24, 3774:17, 3779:18, 3782:2, 3792:1, 3812:17, 3818:9, 3821:1, 3832:11, 3870:15
**includes** [2] - 3773:2, 3796:9
**including** [4] - 3763:14, 3769:24, 3813:14, 3835:24
**inclusion** [1] - 3791:5
**income** [4] - 3793:16, 3793:20, 3793:22, 3796:6
**inconsistent** [2] - 3849:23, 3852:7
**increase** [2] - 3805:6, 3819:10
**increases** [2] - 3792:10, 3795:5

**increasing** [1] - 3792:12
**incurred** [5] - 3768:16, 3785:5, 3791:19, 3792:20, 3808:3
**indicate** [3] - 3838:15, 3845:1, 3852:2
**indicated** [2] - 3783:24, 3878:18
**indicates** [5] - 3772:25, 3786:6, 3789:22, 3852:20, 3878:9
**indicating** [1] - 3846:7
**indication** [5] - 3801:22, 3841:9, 3846:18, 3846:20, 3873:17
**indicative** [6] - 3785:9, 3786:15, 3786:19, 3801:12, 3801:20, 3849:20
**indicia** [5] - 3776:18, 3777:14, 3778:4, 3778:18, 3781:9, 3784:20, 3785:18
**individual** [2] - 3840:7, 3846:22
**individuals** [1] - 3755:6
**indulge** [1] - 3865:8
**industry** [2] - 3832:17, 3832:24
**infer** [1] - 3828:10
**inference** [2] - 3778:23, 3873:11
**influenced** [1] - 3827:12
**inform** [6] - 3829:20, 3830:5, 3831:23, 3833:16, 3850:3, 3875:12
**information** [7] - 3766:25, 3787:25, 3822:14, 3831:12, 3840:11, 3869:9, 3878:15
**informed** [4] - 3775:8, 3813:6, 3831:14, 3832:7
**initial** [7] - 3776:3, 3810:21, 3819:1, 3826:17, 3838:16, 3864:5, 3867:16
**insider** [5] - 3759:14, 3766:12, 3766:16, 3766:23, 3768:8
**insiders** [1] - 3766:25
**insofar** [4] - 3798:21, 3818:10, 3851:25,

3877:11
**instance** [1] - 3837:11
**instances** [1] - 3756:19
**instead** [2] - 3813:19, 3864:10
**institution** [2] - 3809:2, 3809:23
**INSURANCE** [3] - 3750:8, 3750:18, 3751:2
**integrity** [1] - 3830:16
**intended** [1] - 3815:17
**intensive** [1] - 3828:4
**interceding** [1] - 3882:23
**interest** [2] - 3766:3, 3827:9
**interested** [2] - 3794:12, 3883:10
**interesting** [2] - 3766:16, 3797:6
**interests** [1] - 3834:22
**interject** [1] - 3780:7
**internal** [1] - 3847:23
**internally** [1] - 3824:2
**interpret** [5] - 3837:20, 3837:21, 3843:16, 3850:20, 3860:7
**interpretations** [1] - 3838:14
**interpreting** [2] - 3860:6, 3860:8
**intuition** [1] - 3795:14
**investigate** [1] - 3841:17
**investigating** [3] - 3765:24, 3821:12, 3854:14
**investigation** [10] - 3809:15, 3817:14, 3817:23, 3821:19, 3821:22, 3821:25, 3822:2, 3822:11, 3824:7, 3855:3
**investigations** [2] - 3821:10, 3822:21
**investigator** [2] - 3821:13, 3839:2
**investment** [1] - 3815:14
**investor** [5] - 3815:10, 3816:16, 3816:17, 3862:5, 3862:18
**investors** [4] - 3768:16, 3833:3, 3845:15, 3848:17
**involve** [1] - 3766:10
**involved** [5] - 3766:5, 3768:10, 3822:13,

3825:23, 3878:5
**involves** [2] - 3832:2, 3869:11
**involving** [3] - 3766:12, 3768:9, 3768:11
**irrelevant** [1] - 3850:3
**Isaac** [1] - 3757:15
**isolated** [2] - 3837:11, 3838:21
**isolates** [1] - 3872:4
**issue** [20] - 3756:12, 3771:11, 3776:1, 3780:7, 3796:2, 3804:4, 3804:10, 3808:5, 3808:7, 3811:6, 3827:15, 3839:22, 3853:25, 3861:11, 3862:12, 3867:6, 3867:9, 3878:15, 3885:6
**issues** [11] - 3777:20, 3779:23, 3780:2, 3781:17, 3806:9, 3826:22, 3827:6, 3827:9, 3832:6, 3844:8, 3862:10
**items** [2] - 3851:6, 3851:19
**itself** [2] - 3793:12, 3798:24
**Ivan** [1] - 3766:16

## J

**JACOBS** [1] - 3750:15
**jail** [3] - 3857:23, 3864:9, 3871:4
**January** [1] - 3754:5
**job** [1] - 3833:8
**Journal** [1] - 3767:15
**journals** [3] - 3767:11, 3767:13, 3767:14
**JUDGE** [1] - 3750:15
**judge's** [1] - 3819:20
**judgment** [3] - 3807:25, 3808:22, 3852:3
**July** [2] - 3841:19, 3841:22
**jumbled** [1] - 3849:2
**junk** [64] - 3755:10, 3758:6, 3758:21, 3770:3, 3770:4, 3770:5, 3772:13, 3772:19, 3774:4, 3781:8, 3784:5, 3784:12, 3784:15, 3786:3, 3786:15,

3786:19, 3789:19, 3791:2, 3791:10, 3791:14, 3796:18, 3801:13, 3801:20, 3801:22, 3812:10, 3813:11, 3817:15, 3817:24, 3820:18, 3824:9, 3824:24, 3825:7, 3826:23, 3827:15, 3829:21, 3835:6, 3835:21, 3838:11, 3841:21, 3841:25, 3842:11, 3842:13, 3842:19, 3842:22, 3843:6, 3843:8, 3843:9, 3843:12, 3848:14, 3848:15, 3849:21, 3850:4, 3851:3, 3851:7, 3851:9, 3852:1, 3852:7, 3854:1, 3864:2, 3875:5, 3877:11
**jury** [1] - 3851:3
**Justice** [1] - 3768:5

## K

**keep** [5] - 3810:4, 3815:4, 3825:1, 3861:4, 3871:5
**Kelly** [5] - 3837:6, 3837:22, 3839:24, 3873:4, 3874:15
**Ken** [1] - 3762:12
**KENNETH** [4] - 3752:5, 3752:6, 3753:6, 3762:6
**Kenneth** [1] - 3761:6
**kept** [1] - 3876:12
**KEVIN** [1] - 3750:4
**key** [5] - 3789:16, 3797:2, 3807:5, 3849:17, 3864:4
**kids** [1] - 3884:17
**kind** [8] - 3759:19, 3768:6, 3821:6, 3821:17, 3880:8, 3880:25, 3881:23, 3884:21
**kindness** [1] - 3881:25
**kinds** [1] - 3869:1
**King** [1] - 3751:16
**Kissick** [26] - 3753:11, 3754:3, 3754:18, 3755:3, 3755:17, 3822:22, 3822:25, 3824:3, 3824:8, 3837:22, 3838:2,

3838:23, 3839:25, 3863:2, 3863:6, 3863:11, 3863:24, 3864:7, 3864:9, 3864:23, 3872:12, 3874:14, 3874:18, 3875:3, 3877:21
**Kissick's** [3] - 3753:17, 3837:15, 3874:8
**knowledge** [1] - 3832:14
**known** [1] - 3786:24
**knows** [1] - 3856:7
**Knows** [1] - 3884:19

## L

**labeled** [1] - 3812:16
**lack** [1] - 3755:20
**lag** [2] - 3849:22, 3852:5
**lags** [1] - 3849:25
**laid** [1] - 3809:6
**LANDGRAFF** [1] - 3751:9
**language** [1] - 3828:17
**largely** [4] - 3765:2, 3765:21, 3768:8, 3833:1
**largest** [5] - 3779:1, 3783:5, 3783:11, 3871:19, 3879:7
**last** [15] - 3756:22, 3756:24, 3760:2, 3770:3, 3790:14, 3790:6, 3790:7, 3790:18, 3790:24, 3794:3, 3836:3, 3857:15, 3880:9, 3882:17, 3883:6
**lasted** [1] - 3825:23
**late** [1] - 3885:11
**Laughter** [7] - 3795:17, 3868:21, 3880:11, 3881:8, 3882:6, 3884:13, 3884:23
**law** [2] - 3765:5, 3769:6
**Law** [1] - 3765:11
**LAWRENCE** [1] - 3751:3
**lawsuit** [1] - 3833:20
**lawyer** [6] - 3768:25, 3776:23, 3808:19, 3808:21, 3809:11, 3860:2

**lawyers** [1] - 3883:13
**learned** [1] - 3847:24
**learning** [2] - 3827:2, 3833:8
**least** [7] - 3766:20, 3801:22, 3833:2, 3847:19, 3850:1, 3867:21, 3878:10
**leaves** [1] - 3792:21
**led** [1] - 3789:5
**Lee** [7] - 3760:4, 3831:6, 3854:6, 3854:8, 3854:15, 3856:17, 3877:2
**left** [7] - 3770:10, 3770:18, 3789:13, 3795:19, 3803:9, 3852:11, 3885:4
**left-hand** [3] - 3789:13, 3795:19, 3803:9
**legal** [9] - 3769:1, 3775:16, 3775:18, 3809:3, 3809:11, 3809:19, 3810:1, 3860:8, 3871:6
**legitimate** [15] - 3804:16, 3813:20, 3815:17, 3819:15, 3819:22, 3835:14, 3843:10, 3866:10, 3866:11, 3866:17, 3866:21, 3867:2, 3867:13, 3871:14, 3871:15
**Lehn** [63] - 3761:3, 3761:6, 3761:16, 3761:20, 3762:9, 3762:12, 3762:13, 3762:16, 3762:24, 3763:3, 3763:19, 3763:22, 3764:8, 3764:4, 3767:5, 3767:17, 3769:10, 3769:16, 3769:19, 3771:6, 3773:4, 3773:7, 3773:14, 3774:17, 3776:6, 3776:7, 3776:16, 3778:7, 3778:15, 3778:17, 3780:10, 3782:21, 3784:4, 3785:10, 3785:16, 3785:22, 3787:20, 3788:14, 3790:18, 3793:16, 3795:7, 3795:11, 3802:7, 3803:1, 3803:6, 3804:1, 3804:6, 3804:20, 3805:25,

**lawyers** - *see below*
3817:13, 3834:7, 3854:18, 3859:16, 3866:2, 3872:11, 3872:21, 3873:19, 3877:2, 3877:19, 3878:20, 3880:19, 3880:20, 3882:5
**LEHN** [2] - 3752:6, 3762:6
**Lehn's** [6] - 3777:25, 3780:5, 3781:16, 3781:25, 3787:15, 3828:18
**lender** [6] - 3757:22, 3816:9, 3816:11, 3853:13, 3853:16, 3869:12
**lenders** [9] - 3815:8, 3815:9, 3815:13, 3815:20, 3845:23, 3846:3, 3861:25, 3866:12
**lending** [10] - 3832:16, 3852:20, 3853:3, 3866:10, 3867:13, 3867:23, 3869:3, 3869:18, 3878:3, 3879:8
**length** [3] - 3779:22, 3779:24, 3782:3
**less** [10] - 3756:20, 3756:25, 3757:3, 3774:7, 3774:13, 3798:11, 3806:11, 3814:3, 3877:18
**lesser** [1] - 3798:14
**level** [6] - 3763:12, 3769:19, 3803:5, 3821:23, 3838:15, 3839:24
**LEVINE** [9] - 3751:9, 3756:11, 3759:5, 3760:16, 3778:14, 3879:23, 3881:14, 3882:4, 3882:7
**Levine** [1] - 3778:5
**Lexecon** [9] - 3769:13, 3787:1, 3802:8, 3827:17, 3828:3, 3828:7, 3828:15, 3828:24, 3829:3
**Lexicon** [1] - 3850:15
**lheftman@ schiffhardin.com** [1] - 3751:6
**liability** [19] - 3760:10, 3760:12, 3760:13, 3769:3, 3769:6, 3769:7, 3775:2,

3775:3, 3775:7,
3775:8, 3775:13,
3775:24, 3780:10,
3780:24, 3781:3,
3781:5, 3781:11,
3875:9, 3875:15
**liable** [2] - 3792:19,
3794:14
**lie** [1] - 3808:17
**lies** [1] - 3795:13
**light** [2] - 3771:2,
3882:9
**likely** [1] - 3823:24
**line** [50] - 3753:17,
3754:4, 3764:12,
3772:4, 3783:15,
3784:15, 3784:17,
3792:14, 3793:16,
3794:3, 3799:7,
3805:10, 3805:12,
3814:2, 3814:23,
3818:8, 3818:15,
3818:16, 3821:2,
3825:7, 3829:22,
3837:19, 3842:3,
3842:9, 3842:12,
3842:24, 3843:4,
3843:12, 3843:18,
3845:25, 3846:19,
3847:5, 3851:6,
3851:19, 3853:13,
3853:20, 3853:21,
3856:23, 3856:24,
3859:1, 3863:20,
3863:22, 3864:2,
3864:4, 3864:12,
3869:10, 3873:15
**lines** [18] - 3765:12,
3772:20, 3777:9,
3777:16, 3778:19,
3786:2, 3791:15,
3797:1, 3828:19,
3837:25, 3840:7,
3842:14, 3842:19,
3843:6, 3846:25,
3850:12, 3874:19
**list** [4] - 3757:24,
3868:2, 3868:13,
3873:3
**lists** [2] - 3823:23,
3879:4
**literal** [1] - 3821:18
**Litigation** [1] -
3845:10
**litigation** [8] -
3767:17, 3767:24,
3768:25, 3831:18,
3833:14, 3845:8,
3847:14, 3862:17
**litmus** [5] - 3777:1,

