IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE COLONIAL BANCGROUP INC., and KEVIN O'HALLORAN | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) ) ) | |
| | ) | CASE NO. 2:11-cv-746-BJR |
| | ) | |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP, | ) ) ) | |
| Defendants. | ) ) | |
| | ) | |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | CASE NO. 2:12-cv-957-BJR |
| v. | ) ) | |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP | ) ) ) | |
| Defendants. | ) | |

**ORDER ON THE DAMAGES PHASE OF THE PWC BENCH TRIAL**

## I.     INTRODUCTION

The case before the Court involves a lawsuit by the Federal Deposit Insurance Corporation ("FDIC") as receiver for Colonial Bank ("Colonial"). The FDIC seeks to recover damages incurred as a result of the failure of Colonial. Colonial's failure was precipitated by a massive fraud perpetrated by Colonial's largest customer Taylor, Bean & Whitaker Mortgage Corporation ("TBW") and certain Colonial employees. The fraud began in 2002, grew and became more complex as the years progressed, until it was exposed in August 2009 and Colonial was placed into receivership with the FDIC. In 2012, the FDIC instituted this professional negligence action against Defendant PricewaterhouseCoopers LLP ("PWC"). PWC served as the independent, external auditor for Colonial's parent company, Colonial BancGroup, Inc. ("CBG") during the years that Colonial was victimized by the fraud.[1]

This Court bifurcated the liability and damages phases of the case and a bench trial on PWC's liability was held September 18 through October 13, 2017. Thereafter, on December 28, 2017, this Court issued an order (the "Liability Order") in which it sustained the FDIC's professional negligence claim against PWC, concluding that PWC was negligent in its 2003-2005 and 2008 audits of CBG and Colonial, and rejected the FDIC's remaining claims.[2,3] Dkt.

---

[1]  The FDIC also brought claims against Crowe Horwath, LLP ("Crowe") who served as CBG's internal auditor during the relevant years. The FDIC and Crowe reached a settlement and they have jointly moved to dismiss the FDIC's claims against Crowe. Dkt. No. 862.

[2]  The 2006 and 2007 audits of CBG were not tried in the bench trial because, for those audit years, the FDIC did not waive its right to a jury trial. A jury trial on the claims based on those audit years is yet to be scheduled.

[3]  CBG also instituted a lawsuit against PWC and Crowe. The lawsuit was consolidated with the FDIC's lawsuit and CBG's claims against PWC were also tried before this Court during the September 18 through October 13, 2017 bench trial. As set forth in the Liability Order, this Court determined that CBG's claims against PWC are barred by the doctrine of *in pari delicto*, the *Hinkle* Rule, and the audit interference rule. Dkt. No. 798. Thereafter, this Court granted CBG and Crowe's joint motion to dismiss CBG's claims against Crowe without prejudice and with leave to refile should this Court's determination regarding these defenses be reversed on appeal.  Dkt. No. 832.

No. 798. The Liability Order also held that PWC was not liable for Colonial's losses related to certain "shipped not paid" mortgages.[4] *Id.*

The damages portion of the case proceeded to trial before the Court from March 19 through March 23, 2018. Stephen Sorenson of Thomas, Alexander, Forrester & Sorensen LLP, David Mullin of Mullin Hoard & Brown LLP, Lawrence H. Heftman of Schiff Hardin LLP, and Grace L. Kipp of Spotswood Sansom & Sansbury LLC appeared for the FDIC; Philip S. Beck, Mark L. Levine, Christopher D. Landgraff, Christopher Hagale, Jameson R. Jones, and Nicholas Martinez of Bartlit Beck Herman Palenchar & Scott and Meredith Moss of King & Spalding appeared for PWC.

The Court heard testimony from: Kenneth Malek, the FDIC's damages expert, and Kenneth Lehn, PWC's damages expert. In addition, the parties submitted designated portions of the depositions of Wayne Beahler, Ray Bowman, Laura Bryan, Desiree Brown, Cherie Fite, Time Kviz, Teresa Kelly, Wes Kelly, Cathie Kissick, Neil Luria, Sarah Roland, and Brent Spencer.

The Court having considered the testimony of each of the witnesses, the deposition designations, the admitted trial exhibits, the arguments of counsel, the parties' proposed findings of fact and conclusions of law, the parties' supplemental briefing, and the relevant legal authority, concludes that the FDIC is entitled to $625,309,085 in damages from PWC. The reasoning for the Court's decision is set forth below.

## II.    BACKGROUND

The Court presumes familiarity with the Liability Order, which sets forth this Court's findings of fact and conclusions of law with respect to PWC's liability. Dkt. No. 798. The

---

[4]  This eliminated approximately $900 million in potential damages.

following is a brief overview of the relevant factual background. The Court will make detailed findings as to contested facts when discussing the parties' claims below.

A.     The Fraud

Colonial was one of the twenty five largest banks in the United States with over $26 billion in assets and more than 340 branches throughout Alabama, Georgia, Florida, Nevada, and Texas in 2008. The Mortgage Warehouse Lending Division ("MWLD") was a division of Colonial; it was run by Cathie Kissick, a senior vice president at Colonial. The MWLD provided short-term funding to mortgage originators. It was anticipated that the funding would be in place until the mortgages were sold to third-party investors, at which time Colonial would recoup its funds. TBW, a large-scale mortgage originator, was the MWLD's largest customer. The MWLD advanced funds to TBW under three funding facilities: (1) a traditional warehouse line of credit whereby Colonial took the underlying mortgage loans that TBW originated as collateral for its funding, (2) the COLB Facility whereby Colonial acquired, as collateral, a 99% participation interest in the underlying mortgage loans originated by TBW, and (3) the AOT Facility whereby Colonial acquired, as collateral, a 99% participation interest in pools of loans originated by TBW.

