## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| THE COLONIAL BANCGROUP, INC., and KEVIN O'HALLORAN, | |
| Plaintiff, | |
| v. | Case No. 2:11-cv-00746-BJR (LEAD CASE) |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP, | REDACTED |
| Defendants. | |
| ——————————————— | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Colonial Bank, | |
| Plaintiff, | |
| v. | Case No. 2:12-cv-00957-BJR |
| PRICEWATERHOUSECOOPERS LLP and CROWE HORWATH LLP, | |
| Defendants. | |

## PLAINTIFF FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK'S OPPOSITION TO PWC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE SHIPPED NOT PAID DAMAGES

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

PWC'S "UNDISPUTED" FACTS ARE DISPUTED .................................................... 2

ARGUMENT ...................................................................................................................... 3

I.   The FDIC-R is entitled to summary judgment because the SNP losses were foreseeable as a matter of law. ................................................................................................................. 3

II.   This Court has already held that whether BoA's conduct was an unforeseeable intervening cause is a question of fact. ................................................................................................. 7

III. PwC did not have to foresee BoA's precise conduct but rather only that some "general harm or consequence" would result from its negligence. .................................................... 8

   A.  A defendant's knowledge of a third party's propensities is relevant only where an intentional act is the potential intervening cause. ..................................................... 9

   B.  Where neither intentional nor criminal misconduct is at issue, general concepts of foreseeability apply to the question of whether a third party's conduct is an intervening cause. ................................................................................................ 10

IV. At the very least, the FDIC-R is entitled to have a jury decide whether BoA's misconduct was intentional. .................................................................................................................. 13

V.  The FAS 140 claim presents a distinct causation analysis for the SNP damages that the jury must decide. ............................................................................................................... 17

   A.  The FDIC-R's FAS 140 claim presents an independent causation analysis. .......... 17

      1.  In determining causation and foreseeability, the fact finder must consider the connection between the alleged wrongful act and the harm suffered. ............. 17

      2.  The FDIC-R's FAS 140 claim offers a distinct causation and foreseeability analysis for the SNP losses unrelated to the detection of the fraud. ................ 19

   B.  Even if PwC's causation standard is applied, there is a fact issue for the jury on whether PwC should have foreseen the risk of a borrower diverting collateral. .... 21

VI. The FDIC-R is entitled to have a jury decide whether BoA's conduct was an intervening cause as to its failure-to-find-the fraud claim. ................................................................. 24

   A.  The Court's decision to bifurcate the trial cannot foreclose the FDIC-R's right to present its failure-to-find-the fraud claim to a jury. ................................................ 24

B.   The Court made factual determinations in deciding the intervening cause question at the bench trial, on which reasonable fact finders could differ. ........................... 25

CONCLUSION ............................................................................................................................. 30

## INTRODUCTION

The "shipped-not-paid" ("SNP") losses were a reasonably foreseeable result of PwC's negligence. PwC not only failed to uncover the massive TBW fraud but also caused Colonial to grossly exceed the legal lending limit to TBW by over $2 billion. That limit exists for the very purpose of protecting banks from losses due to overexposure to a single customer. As a matter of law, every dollar of excess lending lost is damage to Colonial, and that damage occurred the moment Colonial advanced money to TBW beyond the legal lending limits. How that money was lost, and any role BoA played in the loss, are legally irrelevant. The SNP damages were foreseeable as a matter of law.

At the very least, there are many disputed questions of fact on the FAS 140 claim that a jury must decide, including whether PwC foresaw or should have foreseen the risk of loss from excess lending, the foreseeability of collateral being diverted by a fraudulent borrower (TBW) from a bailee (BoA), and whether BoA's conduct was intentional. This proximate cause analysis is different from the failure-to-find-the-fraud analysis. It is blackletter law that any proximate cause analysis must start with the misconduct at issue and what injuries are reasonably foreseeable in light of that misconduct. If the harm sustained is part of the normal, anticipated risk created by the wrong, the wrongdoer is not relieved of liability. Thus, what constitutes foreseeable damages is different when an auditor fails to detect fraud than when an auditor negligently allows grossly excessive lending to one borrower. Finally, because this Court's decision to bifurcate the trial cannot impact the FDIC-R's jury rights, the FDIC-R also is entitled to have a jury decide whether the SNP losses were a foreseeable result of PwC's negligent audit, as the Court's Liability Opinion turned on multiple disputed facts.

PwC's motion should be denied for three reasons: (1) given statutory lending limits, the SNP damages were a foreseeable result of PwC's FAS 140 negligence as a matter of law; (2) at a minimum, fact questions exist as to whether the SNP damages were a foreseeable result of PwC's FAS 140 negligence; and (3) under *Beacon Theaters*, the FDIC-R is entitled to have a jury determine if the SNP damages were a foreseeable result of PwC's failure to detect the fraud. This Court has already determined that this is a disputed factual issue for the fact finder.

## PWC'S "UNDISPUTED" FACTS ARE DISPUTED

Many of PwC's purportedly "undisputed" facts are clearly disputed, and there are numerous, other factual disputes. ECF 913 at 4-8.

**PwC's Facts Are Disputed:**

- PwC incorrectly claims that "Mr. Farkas launched a new and different fraudulent scheme." ECF 913 at 4.
  - A reasonable jury could conclude that the SNP fraud was a continuation of Farkas' fraudulent scheme to divert Colonial's money—the very risk of borrower fraud identified in PwC's workpapers. Ex. 1 (Tr. Tran.) at 847:7-18; *see also* 848:11-19, 849:7-16; Ex. 2 (Tr. Ex. A83) at 2; *see infra* at 16-17.

- PwC incorrectly claims that the SNP fraud "did not involve Ms. Kissick and the other Colonial insiders." ECF 913 at 4.
  - The Court's Liability Order made credibility determinations that are inherently factual, and a reasonable jury could decide differently. *See infra* § VI.B.

- PwC incorrectly claims that "[n]o dispute exists over any of the facts related to Bank of America's role in the Shipped Not Paid fraud." ECF 913 at 4.
  - There are many disputed facts regarding BoA's conduct. There is no conclusive evidence that BoA intentionally violated its custodial duties, which fundamentally changes the causation analysis.[1] Further, the custodial agreement permitted BoA to follow TBW's instructions on sending money for loans purchased by Freddie Mac. BoA witnesses testified that they followed TBW's written instructions to disburse funds. And BoA obviously had no incentive to knowingly breach its duties. *See infra* § IV.

---

[1] Any statements made by the FDIC-R in prior briefing are not conclusive, and a jury is free to give them little or no weight in making its decision. *See* ECF 913 at 2. As the Court noted, while a pleading "from one proceeding is indeed admissible . . . it [is] not a judicial admission and thus not binding or conclusive." ECF 798 at 44 (quoting *Enquip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981)).

- PwC incorrectly claims that "[t]here is no evidence in the extensive trial record, or produced in discovery in this case, that PwC had any reason to foresee that Bank of America" would breach its bailee obligations. ECF 913 at 8.
    - PwC's workpapers repeatedly foresaw the risk of borrower fraud, including the danger that a bank would improperly release funds under false pretenses. Ex. 1 at 847:7-18; *see also* 848:11-19, 849:7-16; Ex. 2 at 2; Ex. 4 (Tr. Ex. D326); ECF 567-14 at 37-40. That is precisely what happened when TBW induced BoA to send it the proceeds of the COLB loan sales. Additionally, the COLB loan participation sales agreement made TBW responsible for repaying Colonial for any loans that were shipped but not paid. Ex. 6 (Tr. Ex. A372). Thus, the risk of both bailee violations and loans being shipped but not paid for were contemplated in the very contract PwC had to review during the course of its audit.
    - PwC was also BoA's auditor and knew that a reputable bank like BoA was accused of various acts of misconduct, including breach of fiduciary duties and involvement in customer fraud. *See infra* n.10.

- PwC incorrectly claims that "the Shipped Not Paid fraud did not depend upon any assistance from the audit client's (Colonial Bank's) employees." ECF 913 at 8.
    - The Court's Liability Order recognized that this was a disputed issue of fact and made credibility determinations in reaching its decision. ECF 798 at 47. A reasonable jury could find that Kissick stopped the TBW loans from being recalled from BoA, despite the absence of timely payment, to conceal the fraud and allow the TBW theft through SNP to continue. Ex. 7 (Tr. Ex. P3123) at 276:23-278:10, 279:3-286:16, 282:22-284:2; Ex. 8 (Tr. Ex. A333); Ex. 9 (Tr. Ex. A340); Ex. 10 (Tr. Ex. A341); Ex. 11 (Tr. Ex. A378); Ex. 12 (Tr. Ex. D1488). Additionally, Kelly testified that Kissick knew that TBW was "playing around with the wires" from the COLB sales (*i.e*, diverting the proceeds away from where they were supposed to go). Ex. 13 (Tr. Exs. D3071 and D3073) at 187:24-190:25, 191:7-13; 472:10-16, 473:8-17. *See also infra* § VI.B.