3797:3, 3799:14,
3821:5, 3850:3
**lived** [1] - 3765:9
**living** [1] - 3762:13
**LLP** [10] - 3750:6,
3750:6, 3750:10,
3750:11, 3750:19,
3750:22, 3751:4,
3751:7, 3751:11,
3751:16
**loan** [72] - 3758:24,
3758:25, 3759:17,
3771:10, 3771:14,
3771:25, 3773:10,
3776:21, 3776:24,
3776:25, 3777:2,
3786:6, 3786:14,
3787:4, 3789:15,
3789:18, 3789:19,
3789:22, 3790:8,
3797:8, 3797:10,
3797:11, 3797:12,
3797:15, 3797:16,
3797:22, 3797:23,
3797:24, 3798:4,
3798:25, 3799:4,
3801:12, 3801:13,
3808:18, 3811:16,
3812:13, 3814:25,
3815:4, 3817:15,
3818:6, 3818:11,
3818:13, 3818:18,
3818:19, 3818:21,
3824:9, 3824:24,
3825:7, 3826:23,
3827:15, 3835:21,
3836:19, 3838:11,
3841:6, 3843:8,
3843:9, 3843:11,
3849:13, 3852:6,
3852:11, 3852:15,
3852:21, 3852:23,
3876:6, 3876:14,
3876:19
**loans** [210] - 3753:24,
3754:16, 3754:18,
3754:19, 3755:4,
3755:6, 3755:9,
3755:11, 3755:18,
3755:19, 3756:4,
3756:10, 3756:23,
3757:24, 3757:25,
3758:21, 3759:7,
3759:8, 3759:14,
3759:16, 3759:21,
3759:24, 3771:11,
3771:12, 3772:13,
3772:15, 3772:19,
3772:22, 3772:23,
3772:25, 3774:4,

3774:10, 3776:17,
3777:8, 3778:2,
3778:4, 3781:8,
3784:5, 3784:15,
3784:23, 3785:8,
3785:12, 3786:2,
3789:11, 3791:2,
3791:14, 3792:3,
3795:25, 3796:2,
3796:18, 3796:25,
3797:3, 3798:18,
3801:15, 3801:21,
3801:25, 3804:15,
3807:18, 3810:24,
3811:3, 3811:5,
3812:2, 3812:10,
3814:18, 3814:22,
3815:18, 3815:21,
3816:9, 3816:12,
3816:13, 3816:16,
3816:20, 3817:14,
3817:16, 3817:24,
3818:2, 3818:6,
3818:23, 3819:8,
3819:9, 3819:14,
3819:22, 3820:1,
3820:15, 3820:18,
3820:22, 3820:23,
3820:24, 3821:2,
3823:21, 3823:23,
3823:24, 3823:25,
3824:1, 3824:19,
3825:7, 3825:9,
3829:21, 3831:4,
3831:22, 3834:18,
3834:22, 3834:24,
3835:2, 3835:6,
3835:7, 3835:13,
3835:17, 3835:18,
3836:15, 3837:7,
3837:12, 3837:18,
3837:24, 3838:10,
3839:17, 3840:1,
3840:23, 3840:25,
3841:6, 3841:25,
3842:10, 3842:12,
3842:19, 3842:22,
3842:23, 3843:3,
3843:18, 3846:3,
3846:10, 3847:5,
3848:14, 3848:15,
3849:4, 3849:19,
3851:3, 3852:1,
3852:24, 3853:1,
3853:12, 3854:1,
3854:4, 3854:7,
3854:16, 3854:23,
3854:25, 3855:4,
3855:8, 3856:8,
3856:17, 3856:22,
3857:6, 3858:1,

3858:19, 3858:25,
3859:3, 3859:9,
3859:20, 3861:25,
3862:1, 3862:22,
3863:18, 3863:19,
3863:22, 3864:4,
3864:10, 3864:20,
3866:11, 3868:12,
3869:11, 3869:12,
3873:15, 3873:25,
3874:25, 3875:2,
3875:5, 3876:10,
3876:12, 3876:23,
3877:5, 3877:11,
3877:16, 3877:24,
3878:12, 3878:21,
3878:24, 3879:4,
3879:11, 3879:13,
3885:8
**long-term** [1] -
3815:14
**look** [46] - 3753:16,
3754:2, 3754:3,
3754:11, 3759:20,
3761:22, 3783:14,
3789:12, 3790:20,
3803:8, 3823:5,
3823:16, 3828:21,
3830:10, 3833:15,
3834:11, 3834:15,
3836:1, 3836:2,
3836:22, 3839:20,
3840:12, 3841:19,
3841:20, 3842:7,
3847:6, 3848:2,
3849:1, 3850:12,
3853:13, 3854:3,
3854:12, 3854:13,
3855:15, 3855:17,
3857:16, 3858:3,
3858:14, 3859:24,
3862:13, 3867:13,
3869:4, 3872:6
**looked** [10] - 3793:20,
3794:9, 3812:22,
3812:23, 3823:1,
3835:20, 3846:25,
3850:11, 3858:13,
3884:20
**looking** [15] - 3757:24,
3773:14, 3785:5,
3798:19, 3806:2,
3826:7, 3829:11,
3832:8, 3832:9,
3836:14, 3846:24,
3856:16, 3867:22,
3868:7, 3868:22
**looks** [3] - 3792:16,
3870:1, 3870:2
**lopped** [1] - 3843:1

**Lori** [1] - 3751:20
**loss** [27] - 3755:2,
3758:10, 3759:1,
3759:10, 3759:24,
3771:24, 3773:2,
3773:11, 3774:19,
3774:21, 3777:6,
3792:11, 3807:17,
3808:1, 3808:3,
3808:23, 3811:11,
3820:20, 3825:20,
3830:7, 3858:3,
3858:4, 3859:10,
3859:12, 3867:12
**losses** [93] - 3763:14,
3763:16, 3768:15,
3769:24, 3769:25,
3770:18, 3771:8,
3772:1, 3772:7,
3772:9, 3772:11,
3772:15, 3773:16,
3773:18, 3774:22,
3774:23, 3774:24,
3776:24, 3782:1,
3782:3, 3785:5,
3788:18, 3789:5,
3790:7, 3790:11,
3790:14, 3790:16,
3790:22, 3790:25,
3791:3, 3791:9,
3791:13, 3791:18,
3791:19, 3792:1,
3792:2, 3792:14,
3792:17, 3792:18,
3792:20, 3792:22,
3793:6, 3793:7,
3793:10, 3793:23,
3794:13, 3794:15,
3794:18, 3794:20,
3794:25, 3795:19,
3796:10, 3796:25,
3798:23, 3799:21,
3799:23, 3800:2,
3800:4, 3800:12,
3803:17, 3803:18,
3803:20, 3804:2,
3804:7, 3805:1,
3805:8, 3805:9,
3807:7, 3807:19,
3808:9, 3810:23,
3810:24, 3813:14,
3817:21, 3832:12,
3833:4, 3833:5,
3835:18, 3867:11,
3867:17, 3867:20,
3869:19, 3870:11,
3870:16, 3871:23
**lost** [5] - 3802:3,
3802:15, 3813:22,
3870:23, 3871:19

**loud** [1] - 3874:22
**Louis** [1] - 3765:9
**ly** [2] - 3846:24, 3882:25

# M

**Mac** [1] - 3770:8
**machine** [1] - 3751:25
**magnitude** [1] - 3879:2
**maiden** [1] - 3874:9
**mail** [13] - 3836:6, 3836:14, 3836:15, 3837:16, 3838:13, 3838:21, 3839:18, 3840:13, 3842:9, 3846:16, 3846:20, 3846:23, 3847:1
**mails** [3] - 3836:4, 3875:19, 3875:23
**main** [2] - 3765:21, 3849:11
**maintain** [1] - 3880:16
**maintained** [1] - 3851:24
**major** [3] - 3772:22, 3783:8, 3864:14
**majority** [5] - 3842:15, 3842:20, 3843:7, 3844:7
**maker** [2] - 3883:24, 3884:1
**makers** [1] - 3884:25
**Malek** [109] - 3753:4, 3758:5, 3759:6, 3760:25, 3761:20, 3761:22, 3762:3, 3763:13, 3769:17, 3769:21, 3771:9, 3771:24, 3772:7, 3772:23, 3774:11, 3774:17, 3774:25, 3776:16, 3776:21, 3777:7, 3778:23, 3779:14, 3780:8, 3780:11, 3780:22, 3782:1, 3782:6, 3783:3, 3784:4, 3784:9, 3784:18, 3785:10, 3785:16, 3785:23, 3786:9, 3786:13, 3787:14, 3788:23, 3789:18, 3790:2, 3790:4, 3790:12, 3791:5, 3791:9, 3791:11, 3791:20, 3791:25, 3792:16, 3793:2,

3793:13, 3793:20, 3794:9, 3794:20, 3794:25, 3795:13, 3796:10, 3800:2, 3801:11, 3803:15, 3805:2, 3805:8, 3806:2, 3806:18, 3806:25, 3808:4, 3813:13, 3817:19, 3819:4, 3819:17, 3819:25, 3824:17, 3824:18, 3825:1, 3826:6, 3826:13, 3828:6, 3832:7, 3834:6, 3835:16, 3841:14, 3847:3, 3847:12, 3847:22, 3848:8, 3849:1, 3849:8, 3849:19, 3850:14, 3851:8, 3851:13, 3851:25, 3853:11, 3853:17, 3853:23, 3855:11, 3856:21, 3861:19, 3866:6, 3866:7, 3867:1, 3867:10, 3868:8, 3869:15, 3871:14, 3872:25, 3873:6, 3873:10, 3880:13
**MALEK** [2] - 3752:5, 3753:6
**Malek's** [44] - 3763:2, 3768:24, 3770:19, 3771:7, 3773:15, 3777:14, 3778:5, 3778:8, 3778:10, 3778:17, 3779:15, 3780:18, 3782:22, 3783:14, 3785:3, 3785:24, 3787:16, 3791:21, 3794:16, 3795:19, 3799:21, 3800:19, 3801:9, 3802:16, 3803:7, 3804:24, 3805:10, 3805:19, 3805:20, 3807:13, 3819:23, 3826:9, 3828:1, 3828:4, 3828:15, 3828:22, 3835:24, 3837:4, 3840:13, 3848:2, 3871:25, 3875:22, 3876:1, 3877:6
**manage** [4] - 3783:13, 3864:18, 3878:16
**management** [5] - 3786:25, 3798:21, 3799:11, 3863:23, 3878:11

**managing** [2] - 3769:15, 3783:19
**manifests** [1] - 3793:12
**manipulating** [1] - 3859:23
**manufactured** [1] - 3834:24
**March** [2] - 3750:6, 3872:14
**margin** [4] - 3783:15, 3784:1, 3864:18, 3878:19
**mark** [5] - 3789:17, 3789:22, 3790:10, 3801:19, 3853:12
**MARK** [1] - 3751:9
**mark.levine@bartlit** [1] - 3751:14
**mark.levine@bartlit-beck.com** [1] - 3751:14
**marked** [12] - 3786:17, 3786:18, 3786:21, 3786:22, 3787:4, 3801:18, 3847:19, 3849:7, 3849:8, 3849:19, 3852:6, 3853:15
**market** [2] - 3755:20, 3821:18
**markets** [1] - 3766:2
**marking** [4] - 3786:6, 3786:14, 3801:12, 3849:23
**marks** [2] - 3789:17, 3789:24
**MARTINEZ** [1] - 3751:10
**massive** [1] - 3869:10
**master's** [1] - 3763:21
**matching** [1] - 3753:19
**material** [3] - 3766:25, 3822:15, 3845:14
**materiality** [2] - 3821:17, 3845:11
**materials** [6] - 3768:21, 3768:23, 3823:1, 3828:16, 3828:23, 3828:25
**math** [4] - 3788:24, 3804:2, 3828:8, 3829:7
**matter** [8] - 3756:15, 3769:22, 3809:19, 3817:20, 3820:3, 3824:16, 3835:24, 3886:5
**matters** [2] - 3803:25,