The fraud perpetrated against Colonial was centered in the MWLD; it was spearheaded by Lee Farkas, the chairman of TBW, along with the assistance of Kissick and other Colonial employees. It began in the spring of 2002 when TBW began to overdraw on its accounts at Colonial. At Farkas' urging, MWLD employees "swept" funds between TBW's accounts to prevent the overdrafts from appearing on Colonial's daily overdraft reports. In late 2003, the fraudsters moved TBW's overdraft, which was then approximately $120 million, to the COLB Facility. Under this phase of the fraud, TBW acquired COLB funding by selling Colonial

4

participation interests in mortgages that had already been sold to other investors. This had the effect of concealing TBW's overdraft by making it appear on Colonial's books that the bank owned a 99% participation interest in mortgages that had value, when, in reality, the mortgages were valueless.

Thereafter, in the summer of 2005, the fraudsters moved the fraud from the COLB Facility to the AOT Facility. At this point, the fraud had grown to nearly $600 million. During this phase of the fraud, instead of Colonial receiving participation interests in individual mortgages that had already been sold to other institutions, Colonial received participation interests in pre-certified securities-in-process that were supposed to be backed by pools of mortgages, but that in fact had no underlying mortgages backing them. There were also pools of loans that contained so-called "junk loans"—real mortgages that were in default or had other problems. By the time the fraud was discovered in August 2009 and Colonial was placed in receivership, the AOT Facility contained $1.473 billion of mortgage trades, all of which were fake or otherwise impaired.

**B.      PWC's Professional Obligations to Colonial**

As a publicly traded company, CBG was subject to disclosure laws and regulations monitored and enforced by the U.S. Securities and Exchange Commission ("SEC"), including the requirement that CBG annually file a Form 10-K with the SEC. Securities Exchange Act of 1934, as amended; 17 C.F.R. Part 210, *et seq*. The Form 10-K required a comprehensive summary of CBG's financial performance and an integrated audit of CBG's financial statement and internal controls by an independent auditor. *Id*. The Sarbanes Oxley Act of 2002 ("SOX"), imposed additional year-end disclosures and certification requirements relating to CBG's system

of internal controls. Section 404 of SOX required that CBG's independent auditor perform an audit of the operating effectiveness of CBG's internal controls.

In order to fulfill these requirements, CBG retained PWC as its independent external auditor. PWC agreed to audit CBG on a consolidated basis, which meant that the financial statements PWC audited included the financial information of Colonial, along with that of CBG. At the conclusion of each of its audits for 2003 through 2008—the years that Colonial was victimized by the fraud—PWC issued a "clean" or unqualified audit report representing, among other things, that (1) PWC had performed an audit in accordance with the relevant auditing standards; (2) CBG's year-end financial statements fairly and accurately presented in all material respects the financial position of CBG and Colonial; and (3) CBG and Colonial maintained in all material respects effective internal controls.

## C.    PWC's Negligence

As set forth in the Liability Order, this Court ruled that PWC violated its professional duties to Colonial by negligently performing its 2003-2005 and 2008 audits. Specifically, this Court determined that (1) PWC did not design its audits so as to enable it to detect fraud, and (2) PWC did not obtain sufficient competent evidence of the COLB Facility or the AOT Facility to sign the 2003-2005 and 2008 audit reports. Among other errors, this Court faulted PWC for failing to inspect a single TBW COLB loan file in 2003 or 2004, failing to follow up on illogical dates on Colonial's financial reports, failing to understand the AOT Facility (including

delegating that responsibility to a college intern), failing to physically inspect the AOT collateral, and failing to follow-up when tested sample loans failed to meet audit expectations.

### D.    The FDIC's Alleged Damages

The FDIC seeks $625,309,085 in damages that it contends were caused by PWC's negligence; PWC urges this Court to cap the FDIC's damages at $306,745,851.

#### 1.    The FDIC's Calculations

The FDIC presented its damage testimony through its expert witness, Kenneth Malek. The FDIC contends that had PWC performed a proper, negligence-free audit in 2003, the fraud would have been uncovered and Colonial's business relationship with TBW terminated. PWC issued its 2003 audit opinion on February 20, 2004, therefore Malek assumed that Colonial's relationship with TBW would have terminated five days later on February 25, 2004 (Malek gave PWC a five-day "grace period" because it had taken about five days to stop the fraud after it was discovered in 2009). Thus, Malek's task was to ascertain the losses Colonial sustained as a result of PWC's negligence between February 25, 2004 and August 14, 2009 (the date when the Alabama State Banking Department closed Colonial).

The parties agree that by the time the fraud was discovered, it was concentrated in the AOT Facility, which contained $1.473 billion in fake trades at bank close. Therefore, Malek used the $1.473 billion as the starting point for calculating Colonial's losses. From this, Malek subtracted approximately $229 million in fraud-related losses Colonial suffered before February 25, 2004. PWC does not criticize Malek's calculation of the pre-audit damages.

Next, Malek calculated the "net income" Colonial earned from its relationship with TBW between February 25, 2004 and August 14, 2009 (*e.g.*, fees and interest). He concluded that Colonial's TBW-related net income during that relevant period was approximately $365 million.

PWC also does not criticize Malek's "net-income" number. Lastly, Malek calculated the recoveries the FDIC has received since bank close to be approximately $254 million. Based on his calculations, Malek opines that the losses Colonial suffered (and borne by the FDIC) as a result of PWC's negligent 2003 audit are $625,309,085.