- PwC incorrectly claims that "PwC could not have foreseen Bank of America would assist in TBW's fraud against Colonial." ECF 913 at 8.
    - A jury could find it foreseeable that a borrower could defraud a bank like BoA. Borrower fraud is the prime risk foreseen in PwC's workpapers. Ex. 1 at 847:7-18; *see also* 848:11-19, 849:7-16; Ex. 2 at 2; Ex. 4. PwC's audit manual also identifies the risk of banks failing in their custodial responsibilities and the risk of loss such failures pose. *See* Ex. 29. Thus, there is nothing unforeseeable about the risk of a deceptive borrower (TBW) deceiving other banks or the risk that a bank may fail to perform its custodial obligations. A reasonable jury could find that the risk of collateral diversion is foreseeable. *See infra* n.14.

## ARGUMENT

## I.     The FDIC-R is entitled to summary judgment because the SNP losses were foreseeable as a matter of law.

3

The statutory framework surrounding the federal lending limits makes clear that the SNP losses were, as a matter of law, a foreseeable result of PwC's failure to properly apply FAS 140. The FDIC-R, not PwC, is entitled to summary judgment.[2]

The statutory lending limits exist for the express purpose of protecting a bank from excessive loss by spreading risk over numerous borrowers. *See* 12 C.F.R. § 32.1 ("The purpose of [the lending limits] is to protect the safety and soundness of national banks and savings associations by preventing excessive loans to one person, [] and to promote diversification of loans . . . ."); *see also* OCC Interpretive Letter No. 15 (Jan. 10, 1978) reprinted in [Transfer Binder 1978-79] Fed. Banking L. Rep. (CCH) ¶ 85,090 (the statute "is intended to prevent one individual, or a relatively small group, from borrowing an unduly large amount of the bank's deposits for the use of the particular enterprises in which they are engaged"); 68 Cong. Rec. H817 (1927) (statement of Rep. McFadden, Chairman of the House Banking Committee and architect of the statute) ("[T]his is the most important section of the National Bank Act. It regulates the amount that a national bank may lend to one individual, firm, or corporation. . . . [The statute] is intended to safeguard the bank's depositors by spreading the loans among a relatively large number of persons engaged in different lines of business."). Indeed, this Court and others have recognized that the "purpose of [the lending limits] is to protect the soundness and integrity of the banking system." ECF 582 at 4; *see also Corsicana Nat'l Bank v. Johnson*, 251 U.S. 68, 83 (1919) ("The statutory limit is a special safeguard prescribed by Congress for the very purpose (among others) of preventing undue reliance upon the financial standing of borrowers.").

The lending limits exist to protect banks from any type of loss due to overextended

---

[2] In the hearing precipitating this briefing, the Court made clear that it did not want cross motions for summary judgment. Ex. 14 (Excerpts from 1.12.19 Hr'g Tr.) at 60:23. Consistent with that directive, the FDIC-R has not filed a separate brief but rather argues here that it is entitled to summary judgment on the question of whether the SNP losses were a reasonably foreseeable result of PwC's negligent application of FAS 140.

borrowers who cannot repay their loans—whether because of fraud, economic hardship, or just plain bad luck. Under 12 U.S.C. §§ 84 & 93, a bank director is personally liable for any damages sustained as a result of a knowing lending limit violation, regardless of how or why the loan ultimately goes into default. This is because lending limit damages accrue at the moment the excessive loan is <u>made</u>, *not* when the loan actually defaults. *Corsicana*, 251 U.S. at 86 ("The cause of action against a director knowingly participating in or assenting to such excessive loan would be complete at that moment. . . . Hence the entire excessive loan would have to be regarded as the basis for computing the damages of the bank."); *see also FDIC v. Stahl*, 89 F.3d 1510, 1521 n.15 (11th Cir. 1996) (noting that under *Corsicana*, lending limit violations accrue "on the date the loan was made"). Thus, lending limit violations accrue *at the time the loan is made*; how or why the bank ultimately loses money on that loan is wholly irrelevant.[3]

The same principles of accrual and foreseeability apply here. Colonial was harmed the moment it was deprived of the protections of the lending limits, *i.e.*, the moment PwC allowed Colonial to loan TBW money in excess of the limits. PwC did not have to foresee *how* those funds ultimately would be lost. Under the statutory framework, the damage occurred when the loans were *made* as a result of PwC's negligent application of FAS 140, allowing billions in illegal lending.

Courts often look to statutory obligations to determine that certain losses are foreseeable as a matter of law. In *Keeton v. Fayette County*, 558 So. 2d 884 (Ala. 1989), the county applied for and received approval to house juvenile prisoners. *Id*. at 886. As part of that approval, it agreed to provide a certain level of monitoring for all juveniles in its care. *Id.* The county failed, however,

---

[3] Indeed, the FDIC-R was unable to locate any lending limit violation cases wherein the court discussed how or why the loans went into default. Having allowed this excess and illegal lending, PwC cannot avoid the legal consequences of its failures by blaming BoA for not saving it from its own negligence.

to provide the requisite monitoring, and Keeton hanged himself after being left alone in his cell. *Id.* at 887. Although suicide is typically deemed to be an intervening cause, the Alabama Supreme Court held that because "one reason for requiring the monitoring of a juvenile offender confined to a jail cell is to make certain that the juvenile does not injure himself, [] the fact that juveniles may attempt to harm themselves when incarcerated was reasonably foreseeable as a matter of law." *Id.; Vinson v. Clarke County*, 10 F. Supp. 2d 1282, 1305 n.22 (S.D. Ala. 1998) (citing *Keeton* as "finding that a county could be liable for the suicide death of a juvenile inmate where county had voluntarily undertaken to provide cells for juvenile detainees and where the foreseeability of juvenile suicide was established as a matter of law"); *see also Patrick v. Union State Bank,* 681 So. 2d 1364, 1369 (Ala. 1996) (finding it foreseeable as a matter of law "that the person in whose name and Social Security number and upon whose identification a checking account is opened may be injured or harmed by fraud if the bank does not employ commercially reasonable means to verify that the person opening the account and to whom checks are given is not an imposter"); Am. L. Prod. Liab. 3d § 10:10 ("The concepts of duty and proximate cause are often interchangeable, and can be easily confused, when the analysis of both involves the common question of foreseeability. However, the determination under either concept of whether a risk was reasonably foreseeable as a matter of law depends, in part, on the common sense consideration of the risks created by various conditions and circumstances and, in part, on the policy consideration of whether a defendant's responsibility should extend to the results in question.").

Just as the monitoring requirements in *Keeton* existed to prevent inmates from harming themselves, the lending limits exist to prevent losses from excessive lending to a single borrower. PwC had a duty to properly apply FAS 140 but failed to do so, resulting in losses to Colonial. TBW was not able to repay the SNP loans, and under the lending limits, it never should have been

able to borrow that money. As in *Keeton*, PwC assumed a duty to properly apply FAS 140, knew the risk of allowing Colonial to use FAS 140 to bypass the lending limits, and yet allowed Colonial to grossly violate the limits with TBW, resulting in enormous losses. The fact that a statute exists to prevent precisely the damage that occurred shows that the injury is foreseeable as a matter of law. *See also, e.g., Cusenbary v. Mortensen*, 987 P.2d 351, 358 (Mont. 1999) (explaining that the state's dram-shop act, which contemplated the harm that resulted, made drunk driving a *foreseeable* intervening event as a matter of law). As a matter of law, the SNP losses were a foreseeable result of PwC's negligent FAS 140 audit.

## II.   This Court has already held that whether BoA's conduct was an unforeseeable <u>intervening cause is a question of fact</u>.

Absent summary judgment for the FDIC-R, the question of whether BoA's conduct was an unforeseeable intervening cause is a fact issue for the jury. PwC previously moved for summary judgment on this very issue, and the Court properly rejected it because it is an inherently factual issue that a jury must decide. As this Court previously held, "[t]he question of foreseeability becomes a legal question *only* when 'the facts of the cause are not conflicting, and where there can be *no* reasonable difference of opinion as to the conclusion to be reached upon them.'" ECF 677 at 19 (emphasis added); *see also* ECF 72 at 11-12 (Watkins, J.); *see also* ECF 677 at 18-19 (citing cases, including *Lemond Constr. Co. v. Wheeler*, 669 So. 2d 855, 862 (Ala. 1995) ("[I]t is well established that the question of proximate cause is almost always a question of fact to be determined by the jury, and that the question must go to the jury if reasonable inferences from the evidence support the plaintiff's evidence.")).[4] This Court has already held that "[t]his is *not* such

---

[4] Issues of foreseeability are almost always for the fact finder, except in cases of intentional or criminal conduct—neither of which is at issue here. *See Peters v. Calhoun Cty. Comm'n*, 669 So. 2d 847, 850 (Ala. 1995) ("While foreseeability in the context of an intervening cause may be decided as a matter of law, *see Gilmore*, 613 So. 2d at 1278 (holding that 'suicide and/or deliberate and intentional self-destruction is unforeseeable as a matter of

a case," *id.* (emphasis added), because a trier of fact reasonably could conclude that BoA's conduct was foreseeable, *id.*; *see also* ECF 798 ("[A] reasonable trier of fact could adopt either PWC's or [the] FDIC's framing of the issue.").