3821:12
**may-call** [1] - 3881:2
**McCullough** [1] - 3764:13
**mean** [29] - 3764:16, 3775:18, 3776:24, 3777:6, 3797:14, 3799:10, 3804:1, 3809:14, 3812:19, 3820:6, 3829:2, 3838:2, 3839:9, 3839:12, 3843:13, 3846:23, 3846:24, 3847:24, 3851:13, 3856:18, 3857:1, 3859:11, 3860:7, 3868:3, 3869:7, 3884:6, 3885:4
**meaning** [5] - 3772:18, 3786:3, 3821:2, 3830:24, 3838:5
**meaningful** [1] - 3882:23
**means** [8] - 3757:16, 3785:9, 3786:22, 3847:14, 3851:12, 3851:23, 3853:18, 3884:2
**meant** [2] - 3846:16, 3851:21
**mechanic** [1] - 3831:3
**mediation** [2] - 3882:14, 3883:6
**mediator** [2] - 3882:20, 3882:24
**meet** [2] - 3884:1, 3884:2
**memory** [2] - 3828:17, 3844:19
**mention** [2] - 3777:25, 3778:3
**mentioned** [5] - 3764:25, 3766:4, 3821:6, 3844:2, 3867:18
**mentions** [1] - 3777:20
**mere** [1] - 3787:15
**MEREDITH** [1] - 3751:15
**mergers** [1] - 3765:4
**merits** [1] - 3763:18
**Mesirow** [1] - 3817:1
**methodology** [11] - 3771:7, 3771:9, 3790:2, 3794:22, 3794:23, 3800:22, 3803:15, 3803:22, 3805:20, 3807:3,

3808:8
**Metropolitan** [1] - 3845:9
**MEZZINA** [1] - 3751:15
**MF** [1] - 3844:13
**mic** [1] - 3771:1
**Michael** [1] - 3766:19
**microphone** [6] - 3762:17, 3770:14, 3770:24, 3773:5, 3777:22
**middle** [4] - 3796:8, 3823:21, 3834:21, 3842:8
**MIDDLE** [1] - 3750:1
**might** [21] - 3757:9, 3761:19, 3766:14, 3776:3, 3783:4, 3783:9, 3783:12, 3790:13, 3807:2, 3811:4, 3813:18, 3813:21, 3825:3, 3830:23, 3864:15, 3864:19, 3869:21, 3882:19
**Milken** [1] - 3766:19, 3766:20
**Milken's** [1] - 3767:3
**Milken/Drexel** [1] - 3767:1
**million** [85] - 3759:14, 3759:25, 3763:10, 3772:10, 3772:14, 3773:2, 3773:18, 3788:20, 3789:5, 3790:13, 3791:1, 3791:3, 3791:11, 3791:12, 3791:13, 3791:22, 3791:25, 3792:1, 3792:8, 3792:11, 3792:25, 3793:7, 3793:9, 3794:17, 3794:24, 3795:3, 3795:8, 3795:24, 3796:1, 3796:6, 3796:8, 3796:12, 3796:14, 3796:25, 3799:22, 3800:1, 3800:9, 3800:11, 3800:12, 3800:14, 3800:15, 3800:23, 3800:25, 3802:25, 3803:2, 3803:13, 3804:4, 3804:6, 3804:12, 3804:21, 3805:1, 3805:5, 3805:6, 3805:17, 3805:18, 3805:19, 3806:14,

3806:24, 3807:6,
3807:13, 3807:25,
3812:16, 3813:11,
3813:14, 3813:21,
3814:3, 3819:3,
3819:13, 3819:14,
3820:5, 3820:15,
3820:20, 3829:24,
3843:2, 3848:5,
3868:13, 3870:18,
3870:22, 3877:11,
3877:13, 3881:10
**millions** [1] - 3863:14
**mind** [6] - 3768:3,
3770:21, 3770:23,
3838:23, 3874:16,
3875:4
**minds** [1] - 3815:6
**minor** [1] - 3803:19
**minute** [1] - 3787:22
**minutes** [9] - 3761:7,
3817:10, 3856:11,
3881:13, 3881:14,
3881:16, 3881:19,
3881:22, 3881:24
**mischaracterizing** [1]
- 3835:15
**misconduct** [8] -
3798:23, 3799:13,
3808:3, 3830:11,
3830:12, 3844:22,
3860:4
**mistake** [1] - 3774:20
**mistakes** [1] - 3868:19
**mmoss@kslaw.com**
[1] - 3751:18
**moment** [1] - 3797:8
**money** [15] - 3783:17,
3783:20, 3808:11,
3811:17, 3811:24,
3812:3, 3812:6,
3812:12, 3813:19,
3818:14, 3840:24,
3846:5, 3846:7,
3862:1, 3864:10
**month** [2] - 3826:17,
3826:18
**mortgage** [48] -
3758:9, 3768:11,
3771:14, 3771:18,
3771:21, 3771:23,
3772:17, 3773:7,
3773:9, 3773:11,
3774:5, 3774:6,
3774:13, 3779:7,
3779:19, 3779:24,
3782:14, 3782:15,
3782:16, 3784:19,
3785:1, 3785:6,
3787:2, 3789:15,

3813:21, 3815:7,
3815:8, 3815:9,
3815:13, 3815:14,
3829:22, 3832:16,
3832:23, 3833:1,
3834:22, 3852:19,
3853:2, 3853:13,
3866:3, 3866:10,
3866:12, 3866:13,
3867:13, 3867:20,
3869:3, 3869:18,
3878:3, 3879:7
**mortgage-related** [2] -
3785:6, 3867:20
**Mortgages** [1] -
3763:9
**mortgages** [58] -
3758:6, 3763:15,
3769:24, 3770:6,
3772:4, 3772:5,
3772:10, 3772:12,
3772:14, 3773:19,
3774:4, 3774:10,
3774:15, 3774:18,
3777:15, 3778:19,
3783:25, 3784:17,
3785:5, 3786:16,
3788:15, 3788:19,
3789:6, 3789:12,
3790:15, 3790:16,
3790:22, 3790:25,
3791:4, 3791:7,
3793:6, 3793:10,
3793:13, 3794:18,
3798:12, 3798:22,
3799:23, 3800:2,
3800:13, 3801:17,
3803:17, 3805:1,
3810:20, 3811:10,
3813:7, 3813:10,
3815:25, 3816:22,
3833:10, 3835:25,
3838:7, 3838:16,
3838:25, 3839:23,
3867:19, 3870:14
**MOSS** [1] - 3751:15
**most** [13] - 3764:1,
3766:11, 3779:3,
3783:25, 3790:5,
3817:21, 3818:1,
3818:3, 3820:1,
3830:20, 3856:8,
3878:17, 3881:14
**mostly** [1] - 3771:14
**move** [11] - 3773:4,
3800:24, 3811:18,
3833:11, 3840:20,
3841:8, 3842:10,
3856:12, 3863:25,
3864:1, 3869:23

**moved** [9] - 3758:22,
3773:8, 3773:11,
3786:2, 3792:4,
3797:1, 3799:4,
3811:10, 3824:19
**moving** [6] - 3767:5,
3799:8, 3799:10,
3799:18, 3799:24,
3843:22
**MR** [204] - 3753:3,
3753:8, 3754:13,
3754:15, 3756:1,
3756:3, 3756:8,
3756:9, 3756:11,
3756:17, 3757:7,
3757:11, 3758:2,
3758:4, 3759:3,
3759:5, 3760:16,
3760:18, 3761:1,
3761:4, 3761:6,
3761:10, 3761:12,
3761:18, 3762:4,
3762:8, 3762:23,
3771:5, 3775:6,
3775:11, 3775:15,
3775:19, 3775:23,
3776:1, 3776:6,
3776:11, 3776:15,
3777:13, 3777:18,
3777:23, 3778:3,
3778:10, 3778:14,
3779:9, 3779:14,
3779:17, 3779:22,
3780:1, 3780:5,
3780:6, 3780:22,
3781:7, 3781:14,
3781:25, 3782:10,
3782:12, 3782:21,
3783:1, 3784:3,
3785:15, 3785:20,
3785:21, 3787:5,
3787:10, 3787:11,
3787:13, 3787:17,
3787:20, 3787:24,
3788:3, 3788:7,
3788:11, 3788:13,
3789:1, 3790:17,
3793:15, 3794:2,
3796:16, 3796:20,
3799:17, 3802:1,
3802:5, 3802:11,
3802:19, 3802:22,
3802:24, 3803:25,
3804:5, 3804:11,
3804:14, 3804:15,
3804:18, 3804:19,
3805:22, 3805:24,
3807:10, 3810:6,
3811:23, 3812:1,
3814:8, 3814:9,
3814:12, 3814:14,

3817:7, 3817:12,
3823:3, 3823:4,
3823:6, 3823:12,
3825:11, 3825:13,
3825:16, 3825:17,
3828:18, 3828:20,
3829:9, 3834:5,
3834:10, 3836:3,
3836:5, 3836:11,
3836:12, 3841:13,
3841:16, 3843:22,
3844:1, 3848:11,
3848:12, 3848:21,
3848:25, 3851:17,
3854:17, 3854:21,
3855:7, 3855:12,
3856:1, 3856:11,
3856:14, 3856:15,
3857:11, 3857:12,
3857:17, 3857:18,
3858:5, 3858:9,
3858:15, 3858:17,
3859:3, 3859:5,
3859:10, 3859:16,
3859:19, 3860:7,
3860:9, 3860:12,
3860:15, 3861:3,
3861:10, 3861:13,
3862:15, 3865:14,
3865:17, 3865:20,
3865:25, 3866:1,
3868:5, 3868:6,
3868:22, 3868:23,
3871:10, 3872:8,
3872:10, 3875:13,
3875:17, 3879:14,
3879:16, 3879:23,
3880:5, 3880:8,
3880:15, 3880:20,
3880:23, 3880:25,
3881:6, 3881:11,
3881:14, 3881:18,
3881:25, 3882:2,
3882:4, 3882:7,
3882:13, 3882:17,
3883:3, 3883:12,
3883:20, 3883:24,
3884:6, 3884:10,
3884:14, 3884:17,
3884:24, 3885:1,
3885:8
**MULLIN** [1] - 3750:22
**Mullin** [1] - 3750:22
**must** [2] - 3784:24,
3847:1
**Mutual** [1] - 3838:9

# N

**name** [4] - 3762:11,

3762:12, 3766:17,
3874:9
**namely** [2] - 3810:25,
3849:12
**names** [1] - 3858:12
**National** [1] - 3750:23
**naturally** [1] - 3798:16
**nature** [2] - 3809:4,
3830:8
**nearly** [1] - 3831:9
**necessary** [4] -
3816:12, 3829:23,
3830:25, 3869:15
**need** [10] - 3761:7,
3762:16, 3825:21,
3825:22, 3830:5,
3842:4, 3855:25,
3865:6, 3881:15,
3882:20
**needed** [2] - 3881:22,
3881:23
**needs** [1] - 3783:3
**negligent** [3] -
3810:14, 3860:17,
3860:24
**negotiations** [1] -
3882:23
**never** [3] - 3787:8,
3844:20, 3861:9
**New** [2] - 3779:7,
3844:13
**new** [5] - 3779:25,
3787:8, 3802:13,
3871:15, 3875:14
**next** [6] - 3765:12,
3791:2, 3793:16,
3802:21, 3848:21,
3854:22
**NICOLAS** [1] -
3751:10
**nightclub** [1] -
3759:19
**nightclub-type** [1] -
3759:19
**non** [2] - 3757:20,
3861:17
**non-A** [1] - 3757:20
**non-fraud** [1] -
3861:17
**none** [11] - 3782:18,
3784:13, 3786:22,
3787:7, 3787:18,
3790:3, 3800:4,
3871:21, 3871:22,
3871:23
**nonfraud** [9] -
3768:15, 3774:24,
3782:1, 3807:7,
3808:9, 3813:13,
3832:11, 3833:6,

# O

3867:17
**nonfraudulent** [2] -
3798:25, 3868:24
**nonperformance** [1] -
3869:17
**normal** [3] - 3813:22,
3815:12, 3830:1
**NORTHERN** [1] -
3750:2
**note** [1] - 3880:15
**notes** [1] - 3857:6
**nothing** [18] -
3760:16, 3760:18,
3774:3, 3777:20,
3779:10, 3779:25,
3782:19, 3788:1,
3797:23, 3798:24,
3799:9, 3805:22,
3812:6, 3852:14,
3856:7, 3863:23,
3878:9, 3879:15
**notice** [2] - 3780:20,
3817:6
**nuanced** [1] - 3824:13
**number** [44] - 3759:7,
3759:12, 3759:16,
3760:6, 3764:3,
3767:21, 3781:17,
3784:25, 3789:15,
3790:13, 3790:24,
3791:1, 3791:2,
3791:7, 3791:11,
3792:21, 3792:24,
3793:1, 3793:24,
3795:1, 3795:20,
3795:21, 3796:11,
3796:12, 3796:14,
3800:18, 3800:20,
3801:7, 3801:8,
3802:18, 3805:11,
3805:20, 3807:3,
3807:6, 3814:4,
3819:13, 3820:17,
3826:22, 3829:24,
3836:24, 3855:7,
3870:19, 3877:13,
3877:14
**numbers** [10] -
3770:15, 3772:6,
3795:13, 3812:5,
3820:11, 3820:12,
3827:20, 3858:19,
3859:9, 3885:6
**nutshell** [2] - 3858:18,
3858:23
**NW** [2] - 3751:16,
3751:22