### 2.   PWC's Calculations

PWC's dispute with Malek's damages calculation is confined to two disagreements. First, it contends that Malek erroneously included in his damages calculation losses based on what PWC has dubbed the "blue mortgages," mortgages that PWC argues should not be deemed part of the TBW fraud and, as such, are not recoverable fraud losses. PWC claims that the losses associated with the "blue mortgages" are $300,922,884. Second, it contends that the FDIC's damages should be reduced by another $30,663,432 to reflect the value of certain "REO" mortgages that were on the AOT Facility at bank close. Thus, PWC maintains that the FDIC may recover at most $306,745,851.

### III.   STANDARD OF REVIEW

In a bench trial, the judge serves as the sole fact-finder. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law. *See Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993) (holding that "it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony"); *Prickett v. United States*, 111 F. Supp. 2d 1191, 1192 (M.D. Ala. 2000) (citing *Childrey*, 997 F.2d at 834) *aff'd*, 268 F.3d 1066 (11th Cir. 2001) ("In bench trials, the judge serves as the sole fact-finder and, thus, assumes the

role of the jury. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law.").

## IV.     DISCUSSION

It is well-settled under Alabama law that in order to recover on a tort action, "one must prove the existence of a duty, a breach of that duty, and that the breach of that duty proximately caused the injury, and damages." *Ramsey v. Avco Fin. Servs.*, 646 So. 2d 142, 143 (Ala. Civ. App. 1994) (citing *Herston v. Whitesell*, 348 So. 2d 1054 (Ala. 1977)). This Court has already determined that PWC owed a duty to Colonial and that it breached that duty when it performed its 2003 audit (as well as the 2004, 2005, and 2008 audits) in a negligent manner. *See generally* Dkt. No. 798. PWC concedes (based on this Court's liability finding) that its breach caused Colonial approximately $307 million in damages. The current dispute centers on whether the FDIC has established that it is entitled to the remaining approximately $301 million in losses Colonial suffered based on the "blue mortgages" in the AOT Facility at bank close and whether the FDIC's damages should be reduced by another approximately $30 million to reflect value the FDIC allegedly received for certain REO mortgages that were in the AOT Facility at bank close.

### A.     The Causation Standard

Under Alabama law, "a party may recover *all* of his damages *if* they flow directly and naturally from the breach and are not speculative." *Ramsey v. Avco Fin. Servs.*, 646 So. 2d 142, 143-44 (Ala. Civ. App. 1994) (emphasis added) (citing C. Gamble, Alabama Law of Damages, § 1-2 (2d ed. 1988)). However, "[i]t is axiomatic that regardless of a tortfeasor's culpability, regardless of whether he failed to exercise reasonable care in carrying out a duty imposed upon him by law, he may not be held liable unless there is a causal connection between his action and the injury for which the aggrieved party seeks compensation." *Gen. Motors Corp. v. Edwards*,

482 So. 2d 1176, 1193 (Ala. 1985) (citing *Smith v. Alabama Water Serv. Co*., 143 So. 893 (Ala. 1932)). Moreover, while necessary, a causal connection between the action and the injury is not sufficient; rather, the action must be the proximate cause of the injury. *Id*. at 1194. "Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred." *Thetford v. City of Clanton*, 605 So. 2d 835, 840 (Ala. 1992); *see also Gooden v. City of Talladega*, 966 So. 2d 232, 239 (Ala. 2007).

Foreseeability is the cornerstone of proximate cause under Alabama law. *Edwards*, 482 So. 2d at 1194. There can be no liability where "the resulting injury could not have been reasonably anticipated by the defendant." *Thetford*, 605 So. 2d at 840; *see also, Prescott v. Martin*, 331 So. 2d 240 (Ala. 1976) (quoting *Armstrong, Admr'x v. Montgomery Street Railway Co*., 26 So. 349, 354 (Ala. 1998) (a tortfeasor is legally "responsible for all consequences which a prudent and experienced man, fully acquainted with all the circumstances which in fact existed, whether they could have been ascertained by reasonable diligence or not, would, at the time of the negligence act, have thought reasonably possible to follow"). As this Court has already held, "[f]oreseeability does not require that the *particular* consequence should have been anticipated, but rather that some *general* harm or consequence could have been anticipated." Dkt. No. 73 at 5 (quoting *Theford*, 605 So. 2d at 840) (emphasis added).

### B.    Colonial's Losses Associated with the "Blue Mortgages"

#### 1.    The Parties' Positions

As stated above, it is the FDIC's position that had PWC performed a proper audit in 2003, the fraudulent relationship between Colonial and TBW would have been terminated no later than February 25, 2004, the date PWC released its 2003 audit opinion. Therefore, the FDIC argues, PWC is responsible for all losses—fraud or business related—that Colonial sustained after February 25, 2004 as a result of its ongoing business relationship with TBW.