The Court's Liability Order does not change the fact that these causation/foreseeability issues are factual questions for the jury. Although the Court noted that it now "know[s] a lot" more after sitting through two trials, Ex. 14 at 62 at 4, the Court's Liability Order—which was issued *after* the Court heard all the evidence on BoA and SNP damages—reiterated that "foreseeability is a question of *fact*" and went on to reach a *factual* conclusion on foreseeability based on its review of the "relevant evidence." *See* ECF 798 at 47; *see infa* § VI.B. At a minimum, the question of foreseeability in this case has been and continues to be a question for the fact finder. *Dixon v. Bd. of Water & Sewer Comm'rs*, 865 So. 2d 1161, 1165 (Ala. 2003) ("[T]he question of proximate cause is almost always a question of fact to be determined by the jury."). The fact that the Court reached its own conclusions on the issues of foreseeability and intervening cause, in its role as fact finder at the bench trial, does not somehow convert a factual question into a legal question. The FDIC-R is entitled to present these issues to a jury.

**III.    PwC did not have to foresee BoA's precise conduct but rather only that some "general harm or consequence" would result from its negligence.**

---

law'), it is more commonly a question for the trier of fact."); *Thetford v. City of Clanton,* 605 So. 2d 835, 841 (Ala. 1992) ("Foreseeability is an issue for the jury to resolve."); *Springer v. Jefferson County,* 595 So. 2d 1381, 1384 (Ala. 1992) (jury to decide fact questions of causation and foreseeability). Indeed, PwC cites cases dealing with *intentional, criminal* acts or suicide in arguing that this Court should rule as a matter of law. *See* ECF 913 at 10-11 and n.2 (citing *Ex parte Wild Wild W. Soc. Club, Inc.*, 806 So. 2d 1235, 1240 (Ala. 2001) (assault); *Vines v. Plantation Motor Lodge*, 336 So. 2d 1338, 1340 (Ala. 1976) (theft); *Morguson v. 3M Co.*, 857 So. 2d 796, 801 (Ala. 2003) (intentional removal of safety valve); *Ala. Power Co. v. Moore*, 899 So. 2d 975, 980 (Ala. 2004) (intentional property destruction); *Gilmore v. Shell Oil Co.*, 613 So. 2d 1272, 1277-78 (Ala. 1993) (suicide)). Where intentional or criminal conduct is not at issue, issues of foreseeability are generally reserved for the finder of fact. In the other two cases PwC relies on, there was no link between the alleged misconduct and the harm; accordingly, an intervening cause existed as a matter of law. *See City of Mobile v. Havard*, 268 So. 2d 805 (Ala. 1972) (would not expect an overloaded soybean truck with defective brakes to cause a fire); *Morgan v. City of Tuscaloosa*, 108 So. 2d 342 (Ala. 1959) (would not expect negligent construction or maintenance of a storm drain to cause a pedestrian to be struck by a car). In both cases, the actual harm was clearly outside the scope of a reasonably foreseeable injury. Instead, the harms were both "extraordinary and totally unexpected." *See infra* § V.A.1.

**A. A defendant's knowledge of a third party's propensities is relevant only where an intentional act is the potential intervening cause.**

PwC repeatedly argues that "a third party's wrongful conduct is foreseeable only when the defendant was *on notice* of likely wrongdoing." *See, e.g.*, ECF 913 at 3 (emphasis added), 10. This standard, however, applies when *intentional* (generally criminal) conduct is at issue. All the cases PwC cites for this proposition deal with criminal or intentional conduct. *See* ECF 913 at 10-12 (citing *Vines*, 336 So. 2d at 1339-40 (theft); *Ex parte Wild Wild W. Soc. Club, Inc.*, 806 So. 2d at 1240-41 (assault); *Moore*, 899 So. 2d at 980 (*intentional* property destruction); *Morguson*, 857 So. 2d at 801 (*intentional* removal of safety valve)[5]; *Benson*, 631 So. 2d at 907 (assault); and Thetford, 605 So. 2d at 840-41 (murder)).[6] Alabama law is clear:

> We have held that in order to recover against a defendant for harm caused by the *criminal actions* of a third party, the plaintiff must establish that the defendant "knew or had reason to know of a probability of conduct by third persons that would endanger the plaintiff."

*Thetford*, 605 So. 2d at 840 (emphasis added); *see also Wild Wild W. Soc. Club*, 806 So. 2d at 1240 ("The act of a third person in committing an *intentional tort or crime* is a superseding cause of

---

[5] Although the court in *Morguson* referenced the unforeseeability of the multiple hospital personnel failures, 857 So. 2d at 800-01, the Alabama Supreme Court ultimately affirmed summary judgment because "the *removal of the one-way safety valve* amounted to an intervening and superseding cause that broke any causal chain between the manufacture of the perfusion system and Mr. Morguson's death." *Id.* at 801 (emphasis added). *Morguson* was a products liability case, and the surgeon's *intentional* act constituted an intervening cause because, under products liability law, the removal of a safety guard is a "substantial change that relieve[s] the seller from liability for injuries caused." *Id.* (citing cases). In any event, *Morguson* is inapplicable here because there is no evidence of *intentional*, as opposed to negligent, misconduct on the part of BoA.

[6] PwC also cites *Springer v. Jefferson County*, 595 So. 2d 1381 (Ala. 1992), arguing that the driver's negligence was foreseeable only because the county had *actual knowledge* of multiple, similar accidents on the same road. ECF 913 at 12. *Springer* does not stand for the proposition that actual notice of prior accidents is required, however; there just happened to be actual knowledge in that case. In *Holt v. Lauderdale County*, 26 So. 3d 401 (Ala. 2008), the Alabama Supreme Court cited *Springer* but held that "notice can be constructive." *Id.* at 404. Because the county had maintained the bridge in question since its construction and because "safety and construction standards . . . require the construction of guardrails at points such as the place where this accident occurred," there was "a genuine issue of material fact as to whether Lauderdale County was put on constructive notice that the approach to the bridge was not reasonably safe." *Id.* at 405. Thus, constructive notice can exist where a defendant has been charged with the care and maintenance of something, and applicable regulations require certain actions. Here, PwC was, at the very least, on constructive notice that it was charged with protecting Colonial from losses from excessive lending and borrower fraud and that both statutes and PwC's own manuals and workpapers contemplated these very losses. *Springer* makes clear this is, at a minimum, a question for the jury.

harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such tort or crime, unless the actor at the time of his negligent conduct should have *realized* the likelihood that such a situation might be created thereby and that a third person might avail himself of the opportunity to commit such a tort or crime." (emphasis added)).

The reason that *actual knowledge* is required where intentional or criminal conduct is at issue is because in those circumstances a presumption of unforeseeability exists. One generally does not have a duty to protect another from the criminal acts of a third party. *Carroll v. Shoney's, Inc.,* 775 So. 2d 753, 756 (Ala. 2000) ("[A]bsent a special relationship or special circumstances a person has no duty to protect another from criminal acts of a third person"); *see also Moore,* 899 So. 2d at 979 (defendant is not responsible for "unanticipated" injuries that "result from 'intentional or criminal acts against which no reasonable standard of care would require the defendant to be on guard'"). When, however, one has actual knowledge that the particular criminal conduct might occur, that presumption is overcome, and a wrongdoer can be held liable for the resulting harm. *See Thetford,* 605 So. 2d at 840-41. Accordingly, the presumption that criminal or intentional conduct is *unforeseeable* can only be overcome by evidence that the defendant had knowledge rendering that conduct foreseeable.

**B.  Where neither intentional nor criminal misconduct is at issue, general concepts of foreseeability apply to the question of whether a third party's conduct is an intervening cause.**

Where, however, neither criminal nor intentional conduct is at issue, there is no presumption that a third party's conduct is an intervening cause. One is responsible for any harm (including that caused by a third party) that is a reasonably foreseeable result of the alleged misconduct. *Gen. Motors v. Edward,* 482 So. 2d 1176, 1194 (Ala. 1985) ("[O]ne is held legally responsible for all consequences which a prudent and experienced person, fully acquainted with

10

all the circumstances, at the time of his negligent act, would have thought reasonably possible to follow that act, *including the negligence of others*. [] If an intervening cause could have reasonably been foreseen at the time the tortfeasor acted, it does not break the chain of causation between his act and the injury.") (citations omitted).

In determining foreseeability, Alabama law provides that "it is not necessary to anticipate the *specific* event that occurred, but only that some general harm or consequence would follow." *Smith v. AmSouth Bank, Inc.,* 892 So. 2d 905, 910 (Ala. 2004); *see also Hail v. Regency Terrace Owners Ass'n*, 782 So. 2d 1271, 1275 (Ala. 1999) (same). Alabama is not alone in this understanding of foreseeability. *See, e.g.*, *Belmont v. MB Inv. Partners, Inc.,* 708 F.3d 470, 491 (3d Cir. 2013) ("A harm is foreseeable if it is part of a general type of injury that has a reasonable likelihood of occurring."); *Serbin v. Bora Corp., Ltd.,* 96 F.3d 66, 72 (3d Cir. 1996) ("The concept of foreseeability means the likelihood of the occurrence of the general type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury."); Restatement (2d) of Torts § 435(1) ("If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the *extent* of the harm or the *manner* in which it occurred does not prevent him from being liable.") (emphasis added).