**O'HALLORAN** [1] -
3750:4
**oath** [1] - 3830:16
**object** [9] - 3775:6,
3777:18, 3787:5,
3823:6, 3834:5,
3834:8, 3854:17,
3856:1, 3858:5
**objected** [2] - 3778:5,
3875:13
**objecting** [2] -
3870:19, 3870:21
**objection** [11] -
3756:11, 3777:24,
3778:13, 3780:8,
3781:13, 3781:24,
3801:5, 3801:8,
3802:7, 3859:18,
3860:9
**objections** [1] -
3780:3
**obligation** [2] -
3778:2, 3861:24
**obligations** [3] -
3780:15, 3782:11,
3782:22
**observation** [2] -
3851:10, 3852:3
**observations** [1] -
3852:4
**obviously** [10] -
3764:21, 3781:16,
3792:6, 3823:16,
3826:22, 3828:9,
3842:25, 3849:12,
3859:11, 3880:16
**Ocala** [1] - 3842:11
**occur** [1] - 3871:23
**occurred** [11] -
3761:19, 3773:23,
3773:24, 3774:9,
3774:23, 3774:24,
3793:8, 3811:7,
3819:12, 3823:20,
3860:20
**occurring** [1] -
3819:11
**occurs** [1] - 3799:1
**October** [1] - 3775:9
**OF** [2] - 3750:1,
3750:14
**offer** [3] - 3807:14,
3825:19, 3833:3
**offered** [2] - 3844:17,
3845:12
**offering** [4] - 3769:20,
3800:19, 3807:24,

3819:21
**office** [1] - 3765:17
**Official** [1] - 3886:3
**offline** [2] - 3811:6,
3859:21
**often** [5] - 3766:24,
3817:7, 3840:6,
3849:25, 3856:17
**oftentimes** [2] -
3830:10, 3830:14
**Oklahoma** [1] -
3844:21
**old** [2] - 3875:2
**once** [4] - 3811:10,
3817:9, 3874:24,
3885:9
**one** [87] - 3756:23,
3758:10, 3759:7,
3760:2, 3763:6,
3763:8, 3763:9,
3764:4, 3764:21,
3765:22, 3771:12,
3771:18, 3773:21,
3774:22, 3776:18,
3777:14, 3778:17,
3778:24, 3781:8,
3781:20, 3783:8,
3783:18, 3785:4,
3785:7, 3785:17,
3786:13, 3790:5,
3790:6, 3791:17,
3793:2, 3799:8,
3801:1, 3803:17,
3804:15, 3806:14,
3808:2, 3808:8,
3809:7, 3809:8,
3810:23, 3810:24,
3811:9, 3813:12,
3813:18, 3817:18,
3818:22, 3819:2,
3819:3, 3823:1,
3823:11, 3826:11,
3828:7, 3828:12,
3830:15, 3834:15,
3836:18, 3838:2,
3838:13, 3839:20,
3842:18, 3845:1,
3847:16, 3847:17,
3849:6, 3849:7,
3850:25, 3852:4,
3852:9, 3854:18,
3855:24, 3857:15,
3859:20, 3863:2,
3864:2, 3867:16,
3868:13, 3869:4,
3869:5, 3870:14,
3874:8, 3877:12,
3879:14, 3882:22,
3883:15, 3884:1,
3884:20

**one-page** [1] - 3764:4
**ones** [12] - 3758:13,
3758:14, 3763:15,
3789:25, 3796:2,
3796:3, 3806:11,
3810:25, 3811:1,
3814:1, 3850:24
**opening** [7] - 3763:5,
3769:16, 3775:16,
3779:10, 3785:3,
3805:13, 3814:12
**opine** [1] - 3776:23
**opined** [1] - 3825:8
**opining** [1] - 3780:23
**opinion** [98] -
3760:11, 3763:11,
3763:13, 3763:15,
3769:19, 3769:21,
3769:25, 3773:17,
3775:2, 3775:4,
3775:7, 3775:8,
3775:10, 3775:17,
3775:21, 3775:24,
3776:4, 3776:7,
3776:12, 3777:19,
3778:1, 3779:19,
3779:21, 3780:2,
3781:19, 3781:22,
3781:25, 3782:5,
3787:8, 3793:3,
3793:11, 3797:21,
3800:3, 3801:9,
3802:1, 3802:5,
3802:9, 3802:13,
3804:23, 3807:13,
3807:24, 3810:12,
3812:23, 3813:3,
3813:15, 3819:21,
3820:7, 3823:1,
3824:12, 3824:16,
3825:19, 3828:2,
3828:9, 3831:1,
3831:15, 3832:11,
3833:17, 3834:2,
3834:13, 3835:13,
3835:16, 3835:19,
3836:7, 3836:8,
3837:17, 3838:13,
3838:15, 3838:24,
3843:1, 3844:17,
3844:20, 3844:23,
3845:4, 3845:12,
3845:13, 3846:8,
3847:16, 3848:4,
3850:4, 3851:3,
3858:4, 3858:10,
3860:8, 3866:23,
3866:25, 3867:6,
3867:8, 3869:21,
3873:10, 3875:8,

3875:12, 3875:15,
3877:9
**opinions** [6] -
3762:24, 3768:21,
3780:24, 3782:4,
3830:4, 3872:22
**opportunity** [3] -
3787:9, 3862:1,
3862:8
**opposed** [2] - 3809:4,
3840:19
**optimism** [2] - 3880:3,
3881:4
**optimist** [2] - 3761:19,
3880:5
**optimistic** [2] -
3880:9, 3881:19
**orange** [22] - 3771:11,
3772:4, 3772:14,
3772:23, 3774:4,
3789:11, 3790:12,
3790:15, 3790:16,
3790:22, 3790:25,
3791:4, 3795:25,
3796:15, 3796:16,
3796:17, 3810:25,
3812:17, 3816:22,
3846:17, 3867:19,
3871:22
**order** [6] - 3769:7,
3808:18, 3809:7,
3831:1, 3854:20,
3879:2
**ordinary** [2] - 3755:1,
3774:24
**originally** [7] - 3774:5,
3776:4, 3789:23,
3790:1, 3792:3,
3796:1, 3848:14
**originated** [5] -
3772:19, 3796:25,
3821:2, 3824:19,
3852:1
**originates** [1] -
3797:15
**origination** [4] -
3852:21, 3852:23,
3853:4, 3853:9
**originators** [6] -
3779:7, 3779:19,
3782:14, 3782:16,
3813:21, 3815:7
**otherwise** [4] -
3803:21, 3834:23,
3838:4, 3864:23
**outside** [13] - 3772:20,
3777:18, 3778:6,
3787:2, 3789:20,
3791:15, 3792:3,
3796:3, 3796:25,

3798:17, 3824:19, 3848:14, 3852:1
**overdraft** [1] - 3840:21
**overlap** [1] - 3826:21
**Overline** [5] - 3818:16, 3818:24, 3847:2, 3849:5, 3877:24
**overnight** [1] - 3865:9
**overriding** [1] - 3853:24
**overrule** [1] - 3778:13
**overruled** [4] - 3756:16, 3834:9, 3856:13, 3858:8
**oversaw** [1] - 3766:8
**overstated** [2] - 3763:14, 3769:22
**owed** [1] - 3818:14
**own** [3] - 3786:16, 3786:17, 3801:20
**owned** [3] - 3820:23, 3823:25, 3834:23
**ownership** [1] - 3806:24

## P

**p.m** [4] - 3750:6, 3817:11, 3885:13
**P1907** [2] - 3836:2, 3874:6
**P2094** [1] - 3840:12
**P2100** [1] - 3841:19
**P2869** [2] - 3823:3, 3872:11
**P2879** [2] - 3833:15, 3873:20
**P2946** [1] - 3868:5
**page** [37] - 3753:15, 3754:3, 3754:13, 3756:1, 3756:2, 3756:19, 3756:22, 3756:24, 3760:9, 3763:24, 3764:4, 3781:16, 3781:21, 3789:14, 3790:18, 3820:21, 3823:5, 3823:22, 3828:21, 3834:16, 3836:3, 3841:21, 3842:7, 3842:9, 3848:2, 3848:9, 3848:21, 3849:3, 3850:12, 3854:3, 3854:13, 3854:23, 3857:16, 3857:17, 3858:12
**PAGE** [1] - 3752:3
**pages** [6] - 3764:3, 3868:12, 3874:19,

3879:3, 3879:4, 3886:4
**paid** [10] - 3794:14, 3816:14, 3818:13, 3818:18, 3818:23, 3824:1, 3827:5, 3834:12, 3859:14, 3859:24
**paid-in-full** [2] - 3818:23, 3824:1
**pain** [1] - 3820:24
**pain-in-full** [1] - 3820:24
**Palenchar** [1] - 3751:11
**pals** [1] - 3881:6
**paper** [7] - 3754:5, 3754:9, 3754:11, 3755:18, 3757:20, 3841:3
**papers** [3] - 3764:22, 3766:2, 3767:6
**paragraph** [10] - 3823:5, 3823:19, 3823:20, 3834:21, 3835:1, 3848:9, 3848:11, 3858:14, 3858:18, 3862:13
**paragraphs** [6] - 3777:20, 3777:25, 3779:20, 3781:20, 3781:21, 3834:16
**parameter** [1] - 3849:17
**parameters** [2] - 3806:6, 3809:6
**pardon** [1] - 3825:13
**Paris** [1] - 3883:5
**parse** [2] - 3838:18, 3847:10
**parsed** [2] - 3833:6, 3846:15
**part** [21] - 3753:20, 3755:2, 3776:25, 3786:23, 3796:19, 3798:5, 3807:25, 3818:8, 3818:15, 3822:13, 3835:18, 3835:25, 3838:7, 3838:17, 3838:25, 3839:23, 3846:8, 3853:10, 3863:11, 3864:8
**particular** [7] - 3789:15, 3789:18, 3794:12, 3813:10, 3814:23, 3826:11, 3832:3
**party** [1] - 3856:19
**past** [3] - 3765:3,

3865:9, 3865:11
**PAUL** [1] - 3751:15
**pause** [1] - 3855:20
**pay** [3] - 3814:24, 3836:19, 3836:20
**payments** [5] - 3771:15, 3771:23, 3783:25, 3794:10, 3794:11
**PDF** [2] - 3842:8, 3854:13
**Peace** [1] - 3883:5
**pejorative** [3] - 3770:5, 3838:5, 3838:22
**Pennsylvania** [1] - 3751:16
**people** [12] - 3781:2, 3829:3, 3829:19, 3830:21, 3839:10, 3878:2, 3878:5, 3882:9, 3883:7, 3883:8, 3884:24
**people's** [1] - 3830:16
**per** [3] - 3854:6, 3857:20, 3877:2
**percent** [9] - 3801:7, 3801:18, 3801:21, 3801:24, 3802:10, 3827:23, 3868:10, 3877:18, 3878:22
**percentage** [3] - 3803:12, 3803:13, 3877:16
**perfection** [1] - 3755:21
**perfectly** [2] - 3804:16, 3835:14
**performance** [2] - 3867:2, 3869:18
**performed** [1] - 3867:14
**performing** [1] - 3755:19
**perhaps** [3] - 3830:23, 3862:3
**period** [9] - 3766:15, 3766:18, 3771:23, 3779:3, 3784:24, 3785:8, 3792:12, 3815:18, 3867:14
**periodically** [1] - 3765:5
**person** [2] - 3840:9, 3857:24, 3875:4
**person's** [1] - 3838:13
**personal** [1] - 3759:8
**personally** [4] - 3766:7, 3819:14, 3826:8, 3850:12

**perspective** [1] - 3849:17
**persuade** [1] - 3838:12
**pertain** [1] - 3826:15
**pertained** [1] - 3766:1
**pertains** [1] - 3848:23
**Ph.D** [1] - 3763:21
**phase** [2] - 3769:3, 3769:6
**PHILIP** [1] - 3751:8
**philip.beck@bartlit** [1] - 3751:13
**philip.beck@bartlit-beck.com** [1] - 3751:13
**phrase** [3] - 3830:22, 3836:24, 3838:4
**picture** [1] - 3865:15
**pieces** [1] - 3796:21
**Pinnacle** [2] - 3868:2, 3879:3
**Pittsburgh** [4] - 3762:14, 3764:13, 3764:17, 3764:20
**Place** [1] - 3751:11
**place** [6] - 3778:24, 3817:5, 3826:11, 3874:4, 3874:23, 3882:22
**placed** [2] - 3807:11, 3843:11
**Plaintiff** [1] - 3750:9
**plaintiff** [1] - 3808:3
**PLAINTIFFS** [2] - 3753:6, 3762:6
**Plaintiffs** [1] - 3750:5
**Plan** [11] - 3772:9, 3774:1, 3795:24, 3796:18, 3810:25, 3811:13, 3811:21, 3811:23, 3812:6, 3840:19, 3870:17
**plan** [2] - 3750:4, 3842:10
**plane** [1] - 3879:17
**player** [1] - 3863:5
**Plaza** [1] - 3750:23
**plea** [1] - 3831:10
**pleading** [1] - 3834:11
**pleadings** [3] - 3769:2, 3776:8, 3833:16
**plus** [1] - 3796:18
**pmezzina@kslaw.com** [1] - 3751:14
**PO** [1] - 3750:23
**point** [14] - 3778:25, 3790:3, 3792:5, 3810:11, 3810:21,