PWC counters that this Court's liability ruling only makes it responsible for Colonial's "fraud-related losses," which PWC defines as "money that the fraudsters improperly funneled to TBW" from Colonial. Dkt. No. 850 at 1. Based on this definition, PWC admits that it is responsible for Colonial's losses related to over seventy percent of the "mortgages that were in the AOT facility when [Colonial] closed on August 14, 2009." [5] *Id*. at 2. However, PWC argues that is not responsible for Colonial's losses associated with the remaining approximately thirty percent of the mortgages in the AOT Facility at bank close. PWC refers to these remaining mortgages as the "blue mortgages." PWC claims that no money was improperly funneled from Colonial to TBW through these "blue mortgages"; rather, the "blue mortgages" represent legitimate mortgages for which Colonial received full value at the time of funding. Dkt. No. 850 at 25 (quoting Kissick Dep. (Ex. D4020) at 974:21-975:14, 1001:24-25, 1002:2, 1002:7-11 (the mortgages were "totally unrelated to anything having to do with [the part of the fraud that caused

---

[5]  PWC refers to these mortgages as the "red" and "orange" mortgages. The "red mortgages" represent losses Colonial incurred when the fraudsters caused Colonial to funnel cash to TBW in exchange for fake mortgages. PWC admits that when Colonial was closed in August 2009, approximately thirty four percent of the mortgages on the AOT Facility constituted these worthless "red mortgages." The "orange mortgages" represent losses Colonial incurred when the fraudsters caused Colonial to extend funding to TBW in exchange for mortgages that were impaired. Dkt. No. 850 at 3. PWC concedes that at bank close approximately thirty eight percent of the mortgages on the AOT Facility constituted these impaired "orange mortgages." *Id*. at 4.

Colonial to extend funds for little or no collateral]," rather the mortgages were "legitimate" mortgages for which "the market [had] dried up.")). Therefore, PWC argues, the FDIC has not established that the "blue mortgages" constitute recoverable fraud-related losses.

### 2.    The "Blue Mortgage" Losses Are Fraud-Related Losses

This Court rejects PWC's artificially narrow definition of what constitutes "fraud-related losses," and makes the following findings of fact and reaches the following conclusions of law with respect to the "blue mortgages."

Colonial's MWLD provided short-term funding to mortgage originators until such time that the loans could be sold to third-party investors. It was expected that any given mortgage would stay on Colonial's books for only a short period of time (*e.g.*, 30 to 45 days) before it was sold to an end investor and Colonial's advance paid off. If a mortgage was not paid off within a certain amount of time (*e.g.*, 90 days) it was considered "aged." Roland Dep. (D4021) at 174:20-175:3. The parties agree that the fact that a mortgage ended up aged does not necessarily mean that Colonial did anything wrong by advancing funds for that particular mortgage. *Id.* at 35:1-11 (Roland, a Colonial compliance officer, testifying that "[t]he fact that loans are aged, in and of itself, that doesn't indicate there's something fraudulent occurring."); Tr. 3563:9-12 (Malek). Mortgages became aged for any number of non-fraudulent reasons, including market conditions, document exceptions, and homeowner delinquency. Bowman Dep. (F4362) 48:18-24, 185:19-186:23. Indeed, Colonial's mortgage originator customers other than TBW had aged mortgages on Colonial's books. *See*, *e.g.*, A185 at 129-130, 163, 166, 170 & 172.

However, Colonial was not supposed to bear the risk of loss on aged mortgages. Tr. 3434:2-3435:23, 3564:2-10 (Malek). Instead, if a mortgage was not sold to a third-party investor for whatever reason, Colonial had two remedies available to it: curtailment and the right to "put-

back" impaired loans to the mortgage originator. For mortgage loans that were funded through the MWLD's Warehouse funding line, Colonial could "curtail" an aged loan. Colonial could go into the mortgage originator's account and take back a portion of the advance on the loan as a "paydown" on part of the balance due. Kissick Dep. (D4020) 911:20-912:8, Tr. 3434:2-3435:23, 3564:2-10, 3565:9-14, 3566:11-15 (Malek). For mortgages that were funded through the MWLD's COLB Facility, Colonial had a "put-back" right, which meant that Colonial could force the mortgage originator to repurchase the aged mortgage for the full amount of the loan. *See* Loan Participation Sale Agreement (A372) at ¶ 17; *see also* Beahler Dep. (D4017) 45:15-18 (testifying that "if there was some indication, especially with the COLB, if there was indication that the loan was not going to be purchased, the client could be forced to pay that loan in full at any time"); W. Kelly Dep. (P3121) at 83:9-22 (Colonial had the right to push COLB loans back on TBW); P2879 at ¶ 22.

Colonial exercised its curtailment and put-back rights with its non-TBW mortgage originator customers who had aged loans on its books. Tr. 3434:9-20, 3435:1-23, 3565:9-14, 3566:11-15, 3578:1-24 (Malek testifying that during the 2007 nationwide "mortgage crisis," Colonial reported significant earnings on the non-fraudulent "part of [the MWLD] business" because it was able to minimize its exposure by "using the right to return the mortgages" and by "curtailing the overall relationship with borrowers who ran into trouble" … "that is how a non-fraudulent mortgage warehouse lending relationship is supposed to work."). For instance, in December 2007, out of the approximately $1 billion of non-TBW COLB customers, there were four aged COLB loans worth approximately $500,000 in the MWLD. A185 at 129-130, 163, 166, 170 & 172. This represented 0.4% of the aged COLB loans in the MWLD at that time. The remaining 99.6% (approximately $165 million) of the aged COLB loans were TBW loans.

P2946; W. Kelly Dep. at 35:4-17; 37:11-38:12 (F4365); Tr. 3433:13-25 (Malek). Similarly, as of December 31, 2008, legitimate, non-TBW COLB customers had $600 million in COLB loans but less than $2 million worth of those loans were aged over 90 days. D356 at 5. Warehouse loans show the same story. Only 2% of legitimate Warehouse loans were aged as of December 31, 2008. *Id.* at 8. The difference was even starker at bank close. TBW had forty eight times more aged loans than all of the other MWLD customers combined.[6] Compare D249 at 6-7 with F4193. Colonial's legitimate mortgage originator customers faced the same market conditions as TBW, but these legitimate customers' aged loans were managed through curtailment or put-back rights. Tr. 3434:9-20, 3435:1-23, 3565:9-14, 3566:11-15, 3577:16-3578:24 (Malek).