Thus, the proper question for the failure-to-find-the-fraud claim is not whether PwC was specifically on notice that BoA would breach its custodial obligations, but rather whether it was reasonably possible that Farkas would find a way to divert additional funds from Colonial. Alabama "[n]egligence law does *not* require [the] FDIC to prove that the defendants knew or should have known that the fraud would take the particular form of double- or triple-pledging." ECF 73 at 5 (Watkins, J.) (emphasis added) (discussing Alabama law on intervening causes and holding that foreseeability requires only that "some *general* harm or consequence could have been

11

anticipated" (citing *Thetford*, 605 So. 2d at 840)); *see also Ala. Power Co. v. Guy*, 206 So. 2d 594 (Ala. 1967) ("It is not necessary that the defendant should anticipate the injury in the precise form as resulted. Nor need the particular consequences have been within the contemplation of the parties. [] As regards proximate cause . . . the courts look more for the possibility of a hazard of some form to some person than for the expectation of the particular chance that happened.").[7] Similarly, the proper question for the FAS 140 claim, assuming the Court does not find foreseeability as a matter of law, is whether it was foreseeable that TBW would be unable to repay over $2 billion loaned in excess of the legal lending limits—limits that exist for the express purpose of protecting a lender from overexposure to a single customer.

PwC, however, wrongly contends that it had to foresee *exactly* how the losses would occur, including BoA's role. PwC cites *Prill v. Marrone*, 23 So. 3d 1 (Ala. 2009), but that is a Russian roulette case where intentional conduct is at issue. The type of "intervening cause" at issue in *Prill* was a teenager's impulsive decision to play Russian roulette with a loaded gun. *Id.* at 4. No one was to blame for the boy's death, because no one could have foreseen that he would turn a loaded weapon on himself: "such acts are not the ordinary and naturally flowing consequences of the defendant's negligent conduct"; rather, the boy, "by his own hands, acted intentionally and deliberately in a manner that was calculated to result in his own death." *Id.* at 6 (quoting *Gilmore*, 613 So. 2d at 1278).

Here, by contrast, there is no evidence proving that BoA intentionally breached its bailee obligations. It obviously would have no incentive to do so, and PwC cites no testimony or

---

[7] PwC claims that the Court "rejected the FDIC's interpretation of Alabama law" and distinguished *Thetford* and *Benson* in its Liability Order. ECF 913 at 12. However, the Court did not address the above quoted language from *Thetford* and *Benson* but rather noted that in those cases, wherein criminal conduct was at issue, the defendants "were on clear notice that the respective assailants had violent intentions." ECF 798 at 48. Thus, contrary to PwC's argument, the Court did not reject the principle that one need not foresee exactly how a harm will occur when criminal or intentional misconduct is *not* at issue. Instead, it applied the criminal/intentional foreseeability standard here even though there is no actual evidence that BoA acted intentionally.

documents supporting the assertion that BoA had any knowledge of Farkas' fraud or intended to further it. Instead, the evidence shows that BoA followed TBW's instructions based upon the contract between Colonial and TBW and was duped by Farkas. The fact that Farkas would be able to deceive yet another financial institution was certainly within the general realm of risk created by PwC's failings. He had already used at least five banks (Colonial, LaSalle,[8] BNP, Deutsche, and BONY) to further his fraud. *See* Ex. 28; Ex. 1 at 514:14-518:2; Ex. 5 at 7, 14.

Accordingly, because BoA's misdeeds cannot be deemed intentional (at a minimum, there is a jury question), the proximate cause analysis does not require actual knowledge. It needed only to be foreseeable that some general consequence might result from PwC's failures. PwC knew that customer fraud in the mortgage warehouse lending was a key risk for Colonial and that there was a risk of bailees breaching their obligations. That risk is identified both in the LPSA itself and in PwC's audit manual. *See* Exs 6, 29. Similarly, when you allow your audit client to violate the law and lend $2 billion more than permitted, it is certainly within the general realm of risk that collateral could be diverted and that the borrower could not repay those loans. PwC did not actually have to know that Farkas would defraud BoA or why TBW would be unable to repay the money; those outcomes were clearly "general consequences" that were reasonably foreseeable in light of PwC's negligence.

## IV. At the very least, the FDIC-R is entitled to have a jury decide whether BoA's misconduct was intentional.

There is no conclusive evidence in the record that BoA intentionally violated its duties to

---

[8] Indeed, as part of PwC's 2007 audit, it obtained from Kissick a list of supposed AOT sales, which included fraudulent AOT recyclings that involved Ocala and LaSalle/BOA. Dr. Carmichael opines that PwC should have reviewed the underlying sales documents, including the wires, to obtain competent evidence that the sales occurred. *See* Ex. 30; ECF 567-39 at 61-63. If ███████████████████████████████████████

Colonial. *See supra* n.1. On the contrary, in its Liability Order, the Court seemed to conclude that

BoA, like many other financial institutions including Colonial, was tricked by Farkas. Specifically,

the Court noted that: "BOA sent the money to TBW or other third parties [] pursuant to TBW's

instructions," ECF 798 at 43; BoA became "complicit in [a] fraud and violate[d] its independent

obligations to Colonial," *id*. at 52; and "chief fraudster, Farkas, and his company, Ocala, were

maneuvering and directing these transactions," *id*. at 52-53. Nowhere does the Court suggest that

BoA acted intentionally in violating its obligations. Indeed, the evidence is directly to the contrary.

BoA obviously had no motivation to intentionally breach its obligations and expose itself to

liability for no benefit. At the very least, the FDIC-R is entitled to have a jury determine whether

BoA acted intentionally or was merely negligent and unwittingly pulled into Farkas' deceit.

Specifically, a jury would have to weigh the following disputed facts to determine whether

BoA intentionally violated its obligations to Colonial:

- **The contract permitted BoA to follow TBW's direction on where to send the money**: Paragraph 11 of the Custodial Agreement, signed by Colonial (via Kissick), BoA, and TBW (via Farkas) provided in part: "[BoA] shall also be entitled to rely upon any notice, document, correspondence, request or directive received by it from [Colonial] or [TBW], as the case may be, which [BoA] believes to be genuine and to have been signed or presented by the proper and duly authorized officer or representative thereof, and shall not be obligated to inquire as to the authority or power of any Person so executing or presenting such documents as to the truthfulness of any statements set forth therein." Ex. 15 (Tr. Ex. P1696) at 6. Thus, Colonial, through Kissick, agreed that BoA was entitled to rely on requests received from TBW and that BoA was not obligated to inquire whether TBW was authorized to direct that collateral proceeds be sent to TBW. *Id.*

- **The BoA employee responsible for wiring the SNP money to TBW thought he was able to rely on TBW's instructions**:

14

███████████████████████████████████████[9]

- **Most, if not all, of the loans involved in the SNP losses were shipped to BoA straight from TBW supporting BoA's belief that TBW could direct the funds**: ████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

███████ issick testified that one of the reasons the SNP fraud succeeded was that most of the loans went directly to BoA from TBW. Ex. 18 at 578:7-579:22. PwC has no evidence that bailee letters were actually sent on all of the SNP loans.

- **The BoA employee signing the 996 forms thought he was releasing Ocala's interest, not Colonial's**: ██

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

- **BoA had no incentive to assist fraud to its detriment**: There is a complete absence of actual evidence of intentional misconduct by BoA. BoA had no incentive to engage in fraud and received none of the misdirected SNP funds. The evidence is clear that the cause of BoA's errors was not bad faith, but rather Farkas and TBW misleading BoA employees.

---

[9]The BoA depositions may be considered by the Court in ruling on PwC's motion for summary judgment. Those depositions were produced during discovery in this case. The deposition testimony is offered to show the BoA employees' state of mind. Fed. R. Evid. 801(c)(2). Regardless, it may be considered on summary judgment because it can be reduced to admissible form at trial, either through live testimony or, if unavailable, under Rule 804(b)(1) or Fed. R. Civ. P. 32(a)(4). *See, e.g.,* 8A Fed. Prac. & Proc. Civ. § 2142 (3d ed.) ("A deposition is at least as good as an affidavit and should be usable whenever an affidavit would be permissible, even though the conditions of the rule on use of a deposition at trial are not satisfied."); *Anglin v. Household Retail Servs., Inc.*, 17 F. Supp. 2d 1251, 1254 n.2 (M.D. Ala. 1998) (deposition testimony from another case is "a sworn statement" that may be considered at summary judgment); *Howard v. Hudson*, 2014 WL 5500731, at *4-5 (S.D. Ala. Oct. 30, 2014) (considering deposition testimony from another case on summary judgment because "inadmissible hearsay may be considered on summary judgment provided that such hearsay could be reduced to admissible form at trial") (citing cases).