3818:22, 3830:3, 3840:6, 3843:4, 3855:15, 3864:5, 3873:16, 3878:10, 3882:25
**pointed** [1] - 3813:12
**points** [1] - 3790:22
**policy** [1] - 3765:25
**pool** [1] - 3755:11
**pools** [2] - 3758:22, 3835:2
**portion** [3] - 3873:23, 3873:24, 3875:9
**position** [4] - 3793:14, 3809:12, 3865:16
**positions** [1] - 3765:17
**possibility** [2] - 3761:21, 3761:24
**possible** [3] - 3768:3, 3844:5, 3862:11
**possibly** [1] - 3862:8
**post** [1] - 3827:11
**post-August** [1] - 3827:11
**postdate** [1] - 3876:19
**potential** [1] - 3790:4
**potentially** [1] - 3806:9
**power** [1] - 3753:18
**practice** [2] - 3830:1, 3837:23
**preceding** [1] - 3828:21
**precise** [7] - 3806:7, 3806:11, 3814:3, 3817:22, 3820:11, 3838:5, 3844:19
**precluding** [1] - 3825:3
**preexisting** [5] - 3791:18, 3792:1, 3792:11, 3794:15, 3803:20
**prejudgment** [1] - 3827:8
**preparation** [2] - 3836:14, 3875:10
**prepare** [1] - 3795:7
**prepared** [2] - 3884:11, 3884:25
**preparing** [3] - 3826:7, 3826:9, 3850:9
**presence** [2] - 3786:14, 3801:11
**present** [1] - 3883:13
**PRESENT** [1] - 3751:19
**presented** [6] -

3774:15, 3791:11, 3793:14, 3817:19, 3819:12, 3847:4
**president** [1] - 3845:22
**presumably** [2] - 3852:25, 3871:3
**presume** [7] - 3809:17, 3810:10, 3815:2, 3815:23, 3828:10, 3863:17, 3876:16
**pretenses** [1] - 3808:11
**pretty** [3] - 3795:12, 3798:7, 3883:22
**prevented** [1] - 3848:16
**previously** [1] - 3844:4
**price** [1] - 3845:14
**prices** [1] - 3779:6
**PRICEWATERHOUS ECOOPERS** [3] - 3750:6, 3750:10, 3751:7
**primarily** [1] - 3832:19
**principal** [1] - 3863:5
**principally** [1] - 3772:20
**pro** [2] - 3794:23, 3803:15
**probative** [4] - 3867:23, 3869:15, 3869:19, 3869:21
**problem** [10] - 3799:5, 3802:11, 3841:21, 3842:11, 3852:21, 3852:23, 3853:1, 3853:4, 3853:9, 3861:15
**problems** [2] - 3828:8, 3848:15
**proceed** [1] - 3762:4
**Proceedings** [1] - 3751:25
**proceedings** [3] - 3769:1, 3885:13, 3886:5
**process** [1] - 3821:21
**produced** [6] - 3751:25, 3768:25, 3847:13, 3847:20, 3848:1, 3848:23
**professional** [3] - 3832:16, 3833:9, 3833:12
**Professor** [8] - 3764:13, 3777:24, 3781:15, 3804:1,

3805:25, 3817:13, 3828:18, 3866:2
**professor** [3] - 3762:14, 3764:19, 3765:7
**profitability** [1] - 3867:22
**profitable** [1] - 3867:3
**program** [1] - 3765:10
**ProMerit** [3] - 3786:22, 3849:24, 3863:23
**prominent** [1] - 3766:17
**prompt** [1] - 3848:16
**proof** [5] - 3855:21, 3858:3, 3858:4, 3859:10, 3859:12
**proper** [7] - 3758:16, 3758:20, 3800:21, 3805:21, 3806:7, 3854:22, 3877:21
**properly** [5] - 3799:12, 3808:6, 3812:17, 3818:9, 3820:25
**proposals** [1] - 3766:1
**prove** [1] - 3859:8
**proven** [3] - 3775:12, 3823:8, 3856:4
**provide** [11] - 3766:24, 3769:14, 3782:14, 3795:14, 3807:1, 3809:12, 3812:5, 3813:15, 3820:6, 3843:7, 3851:8
**provided** [12] - 3772:24, 3774:11, 3784:13, 3811:16, 3819:25, 3821:15, 3824:18, 3825:2, 3832:15, 3835:17, 3850:14, 3861:19
**provides** [2] - 3769:14, 3852:22
**providing** [3] - 3764:23, 3765:23, 3765:25
**publications** [2] - 3764:9, 3767:5
**published** [1] - 3767:6
**publishing** [2] - 3764:22, 3766:2
**pull** [5] - 3754:14, 3756:1, 3756:8, 3836:4, 3850:22
**pulling** [1] - 3873:23
**purchase** [1] - 3862:18
**purchased** [1] - 3862:5
**purchasers** [1] -

3854:25
**purchasing** [1] - 3770:7
**pure** [1] - 3780:8
**purpose** [2] - 3852:19, 3869:25
**purposes** [3] - 3813:24, 3822:17, 3854:10
**pursuant** [2] - 3820:24, 3824:4
**pursue** [1] - 3883:11
**pursuing** [1] - 3883:10
**put** [43] - 3753:14, 3757:9, 3758:2, 3758:3, 3758:9, 3761:21, 3763:3, 3763:22, 3764:4, 3764:7, 3776:17, 3780:5, 3785:20, 3789:2, 3795:10, 3797:18, 3797:19, 3797:22, 3797:23, 3803:1, 3803:4, 3813:8, 3817:24, 3818:7, 3819:8, 3822:12, 3827:17, 3827:19, 3828:5, 3828:10, 3832:13, 3840:25, 3843:8, 3849:4, 3852:18, 3853:2, 3854:23, 3859:1, 3873:6, 3877:20, 3878:17
**put-back** [1] - 3877:20
**puts** [1] - 3837:25
**putting** [5] - 3761:3, 3799:10, 3852:19, 3857:25, 3885:10
**puzzling** [1] - 3847:16
**PwC** [48] - 3753:10, 3754:5, 3758:6, 3758:16, 3758:20, 3761:6, 3763:3, 3764:7, 3768:17, 3770:10, 3772:2, 3773:14, 3791:17, 3792:19, 3794:4, 3794:14, 3795:10, 3796:21, 3798:24, 3799:12, 3799:19, 3799:24, 3803:4, 3810:14, 3814:13, 3816:4, 3831:25, 3833:20, 3835:5, 3835:20, 3844:4, 3844:9, 3844:10, 3844:12, 3844:16, 3844:17, 3844:21, 3844:23, 3845:9,

3860:16, 3860:24, 3862:16, 3862:19, 3870:1, 3870:3, 3870:10, 3872:3, 3883:8
**PwC's** [13] - 3814:15, 3815:24, 3816:5, 3833:18, 3833:24, 3834:4, 3834:11, 3835:12, 3845:13, 3854:4, 3860:4, 3862:13, 3873:20

## Q

**qualification** [1] - 3813:12
**qualifications** [1] - 3821:7
**qualified** [4] - 3822:19, 3851:10, 3851:11, 3851:13
**qualify** [1] - 3820:19
**quality** [2] - 3755:18, 3757:25
**quarter** [1] - 3881:16
**questioned** [3] - 3782:3, 3787:7, 3787:11
**questioning** [2] - 3779:25, 3830:15
**questions** [19] - 3753:16, 3759:3, 3788:7, 3808:23, 3809:4, 3809:10, 3823:10, 3855:15, 3872:8, 3872:11, 3872:21, 3873:19, 3874:14, 3875:18, 3875:19, 3877:2, 3877:19, 3879:16, 3884:20
**quickly** [2] - 3857:15, 3858:12
**quite** [4] - 3772:2, 3804:18, 3851:20, 3854:21
**quote** [13] - 3753:18, 3777:1, 3777:4, 3777:5, 3786:3, 3791:10, 3797:8, 3797:12, 3799:1, 3813:20, 3851:8, 3857:2, 3877:12
**quote-unquote** [6] - 3777:1, 3777:5, 3799:1, 3813:20, 3851:8, 3877:12

## R

**Rami** [6] - 3751:20, 3780:5, 3814:12, 3848:11, 3857:11, 3858:15
**ran** [2] - 3785:11, 3785:17
**range** [2] - 3759:14, 3760:1
**rarely** [2] - 3868:19, 3882:20
**rata** [2] - 3794:23, 3803:15
**rate** [3] - 3769:12, 3802:10
**rates** [1] - 3779:6
**rather** [2] - 3764:3, 3811:13
**rating** [1] - 3757:15
**ray** [1] - 3873:4
**re** [1] - 3865:11
**re-cross** [1] - 3865:11
**reach** [1] - 3851:6
**reached** [4] - 3775:8, 3775:10, 3829:24, 3875:15
**reaction** [5] - 3777:11, 3778:22, 3782:23, 3784:8, 3784:22
**read** [39] - 3759:13, 3760:6, 3760:9, 3760:11, 3769:1, 3769:2, 3775:20, 3781:1, 3784:13, 3809:8, 3822:25, 3829:13, 3829:16, 3830:2, 3830:20, 3831:6, 3831:16, 3835:10, 3839:15, 3840:2, 3840:4, 3840:5, 3840:6, 3843:1, 3843:15, 3845:17, 3846:15, 3846:23, 3847:1, 3850:15, 3851:11, 3854:19, 3858:21, 3858:23, 3872:22, 3874:19, 3875:8
**reading** [11] - 3753:17, 3760:14, 3810:16, 3829:25, 3837:15, 3839:10, 3839:18, 3839:19, 3840:8, 3840:9, 3873:9
**readvanced** [1] - 3853:20
**ready** [2] - 3753:2, 3884:25

**Reagan** [1] - 3882:7
**real** [7] - 3772:12, 3820:23, 3823:25, 3834:23, 3859:9, 3883:8, 3884:17
**Real** [2] - 3758:6, 3763:9
**reality** [1] - 3872:3
**realize** [1] - 3797:6, 3806:20
**really** [16] - 3761:25, 3774:3, 3783:22, 3809:12, 3822:13, 3822:17, 3847:18, 3848:2, 3859:8, 3862:24, 3862:25, 3865:6, 3865:17, 3868:17, 3882:5, 3884:15
**realm** [1] - 3820:13
**reason** [6] - 3791:24, 3798:8, 3799:3, 3814:17, 3816:8, 3834:7
**reasonable** [4] - 3806:3, 3806:17, 3812:18, 3843:16
**reasoning** [2] - 3814:2, 3814:10
**reasons** [8] - 3786:13, 3793:2, 3798:16, 3798:18, 3810:13, 3847:17, 3861:17, 3861:18
**rebuttal** [24] - 3761:1, 3762:2, 3768:24, 3778:8, 3778:11, 3784:9, 3787:14, 3787:23, 3788:1, 3807:4, 3813:24, 3820:6, 3848:3, 3848:8, 3848:13, 3851:9, 3872:25, 3873:7, 3880:13, 3880:21, 3880:23, 3881:2, 3881:3
**recap** [1] - 3804:23
**receivables** [2] - 3845:24, 3846:11
**receive** [1] - 3774:2
**received** [9] - 3771:13, 3771:22, 3772:16, 3774:6, 3774:12, 3798:13, 3827:23, 3828:4, 3842:24
**RECEIVER** [1] - 3750:8
**receiving** [3] - 3810:19, 3826:17, 3843:18

**recent** [2] - 3764:1, 3765:2
**reception** [1] - 3784:1
**recess** [2] - 3817:10, 3885:12
**Recess** [1] - 3817:11
**recognize** [1] - 3813:24
**recognized** [1] - 3867:25
**recollection** [5] - 3759:13, 3759:25, 3783:23, 3837:3, 3845:11
**record** [9] - 3762:22, 3777:24, 3779:9, 3801:6, 3801:8, 3813:3, 3816:13, 3831:22, 3886:5
**records** [12] - 3808:24, 3809:2, 3809:16, 3809:23, 3847:8, 3847:23, 3849:4, 3852:18, 3856:22, 3876:12, 3876:13, 3876:18
**recoveries** [17] - 3794:4, 3794:8, 3794:9, 3794:13, 3794:20, 3794:24, 3796:7, 3796:9, 3800:1, 3800:4, 3800:13, 3803:8, 3803:20, 3804:21, 3805:7, 3805:8, 3879:5
**recovery** [3] - 3794:11, 3795:1, 3803:10
**recreates** [1] - 3803:7
**Recross** [1] - 3752:5
**RECROSS** [1] - 3759:4
**RECROSS-EXAMINATION** [1] - 3759:4
**Recross-Examination............ ............** [1] - 3752:5
**red** [7] - 3771:11, 3772:4, 3772:10, 3795:23, 3796:16, 3796:17, 3871:22
**redefine** [1] - 3780:9
**Redirect** [2] - 3752:5, 3752:7
**REDIRECT** [2] - 3753:7, 3872:9
**redo** [1] - 3856:4
**reduce** [1] - 3863:18

**reduced** [1] - 3799:20
**reduces** [2] - 3795:5, 3800:8
**reducing** [2] - 3792:10, 3800:13
**reduction** [5] - 3795:1, 3800:15, 3804:7, 3805:5, 3805:7
**reductions** [2] - 3796:5, 3800:8
**refer** [1] - 3866:7
**reference** [4] - 3785:4, 3838:13, 3842:23
**references** [1] - 3838:22
**referred** [3] - 3824:2, 3843:12, 3856:17
**referring** [3] - 3837:7, 3842:22, 3852:24
**refers** [3] - 3755:15, 3770:6, 3771:9
**refined** [1] - 3783:13
**reflect** [5] - 3757:18, 3774:15, 3797:2, 3805:7, 3870:15
**reflected** [2] - 3755:24, 3805:4
**refresh** [2] - 3828:17, 3844:19
**refreshing** [1] - 3755:10
**regulatory** [1] - 3862:10
**reject** [2] - 3814:21, 3815:25
**rejected** [8] - 3814:18, 3814:25, 3816:9, 3836:19, 3837:8, 3837:12, 3837:24, 3841:6
**rejecting** [2] - 3816:12, 3838:9
**relate** [4] - 3775:3, 3775:24, 3793:19, 3877:9
**related** [8] - 3766:2, 3785:1, 3785:6, 3798:16, 3801:7, 3862:10, 3867:20, 3874:12
**relates** [1] - 3876:22
**relation** [2] - 3782:6, 3877:20
**relations** [1] - 3867:23
**relationship** [8] - 3793:21, 3863:3, 3866:11, 3866:13, 3866:17, 3871:1, 3871:24, 3876:6
**relative** [1] - 3832:10