For each of the "blue mortgages"—*i.e.*, the mortgages for which PWC claims Colonial received full value at origination—Colonial had put-back or curtailment rights. Tr. 3434:9-15, 3435:1-23 (Malek). However, when "blue mortgages" became aged, Colonial never exercised its rights with these mortgages. *Id.* Instead, the fraudsters allowed the mortgages to continue to age on the Warehouse or COLB lines until they attracted the attention of Colonial's management, and then the fraudsters moved the aged mortgages to the AOT Facility where they remained until bank close. *See e.g.*, D. Brown Dep. (F4363) 329:16-330:7.

The FDIC presented evidence, which the Court finds persuasive, that the fraud prevented Kissick from exercising Colonial's put-back rights because forcing TWB to repurchase the aged mortgages would have exposed TBW's dire financial circumstances, thereby revealing the fraud and Kissick's role in it. Tr. 3435:17-20 (Malek testifying that if "Colonial [had] put back just the $16 million of [aged] loans that existed at the date of the [2003] failed audit, the fraud would have been stopped in its tracks" because TBW did not have the money to reimburse Colonial for

---

[6]  PWC accuses the FDIC of "cherry-picking" data. See Dkt. No. 861 at 14. Yet, PWC is only able to point to data that shows non-TBW aged mortgages accounted for, at most, ten percent of Colonial's aged mortgages. *Id.*

those loans). TWB's president Ray Bowman testified that because Kissick was deeply compromised by the fraud, Kissick "had to keep [TBW] going because she had to work out the situation." Bowman Dep. (F4362) 184:16-185:8. According to Bowman, while "other lenders could just cut [TBW] off and fold the relationship," Kissick did not have that luxury. *Id*.; *see also* D. Brown Dep (F4363) 211:21-212:4 (TBW's treasurer testifying that if Kissick stopped funding the fraud TBW probably would have gone out of business); T. Kelly Dep (F4364) 81:8-83:7 (Kelly and Kissick could not say no to TBW because they were compromised by their involvement in the fraud), 175:25-176:7 (noting that Kissick "drove the train" as to why Colonial did not force TBW to repurchase aged loans on the COLB).

Indeed, because Kissick was compromised by the fraud, she was forced to accept (*i.e.*, caused Colonial to fund) loans that had been curtailed or put-back by TBW's other lenders. Bowman Dep. (F4362) 186:24-187:24 (noting that when TBW's other lenders would say "you've got to get these aged receivables off our line," TBW would turn to Colonial, the "dumping ground for aged receivables"); T. Kelly Dep (F4364) 81:16-25 ("Anytime [TBW] had aged-loan issues at other lenders that they were borrowing money from, they would dump them right back on [Colonial]."), 82:19-83:7 (Kelly and Kissick "couldn't say no" to TBW because they were "compromised by [their] involvement in the fraud"); D. Brown Dep (F4363) 313:13-314:15; P1907. Mr. Bowman explained that TBW knew it could send impaired loans to Colonial because, due to Kissick's "unique situation," she could not reject the loans. *Id*. at 184:21-23.

PWC argues that Kissick declined to exercise Colonial's put-back rights, not because doing so would have exposed the TBW fraud, but rather, because Colonial's regulators allegedly told her that she could not do so and maintain COLB sales-accounting treatment under Financial

Accounting Standard 140 ("FAS 140").[7] The Court rejects this argument for several reasons.

First, this testimony contradicts the express terms of the LPSA agreement between Colonial and TBW, which specifically grants Colonial the right to force TBW to repurchase any impaired loans. *See* Ex. A372. Moreover, the record is unclear as to when Colonial's regulators told Kissick that exercising Colonial's put-back rights would jeopardize the FAS 140 sales-accounting treatment for COLB transactions. What is clear from the record is that Colonial's regulators did not question the sales-accounting treatment until spring 2008, yet TBW had an aging problem long before that. Tr. 3435:1-20 (Malek); Dkt. No. 798 at 59. Second, in April 2008, PWC acknowledged that Colonial had put-back rights under the LPSA, but still advised Colonial that the transactions qualify for FAS 140 sales-accounting treatment. A203 at 3, 9. Yet, even with this assurance from PWC, Kissick did not begin to exercise Colonial's put-back rights. Finally, as stated above, Kissick was exercising Colonial's put-back rights for its other non-TBW COLB loans without being concerned about compromising the FAS 140 sales-accounting treatment. Tr. 3434:2-3435:23, 3577:13-3578:24, 3722:11-3724:5 (Malek). Indeed, the MWLD's procedure manual describes the process for loan repurchases from the COLB Facility. D168 at 7-8. Based on the foregoing evidence, the Court rejects PWC's claim that Kissick declined to exercise Colonial's curtailment and put-back rights because she was concerned about the FAS 140 sales accounting treatment and, instead, concludes that Kissick prohibited Colonial from exercising such rights because she knew doing so would reveal the TBW fraud.[8]

Next PWC argues that the aged "blue mortgages" could not be part of the TBW fraud because Colonial's management knew about the aged mortgages, and in at least one instance,

---

[7] It was important to Colonial to be able to account for the COLB transactions as "sales" rather than "loans" so that Colonial's financial relationship with TBW did not run afoul of the federal lending limits. *See* Dkt. No. 798 at 58.