In its Liability Order, the Court made the factual determination that "[i]t was not foreseeable that a reputable non-fraudster third party would become complicit in [the TBW] fraud and violate its independent obligations to Colonial." ECF 798 at 52. This is a disputed fact, and a reasonable jury could reach a different conclusion. *Id.* at 47("[A] reasonable trier of fact" could agree that "BOA's breach was a foreseeable twist in an ongoing fraudulent scheme that continued to evolve through different permutations intended to steal assets from Colonial's mortgage lending division."); *see also* ECF 677 at 19 ("Based on the long-term, evolving nature of the fraud . . . a trier of fact could reasonably conclude that it was foreseeable that TBW would convince BOA to breach its duties under the Custodial Agreement and Bailee Letters.").

Specifically, the jury will have to decide at least the following disputed issues of fact:

- Whether it was foreseeable that Farkas would deceive BoA after he had demonstrated an ability to deceive other major institutions such as Deutsche Bank, BNP Paribas, Freddie Mac, and Deloitte. *See* Ex. 28. All of those reputable institutions—like BoA—became involved, unknowingly, in Farkas' fraud. This is a standard, known risk of customer fraud that PwC foresaw in its workpapers. *See* Ex. 29.

- Whether PwC could foresee that BoA could breach its bailee obligations given that PwC audited BoA from 2005 through 2008 and knew from those audits that BoA was accused of fraudulent misconduct and fiduciary breaches, many of which resulted in lawsuits pending prior to PwC's completion of its 2006 and 2007 Colonial audits.[10] Ex. 27.

---

[10] PwC is BoA's long time auditor, and PwC knew from those audits that a reputable national bank could be involved (negligently or unknowingly) in fraud or misconduct. For example, BOA's financial statements for year-end 2005 through 2008 disclosed various material allegations of misconduct and breach of duties. BOA's year-end 2005 and 2006 financial statements disclosed litigation alleging BOA's role in the Parmalat accounting fraud and the Refco fraud. BoA's 2007 and 2008 financial statements continued to identify numerous, significant allegations of misconduct and breach of duties, notwithstanding BoA's status as a reputable bank. In its 2007 and 2008 year-end financial statements, BoA identified no less than seven pieces of significant litigation wherein it was accused of all kinds of misconduct. *See Adelphia Recovery Trust v. Bank of Am. NA*, No. 1:05-cv-09050-LMM (S.D.N.Y) (BoA accused of aiding and abetting fraud); *Bondar v. Bank of Am. Corp.*, No. 08-CV-2599-JSW (2008) (N.D. Cal.) (putative class action alleging that BoA manipulated the market for, and failed to disclose material facts about, auction rate securities); *In AIG Global Sec. Lending Corp., et al. v. Banc of Am. Secs. LLC*, No. 01-cv-11448-JGK (S.D.N.Y.) (lawsuit alleging that BoA made misrepresentations in connection with the sale of certain asset-backed securities, resulting in a $144 million jury verdict); *In re: Lehman Bros. Equity/Debt Secs. Litg.*, No. 1:08-cv-05523 (S.D.N.Y.) (putative class action alleging that BoA made false or misleading disclosures in connection with various debt and convertible stock offerings); *In re Municipal Derivatives Antitrust Litig*, MDL No. 1950 (Master Docket No. 08-2516) (S.D.N.Y.) (lawsuit alleging that BoA conspired to allocate customers and fix or stabilize the prices of certain municipal derivatives); *William L. Pender, et al. v. BoA, et al.*, No. 2005-cv-00238 (W.D.N.C) (allegations of ERISA violations);

- Whether it was foreseeable that BoA would unintentionally or negligently violate its bailee obligations given that the FDIC settled nineteen lawsuits against BoA on behalf of eight receiverships alleging violations of the securities laws, fraud, various torts, negligence, and breaches of contractual and fiduciary duties from conduct and litigation stretching as far back as 2004. *See* Ex. 17 (Tr. Ex. P1701).

- Whether BoA's conduct was entirely independent of Farkas, Kissick, or Kelly. *See Vines*, 336 So. 2d at 1339 (noting that an intervening cause must be independent of the original negligent act). A reasonable jury could find that the SNP losses would not have occurred without Farkas, Kissick and/or Kelly.

- Whether it was foreseeable that diversions of collateral and collateral proceeds by borrowers could occur, especially when the borrower was in financial distress, a fact that should have been known to PwC. Ex. 29 (Tr. Ex. P3111 at bates 012770, 012774) (identifying the inherent risk factors auditors should be aware of in banking, including the risk of loss from custodial activities); *see also infra* n.14. The COLB contract, which PwC audited, specified that TBW had to repay the loan if it was shipped but not paid—the very result here was foreseen at the outset of COLB. Ex. 6, § 14.

## V.   The FAS 140 claim presents a distinct causation analysis for the SNP damages that the jury must decide.

The Court and PwC both have acknowledged that the FDIC-R's FAS 140 claim has not been decided. Ex. 14 at 43:18-21. Accordingly, the FDIC-R is entitled to present this independent liability theory and its distinct causation analysis to the jury. PwC, however, wrongly contends that the FAS 140 claim presents the same causation theory as the failure-to-find-the-fraud claim. Independent of whether PwC ever detected the fraud, proper application of FAS 140 would have constrained and prevented lending to TBW beyond the lending limits, preventing the SNP losses.

### A.  The FDIC-R's FAS 140 claim presents an independent causation analysis.

#### 1.  *In determining causation and foreseeability, the fact finder must consider the connection between the alleged wrongful act and the harm suffered.*

Alabama law is clear that any foreseeability analysis must begin with the relationship

---

*IPO Secs. Lit. et al.*, No. 1:21-mc-00092 (S.D.N.Y.) (multiple putative class action lawsuits that BoA failed to make certain required disclosures and manipulated the price of securities); *see also* Ex. 17 (detailing BoA settlement of numerous securities law, fraud, negligence, and fiduciary breach claims for more than $1 billion).

between the alleged misconduct and the resulting harm. That link, or lack thereof, is critical. As set forth in the Liability Order, "[p]roximate cause exists if the 'injury [is the] natural and probable consequence of the negligent act [] which an ordinarily prudent person ought reasonably to foresee would result in injury." ECF 798 at 46 (quoting *Vines*, 336 So. 2d at 1339). The alleged misconduct creates a scope of anticipated risk. If the injury sustained is within that scope, the defendant is liable. *See Ala. Power Co. v. Moore,* 899 So. 2d 975, 979 (Ala. 2004) (explaining that the "line is drawn to terminate the defendant's responsibility for *injuries* of the *unanticipated* sort resulting from 'intervening causes which could not reasonably be foreseen, and which are *no normal part of the risk created*'" (emphasis added)). Thus, to properly evaluate foreseeability, the fact finder must start with the alleged misconduct and then consider whether the injury was within the scope of what an "ordinarily prudent person ought reasonably to foresee." ECF 798 at 46. If the injury was within that scope, it is irrelevant if it was unintentionally caused by a third party.

The Restatement (Second) of Torts § 442B (1965), consistent with Alabama law, clearly sets out this principle:

> Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, *the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability*, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.

*Id.* (emphasis added). "If the actor's conduct has created or increased the risk that a particular harm to the plaintiff will occur, and has been a substantial factor in causing that harm, it is immaterial to the actor's liability that the harm is brought about in a manner which no one in his position could possibly have been expected to foresee or anticipate. This is true [] where the result . . . is brought about through the intervention of other forces which the actor could not have expected, [including] those of third persons which are not intentionally tortious or criminal. This is to say that any harm which is in itself foreseeable, as to which the actor has created or increased the recognizable risk,

18

is always 'proximate,' no matter how it is brought about, except where there is such intentionally tortious or criminal intervention, and it is not within the scope of the risk created by the original negligent conduct." *Id.* at cmt. b.; *see also Orange Beach Water, Sewer, & Fire Prot. Auth. v. M/V Alva*, 680 F.2d 1374, 1379 (11th Cir. 1982) (affirming S.D. Alabama's ruling that negligence of a third party was not a supervening cause but rather a "*foreseeable* intervening force, within the scope of the risk created by" the defendant (emphasis added)); 1 Modern Tort Law: Liability and Litigation § 4:9 (2d ed.) ("[A]n intervening or superseding cause is one . . . that is 'of such an extraordinary nature or so *attenuates defendant's negligence from the ultimate injury* that responsibility for the injury may not be reasonably attributed to the defendant") (emphasis added).

Nevertheless, PwC wrongly claims that the FDIC-R has no authority for the idea that any causation analysis must begin with the link between the misconduct and the injury. *See* ECF 913 at 18. Indeed, PwC's own cases make clear that the connection between the alleged wrong and the harm sustained is key. *See* ECF 913 at 11 n.2 (citing *Morgan*, 108 So. 2d at 345 (no reasonable connection between the negligent construction or maintenance of a storm drain and a pedestrian being struck by a car); *Havard*, 268 So. 2d at 809 (no connection between "an overloaded soybean truck with defective brakes" and the negligent maintenance of fire equipment in a tunnel). What does or does not constitute an intervening cause turns on the alleged misconduct and any injury that might reasonably flow from that misconduct.

### 2. The FDIC-R's FAS 140 claim offers a distinct causation and foreseeability analysis for the SNP losses unrelated to the detection of the fraud.