**relevant** [6] - 3776:1, 3781:18, 3790:5, 3810:13, 3866:23, 3866:24
**reliability** [1] - 3847:22
**reliable** [7] - 3819:25, 3824:18, 3831:1, 3835:17, 3845:2, 3876:17, 3876:21
**relied** [1] - 3850:15
**relies** [1] - 3853:11
**reluctant** [1] - 3798:6
**rely** [8] - 3780:24, 3781:3, 3824:11, 3824:22, 3830:17, 3831:19, 3838:6, 3840:11
**remained** [1] - 3876:9
**remaining** [1] - 3801:24
**remains** [1] - 3755:5
**remember** [10] - 3753:12, 3753:22, 3753:24, 3759:12, 3759:23, 3779:5, 3858:12, 3872:11, 3879:3
**removal** [1] - 3781:19
**remove** [1] - 3804:25
**removed** [2] - 3800:1, 3820:16
**removing** [2] - 3813:13, 3825:8
**repaid** [1] - 3815:22
**repeat** [5] - 3778:16, 3818:17, 3832:1, 3866:14, 3876:20
**repeating** [1] - 3825:1
**report** [72] - 3755:9, 3759:21, 3764:2, 3768:24, 3775:14, 3777:19, 3777:25, 3778:5, 3778:6, 3778:8, 3778:9, 3778:11, 3779:10, 3780:5, 3780:12, 3780:17, 3780:18, 3780:19, 3780:23, 3781:16, 3781:17, 3781:23, 3782:7, 3784:9, 3785:2, 3785:3, 3785:11, 3785:17, 3785:25, 3787:13, 3787:14, 3787:15, 3787:16, 3787:19, 3787:23, 3788:1, 3788:10, 3788:11, 3789:3, 3789:4, 3801:3,

3801:10, 3802:6, 3802:12, 3813:13, 3826:8, 3826:9, 3827:1, 3829:18, 3830:4, 3834:6, 3840:5, 3848:3, 3848:5, 3848:8, 3848:13, 3850:15, 3851:2, 3867:16, 3867:25, 3872:22, 3873:1, 3873:7, 3876:4, 3876:22, 3877:6, 3877:17
**reported** [3] - 3751:25, 3754:18, 3755:3
**reporter** [1] - 3880:1
**Reporter** [2] - 3751:21, 3886:3
**reporting** [1] - 3766:20
**reports** [10] - 3783:14, 3826:12, 3826:18, 3826:23, 3827:15, 3844:25, 3847:15, 3851:6, 3877:25, 3878:2
**represent** [2] - 3858:22, 3868:11
**representation** [1] - 3868:16
**represents** [2] - 3790:19, 3796:23
**reprove** [1] - 3856:2
**repurchase** [16] - 3777:8, 3777:15, 3778:2, 3778:4, 3778:19, 3782:10, 3782:22, 3783:11, 3783:18, 3815:1, 3853:12, 3853:15, 3853:18, 3861:24, 3864:20
**repurchased** [4] - 3853:7, 3853:8, 3853:19, 3878:12
**require** [1] - 3783:17
**required** [1] - 3814:25
**requirements** [1] - 3814:19
**requiring** [2] - 3777:15, 3778:18
**research** [1] - 3764:22
**respect** [14] - 3766:23, 3767:1, 3774:10, 3775:2, 3801:9, 3802:6, 3802:9, 3810:12, 3811:1, 3867:19, 3875:24, 3878:12, 3878:24, 3879:10

**respond** [8] - 3763:2,
3778:7, 3779:16,
3780:11, 3780:16,
3806:25, 3834:7,
3844:13
**responded** [3] -
3778:8, 3780:20,
3848:8
**responding** [5] -
3806:7, 3819:17,
3824:17, 3826:12,
3835:16
**response** [6] - 3784:1,
3826:10, 3873:1,
3873:10, 3880:14,
3880:19
**responsibilities** [3] -
3764:19, 3765:19,
3765:22
**responsible** [2] -
3844:18, 3844:23
**rest** [1] - 3840:2
**restitution** [3] -
3794:10, 3794:11,
3803:10
**restrictions** [2] -
3807:11, 3862:10
**result** [4] - 3800:17,
3805:17, 3806:15,
3882:14
**results** [1] - 3796:13
**retained** [9] - 3767:23,
3767:24, 3768:17,
3826:13, 3832:25,
3833:3, 3844:2,
3844:15, 3845:8
**return** [1] - 3817:13
**revealed** [1] - 3787:6
**review** [12] - 3754:9,
3768:22, 3775:3,
3776:7, 3788:7,
3817:19, 3820:2,
3826:15, 3847:3,
3847:20, 3858:10,
3873:6
**reviewed** [9] - 3769:3,
3769:4, 3769:5,
3772:25, 3775:1,
3788:4, 3835:23,
3836:6, 3875:8
**reviewing** [5] -
3826:9, 3828:15,
3829:12, 3831:2,
3839:5
**right-hand** [2] -
3790:20, 3857:19
**rights** [1] - 3877:20
**rise** [2] - 3838:15,
3839:23
**role** [2] - 3766:22,

3838:17
**rookie** [1] - 3774:20
**Room** [1] - 3751:22
**ROTHSTEIN** [1] -
3750:15
**rough** [1] - 3767:21
**roughly** [7] - 3786:16,
3786:18, 3789:11,
3793:7, 3800:8,
3804:21, 3853:14
**row** [1] - 3791:17
**rows** [1] - 3803:9
**RPR** [1] - 3751:21
**Rules** [10] - 3847:11,
3848:24, 3849:16,
3850:2, 3850:7,
3851:24, 3852:8,
3853:10, 3876:18,
3876:21
**run** [1] - 3765:17
**running** [1] - 3765:19
**Ryan's** [1] - 3827:1

# S

**sale** [8] - 3770:9,
3786:8, 3817:16,
3817:24, 3848:16,
3876:14, 3876:19,
3876:23
**sales** [1] - 3824:1
**Samuel** [1] - 3764:12
**sarcastic** [1] - 3875:1
**save** [3] - 3803:11,
3804:7, 3860:21
**saved** [1] - 3804:18
**saw** [4] - 3837:4,
3840:13, 3845:23,
3868:2
**say-so** [1] - 3876:2
**scale** [2] - 3757:19,
3826:14
**schedule** [3] -
3850:11, 3850:20,
3879:24
**schedules** [3] -
3828:2, 3828:23,
3837:4
**Schiff** [1] - 3751:4
**Schillinger** [1] -
3751:19
**scholarly** [3] - 3767:6,
3767:11, 3767:14
**school** [4] - 3763:20,
3764:18, 3764:24,
3765:6
**scope** [7] - 3756:11,
3756:14, 3777:19,
3778:6, 3780:1,

3780:13, 3807:11
**score** [4] - 3755:19,
3756:6, 3756:19,
3757:8
**scores** [3] - 3756:14,
3757:3, 3757:6
**scoring** [1] - 3757:12
**Scott** [1] - 3751:11
**screen** [13] - 3758:3,
3761:15, 3763:4,
3763:22, 3764:7,
3785:20, 3789:2,
3795:10, 3803:4,
3823:13, 3833:17,
3873:23
**scroll** [1] - 3857:11
**scrutiny** [1] - 3863:18
**search** [1] - 3868:11
**SEC** [26] - 3765:15,
3765:17, 3765:18,
3765:20, 3766:1,
3766:3, 3766:6,
3766:9, 3768:7,
3809:15, 3821:7,
3821:10, 3821:12,
3821:21, 3821:24,
3822:9, 3822:22,
3823:7, 3824:14,
3824:23, 3825:6,
3825:9, 3833:10,
3835:20, 3839:1,
3872:12
**SEC's** [3] - 3822:25,
3824:7, 3835:5
**second** [16] - 3755:20,
3764:22, 3765:24,
3772:13, 3779:3,
3786:21, 3789:14,
3796:12, 3809:22,
3810:8, 3834:25,
3847:21, 3858:14,
3858:18, 3859:25,
3879:14
**secret** [6] - 3755:9,
3758:9, 3758:17,
3776:17, 3786:23,
3810:7
**section** [4] - 3834:16,
3855:8, 3859:4,
3859:7
**sections** [1] - 3795:22
**Securities** [4] -
3765:13, 3765:14,
3768:4, 3845:9
**securities** [12] -
3765:14, 3766:2,
3766:11, 3766:21,
3785:6, 3821:25,
3822:9, 3822:23,
3824:8, 3824:15,

3845:8, 3867:20
**Security** [2] - 3858:19,
3859:9
**see** [67] - 3754:4,
3754:7, 3754:17,
3756:10, 3756:18,
3756:24, 3758:7,
3760:12, 3762:3,
3770:11, 3770:19,
3770:25, 3771:2,
3773:21, 3775:19,
3779:21, 3782:25,
3783:14, 3789:16,
3789:17, 3789:22,
3789:24, 3790:6,
3790:7, 3790:10,
3791:1, 3791:2,
3791:17, 3792:2,
3793:17, 3794:5,
3795:18, 3795:20,
3795:21, 3796:7,
3796:14, 3799:3,
3822:14, 3823:19,
3823:20, 3824:5,
3834:19, 3835:3,
3836:16, 3840:3,
3840:6, 3841:3,
3841:8, 3842:8,
3842:16, 3842:17,
3842:23, 3846:1,
3854:15, 3855:13,
3857:8, 3857:13,
3857:19, 3864:6,
3866:21, 3872:14,
3874:11, 3874:18,
3880:6, 3883:18,
3885:12
**seeing** [2] - 3836:8,
3879:3
**seek** [1] - 3842:25
**seeking** [1] - 3836:18
**seem** [2] - 3810:2,
3850:5
**self** [1] - 3858:6
**self-serving** [1] -
3858:6
**sell** [15] - 3847:9,
3849:4, 3852:18,
3852:20, 3854:6,
3854:13, 3854:23,
3856:17, 3856:18,
3856:19, 3856:22,
3857:20, 3857:25,
3861:17, 3877:2
**selling** [1] - 3842:1
**semantic** [1] - 3808:7
**send** [6] - 3783:17,
3783:20, 3846:4,
3862:4, 3862:17,
3862:22

**sending** [4] - 3815:20,
3829:21, 3831:3,
3861:25
**sends** [2] - 3837:23,
3837:24
**sense** [11] - 3755:7,
3755:8, 3797:13,
3816:3, 3829:2,
3830:24, 3830:25,
3846:12, 3870:4,
3870:24, 3877:10
**sent** [2] - 3818:19,
3862:2
**sentence** [1] - 3835:1
**sentencing** [2] -
3767:4, 3822:17
**separate** [4] - 3799:8,
3810:4, 3811:6,
3865:4
**series** [1] - 3789:24
**serious** [3] - 3754:24,
3822:10, 3884:10
**served** [2] - 3767:10,
3767:17
**service** [1] - 3764:23
**servicer** [1] - 3876:9
**servicing** [4] -
3847:23, 3876:12,
3876:13, 3876:18
**serving** [4] - 3764:23,
3767:21, 3833:9,
3858:6
**Session** [1] - 3750:11
**set** [11] - 3758:17,
3761:7, 3776:17,
3799:14, 3809:22,
3810:4, 3810:8,
3828:13, 3848:4,
3859:21, 3859:25
**setoff** [1] - 3795:6
**setting** [4] - 3761:11,
3761:16, 3761:18,
3864:16
**settled** [1] - 3844:20
**settlement** [2] -
3882:12, 3882:23
**seven** [2] - 3825:23,
3863:7
**seven-year** [1] -
3863:7
**several** [3] - 3786:13,
3824:17, 3853:11
**shady** [1] - 3797:24
**shape** [1] - 3883:5
**ship** [3] - 3794:14,
3827:5, 3834:12
**shipped** [1] - 3836:16
**shooting** [1] - 3783:12
**short** [4] - 3775:20,
3783:2, 3783:18,

3815:8
**short-circuit** [1] -
3783:2
**short-term** [1] -
3815:8
**shorthand** [1] -
3751:25
**show** [7] - 3753:9,
3755:14, 3852:1,
3855:17, 3856:7,
3864:22, 3864:23
**showed** [3] - 3763:4,
3780:22, 3785:11
**shown** [2] - 3753:9,
3760:2
**shows** [4] - 3759:21,
3781:1, 3786:16,
3789:4
**sic** [3] - 3777:3,
3799:22, 3830:6
**side** [4] - 3803:9,
3844:8, 3844:10,
3881:13
**signature** [1] -
3753:19
**signed** [1] - 3815:9
**significant** [1] -
3757:22
**significantly** [4] -
3820:22, 3823:23,
3824:1, 3824:2
**similar** [1] - 3833:7
**simple** [2] - 3771:18,
3885:6
**simply** [9] - 3791:12,
3796:12, 3802:9,
3805:18, 3806:10,
3808:5, 3824:12,
3824:21, 3856:2
**single** [2] - 3760:9,
3785:4
**sitting** [5] - 3819:20,
3841:25, 3842:13,
3846:3, 3853:21
**situation** [1] - 3798:5
**six** [4] - 3794:9,
3829:10, 3832:25,
3840:17
**skyrocketing** [1] -
3779:6
**slide** [1] - 3805:13
**small** [3] - 3796:21,
3803:21, 3877:16
**so-called** [7] -
3772:13, 3772:19,
3786:15, 3791:14,
3794:8, 3801:20,
3854:1
**Social** [2] - 3858:19,
3859:8