[8] Nor does the Court give credence to PWC's claim that Kissick made a legitimate business decision to not exercise Colonial's put-back rights on the impaired mortgages. During Colonial's entire eight-year relationship with TBW, it

Hosein (CBG and Colonial's treasurer) instructed Kissick to transfer a significant number of the aged mortgages onto the AOT Facility, a fact this Court found in the Liability Order. Dkt. No. 798 at 87. However, this is a far cry from establishing that Hosein knew that he was instructing Kissick to place the aged "blue mortgages" in fake AOT trades. To the contrary, the Court finds that the evidence establishes that the fraudsters falsified accounting records and manipulated wire transfers so that Colonial's management thought the bank was able to sell the loans (and recoup its advances) as part of a legitimate AOT trade. *See* D-19 at 1 (Kissick tells Colonial's assistant treasurer "[i]t's an honest to god security"); D733 at 1 (Kissick tells Hosein "TBW will get the security issued this week"); P1689 at 434-35 (Trade Assignment Agreement allegedly from Credit Suisse First Boston LLS); Tr. 2351:4-2352:3 (Bathen); C. Kissick Dep. (D4020) 546:13-18 (Colonial management knew about the aged loans but not the fake mortgages); D. Brown Dep (F4363) 337:12-339:19, 342:2-343:3 (testifying that the fraudsters would "refresh" or "recycle" the agency pools on the AOT line (*i.e.*, take the trades out of a private-label pool and put them into a fake GSE pool) to make it look like the trades were selling); Tr. 3448:2-3449:8, 3579:8-16, 3641:7-3643:4 (Malek). What management did not know, of course, was that the fraudsters were actually moving the aged mortgages into fake AOT trades with no legitimate investor commitment, so that Colonial was stuck with the mortgages at bank close. Tr. 3569:14-25 (Malek).

Based on the forgoing findings of fact, this Court concludes that the fraud prohibited Colonial from exercising its curtailment and put-back rights making the losses on the "blue mortgages" fraud-related losses.

---

made only $365 million in net income from TBW (a number PWC does not dispute). It stretches credibility to argue that Kissick made a reasoned business decision to risk losing more than Colonial made from TBW by keeping $415 million worth of impaired mortgages (*i.e.*, the "blue mortgages") on its books to "help" TBW.

### 3.    PWC Is Liable for All Losses Colonial Suffered as a Result of Its Ongoing Relationship with TBW, including the "Blue Mortgages"

This Court has already determined that it was reasonably foreseeable that PWC's failure to uncover the fraud allowed the fraud to continue. Dkt. No. 798 at 52. This Court now holds that it was equally reasonably foreseeable that PWC's failure to uncover the fraud allowed Colonial's business relationship with TBW to continue past February 20, 2004, the date PWC issued its 2003 audit opinion. There can be no real dispute (indeed PWC does not raise one) that it was foreseeable that because PWC failed to detect the fraud, Colonial would continue to fund TBW-originated mortgages, both legitimate and fake. Therefore, the money Colonial lost because it continued to fund TBW mortgages—legitimate or fake—after February 20, 2004 are damages that were proximately caused by PWC's negligent 2003 audit. The FDIC has established that each of the "blue mortgages" was funded after February 20, 2004, thus Colonial's losses associated with those mortgages were proximately caused by PWC's negligence.

This conclusion is consistent with *Grant Thornton, LLP v. FDIC*, 535 F. Supp. 2d 676 (S.D.W. Va. 2007), *aff'd*, 435 F. App'x 188 (4th Cir. 2011), a decision this Court has found instructive throughout this litigation. In *Grant Thornton*, the defendant auditor failed to detect a fraud perpetrated against its client bank. The court, applying West Virginia law which is substantively similar to Alabama law, determined the auditor's failure to detect the fraud allowed the fraud to continue. *Id.* at 711 ("From the standpoint of a reasonably prudent auditor, it is foreseeable that the failure to discover that the Bank has lost hundreds of millions of dollars and is hopelessly insolvent will result in a continuation of those losses."). The court further concluded that because a proper audit would have resulted in the immediate closure of the bank, all of the bank's operating losses (from two days after the faulty audit was completed until the day the bank was closed by the bank's regulators) were proximately caused by the auditor's

failures. *Id*. at 711 ("Grant Thornton's negligence in failing to discover the fraud at [the bank] allowed the fraud to continue, and the losses that the FDIC seeks to recover [the post-audit net operating losses] are the foreseeable result of that ongoing fraudulent scheme.").[9] The Fourth Circuit affirmed the district court's decision, holding that it was "reasonably foreseeable to any prudent auditor that a failure to perform an audit with due care could result in the continued operation of a Bank that was in fact woefully insolvent and hemorrhaging losses," such that the auditor was liable for all post-audit net operating losses—the "natural and foreseeable losses as a result of [the bank's] continued operations." *Grant Thornton, LLP v. FDIC*, 435 F. App'x 188, 195-96 (4th Cir. 2011).[10]

Similarly, here, the FDIC is entitled to recover all reasonably foreseeable losses Colonial incurred from its ongoing fraudulent relationship with TBW. *See also, In re CBI Holding Co., Inc.*, 419 B.R. 553, 569 (S.D.N.Y. 2009) (negligent auditor was responsible not just for the losses arising from the undiscovered fraud, but for "the company's total loss of value" caused by the company's bankruptcy because if investor in company "had known of [company's] true financial condition and the fraudulent scheme [] earlier, [the investor] would have taken over [the

---

[9] The Court also finds the *Grant Thornton* court's analysis of *Askanase v. Fatjo*, 130 F.3d 657 (5th Cir. 1997) applicable here. 535 F. Supp. at 711-13. In this case, unlike in *Askanase*, there is no question that had PWC properly performed its audit, the relationship between Colonial and TBW would have discontinued. Moreover, PWC did not merely "furnish the condition" for Colonial's harm, "[i]t affirmatively acted when it issued its audit report and that opinion effectively" allowed TBW to continue to steal from Colonial. *Id*. at 712.