An intervening cause analysis does not occur in a vacuum. *See* ECF 677 at 19 (rejecting PwC's assumption that "a trier of fact will look at the 'Shipped Not Paid' scheme in a vacuum" when assessing foreseeability). It matters whether the fact finder is considering questions of

intervening cause and foreseeability in the context of the FDIC-R's failure-to-find-the-fraud claim or its FAS 140 claim. The two claims turn on independent acts of negligence, and each carries its own set of reasonably foreseeable injuries.

PwC's failure to find the fraud allowed the fraud to continue, resulting in losses. In contrast, the FDIC-R has presented two, distinct causation routes to the SNP damages for FAS 140. One theory is that the fraud is detected because, upon identifying the lending limit violations, the assets would have been scrutinized and the fraud uncovered. The other, independent causation theory is that PwC's failure to properly apply FAS 140 allowed Colonial to become grossly overexposed to TBW, which ultimately could not repay its loans, resulting in losses. That FAS 140 causation chain is not dependent on detection of the fraud.[11] It is irrelevant how or why the money was ultimately lost, *see supra* § I; all that matters is that PwC eliminated the lending limits protections, resulting in catastrophic loss to Colonial from grossly excessive lending to TBW, which could never repay it.

PwC falsely depicts the FDIC-R's FAS 140 causation theory by leaving out the argument that a prior FAS 140 audit would have stopped the COLB loan growth, thereby preventing the SNP damages. *See* ECF 913 at 16. Separate and apart from whether the fraud is detected, a fact finder certainly could find that it was foreseeable that PwC's negligent application of FAS 140 would allow Colonial to loan excessive amounts to TBW, in violation of the statutory lending limits, and result in losses. As Mr. Malek explained, "[c]ompliance with FAS 140 would have . . . materially curtailed the Bank's ability to transact with TBW, due to the application of

---

[11] PwC argues that the FDIC-R's separate FAS 140 causation theory is somehow "new." ECF 913 at 16-17 That is clearly not the case. *See* ECF 889 at 11. PwC admitted that the FDIC-R's separate FAS 140 claim has its own distinct causation analysis. *See* Ex. 1 at 3275:13-20 ("So it's that – you're exactly right, Your Honor. Their theory is that, if you had done the accounting differently, then they wouldn't have been able to use COLB to do all these transactions because they would have run up against the lending limits. So I think we're on the same page there.").

regulatory lending limits to COLB transactions and to AOT transactions." ECF 885-5 at 2. Had PwC properly applied FAS 140 in the 2007 audit, Colonial would not have exceeded its lending to TBW by $2 billion, and there would have been no SNP losses. *Id.* at 48, Fig. I (Colonial lending limit was $312 million; TBW borrowed a total of $2.4 billion); *see also* Ex. 1 at 287:8-288:2. To be sure, because AOT was riddled with fake assets, the process of selling loans to comply with lending limits would have revealed and stopped the fraud. That is one causation route for the FAS 140 claim. But even if the fraud had not been discovered, compliance with the lending limits would have avoided all of the SNP losses. PwC's FAS 140 negligence made all of the SNP losses possible by allowing TBW lending to skyrocket to over $3.3 billion by spring 2009. ECF 567-14 at 71.[12] This independent causation theory must be resolved by the jury.

## B. Even if PwC's causation standard is applied, there is a fact issue for the jury on whether PwC should have foreseen the risk of a borrower diverting collateral.

Assuming the Court does not rule as a matter of law that the FDIC-R is entitled to recover the SNP damages under its FAS 140 claim, the jury will have to make multiple factual findings.[13] First and foremost, the jury will have to decide whether, applying the correct intervening cause analysis, PwC was or should have been aware that its failure to properly apply FAS 140 could

---

[12] PwC argues that BoA's misconduct is "even more remote from the FAS-140 issue." ECF 913 at 19. Again, PwC ignores the separate FAS 140 causation chain. As the law and legislative history surrounding the lending limits make clear, it does not matter how or why an illegal loan is never paid off—losses from excessive lending are per se foreseeable. Moreover, PwC foresaw a risk of loss both from customer fraud (TBW's deception of BoA) and from a bank, such as BoA, serving as a bailee (the COLB agreement itself and PwC's manual). *See* Exs. 6, 29. These factual issues of foreseeability are for a jury to decide.

[13] In August 2017, this Court granted the FDIC-R's motion for summary judgment, ruling that certain imputation-based defenses do not apply to the FDIC-R as the innocent receiver. ECF 720. PwC plans to seek appellate review of that determination. A finding of negligence with regard to FAS 140, however, would not be subject to those imputation-based defenses because nothing interfered with PwC's ability to properly apply FAS 140 and, according to PwC, the SNP fraud is unconnected to any Colonial employees' misconduct. *See* ECF 885 at 4. Accordingly, even if an appellate court were to disagree with this Court's findings regarding the applicability of imputation-based defenses to the FDIC-R, the FDIC-R would still have a professional negligence claim against PwC. This Court has already indicated that it would find that PwC breached its professional obligations to Colonial in misapplying FAS 140. *See* ECF 798 at 59 n.10. PwC, therefore, is liable to the FDIC-R for that failure, which allowed Colonial to extend credit to TBW far beyond legal lending limits and resulted in catastrophic overexposure to a single customer.

result in losses to Colonial on the excessive lending to TBW. Moreover, although not required under Alabama law, the FDIC-R can also meet the "actual knowledge" standard suggested by PwC and prove that PwC knew or should have known that a customer could use a third party to convert collateral from Colonial, and that such conversion could be catastrophic if the lending limits were not enforced. There is always risk that an agent might convert collateral entrusted to its care, and there is significant evidence that PwC was on notice that this type of loss could occur and knew the lending limits were key protection against such devastating losses.[14]

PwC knew the purpose of the lending limits was to protect banks and that lenders might try to use sales accounting classifications to evade those protections. Ex. 30; ECF 567-39 at 100, 114, 115, 121, 124-25; *see also* Ex. 1 at 534:13-535:16. Moreover, the COLB contract between Colonial and TBW specifies that if there is a bailee violation, TBW has to repay Colonial. *See* Ex. 6 § 14. Thus, the COLB contract—a contract that PwC audited—expressly contemplated this kind of loss caused by BoA's failure to protect Colonial. PwC's own manuals also cite this risk in the section entitled "Consideration of Inherent Risks" where PwC advises that its "auditor[s] should be aware of the general business and economic risk factors that affect the banking industry." *See* Ex. 29 at 12770, 12774) ("Many bank activities involve custody of financial assets, management of such assets, or both. Fiduciary responsibilities are the focus of activities such as servicing the

---

[14] The risk that an agent may—intentionally or unintentionally—misdirect collateral is common knowledge. *See, e.g., Advance Dental Care, Inc. v. SunTrust Bank,* 816 F. Supp. 2d 268, 269 (D. Md. 2011) (depository bank negligently permitted plaintiff's employee to deposit checks payable to plaintiff into employee's personal account); *Great Am. Ins. Co. v. Canandaigua Nat'l Bank & Trust Co.,* 804 N.Y.S.2d 177, 180 (App. Div. 4th Dep't 2005) (bank escrowee breached duty under escrow agreement by releasing CD funds without notifying and obtaining consent of insurer where CD funds were placed with bank as part of escrow agreement); *Mich. Nat'l Bank v. Mich. Livestock Exch.,* 439 N.W.2d 884 (Mich. 1989) (unwitting auctioneer liable to lender for conversion upon auction of livestock serving as collateral; "where an auctioneer receives and takes . . . property into his possession, and sells it, paying over the proceeds, less his commission, he is liable, although he has no knowledge of want of title in the party for whom he sells, and acts in good faith"); *State Bank v. Equity Livestock Auction Market,* 417 N.W.2d 32, 35 (Wis. Ct. App. 1987) ("By the weight of authority an agent such as Equity may be liable for conversion if the principal engaged in a wrongful act. The agent's good faith and lack of knowledge of the security interest are not good defenses.").

collateral behind asset-backed securities (various collateral types), managing investment accounts or mutual funds, and administering trusts. These activities expose the institution to the risk of loss arising from failure to properly process transactions or handle the related assets on behalf of third parties."). Similarly, PwC's workpapers repeatedly indicate that customer fraud was the largest risk facing the MWLD, and Kissick expressly told PwC of that risk. Ex. 1 at 847:1-18, 848:11-19, 849:7-16; Ex. 2 at 2; ECF 567-14 at 37-39.

The SNP losses are just another example of customer fraud that PwC foresaw but negligently failed to address. PwC knew that the lending limits prevent overexposure to a single customer and that failing to properly adhere to those limits can result in tremendous losses. Likewise, there was clearly a *contemplated* risk that a customer would deceive a bank and obtain money under false pretenses. The fact that the customer fraud occurred at BoA instead of Colonial makes it no less foreseeable. Thus, even if the FDIC-R is held to PwC's false standard of knowing how the losses would occur, there is ample evidence that PwC was or should have been aware of the risk that TBW would convert Colonial's collateral by fooling BoA. PwC cannot credibly argue that there is no dispute for a jury to resolve whether the SNP losses were within the scope of reasonably expected damages issuing from its negligence.