**sold** [17] - 3754:20,
3754:23, 3755:1,
3755:12, 3755:20,
3772:18, 3784:19,
3812:2, 3815:10,
3817:17, 3818:7,
3820:24, 3824:3,
3834:21, 3856:22,
3876:6, 3876:10
**solid** [1] - 3820:11
**someone** [1] -
3780:11
**sometimes** [3] -
3789:16, 3789:17,
3822:16
**somewhere** [4] -
3755:24, 3792:25,
3802:4, 3856:9
**SORENSEN** [21] -
3750:19, 3753:3,
3753:8, 3754:13,
3754:15, 3756:1,
3756:3, 3756:8,
3756:9, 3756:17,
3757:7, 3757:11,
3758:2, 3758:4,
3759:3, 3760:18,
3761:1, 3880:15,
3880:20, 3880:23,
3885:1
**Sorensen** [2] -
3750:19, 3883:13
**sorry** [11] - 3785:14,
3802:3, 3823:11,
3836:4, 3850:24,
3858:15, 3876:20,
3880:20, 3883:13,
3884:16
**sort** [3] - 3822:18,
3882:14, 3884:3
**sorting** [1] - 3849:6
**sound** [1] - 3798:22
**sounds** [2] - 3843:24,
3883:4
**source** [1] - 3831:11
**sources** [1] - 3803:10
**Spalding** [1] - 3751:16
**special** [1] - 3854:14
**specialty** [1] - 3839:2
**specific** [16] -
3759:12, 3782:5,
3788:18, 3809:5,
3809:21, 3811:12,
3825:5, 3827:20,
3838:9, 3845:3,
3861:15, 3867:9,
3868:4, 3875:23
**specifically** [2] -
3759:23, 3820:15,
3874:11

**specifies** [1] - 3834:25
**speculate** [1] -
3871:15
**spend** [2] - 3770:13,
3884:9
**spent** [11] - 3765:16,
3812:25, 3826:6,
3826:8, 3826:18,
3827:2, 3827:5,
3827:8, 3827:11,
3829:10, 3832:8
**sponsored** [1] -
3770:8
**spreadsheet** [1] -
3849:3
**spreadsheets** [1] -
3857:2
**St** [1] - 3765:9
**staff** [2] - 3769:15,
3827:16
**stage** [1] - 3848:4
**stale** [1] - 3755:11
**stand** [6] - 3770:14,
3780:17, 3820:16,
3851:21, 3865:8,
3880:13
**standards** [1] -
3838:20
**start** [8] - 3776:5,
3776:14, 3790:3,
3790:5, 3791:20,
3823:21, 3840:16,
3885:10
**started** [1] - 3872:20
**starting** [1] - 3802:14
**state** [5] - 3762:11,
3784:4, 3838:22,
3874:16, 3875:4
**State** [1] - 3845:9
**statement** [5] -
3780:14, 3814:13,
3837:14, 3838:2,
3854:18
**statements** [6] -
3763:5, 3769:17,
3805:14, 3838:3,
3859:17, 3866:20
**states** [1] - 3834:21
**STATES** [2] - 3750:1,
3750:15
**statistics** [1] - 3869:7
**stay** [2] - 3762:20,
3865:9
**staying** [2] - 3865:9,
3865:11
**steal** [2] - 3812:6,
3863:8
**stealing** [42] -
3773:22, 3773:23,
3773:24, 3774:8,

3774:9, 3774:16,
3776:25, 3777:1,
3793:12, 3797:2,
3797:8, 3797:16,
3798:5, 3798:9,
3799:1, 3799:9,
3799:14, 3805:4,
3810:18, 3810:19,
3811:1, 3811:7,
3811:11, 3811:13,
3811:24, 3812:3,
3812:5, 3812:9,
3812:12, 3818:20,
3832:2, 3838:7,
3838:25, 3860:5,
3860:19, 3870:11,
3870:15, 3874:3
**stemming** [1] -
3768:12
**step** [6] - 3760:19,
3760:21, 3761:17,
3770:25, 3817:9,
3879:20
**STEPHEN** [1] -
3750:19
**steps** [3] - 3760:23,
3771:4, 3879:22
**stick** [2] - 3807:9,
3864:10
**sticking** [1] - 3859:25
**still** [9] - 3771:2,
3802:17, 3827:21,
3827:22, 3849:9,
3880:7, 3880:16,
3881:15, 3882:11
**stipulates** [1] - 3804:5
**stock** [2] - 3821:18,
3845:14
**stole** [1] - 3811:17
**stolen** [4] - 3813:8,
3863:15, 3870:18,
3870:20
**stop** [3] - 3860:10,
3861:8, 3871:11
**stops** [1] - 3871:23
**straw** [1] - 3854:24
**Street** [1] - 3751:12
**string** [1] - 3809:10
**striped** [1] - 3796:16
**strongly** [1] - 3784:23
**structure** [1] - 3871:7
**studied** [5] - 3867:2,
3867:8, 3868:17,
3869:14, 3869:22
**study** [2] - 3779:3,
3866:19
**stuff** [4] - 3755:14,
3767:1, 3796:19,
3868:19
**subcategories** [2] -

3772:1, 3772:3
**subject** [2] - 3756:14,
3838:14
**submitted** [1] - 3764:2
**subprime** [1] -
3757:20
**subsequent** [4] -
3772:21, 3792:7,
3811:9, 3836:9
**subsequently** [4] -
3777:3, 3792:4,
3796:3, 3840:5
**substantial** [1] -
3833:13
**substantially** [3] -
3756:25, 3763:13,
3769:21
**substantive** [1] -
3883:4
**subtract** [3] - 3790:14,
3791:12, 3805:18
**subtracted** [1] -
3796:13
**subtracting** [2] -
3792:20, 3799:22
**subtracts** [2] -
3771:16, 3792:17
**suddenly** [1] -
3838:24
**sued** [3] - 3833:21,
3844:12, 3844:21
**suffered** [4] - 3758:25,
3774:18, 3833:4,
3866:12
**sufficient** [1] -
3839:21
**sufficiently** [1] -
3839:21
**suggest** [2] - 3838:4,
3883:17
**suggestion** [1] -
3882:18
**Suisse** [2] - 3840:21,
3840:23
**Suite** [1] - 3751:11
**sum** [5] - 3777:19,
3777:24, 3781:19,
3789:12, 3796:6
**summarize** [2] -
3764:5, 3764:10
**summarized** [1] -
3849:2
**summary** [2] - 3764:9,
3764:11
**summed** [1] - 3794:10
**summing** [1] -
3790:21
**support** [8] - 3769:14,
3793:14, 3821:15,
3825:18, 3835:22,

3835:24, 3855:9,
3873:11
**supporting** [3] -
3781:19, 3828:1,
3828:22
**supports** [1] - 3786:1
**supposed** [6] -
3815:7, 3815:8,
3815:11, 3831:25,
3840:20, 3884:11
**survive** [1] - 3871:7
**sustain** [1] - 3859:18
**sustained** [4] -
3788:12, 3799:6,
3802:8, 3875:16
**sworn** [1] - 3761:17
**SWORN** [1] - 3762:6
**sympathy** [1] - 3884:8
**system** [1] - 3856:18

## T

**table** [2] - 3815:10,
3883:5
**takeout** [2] - 3848:16,
3862:17
**talented** [1] - 3882:21
**talks** [1] - 3883:4
**Talks** [1] - 3883:5
**tantamount** [1] -
3783:12
**task** [1] - 3768:14
**taught** [2] - 3765:3,
3765:10
**Taylor** [1] - 3833:21
**TBW** [79] - 3754:19,
3755:4, 3771:17,
3771:19, 3773:24,
3774:1, 3774:16,
3777:8, 3777:15,
3778:19, 3778:25,
3783:5, 3783:17,
3783:20, 3784:12,
3784:14, 3793:16,
3793:21, 3796:6,
3798:10, 3799:13,
3810:16, 3813:19,
3814:24, 3814:25,
3815:20, 3818:6,
3820:24, 3824:3,
3829:16, 3829:19,
3831:3, 3834:21,
3836:16, 3837:11,
3837:23, 3838:8,
3842:24, 3843:17,
3845:21, 3847:17,
3847:21, 3849:14,
3851:24, 3852:5,
3852:11, 3852:14,

3852:18, 3852:24,
3852:25, 3856:18,
3860:4, 3860:20,
3861:25, 3862:24,
3863:3, 3863:7,
3863:15, 3864:19,
3866:13, 3868:11,
3868:13, 3870:25,
3871:5, 3871:12,
3871:13, 3871:23,
3873:15, 3875:20,
3876:5, 3876:9,
3876:18, 3878:18,
3878:22, 3878:25,
3879:5, 3879:7,
3879:11
**TBW's** [9] - 3814:18,
3815:4, 3847:8,
3849:4, 3852:8,
3852:12, 3856:22,
3864:16, 3869:2
**TBW-Colonial** [1] -
3870:25
**teach** [3] - 3764:25,
3765:2, 3765:5
**teaching** [3] -
3764:22, 3764:25,
3765:1
**team** [1] - 3849:8
**technically** [1] -
3844:15
**techniques** [1] -
3822:15
**tedious** [3] - 3795:12,
3795:15, 3803:3
**ten** [1] - 3768:13
**tenure** [1] - 3766:8
**Teresa** [3] - 3840:20,
3841:8, 3873:4
**term** [5] - 3770:3,
3770:6, 3815:8,
3815:14, 3838:22
**terms** [6] - 3759:16,
3798:23, 3827:16,
3839:19, 3839:20,
3884:9
**Terry** [1] - 3874:25
**test** [5] - 3777:1,
3797:3, 3799:14,
3821:5, 3850:3
**testified** [18] - 3759:7,
3760:2, 3760:13,
3778:12, 3781:8,
3784:5, 3785:16,
3787:17, 3802:19,
3826:6, 3831:10,
3841:14, 3842:18,
3844:20, 3845:22,
3847:12, 3867:1,
3870:7

**testifies** [2] - 3775:22,
3856:16
**testify** [7] - 3775:9,
3776:11, 3784:18,
3785:10, 3787:9,
3787:15, 3844:7
**testifying** [1] - 3810:2
**testimonies** [1] -
3840:4
**testimony** [55] -
3753:11, 3753:12,
3753:22, 3753:25,
3754:2, 3755:13,
3763:6, 3777:11,
3778:6, 3778:17,
3780:10, 3781:2,
3781:4, 3781:5,
3782:15, 3782:22,
3784:16, 3801:5,
3807:12, 3807:18,
3807:22, 3826:7,
3829:14, 3830:8,
3831:3, 3831:6,
3831:20, 3831:23,
3832:9, 3832:15,
3838:3, 3839:10,
3839:24, 3840:2,
3840:13, 3842:8,
3842:25, 3843:15,
3845:18, 3846:25,
3847:7, 3847:25,
3854:5, 3854:7,
3854:14, 3856:6,
3857:8, 3867:4,
3873:3, 3873:10,
3875:22, 3880:4,
3882:19, 3885:5
**TESTIMONY** [1] -
3752:3
**testing** [1] - 3847:22
**that..** [1] - 3759:15
**THE** [167] - 3750:1,
3750:3, 3750:15,
3753:2, 3753:5,
3753:6, 3756:16,
3757:6, 3760:17,
3760:19, 3760:22,
3760:24, 3761:2,
3761:5, 3761:8,
3761:11, 3761:14,
3761:25, 3762:5,
3762:6, 3762:16,
3762:18, 3762:19,
3762:20, 3770:23,
3771:2, 3775:18,
3776:3, 3776:10,
3776:13, 3777:12,
3777:21, 3778:13,
3779:12, 3779:21,
3780:4, 3780:14,

3781:5, 3781:12,
3782:9, 3782:20,
3782:24, 3783:2,
3783:20, 3783:21,
3783:22, 3783:23,
3785:14, 3787:22,
3787:25, 3788:6,
3788:9, 3788:12,
3788:21, 3788:23,
3789:9, 3789:10,
3792:24, 3793:1,
3793:4, 3793:5,
3793:25, 3794:1,
3795:16, 3795:18,
3796:17, 3797:5,
3797:13, 3797:14,
3797:17, 3797:18,
3797:20, 3797:21,
3798:1, 3798:3,
3798:6, 3799:16,
3802:3, 3802:15,
3802:21, 3802:23,
3803:11, 3803:14,
3803:23, 3804:3,
3804:9, 3804:12,
3804:17, 3806:20,
3806:23, 3807:8,
3810:1, 3811:22,
3811:25, 3814:5,
3817:5, 3817:9,
3823:10, 3823:11,
3825:10, 3825:12,
3825:14, 3829:6,
3834:9, 3841:10,
3841:11, 3841:12,
3841:15, 3843:20,
3843:24, 3848:22,
3851:15, 3855:5,
3855:10, 3855:13,
3856:5, 3856:13,
3858:8, 3859:2,
3859:7, 3859:18,
3860:10, 3860:13,
3860:16, 3860:21,
3861:4, 3862:14,
3864:21, 3865:15,
3865:19, 3865:21,
3868:18, 3868:20,
3871:4, 3871:6,
3875:16, 3879:17,
3879:18, 3879:20,
3879:21, 3879:25,
3880:6, 3880:10,
3880:12, 3880:18,
3880:22, 3880:24,
3881:4, 3881:7,
3881:9, 3881:12,
3881:15, 3881:21,
3882:1, 3882:3,
3882:5, 3882:8,
3882:16, 3882:18,