[10] In its opinion affirming the district court's finding of proximate cause and award of damages in *Grant Thornton*, the Fourth Circuit found "it particularly significant in this case that Grant Thornton was hired to perform the audit, not in the ordinary course, but at the insistence of federal regulators who were closely watching Keystone. And Grant Thornton was well aware that factor was the reason behind its engagement." 435 F. App'x at 195. This Court does not, however, read the Fourth Circuit's opinion as requiring that specific type of knowledge. Indeed, the Fourth Circuit went on to favorably cite *Thabault v. Chait*, 541 F.3d 512 (3d Cir. 2008), in which the Third Circuit upheld a "jury verdict of almost $120 million as proximately caused by auditors' negligent failure to discover insolvency of insurance company where the damages represented the net cost of continuing operations from the date of the audit to the date of liquidation, a period of more than nineteen months." 435 F. App'x at 196. In *Thabault*, the auditor was neither hired at the insistence of a regulator nor aware of any potential problems at the insurance company. *See* 541 F.2d at 516. In fact, similar to this case, the various regulators in *Thabault* also failed to detect the problems with the insurance company. *Id*. at 523. Moreover, as noted, the damages the FDIC seeks here are directly tied to the TBW fraud that PWC's negligence allowed to continue.

company] at a point when it was still profitable, changed the management, and focused on preserving the company's value … [the company] would not have collapsed"); *Bd. of Tr. of Cmty. Coll. Dist. No. 508, Cty. of Cook v. Coopers & Lybrand, L.L.P.*, 803 N.E.2d 460, 472 (Ill. 2003) (upholding jury verdict that because the auditor failed to detect the treasurer's violation of investment policies, the plaintiff could not take steps to correct those violations, resulting in losses on those investments—the "Board could have ended those investment practices and the later investments that ultimately resulted in the claimed losses would not have occurred"); *Stroud v. Arthur Andersen & Co.*, 37 P.3d 783, 792 (Okla. 2001) (upholding jury verdict awarding damages to client because auditor issued flawed audits and client made several business decisions to its detriment in reliance on the flawed audits); *Comeau v. Rupp*, 810 F. Supp. 1172, 1176-79 (D. Kan. 1992) (The accountant's failure to disclose the deleterious effect of prior risky loans bore a sufficient causal relationship to the ultimate injury (losses from similar risky loans purchased from the same source as the previous loans) to support a finding of proximate cause).

Thus, for the foregoing reasons, this Court concludes that the FDIC has established by a preponderance of the evidence that PWC's negligence was the proximate cause of Colonial's losses on the "blue mortgages."

### C.     The REO Mortgages

PWC's second dispute with Malek's damages calculation involves certain foreclosed Real Estate Owned ("REO") mortgages that were on Colonial's books at bank close and that eventually were sold by the TBW Bankruptcy Trustee at a bulk-sale auction for approximately $78 million. B182 at 5; D4001; Tr. 3918:14-3919:2 (Malek). PWC argues that Malek should have included a portion of these proceeds when calculating Colonial's income in determining the bank's net losses. According to PWC, "[b]ecause Mr. Malek failed to consider the value of the

REO [mortgages], the FDIC's claimed damages are overstated by more than $30 million." Dkt.
No. 861 at 23. PWC's argument challenges the overall settlement agreement between the FDIC
and the TBW Bankruptcy Trustee, which resolved many disputes over TBW's assets, including
which entity was entitled to the $78 million proceeds. *See* B182 at 5. The FDIC did not have
possession of the REO mortgages, which were held by TBW, nor the $78 million in proceeds
from the bulk sale, which went straight to the TBW Bankruptcy Estate. *See* Debtor's Emergency
Motion at ¶ 38, *In re: Taylor Bean & Whitaker Mortgage Corp.* (8/31/2009) (09-bk-07047, ECF
83); F4352, ¶ 8. The FDIC merely had a disputed claim to the REO proceeds. Ultimately, the
FDIC gave up any rights it may have had to those proceeds through its settlement with the TBW
Bankruptcy Trustee.

PWC's argument runs afoul of this Court's prior ruling that PWC is not entitled to second
guess the FDIC's settlement with another party and, instead, is limited to a credit based on the
actual terms of the settlement agreement. *See* Dkt. Nos. 665, 673. PWC previously attempted to
obtain a setoff from a settlement the FDIC's reached with Bank of America, N.A. greater than
the settlement amount actually allocated to certain damages that had been at issue in this case.[11]
This Court rejected that effort, agreeing with the FDIC that, "because Alabama is a joint-and-
several liability state wherein joint tortfeasors are each liable for the total amount of any

---

[11]  The FDIC, as receiver for several failed financial institutions in addition to Colonial, instituted fourteen lawsuits
against Bank of America, N.A. ("BOA"). *See* Dkt. No. 673 at 2. On August 21, 2014, the FDIC reached a global
settlement with BOA on the fourteen lawsuits for $1.031 billion. The settlement allotted a lump sum payment to the
FDIC without specifying how the funds would be allocated among the fourteen failed institutions, nor how they
would be allotted to the various claims in the lawsuits. The FDIC ultimately allocated $363.7 million of the lump
sum payment to certain "shipped not paid" damages that were also a subject of this lawsuit. PWC sought discovery
related to how the FDIC determined that the $363.7 million was an appropriate allocation for the "shipped not paid"
damages, arguing that it was entitled to that information because the FDIC sought to recover from PWC for the
same damages. This Court allowed PWC limited discovery to determine "what BOA *actually paid* the FDIC for the
[Shipped not Paid] losses," but further determined that under Alabama law, PWC is not entitled to question the
FDIC's decision to accept $363.7 million to settle the "shipped not paid" claim with BOA. *Id*. at 3 (emphasis in
original).

judgment . . . a non-settling defendant cannot challenge the amount of any settlement the plaintiff may reach with a co-defendant." Dkt. No. 673 at3.