In addition to whether PwC knew or should have known of the risk that a customer might use another financial institution to convert collateral, the jury will have to decide:

- Whether Colonial's COLB and AOT transactions with TBW were loans.[15]

- Whether Colonial justifiably relied on PwC's expertise with regard to the proper application of FAS 140.

- Whether PwC knew or should have known that the purpose of the lending limits was to avoid excessive losses by preventing Colonial from extending credit in excess of the limit to any single borrower.

---

[15] The Court has indicated that it "would be inclined to find that the COLB and AOT transactions were loans." ECF 798 at 59 n.10, 62. Record evidence strongly supports that determination. *See* ECF 785 at 72-74, 77-81.

- Whether PwC was aware that the purpose of securing sales accounting for COLB and AOT was to avoid the lending limits. Ex. 31 (Tr. Ex. P2887 at bates 2771); Ex. 32 (Tr. Ex. P2388); Ex. 33 (Tr. Ex. P2978 at bates 8351); Ex. 1 at 1236:23-25, 801:25-802:17, 852:21-25, 885:20-887:10.

- Whether PwC knew or should have known that, as of audit year 2007, if COLB or AOT were not sales, Colonial had loaned TBW $2.4 billion, over seven and a half times the legal lending limit. ECF 567-14 at 70-71.

- Whether PwC knew or should have known that TBW could not repay even a small portion of the $2.4 billion in loans. Ex. 34 (Tr. Ex. P1342) (PwC review of TBW financial reports showed only $54 million in equity).

- Whether the SNP damages were a result of PwC's failure to properly apply FAS 140 given that there would have been *no* SNP losses if PwC had properly applied the lending limits.

## VI. The FDIC-R is entitled to have a jury decide whether BoA's conduct was an intervening cause as to its failure-to-find-the fraud claim.

### A. The Court's decision to bifurcate the trial cannot foreclose the FDIC-R's right to present its failure-to-find-the fraud claim to a jury.

The Court has confirmed that the FDIC-R has not waived its right to a jury trial on its 2006 and 2007 audit year claims against PwC. *See* Ex. 14 at 14:12-13, 58:9-10. Likewise, both the Supreme Court (and this Court) have made clear that the Court's decision to bifurcate the trial cannot foreclose the FDIC-R's right to a jury, particularly given the Court's repeated affirmations of the FDIC-R's right. *See* Ex. 1 at 1250:14-15 ("I am not going to let the fact that I have artificially divided this case [by bifurcating liability and damages] make a difference."); *see also Lytle v. Household Mfg. Inc.*, 494 U.S. 545, 551-52 (1990) ("[O]nly under the most imperative circumstances . . . which . . . we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equitable claims" and noting that "a district court may not deprive a litigant of his right to a jury trial by resolving a[] [non-jury claim] before a jury hears a [jury] claim raising common issues."); *Printers II, Inc. v. Prof'ls Publ'g, Inc.*, 784 F.2d 141, 147 (2d Cir. 1986) ("We agree with [plaintiff] that the trial of the non-jury issues may not be used to

collaterally estop [plaintiff] on fact issues to which it was entitled to a jury."). "When [jury and non-jury claims] are tried together, the right to a jury [] encompasses the issues common to both." *Lincoln v. Bd. of Regents of Univ. Sys. of Georgia*, 697 F.2d 928, 934 (11th Cir. 1983)).[16]

Thus, while this Court has indicated a preference to save the question of "whether [a] jury trial trumps" its prior ruling for another day, Ex. 14 at 59:2-4, it is important to note that the Court's bench trial ruling on intervening cause cannot foreclose the FDIC-R's right to present its failure-to-find-the-fraud claim to a jury to recover the outstanding SNP losses.[17]

### B. The Court made factual determinations in deciding the intervening cause question at the bench trial, on which reasonable fact finders could differ.

In its Liability Order, the Court resolved disputed facts and made credibility determinations regarding BoA and causation of the failure-to-find-the-fraud claim. *See* ECF 798 at 47 ("Having reviewed the relevant evidence and legal authority, the Court now finds that BOA's breach was

---

[16] Should any inconsistency arise between a jury verdict and the Court's prior findings, the Court can amend its prior findings on that issue, which are not yet final, to conform with the jury's verdict. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962) (finding that when a complaint sets forth both jury and non-jury claims and there are factual issues common to both sets of claims, the common facts must be determined by the jury "prior to any *final* court determination" of the non-jury claims) (emphasis added); *Hardin v. Hayes*, 52 F.3d 934, 938 (11th Cir. 1995) (noting that a "district court has plenary power over [an interlocutory order] and may therefore reconsider, revise, alter or amend that order at any time prior to final judgment") (quotations omitted).

[17] In its Appendix 1, PwC asks the Court to allow the presentation of PwC's evidence on contributory negligence so that the jury can issue a finding on those defenses, preventing a "whole new trial on contributory negligence if the Eleventh Circuit reverses this Court's imputation ruling." ECF 913-1 at Scenario 2; *see also* Scenario 3. PwC cites no caselaw for this proposition. It is blackletter law, however, that evidence must be relevant to a "fact of consequence" even to be considered admissible at trial. *See* Fed. R. Evid. 401, 402; *see also Black v. Reynolds*, 2016 WL 375149, at *2 (S.D. Ala. Jan. 29, 2016), *aff'd*, 674 F. App'x 851 (11th Cir. 2016) (granting summary judgment as to one claim and holding that "[t]o be potentially admissible at trial, offered evidence must be relevant to" the only remaining claim); *see also United States v. Noriega-Lopez*, 47 F.3d 1177 (9th Cir. 1995) ("To be admissible, such evidence must be relevant to an issue at trial."). This Court has ruled that Colonial's conduct cannot be imputed to the FDIC-R. ECF 720 at 6-11. Accordingly, what any Colonial employee did or did not do is irrelevant to the FDIC-R's claims against PwC. Inclusion of this evidence would unnecessarily and meaningfully prolong the trial, prejudicing the FDIC-R by forcing it to defend against affirmative defenses it has already defeated, and influencing the jury with irrelevant evidence. It would be clear error for the Court to admit evidence that is entirely unrelated to a "fact of consequence" at issue in the jury trial on the off chance that the Eleventh Circuit might reverse the Court on appeal. Moreover, the jury cannot render "advisory opinions" on issues not properly before it. *See Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1560 (11th Cir. 1988) ("advisory" rulings on questions not properly before a jury are not binding). A jury trial presents a very different situation than the bench trial, which involved CBG, and did not pose that same risk that improper evidence would prejudice the factfinder.

not foreseeable and therefore was an intervening cause. . . .”). Specifically, the Court decided:

- “Mr. Farkas devised a new fraud, the 'Shipped Not Paid' fraud, that did not depend on the cooperation of Ms. Kissick and the other Colonial insiders.” *Id.* at 42.

- Ms. Fite’s testimony regarding certain COLB mortgages shipped to Ocala Funding for which Colonial had not been paid and Ms. Kissick’s subsequent instruction to hold off on requesting those mortgages did not demonstrate that Kissick was aware of the SNP fraud. *Id.* at 45.

- Ms. Kissick’s testimony was “more persuasive,” so the Court “decline[d] to credit Ms. Kelly’s speculation that Ms. Kissick was somehow aware of the Shipped Not Paid fraud.” *Id.* at 44-46.

- “PwC had no reason to believe that a reputable bank would abdicate its duties and execute demonstrably false documents stripping Colonial of its ownership rights in the mortgages.” *Id.* at 48-49.

- “[I]t was not foreseeable that BOA would bypass its regular due diligence and transfer mortgages without payment.” *Id.* at 49.

- “[T]here is no evidence that PWC was aware of BOA’s propensity for violating custodial agreements, that PWC was aware of similar bailee violations, or that PWC had received previous complaints about BoA. *Id.* at 50.

- BoA was a “reputable non-fraudster third party.” *Id.* at 52.

- “It was not foreseeable that a reputable non-fraudster third party would become complicit in [] fraud and violate its independent obligations to Colonial.” *Id.* at 52.

Relying on these factual conclusions, the Court found that the SNP fraud was new, did not involve Colonial insiders, and that neither Kissick nor Kelly were aware of it. *Id.* at 42, 45-46. Because the Court found that the SNP fraud constituted a “new” fraud, it also determined that PwC was not responsible for finding it. As a result, the Court found that PwC was not liable for the attendant SNP losses. *See* ECF 798 at 42, 52 (concluding that although “an auditor’s negligence in failing to discover fraud will allow *that fraud* to continue,” the SNP fraud was a “*new fraud*” (emphasis added)).