3883:11, 3883:17,
3883:21, 3884:5,
3884:7, 3884:15,
3885:3, 3885:9
**theorist** [1] - 3880:9
**therefore** [8] - 3770:1,
3770:8, 3774:14,
3786:19, 3794:25,
3800:4, 3814:4,
3870:11
**thick** [1] - 3785:3
**third** [7] - 3764:23,
3766:1, 3772:19,
3789:16, 3796:11,
3833:19, 3856:19
**thomas** [1] - 3750:19
**thorough** [6] - 3822:2,
3822:4, 3822:7,
3822:11, 3828:15,
3828:25
**thousand** [3] - 3847:8,
3856:21, 3860:23
**thousands** [1] -
3849:3
**thousands-of-page**
[1] - 3849:3
**three** [16] - 3763:20,
3764:21, 3765:21,
3768:13, 3772:1,
3772:3, 3772:9,
3777:19, 3777:25,
3779:19, 3781:21,
3795:18, 3795:22,
3833:2, 3856:11,
3877:8
**threes** [1] - 3765:21
**thrust** [1] - 3833:12
**tie** [7] - 3770:14,
3808:2, 3847:15,
3849:11, 3853:5,
3877:1
**tied** [1] - 3875:23
**timing** [1] - 3880:10
**tip** [2] - 3755:13,
3755:14
**title** [1] - 3845:21
**titled** [1] - 3763:9
**today** [8] - 3761:20,
3763:6, 3769:20,
3770:13, 3867:16,
3880:4, 3882:9,
3885:6
**together** [7] - 3764:4,
3803:1, 3828:6,
3853:5, 3881:7,
3883:8, 3885:11
**tomorrow** [5] -
3762:1, 3880:12,
3882:3, 3883:21,
3885:12

**took** [8] - 3788:8, 3798:9, 3810:19, 3815:25, 3816:2, 3832:2, 3854:24, 3874:3
**top** [5] - 3770:18, 3833:2, 3836:4, 3836:22, 3848:21
**topic** [3] - 3756:12, 3760:2, 3843:22
**topics** [2] - 3766:2, 3766:3
**total** [23] - 3759:9, 3759:24, 3765:16, 3777:19, 3777:24, 3781:19, 3781:21, 3790:11, 3790:16, 3790:24, 3791:3, 3791:9, 3794:3, 3826:19, 3827:14, 3841:21, 3842:11, 3842:13, 3842:22, 3843:6, 3877:10
**totally** [1] - 3865:4
**totals** [1] - 3773:1
**towards** [1] - 3762:17
**traced** [1] - 3857:2
**trade** [5] - 3812:5, 3817:1, 3837:2, 3859:21, 3859:23
**trades** [7] - 3755:10, 3772:11, 3816:21, 3817:2, 3840:16, 3863:18, 3864:10
**trading** [5] - 3766:12, 3766:16, 3766:23, 3766:25, 3768:8
**traffic** [1] - 3882:9
**transactions** [4] - 3811:8, 3813:20, 3815:17, 3875:23
**TRANSCRIPT** [1] - 3750:14
**transcript** [8] - 3751:25, 3753:15, 3754:3, 3775:1, 3775:24, 3854:19, 3875:9, 3886:4
**transcription** [1] - 3751:25
**transcripts** [9] - 3760:3, 3760:6, 3760:9, 3760:14, 3769:3, 3769:4, 3776:8, 3784:11, 3873:17
**transfer** [1] - 3798:24
**transferred** [5] - 3772:21, 3789:20,

3791:15, 3792:7, 3796:4
**transform** [1] - 3797:11
**treating** [1] - 3865:3
**treatment** [1] - 3797:11
**tree** [1] - 3772:7
**trial** [27] - 3753:15, 3760:3, 3760:4, 3760:10, 3760:13, 3769:2, 3769:6, 3772:3, 3775:2, 3775:3, 3775:7, 3775:8, 3775:13, 3775:24, 3780:12, 3781:2, 3782:7, 3813:24, 3831:7, 3831:9, 3842:7, 3850:9, 3854:8, 3870:10, 3883:16, 3884:18
**TRIAL** [1] - 3750:14
**troubled** [2] - 3786:7
**true** [5] - 3754:21, 3755:22, 3808:21, 3850:17, 3852:17
**trustee** [2] - 3750:4, 3833:21
**truth** [1] - 3868:19
**truthful** [1] - 3851:18
**try** [1] - 3783:10
**trying** [10] - 3775:15, 3801:11, 3819:7, 3819:19, 3849:9, 3856:2, 3856:3, 3856:5, 3856:6, 3865:7
**Tuesday** [2] - 3847:12, 3847:25
**turn** [2] - 3781:16, 3846:10
**turned** [2] - 3847:12, 3880:9
**turning** [1] - 3858:12
**twice** [1] - 3802:19
**two** [21] - 3759:6, 3759:21, 3765:12, 3768:3, 3789:12, 3793:2, 3803:16, 3804:25, 3817:18, 3819:25, 3826:20, 3827:14, 3834:16, 3836:4, 3841:24, 3850:24, 3854:4, 3854:6, 3881:1, 3881:5
**Two** [1] - 3750:23
**twofold** [1] - 3766:23
**TX** [1] - 3750:24

**type** [9] - 3754:20, 3759:19, 3764:25, 3766:11, 3811:5, 3839:5, 3840:10, 3848:16, 3849:25
**typically** [4] - 3822:14, 3830:17, 3831:19, 3840:10
**typo** [1] - 3753:19

## U

**U.S** [4] - 3751:22, 3765:12, 3765:14, 3767:24
**UCLA** [1] - 3765:9
**unclear** [3] - 3847:13, 3848:19, 3848:23
**uncommon** [1] - 3784:24
**uncovered** [2] - 3758:21, 3877:22
**under** [12] - 3772:1, 3779:3, 3786:19, 3797:15, 3800:22, 3808:11, 3811:2, 3830:16, 3834:17, 3858:16, 3871:25, 3877:14
**underlying** [6] - 3785:23, 3787:16, 3789:5, 3850:11, 3850:13
**underneath** [1] - 3792:14
**understandings** [1] - 3832:10
**understood** [2] - 3821:24, 3861:10
**unequivocal** [1] - 3798:7
**unequivocally** [1] - 3798:8
**unfortunately** [1] - 3762:20
**unilaterally** [1] - 3863:24
**unit** [1] - 3853:3
**UNITED** [2] - 3750:1, 3750:15
**universities** [1] - 3765:7
**University** [5] - 3762:14, 3764:13, 3764:17, 3764:20, 3765:8
**university** [2] - 3764:24, 3765:6
**unless** [2] - 3762:1,

3870:14
**unprecedented** [4] - 3779:4, 3783:7, 3867:24, 3868:1
**unquote** [6] - 3777:1, 3777:5, 3799:1, 3813:20, 3851:8, 3877:12
**unrelated** [1] - 3826:23
**unusual** [1] - 3864:13
**up** [33] - 3753:14, 3756:1, 3757:9, 3758:2, 3761:7, 3761:11, 3761:16, 3761:18, 3762:17, 3763:22, 3764:7, 3770:15, 3772:4, 3773:14, 3780:5, 3781:1, 3789:2, 3789:8, 3794:10, 3799:15, 3803:4, 3815:18, 3836:4, 3836:22, 3844:13, 3850:22, 3854:5, 3854:24, 3865:10, 3872:14, 3873:23, 3878:10
**urging** [1] - 3885:3
**uses** [2] - 3771:9, 3803:15

## V

**vacation** [2] - 3884:3, 3884:12
**vaguely** [1] - 3868:9
**validate** [1] - 3828:8
**valley** [1] - 3811:10
**valuation** [3] - 3765:3, 3767:18, 3832:20
**value** [20] - 3755:5, 3774:7, 3774:13, 3783:15, 3798:14, 3799:3, 3799:6, 3812:14, 3813:8, 3816:2, 3817:17, 3817:25, 3818:7, 3818:19, 3820:22, 3823:24, 3824:2, 3834:17, 3836:19, 3869:9
**variety** [4] - 3765:2, 3768:23, 3790:4, 3847:17
**various** [4] - 3765:4, 3766:20, 3769:2, 3790:22
**vast** [1] - 3844:7

**veer** [1] - 3802:14
**Venice** [1] - 3750:20
**veracity** [3] - 3830:15, 3837:14, 3847:23
**verify** [1] - 3850:16
**versus** [4] - 3774:23, 3799:9, 3867:12, 3879:11
**view** [17] - 3786:1, 3810:12, 3812:25, 3822:6, 3824:14, 3829:23, 3835:25, 3838:17, 3839:11, 3849:24, 3852:7, 3860:23, 3861:14, 3864:7, 3864:11, 3867:15, 3867:18
**violate** [1] - 3770:7
**violations** [1] - 3766:21
**virtue** [1] - 3823:25
**visited** [1] - 3765:9
**visually** [1] - 3796:24
**vitae** [3] - 3763:24, 3763:25, 3764:1
**volume** [2] - 3854:13, 3864:20
**volumes** [1] - 3760:6
**volunteered** [1] - 3830:22
**Vorwerk** [2] - 3857:25, 3858:14
**vouch** [3] - 3828:24, 3829:2, 3837:14

## W

**Wacker** [1] - 3751:4
**wait** [6] - 3777:12, 3787:22, 3802:3, 3880:18
**walk** [3] - 3770:15, 3771:6, 3789:7
**WAMU** [3] - 3836:15, 3836:20, 3845:23
**wants** [3] - 3787:20, 3851:25, 3864:2
**warehouse** [19] - 3815:8, 3815:13, 3816:11, 3819:8, 3829:22, 3832:16, 3852:19, 3853:2, 3853:13, 3853:15, 3859:25, 3866:10, 3866:12, 3867:13, 3867:23, 3869:3, 3869:18, 3878:3, 3879:7
**Warehouse** [14] -

3772:20, 3773:12, 3789:23, 3799:7, 3818:8, 3818:16, 3818:24, 3837:19, 3840:25, 3847:2, 3849:5, 3856:23, 3859:1, 3877:24

**Washington** [7] - 3750:7, 3751:17, 3751:23, 3765:8, 3765:10, 3838:9, 3845:9

**watch** [3] - 3760:20, 3761:11, 3770:25

**WAYNE** [3] - 3751:21, 3886:3, 3886:8

**ways** [1] - 3775:5

**week** [1] - 3882:17

**weekend** [1] - 3883:23

**welcome** [2] - 3753:4, 3823:16

**Welsh** [3] - 3759:8, 3759:21, 3854:7

**West** [1] - 3751:12

**whatsoever** [1] - 3817:15

**wheeling** [1] - 3780:16

**wherewithal** [1] - 3864:20

**Whitaker** [1] - 3833:21

**whoa** [2] - 3860:10

**whole** [3] - 3776:8, 3804:7, 3884:19

**Whyte** [1] - 3845:5

**witness** [14] - 3760:23, 3771:4, 3773:6, 3779:18, 3780:20, 3830:2, 3833:9, 3855:2, 3855:10, 3855:14, 3865:8, 3865:11, 3865:23, 3879:22

**WITNESS** [33] - 3752:3, 3753:5, 3753:6, 3760:22, 3762:6, 3762:18, 3762:20, 3771:2, 3783:2, 3783:21, 3783:23, 3788:23, 3789:10, 3793:1, 3793:5, 3794:1, 3795:18, 3796:17, 3797:13, 3797:17, 3797:20, 3798:1, 3798:6, 3803:14, 3806:23, 3823:11, 3841:11, 3848:22, 3860:16, 3868:20, 3871:6, 3879:18, 3879:21

**witnesses** [3] - 3760:13, 3881:2, 3881:5

**word** [3] - 3784:13, 3844:25, 3866:6

**wording** [1] - 3872:6

**words** [8] - 3835:10, 3835:11, 3837:15, 3839:19, 3841:3, 3841:4, 3842:2, 3842:17

**works** [2] - 3770:14, 3770:24

**world** [17] - 3807:21, 3813:17, 3813:18, 3864:14, 3869:25, 3870:1, 3870:2, 3870:4, 3870:6, 3870:9, 3870:10, 3870:25, 3871:21, 3871:25, 3872:2

**worth** [3] - 3792:5, 3798:11, 3812:14

**worthless** [1] - 3798:11

**writing** [1] - 3826:12

**written** [1] - 3775:17

**wrongful** [3] - 3870:1, 3870:3, 3872:4

**wrote** [1] - 3848:4

## Y

**year** [1] - 3863:7

**years** [11] - 3765:1, 3765:2, 3765:16, 3767:16, 3767:22, 3768:13, 3768:20, 3825:24, 3831:18, 3880:7, 3880:9

**yellow** [2] - 3758:14, 3857:9

**yesterday** [1] - 3753:10

**York** [1] - 3844:13

**yourself** [2] - 3783:12, 3830:5