Here, PWC is responsible for the full measure of damages resulting from its negligence. While PWC may benefit, through a setoff, from any recovery the FDIC actually receives through settlement with another party, PWC is not entitled to second guess the terms of that settlement and claim it should have gotten more. Regardless of how the settlement agreement could have been drafted, PWC is entitled to a credit only for the actual settlement amount for common claims. *See Campbell v. Williams*, 638 So. 2d 804, 812 (Ala. 1994) ("The relief to which the joint [tortfeasor] is entitled is a set-off of the amount of the *pro tanto* settlement against the amount of the verdict."); *Ex parte Barnett*, 978 So. 2d 729, 733 (Ala. 2007) (same).

Accordingly, it is irrelevant that the FDIC and the TBW Bankruptcy Trustee could have reached different terms. All that matters is the actual terms reached and what the FDIC actually received under those terms for claims for which PWC is liable. Under the actual terms of the TBW bankruptcy settlement, PWC is entitled to a $188 million setoff—undisputedly already applied by Malek—for the FDIC's actual recovery through its secured claim on the AOT loans. *See* Tr. 3502:9-18, 3649:15-3650:20 (Malek). PWC is not, however, entitled to any further setoff based on the value of the FDIC's disputed pre-settlement right to the AOT REO mortgages. Whatever alleged right the FDIC may have had to the REO proceeds was settled as part of a multi-factor settlement, and it would be unfair and improper to give PWC credit for the full value of that alleged right without also unwinding the other parts of the settlement, which this Court

obviously cannot do.  Thus, the Court concludes that PWC is not entitled to an additional setoff

for the FDIC's purported unsecured claim to the proceeds from the sale of the AOT REO.

> **D.      The FDIC Has Proven Its Damages to a Reasonable Certainty**

Damages can only be awarded where they are reasonably certain and not based on

speculation. This does not mean, however, that the FDIC must prove the amount of its damages

to a mathematical certainty. Rather, it need only produce evidence tending to show the extent of

damages as a matter of just and reasonable inference. *Jamison, Money, Farmer & Co. P.C. v.*

*Standeffer*, 678 So. 2d 1061, 1067 (Ala. 1996) ("The rule that one cannot recover uncertain

damages relates to the nature of the damages, and not to their extent. If the damages or loss or

harm suffered is certain, the fact that the extent is uncertain does not prevent recover."); *Indus.*

*Chem. & Fiberglass Corp. v. Chandler*, 547 So. 2d 812, 820 (Ala. 1988) (same); Restatement

(Second) of Torts § 912 cmt. a (1979) ("It is desirable . . . that there be definiteness of proof of

the amount of damage as far as is reasonably possible. It is even more desirable, however, that an

injured person not be deprived of substantial compensation merely because he cannot prove with

complete certainty the extent of harm he has suffered.").

Although a court will not permit a plaintiff to recover damages based on "speculation"

*Standeffer*, 678 So. 2d at 1067, the plaintiff need only provide some reasonable basis upon which

to estimate damages. *See Palmer v. Conn. Ry. & Lighting Co*., 311 U.S. 544, 561 (1941)

("Certainty as to the amount [of damages] goes no further than to require a basis for a reasoned

conclusion."). Indeed "[a] defendant should not be permitted to profit on the basis that

calculating damages may be theoretically challenging." *In re MyFord Touch Consumer Litig*.,

No. 13-CV-03072-EMC, 2018 WL 887534, at *27 (N.D. Cal. Feb. 14, 2018) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)).

The Court finds the damages computations presented by the FDIC through its expert, Mr. Malek, to be logical, well-supported, and well-reasoned. Malek meticulously reconstructed TBW's relationship with Colonial, accounted for the costs and income associated with that relationship, and deducted any other recoveries attributable to these same damages. In fact, Malek's precise calculations far exceed those required to establish damages with reasonable certainty in the context of a failed bank. *See*, *e.g.*, *FDIC v. First Am. Title Ins. Co*., 611 F. App'x 522, 533 (11th Cir. 2015) (noting that given "the circumstances of a failing bank" "'reasonable certainty' does not require a calculation of the book value of each loan"; damages are properly calculated by comparing the cash out on a loan with the amount recovered). Accordingly, the Court finds that Malek's calculation of damages in the amount of $625,309,085 is reasonably certain and amply supported by reliable evidence.

## V.    CONCLUSION

For the foregoing reasons, this Court concludes that the FDIC has established by a preponderance of the evidence that PWC's negligence proximately caused the FDIC's asserted damages and further concludes that the FDIC has quantified its damages to a reasonable certainty. Accordingly, the FDIC is entitled to $625,309,085 in damages from PWC.[12]

Dated this 2nd day of July, 2018

*Barbara J. Rothstein*
Barbara Jacobs Rothstein
U.S. District Court Judge

---

[12] The parties are instructed to jointly file within ten business days of the date of this order a status report as to PWC's setoff rights with respect to the $60 million settlement paid by Crowe to the FDIC.