PwC tries to downplay the importance of the Court’s clear factual finding, claiming that

26

"[n]ot one part of this Court's finding that Bank of America's actions were unforeseeable to PwC turned on Ms. Kissick's mental state." ECF 913 at 22. That is simply not true. The Court found that PwC was not responsible for uncovering the "new" BoA fraud, precisely because no one at Colonial was involved with it. *See* ECF 798 at 42-46. If Kissick knowingly allowed Farkas to take Colonial's collateral proceeds through the SNP phase of the fraud, then she consented to BoA's conduct, and no intervening cause or foreseeability analysis is necessary. In fact, the Court wrote for nearly two pages, weighing evidence and testimony, and ultimately determined that Kissick was not aware of the fraud. *Id.* at 44-46. It was this factual finding that caused the Court to reject the FDIC-R's argument that "BOA's breach was a foreseeable twist in an ongoing fraudulent scheme that continued to evolve through different permutations intended to steal assets from Colonial's mortgage lending division." *Id.* at 47. Thus, PwC's claim that "the FDIC has no evidence that Ms. Kissick knew about the Shipped Not Paid fraud," ECF 913 at 22, is simply not true. The Court's own Liability Order, clearly shows that the Court weighed and measured competing testimony and evidence regarding Kissick's knowledge and involvement in the SNP fraud.

A reasonable jury could easily conclude either that (1) Kissick was involved in the SNP fraud, or (2) Kissick's involvement in the SNP fraud is irrelevant as Farkas was clearly at the center of everything and the SNP damages are a result of the continuation of his fraudulent conduct.[18] Indeed, the SNP fraud involved the same victim (Colonial), the same Colonial customer (TBW), the same Colonial division (the MWLD), and the same criminal mastermind (Farkas); was meant

---

[18] A reasonable juror could conclude that Kelly's testimony was not speculative as she testified unequivocally that she told Kissick about her suspicions that TBW was playing around with the wires. Ex. 13 at 187:24-190:25, 191:7-13, 472:10-16-473:8-17. Given that testimony, a reasonable juror could decide that there is no other explanation for Kissick's failure to follow up on Kelly's suspicions except that she already knew about the SNP fraud or was willfully turning a blind eye.

to achieve the same purpose (fund TBW); and resulted in the same harm to Colonial (stolen funds). The mechanics of the various fraud phases were similar as well. Both the SNP and the sweeping phases involved the diversion of Colonial's collateral proceeds, and Freddie Mac was the end investor for the vast majority of the loans and loan pools (both legitimate and bogus) that were part of both Plan B and the SNP phases of the fraud. Ocala Bank and LaSalle Bank were both used by Farkas, with Kissick's approval, in the 2008 fraudulent AOT recyclings. Ex. 35 at 515:5-526:15; Ex. 13 at 192:9-193:2, 296:16-298:18; Ex. 18A at 297:16-25; Ex. 38.

In fact, PwC has argued that Farkas and his co-conspirators engaged in one, continuous fraud up until Colonial was closed. PwC noted that TBW "[s]tole money from Colonial Bank . . . with the help of Colonial Bank insiders who conspired with TBW's controlling shareholder, senior executives, and directors" "from 2002 until August 3, 2009." Ex. 37 (PwC Opp'n to Pl's Mot. in Limine, Case No. 13-33964 CA 01 (59)). PwC alleged the Colonial insiders continued with the SNP fraud. *Id.* The Court has also held that "[b]ased on the long-term, evolving nature of the fraud, . . . a trier of fact could reasonably conclude that it was foreseeable that TBW would convince BOA to breach its duties under the Custodial Agreement and Bailee Letters." ECF 677 at 19.

While Farkas' involvement in the SNP fraud was apparently insufficient, as a factual matter, for the Court to find PwC accountable for the SNP losses, ECF 798 at 52-53, a jury could find otherwise. Farkas was able to deceive multiple, major, reputable financial institutions in furtherance of his fraud, and a reasonable jury could find that BoA was just another victim. Had PwC discovered the fraud, Colonial would have severed all ties with TBW and Farkas, the SNP loans never would have been made, BoA never would have been deceived by Farkas to send loans proceeds to his companies, and there would have been no SNP losses. The SNP losses occurred *because* Farkas continued to steal from Colonial, and a reasonable jury could find that the losses

were reasonably foreseeable and hold PwC liable.

In its Damages Order, the Court held that any damages Colonial sustained "because it continued to fund TBW mortgages" were reasonably foreseeable. ECF 875 at 18. Accordingly, "the FDIC is entitled to recover all reasonably foreseeable losses Colonial incurred from its ongoing fraudulent relationship with TBW." *Id.* at 19. The SNP losses were all incurred because PwC's negligence allowed Colonial to continue its fraudulent relationship with TBW. The decision in *Grant Thornton v. FDIC*, 535 F. Supp. 2d 676 (S.D.W. Va. 2007), *aff'd* F. App'x 188 (4th Cir. 2011), which this "Court has found instructive throughout this litigation," ECF 875 at 18, is directly on point. As this Court noted, the *Grant Thornton* court "concluded that because a proper audit would have resulted in the immediate closure of the bank, all of the bank's operating losses (from two days after the faulty audit was complete until the day the bank was closed by the bank's regulators) were proximately caused by the auditor's failures." *Id.*; *see also Grant Thornton*, 535 F. Supp. 2d at 711 ("[The auditor's] negligence in failing to discover the fraud at [the bank] allowed the fraud to continue, and the losses that the FDIC seeks to recover are the foreseeable result of that ongoing fraudulent scheme. . . . [I]t is certainly foreseeable from the standpoint of a reasonably prudent auditor that the failure to discover fraud will result in the continuation of the fraud.").

The Court previously held that the: "FDIC's theory of negligence is not that the defendants failed to detect the double- and triple-pledging fraud. Rather the FDIC's theory is that the defendants failed to discover existing fraud at the time of their auditing services, which permitted the continuation of the fraudulent scheme, albeit through different means. . . . It is plausible that the defendant auditors should have reasonably anticipated that a general fraudulent scheme would continue if their allegedly faulty auditing services failed to detect existing wrongdoing." ECF 73

at 5 (Watkins, J.). It does not matter how the fraud continues, only that it is reasonably foreseeable that it will continue. The FDIC-R is entitled to have a jury determine these factual questions.

## CONCLUSION

The Court should find as a matter of law that the SNP damages were foreseeable.[19] Otherwise, the Court should deny PwC's motion and set the FDIC-R's FAS 140 and failure-to-find-the-fraud claims for a jury trial for the 2006 and 2007 audit years.

Dated: February 11, 2019

Respectfully submitted,

*/s/ Grace L. Kipp*

THOMAS ALEXANDER FORRESTER & SORENSEN LLP
Stephen Sorensen
14 27th Ave
Venice, CA 90291
Telephone: 310-961-2536
Facsimile: 310-526-6852
Email: steventhomas@tafsattorneys.com

MULLIN HOARD & BROWN, LLP
David Mullin (TX Bar No. 14651600) *PHV*
John G. Turner, III (TX Bar No. 20320550) *PHV*
500 South Taylor, Suite 800
Amarillo, Texas 79101
Telephone: (806) 372-5050
Facsimile: (806) 372-5086
Email: dmullin@mhba.com
        jturner@mhba.com

---

[19] PwC again criticizes the FDIC-R's settlement with BoA which this Court already ruled cannot be challenged by PwC. ECF 913 at 3, 23; *see also* ECF 655, 673, 875. PwC has gotten the full benefit of an offset from that settlement, reducing the remaining damages it owes by $363 million. PwC is jointly and severally liable for the full amount of harm caused by its negligence and has no legitimate complaint. In determining the settlement amount, the FDIC considered the strength of the claims, the amount of damages sought, the timing of settlement, and litigation risks and costs. PwC's simplistic challenge to the settlement is irrelevant to PwC's liability.

Without any legal or factual support, PwC makes the wholly irrelevant argument that PwC should escape liability for its negligence because BoA allegedly would benefit from the Colonial receivership recovering the SNP losses. ECF 913 at 23. PwC has no evidentiary foundation to argue that BoA's assessments would actually change based upon any recovery in this action. Regardless, it is no grounds for PwC to evade responsibility for its negligence.

**SCHIFF HARDIN LLP**
Lawrence H. Heftman (ARDC No. 6283060) *PHV*
233 South Wacker Drive; Ste. 7100
Chicago, IL 60606
Telephone: 312-258-5500
Facsimile: 312-258-5600
Email: lheftman@schiffhardin.com

**SPOTSWOOD SANSOM & SANSBURY LLC**
Grace L. Kipp (LON 049)
Mary G. Menge (MEN 014)
One Federal Place
1819 Fifth Avenue North, Suite 1050
Birmingham, Alabama 35203
Telephone:     (205) 986-3620
Facsimile:      (205) 986-3639
Email:  gkipp@spotswoodllc.com
            mmenge@spotswoodllc.com

**RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.**
Dennis Bailey (ASB-4845-171D)
J. Evans Bailey (ASB-9995-J61B)
184 Commerce Street
Post Office Box 270
Montgomery, Alabama 36101-0270
Telephone:     (334) 206-3234
Facsimile:      (334) 481-0031
Email: DRB@rsjg.com

*Attorneys for Plaintiff Federal Deposit Insurance Corporation as Receiver for Colonial Bank*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically served on February 11, 2019, by transmission of Notices of Electronic Filing generated by CM/ECF to persons registered as of issuance of filing.


*/s/ Grace L. Kipp*

OF COUNSEL